ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CHEVRON U.S.A. INC.,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | 04-1365C |

FILED
AUG 20 2004
U.S. COURT OF FEDERAL CLAIMS

**COMPLAINT**

Chevron U.S.A. Inc., for its complaint against the United States, alleges as follows:

**NATURE OF THE DISPUTE**

1. This case arises out of the United States Department of Energy's breach of an agreement between DOE and Chevron U.S.A. Inc. ("ChevronTexaco"), as the two equity owners of the Elk Hills Field, an oil- and gas-producing unit in California.

2. The agreement in question was executed on May 19, 1997. It sets out a specific process for determining the owners' respective interests in the unit. The process specified in the May 19, 1997 agreement requires DOE and ChevronTexaco, as equity owners and parties in interest, to appear as advocates before the Assistant Secretary of Fossil Energy or the Assistant Secretary's delegate (collectively referred to hereinafter as the Assistant Secretary) acting as an objective and impartial decision maker. As DOE has itself stated, the Assistant Secretary as the designated decision maker "is to impartially determine the final equity shares between ChevronTexaco and the Department of Energy."

3. To ensure impartiality and independence in the Assistant Secretary's decision, the May 19, 1997 agreement prohibits ex parte contacts between an owner's advocacy team (which presents the owner's position on disputed issues) and the Assistant Secretary (who must impartially decide those issues). DOE has materially violated these provisions.

4. In particular, the lead in-house DOE attorney advocating the ownership interest of DOE (in opposition to ChevronTexaco's advocates) in adversarial proceedings before the Assistant Secretary *simultaneously* served as *an advisor* to the Assistant

Secretary in the same proceedings. This DOE attorney—ChevronTexaco's *opposing counsel* in the proceedings—*has herself participated in the preparation of decisions ruling against ChevronTexaco.* This dual role has completely undermined the process agreed to by the parties and has assured that the Assistant Secretary's decisions have been neither impartial nor fair.

5. ChevronTexaco therefore seeks damages for costs and expenses, including legal fees, it has incurred to participate in these proceedings which have been corrupted by DOE's breaches.

**JURISDICTION**

6. This Court has jurisdiction over this dispute under 28 U.S.C. § 1491(a), inasmuch as this complaint states claims against the United States founded upon a contract with the United States.

**PARTIES**

7. Chevron U.S.A. Inc., incorporated under the laws of Pennsylvania, is a wholly owned subsidiary of ChevronTexaco Corp., a public corporation incorporated under the laws of Delaware. ChevronTexaco Exploration & Production Company, formerly known as Chevron U.S.A. Production Company, is a division of Chevron USA Inc., and is a party to the May 19, 1997 agreement.

8. United States, through the United States Department of Energy and its employees and agents, is a party to the May 19, 1997 agreement.

**FACTS COMMON TO ALL CAUSES OF ACTION**

Unitization and the Unit Plan Contract

9. Unitization is a procedure, well recognized among oil and gas producers, by which owners of interests in a common oil or gas field combine their respective interests and agree to produce commonly, with each owner receiving a share of all production from the unit. The agreement forming the unit typically specifies how the owners are to share in the production from the unit.

10. In 1944, the United States, through the Department of the Navy, and Standard Oil of California, the predecessor of ChevronTexaco, combined their respective interests in the Elk Hills Field by executing a unitization agreement otherwise termed the Unit Plan Contract (sometimes referred to herein as the "UPC"). A true and correct copy of the Unit Plan Contract with the amendments thereto is attached hereto as Exhibit A.

11. While the purpose of most unitization agreements is to facilitate production from the unit, the Unit Plan Contract's primary purpose was to restrict production. More specifically, the Navy wished to preserve the hydrocarbons in the unit for subsequent use in the event of a national security emergency. Therefore, the Unit Plan Contract not only combined the United States' interest with Standard's interest in a

single unit, it gave the Navy authority over when and how much would be produced from the unit. *See* UPC § 3.

12. The Unit Plan Contract identified and divided the Reserve into three horizontal producing zones: the Dry Gas Zone, the Shallow Oil Zone, and the Stevens Zone. *See* UPC § 2(c). In 1976, a fourth commercially productive zone, the Carneros Zone, was recognized.

13. The UPC assigned each owner an initial percentage interest in each zone which was based on estimates of the owners' relative proportions of the total hydrocarbons in the zone that underlay that party's lands on November 20, 1942. Those percentages could be adjusted as described below.

Equity Redetermination

14. Subterranean hydrocarbons have a tendency to migrate over time, and the owners did not intend for such changes to affect the division of ownership in the field. However, when the UPC was executed, relatively little was known about the subterranean geology in the Reserve, because relatively few producing wells had been drilled.

15. Therefore, the Unit Plan Contract provided that the owners' respective interests were subject to redetermination, at the request of either party, but only if more accurate information regarding the volume of recoverable hydrocarbons underlying a party's lands on November 20, 1942 became available. *See* UPC § 2.

16. Such redeterminations (called equity redeterminations) were done from time to time between 1944 and 1996.

DOE's Right to Terminate the UPC

17. Under the terms of the Unit Plan Contract, the United States had the right to terminate the contract unilaterally, and upon termination, the Secretary (or the Secretary's delegate) was required to make "an adjustment of all . . . rights and obligations [under the Unit Plan Contract] . . . on a fair and equitable basis." UPC § 11.

The May 19, 1997 Agreement

18. In 1976, Congress transferred authority over the Reserve from the Navy to the Department of Energy, and assigned to DOE the Navy's interest in the Unit Plan Contract. At that time, Congress determined that the Navy's original objective for the Unit Plan Contract—to maintain the Reserve in a state of readiness in case of national emergency—was no longer necessary. Congress thus directed DOE to maximize the United States' economic realization from the Reserve, through production of hydrocarbons and other means.

19. In 1995, Congress passed the National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106, §§ 3412-3416 (codified at 10 U.S.C. § 7420 note).

That statute included a requirement that DOE sell the United States' interest in the Reserve within two years. *See* Pub. L. 104-106 § 3412(a). To facilitate the sale, DOE was required by the legislation to finalize the owners' equity interests in the Reserve ("equity finalization") within eight months after the effective date of the legislation (*i.e.*, on or before February 10, 1996). *Id.* at. § 3412(b).

20. In carrying out this mandate, DOE was required by the Unit Plan Contract to implement a process to determine ChevronTexaco's allocable share of the underlying hydrocarbons on a fair and equitable basis.

21. ChevronTexaco at all times made good-faith efforts to cooperate with DOE in the finalization process so that DOE could sell the United States' interest as quickly as reasonably possible.

22. Despite ChevronTexaco's cooperation, finalization proceeded far more slowly than Congress had directed, and DOE did not meet the statutory deadline of eight months for completing finalization.

23. ChevronTexaco in 1997 continued its good-faith efforts to cooperate with DOE by agreeing to "decouple" the sale of the United States' interest in the Reserve from the equity finalization process mandated by statute. As part of this agreement, the parties agreed that finalization would thereafter proceed under specified procedures which were intended to facilitate the finalization process and allow for the fair and equitable resolution of all disputed issues in an expeditious manner, without litigation.

24. Consistent therewith, on May 19, 1997, DOE and ChevronTexaco entered into an agreement implemented in two parts, which included the "Agreement Regarding Fixing of Equity Interest at Naval Petroleum Reserve No. 1 for Purposes of Sale" ("Decoupling Agreement," attached as Exhibit B.1), and the "Agreement Regarding Equity Redetermination Process" ("Equity Process Agreement," attached hereto as Exhibit B.2).

25. The May 19, 1997 agreement was embodied in two simultaneously executed parts because DOE wished to keep one part—the Decoupling Agreement—confidential.

26. The Decoupling Agreement decoupled sale of the United States' share of the Reserve from the equity finalization process, allowing the former to occur before completion of the latter. This part of the May 19, 1997 agreement fixed DOE's interest in the Reserve for purposes of sale, and provided for monetary adjustment to be made between DOE and ChevronTexaco following finalization to reflect the difference between the interest sold by the United States and its actual interest in the Reserve.

27. The Equity Process Agreement specified procedures designed to achieve an impartial determination of each party's interest (as of 1942) in the Reserve consistent with the terms of the Unit Plan Contract regarding equity redeterminations, and in compliance with the finalization responsibility and authority given to the Secretary by the Unit Plan Contract.

28. Consistent with the terms of Unit Plan Contract § 11 and in keeping with a protocol issued by the Secretary of Energy in 1996 (a copy of which is attached hereto as Exhibit C), the Equity Process Agreement made the Assistant Secretary for Fossil Energy (as the delegate of the Secretary of Energy for finalization under the Unit Plan Contract) the decision maker with respect to the parties' interests in each of the four zones. The Assistant Secretary was to receive a recommendation from a technically qualified and impartial "Independent Petroleum Engineer." *See* Equity Process Agreement ¶ ¶ B.1, B.2.

29. In order to ensure an impartial decision by the Assistant Secretary, section B of the Equity Process Agreement provides that "Chevron and DOE agree on [certain specified] procedures for the redeterminations of equity by the Assistant Secretary for Fossil Energy for all four unitized zones." Under this process, each of the owners would be represented by its own equity team, to present that owner's respective position to the Independent Petroleum Engineer and to the Assistant Secretary, who was specially designated as the decision maker. In light of the Assistant Secretary's obvious affiliation with one of the owners and to ensure the objective of fairness, the agreement required that the Assistant Secretary determine the case on the basis of information openly communicated to him or her by the adversary parties.

30. In furtherance of this arrangement, the Equity Process Agreement set up a wall between DOE as owner and the Assistant Secretary as decision maker. The agreement requires that no "communications concerning equity redetermination-related matters . . . . by the ASFE with either equity team shall be on an ex parte basis." *Id.* at B.4. The Equity Process Agreement also requires that "[a]ny written materials submitted to the ASFE by either equity team shall be provided to the other party." *Id.* It further states that "[t]he ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters" on an ex parte basis. *Id.* In short, the Process Agreement promises an impartial adjudication, to be accomplished by a defined separation of functions within DOE and a bar on secret or one-sided communications between an owner and the decision maker.

31. The Equity Process Agreement also provided for an Independent Legal Advisor upon whose decisions the Assistant Secretary was allowed but not required to rely. *See* Equity Process Agreement ¶ B.11. This continued and refined the practice of the parties under a supplement to the 1996 protocol issued by the Assistant Secretary, a copy of which is attached hereto as Exhibit D.

32. In the Equity Process Agreement, DOE was given no right of appeal from an adverse Assistant Secretary decision.

33. While equity redetermination proceedings were ongoing, on February 5, 1998, the parties entered into an "Agreement to Terminate the Unit Plan Contract" ("Termination Agreement," attached hereto as Exhibit E), and the United States subsequently sold its interest in the Reserve to a third party. In the Termination Agreement, the parties expressly perpetuated all their respective rights under the Unit Plan Contract. *See* Termination Agreement § 2.2.

34. Prior to its termination, the Unit Plan Contract placed no limitation on ChevronTexaco's right to seek to remedy in court any breach by the United States of its obligations under the Unit Plan Contract. In a significant concession and to help speed the finalization process, under the Equity Process Agreement, ChevronTexaco agreed that there would be no "judicial resolution of any dispute regarding ASFE equity redetermination decisions," "[i]n order to avoid the potential for protracted and costly litigation." Equity Process Agreement at B.8. Instead, determinations of the Assistant Secretary that adopted the Independent Petroleum Engineer's technical recommendations were made final, but ChevronTexaco could appeal to DOE's Office of Hearings and Appeals any aspect of the Assistant Secretary decision contrary to the Independent Petroleum Engineer's technical recommendation, as well as any legal issue decided by the Assistant Secretary adverse to ChevronTexaco. There is no limitation on the resort to a court to remedy a breach of the Equity Process Agreement.

35. ChevronTexaco agreed to give up its right to bring disputes concerning equity redetermination to a court in part in exchange for the promise of an objective and impartial decision from the Assistant Secretary.

36. The promise of an impartial decision from the Assistant Secretary built on prior protocols issued by the Assistant Secretary, in consultation with ChevronTexaco. For example, in 1996 the Assistant Secretary issued Administrative Order No. 96-01. That protocol stated that it "sets out an equity finalization implementation process that is designed to be open, fair, transparent and one that will adequately protect the respective ownership interests of the parties." Protocol ¶ B.5. The protocol prohibited the owners from any ex parte contact with the Independent Petroleum Engineer, and provided that both owners had the right to attend when the Independent Petroleum Engineer presented its recommendation to the Assistant Secretary. The protocol further stated that "[t]here will be no written or oral equity related communication or meeting with the Equity IPE . . . by an owner . . . without the participation or opportunity to participate by the other owner." *Id.* ¶ C.5. And it provided that "[t]he Equity IPE shall provide its recommendation (orally and in writing) to the Assistant Secretary for Fossil Energy. Both owners may attend such presentation." *Id.* ¶ C.18.

<u>Subversion of Finalization Proceedings</u>

37. During equity redetermination proceedings in the finalization process, deliberate actions by DOE personnel have thoroughly subverted the procedures for which ChevronTexaco bargained.

38. In particular, during the Dry Gas Zone proceedings, Carneros Zone proceedings, and Stevens Zone proceedings, DOE through its counsel engaged in repeated direct and indirect ex parte communications with the decision makers in clear violation of the Equity Process Agreement. Deputy General Counsel for Technology Transfer and Procurement Mary Egger functioned both as the lead litigation counsel for the DOE equity team *and* as an advisor to the decision maker in each proceeding, the Assistant Secretary—including participation in the preparation of the Assistant Secretary's decisions.

39. The decision maker during the Dry Gas Zone and Carneros Zone proceedings was Patricia Godley, then-Assistant Secretary for Fossil Energy, who was the Secretary of Energy's delegate under the UPC for such matters, and who at all times performed the designated functions of the Assistant Secretary under the Equity Process Agreement.

40. The decision maker during the Stevens Zone proceedings was Robert Kripowicz, who was the Secretary of Energy's delegate under the UPC for such matters, and who at all times performed the designated functions of the Assistant Secretary under the Equity Process Agreement. (For purposes of the latter agreement, he was at all times either the acting Assistant Secretary or the Principal Deputy Assistant Secretary (PDASFE) serving as the Assistant Secretary's delegate.)

41. During those portions of these proceedings that took place before the Independent Petroleum Engineer, the Independent Legal Advisor, and the Assistant Secretary, Ms. Egger was in fact, and has openly and consistently held herself out as and acted as, lead in-house counsel for the DOE equity team.

42. Ms. Egger was in fact, and openly and consistently held herself out as and acted as lead in-house counsel for the DOE equity team before the Independent Legal Advisor by personally participating in mediation meetings on behalf of the DOE equity team, by signing correspondence directed to the Independent Legal Advisor, and by representing to the Independent Legal Advisor that she was to be the primary contact for the DOE equity team on substantive legal matters.

43. Ms. Egger was in fact, and openly and consistently held herself out as and acted as lead in-house counsel for the DOE equity team before the Independent Petroleum Engineer, for example, by corresponding with the Independent Petroleum Engineer on behalf of the DOE equity team with regard to legal issues and potential legal issues, by signing an agreement with ChevronTexaco counsel regarding the Independent Petroleum Engineer's conflicts of interest, and by corresponding and speaking by telephone with ChevronTexaco counsel regarding disputed issues before the Independent Petroleum Engineer.

44. Ms. Egger was in fact, and openly and consistently held herself out as and acted as lead in-house counsel for the DOE equity team before the Assistant Secretary, for example, on information and belief, by participating in and supervising the drafting of the DOE equity team's submissions to the Assistant Secretary.

45. On information and belief, Ms. Egger was the primary contact for and supervised lead outside counsel for the DOE equity team (O'Melveny & Myers) at all times during the proceedings before the Independent Petroleum Engineer, the Independent Legal Advisor, and the Assistant Secretary.

46. Ms. Egger thus has been an active advocate on behalf of the positions asserted by the DOE equity team before the Independent Petroleum Engineer,

Independent Legal Advisor, and Assistant Secretary in connection with the Dry Gas Zone decision, the Carneros Zone decision, and the Stevens Zone decision.

47. Despite her role as advocate for the DOE equity team, Ms. Egger also participated in the preparation of the Assistant Secretary's preliminary decisions and final decisions in the Dry Gas Zone proceedings, Carneros Zone proceedings, and Stevens Zone proceedings. In each proceeding, Ms. Egger, acting personally or through her subordinates, collaborated with the Assistant Secretary in drafting the decision. Through the Freedom of Information Act, ChevronTexaco has obtained redacted versions of at least some of the drafts that were circulated between the Assistant Secretary and Ms. Egger. When produced to ChevronTexaco the drafts were entirely redacted except for the title pages, in continued violation of section B.4. of the Equity Process Agreement.

48. Other documents, though heavily redacted by DOE or withheld entirely (in continued violation of section B.4. of the Equity Process Agreement), confirm additional ex parte contacts, prohibited by the Equity Process Agreement, between Ms. Egger and the Assistant Secretary or his staff with respect to disputed matters to be decided by the Assistant Secretary.

49. On information and belief, others acting with or under the direction of Ms. Egger also were involved in ex parte contacts with the Assistant Secretary prohibited by the Equity Process Agreement.

50. That the decision maker in the foregoing proceedings received ex parte advice from counsel for one of the two adversary parties violated the Equity Process Agreement and caused the proceedings to be inherently biased and unfair.

51. The dual role of Ms. Egger and others acting with or under her direction has irreversibly stripped the parties' agreed-upon procedures of any legitimacy, has deprived ChevronTexaco of the benefit of an independent and impartial decision from the Assistant Secretary that it bargained for, and constitutes a material breach of DOE's contract obligations.

<u>Other Prohibited Ex Parte Communications between the Assistant Secretary and the DOE Equity Team</u>

52. Documents produced in response to ChevronTexaco's FOIA request also indicate that there have been inappropriate ex parte communications between the Assistant Secretary (or the Assistant Secretary's staff) and engineers on the DOE equity team.

53. These communications constitute material breaches of the Equity Process Agreement.

Prohibited Ex Parte Contacts Between the Assistant Secretary and the Independent Petroleum Engineer

54. Redacted documents produced in response to ChevronTexaco's FOIA request also indicate that there have been inappropriate ex parte communications between the Assistant Secretary or his staff and the Independent Petroleum Engineer with respect to the Stevens Zone.

55. These communications constitute material breaches of the Equity Process Agreement. They also are inconsistent with the 1996 protocol.

Further Allegations

56. From January 2003 until December 2003, DOE deliberately and without justification delayed ChevronTexaco from gaining access through the Freedom of Information Act to documents showing Ms. Egger's and OGC's involvement in the preparation of the Assistant Secretary's preliminary and final decisions in the Stevens Zone proceeding, and to documents showing prohibited ex parte communications between the Assistant Secretary and the Independent Petroleum Engineer.

57. ChevronTexaco first learned of DOE's breaches with respect to the Stevens Zone proceedings when DOE responded on December 23, 2003 to a FOIA request that was filed on January 7, 2003. ChevronTexaco first learned of DOE's breaches with respect to the Dry Gas Zone proceedings and the Carneros Zone proceedings when DOE responded on June 23, 2004 to a FOIA request filed on February 19, 2004.

58. DOE's breaches of the Equity Process Agreement have not only deprived ChevronTexaco of the rights it was promised, they have also caused ChevronTexaco to incur significant expenses and costs, including legal and consulting fees, by participating in a process through which its rights had been subverted and which was otherwise fundamentally corrupted. Further, DOE's actions have materially contributed to ensuring delays in the finalization process, extending that process beyond what Congress intended and beyond any reasonable time.

## FIRST CAUSE OF ACTION

### Breach of Contract

59. The allegations in paragraphs 1-58 are incorporated by reference.

60. During the Dry Gas Zone proceedings, the Carneros Zone proceedings, and the Stevens Zone proceedings, DOE's Deputy General Counsel for Technology Transfer and Procurement, and others acting with or under her direction, engaged in contractually prohibited communications, serving both as attorney for the DOE equity team and as an advisor to the Assistant Secretary decision maker.

61. On information and belief, the Assistant Secretary also engaged in contractually prohibited communications with the Independent Petroleum Engineer.

62. On information and belief, the Assistant Secretary also engaged in contractually prohibited communications with engineers on DOE's equity team.

63. DOE's actions constitute a breach of the Equity Process Agreement and, in turn, the parties' two-part May 19, 1997 agreement.

64. ChevronTexaco therefore is entitled to a finding that DOE has materially breached the Equity Process Agreement, and, in turn, the parties' two-part May 19, 1997 agreement. ChevronTexaco is further entitled to an award of damages in an amount to be determined at trial to compensate ChevronTexaco for the expenses, effort, and time it invested in proceedings tainted through ex parte communications.

65. ChevronTexaco also is entitled to an award of interest, costs, and attorneys fees to the extent authorized by law and by the parties' agreements.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

66. The allegations in paragraphs 1-65 are incorporated by reference.

67. The Equity Process Agreement imposed upon both parties a duty to act in good faith and to deal fairly with the other party in the performance of the agreement.

68. By engaging in ex parte communications, DOE has acted in bad faith in performance of the Equity Process Agreement, including, but not limited to, evading the spirit of the bargain, undermining an agreed common purpose of the parties, deliberately violating the justified expectations of ChevronTexaco, employing subterfuge, and depriving ChevronTexaco of consideration for which it bargained — an objective and impartial decision by the Assistant Secretary for each and every one of the zones in the Reserve.

69. DOE's actions constitute a breach of DOE's contractual duty of good faith and fair dealing with respect to the parties' two-part May 19, 1997 agreement.

70. ChevronTexaco therefore is entitled to a finding that DOE has materially breached the implied covenant of good faith and fair dealing with respect to the parties' two-part May 19, 1997 agreement. ChevronTexaco is further entitled to an award of damages in an amount to be determined at trial to compensate ChevronTexaco for the expenses, effort, and time it invested in proceedings tainted through ex parte communications.

71. ChevronTexaco also is entitled to an award of interest, costs, and attorneys fees to the extent authorized by law and by the parties' agreements.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against the defendant as follows:

1. For damages according to proof;
2. For interest, costs, and attorneys fees; and for
3. Such other further relief as the Court may deem just and appropriate.

DATED: August 20, 2004

Respectfully submitted,

Donald B. Craven /MCG

Donald B. Craven
Daniel Joseph
C. Fairley Spillman
Merrill C. Godfrey
Akin Gump Strauss Hauer & Feld, L.L.P.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4000
(202) 887-4288 Fax

Attorneys for Chevron U.S.A. Inc.

CONTRACT NO. NOd-4219

UNIT PLAN CONTRACT

BETWEEN

NAVY DEPARTMENT AND STANDARD OIL COMPANY OF CALIFORNIA

RELATING TO
NAVAL PETROLEUM RESERVE NO. 1 (ELK HILLS)

JUNE 19, 1944

# UNIT PLAN CONTRACT

This contract made and entered into this 19th day of June, 1944, by and between the United States of America, acting herein by and through the Secretary of the Navy, (hereinafter referred to as "Navy"), and Standard Oil Company of California, a corporation organized and existing under the laws of the State of Delaware, (hereinafter referred to as "Standard"),

W I T N E S S E T H :

**Recitals**

(1) This contract covers and relates to all of the lands lying within the boundaries of Naval Petroleum Reserve No. 1, located in Kern County, California, (hereinafter referred to as the "Reserve"), comprising 43,815 acres, more or less, and indicated by the area embraced within the heavy black line on the map attached hereto, marked Exhibit "A" and hereby made a part hereof.

(2) Standard owns lands and interests in lands lying within the boundaries of the Reserve, as follows:

(a) It is the owner in fee simple of the following described lands, comprising 8297.[illegible] acres:

All of Section Thirteen (13), Township Thirty (30) South, Range Twenty-Three (23) East, M.D.B.& M.

Northwest Quarter (NW¼) of Section Seventeen (17), Township Thirty (30) South, Range Twenty-Three (23) East, M.D.B.& M.

Northwest Quarter (NW¼) of Section Nineteen (19), Township Thirty (30) South, Range Twenty-Three (23) East, M.D.B.& M.

South Half (S½) of Section Thirteen (13), Township Thirty-One (31) South, Range Twenty-Three (23) East, M.D.B.& M.

All of Section Seventeen (17), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Nineteen (19), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Twenty-One (21), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Twenty-Five (25), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Twenty-Seven (27), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Twenty-Nine (29), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Thirty-One (31), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Thirty-Three (33), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

A62922

All of Section Thirty-Five (35), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Thirty-Six (36), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

Northwest Quarter (NW¼) of the Northwest Quarter (NW¼) of Section Twenty-Three (23), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

South half (S½) of the Northwest Quarter (NW¼) of Section Twenty-Three (23), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

Southwest Quarter (SW¼) of the Northeast Quarter (NE¼) of Section Twenty-Three (23), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

South half (S½) of Section Twenty-Three (23), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

Southwest Quarter (SW¼) of the Southwest Quarter (SW¼) of Section Twenty-Four (24), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M., (according to the Official Plat of the survey of the said land returned to the General Land Office by the Surveyor General), EXCEPTING THEREFROM, that portion thereof conveyed to Elk Hills School District by deed recorded November 20, 1933 in Book 411, Page 312 of Official Records of Kern County, California, described as follows: Commencing at a point in the East line of the Southwest Quarter (SW¼) of the Southwest Quarter (SW¼) of said Section Twenty-Four (24) which point is distant three hundred thirty feet (330') North of the Southeast corner of said Southwest Quarter (SW¼) of the Southwest Quarter (SW¼) of said Section; running thence North along said East line a distance of six hundred sixty feet (660'); thence at right angles West, a distance of six hundred sixty feet (660'); thence at right angles South, a distance of six hundred sixty feet (660'); thence at right angles East, a distance of six hundred sixty feet (660') to the point of beginning. Also, EXCEPTING THEREFROM, all oil and gas in said lands as reserved in that certain United States of America Land Patent Number 695254 dated the first day of July 1919, being Land Office Serial Number Visalia 07529.

All that portion of the Southwest Quarter (SW¼) of the Southeast Quarter (SE¼) of Section Twenty-Four (24), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., (according to the Official map of the survey of said land returned to the General Land Office by the Surveyor General), lying South and West of the so-called "Outlet Canal" as same existed on June 14, 1932, date of the deed of said land from Commercial Land Company, a corporation to Kern Investment Company, a corporation, recorded June 14, 1932 in Book 446, Page 63 of Official Records of Kern County, California; EXCEPTING THEREFROM, that portion thereof lying within the townsite of Tupman as shown by map of said townsite, recorded September 2, 1923 in Book 3, Page 94 of Maps in the Office of the County Recorder; ALSO EXCEPTING a parcel of land one hundred feet (100') by one hundred fifty feet (150') comprising 0.34 acres more or less, particularly described as beginning at the Northwest corner of the Southwest Quarter (SW¼) of the Southeast Quarter (SE¼) of said Section, and running thence North 89°54' East along the North line of the Southwest

Quarter (SW 1/4) of the Southeast Quarter (SE 1/4) of said Section Two Hundred Forty feet (240'); thence South 51° 36' East one hundred fifty feet (150') to the true point of beginning of said excepted parcel; thence South 38° 24' West one hundred feet (100'); thence South 51° 36' East One Hundred Fifty feet (150'); thence North 38° 24' East one hundred feet (100'); thence North 51° 36' West one hundred fifty feet (150') to the true point of beginning; also, EXCEPTING THEREFROM all oil and gas in said lands as reserved in Patent from the United States of America dated June 29, 1923 recorded July 16, 1923 in Book 21, Page 445 of Patents; AND SUBJECT to right-of-way for pipe line granted to Commercial Land Company, a corporation, by deed recorded November 4, 1935 in book 625, Page 236 of Official Records of Kern County, California.

Southwest Quarter (SW 1/4) of Section 7, Township Thirty-One South (31), Range Twenty-Four (24) East, M.D.B.&M.

(b) It is the owner of oil and gas leasehold interests in the West Half (W½) of Section 31, Township 30 South, Range 25 East, M.D.B.&M., comprising 335.6 acres, under two certain oil and gas leases dated March 10, 1920, and September 16, 1941, respectively, from Kern County Land Company, as lessor, to Standard, as lessee.

The above described fee lands, and Standard's leasehold interest under the aforementioned oil and gas lease, dated March 10, 1920, from Kern County Land Company, are hereinafter collectively referred to as "Standard's lands."

(3) Navy owns the full right, title and interest in and to all of the remaining lands in the Reserve, with the following exceptions and subject to the following outstanding interests:

(a) West Half (W½) of Section Thirty-One (31), Township Thirty (30) South, Range Twenty-Five (25) East, M.D.B.&M., comprising 335.6 acres, owned in fee by Kern County Land Company and subject to two certain oil and gas leases dated March 10, 1920 and September 16, 1941, respectively, to Standard, as lessee.

(b) Southwest Quarter (SW 1/4) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019525, to Union Oil Company, as lessee.

South Half (S½) of the Northeast Quarter (NE¼) of the Southeast Quarter (SE¼), West Half (W½) of the Southeast Quarter (SE¼), and Southeast Quarter (SE¼) of the Southeast Quarter (SE¼) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019527, to B.&M. Oil Company, as lessee.

Northwest Quarter (NW 1/4) of Section Six (6), Township Thirty-One (31) South, Range Twenty-Five (25) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019516, to Richfield Oil Corporation, as lessee.

(c) East Half (E½) of the East Half (E½), Northwest Quarter (NW 1/4) of the Northeast Quarter (NE 1/4), and Southwest Quarter (SW 1/4) of the Southeast Quarter (SE 1/4) of Section Twenty-Two (22), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019265, to Exeter Oil Company, as lessee.

South Half (S½) of the Northwest Quarter (NW 1/4), and Northwest Quarter (NW 1/4) of the Northwest Quarter (NW 1/4) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019569, to Gibson Oil Company, as lessee.

North Half (N½) of the Northeast Quarter (NE 1/4) of the Southeast Quarter (SE 1/4) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 020998, to F. G. Munzer, as lessee.

West Half (W½) of the West Half (W½), and Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section Twenty-Two (22), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019264, to Pacific Western Oil Company, as lessee.

Southwest Quarter (SW 1/4) of Section Six (6), Township Thirty-One (31) South, Range Twenty-Five (25) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019491, to Richfield Oil Corporation, as lessee.

Northeast Quarter (NE 1/4) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019634, to Transport Oil Company, as lessee.

Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019459, to Transport Oil Company, as lessee.

South Half (S½) of the Southwest Quarter (SW 1/4), and Southwest Quarter (SW 1/4) of the Southeast Quarter (SE 1/4) of Section Twenty-Four (24), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., the mineral rights to which are owned by the United States of America subject to a certain oil and gas lease, numbered Sac. 031888, to Mary C. Hagood, as lessee.

The lands, leases, and interests in land referred to in this paragraph (3), including the interest now owned by Kern County Land Company in the above described 335.6-acre tract under the aforementioned oil and gas lease, dated March 10, 1920, to Standard, and any interests in lands in the Reserve acquired by Navy, are hereinafter collectively referred to as "Navy's lands."

(4) Standard is presently operating the lands of Navy and Standard in the Reserve under an agreement, dated September 8, 1943, between Navy and Standard entitled "Rescission and Temporary Operating Agreement," as extended by agreements respectively dated December 8, 1943, March 7, 1944, and June 5, 1944, which rescinded an earlier agreement, dated November 20, 1942, between Navy and Standard relating to the Reserve.

(5) Certain of the lands of Navy and Standard, respectively, have heretofore been developed in varying degrees. Petroleum engineers and geologists representing Navy and Standard, respectively, have prepared an engineering report, dated September 28, 1942, pertaining to the subsurface conditions underlying a portion of the lands in the Reserve. Such report is entitled "Revised Estimate of Commercially Productive Acre Feet of Formation Proved Zones Elk Hills by United States Navy and Standard Oil Company of California Representatives," (hereinafter referred to as the "Engineering Report"), and is incorporated herein by reference.

(6) The following considerations have led Navy and Standard to conclude that the most desirable and effective means of protecting the Reserve and of assuring the maximum ultimate recovery of oil, gas, natural gasoline and associated hydrocarbons from the Reserve is to develop and operate all lands in the Reserve as a unit:

(a) The Reserve is a part of a single geologic structure; and the practice of offset drilling has not proved to be an effective means of assuring to Navy its proper share of oil produced from the Reserve and does not conserve Navy's oil in the ground.

(b) The independent development and operation of privately-owned lands in the Reserve, from which oil may be freely produced without control or restraint by Navy, would constitute a grave threat to the security of the Reserve and would impair Navy's power to conserve oil in the ground.

(c) Navy deems it inadvisable to shut in the wells on Navy's lands forthwith in view of possible permanent damage to the wells or to the national interest in the ultimate economical production of oil therefrom, and in view of the probable drainage of oil from Navy's lands in the event lands not controlled by Navy are developed and operated without simultaneous protective development and operation of Navy's lands.

(d) The unit plan of development and operation as set out herein will:

(i) Afford Navy a means of acquiring complete control over the development of the entire Reserve and the production of oil therefrom in order that Navy may protect the Reserve and conserve in the ground all of Navy's share of the oil in the Reserve as well as a substantial portion of Standard's share of oil in the Reserve.

(ii) Make available to Standard a limited quantity of oil from one of its most important sources at a time when it is needed by Standard to meet its war requirements for refined petroleum products in the West Coast area.

(iii) Place the Reserve in a condition of readiness whereby it will be able promptly to produce oil in substantial quantities whenever the strategic situation of the United States in the future may so require.

(iv) Result in the eventual receipt by Navy and Standard, respectively, from the various commercially productive zones underlying the Reserve of the quantities of recoverable oil, gas, natural gasoline and associated hydrocarbons underlying their respective lands as of November 20, 1942.

(v) Provide for the economical and efficient development and operation of the Reserve.

(vi) Result in securing the maximum ultimate recovery of oil, gas, natural gasoline and associated hydrocarbons from the Reserve.

(7) The authority for the Secretary of the Navy to enter into this contract for the development and operation of the Reserve as a unit is to be found in an Act of Congress approved June 4, 1920, relating to the conservation, care, custody, protection and operation of the Naval petroleum and oil shale reserves (41 Stat. 813), as amended by an Act of Congress approved June 30, 1938 (52 Stat. 1252), and as further amended by an Act of Congress approved June 17, 1944 (Public Law No. 343, 78th Congress, 2d Session).

