No. 04-1365C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHEVRON U.S.A. INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MOTION TO DISMISS

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

ROBERT E. KIRSCHMAN, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 307-6289
Facsimile: (202) 514-7969

Attorneys for Defendant

OF COUNSEL:

PAUL T. MICHAEL
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., NW
Washington, D.C. 20585

November 19, 2004

**TABLE OF CONTENTS**


**PAGE**

DEFENDANT'S MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I. Standard Of Review . . . . . . . . . . . . . . . . . . 11

II. Chevron Has Failed To State A Claim Upon Which Relief Can Be Granted In This Court . . . . . . . . . 12

A. The Equity Process Agreement Did Not Create A Substantive Right Which Can Be Fairly Interpreted As Mandating Compensation To Chevron . . . . . . . . . . . . 12

B. Because This Dispute Arises In The Context Of An Established Statutory Scheme That Does Not Contemplate Judicial Review, This Court Does Not Possess Jurisdiction To Consider Chevron's Complaint . . . . . . . . . . 17

1. The Authorization Act for FY96 Provides The Secretary Of Energy With Maximum Discretion To Choose A Method To Make A Final Determination Regarding The Parties' Final Equity Interests . . . . . . 18

2. The Authorization Act For FY96 Clearly Contemplated No Judicial Review Of The Equity Finalization Process . . . . . . . . 21

**TABLE OF CONTENTS (Contd.)**

**PAGES**

C. In The Absence Of A Statute Or Contract Provision Creating A Substantive Right Specifically To Recover Attorney Fees, They Are Unrecoverable In This Court . . . . . 22

D. Chevron's Claims Are Barred By The Agreed-Upon Terms Of The Equity Process Agreement . . 26

E. Because The Damages Chevron Seeks Could Not Have Been Caused By The Alleged Breach Of Contract, Chevron Is Barred From Recovering Those Damages As A Matter Of Law . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 38

## TABLE OF AUTHORITIES

**CASES** **PAGES**

Bobula v. United States Department of Justice,
970 F.2d 854 (Fed. Cir. 1992) . . . . . . . . . . . . . . . 22

Chevron, U.S.A. Production Co. v. O'Leary,
958 F. Supp. 1485 (E.D. Cal. 1997) . . . . . . . . . . . . 36

Collins v. United States,
67 F.3d 284 (Fed. Cir. 1995) . . . . . . . . . . . . . 18, 20

Conley v. Gibson,
355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . 12

Del-Rio Drilling Programs, Inc. v. United States,
146 F.3d 1358 (Fed. Cir. 1998) . . . . . . . . . . . . . . 18

Do-Well Mach. Shop, Inc. v. United States,
870 F.2d 637 (Fed. Cir. 1989) . . . . . . . . . . . . . . . 27

Eastport Steamship Corp. v. United States,
178 Ct. Cl. 599, 372 F.2d 1002 (1967) . . . . . . 12, 13, 14

England v. Contel v. Advanced Systems,
384 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . 24, 25

Garner v. United States,
230 Ct. Cl. 941 (1982) . . . . . . . . . . . . . . . . . . 37

Griswold v. United States,
61 Fed. Cl. 458 (2004) . . . . . . . . . . . . . . . . . **passim**

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . 37

Haynes v. United States,
61 Fed. Cl. 788 (2004) . . . . . . . . . . . . . . . . . . 34

Kania v. United States,
227 Ct. Cl. 458, 650 F.2d 265 (1981) . . . . . . . . . 17, 24

Khan v. United States,
201 F.3d 1375 (Fed. Cir. 2000) . . . . . . . . . . . . . . 13

**TABLE OF AUTHORITIES (Contd.)**

**CASES** **PAGES**

Lee v. United States,
33 Fed. Cl. 374 (1995) . . . . . . . . . . . . . . . . . . . 13, 14

Leesona Corp. v. United States,
220 Ct. Cl. 234, 599 F.2d 958 (1979) . . . . . . . . . . . . 37

Library of Congress v. Shaw,
478 U.S. 310 (1986) . . . . . . . . . . . . . . . . . . . . 24, 25

Locke v. United States,
151 Ct. Cl. 262, 283 F.2d 521 (1960) . . . . . . . . . . . . 36

Madigan v. Hobin Lumber Co.,
986 F.2d 1401 (Fed. Cir. 1993) . . . . . . . . . . . . . . . 26

Massie v. United States,
166 F.3d 1184 (Fed. Cir. 1999) . . . . . . . . . . . . . . . 18

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,
473 U.S. 614 (1985) . . . . . . . . . . . . . . . . . . . . . 27

Moehl v. United States,
29 Fed. Cl. 249 (1993), rev'd on other grounds,
60 F.3d 839 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . 37

New York Life Ins. Co. v. United States, ,
118 F.3d 1553 (Fed. Cir. 1997) . . . . . . . . . . . . . . . 13

Perez v. United States,
156 F.3d 1366 (Fed. Cir. 1998) . . . . . . . . . . . . . . 11-12

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) . . . . . . . . . . . . . . 33-34

San Carlos Irrigation & Drainage District v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . 33, 34

Servidone Construction Corp. v. United States,
931 F.2d 860 (Fed. Cir. 1991) . . . . . . . . . . . . . 33, 34

Smithson v. United States,
847 F.2d 791 (Fed. Cir. 1988) . . . . . . . . . . . . . . . 24

**TABLE OF AUTHORITIES (Contd.)**


| CASES | PAGES |
|---|---|
| Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931) | 33-34 |
| Texas Instruments Inc. v. United States, 991 F.2d 760 (Fed. Cir. 1993) | **passim** |
| Tippett v. United States, 185 F.3d 1250 (Fed. Cir. 1999) | 14 |
| Todd v. United States, 386 F.3d 1091 (Fed. Cir. 2004) | 30 |
| United States v. Connolly, 716 F.2d 882 (Fed. Cir. 1983), cert. denied, 465 U.S. 1065 (1984) | 12, 13 |
| United States v. Fausto, 484 U.S. 439 (1988) | 24 |
| United States v. King, 395 U.S. 1 (1969) | 13, 14, 15 |
| United States v. Mescalero Apache Tribe, 207 Ct. Cl. 369, 518 F.2d 1309 (1975) | 25 |
| United States v. Mitchell, 445 U.S. 535 (1980) | 13 |
| United States v. Testan, 424 U.S. 392 (1976) | 12, 13 |
| Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012 (Fed. Cir. 1996) | 33 |

