**Electronically Filed on February 1, 2005**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CHEVRON U.S.A. INC.,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | No. 1:04cv1365<br>Judge Susan G. Braden |

# CHEVRON U.S.A. INC.'S RESPONSE TO THE UNITED STATES' MOTION TO DISMISS

Donald B. Craven
Daniel Joseph
C. Fairley Spillman
Merrill C. Godfrey
Akin Gump Strauss Hauer & Feld, L.L.P.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4000
(202) 887-4288 Fax

Counsel for Chevron U.S.A. Inc.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

ISSUES PRESENTED..............................................................................................1

STATEMENT OF THE CASE....................................................................................3

A. The Unit Plan Contract ....................................................................................3

B. The 1995 Act.......................................................................................................4

C. The 1997 Agreement..........................................................................................4

D. DOE's Material Breach of the 1997 Agreement ................................................6

STANDARD FOR DETERMINING SUBJECT MATTER JURISDICTION..............................7

STANDARD FOR DETERMINING SUFFICIENCY OF THE COMPLAINT ............................8

ARGUMENT ............................................................................................................8

I. Because the Complaint Alleges Breach of Contract by the United States and Seeks Damages, the Tucker Act Applies. ..............................................................8

A. The Substantive Law of Contract Gives ChevronTexaco a Right to Seek Damages for Any Breach of the 1997 Agreement. ...............................................9

1. Only Non-Contractual Bases for Jurisdiction Must Be Analyzed to Determine Whether They Are "Money-Mandating." ...............................10

2. The Cases Cited by the Government Do Not Purport to Rewrite Testan or the Rules of Contract Law. .......................................................13

B. In Any Event, the 1997 Agreement Is Fairly Read as Providing a Right to Damages for Breach. .....................................................................................18

II. Congress Has Not Withdrawn Tucker Act Jurisdiction for this Case. ..............................19

A. Congress Did Not and Could Not Create an Administrative Review Process To Supplant ChevronTexaco's Rights Under the Unit Plan Contract. ..........................................................................................................20

B. By Submitting to the Terms of the 1997 Agreement, the Secretary Has Already Exercised Discretion. ...................................................................22

C. The Secretary's Authority to Issue a "Final" Decision Does Not Preclude This Court from Considering ChevronTexaco's Claims of Breach. ......................24

III. The Equity Process Agreement Does Not Bar an Action to Remedy a Breach of the Equity Process Agreement. ..........................................................................25

IV. The Government's Causation Argument Improperly Contests Facts in the Complaint and Defies Established Law Regarding Reliance Damages. ...........................27

A. Reliance Damages Are Available for All Expenditures Made in Reasonable Reliance on the Contract, Whether Made Before or After Breach. .......................29

B. The Government is Not Entitled to Assert in a Motion to Dismiss That Its Breach Has Caused No Harm. ..................................................................30

C. The Government is Required to Prove at Trial that ChevronTexaco is No Worse Off After the Breach than if the Contract Had Been Performed. ...............31

D. The Government is Wrong on the Facts and Will Never Be Able to Prove that its Breaches of Contract Were Harmless. .......................................................33

V. The United States Can Be Held Liable for Contract Damages Whether or Not Those Damages are Compensation for Litigation Expenses. ...........................................34

CONCLUSION ..........................................................................................................38

APPENDIX:

National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106 §§ 3412-3416

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975) ....35

*American Capital Corp. v. United States*, 59 Fed. Cl. 563 (2004) ....19

*Anchor Sav. Bank v. United States*, 59 Fed. Cl. 126 (2003) ....19

*Bell v. Hood*, 327 U.S. 678 (1946)....8

*Bobula v. United States Dep't of Justice*, 970 F.2d 854 (Fed. Cir. 1992) ....22

*Bray v. United States*, 48 Fed. Cl. 781 (2001) ....13

*Brown v. United States*, 86 F.3d 1554 (Fed. Cir. 1996)....13

*Chevron U.S.A., Inc. v. United States*, 20 Cl. Ct. 86 (1990)....4, 36

*Chevron U.S.A. Prod. Co. v. O'Leary*, 958 F. Supp. 1485 (E.D. Ca. 1997)....32

*Cohens v. Virginia*, 19 U.S. 264 (1821)....14

*Concept Automation, Inc. v. United States*, 41 Fed. Cl. 361 (1998)....37

*Conley v. Gibson*, 355 U.S. 41 (1957) ....8

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999)....8

*Eastport S.S. Corp. v. United States*, 372 F.2d 1002 (Ct. Cl. 1967)....11, 12, 13, 15, 19

*Furash & Co. v. United States*, 252 F.3d 1336 (Fed. Cir. 2001) ....10

*Gentex Corp. v. United States*, 61 Fed. Cl. 49 (2004) ....37

*Glendale Fed. Bank v. United States*, 239 F.3d 1374 (Fed. Cir. 2001) ....29

*Gould, Inc. v. United States*, 935 F.2d 1271 (Fed. Cir. 1991) ....26

*Granite Constr. Co. v. United States*, 962 F.2d 998 (Fed. Cir. 1992) ....34

*Griswold v. United States*, 61 Fed. Cl. 458 (2004) ....15, 17, 22

*Hamilton Secs. Advisory Servs., Inc. v. United States*, 60 Fed. Cl. 161 (2004)....13

*Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed. Cir. 2004) ....27

*Kania v. United States*, 227 Ct. Cl. 458 (1981) ....10

*Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001) ........................................38

*Lee v. United States*, 33 Fed. Cl. 374 (1995) ........................................13, 14, 22

*Lynch v. United States*, 292 U.S. 571 (1934)........................................9

*Martinez v. United States*, 333 F.3d 1295 (Fed. Cir. 2003)........................................13

*Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226 (Fed. Cir. 1997) ........................................9, 10, 34, 35, 36

*Mosca v. United States*, 417 F.2d 1382 (Ct. Cl. 1969) ........................................11

*Moyer v. United States*, 190 F.3d 1314 (Fed. Cir. 1999)........................................7, 12

*North Star Steel Co. v. United States*, 58 Fed. Cl. 720 (2003) ........................................13

*Pratt v. United States*, 50 Fed. Cl. 469 (2001)........................................35

*Ralston Steel Corp. v. United States*, 169 Ct. Cl. 119, 125 (1965)........................................12

*Sanders v. United States*, 252 F.3d 1329 (Fed. Cir. 2001) ........................................9, 10

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ........................................8

*Schooling v. United States*, 63 Fed. Cl. 204 (2004)........................................16, 17

*Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001)........................................8

*Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679 (Fed. Cir. 1992) ........................................7

*Standard Oil Co. v. United States*, 685 F.2d 1322 (Ct. Cl. 1982) ........................................4

*Standard Oil Co. v. United States*, 685 F.2d 1337 (Ct. Cl. 1982) ........................................4

*Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548 (Fed. Cir. 1992)........................................34

*Terteling v. United States*, 167 Ct. Cl. 331 (1964) ........................................36

*Texas Instruments Inc. v. United States*, 991 F.2d 760 (Fed. Cir. 1993)........................................37, 38

*Trauma Serv. Group v. United States*, 104 F.3d 1321 (Fed. Cir. 1997) ........................................7

*United States v. Behan*, 110 U.S. 338 (1884) ........................................31, 32

*United States v. Fausto*, 484 U.S. 439 (1988) ........................................16, 17, 22

*United States v. King*, 395 U.S. 1 (1969)........................................8, 12

*United States v. Mitchell (Mitchell II)*, 463 U.S. 206 (1983)........................................12, 13, 19

*United States v. Standard Oil Co.*, 545 F.2d 624 (9th Cir. 1976)............................4, 25, 28

*United States v. Testan*, 424 U.S. 392 (1976).................................................11, 12, 13, 14

*United States v. Winstar Corp.*, 518 U.S. 839 (1996)..................................................9, 21

*Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544 (2003) .....................................32

**STATUTES AND REGULATIONS**

5 U.S.C. § 504 .........................................................................................................38

5 U.S.C. § 7503(b)(4) ...............................................................................................16

28 U.S.C. § 1491(a)(1)...........................................................................................8, 12

28 U.S.C. § 2517......................................................................................................10

42 U.S.C. § 7133........................................................................................................5

48 C.F.R. § 1.602-2(b)...............................................................................................38

National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106 §§ 3412-3416 (codified at 10 U.S.C. § 7420 note).................................................. passim

**MISCELLANEOUS**

Holmes, "The Path of the Law," in *Collected Legal Papers* (1920) .................................31

*Corbin on Contracts* ..........................................................................................19, 37

Restatement (Second) of Contracts (1981).......................................................9, 27, 29, 37

## INTRODUCTION

Under the Tucker Act and the common law of contract, when the United States breaches a contract, it is liable in damages in this Court.

As detailed in the complaint, the Department of Energy contractually promised to Chevron U.S.A. Inc. (ChevronTexaco) in 1997 that DOE would abide by a specified set of quasi-judicial procedures to determine ChevonTexaco's and DOE's respective interests in the Elk Hills petroleum field near Bakersfield, California. (The field is also referred to as the Naval Petroleum Reserve No. 1 or "Reserve".) DOE repeatedly violated those procedures and concealed its violations from ChevronTexaco. Meanwhile, ChevronTexaco in good faith spent large amounts of money on a process that, unbeknownst to ChevronTexaco, had been irretrievably subverted by DOE's breaches of contract.

These allegations make the United States answerable to this Court to compensate ChevronTexaco for the monies ChevronTexaco reasonably spent in reliance on DOE's contractual promises. The Government's motion to dismiss presents no valid argument to the contrary.

## ISSUES PRESENTED

**1.** Contracts with the United States are governed by the common law of contract, which provides a right to damages to compensate for any breach. And this Court has jurisdiction over "any" damages claim based on "any" contract with the United States. The complaint seeks damages caused by the United States' breach of its 1997 agreement with ChevronTexaco. *Do the allegations in the complaint give this Court jurisdiction?*

**2.** The 1944 "Unit Plan Contract" (UPC), which has previously been enforced in court, tells the Government how the division of ownership in the Reserve is to be determined. A 1995 statute specifies the manner in which the Secretary of Energy must comply with the

UPC, and it says nothing about withdrawing this Court's jurisdiction over any contractual dispute. *Does the 1995 statute impliedly withdraw this Court's jurisdiction to enforce the Secretary's subsequent, voluntary agreements?*

**3.** The 1997 Agreement provides that if the Secretary of Energy abides by certain quasi-judicial procedures to determine ownership rights in the Reserve, then any determination made under such procedures cannot be challenged in court. The complaint alleges that DOE has violated and subverted the procedures. The 1997 Agreement states that it is "enforceable against [the parties] in accordance with its terms." *Is the 1997 Agreement itself a bar to judicial enforcement of that very same agreement?*

**4.** The complaint alleges that the Government's breaches have deprived ChevronTexaco of valuable consideration: impartial decisions the Government promised to ChevronTexaco in the 1997 Agreement. The Government argues that the destruction of this consideration has not harmed ChevronTexaco because the impartial decisions had no independent worth. *Can this Court reject allegations of damage without hearing any evidence, and hold as a matter of law that ChevronTexaco has not been harmed?*

**5.** Breach-of-contract damages are recoverable if they are foreseeable at contracting, and foreseeability is a question of fact. The 1997 Agreement requires participation in certain procedures. The Government knew that to perform under the contract, ChevronTexaco would have to spend money for (among other things) legal counsel; and ChevronTexaco did so. The Government has destroyed the contractual procedures and the value of ChevronTexaco's performance. *Can the Government avoid contract damages as a matter of law whenever they are attributable in part to the cost of legal counsel during contract performance?*

## STATEMENT OF THE CASE

This is a suit to recover money damages flowing from the Department of Energy's breach of a written contract with ChevronTexaco. The contract in question was executed in two parts on May 19, 1997 (the 1997 Agreement). Complaint ¶ 24. The 1997 Agreement sets out a specific process for finally determining ChevronTexaco's and the Government's respective interests under a prior contract (the Unit Plan Contract). *Id.* ¶ 27. The Unit Plan Contract governs ownership rights in the Reserve. *Id.* ¶¶ 10-16.

