No. 04-1365C
(Judge Braden)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHEVRON U.S.A. INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

ROBERT E. KIRSCHMAN, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 307-6289
Facsimile: (202) 514-7969

Attorneys for Defendant

OF COUNSEL:

PAUL T. MICHAEL
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., NW
Washington, D.C. 20585

February 25, 2005

# TABLE OF CONTENTS


**Page(s)**

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS . . . . . 1

I. Chevron Has Not Established This Court's Jurisdiction To Consider This Dispute, Because The Contract Does Not Create A Substantive Right To Money Damages . . . . . 1

A. A Contract Must Provide A Substantive Right To Money Damages To Form The Basis For Tucker Act Jurisdiction . . . . . 1

B. Chevron Has Failed To Show That The Agreed-Upon Terms Of The Equity Process Agreement Do Not Bar Its Claim For Attorney Fees And Expenses . . . . . 6

C. The Authorization Act For FY96 Did Not Contemplate Judicial Review Of The Equity Finalization Process . . . . . 8

II. Causation Is A Requisite Element Of Chevron's Claim That Chevron Cannot Establish And That Is, Therefore, Subject To Our Dispositive Motion . . . . . 13

III. The Attorney Fees Sought By Chevron Are Not Recoverable In This Action . . . . . 18

Conclusion . . . . . 20

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

Albemarle Bank and Trust v. United States,
12 Cl. Ct. 704 (1987) . . . . . . . . 20

Arakaki v. United States,
62 Fed. Cl. 244 (2004) . . . . . . . . 3, 16

AT & T Technologies, Inc. v. United States,
18 Cl. Ct. 315 (1989) . . . . . . . . 19

Bay View, Inc. v. United States,
46 Fed. Cl. 494 (2000) . . . . . . . . 4

Bighorn Lumber Co., Inc. v. United States,
49 Fed. Cl. 768 (2001) . . . . . . . . 19

Brown v. United States,
86 F.3d 1554 (Fed. Cir. 1996) . . . . . . . . 3

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002) . . . . . . . . 13, 17

Chevron, U.S.A. Production Co. v. O'Leary,
958 F. Supp. 1485 (E.D. Cal. 1997) . . . . . . . . 9

Chevron U.S.A., Inc. v. United States,
20 Cl. Ct. 86 (1990) . . . . . . . . 10, 19

Clark v. United States,
229 Ct. Cl. 570 (1981) . . . . . . . . 8

Coflexip & Services, Inc. v. United States,
20 Cl. Ct. 412 (1990) . . . . . . . . 19

Concept Automation, Inc. v. United States,
41 Fed. Cl. 361 (1998) . . . . . . . . 19

## TABLE OF AUTHORITIES (Contd.)

Page(s)


Elcon Enterprises, Inc. v. Washington Metropolitan Area Transit Authority,
977 F.2d 1472 (D.C. Cir. 1992) .................................... 15, 16

Gentex Corp. v. United States,
61 Fed. Cl. 49 (2004) .................................... 19

Glendale Fed. Bank v. United States,
239 F.3d 1374 (Fed. Cir. 2001) .................................... 13

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) .................................... 8

Griswold v. United States,
61 Fed. Cl. 458 (2004) .................................... **passim**

Grumman Data Systems Corp. v. United States,
28 Fed. Cl. 803 (1993) .................................... 19

Khan v. United States,
201 F.3d 1375 (Fed. Cir. 2000) .................................... 1, 2, 4

Laka Tool and Stamping Co. v. United States,
227 Ct. Cl. 468, 650 F.2d 270 (1981) .................................... 13

LaSalle Talman Bank, F.S.B. v. United States,
317 F.3d 1363 (Fed. Cir. 2003) .................................... 14

Lee v. United States,
33 Fed. Cl. 374 (1995) .................................... 2, 3, 8

Lion Raisins, Inc. v. United States,
52 Fed. Cl. 629 (2002) .................................... 19

Lynch v. United States,
292 U.S. 571 (1934) .................................... 7

## TABLE OF AUTHORITIES (Contd.)

**Page(s)**

Martinez v. United States,
333 F.3d 1295 (Fed. Cir. 2003) . . . . . 3

Massachusetts Bay Transportation Authority v. United States ("MBTA"),
129 F.3d 1226 (Fed. Cir. 1997) . . . . . 20

Mid States Coalition For Progress v. Surface Transportation Board,
345 F.3d 520 (8th Cir. 2003) . . . . . 16, 17

Moyer v. United States,
190 F.3d 1314 (Fed. Cir. 1999) . . . . . 3

New Valley Corp. v. United States,
119 F.3d 1576 (Fed. Cir. 1997) . . . . . 7

Pijanowski v. United States,
60 Fed. Cl. 628 (2004) . . . . . 2

Princeton Combustion Research Labs v. McCarthy,
674 F.2d 1016 (3rd Cir. 1982) . . . . . 15

R.A. Holman & Co. v. Securities and Exchange Commission,
299 F.2d 127 (D.C. Cir. 1962) . . . . . 15

