IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON U.S.A., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1365C |
| | ) | (Judge Braden) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S CHART OF PERTINENT STATUTES AND CONTRACTS

Pursuant to the Court's direction, and in preparation for oral argument presently scheduled for July 21, 2005, at 10 a.m., defendant submits the following chart of pertinent statutes and contracts.

Defendant has set forth, in chronological order, the statutes (and executive orders) relevant to the jurisdictional and other issues in the briefs, followed by the contract(s) that were authorized by the statutes that implement statutes, and/or that were amended to reflect statutory changes. For each entry, a brief description of the action is given unless the title is self-explanatory.

Statutes and Executive Orders

| | |
|---|---|
| 1909-1910 | Executive actions<br>(United States withdrew acres of oil lands in California from public land laws) |
| 1912 | Executive Order<br>(President Taft established initial Reserve boundaries and President Roosevelt placed significant portion of lands in Reserve) |
| June 4, 1920 | Naval Appropriations Act, Pub.L. No. 66-243, 41 Stat. 812, 813, 10 U.S.C. §7426(a)<br>(Congress directed Secretary of Navy to manage the reserve) |
| 1938 | Act of 1938, Pub.L.No. 75-786, 52 Stat. 1252, 1253<br>(amended 1920 appropriations act; authorized Secretary of Navy to contract with private owners of land to eliminate drainage of oil reserves; if no voluntary agreement, Secretary, with approval of President, could acquire privately-held lands) |
| 1942 | Executive Action<br>(President Roosevelt extended Reserve boundaries) |

***Contract***

| | |
|---|---|
| November 20, 1942 | Original Unit Agreement<br>(to unitize production) |
| September 6, 1943 | Rescission and Temporary Operating Agreement<br>(rescinded the original unit agreement and provided operation of the lands by Standard Oil Company) |

Statute

June 17, 1944 — The Act of June 17, 1944, Pub.L.No. 78-343, 58 Stat. 280, 10 U.S.C. §7426(a);
(amended 1920 appropriations act; authorized Secretary of Navy to unitize the lands and conserve production)

***Contract***

June 19, 1944 — Unit Plan Contract (UPC)

December 22, 1948 — Amendatory and Supplemental Agreement
(amended the UPC)

Statute or Executive Action

1949 — Executive Action
(President Truman extended Reserve boundaries)

***Contract***

September 16, 1966 — Amendatory Agreement
(amended the UPC)

Statute

1976 — Naval Petroleum Reserves Production Act of 1976 , Pub.L 94-258
(Congress directed Secretary to produce oil to maximum efficient rate)

***Contract***

May 25, 1976 — UPC amended
(amended to recognize Congressional direction to produce oil)

Statute and Administrative Orders

1977 Department of Energy Organization Act, 42 U.S.C. §7156(l), 10 U.S.C. §7426(a)
(transferred authority over Reserve from Navy to Department of Energy (DOE))

1996 National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104-106, 110 Stat. 631
(Congress required DOE to sell US interest in Reserve within two years and finalize owners' equity interests)

July 8, 1996 Assistant Secretary for Fossil Energy (ASFE) issued Administrative Order No. 96-01 - Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process
(established equity finalization implementation process protocol; if no agreement between parties, dispute to ASFE)

October 11, 1996 ASFE issued Supplement No. 1 to Administrative Order 96-01, Legal Issues Protocol

January 21, 1997 ASFE issued Supplement No. 1 to Administrative Order 96-01 (Equity Finalization Implementation Protocol Relating to the Stevens Zone)

***Contracts***

May 17, 1997 Contracts

1. Agreement Regarding Fixing of Equity Interest at Naval Petroleum Reserve No. 1 for Purposes of Sale (Decoupling Agreement)
(fixes equity interests for purposes of sale; decouples sales and equity finalization process)

2. Agreement Regarding Equity Redetermination Process

February 5, 1998 Agreement to Terminate the UPC,
(relating to winding down of affairs of owners)

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Phone: (202) 307-1011
Fax: (202) 514-8624

July 21, 2005

**Department of Energy**
Washington, DC 20585

June 18, 2002

Mr. Norman D. Stone
ChevronTexaco
4900 California Avenue
Bakersfield, CA 93309

Mr. Francis Gangle
U.S. Department of Energy
Naval Petroleum and Oil Shale Reserves
1000 Independence Ave., S.W.
Washington, DC 20585

**RE: *Final Decision Finalizing Elk Hills Stevens Zone Equity***

Gentlemen:

Please find enclosed the Final Decision Finalizing Participation Percentages in Production from the Stevens Zone, Naval Petroleum Reserve No. 1. In accordance with the provisions of the Equity Process Agreement, Paragraph B.3, the Equity Finalization Teams were each given an opportunity to provide comments on the Preliminary Decision issued by me in November 2001. Both equity teams provided comments by letters dated February 15, 2002. I have considered these comments in making the Final Decision as discussed in the text of the Final Decision.

Thank you for your attention to this matter.

Sincerely,

Robert S. Kripowicz
Principal Deputy Assistant Secretary
for Fossil Energy

Enclosures

cc: Mr. Gary Luquette
Gary Henderson, Esq.
Mr. Richard Furiga
Greg Thorpe, Esq.
Mary Egger, Esq.

6

# DECISION FINALIZING PARTICIPATION PERCENTAGES IN PRODUCTION FROM THE STEVENS ZONE, NAVAL PETROLEUM RESERVE NO. 1

United States Department of Energy
June 2002

TABLE OF CONTENTS

I. BACKGROUND AND AUTHORITIES 1
A. The Unit Plan Contract 1
B. Stevens Zone 3
C. National Defense Authorization Act for Fiscal Year 1996 3

II. IMPLEMENTATION OF THE NDA ACT 4
A. Retention of Independent Petroleum Engineer 4
B. Equity Finalization Procedures 4
1. Protocol 4
2. Supplement to the Protocol - Legal Issues 5
3. Agreement Regarding Equity and Redetermination Process 5
C. DOE and Chevron's Recommendations on Final Equity 7
D. NSAI's Equity Recommendation and Referral to the ILA 7
E. DOE and Chevron's Comments on NSAI's Final Recommendation 9
F. Preliminary Decision 11
G. Parties' Comments on the Preliminary Decision 11

III. DECISION 12
A. Introduction 12
B. NSAI's Final Recommendation 13
C. The Preliminary Decision and The Parties' Comments 14
D. Response to DOE and Chevron Issues Concerning the Preliminary Decision 15
1. Basis for Gas-to-Oil Conversion 15
a. Whether the UPC or Legislation Authorizing the UPC Provides Guidance on the Conversion Method 17
b. Whether the IPE Has Discretion to Determine the Appropriate Conversion Methodology 19
c. What is the Parties' Agreement, If Any, Regarding Conversion Methodology 20
d. What Conversion Methodology is Appropriate for This Proceeding 21
2. 26R Sand Abandonment Pressure 22
3. Production from Well 315-6G 28
4. The Role of Solution Gas in the Equity Calculation 29

IV. CONCLUSION 31



8

# DECISION FINALIZING PARTICIPATION PERCENTAGES IN PRODUCTION FROM THE STEVENS ZONE NAVAL PETROLEUM RESERVE NO. 1

This Decision is issued pursuant to section 3412(b) of the National Defense Authorization Act for Fiscal Year 1996 (NDA Act), and in accordance with the Unit Plan Contract, as amended, between the United States Department of Energy and Chevron U.S.A. Production Company, and with the parties' May 19, 1997 Agreement Regarding Equity Redetermination Process.

## I. BACKGROUND AND AUTHORITIES

### A. The Unit Plan Contract

Chevron U.S.A. Production Company (Chevron) and the United States Department of Energy (DOE) each owned sections of oil and gas-bearing properties in the Elk Hills field, Kern County, California. DOE and Chevron, respectively, were parties as successors in interest to a Unit Plan Contract between United States Navy Department and Standard Oil Company of California Relating to Naval Petroleum Reserve No. 1 (NPR-1), Contract No. Nod-4219 (the UPC). The UPC was made and entered into on June 19, 1944, and was amended and/or supplemented in 1948, 1966, and 1976.

On February 5, 1998, DOE closed the sale of its interest in the Elk Hills field. In accordance with section 3413(a)(2) of the NDA Act and section 11(b) of the UPC, DOE terminated the UPC effective as of the closing date. Effective February 5, 1998, Chevron and DOE executed the Agreement to Terminate the Unit Plan Contract, which further confirms and defines the parties' rights and obligations upon the termination of the UPC. Section 2.2 of that agreement provides that the terms of the UPC as it was in effect prior to termination shall be the basis on which the rights and obligations of the parties with respect to, *inter alia*, establishment of the final equity participations of the parties shall be determined.

The UPC includes specific provisions for determining how the oil, gas, natural gasoline, and associated hydrocarbons produced from the unitized areas will be shared between DOE and Chevron. Section 2(b) of the UPC provides:

> [DOE] and [Chevron] shall, subject to the further provisions of this contract, share in the oil, gas, natural gasoline and associated hydrocarbons produced from each commercially productive zone underlying the Reserve upon the basis of the percentages representing the ratio between (1) the estimated acre-feet (heretofore determined in the manner provided in the Engineering Report or hereafter determined by the Engineering Committee applying weighting factors in accordance with sound oil field engineering principles) of oil and/or gas bearing formations within the Estimated Limiting Line of Commercial Productivity for each such commercially productive zone underlying the respective lands of [DOE] and [Chevron] as of November 20, 1942, and (2) the total of such estimated acre-feet within the Estimated Limiting Line of Commercial

> Productivity for such zone as of November 20, 1942. These percentages are initially established for each known commercially productive zone in paragraph (d) of this Section 2. Such percentages may be revised as hereinafter provided and when so revised shall be retroactive to November 20, 1942.

The UPC thus provides that the parties' participating percentages in production may be redetermined from time to time.

