ChevronTexaco Exploration & Production Company
A Division of Chevron U.S.A. Inc
9525 Camino Media, A 2056
Bakersfield, California 93311
Tel 661 654 7740
Fax 661 654 7101

Warner Williams
Vice President

January 28, 2004

**ChevronTexaco**

Honorable Carl Michael Smith
Assistant Secretary for Fossil Energy, FE-1
U.S. Department of Energy
1000 Independence Ave., S.W
Washington, DC 20585

Dear Assistant Secretary Smith:

Chevron U.S.A. Inc. ("ChevronTexaco") very recently discovered that DOE has materially breached important contracts between DOE and ChevronTexaco concerning finalization of the United States' and ChevronTexaco's respective interests in the Elk Hills Field. The contracts concern the resolution of issues between DOE and ChevronTexaco worth hundreds of millions of dollars. In brief, it appears that personnel in DOE's Office of General Counsel both acted as advocates before a decision maker who was supposed to be impartial and served as undisclosed participants in the decision-making itself. As a result, the dispute resolution mechanism agreed to by the parties has been completely undermined, one-sided rather than impartial decisions have been rendered against ChevronTexaco, and substantial amounts of time and money have been wasted.

These actions are in breach of the Department's promises and obligations pursuant to the parties' agreements and in violation of due process, and ChevronTexaco is prepared to seek redress in the United States courts. However, in advance of such action, I am writing to request a meeting with you at the earliest possible date to discuss your agency's response to this situation and whether a means exists to salvage the process and resolve the parties' disputes without legal action.

Obviously ChevronTexaco is not yet privy to all the details concerning the activities of OGC personnel as both advocates for DOE's positions and advisors to the decision-maker. The following brief summary is based on ChevronTexaco's own documents and on copies of internal DOE materials recently obtained by ChevronTexaco pursuant to the Freedom of Information Act (FOIA).

<u>The Unit Plan Contract</u>

The "Unit Plan Contract" (UPC) executed in 1944 between the predecessors of DOE and ChevronTexaco unitized the Elk Hills Field near Bakersfield, California, in which

40

Honorable Carl Michael Smith
Assistant Secretary for Fossil Energy, FE-1
U.S. Department of Energy
January 28, 2004
Page 2

ChevronTexaco's predecessor, Standard Oil of California, and the United States each owned interests. To accomplish the United States' purpose in entering the agreement – to ensure the availability of sufficient petroleum reserves for national security purposes – Standard had to forgo substantial property rights and consent to a drastic curtailment of production from its own property in order to preserve the oil and gas for the benefit of the United States' interests.

Under the UPC, each party was to share in production from the Elk Hills Field in proportion to the recoverable hydrocarbons underlying that party's land as of 1942. However, in 1944, the parties knew relatively little regarding the hydrocarbons that lay beneath the surface of the Reserve. Therefore, the parties agreed that their respective equity interests were subject to recalculation based on subsequently acquired information regarding the state of the field as it existed in 1942. Such recalculations (equity redeterminations) were done from time to time between 1944 and 1996.

The Agreement Regarding Equity Redetermination Process

In 1995, Congress passed the National Defense Authorization Act for Fiscal Year 1996, P.L. 104-106, which included a requirement that DOE sell the United States' interest in the Reserve. *Id.* at §§ 3412-3416, 10 U.S.C. § 7420 note. As part of this process, each owner's equity interests had to be finalized in accordance with the UPC. To this end, and to permit the DOE to sell its interest in advance of equity finalization, on May 19, 1997, DOE and ChevronTexaco signed an "Agreement Regarding Equity Redetermination Process" (Process Agreement). Consistent with the UPC, this agreement made the Assistant Secretary for Fossil Energy (as the delegate of the Secretary of Energy) the arbiter of the parties' contractual interests in each of the four zones. The ASFE was to receive a recommendation from a technically qualified "Independent Petroleum Engineer" (IPE). The IPE in turn would rely for contract interpretation on decisions of an Independent Legal Advisor (ILA).

The Process Agreement diverged significantly from the UPC in that it prohibited "judicial resolution of any dispute regarding ASFE equity redetermination decisions," "[i]n order to avoid the potential for protracted and costly litigation." Process Agreement at B.8. Instead, determinations of the ASFE that favored ChevronTexaco were made final, and ChevronTexaco could appeal to DOE's Office of Hearings and Appeals any aspect of the ASFE decision contrary to the IPE's technical recommendation, as well as any legal issue decided by the ASFE against ChevronTexaco. ChevronTexaco agreed to these significant limitations on its right to resort to a judicial remedy in exchange for the promise of an impartial decision from the ASFE.

To ensure such an impartial decision, section B of the Process Agreement states that "Chevron and DOE agree on [certain specified] procedures for the ASFE redeterminations of equity for all four unitized zones." These procedures treat ChevronTexaco and DOE (also referred to as "the parties" or "the Chevron and DOE equity teams") as adversaries and designate the ASFE as the adjudicator bound to determine the case on the basis only of information openly communicated to him or her by the adversary parties. In particular, the agreement requires that no "communications concerning equity redetermination-related matters . . . . by the ASFE with either equity team shall be on an ex parte basis." *Id.* at B.4. It also requires that "[a]ny written materials submitted to the ASFE by either equity team shall be provided to the other party." *Id.* In short, the Process Agreement promises an impartial adjudication, to be accomplished by a defined separation of functions within DOE and a bar on secret or one-sided communications between the adversaries and the decision maker.

Subversion of the Stevens Zone Equity Finalization Proceeding

It appears that actions by DOE personnel have thoroughly subverted the procedures for which ChevronTexaco bargained. In particular, direct and indirect ex parte communications between DOE's OGC and your predecessor[1] resulted in a situation in which the lead litigation counsel for the DOE equity team, Assistant Deputy General Counsel Mary Egger, also functioned as legal advisor to the adjudicator in this dispute. The Department thus has violated the separation of functions set out in the Process Agreement and ChevronTexaco has thereby been denied its rights under the UPC.[2]

ChevronTexaco recently obtained pursuant to a Freedom of Information Act request (discussed in more detail below), documents indicating that Ms. Egger participated in the drafting of your predecessor's preliminary decision in the Stevens Zone proceeding. We have learned that shortly before the ASFE's issuance of a preliminary decision on November 13, 2001, Ms. Egger wrote to the ASFE on October 25, 2001, forwarding a "Draft Preliminary Decision Finalizing Elk Hills Stevens Zone Equity" and offering "to discuss it further at your convenience." And on November 9, just two business days prior to issuance of the decision, Orna Cadieux, apparently acting under the direction of Ms. Egger, wrote to

---

[1] The communications of which we are aware occurred between OGC and Robert Kripowicz, directly or through his staff. At the time of the preliminary decision on the Stevens Zone equity finalization, Mr. Kripowicz was the acting Assistant Secretary for Fossil Energy. At the time of the final decision and at other times relevant to this matter, Mr. Kripowicz was Principal Deputy Assistant of Fossil Energy

[2] Although the parties agreed to terminate the Unit Plan Contract in conjunction with DOE's sale of its interest in the reserve, the parties expressly perpetuated all their respective rights under the UPC. *See* Agreement to Terminate the Unit Plan Contract § 2.2.

42

Honorable Carl Michael Smith
Assistant Secretary for Fossil Energy, FE-1
U.S. Department of Energy
January 28, 2004
Page 4

the ASFE stating, "Enclosed is the preliminary Stevens Zone decision with the revisions we discussed, *for your issuance*. Please call me if you have any questions." (Emphasis added.) Other documents, though heavily redacted by DOE or withheld entirely (in continued violation of section B.4. of the Process Agreement), confirm additional ex parte contacts between Ms. Egger and the ASFE or his staff with respect to matters to be decided by the ASFE.

During these same proceedings, Ms. Egger has openly and consistently held herself out as and acted as lead counsel for the DOE equity team, thereby necessarily becoming a part of that team for purposes of the Process Agreement. For example, in legal proceedings before the ILA that presaged similar advocacy before the ASFE, Ms. Egger has signed legal correspondence to the ILA and has personally participated in mediation meetings with the ILA and counsel from the ChevronTexaco equity team. Moreover, the ILA unequivocally understood Ms. Egger to be counsel for the DOE equity team. As the ILA explained on one occasion, "Ms. Egger stated that while Ms. [Beth] Kelly was named as COR [counsel of record] in the contract, she (Ms. Egger) will be the contact on substantive – as opposed to administrative – matters."[3] The ILA has consistently addressed correspondence and resolution of disputed legal issues to Ms. Egger as well as litigation counsel for the ChevronTexaco equity team. Similarly, the IPE recognized Ms. Egger as counsel for the DOE equity team in correspondence.

In addition, Ms. Egger has for years corresponded with and telephoned ChevronTexaco's in-house and outside litigation counsel regarding procedural matters, exactly as opposing counsel interact outside the courtroom. For example, in her representation of the DOE equity team before the IPE, ILA, and ASFE, she has both requested and consented to extensions of time; signed an agreement with ChevronTexaco counsel regarding the IPE's conflicts of interest; signed joint requests (with ChevronTexaco counsel) for determinations by the IPE; attempted to resolve disputes through correspondence; advised ChevronTexaco counsel of the advocacy positions of "the DOE team;" and participated in conference calls with ChevronTexaco counsel to discuss issues to be brought before the IPE or ILA. In all of these matters, Ms. Egger was purporting to act on behalf of the DOE equity team.

Ms. Egger thus has been an active advocate with respect to the DOE equity team's assertion of positions before the ASFE in connection with the Stevens Zone decision. She also,

[3] Letter from Kenneth Roberts to Mary Egger and Cynthia Giumarra (Assistant General Counsel for ChevronTexaco U.S.A.), dated October 23, 1998; *accord* Letter from Roberts to Egger, Gary Henderson (in-house counsel for ChevronTexaco), Gregory Thorpe, and William H. Taft IV (outside litigation counsel for ChevronTexaco), dated September 9, 1999 ("While my normal contacts are Ms. Egger and Mr. Henderson. . .").

Honorable Carl Michael Smith
Assistant Secretary for Fossil Energy, FE-1
U.S. Department of Energy
January 28, 2004
Page 5

however, has participated in the preparation of the ASFE's decision itself. In other words, she has represented both a party and the adjudicator ruling on that party's positions. In these circumstances it is hardly a surprise that the adjudicator's decision favored the DOE.

In contrast, ChevronTexaco bargained for a process in which its own views, developed and expressed at great effort and expense, would be considered carefully and fairly by an impartial decision maker. The dual role of the OGC in the process, however, has irreversibly stripped the parties' agreed-upon procedures of any legitimacy. Further, The FOIA documents also indicate that there were inappropriate ex parte communications between the ASFE or his staff and the IPE with respect to the Stevens Zone.

<u>DOE's Actions With Respect to ChevronTexaco's FOIA Request Suggest an Awareness of the Problems with the Conduct of the Stevens Zone Proceedings</u>

DOE tried to prevent, and succeeded for some time in preventing, Chevron Texaco from gaining access to the information contained in the recently released documents regarding irregularities in your predecessor's decision-making. ChevronTexaco first began investigating whether prohibited ex parte contacts had occurred following the ASFE's Stevens Zone decision. ChevronTexaco filed a request under the Freedom of Information Act on January 7, 2003, seeking materials that would allow it to determine the bases on which the ASFE's decision had been made. The DOE thereafter proceeded to stall and delay responding for almost an entire year.

