FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

1001 PENNSYLVANIA AVENUE, N.W., SUITE 800
WASHINGTON, DC 20004 - 2505
202 - 639 - 7000
FAX - 202 - 639 - 7008

March 4, 1999

202-639-7146

**Via Hand Delivery**

George B. Breznay, Director
Office of Hearings and Appeals
U.S. Department of Energy
950 L'Enfant Plaza, 7th Floor
Washington, D.C. 20585

**RE: Case No. VEA – 0010**

Dear Director Breznay:

This is in response to your letter dated February 26, 1999 regarding the dispute between Chevron U.S.A. Production Co. (Chevron) and the United States Department of Energy (DOE) over the inclusion of three documents in the administrative record for the above-captioned appeal. The documents at issue are: (1) the 1997 offering materials provided by the DOE to prospective Elk Hills purchasers; (2) a September 18, 1998 letter from the California Department of Conservation to Chevron regarding the geologic structure of the 25Z lands; and (3) a September 24, 1996 letter from Chevron to DOE regarding the Asphalto Field.

In your February 26, 1999 letter you state that these three documents may be made part of the administrative record if Chevron intends to use the documents to support an argument that the Carneros Zone underlying Section 25Z was brought under the terms of the Unit Plan Contract in 1980. Your letter also requested that Chevron advise OHA whether it intended to use any of the three documents to support such an argument.

Chevron hereby advises OHA that it intends to use all three of the disputed documents to support its argument that the Carneros Zone underlying Section 25Z was made subject to the terms of the Unit Plan Contract in 1980. Thus, as you have noted in your letter, these documents are properly part of the administrative record for this appeal.

138

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

Sincerely,

William Taft by David Wiseman

William H. Taft, IV
Counsel for Chevron U.S.A. Production Co.

cc: Gary Henderson, Esq.

## CERTIFICATIONS

Pursuant to 10 C.F.R. § 1003.9(b), I, William H. Taft, IV hereby certify that I am a duly authorized representative of Chevron U.S.A. Production Company (Chevron). In addition, I certify that Chevron has complied with all of the notice requirements set forth in 10 C.F.R. § 1003.34, and has caused a copy of the foregoing letter to be served by mail, postage prepaid, on the counsel listed below:

Mary H. Egger, Esq.
Assistant General Counsel
United States Department of Energy
1000 Independence Avenue S.W.
Washington, D.C. 20585

Greg Thorpe, Esq.
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, CA 90071

Dated: March 4, 1999

William H. Taft, IV
Counsel for Chevron U.S.A. Production Co.

**Department of Energy**
Washington, DC 20585

APR 21 1998

MEMORANDUM

To: Jean Morgan
Director, Capital Accounting Center

From: Charles J. Roy
Financial Systems Officer
Office of Fossil Energy

Subject: Transfer of Sales Proceeds from the Sale of Elk Hills

The Department must soon recognize the sales proceeds from the Elk Hills divestment which were deposited with the U.S. Treasury by the Occidental Petroleum Corporation (Oxy) on February 5, 1998. I understand those funds currently reside in account 89x6429, a special deposit and disbursement fund established to hold the sales proceeds until their disposition could be determined. In accordance with our numerous discussions regarding this issue, please undertake the following actions:

1. *Please recognize the sales proceeds deposited into Treasury account 89x6429 under the Budget and Reporting Classification number (B&R) ZN1702000.*

On February 5, 1998, Occidental Petroleum Corporation (Oxy) deposited $3,519,450,039 with the U.S. Treasury (account 89x6429) for payment for the Elk Hills oil field. Most of these funds will be transferred to the Treasury Miscellaneous Receipts account, the Elk Hills School Land Fund, and the Naval Petroleum and Oil Shale Reserves Operating Account, with the remainder continuing to be held in 89x6429 as a contingency fund pending the finalization of ownership equity with Chevron and final adjustments to Oxy's payment.

2. *Transfer $298 million from 89x6429 (ZN1702000) to 895428.001 (ZN1702000).*

The Elk Hills School Lands Fund--Special Account, 895428.001, is intended to receive the portion of Elk Hills sales proceeds to be retained for future disbursements to the State of California pending authorization by Congress.

The Defense Authorization Act for Fiscal Year 1996 (PL 104-106) required the Secretary of Energy to make an offer of settlement to the State of California regarding the disputed sections of land within Elk Hills. It further required nine percent of the net sales proceeds be reserved in a contingent fund for payment to the State in the event and to the extent the claims were resolved by settlement or court decision in favor of the State. A Settlement Agreement was reached with the



Printed with soy ink on recycled paper

State of California in October 1996 providing for yearly payments from the contingent fund for up to seven years, subject to appropriation by Congress. The amount to be deposited into this contingent fund is calculated as follows:

| | | |
|---|---|---|
| $ | 3,650,000,000 | Price for Elk Hills as of October 1, 1997 |
| | (288,000,000) | Possible payment to Chevron pending finalization of equity |
| | (12,775,000) | Commission paid to investment banker (0.35% of sale price) |
| | (36,300,000) | Current estimate of final divestment expenses (subject to change) |
| $ | 3,312,925,000 | Estimate of net sales proceeds |
| | 9% | Percent of net sales proceeds to be reserved pursuant to PL 104-106 |
| $ | 298,163,250 | Amount to be reserved for possible appropriation and payment |

Please round the above figure to $298 million. This estimated payment to the State of California is subject to future adjustment. First, divestment-related costs are still being incurred. An ongoing review of those costs suggests that total divestment expenses (excluding banker's fee) may reach almost $55 million, as opposed to the $36.3 million shown above. The $36.3 million estimate is based on the various reprogrammings sought by the Department to pay for divestment activities.

Second, pursuant to a "Decoupling Agreement," the DOE and Chevron are involved in a process of finalizing equity shares of the Elk Hills oil field. Under the agreement, both parties are to set aside a certain amount of money as a contingency payment to the other party. The Department is required to set aside $288 million for potential payment to Chevron. Chevron is establishing a letter of credit in the amount of $215 million for potential payment to DOE.

For the purpose of calculating the amount due to the State of California, any payment to Chevron resulting from the finalization of equity will be a reduction of the sales proceeds, thus reducing the Department's potential payment to the State. However, if DOE does not make any payment to Chevron as a result of equity finalization, then the $288 million reservation will be counted as a sales proceed, and the State will be eligible to receive nine percent of that amount, subject to appropriation. In addition, any payment received from Chevron will be considered an additional proceed from the sale, and the State is eligible to receive nine percent of such payment, subject to appropriations.

3. *Please establish B&R CA01 (CA Elk Hills School Lands Fund; 01 California Teachers' Retirement Fund payments) which is to be associated with Treasury account 89x5428.*

Account number 89x5428 is the Elk Hills School Lands Fund--Congressional Disbursement Authority Account and will be used for executing payment to the State of California. As Congress appropriates funds for payment, the appropriated dollar amount will be transferred from 895428.001 to the disbursement account, 89x5428. In addition, please establish CA01 under the control of the Office of Fossil Energy. The CA01 B&R will be used for tracking funds paid from 89x5428. No deposits into 89x5428 are anticipated until FY 1999.

4. *Please establish B&R CB030801 and transfer $10,975,000 from 89x6429 (ZN17020000) to 89x0219 (CB030801).*

Account 89x0219 is the Naval Petroleum and Oil Shale Reserves Operating Account. OMB has requested that payment to the investment banker be made from 89x0219. Further, as noted in the authorizing legislation, PL 104-106, the investment banker may be paid from the proceeds of the sale. Therefore, before such payment can be recorded from 89x0219, a transfer from 89x6429, must occur. CB030801 is a new B&R code established for the purpose of segregating the sales proceeds from the appropriated funds within 89x0219.

5. *Please transfer $2,887,475,039 from 89x6429 (ZN1702000) to 892230.*

Account 892230 is the Treasury Miscellaneous Receipts Account. The money to be transferred to the Miscellaneous Receipts Account is calculated as follows:

| | | |
|---|---|---|
| $ | 3,519,450,039 | Adjusted price paid for Elk Hills based on an estimate of DOE's net revenues for the period beginning October 1, 1997, and ending February 5, 1998. (Subject to a final adjustment based on actual net revenues.) (This is the beginning balance of account 89x6429.) |
| | (10,975,000) | Less commission paid to investment banker (0.35% of sale price). (Transferred into 89x0219. Total commission is $12.775 million, of which $1.8 million was paid from appropriated funds within 89x0219.) |
| | (298,000,000) | Less proceeds transferred to Elk Hills School Lands Fund--Special Account (transferred to account 895428.001). |
| | (288,000,000) | Less proceeds required for contingency payment to Chevron pending outcome of equity finalization. (This money will remain in 89x6429 until equity finalization.) (Nine percent of this reservation not paid to Chevron will be transferred to the Elk Hills School Lands Funds--Special Account, 895428.001, after equity is finalized with Chevron.) |
| | (33,200,000) | Less proceeds to be kept in reserve pending final accounting adjustments to Occidental's purchase price. (This money will remain in 89x6429 until final adjustments are determined.) |
| | (1,800,000) | An advance on the investment banker's commission paid from the Program's operating account and netted from their final commission payment. (To remain in 89x6429 until OMB's final determination is made.) |
| $ | 2,887,475,039 | Amount to be transferred to Treasury Miscellaneous Receipts (account 892230). |

143

The results of these various transfers will leave a balance of $323 million in the Elk Hills Deposit Account (89x6429): $288 million for a contingency payment to Chevron; $33.2 million reserved for anticipated adjustments to Oxy's final payment; and $1.8 million reserved for possible reimbursement of the Program's operating fund as described below.

