**Electronically Filed on September 29, 2005**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:04cv1365 |
| vs. | ) | |
| | ) | Judge Susan G. Braden |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**CHEVRON U.S.A. INC.'S RESPONSE TO THE UNITED STATES' SUPPLEMENTAL MOTION TO DISMISS**

Donald B. Ayer
Lawrence D. Rosenberg
Louis K. Fisher
Victoria Dorfman
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Tel.: 202-879-3939
Fax: 202-626-1700

*Counsel for Chevron U.S.A. Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

INTRODUCTION AND BACKGROUND ..... 1

ARGUMENT ..... 5

I. The Government Has Waived Sovereign Immunity Through the Tucker Act ..... 5

A. The Government's Waiver of Sovereign Immunity for Breach of the Equity Process and Decoupling Agreements Is Governed by the Tucker Act ..... 5

B. Chevron Has Satisfied Its Burden to Plead a Tucker Act Waiver of Sovereign Immunity ..... 7

C. The Tucker Act Requires No Separate Showing That a Contract Is "Money Mandating" ..... 8

D. The Equity Process Agreement Does Not Waive Chevron's Tucker Act Remedies for Breach of the EPA Itself ..... 13

II. The Non-Appropriated Funds *Instrumentality* Doctrine Does Not Apply Because the Department of Energy Receives Appropriated Funds ..... 15

A. The NAFI Doctrine Applies Only To Specific *Agencies* That Do Not and Cannot Receive Any of Their Funding Through Appropriations ..... 15

B. The Department of Energy Plainly Is Not a NAFI Because It Receives Appropriated Funds ..... 19

C. Because the 1997 Contract Is Not a Contract Between a Private Party and a NAFI, the Tucker Act's Requirement That Judgments Be Payable Out of Appropriated Funds Is Satisfied ..... 19

1. The Judgment Will Be Payable Out of Appropriated Funds in the Judgment Fund Under 31 U.S.C. § 1304 ..... 19

2. Even If the Judgment Were Not Payable Out of the Judgment Fund, It Would Be Payable Out of Appropriated Funds ..... 21

III. No Separate Waiver of Sovereign Immunity Is Required for Recovery of Equity Process Expenses as an Element of Reliance Damages ..... 22

IV. The Equity Process Agreement Does Not Give OHA Authority to Resolve Disputes Over the Agreement Itself ..... 25

CONCLUSION ..... 29

## TABLE OF AUTHORITIES

**Page**

### CASES

*AINS, Inc. v. United States*,
365 F.3d 1333 (Fed. Cir. 2004) ....................16, 17, 19

*Arakaki v. United States*,
62 Fed. Cl. 244 (2004) ....................7, 10

*Asociacion Colombiana de Exportadores de Flores v. United States*,
916 F.2d 1571 (Fed. Cir. 1990) ....................27

*Bath Iron Works Corp. v. United States*,
20 F.3d 1567 (Fed. Cir. 1994) ....................21

*Baxter v. Claytor*,
652 F.2d 181 (D.C. Cir. 1981) ....................28

*Bay View, Inc. v. United States*,
46 Fed. Cl. 494 (2000), *aff'd*, 278 F.3d 1259 (Fed. Cir. 2001) ....................11

*Beard v. General Services Admin.*,
801 F.2d 1318 (Fed. Cir. 1986) ....................28

*California v. United States*,
271 F.3d 1377 (Fed. Cir. 2001) ....................5

*Chambers v. United States*,
417 F.3d 1218 (Fed. Cir. 2005) ....................8

*Charles O. Finley & Co. v. Kuhn*,
569 F.2d 527 (7th Cir. 1978) ....................14

*Chevron U.S.A., Inc. v. United States*,
20 Cl. Ct. 86 (1990) ....................2, 22, 23

*Cincinnati v. United States*,
153 F.3d 1375 (Fed. Cir. 1998) ....................7

*Core Concepts of Florida, Inc. v. United States*,
327 F.3d 1331 (Fed. Cir. 2003) ....................16

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Do-Well Machine Shop, Inc. v. United States*,
870 F.2d 637 (Fed. Cir. 1989) ....................8

*Eastport Steamship Corp. v. United States*,
135 Ct. Cl. 175, 140 F. Supp. 773 (1956)....................21

*Federal Group, Inc. v. United States*,
67 Fed. Cl. 87 (Ct. Cl. 2005) ....................17, 18, 19

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) ....................8, 11

*Furash & Co. v. United States*,
252 F.3d 1336 (Fed. Cir. 2001) ....................18

*Gentex Corp. v. United States*,
61 Fed. Cl. 49 (2004) ....................22, 23, 24, 25

*Griswold v. United States*,
61 Fed. Cl. 458 (2004) ....................11

*Hamlet v. United States*,
63 F.3d 1097 (Fed. Cir. 1995) ....................10, 11

*Iddir v. INS*,
301 F.3d 492 (7th Cir. 2002) ....................28

*Irene v. Cathedral Park Tower Board of Managers, Ltd.*,
273 A.D.2d 816, 710 N.Y.S.2d 267 (App. Div. 2000) ....................14

*Khan v. United States*,
201 F.3d 1375 (Fed. Cir. 2000) ....................10, 11

*Lee v. United States*,
33 Fed. Cl. 374 (1995) ....................11

*Lee v. United States*,
124 F.3d 1291 (Fed. Cir. 1997) ....................20, 21

*Lion Raisins, Inc. v. United States*,
416 F.3d 1356 (Fed. Cir. 2005) ....................17, 19, 22

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Massachusetts Bay Transportation Authority v. United States*,
129 F.3d 1226 (Fed. Cir. 1997) ....................22, 23, 24, 25

*McCafferty v. United States*,
61 Fed. Cl. 615 (2004), *aff'd*, No. 05-5005 (Fed. Cir. July 11, 2005)....................16, 17, 19

*Moyer v. United States*,
190 F.3d 1314 (Fed. Cir. 1999) ....................9

*Pijanowski v. United States*,
60 Fed. Cl. 628 (2004), *aff'd*, 125 Fed. Appx. 1015 (Fed. Cir. 2005)....................12

*Porter v. Board of Trustees of Manhattan Beach Unified Sch. District*,
307 F.3d 1064 (9th Cir. 2002), *cert. denied*, 537 U.S. 1194 (2003)....................27

*Pratt v. United States*,
50 Fed. Cl. 469 (2001)....................22, 23, 24, 25

*Ransom v. United States*,
900 F.2d 242 (Fed. Cir. 1990) ....................12

*San Juan City College v. United States*,
391 F.3d 1357 (Fed. Cir. 2004) ....................9, 13

*Sanders v. United States*,
252 F.3d 1329 (Fed. Cir. 2001) ....................13

*Schooling v. United States*,
63 Fed. Cl. 204 (2004)....................12

*Shalala v. Illinois Council on Long Term Care, Inc.*,
529 U.S. 1 (2000)....................27

*Southern California Federal Sav. & Loan Association v. United States*,
Nos. 04-5036, 04-5038, 2005 WL 2001022 (Fed. Cir. Aug. 22, 2005)....................6

*Standard Oil Co. v. United States*,
685 F.2d 1322 (Ct. Cl. 1982)....................24

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Texas Instruments Inc. v. United States*,
991 F.2d 760 (Fed. Cir. 1993) ....................24

*Trauma Service Group v. United States*,
104 F.3d 1321 (Fed. Cir. 1997) ....................7

*United States v. General Electric Corp.*,
727 F.2d 1567 (Fed. Cir. 1984) ....................16, 17, 18, 19

*United States v. Mitchell*,
463 U.S. 206 (1983)....................11

*United States v. Standard Oil Co.*,
545 F.2d 624 (9th Cir. 1976) ....................2