(8) It is expressly recognized by Navy and Standard that this contract does not and cannot, in and of itself, authorize the production of any of Navy's share of the oil, gas, natural gasoline and associated hydrocarbons in the Reserve, as distinct from that portion of Standard's share hereinafter permitted to be produced and received by Standard under the terms of paragraphs (d) and (f) of Section 5. The production of the remainder of Standard's share and of all of Navy's share must, except for the purpose of protecting, conserving, maintaining, or testing the Reserve, be preceded by and based upon an authorization by joint resolution of the Congress as provided in the Act of June 4, 1920, as amended; and references hereinafter to an authorization or election by Navy to order the production of any of such oil are intended to be limited to action by the Navy within the terms of any such joint resolution. The production of that portion of Standard's share hereinafter permitted to be produced and charged to its account under paragraphs (d) and (f) of Section 5, including the oil so produced and charged from November 20, 1942 to the date of this contract, is authorized under the provision of the Act of June 4, 1920, as amended, directing the use and operation of the Reserve for its protection, conservation, maintenance and testing; and the production and receipt of such portion by Standard is intended to, and does in fact, represent a consideration moving to Standard under the contract for its agreement hereinafter to relinquish to Navy the control over the time and rate of production from its lands. (See H. R. Report No. 1529, 78th Congress, 2d Session.)

NOW, THEREFORE, Navy and Standard, in consideration of the premises and of the mutual undertakings herein contained, do hereby agree as follows:

Section 1. *Development and Operation of the Reserve as a Unit.*

(a) Navy's lands and Standard's lands shall be developed and operated as a unit for the protection of the Reserve and, to the extent herein provided or hereafter authorized by

Navy, for the production of oil, gas, natural gasoline and associated hydrocarbons therefrom. All operations on the Reserve shall be in accordance with the provisions of this contract.

(b) The ownership interests of Navy and Standard, respectively, in the lands within the Reserve shall not, as between themselves, be regarded as changed or altered hereby in any manner, except to the extent that they are to be developed and operated as a unit for the purposes of this contract. The rights and obligations of Standard under the lease, dated March 10, 1920, from Kern County Land Company, referred to in sub-paragraph (b) of paragraph (2) of the Recitals, shall, subject to the acquisition by Navy of the interest of Kern County Land Company subject to such lease, be governed by this contract.

(c) The duly authorized representatives of Navy and Standard, respectively, shall have the right to go upon the lands of the other, freely and without liability for trespass, for the purpose of carrying on the functions contemplated by this contract.

(d) Any and all wells, equipment and facilities (including gathering lines and stock tanks), owned or hereafter acquired by either Navy or Standard and located on the lands of Navy and Standard in the Reserve on November 20, 1942, shall be held for use, and may be used, by Navy or by any operator selected by Navy in the development and operation of the Reserve hereunder without charge for such use or for depreciation occasioned by such use. Any and all wells drilled on such lands after November 20, 1942, and any and all equipment and facilities acquired pursuant to this contract after November 20, 1942, shall be similarly available for use by Navy or any operator selected by Navy in the development and operation of the Reserve hereunder. The foregoing undertakings by Navy and Standard with respect to equipment and facilities shall not, however, be deemed to extend to (i) automotive, drilling or other equipment placed on the Reserve for merely temporary use or (ii) trunk pipe lines, including any branches thereof and any pump stations and telephone or telegraph poles and lines used in connection therewith.

Section 2. *Relative Participations in Production.*

(a) The following terms and references are defined and identified as follows:

(1) "Acre-foot"

One acre, one foot thick, of oil and/or gas bearing formations which, in the opinion of the Engineering Committee, are capable of being produced in paying quantities.

(2) "Commercially productive zones"

Geologic strata beneath the surface of the earth which, in the opinion of the Engineering Committee, contain oil and/or gas bearing formations capable of producing oil or gas in paying quantities.

(3) "Engineering Committee"

A committee which shall consist of six members, two of whom shall be the members of the Operating Committee hereinafter described. The other four members shall be petroleum engineers or geologists, two of whom shall be appointed by and shall represent Navy, and two of whom shall be appointed by and shall represent Standard; each member so appointed shall have had at least ten (10) years' experience as a petroleum geologist or petroleum engineer, or if a graduate geologist or engineer, at least five (5) years' such experience. Navy and Standard shall appoint their respective representatives on the Engineering Committee within thirty (30) days after the date of this contract, and shall each have the right at any time and from time to time to remove any one or more of its representatives on such Committee and to appoint a new representative or representatives in substitution therefor.

(4) "Estimated Limiting Line of Commercial Productivity"

Surface boundary line or lines, fixed heretofore by the Engineering Report or hereafter by the Engineering Committee, which mark out the geographical surface areas underlain by the various commercially productive zones.

(b) Navy and Standard shall, subject to the further provisions of this contract, share in the oil, gas, natural gasoline and associated hydrocarbons produced from each commercially productive zone underlying the Reserve upon the basis of the percentages representing the ratio between (1) the estimated acre-feet (heretofore determined in the manner provided in the Engineering Report or hereafter determined by the Engineering Committee applying weighting factors in accordance with sound oil field engineering principles) of oil and/or gas bearing formations within the Estimated Limiting Line of Commercial Productivity for each such commercially productive zone underlying the respective lands of Navy and Standard as of November 20, 1942, and (2) the total of such estimated acre-feet within the Estimated Limiting Line of Commercial Productivity for such zone as of November 20, 1942. These percentages are initially established for each known commercially productive zone in paragraph (d) of this Section 2. Such percentages may be revised as hereinafter provided and when so revised shall be retroactive to November 20, 1942.

(c) The known commercially productive zones identified by the Engineering Report are as follows:

| | |
|---|---|
| Dry Gas Zone: | All dry gas bearing formations above the top of the Lower Scalez marker bed. |
| Shallow Oil Zone: | All oil and gas bearing formations of Pliocene Age above the Reef Ridge Shale. |
| Stevens Zone: | All oil and gas bearing formations of Upper Miocene Age within the stratigraphic interval between the top of the Reef Ridge Shale and the top of Valvulineria Californica or associated faunas of Middle Miocene Age. |

(d) The percentage participations of Navy and Standard in the production from the known commercially productive zones underlying the lands in the Reserve are, as set out in the Engineering Report, initially established as follows:

Dry Gas Zone

| | |
|---|---|
| Navy | 77.0492 % |
| Standard | 22.9508 % |

Shallow Oil Zone

| | |
|---|---|
| Navy | 63.9301 % |
| Standard | 36.0699 % |

Stevens Zone

| | |
|---|---|
| Navy | 65.4517 % |
| Standard | 34.5483 % |

(e). As any other prospective zone is proved by development to be commercially productive, an Estimated Limiting Line of Commercial Productivity for such zone shall be established by the Engineering Committee and a determination made of (1) the estimated acre-feet of oil and/or gas bearing formations in such zone underlying the respective lands of Navy and Standard, and (2) the total of such estimated acre-feet within the Estimated Limiting Line of Commercial Productivity for such zone. The initial percentages of participation in production from such zone shall then be determined in accordance with the formula described a paragraph (b) of this Section 2. Such determination shall be made by the Engineering Committee after examination of all available data, provided the members of such Committee agree unanimously thereon. Such determination shall be set forth in a written report to be furnished Navy and Standard and shall be binding upon Navy and Standard. If the Engineering Committee is unable to agree unanimously upon such determination, the Secretary of the Navy shall make such determination, as hereinafter provided in Section 9.

(f) The initial or any subsequently established percentage participations in the production from any commercially productive zone underlying lands in the Reserve shall be subject to revision from time to time in the manner hereinafter set forth. Whenever Navy or Standard is of the opinion that consideration should be given to the revision of such percentages, it shall

notify the other thereof in writing. The Engineering Committee shall promptly examine and review all available data, and if the Committee finds that any one or more of the following exist:

(1) The presence, as of November 20, 1942, of commercially productive oil and/or gas bearing formations extending beyond the Estimated Limiting Line of Commercial Productivity for any zone;

(2) The absence or exhaustion, as of November 20, 1942, of commercially productive oil and/or gas bearing formations within the Estimated Limiting Line of Commercial Productivity for any zone;

(3) A variation, as of November 20, 1942, from the acre-feet of commercially productive oil and/or gas bearing formations previously estimated to be contained within the Estimated Limiting Line of Commercial Productivity for any zone;

(4) A variation, as of November 20, 1942, from the acre-feet of commercially productive oil and/or gas bearing formations previously estimated to underlie the respective lands of Navy and Standard; or

(5) Any condition, fact or circumstance which will aid in a more accurate determination of such percentages as of November 20, 1942;

said Committee shall thereupon determine, in accordance with the formula described in paragraph (b) of this Section 2, the revision, if any, to be made. Any revision unanimously agreed upon by the members of the Engineering Committee shall be set forth and explained in a written report to be furnished Navy and Standard, and such revision shall be binding upon both Navy and Standard. If the Engineering Committee is unable to agree unanimously upon any such proposed revision, the Secretary of the Navy, as hereinafter provided in Section 9, shall determine what revision, if any, shall be made.

(g) Revisions of percentage participations under this Section 2 shall be retroactive to November 20, 1942, and all necessary adjustments shall be made in future allocations of production between Navy and Standard in order to give effect to such revisions of percentage participations.

Section 3. *Control by Navy of Exploration, Prospecting, Development, and Operation of the Reserve.*

(a) Navy shall, subject to the provisions hereof, have the exclusive control over the exploration, prospecting, development, and operation of the Reserve, and Navy may, in its discretion, explore, prospect, develop, and/or operate the Reserve directly with its own personnel or it may contract for all or any part of such exploration, prospecting, development and/or operation with competent and responsible parties. Such contracts may be awarded by Navy either upon the basis of competitive bids or by direc. negotiation, in its sole discretion, subject to applicable law, but Navy shall always use its best efforts to secure as economical an operation as is consistent with sound oil field engineering practices. If any such contract is awarded to Standard at any time, it shall provide for the performance of the work thereunder at the actual cost thereof to Standard. Subject to the other provisions hereof, Navy and Standard shall each be obligated to bear its respective share of all costs and expenses incurred or contracted for by Navy in the exploration, prospecting, development and operation of the Reserve as a unit under this contract.

(b) All exploration, prospecting, development, and producing operations on the Reserve shall be carried on under the supervision and direction of an Operating Committee consisting of two petroleum engineers, one of whom shall be appointed by and shall represent Navy and the other shall be appointed by and shall represent Standard. Each appointee shall have had at least ten (10) years' experience as a petroleum engineer, or if a graduate engineer, at least five (5) years' such experience. Navy and Standard shall each have the right at any time and from time to time to remove its representative on such Committee and to appoint a new representative in substitution therefor. Subject to the other provisions hereof, the Operating Committee shall perform the following functions:

(1) Determine the number of wells to be drilled on the Reserve necessary to secure and to maintain production under this contract, and the location and depth of each well.

(2) Determine the rate at which each well should be produced in accordance with sound oil field engineering practices.

(3) Inspect and supervise all exploration, prospecting, development and producing operations on the Reserve.

(4) Require the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the Reserve.

(5) Act with respect to such other matters as may be elsewhere herein provided or as may hereafter be referred to the Committee from time to time by both Navy and Standard.

Section 4. *Control by Navy of Rate of Exploration, Prospecting, Development, and Production.*

(a) Except as otherwise limited or provided in this contract, and subject always to the limitations described above in paragraph (8) of the Recitals, Navy shall have full and absolute power to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires.

(b) Until Standard shall have received from its share of production from the Shallow Oil Zone the quantity of oil it is permitted to receive under the provisions of paragraph (d) of Section 5, the Reserve shall be developed and operated in such manner and to such extent as will, so far as practicable, permit production from the Shallow Oil Zone to be maintained at a rate sufficient to produce therefrom not less than 15,000 barrels of oil per day, averaged over each quarterly period, or such lesser amount as may be fixed by the Secretary of the Navy under the terms of paragraph (d) of Section 5. Navy may, however, at any time and at its election, increase such rate of production. After Standard shall have received the quantity of production permitted to be received by it under the provisions of paragraph (d) of Section 5, production from the Shallow Oil Zone shall be maintained at a rate no greater than that required to insure the delivery to Standard of the quantity of oil which Standard is permitted, under the provisions of paragraph (f) of Section 5, to receive from the Reserve, unless Navy determines to increase such rate of production.

(c) The drilling of wells hereafter for exploratory purposes shall be governed by the following provisions of this paragraph:

(1) Either Navy or Standard may at any time advise the Engineering Committee of its desire to have an exploratory well drilled at a given location for the purpose of securing additional data for possible revision of the percentage participations of Navy and Standard (then obtaining under Section 2) in the production from any established commercially productive zone or zones in the Reserve. If the Engineering Committee unanimously determines that such well should be drilled for such purpose, then such well shall be drilled and the cost of drilling and equipping such well shall be borne by Navy and Standard in proportion to their percentage participations (then obtaining under Section 2) applicable to the zone to which such well is drilled. In the event of the failure of the Engineering Committee to reach such a unanimous determination, the matter shall be referred to the Secretary of the Navy for determination in the manner hereinafter provided in paragraph (b) of Section 9. If the Secretary determines that such well shall be drilled for such purpose, the cost of drilling and equipping such well shall be borne by Navy and Standard in proportion to their percentage participations (then obtaining under Section 2) applicable to the zone to which such well is drilled. If upon such reference the Secretary determines that such well should not be drilled for such purpose, or if the Engineering Committee shall in the first instance unanimously make the same determination, the party proposing the drilling of such well shall, notwithstanding such determination, be entitled to have such well drilled but the cost of drilling and equipping such well shall be borne solely by such party.

(2) If either Navy or Standard desires at any time to have an exploratory well drilled for the purpose of establishing the existence of any additional commercially productive zone in the Reserve, it shall so advise the other party. If Navy and Standard agree that

such well shall be drilled, fifty percent (50%) of the cost of drilling and equipping such well shall initially be paid by Navy and fifty percent (50%) by Standard. If such well establishes the existence of a commercially productive zone, a subsequent adjustment of such initial equal division of cost shall be made between Navy and Standard on the basis of their respective percentage participations in the production from such additional zone when such percentages are initially determined pursuant to paragraph (e) of Section 2. If Navy and Standard do not agree upon the drilling of such well, then the party desiring to drill such well shall be entitled to have such well drilled but at its sole cost and expense.

(3) The production taken from any exploratory well drilled pursuant to this paragraph (c) shall, irrespective of the manner in which the costs of initially drilling and equipping such well are borne by Navy and/or Standard under the foregoing sub-paragraphs (1) and (2), be allocated between Navy and Standard as provided hereinafter in Section 5 with respect to production from the zone to which such well is drilled.

Section 5. *Allocation of Production.*

(a) Standard shall be charged with the quantity of production which it shall have received from the Shallow Oil Zone underlying the Reserve (whether produced from Navy's lands or Standard's lands) during the period from November 20, 1942 to the date of this contract. Such quantity shall be retained by Standard and charged against Standard's interest in the total production from such zone. Standard shall, notwithstanding any provision of the Rescission and Temporary Operating Agreement, dated September 8, 1943, as extended, be under no obligation to account to Navy for that portion of such production which came from Navy's lands.

(b) Standard shall account in cash to Navy for Navy's share (based upon Navy's percentage participations then obtaining under Section 2) of all production which Standard shall have received from the Dry Gas Zone and from the Stevens Zone during the period from November 20, 1942 to the date of this contract, and such total production from each such zone shall be charged against the respective interests of Navy and Standard in the total production from such zone.

(c) All production from any of the tracts of land referred to in sub-paragraphs (b) and (c) of paragraph (3) of the Recitals, but which are not now owned or controlled by Navy (although included in the calculation of Navy's percentage participations set forth in paragraph (d) of Section 2), during the period from November 20, 1942 to the date upon which Navy shall acquire or otherwise gain control of any such tract, shall be charged against Navy's interest, as of November 20, 1942, in the total production from the zone or zones from which such production came.

(d) Standard shall be permitted to receive from production from the Shallow Oil Zone after the date of this contract 15,000 barrels of oil per day, averaged over each calendar quarterly period, together with associated hydrocarbons, or such lesser quantity as the Secretary of the Navy in his absolute discretion (provided that he is not then causing petroleum to be produced pursuant to a joint resolution of Congress) may, after not less than 90 days' written notice to Standard, fix as the average daily quantity which Standard will thereafter be permitted to receive under this paragraph (d), until either

(1) such time as the Secretary of the Navy in his absolute discretion (provided that he is not then causing petroleum to be produced pursuant to a joint resolution of Congress) may, after not less than 90 days' written notice to Standard, suspend such production; or

(2) the total quantity of oil received by Standard from production from the Shallow Oil Zone from and after November 20, 1942 equals 25,000,000 barrels of oil, together with associated hydrocarbons; or

(3) the total quantity of oil received by Standard from production from the Shallow Oil Zone from and after November 20, 1942 equals one-third (1/3) of Standard's share of the estimated recoverable oil, determined by the Engineering Committee, within the Estimated Limiting Line of Commercial Productivity for the Shallow Oil Zone, as of November 20, 1942;

whichever of said events shall first occur. The period of time during which Standard is permitted to receive production from the Shallow Oil Zone under this paragraph (d) is hereinafter sometimes referred to as the "primary period." All oil so received by Standard during the primary period shall be charged against Standard's interest in the total production from the Shallow Oil Zone. The Engineering Committee shall convene within thirty (30) days after the date of this contract for the purpose of determining, as provided in subparagraph (3) of this paragraph (d), the estimated recoverable oil within the Estimated Limiting Line of Commercial Productivity for the Shallow Oil Zone as of November 20, 1942. Such determination shall be completed, or notification of disagreement given as provided in paragraph (b) of Section 9, not later than six (6) months after the date of this contract. Consideration shall be given by the Engineering Committee to the revision of such determination whenever, in the opinion of either Navy or Standard and upon notice in writing to the other, developments in the field warrant such re-examination.

(e) If, during the primary period, Navy shall elect to require production from the Shallow Oil Zone at a rate in excess of the average daily quantity which Standard is permitted to receive under the provisions of paragraph (d) of this Section 5, Navy shall take all of such excess production until such time as the total quantity of production received by Navy from the Shallow Oil Zone, together with any production charged to Navy's interest in the production from such zone under the provisions of paragraph (c) of this Section 5, shall equal Navy's share (based upon the percentage participations then obtaining under Section 2) of all production from the Shallow Oil Zone from and after November 20, 1942. Thereafter, all production from the Shallow Oil Zone shall be allocated to and received by Navy and Standard, respectively, in accordance with the percentage participations then obtaining under Section 2 applicable to such zone, provided, however, that Standard's right to receive production from the Shallow Oil Zone during the primary period under paragraph (d) of this Section 5 shall not be impaired or lessened except in the manner and on the conditions provided in such paragraph (d). All production received by Navy and Standard, respectively, under this paragraph (e) shall be charged against their respective interests in the total production from the Shallow Oil Zone.

(f) If, at any time, Navy shall elect (see paragraph (8) of the Recitals) to suspend or to reduce production from the Reserve, Standard shall nevertheless, subject to the other provisions of this paragraph (f), be permitted to receive a daily quantity of production from the Reserve, the value of which, averaged over each quarterly period, shall equal the sum of (1) Standard's share of the current expenses of protecting, conserving, testing, and maintaining the Reserve in good oil-field condition, and (2) the real and personal taxes levied or assessed against Standard's lands and equipment and/or its rights and interests under this contract. In determining the quantity of such production, the value of crude oil and natural gasoline shall be measured by the average posted market price offered and paid for crude oil and natural gasoline of similar gravity, quality and grade in Kern County, California by the major oil purchasing companies, excluding Standard, at the time such crude oil and natural gasoline are run, (the price so used to be in no event less than Standard's posted price), and the value of dry gas shall be measured by the average price per thousand cubic feet paid in Kern County, California by gas purchasing companies, or the highest price paid to Standard by such companies for gas produced from the Reserve, whichever is higher at the time such gas is run. The production to be received by Standard under this paragraph (f) shall be taken from such zone or zones as may be determined from time to time by Navy, and all such production shall be charged against Standard's interest in the total production from the zone from which produced. If the total quantity of production received by Standard under this paragraph (f) from any zone, together with the quantity theretofore received by Standard from such zone from and after November 20, 1942, shall at any time equal one-third (1/3) of Standard's share of the estimated recoverable oil, determined by the Engineering Committee, within the Estimated Limiting Line of Commercial Productivity for such zone, as of November 20, 1942, then Standard shall not be permitted to receive any further production from such zone under this paragraph (f). In such event Standard shall be permitted to receive production under this paragraph (f) from any other zone or zones (to be determined by Navy), provided that Standard shall not be permitted to receive production under this paragraph (f) from any such other zone at any time when the total quantity of oil received by Standard therefrom since November 20, 1942 shall equal one-third (1/3) of its share of the estimated recoverable oil, determined by the Engineering Committee, within the Estimated Limiting Line of Commercial Productivity for such zone, as of November 20, 1942.

(g) If, during the primary period, Navy shall elect to permit production from any zone other than the Shallow Oil Zone, or if, after the expiration of the primary period, Navy shall elect to permit production from the Reserve in excess of the production which Standard may then be receiving under the provisions of paragraph (f) of this Section 5, then and in either such event Navy and Standard, respectively, shall take and share in such production from the respective zones as follows:

Standard shall take and receive only one-third (1/3) of what its percentage participations in the production from the respective zone would have been if the quantities of oil received by Navy and Standard, respectively, from such zone were in balance with the percentage participations (then obtaining under Section 2) in the total production from such zone, and Navy shall take and receive the remainder of the production from such zone until such time as such allocations have had the effect of bringing the quantities of oil received by Navy and Standard, respectively, from the respective zones from and after November 20, 1942, (including any production charged to Navy's interest in production from the respective zones under the provisions of paragraph (c) of this Section 5), into balance with their respective percentage participations (then obtaining under Section 2) in the total production from such respective zones. Thereafter, subject always to the provisions of paragraph (f) of this Section 5, all production from each zone shall be allocated to and received by Navy and Standard, respectively, in accordance with the percentage participations then obtaining under Section 2 applicable to such zone. The quantities of production received by Navy and Standard, respectively, from the respective zones under this paragraph (g) shall be charged against their respective interests in the total production from such respective zones.

(h) Neither Navy nor Standard shall be permitted ultimately to receive, so far as is feasible, a proportion of the total production withdrawn from any zone in excess of its percentage participation in such zone. If, however, at the time when any zone shall become exhausted or substantially so, the quantities of production received by Navy and Standard, respectively, from such zone shall not, for any reason, be in balance with their respective percentage participations (then obtaining under Section 2) in the total production from such zone, then an adjustment shall be made in future allocations of production from other zones in order to bring such quantities into balance. If, on the termination of this contract under paragraph (a) of Section 11, the quantities of production received by Navy and Standard, respectively, from all zones shall not be in balance with their respective percentage participations (then obtaining under Section 2) in the total production from all zones, an appropriate cash adjustment shall be made.

<u>Section 6.</u> <u>*Costs of Exploration, Prospecting, Development and Operation.*</u>

(a) <u>Ultimate Sharing of Costs.</u> The costs of exploring, prospecting, developing and operating the Reserve, incurred by Navy and/or Standard (including any costs which Navy may hereafter incur, directly or indirectly, by reason and in respect of the development of "Navy's lands", as defined in subparagraphs (a), (b) and (c) of paragraph (3) of the Recitals, by Navy's predecessors in title, after November 20, 1942 and prior to acquisition by Navy) from and after November 20, 1942 and throughout the life of this contract with respect to each zone underlying the Reserve, and, in the case of the Stevens Zone, certain additional exploratory, prospecting and development costs incurred prior to November 20, 1942, as shown on Exhibit B annexed hereto and hereby made a part hereof, and which disclosed the existence of commercial production in the Stevens Zone, shall be borne ultimately by Navy and Standard in accordance with their respective percentage participations under Section 2 of this contract in the total production from such zone, except as otherwise provided in paragraph (c) of Section 4 with respect to exploratory wells. The cost to Navy or Standard of any and all wells, equipment and facilities (including gathering lines and stock tanks), owned or hereafter acquired by either Navy or Standard and located on the lands of Navy and Standard in the Reserve on November 20, 1942, shall be borne by either Navy or Standard alone, as the case may be, and shall not, with the exception of the Stevens Zone costs referred to in Exhibit B, be included within the costs to be borne ultimately by Navy and Standard under this paragraph. All taxes levied or assessed against Standard's lands and equipment and/or its rights and interests under this contract shall be borne by Standard alone and shall not be included within the costs to be borne ultimately by Navy and Standard under this paragraph.

(b) <u>Current Payment of Costs.</u> Subject to the ultimate sharing of responsibility as specified in paragraph (a) of this Section 6, the respective liabilities of Navy and Standard for current costs under the preceding paragraph (a) shall accrue and be paid at the times and in the manner hereinafter set forth:

(1) Navy and Standard shall each pay currently at least once each month that proportion of the total costs accruing during the period for which payment is made with respect to each zone which the quantity of production currently received by it from such zone during such period bears to the total quantity of production currently received by both Navy and Standard from such zone during such period, except in the following instances:

(i) *Additional production from the Shallow Oil Zone during the primary period.*

If, at any time during the primary period, Navy shall determine, under Section 4, to require production from the Shallow Oil Zone at a rate in excess of that permitted to be received by Standard under paragraph (d) of Section 5, and, in order to accomplish such purpose, it becomes necessary, in the opinion of the Operating Committee, to drill or recondition and to equip wells to achieve such increased rate of production, and to install tanks and other equipment to receive and handle the production at such increased rate, the cost thereof shall be currently paid by Navy at least once each quarter until such increased rate has been obtained. For this purpose the Operating Committee shall determine, as soon as practicable after the expiration of each quarter during the primary period, the proportion of the costs accruing during such period which are properly to be paid currently by Navy under the provisions of this subparagraph (i). When such increased rate of production has been attained, the cost of such development as may thereafter be needed to maintain the total production at the increased rate shall be paid by Navy and Standard as hereinbefore provided in paragraph (l) of this Section 6.

(ii) *Exploratory Wells in the Shallow Oil Zone.*

If, at any time during the primary period, there shall be drilled to the Shallow Oil Zone an exploratory well, the cost of which is (pursuant to paragraph (c) of Section 4) to be borne ultimately by Navy and Standard in the proportions of their respective percentage participations applicable to such Zone under Section 2, the costs of drilling such well and of testing it for production shall be paid currently by Navy and Standard in the same proportions; provided that, if any such well is drilled and completed when, under Section 4, Navy has not determined to require production from the Shallow Oil Zone in excess of that permitted to be received by Standard under paragraph (d) of Section 5, and if Standard elects to utilize such well for production (beyond that necessary for test purposes) in order to maintain the rate of production to which it is entitled under paragraph (d) of Section 5, Standard shall thereupon currently pay the full cost of drilling and equipping such well; and provided, further, that if any such well is drilled and completed when, under Section 4, Navy has determined to require production from the Shallow Oil Zone at a rate in excess of that permitted to be received by Standard under paragraph (d) of Section 5, but prior to the time the increased rate is attained, and if Navy elects to utilize such well for production (beyond that necessary for test purposes), the full cost of drilling and equipping such well shall be currently paid by Navy in the same manner as provided in subparagraph (i) of paragraph (b) of this Section 6.

(iii) *Exploratory Wells in the Stevens Zone.*

If, at any time, Navy shall suspend or reduce production from the Reserve as contemplated in paragraph (f) of Section 5 and shall elect to permit production from the Stevens Zone under such paragraph, and as a result thereof the quantity of production received by Standard from such zone is greater than its share (based upon the percentage participations then obtaining under Section 2) of all production from such zone from and after November 20, 1942, then, notwithstanding that Navy and Standard are not in balance in production received from such zone, the costs of drilling and equipping any exploratory wells in the Stevens Zone which, pursuant to the provisions of paragraph (c) of Section 4, are to be borne by Navy and Standard in proportion to their percentage participations (then obtaining under Section 2) applicable to such zone, shall be currently paid by Navy until such time as the total payments by Navy and Standard, respectively, of the costs of exploration, prospecting, development and operation referred to in paragraph (a) of this Section 6 with respect to such zone have been brought into balance with their respective percentage participations (then obtaining under Section 2) in the total production from such zone.

(iv) *Development for readiness purposes.*

If, at any time during the life of this contract, Navy shall drill and equip, or cause to be drilled and equipped, wells (other than exploratory wells drilled pursuant to paragraph (c) of Section 4) for the purpose, not of immediate production, but of having productive capacity available and ready to produce in the future as Navy shall determine, the cost thereof shall be currently paid by Navy.

(v) *Equilibrium in receipt of production.*

If, as to the Shallow Oil Zone, at any time after the primary period, and, as to any other zone, at any time during the life of this contract, the quantities of production received by, or charged to, Navy and Standard, respectively, from any zone since November 20, 1942 shall be in balance with their percentage participations (then obtaining under Section 2) in the total production from such zone, and if at such time the payments of the costs of exploration, prospecting, development and operation referred to in paragraph (a) of this Section 6 theretofore made by Navy and Standard, respectively, with respect to such zone shall not be in the same proportions as the respective quantities of production received by, or charged to, each from such zone since November 20, 1942, thereafter current payment of all costs accruing in respect of such zone, except those costs provided for in subparagraph (vi) below, shall be made by either Navy or Standard, as the case may be, in such manner and for such period of time as may be necessary to bring the total payments of such costs by Navy and Standard, respectively, into balance with their percentage participations (then obtaining under Section 2) in the total production from such zone.

(vi) *Suspension of production by Navy.*

If, at any time, Navy shall suspend or reduce production from the Reserve as contemplated in paragraph (f) of Section 5, thereafter the costs incurred in producing the limited quantity of production provided in paragraph (f) of Section 5 shall be paid currently by Standard. All other costs of protecting, maintaining and operating the Reserve shall be currently paid by Navy (subject to appropriations by Congress) and Standard in accordance with the percentage participations then obtaining under Section 2. The Operating Committee shall determine, as soon as practicable after the expiration of each quarterly period referred to in paragraph (f) of Section 5, the proportions of the costs accruing during such period which are properly to be paid currently by Navy and Standard, respectively, under the terms of this subparagraph (vi).

(c) The costs referred to in paragraph (a) of this Section 6 with respect to the Stevens Zone incurred prior to the date of this contract have been paid by Standard and shall, therefore, be deemed to have accrued against Standard at the time so paid; and Standard's ultimate liability for the costs referred to in said paragraph (a) in respect of the Stevens Zone shall, to that extent, be deemed to have been satisfied. It is recognized by Navy and Standard that the quantities of production received by each since November 20, 1942 from the Stevens Zone are, by reason of paragraph (b) of Section 3, in balance, as of the date of this contract, with their respective percentage participations in the Stevens Zone (initially obtaining under Section 2); and, further, that the costs so paid by Standard shall be taken into account in determining, under subparagraph (v) of paragraph (b) of this Section 6, the liability for current payment of costs in respect of the Stevens Zone incurred after the date of this contract.

(d) This contract shall supersede the provisions of the Rescission and Temporary Operating Agreement, dated September 8, 1943, as extended, relating to the costs incurred by Standard in the development of, and operations on, Navy's lands.

Section 7. *Disposition of Production.*

Navy (subject to applicable law) and Standard shall each have the right to take delivery, and make such disposition, of the production allocated to it hereunder as it may desire, and each party shall make prompt disposition thereof or provide its own storage over and above such storage facilities as may be available for use under the provisions of paragraph (d) of Section 1. Neither Navy nor Standard shall have any preferential right to purchase any portion of the other's share of such production.

Section 8. *Helium.*

The right to extract helium from any gas produced from the Reserve shall belong exclusively to Navy, and Navy shall not be compelled to account to Standard in any degree for such helium as it may elect to take hereunder. Navy shall bear all costs directly attributable to the extraction of such helium.

Section 9. *Determination of Disputes.*

(a) In the event the Operating Committee is unable to agree upon any matter arising in the performance of its functions, such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and shall be binding upon Navy and Standard.

(b) In the event the Engineering Committee is unable to agree unanimously upon any matter subject to determination by it, said Committee shall notify both Navy and Standard thereof and shall refer such matter to the Secretary of the Navy for determination. Thereupon the Secretary of the Navy on his own initiative may, and upon the request of Standard shall, submit the matter to an independent petroleum engineer, to be selected by him, for the purpose of securing an advisory report thereon from such engineer. The compensation and expenses of such engineer shall be borne by Navy and Standard in the respective percentages then obtaining under Section 2, and a copy of such report shall be supplied to Standard. After consideration of the matter, the Secretary of the Navy shall render his decision thereon and such decision in each such instance shall be final and shall be binding upon Navy and Standard.

Section 10. *Accounting.*

Navy shall cause to be kept complete and accurate records of all matters and transactions affecting the Reserve or its development and operation hereunder, and such records shall be available at all reasonable times for inspection by Standard's accredited representatives. Navy shall, within a reasonable time after the end of each calendar month throughout the term of this contract, cause to be furnished to Standard a detailed statement of account setting forth the quantity of production from the Reserve during such month and the costs of development and operation incurred therein. The expenses incurred or contracted for by Navy under this Section 10 shall be deemed a part of the costs of operating the Reserve hereunder and, as such, shall be borne and paid by Navy and Standard under the provisions of Sections 3 and 6. All records of Standard pertaining to the exploration, prospecting, development and operation of the Reserve, either prior to or after the date of this contract, and all data obtained from wells on lands owned in fee by Standard outside the Reserve but contiguous thereto, shall be available at all reasonable times for inspection by Navy's accredited representatives.

Section 11. *Term.*

(a) Unless sooner terminated as provided in paragraph (b) of this Section, this contract shall continue and remain in full force and effect as long as oil, gas, natural gasoline and/or associated hydrocarbons can be produced from the Reserve in paying quantities.

(b) This contract may be terminated at any time by the Secretary of the Navy in his discretion and subject to the approval of the President on six (6) months' written notice to Standard. Such termination shall be effective as of the date fixed therefor and shall not operate retroactively or to impair the rights and obligations of Navy or Standard under this contract accruing to the termination date. Termination shall be followed by an adjustment of all such rights and obligations, including the rights and obligations growing out of the costs incurred, and the respective quantities of production received, by Navy and Standard, respectively, under the contract, on a fair and equitable basis.

Section 12. *Notices.*

All notices required or permitted to be given under this contract shall be directed to the parties as follows:

Secretary of the Navy,
Navy Department,
Washington, D. C.

Standard Oil Company of California
225 Bush Street
San Francisco, California

Any such notice shall be in writing and may be personally delivered or sent by registered mail or telegraph to the party for whom intended at the address of such party as specified above. Either party may by notice given as aforesaid change its address for notices thereafter.