**TABLE OF AUTHORITIES (Contd.)**


**STATUTES, RULES AND REGULATIONS** **PAGES**

10 U.S.C. § 7420 note . . . . . . . . . . . . . . . . . . 6, 27

10 U.S.C. §§7420-7439 . . . . . . . . . . . . . . . . . . 18, 27

Pub. L. 104-106, §§ 3412-3416
(codified at 10 U.S.C. § 7420 note) . . . . . . . . . . 6, 18

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . 12

RCFC 10(c) . . . . . . . . . . . . . . . . . . . . . . . . . 1

RCFC 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . 1, 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., Plaintiff, | ) | No. 04-1365C (Judge Braden) |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court dismiss the complaint of plaintiff Chevron U.S.A. Inc. ("Chevron") upon the ground that plaintiff has failed to state a claim upon which relief can be granted. In support of its motion, defendant relies upon the complaint, and the following brief.[1]

DEFENDANT'S BRIEF

Nature of the Case

In this case, Chevron alleges that the United States Department of Energy ("DOE") breached a 1997 agreement between the parties which established an "equity finalization implementation process." That agreement is referred to as the "Equity Process Agreement." Specifically, Chevron alleges both a breach of contract and breach of the implied covenant of good faith and fair dealing.

[1] "Comp. __" refers to plaintiff's complaint. "Comp. App. __" refers to the appendix to plaintiff's complaint. This appendix is considered part of the complaint for purposes of the motion to dismiss. See RCFC 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

The "finalization process" established by the Equity Process Agreement was used to determine the respective ownership interests of the parties in Elk Hills Field, an oil- and gas-producing unit in California, Naval Petroleum Reserve No. 1. That "finalization process" included, in part, presentations from each party's designated Equity Finalization Team ("EFT") to an Independent Petroleum Engineer ("IPE") and submissions to a DOE Assistant Secretary, who was designated by the Secretary of Energy to fulfill the statutory role of decision-maker. Chevron alleges that DOE breached the Equity Process Agreement because its counsel served in conflicting roles as advisor to the DOE equity team and as advisor to the Assistant Secretary, and by engaging in prohibited <u>ex parte</u> communications with the IPE and the Assistant Secretary assigned to consider the parties' presentations and make a determination regarding their ownership interests.

Based upon this alleged breach of the Equity Process Agreement, Chevron seeks the attorney fees and other costs and expenses it incurred in participating in the equity redetermination proceedings during the finalization process.

## <u>Statement Of The Issues</u>

1. Whether the Equity Process Agreement entered into by the parties conferred jurisdiction upon this Court to consider Chevron's complaint.

2. Whether Chevron's claims are barred by the terms of the Equity Process Agreement agreed upon by the parties.

3. Whether attorney fees and expenses incurred by Chevron while participating in the equity redetermination proceedings are recoverable in this Court as damages for an alleged breach of contract.

4. Whether Chevron can establish that the damages it seeks were caused by the alleged breach of contract and, if not, whether Chevron is barred from recovering those damages as a matter of law.

## Statement of Facts

The facts relevant to this motion are numerous, but relatively straight-forward.[2] In 1944, the United States Department of the Navy and Standard Oil of California, the predecessor of plaintiff Chevron, combined the operations of their respective ownership interests in the oil and gas fields of Naval Petroleum Reserve No. 1 (Elk Hills) in a unitization agreement commonly referred to as the 1944 Unit Plan Contract or UPC. Compl. ¶10. A unitization agreement is a contract under which owners of interests in a common oil or gas field combine their respective interests and agree to produce commonly, with each owner receiving a share of all production from the common unit. Compl. ¶9.

[2] The facts are developed largely from Chevron's complaint. For purposes of this motion only, we accept as true and correct the allegations within Chevron's complaint. Should the Court deny this motion, we respectfully reserve the right to challenge the allegations within Chevron's complaint.

The 1944 Unit Plan Contract provided that the owners' respective interests were subject to redetermination, at the request of either party, based upon, for example, the development of more accurate information regarding the subterranean geology and a variation of commercially productive oil and gas bearing formations. Compl. ¶¶14-15; Compl. Exh. A1, pp. 7-8. Such redeterminations, which were retroactive to November 20, 1942, occurred from time to time between 1944 and 1996. Compl. ¶16.

The 1944 Unit Plan Contract expressly left the authority to resolve any disputes between the parties solely at the discretion of the Secretary of the Navy. For example, the UPC created an "Engineering Committee" which consisted of petroleum engineers or geologists representing both the Navy and Standard. Compl. Exh. A1, p. 6. The Engineering Committee was, among other things, authorized to determine, if unanimous, revisions in the percentage participation of the parties in the production from any commercially productive zone underlying lands in the Reserve. Id., pp. 7-8. Any revision unanimously agreed upon by the Engineering Committee would become binding on both the Navy and Standard. However, the UPC provided that, "[i]f the Engineering Committee [was] unable to agree unanimously upon any such proposed revision, the Secretary of the Navy, as provided in Section 9, shall determine what revision, if any, shall be made." Id., p. 8. In turn, section 9(b) of the UPC stated, in relevant part:

> In the event the Engineering Committee is unable to agree unanimously upon any matter subject to determination by it, said Committee shall notify both Navy and Standard thereof and shall refer such matter to the Secretary of the Navy for determination. Thereupon, the Secretary of the Navy on his own initiative may, and upon the request of Standard shall, submit the matter to an independent petroleum engineer, to be selected by him, for the purpose of securing an advisory report thereon from such engineer. . . . After consideration of the matter, the Secretary of the Navy shall render his decision thereon and such decision in each such instance shall be final and shall be binding upon Navy and Standard.

Id., p. 15.[3]

Finally, the 1944 Unit Plan Contract authorized the Secretary of the Navy to terminate the contract at any time in his discretion, subject to the approval of the President and after six months written notice to Standard. Compl. Exh. A1, p. 15. It also provided that "[t]ermination shall be followed by an adjustment of all . . . rights and obligations, including the rights and obligations growing out of the costs incurred, and the respective quantities of production received, by Navy and Standard, respectively, under the contract, on a fair and equitable basis." Id.

---

[3] Section 9(a) of the 1944 Unit Contract Plan similarly addressed the resolution of disputes by an Operating Committee that was to be established pursuant to the UCP. Section 9(a) provided: "In the event the Operating Committee is unable to agree upon any matter arising in the performance of its functions, such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and shall be binding upon Navy and Standard." Id.