### A. The Unit Plan Contract

Where a single underground hydrocarbon formation exists under multiple surface tracts or leaseholds, the owners of the surface rights often "unitize" their mineral rights and produce the minerals cooperatively in a single "unit." Typically, the owners then share in the unit's production according to a contractually specified formula. *Id.* ¶ 9.

In 1944, the United States (through the Department of the Navy) and Standard Oil Company of California (predecessor to ChevronTexaco) combined their respective interests in the Reserve by executing a unitization agreement, the Unit Plan Contract or "UPC." *Id.* ¶ 10. The UPC assigned each owner an initial percentage interest in each of the producing zones in the Reserve, but made such interests subject to "redetermination" under certain circumstances. *Id.* ¶¶ 13-15. Such redeterminations are unusual in unitization agreements, and in the UPC they were allowed only insofar as new information revealed more about underground conditions at unitization. *Id.* The equity redetermination process in dispute here was simply to be the last of such adjustments. *See id.* ¶ 17; UPC §§ 9, 11.

Under the UPC, disputes regarding the parties' respective interests were to be resolved by the Secretary (the Secretary of the Navy prior to 1976; thereafter, the Secretary of Energy), *see* UPC § 9(b), subject to an action for breach of contract by Standard.[1]

**B. The 1995 Act**

In 1995 Congress directed DOE to sell the United States' interest in the Reserve. *See* National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106 §§ 3412-3416 (codified at 10 U.S.C. § 7420 note) (the 1995 Act) (included as an appendix to this brief). The 1995 Act specified a time frame for the sale to occur and directed DOE to finalize division of ownership under the UPC before the sale. Complaint ¶ 19. Far from purporting to abrogate the UPC or to withdraw any judicial remedies ChevronTexaco possessed thereunder, the 1995 Act provided that "[n]othing in this subtitle shall be construed to adversely affect the ownership interest of any . . . entity having any right, title, and interest in . . . lands within the boundaries of Naval Petroleum Reserve Numbered 1 . . . subject to the unit plan contract." 1995 Act § 3413(c).

**C. The 1997 Agreement**

DOE did not meet its deadline for completing finalization of the parties' interests. Complaint ¶ 22. Thus, in early 1997, DOE and ChevronTexaco agreed to "decouple" the sale of the United States' interest in the Reserve from the finalization process, allowing the former to occur before completion of the latter. *Id.* ¶¶ 24, 26. On May 19, 1997, DOE and ChevronTexaco

---

[1] On several occasions, this Court's predecessors adjudicated the government's liability for breach of the UPC. *Standard Oil Co. v. United States*, 685 F.2d 1322 (Ct. Cl. 1982) (breach of contract action); *Standard Oil Co. v. United States*, 685 F.2d 1337 (Ct. Cl. 1982) (same action as prior citation); *Chevron U.S.A., Inc. v. United States*, 20 Cl. Ct. 86 (1990) (breach of contract action); *cf. United States v. Standard Oil Co.*, 545 F.2d 624 (9th Cir. 1976) (declaratory judgment action brought by government).

entered into the 1997 Agreement, which consisted of two parts: the "Decoupling Agreement" (Complaint Ex. B.1) and the "Equity Process Agreement" (Complaint Ex. B.2).

The Decoupling Agreement fixed the United States' interest in the Reserve for purposes of sale. It also provided for monetary adjustment to be made between DOE and ChevronTexaco following finalization, to reflect the difference between the interest sold by the United States and its interest as determined under the UPC. *Id.* ¶ 26. Pending this adjustment, ChevronTexaco was required to obtain (at significant expense) an irrevocable letter of credit payable in the event the Secretary determined that ChevronTexaco's equity percentage had been overstated in the 1997 Agreement. Complaint Ex. B.1 § 3.2.

The Equity Process Agreement made the delegate of the Secretary of Energy—the Assistant Secretary for Fossil Energy (or "ASFE")—the arbiter of the parties' contractual interests in each of the Reserve's four zones (the Dry Gas Zone, the Shallow Oil Zone, the Stevens Zone, and the Carneros Zone).[2] Complaint ¶ 28. The Assistant Secretary was to receive a recommendation from a technically qualified and impartial "Independent Petroleum Engineer."[3] *Id.*

Under the Equity Process Agreement, the ASFE must follow specified procedures patterned on the basic model for administrative adjudication: each of the owners is to be represented by its own "equity team," which presents that owner's position to the Assistant

---

[2] The Assistant Secretary for Fossil Energy is a presidential appointee who must be confirmed by the Senate. *See* 42 U.S.C. § 7133. Thus, the ASFE has a degree of independence, standing, and accountability to Congress, which makes impartial ASFE decisions particularly valuable to ChevronTexaco.

[3] *See* Complaint Ex. B.2 ¶¶ B.1, B.2; *compare* UPC § 9(b). The Independent Petroleum Engineer, or "IPE," in turn was required to rely on the Independent Legal Advisor, or "ILA," and incorporate the ILA's rulings into any report, but the ASFE was not required to accept those portions of the IPE's report that reflected such advice. In other words, the ASFE had the authority to decide legal questions *de novo*.

Secretary. Under paragraph B.4, the ASFE must determine the case using only information openly communicated to him or her by the adversary parties. "No . . . communications by the ASFE with either equity team shall be on an ex parte basis." *Id.* at B.4. Also, "[a]ny written materials submitted to the ASFE by either equity team shall be provided to the other party." *Id.* Further, "[t]he ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters" on an ex parte basis. *Id.*

Following the ASFE's decision, ChevronTexaco (but not DOE) could appeal to DOE's Office of Hearings and Appeals any aspect of an ASFE decision contrary to the Independent Petroleum Engineer's technical recommendation, as well as any legal issue decided by the Assistant Secretary against ChevronTexaco. *Id.* ¶¶ B.7, B.11.

In return, in part, for DOE's detailed contractual promises that it would abide by the procedures just described, ChevronTexaco acceded to DOE's requests that ChevronTexaco relinquish its right to challenge in court DOE's actions—a right ChevronTexaco had exercised on more than one prior occasion. Complaint ¶ 34. But the Equity Process Agreement placed no limitation on ChevronTexaco's right to seek to remedy in court any breach by the United States of its obligations under the Equity Process Agreement itself. *Id.* Rather, the Equity Process Agreement states that it is "enforceable against [the parties] in accordance with its terms." Complaint Ex. B.2 ¶ C.4; *cf.* Ex. B.1 § 6.5.

**D. DOE's Material Breach of the 1997 Agreement**

ChevronTexaco acted in reliance on the procedures set forth in the 1997 Agreement and on the United States' binding promise that equity finalization would be conducted in an impartial manner without ex parte contacts. Complaint ¶¶ 1-5. ChevronTexaco invested years of effort, through its employees and others retained for the purpose, including attorneys and consultants, to participate in the contractually mandated procedures. *Id.* ¶ 58.

In late 2003 ChevronTexaco learned that DOE personnel had violated the Government's promises regarding the finalization process. *Id.* ¶¶ 56-58. During finalization, DOE's equity team, through counsel, engaged in repeated direct and indirect ex parte communications with the supposedly impartial decision maker, in violation of the 1997 Agreement. *Id.* ¶¶ 38, 41-49. In fact, the DOE Assistant Deputy General Counsel actually functioned both as the lead litigation counsel for the DOE equity team *and* as legal advisor to the decision maker, the Assistant Secretary—including participation in the preparation of the Assistant Secretary's decisions. *Id.* ¶ 38. The dual role of the OGC has irreversibly stripped the parties' agreed-upon procedures of legitimacy, has deprived ChevronTexaco of the benefit of the independent and impartial decisions from the Assistant Secretary that it bargained for, and constitutes a material breach of DOE's contractual obligations. ¶ 51.

Because DOE has violated the procedures that it promised to follow, ChevronTexaco's efforts to perform under the 1997 Agreement have gone to waste. ChevronTexaco relied on the Government's contractual promises. With those promises broken, ChevronTexaco now seeks to recover the amount of its outlays in the wasted processes of the last several years.

**STANDARD FOR DETERMINING SUBJECT MATTER JURISDICTION**

"A well-pleaded allegation in the complaint" of the existence of a contract with the United States "suffices to confer subject matter jurisdiction in the Court of Federal Claims." *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (citing *Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 686 (Fed. Cir. 1992)). "Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged." *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999). However, "[w]hether the complaint states a cause of action on which relief could be granted is a question

of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy." *Bell v. Hood*, 327 U.S. 678, 682 (1946).

**STANDARD FOR DETERMINING SUFFICIENCY OF THE COMPLAINT**

A federal court's review of a complaint on a motion to dismiss is limited to ascertaining "whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The court must accept as true the facts alleged in the complaint, *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 633 (1999), and must construe all reasonable inferences in favor of the non-movant, *Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed. Cir. 2001).

**ARGUMENT**

**I. <u>Because the Complaint Alleges Breach of Contract by the United States and Seeks Damages, the Tucker Act Applies.</u>**

The Government accepts as true for purposes of its motion that it has breached a contract with ChevronTexaco. *See* Motion at 3 n.2. Accordingly, the well-pleaded complaint brings ChevronTexaco's claims within the terms of the Tucker Act, which provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon *any claim* against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon *any express or implied contract* with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (emphases added).

The plain language of this provision covers "any" claim for breach of "any" contract with the United States. Therefore, with the proviso that only money damages may be sought, *see, e.g., United States v. King*, 395 U.S. 1, 2-3 (1969), the general rule is that this Court has

jurisdiction over all breach-of-contract claims against the United States. The Government cannot and does not dispute that the complaint is based purely on contract and comes within this general rule. Instead, as discussed below, the Government seeks to rewrite a very basic rule of contract law for the purpose of dodging this Court's jurisdiction over claims for contract damages.

### A. The Substantive Law of Contract Gives ChevronTexaco a Right to Seek Damages for Any Breach of the 1997 Agreement.

The Tucker Act does not change the substantive law governing this action, which is the common law of contract. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 (1934).

Under the law of contract, a contracting party always has a remedy at law in the form of an action for contract damages. "[D]amages are always the default remedy for breach of contract." *United States v. Winstar Corp*., 518 U.S. 839, 885 (1996) (plurality opinion) (citing, *e.g.*, Restatement (Second) of Contracts § 346, cmt. a (1981)). As the Federal Circuit has explained, "in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." *Sanders v. United States*, 252 F.3d 1329, 1334-35 (Fed. Cir. 2001). That is, every breach of contract gives the injured party a right to recover money as compensation for the injury. *See, e.g.,* Restatement (Second) of Contracts § 346 ("The injured party has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged.") "No authority supports the theory that the government is not liable for breach of its contractual undertakings." *Massachusetts Bay Transp.*

*Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997) (citing *Winstar*).[4]

The Government, by citing Tucker Act precedents that do not apply when purely contractual rights are the basis for jurisdiction, seeks to strip ChevronTexaco of its rights under substantive contract law.

**1. Only *Non-Contractual* Bases for Jurisdiction Must Be Analyzed to Determine Whether They Are "Money-Mandating."**

In search of some basis to attack the complaint, the Government looks beyond the controlling law cited above and insists that, to be enforceable against the government in this Court, each individual provision in a government contract must include specific language "contemplat[ing]" the government contractor's right to damages for breach. Having thus comfortably articulated its rule of "contemplat[ion]," the Government looks at the provisions it has breached and pronounces, "[t]his language does not in any way require the United States to pay money damages . . . . [I]t does not contemplate the creation of rights to money in Chevron." Motion at 14-15.