Ransom v. United States,
900 F.2d 242 (Fed. Cir. 1990) . . . . . 3

San Juan City College v. United States,
391 F.3d 1357 (Fed. Cir. 2004) . . . . . 5

Sanders v. United States,
252 F.3d 1329 (Fed. Cir. 2001) . . . . . 5, 6

## TABLE OF AUTHORITIES (Contd.)

**Page(s)**

Schooling v. United States,
63 Fed. Cl. 204 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Standard Oil Co. v. United States,
231 Ct. Cl. 86, 685 F.2d 1322 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Standard Oil Co. v. United States,
231 Ct. Cl. 112, 685 F.2d 1337 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Terteling v. United States,
167 Ct. Cl. 331, 334 F.2d 250 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Texas Instruments Inc. v. United States,
991 F.2d 760 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Touche Ross & Co. v. Securities and Exchange Commission,
609 F.2d 570 (2nd Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Behan,
110 U.S. 338 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States v. Mitchell ("Mitchell II"),
463 U.S. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Testan,
424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Winstar Corp.,
518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Wells Brothers Co. v. United States,
254 U.S. 83 (1920) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Westfed Holdings, Inc. v. United States,
52 Fed. Cl. 135 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## TABLE OF AUTHORITIES (Contd.)

**Page(s)**

### STATUTES, RULES AND REGULATIONS

5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

37 U.S.C. § 204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

RCFC 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

RCFC 7.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RCFC 12(b)(6) and 7.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1365C |
| v. | ) | (Judge Braden) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(6) and 7.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this reply to the opposition brief of plaintiff, Chevron U.S.A. Inc. ("Chevron").

I. Chevron Has Not Established This Court's Jurisdiction To Consider This Dispute, Because The Contract Does Not Create A Substantive Right To Money Damages

A. A Contract Must Provide A Substantive Right To Money Damages To Form The Basis For Tucker Act Jurisdiction

In an effort to undermine our argument that Chevron cannot establish the jurisdiction of this Court to consider its complaint, Chevron misstates our position and ignores precedent upon which we relied. It asserts that "only non-contractual bases for jurisdiction must be analyzed to determine whether they are 'money-mandating.'" Response Brief ("Resp.") 10 (emphasis in original).

In making this assertion, Chevron conspicuously ignores precedent that we quoted verbatim in our motion, Khan v. United States, 201 F.3d 1375 (Fed. Cir. 2000). In Khan, the United States Court of Appeals for the Federal Circuit articulated clearly that "to invoke jurisdiction under the Tucker Act, a plaintiff must identify a contractual relationship, constitutional provision, statute, or regulation that

provides a substantive right to money damages." Id. at 1377 (emphasis added). Indeed, this Court recently relied upon this exact language in Khan to set forth the limits of the court's jurisdiction. Schooling v. United States, 63 Fed. Cl. 204, 205 (2004). In doing so, the Court acted consistent with prior decisions of this Court. See, e.g., Pijanowski v. United States, 60 Fed. Cl. 628, 630 (2004). While Chevron does address the decision in Schooling, it fails to note the Court's proper reliance upon Khan.

Chevron belittles decisions of this Court that establish that a complaint must identify "contractual rights which may be fairly interpreted as requiring the payment of compensation from the United States." Lee v. United States, 33 Fed. Cl. 374, 378 (1995); Griswold v. United States, 61 Fed. Cl. 458, 462 (2004) (same). However, these decisions are consistent with Khan. Morever, while Chevron is quick to label the language in these other decisions as based upon "unusual paraphrasing" or "incorrectly" relying upon Supreme Court precedent, this Court should not follow Chevron's lead.

Indeed, the Supreme Court in United States v. Mitchell ("Mitchell II"), 463 U.S. 206, 215 (1983), in discussing the Tucker Act's waiver of sovereign immunity, stated that the Tucker Act "makes absolutely no distinction between claims founded upon contracts and claims founded upon other specified sources of law." In relying upon a later excerpt from Mitchell II, Chevron ignores this relevant point in Mitchell II and asks this Court to consider only the language it selected from Mitchell II to draw an "implication . . . that there is no need for any inquiry into whether a contract 'can fairly be interpreted' as money-mandating." Resp. 12 (emphasis added and deleted).

The purported "unambiguous precedent" which Chevron cites as support for its position neither addresses this issue directly, nor contravenes the case law we cite. Thus, Chevron is left to request that

this Court draw an "implication" which is not warranted by the precedent. Thus, the Federal Circuit in Martinez v. United States, 333 F.3d 1295 (Fed. Cir. 2003) (en banc), did not address, let alone decide, whether contracts that do not mandate the payment of money constitute a basis for Tucker Act jurisdiction. In Martinez, the petitioner did not present a contract claim, but argued that an Army Board for Correction of Military Records arbitrarily refused to correct his record and challenged his discharge from active duty. Id. at 1300. The potential "money-mandating" source for Mr. Martinez's money damages was the Military Pay Act, 37 U.S.C. § 204, not a contract. Id. at 1303. In Moyer v. United States, 190 F.3d 1314 (Fed. Cir. 1999), the petitioner also sought correction of his military records, and money that he would have received had he been medically discharged. Moyer did not involve a contract claim. In Brown v. United States, 86 F.3d 1554 (Fed. Cir. 1996), the court also did not address a contract claim, but a claim for money damages based upon allegations of a breach of trust, based upon the terms of a statute. Finally, United States v. Testan, 424 U.S. 392 (1976), clearly did not involve a contract claim. Id. at 400. Thus, none of these cases raised the issue addressed here.