Section 2(f) of the UPC prescribes the basis and process for such redetermination. It permits either party to suggest the need for a revision, after which the Elk Hills Engineering Committee (Engineering Committee) must review whether certain specified conditions exist that would warrant a redetermination of the parties' participation percentage in production from a commercially productive zone. If the Engineering Committee finds that any one or more of the specified conditions exist, section 2(f) provides:

> [S]aid Committee shall thereupon determine, in accordance with the formula described in paragraph (b) of this Section 2, the revision, if any, to be made. Any revision unanimously agreed upon by the members of the Engineering Committee shall be set forth and explained in a written report to be furnished [DOE] and [Chevron], and such revision shall be binding upon both [DOE] and [Chevron]. If the Engineering Committee is unable to agree unanimously upon any such proposed revision, the Secretary of [DOE], as hereinafter provided in Section 9, shall determine what revision, if any, shall be made.

Section 9(b) of the UPC then states the procedure for equity redetermination[1] in the absence of an agreement by the Engineering Committee:

> In the event the Engineering Committee is unable to agree unanimously upon any matter subject to determination by it, said Committee shall notify both [DOE] and [Chevron] thereof and shall refer such matter to the Secretary of [DOE] for determination. Thereupon the Secretary of [DOE] on his own initiative may, and upon the request of [Chevron] shall, submit the matter to an independent petroleum engineer, to be selected by him, for the purpose of securing an advisory report thereon from such engineer. . . . After consideration of the matter, the Secretary of [DOE] shall render his decision thereon and such decision in each such instance shall be final and shall be binding upon [DOE] and [Chevron].

The UPC thus assigns the final decision on a dispute regarding equity redetermination to the Secretary of DOE. By Delegation Order 00-002.00, dated December 6, 2001, Redelegation Order No. 00-002.04, dated January 8, 2002, and Subdelegation under DOE Redelegation Order

---

[1] In this Decision, the term "equity" is used to refer to an owner's percentage participation in production from the commercially productive zones in the Elk Hills field.

No. 00-002.04, dated May 1, 2002, and predecessor delegation orders, I have been delegated, *inter alia*, the Secretary of Energy's dispute resolution authority under section 9 of the UPC.

B. Stevens Zone

The Stevens Zone is one of the recognized commercially productive zones in Naval Petroleum Reserve No. 1, Elk Hills field, Kern County, California. *See* UPC § 2(c). The UPC originally set the participation percentages in production from the Stevens Zone at 65.4517 percent for Navy (DOE's predecessor) and 34.5483 percent for Standard (Chevron's predecessor). UPC § 2(d). These initial percentages were based upon the "Revised Estimate of Commercially Productive Acre Feet of Formation Proved Zones Elk Hills by United States Navy and Standard Oil Company of California Representatives," dated September 28, 1942 and defined in the UPC as the "Engineering Report." UPC, Recital 5, at 4.

The participating percentages in the Stevens Zone were subsequently redetermined in 1947, 1957, and 1980. The 1980 equity redetermination established the current participating percentages at 79.6357 percent for the DOE and 20.3643 percent for Chevron.

C. National Defense Authorization Act for Fiscal Year 1996

Effective February 10, 1996, the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106 (the NDA Act) was signed into law. Title XXXIV, Subtitle B, of the Act required DOE to sell the United States' interest in NPR-1 pursuant to the Act's provisions. To prepare for the sale, section 3412(b)(1) of the NDA Act required the Secretary to "finalize equity interests of the known oil and gas zones" in the Reserve. The Secretary has delegated the authority to implement the provisions of the NDA Act to the Undersecretary for Energy, Science, and Environment, who redelegated this authority to the Assistant Secretary for Fossil Energy.[2] The Assistant Secretary subsequently subdelegated the authority to Robert Kripowicz, the Principal Deputy Assistant Secretary for Fossil Energy (PDASFE).[3]

---

[2] By Delegation Order 00-002.00, dated December 6, 2001, the Undersecretary was delegated, *inter alia*, the Secretary of Energy's authority to perform the functions related to the finalization of equity in Naval Petroleum Reserve No. 1. By Redelegation Order 00.002.04, the Undersecretary delegated this authority to the Assistant Secretary. This authority previously had been delegated to the Assistant Secretary under Delegation Order 0204-158, dated June 17, 1996, and predecessor delegation orders.

[3] Subdelegation under Delegation Order 00-002.04, signed by the Honorable C. Michael Smith, Assistant Secretary for Fossil Energy, on May 1, 2002.

II. IMPLEMENTATION OF THE NDA ACT

A. Retention of Independent Petroleum Engineer

Section 3412(b)(2) of the NDA Act required the Secretary to retain the services of an independent petroleum engineer (IPE), mutually acceptable to DOE and to Chevron, to recommend final equity figures for three of the commercially productive zones recognized by the UPC: the Dry Gas Zone, Carneros Zone, and Stevens Zone.[4] Specifically, section 3412(b)(2) provides:

> The Secretary shall retain the services of an independent petroleum engineer, mutually acceptable to the equity owners, who shall prepare a recommendation on final equity figures. The Secretary may accept the recommendation of the independent petroleum engineer for final equity in each known oil and gas zone and establish final equity interest in Naval Petroleum Reserve Numbered 1 in accordance with the recommendation, or the Secretary may use such other method to establish final equity interest in the reserve as the Secretary considers appropriate.

*Id.* § 3412(b)(2). Having determined that the firm of Netherland, Sewell and Associates, Inc. (NSAI) was acceptable to Chevron, on July 8, 1996, DOE retained NSAI to serve as the IPE and to provide final equity recommendations as required by section 3412(b)(2) of the NDA Act.

B. Equity Finalization Procedures

1. Protocol

Following discussions among representatives of NSAI, Chevron, and DOE regarding an equity finalization implementation process, on July 8, 1996, the Assistant Secretary for Fossil Energy issued Administrative Order 96-01, entitled "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process" (the Protocol). The Protocol set forth procedures and a schedule for DOE and Chevron to provide information regarding the determination of equity in the Dry Gas, Carneros and Stevens Zones to NSAI, in a manner designed to be open, fair, and transparent, and to adequately protect the interests of each owner.

The Protocol also provided for NSAI to issue a provisional recommendation for each zone, followed by an opportunity for each party to submit to NSAI written comments on the provisional recommendation. NSAI then was to issue its final recommendation for each zone,

---

[4] On the effective date of the NDA Act, the fourth commercially productive zone, the Shallow Oil Zone, was the subject of an ongoing equity redetermination dispute under section 9(b) of the UPC between DOE and Chevron. Accordingly, finalization of DOE and Chevron's equity in the Shallow Oil Zone was subject to a separate determination under section 3412(b)(3) of the NDA Act.

both orally and in writing, to the Assistant Secretary for Fossil Energy. Chevron agreed to the terms of the Protocol as reflected in its letter dated July 8, 1996.

2. Supplement to the Protocol - Legal Issues

Subsequent to the issuance of the Protocol, NSAI, DOE and Chevron concluded that there was a need for an additional procedure to address legal issues relating to the interpretation of provisions of the UPC pertaining to equity determination. On October 11, 1996, after extensive discussions among NSAI, DOE, and Chevron, the Assistant Secretary for Fossil Energy issued Supplement No. 1 to the Protocol (the Supplemental Protocol).

The Supplemental Protocol established a procedure for the parties to utilize an independent legal advisor (ILA) to serve initially as a mediator between DOE and Chevron on legal issues arising in the equity finalization process. Paragraph C.3(c) of the Supplemental Protocol provided that "[i]f the owners . . . reach agreement on the guidance to be provided to [NSAI], joint guidance will be provided to [NSAI], and such guidance will be binding on the owners and not subject to later administrative or judicial review in any forum."

Paragraph C.3(d) of the Supplemental Protocol further provided that, if the parties failed to reach agreement on any such legal issue, the ILA would issue independent legal guidance to NSAI on that issue. In such event, NSAI was to rely upon the ILA's guidance in the development of its final equity recommendations. Moreover, the owners could question the legal guidance "only in conjunction with their review of the final equity recommendations of [NSAI]." Chevron agreed to the terms of the Supplemental Protocol by letter dated October 11, 1996.[5]

In accordance with paragraph 3 of the Supplemental Protocol, DOE first retained Edward S. Renwick, Esq., of the firm of Hannah and Morton, as the ILA effective October 30, 1996. Chevron concurred in DOE's selection of the ILA. DOE later, with Chevron's concurrence, retained C. Kenneth Roberts, Esq. to serve as the ILA effective October 13, 1998.

3. **Agreement Regarding Equity and Redetermination Process**

As DOE proceeded with the NPR-1 sales process in accordance with the provisions of the NDA Act, it became apparent that, notwithstanding the diligent efforts of both DOE and Chevron, equity could not be finalized before the statutory deadline of February 10, 1998, for all four unitized producing zones, in a manner that would allow the parties and NSAI fully to develop and consider the complex geologic and petrophysical issues as required responsibly to finalize equity. Accordingly, DOE negotiated two agreements with Chevron pertaining to the issue of ownership of production from each of the four zones.

---

[5] The Protocol was subsequently further supplemented to revise the equity finalization schedule for the Stevens Zone.

The first was the May 19, 1997 Agreement Regarding Fixing of Equity Interests at Naval Petroleum Reserve No. 1 for Purposes of Sale (Decoupling Agreement), which established, for purposes of the NPR-1 sale only, the United States' equity interest in each of the commercially productive zones, as well as the United States' ownership interests in facilities and equipment at NPR-1. In this agreement, Chevron agreed that it would not challenge DOE's right to sell or transfer title to such interests to the purchaser or purchasers of the United States' interest in NPR-1.

The second agreement was the May 19, 1997 Agreement Regarding Equity Redetermination Process (Equity Process Agreement), which DOE and Chevron agreed would govern the process for the final determination of equity in all four unitized zones. Paragraph B.6 of this Agreement described the process to be employed by the Assistant Secretary in considering NSAI's final recommendation on DOE and Chevron's final participating percentages in production from each zone as follows:

> In issuing the equity redetermination decision for a zone, the [Assistant Secretary] may accept the [NSAI] recommendations or reject the [NSAI] recommendations in whole or in part. If the [Assistant Secretary] decides to reject the [NSAI] recommendations in whole or in part, such decision must be based on a determination by the [Assistant Secretary] that one or more of the following criteria exist:
>
> a. The [NSAI] recommendation(s) was arbitrary or capricious;
>
> b. The [NSAI] recommendation(s) was a result of fraud;
>
> c. The [NSAI] recommendation[s] was a result of undue influence, unless such undue influence had no impact on [NSAI's] recommended equity percentages;
>
> d. The [NSAI] recommendation(s) was inconsistent with statute, the UPC or an applicable Settlement Agreement between Chevron and DOE, unless such inconsistency had no impact on [NSAI's] recommended participation percentages;
>
> e. The [NSAI] recommendation(s) was not based on substantial geophysical, geological and/or petrophysical data; or
>
> f. The [NSAI] recommendation(s) resulted from an approach or methodology which is inconsistent with sound oil field engineering principles.