On January 30, 2003, DOE sent "an initial response" to our FOIA request consisting of a one-page letter by Gary Latham, technical adviser to the ASFE, stating, "we will be unable to furnish you with a response to this request within the twenty days provided in the statute. We will do the work necessary to process this request as quickly as possible and hope to provide you with a response shortly thereafter."

On March 7, 2003, ChevronTexaco counsel called Mr. Latham to ask about the status of our request. Mr. Latham said that the Office of the General Counsel was handling the request and that we should expect to receive a letter very soon. We heard nothing. In early April, ChevronTexaco counsel again called Mr. Latham to find out where the letter was. Mr. Latham stated that OGC said it would be sending a letter within a few days.

On April 17, 2003, we received a letter, not from OGC, but from James Webber, a Procurement Analyst in DOE's Corporate Services Division, who by his own admission had no previous experience or understanding regarding the Elk Hills Field. Thus, assuming that the statements made earlier to us by Mr. Latham about the matter being handled by OGC were correct, three and a half months after filing our request, our request was suddenly and

without explanation delegated by those with direct knowledge of the matter (OGC) to someone who knew nothing about it. Moreover, as a non-lawyer working in an office entirely unrelated to OGC, Mr. Webber not only lacked knowledge of the relevant documents but had no access to them, much less authority to release them.

Mr. Webber's letter included a response to only *one* of the twelve items in our request, a response that consisted of a single redacted document. The letter denied the remainder of our request *on the ground that our request had not been specific enough*. This sudden realization by DOE, after three months of promising a response, was obviously disingenuous. It was not made any less so by Mr. Webber's suggestion that we submit a "reformulated request" that would restart the 20-day statutory response period.

We appealed the denial to the Office of Hearings and Appeals, which immediately indicated that the denial appeared to be improper. As a result, on June 19, 2003, Mr. Webber wrote, "We are working on your FOIA request and will contact you shortly concerning the status of your request and the cost of fulfilling that request."

We soon learned that Ms. Beth Kelly of OGC had taken responsibility for one portion of the response, and that Mr. Webber would be responsible for the other portion. This fresh interest on the part of OGC in assisting in formulating a response suggests that its delegation to Mr. Webber had been little more than an evasive move.

Still, for many months more we heard nothing and received nothing from either OGC or Mr. Webber. In October and November 2003, ChevronTexaco counsel made repeated calls to Ms. Kelly and Mr. Webber Both Ms. Kelly and Mr. Webber went out of their way to discuss how hard DOE was working on the matter, and, just as carefully, each avoided committing to any specific date for producing the materials.

On December 19, 2003, ChevronTexaco counsel sent a letter to DOE threatening to sue for release of the documents. *Four days later* Messrs. Latham and Webber each sent responses to the FOIA request, with a total of perhaps three loose-leaf binders' worth of documents (heavily redacted). As discussed above, these documents conclusively show the OGC's involvement in the preparation of the ASFE's decision in the Stevens Zone Appeal, and other apparent irregularities in the process.

Some Implications of the Breach of Contract

The implications of the DOE's actions are substantial. First, ChevronTexaco has been deprived of the consideration it bargained for in the Process Agreement—an impartial decision by the ASFE—leaving ChevronTexaco with its residual rights under the Unit Plan

45

contract, enforceable at law. The Stevens Zone proceeding has been rendered a nullity resulting in an enormous waste of time, effort, and expense. Second, the previously completed Carneros Zone and Dry Gas Zone proceedings likewise have been called into serious doubt. For without further investigation assisted by disclosures from DOE, ChevronTexaco cannot rationally accept that there are not similar issues with respect to the ASFE's decision-making in those proceedings. Finally, it is clear that, absent some mutually agreeable resolution between the parties, the federal courts are the proper forum for this dispute. Among other things, OHA (as it has recognized) does not have the power to construe the very agreement that brought OHA into the process to begin with. *See* Letter from George B. Breznay, Director, Office of Hearings and Appeals, to Mary H. Egger and William H. Taft IV, dated Feb. 26, 1999, at 2 ("OHA does not have the authority to review disputes over the May 1997 agreement."). Moreover, the Process Agreement gives OHA power only to review a decision made pursuant to the Process Agreement, not one made in violation of that agreement.

ChevronTexaco respectfully requests a meeting with you or other DOE officials who are authorized to speak on behalf of the Department as soon as possible so that we can discuss whether it will be possible to remedy this situation without legal action. At such a meeting, we would hope to hear DOE's willingness to take at least the following steps:

(1) immediately suspend the proceedings in the Stevens Zone appeal pending before OHA;

(2) agree to the appointment of an unquestionably impartial decision maker, whose conclusions will be subject to de novo judicial review at ChevronTexaco's request;

(3) consistent with the requirements of paragraph B of the Process Agreement, provide ChevronTexaco with: (a) all documents submitted to the ASFE or his staff by or at the direction of any DOE attorney who has represented the EFT; (b) a description of any ex parte oral communications between those attorneys and the ASFE or his staff; and (c) documents or information consisting of or reflecting any ex parte communications between NSAI and the ASFE or his staff; and

(4) produce a sufficiently detailed account of the specific roles of OGC personnel in any other equity finalization proceedings so as to enable ChevronTexaco to determine whether those proceedings were similarly tainted by violations of the agreements between DOE and ChevronTexaco.

Honorable Carl Michael Smith
Assistant Secretary for Fossil Energy, FE-1
U.S. Department of Energy
January 28, 2004
Page 8

DOE cannot afford to allow these proceedings to continue without resolving this serious issue that puts the legitimacy of all of the equity finalization efforts thus far in doubt. According to the limited information obtained by ChevronTexaco through the FOIA request, it appears that DOE has paid the IPE well in excess of $10 million. In addition, the public fisc has funded over $18 million in charges by DOE's technical consultants. The equity finalization process has already taken far longer and cost exponentially more than Congress contemplated, and it is not yet close to completion. We doubt that further proceedings under these circumstances would be acceptable to the Congressional overseers of DOE's activities.

I note one final matter. Our FOIA request put DOE employees on notice that documents evidencing the course of conduct outlined herein are potentially relevant to litigation. Now, with litigation a distinct possibility and ChevronTexaco in possession of evidence of the OGC's role in preparation of the ASFE's decision and other improper communications, we ask explicitly that DOE preserve all documents, electronic data (including e-mails), and any other information or materials potentially relevant to this contract dispute.

We look forward to your response.

Sincerely,

Warner Williams

cc: Lee Sarah Lieberman Otis, Esq.
Mary Egger, Esq.
Gregory Thorpe, Esq.
Gary Henderson, Esq.
Donald B. Craven, Esq.

**Department of Energy**
Washington, DC 20585

April 1, 2004

Mr. Warner Williams
Vice President
Chevron Texaco Exploration
and Production Co.
9525 Camino Media A2056
Bakersfield, CA 93311

Dear Mr. Williams:

We have reviewed the issues raised in your January 28, 2004, letter to Assistant Secretary Smith. In that letter, you expressed concern that "it appears that personnel in DOE's Office of General Counsel both acted as advocates before a decision maker who was supposed to be impartial and served as undisclosed participants in the decision-making itself." Specifically, you suggested that section B.4 of the Agreement Regarding Equity Redetermination Process ("Process Agreement") may have been violated by "a situation in which the lead litigation counsel for the DOE equity team, Assistant Deputy General Counsel Mary Egger, also functioned as legal advisor to the adjudicator in this dispute." I think that when you more closely examine the record you will find that such allegations are baseless.

To begin with, although your letter refers to an "adjudicator in this dispute," I do not read the letter to assert that the Administrative Procedure Act's requirements governing formal adjudications are applicable. Nonetheless, it is worth stating categorically that the process in question is not an "adjudication required by statute to be determined on the record after opportunity for an agency hearing" as contemplated by the APA. 5 U.S.C. 554(a). Quite the contrary, the applicable statute, section 3412(b)(2) of the National Defense Authorization Act for Fiscal Year 1996, Pub. L. No. 104-106, provides that the Secretary of Energy "may use such * * * method to establish final equity interest in the reserve as the Secretary considers appropriate." Accordingly, as your letter seems to recognize, any restrictions on the Department's decision-making process could only arise by virtue of an agreement between the parties.

The agreement between the parties that your letter cites, the Process Agreement, was quite specific. In relevant part it provided:

> The ASFE [Assistant Secretary for Fossil Energy] will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related

Printed with soy ink on recycled paper

> matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an ex parte basis.

There are two incidents that occurred contemporaneous with the parties' drafting of the Process Agreement that I would draw to your attention for the insights they provide concerning the parties' understanding of these terms:

First, on May 14, 1997, Chevron's counsel, Cynthia Giumarra, proposed language that, had it been adopted, might arguably have made the allegations contained in your letter at least understandable. Specifically, Ms. Giumarra proposed that the Process Agreement state that "The ASFE shall have no ex parte communications with the attorneys or technical team members who participated in the preparation of the DOE or the Chevron equity presentations to NSA." But Ms. Giumarra's proposal to restrict communications between the ASFE and attorneys was not adopted by the parties.

Second, just two weeks after execution of the Process Agreement, on June 2, 1997, Chevron's counsel, Cynthia A. Giumarra, wrote to Ms. Egger to complain that DOE's field equity technical team had failed to produce certain documentation to the Independent Petroleum Engineer ("IPE"). Ms. Giumarra asked Ms. Egger "to discuss this matter with your technical team and with Pat Godley." Since Pat Godley was then the ASFE, this letter alone establishes that Chevron's counsel did not believe that section B.4 of the Process Agreement restricted communications between Ms. Egger and the ASFE.

The drafters of the Process Agreement thus understood that section B.4 was limited to proscribing ex parte communications between the ASFE and certain defined persons - - the "DOE field equity technical team" - - concerning a particular subject - - "equity redetermination-related matters." They did not intend for it to inhibit or restrict communications between the ASFE and "DOE technical staff in Washington, D.C." Indeed, section B.3 of the Agreement clearly contemplated that the ASFE would receive "draft documents, * * * legal [and] technical advice" to which neither party's equity team would be privy.

Ms. Egger was never a member of the "DOE field equity technical team." On its face, therefore, section B.4 has no applicability to any communications between Ms. Egger and the ASFE. Your letter asserts, however, that Ms. Egger was "lead litigation counsel for the DOE equity team," "thereby necessarily becoming a part of that team for purposes of the Process Agreement." Both the premise and conclusion here are wrong.

Ms. Egger is DOE's Deputy General Counsel for Technology Transfer and Procurement, and formerly was DOE's Assistant General Counsel for Procurement and Financial Assistance. In these positions she is and has been the Department's lead attorney for contract-related issues, and during the Elk Hills sales process DOE's lead on many sales-related activities, including equity finalization. Because the Elk Hills equity finalization process involves the close-out of DOE's and Chevron's contractual relationship, Ms. Egger is the chief counsel to the concerned program office within the Department regarding this matter, that is, the office of the ASFE.