$288 million is required to be held in reserve pursuant to the "Decoupling Agreement" with Chevron as a contingency fund for possible payment pending the results of the equity finalization process outlined in that agreement. The process for determining final equity shares is anticipated to continue into FY 2001.

Of the remaining balance in account 89x6429, $33.2 million will be held in reserve in anticipation of a final adjustment to the payment received from Oxy. The price for Elk Hills was $3.65 billion as of October 1, 1997, and will be adjusted based on the net revenues DOE realized from operating Elk Hills from October 1, 1997, until the February 5, 1998, closing date. Oxy's February 5, 1998, payment was based on DOE's estimate of its costs and revenues and a final adjustment will be made within nine months of the closing date to allow for a final compilation of the actual costs and revenues. (As of the end of March 1998, it appears that Oxy may owe an additional $9 million, but this is a preliminary number undergoing review by an independent accounting firm.)

The final unresolved issue is whether OMB will allow reimbursement for $1.8 million paid to the investment banker from the Naval Petroleum Reserve's Operating Account (89x0219) over 18 months as an advance on their commission. NPOSR's position is that the law requiring the sale of Elk Hills authorized payment to the investment banker from the proceeds of the sale. The commission totaled $12.775 million, of which only $10.975 million was paid from sales proceeds with the remainder paid from the program's appropriated funds.

After final adjustments to Oxy's payment are made, and a final determination is reached regarding the allowableness of reimbursement to the program's operating account, then any proceeds in excess of the $288 million will be transferred from 89x6429 to the Treasury Miscellaneous Receipts Account.

If you have any questions regarding this matter, please call Brent Sheets on 202-586-1498.

Concur:

Anton R. Dammer,
Acting Deputy Assistant Secretary,
Naval Petroleum and Oil Shale Reserves

Apr. 8, 1998
(date)

Anthony J. Como,
Elk Hills Divestment Administrator

4/13/98
(date)

Mary H. Egger,
Assistant General Counsel,
Procurement and Financial Assistance

4/21/98
(date)

cc: George Tengan, CR-52
Sherry Reid, CR-14
Missy Nicholson, FE-3
Paul Kelley, CR-13
Gary Latham, FE-60

# United States Court of Appeals for the Federal Circuit

04-5042

SAMISH INDIAN NATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Craig J. Dorsay, of Portland, Oregon, argued for plaintiff-appellant. With him on the brief were William R. Perry and Anne D. Noto, Sonosky, Chambers, Sachse, Endreson & Perry, of Washington, DC.

Kathryn E. Kovacs, Attorney, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Thomas L. Sansonetti, Assistant Attorney General and Todd S. Aagaard, Attorney. Of counsel on the brief was Jason Roberts, Attorney, Office of the Solicitor, United States Department of Interior, of Washington, DC.

Appealed from: United States Court of Federal Claims

Chief Judge Edward J. Damich

# United States Court of Appeals for the Federal Circuit

04-5042

SAMISH INDIAN NATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

---

DECIDED: August 19, 2005

---

Before CLEVENGER, SCHALL and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

The Samish Indian Nation ("Samish") appeal from the judgment of the United States Court of Federal Claims in favor of the United States. In two counts the Samish claimed federal benefits allegedly owed between 1969 and 1996. The trial court dismissed these counts with prejudice. In a third count the Samish claimed federal benefits allegedly owed since 1996. The trial court dismissed this count without prejudice. Samish Indian Nation v. United States, 58 Fed. Cl. 114 (2003) ("Samish").

The court concludes that two statutes on which the Samish premise their claims to benefits from 1969 to 1996, namely the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. §§ 450 et seq., and the Snyder Act, 25 U.S.C. §§ 2,

13, are not money-mandating for purposes of the Samish claims. These claims are not within the trial court's Tucker Act or Indian Tucker Act jurisdiction, and we affirm their dismissal.

The court concludes, however, that the Samish claims to federal benefits for the 1969 to 1996 period are not time barred. We therefore reverse the dismissal of count two on limitations grounds and remand for further proceedings to determine whether the remaining statutes underlying the claim are money-mandating.

The court affirms the dismissal, without prejudice, of the Samish claims to post-1996 benefits.

I.

The Samish contend, in essence, that but for federal misconduct they would have received federal benefits since 1969. In many cases, since the 1970s, Congress has conditioned statutory benefits to Indian tribes on federal acknowledgment. The Samish contend that the federal government wrongfully refused them this status, and the counterfactual – that they would otherwise have been acknowledged – is the first element to their claims for benefits between 1969 and 1996.

For thirty-three years the Samish have, in administrative actions, sought federal acknowledgment for statutory benefits. During that time the Samish's ability to claim treaty rights, under the 1855 Treaty of Point Elliott, has also been disputed and, as shown below, come full circle. And during that time the law has also evolved concerning the relation between recognition for treaty purposes and recognition for statutory benefits, and more generally concerning the justiciability of federal recognition.

Federal recognition or acknowledgement is a prerequisite to an Indian tribe's right to claim benefits under federal statutes. 25 C.F.R. § 83.2 (2005). The federal government did not formalize the recognition process until 1978 with the Department of the Interior's adoption of the regulatory acknowledgment criteria now codified at 25 C.F.R. Part 83; before 1978 the executive branch accorded tribes recognition on an ad hoc basis. Cf. Kahawaiolaa v. Norton, 386 F.3d 1271, 1272-73 (9th Cir. 2004) (discussing pre-1970s recognition process).

In 1972, the Samish first sought federal recognition for statutory benefits by petitioning the Department of the Interior. Those efforts are chronicled in several judicial opinions including, most recently, (1) Greene v. Babbitt, 943 F. Supp. 1278 (W.D. Wash. 1996), and (2) United States Department of the Interior, Office of Hearings and Appeals, Recommended Decision of Administrative Law Judge Torbett in Greene v. Babbitt, No. Indian 93-1 (Aug. 31, 1995).

A.

The facts relevant to Samish recognition date to a treaty signed in 1855. The Samish descend from a signatory tribal party to the 1855 Treaty of Point Elliott, 12 Stat. 927, by which several tribes in the Pacific Northwest ceded land to the United States but retained various fishing rights.[1] See United States v. Washington, 641 F.2d 1368, 1373-74 (9th Cir. 1981);[2] Duwamish v. United States, 79 Ct. Cl. 530, 1934 WL 2033

---

[1] The parties signed the treaty on January 22, 1855. It became effective with Senate ratification on March 8, 1859.

[2] In Washington the Ninth Circuit affirmed a district court finding, United States v. Washington, 476 F. Supp. 1101, 1106 (W.D. Wash. 1979), that the Samish, through assimilation, had lost the degree of "political and cultural cohesion" needed to claim rights under the Treaty of Point Elliott. Washington, 641 F.2d at 1373-74.

(1934) (Finding of Fact IV); cf. Samish Tribe of Indians v. United States, 6 Ind. Cl. Comm. 159, 159-62 (1958).

In 1958 the Indian Claims Commission reported that the Samish were "an identifiable tribe of American Indians residing within the territorial limits of the United States along the shoreline of Guemes Island and Samish Peninsula in what is now the Northwest portion of the State of Washington." Samish, 6 Ind. Cl. Comm. at 159. It is unclear from the present record, however, whether Congress ever ratified this finding by legislation.

In 1966 the Bureau of Indian Affairs ("BIA") drew up a list of Indian tribes that appeared in their files. According to the BIA, the 1966 list was not intended "to be a list of federally recognized tribes as such." Id. The list included the Samish. This was not a formal list premised on any legal basis. At the time, the BIA pursued its duties and responsibilities in such an ad hoc fashion that it was unable to determine which tribes were treaty recognized, and which were not.

B.