*United States v. Winstar Corp.*,
518 U.S. 839 (1996)....................8, 9, 13

*Winn-Dixie Stores, Inc. v. FTC*,
377 F. Supp. 773 (M.D. Fla. 1974)....................14

*Yancheng Baolong Biochem. Products Co. v. United States*,
406 F.3d 1377 (Fed. Cir. 2005) ....................24

**STATUTES**

Pub. L. No. 104-106, 110 Stat. 186 (1995)....................2

§ 3401....................19

§ 3412(b)(2) ....................3

§ 3412(b)(3) ....................3

§ 3413(c) ....................3, 6

Pub. L. No. 108-375, 118 Stat. 1811 (2004)....................19

10 U.S.C. § 7420 note sec. 3412....................6

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

10 U.S.C. § 7426 .......... 6

28 U.S.C. § 1491(a)(1) .......... 1, 8

28 U.S.C. § 2517(a) .......... 21

31 U.S.C. § 1304(a)(1) .......... 20

42 U.S.C. § 7256 .......... 6

## MISCELLANEOUS

11 Arthur Linton Corbin, *Corbin on Contracts* (Interim ed. 2002) .......... 23

## INTRODUCTION AND BACKGROUND

The Government's "Supplemental Rule 12(b)(1) Motion," like its Rule 12(b)(6) motion, should be denied. The Government's supplemental brief recasts the arguments from its Rule 12(b)(6) motion and brings forth new arguments in an attempt to dispute its waiver of sovereign immunity and the existence of jurisdiction in this Court. As Plaintiff Chevron U.S.A. Inc., demonstrates in this Response, however, the Complaint's allegation of a breach of contract by the United States sufficiently establishes that the United States has waived its sovereign immunity, that jurisdiction lies in this Court, and that Chevron has a claim upon which relief can be granted. The Tucker Act expressly waives sovereign immunity by providing that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). Chevron's claim against the United States clearly is founded upon an express contract with the United States – the Equity Process and Decoupling Agreements executed by the parties on May 19, 1997. By engaging in specifically prohibited *ex parte* communications that irrevocably tainted the finalization of the parties' respective equity interests in the Elk Hills Reserve, the United States materially breached this contract with Chevron, which has suffered reliance damages in the amount of many millions of dollars as a direct result of the breach.

The Department of Energy's promise to eschew *ex parte* communications was an essential element of the consideration received by Chevron in exchange for its relinquishment of valuable legal rights. The rights relinquished by Chevron in the 1997 Agreements arise under the 1944 Unit Plan Contract (the "UPC"), which "unitized" the parties' interests in the Elk Hills Reserve. In 1995, Congress enacted legislation instructing the Secretary of Energy to terminate

the UPC and to sell the United States' interest in the Reserve. Pub. L. No. 104-106, §§ 3411-3416, 110 Stat. 186, 631-37 (1995). The UPC allows the Government to terminate the contract, but it protects Chevron's interests by providing: "Termination shall be followed by an adjustment of all . . . rights and obligations, including the rights and obligations growing out of the costs incurred, and the respective quantities of production received, by Navy and Standard, respectively, under the contract, on a fair and equitable basis." UPC ¶ 11(b) (Compl. Ex. A.1). When the United States terminated the UPC, therefore, that contract gave Chevron the right to a "fair and equitable" final reconciliation based on the parties' equity interests in the Reserve as of 1942.

Prior to the execution of the Equity Process and Decoupling Agreements, moreover, the parties understood that Chevron had the right to sue the United States for breaches of the UPC. For example, in *Standard Oil Co. v. United States*, 685 F.2d 1322 (Ct. Cl. 1982), the Court of Claims held that the United States had breached the UPC, and was required to pay damages to Standard (Chevron's predecessor), because the United States had failed to comply with UPC ¶ 5(f) in determining the amount of oil that Standard was entitled to receive from the Reserve. Similarly, in *Chevron U.S.A., Inc. v. United States*, 20 Cl. Ct. 86 (1990), the Claims Court held that the United States had breached the UPC, and was required to pay damages to Chevron, because the United States had failed to share the costs of a third-party lawsuit as required by UPC ¶ 6. The United States likewise has obtained a judicial determination of the parties' rights and obligations under the UPC. *See United States v. Standard Oil Co.*, 545 F.2d 624, 631-36 (9th Cir. 1976) (construing the UPC and holding that certain lands had not become part of Elk Hills operating unit, but could be added by Secretary of Navy pursuant to UPC ¶ 15(b)). The parties therefore knew that, absent a waiver, Chevron was entitled to sue the United States for

any breach of the UPC's requirements, including the requirement of a fair and equitable final reconciliation of rights between the parties.

These rights of Chevron under the UPC were not abrogated by the 1995 statute that provided for the sale of the United States' interest in the Reserve. To the contrary, the statute expressly stated that "[n]othing in this subtitle shall be construed to adversely affect the ownership interest of any other entity having any right, title, and interest in and to lands within the boundaries of Naval Petroleum Reserve Numbered 1 and which are subject to the unit plan contract." Pub. L. No. 104-106, § 3413(c), 110 Stat. at 634-35. The statute also confirmed more specifically that ongoing equity redetermination disputes "shall be resolved in the manner provided in the unit plan contract." *Id.* § 3412(b)(3), 110 Stat. at 632. Thus, in instructing the Secretary of Energy to "establish final equity interest in the reserve" through "such . . . method . . . as the Secretary considers appropriate," *id.* § 3412(b)(2), Congress neither authorized the Secretary to breach the UPC nor extinguished Chevron's right to sue for any such breach. The Secretary, in fact, subsequently issued an agreed "protocol" designed to insure compliance with the UPC while preserving "any available legal remedies to review . . . the final equity decisions . . . made pursuant to section 3412(b)(2) of the Act." Administrative Order No. 96-01, Supplement 1, at ¶ 3(d) (Compl. Ex. D). This contemporaneous agreement further reinforces that the statute had not deprived Chevron of its ability to sue the United States for breach of the UPC.

This background highlights the essence of the bargain struck by the parties in the Equity Process portion of the Equity Process and Decoupling Agreements. Immediately before the parties made these agreements, the equity finalization process was governed by a set of procedures established under the UPC and under the protocol that had been adopted after the

1995 statute's enactment. Pursuant to these procedures, an independent petroleum engineer ("IPE") would recommend a final equity determination to the Assistant Secretary for Fossil Energy, the ASFE would adopt the recommendation or make a different final equity determination, and Chevron would accept the Government's final action or bring a lawsuit claiming breach of the UPC (or seeking APA review). *See* Administrative Order No. 96-01 & Supplement 1 (Compl. Exs. C-D) (establishing IPE procedure). Chevron made a very significant concession, therefore, when it agreed in the Equity Process Agreement to accept limited OHA review of the ASFE's determination in place of the full judicial review to which it was entitled. This concession was possible because of the Government's assurance that the ASFE, although a Department of Energy official, would act as much as possible like an impartial federal judge. The prohibition on *ex parte* communications by the ASFE was an essential part of the consideration received by Chevron, and the Government's violation of that prohibition materially breached the Equity Process and Decoupling Agreements.

As demonstrated below, Chevron's claim for this breach falls squarely within the Court's jurisdiction under the Tucker Act. In its supplemental motion, the Government advances three arguments in an effort to show that there has been no waiver of sovereign immunity, and also asserts that Chevron failed to exhaust remedies supposedly available before the Department of Energy's Office of Hearings and Appeals ("OHA"). These arguments are erroneous. *First*, this contract – like every contract – inherently requires the payment of money damages for breach, and it does not waive judicial remedies for breach of its own provisions. *Second*, the "non-appropriated funds instrumentality" doctrine does not apply here because the United States plainly appropriates funds and accepts financial responsibility for the Department of Energy. *Third*, no separate waiver of sovereign immunity is necessary for recovery of attorney's fees and

related costs that, as here, are an element of contract damages rather than expenses incurred in litigating the breach. *Finally*, OHA lacks jurisdiction over Chevron's claim—as OHA itself has determined.