Section 13. *Unlawful Interest.*

No Member or Delegate to Congress or Resident Commissioner, after his election or appointment, or either before or after he has qualified and during his continuance in office, and no officer, agent or employee of the Department of the Navy, shall be admitted to any share or part of this contract or derive any benefit that may arise therefrom but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit; and the provisions of Section 3741 of the Revised Statutes of the United States, and Sections 114, 115 and 116 of the Codification of the Penal Laws of the United States approved March 4, 1909 (35 Stat. 1109), relating to contracts, enter into and form a part of this contract so far as the same may be applicable.

Section 14. *Covenant Against Contingent Fees.*

Standard warrants that it has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage or contingent fee. Breach of this warranty shall give Navy the right to annul this contract or, in its discretion, to deduct from any amounts which may become owing to Standard by Navy hereunder the amount of such commission, percentage, brokerage or contingent fee.

Section 15. *Inclusion of Additional Lands.*

(a) Navy and Standard have expressly excluded from this contract Standard's leasehold interest under an oil and gas lease, dated September 16, 1941, from Kern County Land Company, covering the 335.6-acre tract owned in fee by Kern County Land Company in the W 1/2 of Section 31, T. 30 S., R. 25 E., M.D.B.&M., within the Reserve. This exclusion has resulted from uncertainty, due to the present lack of adequate information, as to whether or not the Stevens Zone underlying all or any part of such tract is part of the same Stevens Zone structure underlying the remainder of the Reserve and covered by this contract. It is contemplated by Navy and Standard that an exploratory program will be carried on, independently of this contract, to determine the relationship of these structures. If it is established that the Stevens Zone underlying all or any part of such tract is a part of the same Stevens Zone structure underlying the remainder of the Reserve, Standard's leasehold interest in the area affected will, upon the acquisition by Navy of control over the Kern County Land Company's interest in the area affected, be included within the unit operation created hereby.

(b) It is contemplated that it may hereafter be desirable to include under the terms of this contract other lands located outside of the present limits of the Reserve but which lie on the same geologic structure underlying the present limits of the Reserve. If and when any such situation shall arise, Navy and Standard will endeavor to agree upon the terms and conditions on which such additional lands may be included under this contract upon the basis of the estimated acre-feet of commercially productive formations in each commercially productive zone underlying such additional lands. If Navy and Standard shall be unable to agree upon the terms and conditions on which such additional lands may be included, the Secretary of the Navy shall decide such terms and conditions upon a fair and equitable basis, and such decision in each such instance shall be final and shall be binding upon Navy and Standard. In determining the estimated acre-feet of commercially productive formation underlying such additional lands, the Secretary shall, at Standard's request or on his own initiative, secure and consider an advisory report from an independent petroleum engineer in the manner provided in paragraph (b) of Section 9.

IN WITNESS WHEREOF, the parties hereto have executed this contract in triplicate as of the day and year first above written.

THE UNITED STATES OF AMERICA

By /s/ JAMES FORRESTAL
Secretary of the Navy

STANDARD OIL COMPANY OF CALIFORNIA

By /s/ H. D. COLLIER
President

(SEAL)

Attest:

/s/ G. M. FOSTER
Assistant Secretary

I, FRANKLIN D. ROOSEVELT, President of the United States of America, on the 28th day of June, 1944, do hereby approve the execution of the foregoing contract by the Secretary of the Navy.

/s/ FRANKLIN D. ROOSEVELT
President of the United States

STATE OF CALIFORNIA )
) ss.
City and County of San Francisco)

On this 26th day of June in the year one thousand nine hundred and forty-four, before me, FRANK L. OWEN, a Notary Public in and for the City and County of San Francisco, State of California, residing therein, duly commissioned and sworn, personally appeared H. D. COLLIER 2nd G. M. FOSTER known to me to be President and Assistant Secretary, respectively of Standard Oil Company of California, the corporation described in and that executed the within instrument, and also known to me to be the persons who executed the within instrument on behalf of said corporation and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, in the City and County of San Francisco, the day and year in this certificate first above written.

/s/ FRANK L. OWEN
Notary Public in and for the City and County of San Francisco, State of California.

My Commission Expires Nov. 22, 1945

EXHIBIT "B"

EXPLORATION, PROSPECTING AND DEVELOPMENT
COSTS WITH RESPECT TO THE STEVENS ZONE
INCURRED BY STANDARD
PRIOR TO NOVEMBER 20, 1942

The costs incurred and paid by Standard prior to November 20, 1942, in connection with the exploration, prospecting and development of the Stevens Zone are as follows:

Drilling and equipping four (4) producing wells which disclosed the existence of commercial production in the Stevens Zone --

| | | |
|---|---|---|
| Well No. 42-31-S ............ | $401,458 | |
| Well No. 62-31-S ............ | 252,864 | |
| Well No. 44-33-S ............ | 193,226 | |
| Well No. 43-31-T ............ | 191,364 | |
| | | $1,038,912 |

Exploring and prospecting the Stevens Zone by means of geophysical surveys on the Reserve during the period from February to July, 1942, inclusive, for the purpose of determining the outline of the structure in the Stevens Zone and of acquiring data necessary to the location of future wells

| | |
|---|---|
| | 79,607 |
| Total | $1,118,519 |


SO
Standard Oil Co. Lands.
KCL
Kern County Land Co. Lands Leased to Standard
Public Land Leases.
U.S. Navy
Navy Lands.
SO
River
Lake
Exhibit A
ELK HILLS

CONTRACT NO. NOd-8477

# *Amendatory and Supplemental Agreement*

(Dated December 22, 1948)

to

UNIT PLAN CONTRACT

Dated June 19, 1944,

between

NAVY DEPARTMENT AND STANDARD OIL COMPANY OF CALIFORNIA,
RELATING TO
NAVAL PETROLEUM RESERVE NO. 1 (ELK HILLS)

## AMENDATORY AND SUPPLEMENTAL AGREEMENT

THIS AGREEMENT, made and entered into this 22nd day of December, 1948, by and between the UNITED STATES OF AMERICA, acting by and through the Secretary of the Navy (hereinafter referred to as "Navy") and the STANDARD OIL COMPANY OF CALIFORNIA, a corporation organized and existing under the laws of the State of Delaware (hereinafter referred to as "Standard"),

*WITNESSETH:*

RECITALS

1. Navy and Standard have heretofore entered into and are now operating under (i) a Unit Plan Contract (NOd-4219) dated June 19, 1944, covering and relating to all of the lands within the present boundaries of Naval Petroleum Reserve No. 1 (Elk Hills) located in Kern County, California (hereinafter referred to as the "Reserve") and (ii) an Operating Agreement (NOd-4220) dated June 19, 1944, pursuant to said Unit Plan Contract.

2. Some of the lands covered by said Unit Plan Contract were and are owned by Navy and some were and are owned by Standard. The production and receipt by Standard of that portion of its oil, together with associated hydrocarbons, permitted to be produced and received by it during the "primary period" under the Unit Plan Contract was intended to, and did in fact, represent a consideration moving to Standard thereunder for its agreement therein to relinquish to Navy the control over the time and rate of production from its lands specified therein.

3. Section 15(b) of the Unit Plan Contract contemplates that it may be desirable to include under the terms of the contract other lands located outside of the present limits of the Reserve but which lie on a geologic structure underlying the present limits of the Reserve, and further provides that if and when any such situation shall arise, Navy and Standard will endeavor to agree upon the terms and conditions on which such additional lands may be included under the contract, upon the basis of the estimated acre-feet of commercially productive formations in each commercially productive zone under-

lying such additional lands. The parties hereto desire to and do hereinafter agree upon the terms and conditions, to the extent that it is possible to do so at this time, on which certain such additional lands will be included under the Unit Plan Contract pursuant hereto.

4. Navy has heretofore proposed a temporary extension of the boundaries of the Reserve to include certain additional lands outside the Reserve, some of which are owned by the Government and some of which are owned by Standard. Said lands are shown within the heavy broken black line on the map attached hereto, marked "Exhibit A" and hereby made a part hereof (hereinafter referred to as the "proposed extended area"). This temporary extension was proposed by Navy as a result of Navy engineers having concluded, on the basis of data resulting from exploration undertaken within the Reserve since the execution of the Unit Plan Contract, that one or more pools of oil or geologic structures now productive within the present boundaries of the Reserve extend beyond its boundaries. On the basis of additional data resulting from the further exploration provided for herein, the limits of said proposed extended area may be further enlarged or retracted by Navy.

5. Pursuant to statute, Navy and Standard recently consulted the Special Subcommittee on Petroleum, Committee on Armed Services, House of Representatives, United States Congress, with regard to the proposed extension of the boundaries of the Reserve. The Subcommittee decided to defer further consultation thereon until after the parties hereto should have determined definitely, by drilling additional exploratory wells within the Reserve, whether any pool of oil or geologic structure now productive within the present boundaries of the Reserve extends beyond said boundaries and outside of the Reserve.

6. As a result of further exploration within the Reserve completed since the consultation with the Special Subcommittee on Petroleum referred to in Recital 5 above, the parties hereto have determined definitely that one or more geologic structures now productive within the present boundaries of the Reserve do extend beyond said boundaries.

7. The parties hereto recognize the necessity of exploring beyond the present boundaries of the Reserve, as expeditiously as pos-

sible, in order to determine the exact and ultimate extent of such structure or structures, and herein provide a program for drilling and testing certain exploratory wells on both Government lands and Standard lands outside the Reserve with a view to the inclusion of all of such structure or structures under the Unit Plan Contract and, if so ordered by competent authority, within the Reserve.

8. In order to protect the Reserve from drainage by operations outside thereof, the Department of the Interior, at the request of Navy, by Public Land Order No. 460, dated April 1, 1948, withdrew from all forms of public entry all public lands within the proposed extended area pending the ultimate inclusion within the Reserve of part or all of such withdrawn public lands.

9. Navy intends to ask now for the temporary inclusion within the Reserve, subject to valid existing rights, of the Government lands within the proposed extended area; and to ask later for the permanent inclusion within the Reserve of such Standard lands and Government lands as may be determined to contain any part of a structure or structures now productive within the present boundaries of the Reserve.

10. Navy has not sought, and does not propose herein, to have included under the Unit Plan Contract or within the Reserve any structure or structures lying wholly outside the present boundaries of the Reserve.

11. It has been found necessary, for engineering reasons, to continue limited production from the Shallow Oil Zone of the Reserve in order to conserve, protect, test and maintain said zone in good oil field condition and in a condition of readiness to produce oil in substantial quantities promptly whenever the strategic situation of the United States in the future may so require.

12. At the present rate of production necessitated by engineering reasons, the "primary period" under the Unit Plan Contract will expire before the parties hereto can complete the exploration outside of the Reserve referred to in Recital 7 above.

13. The production and receipt by Standard of the additional portion of its oil, together with associated hydrocarbons, which may be produced and received by it during any extension and/or renewal

of the primary period provided for hereinafter is intended to, and does in fact, represent a consideration moving to Standard hereunder in return for its relinquishing to Navy the control over the time and rate of production from additional Standard lands included and to be included under the Unit Plan Contract hereunder and pursuant hereto. The production and receipt of such additional portion is also one of the terms and conditions on which such additional Standard's lands located outside the present limits of the Reserve but which lie on a geologic structure underlying the present limits of the Reserve, are included and may hereafter be included under the Unit Plan Contract hereunder and pursuant hereto.

14. Events since the date of said Unit Plan Contract have been such that Navy and Standard desire to modify and amend the Unit Plan Contract in certain other particulars as hereinafter set forth.

15. The authority for the Secretary of the Navy to enter into this agreement is to be found in the Act of Congress, approved June 4, 1920, relating to the conservation, care, custody, protection and operation of the Naval Petroleum and Oil Shale Reserves (41 Stat. 813), as amended by the Act of Congress approved June 30, 1938 (52 Stat. 1252), and as further amended by the Act of Congress approved June 17, 1944 (58 Stat. 280).

Now, Therefore, Navy and Standard, in consideration of the premises and of the mutual undertakings herein contained, do hereby agree as follows:

## PART I

Section 1. Definition.

(a) Recital 6(a) of the Unit Plan Contract is hereby modified and amended by striking therefrom the words:

"The Reserve is a part of a single geologic structure; and".

(b) Section 2(a) of the Unit Plan Contract is hereby modified and amended by adding to the end thereof the following subparagraph:

"(5) 'Same geologic structure (Elk Hills geologic structure, geologic structure and structure).' These terms as used in the Act of June 17, 1944, the legislative history relating thereto, and

this contract shall be deemed to mean and encompass only the oil pools and reservoirs underlying in whole or in part the present boundaries of the Reserve. (For the purpose of this definition, 'reservoirs' shall have the same meaning as 'pools')."

SECTION 2. ADVISORY FUNCTIONS OF THE ENGINEERING COMMITTEE.

Section 3 of the Unit Plan Contract is hereby modified and amended by adding to the end thereof the following paragraph:

"(c) The Operating Committee may request the advice of the Engineering Committee as to the performance of any of its functions under the foregoing paragraph (b), and the Engineering Committee shall give such advice when so requested by the Operating Committee. Any advice so given by the Engineering Committee shall be in no way binding on the Operating Committee, and nothing contained in this paragraph (c) shall relieve the Operating Committee of its duties and responsibilities as set forth in the foregoing paragraph (b)."

SECTION 3. EXPLORATORY WELLS TO NEW ZONES.

Section 4(c) (2) of the Unit Plan Contract is hereby modified and amended effective retroactively to the date of the execution of said Unit Plan Contract, by adding to the end thereof the following sentence:

"If such well establishes the existence of a commercially productive zone, however, the cost of drilling and equipping such well shall be shared ultimately by Navy and Standard under the provisions of Section 6 hereof, and in accordance with their respective percentage participations (then obtaining under Section 2) in the total production from such zone."

SECTION 4. READINESS COSTS.

Section 6(b)(1)(vi) of the Unit Plan Contract is hereby modified and amended to read as follows:

"(vi) *Cost of maintaining Reserve in a condition of Readiness.*

(a) *Shallow Oil Zone.*

Until such time as Standard shall have received from production from the Shallow Oil Zone (from and after November 20, 1942)

a total of 25,000,000 barrels of its oil, together with associated hydrocarbons, Standard shall pay currently all of the costs of protecting, conserving, testing, and maintaining the Shallow Oil Zone in good oil field condition and in a condition of readiness (except the cost of development for readiness purposes provided for in subparagraph (iv) above) including ordinary production costs. Thereafter, during any extension or renewal of the 'primary period,' Standard shall pay currently all of the costs incurred in producing the quantity of production which it is permitted to receive during such period; and all other costs of protecting, conserving, testing, and maintaining the Shallow Oil Zone in good oil field condition and in a condition of readiness (except the cost of development for readiness purposes provided for in subparagraph (iv) above) shall be paid currently by Navy (subject to appropriations by Congress) and Standard in accordance with their percentage participations (then obtaining under Section 2) in the total production from such zone. After the termination of the 'primary period,' as extended or renewed, or during any suspension thereof, all costs of protecting, conserving, testing, and maintaining the Shallow Oil Zone in good oil field condition and in a condition of readiness (except the cost of development for readiness provided for in subparagraph (iv) above) shall be paid currently by Navy (subject to appropriations by Congress) and Standard in accordance with the provisions of Section 6(b)(1) hereof, until such time as Navy and Standard are in balance in the total of such costs in the Shallow Oil Zone, excluding ordinary production costs, in accordance with their percentage participations (then obtaining under Section 2) in the total production from such zone. Thereafter, the costs of protecting, conserving, testing, and maintaining the Shallow Oil Zone in good oil field condition and in a condition of readiness (except the cost of development for readiness purposes provided for in subparagraph (iv) above), but excluding ordinary production costs, shall be paid currently by Navy (subject to appropriations by Congress) and Standard in accordance with their percentage participations (then obtaining under Sec-

tion 2) in the total production from such zone. The Operating Committee shall determine as soon as practicable after the expiration of each quarterly period referred to in paragraph (d) of Section 5, the proportions of the costs accruing during such period which are properly to be paid currently by Navy and Standard, respectively, under the terms of this subparagraph.

(b) *Other Zones.*
The costs of protecting, conserving, testing and maintaining all zones other than the Shallow Oil Zone in good oil field condition and in a condition of readiness (except the cost of development for readiness purposes provided for in subparagraph (iv) above), but excluding ordinary production costs, shall be paid currently by Navy (subject to appropriations by Congress) and Standard in accordance with their percentage participations (then obtaining under Section 2) in the total production from such zones, respectively."

## PART II

SECTION 1. EXPLORATORY PROGRAM.

(a) Standard forthwith shall drill, test and produce for testing purposes only, one well on its own lands within the proposed extended area, and promptly thereafter shall drill, test, and produce for test purposes only, a second such well, provided the Engineering Committee established under the Unit Plan Contract determines said second well to be necessary in order to obtain adequate information concerning the extent of any structure or structures now productive within the present boundaries of the Reserve.

(b) Navy shall drill, test, and produce for testing purposes only, or cause to be drilled, tested, and produced for testing, on government lands (contingent upon such Government lands being included within the Reserve) and/or upon Standard lands (contingent upon such Standard lands being included under the Unit Plan Contract), such other wells as the Engineering Committee determines to be necessary in order to obtain adequate information concerning the extent of any structure or structures extending within the proposed extended area and now productive within the present limits of the Reserve

even though such wells may be located outside the proposed extended area.

(c) The wells drilled pursuant to paragraphs (a) and (b) above shall be drilled to a depth sufficient, in the opinion of the Operating Committee, to test adequately the Stevens Zone as defined in the Unit Plan Contract.

SECTION 2. PERFORMANCE OF OPERATIONS AND COSTS.

(a) Standard shall perform the operations described in the foregoing Section 1 hereof, and shall perform said operations at actual cost, in the same manner as is provided in the Unit Plan Contract and the Operating Agreement; and the charges to be made by Standard shall be determined in accordance with Exhibit A annexed to the Operating Agreement.

(b) Standard shall pay currently the costs of drilling, and completing for production or abandoning, any well drilled pursuant to paragraph (a) of the foregoing Section 1 hereof; and Navy shall pay currently (subject to appropriations by Congress) such costs of any well drilled pursuant to paragraph (b) of said Section 1. The costs of each such well shall be included in the costs of exploring, prospecting, developing, and operating the Stevens Zone in the Reserve, for ultimate sharing by the parties hereto in accordance with Section 6 of the Unit Plan Contract, in the event said well is commercially productive of oil, gas, and/or associated hydrocarbons from a structure now productive within the present boundaries of the Reserve; the costs of any such well shall not be so included, but shall be borne ultimately by that party paying for such well currently, and that party alone, in the event said well is not commercially productive. If such well is productive from a structure not subject to inclusion under the Unit Plan Contract pursuant hereto, such costs shall be borne in accordance with the provisions of Section 5(d) below.

(c) Standard shall not be required to proceed with any work under this agreement on any Government lands until such lands have been included within the Reserve, subject to valid existing rights, by order of competent authority, and until Navy has full and unrestricted right to perform such work on such lands.

(d) Standard shall not be required to proceed with any work under this agreement unless and until funds for the payment of Navy's share of the costs of such work have been appropriated and made available therefor.

(e) All production data, cores, surveys, reports, studies, and investigations acquired or made in connection with the drilling, testing, and producing of wells under this agreement shall be available for inspection by Navy and Standard, and by such other parties as may be designated in writing by Navy and Standard. Representatives of Navy and Standard shall be permitted at all reasonable times to inspect all operations hereunder.

SECTION 3. FUNCTIONS OF ENGINEERING AND OPERATING COMMITTEES.

(a) The Engineering and Operating Committees created by the Unit Plan Contract shall function for the purpose of this agreement in the same manner as under the Unit Plan Contract and the Operating Agreement and as provided herein. The provisions of Section 9 of the Unit Plan Contract with respect to the determination of disagreements within said Committees are to be deemed incorporated herein and shall govern in the case of all such disagreements occurring within the Engineering and the Operating Committee in the performance of their respective functions hereunder.

(b) All drilling, producing, and testing operations to be carried on hereunder shall be under the supervision and direction of the Operating Committee. Without in any way limiting the foregoing, the Operating Committee shall, in respect of the operations called for by this agreement, make the following specific determinations:

(1) The location of each well to be drilled;

(2) The order in which wells are to be drilled;

(3) The depth to which each well shall penetrate the Stevens Zone;

(4) The manner in which each well is to be tested and the coring program with respect thereto;

(5) The time and rate at which each well, upon completion, shall be produced for testing purposes and for the securing of production, pressure, and other necessary or relevant data;

(6) Whether each well is commercially productive of oil, gas, natural gasoline or associated hydrocarbons.

(c) In making the determinations specifically referred to in the foregoing paragraph (b), the Operating Committee shall act only in accordance with the advice and prior concurrence of at least four of the six members of the Engineering Committee. In the event of the inability of the Engineering Committee to reach a conclusion concurred in by at least four members, the provisions of Section 9(b) of the Unit Plan Contract shall obtain, and reference of the issue shall be made, as therein provided, to the Secretary of the Navy for determination.

SECTION 4. INCLUSION OF LANDS.

(a) The following Standard lands within the proposed extended area and adjacent to the Reserve are hereby included down to and including the Stevens Zone under the Unit Plan Contract pursuant to Section 15(b) thereof, and are hereby made subject to the Operating Agreement:

South Half (S-½) of Southwest Quarter (SW-¼) of Section Thirteen (13), Township Thirty (30) South, Range Twenty-Two (22) East, MDB&M.

North Half (N-½) of Northeast Quarter (NE-¼), and Southeast Quarter (SE-¼) of Northeast Quarter (NE-¼), of Section Twenty-Three (23), Township Thirty (30) South, Range Twenty-Two (22) East, MDB&M.

Said lands are shown within the heavy red line on the map attached hereto, marked "Exhibit A" and hereby made a part hereof.

(b) Promptly after the completion of each exploratory well drilled under Part II of this agreement, the Engineering Committee shall, if said well is commercially productive of oil, gas and/or associated hydrocarbons, determine whether such well produces from any structure or structures now productive within the present boundaries of the Reserve; and if its determination is in the affirmative, the Engineering Committee promptly thereafter shall also determine the

extension of the estimated limiting line of commercial productivity of such structure or structures.

(c) At the time it determines the estimated limiting line of commercial productivity of any structure in accordance with paragraph (b) above, the Engineering Committee shall also determine whether further exploration is necessary in order to obtain adequate information concerning the ultimate extent therein of such structure, and if its determination is in the affirmative, the Operating Committee shall designate the proper location or locations for the next well or wells to be drilled.

(d) Thereafter there shall be included under the Unit Plan Contract, and under the Operating Agreement, such additional Standard lands and such Government lands, down to and including the Stevens Zone, as may be included within said extended limiting line or lines of commercial productivity, and as may be necessary to encompass therewith in one parcel the drilling sites designated by the Operating Committee pursuant to paragraph (c) above (contingent upon said Government lands being included within the Reserve). Such of said lands as lie within the proposed extended area shall be included under the Unit Plan Contract, down to and including the Stevens Zone, upon the terms and conditions, including the consideration to Standard, spelled out herein; and such of said lands as lie outside the proposed extended area shall be included under the Unit Plan Contract, down to and including the Stevens Zone, upon the terms and conditions, including a new and additional consideration to Standard, to be agreed upon at that time, upon the basis of the estimated acre-feet of commercially productive formations in each commercially productive zone in such lands. If Navy and Standard should be unable to agree upon the terms and conditions upon which such lands may be included, including the consideration to Standard, the Secretary of the Navy shall decide such terms and conditions upon a fair and equitable basis, and such decision shall be final and shall be binding upon Navy and Standard. In determining the estimated acre-feet of commercially productive formations in such lands the Secretary may on his own initiative and at Standard's request shall secure and consider an advisory report from an independent petroleum engineer in the manner provided in Section 9(b) of the Unit Plan Contract.

(e) Such lands, down to and including the Stevens Zone, shall be added to the lands covered by the Unit Plan Contract, and shall be described in the same degree of detail as is shown in the descriptions contained in Recitals 2 and 3 of the Unit Plan Contract; and Navy and Standard shall execute promptly such further instruments as may be necessary, from time to time, to effectuate the inclusion of such lands under the Unit Plan Contract, and under the Operating Agreement, pursuant to paragraph (d) above.

SECTION 5. SEPARATE STRUCTURES.

(a) Standard reserves and retains the right of access to any of its lands included under the Unit Plan Contract hereunder or pursuant hereto, for the purpose of drilling for and producing oil and/or gas from any zone or zones stratigraphically lower than the Stevens Zone, or from any structure or structures not subject to inclusion under the Unit Plan Contract pursuant hereto, and Navy reserves and retains a similar right for the same purpose in any Government lands included under the Unit Plan Contract pursuant hereto.

(b) If, under any lands included under the Unit Plan Contract hereunder or pursuant hereto, any structure commercially productive of oil, gas, and associated hydrocarbons is discovered which is stratigraphically lower than the Stevens Zone, and which extends within the present boundaries of the Reserve, such structure shall be included under the Unit Plan Contract (contingent, with regard to the Government lands containing any part of said structure, upon said lands being included within the Reserve). If and when any such situation shall arise, Navy and Standard will endeavor to agree upon the terms and conditions on which such additional structure may be included under the contract, upon the basis of the estimated acre-feet of commercially productive formations in such structure. If Navy and Standard should be unable to agree upon the terms and conditions upon which such structure may be included, including a consideration to Standard for the inclusion of its interest therein, the Secretary of the Navy shall decide such terms and conditions upon a fair and equitable basis, and such decision shall be final and shall be binding upon Navy and Standard. In determining the estimated

acre-feet of commercially productive formations in such structure the Secretary on his own initiative may, and upon the request of Standard shall, secure and consider an advisory report from an independent petroleum engineer in the manner provided in Section 9(b) of the Unit Plan Contract.

(c) If, under any lands included under the Unit Plan Contract hereunder or pursuant hereto, any structure commercially productive of oil, gas, and associated hydrocarbons is discovered which is below, in or above the Stevens Zone, and which does not extend within the present boundaries of the Reserve, such structure, not being subject to inclusion under the Unit Plan Contract, shall be excluded from the Unit Plan Contract, and shall thereafter belong to the party or parties under whose lands it lies, who shall have access to it as provided in paragraph (a) above. Such structure shall be excluded in legal effect, by the determination that it does not extend within the present boundaries of the Reserve, and Navy and Standard shall execute promptly such further instruments as may be necessary, from time to time, to evidence or further effectuate the exclusion of such structure from the Unit Plan Contract as provided for above.

(d) Any well drilled to and productive from any separate structure as defined in the foregoing paragraph (c) shall belong to the party on whose lands it is located, and shall be paid for by that party, both currently and ultimately, and by that party alone; and such party shall promptly reimburse the other party for any part of the cost of said well the latter may have borne.

(e) The Engineering Committee shall determine promptly, upon written request of either Navy or Standard, whether any given structure lies below, in or above the Stevens Zone, or does or does not extend within the present boundaries of the Reserve.

SECTION 6. EXTENSION OF PRIMARY PERIOD.

(a) The "primary period" as defined in Section 5(d) of the Unit Plan Contract is hereby extended for a period of eighteen months from and after the time when Standard shall have received from production from the Shallow Oil Zone (from and after November 20, 1942) a total of 25,000,000 barrels of its oil, together with associated

hydrocarbons, or the time when this agreement is approved by the President of the United States, whichever is later.

(b) Prior to the expiration of the eighteen months' period referred to in the foregoing paragraph, the Engineering Committee shall determine the estimated recoverable oil under Standard's lands within the proposed extended area included under the Unit Plan Contract hereunder and pursuant hereto, down to and including the Stevens Zone; and the "primary period" shall then be extended for such additional period (after the termination of said eighteen months' period) as may be necessary to enable Standard to receive from production from the Shallow Oil Zone during said additional period an additional quantity of its oil equal to one-third of the estimated recoverable oil underlying such Standard lands.

(c) It is contemplated that the determination of estimated recoverable oil underlying Standard lands included under the Unit Plan Contract hereunder and pursuant hereto may be revised from time to time in the light of additional data. The Engineering Committee shall make such revisions as are in its judgment justified upon the written request of either Navy or Standard, and the additional extension of the "primary period" referred to in the foregoing paragraph shall be adjusted on each such revision, to enable Standard to receive from production from the Shallow Oil Zone during said additional period, as adjusted, an additional quantity of its oil equal to one-third of the then estimated recoverable oil underlying its lands within the proposed extended area included under the Unit Plan Contract hereunder and pursuant hereto, and no more.

(d) In the event that, for any reason, the "primary period" shall terminate, and the Engineering Committee shall thereafter determine that the estimated recoverable oil underlying Standard lands within the proposed extended area included under the Unit Plan Contract hereunder and pursuant hereto is such that Standard shall not have received, during an extension of the "primary period" under the foregoing paragraphs (b) and (c), an additional quantity of its oil equal to one-third of such estimated recoverable oil, the "primary period" shall then be revived or renewed for such additional period as will enable Standard to receive from production from the

Shallow Oil Zone, from and after the termination of the eighteen months' period referred to above, an additional quantity of its oil equal to one-third of the then estimated recoverable oil underlying its lands within the proposed extended area included under the Unit Plan Contract hereunder and pursuant hereto, and no more.

(e) During the "primary period" as extended or renewed pursuant hereto Standard shall be permitted to receive all of the oil, together with associated hydrocarbons, which shall be determined by the Operating Committee to be necessary to produce from the Shallow Oil Zone in order to protect, conserve, test, and maintain said zone in good oil field condition, and in a condition of readiness to produce oil in substantial quantities promptly whenever the strategic situation of the United States in the future may so require. All oil, gas, natural gasoline, and associated hydrocarbons so received by Standard shall be charged against Standard's interest in the total production from the Shallow Oil Zone.

(f) Nothing herein shall be construed to authorize or permit Standard to receive from the Shallow Oil Zone during the "primary period," as extended or renewed pursuant hereto, more than one-third of its share of the estimated recoverable oil in said Shallow Oil Zone as of November 20, 1942; and nothing herein shall be construed to nullify or modify in any way Section 5(d) of the Unit Plan Contract, other than subparagraph (2) thereof.

SECTION 7. DISPOSITION OF INITIAL PRODUCTION.

(a) The oil, gas, natural gasoline and associated hydrocarbons produced and saved from any structure underlying Standard's lands shall, until the inclusion of such structure under the Unit Plan Contract, be received by Standard; and that produced and saved from any structure underlying Government lands shall (contingent upon such lands being included within the Reserve), until the inclusion of such structure under the Unit Plan Contract, be received by Navy.

(b) Upon the inclusion under the Unit Plan Contract of any such structure, the production so received by Navy and/or Standard under the foregoing paragraph (a) shall be charged against their respective interests in the total production from the zone in which

said structure lies; and if this results in the quantities of production from the Stevens Zone received by, and charged to, Navy and Standard, respectively, being then out of balance with their percentage participations (then obtaining under Section 2 of the Unit Plan Contract) in the total production from such zone, all of the production from said Stevens Zone shall be allocated to that party which has received less than its proper share until such time as such a balance has been reached.

(c) Navy and Standard shall retain, without obligation to account to each other, such production as may be received by them from such structures as are not included under the Unit Plan Contract pursuant hereto.

SECTION 8. TERM.

(a) Unless sooner terminated as provided in paragraph (b) of this section, Part II of this agreement shall continue and remain in full force and effect until (i) all lands determined by the Engineering Committee to contain any part of a structure or structures now productive within the present boundaries of the Reserve have been included, down to and including the Stevens Zone, under the Unit Plan Contract, and (ii) the Engineering Committee determines that no further wells are necessary in order to obtain adequate information concerning the extent of any structure or structures productive within the present boundaries of the Reserve, and (iii) the "primary period," as extended or renewed pursuant hereto, has terminated.

(b) Part II of this agreement may be terminated by the Secretary of the Navy upon termination of the Unit Plan Contract pursuant to Section 11(b) thereof, and in the same manner provided for therein.

SECTION 9. UNIT PLAN CONTRACT.

References to the Unit Plan Contract herein are to the Unit Plan Contract as modified and amended by Part I of this agreement. Said Unit Plan Contract, as modified and amended, shall continue in full force and effect in all its terms and conditions, except as expressly modified and supplemented by Part II of this agreement

herein, and as it may be modified by the inclusion thereunder of additional lands pursuant hereto.

## PART III

SECTION 1. EFFECTIVE DATE OF AGREEMENT.

This agreement shall become effective when it is approved by the President of the United States.

SECTION 2. ASSIGNMENT; SUBCONTRACTS.

Neither this agreement nor any interest therein may be assigned by Standard without the prior written consent of Navy. Standard may, however, with the approval of the Operating Committee, enter into subcontracts with third parties for the performance of particular portions of the operations contemplated by this agreement.

SECTION 3. PATENTS.

Standard shall hold and save Navy, its officers, agents, servants, and employees, harmless from patent liability of any nature or kind, including costs and expenses, for or on account of any patented or unpatented invention made or used in the performance of this agreement, including the use or disposal thereof by or on behalf of Navy; provided, that the foregoing shall not apply to inventions covered by applications for United States Letters Patent which, on or after the date of execution of this agreement, are being maintained in secrecy under the provisions of Title 35, U.S. Code (1940 ed.), Section 42 as amended.

SECTION 4. NONDISCRIMINATION IN EMPLOYMENT.

(a) Standard, in performing the work required by this agreement, shall not discriminate against any employee or applicant for employment because of race, creed, color, or national origin.

(b) A provision identical with the foregoing paragraph (a) shall be included in all subcontracts made by Standard under this agreement.

(c) For the purpose of this Section 4, subcontracts shall be deemed to include all purchase orders and agreements to perform all

or any part of the work, or to make or furnish any article, required for the performance of this agreement, except purchase orders or agreements for the furnishing of standard commercial articles or materials not requiring special fabrication or treatment after purchase and before being used in performing work hereunder.

SECTION 5. UNLAWFUL INTEREST.

No member or delegate to Congress or resident Commissioner, after his election or appointment, or either before or after he has qualified and during his continuance in office, and no officer, agent or employee of the Department of the Navy, shall be admitted to any share or part of this agreement or derive any benefit that may arise therefrom, but this provision shall not be construed to extend to this agreement if made with a corporation for its general benefit; and the provisions of Section 3741 of the Revised Statutes of the United States, and Sections 114, 115 and 116 of the Codification of the Penal Laws of the United States approved March 4, 1909 (35 Stat. 1109), relating to agreements, enter into and form a part of this agreement so far as the same may be applicable.

SECTION 6. COVENANT AGAINST CONTINGENT FEES.

Standard warrants that it has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage or contingent fee. Breach of this warranty shall give Navy the right to annul this agreement or, in its discretion, to deduct from any amounts which may become owing to Standard by Navy hereunder the amount of such commission, percentage, brokerage or contingent fee.