In 1976, Congress enacted the Naval Petroleum Reserve Production Act of 1976, and determined that the Navy's original goal in entering into the 1944 Unit Plan Contract (that is, to maintain the Reserve in a state of readiness in case of national emergency) was no longer necessary. Rather, the Navy was directed to produce the Reserve at its "maximum efficient rate." In 1977, Congress transferred authority over the oil and gas Reserve from the Navy to the DOE pursuant to Section 307 of the Department of Energy Organization Act, Pub. L. 95-91.

Almost 20 years later, in 1996, Congress passed the National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106, §§ 3412-3416 (codified at 10 U.S.C. § 7420 note). Subject to certain conditions, the statute required that DOE sell the United States' interest in the Reserve within two years. Pub. L. 104-106 § 3412(a) (hereinafter, the "Authorization Act for FY96"). The Secretary of Energy was also required by Congress to finalize the owners' equity interests in the Reserve. The process developed by DOE to finalize the owners' equity interests is commonly referred to as the "equity finalization process." Compl. ¶19.

Congress left the finalization of the parties' equity interests to the sole discretion of the Secretary of Energy. The Authorization Act for FY96 specifically provided:

> (1) . . . the Secretary shall finalize equity interests of the known oil and gas zones in Naval Petroleum Reserve Numbered 1 in the manner provided by this subsection.

> (2) The Secretary shall retain the services of an independent petroleum engineer, mutually acceptable to the equity owners, who shall prepare a recommendation on final equity figures. The Secretary may accept the recommendation of the independent petroleum engineer for final equity in each known oil and gas zone . . . or the Secretary may use such other method to establish final equity interest in the reserve as the Secretary considers appropriate.
>
> (3) If. . . there is an ongoing equity redetermination dispute between the equity owners under section 9(b) of the unit plan contract [the 1944 Unit Plan Contract], the dispute shall be resolved in the manner provided in the unit plan contract. . . . The resolution shall be considered final for all purposes under this section.

Authorization Act for FY 1996, § 3412(b).

Pursuant to the Authorization Act for FY96, the DOE Assistant Secretary for Fossil Energy ("ASFE")issued ASFE Administrative Order No. 96-01 on July 8, 1996. Compl. Exh C. This Administrative Order established an equity finalization implementation process protocol for the presentation to an independent petroleum engineer ("Equity IPE") equity positions by technical teams designated by DOE and Chevron prior to the Equity IPE formulating a recommendation. Chevron expressly accepted the terms of this 1996 protocol. Compl. Exh. C; Compl. Exh. D. The protocol began by quoting the entire language of section 3412(b)(2). It also recognized the parties' agreement upon Netherland, Sewell & Associates ("NSA") as the mutually acceptable Equity IPE. Id., p. 1.

The 1996 protocol then provided that "[t]here will be no written or oral equity-related communication or meeting with the Equity IPE (this term excludes contract administration communications or meetings) by an owner (including its agents and contractors) without the participation or opportunity to participate by the other owner." Id., p. 3. Similarly, the 1996 protocol stated, "[a]ll equity-related meetings with the Equity IPE, including the presentation by the owners of their respective equity positions for each zone, will be sessions at which both owners are invited to attend (this excludes contract administration meetings that may be required by DOE)." Id.

The 1996 protocol also made clear that NSA, the Equity IPE, would not be making a final determination on the equity finalization, but would instead be providing the ASFE only with a recommendation. Id., p. 5.

Finally, the 1996 protocol stated clearly:

> In the event a disagreement arises regarding the equity finalization implementation process or this Protocol which cannot be resolved jointly by the Equity IPE and the EFTs, the matter shall be referred to the Assistant Secretary for Fossil Energy (or designee) for resolution. Prior to resolution, the Assistant Secretary will consult with Chevron.

Id., p. 6.

In 1997, the parties agreed to "decouple" the sale of the United States' interest in the Reserve from the equity finalization process mandated by statute, because the equity finalization process was taking longer than had been contemplated

by Congress. Compl. ¶¶22-23. Specifically, on May 17, 1997, DOE and Chevron entered into two agreements: the "Agreement Regarding Fixing of Equity Interest at Naval Petroleum Reserve No. 1 for Purposes of Sale," (the "Decoupling Agreement") and the "Agreement Regarding Equity Redetermination Process," (previously and hereafter referred to as the "Equity Process Agreement"). The Decoupling Agreement fixed the ownership interests of DOE and Chevron for purposes of sales and decoupled the sale of the Government's share of the Reserve from the equity finalization process, allowing the former to occur before completion of the latter. Compl. Exh. B1. The Equity Process Agreement set forth procedures to "finalize all equity interests in the four unitized productive zones within Naval Petroleum Reserve No. 1 (Elk Hills) pursuant to section 3412(b)." Compl. ¶¶ 26-27; Compl. Exh. B2.

Regarding the procedures to be employed by the parties, the Equity Process Agreement stated, in relevant part:

> The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity re-determination-related matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an ex parte basis.

Comp. Exh. B2, p. 3.

The Equity Process Agreement reflected the statutory requirement that NSA would provide only recommendations to the Secretary. Comp. Exh. B2, p. 3. It also established the

exclusive means for resolution of disagreements regarding an equity finalization decision: the referral of Chevron's challenges of the ASFE's equity finalization decisions to the Department of Energy's Office of Hearings and Appeals ("OHA"). Id., p. 4. The parties specifically contemplated that the Secretary of Energy (or a designee) would issue a memorandum authorizing OHA to conduct the review established by the Equity Process Agreement and issue decisions based upon that review. Id., p. 7.

In addition, paragraph B.9 of the agreement established that the decision of the AFSE or, if that decision were challenged, the decision of the OHA "shall be final, binding, and non-appealable." Id., pp. 4-5. It further states, in relevant part, that

> Chevron and DOE have agreed, as an alternative to judicial resolution of any dispute regarding the ASFE equity redetermination decisions, to submit any challenge to such decisions to OHA and to be bound by the results thereof, without right of any further administrative or judicial review or appeal (nothing in the foregoing, however, shall be deemed to expand Chevron's right to challenge an ASFE decision beyond that permitted in paragraphs B.7 and B.8 above.) To implement the foregoing, DOE and Chevron each knowingly and voluntarily waives any and all rights it may have (i) to bring any other judicial or administrative challenge to the final equity determination decisions by the ASFE, or (ii) to bring any judicial or administrative challenge to any decision by OHA.