But the Government achieves the crafting of its new rule only by misconstruing cases restricting *non-contractual* bases for Tucker Act jurisdiction: statutes, regulations, and the Constitution. When (unlike here) a plaintiff seeks damages from the United States based on a non-contractual source, the court must determine whether such an alternative source can "fairly be interpreted" as equivalent in effect to a contractual promise by the United States to be liable for money damages. Such an inquiry is unnecessary here, because ChevronTexaco seeks to

[4] For obvious reasons, the Government does not argue that the rules applicable to government contracts in the criminal context apply here (usually, damages are not available under plea agreements, criminal cooperation agreements, and the like). *See, e.g., Sanders v. United States*, 252 F.3d 1329 (Fed. Cir. 2001), and *Kania v. United States*, 227 Ct. Cl. 458 (1981). Nor does the Government contend that the "non-appropriated funds doctrine" applies. *See, e.g,, Furash & Co. v. United States***,** 252 F.3d 1336, 1339 (Fed. Cir. 2001); 28 U.S.C. § 2517.

enforce express contractual promises that automatically make the Government liable in damages for breach.

Unambiguous precedent refutes the Government's attempt to force the law of non-contractual jurisdiction onto this case. In *United States v. Testan*, 424 U.S. 392, 398 (1976), the Supreme Court applied the "fairly be interpreted" test for the first time—and it did so only because the plaintiff *did not* claim a contractual relationship with the government:

> [T]he Tucker Act is merely jurisdictional, and grant of a right of action must be made with specificity. The respondents *do not rest their claims upon a contract*; neither do they seek the return of money paid by them to the Government. *It follows that* the asserted entitlement to money damages depends upon whether any federal statute "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."

424 U.S. at 400 (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967), and citing *Mosca v. United States*, 417 F.2d 1382, 1386 (Ct. Cl. 1969)).

Both Court of Claims cases cited approvingly by the *Testan* Court (*Eastport* and *Mosca*) involved the same question as *Testan*: whether a *non-contractual* basis for a damages claim could "fairly be interpreted" as "money-mandating." In both instances, the Court of Claims' reasoning depended on the presence of noncontractual claims. In *Mosca*, the court explained that "jurisdiction in *noncontractual* actions filed under the Tucker Act is limited to . . . those in which a particular provision of law, expressly or by implication, grants him the right to recover a certain sum." 417 F.2d at 1386 (emphasis added). Similarly, in *Eastport* the court held that "[m]onetary claims which cannot be brought within [the "fairly be interpreted" test] *[a]nd which do not fall under another head of jurisdiction, such as a contract with the United States* are beyond this court's jurisdiction, even though they may intimately involve the Constitution, an Act of Congress, or an executive regulation." 372 F.2d at 1008-09 & n.7 (footnote incorporated into text as italics).

The Supreme Court's later reading of *Testan* and *Eastport* likewise recognizes the distinction between claims that are based on contract and those that are non-contractual:

> Not every claim invoking *the Constitution, a federal statute, or a regulation* is cognizable under the Tucker Act. The claim must be one for money damages against the United States, see *United States v. King*, 395 U.S. 1, 2-3 (1969), and the claimant must demonstrate that the source of substantive law he relies upon "'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" *United States v. Testan*, 424 U.S., at 400, quoting *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 607 (1967). [Footnote.]
>
> . . . .
>
> Thus, for claims against the United States "*founded either upon the Constitution, or any Act of Congress, or any regulation* of an executive department," 28 U.S.C. § 1491, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.
>
> [Footnote:] As the *Eastport* decision recognized, the substantive source of law may grant the claimant a right to recover damages either "expressly or by implication." 178 Ct. Cl. at 605. *See also Ralston Steel Corp. v. United States*, 169 Ct. Cl. 119, 125 (1965).

*United States v. Mitchell (Mitchell II*), 463 U.S. 206, 216-18 & n.16 (1983) (emphases added) (parallel citations and one footnote omitted). The necessary implication of the Court's statement in *Mitchell II* is that there is no need for any inquiry into whether a *contract* "can fairly be interpreted" as money-mandating. In a contract case, "the source of substantive law" is the common law of contract, which automatically provides a right to any money damages proven.

Not surprisingly, that is how the Federal Circuit applies the "fairly be interpreted" test:

> Under the Tucker Act, when a cause of action is not based upon breach of contract against the government, the Court of Federal Claims has jurisdiction only over those constitutional provisions, statutes, or regulations that by their terms entitle a plaintiff to money.

*Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999). "A [Tucker Act] claimant must . . . demonstrate *either* that he or she has 'an express or implied contract with the United States,' *or* that some applicable source of substantive law 'can fairly be

interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Brown v. United States,* 86 F.3d 1554, 1559 (Fed. Cir. 1996) (quoting *Testan*, 424 U.S. at 400, and *Eastport*, 372 F.2d at 1009) (citation omitted) (emphasis added). The Federal Circuit has also stated, and this Court has held, that "[t]he actions for which the Tucker Act waives sovereign immunity are [1] actions pursuant to contracts with the United States, [2] actions to recover illegal exactions of money by the United States, and [3] actions brought pursuant to money-mandating constitutional provisions, statutes, regulations, or executive orders." *Martinez v. United States*, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) (en banc); *accord Hamilton Secs. Advisory Servs., Inc. v. United States*, 60 Fed. Cl. 161, 163 (2004) (Braden, J.); *North Star Steel Co. v. United States*, 58 Fed. Cl. 720, 731 (2003) (Braden, J.).

The test set forth in *Testan, Eastport, Mosca, Mitchell II, Moyer, Brown,* and *Martinez* cannot be applied to a claim based on contract. It applies only "[i]n the absence of an express or implied contract." *Bray v. United States*, 48 Fed. Cl. 781, 784 (2001).

**2. The Cases Cited by the Government Do Not Purport to Rewrite *Testan* or the Rules of Contract Law.**

Rather than recognize *Testan*'s inaptness here, the Government urges on the Court an unusual paraphrasing of *Testan*, in dictum, from *Lee v. United States*, 33 Fed. Cl. 374 (1995). *Lee* involved a Title VII claim. There, the court (following substantial precedent) held that claims for breach of "agreements settling [Title VII] discrimination claims brought before administrative agencies" constitute "action[s] pursuant to Title VII," and therefore that jurisdiction for such actions lies exclusively in the district courts. *Id.* at 379-80. The court reasoned that because Title VII is a "precisely-drawn statutory scheme providing for judicial review in another forum," Congress did not intend to provide the court with jurisdiction in such

cases *Id.* at 378. The court further held that district court was the proper forum for any judicial enforcement of the settlement agreement in that case, "because [the agreement] could not have arisen but for the existence of the Title VII statutory scheme." *Id.* at 379 (citation omitted).

In its introductory discussion of Tucker Act jurisdiction, the *Lee* court stated that "[c]laims against the United States for damages must arise from violation of the Constitution, a statute or regulation, or contractual rights which may be fairly interpreted as requiring the payment of compensation from the United States." *Id*. at 378. But the court did not rely on this dictum in dismissing plaintiff's action.

In the dictum, the *Lee* court switched the ordering of the usual summarization of the holding in *Testan*. In so doing, the court put "contractual rights" at the end of the list of bases for jurisdiction instead of at the start. (The reordering in *Lee* of the bases for jurisdiction mirrors the Tucker Act itself instead of *Testan*.) But to be consistent with *Testan* and other precedent, the *Lee* court should have stated, "claims against the United States must arise from *either contractual rights or* a violation of the Constitution, a statute, or a regulation which may fairly be interpreted as requiring the payment of compensation from the United States." The *Lee* court did not indicate any awareness of the novelty of its formulation of Tucker Act jurisdiction or its inconsistency with precedent. Of course, a critical reason why dicta are not binding is the lesser attention that a court may place on non-dispositive aspects of its opinion.[5]

---

[5] *See Cohens v. Virginia*, 19 U.S. 264, 399-340 (1821) (Marshall, C.J.):

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. . . . [T]hey . . . ought not to control the judgment in a subsequent suit . . . . The reason of this maxim is obvious. . . . [T]heir possible bearing on all other cases is seldom completely investigated.

The Government nevertheless seizes on this language and pares it down. The Government asserts that, to sustain jurisdiction of this Court, a plaintiff must identify "contractual rights which may be fairly interpreted as requiring the payment of compensation from the United States"—as though there were any other variety of contractual rights. Motion at 14. This tactic is insufficient to overcome the precedents discussed above.

The other case the Government heavily relies upon, *Griswold*, also is inapposite, for the principal reason that it too involved a settlement agreement under Title VII and cited *Lee* as the basis for transferring the case to the district court. *Griswold v. United States*, 61 Fed. Cl. 458, 465 (2004). As will be discussed further in section II, the rights ChevronTexaco seeks to enforce here are unlike provisions of Title VII settlement agreements: the rights asserted here are purely contractual, and no "statutory scheme" deprives this Court of jurisdiction to enforce the 1997 Agreement, on which those rights are based.

Another reason *Griswold* is readily distinguishable is that the money damages claimed by the plaintiffs in that case were not sufficiently linked in the complaint to the alleged breach. The alleged breach was that plaintiffs were not given notice, required by the Title VII settlement agreement, "of the date and time of the next civil service examination" so that they could *apply for* jobs with the Postal Service. *Griswold*, 61 Fed. Cl. at 465 (emphasis added). As damages, the plaintiffs claimed "an amount equal to what the plaintiffs would have earned *had they become employed* by the Post Office as if they had taken and passed the first exam in question." *Id*. (emphasis added). The *Griswold* court did rely (incorrectly, we submit) on the "fairly interpreted" language from *Eastport* as support for its conclusion that the notice requirement in the contract did not support the damages claimed. *Id*. at 466. But this was not necessary to its disposition of the issue, because the court noted elsewhere in its opinion that the damages

claimed could not, as a legal matter, have been caused by the breach alleged. In particular, the court relied on "'[t]he established rule . . . that one is not entitled to the benefit of a position until he has been duly appointed to it.' Plaintiffs here have not undergone the selection process for employment with the USPS." *Id*. (citations omitted).

Finally, we note that this Court's recent decision in *Schooling v. United States,* 63 Fed. Cl. 204 (2004) (Braden, J.), entered after the Motion to Dismiss was filed, is similarly distinguishable from the present case and should be read in light of the controlling authority cited above. In *Schooling*, this Court held that it lacked jurisdiction over a claim by the pro se plaintiff, an I.R.S. employee, that was derived from a settlement agreement with the I.R.S. One of the terms of the agreement was that the plaintiff would be suspended for 14 days. *Id*. at 204-205. The plaintiff alleged that the agreement was subject to a provision of the Civil Service Reform Act of 1978, 5 U.S.C. § 7503(b)(4), which provides that "[a]n employee against whom a suspension for 14 days or less is proposed is entitled to a written decision and the specific reasons therefor at the earliest practicable date." *Id*. at 205. The single claim in the one-page complaint alleged that "the I.R.S. materially breached the settlement [agreement] by failing to issue a decision letter[] as required by Section 7503(b)(4) of the Civil Service Reform Act of 1978." *Id*. The plaintiff claimed as damages 14 days' pay but did not explain how lack of notice entitled him to such damages. *Id*. at 208. This Court held that *United States v. Fausto*, 484 U.S. 439 (1988), required dismissal of the complaint for lack of jurisdiction over CSRA-based agreements.[6] 63 Fed. Cl. at 207-08. The Court also held that the case was moot because the Plaintiff had already received the decision letter. *Id*. at 208-09.