Conversely, in cases where the plaintiff did raise a breach of contract claim, the courts have considered whether the contract provisions were money-mandating. Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990) ("[t]o maintain a cause of action pursuant to the Tucker Act that is based on contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract"); Schooling, 63 Fed. Cl. at 208; Griswold, 61 Fed. Cl. at 465-66; Lee 33 Fed. Cl. at 379; see also Arakaki v. United States, 62 Fed. Cl. 244, 247 (2004) ("this court has jurisdiction . . . if a claimant makes a non-frivolous allegation that he is 'entitled to money from the United States because a statute or regulation grants him that right,'

or because a contract creates an equivalent right"); Bay View, Inc. v. United States, 46 Fed. Cl. 494, (2000) ("[b]ecause the [statute] is neither a money-mandating contract nor a ratified or enforceable treaty, plaintiff can prove no set of facts that would support its breach of contract/treaty claims").

In Schooling, this Court concluded that, based upon Khan, the plaintiff's complaint should be dismissed because, among other things, it lacked jurisdiction to entertain a claim "based on alleged breach of a non-monetary provision of a settlement agreement." 63 Fed. Cl. at 208. The Court explained that "[t]he proper remedy for this alleged violation would be for the I.R.S. to provide plaintiff with the decision letter, not to pay monetary damages. . . . Plaintiff cites no authority for the proposition that the proper corrective action for this alleged breach would be the payment of money damages." Id. This reasoning is equally applicable in this case. Here, the payment of attorneys fees and expenses is not "the proper corrective action" for the alleged absence of "an objective and impartial decision." Compl. ¶ 68.[1] Consistent with Schooling, and as this Court stated in Griswold, to establish jurisdiction, "[i]t is not simply enough . . . for plaintiffs to present a money claim." Id. at 465. Instead, because the claim in both Schooling and this case was based upon an alleged breach of a "non-monetary provision" that did not mandate the payment of money damages, jurisdiction cannot be established.

Chevron notes correctly that "in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an

[1] An independent review of the ASFE decisions would remedy the alleged breach; and, as explained below, the 1997 Equity Process Agreement specifically provided the sole means for such an independent review, and Chevron has received the benefit of that review.

agreement." Resp. 9, quoting Sanders v. United States, 252 F.3d 1329, 1334-35 (Fed. Cir. 2001).[2] However, that presumption is not dispositive here. First, the presumption does not resolve the threshold jurisdictional issue of whether the contractual provisions in this case can be "'fairly interpreted' as requiring the government to pay money for the 'damage sustained.'" Griswold, 61 Fed. Cl. at 466. Because this constitutes a jurisdictional issue, it must be addressed before the Court can reach the merits of Chevron's claim concerning liability or damages. Because the contract is not money-mandating, the Court does not possess jurisdiction to reach the issue of what damages are available.

Moreover, the Federal Circuit in Sanders, while formulating this presumption, found it inapplicable in the context of the Government's alleged breach of an agreement with a criminal defendant concerning his release on bail. Id. Therefore, this presumption upon which Chevron relies is obviously not irrebuttable, and is not conclusive regarding the issue of jurisdiction.

Furthermore, while the Federal Circuit in Sanders relied upon United States v. Winstar Corp., 518 U.S. 839, 885 (1996), as support for this presumption, the Winstar decision itself relied upon "Comment a" of section 346 of the Restatement (Second) of Contracts (1981). That comment makes it clear that a "breach of contract gives the injured party a right to damages against the party in breach" unless "[t]he parties by agreement vary the rules." Winstar, 518 U.S. at 886 n. 30. Because, as

---

[2] See also San Juan City College v. United States, 391 F.3d 1357, 1361 (Fed. Cir. 2004). However, because the facts of San Juan College are notably different than the facts of this case, that recent decision does not undermine our position. There, the Federal Circuit rejected this Court's conclusion that because the contract between the school and the Government merely incorporated regulations, contract damages could not be recovered. The appellate court concluded that nothing in the parties' agreement supported a view "that the parties understood that damages would not be available in the event of breach." Given the language of, and statutory framework surrounding, the 1997 Agreement, that case is readily distinguishable from this one.

discussed in more detail below, the parties here did in fact "vary the rules" through the 1997 Equity Process Agreement (the "1997 Agreement), the presumption addressed in Sanders is not applicable.

B. Chevron Has Failed To Show That The Agreed-Upon Terms Of The Equity Process Agreement Do Not Bar Its Claim For Attorney Fees And Expenses

Chevron stresses that the 1997 Agreement states that it "constitutes the legal, valid and binding obligation of the parties, enforceable against them in accordance with its terms." Resp. 18 (emphasis in original). Chevron has quoted the document correctly. Comp. Exh. B2. However, it then asserts, without any supporting rationale or authority, that "[t]he only way the Agreement can be 'enforceable against' the U.S. Department of Energy is under the Tucker Act. That is plainly what the Agreement itself provides." Resp. 18; see Resp. 23. These assertions simply do not withstand scrutiny.