Equity Process Agreement at 4. Accordingly, the NSAI recommendation of DOE and Chevron's final participation percentages in the Stevens Zone shall be adopted unless the Assistant Secretary finds that it should be rejected for one or more of the criteria listed above.

C. DOE and Chevron's Recommendations on Final Equity

In accordance with the Protocol and the NSAI implementation plan, DOE and Chevron Equity Finalization Teams (EFTs) each submitted its respective report and recommendation on final equity for the Stevens Zone to NSAI on June 2, 1997.[6] During the period of June 17-26, 1997, each of the owners made an oral presentation of its equity case to the NSAI, in the presence of the other owner. On July 18, 1997, each owner submitted to NSAI written rebuttals of the other owner's position.[7]

In its submittals to NSAI, DOE proposed that the parties' final equity participation in the Stevens Zone be determined as 83.1287 percent for DOE and 16.8713 percent for Chevron. In its submittals to NSAI, Chevron proposed that the parties' final equity participation in the Stevens Zone be determined as 74.0955 percent for DOE and 25.9045 percent for Chevron.

D. **NSAI's Equity Recommendation and Referral to the ILA**

NSAI prepared its provisional recommendation on DOE and Chevron's final participating percentages in Stevens Zone production, recommending that DOE's percentage be determined as 81.1572 percent and Chevron's as 18.8428 percent.[8] NSAI submitted its Provisional Recommendation to the parties on November 4, 1997. The owners provided comments on the Provisional Recommendation to NSAI on March 27, 1998.[9]

By letter dated October 30, 1998, Chevron identified two "legal issues" concerning the IPE's Provisional Recommendation for the Stevens Zone. These relate to the method of crediting the parties for the natural gas and natural gas liquids that underlie each party's lands. In the process of determining equity, the parties have historically converted gas to barrels of oil equivalent (BOE). The IPE's Provisional Recommendation used the heating value in British Thermal Units (BTUs) of the gas cap gas and solution gas relative to the BTU value of oil to convert the gas to

---

[6] DOE, *Unit Operation, Naval Petroleum Reserve No. 1 (Elk Hills), Kern County, California, Stevens Zone Report, Finalization of Equity Interests under Section 3412(b) of the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106,* June 2, 1997; Chevron, *Unit Operation, Naval Petroleum Reserve No. 1 (Elk Hills), Kern County, California, Stevens Zone, Equity Finalization, Proposed Percentage Participations,* June 2, 1997.

[7] DOE, *Written Rebuttal of Chevron U.S.A. Report and Presentation on the Stevens Zone,* July 18, 1997; Chevron, *Rebuttal to DOE Presentations for Stevens Zone Equity Finalization. UONPR#1 (Elk Hills),* July 1997.

[8] NSAI, *Stevens Zone Provisional Recommendation of Equity Participations,* November 4, 1997.

[9] DOE, *Response to Netherland, Sewell & Associates, Inc. Provisional Recommendation of Equity Participations for the Stevens Zone,* March 27, 1998; Chevron, *Comments Regarding NSAI Provisional Recommendation of Stevens Zone Equity Participations,* March 27, 1998.

BOE. Chevron contended that the UPC and an earlier settlement agreement between the parties prohibited the IPE from using the BTU value as the basis of the conversion. Although DOE disagreed with the characterization of the issues as "legal issues" and objected to the issues being raised after the IPE's Provisional Recommendation, the parties engaged in the mediation and guidance process set forth in the Supplemental Protocol. The ILA and the parties were not able to reach a mediated settlement of the issues. By letter dated August 3, 1999, the ILA issued legal guidance to the IPE as provided for in paragraph C.3(d) of the Supplemental Protocol.

With respect to the conversion of natural gas to BOE, the ILA determined that the UPC did not make any provisions for conversion of gas to BOE. However, the ILA determined that the parties' course of practice indicated an agreement to make the conversion to BOE on the basis of price, and that the best evidence of the intent of the parties was an intent to make the conversion on the basis of current price.[10] The ILA left it to the parties to agree upon a methodology for determining current price. For purposes of the IPE's Final Recommendation but expressly reserving their rights to challenge the ILA's guidance before the PDASFE, the parties reached agreement on the current price to be used by the IPE in its Final Recommendation. December 7, 1999 Settlement Agreement. The ILA determined that the use of BTU values on a section-by-section basis is prohibited by the parties' Settlement Agreement. The ILA also determined that the IPE's suggested alternative calculation method using "the price received for all gas entering the gas plant (i.e. both dry gas and NGLs) to determine a price per MCF of wet gas entering the plant," which will be used in the conversion of wet gas to BOE, is consistent with the Settlement Agreement.[11]

On March 2, 2000, NSAI made an oral presentation of, and submitted, its final recommendation to the Assistant Secretary for Fossil Energy, other DOE personnel, and Chevron, in which it recommended that DOE's final equity participation in the Stevens Zone be determined to be 80.4884 percent and Chevron's to be 19.5116 percent.[12] At the March 2, 2000, meeting, NSAI also provided written responses to the parties' comments on NSAI's provisional recommendation.[13] Subsequent to the submission of NSAI's March 2000 recommendation, NSAI received questions from the EFTs as it reviewed the report and were preparing its

---

[10] Letter from the ILA to the attention of Richard F. Krenek II, Netherland, Sewell & Associates, August 3, 1999 (ILA Decision), at 6.

[11] ILA Decision, at 9.

[12] NSAI, *Recommendation of Final Equity Participations for the Stevens Zone, Naval Petroleum Reserve No. 1, Elk Hills Field, Kern County, California, as of November 20, 1942.* March 2, 2000, at 10.

[13] NSAI, *Response to Owner Comments Regarding Provisional Recommendation of Stevens Zone Equity Participations*, Volumes 1 - 2, March 2, 2000.

comments for the PDASFE.[14] In the process of answering the EFTs questions, NSAI discovered two items that eventually changed its equity recommendation by a small amount. The first item involved incorrect gas cap volumetric calculations in the 24Z area of the 29R structure. The second item involved production from several wells in the North Coles Levee area. As a result, with the concurrence of the PDASFE, NSAI prepared an amended final recommendation of equity participation correcting these errors.[15] The amended final recommendation was not submitted prior to the due date for owner comments on the NSAI final recommendation, however, NSAI supplied the essential contents to both owners in advance of the comment due date.[16] The owners were thus able to consider the amendments during preparation of their respective comments. Based on adjustments made as a result of these two items, NSAI's amended final recommendation of equity participation for the Stevens Zone is 80.4432 percent for DOE and 19.5568 percent for Chevron.

## E. DOE and Chevron's Comments on NSAI's Final Recommendation

On September 18, 2000, the parties submitted written comments on NSAI's final recommendation to the Principal Deputy Assistant Secretary.[17] Each party raised a number of issues, summarized in the Tables 1 and 2 below.

---

[14] *E.g.*, Letter from Francis Gangle to Scott Frost, dated August 18, 2000; Letter from P. Scott Frost to Francis J. Gangle, and Norman D. Stone, dated August 1, 2000, addressing issues raised by Chevron (in a July 12, 2000, e-mail) concerning missing production data from North Coles Levee wells; E-mail from Francis Gangle to Rick Krenek and Vicki Allen (NSAI), dated June 25, 2000.

[15] NSAI, *Recommendation of Final Equity Participations for the Stevens Zone, Naval Petroleum Reserve No. 1, Elk Hills Field, Kern County, California, as of November 20, 1942, Addendum*, September 2000.

[16] NSAI, Letter (with enclosures) from Richard F. Krenek II to Norman D. Stone and Francis J. Gangle, September 8, 2000.

[17] DOE, *Assessment of the Netherland, Sewell & Associates, Inc., Final Recommendation of Equity Participations for the Stevens Zone, ASFE Report*, dated September 18, 2000 (DOE Final IPE Comments). Chevron, *Comments Regarding the Independent Petroleum Engineer's Final Stevens Recommendation*, dated September 18, 2000 (Chevron Final IPE Comments).

Table 1 - Issues Raised in DOE's Comments on NSAI's Final Recommendation

| Issue | DOE Position |
|---|---|
| 1. Basis for conversion of gas to oil equivalent | Gas-to-oil conversion factor should be based on heating values, not prices. |
| 2. Estimation of 26R sand recoverable reserves | NSAI improperly handled migrated oil volumes (from N/A shales into the 26R sand) in estimating remaining recoverable reserves for the 26R reservoir using a volumetric approach. This led to an underestimate of the reserves. |
| 3. Credit back of migrated oil to Chevron's section 31S | Use of the Chevron simulation model and "biased" locations of pseudo oil injector wells results in too much oil being credited back to Chevron's section 31S. |
| 4. 26R sand abandonment pressure | The assumed 26R abandonment pressure is too high (500 psi) resulting in an underestimate of recoverable reserves for the 26R sand. The abandonment pressure should be 250 psi.[18] |
| 5. Solution gas production credited to North Coles Levee wells | Solution gas production was credited to three North Coles Levee wells at Chevron's request without supporting unit documentation. |
| 6. Well 315-6G production | Well 315-6G production data from March - July 1997 was ignored. |
| 7. Role of natural gas liquids (NGLs) in equity calculations | NGLs that arise from vaporization of light molecular components of a liquid phase hydrocarbon by lean injection gas during gas injection and gas cycling operations should be counted for equity purposes. |

[18] With a few exceptions needed for precision, in order to avoid needless complexity, pounds per square inch (psi) will be used throughout this document without making the distinction between absolute pressure, which includes atmospheric pressure, and gauge pressure (psig), which does not. The relatively small difference between the two pressure measurements (14.7 psi) is not significant in this context.