I think that when you review the record you will find that the parties have always understood that this has been Ms. Egger's role, and that the suggestion that she was perceived to be part of the DOE field equity technical team rather than the counsel for the program and the ASFE is belied by Chevron's own statements and conduct. To offer just a few examples of what the record reflects:

* Between May 29, 1998, and August 10, 1998, Ms. Giumarra and Ms. Egger exchanged a number of letters concerning "communications protocol" issues that Chevron had raised. In those letters, both Ms. Giumarra and Ms. Egger drew a distinction between the parties' "equity teams" and the "Owners." See, e.g., June 5, 1998, letter from Ms. Egger to Ms. Giumarra; July 17, 1998, letter from Ms. Giumarra to Ms. Egger (and the enclosure thereto). And both recognized that while Ms. Egger might speak <u>to</u> the DOE field equity technical team on behalf of the "Owner," that is, the ASFE, Ms. Egger spoke <u>for</u> the ASFE when speaking to Chevron. See, e.g., July 6, 1998, letter from Ms. Egger to Ms. Giumarra ("it was for this reason that the ASFE * * * gave instructions to both equity teams"). Indeed, Ms. Giumarra described Ms. Egger's proposal for resolving the "communications protocol" issues that Chevron had raised as "intended primarily to affirm the ASFE's authority." See August 10, 1998, letter from Ms. Giumarra to Ms. Egger.

* On October 30, 1998, Ms. Giumarra wrote to Ms. Egger to express concern that "DOE is planning to have a number of Washington personnel attend an interim meeting of the equity teams." Ms. Giumarra asserted that any DOE Headquarters personnel who attended a meeting where the "subjects to be covered * * * include technical, non-administrative items, which are the responsibility of the DOE and the Chevron equity teams, and not the Washington technical staff," should "be treated like members of" the equity team for purposes of section B.4 of the Process Agreement. Ms. Egger responded in a November 19, 1998, letter to William H. Taft, IV, Chevron's outside counsel, expressing "bewilderment" at the assertion that DOE Headquarters staff "is somehow transmogrified into members of the DOE field technical team." "We can appreciate the notion," she said, "that the DOE Washington technical staff, as advisors to the Assistant Secretary for Fossil Energy, must not communicate on



50

an ex parte basis with the DOE field equity team on equity redetermination-related matters." But the meeting they would be attending "was not to be an ex parte meeting," she pointed out. Ms. Egger then addressed "the premise that, unless the DOE Washington technical staff perform distinct functions from the DOE field equity team, then the DOE Washington technical staff would, in essence, become part of the DOE field equity team." "[T]he DOE Washington technical staff and the DOE field equity team perform quite discrete functions," she answered. DOE Headquarters staff "serve as staff advisors to the Assistant Secretary" whereas the DOE field equity team "develops and advocates the DOE equity position." Chevron's counsel found this explanation sufficient. In letters to Ms. Egger and the IPE dated December 11, 1998, Ms. Giumarra expressed "satisf[action] that ex parte communications between DOE Washington personnel and DOE's field equity team have not occurred, and will not occur in the future." And in conceding this point Ms. Giumarra once again demonstrated that she did not view Ms. Egger as someone who should "be treated like [a] member[ ] of" the DOE field equity technical team - - Ms. Giumarra's letter to the IPE invited it to "call Mary Egger" if it had any questions.

When you review the record you will find that Chevron clearly understood that Ms. Egger acted as counsel for DOE and the ASFE, not for the field equity team: Ms. Egger identified issues to be addressed by both equity teams (see June 15, 1998, letter from Gregory B. Thorpe to Cynthia A. Giumarra); Ms. Egger represented the ASFE before the Office of Hearings and Appeals; Chevron directed notice of third-party claims to Ms. Egger (see June 14, 1999, letter from Jeannette Garret to Ms. Egger); Ms. Egger was identified as a representative of "DOE HQ," not the DOE field equity team, in the Minutes of the regular conference calls (see, e.g., October 15, 1999, Minutes; September 7, 2000, Minutes), and Ms. Egger was referred to as "NPRC's general counsel" (September 28, 1999, Minutes) and "DOE's GC" (compare November 9, 1999, Minutes with November 16, 1999, Minutes).

Before leaving this point let me briefly respond to the matters referenced in your letter as supposedly supporting the view that Ms. Egger was identified with the DOE field equity technical team. If you consult Supplement 1 to ASFE Administrative Order No. 96-01, the so-called Legal Issues Protocol, you will see that legal issues, whether before the Independent Legal Advisor or the IPE, are the province of the "Owners," not the field equity technical teams. Similarly, if you consult sections B.1, B.2 and B.3 of the Process Agreement, you will see that scheduling issues are to be determined by the ASFE. Accordingly, Ms. Egger's role in connection with the legal and scheduling issues to which your letter refers was not "to act on behalf of the DOE equity team," as your letter states, but rather to represent the ASFE in fulfilling responsibilities that the Legal Issues Protocol and Process Agreement assigned to him. The parties regarded the legal teams and



51

legal issues separately from the technical issues handled by their respective equity teams, and indeed established an entirely distinct process to deal with legal issues.

The record is thus flatly inconsistent with an assertion that there has been some "dual role of the OGC" that has "stripped the parties' agreed-upon-procedures of any legitimacy." That would be a very serious charge, and I am confident that you will not endorse it when you have been more fully advised. DOE has scrupulously adhered to the terms and conditions of the equity finalization process, and will continue to do so. We similarly expect no less of Chevron Texaco.

Finally, I also am puzzled by your letter's assertion that the process for reviewing the ASFE's equity determination has somehow been compromised and should be abandoned. In the Process Agreement the parties stipulated that an equity determination by the ASFE would be reviewable by the Office of Hearings and Appeals to the extent that the ASFE departed from the Independent Petroleum Engineer's recommendations, and that "OHA's decision shall be final, binding and non-appealable." The ASFE's Stevens Zone determination followed the IPE's recommendations in all but two points, and Chevron has exercised its right to have OHA review one of those deviations. The point on which Chevron has sought OHA review involves a legal issue, and so, under the terms of the Process Agreement, OHA's review of the ASFE's decision will be "de novo," that is, OHA will address and decide the issue anew. Your letter does not allege any irregularity affecting OHA's decision-making process, or the IPE's for that matter. Accordingly, there is no apparent basis for reconsidering the process to which the parties agreed.

I hope that I have succeeded in allaying the concerns you expressed. If you still believe that a meeting would be useful, I would be happy to meet with you.

Sincerely,

Lee Liberman Otis
General Counsel

cc: Mark R. Maddox



52

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

202 887 4409/fax 1 202 887 4409
fspillman@akingump.com

April 2, 2004

Clerk
Office of Hearings and Appeals
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

Re: Case No. TEA-0001

Dear Sir or Madam:

Please find enclosed the original and one copy of Chevron USA Inc.'s reply brief in the above-referenced matter.

Please call me if you have any questions.

Sincerely,

C. Fairley Spillman

CFS/hpb

Encs.

cc w/encs.: Gregory B. Thorpe, Esq. (via fax)
Mary H. Egger, Esq. (via hand delivery)

53

DEPARTMENT OF ENERGY
OFFICE OF HEARINGS AND APPEALS

Case No. TEA-0001

# CHEVRON USA INC.'S APPEAL OF THE PRINCIPAL DEPUTY ASSISTANT SECRETARY FOR FOSSIL ENERGY'S DECISION FINALIZING PARTICIPATION PERCENTAGES IN PRODUCTION FROM THE STEVENS ZONE, NAVAL PETROLEUM RESERVE NO. 1

## REPLY BRIEF OF CHEVRON USA INC. ON THE FINAL EQUITY DETERMINATION FOR THE STEVENS ZONE OF THE ELK HILLS NAVAL PETROLEUM RESERVE

Gary D. Henderson
Assistant General Counsel
Chevron USA Inc.
North America Upstream
San Joaquin Valley Business Unit
Law Department
9525 Camino Media
Bakersfield, CA 93311
(661) 654-7174
(661) 654-7176 Fax

Donald B. Craven
Daniel Joseph
C. Fairley Spillman
Merrill C. Godfrey
Akin Gump Strauss Hauer & Feld, L.L.P.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4000
(202) 887-4288 Fax

TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................ iii

INTRODUCTION ........................................ 1

ARGUMENT ........................................ 2

I. THE UPC REQUIRES CONVERSION USING 1942 PRICES ........................................ 2

A. The UPC Contains Implied Terms, Including a Term Requiring Conversion of Mcfs of Gas to BOEs ........................................ 3

B. Because the Parties Fixed Ownership Percentages at Unitization (Subject to Redetermination), the Implied Basis for Conversion Uses 1942 Prices ........................................ 7

C. DOE's Retrospective Concept of "Fairness" is Not Related to the Mutual Commitments the Parties Undertook in 1944, But Rather Works Backwards From DOE's Current Perception of a Desirable Bottom-Line Outcome of the Bargain ........................................ 9

D. Use of "Btu Equivalency" Impermissibly Smuggles the Relative Current Market Values of Gas and Oil Into the UPC ........................................ 11

II. THE PARTIES DID NOT AGREE TO MAKE THE BASIS FOR CONVERSION SUBJECT TO REDETERMINATION ........................................ 13

A. Section 2's Redetermination Provisions Do Not Allow a Change in the Basis for Conversion ........................................ 14

1. The UPC Allows Only Redetermination Of Inaccurate Facts, Not A Change In Conversion Methodology ........................................ 15

2. Conversion Has Nothing to Do with "Sound Oil Field Engineering" ........................................ 16

3. The UPC Did Not Give the Engineering Committee Power to Revise Economic Terms in the Agreement ........................................ 17

B The Features of the UPC that Address Uncertainty Show that the Parties Did Not Agree to Place Their Bargain at the Mercy of Unknown Future Economic Fluctuations ........................................ 20

1. Variation in the Basis for Conversion Would Thwart the Parties' Efforts to Manage Uncertainty ........................................ 20

2. The Retroactive Nature of Redetermination Shows that the Basis for Conversion Must Be Based on Facts in Existence in 1942 ........................................ 21



55

C. The Secretary's Authority In Finalization Is Derivative Of The Redetermination Process And Does Not Include The Right To Revise The Basis For Conversion ........ 22

1. The Secretary is Bound to Uphold the UPC ........ 22

2. A Unilateral Authority to Alter the Economics of the Parties' Bargain Would Violate the Requirement of Mutuality ........ 23

III. THE PARTIES' PAST POSITIONS DURING THE FINALIZATION DISPUTE *ARE IRRELEVANT TO THE MEANING OF THE UPC* ........ 24

IV. ANY DEVIATION FROM THE PARTIES' AGREEMENT TO CONVERT USING 1942 PRICES SHOULD AT A MINIMUM REFLECT HISTORICAL REALITY ........ 28

CONCLUSION ........ 29



56

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562 (Fed. Cir. 1987) .......5

*Anvil Min. Co v. Humble*, 153 U.S. 540 (1894).......5

*Barco Urban Renewal Corp. v. Housing Auth*, 674 F.2d 1001 (3d Cir. 1982) .......3

*Clark v Mayor, Aldermen, & Common Council of the City Of Washington*, 25 U.S. 40 (1827).......6

*Floss v. Ryan's Family Steak Houses. Inc.*, 211 F.3d 306 (6th Cir. 2000) .......23

*Gray v American Express Co.*, 743 F.2d 10 (D.C. Cir. 1984).......24

*Mapco, Inc. v Pioneer Corp.*, 615 F.2d 297 (5th Cir. 1980).......6

*Nash v. Towne*, 72 U.S. 689 (1866) .......5

*Nat'l Audubon Soc. v Watt*, 678 F.2d 299 (D.C. Cir. 1982).......4, 5

*Nolte v. Hudson Nav. Co*, 16 F.2d 182 (2d Cir. 1926).......11

*Sacramento Nav Co. v Salz*, 273 U.S. 326 (1927) .......3, 5, 7

*Standard Oil Co. v. United States*, 685 F.2d 1322 (Ct. Cl. 1982) .......11, 17

*Travelers Indem Co. v. Holman*, 330 F.2d 142 (5th Cir. 1964).......6

*Union Pac. R.R. Co. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 549 F.2d 114 (9th Cir. 1976).......3