In 1969 the BIA restricted the list to tribes with a "formal organization" approved by the Interior Department. Id. Although the BIA employee who drew up the list had no authority to determine which groups would be accorded federal recognition, the 1969 list

---

The Ninth Circuit, however, recently reversed a decision denying a Samish motion, under Rule 60(b)(6), to reopen the underlying district court judgment, at 476 F. Supp. 1101, in view of the Samish federal acknowledgment in 1996. See United States v. Washington, 394 F.3d 1152, 1161 (9th Cir. 2005) (holding "[f]ederal recognition is determinative of the issue of tribal organization," and characterizing the judgment denying the Samish treaty fishing rights as depending on findings that the Samish had not maintained an organized tribal structure); see generally id. at 1159-61 (discussing relation between federal recognition and criteria for signatory descendants to assert treaty rights).

nonetheless became the basis on which the BIA classified the tribes. Id. A BIA employee testified before an Administrative Law Judge ("ALJ") in August 1994 that the Samish were removed from the 1969 list after the BIA's Portland, Oregon office, without any stated legal basis advised that the Samish were recognized ephemerally "for claims purposes only." The BIA's documentation from that time has now been lost. Id.

C.

In the early 1970s, Congress began conditioning statutory benefits for Indian tribes on federal recognition. See, e.g., Greene v. Lujan, No. C89-645Z, 1992 WL 533059, at *7 (W.D. Wash. Feb. 25, 1992) (discussing Congress's conditioning of federal benefits on recognition after the ISDA's passage in 1975). The parties appear to agree that until the early 1970s individual Samish members received various federal benefits, though the benefits were not necessarily premised on tribal status or recognition. The government has admitted that before 1977, "it had issued blue identity cards to Samish that made them eligible for Indian benefits." Greene v. Babbitt, 64 F.3d 1266, 1274 (9th Cir. 1995). The parties also appear to agree that by the mid-1970s the government stopped providing individual Samish various benefits because the Samish tribe lacked federal recognition.

In 1972 the Samish filed their first petition for federal acknowledgement, but the Department of the Interior took no action. Six years later the Interior Department published its final regulations, now codified at 25 C.F.R. Part 83, adopting standard procedures and criteria for according formal recognition to Indian Tribes. Under these recognition criteria, the BIA must "make inquiries into the social and political structure of

the petitioning tribe," developing findings that are "inherently complex and prone to mischaracterization." Greene v. Lujan, 1992 WL 533059, at *8.

In 1979 the Samish filed a revised petition for recognition under the new Interior Department regulations. On November 4, 1982, the Assistant Secretary of Indian Affairs published a notice recommending against recognition. See Samish Indian Tribe; Proposed Finding Against Federal Acknowledgment, 47 Fed. Reg. 50110 (Nov. 4, 1982). On February 5, 1987, the Secretary of the Interior ("Secretary"), without an evidentiary hearing, published a final denial of the petition. See Final Determination That the Samish Indian Tribe Does Not Exist as an Indian Tribe, 52 Fed. Reg. 3709 (Feb. 5, 1987).[3]

In April 1989 the Samish filed suit in the United States District Court for the Western District of Washington challenging, on due process grounds, the decision denying recognition. On February 25, 1992, the district court vacated the Secretary's decision and remanded to the Interior Department for formal adjudication under § 553 of the Administrative Procedures Act ("APA"). Greene v. Lujan, No. C89-645Z, 1992 WL 533059 (W.D. Wash. 1992), aff'd, 64 F.3d 1266 (9th Cir. 1995).

The parties agreed on procedures to govern the remand. Specifically, they agreed (1) the ALJ would make written findings of fact with a recommendation to the Assistant Secretary of Indian Affairs as to whether the Samish qualified as an Indian tribe under the recognition criteria; and (2) the ALJ would consider only evidence in the

---

[3] The BIA's notice reported the Samish did not "meet three of the criteria set forth in 25 C.F.R. § 83.7 and, therefore, [did] not meet the requirements necessary for a government-to-government relationship with the United States." 47 Fed. Reg. 50110; accord 52 Fed. Reg. 3709 (Final Decision). The 1987 final decision reported the Samish failed to satisfy recognition criteria 25 C.F.R. §§ 83.7(b), (c), & (e), as those criteria were then-formulated.

existing administrative record, and any additional testimony provided at the hearing. Greene, 943 F. Supp. at 1282. The district court approved the agreement before remanding to Interior. Id.

An administrative hearing was conducted and, on August 31, 1995, the ALJ issued detailed proposed findings and recommended granting the Samish federal recognition pursuant to the criteria in 25 C.F.R. § 83.7 ("ALJ Recommendation"). He forwarded the proposed findings and recommendation to the Assistant Secretary of Indian Affairs for a final determination.

On November 8, 1995, an attorney with the Solicitor's Office in the Interior Department, with the government's expert witness from the hearing, conducted an ex parte meeting with the Assistant Secretary "for the purpose of attempting to persuade the Assistant Secretary to reject" the ALJ's recommendation of federal recognition. Greene, 943 F. Supp. at 1283. The government attorney had represented the Interior Department at the administrative hearing in 1994. No transcript of the meeting was made, and no effort was made to notify the Samish of the meeting with the Assistant Secretary.

That same day the Assistant Secretary issued her final decision under 25 C.F.R. Part 83. Although her decision recognized the existence of the Samish, she rejected certain proposed specific findings made by the ALJ. Among the proposed findings the Assistant Secretary rejected were:

1. The Noowhaha tribe and the Samish were at one time different tribes. Dr. Suttles and Dr. Hadja testified that the two tribes had combined probably around 1850 and they had been one tribe since that time. This conclusion of Dr. Suttles and Dr. Hadja is controverted by the Defendants but the

undersigned is convinced that the conclusions drawn by these two witnesses is sound.[4]

2. Dr. Hadja explained that, although many Samish Indians had held public office on the Lummi and Swinomish Reservation, they continued to consider themselves as Samish and participate in Samish activities. . . . While individual members of Samish families living today on reservations, such as the Edwards, may have given up their Samish identity, Dr. Hadja felt that on the whole they had not (TR: 869). Samish leaders living at Swinomish were active in Swinomish affairs as a way of gaining personal prestige, and not as a declaration of Swinomish identity (TR: 1004, TR: 1021-1022).[5]

3. A list prepared in the late 1960s by Ms. Simmons, a BIA employee, was the basis on which groups were then classified as Federally-recognized or not, but she admitted that records of Area and Agency comments have been lost (TR: 351- 352). Subsequently, her revised list was 'generally' consulted to determine groups' legal status, although paradoxically she conceded that she had no authority to make such decisions. . . . On further questioning Ms. Simmons conceded that she had no personal knowledge of the legal status of the groups she had listed under the Portland Area. . . . The earliest official references Dr. Hadja found to the tribe not being federally recognized appeared in the [early 1970s] (TR: 849).[6]

On April 9, 1996, the government published the Assistant Secretary's final decision, according recognition, in the Federal Register, without the findings listed above. See Final Determination for Federal Acknowledgment of the Samish Tribal Organization as an Indian Tribe, 61 Fed. Reg. 15825 (Apr. 9, 1996). In the Final Determination, the Secretary expressly rejected any finding suggesting that the Samish "was a recognized tribe until the 1970s." Instead, the Secretary expressly found that

---

[4] Greene, 943 F. Supp. at 1283, quoting ALJ Recommendation at 22 (Aug. 31, 1995).

[5] Greene, 943 F. Supp. at 1284, quoting ALJ Recommendation, Appx. B, Finding 169 (Aug. 31, 1995).

[6] Greene, 943 F. Supp. at 1284, quoting ALJ Recommendation, Appx. B, Findings 2, 3, and 110 (Aug. 31, 1995); see also Greene, 943 F. Supp. at 1288 n.13.

"[t]he Samish have not been federal recognized as a separate and distinct tribe since the early 1900's, when the core of the tribe moved to the reservations."

The Samish returned to the district court and challenged the government's ex parte contact with the Assistant Secretary as violative of the APA and their due process rights. The Samish asked the district court to reinstate the omitted findings. In rejecting the government's standing challenge as without merit, the district court noted that the "focus and results of the ex parte contact between the government lawyer and Assistant Secretary Deer was to eliminate findings that would be favorable to the Samish in connection with their eligibility for benefits under federal law." Greene, 983 F. Supp. at 1285.

The district court found the omitted-facts satisfied several recognition criteria under 25 C.F.R. Part 83.7. Specifically, the court determined the first rejected claim satisfied recognition criteria 83.7(b) (separate existence and continuity)[7] and (e) (members descended from tribes that functioned as autonomous political entities);[8] the second satisfied 83.7(b) (separate existence and continuity) and (c) (tribe has

---

[7] Section 83.7(b) provides:

> (b) A predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present.