## ARGUMENT

### I. The Government Has Waived Sovereign Immunity Through the Tucker Act

The Government's primary argument (Supp. Br. 3-5) is that there has been no waiver of sovereign immunity for Chevron's claims. But that erroneous argument ignores the express language of the Tucker Act, the inherent money-mandating nature of contracts, and the express language of the Equity Process Agreement. This Court plainly has jurisdiction.

#### A. The Government's Waiver of Sovereign Immunity for Breach of the Equity Process and Decoupling Agreements Is Governed by the Tucker Act

The Tucker Act "grants the Court of Federal Claims jurisdiction over '[a]ny claim against the United States founded . . . upon any express or implied contract with the United States. . . .' It thus constitutes a waiver of sovereign immunity for those claims." *California v. United States*, 271 F.3d 1377, 1381 (Fed. Cir. 2001) (quoting 28 U.S.C. § 1491(a)(1)). "'[I]f a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit.'" *Id.* at 1382 (quoting *United States v. Mitchell*, 463 U.S. 206, 216 (1983)). This presumption of consent can be rebutted only by "unambiguous evidence" that Congress has "'withdrawn the Tucker Act grant of jurisdiction.'" *Id.* at 1383 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017 (1984)).

It is undisputed that Chevron's claims are for breach of an "express contract" between Chevron and the United States – the Equity Process Agreement and the Decoupling Agreement.[1]

[1] The interrelationship between the Equity Process Agreement and the Decoupling Agreement (hereinafter, collectively, the "1997 Contract") confirms that they are to be treated as one contract. Two related contracts entered into by the same parties simultaneously, even where

Therefore, to establish a sovereign immunity defense, the Government must point to "unambiguous evidence" that Congress has by statute "withdrawn" Tucker Act jurisdiction for Chevron's claims. But the Government has not even attempted to do so. Indeed, the Government does not cite any purported statutory basis for its sovereign immunity defense. And there is none. There is nothing that even arguably limits Tucker Act jurisdiction over Chevron's claims in the enabling legislation for the UPC, 10 U.S.C. § 7426 (repealed by Pub. L. No. 106-398, § 1, 114 Stat. 1654, 1654A-484 (2000)), the legislation authorizing the sale of the Government's interest in the Elk Hills Reserve, 10 U.S.C. § 7420 note sec. 3412, or the legislation authorizing the Secretary of Energy to enter into contracts, 42 U.S.C. § 7256. To the contrary, as noted above, the statute authorizing the sale of the Government's interest in Elk Hills specifically states that "[n]othing in this subtitle shall be construed to adversely affect the ownership interest of any other entity having any right, title, and interest in" the Reserve. Pub. L. No. 104-106, § 3413(c), 110 Stat. at 634-35. *See* graphic below:

(continued…)

they do not cross-reference one another, are treated as a single contract. *See, e.g.*, *Southern Cal. Fed. Sav. & Loan Ass'n v. United States,* Nos. 04-5036, 04-5038, 2005 WL 2001022, at *7 (Fed. Cir. Aug. 22, 2005) ("[T]he cases cited apply a basic rule of contract interpretation to the effect that where several instruments, executed contemporaneously or at different times, pertain to the same transaction, they will be read together, even though they do not expressly refer to each other.") (internal quotation marks omitted). Here, the agreements do expressly cross-reference each other and were intended to be construed together. *See, e.g.*, Decoupling Agreement § 1.1(b) (Compl. Ex. B.1) (defining "UPC Final Equity Participations" as equity determinations that are "final and binding on the parties under the Process Agreement"); Equity Process Agreement Preamble (Compl. Ex. B.2) ("upon execution of . . . the 'Decoupling Agreement' by DOE and Chevron, DOE and Chevron hereby agree: . . ."); *id.* ¶ C.3 ("If the Decoupling Agreement is terminated . . . , then this Agreement shall automatically terminate . . . and thereafter shall be of no force or effect . . . ."). In all events, the Complaint clearly *alleges* that this was a single, two-part contract. Compl. ¶¶ 24-25, *id.* ¶ 63 ("DOE's actions constitute a breach of the Equity Process Agreement and, in turn, the parties' two-part May 19, 1997 agreement."). The Government's attempts to dispute this point are inappropriate at the motion to dismiss stage.




Accordingly, there is simply nothing that limits the United States' waiver of sovereign immunity with respect to Chevron's claims, and thus nothing that limits this Court's Tucker Act jurisdiction over those claims.

**B. Chevron Has Satisfied Its Burden to Plead a Tucker Act Waiver of Sovereign Immunity**

Chevron has sufficiently demonstrated this Court's Tucker Act jurisdiction over its claims. A "non-frivolous allegation that there is a contract . . . serves as a sufficient basis for the court's jurisdiction." *Arakaki v. United States*, 62 Fed. Cl. 244, 247 (2004); *Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) ("the invocation of a contract is sufficient to set forth a basis for subject matter jurisdiction"). Consequently, allegations of a breach of contract are sufficient on their face to overcome a Rule 12(b)(1) motion based on sovereign immunity. *Trauma Service Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To show jurisdiction in the Court of Federal Claims, TSG must show that either an express or implied-in-fact contract underlies its claim. A well-pleaded allegation in the complaint is sufficient to overcome challenges to jurisdiction."). Here, Chevron has alleged that it had a contract with the Government, which the Government breached. *See, e.g.*, Compl. ¶¶ 55, 58, 60. In fact, the two causes of action Chevron pleaded are "Breach of Contract" and "Breach of Implied Covenant of

Good Faith and Fair Dealing." These allegations amply satisfy Chevron's burden and necessarily defeat the Government's motion.[2]

### C. The Tucker Act Requires No Separate Showing That a Contract Is "Money Mandating"

The Government urges that Chevron must affirmatively show that its agreement with the DOE contains a "money-mandating" provision. Supp. Br. at 4. That assertion is erroneous.

The Tucker Act requires that the plaintiff be entitled to recover money damages. *See, e.g.*, *Chambers v. United States*, 417 F.3d 1218, 1223 (Fed. Cir. 2005) ("[T]he Tucker Act . . . authorizes certain actions for monetary relief against the United States to be brought in the Court of Federal Claims and waives the government's sovereign immunity for those actions."). The source of this entitlement may come from "the Constitution, or any Act of Congress or any regulation of an executive department, or . . . any express or implied contract with the United States. . . . " 28 U.S.C. § 1491(a)(1).