SECTION 7. WALSH-HEALEY ACT.

If this contract is for the manufacture or furnishing of materials, supplies, articles, or equipment in an amount exceeding, or which may exceed $10,000, there are hereby incorporated by reference the representations and stipulations as set forth in Article 1 of Part I of Regulations No. 504, issued by the Secretary of Labor pursuant to the Walsh-Healey Public Contracts Act (Pub. Act No. 846, 74th Con-

gress), such representations and stipulations being subject to all applicable regulations, exceptions, variations, tolerances, determinations and exemptions of the Secretary of Labor which are now or may hereafter be in effect.

SECTION 8. OVERTIME COMPENSATION OF LABORERS AND MECHANICS.

If the Section of this agreement entitled "Walsh-Healey Act" is inapplicable by its terms, this contract, to the extent it is of a character specified in the Act of June 19, 1912 (37 Stat. 138, U.S.C. Title 40, Secs. 324, 325) is subject to the provisions of Section 303 of the Second Supplemental National Defense Appropriations Act, 1941 (Pub. No. 781, 76th Congress), approved September 9, 1940.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

THE UNITED STATES OF AMERICA
By JOHN L. SULLIVAN
*Secretary of the Navy*

STANDARD OIL COMPANY OF CALIFORNIA
By F. S. BRYANT
*Vice President*

(Seal)

Attest:
H. L. SEVERANCE
*Assistant Secretary*

I, HARRY S. TRUMAN, President of the United States of America, on the 4th day of January, 1949, do hereby approve the execution of the foregoing Amendatory and Supplemental Agreement by The Secretary of the Navy.

HARRY S. TRUMAN
*President of the United States*

DUPLICATE ORIGINAL

CONTRACT NO. NOd-9787

AMENDATORY AGREEMENT

THIS AGREEMENT, made and entered into this 16th day of Sept. 1966, by and between the UNITED STATES OF AMERICA, acting by and through the Secretary of the Navy (hereinafter referred to as "Navy"), and the STANDARD OIL COMPANY OF CALIFORNIA, a corporation organized and existing under the laws of the State of Delaware (hereinafter referred to as "Standard").

W I T N E S S E T H:

RECITALS

1. Navy and Standard have heretofore entered into and are now operating under (i) a Unit Plan Contract (NOd-4219) dated June 19, 1944, covering and relating to most of the lands within the present boundaries of Naval Petroleum Reserve No. 1 (Elk Hills) located in Kern County, California (hereinafter referred to as the "Reserve"), (ii) an Amendatory and Supplemental Agreement (NOd-8477) dated December 22, 1948, and (iii) an Operating Agreement (NOd-9535) dated October 13, 1961, pursuant to said Unit Plan Contract.

2. Sections 4(d) and 5(b) of Part II of said Amendatory and Supplemental Agreement require the inclusion of certain lands or structures under the Unit Plan Contract if the circumstances prescribed therein are present. Because of technical developments Navy and Standard are now of the opinion that inclusion of such lands or structures should be left to the discretion of Navy, and therefore desire to modify the aforesaid Sections 4(d) and 5(b) to allow Navy such discretion.

3. The authority for the Secretary of the Navy to enter into this Agreement is to be found in Chapter 641 of Title 10, United States Code.

NOW, THEREFORE, Navy and Standard, in consideration of the premises, do hereby agree as follows:

SECTION 1.

(a) Strike from the first sentence of Section 4(d) of Part II of the Amendatory and Supplemental Agreement all of the words following the word "Thereafter" and preceding the word "down" and insert

"such additional lands of Navy and Standard as lie within the proposed extended area shall, and such of these lands as lie outside the proposed extended area may, in the sole discretion of Navy, be included under the Unit Plan Contract and under the Operating Agreement,"

and strike from line 13 the word "shall" and insert therefor

"may, in the sole discretion of Navy,".

(b) Strike from the first sentence of Section 5(b) of the said Part II the word "shall" and insert therefor

"may, in the sole discretion of Navy,".

SECTION 2.

Wherever the "Operating Agreement" is referred to in Part II of the Amendatory and Supplemental Agreement, that term shall be deemed to mean the Operating Agreement mentioned in Recital 1 hereof and any extension or renewal thereof.

SECTION 3.

Except as expressly modified herein, all provisions of the Amendatory and Supplemental Agreement shall remain in full force and effect.

SECTION 4.

This Agreement shall be subject to the written approval of the President of the United States and shall not be binding until so approved.

IN WITNESS WHEREOF, The parties hereto have caused this contract to be executed in triplicate as of the day and year first above written.

UNITED STATES OF AMERICA

By [signature]
Acting Secretary of the Navy

SEAL

ATTEST:

[signature]
ASSISTANT Secretary

STANDARD OIL COMPANY OF CALIFORNIA

By [signature]
Vice President

State of California

County of San Francisco

On this the [illegible] day of [illegible], 1966, before me, [illegible], a Notary Public in and for the City and County of San Francisco, State of California, residing therein, duly commissioned and sworn, personally appeared [illegible] and [illegible] known to me to be [illegible] and [illegible], respectively, of the Standard Oil Company of California, the corporation described in and that executed the within instrument, and also known to me to be the persons who executed the within instrument on behalf of said corporation and acknowledged to me that such corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, in the City and County of San Francisco, the day and year in this certificate first above written.

EDMOND LEE KELLY
NOTARY PUBLIC - CALIFORNIA
CITY AND COUNTY OF
SAN FRANCISCO

[illegible signature]
Notary Public in and for the City and County of San Francisco, State of California.

My Commission Expires [illegible] 1968

AMENDATORY AGREEMENT

This AGREEMENT, made and entered into this 25th day of May 1976, by and between the UNITED STATES OF AMERICA, acting by and through the Secretary of the Navy (hereinafter referred to as "Navy"), and the STANDARD OIL COMPANY OF CALIFORNIA, a corporation organized and existing under the laws of the State of Delaware (hereinafter referred to as "Standard").

WITNESSETH:

RECITALS

1. Navy and Standard have heretofore entered into and are now operating under (i) a Unit Plan Contract (NOd-4219) dated June 19, 1944, covering and relating to most of the lands within the present boundaries of Naval Petroleum Reserve No. 1 (Elk Hills) located in Kern County, California (hereinafter referred to as the "Reserve"), (ii) an Amendatory and Supplemental Agreement (NOd-8477) dated December 22, 1942, and (iii) an Amendatory Agreement (NOd-9787) dated September 16, 1966, pursuant to said Unit Plan Contract.

2. Whereas the Congress has enacted the Naval Petroleum Reserves Production Act of 1976 (Public Law 94-258) authorizing the President to produce the Naval Petroleum Reserves Numbered 1, 2 and 3; and

3. Whereas the authorization for such production makes inapplicable certain previous requirements for conservation in the ground of the petroleum underlying said Naval Petroleum Reserves; and

4. Whereas, in view of such production, the parties desire to further amend the Unit Plan Contract (NOd-4219) as set forth below in

order to facilitate production under such Contract in accordance with Public Law 94-258;

Now therefore, Navy and Standard in consideration of the premises and the mutual undertakings herein contained, do hereby agree as follows:

Section 1. The Unit Plan Contract is hereby amended in the following respects:

(a) The reference in Recital 6(d)(i) to conservation of petroleum "in the ground" is inapplicable;

(b) Recital 6(d)(ii) is inapplicable in its entirety;

(c) Recital 8 is inapplicable insofar as it may be inconsistent with the Naval Petroleum Reserves Production Act of 1976; provided, however, that the amendments in this Section 1 shall be effective only for the duration of production from the Reserve pursuant to Public Law 94-258.

Section 2. Recital 7 is amended to include reference at the end thereof to Public Law 94-258, the Naval Petroleum Reserves Production Act of 1976.

Section 3. For the purpose of Section 6(b)(1)(v) of the Unit Plan Contract, production pursuant to Public Law 94-258 is considered as production authorized by a joint resolution of Congress.

IN WITNESS WHEREOF, the parties have executed this Agreement in triplicate as of the day and year first above written.

THE UNITED STATES OF AMERICA

By [signature]

STANDARD OIL COMPANY OF CALIFORNIA

By [signature]

# AGREEMENT REGARDING FIXING OF EQUITY INTERESTS AT NAVAL PETROLEUM RESERVE NO. 1 FOR PURPOSES OF SALE

**THIS AGREEMENT REGARDING FIXING OF EQUITY INTERESTS AT NAVAL PETROLEUM RESERVE NO. 1 FOR PURPOSES OF SALE** (this "**Agreement**") is made as of May 19, 1997 between THE UNITED STATES OF AMERICA, acting by and through its DEPARTMENT OF ENERGY ("**DOE**"), and CHEVRON U.S.A. PRODUCTION COMPANY, a division of CHEVRON U.S.A. INC., a Pennsylvania corporation ("**Chevron**"). References herein to DOE as the owner of property or rights in NPR-1 (defined below) shall be deemed to mean and refer to the ownership interests and rights held in the name of either the United States of America or the Department of Energy.

## RECITALS

A. Chevron and DOE own, in separate ownerships, all of the parcels or mineral interests included within Naval Petroleum Reserve Numbered 1 ("**NPR-1**"), located in Kern County, California. A substantial portion of NPR-1 is operated pursuant to that certain Unit Plan Contract dated June 19, 1944 (as amended to date, the "**UPC**").

B. Title XXXIV of the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106 (the "**Act**"), requires that DOE sell all of the United States' interest in NPR-1, provided that such sale meets the requirements and conditions specified in the Act. Among other things, the Act requires that DOE finalize equity interests in all known oil and gas zones in NPR-1 and that the UPC be terminated not later than the closing of the sale of DOE's interest in NPR-1.

C. DOE and Chevron currently are engaged in finalizing equity interests in the four unitized oil and gas zones established by the UPC. The equity redetermination process is highly complex and technical and may not be completed in time to accommodate the sale timetable contemplated by the Act. Even when completed, the resulting equity participations potentially may be subject to judicial or administrative challenge by Chevron. Any such judicial or administrative challenge could delay final determination of the equity participations in the unitized zones well beyond the targeted sale schedule.

D. The foregoing uncertainty regarding final equity participations in the unitized zones would, among other things, adversely impact DOE's efforts to sell its interest in NPR-1 for full value and on the schedule set forth in the Act. In addition, such uncertainty would impair the ability of DOE and Chevron to estimate the various financial

adjustments that must be made between DOE and Chevron upon termination of the UPC.

E. In addition, DOE and Chevron desire to establish certain understandings between themselves regarding ownership of the facilities at NPR-1 for the purposes of the sale of DOE's interests in NPR-1.

F. In order to provide certainty for prospective bidders for DOE's interest in NPR-1 and to address certain issues regarding the financial adjustments between DOE and Chevron upon termination of the UPC, Chevron and DOE desire to enter into this Agreement on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing recitals, and for other good and valuable consideration, Chevron and DOE hereby agree as follows:

**ARTICLE I**

**FIXING OF EQUITY INTERESTS FOR SALE**

1.1 Final Equity Participations for Sale.

(a) The parties hereby agree that, for purposes only of the sale of DOE's interest in NPR-1 and future operations by Chevron and the purchasers of DOE's interest in NPR-1 (**"DOE's Purchasers"**), their respective equity interests in the four oil and gas zones established pursuant to the UPC (the **"Unitized Zones"**) are fixed as follows:

| | | | |
|---|---|---|---|
| i) | Dry Gas Zone: | DOE | 83.8726% |
| | | Chevron | 16.1274% |
| ii) | Carneros Zone: | DOE | 100.00% |
| | | Chevron | 0.00% |
| iii) | Shallow Oil Zone: | DOE | 70.0119% |
| | | Chevron | 29.9881% |
| iv) | Stevens Zone: | DOE | 79.6357% |
| | | Chevron | 20.3643% |

The parties further agree that, for purposes only of the sale of DOE's interests in NPR-1 and future operations by Chevron and DOE's Purchasers, the non-unit areas owned by DOE and included within NPR-1 (**"Non-Unit Area"**) is hereby fixed as 100% owned by DOE. The foregoing equity participation percentages for the Unitized Zones and the Non-Unit Area are sometimes collectively referred to herein as the **"Fixed Sales Participations"**.

(b) The parties agree that the Fixed Sales Participations are final and binding on DOE and Chevron for purposes of the sale of DOE's interest in NPR-1 and future operations of Chevron and DOE's Purchasers. The Fixed Sales Participations, however, shall not be binding on either DOE or Chevron with respect to the UPC or to any adjustments to be made under the UPC upon its termination. The percentage participations applicable to the UPC shall be those ultimately established in the equity finalization process currently underway pursuant to the Act and the UPC. As used in this Agreement, the term "**UPC Final Equity Participations**" shall mean the equity participations for the Unitized Zones issued by the Assistant Secretary for Fossil Energy ("**ASFE**") under Section 3412(b) of the Act that have become "Final" (defined below). The equity participation numbers for a zone issued by the ASFE pursuant to the Act and the UPC (including any modifications thereto by the DOE Office of Hearings and Appeals pursuant to paragraph B.8 of the "Agreement Regarding Equity Redetermination Process" of even date herewith between Chevron and DOE (the "**Process Agreement**")) shall be deemed "**Final**" upon the earlier of (i) the date the ASFE's equity redetermination decision becomes final and binding on the parties under the Process Agreement, or (ii) the date Chevron notifies DOE in writing that it will not challenge an ASFE's redetermination decision that does not fully accept the recommendation of the Independent Petroleum Engineer.

(c) Chevron and DOE acknowledge that the UPC Final Equity Participations for one or more of the zones may not be the same as the Fixed Sales Participations for such zones. Notwithstanding such situation, Chevron and DOE agree that the Fixed Sales Participations shall govern any future allocation of production from the Unitized Zones and the Non-Unit Area as between Chevron and DOE's Purchasers.

(d) Chevron acknowledges that DOE will advise prospective bidders for DOE's interests in NPR-1 that Chevron has agreed to use the Fixed Sales Participations and the Facilities Fixed Ownership Interests (defined in <u>Section 4.1</u> below) in any future unit operation of NPR-1, and that DOE will make copies of this Agreement available for review by prospective bidders. At the request of DOE, Chevron shall deliver to the purchasers of DOE's interests in NPR-1 a certificate confirming

Chevron's agreement to the Fixed Sales Participations and the Facilities Fixed Ownership Interests.

(e) Nothing in this Agreement shall be deemed to prevent Chevron and DOE's Purchasers from modifying the Fixed Sales Participations or the Facilities Fixed Ownership Interests by mutual agreement of all affected parties at any time after the Last Sale Date (defined below). As used in this Agreement, the term **"Last Sale Date"** means the closing date of the sale to a third party of the last portion of DOE's interest in NPR-1 pursuant to the Act (financial adjustments under this Agreement, including pursuant to this <u>Section 1.2</u>, shall not be considered a sale to a third party for the purposes of determining the "Last Sale Date").

1.2 <u>Potential Financial Adjustments between DOE and Chevron for Differences between UPC Final Equity Participations and Fixed Sales Participations</u>. If the UPC Final Equity Participations for a Unitized Zone are different than the Fixed Sales Participations for that zone, financial adjustments shall be made only between Chevron and DOE to compensate the party whose Fixed Sales Participation is less than its UPC Final Equity Participation for the loss of the future benefit of such interest. Such adjustment shall be made on a zone by zone basis using the formula attached hereto as Exhibit A. The party whose Fixed Sales Participation is greater than its UPC Final Equity Participation for the zone in question shall owe the other party the "Adjustment Value" amount determined pursuant to the formula on Exhibit A. Such amount shall be determined when the zone's UPC Final Equity Participations have become Final. In no event shall amounts owing under this <u>Section 1.2</u> be subject to setoff or deduction of any kind against other amounts owing under this Agreement or the UPC, except that amounts owing under this <u>Section 1.2</u> from one party shall be set off against amounts due from the other party, resulting in a single, combined amount due under this <u>Section 1.2</u>. No payments shall be due under this Section until 30 days after all of the UPC Final Equity Participations for the Unitized Zones have become Final (the **"Section 1.2 Payment Due Date"**). The party owing sums to the other party under this <u>Section 1.2</u> shall also pay the other party interest on the single, combined amount due, at the rate of 5.85% per annum (not compounded), from the Last Sale Date to the date such payment is made.

## ARTICLE II

## UPC POST-TERMINATION ADJUSTMENTS

2.1 Post-termination Adjustments under the UPC. The parties acknowledge that upon termination of the UPC, a final accounting must be made of all production and costs (including capital costs of the Facilities as referenced in Section 4.3 below) during the term of the UPC. The parties hereto further agree that such adjustments shall be calculated on a zone by zone basis for each of the Unitized Zones. Such adjustments shall be performed in accordance with the provisions of the UPC, and the parties shall endeavor to complete the accounting work for the zone in question within 6 months after the later of (i) the termination of the UPC, or (ii) the date the UPC Final Equity Participations for such zone became Final. However, no payments shall be due with respect to a zone until all such cost and production accounting adjustments for all zones have been agreed upon by both DOE and Chevron and combined into a single amount due. The party owing sums as a result of the final accounting of production and costs under the UPC shall also pay the other party interest on the single, combined amount due at the rate of 5.85% per annum (not compounded), from the Last Sale Date to the date such payment is made.

2.2 Production Pricing Mechanism. If, upon termination of the UPC, the quantities of production received by DOE and Chevron, respectively, from a zone are not in balance with the UPC Final Equity Participations for such zone, then the party which received more production than it was entitled (based on the Final UPC Equity Participations) shall owe the other party a lump sum cash amount equal to the value of the excess production allocation. Such payment is a part of the final UPC cost and production balancing payments referenced in Section 2.1, and shall bear interest as provided in Section 2.1. To facilitate calculation of such production balancing payment, Chevron and DOE have agreed to use the following prices for the product types indicated below:

| | Product Type | Price |
|---|---|---|
| (i) | SOZ Oil | $17.43 per barrel |
| (ii) | Stevens Oil | $18.98 per barrel |
| (iii) | Natural Gas | $ 1.79 per MMBTU |
| (iv) | Propane | $ 0.44 per gallon |
| (v) | Mixed Butane | $ 0.36 per gallon |
| (vi) | Isobutane | $ 0.51 per gallon |
| (vii) | Natural Gasoline | $ 0.42 per gallon |

2.3 Funding of Post-Termination Payments under UPC. Chevron and DOE acknowledge that UPC Section 11(b) provides that "Termination [of the UPC] shall be followed by an adjustment of all [of the parties' prior] rights and obligations, including the rights and obligations growing out of the costs incurred, and the respective quantities of production received, by [DOE] and [Chevron], respectively, under the contract, on a fair and equitable basis". Chevron and DOE acknowledge and agree that this provision of the UPC constitutes a general obligation of the United States secured by its full faith and credit and is enforceable in a court of competent jurisdiction. The parties also acknowledge that payment by DOE of any amounts referenced in this Article II is subject to the availability of funds appropriated for such purpose.

2.4 Basis of Adjustments. Chevron and DOE acknowledge that the production balancing and cost sharing records of the unit formed by the UPC (the "Unit") currently do not reflect the Fixed Sales Participations and that the adjustments necessary to implement the UPC Final Equity Participations shall be based on the Unit's actual records of historical production and costs, not on figures reflecting the Fixed Sales Participations.

## ARTICLE III

## SECURITY FOR CERTAIN PAYMENTS

3.1 DOE Account. DOE shall establish a non-interest bearing deposit fund account with the U.S. Treasury Department (the **"Deposit Fund Account"**) to secure DOE's potential obligations under Section 1.2 of this Agreement. DOE shall deposit the DOE Deposit Amount (as defined in Section 3.3 below) in the Deposit Fund Account from the proceeds of the sale of its interest in NPR-1 within 30 days after the Last Sale Date. If, after offsetting all amounts owing between the parties under Section 1.2, DOE owes Chevron funds under Section 1.2, DOE shall make such payment after demand therefor by Chevron by promptly authorizing the U.S. Treasury Department to wire transfer to Chevron the sum due under Section 1.2 from the funds held in the Deposit Fund Account. Such payment shall be made within 30 days after the Section 1.2 Payment Due Date. Any funds remaining in the Deposit Fund Account after any such payment to Chevron (or a determination that no such amount is due from DOE to Chevron under Section 1.2) shall be immediately released from such account and delivered to the miscellaneous receipts account of the U.S. Treasury, and Chevron shall have no claim whatsoever to any of such remaining funds.

3.2 Chevron Letter of Credit. As security for its potential obligations under Section 1.2, Chevron shall, within 30 days after the Last Sale Date, deliver to DOE an irrevocable, direct draw, transferrable letter of credit, which letter of credit (i) shall be issued by a financial institution organized under the laws of the United States (or one of the States) acceptable to DOE, (ii) shall name the United States of America as beneficiary, and (iii) shall be in the amount of the Chevron L/C Amount (defined in Section 3.3 below) (the **"Letter of Credit"**). The Letter of Credit shall have an initial term of 12 months from the Last Sale Date. The Letter of Credit shall provide that it shall be automatically renewed by the issuer thereof for additional 12-month periods until all payments have been made under Section 1.2 above for all of the Unitized Zones, unless written notice of non-renewal is delivered to DOE at least 30 days prior to the then-current expiration date of the Letter of Credit. The Letter of Credit shall provide that DOE may draw thereon by presenting a sight draft in accordance with the provisions of this Section 3.2. The Letter of Credit shall be immediately drawable in full upon DOE's presentation of a sight draft to the issuer certifying that the issuer has notified DOE that it will not renew the then-current Letter of Credit and Chevron has failed to replace such Letter of Credit with another Letter of Credit, meeting all of the terms and conditions of this Section 3.2, at least 15 days prior to the expiry date of the then-current Letter of Credit. In addition, the Letter of Credit shall be immediately drawable in part upon DOE's presentation of a sight draft to the issuer certifying that Chevron has failed to pay an amount due under Section 1.2 of this Agreement within 30 days after the Section 1.2 Payment Due Date, and specifying the amount of such draw (which shall be the amount Chevron failed to pay). DOE shall return the Letter of Credit to Chevron within 10 business days after the earlier of (i) full payment by Chevron of any amounts owing to DOE under Section 1.2, or (ii) a determination that no such amounts are due from Chevron to DOE under Section 1.2.

3.3 Determination of Deposit and L/C Amounts. The amount of funds DOE shall deposit in the Deposit Fund Account (**"DOE Deposit Amount"**) shall equal (A) the sum of all "DOE Potential Payback Amounts" (calculated using the formula set forth on Exhibit B to this Agreement) for the Unitized Zones, plus (B) the amount of interest that would accrue on the sum determined under clause (A) over a 36 month period at the rate of 5.85% per annum (not compounded). The amount of Chevron's Letter of Credit (**"Chevron L/C Amount"**) shall equal (C) the sum of all "Chevron Potential Payback Amounts"

(calculated using the formula set forth on Exhibit B to this Agreement) for the Unitized Zones, plus (D) the amount of interest that would accrue on the sum determined under Clause (C) over a 36 month period at the rate of 5.85% per annum (not compounded). The parties acknowledge that the DOE Deposit Amount and the Chevron L/C Amount are only estimates of the potential amounts that each party may owe the other under Section 1.2 and thus do not constitute a limitation on the maximum amount that a party may owe under Section 1.2. Notwithstanding the foregoing, the parties acknowledge that DOE has no funds other than those that will be reserved in the Deposit Fund Account available for purposes of payment under Section 1.2, and is restricted by the Anti-Deficiency Act (31 U.S.C. § 1341) from making an obligation or entering into a contract for payments in excess of funds available and appropriated for this purpose. In the event the Deposit Fund Account does not contain funds sufficient to pay the amount DOE may owe under Section 1.2, DOE agrees promptly to request that the President of the United States transmit to Congress at the earliest available time a request for an appropriation for and in the amount DOE owes under Section 1.2 in excess of the amounts contained in the Deposit Fund Account.

3.4 Adjustments to Deposit and L/C Amounts. Upon the UPC Final Equity Participations for a particular zone becoming Final, the parties may, if mutually agreeable, agree to re-calculate, and subsequently reduce, both or either the DOE Deposit Amount and/or the Chevron L/C Amount. Such re-calculation shall be based on the UPC Final Equity Participations and the formula set forth on Exhibit B to this Agreement. No such adjustments may be made, however, until after the parties submit their equity reports to Netherland, Sewell & Associates, Inc., the Independent Petroleum Engineer, for the SOZ Zone. In addition, no such adjustments may increase the amount of the DOE Deposit Amount or the Chevron L/C Amount.

## ARTICLE IV

## FACILITIES

4.1 Allocation of Facilities.

(a) In order to facilitate the sale of DOE's interest in NPR-1, DOE and Chevron have agreed, for the purposes only of the sale of DOE's interest in NPR-1 and future operations by Chevron and DOE's Purchasers, to the allocation of the Facilities (defined below) to the following nine categories (each a **"Facility Category"**):

i. DGZ Facilities.

ii. SOZ Facilities.

iii. Stevens Zone Facilities.

iv. Carneros Zone Facilities.

v. Multi-Zone Facilities.

vi. DOE Facilities.

vii. Chevron Facilities.

viii. Materials and Supplies Inventory.

ix. Non-Capitalized Property ("Wall-to-Wall Inventory").

Such allocation of Facilities is set forth in the Schedule of Facilities attached to that certain transmittal letter dated May 19, 1997 from DOE to Chevron (the **"Schedule of Facilities"**).

(b) In addition, Chevron and DOE have agreed, for purposes only of the sale of DOE's interest in NPR-1 and future operations by Chevron and DOE's Purchasers, that the ownership interest of Chevron and DOE in each Facility shall be the ownership interest for that Facility specified on the Schedule of Facilities (the **"Facilities Fixed Ownership Interests"**).

(c) The parties agree that the Facilities Fixed Ownership Interests are final and binding on DOE and Chevron for purposes of the sale of DOE's interest in NPR-1 and future operations by Chevron and DOE's Purchasers. The Facilities Fixed Ownership Interests, however, shall not be binding on either DOE or Chevron with respect to the UPC or to any of the final accounting adjustments under the UPC referenced in Section 2.1.

(d) As used in this Article IV, the term **"Facilities"** shall mean and include all of the personal property and fixtures listed on the Schedule of Facilities, and the term **"Facility"** shall mean each specific item listed on the Schedule of Facilities.

(e) The Schedule of Facilities is intended to list all of the physical personal property and fixtures owned by DOE and/or Chevron and used in connection with operation of NPR-1. At the request of either

DOE or Chevron the parties shall from time to time update the Schedule of Facilities (i) to reflect any additions to or deletions from the items of physical personal property and fixtures used in connection with operations at NPR-1 that have occurred since the date hereof, (ii) to reflect reallocation of any items from one Facility Category to another Facility Category, or (iii) to add items which were inadvertently omitted from the original Schedule of Facilities. All references herein to the Schedule of Facilities shall be deemed to mean the original Schedule of Facilities, as modified by any such updates thereto agreed upon by both DOE and Chevron in writing.

4.2 Fixtures to be Treated as Personal Property. For the purposes of this Agreement and ownership and conveyance of the Facilities in connection with the sale of DOE's interest in NPR-1, the parties intend that any Facility which may be considered to be a "fixture" under applicable law shall be deemed severed from the real property to which it is attached and the ownership thereof established pursuant to this Agreement, and not based on the ownership of such real property.

4.3 Retrospective Adjustment of Capital Costs under the UPC.

(a) Some of the allocations of capital costs specified on the Schedule of Facilities are based upon the parties' equity interests under the UPC. Upon termination of the UPC, such capital costs shall be subject to readjustment between DOE and Chevron as part of the final accounting adjustments under the UPC referenced in Section 2.1 above.

(b) The adjustments referenced in Section 4.3(a) above are for the purpose of the final accounting between DOE and Chevron of capital costs incurred under the UPC and such adjustments shall not affect in any manner the Facilities Fixed Ownership Interests.

4.4 Implementation. To document the allocation of ownership in the Facilities established by this Article IV, Chevron and DOE shall execute and deliver, prior to the sale of DOE's interest in NPR-1, such documents and conveyances as are reasonably necessary to establish that the ownership of each Facility is the "Facility Fixed Ownership Interest" specified on the Schedule of Facilities. Such documents shall include any instruments reasonably necessary to cause the Facilities to be treated as personal property instead

of "fixtures" for the purpose of the sale of DOE's interest in NPR-1.

## ARTICLE V

## LEGAL MATTERS

5.1 Covenant Not to Sue. Chevron hereby agrees that it will not commence any judicial or administrative actions or proceedings that would delay, prevent, hinder or overturn the sale of DOE's interest in NPR-1 on any grounds related to this Agreement or the Fixed Sales Participations or Facilities Fixed Ownership Interests established hereby. In addition, Chevron hereby agrees that it will not commence any judicial or administrative proceedings against any purchaser of, or bidder for, DOE's interest, seeking in any respect to invalidate or change the Fixed Sales Participations or Facilities Fixed Ownership Interests established pursuant to this Agreement. To implement the foregoing, Chevron knowingly and voluntarily waives any and all rights it may have to bring any judicial or administrative challenge to the Fixed Sales Participations or the Facilities Fixed Ownership Interests.

5.2 Agreement to Execute Unit Operating Agreement.

(a) On or before June 13, 1997, Chevron agrees to execute and deliver to DOE in multiple counterparts that certain Unit Agreement and Unit Operating Agreement (**"Unit Operating Agreement"**) in the form attached hereto as Exhibit C, subject to completion of any exhibits thereto not yet completed. Between the date hereof and June 13, 1997 DOE and Chevron representatives will review the form of Unit Operating Agreement to identify possible modifications thereto. Any modifications mutually agreed upon by DOE and Chevron, acting reasonably and in good faith, prior to such date will be incorporated into the form executed by Chevron.

(b) DOE will oblige the DOE Purchasers to execute counterparts of the Unit Operating Agreement on or before the Last Sale Date and will thereafter cause counterparts of the Unit Operating Agreement executed by all such purchasers to be promptly delivered to Chevron.

(c) In the event this Agreement terminates pursuant to Section 6.2, the Unit Operating Agreement shall have no force or effect, and all counterparts

thereof executed by Chevron shall be returned to Chevron.

5.3 Challenges to Equity Finalization Numbers under UPC. If Chevron challenges any of the equity participation numbers issued by the ASFE for any of the Unitized Zones (which challenges may be made only to the extent permitted by the Process Agreement), the Fixed Sales Participations and the Facilities Fixed Ownership Interests shall remain entirely unaffected by the outcome of such challenge. If such a challenge is pursued for any given zone, the potential financial adjustments between Chevron and DOE referenced in Sections 1.2 and 2.1 above shall be deferred until a final resolution of the matter is obtained.

5.4 Inadmissibility in Judicial/Administrative Proceedings. The parties acknowledge and agree that this Agreement is intended solely to facilitate the sale of DOE's interest in NPR-1 and the processing of necessary accounting adjustments that will arise upon termination of the UPC. The Fixed Sales Participations, the Facilities Fixed Ownership Interests, the Zone Participating Percentages (defined on Exhibit A) and the other matters specified in this Agreement have been agreed upon solely for the ease and convenience of the parties for the limited purposes of this Agreement. Therefore, Chevron and DOE each agrees that neither it nor its representations will use or cite to this Agreement or any portion thereof in any administrative or legal proceedings on any subject whatsoever, other than in a judicial proceeding involving the enforcement or the interpretation of the terms of this Agreement.

5.5 Limitation on Default Remedies. Each of Chevron and DOE irrevocably agrees that if either party defaults under the terms of this Agreement in any respect, such default shall not entitle the other party to terminate this Agreement, or to rescind or revoke its agreement to the Fixed Sales Participations, the Facilities Fixed Ownership Interests, or, in the case of Chevron, its agreement not to challenge the validity of the sale of DOE's interest in NPR-1 specified in Section 5.1 above, but instead shall entitle the non-defaulting party to whatever monetary or other relief may be available under applicable law (other than setting aside or modifying the Fixed Sales Participations or the Facilities Fixed Ownership Interests).

## ARTICLE VI

## MISCELLANEOUS

6.1 No Effect on Protocol. The parties agree that nothing contained in this Agreement shall be deemed to modify or affect in any manner the procedures and schedules contained in Assistant Secretary for Fossil Energy Administrative Order Number 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process", as the same has been modified or supplemented to date.

6.2 Termination. This Agreement shall terminate and be of no further force or effect if the United States elects not to sell its interests in NPR-1. Such termination shall be effective on Chevron's receipt of a written notice from DOE that the United States has elected not to sell its interest in NPR-1 pursuant to the Act. If this Agreement is so terminated, (i) neither party shall be liable to the other for any costs or damages, and (ii) each party may cancel any deposit arrangements (or letters of credit) that have been established.

6.3 Notices. Except as otherwise set forth herein, all notices given in connection with this Agreement shall be in writing and shall be delivered either by personal delivery, by telegram, telex, telecopy or similar facsimile means, by certified or registered mail, return receipt requested, or by express courier or delivery service, addressed to the parties at the following addresses:

**Chevron:**

Chevron U.S.A. Production Company
4900 California Avenue
Bakersfield, California 93309
Attn: James Brady
Phone No.: (805) 633-4332
Fax: (805) 633-4319

with a copy to:

Chevron U.S.A. Production Company
4900 California Avenue
Bakersfield, California 93309
Attn: Cynthia A. Giumarra, Esq.
Phone No.: (805) 633-4695
Fax: (805) 633-4698

DOE:

U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585
Attn: Assistant Secretary of Fossil Energy
Phone No.: (202) 586-6660
Fax: (202) 586-7847

with a copy to:

U.S. Department of Energy
Office of General Counsel
1000 Independence Avenue, S.W.
Washington, D.C. 20585
Attn: Mary Egger, Esq.
Phone No.: (202) 586-2440
Fax : (202) 586-0325

or at such other address as either party shall have previously designated by written notice given to the other party in the manner set forth above. Notices shall be deemed given when received, if sent by telegram, telex, telecopy or similar facsimile means (confirmation of such receipt by confirmed facsimile transmission being deemed receipt of communications sent by telex, telecopy or other facsimile means); and when delivered and receipted for (or upon the date of attempted delivery where delivery is refused), if hand-delivered, sent by express courier or delivery service, or sent by certified or registered mail, return receipt requested.

6.4 Waiver. The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay on the part of any party in exercising any right, power or privilege under this Agreement or the documents referred to herein shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (i) no claim or right arising out of this Agreement or documents referred to herein can be discharged by one party hereto, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party hereto; (ii) no waiver which may be given by a party hereto shall be applicable except in the specific instance for which it is given; and (iii) no notice to or demand on one party hereto shall be deemed to be a waiver of any obligation of such party, or of the right of the party giving such notice or demand to take further action without notice

or demand as provided in this Agreement or the documents referred to herein.