Complaint, Exhibit B2, p. 5.

Finally, the Equity Process Agreement contains no provision addressing the payment of money to either party. As its title implies, it addresses only a process.

ARGUMENT

I. Standard Of Review

In deciding whether dismissal for failure to state a claim is appropriate in this case, the Court must focus upon whether the complaint contains allegations, that, if proven, are sufficient to entitle Chevron to the relief it seeks. A motion to dismiss under Rule 12(b)(6) is appropriate when the facts asserted by the plaintiff do not entitle it to a remedy under the law. Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998); see Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (motion to dismiss for failure to state a claim should only be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim which would entitle him to relief"). Whether Chevron's complaint states a claim for which relief can be granted is a question of law. Texas Instruments Inc. v. United States, 991 F.2d 760, 766 (Fed. Cir. 1993). In the context of this case, this inquiry focuses upon applicable precedent and an analysis of the terms of the agreements between the parties.

II. Chevron Has Failed To State A Claim Upon Which Relief Can Be Granted In This Court

A. The Equity Process Agreement Did Not Create A Substantive Right Which Can Be Fairly Interpreted As Mandating Compensation To Chevron

Chevron has failed to state a claim for which this Court possesses jurisdiction to grant relief. Chevron cites the Tucker Act, 28 U.S.C. § 1491, as the basis of the Court's jurisdiction. Compl. ¶6. However, the Tucker Act does not create any substantive right of recovery against the United States for money damages. United States v. Testan, 424 U.S. 392, 398 (1976); Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605-607, 372 F.2d 1002, 1007-09 (1967). Rather, it merely confers jurisdiction upon the Court whenever the substantive right exists. Testan, 424 U.S. at 398; United States v. Connolly, 716 F.2d 882, 885 (Fed. Cir. 1983) (en banc), cert. denied, 465 U.S. 1065 (1984). A plaintiff, therefore, must look beyond this jurisdictional statute and establish a substantive right that entitles it to recover. United States v. Mitchell, 445 U.S. 535, 538 (1980); Connolly, 716 F.2d at 885. Chevron cannot meet that burden here.

A plaintiff such as Chevron that seeks to invoke the court's jurisdiction must present a claim for "actual, presently due money damages from the United States." United States v. King, 395 U.S. 1, 3 (1969); New York Life Ins. Co. v. United States, 118 F.3d 1553, 1556 (Fed. Cir. 1997) ("The claim must, of course, be for money."). Claims against the United States for damages

"must arise from violation of the Constitution, a statute or regulation, or contractual rights which may be fairly interpreted as requiring the payment of compensation from the United States." Lee v. United States, 33 Fed. Cl. 374, (1995), citing Testan, 424 U.S. at 401-02 (emphasis added); Khan v. United States, 201 F.3d 1375, 1377 (Fed. Cir. 2000) ("to invoke jurisdiction under the Tucker Act, a plaintiff must identify a contractual relationship, constitutional provision, statute, or regulation that provides a substantive right to money damages"). The substantive right claimed must be one which "can be fairly interpreted as mandating compensation by the Federal Government for the damages sustained." Eastport S.S. Corp., 372 F.2d at 1009.[4] A plaintiff must, therefore, identify a separate statute or regulation or contract provision that creates a substantive right entitling it to the money damages it seeks. See Tippett v. United States, 185 F.3d 1250 (Fed. Cir. 1999). Even where the Government's alleged actions would constitute a violation of the terms of the parties' agreement, the contractual right violated by the Government still has to be "'fairly interpreted' as requiring the government to pay money for the 'damage sustained.'" Griswold v. United States, 61 Fed. Cl. 458, 466 (2004), quoting Eastport S.S. Corp., 372 F.2d at 1009.

---

[4] Claims which are merely "money-oriented" or "money cast," that is, claims that somehow relate to the ultimate recovery of money, administratively or judicially, are not sufficient. King, 395 U.S. at 3.

In this case, the substantive right that Chevron alleges was violated cannot be fairly interpreted as mandating the payment of compensation to Chevron. The Equity Process Agreement addressed a procedure whereby the parties would present their positions to the IPE and the Assistant Secretary. It did not address or contemplate the payment of money under any condition. It did not create "contractual rights which may be fairly interpreted as requiring the payment of compensation from the United States." Lee, 33 Fed. Cl. at 378. Chevron's complaint does not indicate otherwise, either directly or implicitly.

Here, the contractual provisions Chevron identifies do not entitle it to money damages. According to Chevron, DOE allegedly violated this language within the Equity Process Agreement:

> The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity team does not include the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an ex parte basis.

Compl., App. B2, p.3.

Even a critical review of this language leads to the inevitable legal conclusion that Chevron has failed to present a claim for actual, presently due money damages. King, 395 U.S. at 3. This language does not in any way require the United States to pay money damages for any alleged "damage sustained," or for that matter, to pay money under any circumstance. In sum, it

does not contemplate the creation of rights to money in Chevron.

This case is similar to that encountered by the Court in Griswold, 61 Fed. Cl. 458. In that case, the plaintiffs had entered into settlement agreements with the United States Postal Service ("USPS") after having filed discrimination suits against the Government. Subsequent to the execution of those settlement agreements, the plaintiffs alleged that the USPS violated the express terms of the agreements by not following certain procedures established by the agreements. Specifically, the plaintiffs alleged that the USPS failed to inform the plaintiffs, through their counsel of record, of the date and time for the next civil service examination. Id. at 465. As a result of the alleged breach, the plaintiffs sought compensatory damages in an amount equal to the amount they would have earned if they had become employed by the USPS.

This Court concluded that the plaintiffs in Griswold had not invoked the Court's jurisdiction. The Court explained that "even though defendant's alleged failure to provide notice. . . would constitute a violation of the terms of the Settlement Agreements, that identified 'substantive right' to notice cannot . . . be 'fairly interpreted' as requiring the government to pay money for the 'damage sustained.'" Id. at 466.

This case presents the Court with an analogous situation. Even assuming a violation of the procedures established by the Equity Process Agreement, the terms of that agreement simply cannot be "fairly interpreted" as requiring the Government to pay

money. Those plain terms created no monetary obligation upon the part of the Government under any circumstance.