[6] *Fausto* held that the Civil Service Reform Act created "an integrated scheme of administrative and judicial review," and that the CSRA therefore impliedly withdrew Tucker Act

In an alternative holding unnecessary to the result, the Court accepted the Government's argument, unopposed by the pro se plaintiff (who cited no cases in his own support)[7], that under *Griswold* the provision in question was a "non-monetary provision" of the settlement agreement. *Id*. at 208. If what the Court meant by this was that no allegations connected the alleged breach with the alleged monetary damages, the court was, we submit, correct in a conclusion consistent with contract law. The context supports such a limited reading. Specifically, the Court stated that "[t]he proper remedy for this alleged violation would be for the I.R.S. to provide plaintiff with the decision letter, not to pay monetary damages." *Id*. at 208. This discussion of the "proper remedy" would have been inapposite if the Court had believed that the plaintiff had adequately explained how a failure to receive the notice actually caused a loss of 14 days' pay. Thus, the case is distinguishable, because here ChevronTexaco plainly alleges damage to its reliance interest flowing directly from the Government's breach of contract.

To the extent, however, that the phrasing of the Court's opinion suggests that there may be such a thing as contract provisions that are not enforceable against the Government even where breach of such a provision is properly alleged to have caused damages, we respectfully submit that such a suggestion is inconsistent with the Federal Circuit and Supreme Court authority cited above and should not be perpetuated.

In sum, because the damages here are alleged to have been caused by the United States' breach of a valid contract, this Court has jurisdiction of ChevronTexaco's claims under the Tucker Act.

---

jurisdiction for respondent's case through "deliberate exclusion of employees in respondent's service category from the provisions establishing administrative and judicial review." *Fausto*, 454 U.S. at 445, 454.

[7] Review of the docket materials in *Schooling* shows that the plaintiff submitted no legal research to aid the Court in its decision.

### B. In Any Event, the 1997 Agreement Is Fairly Read as Providing a Right to Damages for Breach.

Even under the Government's theory, the conclusion is the same: this Court has jurisdiction. The 1997 Agreement itself demonstrates conclusively, on its face as well as in the context of the factual allegations of the complaint, that the parties intended for the Agreement to be judicially enforceable against DOE. Paragraph C.4 of the Equity Process Agreement and section 6.5 of the Decoupling Agreement each state:

> Each party represents that it has good and sufficient authority to execute and deliver this Agreement and to perform its respective obligations hereunder. This Agreement has been duly authorized, executed and delivered by the parties and constitutes the legal, valid and binding obligation of the parties, *enforceable against them in accordance with its terms.* Each individual signing this Agreement warrants and represents that he or she has full authority to execute the same on behalf of the party for whom he or she is signing.

(Emphasis added.) Each part of the 1997 Agreement was signed by ASFE Patricia Godley for the "U.S. Department of Energy." The only way the Agreement can be "enforceable against" the U.S. Department of Energy is under the Tucker Act. That is plainly what the Agreement itself provides. And that applies to all "terms" in the Agreement.

Other provisions in the 1997 Agreement reinforce this conclusion, showing that the parties intended that in case of dispute, the contract would be interpreted by a court. For example, the 1997 Agreement provides that it is to be "governed by, and construed under, the federal law of the United States,"[8] further implying judicial enforceability in United States courts.

Moreover, at contracting, the parties knew that to carry out the process outlined in the Agreement, they would each spend not only time but also money to do geological analyses and to prepare and deliver the various presentations provided for in the contract. DOE would have

[8] Complaint Ex. B.2 ¶ C.2; Ex. B.1 § 6.10.

been aware that ChevronTexaco would spend large amounts of money and time in reliance on the contract to present the matters in question to the Independent Petroleum Engineer, the Independent Legal Advisor, and the ASFE.[9] In fact, DOE itself has consistently paid a private law firm and outside technical consultants to prepare submissions to and to appear before the ASFE.

Finally, any suggestion by the Government that only those damages expressly referred to in a contract are recoverable would be inconsistent even with the "money-mandating" analysis for non-contractual jurisdiction. As noted above, "the substantive source of law may grant the claimant a right to recover damages either 'expressly or by implication.'" *Mitchell II*, 463 U.S. at 217 n.16 (quoting *Eastport*, 372 F.2d at 1007).

ChevronTexaco has properly stated claims for breach of contract and is entitled to present evidence in this Court to support those claims.

## II. Congress Has Not Withdrawn Tucker Act Jurisdiction for this Case.

The Government seeks to shield its breach of contract using the 1995 statute that directed DOE to finalize equity and to sell the United States' interest in the Reserve. The Government argues that this statute creates "an established statutory scheme" that precludes enforcement of the 1997 Agreement against DOE in this Court. Motion at 16. As DOE tells the story, the 1995

---

[9] *Cf. Anchor Sav. Bank v. United States*, 59 Fed. Cl. 126, 145-46 (2003):

> Defendant's argument on this point is based on a misunderstanding of the foreseeability inquiry in contract law. As the timeless treatise by Professor Corbin makes clear:
>
> > The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach. It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in the contemplation of the parties at the time they made the contract.
>
> 11 *Corbin on Contracts* § 1009 at 66 (interim ed. 2002).

*Accord American Capital Corp. v. United States*, 59 Fed. Cl. 563, 575-76 (2004) (Braden, J.).

Act gave the Secretary discretion to thereafter enter into agreements and then breach them with impunity in arriving at a "final" decision. But, as the next three sections discuss, the statute forecloses such a conclusion.

First, the 1995 Act by its terms does not *create* any administrative discretion or process for finalizing equity. It rather restates the contractual process already binding on the Secretary and adds to the Secretary's responsibilities without purporting to relieve the Secretary from any existing or future contract. Second, to the extent the Unit Plan Contract gave (and the Act restated) a contractually limited discretion to the Secretary to finalize equity, the 1997 Agreement constituted an exercise of that discretion that bound the Secretary to a further degree. Third, the authority to reach a "final" decision that is discussed in the 1995 Act, the Unit Plan Contract, and the Equity Process Agreement does not include the authority to issue a decision that breaches other contractual duties. These three topics are now explored in more detail.

### A. Congress Did Not and Could Not Create an Administrative Review Process To Supplant ChevronTexaco's Rights Under the Unit Plan Contract.

The "final equity determination scheme created by Congress" referred to by the Government, Motion at 29, is pure fiction. This case involves a *contractual* process, not of Congress's making, that can be and has been breached. As discussed above in Section I, the Tucker Act provides the forum for the requisite enforcement.

In fact, the 1995 Act refutes the Government's arguments here. The 1995 Act expressly protects ChevronTexaco's interest in the Reserve and its contractual rights under the UPC (which rights include—as courts have repeatedly recognized—a Tucker Act remedy):

> SEC. 3413. EFFECT OF SALE OF RESERVE.
>
> (a)(3) *The Secretary shall exercise the termination procedures provided in the unit plan contract* so that the unit plan contract terminates not later than the date of closing of the sale of reserve. . . .

> [The "termination procedures provided in the unit plan contract" are in section 11(b) and require that termination "not operate retroactively or to impair the rights and obligations of Navy or Standard under this contract accruing to the termination date."]
>
> (c) Preservation of private right, title, and interest.—*Nothing in this subtitle shall be construed to adversely affect the ownership interest of any other entity* having any right, title, and interest in and to lands within the boundaries of Naval Petroleum Reserve Numbered 1 and which are *subject to the unit plan contract.*

(Emphases added.) Echoing this express refusal to alter ChevronTexaco's rights, the 1995 Act also provided that a then-pending dispute regarding the Reserve's Shallow Oil Zone "shall be resolved *in the manner provided in the unit plan contract* within eight months." *Id.* § 3412(b)(3) (emphasis added).

To the extent the 1995 Act describes procedures, it either echoes or builds on the UPC (such as by adding deadlines). For example, UPC Section 9(b) gives the Secretary the authority to "render his [final] decision" regarding whether to accept any part of the Independent Petroleum Engineer's advisory report; the 1995 Act restates this by providing that "[t]he Secretary may accept the recommendation of the [IPE] . . . , or the Secretary may use such other method to establish final equity interest in the reserve as the Secretary considers appropriate." 1995 Act § 3412 (b)(2). In another instance, the Act directs the Secretary to comply with the UPC in a particular manner: the UPC provides that the Secretary "may" appoint an IPE, *see* UPC § 9(b), while the statute directs that the Secretary "shall" do so, *see* 1995 Act § 3412(b)(2).

The 1995 Act thus did not enlarge the Secretary's discretion regarding equity finalization, nor did it purport to abrogate any provision of the UPC. Indeed, had the Act purported to prejudice ChevronTexaco's contractual rights, it would have violated the principles articulated in *United States v. Winstar Corp.*, 518 U.S. 839 (1996).

Significantly, the 1995 Act did nothing either explicitly or implicitly to supplant this Court as the proper forum for any disputes arising under agreements subsequently executed by

DOE. Thus, this is not a case where Congress has granted exclusive jurisdiction to some other forum, such as *Fausto* (CSRA), *Lee* (Title VII), *Griswold* (Title VII), and *Bobula v. United States Dep't of Justice*, 970 F.2d 854 (Fed. Cir. 1992) (CSRA).[10] Further, unlike the situation in those cases, ChevronTexaco is not seeking to enforce in this suit any right that "arises out of" the 1995 Act. ChevronTexaco is seeking to enforce its rights under the 1997 Agreement—a contract that the Secretary freely entered into and that binds the government. In addition, DOE does not assert that the 1995 Act constitutes a "precisely-drawn statutory scheme providing for *judicial review in another forum*." *Lee*, 33 Fed. Cl. at 378. Instead, DOE argues that Congress gave DOE the exclusive power to construe its own contractual relationship, with total unaccountability to judicial authority. But as shown above, Congress expressly declined to affect contractual interests, and no statutory language supports such a drastic result.[11]

### B. By Submitting to the Terms of the 1997 Agreement, the Secretary Has Already Exercised Discretion.

The Government heavily relies upon the language in the 1995 Act that "the Secretary may use such other method to establish final equity interest in the reserve as the Secretary considers appropriate." Motion at 18 (quoting 1995 Act § 3412(b)). The Government recognizes that this language refers to the Secretary's authority to issue a decision that disagrees with the IPE's report. *See* Motion at 18. In fact, that is *all* this language means. The full sentence reads,

---

[10] In *Bobula*, the court explained, "[t]he CSRA was intended to be a comprehensive and exclusive legislative scheme to govern federal personnel matters," and therefore held that a settlement agreement under the CSRA that "settles personnel matters arising out of the DOJ's internal grievance procedure" is enforceable only in district court. 970 F.2d at 858.

[11] Nor does the 1997 Agreement accomplish such a result. As discussed in section III below, the Agreement waived a judicial remedy only for those disputes derived from pre-existing rights; the waiver of judicial remedy in the 1997 Agreement was not so broad as to make the 1997 Agreement itself self-defeating, *i.e.*, unenforceable against DOE.

> The Secretary *may accept the recommendation of the independent petroleum engineer* for final equity in each known oil and gas zone and establish final equity interest in Naval Petroleum Reserve Numbered 1 in accordance with the recommendation, *or the Secretary may use such other method* to establish final equity interest in the reserve as the Secretary considers appropriate.

1995 Act Section 3412(b)(2) (emphasis added). Under the statute, the Secretary "may," but need not, follow the recommendation of the IPE. Nothing more should be read into this sentence. *Compare* UPC § 9(b) (either party may seek appointment of an IPE; IPE issues an "advisory report" but the Secretary is not required to adopt the report).

The Government argues that this language deprives the Court of jurisdiction because "where Congress has provided the head of an agency with discretion in determining a proper course, . . . this Court does not possess jurisdiction under the Tucker Act." Motion at 18-19. Of course, the Government's position is only a litigating position, because the 1997 Agreement itself states that the parties intended for it to be judicially enforceable, and Congress said it was leaving Chevron's rights as it found them.