The 1997 Agreement makes no mention of the Tucker Act. Nor does it refer implicitly to the Tucker Act. While Chevron contends that enforcement under the Tucker Act "is plainly what the Agreement itself provides," Chevron offers no citation to the 1997 Agreement to buttress its bald allegation. Nor can it. Similarly, the 1997 Agreement does not provide, either expressly or implicitly, for the payment of money to Chevron for any purported Government violation of its terms. Again, Chevron has conspicuously failed to cite to any provision of the Agreement that provides for or contemplates the payment of money damages to Chevron.

To mask that failing, Chevron describes our position as being that "each individual provision in a government contract must include specific language 'contemplat[ing]' the government contractor's right to damages for breach." Resp. 10 (emphasis added). This is, however, a patent misstatement of our position. We have not argued that each individual provision in a contract must include specific

language. To the contrary, we consistently noted that the "Equity Process Agreement . . . did not address or contemplate the payment of money under any condition," Mot. 15 (emphasis added), and based our position upon the language of the 1997 Agreement as a whole. See Mot. 17. In fact, nowhere in the 1997 Agreement is there a contemplation of any payment of money. We did not argue that "each individual provision in a government contract must include specific language." Chevron's attempt to undermine our position by clearly misstating it should be dismissed.

Furthermore, although the 1997 Agreement states that it is "enforceable against [the parties] in accordance with its terms," it makes no reference to judicial enforcement of its terms. In fact, the opposite is true. The 1997 Agreement could not be more clear that "Chevron . . . knowingly and voluntarily waive[d] any and all rights it may have (i) to bring any other judicial or administrative challenge to the final equity determination decisions by the ASFE." The procedure negotiated was unambiguously agreed to "as an alternative to judicial resolution of any dispute regarding the ASFE equity redetermination decisions." Those words are clear and must be given their unambiguous meaning. The only enforcement of its terms described within the document is through a challenge to the Office of Hearings and Appeals ("OHA"). It does not indicate that money damages from this Court constitute "enforcement." Thus, the Court is precluded from considering Chevron's claims that the ASFE's decisions are "inherently of no value" and "tainted decisions worth nothing" to Chevron. Resp. 24. Such an outcome is in accordance with law. See New Valley Corp. v. United States, 119 F.3d 1576, 1583 (Fed. Cir. 1997) (where a contract clause "indicates that the parties intended for any joint decision to be final and conclusive . . . [s]uch a decision would be barred, then, from judicial review"), citing Lynch v. United States, 292 U.S. 571, 582 (1934). Contract provisions barring damage claims

against the United States have been, and should be, enforced, especially where the contractor is experienced and sophisticated. Wells Brothers Co. v. United States, 254 U.S. 83 (1920). This is such a case.

Chevron complains that OHA has stated that it "does not have the authority to review disputes over the [Equity Process] agreement." Resp. 25. However, that does not mean that the terms of the agreement should now be altered by the Court, based upon OHA's determination. First, Chevron agreed to be bound by the OHA's determination. More important, it is clear that the OHA, while indicating it would not review procedural disputes, nevertheless actively considers the merits of the parties' positions. Therefore, Chevron's contention is a red herring, because it has been afforded significant safeguards to protect its interest - safeguards specifically negotiated for by this experienced and sophisticated contractor in consultation with outside counsel. For that reason, this situation cannot reasonably be compared to that found in Gould, Inc. v. United States, 935 F.2d 1271 (Fed. Cir. 1991). At any rate, "jurisdiction does not arise pursuant to equitable considerations." Lee, 33 Fed. Cl. at 380, citing Clark v. United States, 229 Ct. Cl. 570, 576-77 (1981). To adopt Chevron's position would require the illogical conclusion that Chevron waived its right to any judicial review of the merits of a final decision regarding final equity, but is still free to challenge in court the procedures surrounding the equity determination. This conclusion is contrary to the plain terms of the 1997 Agreement.

C. The Authorization Act For FY96 Did Not Contemplate Judicial Review Of The Equity Finalization Process

In our motion, we established that section 3412(b) of the Authorization Act for FY96 and section 9(b) of the 1944 Unit Plan Contract ("1944 UPC") together establish that any dispute between

the parties was to be ultimately decided through an administrative process established by the Secretary and that his decision "shall be final and binding" for "all purposes." More important, section 3412 does not contemplate any judicial involvement in the dispute process. In response, Chevron raises several points, some with which we do not disagree, but that do not undermine our position.

Chevron asserts, for example, that this case "involves a contractual process, not of Congress's making," and we do not disagree with that assertion. However, this does not change the fact that the 1997 Agreement was entered into as part of a statutory scheme that vested the Secretary with broad discretion and that did not contemplate judicial review of the equity finalization process.