Table 2 - Issues Raised by Chevron in its Comments on NSAI's Final Recommendation

| Issue | Chevron Position |
|---|---|
| 1. Basis for conversion of gas to oil equivalent | Gas-to-oil conversion should be based on 1942 prices, not current prices. |
| 2. Role of solution gas in the equity calculation | Solution gas should not be included in the equity calculation, but if it is, it should be considered to be a part of the oil volume and the gas-oil ratio should be held constant throughout the Stevens Zone. |
| 3. Use of Stevens Zone production data beyond 1997 | NSAI's estimate of reserves in the 26R sand is too high. This conclusion can be tested by comparing 1998 - 2000 production data with NSAI's projections. |

### F. Preliminary Decision

By letter dated November 13, 2001, the Acting Assistant Secretary transmitted to the DOE and Chevron equity teams the Preliminary Decision finalizing Participating Percentages in Production from the Stevens Zone, Naval Petroleum Reserve No. 1 (Preliminary Decision). The Preliminary Decision addressed each of the issues raised by the parties and discussed each issue in detail. The Preliminary Decision adopted the NSAI final recommendation with the exception of two areas: the method of conversion of gas to oil equivalents and the abandonment pressure used to predict the production from the 26R and the NWS Sands.[19]

### G. Parties' Comments on the Preliminary Decision

In accordance with the provisions of the Equity Process Agreement, the equity teams were each given an opportunity to provide comments on the Preliminary Decision. The equity teams requested and received an extension of time to respond to the Preliminary Decision. Both equity teams provided comments on the Preliminary Decision by letters dated February 15, 2002.[20] Each team continues to pursue some of the issues it had raised concerning the NSAI final recommendation. I have considered these comments in making the Final Decision and discuss the remaining issues in detail below.

---

[19] *Preliminary Decision Finalizing Participation Percentages in Production from the Stevens Zone, Naval Petroleum Reserve No. 1.* United States Department of Energy, November 2001 (Preliminary Decision).

[20] February 15, 2002 letter from Norman D. Stone to Robert Kripowicz (Chevron Comments); February 15, 2002 letter from Francis J. Gangle to Robert Kripowicz (with attachments) (DOE Comments).

## III. DECISION

### A. Introduction

The task of finalizing DOE's and Chevron's respective shares of production from the Stevens Zone requires estimation of the quantities of recoverable oil and gas located in complex geological structures underlying DOE's and Chevron's respective parcels of land covering 47,409 acres. The task is made difficult, in part, because it requires the application of analytical methodologies that can reasonably produce divergent results. No single technical petroleum engineering and geological process is available to, for example, compute net pay from an oil or gas-bearing formation, map net pay, or weight acre-feet of oil or gas-bearing formations as required by the UPC to determine equity. Different geological and engineering experts can reach different conclusions in the interpretation of well logs, the preparation of the geological maps, and the application of other tools used in equity determinations. As one expert stated:

> Geology and petroleum engineering are based on established physical laws and principles. However, the interpretation of input data such as well logs for usage in these laws require [sic] technical training, experience, and judgment. Consequently, the ultimate results of a calculation prepared by two equally qualified petroleum engineers or geologists can be different within a range of reasonable certainty.[21]

In addition, in the case of the Elk Hills field, geologic and petrophysical analytical tools and methodologies must be applied to an oil and gas field that began production in the early 1900s and has yielded a plethora of complex geological and petrophysical information. More than 1,200 wells penetrate the Stevens Zone. Most of these wells possess well log measurements through the Stevens Zone intervals located at depths ranging from about 5,000 to 8,000 feet. This information varies in quality and content as oil field exploration and development technology and practices have changed over time.

The application of different information, assumptions, methodologies, and professional judgments to this quantity and quality of complex information should be expected to produce different expert opinions regarding the determination of equity in the Stevens Zone, and it has. Table 3 illustrates the variance among the original equity percentages established under the UPC, the 1947 Revision percentages, 1957 Revision percentages, the 1980 Revision percentages (currently in effect), and the recommendations of DOE, Chevron, and NSAI for final equity:

[21] W. Cobb, "Discussion of Elk Hills Dry Gas Zone Equity Re-Determination Process" Presentation Materials, Washington, D.C., July 12, 1994.

Table 3 - Varying Proposed and Previous Determinations of Equity Participation

| Determination | DOE Equity | Chevron Equity |
|---|---|---|
| 1942 Engineering Report | 65.4517% | 34.5483% |
| 1947 Revision | 79.3089% | 20.6911% |
| 1957 Revision | 83.5073% | 16.4927% |
| 1980 Revision | 79.6357% | 20.3643% |
| DOE's 1997 Proposed Final Determination | 83.1287% | 16.8713% |
| Chevron's 1997 Proposed Final Determination | 74.0955% | 25.9045% |
| NSAI's Final Recommendation | 80.4432% | 19.5568% |

Under the procedures specified by Congress in section 3412(b) of the NDA Act, the Secretary of Energy is required to finalize DOE and Chevron's equity interests in the Stevens Zone, either by accepting NSAI's recommendation and establishing final equity in the Stevens Zone in accordance with the recommendation, or using such other method to establish final equity as the Secretary considers appropriate.

By this Decision, I adopt the NSAI amended final recommendation with two exceptions: the abandonment pressures assumed for the 26R and NWS reservoirs are reduced and exclusive use of current prices as the basis for conversion of gas to equivalent barrels of oil is rejected in favor of averaging the conversion factors derived from the current prices with those derived from relative heating values.

**B. NSAI's Final Recommendation**

NSAI's final recommendation is consistent with the requirements of the UPC as construed by DOE and Chevron in the Settlement Agreement. As stated more fully in the Settlement Agreement, NSAI was required to perform five steps to calculate equity:

1. Determine the Estimated Limiting Line of Commercial Productivity for the Stevens Zone as of November 20, 1942.
2. Estimate the acre-feet of oil and/or gas bearing formations within the Estimated Limiting Line of Commercial Productivity.
3. To the acre-feet so estimated, apply weighting factors to reflect the fact that a "more favored parcel" (*i.e.*, section) of land would have contributed more recoverable hydrocarbons to the unit than a "less favored parcel," and thus should be accorded a higher equity share than a less favored parcel.
4. Determine the weighted acre-feet in the Stevens Zone beneath DOE's lands and Chevron's lands, respectively.
5. Calculate the ratio of each owner's weighted acre-feet to the total.

NSAI performed each of the steps required by the Settlement Agreement in reaching its final equity recommendation. Neither DOE nor Chevron alleges otherwise. Under NSAI's analysis, the total weighted acre-feet in the Stevens Zone is 2,054,167 weighted acre-feet: 1,652,438 of which underlies DOE's lands and 401,729 of which underlies Chevron's lands. Finally, NSAI calculated the equity participation for each owner by dividing each owner's weighted acre-feet by the total weighted acre-feet in the Stevens Zone, resulting in 80.4432 percent final equity for DOE and 19.5568 percent final equity for Chevron.

### C. The Preliminary Decision and The Parties' Comments

The Preliminary Decision addressed each of the parties' issues regarding NSAI's amended final recommendation. It adopted NSAI's recommendation in the main, but revised the BOE conversion methodology and rejected NSAI's determination of the abandonment pressure for the 26R and NWS Reservoirs.

The DOE equity team accepts the findings in the Preliminary Decision with respect to five of the seven issues that it raised in its comments on the NSAI final recommendation: issues 2, 3, 4, 5, and 7 on Table 1.[22] With respect to the gas to oil conversion methodology, the DOE equity team states that it is willing to accept the conversion methodology set forth in the Preliminary Decision, even though it continues to contend that the ASFE could base the conversion entirely on a BTU-based methodology and need not incorporate elements of price-based conversion.[23] The DOE equity team continues to pursue its request to restore missing oil and gas volumes to well number 315-6G that it contends the IPE erroneously deleted.[24] This Final Decision addresses those remaining issues below.

In its comments, Chevron continues to press on issues 1 and 2 in Table 2 and objects to the Preliminary Decision's conclusion that rejected NSAI's recommended abandonment pressure for

---

[22] DOE Comments, at 9, 10, 12, 13, 15-16.

[23] In the Appendix to the DOE equity team's comments, the team states as follows:

> While the DOE EFT continues to believe that "BTU value" is the most appropriate conversion methodology under the Unit Plan Contract for use in the Stevens Zone final equity determination, in order to bring the Stevens Zone redetermination process to a conclusion, it is willing to accept the PDASFE Method as set forth in the Preliminary Decision. However, if Chevron objects to this approach and appeals the PDASFE's determination, the DOE EFT reserves its right to argue the conversion methodology issue "de novo" on appeal, as allowed by the relevant agreements between Chevron and DOE.

DOE Comments, Appendix - DOE EFT Comments on ASFE Preliminary Stevens Zone Decision, Legal Position on Conversion Fact Issue, February 15, 2002, at 1 (footnotes omitted).

[24] DOE Comments, at 16-17.

the 26R and NWS reservoirs. Chevron contends that the Final Decision should "split the difference" between the two methods of calculating solution gas instead of relying on the single method selected by the IPE,[25] the Final Decision should not incorporate the finding in the Preliminary Decision that the abandonment pressure for the 26R and NWS reservoirs should be 250 psi instead of the 500 psi used by the IPE,[26] and that the gas to oil conversion methodology set forth in the Preliminary Decision should be rejected in favor of a conversion methodology based on 1942 prices.[27] This Final Decision addresses Chevron's issues below.