*United States v. Babbitt*, 95 U.S. 334 (1877).......5

*United States v. Standard Oil Co.*, 545 F.2d 624 (9th Cir. 1976).......18

*United States v. Winstar Corp.*, 518 U.S. 839 Chevron Op. Br. at 13.......22, 24

*W & G Seaford Assocs., L.P. v. Eastern Shore Mkts., Inc.*, 714 F. Supp. 1336 (D. Del. 1989) .......3

## STATE CASES

*Danby v. Osteopathic Hosp. Ass'n*, 101 A.2d 308 (Del. Ch. 1953) ........ 3

## DOCKETED CASES

*In re Chevron USA Prod. Co.*, OHA No. VEA-0010 (Oct. 26, 1998) ........ 17, 22

## STATUTES AND REGULATIONS

Pub. L. No. 78-343 , 58 Stat. 280-81 (June 17, 1944) ........ 28

10 C.F.R. § 1003.34 ........ 31

10 C.F.R. § 1003.9(b), 1 ........ 31

## MISCELLANEOUS

6 Williams & Meyers Oil and Gas Law § 921.8 (2002) ........ 9

6 Williams & Meyers Oil and Gas Law § 910 (2002) ........ 8

1 Williston on Contracts § 43 ........ 24

11 Williston on Contracts § 31:7 ........ 3

Corbin on Contracts § 24.16 ........ 6, 15

Restatement (Second) of Contracts § 202(4) ........ 6



58

DEPARTMENT OF ENERGY
OFFICE OF HEARINGS AND APPEALS
Case No. TEA-0001

# REPLY BRIEF OF CHEVRON USA INC. ON THE FINAL EQUITY DETERMINATION FOR THE STEVENS ZONE OF THE ELK HILLS NAVAL PETROLEUM RESERVE

## INTRODUCTION

Chevron USA Inc. ("ChevronTexaco") in its opening brief demonstrated that the parties contracted to use 1942 prices to convert gas to oil under the Unit Plan Contract ("UPC") for purposes of determining ownership percentages in the Reserve. ChevronTexaco showed also that the UPC by its terms allows redetermination of ownership *only* to correct inaccuracies regarding the quantities of recoverable hydrocarbons under each party's lands.

In contravention of contract law and of the terms of the UPC, the PDASFE ("Secretary") assumed without explanation that the UPC gave him, as DOE's representative, unilateral authority to reallocate the fruits of the parties' contract in any manner he deemed "fair and equitable." DOE argues likewise.[1] The unilateral power DOE seeks as a contracting party to change the economic basis of the agreement after the fact would be extraordinary even if expressed in the UPC. That such a power is neither expressed nor implied in the UPC is evident, however, when the most basic principles of interpretation are applied

OHA should construe the language of the UPC in light of the circumstances from which it arose, and should conclude that the parties implicitly agreed to convert gas to oil using current prices at unitization—November 20, 1942—without leaving that term open to unilateral revision.

[1] The PDASFE's decision was supposed to be independent and impartial. However, after ChevronTexaco filed its opening brief in this appeal, it learned that the PDASFE's decision was written with the undisclosed involvement of DOE lawyers, including DOE counsel of record here. This *ex parte* involvement in the drafting of the PDASFE's decision is being addressed through those channels with authority over the matter, and is not at issue here. But because there is no meaningful distinction between briefs drafted by DOE and the PDASFE's decision, references herein to "DOE" or "the PDASFE" (or "Secretary") are each intended to be references to the other as well, except as otherwise may be compelled by context.



59

## ARGUMENT

### I. THE UPC REQUIRES CONVERSION USING 1942 PRICES

This is a contract dispute. The parties agree that the UPC governs the rights at issue in this appeal.[2] Chevron USA Inc. ("ChevronTexaco") has appealed to OHA because DOE has interpreted the UPC incorrectly.[3] To resolve this dispute, OHA must use, exclusively, legal principles of contract interpretation—which are of course very different from the rules for review of DOE actions taken pursuant to some DOE regulatory or administrative authority.

DOE acknowledges the relevance of contract law, although its actual references to that law are sparse and ill-founded. *See* Answering Brief of U.S. Department of Energy ("DOE Br.") at 27-28. Significantly, the decision DOE defends does not purport to apply contract law at all. The Secretary's decision does not refer to a single principle of contract interpretation and does not cite a single case involving the law of contract. Not incidentally, the decision wanders through a subjective "fairness" analysis (as though setting policy or interpreting a regulation) that despite its rhetoric about "agreement" violates the most basic contract law principles. However, with the aid of the controlling law—contract law—analysis of the UPC's implications regarding conversion is straightforward.

---

[2] The UPC is Exhibit 2 to Chevron USA Inc.'s Opening Brief. All citations herein to Exhibits are to those attached to the Opening Brief of Chevron USA Inc., except for references to DOE's exhibits, which are noted.

[3] OHA's authority to decide this appeal comes from the Equity Process Agreement. *See* Agreement Regarding Equity Redetermination Process (May 19, 1997) (Exhibit 1) at ¶¶ B.7.-B 9., B 11. DOE attempts to limit the scope of OHA's review here to one issue: whether the PDASFE was required by the UPC to use 1942 prices in conversion. *See* DOE Br. at 5-6. As shown in Chevron USA Inc.'s opening brief and in this reply brief, ChevronTexaco agrees that this is the issue OHA needs to resolve (and urges an emphatic "yes"). However, to the extent DOE suggests that other aspects of the PDASFE's decision are entitled to deference in any respect, that suggestion is erroneous. The Equity Process Agreement provides that the PDASFE's decision regarding any legal issue "processed by NSA pursuant to instructions from the Independent Legal Advisor . . . shall be reviewed 'de novo' by OHA . . ." Agreement Regarding Equity Redetermination Process ¶ B.11

### A. The UPC Contains Implied Terms, Including a Term Requiring Conversion of Mcfs of Gas to BOEs

DOE's brief demonstrates a far-reaching misapprehension of the scope of the parties' 1944 agreement and of the significance of 1942 prices in that agreement. DOE impugns what it calls "Chevron['s] . . . argument by inference," DOE Br. at 23, but the true target of DOE's disdain is fundamental contract law. Inferred assumptions and other implied additions are common features of contract interpretation. As the Supreme Court has explained,

> [A] contract includes, not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made.

*Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 329 (1927); *see also Union Pac. R.R Co. v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 549 F.2d 114, 116-17 (9th Cir. 1976) ("Most contracts include implied conditions that are indispensable in effectuating the intentions of the parties."). Contract interpretation, including the identification of implicit terms, is emphatically *not* a "remaking" or "revision" of the bargain, but a respect for the full scope and true basis of the bargain. Terms are "implied in contract, not *because* they are reasonable, but because they are necessarily involved in the contractual relationship, such that the parties must have intended them and must have failed to express them only because of sheer inadvertence or because they are too obvious to need expression." 11 *Williston on Contracts* § 31:7 (4th ed. updated 2003) (emphasis added). "They are implied only because they are necessary to give the contract the effect which the parties . . . presumably would have agreed on, if, having in mind the possibilities of the situation which has arisen, they had contracted expressly in reference thereto." *W & G Seaford Assocs., L.P. v. Eastern Shore Mkts., Inc.*, 714 F. Supp. 1336, 1346 (D. Del. 1989) (quoting *Danby v Osteopathic Hosp. Ass'n*, 101 A.2d 308, 313-14 (Del. Ch. 1953)); *accord, e.g., Barco Urban Renewal Corp. v. Housing Auth.*, 674 F.2d 1001, 1007 (3d Cir. 1982) ("When



61

parties to a contract in a commercial setting fail to specify terms that are essential to a determination of their respective legal obligations, courts imply the omitted terms."); *Nat'l Audubon Soc. v. Watt*, 678 F.2d 299, 310 (D.C. Cir. 1982) (same)

Notwithstanding DOE's denunciation of inferred contractual terms (*see* DOE Br. at 23-24, 28), and its incongruous statement that the UPC is "unambiguous" regarding conversion (DOE Br. at 28), DOE's brief abounds with arguments about what the UPC implies regarding conversion.[4] Such inconsistency demonstrates DOE's confusion as to the relevant legal issue here. The issue is not that the UPC contains references to conversion that may or may not be ambiguous. There are no such contract terms. The issue is that the parties, having agreed that conversion was necessary, did not explicitly mention conversion in the written document *at all*. When DOE argues that the UPC "unambiguously" makes conversion subject to redetermination in the face of its admission that the UPC does not even mention conversion, not only is it making a substantive error (for reasons discussed later in this brief), but it is arguing inferentially, contrary to its professed invocation of the "plain meaning rule."

Likewise, DOE misconstrues the boundaries of the parties' contract here. Certainly, a court will not go outside the parties' agreement; therefore it goes without saying that "courts will not write contracts for the parties," will not "supply missing terms" the parties never agreed to, and will not include "something not present in the original agreement." DOE Br. at 28. But none of these maxims, nor the "plain meaning rule," allows a court to ignore what *was* agreed to by the parties: a court may not fail to infer essential terms that are *part of* the agreement

[4] *See, e g.* DOE Br. at 27 ("In light of all these factors, the absence of a reference to use 1942 prices, or to any specific conversion methodology, can only be interpreted to mean that the parties left this decision to the discretion of the decision maker."); *id.* at 28 ("extrinsic evidence can, and should, be used to discover what methodologies meet the 'sound oil field engineering principles' standard"); *id* at 51 ("the use of a conversion factor is necessary" because "[t]he UPC initially established a single equity percentage for each zone").

evidenced by the written document. "What is implied in a statute, will, deed, or contract is as much a part of it as what is expressed." *United States v. Babbitt*, 95 U.S. 334, 336 (1877).[5]

Thus, OHA must discern "all such implied provisions" necessary "to effectuate the intention of the parties" in light of "the language of the contract *and* the circumstances under which it was made." *Sacramento Nav. Co.*, 273 U.S. at 329. The circumstances of contracting must be taken into account:

> Courts, in the construction of contracts, look to the language employed, the subject-matter, and the surrounding circumstances. **They are never shut out from the same light which the parties enjoyed when the contract was executed**, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, **so as to view the circumstances as they viewed them**, and so to judge of the meaning of the words and of the correct application of the language to the things described.

*Nash v. Towne*, 72 U.S. 689, 699 (1866) (emphasis added); *accord Nat'l Audubon Soc.*, 678 F.2d at 307 (an agreement "must be interpreted in light of the circumstances under which the agreement was made"); *Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1565 (Fed. Cir. 1987) (same). And in deciding how a contract applies to changed circumstances, "the *original* intention of the parties *must* be considered," because "'in the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intention of the parties.'" *Alvin*, 816 F.2d at 1565 (emphasis added) (quoting *Williston on Contracts* § 602 (3d ed. 1961)).