25 C.F.R. § 83.7(b) (2005). The provisions have not changed since the Interior Department last revised 25 C.F.R. § 83.7 in 1994. See Procedures for Establishing That an American Indian Group Exists as an Indian Tribe, 59 Fed. Reg. 9293 (Feb. 25, 1994). Unless otherwise indicated, hereinafter citations to 25 C.F.R. § 83.7 will reference the 2005 version of the regulations.

[8] Section 83.7(e) provides:

> (e) The petitioner's membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity.

25 C.F.R. § 83.7(e).

maintained political influence or authority over its members);[9] and the third satisfied 83.7(a) (government identified the tribe on a substantially continuous basis since 1900), via subsection 83.7(a)(1) (allowing proof of identification with evidence of earlier federal identification).[10] See Greene, 943 F. Supp. at 1283-84.

On October 15, 1996, the district court in Greene held for the Samish on both their APA and due process claims, and ordered the omitted findings reinstated. The court entered judgment on November 1, 1996.

D.

On October 11, 2002 the Samish commenced this action in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491, and the Indian Tucker Act, 28 U.S.C. § 1505. The first count alleges violation of the ISDA on grounds that the government's pre-1996 refusal to accord the Samish federal recognition wrongfully prevented the Samish from obtaining self-determination contracts, 25 U.S.C. § 450f, and funds (both program money and contract support costs) the statute obligated the government to pay

---

[9] Section 83.7(c) provides:

> (c) The petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present.

25 C.F.R. § 83.7(c).

[10] Section 83.7(a) provides, in relevant part:

> (a) The petitioner has been identified as an American Indian entity on a substantially continuous basis since 1900. Evidence that the group's character as an Indian entity has from time to time been denied shall not be considered to be conclusive evidence that this criterion has not been met. Evidence to be relied upon in determining a group's Indian identity may include one or a combination of the following, as well as other evidence of identification by other than the petitioner itself or its members.
>
> (1) Identification as an Indian entity by Federal authorities . . . .

25 C.F.R. § 83.7(a).

under such contracts to run various benefits programs, 25 U.S.C. § 450j-1(a)(1). (First Am. Compl. ("FAC") ¶¶ 23-26.) In a second count, the Samish contend that the same refusal to accord federal recognition, before 1996, wrongfully deprived the Samish of benefits that would otherwise have been available under a collection of thirty-eight specific treaties and federal statutes. (FAC ¶¶ 5, 27-31.) These statutes include, among others, the Snyder Act, 25 U.S.C. § 13. (FAC ¶¶ 5(b), 28.) Finally, in a third count, the Samish alleged that since their federal recognition in 1996 the government has continued to withhold funds that should have been provided under the same statutory authorities on which the Samish premised their second count. FAC ¶¶ 43-44.

On September 30, 2003 the trial court dismissed the action and entered judgment for the United States. On reasoning applicable to both counts for past benefits, the court ruled the Samish claims accrued in 1969. Thus, the court concluded the six year limitations period in 28 U.S.C. § 2501 barred the claims to past benefits, and it dismissed both counts with prejudice. Samish, 58 Fed. Cl. at 117-18, 123. Finding the Samish's 1972 petition for acknowledgement was permissive rather than mandatory, the Court of Federal Claims further held the limitations period could not be tolled for administrative exhaustion. Id. at 117-18. The court "confirmed" this ruling, as to the first count, in finding that because federal recognition is a prerequisite to statutory benefits, 25 C.F.R. § 83.2, the ISDA could provide only prospective relief. Id. at 117. Reading the last finding reinstated by the district court as holding the government's exclusion of the Samish from the 1969 BIA "list" was arbitrary, the court reasoned that (1) because this only went to "potential" government liability, (2) the Samish could have brought this action before resolving their administrative challenge. Id. Finding no

government deception the court also rejected an equitable tolling argument made by the Samish. Id.

The court additionally dismissed the ISDA count for lack of subject matter jurisdiction. We read the trial court as holding that the ISDA is not "money-mandating" for claims to past benefits premised on a wrongful refusal to accord federal recognition, and thus the Samish claim under the ISDA did not come within the Court of Federal Claims' Tucker Act and Indian Tucker Act jurisdiction. Id. at 118-19.

Finally, the court dismissed, without prejudice, the Samish claim to benefits after recognition in 1996. Noting that, on September 14, 2002, the Samish had filed a similar claim in the United States District Court for the Western District of Washington—almost a month before filing the instant action in the Court of Federal Claims—the trial court dismissed the third Samish count for lack of jurisdiction under 28 U.S.C. § 1500. Id. at 122-23. The dismissal order provided, however, that the Samish could renew their claim in the Court of Federal Claims should the district court find itself without jurisdiction to hear the first-filed, co-pending claim. On February 6, 2004, the district court in fact dismissed that first-filed, co-pending claim for lack of jurisdiction. Samish Indian Nation v. United States Dep't of the Interior; Bureau of Indian Affairs, No. C02-1955P (W.D. Wash. Feb. 6, 2004) (order on motion to dismiss and cross motions for summary judgment).

The Samish timely appealed, and the court has jurisdiction under 28 U.S.C. § 1295(a)(3) (2000).

II.

The court reviews de novo the Court of Federal Claims' dismissal for lack of jurisdiction. See Brown v. United States, 86 F.3d 1554, 1559 (Fed. Cir. 1996). Like the trial court, this court tests the sufficiency of the complaint as a matter of law, accepting as true all non-conclusory allegations of fact, construed in the light most favorable to the plaintiff. See Bradley v. Chiron Corp., 136 F.3d 1317, 1321-22 (Fed. Cir. 1998); Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). The court also reviews without deference the trial court's statutory interpretation. W. Co. of N. Am. v. United States, 323 F.3d 1024, 1029 (Fed. Cir. 2003).

A.

The court begins with the ISDA claim. The court can affirm the trial court on any basis in the record. See United States v. Am. Ry. Express Co., 265 U.S. 425, 435 (1924). As set forth herein, we conclude that the ISDA is not money-mandating for purposes of the Samish claim, and we affirm the dismissal on that basis.

1.

The Court of Federal Claims' Tucker Act jurisdiction depends on the substantive law the Samish have invoked. The Tucker Act waives sovereign immunity and allows the Court of Federal Claims to award damages upon proof of "any claim against the United States founded either upon the Constitution, or any Act of Congress." 28 U.S.C. § 1491(a)(1) (2000). The Indian Tucker Act, 28 U.S.C. § 1505, extends to Indian Tribes the same jurisdiction available to other parties under the Tucker Act. 28 U.S.C. § 1505 (2000). Tucker Act jurisdiction, however, must derive from substantive law. The relevant substantive law supports a claim within the Tucker Act's sovereign immunity

waiver if, but only if, it "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." United States v. Testan, 424 U.S. 392, 400 (1976); accord United States v. Mitchell, 463 U.S. 206, 216-17 (1983) ( "Mitchell II"); United States v. Mitchell, 445 U.S. 535, 538 (1980) ("Mitchell I"); Eastport S.S. Co. v. United States, 372 F.2d 1002, 1009 (Ct. Cl. 1967); cf. 14 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3657, at 510-11 & n.40 (West 1998 & 2004 Supp.).

Where the substantive law is "reasonably amenable" to an interpretation "that it mandates a right of recovery in damages," claims arising under that law lie within the trial court's jurisdiction under the Tucker Act or Indian Tucker Act. United States v. White Mountain Apache Tribe, 537 U.S. 465, 469-70, 473 (2003). Because the Tucker Act provides the relevant sovereign immunity waiver, when interpreting a statute to determine whether it provides the necessary right of action the court does not strictly construe the substantive law against the claimant. While the premise to a Tucker Act claim will not be "lightly inferred," Mitchell II, 463 U.S. at 218, a fair inference will do. White Mountain, 537 U.S. at 472-73.

The court has found Congress provided such damage remedies where the statutory text leaves the government no discretion over payment of claimed funds. But Tucker Act jurisdiction is not limited to such narrow statutory entitlements. Certain discretionary schemes also support claims within the Court of Federal Claims jurisdiction. These include statutes: (1) that provide "clear standards for paying" money to recipients; (2) that state the "precise amounts" that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions. Perri v. United

States, 340 F.3d 1337, 1342-43 (Fed. Cir. 2003). As explained below, the ISDA fails in these categories.

Fairly interpreted, the ISDA does not reveal congressional intent to provide the damage remedy the Samish have claimed in this action. As the Samish allege, the ISDA identifies two types of funding through self-determination contracts: (1) program money or funds for operating programs under the contracts, 25 U.S.C. § 450j-1(a)(1) (2000); and (2) contract support costs consisting "of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management." 25 U.S.C. § 450j-1(a)(2) (2000). (See also FAC ¶ 24.) Absent a contract the ISDA does not confer a private damage remedy for either type of funding.