Contracts inherently are "money mandating" because a contractual promise is a promise to perform or pay damages. *See, e.g.*, *United States v. Winstar Corp*., 518 U.S. 839, 885-86 n.30 (1996) ("'Every breach of contract gives the injured party a right to damages against the party in breach'" unless "'the parties . . . by agreement vary the rules.'") (quoting *Restatement (Second) of Contracts* § 346, cmt. a (1981)); *see also id.* ("'Virtually any breach [of contract] gives the

[2] Nor is *Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005) (*en banc* in relevant part), to the contrary. *Fisher* held that, for purposes of defeating a Rule 12(b)(1) motion, a plaintiff must show that "the Constitutional provision, statute, or regulation" on which he bases his claim is money-mandating. *Id*. at 1173. The court concluded that if a plaintiff makes such a showing, that is "determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action." *Id*. That holding, however, says nothing about the burden a plaintiff bears in a case where the money-mandating source is a contract. As shown below in Section I.C, contracts are *inherently* money-mandating, which means that for a contract claim there is no separate money-mandating inquiry under Rule 12(b)(6) *or* Rule 12(b)(1). Thus, *Fisher* does not in any way contradict prior cases holding that a non-frivolous allegation of a breach of contract is sufficient to defeat a Rule 12(b)(1) motion.

injured party a claim for damages.'") (quoting 3 E. Allan Farnsworth, *Contracts* § 12.8, at 185 (1990)). Just last year, the Federal Circuit reiterated that money damages are the default remedy for a breach of contract by the United States:

> If the government has breached the Agreement, the College is entitled to seek whatever damages it is entitled to receive. As this Court has stated, "in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement. Indeed, as a plurality of the Supreme Court noted in *United States v. Winstar Corp*., 518 U.S. 839 (1996), 'damages are always the default remedy for breach of contract.'" *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001).

*San Juan City College v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004). This principle is well established. *See, e.g.*, *Winstar,* 518 U.S. at 885-86 ("[W]e suspect that most Government contractors would be quite surprised by the dissent's conclusion that, where they have failed to require an express provision that damages will be available for breach, that remedy must be 'implied in law' and therefore unavailable under the Tucker Act."). Thus, because money damages are the default remedy, no showing is necessary that a contract contains any "money mandating" provision.

By contrast, statutes and regulations are *not* inherently "money mandating" and therefore a plaintiff must separately show an entitlement to money damages. *See, e.g., Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999) ("Under the Tucker Act, when a cause of action is not based upon breach of contract against the government, the Court of Federal Claims has jurisdiction only over those constitutional provisions, statutes, or regulations that by their terms entitle a plaintiff to money. We usually refer to such a provision as 'money-mandating.'") (citations omitted). The cases cited by the Government establish this uncontested point.

In fact, none of the Government's cases actually support its position here. Indeed, the Government candidly acknowledges that "none of the cases [it cites in the Supplemental Brief]

involve the type of contractual source of substantive law here." Supp. Br. at 4. As to the cases the Government previously cited, none support its position here. Notably, the court in *Arakaki*, 62 Fed. Cl. 244 (Reply at 3), held that where "plaintiff's alleged basis for jurisdiction is an express oral contract with HUD," "the court deems plaintiff to have made a non-frivolous allegation that there is a contract. For the purposes of this [Rule 12(b)(1)] motion, *the alleged contract serves as a sufficient basis for the court's jurisdiction*." 62 Fed. Cl. at 247 (citing *Cincinnati*, 153 F.3d at 1377) (emphasis added). The court did not inquire further whether the contract itself was money-mandating.

The Government also previously cited *Khan v. United States*, 201 F.3d 1375 (Fed. Cir. 2000) (Reply at 1-2), a case addressing whether a particular statutory provision, 38 U.S.C. § 7401, was money-mandating. *Id*. at 1378. *Khan* stated that "a plaintiff must identify a contractual relationship, constitutional provision, statute or regulation that provides a substantive right to money damages." *Id*. at 1377. Nothing in this statement indicates that contracts are *not* inherently money-mandating; it says only that a plaintiff must point to a specific contractual relationship under which he seeks recovery. Indeed, *Hamlet v. United States*, 63 F.3d 1097 (Fed. Cir. 1995), on which *Khan* relied, also does not require a separate showing that the contract is money-mandating. *Hamlet* states that "to invoke jurisdiction under the Tucker Act, a plaintiff must point to a substantive right to money damages against the United States. Hamlet's complaint contained three counts, each alleging a substantive right to compensation from the United States: (1) a breach of contract claim; (2) a violation of agency regulation claim; and (3) a claim that her removal violated her constitutional rights." 63 F.3d at 1011 (citation omitted). Thus, the actual language of *Hamlet* suggests that "a breach of contract claim" inherently alleges a "substantive right to money damages against the United States." Accordingly, while it is

possible to read *Khan*'s quick summary of *Hamlet* as requiring a separate showing that a contractual provision is money-mandating, that would be a misinterpretation of both *Khan* and *Hamlet*.

Indeed, *United States v. Mitchell*, 463 U.S. 206 (1983) (Reply at 2), notably excludes contracts from its list of sources of law that must be shown to be money-mandating. *Id.* at 216 ("Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States."); *see also Fisher v. United States*, 402 F.3d 1167, 1172-73 (Fed. Cir. 2005) (*en banc* in relevant part) ("[T]he trial court at the outset shall determine . . . whether *the Constitutional provision, statute, or regulation* is one that is money-mandating.") (emphasis added). And, *Mitchell*'s observation that the Tucker Act "makes absolutely no distinction between claims founded upon contracts and claims founded upon other specified sources of law," 463 U.S. at 216 (Reply at 2), was made in the context of sovereign immunity waiver generally – if sovereign immunity is waivable by contract, it can also be waived by statutes and regulations. *Id*. at 215-16.

The other cases cited by the Government that rely on *Khan* are equally inapposite. Some hold that there is no Tucker Act jurisdiction over Title VII claims because Title VII is "the comprehensive, exclusive and pre-emptive remedy for federal employees alleging discrimination," and, by Title VII's explicit provisions, jurisdiction over those claims lies in federal district courts. *Lee v. United States*, 33 Fed. Cl. 374, 378 (1995) (Reply at 2); *Griswold v. United States*, 61 Fed. Cl. 458, 465 (2004) (Reply at 2) (same); *see also Bay View, Inc. v. United States*, 46 Fed. Cl. 494, 499 (2000) (Reply at 4) (Alaska Native Claims Settlement Act "is clearly a statute, not a contract. ANCSA is a comprehensive statute designed to settle all land claims by Alaska Natives."), *aff'd*, 278 F.3d 1259 (Fed. Cir. 2001). Others hold that no contract,

either express or implied, was formed at all. *Ransom v. United States*, 900 F.2d 242, 244-45 (Fed. Cir. 1990) (Reply at 3); *Pijanowski v. United States*, 60 Fed. Cl. 628, 631 (2004) (Reply at 2), *aff'd*, 125 Fed. Appx. 1015 (Fed. Cir. 2005).

*Schooling v. United States*, 63 Fed. Cl. 204 (2004) (Braden, J.) (Reply at 2, 4), correctly held that one cannot bring an appeal of a personnel decision disguised as a contract action. The Court explained that such actions are governed by a distinct integrated statutory scheme, the Civil Service Reform Act, which commits such claims to a forum different from the Court of Claims – the Merit Systems Protection Board. *Id*. at 206-07. The Court thus concluded that it lacked jurisdiction over the claim. *Id.* at 207. The Court also held that dismissal was required because the case was moot: The plaintiff's claim was based on the failure of the I.R.S. to issue a decision letter setting forth the reasons for the suspension, but by the time the case was decided, the I.R.S. had issued such a letter. *Id*. at 209. As an additional alternative ground for dismissing that *pro se* complaint, the Court also observed that it actually alleged a claim for "equitable" relief beyond the purview of the Court of Claims, noting that "[t]he proper remedy . . . would be to provide plaintiff with the decision letter, not to pay money damages. This type of relief is equitable in nature." *Id.* at 208. Indeed, the plaintiff had not argued the contract at issue was inherently money mandating, and the Court noted that "Plaintiff cites no authority for the proposition that the proper corrective action for th[e] alleged breach would be the payment of money damages." *Id.* And, as the Court observed, the I.R.S. had, in fact, provided such a letter. *Id*. at 209. *Schooling*, therefore, does not support the Government's position here.