6.5 Representation of Authority. Each party represents that it has good and sufficient authority to execute and deliver this Agreement and to perform its respective obligations hereunder. This Agreement has been duly authorized, executed, and delivered by the parties and constitutes the legal, valid and binding obligation of the parties, enforceable against them in accordance with its terms. Each individual signing this Agreement warrants and represents that he or she has full authority to execute the same on behalf of the party for whom he or she is signing.

6.6 Entire Agreement; Modification. This Agreement is intended by the parties as a final expression of their agreement with respect to the specific subject matter hereof, and is intended as a complete and exclusive statement of the terms and conditions of that agreement, and supersedes all prior agreements of the parties with respect to the specific matters covered hereby. This Agreement may not be modified, rescinded or terminated orally, and no modification, rescission, termination or attempted waiver of any of the provisions hereof (including this section) shall be valid unless in writing and signed by the party against whom the same is sought to be enforced.

6.7 Assignments; Successors. This Agreement shall apply to and be binding in all respects upon, and shall inure to the benefit of, the successors and assigns of the parties hereto to which this Agreement is expressly assigned pursuant to a written document.

6.8 Severability. In the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provisions. Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable. Notwithstanding the foregoing, if a court rules that the provisions of this Agreement regarding the Fixed Sales Participations are invalid or unenforceable, then DOE may terminate this entire Agreement.

6.9 Section Headings; Construction. The headings of articles and sections contained in this Agreement are provided for convenience only. They form no part of this Agreement and shall not affect its construction or interpretation. All references to articles and sections in this Agreement refer to the corresponding

articles and sections of this Agreement. All words used herein shall be construed to be of such gender or number as the circumstances require. This Agreement shall be construed without regard to the identity of the party which drafted the various provisions. Each and every provision of this Agreement shall be construed as though all of the parties participated equally in the drafting and any rule of construction that a document is to be construed against the drafting party shall not be applicable to this Agreement.

6.10 Governing Law. This Agreement shall be governed by, and construed under, the federal law of the United States.

6.11 Beneficiaries of Agreement. The provisions of Section 1.1, 4.1, 4.2, 4.4, 5.1, 5.2, 5.3 and 5.5 are also for the benefit of, and may be enforced by, DOE's Purchasers.

6.12 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute but one and the same agreement.

**IN WITNESS WHEREOF,** DOE and Chevron have each caused this Agreement to be executed as of the date first written above.

**UNITED STATES OF AMERICA**
**DEPARTMENT OF ENERGY**

By [signature]

Print Name Patricia F. Godley

Title Assistant Secretary for Fossil Energy

Date May 19, 1997

**CHEVRON U.S.A. PRODUCTION COMPANY**, a division of **CHEVRON U.S.A., INC.**

By [signature]

Print Name Carnie R. Block

Title VP-Gen MGR WBU Chevron USA Production Co.

Date 5/19/97

articles and sections of this Agreement. All words used herein shall be construed to be of such gender or number as the circumstances require. This Agreement shall be construed without regard to the identity of the party which drafted the various provisions. Each and every provision of this Agreement shall be construed as though all of the parties participated equally in the drafting and any rule of construction that a document is to be construed against the drafting party shall not be applicable to this Agreement.

6.10 Governing Law. This Agreement shall be governed by, and construed under, the federal law of the United States.

6.11 Beneficiaries of Agreement. The provisions of Section 1.1, 4.1, 4.2, 4.4, 5.1, 5.2, 5.3 and 5.5 are also for the benefit of, and may be enforced by, DOE's Purchasers.

6.12 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute but one and the same agreement.

IN WITNESS WHEREOF, DOE and Chevron have each caused this Agreement to be executed as of the date first written above.

| UNITED STATES OF AMERICA DEPARTMENT OF ENERGY | CHEVRON U.S.A. PRODUCTION COMPANY, a division of CHEVRON U.S.A., INC. |
|---|---|
| By [signature] | By ______ |
| Print Name Patricia F. Godley | Print Name ______ |
| Title Assistant Secretary for Fossil Energy | Title ______ |
| Date May 19, 1997 | Date ______ |

articles and sections of this Agreement. All words used herein shall be construed to be of such gender or number as the circumstances require. This Agreement shall be construed without regard to the identity of the party which drafted the various provisions. Each and every provision of this Agreement shall be construed as though all of the parties participated equally in the drafting and any rule of construction that a document is to be construed against the drafting party shall not be applicable to this Agreement.

6.10 Governing Law. This Agreement shall be governed by, and construed under, the federal law of the United States.

6.11 Beneficiaries of Agreement. The provisions of Section 1.1, 4.1, 4.2, 4.4, 5.1, 5.2, 5.3 and 5.5 are also for the benefit of, and may be enforced by, DOE's Purchasers.

6.12 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute but one and the same agreement.

**IN WITNESS WHEREOF,** DOE and Chevron have each caused this Agreement to be executed as of the date first written above.

| UNITED STATES OF AMERICA DEPARTMENT OF ENERGY | CHEVRON U.S.A. PRODUCTION COMPANY, a division of CHEVRON U.S.A., INC. |
| --- | --- |
| ______________________ | Carnie R Block |
| By ______________________ | By ______________________ |
| Print Name ______________________ | Print Name Carnie R. Block |
| Title ______________________ | Title Vice Pres & Gen. MGR - WBY |
| Date ______________________ | Date 5/19/97 |

# EXHIBIT A

(Formula for determining payments for Section 1.2)

$$\text{Adjustment Value} = \left[\frac{a \times b}{c}\right] \times d$$

Definitions:

- a = **DOE Sales Total:** The aggregate of all purchase prices paid to DOE pursuant to the purchase and sale agreements for DOE's interests in NPR-1. For the purposes of this calculation, the "purchase price" under each such purchase and sale agreement shall be the final purchase price under the terms of the applicable purchase and sale agreement as of the time of the closing of such sale.

- b = **Zone Participation:** The agreed percentage (expressed as a decimal) that each particular Unitized Zone will be presumed to contribute to the DOE Sales Total. The Zone Participation for the Unitized Zones are as follows:[1]

| | |
|---|---|
| DGZ | .0130 |
| SOZ | .2495 |
| Stevens | .7315 |
| Carneros | .0050 |

- c = **DOE Fixed Sales Participation:** The agreed DOE Fixed Sales Participation (expressed as a decimal) for each particular Unitized Zone. The DOE Fixed Sales Participations for the Unitized Zones are as follows:

| | |
|---|---|
| DGZ | .838726 |
| SOZ | .700119 |
| Stevens | .796357 |
| Carneros | 1.0000 |

- d = **Equity Change:** The amount (expressed as a decimal) by which DOE's UPC Final Equity Participation for each Unitized Zone increases or decreases DOE's equity participation in such zone compared to DOE's Fixed Sales Participation for such zone. An increase in DOE's equity participation means that Chevron will owe funds to DOE. A decrease in DOE's equity participation means that DOE will owe funds to Chevron.

- **Adjustment Value:** the amount of payment due from one party to the other for each particular Unitized Zone under Section 1.2.

---

[1] This list excludes the Non-Unit Area because it is not a Unitized Zone. The Non-Unit Area has been assigned a 0.0010 contribution to the DOE Sales Total.

Examples of foregoing using DGZ:

Example 1:

Assumptions: = **DOE Sales Total:** $1 billion
= **DOE's UPC Final Equity Participation for DGZ:** 85.3726%
= **DGZ Equity Change:** 1.5% increase in DOE interest

Formula: [$1,000,000,000 x .013] / [.838726] x .015 = $232,495

As a result of the above, Chevron would owe DOE $232,495.

Example 2:

Assumptions: = **DOE Sales Total:** $5 billion
= **DOE's UPC Final Equity Participation for DGZ:** 82.3726%
= **DGZ Equity Change:** 1.5% decrease in DOE interest

Formula: [$5,000,000,000 x .013] / [.838726] x (-.015) = ($1,162,477)

As a result of the above, DOE would owe Chevron $1,162,477.

[NOTE: The above examples also assume that the DGZ Zone Participation is .0130, that DOE's DGZ Fixed Sales Participation is .838726, and that any necessary adjustments to the Unit records already have been made to implement the DOE's DGZ Fixed Sales Participation]

# EXHIBIT B

(Formula for determining certain amounts for Section 3.3)

**DOE Potential Payback Amount** (per zone) = $\left[\frac{a \times b}{c}\right] \times e$

**Chevron Potential Payback Amount** (per zone) = $\left[\frac{a \times b}{c}\right] \times f$

Definitions:

- **a** = **DOE Sales Total:** The aggregate of all purchase prices paid to DOE pursuant to the purchase and sale agreements for DOE's interests in NPR-1. For the purposes of this calculation, the "purchase price" under each such purchase and sale agreement shall be the final purchase price under the terms of the applicable purchase and sale agreement as of the time of the closing of such sale.

- **b** = **Zone Participation:** The agreed percentage (expressed as a decimal) that each particular Unitized Zone will be presumed to contribute to the DOE Sales Total. The Zone Participation for the Unitized Zones are as follows:[1]

| | |
|---|---|
| DGZ | .0130 |
| SOZ | .2495 |
| Stevens | .7315 |
| Carneros | .0050 |

- **c** = **DOE Fixed Sales Participation:** The agreed DOE Fixed Sales Participation (expressed as a decimal) for each particular Unitized Zone. The DOE Fixed Sales Participations for the Unitized Zones are as follows:

| | |
|---|---|
| DGZ | .838726 |
| SOZ | .700119 |
| Stevens | .796357 |
| Carneros | 1.0000 |

[1] This list excludes the Non-Unit Area because it is not a Unitized Zone. The Non-Unit Area has been assigned a 0.0010 contribution to the DOE Sales Total.

- e = **DOE Potential Payback Points:** The difference (expressed as a decimal) between the DOE Fixed Sales Participation for a Unitized Zone and the estimated maximum potential reduction in DOE's equity participation percentage for such zone as a result of the UPC equity redetermination process. The DOE Payback Points for each of the Unitized Zones are as follows:

| | |
|---|---|
| DGZ | .0209 |
| SOZ[2] | .0507 |
| Carneros | .0705 |
| Stevens | To be determined[3] |

- f = **CUSA Potential Payback Points:** The difference (expressed as a decimal) between the DOE Fixed Sales Participation for a Unitized Zone and the estimated maximum potential increase in DOE's equity participation percentage for such zone as a result of the UPC equity redetermination process. The CUSA Payback Points for each of the Unitized Zones are as follows:

| | |
|---|---|
| DGZ | .0314 |
| SOZ[2] | .0546 |
| Carneros | .0000 |
| Stevens | To be determined[3] |

---

Examples of foregoing using DGZ:

Example 1:

Assumption: = **DOE Sales Total:** $1 billion

DOE Potential Payback Amount: $\left[\frac{\$1,000,000,000 \times .013}{.838726}\right] \times .0209 = \$323,943$

CUSA Potential Payback Amount: $\left[\frac{\$1,000,000,000 \times .013}{.838726}\right] \times .0314 = \$486,690$

---

[2] If Chevron and DOE have submitted their SOZ final equity reports to NSA before the date that is 30 days after the Last Sale Date, then in lieu of the estimated payback points for the SOZ listed above, the parties shall calculate the SOZ payback points based upon the proposed equity percentages for DOE specified in such equity reports to NSA. If such equity reports have not been submitted by the date 30 days after the Last Sale Date, then the SOZ estimated payback points listed above shall control.

[3] The parties shall calculate the Stevens payback points based upon the proposed equity percentages for DOE specified in their respective equity reports to NSA for the Stevens Zone (the DOE Potential Payback Points shall be calculated from Chevron's equity report to NSA and the Chevron Potential Payback Points shall be calculated from DOE's equity report to NSA).

Example 2:

Assumption: = **DOE Sales Total**: $5 billion

DOE Potential
Payback Amount: [$5,000,000,000 x .013] x .0209 = $1,619,718
[ .838726 ]

CUSA Potential
Payback Amount: [$5,000,000,000 x .013] x .0314 = $2,433,453
[ .838726 ]

[NOTE: **The above examples also assume that the DGZ Zone Participation is .0130, that DOE's DGZ Fixed Sales Participation is .838726, and that any necessary adjustments to the Unit records already have been made to implement the DOE's DGZ Fixed Sales Participation]**

# EXHIBIT C

## Form of Unit Operating Agreement

# EXHIBIT C

## Elk Hills Field

## Kern County, California

---

## UNIT AGREEMENT

## and

## UNIT OPERATING AGREEMENT

This AGREEMENT, entered into by and between ____[1]________________ hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators" effective as of 12:01 a.m. on ____________________, 1998.

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.
## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Affiliate" of a party shall mean any company that is owned or controlled by that party. For purposes of this definition, ownership or control of a company exists if 10% or more of the stock of such company that has the right to vote for directors is owned or controlled, directly or indirectly, by that party. The stock owned or controlled by that party shall be deemed to include all stock owned or controlled, directly or indirectly, by any other company that is owned or controlled by that party.

Wherever in this agreement an action requires a vote or concurrence of two or more parties, that vote or concurrence shall be deemed to require the vote of two or more parties which are not affiliates.

C. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Unit Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.A.2.

I. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

J. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the

---

[1] Blank to be filled with name of the buyer of interest that carries operatorship right.

inclusiveness of this term is specifically stated.

K. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Unit Area which are owned by parties to this agreement.

L. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Unit Area which are owned by the parties to this agreement.

M. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

N. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

O. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

P. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or to drill around junk in the hole to overcome other mechanical difficulties.

Q. The term "Unit Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated on a unitized basis for Oil and Gas purposes under this agreement insofar and only insofar as such lands, Oil and Gas Leases and/or Oil and Gas Interests cover the right to obtain production from the Zones described in Exhibit A-2. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A(1)."

R. The term "Zone" shall mean one of the five producing Zones specifically identified on Exhibit "A(2)" and also the non-producing Tulare Zone, also described in Exhibit "A(2)", which is used in aid of the operation of the Unit Area.

## ARTICLE II.
## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

_X_ A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement.
(2) Restrictions, if any, as to depths, formations, or substances.
(3) Parties to agreement with addresses and telephone numbers for notice purposes.
(4) Percentages or fractional interests of parties to this agreement.

_X_ B. Exhibit "B," Accounting Procedure.
_X_ C. Exhibit "C," Insurance.
_X_ D. Exhibit "D," Gas Balancing Agreement.
_X_ E. Exhibit "E," Non-Discrimination and Certification of Non-Segregated Facilities.

If any provision of any exhibit, except Exhibits "D" and "E is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

## ARTICLE III.
## UNITIZATION AND INTERESTS OF PARTIES

**A. Unitization:**

All Oil and Gas Interests and Oil and Gas Leases in each Zone are hereby unitized so that operations may be conducted as if the Unit Area consisted of a single Oil and Gas Interest. In pursuing operations the parties shall have the right to inject substances into the Unit Area together with the right to drill, use, and maintain injection wells in the Unit Area, and to use for injection purposes any producing, nonproducing or abandoned wells or dry holes in the Unit Area. The parties shall further have all the rights of ingress, egress, use of surface and subsurface, use for laying pipelines and any other rights in pursuit of unitized operations the same as if the entire Unit Area were single Oil and Gas Interest. Nothing herein, however, shall be construed to result in the transfer of title to the Oil and Gas Interests by any party to any other party or to the Operator.

**B. Oil and Gas Interests:**

If any party owns an Oil and Gas Interest in the Unit Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such Lease and the interest of the lessee thereunder.

**C. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Unit Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Unit Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Unit Area up to, but not in excess of, 100% of its share and shall indemnify, defend and hold the other parties free from any liability

therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Unit Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Unit Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.C. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**D. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interest, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.C. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

## ARTICLE IV.
## TITLES

**A. Title Examination:**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Unit Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas lease be lost through failure of title,

which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas leases and Interests; and,

(a) The party credited with contributing the Oil and Gas lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on the basis prescribed in Exhibit A(4), as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or Interest is affected by the title failure will thereafter be reduced in the Unit Area by the amount of the lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Unit Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the lease or Interest claimed to have failed, but if the party contributing such lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Unit Area shall be considered a Failure of Title as to such remaining Unit Area unless that absence of interest is reflected on Exhibit "A."

2. <u>Loss by Non-Payment or Erroneous Payment of Amount Due</u>: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas lease or Interest is not paid or is erroneously paid, and as a result a lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on the basis prescribed in Exhibit A(4), effective as of the date of termination of the lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Unit Area on account of ownership of the lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost lease or Interest, calculated on the basis prescribed in Exhibit A(4), for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost lease or Interest, on the basis prescribed in Exhibit A(4), up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such lease or Interest termination, would be attributable to the lost Lease or Interest on the basis prescribed in Exhibit A(4) and which as a result of such lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the lease or Interest lost, for the privilege of participating in the Unit Area or becoming a party to this agreement.

3. <u>Other Losses</u>: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Unit Area on

account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any lease or interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

## ARTICLE V.
## OPERATOR

**A. Designation of Initial Operator and Responsibilities of Operator:**

__________________ shall be the Operator of the Unit Area and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party, and Operator shall not have fiduciary obligations to the Non Operators or be deemed to have established a confidential relationship with the Non-Operators. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Standards for Operatorship; Designations of Third Party Operators:**

No party to this agreement or third party may become Operator unless such party meets the following minimum requirements: The proposed Operator has: 1) minimum assets of Two Hundred Million U.S. Dollars ($200,000,000.00); and 2) either directly or through its affiliates operated oil and gas properties with at least 250 wells in the aggregate or retained supervisory personnel who have operated at least 250 wells. The named Operator and any other party to this agreement hereafter designated as Operator may delegate its right to serve as Operator to a third party contractor meeting the foregoing standards, provided no such delegation may impose on Non-Operators total costs and expenses in excess of the total costs and expenses that would have been incurred in the absence of such delegation. If the named Operator in Article V.A. does not meet the foregoing standards, that Operator shall immediately so notify the Non-Operators and within 30 days of such notice delegate its rights to act as Operator to a third party contractor that does meet those standards.

**C. Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Unit Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on weighted ownership for voting purposes as shown on Exhibit "A(4)" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within one hundred twenty (120) days from its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material ongoing breach of this Agreement, not cured within the allowable period, which will cause significant financial harm to the Parties or a material adverse change in valuation of the Unit Area.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Unit Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on weighted ownership for voting purposes as shown on Exhibit "A(4)"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on weighted ownership for voting purposes as shown on Exhibit "A(4)" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to

serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Unit Area based on Exhibit "A."

4. Voting When Only Two Parties: At any time when there are only two parties to this agreement, Article V shall require only the vote of the owner of the majority interest in the Unit Area based on weighted ownership interests in accordance with Exhibit A(4). However, when the owner of the majority interest in the Unit Area was the former Operator and was removed or deemed to have resigned, and elects not to vote for any successor Operator or votes only to succeed itself and the owner of the minority interest in the Unit Area has a weighted ownership interest greater than 20% of the Unit Area, then only the vote of the owner of the minority interest shall be required to select the successor Operator. If, however, the owner of the majority interest in the Unit Area was the former Operator and was removed or deemed to have resigned, and elects not to vote for any successor Operator or votes only to succeed itself and the owner of the minority interest in the Unit Area has a weighted ownership interest less than or equal to 20%, then the owner of the minority interest may only select as successor Operator a third party meeting the standards set forth in Article VB and may not elect itself as successor Operator even if it meets those standards.

**D. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**E. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Unit Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Unit Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Unit Area or any operations for the joint account thereof, and shall keep the Unit Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide Dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Unit Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Unit Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Unit Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all

information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder.

(a) Operator will promptly advise Non-Operators of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates. Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Unit Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require naming Operator and all parties to this agreement as additional insureds.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A. Operations:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Unit Area, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. No operation hereunder shall be conducted without the consent of at least two parties in the aggregate owning not less than fifty-one percent (51%) of the working interest based on the weighted ownership for voting pursuant to Exhibit A(4). The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.A.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than one hundred twenty (120) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein: *provided*, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XII) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.A.4. in the event of a Deepening operation and in accordance with Article VI.A.5. in the event of a Sidetracking operation.

2. Operations by less Than All parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.A.1. or VI.B.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in

the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties regardless of whether Operator is itself a Consenting Party. Consenting Parties, when conducting operations on the Unit Area pursuant to this Article VI.A.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" for the relevant Zone or (ii) carry only its proportionate part (determined by dividing such party's interest in the relevant Zone by the interests of all Consenting Parties in the relevant Zone) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i) . In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.A.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.A.6. and VI.D.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking, Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.B.1., all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.D. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) 300 % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) 300 % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.A., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.A.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to

its actual depth, calculated in the manner provided in Article VI.A.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.A.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties 300 % of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.A. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.D.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.E., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.A.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.A.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.A.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest

as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all the parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.A.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.A.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.A.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.A.1., to all parties (including Non Consenting Parties). Thereupon, Articles VI.A.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.A.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses:

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening.

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.E.

5. Sidetracking. Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.A.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.A.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the

prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.A., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Unit Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

**B. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.A.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

> All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.A.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.A.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provisions of Article VI.A.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.A.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.A.2 shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletions have recouped their costs pursuant to Article VI.A.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting Party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.A.1 and Article VI.A.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

**C. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of Two Hundred Thousand Dollars ($200,000.00) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property, but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of fifty thousand Dollars ($50,000.00). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.C. (except in connection with an operation required to be proposed under Articles VI.A.1 or VI.B., which shall be governed exclusively by those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30)

days thereof Operator secures the written consent of two or more* parties owning a majority interest based on ownership weighted for the relevant Zones as shown on Exhibit "A" and entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

D. Abandonment of Wells:

1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.A.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.A.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle Operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the leasehold insofar and only insofar as such leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes an Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the relevant Zone to the aggregate of the percentages of participation in the relevant Zone of all assignees. There shall be no readjustment of interests in the remaining portions of the Unit Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.D.1. or VI.D.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded

---

* Subject to change depending on number of parties.

the opportunity to elect to take over the well in accordance with the provisions of this Article VI.D.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration costs for such well as provided in Article VI.A.2.(b).

**E. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, such operation shall not be terminated without consent of parties bearing __51_% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.A.1., and the provisions of Article VI.A. or VI.D. shall thereafter apply to such operation, as appropriate.

**F. Taking Production in Kind: Gas Balancing Agreement Attached**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Unit Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Unit Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Unit Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

## ARTICLE VII.
## EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Unit Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such

party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Unit Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and therewith (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Unit Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Unit Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the-purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Unit Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Unit Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more. This provision supersedes Paragraph I.3.A of Exhibit C hereto.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation

the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below.

1. <u>Suspension of Rights:</u> Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Unit Area, based on weighted ownership for voting purposes as shown on Exhibit "A(4)," after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VIA. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. <u>Recovery of Damages:</u> Non-defaulting parties or Operator for the benefit of non-defaulting parties may utilize the alternative dispute resolution (ADR) provision of Article XVII (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from utilizing the ADR provision of Article XVII to collect consequential damages accruing to such party as a result of the default.

3. <u>Deemed Non-Consent:</u> The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling of a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.A. or VI.B., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not seek recovery of the unpaid amount.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. <u>Advance Payment:</u> If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem

taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C.

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

## ARTICLE VIII.
## ACQUISITION, MAINTENANCE, OR TRANSFER OF INTEREST

**A. Surrender of leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Unit Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Unit Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement lease taken before expiration of an existing lease, promptly upon expiration of the existing lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement lease, insofar as such lease affects lands within the Unit Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such lease within the Unit Area, which shall be in proportion to the interests held at that time by the parties in the Unit Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Unit Area to the aggregate of the percentages of participation in the Unit

Area of all parties participating in the purchase of such renewal or replacement lease. The acquisition of a renewal or replacement lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Unit Area vary according to depth, then their right to participate proportionately in renewal or replacement leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement leases whether they are for the entire interest covered by the expiring lease or cover only a portion of its area or an interest therein. Any renewal or replacement lease taken before the expiration of its predecessor lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement lease becomes effective; but any lease taken or contracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal or replacement lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Unit Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling parties shared the cost of drilling the well. Such acreage shall become a separate Unit Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Unit Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Unit Area which are in support of well drilled inside the Unit Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the Unit Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Unit Area or in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or

2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Unit Area.

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by one or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Unit Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Unit Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**F. Notice of Intent to Sell:**

Each party agrees to notify the other parties no less than thirty (30) days prior to selling all or any part of its interest in the Unit Area, so that the other parties may have the opportunity to present proposals to purchase the interest to be sold. Within ten (10) days after receiving such notice, each of the other parties may reply by notifying the party proposing to sell whether the replying party wishes to purchase and, if so, the purchase price and other terms of the proposed purchase. Any of the parties receiving the thirty (30) day notice who does not timely reply shall be deemed to have waived any and all rights under this provision. If the party giving the initial thirty (30) day notice receives a timely notice from one or more of the other parties, no sale shall take place within the thirty (30) day period following the initial notice. During that interval, the parties timely replying to the thirty (30) day

notice may present proposals to purchase, but the party desiring to sell shall be under no obligation to accept or to negotiate any such proposals and no commitment made by the party desiring to sell shall be effective unless it is set forth in writing. Thirty (30) days after delivery of the initial notice the other parties' rights under this paragraph shall expire, and the party desiring to sell shall be free to sell to anyone, on any terms and at any time.

The provisions of this Article VIII F shall not apply to any transfers by a party to its affiliates or to any transfers in connection with a merger, reorganization or consolidation.

## ARTICLE IX.
## IMPROVED OIL RECOVERY PROGRAMS

**A. Improved Oil Recovery Programs:**

Operator shall not undertake any new improved oil recovery program (including, without limitation, a program that accelerates production) involving injection of gas, water or other substance by any method, whether now known or hereafter devised, without the party who is proposing the new improved oil recovery program first obtaining the consent of not less than two (2) parties in the aggregate owning not less than fifty-one per cent ( 51 %) of the working interest in the Zone in which such program is proposed to be conducted. If any party should desire to propose a new improved oil recovery program for a Zone in which such party has not otherwise relinquished its interest, such party shall give written notice of the proposed program to the parties who have not otherwise relinquished their interest in such objective Zone, specifying the work to be performed, the location, the objective Zone and the estimated cost of the program. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing the new improved oil recovery program whether they approve the proposed program. Failure of a party to whom such notice is delivered to reply within the time period above shall constitute a vote to disapprove the proposed program. After the requisite vote authorizing such a program is acquired in accordance with this Article IX the parties shall be obligated to contribute their proportionate shares of the program costs and the Operator shall proceed with the conduct of the approved program.

At any time when there are only two parties who own interests in the Zone in which a new improved oil recovery program is proposed, the project may be approved by the affirmative vote of the owner of the larger interest in the Zone. If the two parties have an equal one-half interest in the Zone, such a program shall require the approval of both parties.

Notwithstanding anything contained in this agreement to the contrary, program proposals under this Article IX shall take precedence over any proposals made in accordance with Article VI of this agreement in the event of a conflict. A conflict shall be deemed to exist if any proposal under Article VI would to any degree compromise or interfere with Article IX programs.

**B. Above Ground Facilities:**

This agreement shall not be deemed to require any party to participate in the construction or operation of any gasoline plant, sulphur recovery plant, dewaxing plant or other above ground facilities to process or otherwise treat production, other than such facilities as may be required for treating production in ordinary operations and such facilities as may be required in the conduct of operations authorized under Article IX.A.

## ARTICLE X.
## INTERNAL REVENUE CODE ELECTION

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulations §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Unit Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE XI.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed fifty thousand Dollars ($ 50,000.00 ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the Operator shall provide written notice of same to Non-Operators. Thereafter, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of

handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XII.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XIII.
## NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIV.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as long as any well in the Unit Area is capable of production of Oil and/or Gas in paying quantities, and for an additional period of One Hundred Eighty (180) days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Unit Agreement and Unit Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XV.
## COMPLIANCE WITH LAWS AND REGULATIONS

A. Laws, Regulations and Orders:

This agreement shall be subject to the applicable laws of the state in which the Unit Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

B. Governing Law:

This agreement and all matters pertaining hereto, including but not limited to matters of performance non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Unit Area is located. If the Unit Area is in two or more states, the law of the state of California shall govern.

**B. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Unit Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies or any other Federal, State or local regulatory authority to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

## ARTICLE XVI.
## MISCELLANEOUS

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Unit Area or which own, in fact, an interest in the Unit Area.

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Unit Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

**E. Word Usage:**

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE XVII.
## DISPUTE RESOLUTION

**A. Resolution of Disputes:**

The parties shall resolve any controversy or claim, whether based in contract, tort or otherwise, arising out of, relating to, or in connection with this agreement, the scope, breach, or validity of the agreement; or the commercial or economic relationship of the parties (DISPUTE) in accordance with this Exhibit. The parties' agreement to resolve Disputes pursuant this provision shall survive the expiration or termination of the agreement.

1. The parties shall first seek to resolve any Dispute by negotiations between authorized representatives.
2. If the Dispute has not been resolved by negotiations within thirty days of it having been raised either party may initiate mediation of the Dispute by sending the other party a written request that the Dispute be mediated. The party receiving the request will promptly respond to the requesting party so that the parties can jointly select a mediator and schedule the mediation session.
3. The mediation contemplated by the parties is intended to be a voluntary process in which a third party, who has no power to decide the outcome, facilitates communication among the parties to promote understanding among them and, where possible, to arrive at a mutually acceptable resolution of their Dispute. The mediation shall take place in __________, __________ at the offices of ______________________________. unless the parties mutually agree to a different location.
4. No formal rules of evidence apply to the mediation, and there will be no stenographic record of any mediation meeting. It is expected that, in the mediation, each party will have a representative who is not acting as legal counsel and who is authorized to make the decisions which are part of the process.
5. Mediation sessions are private. The parties and their representatives may attend

mediation sessions. Other persons may attend only with the consent of all the parties and the mediator.

6. Confidential information disclosed to a mediator by the parties or by a witness in the course of the mediation shall not be divulged by the parties or the mediator. All records, reports, or other documents received by a mediator while serving in that capacity shall be confidential. The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any judicial forum or adversary proceeding. The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitration, judicial, or other proceeding:
   a. views expressed or suggestions made by another party with respect to a possible settlement of the Dispute;
   b. admissions made by another party in the course of the mediation proceedings;
   c. proposals made or views expressed by the mediator; or
   d. the fact that another party had or had not indicated a willingness to accept a proposal for settlement made by the mediator.

7. There shall be no stenographic record of the mediation process.

8. Should the mediation not result in a settlement of any or all issues, the party who initiated the mediation will, within five days of the termination of the process, submit a final written offer for settling all outstanding claims; including the other party's counterclaims, if any, or a notice that it will not offer to settle the Dispute. Within five working days of its receipt of the offer or notice, the party receiving the offer must either accept or reject the offer, if any, or submit its own settlement offer as to all outstanding claims, or a notice that it will not offer to settle the Dispute. Within five working days of its receipt of the other party's response, the party who initiated the mediation must accept or reject the other party's offer, if any, as to all outstanding claims. If the claims are not settled within three working days of the last settlement offer, either party may submit the outstanding claims to Binding Arbitration under the terms set forth in XVII.B of this agreement.

9. Either party may withdraw from the mediation after having attended the initial meeting which shall occur no later than ninety days after notice of the election to mediate by one of the parties as set forth above, but withdrawal shall not excuse the obligations relating to communications concerning written settlement offers as set forth above.

**B. Binding Arbitration:**

1. <u>Arbitrators</u>
   a. Unless the parties otherwise agree, one arbitrator will decide the claim.
   b. The arbitrator will be an attorney admitted to practice in the State of California. The arbitrator will disclose to the parties before selection of details of his or her previous representation or work for either party and any financial or personal interest in or bias with respect to each party or the property or interest or with respect to the results of the arbitration proceeding.
   c. Each party shall select and provide to the other party for that party's consideration a list of five arbitrators. A party receiving nomination must accept or reject the nomination in writing. If after thirty working days after the notice of arbitration the parties have failed to select the arbitrator, then application shall be made to the Los Angeles office of JAMS/Endispute ("JAMS") to provide a list of five qualified nominees. Each party will have five working days after receiving the list to strike two nominees. If two or more nominees remain after expiration of said period to make the strikes, JAMS will select the arbitrator from the remaining nominees.
   d. Throughout the proceedings, the arbitrator will promptly provide the parties with copies of all documents filed by each party and not theretofore provided to the other party. The arbitrator will decide all claims and other issues in Dispute (except as specifically provided herein) including whether any claim may be arbitrated, conduct of the arbitration, discovery issues, admissibility of evidence, and interpretation and application of these arbitration terms.
   e. The arbitrator has authority and power to proceed Ex Parte if either party fails after reasonable notice to attend hearings or conferences with the arbitrator, furnish the arbitrator with required papers, information, or briefs, or take any action required by these arbitration terms.
   f. If the arbitrator becomes unwilling or unable to serve or proceed with the arbitration, or is unsatisfactory to either party due to matters disclosed pursuant to paragraph B.1.b hereof, a replacement arbitrator will be selected under paragraph B.1.c of this agreement, provided, however, nominations must be made within five days of an arbitrator's notice to the parties of his or her resignation or the parties becoming aware of the arbitrator's inability to proceed.

2. <u>Representation</u>
   The parties may be represented by legal counsel or other technical or professional persons.

3. <u>Pre-Hearing Procedures</u>
   a. Unless the parties agree otherwise, a preliminary hearing with the arbitrator will be held within 15 working days of the selection of the arbitrator to assist the arbitrator in establishing proceedings, setting the hearing date within the next 90 days, and for other

purposes necessary or desirable for the efficient and expedited disposition of the proceedings.

Unless the parties agree otherwise, the maximum length of the arbitration hearing to be scheduled at or following the preliminary hearing will be five (5) consecutive and mutually convenient working days. The arbitrator will select the dates if the parties cannot agree. The arbitrator will send notice of the arbitration hearing to each party stating the procedures to be followed including the order of testimony.

b. Discovery. The parties intend there be a good faith but limited exchange of information, but only that information relevant to a disputed issue, without duplicating the costly, time-consuming, and burdensome procedures available in civil litigation.

(i) The parties will, within 30 days of the close of the preliminary hearing, designate and exchange the names and addresses of all witnesses who will be called at the arbitration hearing, a brief statement of each witness' expected testimony, and lists and copies of exhibits that may be presented at the hearing. A witness will be designated as a fact witness, an expert witness, or both. Unless otherwise agreed, each side may add no more than one additional witness to the list of witnesses who will be called after the period for producing that list has passed.

(ii) The parties may depose any person who will be called to testify at the hearing at a location convenient to the deponent..