Here, this is especially apparent because, as established below, the determination of the parties' final equity interests was made within an established statutory scheme that dictated clearly that any disputes regarding the method by which those interests would be determined was left to the final decision of the Secretary. Moreover, as also established below, the parties had established a limited administrative review process that would address review of the decision of the Assistant Secretary. Thus, to the extent that Chevron was, hypothetically, "harmed" by the decision of the Assistant Secretary, that harm is to be addressed through that administrative review process. Clearly, the terms of the Equity Process Agreement cannot reasonably be read to provide a basis for money damages in light of this framework.

B. Because This Dispute Arises In The Context Of An Established Statutory Scheme That Does Not Contemplate Judicial Review, This Court Does Not Possess Jurisdiction To Consider Chevron's Complaint

It is well-settled that "[t]he contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds." Kania v. United States, 227 Ct. Cl. 458, 650 F.2d 265, 268 (1981). Thus, the mere fact that Chevron's complaint alleges a breach of contract does not confer

jurisdiction upon this Court. It is by now axiomatic that a contract dispute does not fall within the purview of the Tucker Act if Congress has placed jurisdiction to consider it elsewhere. Massie v. United States, 166 F.3d 1184, 1188 (Fed. Cir. 1999); Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1367 (Fed. Cir. 1998); Collins v. United States, 67 F.3d 284, 286 (Fed. Cir. 1995). As established below, this is such a case.

1. The Authorization Act for FY96 Provides The Secretary Of Energy With Maximum Discretion To Choose A Method To Make A Final Determination Regarding The Parties' Final Equity Interests

The Equity Process Agreement was entered into between the parties to address specifically the equity finalization that was mandated as part of an integrated statutory scheme established by Congress. National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106, §§ 3412-3416(codified at 10 U.S.C. § 7420 note (1998) (the "Authorization Act for FY96"); see 10 U.S.C. §§ 7420-7439. This congressional scheme provides the Secretary of Energy with maximum discretion in establishing the final equity interests of the parties, and set out the only avenue of relief for Chevron regarding disputes against DOE.

Section 3412 of the Authorization Act for FY96 established a specific statutory framework for the subsequent course of dealings between the parties. In section 3412(a), Congress required that the Secretary of Energy "shall enter into one or more contracts for the sale of all right, title, and interest of the United States in and to all lands owned or controlled by the

United States inside Naval Petroleum Reserve Numbered 1 [Elk Hills]."

Congress next specifically addressed the related issue of "equity finalization" in subsection (b) of section 3412. In subsection (b)(1) Congress instructed that "the Secretary shall finalize equity interests of the known oil and gas zones in Naval Petroleum Reserve Numbered 1 in the manner provided by this subsection." Congress then provided in subsection (b)(2):

> The Secretary shall retain the services of an independent petroleum engineer, mutually acceptable to the equity owners, who shall prepare a recommendation on final equity figures. The Secretary may accept the recommendation of the independent petroleum engineer for final equity in each known oil and gas zone. . . and establish final equity interest in Naval Petroleum Reserve Numbered 1 in accordance with the recommendation, or the Secretary may use such other method to establish final equity interest in the reserve as the Secretary considers appropriate.

Authorization Act for FY96, § 3412(b)(2) (emphasis added).

This language within subsection (b)(2) clearly gave the Secretary of Energy the discretion to determine the methods by which the final equity interest of the owners would be established. Thus, for example, although the Equity IPE could provide a recommendation, it was not binding upon the Secretary, who was free to "use such other method to establish final equity interest in the reserve as the Secretary considers appropriate." In such circumstances, where Congress has provided the head of an agency with discretion in determining a proper course, the

Federal Circuit has ruled that this Court does not possess jurisdiction under the Tucker Act. See Collins, 67 F.3d at 286 (the payment of the plaintiff's claim for attorney fees was discretionary with the Secretary of the Army, so that the Court did not possess jurisdiction to consider the Secretary's denial of the claim).

Following subsection (b)(2), section 3412(b)(3) of the Authorization Act For FY96 provided further evidence that the Secretary was authorized to make final decisions:

> If, on the effective date, there is an ongoing equity redetermination dispute between the equity owners under section 9(b) of the unit plan contract, the dispute shall be resolved in the manner provided in the unit plan contract within eight months after the effective date. The resolution shall be considered final for all purposes under this section.

Authorization Act for FY96, § 3412(b)(3) (emphasis added).[5]

Section 9(b) of the 1944 Unit Plan Contract, cited in section 3412(b)(3), captioned "Determination of Disputes," provided similarly that:

> In the event the Engineering Committee is unable to agree unanimously upon any matter subject to determination by it, said Committee shall notify both Navy and Standard thereof and shall refer such matter to the Secretary of the Navy for determination. Thereupon the Secretary of the Navy on his own initiative may, and upon the request of Standard shall, submit the matter to an independent petroleum engineer, to be

[5] At the time the Authorization Act for FY96 was enacted, there was an "ongoing equity redetermination dispute" over the Shallow Zone. Compl. B2, p. 1.

> selected by him, for the purpose of securing <u>an advisory report thereon from such engineer.</u> . . . After consideration of the matter, <u>the Secretary of the Navy shall render his decision thereon</u> <u>and such decision in each such instance shall be final and shall be binding upon Navy and Standard.</u>

Complaint, Exh. A (emphasis added). This language establishes unequivocally that the final decision regarding the equity determination rested with the Secretary.

2. <u>The Authorization Act For FY96 Clearly Contemplated No Judicial Review Of The Equity Finalization Process</u>

Section 3412(b) of the Authorization Act for FY96 and section 9(b) of the 1944 Unit Contract Plan together establish that any dispute between the parties was to be ultimately decided through an administrative process established by the Secretary and that his decision "shall be final and binding" for "all purposes." Section 3412 does not contemplate any judicial involvement in the dispute process established by Congress. To the contrary, it contemplated clearly that any continuing equity redetermination dispute at the time of the equity finalization was to be resolved by the Secretary and that resolution would be final.

Without question, disposition of Chevron's breach of contract claim would necessarily require this Court to review a subject matter reserved for another forum, here an administrative one. <u>See</u> <u>Bobula v. United States Department of Justice</u>, 970 F.2d 854, 858 (Fed. Cir. 1992) (where granting requested relief would require court to review the underlying subject matter that

Congress had placed under the exclusive control of another forum, review under the Little Tucker Act was precluded). Accordingly, the Court should decline Chevron's invitation to consider its complaint.