Furthermore, the Government's argument is nonsensical. Did the "discretion" conferred on the Secretary by the 1995 Act include the power to enter into enforceable contracts regarding equity finalization? If so, this Court has jurisdiction to enforce such a contract against the Secretary. If not, then the Secretary's assent to the 1997 Agreement was *ultra vires* and the Agreement is void, something the Government surely does not concede. While the Government admits that "agreed-upon contract terms must be enforced," Motion at 25, what it truly seeks is to make this a one-sided principle.

Although the Secretary certainly had discretion pursuant to the 1995 Act to enter into or not enter into the 1997 Agreement, the Secretary has no discretion to breach that Agreement and then refuse to pay damages.

**C. The Secretary's Authority to Issue a "Final" Decision Does Not Preclude This Court from Considering ChevronTexaco's Claims of Breach.**

The Government argues that the Secretary (personally or through delegates) has authority to issue "final" decisions, and that such decisions are unreviewable by this Court. This argument badly misreads the complaint. The complaint seeks redress for the *absence* of the final decisions required by the 1997 Agreement. As will be shown at trial, the ASFE decisions to date (for three of the four zones) were rendered in a process that violated the Agreement, and therefore those decisions are not "final decisions" within the meaning of the 1997 Agreement. Those decisions are *results* of the breach, or at most a continuation of the breach: the communications that breached the agreement and tainted the decision-making process are, of course, alleged to have occurred before (and to have caused) the rendering of tainted decisions worth nothing to ChevronTexaco. The complaint does not challenge any ASFE decisions, and the Court need not review any ASFE decisions to adjudicate ChevronTexaco's claims. The complaint rather seeks redress for the breaching conduct that caused those decisions to be inherently of no value.

Moreover, to the extent the Act, the Unit Plan Contract and the 1997 Agreement recognize the Secretary's role in issuing a "final" and "binding" decision regarding equity, those adjectives do not erase the Secretary's other contractual obligations or deprive ChevronTexaco of the right to seek judicial remedy for breach of the 1997 Agreement. The Secretary's authority to issue a "final decision" did not, for example, include the authority to disregard or modify the contractually specified criteria for making such a decision, or the authority to violate any law or constitutional provision.

In that regard, the Government's argument is based in part upon the false premise that if the Secretary makes a "final" decision under the UPC, the decision cannot be challenged as a breach of the UPC. *See* Motion at 19-20. The Government has not informed the Court that this

same argument about "final[ity]" under the UPC was foreclosed back in 1976. In *United States v. Standard Oil Co.*, 545 F.2d 624 (9th Cir. 1976), the Court interpreted section 15(b) of the UPC, but did not reach certain "questions . . . more appropriately resolved in *judicial review of the final administrative decision* under section 15(b)." *Id.* at 632 n.2 (emphasis added). The 1995 Act's instruction that the Secretary's decision regarding equity finalization "shall be final and binding" does not and cannot deprive ChevronTexaco of the right to sue the Secretary for breach of contract.

## III. <u>The Equity Process Agreement Does Not Bar an Action to Remedy a Breach of the Equity Process Agreement.</u>

The Government argues that the 1997 Agreement itself bars any lawsuit that is based on a breach of that same agreement. The Government's Escher-like interpretation means that the water flows both uphill and downhill in the Agreement: procedures specified in the Agreement are themselves the only procedures under which those procedures can be enforced. As the Government knows, OHA itself has rejected this reading of the Agreement. In a February 26, 1999 letter ruling by OHA, OHA stated that it "does not have the authority to review disputes over the [Equity Process] agreement." Therefore, if this Court were to hold that OHA is the exclusive forum for claims of breach of the 1997 Agreement, the procedural limitations on DOE in that Agreement would be a nullity. That is precisely the result the Government seeks.

As discussed above in Section I.B., the Government's argument is contradicted by the 1997 Agreement, which "constitutes the legal, valid and binding obligation of the parties, *enforceable against them in accordance with its terms.*" Equity Process Agreement ¶ C.4; Decoupling Agreement § 6.5 (emphasis added). Further, the Federal Circuit does not look favorably on such arguments: "[such an] approach leads to the bizarre result that the very agreement in which [the plaintiff] sought to reserve the right to pursue its claim also caused that

reserved right to be worthless. The government's illogical contentions as to what the settlement agreement means are, to say the least, not overly persuasive." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

In 1997 ChevronTexaco possessed an unqualified right to a judicial remedy for any breach of the UPC. DOE specifically bargained to have ChevronTexaco relinquish that right with respect to equity finalization, and in the end ChevronTexaco did so in exchange for, among other things, the right to impartial decisions from the ASFE. It is wrong for DOE to accept consideration from Chevron—the waiver of judicial remedy—and then attempt to use that consideration to avoid accountability for its failure to deliver on its part of the bargain.

Further, under contract law, any relinquishment by ChevronTexaco of a judicial remedy was conditioned on DOE's compliance with the terms of the 1997 Agreement setting out procedures to be followed. "[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." Restatement (Second) of Contracts § 237. "[E]ach party is entitled to the assurance that he will not be called upon to perform his remaining duties of performance with respect to the expected exchange if there has already been an uncured material failure of performance by the other party." *Id.* § 237 cmt. (b). Any duty ChevronTexaco previously had not to seek a judicial remedy has been discharged by DOE's material breach.

The language and structure of the 1997 Agreement leave no doubt on this point. Section B. of the Equity Process Agreement is titled "Equity Redetermination Process," and begins with the explanation, "Chevron and DOE agree on the following procedures for the ASFE redeterminations of equity for all four unitized zones and for any review of such equity

redetermination decisions." Section B then contains 11 numbered paragraphs setting out the process. Paragraph 4 is the prohibition on ex parte contacts, and paragraph 9 is the prohibition on judicial remedies challenging "the ASFE equity redetermination decisions." The "decisions" referred to in paragraph 9 must conform to the requirements in the preceding paragraphs for paragraph 9 to come into play at all. It would be contrary to the law of contract to allow DOE to breach paragraph 4 but insist on enforcement of paragraph 9. Assuming that paragraph 9 has any bearing at all here (a point ChevronTexaco does not concede), DOE's compliance with paragraph 4 is a (failed) condition precedent to the prohibition in paragraph 9.

As a final point, it is absurd for the Government to read the 1996 protocol (Complaint Ex. C) as foreclosing judicial remedies. *See* Motion at 26-27. Nothing in the protocol remotely suggests any such agreement—a fact confirmed by the Government's paltry argument of this point. Further, the Government's argument is disingenuous, because the Government had to bargain specifically in *1997* for ChevronTexaco's relinquishment of judicial remedies.

## IV. <u>The Government's Causation Argument Improperly Contests Facts in the Complaint and Defies Established Law Regarding Reliance Damages.</u>

ChevronTexaco seeks to recover the costs of performing under a contract that DOE materially breached. The complaint seeks compensation based on ChevronTexaco's reliance interest: the amount of money ChevronTexaco has spent in reliance on its contract with the United States. As the United States Court of Appeals for the Federal Circuit has explained, "[i]n the event of a breach, contract law recognizes that the promisee has three enforceable interests: expectation, reliance, and restitution." *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308 (Fed. Cir. 2004) (citing Restatement (Second) of Contracts § 344 (1981)).

To see how the reliance interest described in the complaint differs from the more familiar expectation interest, one must consider ChevronTexaco's situation in 1997. In 1997,

ChevronTexaco had no contractual right to be heard by the Secretary during the Secretary's consideration of the parties' respective equity interests in the Reserve, and the Secretary had a range of discretion in unilaterally determining certain factual issues.[12] *See United States v. Standard Oil Co.*, 545 F.2d 624 (9th Cir. 1976). But ChevronTexaco had a right to seek judicial remedy for any breach of contract or violation of law by the Secretary, including any factual determinations outside legal bounds. *Cf. id.* In the 1997 Agreement, ChevronTexaco traded this judicial remedy in exchange for (among other things) impartial *ex ante* consideration of its views by the Secretary, pursuant to a quasi-judicial process in which the Assistant Secretary would be an independent decision maker. To calculate directly what that right was worth would be difficult: one would have to measure (1) the value of a decision from the ASFE that impartially accounts for ChevronTexaco's views regarding disputed legal and factual issues, and then subtract (2) the value of ChevronTexaco's pre-existing right to sue for any breach of contract arising from an ASFE decision that does *not* consider ChevronTexaco's views impartially. So ChevronTexaco seeks damages by a simpler measure—reliance damages. ChevronTexaco seeks to be put in the position it was in as of 1997, when it had not spent large sums of money on a drawn-out but tainted process. Although DOE's abandonment of the parties' contract means that ChevronTexaco can now once again sue for any breach of the UPC, ChevronTexaco is still out the money it spent on the process that DOE unilaterally abrogated.

The Government raises two objections to such a recovery. The first neglects both the nature of the complaint and the relevant law regarding reliance damages. The second is a factual

---

[12] Pursuant to ASFE Order No. 96-01 (Complaint Ex. C), adopted by the ASFE in consultation with ChevronTexaco, ChevronTexaco was able to present information and arguments to the IPE as the IPE formulated its recommendation to the ASFE, but ChevronTexaco was not entitled to present its views and arguments directly to the ASFE. The ASFE was, however, required to solicit Chevron's views in any dispute regarding IPE procedures. *Id.* ¶ 21.

dispute, improperly raised on a motion to dismiss, contrary to the burden of proof at trial, and based on erroneous facts.

### A. Reliance Damages Are Available for All Expenditures Made in Reasonable Reliance on the Contract, Whether Made Before or After Breach.

The Government argues that "as a matter of timing, the purported *ex parte* communications could not have, and did not, cause [ChevronTexaco's] attorney[s'] fees and expenses to be incurred," because ChevronTexaco found out about the breaches only in 2003. Motion at 32-33. Apparently, the Government thinks that breaches of contract cause damage only when they are discovered. Although the Government can be *held to account* only after a breach is discovered, reliance damages do not depend on when the breach is discovered—or even on when the breach occurs. Rather, reliance damages "are available for injuries resulting from activities that occurred either before or after the breach." *Glendale Fed. Bank v. United States*, 239 F.3d 1374, 1383 (Fed. Cir. 2001). This follows logically because "[t]he underlying principle in reliance damages is that a party who relies *on another party's promise* made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise." *Id.* at 1382 (emphasis added). The point of protecting the reliance interest is that a breach has rendered all reliance fruitless. The complaint plainly alleges that DOE's breaches have caused ChevronTexaco's expenditures made in reliance on the contract to go to waste.

Reliance damages should place the injured party in "'as good a position as he would have been in had the contract not been made.'" *Id.* at 1383 (quoting Restatement (Second) of Contracts § 344(b)). Before the 1997 Agreement, ChevronTexaco had not yet made substantial expenditures to present its position regarding the parties' respective interests in the Reserve to

the ASFE (and in appeals to OHA based on tainted ASFE decisions). ChevronTexaco is entitled to recover those expenditures as damages.

**B. The Government is Not Entitled to Assert in a Motion to Dismiss That Its Breach Has Caused No Harm.**

The Government next argues that "assuming such a breach of contract did occur, the only real potential harm to Chevron would be a decision that overstated the amount of equity to which DOE was entitled and understated the amount of equity to which Chevron was entitled." Motion at 33. According to DOE this "real potential harm" can be remedied by—and is governed exclusively by—the appeal process that was included *in the very same contract DOE breached* and that is dependent upon the framework which DOE's breach has destroyed.

While it is tempting to jump first to all the reasons DOE is wrong on the facts, we save that for paragraph D. below. We begin instead by noting that the most basic flaw in the Government's argument is that it is admittedly fact-based: it takes issue with the allegations of the complaint and the reasonable inferences therefrom.