Chevron also asserts that "the 1995 Act did nothing either explicitly or implicitly to supplant this Court as the proper forum for any disputes arising under agreements subsequently executed by DOE." However, the premise of Chevron's assertion stands unsupported. Chevron has not, and cannot, demonstrate that this Court was "the proper forum" for any and all disputes regarding agreements "subsequently executed by DOE."[3] In fact, the Authorization Act For FY96 does not contemplate or cite any judicial forum. Moreover, the later 1996 protocol, which Chevron approved, expressly provided that where a disagreement "regarding the equity finalization implementation process . . . cannot

---

[3] An earlier case Chevron initiated regarding the implementation of the Authorization Act For FY96 was filed by Chevron in district court. Chevron, U.S.A. Production Co. v. O'Leary, 958 F. Supp. 1485, 1498-99 (E.D. Cal. 1997). In that case, Chevron sought to compel the Secretary of DOE to issue by a date certain the agency's determination concerning the participation percentages related to the Shallow Oil Zone ("SOZ"), pursuant to section 3412(b)(3). Although Chevron claimed that it was "losing substantial amounts of money," 958 F. Supp. at 1498, Chevron did not claim that the Authorization Act was money-mandating, or that the Secretary's purported failure to follow the procedures set out in it constituted a basis to award money damages under the Tucker Act. It did not seek its attorneys fees and expenses.

be resolved . . . the matter shall be referred to the Assistant Secretary for Fossil Energy . . . for resolution." Our position is not that the Authorization Act divested this Court of jurisdiction; our argument is that Chevron never had a right to bring this matter to the Court for consideration pursuant to the Authorization Act for FY96 or the 1996 protocol, and it never gained that right through the 1997 Agreement. Mot. 28. Chevron's premise is unsupported and its argument circular.

Chevron asserts that its rights under the 1944 UPC "include - as courts have repeatedly recognized - a Tucker Act remedy." Resp. 20. This assertion is correct to a point, but it is also inapposite here. This case involves a purported breach of the 1997 Agreement, not a breach of the 1944 UPC. These are two separate contracts. In fact, the prior decisions of this Court and the Court of Claims highlight the strength of our position. In Chevron U.S.A., Inc. v. United States, 20 Cl. Ct. 86 (1990), the Court was required to interpret section 6 of the 1944 UPC, that specifically provided: "The costs of exploring, prospecting, developing and operating the Reserve, incurred by Navy and/or Standard . . . shall be borne ultimately by Navy and Standard in accordance with their respective percentage participations under Section 2 of this contract in the total production from such zone. . . ." Id. at 87, 88. Compl. Exh. A1, p. 12. Clearly, that contract section provided directly for the payment of money, and the only issue in that case was whether attorney fees incurred in defending against a third-party claim constituted "costs of . . . operating the Reserve." Notably, Chevron in this case can point to no similar provision within the 1997 Agreement that comes anywhere close to mandating the payment of money as does section 6 of the 1944 UPC.

Similarly, in Standard Oil Co. v. United States, 231 Ct. Cl. 86, 685 F.2d 1322 (1982), the Court of Claims was called upon to interpret section 5(f) of the 1944 UPC. Comp. Exh. A1, p. 11.

Section 5(f) expressly provided Standard with the right to receive oil from the reserve, that would serve to compensate Standard for its payment of its share of expenses and taxes on the reserve, where the Government had elected to suspend or reduce its production. Id., 685 F.2d at 1328-33. In this circumstance, it is clear that Standard's allegation that the Government had not provided it with sufficient oil pursuant to the terms of section 5(f) to pay Standard's expenses and taxes constituted a claim for money based upon a contractual right that could be "'fairly interpreted' as requiring the government to pay money for the 'damage sustained.'" Griswold, 61 Fed. Cl. at 466. Cf. Standard Oil Co. v. United States, 231 Ct. Cl. 112, 685 F.2d 1337 (1982) (Court of Claims interpreted section 5(g) to determine that the Government correctly reduced Standard's allotment of oil). Chevron cannot make that argument here. This distinction between the 1944 UPC and the 1997 Agreement, where the former provides for the payment of expenses and resource distribution, while the latter sets forth procedures, renders Chevron's reliance upon contract rights under the 1944 UPC unavailing, because Chevron is seeking damages for a purported breach of the 1997 Agreement. Our position is not, as Chevron suggests, that the Authorization Act For FY96 "abrogate[d] any provision of the UPC." Resp. 21. Instead, it addressed matters not previously covered by the UPC and, in doing so, made clear that disputes related to the final equity determination would be resolved within DOE.

Also ineffective is Chevron's quotation of section 3413(c) of the Authorization Act For FY96, for the proposition that nothing related to the sale of the Naval Petroleum Reserve "shall be construed to adversely affect the ownership interest of any other entity." Resp. 20-21. This reference is inapposite, because this case obviously does not address what ownership interests were conveyed in the Government's sale of the reserve, and we do not dispute the proposition in the plain text of section

3413(c). Notably, a separate contract not at issue here, the 1997 Decoupling Agreement, addresses that sale.