## D. Response to DOE and Chevron Issues Concerning the Preliminary Decision

### 1. Basis for Gas-to-Oil Conversion

In order to determine equity, one must take into account both the oil and gas (including natural gas liquids) underlying the Stevens Zone. However, historically, the parties have not calculated equity separately for the differing types of hydrocarbons. Instead, they have converted the volumes of gas to BOE by varying ratios. In their comments on the amended final equity recommendation, both DOE and Chevron challenged the methodology the IPE used for determining the conversion, with each side proposing to use a different methodology than that used by the IPE at the direction of the ILA. This issue did not surface during the Carneros final equity determination and is not applicable to the Dry Gas Zone, which does not contain any oil. After the IPE issued the provisional equity recommendation for the Stevens Zone, Chevron raised the issue of the appropriate manner to convert the volumes of gas to barrels of oil. The matter was brought before the ILA in 1998, who first attempted, unsuccessfully, to obtain a mediated settlement between the parties. Pursuant to the Supplemental Protocol, the ILA then issued a decision on the issue, concluding that the conversion should be performed on the basis of the ratio of current prices for oil and gas. He instructed the IPE to use current product prices (as agreed to by the parties) to determine the BOE for natural gas and natural gas liquids.[28]

The ILA's analysis is contained in his August 3, 1999 decision. To summarize, the ILA concluded that the UPC did not require the parties to convert gas to BOE, that the parties had adopted the consistent practice of doing so for equity determinations, and that the parties agreed to convert gas to BOE in order to determine equity. He stated that the parties agreed there are "two sound methods of converting: on an energy (BTU) equivalency basis and on price."[29] The ILA also concluded that the parties agreed that there was no written agreement on how to convert, but stated that the parties agreed that one can determine how to convert to BOE from

---

[25] Chevron Comments, at 3-6.

[26] Chevron Comments, at 6-8.

[27] Chevron Comments, at 8.

[28] ILA Decision at 6, 9.

[29] ILA Decision, at 2.

available information, and that he must accept that there is an implied agreement to convert and an implied agreement on how to convert.[30] The ILA, concluding that there was an agreement about how to convert, further concluded that the best evidence of the parties' agreement indicates there was an agreement to convert based on current prices. The ILA based his conclusion on various evidence, including minutes from the Engineering Committee, and determined that "the parties understood that current prices should be used unless the parties agreed on some other method of converting."[31]

Because the ILA lacked sufficient information to determine "current price," the ILA referred the issue to the parties. The parties then agreed that, for purposes of the IPE implementing the ILA's determination only, prices obtained by DOE over a 20-month period just prior to termination of the UPC would be used by the IPE for the conversion.[32] Neither party is challenging the faithfulness of the IPE in implementing the ILA's determination. Both parties, however, challenge the decision reached by the ILA. The Supplemental Protocol, paragraph 3(d), requires the IPE to rely on the guidance provided by the ILA, but permits the owners to "question legal guidance provided by the Independent Legal Adviser to the Equity IPE only in conjunction with their review of the final equity recommendations of the Equity IPE."

Chevron agrees with the ILA that conversion should be on price, but disagrees with the use of current prices. Chevron argues that, based on precedent, 1942 prices must be used.[33] The ILA addressed Chevron's position, stating: "The best evidence of the intent of the parties regarding the appropriate price is the [October 8, and October 29] 1980 [Elk Hills Engineering Committee] minutes that indicate that in the absence of a market distortion current price should be used."[34] DOE contends that the IPE had the authority to select the method of conversion and that his selection of relative heating values for the BOE calculation should be reinstated.[35] DOE alternatively contends that there is no agreement of the parties to convert based on price and that if price is to be used, current prices should be used and not 1942 prices. The ILA rejected DOE's argument regarding the IPE's authority, concluding that the IPE did not have authority to make the decision. The ILA further noted that the parties had not reached an agreement to convert based on heating value, relying on language contained in the October 29, 1980 minutes

---

[30] *Id.*

[31] ILA Decision, at 5.

[32] Stevens Zone Settlement Agreement Dated as of December 7, 1999, Section A.1.

[33] Chevron's Final IPE Comments, at 4.

[34] ILA Decision, at 6.

[35] DOE, Comments to the Principal Deputy Assistant Secretary for Fossil Energy Regarding Final Equity Recommendation for the Stevens Zone Former Naval Petroleum Reserve Numbered 1 (DOE Legal Comments), at 19.

of the Elk Hills Engineering Committee which states that "no industry precedent was found for equating a gas cap to an oil band in unit operations on a BTU basis at this time."[36]

In its comments on the amended final equity recommendation, Chevron raises two principal arguments in support of its position that 1942 prices must be used for conversion. Chevron contends that only the use of 1942 prices can implement the directions given in the legislation that authorized the signing of the UPC, and the UPC itself, to the effect that the United States is to receive its share of hydrocarbons underlying its Elk Hills lands as of 1942. Chevron further contends that the ILA misunderstood the parties' agreement and that additional information from the Engineering Committee minutes demonstrates that in every determination where the parties converted on the basis of price, they did so based on 1942 prices.

DOE contends that the IPE should have been permitted to use its technical judgment to determine the conversion methodology and that the initial IPE selection of a heating value conversion factor should be restored. DOE contends that the legislation that established the process for the sale of the Elk Hills Naval Petroleum Reserve is the source of the IPE's authority to make such judgments.[37] Anticipating Chevron's arguments, DOE further argued that if relative prices were used for the BOE conversion, that 1942 prices were not required for use by the parties' prior actions or the UPC, and that current prices are more appropriate for use as consistent with sound oil field engineering principles and the parties' 1980 discussion of this issue.

In light of the parties' positions and the ILA's decision, it is appropriate to address several preliminary questions. First, whether the UPC or the legislation authorizing the UPC includes any provisions that control the determination of the conversion question. Second, whether the NDAA provided the IPE with the discretion to determine the conversion methodology. Third, whether the parties have any implied agreement to use a particular conversion methodology. After addressing these issues, it is then appropriate to address the ultimate question of what methodology should be used for the conversion.

**a. Whether the UPC or Legislation Authorizing the UPC Provides Guidance on the Conversion Method**

The ILA concluded that the UPC did not provide any guidance on the conversion method.[38] The parties have agreed that the UPC does not provide specific guidance on how to accomplish conversion. However, Chevron contends that other parts of the UPC provide guidance on the goal of the conversion. Chevron contends that the numerous references to ensuring that the United States gets the share of hydrocarbons underlying its lands as of 1942 mean that the

---

[36] ILA Decision, at 5.

[37] DOE Legal Comments, at 7-8.

[38] ILA Decision, at 1.

conversion must be based on 1942 prices.[39] These references, however, relate to the fact that the UPC was not executed until 1944 due to the rescission of a previous agreement between DOE and Standard to operate the reserve as a unit that had been entered into on November 20, 1942.[40] During the period between the rescission of the original unit agreement and the execution of the UPC, DOE and Standard operated the unit under a temporary unit agreement. Thus, unit operations actually began in 1942, even though the UPC was not authorized and entered into until 1944. The multiple references in the UPC to "as of November 20, 1942" thus operate to ensure that even though the UPC was not authorized until 1944, the UPC would apply as if it had been in place at the beginning of unit operations in 1942. Thus, the references in the UPC to the 1942 date operate to ensure that DOE and Chevron each receive their "original share" of the oil and gas underlying their respective portions of the unit as of the beginning of unit operations in 1942 instead of the original share underlying their respective portions as of 1944, when the UPC was executed and unit operations had been underway for almost two years. Certainly there is no suggestion in the UPC or the legislation that the United States' share should be determined based on the monetary value of the original share of the hydrocarbons underlying its lands. Moreover, Chevron's initial presentations on this equity determination did not use 1942 prices but instead used a form of current prices, demonstrating that Chevron's interpretation of the 1944 agreement did not change until after its IPE issued his provisional equity recommendation.[41]

DOE contends that the only provision of the UPC that can be interpreted as providing any insight on this issue augurs in favor of using current prices.[42] Section 5(h) of the UPC provides for cash balancing of equity allocations in the event that a zone is completely exhausted with one party receiving more than its share of production and there is not production available from another zone to make up the balance. DOE correctly points out that in those instances the UPC provides for a cash adjustment. However, neither section 5(h) nor section 5(b), which also calls for an adjustment in cash instead of in production, indicate the basis on which the cash adjustment should be calculated.

The conclusion to be drawn from this information is that neither the UPC nor its authorizing legislation provide any affirmative guidance on the particular conversion method to be used. Neither the parties nor Congress appear to have contemplated the need for conversion and thus did not provide any guidance on the conversion methodology. This issue appears to have been left to the policy formation and dispute resolution mechanisms set forth in the UPC.

---

[39] Chevron Final Comments, Appendix I, at 12-18.

[40] UPC, recital 4.

[41] *See* DOE Legal Comments, at 17 and cited references.

[42] DOE Legal Comments, at 17.

b. Whether the IPE Has Discretion to Determine the Appropriate Conversion Methodology

DOE takes the position that the IPE was authorized to determine the appropriate conversion methodology as part of its many technical judgments concerning its equity recommendation, that the IPE selected the BTU-based methodology, and that this choice should be restored. The ILA's view of this argument was that, although the IPE had considerable discretion to establish weighting methodologies, the parties had not agreed that the IPE had such discretion with respect to conversion methodologies. The ILA further believed that the IPE was not the "alter ego" of the Engineering Committee with authority to decide engineering policy decisions.[43]

I believe the NDAA, the Protocols, the Settlement Agreement, and the Equity Process Agreement make clear that the purpose of the IPE is to produce an equity recommendation reflecting the IPE's independent technical judgment consistent with the UPC and sound engineering principles. However, even if the IPE had the authority to make an independent decision as to the conversion methodology, it is not at all clear that the IPE made an independent technical judgment on this issue that should lead to deference. In addressing the parties' raising of the conversion issue with the ILA, the IPE stated that it felt constrained by the parties' May 1, 1997 Stevens Zone Settlement Agreement not to use a price-based conversion factor.[44] Moreover, in the face of DOE's objection to describing the conversion issue as a legal issue, the IPE described the conversion question as a potential legal issue and encouraged the parties to resolve the issue through the process set forth for resolution of legal issues.[45] Since it appears the IPE did not make an independent technical judgment but instead felt it was applying the parties' Settlement Agreement in choosing which conversion factor should be used, I conclude that I cannot simply return to the methodology used in the IPE's provisional recommendation on the basis that this reflects the IPE's independent technical judgment on the issue.