As noted above, DOE effectively concedes that any correct interpretation of the UPC must go beyond the face of the agreement, because conversion, though necessary, is not explicitly mentioned. DOE recognizes that because the UPC expresses the parties' intention to have a single ownership percentage for each zone, and to include not only oil but also gas in that

[5] *See, e.g., Sacramento Nav. Co.*, 273 U.S. 326; *Anvil Min. Co. v. Humble*, 153 U.S. 540, 549 (1894) (breaching party liable for lost profits damages "where, from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into").

percentage, the UPC contains an "indispensable" implied requirement that Mcfs of gas underlying the parties' respective lands on November 20, 1942 be converted to "BOEs" (barrels of oil equivalent) at unitization. *See* DOE Br. at 51-52 (conversion of gas to BOEs is "necessary" under the UPC).

DOE also concedes the relevance to contract interpretation of the parties' course of performance, by relying on the parties' "continued . . . practice of using a single equity percentage for a zone" during redeterminations. DOE Br. at 52. The parties' course of performance under the UPC "is an indicator of what the parties intended *at the time they formed their agreement*. It is an expression by the parties of the meaning that they gave to the terms of the contract that they made." *Corbin on Contracts* § 24.16 at 136 (emphasis added). A court's reliance on the parties' course of performance "is a logical extension [to] a post-contract point of time of the familiar principle that in contract interpretation, the court must put itself in the position of the parties." *Mapco, Inc. v. Pioneer Corp.*, 615 F.2d 297, 301-02 (5th Cir. 1980) (quoting *Travelers Indem. Co. v Holman*, 330 F.2d 142, 149 (5th Cir. 1964)); *Clark v. Mayor, Aldermen, & Common Council of the City Of Washington*, 25 U.S. 40, 59-63 (1827) (Marshall, J.) (reviewing "all the circumstances of the case," and analyzing at length conduct under a contract to determine whether the contract relieved one of the parties of liability).[6] Accordingly, the parties' conduct that follows most closely the execution of the contract has the greatest weight in its interpretation. *See* Opening Brief of Chevron USA, Inc. ("Chevron Op. Br.") at 28-30 (citing cases).

[6] The parties' course of performance "is given great weight in the interpretation of the agreement." Restatement (Second) of Contracts § 202(4); *see id* cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."), UCC § 2-208 cmt. 1 ("The parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was.").



64

These same principles allow OHA to discern not only that the parties agreed to convert to a single ownership percentage for each zone, but also to discern the methodology the parties agreed to use in calculating that conversion: use of 1942 prices. This is the only methodology that fits with the rest of the bargain embodied in the UPC.

**B. Because the Parties Fixed Ownership Percentages at Unitization (Subject to *Redetermination*), *the Implied Basis for Conversion Uses 1942 Prices***

As just shown, DOE and ChevronTexaco agree that for purposes of determining ownership, each party contributed to the Unit the gas underlying its land as of November 20, 1942 as BOEs. And DOE does not contest that, in "the circumstances under which [the contract] was made" (*Sacramento Nav. Co.*, 273 U.S. at 329), the only available basis for conversion of gas to BOEs as of that date was price.[7] *See* DOE Br. at 26. Thus, the parties did not have to be explicit in the UPC about the basis for conversion because that basis was obvious, there concededly being no alternative.

Therefore, it is not surprising that the first evidence of conversion, from the 1949 Shallow Oil Zone redetermination, shows that the parties used 1942 prices, not 1949 prices. DOE concedes that this was at least consistent with the UPC. *See* DOE Br. at 4; *id.* at 31 n.63. DOE argues that once fixed, the basis for conversion *could* be changed in redetermination—that is, that the Engineering Committee *could* have changed it in 1949 to a ratio based on 1949 prices, but elected not to. That argument is discussed at length later in this brief. However, DOE concedes that the basis for conversion, like the parties' ownership percentages, did not fluctuate automatically, day to day, based on variations in gas and oil prices.

[7] Of course, in the U.S. economy, the presumptive method for valuing one thing in relation to another is price.

Fixing ownership percentages is a central element of any unitization agreement. *See* 6 *Williams & Meyers Oil and Gas Law* § 921.8 (2002) ("[A]llocation of unit production . . . . [is] the essence of the [unitization] agreement . . . ."); *id.* § 910 ("The principal obstacle to full, voluntary agreement [regarding unitization] is the problem of dividing the proceeds of production."). Thus, a critical feature of the UPC was to fix ownership percentages based on the facts that existed together at unitization, even though those facts might take time (decades even) to determine accurately.[8] Inasmuch as section 2(d) fixes ownership percentages using the geologic facts as they existed on November 20, 1942, those percentages necessarily derive from the *economic* facts as they existed on that date as well. And accordingly, just as ownership did not fluctuate day to day, no one has ever suggested that redetermination procedures could be invoked whenever gas prices changed in relation to oil prices, by the advantaged party's claim that a "new or more accurate methodolog[y]" (DOE Br. at 26) had been "discovered." Yet that scenario is necessarily endorsed by DOE's argument here that the basis for conversion is subject to redetermination. That is no fixing of equity; it is chaos.

The UPC attempts to allocate ownership based on a goal of perfect knowledge regarding hydrocarbons as they existed on November 20, 1942. Who had what hydrocarbons when the parties put them all into the common pot in exchange for a single percentage? To the parties, unitization was like starting a business together and distributing stock based on the value of the assets each party brings to the business at startup. Putting everything into that common pot is a requirement of unitization; without that, the business cannot succeed. Thereafter, all common stock is of course valued equally.

---

[8] Had the parties been more confident in their knowledge of the reservoirs at the time the UPC was entered into, they would have followed the standard practice of dividing ownership permanently—using, necessarily, then-current economic facts. *See* 6 *Williams & Meyers Oil and Gas Law* § 921.8 (2002) (a unit agreement usually "describ[es] the premises . . . and set[s] forth the agreed participation of each such tract in unit production").



66

### C. DOE's Retrospective Concept of "Fairness" is Not Related to the Mutual Commitments the Parties Undertook in 1944, But Rather Works Backwards From DOE's Current Perception of a Desirable Bottom-Line Outcome of the Bargain

The parties always interpreted the UPC to include conversion to BOEs as an integral, necessary step in fixing ownership as of 1942. As DOE admits, **it agreed to fold gas into a single ownership percentage as of a date when there was no market for gas and a barrel of oil was worth 18 times more than an Mcf of gas.** *See* DOE Br. at 49. This was hardly irrational; the relative value of gas, like any commodity, could have stayed roughly the same, or could have dipped below 1942 prices. Each party accepted the risk that folding gas and oil into a single ownership percentage might be either more or less advantageous to it than separate percentages for gas and oil would have been. (Commodity markets allocate such risks all the time in sales of futures and the like.) But now, fifty years after DOE put its eggs into the batter, with the benefit of hindsight, DOE does not like the way the parties agreed to divide the cake. DOE wants extra cake because the price of eggs has gone up.

In DOE's discussion of what it calls "fairness," DOE assumes the conclusion, instead of evaluating the circumstances in which the parties contracted. DOE argues that applying 1942 prices is unfair, and cannot be "what the parties intended," (1) because the value of gas in 1942, compared to subsequent years, was "imbalanced " and (2) "in light of the vast quantities of natural gas which were discovered in the Stevens Zone after 1942." DOE Br. at 50. It is hard to imagine more purely hindsighted, revisionist arguments. DOE argues as though the parties in 1944 could have said, "We can't fix ownership using 1942 prices, see how imbalanced they are! And besides, there are vast quantities of gas in the Stevens Zone we haven't discovered!" Moreover, DOE concedes that in subsequent redeterminations the parties used 1942 prices, which were even then, in that time's hindsight, "imbalanced," and that in doing so the parties

complied with the UPC. *See* DOE Br. at 4. Though DOE avoids explaining why the parties acted in this manner, instead of using then-current prices, it is no mystery. Fixing ownership using 1942 conditions, both economic and geologic, was central to the UPC.

The folly of DOE's position is nowhere more evident than in its argument that "there is no industry precedent for applying an almost sixty-year old price ratio" to convert gas to oil. DOE Br. at 42. There most certainly is such precedent; anyone comparing the value of crude oil to the value of gas *in its possession as of 1942* used 1942 prices.[9] DOE's current-price argument backfires, for DOE forgets that the relevant gas is not the gas under the parties' lands in 1998, but the gas under their lands in 1942. Conversion to BOEs is effective "as of November 20, 1942" for the gas present on that day. (To underscore the point: much of this gas no longer existed in 1998.) It is DOE's position that lacks precedent—no one has ever valued 1942 gas using 1998 prices. Similarly, DOE's characterization of "current price" as a "new" methodology and a "later-discovered scientific method[]," DOE Br at 26, is preposterous. It is the same methodology—price—applied using inputs from the wrong point in time.

For these reasons, DOE's argument that most of the production in the Stevens Zone occurred after 1976 is irrelevant. *See* DOE Br. 48-49. The parties did not agree to redetermine ownership at some later point based on what prices gas and oil fetched when they were eventually produced. Under the UPC, the time of production is irrelevant to the parties' ownership percentages.

Indeed, as described in ChevronTexaco's opening brief, the Navy entered into the UPC on behalf of the United States to preserve for the United States the hydrocarbons then under its

---

[9] It must be remembered that in the vast majority of voluntarily formed units, the equity percentages were and are fixed at the time of unitization. *See supra* n.7 Because the only way to value gas relative to oil in 1942 was by then-current prices, any unit formed at that time that converted gas to oil did so using 1942 prices – for the entire duration of the unit.

lands. The Navy's primary goal was to fix ownership *independent of production*. "The primary objective of the [UPC] is the conservation of oil in the ground rather than the regulation of production." *Standard Oil Co. v. United States*, 685 F.2d 1322, 1327 (Ct. Cl 1982) (relying on stipulated facts agreed to by both parties to the UPC). The UPC did not leave the government's ownership interest in the Reserve to the vagaries of future markets; to do so would have been intolerable to the Navy. The only way to fix ownership independent of future economics was to use then-current, known economic conditions. That is why the Navy always interpreted the UPC as fixing ownership using 1942 prices for conversion. Now, long after the Navy achieved its major purpose in entering into the UPC, its successor, DOE, seeks to reinterpret the UPC in a manner that would have undermined the Navy's major purpose.

In any event, if DOE, in pursuit of profit maximization, thought at any point that in retrospect its gas was not sufficiently taken into account, DOE had explicit power in the UPC to exit the unit agreement and seek to enter another one ("market-out" protection). *See* UPC § 11 (Exhibit 2). But DOE never used it. This strongly suggests that DOE and its predecessor accepted the validity of the interpretation just explained. Furthermore, where a term is not explicitly provided in the agreement, the parties "must be content with the interpretation which they put upon [the agreement] immediately thereafter, and to which they continuously adhered. . . ." *Nolte v. Hudson Nav. Co.*, 16 F.2d 182, 184 (2d Cir. 1926) (Learned Hand, J.). DOE, like its predecessor, decided to maintain the benefits it had under the UPC. Therefore, as is in the nature of contracts, it must live with the other features of the agreement.