We begin with the provisions relating to program money. The objective in interpreting the ISDA is to give effect to congressional intent. Doyon, Ltd. v. U.S., 214 F.3d 1309, 1314 (Fed. Cir. 2000); In re Portola Packaging, Inc., 110 F.3d 786, 788 (Fed. Cir. 1997). To determine Congressional intent the court begins with the language of the statutes at issue. Toibb v. Radloff, 501 U.S. 157, 162 (1991). To fully understand the meaning of a statute, however, the court looks "not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." Crandon v. United States, 494 U.S. 152, 158 (1990).

Self-determination contracts under the ISDA are a mechanism for directing benefits arising under other statutes. The benefits provided under these contracts depend on the underlying substantive law rather than the ISDA. See 25 U.S.C. §§ 450j-1(a)(1) (2000) (program money under self-determination contracts will be funded at

level Department would have otherwise provided for specific program operation); 450j-1(b)(2)(A) (2000) (self-determination contract funding may be reduced where appropriations for specific programs or functions under contract are also reduced); cf. 25 U.S.C. § 450j-1(b) (2000) (funding is subject to availability of appropriations). Without an actual self-determination contract, whether these underlying grants provide a damage remedy cannot be determined by reference to the ISDA itself. For these reasons we find the nature of the Secretary's discretion to refuse a self-determination contract irrelevant to the jurisdictional question at bar, and the Samish's reliance on that limited discretion misplaced.

The ISDA's language and structure confirm the dependent nature of program money under self-determination contract. As originally enacted, the ISDA provided self-determination contracts would encompass programs subject to (1) "the Act of April 6, 1934 (48 Stat. 596), as amended" by the ISDA; (2) "any other program or portion thereof which the Secretary of the Interior is authorized to administer for the benefit of Indians under the Act of November 2, 1921 (42 Stat. 208)"; and (3) "any Act subsequent thereto." Pub. L. No. 93-638, § 102(a), 88 Stat. 2203, 2206 (1975). This structure remains largely unchanged. In its current form, § 450f(a)(1) provides in relevant part:

> (1) The Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof, including construction programs –
>
> > (A) provided for in the Act of April 16, 1934 (48 Stat. 596), as amended [25 U.S.C. §§ 452 et seq.];
> >
> > (B) which the Secretary is authorized to administer for the benefit of Indians under the Act of November 2, 1921 (42 Stat. 208) [e.g., the Snyder Act, now codified at 25 U.S.C. § 13], and any Act subsequent thereto;

> (C) provided by the Secretary of Health and Human Services under the Act of August 5, 1954 (68 Stat. 674), as amended [42 U.S.C. §§ 2001 et seq.];
>
> (D) administered by the Secretary for the benefit of Indians for which appropriations are made to agencies other than the Department of Health and Human Services or the Department of the Interior; and
>
> (E) for the benefit of Indians because of their status as Indians without regard to the agency or office of the Department of Health and Human Services or the Department of the Interior within which it is performed.

25 U.S.C. § 450f(a)(1) (2000). Despite the addition of §§ 450f(a)(1)(C)-(E), this remains a provision that channels program money, associated with other statutory benefits, to tribal organizations, through self-determination contracts.

Absent a contract this statutory language and structure is not reasonably read as demonstrating congressional intent to establish a damage remedy under the ISDA for non-payment of the underlying benefits, based on the wrongful refusal to accord the Samish federal recognition between 1975 and 1996 (thereby precluding entry into a self-determination contract).[11] Indeed, in its original and current forms the ISDA includes Snyder Act authorizations, 25 U.S.C. § 13, among the sources of program money subject to self-determination contracting. See 25 U.S.C. § 450f(a)(1)(B) (2000); 88 Stat. 2203, 2206 (1975) (citing 42 Stat. 208). But the Supreme Court has already determined the Snyder Act does not provide a damage remedy because it does not require the expenditure of general appropriations, on specific programs, for particular classes of Native Americans. See Lincoln v. Vigil, 508 U.S. 182, 194 (1993) (reading

[11] The Samish concede they cannot claim past benefits under the ISDA before its enactment in 1975.

the Snyder Act as giving the Secretary broad discretion how to allocate lump sum appropriations); see also White Mountain Apache Tribe v. United States, 249 F.3d 1364, 1372 (Fed. Cir. 2001), aff'd 537 U.S. 465 (2003). Without the government obligating itself to a self-determination contract, merely bundling Snyder Act funds into ISDA program money fails to support the damage remedy the Samish allege here. Thus, to the extent the Samish claim a damage remedy, it must derive from the various sources of program money subject to self-determination contracting.

Nor do ISDA provisions for contract support costs provide the damage remedy the Samish assert here. As recently discussed in Thompson v. Cherokee Nation of Okla., 334 F.3d 1075 (Fed. Cir. 2003), Congress amended the ISDA in 1988 specifically to address tribal and tribal organization funding problems regarding administrative costs of federal programs subject to self-determination contracts. Thompson, 334 F.3d at 1080-81. As we noted, the statute originally did not require funding the administrative costs tribes incurred in federal program operation. Id. at 1080, discussing S. Rep. No. 100-274 (1987). Partly in response, Congress enacted the Indian Self-Determination Amendments of 1988, Pub. L. No. 100-472, 102 Stat. 2285. Id. at 1081. This amendment added current § 450j-1(a)(2), requiring payment of contract support costs consisting of "an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management." 25 U.S.C. § 450j-1(a)(2) (2000).

On its face this section demonstrates no congressional intent to allow the Samish to seek damages for contract support costs never incurred, on contracts never created, based on a wrongful refusal to accord federal recognition. The court must construe

§ 450j-1(a)(2) to advance its remedial purpose, namely, removing the financial burden incurred by tribes and tribal organizations when implementing federal programs under self-determination contracts. See Chisom v. Roemer, 501 U.S. 380, 403 (1991) (court should interpret remedial statute broadly to advance its remedial purpose); Smith v. Brown, 35 F.3d 1516, 1525 (Fed. Cir. 1994) ("It is of course true that courts are to construe remedial statutes liberally to effectuate their purposes."), superseded on other grounds by 38 U.S.C. § 7111; United States v. Absentee Shawnee Tribe of Okla. on Behalf of Shawnee Nation, 200 Ct. Cl. 194, 1972 WL 20807, at *3 (Ct. Cl. Dec. 12, 1972) (discussing interpretive canon). The Samish have not suffered the harm Congress intended to remedy with the support cost provisions. Since the Samish never incurred any administrative costs, because they never obtained a self-determination contract in the years at issue, no sensible reading of the ISDA would allow their present suit for these funds. Such a damage remedy, if available, would provide them nothing but a windfall. This reading would not advance the specific remedial purpose of § 450j-1(a)(2), and we do not think Congress intended that result.

We therefore conclude Congress did not intend the ISDA to provide a damage remedy for past program money, or contract support costs never incurred, based on the government's wrongful refusal to accord recognition in past years.

2.

Although fiduciary duty can also give rise to a claim for damages within the Tucker Act or Indian Tucker Act, no such theory provides a right of action for the ISDA monies claimed here. See White Mountain, 537 U.S. at 473-74 (discussing fiduciary relations giving rise to Indian Tucker Act jurisdiction); Mitchell II, 463 U.S. at 224-26. In

White Mountain, the court recognized a difference in kind between instances where the government undertook "full" or pervasive responsibility for managing Indian land and resources, and a "bare" or "limited" trust relation in which the government undertook no resource management responsibility. White Mountain, 537 U.S. at 473-74. The court explained the former relationship "defined the contours" of fiduciary responsibilities "beyond the bare or minimal level, and thus could fairly be interpreted as mandating compensation through money damages if the Government faltered in its responsibilities." Id. at 474 (internal citation omitted), quoting Mitchell II, 463 U.S. at 224-26. On the merits the court found the government's conduct established a fiduciary relation triggering an obligation to preserve improvements in the property held, by statute, in trust. See White Mountain, 537 U.S. at 474-75 (discussing Pub. L. No. 86-392, 74 Stat. 8, and plenary authority the United States actually exercised over the Apache's trust corpus).