Notably, the Government concedes that absent a "var[iance of contract] rules," Reply at 4, there is a presumption that money damages are available. But, far from indicating that the default rule is inapplicable to Chevron's claims here, the 1997 Contract expressly provides that it

is "enforceable against the[ parties] in accordance with its terms." Equity Process Agreement ¶ C.4; Decoupling Agreement § 6.5. Thus, the default presumption that money damages are the appropriate remedy is in full effect, *San Juan City College*, 391 F.3d at 1361; *Winstar*, 518 U.S. at 885; *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001), and money damages are available to enforce the Government's obligations under the 1997 Contract. As shown below, the Government's only argument to the contrary, that Paragraph B.9 of the Equity Process Agreement provides an alternative remedy to money damages, is plainly wrong.

### D. The Equity Process Agreement Does Not Waive Chevron's Tucker Act Remedies for Breach of the EPA Itself

The Government's final argument in support of its sovereign immunity defense (Supp. Br. at 4-5) is that Paragraph B.9 of the Equity Process Agreement precludes judicial review here. However, that provision is inapplicable on its face. Paragraph B.9 provides:

> The ASFE's determination of final equity shall be final, binding and non-appealable unless challenged by Chevron under the procedures and criteria set out above, in which case OHA's decision shall be final, binding and non-appealable. In order to avoid the potential for protracted and costly litigation, Chevron and DOE have agreed, as an alternative to judicial resolution of *any dispute regarding the ASFE equity redetermination decisions*, to submit any challenge to such decisions to OHA and to be bound by the results thereof, without right of any further administrative or judicial review or appeal (nothing in the foregoing, however, shall be deemed to expand Chevron's right to challenge an ASFE decision beyond that permitted in paragraphs B.7 and B.8 above). To implement the foregoing, DOE and Chevron each knowingly and voluntarily waives any and all rights it may have (i) to bring any other judicial or administrative challenge to *the final equity determination decisions by the ASFE*, or (ii) to bring any other judicial or administrative challenge to *any decision by OHA*. (Emphasis added.)

That language plainly does not apply here. Chevron is not now challenging any final equity determination decision by the ASFE or any decision by OHA. Rather, Chevron is suing for damages incurred as a result of the Government's breach of the 1997 Contract through prohibited *ex parte* communications. Chevron is not claiming that any final equity determination decision by the ASFE or any decision by OHA constituted the breach or otherwise caused these

damages. Paragraph B.9 simply does not apply to a claim for breach of the equity finalization *process* itself, rather than a challenge to a "final equity determination decision" or a "decision by OHA."

Moreover, even if Paragraph B.9 were otherwise applicable, the Government's underlying breach of the 1997 Contract renders Paragraph B.9 ineffective and not binding on Chevron. In virtually identical circumstances, the court in *Winn-Dixie Stores, Inc. v. FTC*, 377 F. Supp. 773 (M.D. Fla. 1974), held that it had jurisdiction over an action for breach of an agreement setting forth the process under which a Consent Order with the FTC would be finalized. The court so held notwithstanding a provision waiving "[a]ll rights to seek judicial review or otherwise to challenge or to contest the validity of the Order entered pursuant to this Agreement." *Id.* at 775 (internal quotation marks omitted). The court reasoned that for the procedural safeguards of the agreement to have meaning – there, a 'most favored nations' clause entitling Winn-Dixie to reopen the proceedings to modify the consent order if another party got more favorable treatment from the FTC – "judicial review" of claims alleging breach of that process was necessary. *See id.* at 777-78. Moreover, waivers of judicial review are inapplicable where one party to the contract has engaged in self-dealing or misconduct. *See, e.g., Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 544 (7th Cir. 1978) (holding that "waiver of recourse" clause that waived right to judicial review would not preclude recourse to the courts where actions of association were "in disregard of" governing charter and "failed to follow the basic rudiments of due process of law"); *Irene v. Cathedral Park Tower Bd. of Managers, Ltd.*, 273 A.D.2d 816, 816, 710 N.Y.S.2d 267 (App. Div. 2000) (holding that judicial review was available even where a condominium member had waived his right to judicial review of the condominium board's decision, where the board's action constituted "bad faith, fraud, self-dealing or other

misconduct"). DOE's failure to abide by the process the parties bargained for and agreed to deprives it of the right to invoke Paragraph B.9 of the Equity Process Agreement, which in all events does not apply here.

## II. The Non-Appropriated Funds *Instrumentality* Doctrine Does Not Apply Because the Department of Energy Receives Appropriated Funds

The Government next tries to invoke the non-appropriated funds instrumentality doctrine ("NAFI") to claim that the damages Chevron seeks could not be ordered by this Court. Supp. Br. at 5-9. It does so even as it apparently acknowledges that damages stemming from wasted equity process expenses, as opposed to damages stemming from a "final equity redetermination decision," would not be subject to its argument. *Id.* at 5 & n.3 ("If Chevron's claim is limited to claims for attorney fees and costs, and if the United States had waived sovereign immunity for Chevron's claim for attorney fees and costs (a legal point which we dispute . . . ), the non-appropriated funds doctrine would not be applicable.") (emphases omitted). Of course, as discussed above, Chevron's complaint seeks damages other than those stemming from a "final equity redetermination decision." Thus, the Government appears to have conceded that its NAFI argument does not apply at all. In all events, the Government's NAFI position is flatly wrong.

### A. The NAFI Doctrine Applies Only To Specific *Agencies* That Do Not and Cannot Receive Any of Their Funding Through Appropriations

The Government's argument is that, if Chevron sought review of a final equity redetermination decision, damages would be unavailable because funds apart from DOE's general appropriations would be at issue, and thus, the NAFI doctrine would defeat this Court's jurisdiction. However, the Government misconstrues both the NAFI doctrine and the cases applying it. The very name of the non-appropriated funds *instrumentality* doctrine explains why it is inapplicable here: This limitation on the Court's jurisdiction is relevant only where an instrumentality (an agency) created by the United States is financially self-sufficient and cannot

receive appropriated funds and thus, the United States has assumed no financial responsibility for the actions of that entity. Examples of NAFIs include "a self-supporting post fund that Army officers administered to aid indigent widows and children of deceased Civil War soldiers" – "[t]he first historically recorded NAFI," *AINS, Inc. v. United States*, 365 F.3d 1333, 1337 (Fed. Cir. 2004); Federal Prison Industries, a self-sufficient corporation providing work-simulation programs for inmates, which does not operate with appropriated funds, whose funds are to be kept distinct from general federal revenue, and whose enabling legislation includes no authorization of appropriations, *Core Concepts of Florida, Inc. v. United States*, 327 F.3d 1331, 1336 (Fed. Cir. 2003); and Army Reserve Forces Training Area-Deven (RFTA-Deven), which is specifically listed in the Army Regulations as a NAFI, does not receive congressional appropriations and is self-sufficient, *McCafferty v. United States*, 61 Fed. Cl. 615, 618 (2004) (Braden, J.), *aff'd*, No. 05-5005 (Fed. Cir. July 11, 2005). By contrast, the Department of Energy is clearly not a NAFI because it receives appropriated funds, and, as such, is subject to suit here.

The determination of whether the NAFI doctrine applies is an *entity-based inquiry*. The key question is whether the United States is deemed not to have accepted financial responsibility for a particular *agency*. *See, e.g., AINS*, 365 F.3d at 1337 ("*Standard Oil* [*Co. of California v. Johnson*, 316 U.S. 481 (1942)] recognize[s] the existence of 'government *agencies'* for which the government had not accepted financial responsibility.") (emphasis added); *McCafferty*, 61 Fed. Cl. at 618 (Braden, J.) ("A federal *agency* cannot be a NAFI if it can use appropriated funds, even if it chooses not to do so. . . . To best determine congressional intent, the court must first examine the *agency's* enabling legislation.") (emphasis added); *United States v. General Electric Corp.*, 727 F.2d 1567, 1570 (Fed. Cir. 1984) ("[T]he non-appropriated funds exclusion

is limited to instances when, by law, appropriated funds not only are not used to fund the *agency*, but could not be.") (emphasis added).