(iii) Each party may submit to the arbitrator one set of requests for production of relevant documents, one set of interrogatories containing not more than 30 questions, including subparts, soliciting relevant information, and requests for depositions of individuals with relevant information who are not identified by the opposing party as witnesses. The arbitrator may order responses if discovery requests are reasonable in scope. Each party requesting documents, interrogatories, or depositions of persons who are not identified by the opposing party as witnesses will reimburse the opposing party for the opposing party's reasonable cost to respond to the request, including but not limited to attorney's fees, reproduction costs, staff time, and travel expenses.

(iv) The arbitrator may subpoena persons designated as witnesses, representatives of the parties, and persons with information relevant to the Dispute to appear for oral deposition.

(v) The arbitrator will establish a procedure to resolve discovery Disputes, and rule on the depositive motions promptly and efficiently. The procedure may include presenting motions by letter as opposed to formal pleadings and resolution by telephone conferences.

(vi) The arbitrator may impose sanctions that he or she deems appropriate, including but not limited to award of attorney's fees for a party's failure to identify witnesses and the substance of their testimony, to provide copies of exhibits, or to respond timely and in good faith to discovery requests. The arbitrator may extend any deadline in the interest of fairness if a party fails to comply with the arbitration terms.

c. At least 30 working days before the arbitration hearing, the parties will jointly prepare and file with the arbitrator an agreed pre-hearing statement setting out the disputed issues to be decided by the arbitration, statement of agreed facts, the identity of all witnesses to be called, a list of exhibits that will be used, and the copies of documents concerning the disputed issues that the parties agree should be provided to the arbitrators.

d. Each party will also submit a pre-hearing brief unless the parties agree otherwise. Plaintiff's brief as to all claims will be due no later than 30 working days before the arbitration hearing. Defendant's brief as to all claims, including defendant's counter-claims, will be due no later than 20 working days before the hearing.

4. Hearing

a. The arbitration will be held in Bakersfield, California at a location agreed to by the parties unless the parties otherwise agree.

b. The hearing will begin on a Monday no later than ninety (90) working days after the preliminary hearing. The maximum length of the hearing is five consecutive working days. Each party will have one half of the scheduled time for its case including direct, redirect, and rebuttal testimony, cross-examination of the opposing party's witnesses, and opening and closing statements, but excluding time attributable to the opposing party's objections during the hearing and questions. The arbitrator will preside at the hearing and rule on the admission and exclusion of evidence and procedural questions and may exercise all other powers conferred by statute on an arbitrator. The hearing will be conducted as if it were an informal court trial. The arbitrator may

question any witnesses appearing at the arbitration hearing. The parties may change these provisions by agreement.

c. Attendance of Witnesses and Production of Evidence

(i) The arbitrator may subpoena witnesses and require production of documents.

(ii) In addition to presenting evidence at the arbitration hearing through the testimony of qualified witnesses, either party may submit testimony by affidavit. Either party may submit testimony by affidavit as follows: Testimony offered by affidavit must be submitted to the opposing party and the arbitrator at least 30 working days before the arbitration hearing. Either the opposing party or any arbitrator may, by written notice at least 15 working days before the arbitration hearing, request the individual affiant appear at the arbitration hearing for cross examination. If the affiant is not previously identified as a witness, the opposing party will also have a reasonable opportunity to depose the affiant and require, by giving notice within five working days after such deposition that the affiant appear at the hearing. If after said notice the affiant is not able to appear at the hearing, the hearing will be rescheduled. If the affiant does not appear as requested either for the arbitration hearing or the deposition for whatever reason after timely request by a party, the testimony of the affiant will be disregarded by the arbitrator for all purposes. A party may not advance an issue at the arbitration hearing, unless the party identified the issue in writing to the opposing party and the arbitrators at least 30 working days before the hearing. A party may not introduce or advance documentary evidence at the arbitration hearing unless it furnished a copy to the opposing party and identified it as an exhibit as provided in B.3.b(i) of this agreement, and to the arbitrator at least 30 working days before the hearing. A party may not call a witness unless the opposing party has had an opportunity to depose the witness and the nature of the testimony was previously disclosed in writing to the opposing party as provided in B.3.b(i) of this agreement and to the arbitrators at least 30 days before the hearing.

(iii) If a witness is unable for good cause to appear at the hearing, the arbitrator may extend or postpone the hearing as reasonably necessary in the interest of fairness.

(iv) All witnesses will give all testimony at the hearing under oath administered by a court reporter. The arbitrator must be present when evidence is given and/or admitted.

d. The arbitrator will be guided by common sense and justice in allowing evidence to be presented. No federal or state rule relating to the order of proof, the conduct of the hearing, or the presentation and admissibility of evidence will be applicable in the arbitration hearing except that the arbitrator must recognize and apply the attorney-client privilege and work-product immunity doctrine during the pre-hearing discovery and at the hearing. Any relevant evidence including hearsay may be admitted by the arbitrator if reasonable persons would reasonably rely on it in the conduct of serious affairs, regardless of the admissibility of the evidence in a court of law.

e. The arbitrator will declare the hearing closed after the parties have presented their evidence and made their closing arguments. Time limits within which the arbitrator is required to make his or her decision will begin on the date the hearing closes. Unless expressly requested by the arbitrator, no briefs or other documents may be submitted by any party after the arbitration hearing concludes. If any such post-hearing brief is requested from one party the other party shall be given the opportunity and reasonable time to submit a reply brief.

f. The parties acknowledge that they have agreed to this arbitration provision to expedite settlement of any Dispute, and the arbitrator is instructed that any extention of time must be reasonable and of the shortest length necessary to accommodate the reason for the delay.

5. Award and Enforcement

a. Unless the parties agree otherwise, the arbitrator will decide each claim and disputed issue within 20 working days after the date the hearing closes based on applicable law and testimony, documents, and other materials the parties submit in accordance with this agreement. The

decision must be within the bounds set by the parties. The decision must be in writing, including findings of fact and conclusions of law. The arbitrator must sign the opinion.

b. The decision of the arbitrator is final and binding on the parties and non-appealable.

c. The arbitrator may award compensatory damages only. The arbitrator may not award, and the parties specifically waive rights to multiple damage awards that may be allowed by statute, or punitive or exemplary damages. The arbitrator may also, as appropriate, declare the rights of the parties or grant equitable relief.

d. Judgment may be entered on the award and the award may be judicially enforced. The award is final and binding and no appeal from the award may be taken on the grounds of error in application of law or findings of fact. After the arbitrator issues his or her decision, an aggrieved party may request an appropriate court to vacate the decision of the arbitrator only under the circumstances set out in California Civil Procedure § 1280 et seq.

6. General Terms

a. The parties may by mutual agreement modify any time period provided in this Article XVII.

b. The substantive law, including time bars, applicable to all claims and disputed issues, is the law of the State of California without regard to the choice of law rules of California that refer to the laws of any other jurisdiction.

c. Except as expressly provided in Article XVII.B.1.e of this agreement, no party may have any ex parte communication with the arbitrator. For the purposes of this agreement, ex parte communications means both oral communications without the participation of a representative from the opposing party (or the written consent of the opposing party) and written communications unless a complete copy of the communication is provided to the representative of the opposing party simultaneously with service on the arbitrator.

d. If the arbitrator's award as to all claims exceeds or equals the final settlement offer of the party who initiated the mediation process as to all claims provided in the mediation agreement attached hereto or the total amount claimed if the party who initiated the mediation process declined or failed to make a settlement offer, the arbitrator will award that party an additional sum equal to its reasonable cost. If the arbitrator's awards as to all claims equals or is less than the responding party's settlement offer as to all claims as provided in the mediation agreement or zero if the responding party declined or failed to make a settlement offer, the arbitrator will award the responding party a sum equal to its reasonable cost. If the arbitrator's award of all claims is greater than the responding party's final settlement offer as to all claims, but less than the final settlement offer of the party who initiated the mediation process as to all claims, or the total amount claimed if the party who initiated the mediation process declined or failed to make a settlement offer, each party will pay its own costs and its one-half share of the arbitrator fees and expenses and other arbitration costs. Costs as used in this section of this agreement includes a party's attorney's fees and expenses, staff time and expenses, including the party's discovery costs under B.3 through B.4 of this agreement and the party's one-half share of the arbitrator's fees and expenses and other arbitration costs.

e. Subject to B.6.f of this agreement, either party may hire a court reporter to produce a stenographic record at depositions, the hearing, or other proceedings. The requesting party must notify the other party of the arrangements in advance and must pay the costs incurred. If the opposing party wants a copy of the record, that party will be provided a copy on payment of one-half of the cost of the stenographic record.

f. All proceedings and all information obtained during discovery or the proceedings and the settlement agreement if any or the arbitrator's award will be kept confidential and may not be disclosed or used by either party for a period of four years from the date of the arbitrator's award except as provided in these arbitration terms and except in connection with an action to enforce or challenge the arbitrator's award if any, or as may be required by law or court order.

g. In computing any period described or allowed by these arbitration terms, the day of the act, event, or default from which the designated period begins to run will not be included. The last day of the period

is included unless it is a Saturday, Sunday, or legal holiday, in which event the period runs until the end of the next day that is not a Saturday, Sunday or U.S. legal holiday. The last day of the period will end for the purposes of compliance with this agreement at 5:00 p.m., Pacific Time.

h. Whenever these arbitration terms provide for notice, exchange of information or other communications between the parties, the notice will be delivered to the representative designated in this agreement. Notice to or service on any person other than a party's designated representative will not constitute notice or service on a party for purposes of these arbitration terms. Written notice to a party may be accomplished by personal service, overnight courier, facsimile or U.S. mail. Service is accomplished upon receipt at the business office of the designated representative. Notices, exchanges of information, and other communications must also be delivered to designated counsel, if any, for each party in the same manner as notice or service is provided to a party's designated representative.

i. An action to enforce or challenge these arbitration terms including an action to confirm or validate an arbitration award must be brought in Kern County Superior Court, Bakersfield, California.

j. Any party that proceeds under this arbitration agreement after it knows or should have known that a party or arbitrator has not complied with any provision or requirements of this agreement and that fails to file a written objection with the arbitrator within five calendar days after it knows or should have known of the non-compliance will be deemed to have waived its right to object.

IN WITNESS, WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

CHEVRON U.S.A. PRODUCTION COMPANY, a division of CHEVRON U.S.A., INC.

By:____________________
Print Name:____________________
Title:____________________
Date:____________________

[other signatures on additional pages]

**EXHIBIT A(1)**
**Description of Land**
**Comprising the Unit Area**

The Unit Area encompasses and includes the following interests in Land which are hereby made subject to this Unit Agreement and Unit Operating Agreement

Chevron Lands

[Insert]

Former United States Lands

[Insert]

[NOTE: Unit Area will be those lands currently subject to existing Unit Plan Contract.]

**Exhibit A(2)**
**Restrictions as to Depths**
**and Formations**

This Unit Operating Agreement has the effect of unitizing for development, operation and production each of the following described Zones within the Unit Area.

[Insert descriptions of Five Known Zones]

Each party hereto owning interests within the Unit Area lands that are outside of the above described Zones retains the sole right to explore for, develop and produce Oil and Gas therefrom for its own account so long as such operations do not unreasonably interfere with operations within the described Zones.

**Exhibit A(3)**
**Parties' Addresses and Telephone Numbers**

[To be supplied]

**Exhibit A(4)**
**Percentages or Fractional**
**Interests of the Parties**

The respective percentages or fractional interests of the parties in the four Zones described in Exhibit A(4) shall be as follows:

| Parties | Dry Gas Zone | Shallow Oil Zone | Stevens Zone | Carneros Zone | Asphalto Zone | Weighted Ownership for Voting |
|---|---|---|---|---|---|---|
| Chevron | 16.1274% | 29.9881% | 20.3643% | 0.0% | 0.0% | 22.88% |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Subject only to adjustments pursuant to Article IV, the foregoing percentages or fractional interests of the parties shall remain fixed and final for the entire term of this Unit Operating Agreement and shall not be subject to future changes or redeterminations. Nothing in this agreement shall be deemed to prevent the parties from modifying the foregoing percentages or fractional interests of the parties by mutual agreement of all affected parties at any time after the effective date of this agreement. Any adjustments to a party's interests set forth above, made as a result of the title provisions of Article IV, shall be made based on the proportion of that party's percentage participation in each Zone underlying the land for which any title adjustment is made that is attributable to the Oil and Gas Interest as to which there has been a title failure, and not on a surface acreage basis.

[NOTE: The Weighted Ownership for Voting of Chevron U.S.A. Production Company shall be 22.88%. The Weighted Ownership for Voting of the purchasers of interests from the United States shall be calculated by multiplying the percentage shares of the United States interests purchased by them by ____%]

**EXHIBIT "B"**

Attached to and made a part of that certain Unit Agreement and Unit Operating Agreement between ______________________, as Operator, and ______________________ as Non-Operators, dated ______________, 1998

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

1. **Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.
"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.
"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.
"Operator" shall mean the party designated to conduct the Joint Operations.
"Non-Operators" shall mean the Parties to this agreement other than the Operator.
"Parties" shall mean Operator and Non-Operators.
"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.
"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.
"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.
"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.
"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

2. **Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

3. **Advances and Payments by Non-Operators**

A. Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within fifteen (15) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B. Each Non-Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at ______________________ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

4. **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

COPYRIGHT© 1985 by the Council of Petroleum Accountants Societies.

COPAS

5. **Audits**

A. A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B. The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6. **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1. **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2. **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3. **Labor**

A. (1) Salaries and wages of Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations.

(2) Salaries of First Level Supervisors in the field.

(3) Salaries and wages of Technical Employees directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B. Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D. Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II.

4. **Employee Benefits**

Operator's current costs of established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

5. **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6. **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A. If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B. If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C. In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7. **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8. **Equipment and Facilities Furnished By Operator**

A. Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed ______ ____________ percent (______%) per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property less 20%. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9. **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10. **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgements and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, except that no charge for services of Operator's legal staff or fees or expense of outside attorneys shall be made unless previously agreed to by the Parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11. **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties. In the event Joint Operations are conducted in a state in which Operator may act as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

COPAS

# III. OVERHEAD

1. Overhead - Drilling and Producing Operations

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( ) Fixed Rate Basis, Paragraph 1A, or
( ) Percentage Basis, Paragraph 1B

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

( ) shall be covered by the overhead rates, or
( ) shall not be covered by the overhead rates.

iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

( ) shall be covered by the overhead rates, or
( ) shall not be covered by the overhead rates.

A. Overhead - Fixed Rate Basis

(1) Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate $ ____________
(Prorated for less than a full month)

Producing Well Rate $ ____________

(2) Application of Overhead - Fixed Rate Basis shall be as follows:

(a) Drilling Well Rate

(1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b) Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached. The adjustment shall be computed by multiplying the rate currently in use by the percentage increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers for the last calendar year compared to the calendar year preceding as shown by the index of average weekly earnings of Crude Petroleum and Gas Production Workers as published by the United States Department of Labor, Bureau of Labor Statistics, or the equivalent Canadian index as published by Statistics Canada, as applicable. The adjusted rates shall be the rates currently in use, plus or minus the computed adjustment.

B. Overhead - Percentage Basis

(1) Operator shall charge the Joint Account at the following rates:

COPAS

(a) **Development**

Four Percent ( 4 %) of the cost of development of the Joint Property exclusive of costs provided under Paragraph 10 of Section II and all salvage credits.

(b) **Operating**

Fourteen Percent ( 14 %) of the cost of operating the Joint Property exclusive of costs provided under Paragraphs 2 and 10 of Section II, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead - Percentage Basis shall be as follows:

For the purpose of determining charges on a percentage basis under Paragraph 1B of this Section III, development shall include all costs in connection with drilling, redrilling, deepening, or any remedial operations on any or all wells involving the use of drilling rig and crew capable of drilling to the producing interval on the Joint Property; also, preliminary expenditures necessary in preparation for drilling and expenditures incurred in abandoning when the well is not completed as a producer, and original cost of construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, except Major Construction as defined in Paragraph 2 of this Section III. All other costs shall be considered as operating.

2. **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $ ________:

A. ___5___ % of first $100,000 or total cost if less, plus

B. ___3___ % of costs in excess of $100,000 but less than $1,000,000, plus

C. ___2___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3. **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A. ___5___ % of total costs through $100,000; plus

B. ___3___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C. ___2___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4. **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

## IV. PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

1. **Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

2. **Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

COPAS

A. New Material (Condition A)

(1) Tubular Goods Other than Line Pipe

(a) Tubular goods, sized 2⅜ inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b) For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

(c) Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d) Macaroni tubing (size less than 2⅜ inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2) Line Pipe

(a) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b) Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus 20 percent, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c) Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d) Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3) Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4) Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2 A (1) and (2).

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2) Material used on and moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material.

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

COPAS

(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

3. **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished to Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of his share of such Material suitable for use and acceptable to Operator.

4. **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2. **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3. **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4. **Expense of Conducting Inventories**

A. The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

EXHIBIT C
Insurance

[to come]

**EXHIBIT D**
**Gas Balancing Agreement**

[to come]

**EXHIBIT E**
**Non-Discrimination and Certification of Non-Segregated Facilities**

[to come]

**Exhibit A(6)**
**Percentages or Fractional**
**Interests of the Parties**

The respective percentages or fractional interests of the parties in the four Zones described in Exhibit A(4) shall be as follows:

| Parties | Dry Gas Zone | Shallow Oil Zone | Stevens Zone | Carneros Zone | Asphalto Zone | Weighted Ownership for Voting |
|---|---|---|---|---|---|---|
| Chevron | 16.1274% | 29.9881% | 20.3643% | 0.0% | 0.0% | 22.88% |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

11*

Subject only to adjustments pursuant to Article IV, the foregoing percentages or fractional interests of the parties shall remain fixed and final for the entire term of this Unit Operating Agreement and shall not be subject to future changes or redeterminations. Nothing in this agreement shall be deemed to prevent the parties from modifying the foregoing percentages or fractional interests of the parties by mutual agreement of all affected parties at any time after the effective date of this agreement. Any adjustments to a party's interests set forth above, made as a result of the title provisions of Article IV, shall be made based on the proportion of that party's percentage participation in each Zone underlying the land for which any title adjustment is made that is attributable to the Oil and Gas Interest as to which there has been a title failure, and not on a surface acreage basis.

[NOTE: The Weighted Ownership for Voting of Chevron U.S.A. Production Company shall be 22.88%. The Weighted Ownership for Voting of the purchasers of interests from the United States shall be calculated by multiplying the percentage shares of the United States interests purchased by them by ____%]

**Agreement Regarding Equity Redetermination Process**

This Agreement Regarding Equity Redetermination Process (this "Agreement"), dated as of May 19, 1997, is by and between the U.S. Department of Energy ("DOE") and Chevron U.S.A. Production Company, a division of Chevron U.S.A. Inc. ("Chevron"). DOE and Chevron officials have been engaged in an effort to finalize all equity interests in the four unitized productive zones within Naval Petroleum Reserve No. 1 (Elk Hills) pursuant to section 3412(b) of the National Defense Authorization Act for Fiscal Year 1996, Pub.L. 104-106 ("Act"). In connection with this activity and upon the execution of the Agreement Regarding Fixing of Equity Interests at Naval Petroleum Reserve No. 1 for Purposes of Sale (hereinafter the "Decoupling Agreement") by DOE and Chevron, DOE and Chevron hereby agree:

**A. <u>Independent Petroleum Engineer Process for Shallow Oil Zone</u>.**

1. DOE will submit the pending Shallow Oil Zone ("SOZ") equity redetermination dispute to Netherland, Sewell & Associates ("NSA") for its recommendation of final SOZ equity to the Assistant Secretary for Fossil Energy ("ASFE"). Such recommendation by NSA shall constitute the advisory report of the independent petroleum engineer for purposes of both section 3412(b) of the Act and section 9(b) of the Unit Plan Contract dated June 19, 1944, as amended and supplemented (the "UPC").

2. The procedures of Assistant Secretary for Fossil Energy Administrative Order No. 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process," dated July 8, 1996, as amended and supplemented, will be utilized for the SOZ pursuant to a schedule to be agreed upon by DOE, Chevron and NSA. The parties will agree upon a SOZ schedule based on the procedural framework set forth in Assistant Secretary for Fossil Energy Order No. 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process (Supplement 2)," dated January 21, 1997.

3. The disposition of legal issues associated with the SOZ which are common to the other zones (e.g., issues relating to proved reserves, recovery factors, and the appropriateness of the use of API gravity as a weighting factor) will apply to the SOZ redetermination process, including, without limitation, the disposition of legal issues in the Settlement Agreement, dated January 6, 1997 and in the Stevens Zone Settlement Agreement Dated May 7, 1997 ("Stevens Settlement Agreement"). In furtherance of the foregoing, the parties specifically agree that,

notwithstanding the language of the Stevens Settlement Agreement, the Stevens Settlement Agreement shall apply to the SOZ redetermination process. Any new legal issues arising in the SOZ will be addressed by following the procedures set forth in Assistant Secretary for Fossil Energy Administrative Order No. 96-01 (Supplement No. 1), dated October 11, 1996.

4. In light of the substantial body of prior equity work already completed by the parties on the SOZ, the parties shall use their best efforts to agree on the scope and methodology to be used in the SOZ equity work, including manual sand counting and other issues, with the goal of facilitating and shortening the SOZ equity study process. The parties will use a production and data cutoff date of December 31, 1997.

5. Upon the execution of the Decoupling Agreement, the ASFE will withdraw the Preliminary SOZ Redetermination Decision, dated March 28, 1997. Upon withdrawal of the Preliminary SOZ Redetermination Decision, the parties agree to set aside the Independent Petroleum Engineer Report issued by James K. Dietrich and Associates (hereinafter the "Dietrich Report"), dated November 1995, on the SOZ and to provide a joint instruction to NSA to disregard the Dietrich Report for all purposes.

6. Neither DOE nor Chevron, or their representatives, will use, cite or reference either (i) the Preliminary SOZ Redetermination Decision, or (ii) the Dietrich Report on the SOZ, or any portions thereof, in any administrative or legal proceedings on any subject whatsoever, or in the SOZ equity finalization process described herein.

7. The ASFE's decision on SOZ equity issued as a result of the process described in this agreement will be both a redetermination of equity pursuant to sections 2(f) and 9(b) of the UPC, as well as a final determination of equity pursuant to § 3412(b) of the Act.

8. Chevron and DOE acknowledge that as a result of the process specified in this Agreement, the date for issuance of the ASFE's final SOZ equity redetermination decision will be delayed until after completion of the procedural steps described in paragraphs B.1 through B.3 below. Chevron waives any claim it may have as a result of the process specified in this Agreement that the ASFE's final SOZ decision is unduly delayed, was due by a certain date, or that following the procedures set forth in this agreement violates any requirements of § 3412(b) of the Act or the UPC.

B. Equity Redetermination Process.

Chevron and DOE agree on the following procedures for the ASFE redeterminations of equity for all four unitized zones and for any review of such equity redetermination decisions:

1. NSA will provide a provisional equity recommendation report for each zone. Chevron and DOE will review such report for factual accuracy, error or misinterpretation and provide written comments thereon to NSA within 30 days after issuance of the provisional recommendation, or such later date as determined by the ASFE upon the request of either party, which request will not be unreasonably withheld.

2. NSA shall issue its final recommendation report to the ASFE, with a copy to Chevron. Chevron and DOE will review the final recommendation and provide written comments thereon to the ASFE within two weeks after issuance of the final recommendation, or such later date as determined by the ASFE upon the request of either party, which request will not be unreasonably withheld.

3. After receipt of the NSA recommendation for a zone, the ASFE shall issue a preliminary decision on such zone and shall provide the Chevron and DOE equity teams with copies of the documents relied upon in reaching the preliminary decision which are not already in the equity teams' possession, including, without limitation, any geophysical, geological or petrophysical data relied upon by the ASFE, but excluding draft documents, any legal or technical advice provided to the ASFE, or documents concerning the deliberative process of reaching the preliminary decision. The Chevron and the DOE equity teams shall have the opportunity to review the preliminary decision and provide written comments thereon to the ASFE within 30 days after its issuance, or such later date as determined by the ASFE upon the request of either party, which request will not be unreasonably withheld.

4. The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an ex parte basis. Any written materials submitted to the ASFE by either equity team shall be provided to the other party. The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.

5. The ASFE shall use reasonable efforts to issue a preliminary decision on a zone within 6 months after the ASFE's receipt of written comments, if any, from DOE and Chevron on the NSA final recommendation for such zone. The ASFE shall use reasonable efforts to issue a final decision on such zone within 3 months after receipt of written comments, if any, from DOE and Chevron on the ASFE's preliminary decision.

6. In issuing the equity redetermination decisions for a zone, the ASFE may accept the NSA recommendations or reject the NSA recommendations in whole or in part. If the ASFE decides to reject the NSA recommendations in whole or in part, such decision must be based on a determination by the ASFE that one or more of the following criteria exist:

   a. The NSA recommendation(s) was arbitrary or capricious;

   b. The NSA recommendation(s) was a result of fraud;

   c. The NSA recommendation(s) was a result of undue influence, unless such undue influence had no impact on NSA's recommended equity participation percentages;

   d. The NSA recommendation(s) was inconsistent with statute, the UPC or an applicable Settlement Agreement between Chevron and DOE, unless such inconsistency had no impact on NSA's recommended participation percentages;

   e. The NSA recommendation(s) was not based on substantial geophysical, geological and/or petrophysical data; or

   f. The NSA recommendation(s) resulted from an approach or methodology which is inconsistent with sound oil field engineering principles.

7. If an ASFE decision adopts the NSA recommendation for a particular zone, that ASFE decision shall be final and not subject to challenge by Chevron. If an ASFE final decision rejects, in whole or in part, NSA's participation percentage recommendations, Chevron may challenge the ASFE decision and such challenge shall be referred to the Department of Energy Office of Hearings and Appeals ("OHA") for a decision. In this event, OHA shall review only the points on which the ASFE rejected NSA's recommendations that have been challenged by Chevron, and in all other respects the ASFE's decision shall be final. Chevron and DOE agree that the standard of review to be applied by OHA shall be the standards set forth in the Administrative Procedures Act (5 U.S.C. § 706) and the Wunderlich Act (41 U.S.C. §§ 321 and 322). Chevron shall file with OHA any challenge to an ASFE final redetermination decision for a zone within 6 months after the date of such ASFE final redetermination decision

for the zone in question. If Chevron does not file such challenge within such 6-month period, the ASFE redetermination decision for the zone in question shall be final and binding on the parties and not subject to challenge by Chevron.

8. If OHA denies the Chevron challenge to the ASFE's decision on an issue, the ASFE's decision on such issue shall be final and binding on the parties. If OHA upholds the Chevron challenge on an issue, then the NSA recommendation(s) at issue shall be adopted as final. If OHA determines to uphold the ASFE decision in part, then OHA, in its discretion, may either (i) direct that the NSA recommendation on the issue be adopted by the ASFE, (ii) remand the specific issue back to the ASFE for further determinations in accordance with OHA's instructions, or (iii) render a decision on such issue based on the record before it. If OHA remands an issue to the ASFE, Chevron shall have the right to challenge any further determination of the ASFE on such remand under the process set forth in paragraph B.7 above.

9. The ASFE's determination of final equity shall be final, binding and non-appealable unless challenged by Chevron under the procedures and criteria set out above, in which case OHA's decision shall be final, binding and non-appealable. In order to avoid the potential for protracted and costly litigation, Chevron and DOE have agreed, as an alternative to judicial resolution of any dispute regarding the ASFE equity redetermination decisions, to submit any challenge to such decisions to OHA and to be bound by the results thereof, without right of any further administrative or judicial review or appeal (nothing in the foregoing, however, shall be deemed to expand Chevron's right to challenge an ASFE decision beyond that permitted in paragraphs B.7 and B.8 above). To implement the foregoing, DOE and Chevron each knowingly and voluntarily waives any and all rights it may have (i) to bring any other judicial or administrative challenge to the final equity determination decisions by the ASFE, or (ii) to bring any judicial or administrative challenge to any decision by OHA.

10. Chevron and DOE acknowledge that the procedural steps referenced in paragraphs B.1 and B.2 already have been completed for the Carneros Zone and the Dry Gas Zone for all purposes of this Agreement and that such steps shall not be repeated for such zones.

11. Notwithstanding the provisions of paragraph B.7 above, Chevron and DOE agree that any challenge by Chevron to the ASFE's decision regarding the "25Z area" legal issue (which affects only the Carneros Zone) shall be reviewed "de novo" by OHA and that any OHA determination of the matter shall be

final and binding on the parties. If any other legal issues arise that are processed by NSA pursuant to instructions from the Independent Legal Advisor (as opposed to instructions agreed upon by Chevron and DOE in the form of a Settlement Agreement), the ASFE's decision on such legal issue, if challenged by Chevron, also shall be reviewed "de novo" by OHA and OHA's determination of the matter shall be final and binding on the parties.

C. **Miscellaneous**

1. The parties acknowledge that the ASFE is currently delegated the Secretary of Energy's authorities under title XXXIV of the Act. In the event this delegation is subsequently revised to alter this designation or in the event the Secretary chooses to perform the functions himself, such later designated official or the Secretary, as the case may be, will perform the ASFE functions identified in this Agreement.

2. This Agreement shall be governed by, and construed under, the federal law of the United States.

3. If the Decoupling Agreement is terminated pursuant to Sections 6.2 or 6.8 thereof, then this Agreement shall automatically terminate effective on the termination date of the Decoupling Agreement, and thereafter shall be of no force or effect, unless extended or modified by mutual agreement of the parties.

4. Each party represents that it has good and sufficient authority to execute and deliver this Agreement and to perform its respective obligations hereunder. This Agreement has been duly authorized, executed and delivered by the parties and constitutes the legal, valid and binding obligation of the parties, enforceable against them in accordance with its terms. Each individual signing this Agreement warrants and represents that he or she has full authority to execute the same on behalf of the party for whom he or she is signing.

5. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute but one and the same agreement.

6. Following execution of this Agreement, the Secretary of Energy (or designee) will issue a written memorandum authorizing OHA to perform the functions set forth in paragraphs 7 and 8 of Part B of this Agreement. Chevron will be provided a copy of such memorandum.

**IN WITNESS WHEREOF**, DOE and Chevron have each caused this Agreement to be executed as of the date first written above.

U.S. Department of Energy

By: Patricia F. Godley
Title: Assistant Secretary for Fossil Energy

Chevron U.S.A. Production Company, a division of Chevron U.S.A., Inc.

By: [signature]
Title: VP- Gen MGR WSG
Chevron USA Production Co

**Department of Energy**
Washington, DC 20585

Assistant Secretary for Fossil Energy Administrative Order No. 96-01

A. SUBJECT: PROTOCOL ON NAVAL PETROLEUM RESERVE NUMBERED 1 EQUITY FINALIZATION IMPLEMENTATION PROCESS

B. BACKGROUND

1. Pursuant to Section 3412(b)(1) of the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106 (110 Stat. 186), the Secretary of Energy is authorized and directed to "finalize the equity interests of the known oil and gas zones in Naval Petroleum Reserve Numbered 1 in the manner provided by this subsection."

2. Section 3412(b)(2) of the National Defense Authorization Act for Fiscal Year 1996 further provides:

> The Secretary shall retain the services of an independent petroleum engineer, mutually acceptable to the equity owners, who shall prepare a recommendation on final equity figures. The Secretary may accept the recommendation of the independent petroleum engineer for final equity in each know oil and gas zone and establish final equity interest in Naval Petroleum Reserve Numbered 1 in accordance with the recommendation, or the Secretary may use such other method to establish final equity interest in the reserve as the Secretary considers appropriate.

3. The equity owners of lands within Naval Petroleum Reserve Numbered 1, Chevron U.S.A. Production Company (Chevron) and the U.S. Department of Energy (DOE), will present their respective final equity positions to the mutually acceptable independent petroleum engineer (Netherland, Sewell & Associates, Inc.) (hereinafter Equity IPE) to be retained by the Secretary to provide final equity recommendations in the Dry Gas Zone, Carneros Zone, and the Stevens Zone.

4. Over the last two months there have been numerous meetings, discussions and correspondence, and oral communications between Chevron and DOE staff on the equity finalization implementation process. During the course of thesecommunications, Chevron and DOE staff each have presented varying viewsregarding the process to be utilized and have consulted with Netherland, Sewell.

5. There will be no written or oral equity-related communication or meeting with the Equity IPE (this term excludes contract administration communications or meetings) by an owner (including its agents and contractors) without the participation or opportunity to participate by the other owner. Before any equity-related communication or meeting occurs, the Equity IPE will notify both owners of the planned equity-related communication/meeting so as to allow both owners the opportunity to participate in all communications or meetings held between the Equity IPE and an owner. The Equity IPE shall record summaries of these communications/meetings and provide copies to the owners. In the event an owner chooses not to participate in an equity-related communication/meeting, the Equity IPE will notify both owners of that fact in writing prior to having the communication/meeting and provide both owners with a summary of the communication/meeting thereafter.

6. The equity presentations by the owners to the Equity IPE will commence on or about October 8, 1996 for the Dry Gas Zone and Carneros Zone, and on or about January 13, 1997 for the Stevens Zone. For the Stevens Zone, the initial presentations and rebuttals will end on or before January 24, 1997.

7. The order of presentation by the owners will be determined by a coin toss conducted by the Equity IPE in advance of the scheduled date for the Dry Gas Zone, and the owner who presents its equity position second for the Dry Gas Zone will be the first presenter of its equity position for the Carneros Zone. A separate coin toss will be conducted by the Equity IPE for the Stevens Zone.

8. Oral presentations will be conducted at a convenient location designated in advance by the owner conducting the presentation.

9. All equity-related meetings with the Equity IPE, including the presentation by the owners of their respective equity positions for each zone, will be sessions at which both owners are invited to attend (this excludes contract administration meetings that may be required by DOE). Each owner is permitted to designate its attendees, who will execute appropriate confidentiality agreements against disclosure of proprietary information.

10. On September 23, 1996 for the Dry Gas Zone/Carneros Zone and on December 18, 1996 for the Stevens Zone, each owner will submit to the Equity IPE 10 copies of all documentation identified in Attachment 1 hereto. The documentation submitted in advance of the oral presentations is to be the basis of the owners' final equity positions and no alteration in methodology or other significant change in the documentation will be permitted after the date of the advance submission of

documentation. (Correction of errors in the documentation by the owners will be permitted between the date required for the advance submission of documentation and the oral presentation, and any resulting changes by an owner in the documentation submitted must be promptly identified and explained in writing). The Equity IPE will ensure prompt distribution to the other owner of all materials submitted to the Equity IPE by an owner.