### C. In The Absence Of A Statute Or Contract Provision Creating A Substantive Right Specifically To Recover Attorney Fees, They Are Unrecoverable In This Court

Even assuming that the Court were to find that the Equity Process Agreement provides Chevron with a substantive right to money damages, it plainly does not create a substantive right to recover the specific relief Chevron seeks here - attorney fees and expenses. This Court thus lacks authority to grant such relief. Upon this additional ground, Chevron's claim for attorneys fees and expenses does not state a claim in this court upon which relief can be granted.

Precedent from both the United States Court of Appeals for the Federal Circuit and the United States Court of Claims establishes that Chevron has failed to state a claim for which relief can be granted. Chevron can point to no statute or regulation or contractual provision which may be fairly interpreted as requiring the payment of attorney fees and expenses by the United States. To the contrary, precedent establishes that the United States has not waived its sovereign immunity against such form of damages except in limited situations not applicable here.

In Texas Instruments, 991 F.2d 760, the Federal Circuit considered a breach of contract claim by Texas Instruments

("TI"), in which TI sought the attorney fees and expenses it incurred in participating in administrative proceedings before the Armed Services Board of Contract Appeals as a result of allegedly bad faith actions taken by the Government's contracting officer in handling and resolving a contract dispute. Like Chevron, Texas Instruments alleged both a breach of contract and a "breach of the implied duty of good faith and fair dealing implicit in all contracts." Id. at 762. Texas Instruments, similar to Chevron here, argued that the Government's actions damaged TI by requiring it to expend time, money and effort to participate in administrative proceedings that were necessitated by the Government's alleged bad faith actions. Id. at 763.

The Federal Circuit affirmed the conclusion of this Court that Texas Instruments' claim for attorneys fees did not state a claim upon which relief could be granted. The court concluded that the remedy sought by TI could not be found in a breach of contract theory. The court explained: "An award of money damages from the United States must have some concrete, legislatively authorized basis; that basis has not been shown to exist." Id. at 768, citing Library of Congress v. Shaw, 478 U.S. 310, 321 (1986); Smithson v. United States, 847 F.2d 791, 794 (Fed. Cir. 1988); Kania, 650 F.2d at 269; and United States v. Fausto, 484 U.S. 439, 440 (1988).

The analysis set forth by the Federal Circuit in Texas Instruments was analogous to, and guided by, the analysis expressed by the Supreme Court in Shaw. In that case, the

Supreme Court ruled that, in the absence of specific congressional consent to the award of interest, separate from a general waiver of immunity to suit, the United States is immune from an award of interest against it. The Court explained that a specific waiver of sovereign immunity applying to interest is necessary because interest is generally presumed not to be within the contemplation of the parties engaging in a contract. 478 U.S. at 314. Consequently, a general waiver of immunity from liability for breach of contract is not sufficient to include a waiver of immunity from liability for interest. The Court also held that this rule cannot be circumvented by characterizing interest as "damages."

The validity of the "no-interest rule" explained in Shaw was recently reconfirmed by the Federal Circuit in England v. Contel Advanced Systems, 384 F.3d 1372 (Fed. Cir. 2004). There, the court of appeals stressed the point made by the Supreme Court in Shaw:

> [T]he force of the no-interest rule cannot be avoided simply by devising a new name for an old institution: [T]he character or nature of "interest" cannot be changed by calling it "damages," "loss," "earned increment," "just compensation," "discount," "offset," or "penalty," or any other term, because it is still interest and the no-interest rule applies to it.

Id. at , quoting Shaw, 478 U.S. at 321 (quoting United States v. Mescalero Apache Tribe, 207 Ct. Cl. 369, 389, 518 F.2d 1309, 1322 (1975)).

Like the no-interest rule addressed by the Supreme Court in Shaw and the Federal Circuit in Contel Advanced Systems, the rule barring the award of attorney fees addressed in Texas Instruments is a result of the fact that the award of attorney fees as damages is not typically within the contemplation of the parties. That is certainly the case here, where the actions of the parties were within the framework of the Authorization Act for FY96.

Here, there is no statute authorizing an award of fees to Chevron. Nor does any contract provision provide for such relief. Consequently, in the absence of a specific waiver of sovereign immunity beyond any general waiver of immunity to suit, Chevron's attorney fees cannot be awarded against the Government, whether as direct costs or as part of Chevron's damages for breach of contract. Accordingly, the Court is constrained by Congress' limited waiver of sovereign immunity with respect to attorney fees, regardless of the fact that Chevron characterizes such fees as "contract damages."

The fact that Chevron incurred these attorney fees and expenses as part of the administrative process established to determine final equity interests does not alter the above analysis. Indeed, the equity finalization process was to serve as an alternative to litigation. The attorney fees expended by Chevron were thus alternative to, and clearly akin to, litigation fees. There is no statutory or contractual basis under those circumstances to hold the Government liable for the attorney fees

Chevron chose to expend in this process.[6]

D. Chevron's Claims Are Barred By The Agreed-Upon Terms Of The Equity Process Agreement

The Court should also dismiss this case because the parties reached an express agreement that judicial review was not available regarding the equity finalization. A long line of precedent has established that "agreed-upon contract terms must be enforced." Madigan v. Hobin Lumber Co., 986 F.2d 1401, 1403 (Fed. Cir. 1993). Thus, in a similar context, the Federal Circuit has ruled, "'[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" Do-Well Mach. Shop, Inc. v. United States, 870 F.2d 637, 640-41 (Fed. Cir. 1989) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985)).

Application of this rule is especially appropriate here, where the relevant statute certainly created no right in Chevron to pursue judicial review. To the contrary, as noted, Congress expressly stated that the Secretary "shall" establish final equity interests and specified a clear intent that the Secretary's determination of any continuing equity redetermin-ation dispute "shall be considered final for all purposes under

[6] In fact, this case can be readily compared to Texas Instruments, where the attorney fees were expended to proceed in an administrative procedure before an agency board, as opposed to proceeding in court.

this section." Authorization Act for FY 1996, § 3412(b)(2) (emphasis added). The 1997 Equity Process Agreement does not explicitly or implicitly wrest that discretion from the Secretary. At all times, and in all relevant documents, the final authority for the resolution of disputes remained within DOE. As established above, the Equity Process Agreement arose from a requirement imposed upon the Secretary by Congress pursuant to the comprehensive statutory framework set forth in 10 U.S.C. §§ 7420-7439 and, specifically, the Authorization Act for FY96 (10 U.S.C. § 7420 note). It expressly contemplated that the Secretary would be the final arbiter regarding any disputes between the parties concerning equity determinations.