ChevronTexaco clearly has alleged damages flowing from DOE's breach. *See, e.g.,* Complaint ¶ 58. The complaint alleges that DOE took actions that by their very nature stripped ChevronTexaco of the valuable right to an impartial decision by the primary fact-finder and adjudicator and relegated ChevronTexaco to an inferior procedural stance (as the appellant before OHA). *See id.* ¶ 56.

In its defense, the Government asserts the so-called "undisputed fact that ChevronTexaco has recourse before the OHA for the only real damage that it could potentially suffer as a result of the alleged breach." Motion at 34. The Government's own motion concedes that this is a question of "fact." There is nothing in the complaint or its attachments that compels the conclusion as a matter of law that Chevron's claims of having years of effort go to waste are

false. Whether ChevronTexaco has in fact suffered "real" damage and the extent and nature of such damage, including whether the breach was total, are not appropriate issues for resolution on a motion to dismiss.

Contrary to the Government's assertion, ChevronTexaco need not prove and this Court need not examine the merits of any of the ASFE or OHA decisions. The complaint alleges material breaches of the 1997 Agreement and expenditures made in reasonable reliance on the Agreement. DOE can conduct finalization as it wishes. But DOE must accept the consequences of its chosen course of action—including liability for damages suffered by ChevronTexaco—when DOE insists on doing things in a way that violates contractual promises. "The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it—and nothing else." Holmes, "The Path of the Law," in *Collected Legal Papers* 167, 175 (1920).

**C. The Government is Required to Prove at Trial that ChevronTexaco is No Worse Off After the Breach than if the Contract Had Been Performed.**

To emphasize how wrong the Government's causation arguments are, we note that even at trial, the Government will bear the burden of proof on its "no-harm" theory. In fact, the Supreme Court long ago rejected the legal argument the Government raises here. In *United States v. Behan*, 110 U.S. 338 (1884), an appeal from the Court of Claims, the Government had destroyed the deal the plaintiff had bargained for, just as DOE destroyed the bargain here. In its defense, the Government argued, "it does not appear from the evidence whether or not the claimant would have made any profits, or would have incurred loss, therefore the claimant was not entitled to judgment for any amount whatever." *Id.* at 342-43. The Supreme Court found the argument so lacking in merit that it was "unnecessary to review the authorities on this subject." *Id.* at 346. The Court explained that reliance damages are always available without any affirmative proof of damage to the expectation interest:

> Unless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures.
>
> . . . .
>
> . . . It does not lie . . . in the mouth of the party[] who has voluntarily and wrongfully put an end to the contract[] to say that the party injured has not been damaged at least to the amount of what he has been induced fairly and in good faith to lay out and expend, (including his own services) . . . .

*Id.* at 344, 345. Here, the Government's breach is similarly total, because it has destroyed the integrity of the process promised and has thereby left ChevronTexaco worse off than before the bargain. In such circumstances, it "does not lie . . . in the mouth of the [Government]" to contest as a matter of law the appropriateness of reliance damages. *Id.* at 345.

Thus, the Government bears the burden of proving at trial its allegation that ChevronTexaco would have been no better off had the Government kept its promises. For example, in *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 558-60 (2003), this Court awarded the plaintiff reliance damages and refused the Government's claim of offset, because the Government failed to show that the plaintiff would have suffered losses absent the breach. *Westfed* quoted the Restatement (Second) of Contracts § 349 (1981): "the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that *the party in breach* can prove with reasonable certainty the injured party would have suffered had the contract been performed." (Emphasis added.) Here, even if such proof existed, it could not be offered at this stage.

*Chevron U.S.A. Prod. Co. v. O'Leary*, 958 F. Supp. 1485 (E.D. Ca. 1997), does not support the Government's attempts to shift its burden of proof. There, Chevron sought a preliminary injunction under the APA compelling the issuance of an equity finalization decision by the Secretary of Energy. Chevron relied exclusively on a deadline in the 1995 Act that

Chevron alleged had been violated. Chevron alleged that it would lose the time value of money for any favorable decision issued later than the deadline. Applying the standard for mandamus, the court noted that the ASFE might rule against Chevron, and therefore concluded that the harm alleged was "speculative." Here, by contrast, no preliminary relief is sought. Chevron seeks reliance damages already incurred. Under the precedents cited above, in order to defeat recovery, the Government must prove at trial that Chevron would be no better off even if the Government had complied with the 1997 Agreement.

### D. The Government is Wrong on the Facts and Will Never Be Able to Prove that its Breaches of Contract Were Harmless.

To further demonstrate the inappropriateness of the Government's factual argument, we point out that it is based on incorrect facts that ChevronTexaco contests. The Government's factual argument asserts that because ChevronTexaco was promised both (1) an impartial ASFE decision that was unappealable by DOE *and* (2) a unilateral right to appeal that decision to OHA, ChevronTexaco can be stripped of the former with no harm done because it still has the latter. This is equivalent to saying that the right to an impartial decision from the ASFE *unappealable by DOE* has no value to ChevronTexaco. The Government is wrong on the facts.

First, Chevron has no resort to OHA to remedy breaches of the 1997 Agreement. OHA itself has recognized it has no authority to resolve disputes regarding the Equity Process Agreement. Moreover, because DOE effectively concealed its contractually prohibited conduct, neither OHA nor ChevronTexaco knew of DOE's breach at the time of the appeal for the Carneros Zone. In addition, no appeal to OHA was available for the Dry Gas Zone. The ASFE adopted the IPE's report for the Dry Gas Zone despite certain objections ChevronTexaco raised;

and that ASFE decision was not appealable under the 1997 Agreement.[13] The contractual right to appeal to OHA provided only an avenue, limited to certain circumstances specified by contract, for the correction of a decision rendered under the required contractual procedures. It was not designed to be (and is not) a cure for a material breach of the contract that created it.

Second, no decision by OHA can compensate substantively for a tainted and invalid decision by the ASFE. Describing the OHA hearing as an "appeal" is itself an indication of limited scope. An "appeal" is not a new trial. Furthermore, the OHA process itself has been compromised by the ASFE's decisions: both appeals to OHA have been based exclusively on decisions (and, for the most part, records) made during the tainted proceedings before the ASFE. The appeal provision in the 1997 Agreement is not a sword to eviscerate the rest of that Agreement. Rather, the contract must be read as a whole; no provision should be rendered meaningless,[14] and it must be presumed that each and every consideration given is in exchange for each and every consideration received.[15]

## V. <u>**The United States Can Be Held Liable for Contract Damages Whether or Not Those Damages are Compensation for Litigation Expenses.**</u>

The Government has resurrected a litigation-expenses-as-contract-damages argument that it has already lost in this Court and in the Federal Circuit. The Government argues that even if

---

[13] *See* Complaint Ex. B.2 ¶ B.7 ("If an ASFE decision adopts the [IPE] recommendation for a particular zone, that ASFE decision shall be final and not subject to challenge by Chevron.")

[14] *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992) (contract must be interpreted "as a whole," giving reasonable meaning "to all its parts" and avoiding "conflict or surplusage"); *Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed. Cir. 1997) ("A contract is deemed to have been written so that all parts 'make sense,' and it is so construed when conflicting interpretations are offered after dispute arises.").

[15] "[W]hen parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992).

the breach-of-contract damages alleged in the complaint are shown to have been foreseeable to the Government at contracting, those damages cannot be awarded if the damages (1) can be characterized as litigation expenses and (2) were not specifically mentioned in the contract (or in statute) as being recoverable as damages. The Government's argument contorts the American Rule, applicable to all litigants public and private, which holds that a prevailing litigant cannot recover attorneys' fees without some statutory or contractual exception.[16] But the American Rule has no application to ChevronTexaco's claims. Where, as here, the breach itself imposes costs on the non-breaching party apart from and independent of the costs of the contract enforcement, it is irrelevant that those costs include the cost of legal counsel. They are not the attorneys' fees of a "prevailing litigant." They are rather a foreseeable cost imposed by breach.[17] The Government "cites no precedent holding that, as a matter of law, legal fees cannot be the direct and foreseeable consequence of a breach of contract." *Pratt v. United States*, 50 Fed. Cl. 469, 482 (2001).

The Federal Circuit has definitively rejected the Government's litigation-expenses-as-contract-damages argument. In *Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226 (Fed. Cir. 1997), the Government had breached a contract to obtain insurance, and the plaintiff sought to recover certain litigation costs that would have been covered by the insurance. The Government argued that it was not liable for any contract damages attributable to litigation costs. The Federal Circuit disagreed: "the recovery sought by [the plaintiff] is not for attorney fees in

[16] *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975).

[17] An exception to the American Rule may well apply to attorneys' fees incurred by ChevronTexaco in pursuing this breach of contract case, but that is irrelevant here.

an action against the United States, but for damages for breach of a contract." *Id.* at 1233.[18]

The Government raised a similarly meritless argument against Chevron fifteen years ago in a case involving the Unit Plan Contract. *Chevron U.S.A., Inc. v. United States*, 20 Cl. Ct. 86 (1990). Chevron sought to recover, as damages for the United States' breach of contract, a pro rata portion of the costs of Chevron's litigation (in its role as Unit Operator) against a third party. The Government argued that the UPC did not require it to reimburse legal fees. The Claims Court rejected the Government's argument, reasoning that such expenses were foreseeable operating costs and were therefore recoverable as contract damages: "[t]he parties certainly must have anticipated the risk of litigation expenses, including judgments, associated with the operation of a highly sophisticated oil and gas producing Reserve . . . ." *Id.* at 88. The court granted summary judgment against the United States on liability for breach of contract.

Moreover, it makes no difference here that the cost of counsel included expenses for presenting ChevronTexaco's views to the Government. Such expenses are similar to damages awarded in bid protest cases. In a bid protest, if the Government has breached its duty to treat a bidder fairly and impartially, the bidder may recover as reliance damages the cost of preparing and submitting its bid, including the cost of counsel. This Court has held that such a recovery is analogous to the kind of contract damages ChevronTexaco seeks here:

> [B]id preparation and proposal costs are a type of reliance damages. Reliance damages are appropriate here because Plaintiff's proposal efforts have been wasted in reliance upon the Government's obligation to treat its bid fairly . . . .
>
> Returning a disappointed bidder to its pre-bid position wherein it recovers the cost of its wasted bid preparation and proposal costs also comports with longstanding

[18] *See also, e.g., Terteling v. United States*, 167 Ct. Cl. 331 (1964) (United States required to pay the plaintiffs' litigation expenses as breach-of-contract damages following the United States' breach of a contract to indemnify plaintiffs in litigation against a third party).

> precedent awarding bid preparation and proposal costs under the theory of breach of the implied contract of fair dealing.

*Gentex Corp. v. United States*, 61 Fed. Cl. 49, 54-55 (2004) (citations omitted).[19]

Although the Government attempts to give its argument jurisdictional overtones, it concedes that the Tucker Act does not change substantive law of contracts. And contract law makes litigation expenses recoverable as damages in situations like this one:

> If two parties have contracted to submit an existing dispute to arbitration, it is practically impossible to determine the amount of harm that has been done by a repudiation of the contract. *If one party repudiates such a contract after the other has employed counsel, taken depositions, and paid witnesses, the amounts reasonably expended in this manner can be recovered as damages* after subtracting the value to the injured party, in subsequent litigation or otherwise, of the service, depositions, and information received as a result of his expenditures.

11 *Corbin on Contracts* § 1031 at 170 (interim ed. 2002).[20] Moreover, ChevronTexaco seeks as reliance damages expenses unrelated to litigation, including the cost of a letter of credit, consulting fees, and the value of time expended by ChevronTexaco personnel. This Court cannot dismiss the complaint just because the cost of counsel is among the damages sought.