Chevron also contends that, if the Secretary possessed the authority to enter into enforceable contracts regarding the equity finalization process, then "this Court has jurisdiction to enforce such a contract against the Secretary." According to Chevron, if that is not the case, "then the Secretary's assent to the Equity Process Agreement was ultra vires and the Agreement is void." Resp. 23. Chevron offers no reasoning or legal authority to support this glaring assertion. Chevron has not and cannot explain how the existence or absence of this Court's jurisdiction could affect the authority of the Secretary to enter into the 1997 Agreement. Clearly, in Schooling and Griswold, the Court did not conclude, having determined that it did not possess jurisdiction to award money damages for the alleged breach of the settlement agreement, that the Government was without the authority to enter into the settlement agreement in the first place, or that the settlement agreement was void. Schooling, 63 Fed. Cl. at 208; Griswold, 61 Fed. Cl. at 466. The authority of the Secretary to enter into a contract is not intertwined with the jurisdiction of this Court. Chevron's contrary argument should be rejected.

Chevron asserts that "[t]he complaint does not challenge any ASFE decisions," but then in the same paragraph contends that the three ASFE decisions rendered to date "are not 'final decisions' within the meaning of the 1997 Agreement" in light of the alleged breach of that Agreement. Resp. 24. It is obvious that Chevron is challenging the ASFE decisions in this Court, despite its contrary assertions. Indeed, this is clearly the position Chevron took before the OHA. Appendix ("App.") 15-16. More important, Chevron has not explained why the decisions of the ASFE, even if "tainted," are not his "final decisions," nor explained how the distinction between "final" and "non-final" affects this

Court's jurisdiction. In essence, Chevron has erected an illogical straw man solely to knock it down.

II. Causation Is A Requisite Element Of Chevron's Claim That Chevron Cannot Establish And That Is, Therefore, Subject To Our Dispositive Motion

Although it did not label its claims for damages as "reliance damages" in its complaint, see Compl. ¶¶ 64-71, Chevron took the opportunity to do so in its opposition brief. Resp. 27-28. However, the law regarding reliance damages does not assist Chevron.

To recover reliance damages, a party has to demonstrate not only that (1) its alleged damages were incurred in reliance upon the contract, but also (2) that the damages were sustained as a result of the purported breach by the DOE. Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 160-161 (2002), citing Glendale Fed. Bank v. United States, 239 F.3d 1374, 1382 (Fed. Cir. 2001). Put another way, "[t]he value of the expenditures must have been lost as a result of the breach." Westfed, 52 Fed. Cl. at 161 (citing Laka Tool and Stamping Co. v. United States, 227 Ct. Cl. 468, 650 F.2d 270, 272 (1981)). Even assuming, arguendo, that Chevron can meet the first element, it cannot meet this second element, as a matter of law. Castle v. United States, 301 F.3d 1328, 1341 (Fed. Cir. 2002) (the absence of a causal link precludes recovery under a reliance theory).

Chevron first chastises the Government for asserting that "as a matter of timing, the purported ex parte communications could not have, and did not, cause those attorney fees and expenses to be incurred." Mot. 21; Resp. 29. However, our argument was in response to specific allegations within Chevron's complaint. There, Chevron claimed that DOE's purported breaches of the 1997 Agreement "caused ChevronTexaco to incur significant expenses and costs, including legal and consulting fees . . . ." Complaint ¶ 58 (emphasis added). It was that allegation which we addressed in our motion. And,

as a matter of logic, we are correct. Any alleged ex parte communications did not cause Chevron to incur its legal expenses in participating in the process, if for no other reason than Chevron was unaware of those alleged communications. Chevron incurred those expenses of its own volition.

Notwithstanding that point, it is also true that reliance damages can be defined by costs that have already been incurred. LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1376 (Fed. Cir. 2003). We addressed this issue in the latter portion of our causation argument. Mot. 33-34. The issue properly framed is whether the Court could find that the alleged breach caused Chevron to lose the benefit of its legal expenses. As explained both in our motion and below, Chevron cannot establish that is the case here, as a matter of law.

Chevron cannot prevail because it cannot establish that it lost the value of its expenditures as a result of the purported breach. To the contrary, because the 1997 Agreement between the parties provided for review by the OHA, the value of Chevron's expenditures cannot be said to have been lost. Significantly, this OHA review is pursuant to the terms of the contract and thus exists as a matter of law; not, as Chevron contends, a matter of fact. See Resp. 28-29.[4]

Pursuant to the contractual framework agreed upon by the parties, the OHA reviews legal issues brought before it de novo, whether pursuant to the APA standard of review cited in paragraph B.7 of the 1997 Agreement (under the APA, the issue is whether the AFSE decision was "otherwise not in accordance with law," 5 U.S.C. § 706(2)), or pursuant to paragraph B.11, which explicitly sets

---

[4] Despite Chevron's assertion, we certainly did not concede that there exists an unresolved question of fact, and a plain reading of our motion bears that out. The existence of a review procedure by OHA, as evidenced in the attachments to the complaint establishes that, as a matter of law, Chevron's expenses have not "go[ne] to waste." Resp. 30.

forth that de novo standard. Compl. Exh. B2, pp. 4-6. Therefore, the OHA review of these issues does not, as Chevron baldly asserts, "relegate" it to "an inferior procedural stance (as the appellant before OHA)". Resp. 30. Chevron has not explained how it has been harmed, or could be harmed, by resort to the review process agreed upon by the parties. Further, it has not - and could not possibly - demonstrate a depreciation in the value of its legal costs and expenditures, when its position has been, or will be, considered independently by the OHA. Indeed, consistent with the parties' agreement, its legal arguments will be, or have been, considered de novo by the OHA. Chevron, therefore, cannot argue that the legal expenses it incurred were rendered valueless as a result of the alleged breach.