Moreover, the legislation authorizing the Elk Hills sale and providing for the finalization of equity between DOE and Chevron did not vest the IPE with any authority to make equity decisions, but rather required DOE to hire an IPE and permitted DOE to "accept the recommendation of the independent petroleum engineer for final equity in each known oil and gas zone ... [or] use such other method to establish final equity interest in the reserve as the Secretary considers appropriate."[46] Thus, the sales legislation does not require me to defer to the IPE's decision in any respect. The parties' May 1997 agreement with respect to equity determinations recognizes the Secretary's authority to finalize equity, and provides that if I, as designee of the Secretary, decide to adopt the IPE's determination, that determination is unreviewable to the extent I adopt it. However, in light of the Supplemental Protocol on legal

---

[43] ILA Decision, at 3.

[44] November 19, 1998 letter from NSAI to the parties, at 1.

[45] November 2, 1998 letter from NSAI to the parties.

[46] NDA Act, § 3412(b)(2).

issues, and the IPE's final equity recommendation incorporating the ILA's advice to use current prices for BOE conversion, I do not interpret the parties' agreement to permit or require me to defer to the IPE's initial position with respect to the conversion methodology on an unreviewable basis.

c. What is the Parties' Agreement, If Any, Regarding Conversion Methodology

The ILA took as a given that, if the parties had an agreement to convert to BOE, they must also have an agreement to convert using a particular methodology, and he sought to discern that agreement and use it to provide guidance to the parties. For this matter, I cannot agree with the ILA's conclusion in this regard because I have found no basis to conclude that the parties had an agreement to convert using a particular methodology. When viewing the parties' course of dealing, the only reasonable conclusion is that, to the extent the parties had an agreement on how to do the conversion, the agreement was to address this issue anew in each equity redetermination.

As the ILA recognized, the parties have considered using at least three methods of conversion: 1942 prices, current prices, and heating value. Of the three methods, only current prices -- the method selected by the ILA as the result of the parties' implied agreement -- has not been used. As reflected in the relevant documents detailing the most consideration of this issue in 1980 during the events leading up to the Third Revision to the Stevens Zone (i.e., the Engineering Committee minutes), the parties apparently believed it was not only permissible but also appropriate to consider "updating" the equivalency factor and that current prices were not feasible for use as a conversion factor in 1980 because at that time those prices were subject to rapid changes and artificial price controls. Although price controls have been abandoned and do not affect the current prices used for the IPE's amended final equity recommendation, a price-based methodology is subject to the market fluctuations and ratios extant during the time frame selected.

The parties considered but did not adopt in 1980 the use of a heating value conversion, noting there was "no industry precedent" for doing so. Both parties now acknowledge that there is industry precedent for using heating value. Heating value was used as the conversion factor in the 1998 Carneros Zone equity redetermination and neither party objected to its use. In addition, DOE emphasizes that Chevron has used heating value as the conversion factor in its SEC-regulated financial reports for 1997 and 1998.

During the course of this equity determination, Chevron has advocated two different methods: 1942 prices and current prices (using the previous twenty months' prices), with the latter being Chevron's position prior to this issue being raised as a dispute.[47] The record reflects that the parties have used 1942 prices as a conversion factor in several previous determinations, although the ratio they have used has not been constant and occasionally has been combined with a

---

[47] *See supra* note 41.

recovery factor without a clear delineation of the effect of each separate factor. Given this prior course of dealing and background, I do not believe the record supports the conclusion that the parties ever viewed the conversion factor methodology as a settled question that was determined by a prior agreement.

Although the UPC does not provide any explicit guidance on this issue, the parties' course of dealing on the conversion factor is consistent with the UPC's provisions concerning redeterminations. Section 2(f) of the UPC provides for redeterminations of equity and includes as one basis for redetermination the presence of "[a]ny condition, fact or circumstance which will aid in a more accurate determination of such percentages as of November 20, 1942." The UPC thus envisioned that there might be improvements in knowledge and methodology after the initial equity determination that would be appropriate to consider in redeterminations. The parties' course of dealing with respect to the conversion methodology has likewise been to remain open to consider changes in the conversion methodology in each redetermination. Therefore, I conclude that the parties do not have any agreement to use a particular conversion methodology.

Even though I do not consider the ILA's views on this issue to have any binding effect on my decision, I have considered the ILA's contrary view on this issue, to the effect that the parties had reached an agreement to use current prices as the conversion methodology. The ILA's conclusion, while fairly simple to implement, is simply not consistent with the parties' conduct before, during, or after the time period of the ILA's consideration. Moreover, the ILA's assumption that the parties had agreed on a particular method of conversion does not appear to be supported by the totality of the evidence. Thus, while I respect the effort that the ILA expended to address this issue with and for the parties, I cannot utilize the ILA's guidance in this decision.

### d. What Conversion Methodology is Appropriate for This Proceeding

Having concluded that the parties have not reached agreement on a particular method of conversion, and that the UPC does not provide specific guidance on the appropriate method, I am left with the task of deciding what method of conversion to apply. Under these circumstances, I have considered the method that is fair and equitable to both parties which is consistent with the UPC and with sound oil field engineering principles.

*Finding*

The parties have presented arguments regarding three different methodologies for conversion: a price-based methodology based on the ratio of 1942 prices for oil and gas; a price-based methodology based on the ratio of current prices for oil and gas; and a BTU-equivalent methodology based on the heating value of oil and gas.

Based on the record and because of the need to update the methodology, particularly for this final redetermination process, I conclude that the use of 1942 prices is not a rational or fair method of converting to BOE. Other than their use at Elk Hills for the interim redetermination, I am unaware of any practice in the oil and gas industry for using prices of such a vintage (more than five decades old) to convert to BOE in a final redetermination of equity. Moreover, because natural gas was not widely used in the 1940's, there was not a market for natural gas such that the market prices for natural gas would be comparable to the prices for oil.

Use of relative prices is a standard technique in the oil and gas industry for calculating equivalent barrels of oil for a given volume of gas. So, however, is the use of BTU-equivalent. *See* SPEE Monograph I, Guidelines for Application of the Definitions for Oil and Gas Reserves, Second Edition, October 1998 ("Reserves may also be reported as oil equivalent barrels or gas equivalent Mcf. The conversion may be made on a BTU-equivalent basis (approximately 6 MCF/BBL) or on a dollar-value basis. The dollar equivalent value is preferred."). I agree with the ILA that the UPC does not provide any express determination of the appropriate method for converting gas to BOE. However, I consider BTU-based conversion to be a rational method for performing the conversion because it reflects the physical properties of the oil and gas, it avoids the potential for distortion based on market price fluctuations, and has gained technical acceptability and has been previously considered by the parties and used in this finalization process. Similarly, the ILA's recommended current-price based methodology appears rational, given its industry acceptance and prior consideration by the parties.

Although I might have a preference for one method, because both methods are acceptable, rather than select between two rational methodologies, it seems appropriate to use them both. Therefore, in this determination of Stevens Zone equity, I am using the average of the BOE conversion factors for current prices and for BTU value. The values used for this calculation are included in Appendix A to this decision.

### 2. 26R Sand Abandonment Pressure

Abandonment pressure is normally defined as the average reservoir pressure at which gas production is no longer economic.[48] NSAI used 500 psi as an abandonment pressure for the 26R Sand, meaning that NSAI assumed that once the pressure of the 26R Sand fell below 500 psi, there would be no further commercial production from this reservoir. DOE contends that the use

---

[48] *A Dictionary for the Petroleum Industry*, First Edition, Petroleum Extension Service, Division of Continuing Education; The University of Texas at Austin, 1991, at 1.

of 500 psi as an abandonment pressure is arbitrary and unreasonably reduced the estimated gas recovery from the 26R reservoirs. Chevron proposes an abandonment pressure of 800 psi because, it contends, communication with other pools would prevent drawdown to 500 psi.[49] DOE contends that the 26R pool clearly could produce economic rates of gas at a reservoir pressure well below the 500 psi selected by NSAI. DOE calculated incremental gas reserves of 37.9 BCF attributable to reducing the abandonment reservoir pressure from 500 psi to 250 psi.[50] DOE asserts that this volume of incremental gas recovery would more than justify the cost of any compression equipment and upgraded gas pipelines required to achieve a final pressure of 250 psi or below. Furthermore, DOE points out that the existing gas gathering system in the field at the end of 1997 already had the compression capability to reduce wellhead pressures below 150 psi.[51] DOE estimates that AOFP (absolute open flow potential of a reservoir) at a reservoir pressure of 250 psi would be about eight MMSCFD.[52] Even though this is a theoretical maximum rate, achievable gas recovery rates at this AOFP would certainly be economic. As a result, DOE contends that an abandonment pressure of 250 psi is reasonable for the 26R Sand reservoir. *Id.*

NSAI states that its estimated final 500 psi abandonment pressure is based on results of two predictive runs of the Chevron 26R simulation model. One run simulates 26R reservoir behavior for an early blowdown of the 26R gas cap beginning on January 1, 2001. The second run predicts reservoir behavior for depletion by horizontal wells. Both cases were run out to the year 2030. For the blowdown case, average field gas pressure declines to 156 psi and no oil is being produced at 2030 (commercial oil production ceases by 2010). The gas flow rate is 1,984 MCFD by 2030. For the horizontal well case, pressure declines to 797 psi and oil production is at 215 BOPD by 2030. The gas flow rate by 2030 is 4,862 MCFD. To obtain an abandonment pressure, NSAI averaged the two year 2030 pressures, which yielded an average of 477 psi, and rounded up to 500 psi. NSAI explained that part of its rationale for using 500 psi was its similarity to the NWS Sands: "Since both the 26R Sand and NWS A-1, A-2 and A-3 Sands should have similar depletion scenarios, we used a 500-psig abandonment pressure for both structures."[53] Thus, NSAI based its estimate of the 500 psi abandonment pressure on two

---

[49] Chevron, *Comments Regarding NSAI Provisional Recommendation of Stevens Zone Equity Participations*, March 27, 1998, Reservoir Engineering.

[50] DOE, *Response to Netherland, Sewell & Associates, Inc. Provisional Recommendation of Equity Participations for the Stevens Zone*, Volume I Report, March 27, 1998, Issue 1, at 5.

[51] DOE Final IPE Comments, September 18, 2000, at 19.

[52] DOE, *Response to Netherland Sewell & Associates, Inc. Provisional Recommendation of Equity Participation for the Stevens Zone*, Volume I Report, March 27, 1998, Issue 1, at 5.