### D. *Use of "Btu Equivalency" Impermissibly Smuggles the Relative Current Market Values of Gas and Oil Into the UPC*

The parties agreed to unitize their interests when gas was worth far less than it is today, and therefore they implicitly agreed that gas would be counted less in ownership than might be



69

the case were unitization to occur today, over fifty years later. DOE's current-price argument gets the answer backwards, but at least it addresses the issue at hand: whether the relevant time frame for conversion is 1942 or the mid 1990s. By contrast, DOE's advocacy of Btu-based conversion avoids the issue entirely. This argument pretends to seek a relationship that is outside space and time. However, Btu-based conversion is just one way to describe current market conditions, not some deep scientific truth about the "physical properties" of gas and oil. It is not as though Btu equivalency was recently "discovered"; rather, it is only recently that the relative prices of gas and oil have come to be correlated to their relative Btu content. DOE would not advocate "Btu equivalency" if it were not a proxy for current price.[10]

The great, irrelevant virtue DOE uses to justify valuing Btus of gas as equivalent to Btus of oil is that "energy *content* is a physical attribute of the different hydrocarbon types and is stable over time." DOE Br. at 45 (emphasis added). What matters here is not the Btu *content* of gas and oil over time, but the relative *value* of the Btu content of gas and oil over time—how many Btus of gas is worth a Btu of oil. That most certainly is *not* constant over time, as DOE is acutely aware. If DOE were correct, gas and oil would always have been at their current relative value—which they were not. That one can measure a quantity of gas and a quantity of oil that have the same energy content says nothing about their relative values at any given time and place.[11]

Because the Btus in the gas DOE contributed to the Unit were worth less in relation to oil at unitization than they are today, DOE rightly got less equity than it would get if unitization

---

[10] Use of Btu equivalency in financial reports to investors is justified *solely* as a reflection of hydrocarbons' *current* relative values.

[11] If we assume, for example, that the issues surrounding transportation of liquefied natural gas are comprehensively resolved, and large-scale importation of LNG occurs as a result, then the comparative values of oil and gas might well change again.

were to occur today. Use of a Btu conversion would impermissibly graft the current relative valuation of gas and oil onto the bargain the parties made in 1944. *See* SPEE Monograph 1 (2d ed. Oct. 1998) (excerpted as Exhibit 38) at 30 (describing Btu equivalency as a permissible, but less favored, *substitute* for prices).

## II. THE PARTIES DID NOT AGREE TO MAKE THE BASIS FOR CONVERSION SUBJECT TO REDETERMINATION

DOE does not seriously dispute that following execution of the UPC, as gas became more important to the Unit, the parties nonetheless understood the UPC to provide for conversion using a ratio comparing the 1942 prices of gas and oil. Or, at least DOE has no serious basis to dispute this.[12] The bulk of DOE's argument aims at a different point. Recognizing that ownership percentages, though fixed, could be redetermined by the Engineering Committee, DOE argues that the parties implicitly agreed that *basis for conversion* could be redetermined (since it is a part of the equity calculation). Whether the UPC includes such an implied

---

[12] For the first time, DOE argues in its response brief that in 1947 the Engineering Committee applied a conversion ratio of 1:1 *See* DOE Br at 29. That is false There was no such conversion. DOE misleadingly cites an Engineering Committee report dated July 1, 1947 that contains an extensive discussion regarding the basis for the selection of oil-field weighting factors. As the report explains, these weighting factors accounted for "production and recovery characteristics" and "structural considerations" regarding the hydrocarbons in the Stevens Zone The final paragraph of this explanation discusses Section 26-2, where there was insufficient data to do any such weighting analysis.

> Application of a weighting factor of less than unity was not applied at this time to the indicated volume of gas-bearing sand in Section 26-Z because:
>
> 1. The position of the gas-oil interface is not known
>
> 2 The zone has not yet been produced.
>
> 3. A relatively small volume of sand is involved.

Participating Percentages Stevens Zone as Revised July 1, 1947, attached to Letter from L Stone (O'Melveny & Myers) to G Breznay (OHA) dated Jan. 16, 2004. In the context described (which DOE excises), it is as clear as crystal that the Engineering Committee was simply indicating that it had insufficient data about the hydrocarbons in Section 26-Z to evaluate "the production and recovery characteristics" and "structural considerations" necessary for weighting. First, it could not tell how much gas there was because it could not tell where oil ended and gas began; second, there was no production data, and third, the quantity of gas was not significant enough to merit immediate concern.

agreement to allow a change in the basis of conversion away from 1942 prices is the point on which OHA's decision must turn. The Secretary assumed the answer to this question without attempting any interpretation of the UPC. The entirety of his treatment consists of an unexplained, illogical assumption:

> Neither the parties nor [the] Congress [that enacted the authorizing legislation for the UPC] appear to have contemplated the need for conversion and thus did not provide any guidance on the conversion methodology. This issue appears to have been left to the policy formation and dispute resolution mechanisms set forth in the UPC.

Decision (Exhibit 18) at 18. Consistent with his wholesale avoidance of contract law, the Secretary did not examine those contractual "mechanisms" to determine whether they covered "[t]his issue." DOE recognizes the void and attempts to fill it. But as DOE concedes, redetermination concerns only "the parties' respective *physical shares as of 1942*." DOE Br. at 3. And as OHA has previously held, "[t]he UPC provided for redetermination of equity interests as the parties gained additional knowledge *of the underlying geology*." *In re Chevron USA Prod. Co.*, OHA No. VEA-0010 (Oct. 26, 1998) (Carneros Zone decision).

**A. Section 2's Redetermination Provisions Do Not Allow a Change in the Basis for Conversion**

There is no mention in the UPC of a power to go beyond a redetermination of "underlying geology" to a revision of the basis for conversion. To infer such a power would contradict the language of the UPC and would undermine the parties' evident purposes at contract formation.

72

1. <u>The UPC Allows Only Redetermination Of Inaccurate Facts, Not A Change In Conversion Methodology</u>

Section 2(b) allows revision only when one or more of five circumstances are present.[13] The first four explicitly concern the correction of geologic facts regarding the location or quantity of hydrocarbons in the Unit on November 20, 1942. Therefore, DOE relies exclusively on the fifth factor, which allows redetermination for "[a]ny condition, fact, or circumstance which will aid in a more accurate determination of [ownership] percentages as of November 20, 1942." *See, e.g.*, DOE Br. at 23, 26. Under the maxim of contract interpretation *ejusdem generis* ("of the same kind or character"), when a list consists of items having a specific and particular meaning and includes a final, more general term, the presumption is that the parties "intend that the general term include only the type of items specified." *Corbin on Contracts* § 24.28 at 309-10 & n.594. Such final, "catchall" terms are not interpreted to be so general as to render superfluous the specificity of the previously listed items. Applying this maxim here, the most natural reading of section 2(f)(5) limits it to a revision of inaccurate facts concerning the location or quantity of hydrocarbons underlying the parties' respective lands "as of November 20, 1942."[14]

---

[13] Those five circumstances are:

(1) The presence, as of November 20, 1942, of commercially productive oil and/or gas bearing formations extending beyond the Estimated Limiting Line of Commercial Productivity for any zone;

(2) The absence or exhaustion, as of November 20, 1942, of commercially productive oil and/or gas bearing formations within the Estimated Limiting Line of Commercial Productivity for any zone;

(3) A variation, as of November 20, 1942, from the acre-feet of commercially productive oil and/or ags bearing formations previously estimated to be contained within the Estimated Limiting Line of Commercial Productivity for any zone;

(4) A variation, as of November 20, 1942, from the acre-feet of commercially productive oil and/or gas bearing formations previously estimated to underlie the respective lands of Navy and Standard; or

(5) Any condition, fact or circumstance which will aid in a more accurate determination of [equity] percentages as of November 20, 1942[.]

[14] Even if this notion were expanded to include location, quantity, *or value*, it would not help DOE because the facts—economic or physical—had to be facts describing the situation "as of November 20, 1942."

73

More important, the language DOE relies on *excludes* any change in the basis for conversion: redetermination is limited to facts "which will aid in a *more accurate* determination of [ownership] percentages *as of November 20, 1942*." Conversion has nothing to do with "accura[cy]." Implicit in any conversion ratio, price-based or otherwise, is an assessment of the *relative* values of gas and oil. That relative values change over time according to varying *economic* conditions does not make previous values "inaccurate." Although gas is worth more now than it used to be, that does not mean gas was priced "inaccurately" in previous years, or that the ratio of oil and gas prices in the past was "inaccurate." The only way conversion can be "accurate" or "inaccurate" is in the *calculation* of the specific numerical value. For example, in the 1949 Shallow Oil Zone redetermination the Engineering Committee's examination of 1942 prices yielded a ratio of 15:1; but in the 1957 Shallow Oil Zone redetermination, the Committee further researched 1942 prices and revised the ratio to 13:1. *See* Exhibits 5, 6, 11, 12. By contrast, use of 1996-98 prices (or Btus as a proxy for those prices), instead of 1942 prices, to convert gas to oil does not "aid in a more accurate determination of [ownership] percentages as of November 20, 1942." DOE's reading would nullify this contractual requirement and allow redetermination for "[a]ny condition, fact or circumstance."

2. Conversion Has Nothing to Do with "Sound Oil Field Engineering"

Likewise, contrary to DOE's argument (*see, e.g.* DOE Br. at 22), the relative value of a given quantity of oil and gas is not governed by "sound oil field engineering principles" any more than by the laws of physics. "Sound oil field engineering" in the UPC refers to the engineering involved in estimating the quantities, recoverability, and physical properties of the subsurface hydrocarbons in an "oil field." *No* basis for conversion—price, Btu, or any other mathematical calculation of equivalence—involves "oil field engineering," unless that term were

absurdly to mean only multiplication and division of numbers having something to do with oil fields (as DOE apparently argues). Use of prices to convert, as DOE concedes is appropriate, requires reference to published figures, not technical analysis of oil field conditions.[15]

3. <u>The UPC Did Not Give the Engineering Committee Power to Revise Economic Terms in the Agreement</u>

Section 2 delegates the redetermination process to the Engineering Committee. Like the Operating Committee that oversaw it, the Engineering Committee was composed solely of engineers appointed by the parties. *See* UPC §§ 2(a)(3), 3(b) (Exhibit 2). In construing the role of the Operating Committee under the UPC, the Court of Claims has already held that such committees have no authority to determine or revise terms such as the basis for conversion:

> Both members of the Operating Committee must be experienced engineers. There is nothing in the contract to indicate that the parties intended to commit to those individuals' authority the resolution of disputes concerning the interpretation and application of the contract. The question [in dispute] **does not require the application of engineering skills.** It involves the interpretation of the contract to determine the basis for setting Standard's entitlement to oil from the Reserve. **This is a question ordinarily decided by laywers and judges, not engineers.**
>
> . . . . If the parties had intended to require that disputes over the meaning and application of the contract were to be submitted to the Operating Committee, presumably they would have explicitly so provided. We think that **the Operating Committee's authority was intended to extend only to determining engineering and management issues relating to the operational problems of the Reserve.**

*Standard Oil Co. v. United States*, 685 F.2d 1322, 1330-31 (Ct. Cl. 1982) (emphasis added); *see also In re Chevron USA Prod. Co.*, OHA No. VEA-0010 (Oct. 26, 1998) (Cameros Zone

[15]The other references to "sound oil field engineering" in the UPC also concern technical determinations of oil field conditions. *See* UPC § 3(b)(2) (Exhibit 2) ("the Operating Committee shall . . . [d]etermine the rate at which each well should be produced in accordance with sound oil field engineering practices"); UPC § 3(b)(4) ("the Operating Committee shall . . . [r]equire the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the Reserve")

decision) (the UPC gave the Navy "control over decisions related to the Unit" only so that it could "conserve oil for national defense"). The issue here with regard to the Engineering Committee's authority is indistinguishable. *See United States v. Standard Oil Co.*, 545 F.2d 624, 628 (9th Cir 1976) (the Engineering Committee was established "to provide *technical* advice and make certain specified determinations *based upon petroleum engineering data*") (emphasis added) (quoting the stipulated facts submitted by both parties to the UPC).[16]

In contravention of this settled law, the Secretary opined that "the agreement was [for the Engineering Committee] to address this issue [the basis for conversion] anew in each equity redetermination."[17] Decision (Exhibit 18) at 20 (cited in DOE Br. at 32). While DOE defends this conclusion, DOE both fails to address a court decision controlling on this point and offers no evidence of any such agreement. Instead it spins a tale based on its preferred inferences from the 1980 Engineering Committee meeting minutes. There are at least three independent reasons that this position must be rejected.