The Samish nowhere identify a source of fiduciary duty that would provide a damage remedy for ISDA program money or indirect costs they claim in their first count. At most, the Samish rely on the ISDA policy statement at § 450a(b). (Appellant Reply Br. at 13 n.7.) This congressional statement of policy fails to create the necessary trust relation triggering a damage remedy for the program money and indirect costs the Samish claim here.[12] First, this policy statement nowhere uses the express language of

---

12 Section 450a(b) provides:

(b) Declaration of commitment

The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for,

a trust. By contrast, both Mitchell II and White Mountain grounded their fiduciary analysis in statutory language expressly creating a trust relation in a specific property interest. See Mitchell II, 463 U.S. at 224-26; White Mountain, 537 U.S. at 474-75. Second, this ISDA policy statement does not confer on the government pervasive or elaborate control over a trust corpus, such as would increase federal obligations beyond any long-recognized "general trust relationship between the United States and the Indian people." Mitchell II, 463 U.S. at 225. As White Mountain observed, that bare trust obligation does not support specific claims for damages conferring Tucker Act jurisdiction. White Mountain, 537 U.S. at 473-74; cf. Mitchell I, 445 U.S. at 542. If anything, the ISDA has precisely the opposite effect. Instead of arrogating control and authority to the government, like regulations and conduct that gave rise to a damage remedy in White Mountain and Mitchell II, the ISDA delegates to tribal organizations authority over federal programs. And as set forth above, neither does the ISDA, of its own force, convert the underlying statutory programs into entitlements fairly analogized to a trust corpus. The Samish's attempt to fit their ISDA claim within White Mountain's fiduciary framework is misplaced.[13]

---

> and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services. In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

25 U.S.C. § 450a(b) (2000).

[13] We do not decide whether any fiduciary theory supplies Tucker Act jurisdiction over the specific substantive laws, or combination of laws, asserted in the Samish's second count.

For that reason we affirm the trial court's dismissal of count one for lack of subject matter jurisdiction.

B.

Instead of relying solely on the ISDA, the Samish's second count claims past benefits under a basket of thirty-eight other treaties and statutes. The Samish included within this grouping the Snyder Act. But as noted above, the Supreme Court previously determined the Snyder Act is not money-mandating and, e.g., does not provide a private damage remedy. See Lincoln v. Vigil, 508 U.S. 182, 194 (1993); White Mountain Apache, 249 F.3d at 1372 (Fed. Cir. 2001), aff'd 537 U.S. 465 (2003). The court therefore affirms the trial court's dismissal of the Samish's second count, insofar as it relied upon the Snyder Act.

III.

The Court of Federal Claims dismissed the Samish's second count, for past benefits, as time barred. It held that the Samish could have brought this action as early as 1969, when BIA dropped the Samish from the unofficial list of 'recognized' tribes. We disagree for at least two reasons. First, as explained below, the challenge to the federal government's refusal to accord recognition is limited by the contours of the political question doctrine. Recognition is a political act that is generally non-justiciable. The Samish could not, in 1969, have established that the government's conduct was "wrongful" as required by their retroactive benefits claims here.

Second, the Samish claims did not accrue until the Samish, through their administrative challenges, obtained a final ruling by a district court under the APA that the government's refusal to accord historical acknowledgment between 1978 and 1996

was arbitrary and capricious. A claimant must bring action under the Tucker Act, 28 U.S.C. § 1491, within six years of accrual. 28 U.S.C. § 2501 (2000). The same statute of limitations applies to claims brought under the Indian Tucker Act, 28 U.S.C. § 1505. Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576 (Fed. Cir. 1988). A claim accrues under § 2501 "when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc).[14] If a necessary element to a claim must be established in a different forum, the claim will not accrue for § 2501 until that element is finally established in the other proceeding. See, e.g., Heck v. Humphrey, 512 U.S. 477, 489-90 (1994); Midgett v. United States, 603 F.2d 835, 839 (Ct. Cl. 1979).

The Samish had to establish the necessary elements of their historic claim in a different forum. In this case the claim for historic benefits depends on their establishing that the government arbitrarily and capriciously withheld historic federal acknowledgment from the Samish before 1996. Only a district court, acting on a challenge under the APA, has authority to review the Secretary's acts concerning the executive's recognition determination under 25 C.F.R. Part 83. In this case, the district court in Greene identified several facts required for historic recognition of the Samish tribe. The Secretary, however, omitted the pertinent findings from the April 9, 1996 recognition determination, preventing the present action for old non-Snyder Act claims from accruing. In Greene the district court modified the Secretary's April 9, 1996 recognition decision by reinserting the three deleted findings.

---

[14] Cf. Chambers v. United States, No. 04-5134, slip op. at 7-9 (Fed. Cir. Aug. 1, 2005) (applying Martinez).

Those findings support the premise that the Samish should have been given historic recognition and obtain standing for the claims directed to old non-Snyder Act benefits. The missing element was finally established, within the meaning of Heck and Martinez, with the effective date of the district court's modification to the Secretary's acknowledgment determination. That date was November 1, 1996, when the district court in Greene entered its final judgment in the APA action. In sum, the district court's reinstatement validated the historic recognition of the Samish.

A.

There are generally three means by which the federal government can recognize an Indian tribe.[15] The government can enter into a treaty with a tribe. See, e.g., Cherokee Nation v. Georgia, 30 U.S. 1, 16 (1831).[16] Congress can recognize a tribe by enacting a specific statute, in its powers incidental to the Indian Commerce Clause. See, e.g., Chippewa Indians of Minn. v. United States, 307 U.S. 1, 4-5 (1939) (discussing role of Act of 1889 in recognizing the Chippewa Indians); cf. Act of Mar. 2, 1889, ch. 405, 25 Stat. 888 (dividing the reservation of the Sioux Nation of Indians); U.S. Const. art. I, § 8, cl. 3 (authorizing Congress to "regulate Commerce with Foreign nations, and among the several States, and with the Indian Tribes"). Or the executive

---

[15] See generally Felix S. Cohen's Handbook of Federal Indian Law 3-7 (1982 ed.) (discussing tribal recognition); I American Indian Policy Review Comm'n, 95th Cong., 1st Sess., Final Report 462 (Comm. Print 1977) (discussing varying and ad hoc manner in which federal recognition was extended before 1977); cf. William C. Canby, Jr., American Indian Law in a Nutshell 4 (4th ed. 2004) ("Federal recognition may arise from treaty, statute, executive or administrative order, or from a course of dealing with the tribe as a political entity."), quoted in Kahawaiolaa, 386 F.3d at 1273.

[16] "[The Cherokee] have been uniformly treated as a state from the settlement of our country. The numerous treaties made with them by the United States recognize them as a people capable of maintaining the relations of peace and war . . . . The acts of our government plainly recognize the Cherokee nation as a state, and the courts are bound by those acts."

can recognize a tribe pursuant to the authority delegated by Congress. See 25 U.S.C. §§ 2, 9 (2000). As noted above, recognition by one mechanism does not necessarily confer recognition for all purposes.[17] In this case, the Samish challenge the federal government's refusal to accord federal acknowledgment for purposes of statutory benefits.

As a political determination, tribal recognition is not justiciable. As the Supreme Court observed in United States v. Holliday,

> The facts in the case certified up with the division of opinion, show distinctly "that the Secretary of the Interior and the Commissioner of Indian Affairs have decided that it is necessary, in order to carry into effect the provisions of said treaty, that the tribal organization should be preserved." In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same.

70 U.S. (3 Wall.) 407, 419 (1865). The courts, in short, defer to the political determination made by Congress or the executive. See also United States v. Rickert, 188 U.S. 432, 445 (1903) ("It is for the legislative branch of the government to say when these Indians shall cease to be dependent and assume the responsibilities attaching to citizenship. That is a political question, which the courts may not determine. We can only deal with the case as it exists under the legislation of Congress."); United States v. Sandoval, 231 U.S. 28, 46 (1913) ("[I]n respect of distinctly Indian communities the questions whether, and to what extent, and for what time they shall be recognized and

---

[17] The Ninth Circuit, in particular, suggests that treaty recognition and statutory recognition serve different purposes, with independent effect. See Greene v. Babbitt, 64 F.3d 1266, 1270-71 (9th Cir. 1995); Greene v. Babbitt, 996 F.2d 973, 976-77 (9th Cir. 1993)); United States v. Washington, 520 F.2d 676, 693 (9th Cir. 1975); see also 25 C.F.R. § 83.8 (2005).

dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts.").

Examining the principles underlying this precedent in Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court observed that the judicial deference to the recognition determinations by the political branches "reflects familiar attributes of political questions." Id. at 215; see generally id. at 215-17 & n.43. Discussing the general rule for recognizing foreign governments, the Court firmly distinguished between the political act of according recognition and the judicial determination that a party satisfies the status made a condition to any given statute.

> [R]ecognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called "a republic of whose existence we know nothing," and the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory, once sovereignty over an area is politically determined and declared, courts may examine the resulting status and decide independently whether a statute applies to that area.