A contract with an agency for which the United States has not accepted financial responsibility is not deemed a "contract with the United States" under the Tucker Act because "NAFIs are not recipients of appropriated funds and thus cannot contractually obligate the United States." *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1366 (Fed. Cir. 2005); *see also Federal Group, Inc. v. United States*, 67 Fed. Cl. 87, 96 (2005) (Court of Federal Claims lacks jurisdiction over contract claims with NAFIs because "the United States has not assumed the financial obligations of such entities by appropriating funds to them"); *AINS*, 365 F.3d at 1340 ("There must be a clear expression by Congress that the agency was to be separated from general federal revenues.") (internal quotation marks omitted); *General Electric*, 727 F.2d at 1570 ("It is clear that the Air Force and Department of Defense have authority to use appropriated funds to the extent appropriated, and that is sufficient to avoid the non-appropriated funds exclusion.") (internal quotation marks omitted). All of the cases cited by the Government, Supp. Br. at 6-8, including the ones discussed above, restate the same test.

The NAFI doctrine thus applies only if the *agency* (1) does not receive money by appropriation, (2) derives funding primarily from its own activities, (3) cannot receive appropriated funds without statutory amendment, and (4) is one that Congress clearly indicated was to be separated from general federal revenues. *See, e.g.*, *AINS*, 365 F.3d at 1342. For the NAFI doctrine to apply, all four of these requirements must be met. *Id.* at 1342-43. It is also well-established that "[a] federal agency cannot be a NAFI if it can use appropriated funds, even if it chooses not to do so." *McCafferty*, 61 Fed. Cl. at 618. As the Federal Circuit emphasized: "[T]he fact that an agency . . . has been financially self-sufficient is not dispositive. Instead, . . .

there must be a *firm* indication by Congress that it intended to absolve the appropriated funds of the United States from liability for acts of the agency." *Furash & Co. v. United States*, 252 F.3d 1336, 1339 (Fed. Cir. 2001) (internal quotation marks omitted) (emphasis added).

The circumstance that some part of a project undertaken by an agency contains certain self-financing features or set-asides of funds into separate accounts, *see* Supp. Br. at 7-8, does not transform an agency that receives appropriated funds (such as the DOE) into a NAFI. For example, in *General Electric*, the court held that even though "sales under the Arms Export Control Act would be at no cost to the government," and foreign governments could be required to deposit money in a trust fund, which would be used to pay the contractor, the NAFI doctrine did not preclude a suit by General Electric, which entered into a contract with the Department of Defense and Air Force, against the DOD. 727 F.2d at 1570. The court explained that "[t]he classification of funds as 'appropriated' has been read broadly, and exclusions narrowly. . . . [T]he non-appropriated funds exclusion is limited to instances when, by law, *appropriated funds not only are not used to fund the agency, but could not be.* It is clear that the Air Force and Department of Defense have authority to use appropriated funds to the extent appropriated, and that is sufficient to avoid the non-appropriated funds exclusion." *Id.* (internal quotation marks omitted) (emphasis added). Similarly, in *Federal Group*, the court concluded that Office of Personnel Management is not a NAFI and could be sued by a contractor for breach of implied duty to cooperate or the duty of good faith and fair dealing relating to construction of a facility, whose operating budget may be in part generated from revenue derived from other agencies. 67 Fed. Cl. at 95. The court so concluded because funds for that project "could be appropriated by Congress" and because "a significant portion of OPM's budget is appropriated." *Id.* at 96. Thus,

so long as an agency as a whole is eligible to receive appropriated funds, the NAFI doctrine is inapplicable.

**B. The Department of Energy Plainly Is Not a NAFI Because It Receives Appropriated Funds**

The DOE does not meet any of the NAFI criteria enumerated in *AINS*, 365 F.3d at 1342. There is no dispute that the DOE receives appropriated funds. *See, e.g.*, Pub. L. No. 108-375, 118 Stat. 1811 (2004) (authorizing funds for DOE for 2005). Indeed, the 1995 Act authorizing the sale of DOE's interest in Elk Hills *specifically* appropriated funds for activities related to Elk Hills. Pub. L. No. 104-106, § 3401, 110 Stat. at 630-31. Thus, the DOE is not only authorized to receive appropriated funds, but does so. *See McCafferty*, 61 Fed. Cl. at 618 (agency is not a NAFI if it *can* use appropriated funds). Accordingly, the DOE is not a "separate entit[y]" within the meaning of the NAFI doctrine, and because the DOE is a "recipient of appropriated funds," it can "contractually obligate the United States." *Lion Raisins*, 416 F.3d at 1366.

That some portions of the project in question here contain set-asides of funds does not render the NAFI doctrine applicable. Just as the Department of Defense in *General Electric*, 727 F.2d at 1570, and Office of Personnel Management in *Federal Group*, 67 Fed. Cl. at 96, are eligible to receive appropriated funds at the agency-wide level, so is the DOE. That mandates the conclusion that the DOE, just like the DOD and OPM, is not a NAFI.

**C. Because the 1997 Contract Is Not a Contract Between a Private Party And a NAFI, The Tucker Act's Requirement That Judgments Be Payable Out of Appropriated Funds Is Satisfied**

**1. The Judgment Will Be Payable Out of Appropriated Funds in the Judgment Fund Under 31 U.S.C. § 1304**

It is simply irrelevant that the Government has set aside a special fund – the Deposit Fund Account – to pay for any equity shortfall that might exist based on the results of a *valid* equity finalization process under the EPA. In all instances, Chevron's damages here would be paid out

of the Judgment Fund. "Once a claim for contract damages takes the form of a final judgment in the Court of Federal Claims, the judgment is paid by the United States, normally from the permanent, indefinite congressional appropriation known as the 'judgment fund.'" *Lee v. United States*, 124 F.3d 1291, 1295 (Fed. Cir. 1997). The Judgment Fund provision, 31 U.S.C. § 1304(a)(1) ("Judgments, awards, and compromise settlements"), provides: "Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when – (1) payment is not otherwise provided for . . . ." Thus, where "payment is not otherwise provided for," the judgment will come out of the Judgment Fund.

To be sure, the Decoupling Agreement establishes the Deposit Fund Account as the source of any contractual payments due to Chevron based on final equity determinations reached by the ASFE and OHA under the Equity Process Agreement. Decoupling Agreement § 3.1 (Compl. Ex. B.1). But as the Government appears to concede, *see* Supp. Br. at 5 & n.3, the Deposit Fund Account does not "provide for" payment of a judgment for equity process expenses incurred by Chevron in reliance on a process that turned out to be tainted.

Indeed, even if Chevron were now seeking to recover, in addition, amounts it should be paid as damages for breach of contract based on its equity interest in the Reserve, any such recovery would be payable out of the Judgment Fund, not the Deposit Fund Account. That is because this Court would not be ordering specific performance of the Government's payment obligations under the Decoupling Agreement. Rather, the Court would be ordering the payment of *damages* for the Government's *breach* of its fundamental obligations under the 1997 Contract and the UPC. In effect, the Court would be awarding damages for the Government's failure to conform with UPC ¶ 11(b)'s requirement of a "fair and equitable" final reconciliation. Such a

payment for breach of the 1997 Contract and the UPC would have to come out of the Judgment Fund.