11. On the first day of oral presentations for each zone, the owners will provide to the Equity IPE 10 copies of all materials to be used or referred to by them in their presentations. The Equity IPE will provide each owner with copies of the other owner's presentation materials and ensure that each owner has all materials to be used or referred to by the other owner during the presentations (in addition to the documentation provided in advance pursuant to paragraph 10). Owners may not add to or change the presentation materials after the commencement of the first presentation except to correct factual errors in the materials or to provide materials in response to a question from the IPE. If the Equity IPE requests additional documentation from an owner or if an owner makes corrections to any material provided by that owner, such further documentation will be promptly provided to the Equity IPE and, by the Equity IPE, to the other owner. The Equity IPE will provide the owner receiving the further documentation with sufficient time to comment on all additional documentation.

12. For each zone, during and following the first presentation provided by an owner, the Equity IPE may present questions to the presenting owner. During and following the other owner's presentation for that zone, the Equity IPE may present questions to the second presenting owner. Subsequently, the second presenting owner may ask clarifying questions regarding the equity position of the first presenting owner through the Equity IPE and the first presenting owner may ask clarifying questions regarding the equity presentation of the second presenting owner through the Equity IPE. The second presenter for each zone may not reference the first presenter's presentation or offer rebuttal comments during its initial presentation.

13. For each zone, each owner will be permitted to provide, orally and in writing, a rebuttal of the other owner's equity position. The order for the rebuttal sessions shall be the reverse of the order of the original presentations for each zone.

14. During and following each rebuttal presentation, the Equity IPE may ask further questions of the owner making the presentation. If either owner has questions of

the other owner, the questions must be submitted to the Equity IPE, with a copy to the other owner, and the Equity IPE will determine whether to pursue the questions.

15. The Equity IPE shall present (orally and in writing) at a joint session to both parties its provisional recommendation. The owners may pose questions to the Equity IPE for clarification purposes at the oral presentation.

16. Owners will be provided 3 days to transmit written comments on the provisional recommendation to the Equity IPE as to matters of error, factual accuracy, or misinterpretation contained in the provisional recommendation. Following its receipt of both owners' comments, the Equity IPE will promptly transmit a copy of each owner's comments to the other owner.

17. After consideration of the comments, the Equity IPE shall prepare its final recommendation for each zone in accordance with the schedule set forth in the Equity IPE contract.

18. The Equity IPE shall provide its recommendation (orally and in writing) to the Assistant Secretary for Fossil Energy. Both owners may attend such presentation.

19. In the event the owners agree it is not practicable to provide 10 copies of some materials which are otherwise required by this Protocol to be supplied by an owner, the Equity IPE and the owners shall consult regarding the number of copies to be provided to the other owner and the Equity IPE, and the Equity IPE will ensure that each owner has complete and timely access to all materials submitted pursuant to this Protocol so as to provide the other owner with an opportunity to review and comment on all such materials in accordance with the schedules established for each zone. All maps required to be provided by an owner to the IPE and the other owner shall be full scale (at least 1" to 2000'), unless otherwise agreed by the owners.

20. The EFTs and the Equity IPE shall jointly determine the structure and time permitted for the initial and rebuttal presentations. The Equity IPE shall ensure that each owner is able to present its equity positions without interruption by the other owner. Any further matters required to be determined regarding the structure of the equity presentation process will be determined by the Equity IPE in consultation with the owners provided the matter is not otherwise covered by this Order or the Equity IPE contract.

21. In the event a disagreement arises regarding the equity finalization implementation process or this Protocol which cannot be resolved jointly by the Equity IPE and the EFTs, the matter shall be referred to the Assistant Secretary for Fossil Energy (or designee) for resolution. Prior to resolution, the Assistant Secretary will consult with Chevron.

U.S. Department of Energy

Assistant Secretary for Fossil Energy

JUL 28 1998

Date

Attachment 1

DOCUMENTATION TO BE SUBMITTED PRIOR TO FINAL PRESENTATIONS

Dry Gas Zone, Carneros Zone, and Stevens Zone

1. Isochore maps of productive acre-feet with Estimated Limiting Lines of Commercial Productivity as of November 20, 1942 for the respective geologic intervals. This should include a supporting digital database of net pay values (in units of feet of true vertical thickness) by well and by geologic interval that are utilized in the construction of the isochore maps.

2. A stratigraphic column or type log that identifies the specific geologic intervals associated with the maps of productive acre-feet prepared for item #1.

3. A structure map on one correlatable marker or horizon at or near the top of the equity zone.

4. Digital database consisting of tabulations by section for each geologic interval of the following as of November 20, 1942:

   - Productive acres
   - Productive acre-feet
   - Oil-in-place

5. Digital database consisting of tabulations by geologic interval and by section (if available) of the following:

   - Weighting factors
   - Hydrocarbon reserves
   - Weighted acre-feet

6. Sufficient explanation of the weighting methodology utilized to "weight" the productive acre-feet such that the weighting factors and weighted acre-feet can be reproduced by the IPE and each owner.

7. The underlying data records, such as computer model output, petrophysical properties, fluid properties, and/or engineering plots, that support the calculation of oil-in-place volumes and the derivation of all weighting factors.

Department of Energy
Washington, DC 20585

Assistant Secretary for Fossil Energy Administrative Order No. 96-01, Supplement 1

A. SUBJECT: PROTOCOL ON NAVAL PETROLEUM RESERVE NUMBERED 1 EQUITY FINALIZATION IMPLEMENTATION PROCESS (Supplement No. 1)

B. BACKGROUND

Following the discussion of contract interpretation issues at orientation meetings held in Bakersfield on July 9 and 10, 1996, and communications to Netherland, Sewell & Associates (NSA) from the Department of Energy, dated August 28, 1996, and from Chevron U.S.A. Production Company (Chevron), dated September 9, 1996, the owners met to review the situation and the contract interpretation issues raised. As a result of these discussions, the owners agreed to address the matters by developing a mechanism through which joint guidance from the owners could be given to NSA with respect to the handling of UPC contract interpretation issues as NSA performs its role of the independent petroleum engineer for equity finalization (Equity IPE) under section 3412(b) of the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106 ("Act").

The mechanism described in this Protocol is the result of the discussions held between the owners. Chevron has been provided an opportunity to comment on this Protocol and its comments have been considered by the Department. Chevron informed the Department, by letter dated October 11, 1996, that this Equity Finalization Implementation Protocol Relating to UPC Contract Interpretation Issues is acceptable to it.

C. EQUITY FINALIZATION IMPLEMENTATION PROTOCOL RELATING TO UPC CONTRACT INTERPRETATION ISSUES

This Protocol will supersede the above-referenced communications to the Equity IPE of September 9, 1996 and August 28, 1996 and the statements made to the IPE by the owners respecting interpretations of the Unit Plan Contract (UPC) during the Equity IPE orientation meetings held on July 9 and 10, 1996 in Bakersfield, California.

1. The Equity IPE has been retained to provide engineering services. The Equity IPE should conduct its independent technical analysis after considering the owners' presentations, and should prepare its equity recommendations.

2. In the event (a) the Equity IPE believes that it requires guidance on issues of contract interpretation or other legal issues in preparing its report, or (b) one of

the owners notifies the IPE, with simultaneous notice to the other owner, that a legal issue requiring guidance has come up, then, unless the Equity IPE determines that the resolution of such issue will not have a material effect on its equity recommendations, the owners will use their best efforts to provide joint guidance on the issue to the Equity IPE in a timely fashion. If the owners reach agreement on the guidance to be provided to the Equity IPE such guidance will be provided to the Equity IPE, and the guidance will be binding on the owners and not subject to later administrative or judicial review in any forum. Throughout the equity finalization process, the owners agree to use their best efforts to identify legal issues that may require resolution under this protocol and to advise the other owners of the issues as quickly as possible.

3. To assist in the provision of legal guidance to the Equity IPE, the Department shall retain the services of an Independent Legal Advisor, mutually acceptable to the owners. The Independent Legal Advisor will be consulted only in the event the owners cannot agree upon a resolution of a legal issue in accordance with paragraph 2 above and upon the request of one of the owners.

(a) The Independent Legal Advisor shall have the following functions: (1) serve as a mediator to help the owners reach agreement on legal issues arising in the equity finalization process, and (2) serve as independent legal advisor to the Equity IPE if the owners cannot reach agreement after consultation with the Independent Legal Advisor on a given legal issue.

(b) If, under paragraph 3 above, an issue is to be referred to the Independent Legal Advisor, then a written request for the involvement of the Independent Legal Advisor which identifies the issue to be resolved shall be sent by one or both of the owners through the Contracting Officer's Representative within 2 working days of notification by either owner. Thereafter, the Independent Legal Advisor shall consult with the parties as to the timetable and procedures to be used to resolve the issue.

(c) If the owners, with the assistance of the Independent Legal Advisor, reach agreement on the guidance to be provided to the Equity IPE, joint guidance will be provided to the Equity IPE, and such guidance will be binding on the owners and not subject to later administrative or judicial review in any forum.

(d) If the owners, with the assistance of the Independent Legal Advisor, are unable to reach agreement then the Independent Legal Advisor will provide timely independent legal guidance to the Equity IPE on the issue, and the Equity IPE shall rely on such guidance in the development of its final equity recommendations. The owners may question legal guidance provided by the Independent Legal Advisor to the Equity IPE only in conjunction with their

review of the final equity recommendations of the Equity IPE. This provision does not impair the ability of either party to pursue any available legal remedies to review or implement the final equity decisions of the Assistant Secretary for Fossil Energy made pursuant to section 3412(b)(2) of the Act.

4. The technical analysis and presentation process being conducted by the owners and the Equity IPE related to the equity finalization process shall continue during the period the owners and/or the Independent Legal Advisor are developing guidance for the Equity IPE on the contract interpretation or other legal issues raised.

5. This Protocol supplements Assistant Secretary for Fossil Energy Administrative Order 96-01, Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process, dated July 8, 1996. With the exception of the schedule for the Dry Gas Zone, Carneros Zone, and Stevens Zone equity finalization process, which is being or may be revised at the request of Chevron, all terms of the July 8, 1996 Protocol remain in effect and are applicable to the matters addressed herein.

U.S. Department of Energy

[signature]

Assistant Secretary for Fossil Energy

October 11, 1996

Date

## AGREEMENT TO TERMINATE THE UNIT PLAN CONTRACT

This Agreement to Terminate The Unit Plan Contract (this "**Agreement**") is entered into as of February __, 1998, between **CHEVRON U.S.A. INC.**, a Pennsylvania corporation ("**Chevron**"), and the **UNITED STATES OF AMERICA**, acting by and through its **DEPARTMENT OF ENERGY** ("**DOE**").

### R E C I T A L S

A. DOE and Chevron are the current parties to that certain Unit Plan Contract dated June 19, 1944 ("**Original Agreement**") relating to Naval Petroleum Reserve No. 1 ("**NPR-1**"), located in Kern County, California, under which the Parties agreed to operate certain lands in NPR-1 as a unit. The lands included in such unit are referred to herein as the "**Unit Lands**". DOE is the successor to the Department of the Navy, acting through the Secretary of Energy, or his delegatee. Chevron is the successor to Standard Oil of California.

B. The Original Agreement has been amended by the following: (1) Amendatory and Supplemental Agreement dated December 22, 1948 (Contract No. NOd-8477) ("**A&S Agreement**"); (2) Amendatory Agreement dated September 16, 1966 (Contract No. NOd-9787) ("**First Amendatory Agreement**"); and (3) Amendatory Agreement dated May 25, 1976 ("**Second Amendatory Agreement**"). The Original Agreement, as amended by the A&S Agreement, First Amendatory Agreement, Second Amendatory Agreement and all other amendments and modifications to date, is referred to as the "**UPC**".

C. Title XXXIV of the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106 (110 Stat. 186) (the "**Enabling Legislation**") requires that DOE sell all of the United States' interest in the Reserve, provided that the sale meets the requirements and conditions specified in the Enabling

Legislation. Among other things, the Enabling Legislation requires that the UPC be terminated not later than the closing of the sale of the United States' interest in NPR-1.

D. Section 11(b) of the UPC provides that the UPC "may be terminated at any time by the Secretary of the Navy in his discretion and subject to the approval of the President on six (6) months' written notice to Standard. Such termination shall be effective as of the date fixed therefor and shall not operate retroactively or to impair the rights and obligations of Navy or Standard under this contract accruing to the termination date. Termination shall be followed by an adjustment of all such rights and obligations, including the rights and obligations growing out of the costs incurred, and the respective quantities of production received, by Navy and Standard respectively, under contract, on a fair and equitable basis." This Termination Agreement serves to further confirm and define the existing rights and obligations of DOE and Chevron, as successors to Navy and Standard, within the UPC. Chevron and DOE acknowledge that DOE has delivered to Chevron the written notice required under Section 11(b) of the UPC by letter dated August 7, 1997.

E. The Parties desire that the termination of the UPC be effective as of the Closing Date (as hereafter defined).

**NOW THEREFORE**, in consideration of their mutual promises under this Agreement, and other good valuable consideration, the parties agree as follows:

**ARTICLE I.**
**DEFINITIONS**

1.1 As used in this Agreement, the following terms have the following meanings:

"**Additional Remediation Site**" means

(a) Any Unknown Environmental Site; and

(b) Any Known Environmental Matter, any On-going Remediation Site and any Unknown Environmental Site with respect to which DOE, Buyer or Chevron has previously achieved Completion, and that a Governmental Authority with jurisdiction over the Existing Unit under Environmental Laws has determined, in a written notice to either DOE or Chevron, needs additional Remediation as a result of a change in the condition of the site on or after the Closing Date or due to the discovery of a deficiency in the completed remedial work.

"**Attorneys' Fees and Costs**" means the reasonable fees and expenses of counsel (which may include printing, photostating, duplicating and other expenses, air freight charges, fees billed for paralegals and others not admitted to the bar but performing services under the supervision of an attorney, and fees of experts and consultants retained by counsel) and includes all such reasonable fees and expenses incurred with respect to appeals, mediations and arbitrations and bankruptcy proceedings, and also includes all such fees and expenses incurred in enforcing any judgment.

"**Business Day**" means a day other than Saturday, Sunday, a day in which banks are legally closed for business in California or an official Federal holiday.

"**Buyer**" means Occidental of Elk Hills, Inc., a Delaware corporation.

"**Chevron**" means Chevron U.S.A. Inc., a Pennsylvania corporation, and all divisions thereof.

"**Closing Date**" means date on which DOE conveys title to a purchaser or purchasers of all of DOE's interest in the Reserve by a deed recorded in the Official Records of Kern County.

"**Completion**" means, with respect to any Remediation Site:

(a) The Remediating Party has received written notice from the Governmental Authority exercising jurisdiction under Environmental Laws that no material additional Remediation of such Remediation Site, is required at that time under Environmental Laws; or

(b) The Remediating Party has reasonably determined that no material additional Remediation of such Remediation Site is required by Environmental Laws, and the Governmental Authority exercising jurisdiction under Environmental Laws over the Remediation of such Remediation Site, has failed to respond within one year after the Remediating Party's first properly filed or delivered request for written notice that no additional Remediation is required; Remediating Party agrees to use reasonable efforts, including further written communication to obtain such Governmental Authority's written notice that no additional Remediation is required.

"**Contract Operator**" means Bechtel Petroleum Operations, Inc.

"**Contracts and Permits**" means (i) the documents, agreements and permits listed on <u>Exhibit A</u> attached hereto (together with all amendments, modifications, extensions or supplements thereto or guarantees thereof existing as of the

Closing Date) and (ii) all other leases, licenses, contracts, instruments and other agreements and permits relating to the Existing Unit (together with all amendments, modifications, extensions or supplements thereto or guarantees thereof existing as of the Closing Date) requested in writing by Buyer to be assigned to Buyer on the Closing Date, to the extent assignable by DOE.

**"CVFR"** means the Current Value of Funds Rate published from time to time by the United States Treasury Department. The CVFR that applies to a payment shall be the CVFR rate in effect at the time the payment first became due.

**"Decoupling Agreement"** means that certain Agreement Regarding Fixing of Equity Interests at Naval Petroleum Reserve No. 1 for Purposes of Sale dated as of May 19, 1997 between DOE and Chevron.

**"DOE"** means the United States of America, acting by and through the Department of Energy. DOE does not include any agency or department of the United States of America other than the Department of Energy and the Department of the Navy.

**"DOE Remediation Sites"** has the meaning given such term in Section 6.7.1.

**"Enabling Legislation"** has the meaning given such term in the Recitals.

**"Environmental Contamination"** means any chemical, material or substance that is listed or regulated under applicable Environmental Laws as a "hazardous" or "toxic" substance or waste, or as a "contaminant," or is otherwise listed or regulated under applicable Environmental Laws because it poses a hazard to human health or the environment.

"**Environmental Laws**" means any existing or future applicable federal, state and/or county statutes, regulations or ordinances relating to air emissions, storage and use of hazardous or toxic substances, generation, treatment, storage, and disposal of hazardous wastes, wastewater discharges and similar environmental matters, including, but not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Authorization Act 1994 (49 U.S.C. § 5101 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Oil Pollution Act (33 U.S.C. § 2701 et seq.), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.), the Porter-Cologne Water Quality Control Act (Cal. Wat. Code § 13020 et seq.), the Safe Drinking Water and Toxic Enforcement Act of 1986 (Cal. Health & Safety Code § 25249.5 et seq.), the Hazardous Substance Account Act (Cal. Health & Safety Code § 25300 et seq.), and the Hazardous Waste Control Act (Cal. Health & Safety Code § 25100 et seq.).

"**Equipment and Facilities**" means all of the physical personal property and fixtures owned by DOE and/or Chevron and used in connection with the Existing Unit or Unit Operations and described in that certain transmittal letter dated May 19, 1997 from DOE to Chevron, which description may be amended from time to time by written agreement among DOE, Chevron and Buyer, excluding any physical property and fixtures owned by either Party which may have been used in connection with the Existing Unit or Unit Operations.

"**Equity Process Agreement**" means that certain Agreement Regarding Equity Redetermination Process dated as of May 19, 1997 between Chevron and DOE.

"**Existing Unit**" means the unit created by the UPC including the Unit Lands and the Equipment and Facilities.

"**Federal Site**" means a site on land within the Existing Unit formerly owned by DOE that is covered by the provisions of 42 U.S.C. § 9620(h)(3)(A).

"**Governmental Authority**" means any federal, state, local or other governmental, regulatory or administrative agency, governmental commission, department, board, subdivision, court, tribunal, or other governmental decision-maker, arbitral body or other authority, other than the Department of Energy.

"**Knowledge**" or "**Knowledgeable**" or similar phrases mean (i) with respect to DOE, the actual (and not the constructive or imputed knowledge) current knowledge, without independent investigation or inquiry, of the Assistant Secretary of Energy for Fossil Energy for the United States Department of Energy; Deputy Assistant Secretary, Office of Naval Petroleum and Oil Shale Reserves; Deputy Director of the Naval Petroleum and Oil Shale Reserves; and Director of Naval Petroleum Reserves in California; and their respective employees and agents who are substantially involved in the Unit Operations; and (ii) with respect to Chevron, the actual (and not the constructive or imputed knowledge) current knowledge, without independent investigation or inquiry, of the employees and agents of Chevron who are substantially involved in Unit Operations.

"**Known Litigation**" means the matters set forth on Exhibit B attached hereto.

"**Known Environmental Matters**" means all Environmental Contamination (i) listed on Exhibit C or E hereto, (ii) disclosed by that certain Phase I Environmental Site Assessment, Naval Petroleum Reserve No. 1 (Elk Hills), dated June 3, 1997 and prepared by American Technologies, Inc. and any supplements

thereto, dated August 28, 1997 or (iii) disclosed by that certain Review of Pre-Sale Environmental Conditions at Naval Petroleum Reserve No. 1, dated September, 1997 and prepared by WZI, Inc.

"**Liability**" or "**Liabilities**" means collectively, all fines, penalties, liabilities and obligations relating or attributable to the ownership of the Existing Unit and Unit Operations arising after June 19, 1944 and before the Termination Date, including, but not limited to, (i) all liabilities and obligations arising under the Contracts and Permits, (ii) all liabilities under the Known Litigation, (iii) all liabilities for New Third Party Claims, (iv) losses, fines, penalties, expenses, costs to remove, modify, or abandon Equipment and Facilities on or under the Existing Unit, (v) Known and Unknown Environmental Matters and Ongoing Remediation and Additional Remediation Sites, (vi) all obligations defined by applicable laws or regulations to plug and abandon or remove and dispose of the oil, gas, water, disposal and injection wells, anode beds, structures, flowlines, tanks and pipelines on or under the Existing Unit, and (vii) Attorneys' Fees and Costs incurred in defending any claims, causes of action, agency requirements, liens, and judgments, even if such claim, cause of action, agency requirement, lien or judgment commenced after the Termination Date.

"**New Third Party Claim**" means a claim by a Person that is not a representative of DOE or Chevron with respect to matters arising under or related to the Existing Unit, including, without limitation, any of the following:

(1) personal injury, property damage or fines or penalties resulting from or arising out of the ownership of the Existing Unit or from Unit Operations;

(2) breach or default under the Contracts and Permits arising out of the ownership of the Existing Unit or from Unit Operations;

(3) personal injury or property damage arising out of the release or disposal of Environmental Contamination from the Existing Unit as a result of Unit Operations at a location outside the Existing Unit, either before or after the Termination Date;

(4) Any governmental investigation or inquiry regarding any of the foregoing;

(5) claim for the costs of conducting Remediation or seeking an order or demanding that such Person undertake Remediation with respect to Environmental Contamination arising out of Unit Operations; and

(6) claims arising from Remediation or other activities conducted pursuant to this Agreement.

"New Party Claims" do not include matters that relate to or arise under the New Unit Agreement.

**"New Unit Agreement"** means that certain Unit Agreement and Unit Operating Agreement by and between Chevron and Buyer, which agreement has been executed by Chevron and will be executed by Buyer in accordance with the terms of the Purchase Agreement.

**"New Operator"** means the party named initial "Operator" pursuant to the New Unit Agreement, and any successor operator under the New Unit Agreement.

**"Nonremediating Party"** means the Party that is not the Remediating Party.

**"Non-Unit Lands"** means any lands within NPR-1 other than land in the Existing Unit.

"**On-going Remediation Site**" means the sites containing Environmental Contamination at the Existing Unit described on Exhibit E attached hereto, which sites also constitute Known Environmental Matters.

"**Operating Program 2000**" means that program agreed by the Parties dated January 20, 1998 and attached as Exhibit D. The Parties currently intend that Operating Program 2000 shall not be adjusted until the UPC Final Equity Participations have been determined for all Zones. When the UPC Final Equity Participations have been determined for all Zones, Operating Program 2000 shall be adjusted to reflect such UPC Final Equity Participations. All references to "Operating Program 2000" in this Agreement are subject to and conditioned by Section 10.6 below.

"**Party**" means individually Chevron or DOE, as applicable.

"**Parties**" means collectively Chevron and DOE.

"**Person**" means any individual, partnership, joint venture, corporation, limited liability company, firm, trustee, association or unincorporated organization, governmental authority, municipality or other entity.

"**Post-Sale Unit**" means the Unit Lands, together with all other lands, if any, which, subsequent to the Termination Date, will be operated by New Operator pursuant to the New Unit Agreement.

"**Purchase Agreement**" means that certain Purchase and Sale Agreement by and between DOE and Buyer, which agreement has been executed by Buyer and may be executed by DOE in accordance with the terms of that certain Grant of Option Agreement dated as of October 5, 1997.

"**Remediation**" means any or all of the following activities to the extent they relate to or arise from the presence of Environmental Contamination at a site on the Unit Lands or on Non-Unit Lands as a result of Unit Operations: (i) monitoring, investigation, cleanup, containment, removal, mitigation, response or restoration work; (ii) obtaining any permits, consents, approvals or authorizations of any Governmental Authority necessary to conduct any such work; (iii) preparing and implementing any plans or studies for such work; (iv) obtaining a written notice from a Governmental Authority with jurisdiction over the site under Environmental Laws that no material additional work is required by such Governmental Authority; (v) any other activities reasonably determined by the Remediating Party and the Non-Remediating Party to be necessary or appropriate or required under Environmental Laws to address the presence, or alleged presence, of Environmental Contamination in the soil, groundwater or improvements at the site; and (vi) any actions required by Federal or State law, by Governmental Authorities, rule, regulation, or order, or otherwise agreed to by the parties, to protect sensitive, natural, cultural or historic resources during the course of the Remediation of Environmental Contamination.

"**Remediating Party**" means the Party conducting the Remediation of a Remediation Site in accordance with the provisions of this Agreement.

"**Remediation Site**" means any of the DOE Remediation Sites and any other Additional Remediation Sites.

"**Termination Administrator**" has the meaning given such term in Section 3.1.

"**Termination Date**" means the date upon which the UPC terminates, which date will occur concurrently with the closing on the Closing Date (and the occurrence of the closing of the

Unknown Environmental Site and will be deemed to be a Known Environmental Matter unless and until a Governmental Authority serves notice that the site needs additional Remediation. Upon such notice the site shall be deemed an Additional Remediation Site. Unknown Environmental Sites do not include any molecules of Environmental Contamination that were not actually and physically present in the soil or groundwater or improvements on or at Unit Lands or Non-Unit Lands prior to the Closing Date.

**"UPC"** has the meaning given such term in the Recitals. The term "UPC" does not include or refer to either the Decoupling Agreement or the Equity Process Agreement.

**"UPC Final Equity Participations"** has the meaning given such term in the Decoupling Agreement.

**"Zone"** or **"Zones"** refers to one or more of the four zones established under Section 2 of the UPC prior to its termination. Such zones are the Carneros Zone, the Dry Gas Zone, the Shallow Oil Zone, and the Stevens Zone.

## ARTICLE 2
## TERMINATION DATE

2.1 **Termination of UPC**. Notwithstanding anything to the contrary in the UPC, the termination of the UPC will be effective on the Termination Date. The Parties intend that the termination of the UPC occur concurrently with the closing of the sale to the Buyer. Article 8 below shall govern the division of production and expenses on the Termination Date between the Existing Unit and the Post-Sale Unit.

2.2 **Interpretation**. Unless expressly provided otherwise in this Agreement, nothing in this Agreement is intended to supersede or modify the rights and obligations of the Parties under the UPC accrued prior to the Termination Date. The Parties

intend that the terms of the UPC shall be the basis on which such rights and obligations of the Parties shall be determined for all matters arising out of or relating to the UPC or the Existing Unit , including, without limitation, establishment of the final equity participations of the Parties and the final accounting of all production, income and expenses of the Parties under the Existing Unit. It is expressly acknowledged that neither the termination of the UPC nor the execution of this Agreement shall be deemed to constitute a waiver or release of any rights or claims that either DOE or Chevron may have with respect to each other.

## ARTICLE 3
## TERMINATION ADMINISTRATOR

3.1 **Designation and Initial Authority of Termination Administrator**. Chevron and DOE hereby confirm that, except to the extent expressly provided otherwise in this Agreement, DOE shall have the exclusive authority and control over, and the right to perform (either directly or through agents and contractors), all actions and procedures necessary to conclude operations under the Existing Unit and to implement this Agreement. Such actions include, without limitation, collection of all amounts owing as a result of Unit Operations, defense against New Third Party Claims, payment of obligations and liabilities remaining with respect to Unit Operations from funds committed by DOE and Chevron, undertaking environmental characterization and remediation activities with respect to matters arising from Unit Operations, and performing the final accounting of Unit Operations. DOE, when acting in such capacity, is referred to herein as the "**Termination Administrator**". DOE's actions as Termination Administrator shall be governed by this Agreement, including, without limitation, the budget provisions of Section 3.2, and applicable law.

3.2 **Statement of Work**. Chevron and DOE have agreed upon the estimated scope of the work necessary to conclude operations under the Existing Unit and to implement this Agreement, the estimated gross cost associated with such work, and the estimated start and end dates for such work, which matters are set forth in the Post Operation Period Statement of Work ("**POPSOW**") (Exhibit E).

The POPSOW divides the estimated cost for the closeout activities into two major task categories: "Administrative" and "Environmental, Safety, Security, and Health" (each, a "**Major Task Category**"). DOE may, without any consent from Chevron, shift estimated costs between tasks within a Major Task Category. However, transfer of estimated costs from one Major Task Category to the other Major Task Category shall require Chevron's prior approval.

DOE will prepare, on a monthly basis unless otherwise agreed by the Parties, a UPC termination "close-out task" progress report which will be delivered to Chevron for review by the 20th day of the following month until all close-out tasks are complete. The report will include expenditure-to-date for each task under a Major Task Category; the percentage expended against estimated gross costs; revisions to the POPSOW (if any) and, the status of completion (estimated completion date) for each activity. If total expenditures of a Major Task Category are anticipated to exceed 110% of its estimated gross costs, DOE will submit to Chevron an amendment to the POPSOW for that Major Task Category. Chevron shall have 15 business days within which to approve the increased cost, which approval shall not be unreasonably withheld. Any disapproval notice shall specify in detail the proposed costs to which Chevron objects and the reasons for such objections. Any portion of the costs, or tasks, to which Chevron does not object in its notice shall be deemed approved. If Chevron fails to provide DOE written approval or disapproval within said 15 days then the revised POPSOW shall be

deemed approved. Any dispute shall be submitted to arbitration pursuant to Article 9 below. The Termination Administrator may but shall not be required to, continue funding and work on any project or projects that are subject to a budget dispute, but Chevron shall not be required to fund the portion of any costs which are subject to a dispute, unless the arbitrator determines that all or any portion of such sums in dispute should be paid by Chevron, whereupon Chevron shall promptly pay such amount to DOE plus, if DOE advanced funds to pay costs Chevron disputed which the arbitrator determined should have been paid by Chevron, interest thereon at the CVFR (not compounded), commencing on the date that DOE expended such funds until the date paid.

3.3 **Termination Administrator Expenses**. All approved costs and expenses of the Termination Administrator (other than the Unallowed Expenses) are Unit Expenses and shall be borne by DOE and Chevron in accordance with Operating Program 2000.

## ARTICLE 4
## RECEIVABLES AND RECOVERIES

4.1 **Collections**. The Termination Administrator, subject to Section 4.2 below, shall be responsible for collecting all sums due with respect to or arising from Unit Operations, other than with respect to the sale of production from Unit Operations that was delivered or deemed delivered in kind to DOE and Chevron, respectively. Such items include, without limitation, refunds, rebates, insurance proceeds, warranty payments and the like. All costs incurred by the Termination Administrator in attempting to collect such sums shall be handled in accordance with Article 3 hereof.

4.2 **Claim Notices**. If either Party believes that a sum may be due with respect to Unit Operations and that efforts should be made to collect such sum, it shall notify the other Party in writing of such fact and the basis therefore no later

than 3 years after termination of the UPC. If the Parties do not agree that collection efforts should ensue, the Party requesting the collection effort may pursue the claim at its own expense, not as a Unit Expense, and retain from any recovery obtained as a result of the collection effort all expenses incurred in pursuing the claim, plus interest thereon from the date each expense was incurred to the date paid at 5.85% per annum (not compounded). Any sums remaining after such deduction shall be treated as revenues from Unit Operations and shall be allocated between DOE and Chevron in accordance with the Operating Program 2000.

4.3 **Allocation of Funds**. Except as provided in Section 4.2, all sums received by the Termination Administrator with respect to Unit Operations shall be allocated between DOE and Chevron in accordance with the Operating Program 2000.

## ARTICLE 5
## LIABILITIES

5.1 **Liabilities**. Except as otherwise provided in this Agreement, as between each other, DOE and Chevron shall remain responsible for, and shall not be released from, Liabilities arising from or in connection with the Existing Unit or from Unit Operations. The provisions of this Agreement, and of this Article 5 in particular, are subject to the provisions of 28 U.S.C. §516.

5.2 **Known Litigation**. DOE and Chevron acknowledge that the Known Litigation is a Liability and that each of DOE and Chevron shall bear the costs of the Known Litigation in accordance with Operating Program 2000. The Parties intend that, to the extent possible, management of the Known Litigation shall continue as it is currently being conducted, in accordance with Exhibit G.

5.3 New Third Party Claims.

**5.3.1 Notice of Claim.** Subject to the terms of this Agreement and upon obtaining Knowledge of a New Third Party Claim, the Party obtaining Knowledge (the "**Knowledge Party**") shall promptly notify the other Party in writing of such New Third Party Claim (such written notice is referred to as a "**Notice of Claim**"). A Notice of Claim must specify, in reasonable detail, the facts known to the Knowledge Party regarding the New Third Party Claim. Subject to the terms of this Agreement, the failure to provide (or timely provide) a Notice of Claim will not affect the other Party's liability with respect to such New Third Party Claim, except to the extent that the Knowledge Party's failure to provide (or timely provide) a Notice of Claim increases the amount which would otherwise have been payable by the other Party had a Notice of Claim been timely delivered.

**5.3.2 Management of New Third Party Claims.**

(a) With respect to any New Third Party Claim in which DOE is named a party (whether or not other Persons are named as defendants), subject to the provisions contained in this Section 5.3.2, DOE shall elect within twenty (20) days after receiving a Notice of Claim, or concurrently with its delivery of a Notice of Claim, (i) to defend in good faith against such New Third Party Claim with counsel of its choice (which may include the United States Department of Justice or outside retained counsel), (ii) to tender defense of the claim to an insurance carrier (to the extent insurance covers the New Third Party Claim) or to Contract Operator, if applicable, or (iii) with Chevron's concurrence, to have Chevron defend in good faith against such New Third Party Claim. Chevron and DOE shall use reasonable efforts to reach a joint defense agreement whenever possible in cases in which both the DOE (or the United States) and Chevron are defendants.

(b) With respect to any New Third Party Claim in which only Chevron is named a party or in which Chevron and Contract Operator are named as parties, subject to the provisions contained in this Section 5.3.2, Chevron shall defend itself in good faith against such New Third Party Claim with counsel of its choice (or refer the matter to an insurance carrier or Contract Operator, if applicable). Contract Operator's defense shall be handled by itself in accordance with Section 5.3.2(c) below.

(c) With respect to any New Third Party Claims in which only Contract Operator is named as a defendant or Contract Operator and Chevron are named as parties, the defense of Contract Operator in such matter shall be handled in accordance with the terms of the currently existing agreement between DOE and Contract Operator, Contract No. DE-AC01-85FE60520, or the close-out contract to be entered into between DOE and Contract Operator, as applicable, and treated as a Unit Expense, unless pursuant to the terms of the currently existing agreement between DOE and Contract Operator, Contract No. DE-AC01-85FE60520, or the close-out contract to be entered into between DOE and Contract Operator, as applicable, such New Third Party Claim is solely the responsibility of Contract Operator.