The terms of the Equity Process Agreement establish that the parties have knowingly and voluntarily waived judicial review of the equity finalization process. Indeed, the parties' subsequent dealings and agreements were entirely consistent with the legislative terms and intentions addressed above. First, the 1996 protocol regarding the equity finalization implementation process, the terms of which were accepted by Chevron (Compl. Exhs. C and D), could not have been more clear in this regard. It specifically quoted section 3412(b)(2) of the Authorization Act for FY96, which established that the Secretary could use a method to establish final equity interest in the reserve "as the Secretary considers appropriate." Then, in paragraph 21 of the

1996 protocol, the parties agreed that

> In the event a disagreement arises regarding the equity finalization implementation process or this Protocol which cannot be resolved jointly by the Equity IPE and the EFTs, the matter shall be referred to the Assistant Secretary for Fossil Energy (or designee) for resolution. Prior to resolution, the Assistant Secretary will consult with Chevron.

Compl. Exhibit C (emphasis added). This language, with which Chevron concurred, makes it clear that the parties agreed that any dispute regarding the implementation process would be resolved administratively, by the ASFE or a designee.

Similarly, and more important, paragraph B.9 of the 1997 Equity Process Agreement, after establishing that the decision of the ASFE or the OHA "shall be final, binding, and non-appealable," stated unequivocally, in relevant part, that

> Chevron and DOE have agreed, as an alternative to judicial resolution of any dispute regarding the ASFE equity redetermination decisions, to submit any challenge to such decisions to OHA and to be bound by the results thereof, without right of any further administrative or judicial review or appeal (nothing in the foregoing, however, shall be deemed to expand Chevron's right to challenge an ASFE decision beyond that permitted in paragraphs B.7 and B.8 above.) To implement the foregoing, DOE and Chevron each knowingly and voluntarily waives any and all rights it may have (i) to bring any other judicial or administrative challenge to the final equity determination decisions by the ASFE, or (ii) to bring any judicial or administrative challenge to any decision by OHA.

Complaint, Exhibit B.2 (emphasis added). This language is controlling. The phrase "any dispute regarding the ASFE equity

redetermination decisions" is both broad and clear. Similarly, the phrases "without right of <u>any</u> further administrative <u>or judicial review</u> or appeal" and "Chevron . . . knowingly and voluntarily <u>waives any and all rights it may have</u> . . . to bring <u>any other judicial . . . challenge</u> to the final equity determination decisions by the ASFE," both express an unequivocal bar to judicial actions such as the one Chevron has filed here, related to the equity determination decisions of the ASFE. <u>See Todd v. United States</u>, 386 F.3d 1091, 1094 (Fed. Cir. 2004) (as alternative basis to dismiss the claims of the plaintiffs, Federal employees, the Court ruled, "the exclusive grievance procedures of the CBA [collective bargaining agreement] preclude any party from challenging the CBA in the Court of Federal Claims, thereby providing an additional reason that the Court of Federal Claims lacks jurisdiction.").

This conclusion is further bolstered by the clear mandate that "nothing in the foregoing, however, shall be deemed to expand Chevron's right to challenge an ASFE decision beyond that permitted in paragraphs B.7 and B.8 above." Because Chevron never had a right to bring this matter to the Court for consideration pursuant to the Authorization Act for FY96 or the 1996 protocol, it in indisputable that it gained no such right through the 1997 Equity Process Agreement. Perhaps more important, the Equity Process Agreement, in paragraphs B.7-B.9 and B.11, specifically delineates what matters could be challenged, where they could be challenged, and the process for

doing so.

Despite the unequivocal language of the Equity Process Agreement, Chevron alleges in its complaint that "[t]here is no limitation on the resort to a court to remedy a breach of the Equity Process Agreement." Compl. ¶34. This allegation is incorrect, as a matter of law. It is an argument based upon semantics, but not substance. It is wholly controverted by both the statutory language and the language in the agreement itself quoted above. The language within the Authorization Act for FY96, the 1996 protocol, and the Equity Process Agreement uniformly establishes a bar to any court involvement.

Significantly, the substance of the Equity Process Agreement between Chevron and DOE arose out of the terms of the Authorization Act for FY96 - and that legislation made any rights Chevron possessed subject exclusively to the authority of the Secretary. Once Chevron determined that it was not satisfied with the equity determination itself, it could not (and did not) file a challenge to the Secretary's decision with the Court of Federal Claims. Its only recourse was through the Secretary's designee, the OHA. Likewise, this Court is not the proper venue for Chevron's challenge to the implementation of the Equity Process Agreement. The process of which Chevron complains was an integrated part of the entire final equity determination scheme created by Congress and over which the Secretary exercises final authority.

There is no reasoned or legal basis to isolate the procedural issue raised by Chevron from the statutory scheme established by Congress or its own contractual waiver of the judicial process. Although Chevron purports to challenge only the procedures related to the final equity determination (based upon allegedly improper *ex parte* communications), it is beyond cavil that what Chevron is really challenging is the ASFE's determination of final equity itself. This is clear from, foremost, the plain language of the complaint itself. In it, Chevron argues clearly that it has been "deprived. . . of the benefit of an independent and impartial decision from the Assistant Secretary," Compl. ¶51; *see* Compl. ¶68 ("depriving ChevronTexaco of . . . an objective and impartial decision by the Assistant Secretary"). This argument goes to the very core of the ASFE's determination of final equity. Because the statute, the protocol, and the Equity Process Agreement all establish that this determination will be "final, binding and non-appealable" unless reviewed by OHA, and not susceptible to "any other judicial or administrative challenge," this Court does not possess jurisdiction to consider it.[7]

---

[7] Furthermore, even if the Court should adopt Chevron's reasoning and conclude that there is a difference between a challenge to the ASFE's final equity determination and a challenge to an alleged breach of the Equity Process Agreement, the 1996 protocol accepted by Chevron made clear that "a disagreement aris[ing] regarding the equity final-ization implementation process . . . shall be referred to the Assistant Secretary for Fossil Energy (or designee) for resolution." Compl. Exh. C. These agreed-upon terms defeat Chevron's claim that this Court is free to consider such disputes.