The only authority involving legal fees that the Government cites for its position is *Texas Instruments Inc. v. United States*, 991 F.2d 760 (Fed. Cir. 1993). But in that case, the court held that the two contracts in question had not been breached. The contracts each included a

---

[19] *See also Concept Automation, Inc. v. United States*, 41 Fed. Cl. 361 (1998) (Smith, C.J.) (plaintiffs recovered bid preparation *and* protest costs, including attorneys' fees, where the government breached its implied-in-fact contract, acted in an arbitrary and capricious fashion, and unreasonably awarded a contract to an unqualified bidder).

[20] *Accord* Restatement (First) of Contracts § 333 Illustr. 3:

> A contracts with B to submit an existing dispute to arbitration. Arbitrators are appointed; and A employs counsel, takes depositions, and pays witnesses. B then repudiates. There is no evidence indicating whether full performance would have resulted in a profit or a loss. A can get judgment for the amount he has reasonably expended, less the value to him, in subsequent litigation or otherwise, of the service, depositions, and information received as a result of his expenditure.

"Disputes Clause" that required all disputes regarding the contract to be determined by the military agency in the first instance. TI argued that the government had improperly pursued claims of defective pricing and that this constituted a direct breach of the Disputes Clauses. TI also relied on a regulation, 48 C.F.R. § 1.602-2(b), which required that Armed Services Contracting Officers "[e]nsure that contractors receive impartial, fair, and equitable treatment." The court held that because the requirements for an award of attorneys' fees in a defective pricing dispute are *dictated by statute*, 5 U.S.C. § 504, TI could not recover such fees outside the statute. The Court reasoned, "[i]f the lack of substantial justification for the CO's actions could be the basis of an action for damages for breach of contract, ostensibly anyone could sue to recover their attorney fees and expenses incurred before the board without regard for recovery pursuant to section 504." 991 F.2d at 768. In light of the statute, the Court determined that the boilerplate "Disputes Clause" in the contracts at issue did not impose any duty that had been breached and did not implicitly incorporate the regulatory standard. *See id.*

The Government's reliance on *Texas Instruments* here is misplaced, because no statute precludes the breach of contract damages the complaint seeks, and because the complaint does not depend on any argument that regulations have been implicitly incorporated into a contract. ChevronTexaco has properly alleged that its damages were caused by the Government's breach of contract and were foreseeable at the time of contracting. "Foreseeability is a question of fact." *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1379 (Fed. Cir. 2001). Thus, nothing further is required here.

## CONCLUSION

ChevronTexaco has properly stated claims for breach of contract and for breach of the implied duty of good faith and fair dealing present in every contract. ChevronTexaco seeks money damages it has actually suffered in reliance on the contract destroyed by the

Government's breaches. Accordingly, ChevronTexaco respectfully asks this Court to deny the motion to dismiss.

DATED: February 1, 2005

Respectfully submitted,

/s/ Donald Baxter Craven

Donald B. Craven
Daniel Joseph
C. Fairley Spillman
Merrill C. Godfrey
Akin Gump Strauss Hauer & Feld, L.L.P.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4000
(202) 887-4288 Fax

Counsel for Chevron U.S.A. Inc.

**APPENDIX**

National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106 §§ 3412-3416

unless the President determines that a domestic ferroalloy producer is not available to acquire the material.

(c) DOMESTIC FERROALLOY PRODUCER DEFINED.—For purposes of this section. the term "domestic ferroalloy producer" means a company or other business entity that, as determined by the President—

(1) is engaged in operations to upgrade manganese ores of metallurgical grade or manganese ferro; and

(2) conducts a significant level of its research, development, engineering, and upgrading operations in the United States.

**SEC. 3305. TITANIUM INITIATIVE TO SUPPORT BATTLE TANK UPGRADE PROGRAM.**

During each of the fiscal years 1996 through 2003, the Secretary of Defense shall transfer from stocks of the National Defense Stockpile up to 250 short tons of titanium sponge to the Secretary of the Army for use in the weight reduction portion of the main battle tank upgrade program. Transfers under this section shall be without charge to the Army, except that the Secretary of the Army shall pay all transportation and related costs incurred in connection with the transfer.

## Subtitle B—Programmatic Change

**SEC. 3311. TRANSFER OF EXCESS DEFENSE-RELATED MATERIALS TO STOCKPILE FOR DISPOSAL.**

(a) TRANSFER AND DISPOSAL.—Section 4 of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98c) is amended by adding at the end the following new subsection:

"(c)(1) The Secretary of Energy, in consultation with the Secretary of Defense, shall transfer to the stockpile for disposal in accordance with this Act uncontaminated materials that are in the Department of Energy inventory of materials for the production of defense-related items, are excess to the requirements of the Department for that purpose, and are suitable for transfer to the stockpile and disposal through the stockpile.

"(2) The Secretary of Defense shall determine whether materials are suitable for transfer to the stockpile under this subsection, are suitable for disposal through the stockpile, and are uncontaminated.".

(b) CONFORMING AMENDMENT.—Subsection (a) of such section is amended by adding at the end the following:

"(10) Materials transferred to the stockpile under subsection (c).".

# TITLE XXXIV—NAVAL PETROLEUM RESERVES

## Subtitle A—Administration of Naval Petroleum Reserves

**SEC. 3401. AUTHORIZATION OF APPROPRIATIONS.**

There is hereby authorized to be appropriated to the Secretary of Energy $148,786,000 for fiscal year 1996 for the purpose of

carrying out activities under chapter 641 of title 10, United States Code, relating to the naval petroleum reserves (as defined in section 7420(2) of such title). Funds appropriated pursuant to such authorization shall remain available until expended. Of the amount appropriated pursuant to the authorization of appropriations in the preceding sentence, the Secretary may use not more than $7,000,000 for carrying out activities related to the sale of Naval Petroleum Reserve Numbered 1 under section 3412.

**SEC. 3402. PRICE REQUIREMENT ON SALE OF CERTAIN PETROLEUM DURING FISCAL YEAR 1996.** 10 USC 7430 note.

Notwithstanding section 7430(b)(2) of title 10, United States Code, during fiscal year 1996, any sale of any part of the United States share of petroleum produced from Naval Petroleum Reserves Numbered 1, 2, and 3 shall be made at a price not less than 90 percent of the current sales price, as estimated by the Secretary of Energy, of comparable petroleum in the same area.

**SEC. 3403. EXTENSION OF OPERATING CONTRACT FOR NAVAL PETROLEUM RESERVE NUMBERED 1.**

Section 3503 of the National Defense Authorization Act of Fiscal Year 1995 (Public Law 103–337; 108 Stat. 3111) is amended by striking out "two years" in the first sentence and inserting in lieu thereof "three years".

## Subtitle B—Sale of Naval Petroleum Reserve

California. 10 USC 7420 note.

**SEC. 3411. DEFINITIONS.**

For purposes of this subtitle:

(1) The terms "Naval Petroleum Reserve Numbered 1" and "reserve" mean Naval Petroleum Reserve Numbered 1, commonly referred to as the Elk Hills Unit, located in Kern County, California, and established by Executive order of the President, dated September 2, 1912.

(2) The term "naval petroleum reserves" has the meaning given that term in section 7420(2) of title 10, United States Code, except that the term does not include Naval Petroleum Reserve Numbered 1.

(3) The term "unit plan contract" means the unit plan contract between equity owners of the lands within the boundaries of Naval Petroleum Reserve Numbered 1 entered into on June 19, 1944.

(4) The term "effective date" means the date of the enactment of this Act.

(5) The term "Secretary" means the Secretary of Energy.

(6) The term "appropriate congressional committees" means the Committee on Armed Services of the Senate and the Committee on National Security and the Committee on Commerce of the House of Representatives.

**SEC. 3412. SALE OF NAVAL PETROLEUM RESERVE NUMBERED 1.**

(a) SALE OF RESERVE REQUIRED.—Subject to section 3414, not later than two years after the effective date, the Secretary of Energy shall enter into one or more contracts for the sale of all right, title, and interest of the United States in and to all lands owned

or controlled by the United States inside Naval Petroleum Reserve Numbered 1. Chapter 641 of title 10, United States Code, shall not apply to the sale of the reserve.

(b) EQUITY FINALIZATION.—(1) Not later than eight months after the effective date, the Secretary shall finalize equity interests of the known oil and gas zones in Naval Petroleum Reserve Numbered 1 in the manner provided by this subsection.

(2) The Secretary shall retain the services of an independent petroleum engineer, mutually acceptable to the equity owners, who shall prepare a recommendation on final equity figures. The Secretary may accept the recommendation of the independent petroleum engineer for final equity in each known oil and gas zone and establish final equity interest in Naval Petroleum Reserve Numbered 1 in accordance with the recommendation, or the Secretary may use such other method to establish final equity interest in the reserve as the Secretary considers appropriate.

(3) If, on the effective date, there is an ongoing equity redetermination dispute between the equity owners under section 9(b) of the unit plan contract, the dispute shall be resolved in the manner provided in the unit plan contract within eight months after the effective date. The resolution shall be considered final for all purposes under this section.

Publication.

(c) NOTICE OF SALE.—Not later than two months after the effective date, the Secretary shall publish a notice of intent to sell Naval Petroleum Reserve Numbered 1. The Secretary shall make all technical, geological, and financial information relevant to the sale of the reserve available to all interested and qualified buyers upon request. The Secretary, in consultation with the Administrator of General Services, shall ensure that the sale process is fair and open to all interested and qualified parties.

(d) ESTABLISHMENT OF MINIMUM SALE PRICE.—(1) Not later than seven months after the effective date, the Secretary shall retain the services of five independent experts in the valuation of oil and gas fields to conduct separate assessments, in a manner consistent with commercial practices, of the value of the interest of the United States in Naval Petroleum Reserve Numbered 1. The independent experts shall complete their assessments within 11 months after the effective date. In making their assessments, the independent experts shall consider (among other factors)—

(A) all equipment and facilities to be included in the sale;

(B) the estimated quantity of petroleum and natural gas in the reserve; and

(C) the net present value of the anticipated revenue stream that the Secretary and the Director of the Office of Management and Budget jointly determine the Treasury would receive from the reserve if the reserve were not sold, adjusted for any anticipated increases in tax revenues that would result if the reserve were sold.

Reports.

(2) The independent experts retained under paragraph (1) shall also determine and submit to the Secretary the estimated total amount of the cost of any environmental restoration and remediation necessary at the reserve. The Secretary shall report the estimate to the Director of the Office of Management and Budget, the Secretary of the Treasury, and Congress.

(3) The Secretary, in consultation with the Director of the Office of Management and Budget, shall set the minimum accept-

able price for the reserve. The Secretary may not set the minimum acceptable price below the higher of—

(A) the average of the five assessments prepared under paragraph (1); and

(B) the average of three assessments after excluding the high and low assessments.

(e) ADMINISTRATION OF SALE; DRAFT CONTRACT.—(1) Not later than two months after the effective date, the Secretary shall retain the services of an investment banker or an appropriate equivalent financial adviser to independently administer, in a manner consistent with commercial practices and in a manner that maximizes sale proceeds to the Government, the sale of Naval Petroleum Reserve Numbered 1 under this section. Costs and fees of retaining the investment banker or financial adviser may be paid out of the proceeds of the sale of the reserve.

(2) Not later than 11 months after the effective date, the investment banker or financial adviser retained under paragraph (1) shall complete a draft contract or contracts for the sale of Naval Petroleum Reserve Numbered 1, which shall accompany the solicitation of offers and describe the terms and provisions of the sale of the interest of the United States in the reserve.

(3) The draft contract or contracts shall identify—

(A) all equipment and facilities to be included in the sale; and

(B) any potential claim or liability (including liability for environmental restoration and remediation), and the extent of any such claim or liability, for which the United States is responsible under subsection (g).