Our position is amply supported by case law that addresses when a remedy for ex parte contact between a party and the decision-maker are appropriate, an area of the law Chevron does not address. Those cases establish that, where a reviewing court determines that, despite the existence of ex parte communications, the decision reached was rational and in accordance with law, it would be reversible error to award costs as a remedy for the ex parte contacts. Elcon Enterprises, Inc. v. Washington Metropolitan Area Transit Authority, 977 F.2d 1472, 1484-85 (D.C. Cir. 1992), quoting Princeton Combustion Research Labs v. McCarthy, 674 F.2d 1016, 1022 (3rd Cir. 1982). Accordingly, courts do not impose relief for alleged ex parte communications until an administrative process is complete and an adverse determination is made against the complaining party. Touche Ross & Co. v. SEC, 609 F.2d 570 575 (2nd Cir. 1979); R.A. Holman & Co. v. SEC, 299 F.2d 127, 129-30 (D.C. Cir. 1962). Until then, further administrative review could eliminate or moot the harm sought to be remedied. Furthermore, even if an ex parte communication did occur, if that communication was not relied upon by the ultimate decision-maker in reaching a decision, there is no basis for relief. Mid

States Coalition For Progress v. Surface Transportation Board, 345 F.3d 520, 541 (8th Cir. 2003). Finally, despite Chevron's repeated reference to OHA's position that it cannot consider disputes about the equity finalization process, whether OHA will address alleged procedural irregularities is immaterial because it still reviews the matter independently. This point is made clear in Elcon Enterprises, 977 F.2d at 1484-85. What matters is not the OHA's consideration of procedural issues, but whether the value of Chevron's expenses has been compromised. Because independent review forecloses that possibility, no relief is warranted.

The correctness of our causation argument is borne out by events that have transpired subsequent to the filing of our motion to dismiss. On January 31, 2005, the OHA issued its decision regarding the appropriate factor to be used to convert the volumes of gases underlying the Elk Hills unit to barrel-of-oil equivalents, in order to determine each party's percentage participation. App. 1-16. [5] The decision related specifically to the Stevens Zone, the largest producing zone in the unit. App. 3; see Comp. ¶ 12; Comp. Exh A1, p. 7. Notably, one main basis for Chevron's damages claim is the allegation that DOE's alleged ex parte communications during the ASFE proceedings vitiated the effectiveness of its advocacy related to the Stevens Zone. Comp. ¶¶ 47, 54.

In its decision, the OHA granted in part Chevron's appeal. Significantly, the OHA rejected the methodologies of both the ASFE representative and Chevron, concluding that "neither party's methodology complies with the UPC." App. 5. Similarly, the OHA did not accept the methodology

---

[5] Because we are now asking the Court to consider matters outside of the complaint regarding this issue, as does Chevron (e.g., Resp. 33), the Court could treat our 12(b)(6) motion related to the causation issue as a motion for summary judgment under RCFC 56. RCFC 12(b); Arakaki, 62 Fed. Cl. at 245.

applied by the independent petroleum engineer (the "IPE") in his provisional or final recommendations. App. 4. Because the position of the ASFE was not sustained, Chevron cannot establish that the alleged ex parte contacts during the proceedings regarding the Stevens Zone devalued its expenditures. The value of Chevron's legal expenses was not decreased at all, let alone because of any ex parte communication. In fact, while its methodology was not adopted by the OHA, its legal position was ultimately granted in part by the OHA. Therefore, Chevron cannot meet the causation requirement, as a matter of law. Castle, 301 F.3d at 1341; Mid States Coalition For Progress, 345 F.3d at 541. Chevron's complaint, at least as it relates to the Stevens Zone, has essentially been rendered moot by the OHA decision.

To counter our legal argument, Chevron makes baseless factual allegations that do not withstand even cursory review. In light of the OHA's recent decision, the falsity of these allegations is even more obvious. For example, Chevron asserts that all of its expenditures before the ASFE and OHA have "go[ne] to waste." Resp. 29-30; see Resp. 32 ("the Government's [purported] breach . . . has destroyed the integrity of the process promised"). However, Chevron has availed itself of the review procedures established by the 1997 Agreement (albeit under protest). It has, and will, receive independent review of its legal arguments. This has just been demonstrated to be true. Therefore, Chevron cannot establish a causal link between the alleged breach and any loss, as a matter of law.

Similarly, Chevron asserts broadly that "the appeal process . . . is dependent upon the framework which DOE's breach has destroyed." Resp. 30. Chevron, however, does not even attempt to explain how the alleged ex parte communications "destroyed" the contractual "framework" related to the OHA review. Chevron cannot reasonably allege that any taint to the proceedings before the ASFE

has rendered the entire contract "fruitless." In light of the OHA's independent review of the legal arguments made by the parties regarding the Stevens Zone, it is clear that the review process is not dependent upon the undefined "framework" to which Chevron vaguely refers.