[53] NSAI, *Response To Owner Comments Regarding Provisional Recommendation of Stevens Zone Equity Participations*, Volume 2, March 2, 2000, at 7.3-5.

factors: the simulation runs that it considered and the similarity to the NWS Sands, which were not simulated.

As DOE points out, however, one of the two simulation runs on which NSAI relied (the horizontal well case) is not at abandonment conditions by 2030 (production is still at 215 BOPD and 4,862 MCFD), and therefore cannot rationally be used as one estimate of the abandonment pressure. DOE further notes that the simulations relied upon by NSAI demonstrate that an abandonment pressure as low as 156 psi is achievable.[54] I, therefore, indicated in the Preliminary Decision that I did not accept NSAI's conclusion on this issue. The Preliminary Decision used a lower abandonment pressure of 250 psi for the 26R Sand in recognition of the fact that the horizontal well case, which was at 797 psi in the year 2030, did not reflect abandonment conditions. The Preliminary Decision honored NSAI's technical judgment that both the 26R Sands and the NWS Sands should have similar depletion scenarios by using the same abandonment pressure for both, even though neither party challenged NSAI's use of 500 psi for the NWS Sands.

In their comments on the Preliminary Decision, both parties addressed this issue. Chevron contends that the Preliminary Decision was not based on any of the factors set forth in the Equity Process Agreement. Chevron Comments, at 6-7. Chevron also argues that the Preliminary Decision on this issue was not warranted technically: Chevron perceives the Preliminary Decision as being based on "the only case out of many" that supported the decision; that the IPE did not think the horizontal well case was a likely scenario and thus that it should have been discounted in the Preliminary Decision; and that the horizontal well case was an unlikely scenario because of the potential for water encroachment that would water-out all of the horizontal wells long before 2030. *Id.* at 7-8. Each of Chevron's contentions is addressed below. DOE commented that an even lower abandonment pressure than 250 psi might be justified in light of the simulation runs demonstrating that production will continue to be economic at a lower abandonment pressure and the existence of a low pressure gas gathering system that can continue production at pressures below 250 psi. DOE Comments, at 19. DOE, however, accepts the Preliminary Decision as a reasonable compromise.

*The Basis under Paragraph B.6. of the Equity Process Agreement for Rejecting the IPE's Final Recommendation with Respect to the Abandonment Pressures for the 26R and NWS A-1 to A-3 Sands*

In Paragraph B.6 of the Equity Process Agreement, DOE agreed that it would adopt the IPE's final recommendation unless one or more of several criteria were met. Chevron contends that the Preliminary Decision does not indicate which of these criteria were met, apparently disregarding the statement on page 28 of Preliminary Decision that "The NSAI choice of 500 psi as the abandonment pressure for the 26R Sands is not based on sound oil field engineering

[54] DOE, *U.S. Department of Energy Assessment of the Netherland, Sewell & Associates, Inc. Final Recommendation of Equity Participations for the Stevens Zone ASFE Report, September 18, 2000*, at 20-21.

principles." Paragraph B.6(f) of the Equity Process Agreement sets forth as one of the criteria for rejection that "The NSA recommendation(s) resulted from an approach or methodology which is inconsistent with sound oil field engineering principles."

As indicated in the Preliminary Decision, NSAI used the horizontal well case, unadjusted for the fact that the case was not run out to abandonment conditions, as one likely scenario on which to base an estimate of abandonment pressures. NSAI apparently failed to consider the information before it by not addressing the fact that the simulation run on which it relied had not yet reached abandonment conditions. NSAI's use of the horizontal well case is analogous to determining the average height of a population by measuring two representative people, whose heights are 5'4" and 6'9", but using 5'4" and 6' as the numbers to average, reaching an average of 5'8". This creates an arbitrary decision pursuant to Paragraph B.6(a).[55] NSAI's heavy reliance on data that was demonstrably inapplicable also leads to the conclusion that its recommendation in this respect resulted from an approach or methodology which is inconsistent with sound oil field engineering principles, as set forth in Paragraph B.6(f) of the Equity Process Agreement.

*The Technical Basis for the Decision*

Chevron asserts that the Preliminary Decision is unjustified on technical grounds, arguing that "The ASFE chose the only case out of many that showed commercial gas production at year 2030." Chevron Comments, at 7. Chevron misinterprets the basis for the Preliminary Decision. In its Final Recommendation, NSAI explained which simulation runs it used to estimate the final abandonment pressure for the 26R Sands as follows:

> Our [NSAI] estimated final 500-psig abandonment pressure [for the 26R sands] is based on results of [two] predictive runs of the Chevron 26R Sand Eclipse model. We used two depletion scenarios to assess the range of possible reserves [in the 26R reservoirs]. The two cases are shown below along with the average January 1, 2030 reservoir pressure for the total simulation model:
>
> | | |
> |---|---|
> | Gas-cap blowdown starting 1/01 | 156 psia |
> | Depletion of reservoir through horizontal wells | 797 psia |
>
> The average of both cases is 477 psia. The final abandonment pressure used by NSAI is very close to this average model prediction. Additionally, both Chevron and DOE have suggested using 500 psig for the NWS A-1 - A-2 and A-3 Sands. Since both the 26R Sand and the NWS A-1 - A-2 and A-3 Sands should have

[55] *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 51-52 (1983)(failure to offer a rational connection between the evidence and the decisionmaker's choice can render a decision arbitrary and capricious).

similar depletion scenarios, we used 500-psig abandonment pressure for both structures.[56]

In evaluating whether to accept NSAI's final recommendation in this area, the first step was to evaluate whether NSAI's reliance on these two simulation runs was arbitrary or capricious and whether it was based on sound oil field engineering principles. DOE focused its review of the NSAI study on the cases selected and used by NSAI.

DOE pointed out that, of these two critical cases, the horizontal well case had not arrived at abandonment conditions by the end of the simulation run (year 2030) and, therefore, should not have been used unaltered in any calculation of abandonment conditions. The predicted production rates at 2030 for the horizontal well case are 215 BOPD and 4,862 MCFD.[57] This level of production is still highly economically viable, especially where a low-pressure gas-gathering system suitable for recovery of this gas is already in place at the Elk Hills field.

In considering what level to use as the abandonment pressure, I accept NSAI's conclusion that the two simulation runs constitute two reasonably-likely scenarios. Thus, I agree that one likely scenario is gas blowdown until a pressure of 156 psi is reached, and one is horizontal well production that has not reached abandonment conditions by the year 2030, when the pressure is 797 psi. The question then becomes how to adjust the horizontal well scenario to account for the fact that it was not run out to abandonment conditions.

After reviewing the parties' comments on the Preliminary Decision, I requested that additional analysis be performed to determine the predicted pressure at abandonment conditions for the horizontal well case. This analysis took the data used by NSAI and extended it by means of regression analysis. The result of that analysis was a predicted pressure of 687 psi when abandonment conditions were reached in the year 2038.[58]

Using the "true abandonment" figure for the horizontal well case, I was then able to determine the average abandonment pressure for the two cases that NSAI judged to represent the range of likely depletion scenarios. This average is 422 psi. Again, using the same approach as NSAI, I then used this as the abandonment pressure for the 26R as well as the NWS A-1, A-2, and A-3 Sands.

---

[56] *NSAI's Response to Owner Comments Regarding Provisional Recommendation of Stevens Zone Equity Participations*, Volume 2, March 2, 2000, at 7.3-5.

[57] DOE Final IPE Comments, at 20.

[58] Appendix B to this Final Decision includes a detailed explanation of the analysis used to calculate the horizontal well abandonment pressure.

*Whether NSAI's Choice of Simulation Cases Was Balanced and Reasonable*

In its Comments, Chevron contends that "[t]he IPE discounted the likelihood of the horizontal well case ever being implemented by averaging its result with another plausible case. The ASFE should have discounted the likelihood of the horizontal well case as well." Chevron Comments, at 7. Chevron also contends that the Preliminary Decision "used but one case of many that was available to him." *Id.* Chevron mischaracterizes the IPE's methodology. Nothing in the IPE's report indicated that it chose to use the pre-abandonment pressure from the horizontal well case in order to compensate for any lack of confidence in the plausibility of that case. Notably, Chevron has not quoted any part of the IPE's recommendation or any other communication from the IPE in support of its recharacterization of the IPE's rationale. Thus, I do not find Chevron's argument persuasive on this point. Chevron also misperceives the basis for this Decision. As discussed above in detail, this Final Decision utilizes the same two cases that were selected as representative by the IPE. The only difference is that this Decision corrects the error in the IPE's recommendation of using a value that was clearly pre-abandonment as the horizontal well case abandonment condition. As Chevron admits in its own comments, "NSAI used reservoir simulation and looked at many simulation runs before choosing to average two cases that it considered plausible." Chevron Comments, at 7. Chevron has never previously indicated any dissatisfaction with the IPE's choice of simulation cases, which are the same cases that form the basis for this Final Decision. I conclude that there is no basis under Paragraph B.6 of the Equity Process Agreement to reject NSAI's judgment concerning the simulation cases to use in its analysis.

*Whether it was Unreasonable for the IPE to Rely on the Horizontal Well Simulation Case*

In its Comments on the Preliminary Decision, Chevron for the first time contends that the IPE's selection of the horizontal well case from Chevron's model was not appropriate. Chevron Comments, at 8. Chevron now contends that this case was not a likely scenario due to the potential for a bottom-drive aquifer for the 26R that would cause the horizontal wells to "water out" due to aquifer encroachment. Chevron states that "Aquifer encroachment was a phenomenon that was seen several times in the operational history of the [26R] reservoir and is well documented." *Id.* Chevron offers no evidence to substantiate its claim that production from horizontal wells would not last until 2030 or later. In contrast, both DOE and NSAI minimize the potential for water encroachment into the 26R reservoirs. DOE, in its comments on the NSAI Provisional Recommendation (Summary, at 2), concludes that "In the case of reservoirs with limited natural aquifer support, such as the 26R sand and the 31S N/A and C/D shale pools, the abandonment pressure is determined by the pressure at which the gas rate reaches the economic limit." NSAI observed: "In the 26R and NWS A-1 - A-3 reservoirs, where there has been no water injection or significant natural water influx, pressure can be substantially reduced through gas cap blowdown." NSAI Final Recommendation, at F-O-22. Evidence on this point is not available from the simulation results because the Chevron simulation model does not include all other productive 31S reservoirs. I conclude that Chevron has not indicated any basis under Paragraph B.6 of the Equity Process Agreement to conclude that NSAI should not have used the horizontal well case in performing its analysis, and thus that it is reasonable for me to rely on that case as well in this Final Decision.