First, as ChevronTexaco explained in its opening brief, discussions alone, unaccompanied by any change in position, have no weight in the interpretation of the UPC. *See* Chevron Op. Br. at 31 and authorities cited there. And of course, in accordance with the Court of Claims' holding quoted above, the Engineering Committee could not bestow upon itself authority that the UPC did not give to it.

[16] Because the UPC reserved to DOE "market-out" protection in case economic or other conditions departed unacceptably from its assumptions, there is no basis for implying a redundant, broader power for DOE to impose its changing views regarding the conversion process unilaterally and retroactively through the "dispute resolution process." *See* UPC § 11 (Exhibit 2).

[17] Inherent in the Secretary's characterization of the parties' actions "to consider 'updating' the equivalency factor" in 1980 is the recognition that there was a fixed, previously agreed-upon equivalency factor that could be "updated." Of course, that equivalency was always based on 1942 prices. As we have repeatedly stressed, the only changes permissible under the UPC were those that more accurately described 1942 conditions. There was no "updating."

Second, DOE's argument here may very well be a bootstrap from a failed argument from 1980. To put this issue in perspective: *never* during its administration of the UPC did the Navy question that 1942 prices were the contractual basis for conversion calculations. Then, in 1976, DOE took over the Navy's interest in the Reserve. Whereas the Navy's goal in drafting the UPC had always been to preserve hydrocarbons in the ground, DOE's goal, as a newcomer to the UPC, has been to maximize profit. DOE's newly conceived interpretations of the UPC have differed from the Navy's in direct relation to these disparate purposes. In 1980, during DOE's first participation in a redetermination, someone on the Engineering Committee—which included three new DOE representatives—raised the novel suggestion that the basis for conversion be changed. It is undisputed that such a change would have enhanced DOE's fisc, at ChevronTexaco's expense. The most reasonable inference is that someone at DOE (a stranger to the purpose, negotiation, and administration of the UPC) proposed the change. By citing this previous "consideration" of the issue, DOE is apparently trying to bootstrap its way into a unilateral modification of the UPC.

Third, regardless of who raised the issue, the inferences DOE seeks to draw from the 1980 Engineering Committee minutes are unsupported. That the short explanation in the minutes gives practical reasons instead of legal reasons for the rejection of a change in conversion is not surprising. As noted, the Engineering Committee was composed of engineers, not lawyers. Ignoring this, DOE argues that if the UPC truly prohibited such a change, the Committee would have chosen to reject the change on contractual grounds and that it would have stated those grounds in the minutes. This makes no sense. It is more likely that the path of least resistance for a group of engineers faced with this new proposal was to reject it as impractical, rather than perform (or seek) a legal interpretation of a densely worded contract. In any event,

the minutes presumably contain only those reasons the Committee deemed sufficient and could ultimately agree upon.[18] The weight DOE places on inferences that are not compelled by these inconclusive statements is unreasonable.

Because the choice of a basis for conversion is not a matter governed by engineering principles or technical accuracy, and is not subject to revision by the Engineering Committee, redetermination under section 2 has no application to this issue.

**B. The Features of the UPC that Address Uncertainty Show that the Parties Did Not Agree to Place Their Bargain at the Mercy of Unknown Future Economic Fluctuations**

One cannot ponder the parties' purposes and circumstances at unitization and reasonably conclude that they agreed to provide for revision of the economics of the bargain at the ultimate discretion of the Secretary. Again, OHA's task here is to analyze the language of the contract and the circumstances of contract formation to determine what, if the parties had been explicit in drafting the agreement, they would have said.

1. Variation in the Basis for Conversion Would Thwart the Parties' Efforts to Manage Uncertainty

A critical element of unitization was to divide ownership according to fixed percentages. In this process, the parties sought to eliminate risks related to changes in geologic conditions. They did this by fixing ownership using November 20, 1942 conditions. This left a residual, but much narrower, uncertainty regarding the determination of those conditions. The redetermination process was designed to manage and eventually reduce this remaining uncertainty by allowing the parties to "home in" on the precise quantities of hydrocarbons

[18] The very short statement giving reasons for the Committee's rejection of the idea, see Exhibit 13, does not reflect the full debate. There was "[c]onsiderable discussion" that was not transcribed. See Exhibit 15.

underlying each party's lands in 1942. Viewing the bargain as a whole, the parties allowed redetermination only as a matter of increasing technical "accura[cy]" (which would reduce uncertainty), not for inherently transient economic conditions (which would ensure uncertainty). The parties could not have intended to make the basis for conversion indeterminate and discretionary—especially given the wide potential variability in such an economic term.

2. The Retroactive Nature of Redetermination Shows that the Basis for Conversion Must Be Based on Facts in Existence in 1942

That any redetermination of equity operates *both retroactively and prospectively* demonstrates that the parties intended for redetermination to be limited to facts that existed in 1942. Information gleaned in 1996 *about 1942* is inherently retroactive because it shows that the world was *actually different in 1942* than was previously supposed. By contrast, changed circumstances are by definition prospective only. Plainly, if the parties had meant for DOE to use redetermination to adapt the bargain itself to changed economic circumstances, the parties would have made such a redetermination prospective only.[19] DOE's time-bending interpretation of the UPC ignores such realities; it is the stuff of science fiction, not contract.

The retroactivity of redetermination, like other features of the UPC, shows an intent to divide ownership with the goal of "perfect knowledge" in 1942 regarding the Reserve *in 1942*. Contracting parties use facts presently known to allocate future unknown risks. Here the parties reserved the right to gather more information about 1942 and "go back in time" to 1942 as often as they wanted to plug more accurate predicate facts about 1942 into the risk-allocation machinery. The limited role of redetermination was to ensure that risk would be allocated

[19] They would have used different terminology as well. Redetermination is a retrospective term. A fact that was in existence in 1942 can be "redetermined" as knowledge about 1942 is gathered. A fact *not* in existence yet in 1942 (such as 1996 oil and gas prices) cannot be "redetermined." It of course could never have been ascertained in 1942 It would be strange to hold that the parties agreed to "redetermine" facts not yet in existence.

consistent with any increased knowledge regarding the circumstances in which the parties contracted. It was not meant to remedy the parties' lack of soothsaying ability in 1942 regarding changed circumstances and future risks. Those risks are inherent in any contract and are allocated by the parties at the time of contracting.

**C. The Secretary's Authority In Finalization Is Derivative Of The Redetermination Process And Does Not Include The Right To Revise The Basis For Conversion**

1. <u>The Secretary is Bound to Uphold the UPC</u>

DOE argues that conversion during finalization is somehow different from conversion during redetermination. *See, e g.*, DOE Br. at 37-38. The motive for DOE's attempt at distinction is clear; it wants to jettison the parties' unrelenting use of 1942 prices during decades of redeterminations. Yet DOE concedes that the limits of section 2(b) apply here just as they did in redeterminations. *See* DOE Br. at 12 ("The authority granted to the Secretary . . . to make the final equity interest [determination] for each zone essentially restates the final authority granted the Secretary by Section 9(b) of the UPC [to resolve disputes under 2(b)].").

Upon termination of the UPC, the Secretary was authorized only to make "an adjustment" of ChevronTexaco's "rights and obligations . . . *under the contract*." UPC § 11 (Exhibit 2); *accord* Agreement to Terminate the Unit Plan Contract (Exhibit 36), ¶ 2.2 ("the terms of the UPC shall be the basis" for "establishment of the final equity participations of the Parties"); *In re Chevron USA Prod. Co.*, OHA No. VEA-0010 (Oct. 26, 1998) (Cameros Zone decision) ("The UPC unquestionably bound the Secretary of Energy and Assistant Secretary."); *see United States v. Winstar Corp.*, 518 U.S. 839 (1996); Chevron Op. Br. at 13; Decision (Exhibit 18) at 1 ("This Decision is issued . . . in accordance with the Unit Plan Contract, as amended . . . ."). The only contractual "rights and obligations" specifically at issue here are the



80

parties' respective ownership percentages, as redetermined one final time pursuant to section 2(b) and section 9(b). The Secretary explicitly characterized his decision as an exercise of the Secretary's section 9(b) power to resolve section 2(b) disputes. Decision (Exhibit 18) at 3 ("I have been delegated . . . the Secretary of Energy's dispute resolution authority under section 9 of the UPC."). Because the Secretary's decision here was derivative of Section 2(b), he had no authority to revise the basis for conversion.[20]

2. A Unilateral Authority to Alter the Economics of the Parties' Bargain Would Violate the Requirement of Mutuality

Nothing in the UPC indicates that the Secretary's authority to more accurately determine the location and quantities of recoverable hydrocarbons allows him to change the basis of conversion. So to sustain the Secretary's "exercise[]" of "discretion" over conversion, DOE Br. at 39, OHA would have to find an implied grant of authority. Such authority would in turn destroy the agreement. It would violate the basic contractual requirement of mutuality of obligation to give the Secretary ultimate authority to reallocate ownership in the Reserve according to his peculiar notions of fairness. *See, e.g.*, DOE Br. at 46-47. No enforceable contract grants such a unilateral, purely discretionary power. For example, an agreement to arbitrate disputes is "fatally indefinite" where one party has "unfettered discretion" over the "applicable rules and procedures" in the arbitration. *Floss v. Ryan's Family Steak Houses, Inc.* 211 F.3d 306, 315-16 (6th Cir. 2000). This case is far worse. What DOE seeks here is much broader than discretion over procedure; it is discretion over an economic term of the agreement. "Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement. The unlimited choice in effect

[20] DOE's argument that finalization is a particularly important form of redetermination has the issue precisely backwards. Finalization does not necessarily even include redetermination.

 81

destroys the promise and makes it merely illusory." *Id.* (citing 1 Williston, *Contracts* § 43, at 140 (3d ed. 1957)). "Such a reading defies any reasonable expectation that the parties could have had about their contractual relationship," and "would subsume the entire contract and make the underlying contractual relationship illusory." *Gray v. American Express Co.*, 743 F.2d 10, 18-19 (D.C. Cir. 1984). The assortment of conversion factors endorsed by DOE over time shows that if DOE is allowed to pick its own basis for conversion, the division of ownership is essentially arbitrary.[21]

DOE's argument here is more serious than a disagreement over a contractual term. DOE seeks to take a confined discretion over engineering, which was put into the UPC to allow the Navy to conserve hydrocarbons, and to read into it an unlimited power to use hindsight to eliminate the contractual economic risks the government assumed in 1944. Such unilateral power is not to be found in the UPC, or in any enforceable contract. DOE's actions are *ultra vires* and violate *United States v. Winstar Corp.*, 518 U.S. 839 (1996).