369 U.S. at 212.[18] The Court observed that tribal recognition was a special case, because "the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else. . . . [The Indians are] domestic dependent nations . . . in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian." Baker, 369 U.S. at 215 (quoting Cherokee Nation, 30 U.S. at 16-17). The court further recognized that, as explained in Sandoval, the political question principle was bounded in that it did not prevent the courts from

---

18 Accord United States v. 43 Gallons of Whiskey, 93 U.S. 188, 195 (1876) ("As long as these Indians remain a distinct people, with an existing tribal organization, recognized by the political department of the government, Congress has the power to say with whom, and on what terms, they shall deal . . . .").

intervening to limit Congressional overreaching under the Indian Commerce Clause.[19] In sum, the Baker analysis does not alter the rule that recognition is a political question.

Formulating the limits of the political question doctrine, the Baker opinion identified several criteria common to a non-justiciable issue.

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217. Under the political question doctrine any one criterion is both necessary and sufficient. "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." Id. Before 1978 this taxonomy fully described tribal recognition. The treaty power and the Congressional power to regulate commerce with Indian tribes

---

[19] As the Court explained,

> While "[I]t is for [Congress] * * *, and not for the courts, to determine when the true interests of the Indian require his release from (the) condition of tutelage * * *, it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe * * *." United States v. Sandoval, 231 U.S. 28, 46 (1913). Able to discern what is "distinctly Indian," id., the courts will strike down any heedless extension of that label. They will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power.

Baker, 369 U.S. at 215-17.

are plainly matters textually committed, by the constitution, to the political branches. As shown by the case law, the separation of powers reasoning underlying the final three criteria applied both in historical practice and as a matter of principle. Finally, the courts had no judicially discoverable or manageable criteria by which to accord federal recognition.

In 1975, Congress established the American Indian Policy Review Commission. See Pub. L. No. 93-580, 88 Stat. 1910 (1975). Congress specifically instructed the Commission to make a comprehensive investigation into "the statutes and procedures for granting Federal recognition and extending services to Indian communities and individuals." Id., § 2(3), 88 Stat. at 1911. In its final report, the Commission noted that no recognizable criteria applied to the federal recognition decision. "Trying to find a pattern for the administrative determination of a federally recognized Indian tribe is an exercise in futility. There is no reasonable explanation for the exclusion of more than 100 tribes from the Federal trust responsibility. . . . A number of Indian tribes are seeking to formalize relationships with the United States today but there is no available process for such actions." I American Indian Policy Review Comm'n, 95th Cong., 1st Sess., Final Report 462 (Comm. Print 1977) ("Final Report").

In response to the Commission findings, the Interior Department published regulations establishing the first detailed, systematic process by which tribal groups could obtain acknowledgment. See Procedures For Establishing That An American Indian Group Exists As An Indian Tribe, 43 Fed. Reg. 39361 (Sep. 5, 1978) (later codified at 25 C.F.R. Part 54). When the regulations became effective on October 2,

1978, they supplied the courts clearly manageable and objective factors by which to review federal acknowledgment determinations pursuant to the APA.

As several of our sister circuits have recognized, however, supplying these criteria did not alter the general rule of non-justiciability. See Kahawaiolaa, 386 F.3d at 1276;[20] Miami Nation of Indians of Ind., Inc. v. Dep't of Interior, 255 F.3d 342, 346-48 (7th Cir. 2001);[21] W. Shoshone Bus. Council For and on Behalf of W. Shoshone Tribe of Duck Valley Reservation v. Babbitt, 1 F.3d 1052, 1057 (10th Cir. 1993);[22] James v. United States Dep't of Health & Human Servs., 824 F.2d 1132, 1137 (D.C. Cir. 1987).[23] To be sure, by adopting the acknowledgment criteria the government voluntarily bound its process within the confines of its regulations, subject to APA review by the courts. But that limitation alters neither the commitment of the federal recognition determination to the political branches, nor the regard for separation of powers that precludes judicial evaluation of those criteria in the first instance. The political determination may be

---

20 "[I]t is quite correct to say that a suit that sought to direct Congress to federally recognize an Indian tribe would be non-justiciable as a political question."

21 "[R]ecognition lies at the heart of the doctrine of 'political questions.'" Miami Nation, 255 F.3d at 347.

22 In Western Shoshone, the Tenth Circuit refused to second-guess the Interior Department's failure to recognize the Shoshone tribe. As it explained,

> The judiciary has historically deferred to executive and legislative determinations of tribal recognition. See United States v. Rickert, 188 U.S. 432, 445 (1903); United States v. Holliday, 70 U.S. (3 Wall.) 407, 419 (1865). Although this deference was originally grounded in the executive's exclusive power to govern relations with foreign governments, broad congressional power over Indian affairs justifies its continuation.

1 F.3d at 1057.

23 "The purpose of the regulatory scheme set up by the Secretary of the Interior is to determine which Indian groups exist as tribes. 25 C.F.R. § 83.2. That purpose would be frustrated if the Judicial Branch made initial determinations of whether groups have been recognized previously or whether conditions for recognition currently exist."

circumscribed by regulation, but it is still a political act. The regulations create a limited role for judicial intervention, namely, APA review to ensure that the government followed its regulations and accorded due process. See Miami Nation, 255 F.3d at 348 ("By promulgating such regulations the executive brings the tribal recognition process within the scope of the Administrative Procedure Act."). Thus, under the acknowledgment regulations, the executive – not the courts – must make the recognition determination.

B.

The Samish contend that they were deprived of statutory benefits because of the "wrongful actions of the United States in refusing to treat the Samish Indian Nation as a federally recognized tribe." (FAC ¶ 29.) Because tribal recognition remains a political question, the trial court erred in holding that the Samish "could have pursued the present action in court before the administrative proceedings [concerning the Samish petition for federal acknowledgment] were concluded." Samish, 58 Fed. Cl. at 117. Specifically, the Samish cause of action for retroactive benefits did not accrue until they obtained a final determination from the district court, through their APA challenge, that the government's conduct underlying its refusal to accord federal recognition, before 1996, was arbitrary and capricious. See Heck, 512 U.S. at 489-90; Midgett, 603 F.2d at 839. In sum, the Samish could only obtain judicial review of the Secretary's acknowledgement decision through an APA action in a district court. Congress plainly gave the Court of Federal Claims no role in the recognition process, and that court has no inherent authority to take part in it.[24] Moreover, the Court of Federal Claims has no power to review the Secretary's acknowledgment decisions under the APA. In view of

---

[24] No precedent of this court, or its predecessor the Court of Claims, would allow the Court of Federal Claims to delve into tribal recognition.

this, we need not reach the issue of whether or not the Samish could have brought this action in 1969.

The government urges this court to hold that the Samish claims to retroactive benefits accrued on April 9, 1996, when the government accorded the Samish federal recognition. We disagree. The omitted facts go to historic recognition and were not necessary to the Secretary's acknowledgement determination going forward. The same facts, however, are central to the Samish's instant claim. Thus, although the Secretary's April 9, 1996 determination conferred standing, under 25 C.F.R. § 83.2, for the Samish to seek prospective statutory benefits, it did not establish the elements necessary to assert the present claims to past, non-Snyder Act benefits.

Rather, the district court finally established that the government wrongfully withheld the Samish federal acknowledgment, and disregarded facts that would have supported historic recognition, when the district court modified the Secretary's recognition decision to establish the previously omitted ALJ findings. As discussed above, those findings support the Samish contention that but for the government's arbitrary and capricious treatment the Samish would have been extended federal recognition prior to 1996. Indeed, as the trial court noted, the third finding at issue provides that the government was arbitrary and capricious in dropping the Samish from the 1969 BIA list. Read in view of the ALJ's findings, on remand in Greene, that the BIA list "was the basis on which groups were then classified as Federally-recognized or not," the district court's determination provides a predicate "wrongful" element in this action. These findings in combination confirm the contention, central to the Samish's claims at

bar, that the government was arbitrary and capricious in refusing the Samish federal acknowledgment under the regulations before 1996.

We do not suggest that the district court had authority independently to apply the recognition criteria under 25 C.F.R. Part 83. To the contrary, as set forth above, federal acknowledgment has been committed to the coordinate branches. Nonetheless, the parties do not dispute that the district court acted within its authority under the APA modifying the factual basis of the Secretary's recognition determination. The district court modified the executive order as appropriate under its authority pursuant to the APA.

The Samish claims for retroactive benefits thus accrued on November 1, 1996, when the district court entered judgment in Greene. With the six year limitations period under § 2501, the Samish had to file this action before November 1, 2002. Because the Samish brought this action on October 11, 2002, it is timely. Thus, the court reverses the trial court's dismissal of the Samish's second claim as time-barred.

IV.

Because the ISDA is not money-mandating for purposes of count one, we affirm the Court of Federal Claims dismissal for lack of jurisdiction. As the Snyder Act is also not money-mandating, we affirm-in-part the dismissal of count two insofar as it relies on the Snyder Act.