### 2. Even If the Judgment Were Not Payable Out of the Judgment Fund, It Would Be Payable Out of Appropriated Funds

If a judgment against the DOE were not payable out of the Judgment Fund, it would be payable out of DOE's appropriated funds. *See* 28 U.S.C. § 2517(a) ("Payment of Judgments") ("Except as provided by the Contract Disputes Act of 1978, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor, on presentation to the Secretary of the Treasury of a certification of the judgment by the clerk and chief judge of the court."). The Judgment Fund is merely a mechanism for litigants to obtain payment quickly, before the Treasury Department identifies agency appropriated funds that can be used. *See, e.g.*, *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1583 (Fed. Cir. 1994) (Section 1304 "was intended to establish a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlements may order payments without being constrained by concerns of whether adequate funds existed at the agency level to satisfy the judgment."). As soon as agency appropriated funds are identified, they are used to reimburse the Judgment Fund. *See, e.g.*, *Lee*, 124 F.3d at 1295 (citing 41 U.S.C. § 612(c)). Thus, as was the case prior to establishment of the Judgment Fund in 1956, payment can be ordered directly from agency appropriated funds if the Judgment Fund is for some reason unavailable. *See, e.g.*, *Eastport Steamship Corp. v. United States*, 135 Ct. Cl. 175, 140 F. Supp. 773, 774 (1956) (explaining that to pay a judgment plaintiff obtained in 1954, Congress appropriated funds that year).

Ultimately it does not matter whether payment comes in the first instance from the Judgment Fund, agency appropriated funds, or the Deposit Fund Account. So long as the

judgment is not against a NAFI, there is simply no issue regarding the source of the funds. This result is dictated by the basic premise of the NAFI doctrine – that the Court lacks jurisdiction only when an agency does not *and cannot* receive appropriated funds and therefore "could not obligate public monies." *Lion Raisins*, 416 F.3d at 1366. Because of the DOE's receipt of appropriated funds, the DOE is not a NAFI, and, consequently, the concern about committing funds to pay for the breach of contract is unfounded.

## III. No Separate Waiver of Sovereign Immunity Is Required for Recovery of Equity Process Expenses as an Element of Reliance Damages

The Government argues that legal fees Chevron expended in the course of participating in the equity finalization proceedings are not recoverable because they are litigation expenses and, as such, must be borne by Chevron absent a waiver of sovereign immunity by the Government. Supp. Br. at 9. This argument ignores the fact that Chevron is seeking recovery of these fees (including numerous expenditures of Chevron's and its consultants' time, money and resources) for breach of contract by the Government *as part* of contract damages themselves – a remedy that the Federal Circuit has approved on numerous occasions. *See, e.g., Chevron U.S.A., Inc. v. United States*, 20 Cl. Ct. 86, 88 (1990); *Gentex Corp. v. United States*, 61 Fed. Cl. 49, 54 (2004); *Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1233 (Fed. Cir. 1997); *Pratt v. United States*, 50 Fed. Cl. 469, 482 (2001).

There is a fundamental difference between attorney's fees incurred in litigating a breach (which generally are not recoverable) and attorney's fees that are an element of contract damages (which are recoverable). Indeed, in litigation pursuant to the Unit Plan Contract itself, the court granted summary judgment against the United States on liability for breach of contract and rejected the Government's argument that UPC did not require it to reimburse legal fees – costs of Chevron's litigation against a third party. *Chevron*, 20 Cl. Ct. 86. The court held that Chevron

is entitled to such recovery because "[t]he parties certainly must have anticipated the risk of litigation expenses, including judgments, associated with the operation of a highly sophisticated oil and gas producing Reserve." *Id*. at 88.

Similarly, in the analogous context of a suit to recover costs for preparing a bid that was rejected through a tainted process, the court explained that such damages are "appropriate":

> Reliance damages are appropriate here because Plaintiff's proposal efforts have been wasted in reliance upon the Government's obligation to treat its bid fairly, – an obligation encompassed in a regulation which the Government violated. . . . Reliance damages restore the non-breaching party to its pre-contract position by returning as damages the costs incurred in reliance on the contract. . . . *Returning a disappointed bidder to its pre-bid position wherein it recovers the cost of its wasted bid preparation and proposal costs also comports with longstanding precedent awarding bid preparation and proposal costs under the theory of breach of the implied contract of fair dealing*.

*Gentex*, 61 Fed. Cl. at 54 (internal quotation marks omitted) (emphasis added and omitted); *see also* 11 Arthur Linton Corbin, *Corbin on Contracts* § 1031, at 170 (Interim ed. 2002) ("If one party repudiates such a contract after the other has employed counsel, taken depositions, and paid witnesses, the amounts reasonably expended in this manner can be recovered as damages . . . .").

The *Chevron* and *Gentex* rulings are based on the well-established principle that where legal fees are an element of contract damages, no special waiver of sovereign immunity is required. For example, in *Massachusetts Bay Transportation Authority*, 129 F.3d 1226, the court rejected the government's argument that MBTA's claim for attorney's fees and consultant expenses as damages for breach of contract are barred because no statute has waived sovereign immunity for such recovery. The court held that "the recovery sought by MBTA is not for attorney fees in an action against the United States, but for damages for breach of a contract to obtain insurance." *Id*. at 1233. *See also Pratt*, 50 Fed. Cl. at 482-83 ("Defendant cites no precedent holding that, as a matter of law, legal fees cannot be the direct and foreseeable

consequence of a breach of contract. To the contrary, where legal fees incurred in an action by a third party are determined to be a direct and foreseeable consequence of defendant's breach, they have been awarded.").[3]

*Yancheng Baolong Biochem. Prods. Co. v. United States*, 406 F.3d 1377 (Fed. Cir. 2005), cited by the Government in its Supplemental Brief (at 9-10), is inapposite. In *Yancheng*, the basis for the claim of attorney's fees was not breach of contract, but a Rule of the Court of International Trade. 406 F.3d at 1383 ("In the present case, attorney fees were requested based on Rule 86.2 of the Rules of the United States Court of International Trade which provides that '[a] reasonable counsel fee, necessitated by the contempt proceeding, may be included as an item of damage.' . . . Rule 86.2 of the Court of International Trade has no corollary rule in the Federal Rules, and the Rules of the Court of International Trade are not promulgated subject to congressional approval. The court is given blanket authority by statute to promulgate its own rules, but without any specific power to subject the United States to monetary liability."). Equally unpersuasive is *Texas Instruments Inc. v. United States*, 991 F.2d 760 (Fed. Cir. 1993) (Reply at 18). There, no attorney's fees were warranted because no contract had been breached. *Id*. at 768.

By contrast, this is a classic case where legal expenses are an appropriate element of direct damages. Chevron incurred substantial costs in participating in a process that has been irrevocably tainted by the Government. Compl. ¶¶ 58, 65, 71. These costs are recoverable

[3] The Government's attempts in its prior reply (at 18-20) to distinguish these cases are unavailing. The *Chevron* case plainly demonstrates that the measure of contract damages recoverable from the United States can include legal expenses other than those incurred litigating the breach of contract itself. Moreover, neither *Gentex* nor *Massachusetts Bay* are limited to their precise facts. The case law uniformly holds that attorney's fees, just like other expenses, incurred in the performance of a breached contract may be recovered as damages from the Government. *See, e.g.*, *Pratt*, 50 Fed. Cl. at 482-83.

contract damages under a reliance theory, just as the preparation bid costs were recoverable in *Gentex*. As in *Gentex*, Chevron's efforts "have been wasted in reliance upon the Government's obligation to treat" Chevron's equity team's submissions "fairly," here by promising not to engage in *ex parte* communications with the DOE equity team. 61 Fed. Cl. at 54. As in *Gentex*, Chevron is asking to be "restore[d]" to its pre-contract position by obtaining the "costs" of attorney's fees (and substantial other costs) "wasted" in an effort to comply with the flawed process. *Id*.