(d) For purposes of this Agreement, the Party defending the New Third Party Claim or Known Litigation is the "**Defending Party**" and the other Party is the "**Nondefending Party**." In cases where a claim is being handled solely by Contract Operator or by an insurance carrier, DOE shall be deemed to be the "Defending Party" for the purposes of Sections 5.4 and 5.5 below.

5.4 **Settlement or Compromise**.

(a) Subject to the limitations contained in this Agreement, the Defending Party will make decisions as to the

handling of the defense of the New Third Party Claim or Known Litigation and shall have the authority to settle or compromise New Third Party Claims and Known Litigation for which it is acting as the Defending Party, subject to the limitations contained in Section 5.4(b).

(b) The Defending Party shall not settle or compromise a New Third Party Claim or Known Litigation without providing prior written notice to the Nondefending Party of the proposed settlement or compromise that has been agreed to by the parties asserting the New Third Party Claim or Known Litigation (such written notice is referred to as a "**Settlement Notice**"). The Nondefending Party may reasonably object to the terms outlined in a Settlement Notice by delivering written notice of its objection, and the basis for its objection, within five (5) days after receiving a Settlement Notice. If the Nondefending Party approves the proposed action, or does not deliver written notice of any objection within such five (5) day period, Defending Party may settle or compromise the New Third Party Claim or Known Litigation on the terms outlined in the Settlement Notice. If the Nondefending Party delivers a written notice of objection in accordance with the terms of this Section, the Defending Party shall in good faith consider any such objection. If, within the five (5) day period Nondefending Party notifies Defending Party in writing that it has determined the contest should be continued, Defending Party shall continue to contest the New Third Party Claim or Known Litigation, but it shall be liable only for an amount up to its proportionate share of the amount which the third party to the contested New Third Party Claim or Known Litigation had agreed in writing to accept (as contained in Settlement Notice) in payment or compromise for such New Third Party Claim or Known Litigation.

(c) If the Defending Party settles or compromises a New Third Party Claim or Known Litigation on terms that are materially different from the terms outlined in a Settlement

Notice approved (or deemed approved) by Nondefending Party, Nondefending Party's liability will be limited to its proportionate share of costs and expenses outlined in the Settlement Notice.

5.5 **Cooperation**. The Defending Party shall (a) consult with the Nondefending Party throughout the pendency of the New Third Party Claim or Known Litigation regarding the investigation, defense, settlement, arbitration, trial, appeal or other resolution of the New Third Party Claim or Known Litigation (and such consultation shall be at least on a monthly basis, unless otherwise agreed by the parties) and (b) afford the Nondefending Party the opportunity to be associated in the defense of the New Third Party Claim or Known Litigation (to the extent the Nondefending Party is a named defendant). The Parties shall cooperate in the defense of all New Third Party Claims or Known Litigation. If requested by the Defending Party, the Nondefending Party shall cooperate with the Defending Party and its counsel in contesting any such matter that the Defending Party elects to contest or, if appropriate, in making any counterclaim against the Person asserting the claim or demand, or any cross-complaint against any Person. Upon the written request of the Nondefending Party, the Defending Party shall deliver, as an Unit Expense, copies of all complaints, pleadings and other information reasonably requested by Nondefending Party with respect to any New Third Party Claim or Known Litigation.

5.6 **Mitigation**. Each of Chevron and DOE shall take all reasonable steps to mitigate all losses, damages and the like relating to any New Third Party Claim or Known Litigation, including availing itself of any defenses, limitations, rights of contribution, insurance, claims against third persons and other rights at law or equity to avoid to the extent practical potential increased loss to the Parties. Such steps may include the reasonable expenditure of money to mitigate or otherwise

reduce or eliminate any loss or expense for which the Parties would have responsibility pursuant to the UPC or applicable law. If applicable, the Parties shall reasonably coordinate the mitigation measures taken pursuant to this Section.

5.7 **Expenses**.

(a) The following costs of New Third Party Claims and Known Litigation shall be treated as Unit Expenses and will be shared by the Parties in accordance with Operating Program 2000, subject to the limitations contained in Section 5.4:

(i) Defending Party's Attorneys' Fees and Costs, and the Nondefending Party's Attorneys' Fees and Costs when acting at the request of the Defending Party, including the reasonable costs of in house attorneys (including, in the case of DOE, attorneys with the United States Department of Justice) who directly participated in the defense against the Known Litigation or the new Third Party Claims;

(ii) the costs of any settlement or compromise that is made in accordance with the terms of this Agreement;

(iii) the amount of any final judgment or arbitration award reached with respect to a New Third Party Claim or Known Litigation;

(iv) the reasonable expenses incurred by the Nondefending Party acting at the request of the Defending Party (excluding, however, Unallowed Expenses, except to the extent allowed under clause (i) above);

(v) the reasonable expenses directly incurred by a Party in mitigating losses associated with New Third Party Claim or Known Litigation other than Unallowed Expenses.

(b) The Parties intend that each Party shall pay its share of the costs of New Third Party Claims and Known Litigation on a current basis as such costs are incurred. Within thirty (30) days after receiving an invoice for the amounts described in Section 5.7(a) (together with any back-up documentation reasonably requested by the receiving Party), the receiving Party shall reimburse the other Party for its share in accordance with the terms of this Agreement. Such costs shall be allocated in accordance with Operating Program 2000. If any amount payable under this Section 5.7 is not paid when due, then such amount will bear interest at the CVFR (not compounded), commencing on the date that is thirty (30) days after a Party's receipt of an invoice therefor.

5.8 **Intervention**. Nothing in this Agreement shall be deemed to limit the rights of either Chevron or DOE to intervene, to the extent legally possible, in any action, arbitration or proceeding regarding a New Third Party Claim or Known Litigation that is asserted against one, but not both, of Chevron and DOE.

## ARTICLE 6
## ENVIRONMENTAL LIABILITY

6.1 **On-going Remediation Sites**. DOE is the Remediating Party with respect to the On-Going Remediation Sites and will undertake appropriate Remediation until Completion.

6.2 **Federal Sites**. DOE is the Remediating Party with respect to the Federal Sites and will undertake appropriate Remediation until completion.

6.3 **Additional Remediation Sites**. The Party upon whose land any Additional Remediation Site is located shall be the Remediating Party with respect to such Additional Remediation Site; provided, however, if DOE or Buyer is required to conduct the Remediation pursuant to the Purchase Agreement, DOE shall be considered the Remediating Party for the purposes of this Agreement (although the Remediation may in certain cases be conducted by Buyer).

6.4 **Remediation Required Because of Non-Unit Operations**. If Remediation is required of any portion of the Existing Unit because of any activities other than Unit Operations, the Party upon whose land such Remediation is required shall be the Remediating Party, provided, however, if DOE is required to conduct the Remediation pursuant to the Purchase Agreement, DOE shall be the Remediating Party.

6.5 **Notice of Unknown Environmental Site**. Upon receiving Knowledge of any information regarding the presence or suspected presence of any Environmental Contamination on or at Unit Lands or on Non-Unit Land arising out of Unit Operations that a Party believes to be an Unknown Environmental Site, such Party promptly shall, within twenty (20) days, deliver written notice of the presence or suspected presence of Environmental Contamination to the other Party. Such written notice must include any background reports, studies or investigative materials regarding such matter in the Party's possession or control. Within fifteen (15) days after receipt such notice, the receiving Party shall respond in writing to the other Party agreeing or disagreeing with the information provided in said notice. If the receiving Party agrees with the information contained in the notice, the site covered by such notice shall be deemed an Unknown Environmental Site. If the receiving Party disputes the information contained in such notice, then the Parties shall make good faith efforts to resolve the dispute through negotiation. In the event they are

unable to resolve the dispute they shall proceed in accordance with the provisions of Article 9 hereof.

6.6 **Remediation Responsibilities**.

6.6.1 Remediating Party agrees that with respect to all remediation conducted after termination of the UPC, Remediating Party will consult, on a monthly basis unless otherwise agreed by the Parties, in good faith with Nonremediating Party regarding the nature, technical remediation approach, scope, and cleanup objectives for any such Remediation; provided, however, Remediating Party reserves the exclusive right to negotiate and enter into agreements with any Person regarding the nature, technical remediation approach, scope, cleanup objectives or any other aspect of any Remediation undertaken by Remediating Party so long as such negotiations do not shift liability for such Remediation to the Nonremediating Party. All Remediation work will be done in a good and workmanlike manner and in compliance with Environmental Laws.

6.6.2 After Completion of any Remediation, Remediating Party will make reasonable efforts to restore the surface to a condition substantially similar to that existing at the time immediately prior to any such Remediation, provided that no Person (other than the Remediating Party's representatives) has taken actions at the Post-Sale Unit (or as applicable, on Non-Unit Land) so as to make such restoration impracticable or not commercially reasonable under the circumstances.

6.6.3 Upon achieving Completion with respect to any Remediation Site, Remediating Party will provide to Nonremediating Party written evidence of such Completion, including, if requested by the Nonremediating Party, all related non-privileged correspondence with the regulatory agency.

6.6.4 If the Remediating Party receives any reimbursement of its Remediation costs under this Agreement from anyone other than the other party to this Agreement, then such reimbursement shall be deducted from the cost of such Remediation (and thus from Unit Expenses) upon receipt of such reimbursement. If the Nonremediating Party receives any reimbursement or payment toward Remediation expenses conducted under this Agreement from anyone other than the other party to this Agreement, such reimbursement or payment shall either be used to pay for the cost of such Remediation or treated as revenues from Unit Operations and allocated between DOE and Chevron in accordance with Operating Program 2000.

6.6.5 DOE has advised Chevron that the Buyer has agreed in certain circumstances to perform, at the Buyer's cost, certain Remediation activities relating to Environmental Contamination arising from the Existing Unit that might otherwise be, in whole or in part, the responsibility of DOE, or with respect to which DOE might be required to contribute financially, under this Agreement, the UPC or applicable law. Such agreements by the Buyer relate to obligations that DOE may have, not to obligations that the owners of the Existing Unit as a whole may have. Nothing in this Agreement is intended to alter any such agreement between the Buyer and DOE, or to transfer the benefit thereof, in whole or in part, to Chevron or any other third party. To the extent that the Buyer (i) performs such Remediation at its expense and not at the cost of DOE, or (ii) bears DOE's share of the cost of such Remediation, the provisions of Section 6.6.4 shall not apply thereto and, for the purposes of accounting convenience, the cost thereof shall not be treated as a Unit Expense under this Agreement (but nothing in this Section shall be deemed to release Chevron from any responsibility it may have with respect to such Remediation, including any obligation to contribute to the cost thereof based on what its contribution would have been had the matter been treated as a Unit Expense).

6.6.6 Remediating Party and Nonremediating Party shall each make reasonable efforts to avoid taking any action, and to prevent other Persons from taking any action, that would materially increase the cost of any Remediation covered by this Agreement.

6.7 <u>Chevron's Responsibilities</u>.

6.7.1 Chevron acknowledges that as between DOE and Chevron, DOE has the sole responsibility for undertaking the Remediation of the Additional Remediation Sites on former DOE-owned land, Federal Sites and On-going Remediation Sites (collectively, the "**DOE Remediation Sites**"). Chevron shall not initiate or consent to the initiation of any Remediation of any DOE Remediation Sites, or submit, or cause to be submitted, orally or in writing, any information or comments to any Governmental Authority concerning DOE Remediation Sites or any Remediation thereof (other than documents or information routinely and customarily submitted to such Governmental Authority), without the prior written consent of DOE, which will not be unreasonably withheld unless in the judgment of Chevron such actions are required to protect the immediate health and safety of individuals in the vicinity of the Post-Sale Unit.

6.7.2 To the extent that Chevron is the Nonremediating Party, Chevron hereby grants DOE and its contractors a non-exclusive license to enter upon any property Chevron owns within the Post-Sale Unit for the purpose of conducting Remediation of any DOE Remediation Site, subject to the terms and conditions of this Agreement. Upon DOE's request, Chevron shall execute a license agreement, in form and substance reasonably satisfactory to the Parties, confirming the access and remediation rights given DOE under this <u>Article 6</u>. Chevron shall cooperate with DOE's Remediation, assist DOE in obtaining access to the Post-Sale Unit if necessary for the implementation of the Remediation work, and support DOE in its negotiations with any

Governmental Authority with respect to the Remediation. Chevron shall comply, and will use reasonable efforts to cause other Persons at the Post-Sale Unit to comply, with the reasonable requirements, directives, instructions, or plans issued by DOE for the purpose of protecting the health and safety of persons on the Post-Sale Unit during Remediation activities conducted on or in the vicinity of the Post-Sale Unit.

6.7.3 Chevron shall not relocate, disturb or interfere with, or consent to the relocation, disturbance, or interference with, the equipment used by DOE for any Remediation of DOE Remediation Sites. Upon written request from Chevron and New Operator, DOE will relocate such equipment to accommodate New Operator's operation of the Post-Sale Unit, to the extent such relocation can be accomplished without increasing Remediation costs or materially delaying or disrupting Remediation.

6.8 **Other Remediation Covenants**. Until such time as Completion has been achieved with respect to a Remediation Site, Remediating Party and Nonremediating Party will, upon the written request of the other Party, provide to the requesting Party copies of all material reports, correspondence, notices and communications regarding any Remediation Site or the Remediation thereof sent to or received from any Governmental Authority with jurisdiction under Environmental Laws over such Remediation.

6.9 **Expenses**.

6.9.1 The following are Unit Expenses and will be shared by the Parties in accordance with Operating Program 2000:

(a) Remediating Party's costs (excluding Unallowed Expenses), to the extent included in the estimated gross costs under Section 3.2 above, or otherwise approved by the parties, or required to be performed by a Governmental Authority (to the extent the Governmental



RECEIVED DATE : 02/04/98 16:29 FROM :202 383 5414

Agency has specifically mandated the form of Remediation of conducting Remediation of any Remediation Sites (including DOE's costs of conducting Remediation of DOE's Remediation Sites); and

(b) the reasonable expenses incurred by the Nonremediating Party in acting at the request of the Remediating Party (excluding Unallowed Expenses).

6.9.2 Within thirty (30) days after receiving an invoice for the amounts described in Section 6.9.1 (together with any back-up documentation reasonably requested by the receiving Party), the receiving Party shall reimburse the other Party for the receiving Party's share of such expenses in accordance with Operating Program 2000. If any amount payable under this Section 6.9 is not paid when due, then such amount will bear interest at the CVFR (not compounded) commencing on the date that is thirty (30) days after a Party's receipt of an invoice therefor.

6.10 Other Sites. Listed on Exhibit H hereto are sites identified by Chevron as facilities, or former facilities, whose environmental status and Remediation requirements, if any, will be reviewed as part of the close-out activities being conducted under this Agreement. The goal of this effort will be to assist in establishing the environmental status of the listed sites as of the Termination Date. The parties recognize that the items listed on Exhibit H may include items that are duplicates of matters already covered by Exhibits C and E, are facilities currently in use or held for use in operations at the Unit Lands (and thus not appropriate to be listed on Exhibits C and E) or sites that require no Remediation. Chevron and DOE agree to cooperate in the review of the items listed on Exhibit H, with the goal of completing such review within twelve months after the Termination Date. The parties further acknowledge that the work contemplated by this Section, and any resulting Remediation, has not been factored into the $1.5 million estimated budget for the

"Environmental, Safety, Security and Health" Major Task Category. Within 60 days after the Termination Date DOE will propose an estimated cost for the analytical work required by this Section for Chevron's review and approval under the procedure set forth in the last paragraph of Section 3.2. When approved, such amount shall be added to the costs for the "Environmental, Safety, Security and Health" Major Task Category.

Upon completion of the review contemplated by this Section 6.10, the Parties shall discuss in good faith what Remediation, if any, is required to be performed at that time under Environmental Laws with respect to Environmental Contamination, if any, found at the sites listed on Exhibit H. If the Parties agree that any such Remediation should be performed or if Remediation is required by any Governmental Authority, then DOE shall undertake such Remediation on the terms provided in this Agreement, subject to appropriation of funds by Congress for such purpose and to receipt of Chevron's agreement to the Remediation method(s) to be employed and commitment to pay Chevron's portion of the costs of such Remediation. Notwithstanding the foregoing, If any of the sites listed on Exhibit H are included in the review currently being conducted by the California Department of Toxic Substances Control ("DTSC"), the Parties agree that the determination of DTSC (or any other Governmental Authority acting as the result of DTSC's review) regarding whether or not such sites require Remediation, and the extent of such Remediation, shall be final with respect to such sites for the purposes of this Section 6.10.

## ARTICLE 7
## COVENANTS, REPRESENTATIONS AND WARRANTIES

7.1 **Litigation**. DOE and Chevron represent and warrant to each other that, except for the Known Litigation, to each Party's respective Knowledge, there is (i) no suit, action, claim, investigation, or inquiry by any person or entity and (ii) no

legal, administrative, or arbitration proceedings, pending or to each Party's respective Knowledge, threatened against any Party or Contract Operator, or to which DOE or Chevron is a party, relating to the Existing Unit, the Post-Sale Unit, or Unit Operations. Chevron acknowledges that DOE has advised it that an action has been filed in the United States District Court, Eastern District of California, titled Tinoqui-Chalola Council of Kitanemuk and Yowlumne Tejon Indians, et al., v. The United States Department of Energy, et al., in which plaintiffs have raised issues regarding compliance with several federal statutes in connection with the proposed sale of the United States' interest in NPR-1.

7.2 **Contracts and Permits**. DOE and Chevron represent and warrant to the other that except for the Contracts and Permits, to each Party's respective Knowledge, there are no other contracts, agreements, rights of way or permits associated with the Existing Unit or Unit Operations that will be binding on the Existing Unit after the Termination Date.

7.3 **Equipment and Facilities**. DOE and Chevron represent and warrant to the other that except for the Equipment and Facilities, to each Party's respective Knowledge, there is no other physical personal property and fixtures owned by both Parties and used in connection with the Existing Unit or Unit Operations.

7.4 **Authority**. DOE and Chevron each represents and warrants to the other that it has good and sufficient authority to execute and deliver this Agreement and to perform its respective obligations hereunder. This Agreement has been duly authorized, executed, and delivered by the Parties and constitutes the legal, valid and binding obligation of the Parties, enforceable against them in accordance with its terms. Each individual signing this Agreement warrants and represents

that he or she has full authority to execute the same on behalf of the Party for whom he or she is signing.

7.5 Continuing Duty to Supplement. If either DOE or Chevron has Knowledge that any of the representations and warranties contained in this Article 7 is untrue in any material respect, such Party shall deliver written notice to the other Party, together with a supplement, if necessary, to the representation and warranty in order to make such representation and warranty true in all material respects.

## ARTICLE 8
## MEASUREMENT OF PRODUCTION ON CLOSING DATE

8.1 DOE and Chevron shall conduct or cause to be conducted an inventory of all produced hydrocarbons present within the production, storage, pipeline and shipping facilities at NPR-1 as of 7:00 a.m., Pacific Time, on the Closing Date. The purpose of the inventory is to determine the amount of produced hydrocarbons in process or storage at NPR-1 when the UPC terminates and to treat such hydrocarbons as produced prior to the Closing Date (except as indicated below with respect to hydrocarbons in flow lines).

8.2 Such inventory shall be conducted in accordance with the procedures and assumptions specified in Exhibit I attached hereto. All produced hydrocarbons identified at NPR-1 in the inventory conducted on the Closing Date shall be deemed to have been produced prior to the Closing Date (i.e., before termination of the UPC) and shall be included in the final production allocation and balancing under the UPC (and the costs incurred to produce such hydrocarbons prior to the Closing Date shall be included as Unit Expenses). Any produced hydrocarbons in the flow lines above or upstream from the field separators on the Closing Date (i.e., above the point at which measurements of

production will be made on the Closing Date) shall be treated as produced after termination of the UPC.

8.3 DOE shall retain Saybolt Corp. to observe and verify all measurements made during the inventory conducted on the Closing Date, and a copy of such firm's report will be provided to DOE and Chevron. Representatives of both Chevron and DOE may observe and verify the measurements made during the inventory conducted on the Closing Date.

8.4 As between DOE and Chevron, nothing in this Article 8 shall be deemed or construed as changing the ownership or status of any produced hydrocarbons included in such inventory. For example, if any hydrocarbons included in the inventory were produced from non-unit areas (e.g., Section 26Z, etc.), such hydrocarbons shall continue to be treated as non-unit hydrocarbons.

## ARTICLE 9
## ALTERNATIVE DISPUTE RESOLUTION

9.1 **Administrative Dispute Resolution Act**. Except as otherwise explicitly set forth in this Article to the contrary, the Administrative Dispute Resolution Act of 1996, Public Law 104-320, and all rules and regulations promulgated thereunder, will govern any disagreement, difference, or dispute by the Parties with respect to the matters arising under this Agreement.

9.2 **Negotiation**. If there is a claim or dispute arising under this Agreement, the Parties shall make good faith efforts to resolve the dispute or claim through negotiation. If the Parties are unable to resolve the dispute or claim through these good faith efforts within thirty (30) days after the commencement of the dispute or claim, (i) the Parties shall in good faith attempt to agree to mediation of the dispute or claim and the

terms and conditions of any such mediation procedure, or (ii) if the mediation does not resolve the dispute or claim (or the Parties do not agree on mediation), either disputing Party may serve upon the other Party a written demand for arbitration within ten (10) Business Days after the expiration of the 30-day period, or after conclusion of an unsuccessful mediation, as applicable. Within ten (10) Business Days after receipt of a written demand for arbitration, the Parties shall attempt to agree in writing on a Qualified Arbitrator (as that term is defined in Section 9.5). If the Parties are unable to agree, the Parties will seek the assistance of the American Arbitration Association for the selection of a mutually acceptable Qualified Arbitrator. All arbitration proceedings are subject to the Administrative Dispute Resolution Act of 1996, including the provisions set forth in 5 U.S.C. §572.

9.3 **Arbitration**. The arbitrator shall give each of the Parties ten (10) Business Days prior written notice of the date and time of the hearing on the claim or dispute and shall proceed without delay to hear and determine the matters in such dispute. No later than fifteen (15) Business Days after the date of the hearing, the arbitrator shall issue its award, together with written findings of fact and conclusions of law supporting its award. The arbitrator's award must be supported by law and substantial evidence and must comply with the terms of this Agreement. Any award that is not in accordance with the immediately preceding sentence will be deemed to be in excess of the arbitrator's powers and a court of competent jurisdiction shall vacate the award if, after review, it determines that the award cannot be corrected without affecting the merits of the decision made by the arbitrator upon the dispute submitted. The arbitrator's award is final and binding, may be confirmed and entered by any court of competent jurisdiction at the request of any Party, and may not be appealed to any court of competent jurisdiction or otherwise except pursuant to the Federal Arbitration Act, 9 U.S.C. §10.

9.4 __Forum for Mediation or Arbitration__. Any mediation or arbitration conducted pursuant to this __Article 9__ shall be conducted at a location mutually acceptable to DOE and Chevron.

9.5 __Qualified Arbitrator__. As used in this Agreement, the term "**Qualified Arbitrator**" means an arbitrator who is knowledgeable in the matter that is the basis of the claim or dispute.

9.6 __Costs and Expenses__. Each Party shall pay fifty percent (50%) of the costs and expenses of any arbitrator or mediator retained pursuant to this __Article 9__.

**ARTICLE 10**
**FINAL ACCOUNTING**

10.1 The Parties have developed the an accounting statement of work (the "**ASOW**") attached hereto as __Exhibit K__, which sets forth the scope of the Final Accounting for all costs and production related to or arising from the Existing Unit and the guidelines to be used in determining the basis for the Final Joint Owner Billing between the Parties. The parties shall comply with the ASOW.

10.2 Production adjustments resulting from the Final Accounting shall be valued pursuant to the prices set forth in Article II of the Decoupling Agreement.

10.3 DOE and Chevron shall cooperate in the audit. DOE and Chevron shall allow each other full access to all records reasonably necessary for completion of the audit. Should either Party fail to cooperate, the estimated time lines in the ASOW may be suspended by a Party who has not been provided access to the necessary records until access to all necessary records is provided by the Noncooperating Party.

10.4 Unless the Parties agree otherwise, all payments between the Parties arising from the Final Accounting, or equity finalization, shall be made in accordance with the procedures specified in Article II of the Decoupling Agreement.

10.5 Chevron and DOE acknowledge that UPC Section 11(b) provides that "Termination [of the UPC] shall be followed by an adjustment of all [of the parties' prior] rights and obligations, including the rights and obligations growing out of the costs incurred, and the respective quantities of production received, by [DOE] and [Chevron], respectively, under the contract, on a fair and equitable basis". Chevron and DOE acknowledge and agree that this provision of the UPC constitutes a general obligation of the United States secured by its full faith and credit and is enforceable in a court of competent jurisdiction. The Parties also acknowledge that payment by DOE of any amounts referenced in this Agreement is subject to the availability of funds appropriated for such purpose.

10.6 The Parties have agreed, for administrative convenience, that income received and costs incurred under this Agreement shall be allocated, and in the case of expenses, paid, currently during the course of the close-out work in accordance with Operating Program 2000. The Parties, however, intend that all such income and costs be included in the Final Accounting of Unit Expenses and income. As part of such Final Accounting, all income and expenses that were allocated according to Operating Program 2000 under this Agreement shall be reviewed and if such income or expense would have been assigned to a specific Zone or Zones under the Parties' practices during the term of the UPC, then such income or expense shall be assigned to such Zone or Zones and allocated between the Parties in accordance with the UPC Final Equity Participations for such Zone or Zones. If such income or expense would have been treated as an "all Zones" matter, then it shall be allocated in accordance with Operating

Program 2000, as the same has been adjusted to take into account the Parties' UPC Final Equity Participations.

## ARTICLE 11
## ABANDONMENT LIABILITY

11.1 In the Purchase Agreement Buyer agreed, among other things, that upon its acquisition of DOE's interest in NPR-1, Buyer would assume and pay, honor and discharge when due and in accordance with any relevant agreements, instruments and law, any and all obligations that DOE may have to plug and abandon, or remove and dispose of, all wells (including all oil, gas, water, disposal and injection wells), anode beds, structures, flow lines, tanks, pipelines and any other facilities or equipment now or hereafter located on the lands included within NPR-1 (the "Abandonment and Restoration Obligations").

11.2 Neither this Agreement nor the termination of the UPC shall be deemed to affect any rights that Chevron may have to seek contribution from DOE should Chevron be required to conduct Abandonment and Restoration Obligations upon a failure by Buyer to conduct same pursuant to its Purchase Agreement with DOE. Similarly, neither this Agreement nor the termination of the UPC shall be deemed to affect any rights that DOE may have to seek contribution from Chevron should DOE be required to pay, or reimburse others, for the performance of any Abandonment and Restoration Obligations, or for any similar obligations related to NPR-1, as defined in the UPC, that were the responsibility of Chevron. The Parties acknowledge that it is their intent that neither the termination of the UPC nor this Agreement shall release either Party from any liability it may have to the other Party, including, but not limited to, the cost to plug and abandon wells, anode beds, structures, flowlines, tanks, pipelines and other facilities or equipment at NPR-1.

ARTICLE 12

[INTENTIONALLY OMITTED]

ARTICLE 13

MISCELLANEOUS

13.1 Access to Certain Data. DOE and Chevron acknowledge that the equity redetermination process under the UPC will not be completed before the Closing Date and, as more particularly described on Exhibit J, DOE will continue to have access to certain information related to NPR-1 after the Closing Date.

13.2 Notices. All notices given in connection with this Agreement shall be in writing and shall be delivered either by personal delivery, by telegram, telex, telecopy or similar facsimile means, by certified or registered mail, return receipt requested, or by express courier or delivery service, addressed to the parties at the following addresses:

Chevron:

Chevron U.S.A. Production Company
P.O. Box 1392
Bakersfield, CA 93302
5001 California Avenue
Bakersfield, CA 93309
Attention: Mr. Jim Brady
Phone No.: (805) 395-6509
Fax No.: (805) 395-6450

and

Chevron U.S.A. Production Company
P.O. Box 1392
Bakersfield, CA 93302
4900 California Avenue
Bakersfield, CA 93309
Attention: Ms. Cynthia A. Giumarra
Phone No.: (805) 633-4695
Fax No.: (805) 633-4698

DOE

U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585
Attention: Assistant Secretary for Fossil Energy
Telecopy: (202) 586-7847
Telephone: (202) 586-6600

and

U.S. Department of Energy
Office of General Counsel
1000 Independent Avenue SW, Room 6B190
Washington, D.C. 20585
Attention: Mary H. Egger, Esq.
Telecopy: (202) 586-0325
Telephone: (202) 586-2440

copy to:

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Attention: Gregory B. Thorpe, Esq.
Telecopy: (213) 669-6407
Telephone: (213) 669-6000

Any notice given in accordance herewith shall be deemed to have been given (i) when delivered to the addressee in person, if by personal service, (ii) on the date of confirmed dispatch, if by facsimile transmission, or (iii) five (5) days after being placed in the U.S. Mail, if mailed. The Parties hereto may change the designated individuals, addresses, telephone numbers, and facsimile numbers to which such communications are to be addressed by giving written notice in the manner provided in this Section.

13.3 **Implementation**. Each Party hereto, upon written request of the other Party, agrees to execute all documents and instruments and take all other actions necessary to implement this Agreement.

13.4 Inducements. Each Party acknowledges that in entering into this Agreement it has not relied on any promises or inducements not stated herein.

13.5 Waiver. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay on the part of any Party in exercising any right, power or privilege under this Agreement or the documents referred to herein shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (i) no claim or right arising out of this Agreement or the documents referred to herein can be discharged by one Party hereto, in whole or in part, by a waiver or renunciation of the claim or right unless approved in a writing signed by the other Party; (ii) no waiver which may be given by a Party shall be applicable except in the specific instance for which it is given; and (iii) no notice to or demand on one Party shall be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to herein.

13.6 Entire Agreement and Modification. This Agreement is intended by the Parties as a final expression of their agreement with respect to the subject matter hereof, and is intended as a

complete and exclusive statement of the terms and conditions of that agreement, and supersedes all prior agreements of the Parties. This Agreement may not be modified, rescinded or terminated orally, and no modification, rescission, termination or attempted waiver of any of the provisions hereof (including this Section) is valid unless in writing and signed by the Party against whom the same is sought to be enforced.

13.7 Conflict. Chevron and DOE each acknowledge that this Agreement does not create any new rights and obligations under the UPC or modify any of the existing rights and obligations under the UPC. To the maximum extent possible, this Agreement shall be interpreted to be consistent with the UPC. In addition, this Agreement is not intended to alter any provisions of the Decoupling Agreement or the Equity Process Agreement, and in the event of a conflict between this Agreement and either or both of such documents, those documents shall control.

13.8 Assignments, Successors and No Third-Party Rights. This Agreement shall apply to and be binding in all respects upon, and shall inure to the benefit of, the successors and assigns of the Parties hereto. No other person has any right, benefit, priority, or interest hereunder or as a result hereof or has standing to require satisfaction of the provisions hereof in accordance with their terms.

13.9 **Severability**. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any material adverse manner to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

13.10 **Section Headings, Construction**. The headings of articles and sections contained in this Agreement are provided for convenience only. They form no part of this Agreement and shall not affect its construction or interpretation. All references to articles and sections in this Agreement refer to the corresponding articles and sections of this Agreement. All words used herein shall be construed to be of such gender or number as the circumstances require. Unless otherwise specifically noted, the words "herein," "hereof," "hereby," "hereinabove," "hereinbelow," "hereunder," and words of similar import, refer to this Agreement as a whole and not to any particular section, subsection, paragraph, clause or other subdivision hereof. This Agreement shall be construed without

regard to the identity of the Party which drafted the various provisions. Each and every provision of this Agreement will be construed as though all of the Parties participated equally in the drafting and any rule of construction that a document is to be construed against the drafting party is not applicable to this Agreement.

13.11 **Exhibits**. All of the Exhibits referred to in this Agreement are hereby incorporated in this Agreement by reference and constitute a part of this Agreement. Each Party to this Agreement has received a complete set of Exhibits prior to and as of the execution of this Agreement.

13.12 **Time of Essence**. With regard to all time periods set forth or referred to in this Agreement, time is of the essence.

13.13 **Governing Law; Forum**. THIS AGREEMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH UNITED STATES FEDERAL LAW. Any legal action, suit or proceeding brought by one Party against the other Party with respect to any matter arising out of this Agreement or the transactions contemplated hereby must be brought in the United States District Court for the State of California, Eastern District or in the Court of Federal Claims in Washington, D.C. In the event both such courts would have jurisdiction over the action, suit or proceeding, then the matter shall be brought in

the Court of Federal Claims in Washington, D.C. Subject to any jurisdictional limits imposed by the aforementioned courts, DOE and Chevron each hereby irrevocably accepts and submits to the exclusive jurisdiction of each of the aforementioned courts *in personam* generally and unconditionally with respect to any such action, suit or proceeding brought by, on behalf of or against DOE or Chevron arising out of this Agreement, and expressly waive any defense of *forum non conveniens*. Nothing in this Section shall be deemed to waive either Party's right to service of process in accordance with applicable laws.

13.14 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute but one and the same agreement. A faxed copy of a Party's counterpart signature will be deemed to be an original instrument on the date of dispatch so long as the original executed counterpart is received by the other Party with two Business Days after the date of dispatch.

[Signatures on following page]

IN WITNESS WHEREOF, the DOE and Chevron have each caused this Agreement to be executed as of the date first written above.

DOE: UNITED STATES OF AMERICA, acting by and through the Department of Energy

By: Patricia Fry Godley

Name: ______

Title: ______

CHEVRON: CHEVRON U.S.A. INC., a Pennsylvania corporation

**By:** ______

**Name:** ______

**Title:** ______

IN WITNESS WHEREOF, the DOE and Chevron have each caused this Agreement to be executed as of the date first written above.

DOE: UNITED STATES OF AMERICA, acting by and through the Department of Energy

By: ____________________

Name: ____________________

Title: ____________________

CHEVRON: CHEVRON U.S.A. INC., a Pennsylvania corporation

By: [signature]

Name: N. R. JENSEN

Title: Assistant Secretary

IN WITNESS WHEREOF, the DOE and Chevron have each caused this Agreement to be executed as of the date first written above.

DOE: UNITED STATES OF AMERICA, acting by and through the Department of Energy

By: ____________________

Name: ____________________

Title: ____________________

CHEVRON: CHEVRON U.S.A. INC., a Pennsylvania corporation

By: [signature]

Name: N.R. JENSEN

Title: Assistant Secretary