Notably, although judicial review is foreclosed in this case, an avenue of review is available to Chevron. Under the limitations agreed upon by Chevron and DOE in the Equity Process Agreement, the ASFE's decisions could be, have been, and now are being challenged by Chevron before the OHA, the administrative body selected by the parties to adjudicate disputes regarding those decisions. Thus, as addressed below, there is no reason to view Chevron as being deprived of an appropriate remedy in this matter.

E. Because The Damages Chevron Seeks Could Not Have Been Caused By The Alleged Breach Of Contract, Chevron Is Barred From Recovering Those Damages As A Matter Of Law

Not every alleged injury resulting from an alleged breach of contract is remediable in damages. San Carlos Irrigation & Drainage District v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997), citing Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022 (Fed. Cir. 1996). Instead, there must be a direct causal relationship established between the alleged breach and the damages sought to be recovered. Id.

Any claim arising under a contract begins with the general premise that "a contractor must show three necessary elements - liability, causation, and resultant injury." Servidone Construction Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991). Thus, "absent tangible proof of damages, appellant may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992); see Story Parchment

Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63 (1931) (damages which are not certain result of wrong are precluded); San Carlos Irrigation & Drainage Dist., 111 F.3d at 1563 ("contract law precludes recovery for speculative damages"); Haynes v. United States, 61 Fed. Cl. 788 (2004) (citing Roseburg Lumber, the Court dismissed claim where plaintiff failed to show damages sought could be recovered even if breach occurred).

A final basis for the Court to dismiss Chevron's complaint is that the recovery it seeks - attorney fees and other expenses - were not damages caused by the breach of contract alleged by Chevron. As noted, it is well-established that to recover for breach of contract, a party must allege and establish not only a valid contract between the parties that created an obligation or duty, and a breach of that duty, but also that there were damages caused by the breach. San Carlos Irrigation and Drainage Dist., 877 F.2d at 959; Servidone Construction Corp., 931 F.2d at 861. In this case, Chevron cannot establish that the damages it seeks were caused by the breach it alleges.

It is beyond dispute that Chevron would have incurred those attorney fees and expenses it now seeks from the Government, as a cost of participating in the finalization process, regardless of whether the alleged breach took place. Simply stated, as a matter of timing, the purported ex parte communications could not have, and did not, cause those attorney fees and expenses to be incurred. Chevron has not alleged, and cannot allege, otherwise. To the contrary, Chevron alleges clearly that it learned of the

purported ex parte communications through DOE's 2004 responses to FOIA requests, a time well after it had participated in the equity finalization proceedings. Compl. ¶¶ 47, 48, 52, 54. Therefore, it is beyond cavil that the purported ex parte communications could not have affected or influenced the amount of expenses and costs Chevron incurred during the equity finalization process. Chevron alone determined how much to expend during that process, and any purported breach by DOE did not cause the amount of those expenditures to increase.

Moreover, as noted above, assuming such a breach of contract did occur, the only real potential harm to Chevron would be a decision that overstated the amount of equity to which DOE was entitled and understated the amount of equity to which Chevron was entitled. However, the Equity Process Agreement provides an exclusive avenue through which that decision can be reviewed, and Chevron has exercised its right to use that exclusive avenue. Compl. Exh. B2, pp. 4-5. Thus, it is premature and speculative for Chevron to even allege that it has been harmed in any manner by the alleged breach of the Equity Process Agreement. If the Assistant Secretary's decision is ultimately overturned, the OHA can modify it in Chevron's favor and, as a result, Chevron would not be harmed. Conversely, if the OHA sustains the ASFE's decision, then it will be established that Chevron again was not harmed because OHA, as the final review authority, determined the

question of law on a de novo basis. Id., p. 5.[8] Thus, any allegation of damages caused by the purported breach is both speculative and groundless. See Chevron, U.S.A. Production Co. v. O'Leary, 958 F. Supp. 1485, 1498-99 (E.D. Cal. 1997) (district court found Chevron's allegation of damages based upon Secretary's failure to make equity finalization decision in two years was "speculative"). Given the undisputed fact that Chevron has recourse before the OHA for the only real damage that it could potentially suffer as a result of the alleged breach, Chevron is unable to clearly establish a "reasonable probability of damage." Locke v. United States, 151 Ct. Cl. 262, 283 F.2d 521, 524 (1960).

Finally, for the reasons explained above, an award of Chevron's attorneys fees and costs incurred as a result of participating in the equity finalization process would constitute an unwarranted windfall to Chevron. The Equity Process Agreement did not contemplate that either party would pay the other's costs and expenses. More important, any potential harm that may have resulted from the alleged breach of the procedural agreement will be mitigated fully by the OHA's independent consideration of Chevron's challenge to the equity determination reached by the ASFE. Chevron has agreed to the administrative review process, and permitting it to obtain attorneys fees and costs in addition to the relief to which it is entitled under that contractually-

[8] The Equity Process Agreement provides that legal issues are to be decided upon a de novo basis by OHA. Id.

mandated process would constitute a windfall. See Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004) (courts "should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement").[9]

CONCLUSION

For these reasons, defendant, the United States, respectfully requests that the Court grant this motion and dismiss plaintiff's complaint, with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

[9] Similarly, the Court would be precluded from awarding attorney fees and costs to Chevron as a type of penalty against the United States, even if it were to conclude that DOE actually breached the agreement. That is because this Court does not possess jurisdiction to award punitive damages in a breach of contract case. See Garner v. United States, 230 Ct. Cl. 941, 943 (1982) ("the granting of . . . punitive damages are not within the jurisdiction of this court"); Leesona Corp. v. United States, 220 Ct. Cl. 234, 599 F.2d 958, 969 (1979) (punitive damages not based upon any estimate of plaintiff's actual loss are improper); Moehl v. United States, 29 Fed. Cl. 249, 260 (1993), rev'd on other grounds, 60 F.3d 839 (Fed. Cir. 1995) ("[i]t is well settled that this court may not award punitive damages against the United States").

OF COUNSEL:

PAUL T. MICHAEL
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., NW
Washington, D.C. 20585

s/ Robert E. Kirschman, Jr.
ROBERT E. KIRSCHMAN, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., NW
Washington, D.C. 20530
Tele: (202) 307-6289
Fax: (202) 514-7969

Attorneys for Defendant

November 19, 2004