(4) The draft contract or contracts, including the terms and provisions of the sale of the interest of the United States in the reserve, shall be subject to review and approval by the Secretary, the Secretary of the Treasury, and the Director of the Office of Management and Budget. Each of those officials shall complete the review of, and approve or disapprove, the draft contract or contracts not later than 12 months after the effective date.

(f) SOLICITATION OF OFFERS.—(1) Not later than 13 months after the effective date, the Secretary shall publish the solicitation of offers for Naval Petroleum Reserve Numbered 1. Publication.

(2) Not later than 18 months after the effective date, the Secretary shall identify the highest responsible offer or offers for purchase of the interest of the United States in Naval Petroleum Reserve Numbered 1 that, in total, meet or exceed the minimum acceptable price determined under subsection (d)(3).

(3) The Secretary shall take such action immediately after the effective date as is necessary to obtain from an independent petroleum engineer within 10 months after that date a reserve report prepared in a manner consistent with commercial practices. The Secretary shall use the reserve report in support of the preparation of the solicitation of offers for the reserve.

(g) FUTURE LIABILITIES.—To effectuate the sale of the interest of the United States in Naval Petroleum Reserve Numbered 1, the Secretary may extend such indemnities and warranties as the Secretary considers reasonable and necessary to protect the purchaser from claims arising from the ownership in the reserve by the United States.

(h) MAINTAINING PRODUCTION.—Until the sale of Naval Petroleum Reserve Numbered 1 is completed under this section, the

Secretary shall continue to produce the reserve at the maximum daily oil or gas rate from a reservoir, which will permit maximum economic development of the reservoir consistent with sound oil field engineering practices in accordance with section 3 of the unit plan contract.

Notification.

(i) NONCOMPLIANCE WITH DEADLINES.—At any time during the two-year period beginning on the effective date, if the Secretary determines that the actions necessary to complete the sale of the reserve within that period are not being taken or timely completed, the Secretary shall transmit to the appropriate congressional committees a written notification of that determination together with a plan setting forth the actions that will be taken to ensure that the sale of the reserve will be completed within that period. The Secretary shall consult with the Director of the Office of Management and Budget in preparing the plan for submission to the committees.

(j) OVERSIGHT.—The Comptroller General shall monitor the actions of the Secretary relating to the sale of the reserve and report to the appropriate congressional committees any findings on such actions that the Comptroller General considers appropriate to report to the committees.

(k) ACQUISITION OF SERVICES.—The Secretary may enter into contracts for the acquisition of services required under this section under the authority of paragraph (7) of section 303(c) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 253(c)), except that the notification required under subparagraph (B) of such paragraph for each contract shall be submitted to Congress not less than 7 days before the award of the contract.

**SEC. 3413. EFFECT OF SALE OF RESERVE.**

(a) EFFECT ON EXISTING CONTRACTS.—(1) In the case of any contract, in effect on the effective date, for the purchase of production from any part of the United States' share of Naval Petroleum Reserve Numbered 1, the sale of the interest of the United States in the reserve shall be subject to the contract for a period of three months after the closing date of the sale or until termination of the contract, whichever occurs first. The term of any contract entered into after the effective date for the purchase of the production shall not exceed the anticipated closing date for the sale of the reserve.

(2) The Secretary shall exercise the termination procedures provided in the contract between the United States and Bechtel Petroleum Operation, Inc., Contract Number DE–AC01–85FE60520 so that the contract terminates not later than the date of closing of the sale of Naval Petroleum Reserve Numbered 1 under section 3412.

(3) The Secretary shall exercise the termination procedures provided in the unit plan contract so that the unit plan contract terminates not later than the date of closing of the sale of reserve.

(b) EFFECT ON ANTITRUST LAWS.—Nothing in this subtitle shall be construed to alter the application of the antitrust laws of the United States to the purchaser or purchasers (as the case may be) of Naval Petroleum Reserve Numbered 1 or to the lands in the reserve subject to sale under section 3412 upon the completion of the sale.

(c) PRESERVATION OF PRIVATE RIGHT, TITLE, AND INTEREST.—Nothing in this subtitle shall be construed to adversely affect the

ownership interest of any other entity having any right, title, and interest in and to lands within the boundaries of Naval Petroleum Reserve Numbered 1 and which are subject to the unit plan contract.

(d) TRANSFER OF OTHERWISE NONTRANSFERABLE PERMIT.—The Secretary may transfer to the purchaser or purchasers (as the case may be) of Naval Petroleum Reserve Numbered 1 the incidental take permit regarding the reserve issued to the Secretary by the United States Fish and Wildlife Service and in effect on the effective date if the Secretary determines that transfer of the permit is necessary to expedite the sale of the reserve in a manner that maximizes the value of the sale to the United States. The transferred permit shall cover the identical activities, and shall be subject to the same terms and conditions, as apply to the permit at the time of the transfer.

**SEC. 3414. CONDITIONS ON SALE PROCESS.**

(a) NOTICE REGARDING SALE CONDITIONS.—The Secretary may not enter into any contract for the sale of Naval Petroleum Reserve Numbered 1 under section 3412 until the end of the 31-day period beginning on the date on which the Secretary submits to the appropriate congressional committees a written notification—

(1) describing the conditions of the proposed sale; and

(2) containing an assessment by the Secretary of whether it is in the best interests of the United States to sell the reserve under such conditions.

(b) AUTHORITY TO SUSPEND SALE.—(1) The Secretary may suspend the sale of Naval Petroleum Reserve Numbered 1 under section 3412 if the Secretary and the Director of the Office of Management and Budget jointly determine that—

(A) the sale is proceeding in a manner inconsistent with achievement of a sale price that reflects the full value of the reserve; or

(B) a course of action other than the immediate sale of the reserve is in the best interests of the United States.

(2) Immediately after making a determination under paragraph (1) to suspend the sale of Naval Petroleum Reserve Numbered 1, the Secretary shall submit to the appropriate congressional committees a written notification describing the basis for the determination and requesting a reconsideration of the merits of the sale of the reserve. Notification.

(c) EFFECT OF RECONSIDERATION NOTICE.—After the Secretary submits a notification under subsection (b), the Secretary may not complete the sale of Naval Petroleum Reserve Numbered 1 under section 3412 or any other provision of law unless the sale of the reserve is authorized in an Act of Congress enacted after the date of the submission of the notification.

**SEC. 3415. TREATMENT OF STATE OF CALIFORNIA CLAIM REGARDING RESERVE.**

(a) RESERVATION OF FUNDS.—After the costs incurred in the conduct of the sale of Naval Petroleum Reserve Numbered 1 under section 3412 are deducted, nine percent of the remaining proceeds from the sale of the reserve shall be reserved in a contingent fund in the Treasury for payment to the State of California for the Teachers' Retirement Fund of the State in the event that, and to the extent that, the claims of the State against the United

States regarding production and proceeds of sale from Naval Petroleum Reserve Numbered 1 are—

(1) settled by agreement with the United States under subsection (c); or

(2) finally resolved in favor of the State by a court of competent jurisdiction, if a settlement agreement is not reached.

(b) DISPOSITION OF FUNDS.—In such amounts as may be provided in appropriation Acts, amounts in the contingent fund shall be available for paying a claim described in subsection (a). After final disposition of the claims, any unobligated balance in the contingent fund shall be credited to the general fund of the Treasury. If no payment is made from the contingent fund within 10 years after the effective date, amounts in the contingent fund shall be credited to the general fund of the Treasury.

(c) SETTLEMENT OFFER.—Not later than 30 days after the date of the sale of Naval Petroleum Reserve Numbered 1 under section 3412, the Secretary shall offer to settle all claims of the State of California against the United States with respect to lands in the reserve located in sections 16 and 36 of township 30 south, range 23 east, Mount Diablo Principal Meridian, California, and production or proceeds of sale from the reserve, in order to provide proper compensation for the State's claims. The Secretary shall base the amount of the offered settlement payment from the contingent fund on the fair value for the State's claims, including the mineral estate, not to exceed the amount reserved in the contingent fund.

(d) RELEASE OF CLAIMS.—Acceptance of the settlement offer made under subsection (c) shall be subject to the condition that all claims against the United States by the State of California for the Teachers' Retirement Fund of the State be released with respect to lands in Naval Petroleum Reserve Numbered 1, including sections 16 and 36 of township 30 south, range 23 east, Mount Diablo Principal Meridian, California, or production or proceeds of sale from the reserve.

**SEC. 3416. STUDY OF FUTURE OF OTHER NAVAL PETROLEUM RESERVES.**

(a) STUDY REQUIRED.—The Secretary of Energy shall conduct a study to determine which of the following options, or combinations of options, regarding the naval petroleum reserves (other than Naval Petroleum Reserve Numbered 1) would maximize the value of the reserves to the United States:

(1) Retention and operation of the naval petroleum reserves by the Secretary under chapter 641 of title 10, United States Code.

(2) Transfer of all or a part of the naval petroleum reserves to the jurisdiction of another Federal agency for administration under chapter 641 of title 10, United States Code.

(3) Transfer of all or a part of the naval petroleum reserves to the Department of the Interior for leasing in accordance with the Mineral Leasing Act (30 U.S.C. 181 et seq.) and surface management in accordance with the Federal Land Policy and Management Act (43 U.S.C. 1701 et seq.).

(4) Sale of the interest of the United States in the naval petroleum reserves.

(b) CONDUCT OF STUDY.—The Secretary shall retain an independent petroleum consultant to conduct the study.

(c) CONSIDERATIONS UNDER STUDY.—An examination of the value to be derived by the United States from the transfer or sale of the naval petroleum reserves shall include an assessment and estimate of the fair market value of the interest of the United States in the naval petroleum reserves. The assessment and estimate shall be made in a manner consistent with customary property valuation practices in the oil and gas industry.

(d) REPORT AND RECOMMENDATIONS REGARDING STUDY.—Not later than June 1, 1996, the Secretary shall submit to Congress a report describing the results of the study and containing such recommendations (including proposed legislation) as the Secretary considers necessary to implement the option, or combination of options, identified in the study that would maximize the value of the naval petroleum reserves to the United States.

# TITLE XXXV—PANAMA CANAL COMMISSION

## Subtitle A—Authorization of Appropriations

Panama Canal Commission Authorization Act for Fiscal Year 1996.

**SEC. 3501. SHORT TITLE.**

This subtitle may be cited as the "Panama Canal Commission Authorization Act for Fiscal Year 1996".

**SEC. 3502. AUTHORIZATION OF EXPENDITURES.**

(a) IN GENERAL.—Subject to subsection (b), the Panama Canal Commission is authorized to make such expenditures within the limits of funds and borrowing authority available to it in accordance with law, and to make such contracts and commitments without regard to fiscal year limitations, as may be necessary under the Panama Canal Act of 1979 (22 U.S.C. 3601 et seq.) for the operation, maintenance, and improvement of the Panama Canal for fiscal year 1996.

(b) LIMITATIONS.—For fiscal year 1996, the Panama Canal Commission may expend from funds in the Panama Canal Revolving Fund not more than $50,741,000 for administrative expenses, of which—

(1) not more than $15,000 may be used for official reception and representation expenses of the Supervisory Board of the Commission;

(2) not more than $10,000 may be used for official reception and representation expenses of the Secretary of the Commission; and

(3) not more than $45,000 may be used for official reception and representation expenses of the Administrator of the Commission.

(c) REPLACEMENT VEHICLES.—Funds available to the Panama Canal Commission shall be available for the purchase of not to exceed 38 passenger motor vehicles (including large heavy-duty vehicles to be used to transport Commission personnel across the isthmus of Panama) at a cost per vehicle of not more than $19,500. A vehicle may be purchased with such funds only as necessary to replace another passenger motor vehicle of the Commission.