In the same vein, Chevron quotes the Supreme Court in United States v. Behan, 110 U.S. 338, 345 (1884), for the proposition that "[i]t does not lie . . . in the mouth of the party [] who has voluntarily and wrongfully put an end to the contract [] to say that the party injured has not been damaged. . . ." The decision in Behan is not dispositive here. The Court there was addressing a case in which the defendant had wrongfully ended the contract. This is simply not the case here. Instead, the ASFE issued decisions and those decisions are, where provided for, reviewed independently by the OHA. Chevron would like the Court to simply ignore this procedural history, but it should not.[6]

III. The Attorney Fees Sought By Chevron Are Not Recoverable In This Action

To avoid the limitations on this Court's ability to award attorneys fees, Chevron reads the holding of Texas Instruments Inc. v. United States, 991 F.2d 760 (Fed. Cir. 1993), too narrowly. A careful reading of that case establishes its applicability here. There, the Federal Circuit reasoned that, "[i]n almost any agency adjudication, if the Government was wrong . . . there would be a basis for claiming a breach of the Government's implied duty of good faith and fair dealing. Section 504 in large part would be rendered practically unnecessary. . . . An award of money damages from the United States must have some concrete, legislatively authorized basis; that basis has not been shown to exist."

---

[6] Chevron notes correctly that not every decision of the ASFE is reviewable by the OHA and cites the ASFE decision related to the Dry Gas Zone, in which the ASFE adopted the IPE's report. There is no allegation that this independent determination of the IPE was tainted. Therefore, as a matter of law, there is no basis to maintain Chevron's complaint as it relates to the Dry Gas Zone.

991 F.2d at 768. That rationale is applicable here. In fact, Chevron has asserted a count based upon the Government's alleged breach of the "implied covenant of good faith and fair dealing," as Texas Instruments foreshadowed. But, without a "legislatively authorized basis," there is no justification for an award of attorney fees here. Id.

For that reason, Chevron's reliance upon Gentex Corp. v. United States, 61 Fed. Cl. 49 (2004), is unavailing. The recovery of bid preparation and proposal costs is authorized and defined by statute and regulation. Lion Raisins, Inc. v. United States, 52 Fed. Cl. 629, 631 (2002); Grumman Data Systems Corp. v. United States, 28 Fed. Cl. 803, 811-12 (1993); Coflexip & Services, Inc. v. United States, 20 Cl. Ct. 412, 415-16 (1990); AT & T Technologies, Inc. v. United States, 18 Cl. Ct. 315 (1989). Therefore, attorney fees may be recovered in the context of a bid protest, but only when they fall within the regulatory definition of bid and proposal costs. Lion Raisins, 52 Fed. Cl. 632-34, n.7; Grumman Data Systems Corp., 28 Fed. Cl. at 811. This case law related to the ability to recover attorneys fees in bid protest actions underscores the strength of our position, rather than undermines it.[7]

Chevron's reliance upon Chevron U.S.A. is similarly misplaced. There, as discussed above, the contract between the parties (the UPC) specifically provided for the payment of costs incurred. As a result, the Court determined that the Government was bound to pay attorney fees as costs pursuant to specific terms of the contract (section 6). That is not the situation presented here.

---

[7] The decision in Concept Automation, Inc. v. United States, 41 Fed. Cl. 361 (1998), expresses a minority view in this Court. See Bighorn Lumber Co., Inc. v. United States, 49 Fed. Cl. 768, 775-76 (2001). Morever, even in Concept Automation, Judge Smith recognized that it was by then "unclear" whether a plaintiff may recover protest costs under the implied contract theory, in light of the then-recent change to the court's jurisdiction. Id. at 364 n.1.

Finally, Chevron's reliance upon Massachusetts Bay Transportation Authority v. United States ("MBTA"), 129 F.3d 1226 (Fed. Cir. 1997), and Terteling v. United States, 167 Ct. Cl. 331, 334 F.2d 250 (1964), does not advance its case. The court's decision in MBTA was based upon the fact that the contract breached was an agreement to obtain insurance. This is evident by the court's heavy reliance upon state law related to insurance contracts. Id. at 1232-33. In Terteling, the Government had acknowledged that it would be liable for any judgment against the plaintiff and had an interest in the litigation, see Albemarle Bank and Trust v. United States, 12 Cl. Ct. 704, 706 (1987). The 1997 agreement in this case cannot reasonably be analogized to those respective agreements.

## Conclusion

For these reasons, plaintiff's complaint should be dismissed.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Robert E. Kirschman, Jr.
ROBERT E. KIRSCHMAN, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., NW
Washington, D.C. 20530
Tele: (202) 307-6289
Fax: (202) 514-7969
Attorneys for Defendant

OF COUNSEL:

PAUL T. MICHAEL
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., NW
Washington, D.C. 20585

February 25, 2005

CERTIFICATE OF FILING

I hereby certify that on this 25th day of February 2005, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robert E. Kirschman, Jr.