*Finding*

Despite the compelling arguments by DOE that a reservoir pressure lower than the 500 psi value selected by NSAI would yield economic production, it does not appear that NSAI even considered a lower value, choosing instead to rely on an average of the final pressures from two simulation runs and the assumption that the 26R and NWS sand abandonment pressures should be similar. DOE has shown that one of the simulation runs was not carried out to abandonment conditions and therefore, should not be used unadjusted for determination of an average final pressure. NSAI's only stated rebuttal explaining its use of the 500 psi value is that the abandonment pressures should be the same for both the NWS and 26R sands.

NSAI's choice of 500 psi as the abandonment pressure for the 26R sands was arbitrary and capricious, and resulted from an approach or methodology which is inconsistent with sound oil field engineering principles. However, I accept NSAI's professional judgment that the two simulation cases it selected represent a reasonable range of depletion scenarios, and that both the NWS and the 26R sands should have similar depletion scenarios and, thus, similar abandonment pressures. I therefore reject the 500 psi value and use the value of 422 psi as the abandonment pressure for both the 26R sands and the NWS sands, incorporating the corrected predicted abandonment pressure for the horizontal well case into the methodology used by the IPE. The values used for this calculation are shown on the spreadsheets included in Appendix A to this decision.

### 3. Production from Well 315-6G

The DOE alleges that the IPE overlooked production data from a Stevens producer (well 315-6G) for the five-month period from March through July 1997.[59] NSAI responded to this allegation in an e-mail, dated August 29, 2000 as follows:

> NSAI's unit production records indicate that the 315-6G continued to produce oil and gas through July of 1997. In June and July 1997 the well produced at high gas rates and was shut in for the remainder of the year. As with all Stevens Zone producers, NSAI reviewed the 1997 unit production data for the 315-6G. Estimates of remaining reserves as of March 1, 1997, were then made for each Stevens Zone well using historical unit production through March 1, 1997, while additionally using production from March through December 1997 as a guide. Since the data cutoff was March 1, 1997, we did not try to match our forecast to post-March 1, 1997 production exactly on a month-by-month basis.

[59] DOE, E-Mail message from Francis Gangle, DOE, to Rick Krenek and Scott Frost, Netherland, Sewell & Associates, Inc., August 25, 2000.

> Consequently, the estimated production for any well at any point in time after the data cutoff date will most likely not match actual production exactly.[60]

I accepted this explanation in the Preliminary Decision. The DOE EFT's comments on the Preliminary Decision state that it only criticizes the IPE because he "neglected the actual oil and gas production between March and July 1997."[61] Thus, DOE's contention here is that the IPE's results should be revised because they conflict with data concerning time periods after the March 1, 1997 data cutoff. Putting aside the IPE's explanation for the conflict in the data, which I accepted in the Preliminary Decision and continue to accept, the remaining question is whether data from time periods after the data cutoff can be used to undermine the IPE's decision.

In response to questions raised by Chevron, I have previously concluded that the parties' mutually-agreed upon data cutoff date should be honored.[62] That conclusion applies to the issue raised by DOE as well. The purpose for the data cutoff is to create a level playing field for the parties to use to make their technical arguments, and to enable the equity process to end without the need for infinite iterations of the decision as new data are acquired.

*Finding*

The IPE appears to be cognizant of production data from the well in question and to have treated the data from the subject well in a manner consistent with that of all other Stevens Zone wells.[63] I see no reason to single out this particular well for special treatment, especially where the data on which the argument for special treatment is made regards time periods after the data cutoff. Therefore, I conclude that none of the criteria for rejecting the IPE's recommendation have been met regarding this issue and I accept the IPE's recommendation.

### 4. The Role of Solution Gas in the Equity Calculation

The Owners have differing views on whether solution gas should be included in the equity calculation. Chevron originally contended that solution gas is part of the oil and should not be viewed as a separate entity.[64] DOE believes that solution gas should be counted as part of the gas volume for equity purposes, that recoverable solution gas varies considerably across the field, and therefore, that allowances for these variations should be made through a "variable

---

[60] E-Mail message from Scott Frost, NSAI, to Francis Gangle, DOE, Aug. 29, 2000.

[61] DOE Comments, at 16.

[62] Letter from Robert S. Kripowicz to William H. Taft IV, Esq. and Gregory B. Thorpe, Esq., September 23, 1999; Preliminary Decision, at 32-33.

[63] E-Mail message from Scott Frost, NSAI, to Francis Gangle, DOE, Aug. 29, 2000.

[64] Chevron, *Chevron's Recommended Conversion Guidelines*, Chevron Handout at September 9, 1999 Interim Meeting.

solution gas" (VSG) methodology.[65] The IPE did not accept Chevron's view, but instead considered whether to use a constant value for solution gas content or to use VSG methodology. NSAI agreed with the DOE position and included solution gas in the equity calculation using VSG methodology.[66] Chevron contends that although the IPE utilized the VSG methodology, the IPE indicated that use of a constant value to reflect solution gas was also an acceptable methodology.[67] Chevron notes that use of the constant value would benefit Chevron by 0.86% of equity and invited DOE to "split the difference" between the two methodologies rather than choosing one over the other. *Id.* Chevron does not contend that the IPE's decision meets any of the criteria set forth in Section B.6 of the Equity Process Agreement for rejection of the IPE's recommendation.

In the Preliminary Decision, I accepted NSAI's judgment on this issue. In its comments on the Preliminary Decision, Chevron contended that the Preliminary Decision did not address the issue that Chevron had raised. Chevron asserts that the issue was whether solution gas should be calculated using a variable or constant methodology. Chevron Comments, at 4. Chevron asserts that the IPE described both methodologies as sound and that "[w]hile the IPE was required to choose one, and did, the IPE invited the ASFE to choose the other." *Id.* Chevron further asserts that this issue should be resolved by splitting the difference between the two methodologies. *Id.* at 5.

In its final Stevens Zone equity recommendation briefing on March 2, 2000, the IPE concluded that "NSAI believes that it is appropriate to include variations in recoverable solution gas and gas-cap gas in equity calculations (VSG methodology) based on the technical data available."[68] I do not agree with Chevron's characterization of the IPE as "inviting" the ASFE to choose a different technology. Moreover, I concur with the IPE's decision to use the VSG weighting method. There is a significant difference in recoverable solution gas from tract to tract and reservoir to reservoir such that the variable solution gas weighting methodology is an appropriate way to honor that difference. Solution gas calculations can be performed with reasonable certainty due to the cumulative production data available at this time that was not available in the prior redeterminations of Stevens Zone equity. The Chevron-proposed CSG methodology is considerably different and does not recognize the variability of solution gas from tract to tract. As such, it gives no additional weighting credit to different tracts and thus unfairly penalizes the tracts that contain gas-oil ratios above the average while unfairly rewarding tracts that contain gas-oil ratios below the average. The IPE made a reasonable technical choice between the two

---

[65] DOE, *Unit Operation, Naval Petroleum Reserve No. 1 (Elk Hills), Kern County, California*, Stevens Zone Report, June 2, 1997, at 14.

[66] NSAI, *Presentation of Recommended Final Equity Participations for the Stevens Zone*, March 2, 2000, Slide "Treatment of Gas and NGLs, Solution Gas Conclusions."

[67] Chevron Final IPE Comments, at 4.

[68] NSAI, *Presentation of Recommended Final Equity Participations for the Stevens Zone*, March 2, 2000, Slide "Treatment of Gas and NGLs, Solution Gas Conclusions."

competing methodologies. Thus, none of the criteria set forth in paragraph B.6 of the Equity Process Agreement would require or even permit me to reject the IPE's recommendation to use the VSG methodology.

*Finding*

I have no technical basis for rejecting the IPE's election to include solution gas in the equity calculation and to allow for variations in solution gas content throughout the reservoir. A fair distribution of estimated productive acre-feet must account for all the hydrocarbons recoverable by the Unit. This decision is consistent with guidance contained in Item number two of the Stevens Zone Settlement Agreement, dated May 7, 1997, which reads:

> The ILA shall instruct the IPE that quantities of natural gas liquids (NGLs) and associated gas (including solution gas) may be used in weighting estimated acre-feet for the Stevens Zone, provided that such use would be in accordance with sound oil field engineering principles.

Therefore, I accept the IPE's recommendation on this issue.

## IV. CONCLUSION

Finally, for the reasons stated above, with one exception (the 26R abandonment pressure), neither DOE nor Chevron have demonstrated that the final recommendation is inconsistent with sound oil field engineering principles or violates any of the other criteria for rejection. In addition, as noted above with respect to the legal issue related to conversion of gas to oil, I have determined that it is most appropriate in this final equity determination to determine the factor for conversion of gas to oil by using an average of the heating value-based conversion factor and the current prices-based conversion factor.

This Decision therefore adopts the final NSAI recommendation as modified to account for the adjustment in assumed abandonment pressures and for the BOE conversion. Changing the abandonment pressure from 500 psi to 422 psi in the U26R Sand, L26R Sand, NWS A1-A2 Sands, NWS A-3 Sand and using the average gas conversion factors of the 20-month current natural gas price case and the heating value case, results in a final equity as follows:

| | | |
|---|---|---|
| Chevron Weighted Acre-Feet: | 399,905.5 | 19.4575% |
| DOE Weighted Acre-Feet: | 1,655,375.7 | 80.5425% |
| Total | 2,055,281.2 | 100.0000% |

This is an increase of 0.0993 percentage points in favor of DOE over the final NSAI recommendation. For the purpose of equity finalization under section 3412(b)(2) of the NDA Act and the UPC, DOE's final participation percentage in production and costs of production from the Stevens Zone is determined to be 80.5425 percent, and Chevron's final participation percentage in production from the Stevens Zone is determined to be 19.4575 percent.