## III. THE PARTIES' PAST POSITIONS DURING THE FINALIZATION DISPUTE ARE IRRELEVANT TO THE MEANING OF THE UPC

DOE's brief includes extended, repetitive discussion of statements made by ChevronTexaco personnel during prior attempts to resolve disputes in finalization. This approach is misguided.

Unlike a lawsuit with discovery followed by briefing, this equity finalization and related disputes have involved an iterative process, as each side has acquired additional information about an enormous period of time and then had to raise issues and tailor its arguments, in light of new evidence and in light of the increased significance of issues not apparent from the outset.

[21] Again, "accuracy" and "sound oil field engineering principles" are meaningless and inappropriate in this context and DOE uses them as mere rhetoric.



82

OHA would not be particularly well advised to search for its interpretation of the UPC in the records of far less advanced stages of the finalization process.

The record shows that, not untypically, there has been development of the advocacy on both sides of this dispute. No one at either ChevronTexaco or DOE at the time of these proceedings was personally involved in the negotiation, drafting, or early implementation of the UPC. They were not familiar with issues settled decades ago. If a party makes a "mistaken interpretation" of a contract—especially on an as-yet incomplete factual record concerning a 60-year-old corporate contractual relationship—that "does not constitute a course of performance which can assist the court in interpreting a disputed term," and "the other party should never be permitted to profit by such a mistake unless there is proof of a material change of position made in good faith." *Corbin on Contracts* § 24.16 at 163 & n.344. This is especially true when the mistake is made in dispute resolution, and not during the crucial period of performance immediately following execution of the agreement. *See* Chevron Op. Br. at 28-30 (citing cases).

More important, the evidentiary record has changed since the statements DOE rehashes were made. Highly relevant and informative documents have surfaced showing that the 1957 redetermination used 1942 prices for conversion. *See* Exhibits 8, 9; Chevron Op. Br. nn.11, 24. If newly discovered evidence can be used to reopen a judgment, *see, e.g.*, Fed. R. Civ. P. 60(b), certainly it may be used to revise a party's position while a dispute is still pending.[22] Indeed, DOE would have done well to change *its* position as well in light of that evidence, instead of plowing ahead underterred by facts.

[22] This evidence was discovered *after* ChevronTexaco made the statements DOE quotes from ChevronTexaco's mediation submission to the ILA, DOE's Exhibit 7. At the time of that briefing, it was not known that the 7:1 conversion ratio from the 1957 Stevens Zone redetermination was the product of a 1942 price conversion and a weighting factor for recoverability. In any event, statements made during mediation of a dispute are not relevant evidence, *see* Fed. R. Evid. 408, much less a course of performance.



83

Moreover, as DOE knows, ChevronTexaco's statements before the IPE regarding use of current prices were based on one non-lawyer's mistaken belief that the Decoupling Agreement was actually part of the Equity Process Agreement (which was executed simultaneously therewith). *Cf.* DOE Br. at 15. As a result, he used a ratio of the oil and gas prices in the Decoupling Agreement—8.55—which were derived from then-current prices. *See* DOE Br. at 15. So when DOE demanded that all references to the Decoupling Agreement be excised, those references were replaced with references to "current prices." *See* DOE Br. at 15. Once the parties settled into the dispute resolution process and this mistaken interpretation was remedied, ChevronTexaco adopted the position it now advocates based on the UPC and a more fully developed record.

DOE argues that the UPC does not provide for conversion using 1942 prices because ChevronTexaco did not object to use of a Btu conversion methodology in the Carneros Zone finalization. *See* DOE Br. at 33-35. How the conclusion follows from the premise is not explained. It is common (some would say good) litigation strategy not to raise every conceivable objection in every proceeding. To argue that such a tactical choice reflects either an interpretation of the UPC or a waiver is ridiculous.[23]

DOE's fixation on these supposed contradictions is particularly unjustified given its own 1994 statement endorsing the use of 1942 prices *for some of the same reasons* ChevronTexaco has explained. The context of DOE's statement demonstrates DOE's understanding that each

[23] DOE also mistakenly argues that "[t]he parties . . implicitly confirmed their understanding that the UPC did not require 1942 prices when they executed the Equity Process Agreement" because "they made no reference to any specific conversion methodology" in that agreement. DOE Br. at 27. This argument defies the language of the Equity *Process* Agreement, which describes procedures for, among other things, the resolution of any unspecified disputed legal issues *See, e.g.*, ¶ B.11 (Exhibit 1). Although that paragraph mentions one legal issue specifically, it also by its terms applies to "any other legal issues [that] arise." Thus, the Agreement does not "implicitly confirm[]" anything regarding the merits of any such issues.

**party contributed BOEs to the Unit** as of **November 20, 1942**, by using a basis for conversion contemporaneous with the November 20, 1942 geologic facts at issue. In its 1994 Position Paper, DOE explained the steps used to include gas-cap areas as follows (pp. 12-13):

- First, the "net gas-cap acre-feet" of "original [1942] gas cap areas" in each section are calculated.
- Second, "[t]his bulk rock volume is then converted to a gas-in-place volume as of November 20, 1942." This is done "by applying mapped values" for 1942 conditions—"porosity, water saturation and gas formation volume factor reflective of the reservoir pressure as of November 20, 1942."
- Third, the "gas-in-place volume" as of November 20, 1942 is then subjected to recoverability calculations "to determine the distribution of recoverable gas reserves as of November 20, 1942."
- Fourth, the recoverable gas reserves as of November 20, 1942 are converted to "an equivalent oil volume" *as of 1942*. "Conversion of the recoverable gas volume to an equivalent oil volume is achieved by applying the equivalency ratio of 13 Mscf of gas per barrel of oil as utilized in the 1957 equity study. It is important to note that this equivalency is based not on an energy equivalency but rather on a value equivalency as it existed between gas and oil in 1942." In other words, the goal of conversion is to calculate an equivalent oil volume that can then be used interchangeably with the recoverable oil volumes present *on November 20, 1942*.
- The gas-cap acre feet are then weighted section by section, so that acre-feet richer in BOEs are worth more in equity. This is done by "dividing these equivalent oil volumes by the gas cap net acre-feet and normalizing using the factor of 1,216 barrels of oil per acre-foot." In other words, a section with 1,216 BOEs per acre-foot would have a weighting factor of 1.0. The weighting factor for each section is multiplied by the acre-feet in that section to calculate the total *weighted* acre-feet in that section.
- Finally, "[t]he weighted acre-feet [in both gas- and oil-bearing sections]. . . are aggregated for the respective DOE and Chevron lands and divided by the total weighted acre-feet *within the 1942[boundaries of the Unit]*, to obtain the percentage participations, consistent with section 2(b) of the UPC."

Position of DOE on Matters Related to Shallow Zone Third Revision (September 1, 1994) (Exhibit 17). DOE's description of equity calculation under section 2(b) reinforces the logic that compels use of 1942 prices in conversion.[24]

[24] This description also explains that conversion (application of an "equivalency ratio") is different from weighting (the application of a weighting factor). This contradicts a key assumption underlying DOE's brief, that is, that conversion is part of weighting, and is therefore explicitly subject to "sound oil field engineering principles."

## IV. ANY DEVIATION FROM THE PARTIES' AGREEMENT TO CONVERT USING 1942 PRICES SHOULD AT A MINIMUM REFLECT HISTORICAL REALITY

In its opening brief, ChevronTexaco made an alternative argument, in case OHA adopts DOE's view that the UPC is so "flexible" that it does not require 1942 prices as the basis for conversion. In that case, OHA should abandon conversion altogether. This is the functional equivalent of applying a conversion factor based on how the oil and gas was valued by purchasers as it was produced and sold over the life of the UPC. It has the further advantage of being faithful to the purpose of the UPC of dividing equity based on underground facts in 1942, without incorporating the unpredictability of future economic conditions. Although this approach would deprive ChevronTexaco of deserved, contracted-for benefits for the risks it assumed in 1944 regarding future economic conditions, at least it would not actively punish ChevronTexaco. DOE's approach does not even comply with its own hindsighted fairness standard, for it would give DOE equity reflecting what the gas would have sold for had it been produced in one fell swoop in 1996-98, near gas prices' 50-year peak.[25]

Nor is DOE's approach "flexible" to varying conditions, DOE Br. at 8, for it forces the entire history of production into an 18-month window. Rather, the perfectly "flexible" solution is *not* to convert, for this ensures that each party receives equity *precisely* attuned to "its original share of the quantities of recoverable oil, gas, natural gasoline and associated hydrocarbons" in the Reserve. Pub. L. No. 78-343 , 58 Stat. 280-81 (Act of June 17, 1944, authorizing the UPC).

---

*See, e.g.*, DOE Br. at 22. Section 2(b) by its terms discusses only the application of "*weighting factors* in accordance with sound oil field engineering principles."

[25] As previously explained here and in Chevron's opening brief, the Btu conversion is current price conversion in another garb and suffers from the same problems.

In sum, if OHA insists on revising the parties' bargain in hindsight, let it at least be with 20/20 hindsight.[26]

## CONCLUSION

For the reasons stated herein, OHA should hold that the parties agreed to use 1942 prices to convert gas to oil in determining equity. In the alternative, it should order that there be no conversion, or it should apply a conversion factor based on the actual historical values of gas and oil, weighted according to the quantities produced over the life of the contract.

Respectfully submitted,

Donald B. Craven

Donald B. Craven
Daniel Joseph
C. Fairley Spillman
Merrill C. Godfrey
Akin Gump Strauss Hauer & Feld, L.L.P.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4000
(202) 887-4288 Fax

Gary D. Henderson
Assistant General Counsel
Chevron USA Inc.
North America Upstream
San Joaquin Valley Business Unit
Legal Department
9525 Camino Media
Bakersfield, CA 93311
(661) 654-7174
(661) 654-7176 Fax

Attorneys for Chevron USA Inc.

[26] DOE's assertion that the use of pairs of percentages without converting would make it impossible to calculate the allocation of expenses is a case of the tail wagging the dog. All of Congress's interest, and of the parties' interest, is driven by the need to allocate equity. A less-unjust allocation of equity should not be discarded in favor of an approximation for such a small thing as the allocation of expenses. The parties didn't even provide for interest or inflation adjustments on cost reallocations, so precision here is hardly crucial. *See* UPC § 6(b)(v) (Exhibit 2). The total costs per zone are known, and some rational method of allocating costs among product types within a zone can be derived with relatively little difficulty from other data and knowledge.

CERTIFICATIONS

Pursuant to 10 C.F.R. § 1003.9(b), I, Merrill C. Godfrey, hereby certify that I am a duly authorized representative of Chevron USA Inc. (ChevronTexaco). In addition, I certify that ChevronTexaco has complied with all of the notice requirements set forth in 10 C.F.R. § 1003.34, and has caused a copy of the foregoing REPLY BRIEF OF CHEVRON USA INC. ON THE FINAL EQUITY DETERMINATION FOR THE STEVENS ZONE OF THE ELK HILLS NAVAL PETROLEUM RESERVE to be served by mail, postage prepaid on, and sent by facsimile to:

Gregory B. Thorpe, Esquire
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, CA 90071-2899

and served by hand delivery on:

Lisa Stone, Esq.
O'Melveny & Myers, LLP
1625 Eye Street, N.W.
Washington, DC 20006

Mary H. Egger, Esq.
Assistant General Counsel
United States Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

Merrill C. Godfrey
Counsel for Chevron USA Inc.

Dated: April 2, 2004