The Samish's remaining claim to past benefits accrued with the effective date of the district court's modification, in Greene, to the Secretary's findings in support of federal acknowledgment. Because the Samish brought the action before November 1, 2002, within the six year limitations period, the claim is not time-barred. Thus, except

as discussed above with respect to the Snyder Act allegations we reverse the dismissal of count two.

Finally, we affirm the dismissal, without prejudice, of the Samish claim to benefits after 1996.

AFFIRMED IN PART, REVERSED IN PART, REMANDED.

Each side shall bear its own costs.

DEPARTMENT OF ENERGY
DELEGATION ORDER NO. 00-016.00
TO THE DIRECTOR OF THE OFFICE OF HEARINGS AND APPEALS

1. DELEGATION. Under the authority vested in me as Secretary of Energy and pursuant to section 642 of the Department of Energy Organization Act (Public Law 95-91, 42 U.S.C. 7252), I delegate to the Director of the Office of Hearings and Appeals authority to take the following actions:

1.1 Issue orders with respect to applications for an adjustment (exception) to any rule, regulation or order having the applicability and effect of a rule issued under the Federal Energy Administration Act (Public Law 93-275), as amended ("FEAA"), the Emergency Petroleum Allocation Act of 1973 (Public Law 93-159), as amended ("EPAA"), the Energy Supply and Environmental Coordination Act of 1974 (Public Law 93-319), as amended ("ESECA"), the Energy Policy and Conservation Act (Public Law 94-163), as amended ("EPCA"), consistent with the other purposes of the relevant Act, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens.

1.2 Issue orders with respect to applications for exception to any rule, regulation or order having the applicability and effect of a rule issued under any statutory authority other than those listed above, vested in the Secretary, consistent with the other purposes of the relevant statutory authority, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens whenever such statutes or Departmental regulations provide for the issuance of such orders.

1.3. Issue appellate decisions as appropriate under the Freedom of Information Act (Public Law 89-487), as amended, the Privacy Act of 1974 (Public Law 93-579), as amended, the Nuclear Waste Policy Act of 1982 (Public Law 97-425), as amended, and the Energy Policy Act of 1992 (Public Law 102-486), as amended, consistent with the purposes of the relevant Act.

1.4 Issue decisions pursuant to regulations adopted by the Department of Energy (Department or DOE) with respect to the administrative appeal of any DOE order other than those appeals that are vested in the Board of Contract Appeals or assigned to the Federal Energy Regulatory Commission (FERC).

1.5 Issue orders pursuant to Departmental procedures with respect to applications for modification or rescission of any DOE order.

1.6 Issue orders with respect to petitions for special redress, relief, or other extraordinary assistance.

1.7 Issue orders with respect to applications for stay of any order, rule, regulation, ruling or other generally applicable requirement as incident to the proceedings set forth in the other provisions of this Delegation Order.

1.8 Conduct adjudicatory proceedings with respect to and issue final Remedial Orders, Remedial Orders for Immediate Compliance and Orders of Disallowance.

1.9 Advise FERC whenever a recipient of a Remedial Order, Remedial Order for Immediate Compliance or Order of Disallowance notifies the Director that the recipient intends to contest the Order.

1.10 Issue decisions, with the concurrence of the Deputy Secretary, with respect to requests made by organizations for financial assistance to participate in any regulatory or adjudicatory proceeding other than a FERC matter.

1.11 Conduct adjudications under section 11 of the Clayton Act (15 U.S.C. 21) as related to the transportation of oil by pipeline, pursuant to the provisions of section 306 of the DOE Act (42 U.S.C. 7155).

1.12 Conduct adjudicatory proceedings and issue orders in any instance in which a statute vesting authority in the Secretary requires an adjudication or appellate procedure and express Departmental procedures do not specify the manner in which the statutory authority is to be exercised.

1.13 Develop and adopt Guidelines for the evaluation of matters within the Director's jurisdiction.

1.14 Conduct investigatory and adjudicatory proceedings, and issue reports of investigation and initial and appellate agency decisions, pursuant to 10 C.F.R. Part 708, the "Criteria and Procedures for DOE Contractor Employee Protection Program," and make initial jurisdictional determinations, conduct investigatory proceedings, issue reports of investigation, and issue orders for remedial action pursuant to the "Whistleblower Protection Program" in section 3164 of the National Defense Authorization Act for Fiscal Year 2000. For purposes of this Delegation Order, proceedings arising under 10 C.F.R. Part 708 and section 3164 shall not be considered Federal employee personnel matters.

1.15 Conduct adjudicatory proceedings and issue opinions pursuant to 10 C.F.R. Part 710, "Criteria and Procedures for Determining Eligibility for Access to Classified Matter or Special Nuclear Material." For purposes of this Delegation Order, proceedings arising under 10 C.F.R. Part 710 shall not be considered Federal employee matters.

1.16 Pursuant to the Petroleum Overcharge Distribution and Restitution Act of 1986 (Public Law 99-509) ("PODRA"), adopt and administer special refund procedures for adjudicating claims made by injured persons for restitution from any oil overcharge funds made available to the Department of Energy as a result of enforcement actions; in the course of administering the claims process, take any measures necessary or appropriate to reach equitable results in an expeditious manner.

1.17 When necessary and incidental to the exercise of the authority delegated hereby, request information, undertake investigations and conduct conferences, hearings or public hearings with respect to the functions delegated hereby; administer oaths and affirmations to any person, and suspend or disqualify any person appearing at such conferences or hearings; issue subpoenas and, if appropriate, direct that payment of witness fees and mileage be made to any witness appearing in response to such subpoenas.

1.18 Conduct such other proceedings and take such other action as the Secretary or his authorized delegate(s) may, from time to time, direct or authorize.

1.19 Sign documents (other than rulemaking) for publication in the Federal Register which are necessary and appropriate for the director to perform his functions.

2. RESCISSION. Delegation Order 0204-24, Amendment No. 1, 2, and 3 to Delegation Order 0204-24, and Delegation Memorandum of November 2, 1978, "Authority to Formulate and Implement Refund Process" are hereby rescinded.

3. LIMITATION.

3.1 In exercising the authority delegated in this Order, a delegate shall be governed by the rules and regulations of the Department of Energy and the policies and procedures prescribed by the Secretary or delegate(s).

3.2 Nothing in this Order precludes the Secretary from exercising any of the authority delegated by this Order.

3.3 Nothing in this Order shall be construed to supersede or otherwise interfere with the authorities provided to the Administrator for Nuclear Security by law or by delegation. Furthermore, nothing herein constitutes authority to exercise

authority, direction, or control of an employee of the National Nuclear Security Administration or its contractors.

3.4 The orders described in Paragraphs 1.1 and 1.2 (including proposed exception decisions) as well as Paragraph 1.6 shall be issued only with the concurrence of the Administrative Review Committee, the Senior Review Committee or the Deputy Secretary as appropriate. Orders in the nature of an exception issued pursuant to Paragraphs 1.12 and 1.18 shall require the concurrence of the appropriate Review Committee unless otherwise specified by the Deputy Secretary. However, the concurrence of the Review Committee shall not be required for any interlocutory orders, extensions of relief previously provided, summary dismissals, dismissals of a matter without prejudice to resubmission, or supplemental orders generally contemplated by a prior order.

3.5 The authority delegated to the Director by Paragraphs 1.3 and 1.4 of this Delegation Order does not include the authority to order any office of the Department to take or refrain from taking any action except in the context of a pending proceeding before the Office of Hearings and Appeals or with respect to issues involving practice or procedure before the Office of Hearings and Appeals. Prior to taking any action pursuant to Paragraph 1.13, the Director shall consult with the General Counsel and any program office that is directly affected by the proposed action.

3.6 The authority delegated to the Director by this Delegation Order does not include the authority to decide any matter that is within the jurisdiction of the FERC, or that has been assigned or delegated to the Board of Contract Appeals, or that involves Federal employee personnel matters, or to issue determinations that pertain solely to the internal administration of the Department.

3.7 Any amendments to this Order shall be in consultation with the Department of Energy General Counsel.

4. <u>AUTHORITY TO REDELEGATE</u>.

4.1 Except as expressly prohibited by law, regulation, or this Order, the Director of the Office of Hearings and Appeals may delegate this authority further, in whole or in part.

4.2 Copies of redelegations and any subsequent redelegations shall be provided to the Office of Management and Operations Support, which manages the Secretarial Delegations of Authority system.

5. DURATION AND EFFECTIVE DATE.

5.1 All actions pursuant to any authority delegated prior to this Order or pursuant to any authority delegated by this Order taken prior to and in effect on the date of this Order are ratified and remain in force as if taken under this Order, unless or until rescinded, amended or superseded.

5.2 This Order is effective December 6, 2001.

Spencer Abraham
Secretary of Energy