Because Chevron seeks recovery of damages for the breach of the Government's obligation to follow faithfully the equity redetermination process, Chevron needs no special waiver of sovereign immunity nor a special contractual provision allowing recovery of attorney's fees. *See, e.g., Mass. Bay Transp. Auth.*, 129 F.3d at 1233; *Pratt*, 50 Fed. Cl. at 482-83.

## IV. The Equity Process Agreement Does Not Give OHA Authority to Resolve Disputes Over the Agreement Itself

The Equity Process Agreement provides OHA with narrowly circumscribed jurisdiction that does not encompass disputes over the procedures to be followed under the Equity Process Agreement itself. Indeed, in refusing to stay its own proceedings pending resolution of this dispute, OHA unequivocally stated that "disputes about the agreement are outside our purview." U.S. Appx. at 109. This statement by OHA confirms not only that OHA lacks jurisdiction but also that, for the same reason, resort by Chevron to OHA would have been futile.

Under the Equity Process Agreement, OHA has jurisdiction only over a "challenge" by Chevron to an "ASFE final decision [that] rejects, in whole or in part, NSA's [the independent petroleum engineer's] . . . recommendations." Equity Process Agreement ¶ B.7. Thus, when "an ASFE decision adopts the NSA recommendation for a particular zone," OHA has no jurisdiction. *Id.* Even when the ASFE does not adopt NSA's overall recommendation, OHA can "review

only the points on which the ASFE rejected NSA's recommendations." *Id.* In addition, because OHA can resolve only areas of disagreement between the ASFE and NSA, the Equity Process Agreement contemplates that any "legal issues" under review by OHA will have been "processed by NSA pursuant to instructions from the Independent Legal Advisor." *Id.* ¶ B.11.

As discussed in Part I, *supra*, the proceeding in this Court is not a "challenge" to an ASFE decision. Rather, it is a lawsuit for damages caused by the Government's breach of the 1997 Contract. The Government committed that breach by engaging in impermissible *ex parte* communications, not by rejecting an NSA recommendation. In fact, one of the proceedings infected by the Government's breach was the Dry Gas Zone proceeding, over which OHA lacks jurisdiction because the ASFE *adopted* NSA's recommendation. Resolution of this dispute, moreover, requires interpretation of the Equity Process Agreement and factfinding on the Government's *ex parte* communications. These are not "points on which the ASFE rejected NSA's recommendations," and they do not involve legal issues that were "processed by NSA pursuant to instructions from the Independent Legal Advisor." Equity Process Agreement ¶¶ B.7, B.11. Under the plain language of the Equity Process Agreement, OHA lacks jurisdiction over this dispute.

OHA itself agrees. After the Government refused to remedy the breach, Chevron requested a stay of the OHA proceedings pending the outcome of this lawsuit. *See* U.S. Appx. at 94-95. In response to the Government's argument that Chevron had not exhausted administrative remedies, Chevron asserted that OHA lacks jurisdiction: "[T]he issue that ChevronTexaco will bring to court – whether DOE has materially breached the Equity Process Agreement – is not within the limited jurisdiction given to OHA in the Equity Process Agreement." U.S. Appx. at 108. Although OHA declined to grant a stay, its letter ruling in 2004

confirmed its lack of jurisdiction over the Government's breach: "As we have previously stated, disputes about the agreement are outside our purview." *Id.* at 109.

Because OHA's 2004 ruling hardly could be clearer, the fact that OHA reached the same conclusion in a 1999 letter ruling only confirms the absence of an available remedy before OHA. In striving mightily to overcome the 1999 ruling, the Government both misconstrues that decision[4] and, more importantly, ignores entirely OHA's 2004 decision that it has no power to decide the very dispute now before this Court.

The foregoing demonstrates that no remedy before OHA is available for breach of the 1997 Contract. Moreover, even if an administrative remedy were somehow available, Chevron would have had no duty to present this issue yet again to OHA, since it is "well-settled" that "[a] party need not exhaust his administrative remedies where invoking such remedies would be futile." *Asociacion Colombiana de Exportadores de Flores v. United States*, 916 F.2d 1571, 1575 (Fed. Cir. 1990); *accord Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000). The futility doctrine applies, for example, where the administrative body lacks jurisdiction over the dispute. *See Porter v. Bd. of Trustees of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1069-70 (9th Cir. 2002) ("It is . . . clear that it would be futile to bring a

[4] The 1999 decision addressed a disagreement about the inclusion of documents in the administrative record, which depended on a dispute as to how the issue on appeal should be framed. OHA determined that this dispute, in turn, depended partly on the scope of OHA's jurisdiction under the Equity Process Agreement (the "May 1997 agreement") and partly on the merits of the appeal. U.S. Appx. at 135. In its decision, OHA plainly stated that "OHA does not have authority to review disputes over the May 1997 agreement." *Id.* Contrary to the Government's Supplemental Brief, it is irrelevant that the 1999 decision "also went on immediately to conclude that the issue was, in fact, somewhat broader than DOE had framed it." Supp. Br. at 16. OHA reviewed DOE's framing of the issue only because "DOE's framing of the issue to some extent reflected its position on the merits, rather than a position [on] the May 1997 agreement . . . ." U.S. Appx. at 135. The 1999 decision therefore confirms OHA's lack of jurisdiction over disputes about the procedures to be followed under the Equity Process Agreement. The significance of the 1999 ruling is reinforced by OHA's 2004 decision, which, as noted, emphasizes OHA's "previous[] state[ment]" that "disputes about the agreement are outside [its] purview." *Id.* at 109. This was a clear reference to the 1999 ruling, which Chevron had cited in its 2004 submissions to OHA on the stay issue. *Id.* at 108.

complaint to the SEHO . . . given our decision . . . that the SEHO lacks jurisdiction . . . ."), *cert. denied*, 537 U.S. 1194 (2003). Similarly, it would be futile to bring a claim before an administrative body that does not believe it has the authority to grant the requested relief. *See Beard v. General Servs. Admin.*, 801 F.2d 1318, 1321 (Fed. Cir. 1986) ("the Board's view of its authority in reviewing penalties was fully settled"); *Iddir v. INS*, 301 F.3d 492, 499 (7th Cir. 2002) ("the government states that it wholly lacks the ability to grant visas"). And futility is especially clear when the administrative body specifically informs the claimant that it lacks jurisdiction over his claim. *See Baxter v. Claytor*, 652 F.2d 181, 185 (D.C. Cir. 1981) ("the Board's letter incorrectly informed Baxter . . . that it had no jurisdiction").

In this case, resort again to OHA unquestionably would have been futile because (1) under the plain language of the Equity Process Agreement, OHA lacks jurisdiction over disputes concerning that agreement itself, (2) OHA has made clear its (correct) belief that it lacks jurisdiction over any dispute concerning the Equity Process Agreement, and (3) OHA has specifically (and correctly) stated that it lacks jurisdiction to decide *this* dispute over the Government's forbidden *ex parte* communications. Because OHA lacks jurisdiction, and because resort to OHA in all events would be futile, there is no prospect for administrative review that might interfere with this Court's jurisdiction.

## CONCLUSION

For the foregoing reasons, and for those set forth in Chevron's prior Response to the United States' Motion to Dismiss, the Government's motion to dismiss should be denied.

Dated: September 29, 2005

Respectfully submitted,

s/ Lawrence D. Rosenberg by s/ Louis K. Fisher

Donald B. Ayer
Lawrence D. Rosenberg
Louis K. Fisher
Victoria Dorfman
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Tel.: 202-879-3939
Fax: 202-626-1700

*Counsel for Chevron U.S.A. Inc.*