# In the United States Court of Federal Claims

No. 04-1365C
Filed May 31, 2006
**TO BE PUBLISHED**

| | | |
|---|---|---|
| CHEVRON U.S.A., INC., Plaintiff, | * | Department of Energy Organization Act, 91 Stat. 565 (1977); |
| v. | * | Freedom of Information Act, 5 U.S.C. § 551, *et seq.*; |
| THE UNITED STATES, Defendant. | * | Jurisdiction; |
| | * | Motion to Dismiss, RCFC 12(b)(1), 12 (b)(6); |
| | * | National Defense Authorization Act, 10 U.S.C. § 7420, *et seq.*; |
| | * | Naval Petroleum Reserves Production Act of 1976, 90 Stat. 303 (1976). |

**Donald B. Ayer**, **Lawrence D. Rosenberg**, **Louis K. Fisher**, and **Victoria Dorfman**, Jones Day, Washington, D.C., counsel for Plaintiff.

**Jane W. Vanneman**, United States Department of Justice, Washington, D.C., counsel for Defendant, and **Paul Michael**, United States Department of Energy, Of Counsel.

## MEMORANDUM OPINION AND ORDER

**BRADEN, *Judge***

For more than a century, the United States has been an owner and interested party in the development and production of domestic petroleum reserves for strategic military and civilian use. The genesis of this case arises from a 1944 contract between the United States ("the Government") and Standard Oil Company, a domestic producer and refiner, concerning the disposition of the Elk Hills Reserve.

In 1997, the successor-in-interest to the 1944 contract entered into two other contracts with the Government designed to facilitate the transfer of the remaining ownership interests in the Elk Hills Reserve, pursuant to a procedure that both parties anticipated would be expeditious and procedurally equitable. A decade later, the expeditious nature of the transfer has not been achieved and the equitable procedures are now at issue in this breach of contract case.

To facilitate a review of this Memorandum Opinion and Order, the court has provided the following outline:

**I. RELEVANT FACTS.**

**A. The 1944 Unit Plan Contract.**

**B. The Amendment To The 1944 Unit Plan Contract.**

**C. The 1977 Transfer Of Authority Over The Elk Hills Reserve To The Department Of Energy.**

**D. The National Defense Authorization Act For Fiscal Year 1996.**

**E. The July 8, 1996 Department Of Energy Administrative Order No. 96-01.**

**F. The May 19, 1997 Agreements.**

**1. The Decoupling Agreement.**

**2. The Equity Process Agreement.**

**G. The February 5, 1998 Termination Of The 1944 Unit Plan Contract.**

**H. The October 17, 1998 Strom Thurmond National Defense Authorization Act For Fiscal Year 1999.**

**I. The February 26, 1999 Office Of Hearing And Appeals Decision Letter.**

**J. Post Year 2002 Disputes Concerning Chevron's Stevens Zone Office of Hearings and Appeals Appeal And Allegations Of *Ex Parte* Communications.**

**II. PROCEDURAL HISTORY.**

**III. DISCUSSION.**

**A. Jurisdiction.**

**B. Standard Of Review.**

**1. RCFC 12(b)(1) - - Jurisdiction.**

**2. RCFC 12(b)(6) - - Failure To State A Claim.**

C. The Court's Resolution Of The Government's Motions To Dismiss.

1. The Government's RCFC 12(b)(1) Motion To Dismiss.

a. Whether The Equity Process Agreement Was Money Mandating Or Otherwise Provided A Substantive Right To Money Damages.

i. The Government's Argument.

ii. Chevron's Response.

iii. The Court's Resolution.

b. Whether This Dispute Arises In The Context Of An Established Statutory Scheme That Does Not Provide For Judicial Review.

i. The Government's Position.

a). The National Defense Authorization Act Provided The Secretary Of Energy With Discretion To Select A Method To Make A Final Determination Of The Parties' Equity Interests.

b). The National Defense Authorization Act Did Not Provide For Judicial Review Of The Equity Finalization Process.

ii. Chevron's Response.

a). The Secretary Of Energy's Authority To Issue A Final Decision Does Not Preclude Consideration Of Chevron's Breach Of Contract Claims.

b). Congress Did Not Authorize An Administrative Review Process To Supplant Chevron's Rights Under The 1944 Unit Plan Contract.

iii. The Court's Resolution.

a). The Discretion Granted The Secretary Of Energy By The NDA Act Does Not Prohibit Judicial Review.

b). The National Defense Authorization Act Does Not Preclude The United States Court Of Federal Claims From Exercising Jurisdiction Under 28 U.S.C. § 1491.

c. Whether The United States Has Not Waived Sovereign Immunity For Reliance Damages, Including Attorney's Fees.

i. The Government's Position.

ii. Chevron's Response.

iii. The Court's Resolution.

d. Whether The Non-Appropriated Funds Instrumentality Doctrine Is Applicable In This Case.

i. The Government's Position.

ii. Chevron's Response.

iii. The Court's Resolution.

2. The Government's RCFC 12(b)(6) Motion.

a. Whether Plaintiff's Claims Are Barred By Section B.9 Of the Equity Process Agreement.

i. The Government's Position.

ii. Chevron's Response.

iii. The Court's Resolution.

b. Whether Reliance Damages Were Caused By The Alleged Breach.

i. The Government's Position.

ii. Chevron's Response.

a). Reliance Damages Are Available For All Expenditures Made In Reasonable Reliance On The Contract, Whether Made Before Or After The Breach.

b). The Government Is Not Entitled To Assert In A Motion To Dismiss That Its Breach Has Caused No Harm.

c). The Government Is Required To Prove At Trial That Chevron Is No Worse Off After The Breach Than If The Contract Had Been Performed.

iii. The Court's Resolution.

IV. CONCLUSION.

# I. RELEVANT FACTS.[1]

## A. The 1944 Unit Plan Contract.

Plaintiff Chevron U.S.A., Inc. ("Chevron") is a corporation organized under the laws of the Commonwealth of Pennsylvania and is a wholly owned subsidiary of ChevronTexaco Corp., a publicly-traded corporation organized under Delaware law. *See* Compl. ¶ 7. Chevron's predecessor in interest, Standard Oil Company ("Standard Oil"), and the Government entered into a June 19, 1944 Unit Plan Contract ("1944 Unit Plan Contract") governing the joint operation and production of Naval Petroleum Reserve No. 1 ("Elk Hills Reserve"). *Id.*

In *United States* v. *Standard Oil Co.*, 545 F.2d 624 (9th Cir. 1976), the United States Court of Appeals for the Ninth Circuit, in a prior dispute concerning the 1944 Unit Plan Contract, endorsed the following history of the Elk Hills Reserve and the origins and purpose of the 1944 Unit Plan Contract:

> [The Elk Hills Reserve] was established in 1912 and is located in the Elk Hills in Kern County, California, about twenty-five miles southwest of Bakersfield. At the turn of the century, Government lands in the West were rapidly being turned over to private ownership. At the same time, there was a growing realization of the importance of oil for the Navy, which was then changing its ships from coal to oil burning. In response to arguments that the Government should preserve oil for Naval purposes, President Taft withdrew large portions of land in California and Wyoming from eligibility for private ownership, and in 1912 set aside Naval Petroleum Reserve No. 1 by an Executive Order. In the next several years, the three other Naval petroleum reserves were set aside: one more in California, one in Wyoming and one in Alaska.
>
> The establishment of the Reserve was expressly made subject to pre-existing private ownership. There are approximately 46,000 acres within the Reserve, approximately one-fifth is owned by Standard and the remainder, approximately four-fifths by Navy. The Standard lands are not in one block, but are checker-boarded throughout the Reserve. The Executive Order establishing the Reserve affected the Government

---

[1] The relevant facts recited herein were derived from: the August 20, 2004 Complaint ("Compl.") and Exhibits thereto ("Compl. Ex."); the Government's November 19, 2004 Motion to Dismiss ("Gov't Mot. Dis."); Plaintiff's February 1, 2005 Response ("Pl. Resp.") and Appendix thereto ("Pl. Resp. App."); the Government's February 25, 2005 Reply ("Gov't Reply") and Appendix thereto ("Gov't Reply App."); the Government's August 31, 2005 Supplemental Motion to Dismiss ("Gov't Supp. Mot. Dis.") and Appendix thereto ("Gov't Supp. App."); Plaintiff's September 29, 2005 Response to the Government's Supplemental Motion to Dismiss ("Pl. Supp. Resp."); the Government's November 16, 2005 Supplemental Reply ("Gov't Supp. Reply"), and the Transcripts of the July 21, 2005 and December 16, 2005 Oral Arguments ("TR").

lands in the field as far as future use and disposition were concerned, but it had no effect on the privately owned lands, and the owners of those lands were free to use and dispose of them as they saw fit.

In 1944, at the time the Unit Plan Contract was entered into there were three known 'zones' underlying the Reserve which contain areas that were considered commercially productive of oil and/or gas. These zones are defined in Section 2(c) of the Unit Plan Contract as horizontal strata at various depths between specified geologic markers. Of the three zones only the Shallow Oil Zone and the Stevens Zone contained oil . . . .

Within the Shallow Oil and Stevens zones are several separate accumulations of hydrocarbons. These underlie both Navy and Standard lands in the Reserve and production from one part thereof could reduce the amount of oil underlying another part, with the result that the Navy's policy of keeping its hydrocarbons in the ground until needed in an emergency could not be effectively implemented if Standard were producing from its land. In the years prior to World War II, Standard and the Navy Department had an understanding to the effect that neither would drill wells inside the Reserve without six months' notice to the other.

*This is because, subject to certain limitations, the landowner has the exclusive right to recover all that he can from wells on his land. Hydrocarbons, unlike solid minerals, do not remain in place but move because of changes in underground pressure and would move toward producing wells.*

On the threshold of World War II, and with the threat of condemnation, active negotiations began either for an exchange, purchase or condemnation of Standard's land in the Reserve on the one hand, or their operation as a unit with Navy land. A purchase or exchange would have required substantial expenditure by the Government. As an alternative arrangement that would accomplish the Government's purpose of keeping its hydrocarbons safely in the ground without a substantial payment for acquisition of Standard's lands and without having to worry about the value of the land, the Navy Department and Standard agreed to operate within the Reserve as a unit and on June 19, 1944, entered into the Unit Plan Contract.

The parties had entered into an earlier contract in 1942, but in 1943, the Attorney General expressed doubts as to its legality. It was voluntarily terminated by the parties. Congress passed enabling legislation (now 10 U.S.C. § 7426) and the Unit Plan Contract was entered pursuant thereto. The earlier contract is now of historical interest only, but it is the reason why the date of November 20, 1942, is the reference date in the Unit Plan Contract for establishing the respective percentage interests of the parties.

> A unit agreement was at that time and still is a common arrangement in the petroleum industry where two or more owners have interests in a common pool. Under such an arrangement, the pool is operated as a unit and the parties share production and costs in agreed-upon proportions. *Such an arrangement is usually for the life of the field, and the parties have the same objective,* i.e.*, to produce currently, at minimum expense and pursuant to good engineering practices. This eliminates the necessity and the incentive for each of the parties separately to produce as fast as it can in order to be sure that it receives at least its share of the pool, a practice that would be uneconomic and for engineering reasons could result in a lesser aggregate amount of production from the pool.*
>
> The Unit Plan Contract here involved, however, is unusual because its purpose was not to produce currently, and its effect was to conserve as much of the hydrocarbons in place as was feasible until needed for an emergency.

*Id.* at 626-27 (quoting background material provided to the United States District Court) (emphasis added).

Pursuant to the 1944 Unit Plan Contract, Standard Oil and the Government agreed to operate Elk Hills Reserve as a unit and allocate costs for oil and gas production on the basis of the parties' respective interests in the underlying petroleum and hydrocarbons. *See* Compl. ¶¶ 9, 10; *see also* Compl. Ex. A1.

Accordingly, the parties to the 1944 Unit Plan Contract agreed to:

> (i) Afford Navy a means of acquiring complete control over the development of the entire [Elk Hills] Reserve and the production of oil therefrom in order that Navy may protect the [Elk Hills] Reserve and conserve in the ground all of Navy's share of the oil in the [Elk Hills] Reserve as well as a substantial portion of Standard [Oil]'s share of oil in the [Elk Hills] Reserve.
>
> (ii) Make available to Standard [Oil] a limited quantity of oil from one of its most important sources at a time when it is needed by Standard [Oil] to meet its war requirements for refined petroleum products in the West Coast area.
>
> (iii) Place the [Elk Hills] Reserve in a condition of readiness whereby it will be able promptly to produce oil in substantial quantities whenever the strategic situation of the United States in the future may so require.
>
> (iv) Result in the eventual receipt by Navy and Standard [Oil], respectively, from the various commercially productive zones underlying the [Elk Hills] Reserve of the quantities of recoverable oil, gas, natural gasoline, and associated hydrocarbons underlying their respective lands as of November 20, 1942.

(v) Provide for the economical and efficient development and operation of the [Elk Hills] Reserve.

(vi) Result in securing the maximum ultimate recovery of oil, gas, natural gasoline and associated hydrocarbons from the [Elk Hills] Reserve.

Compl. Ex. A1 at 5.

To accomplish these objectives, the 1944 Unit Plan Contract divided the Elk Hills Reserve into three commercially productive zones:[2] the Dry Gas Zone; the Shallow Oil Zone; and the Stevens Zone. *See* Compl. Ex. A1 § 2(c) at 7.[3] The 1944 Unit Plan Contract also assigned the following ownership interests in the "commercially productive zones":

| | | |
|---|---|---|
| Dry Gas Zone: | Navy: | 77.0492% |
| | Standard Oil: | 22.9508% |
| Shallow Oil Zone: | Navy: | 63.9301% |
| | Standard Oil: | 36.0699% |
| Stevens Zone: | Navy: | 65.4517% |
| | Standard Oil: | 34.5483% |

*See* Compl. Ex. A1 § 2(d) at 7.

These ownership interests were based on November 20, 1942 estimates for each zone of the proportionate ownership of total hydrocarbons in each field prior to unitization. *See* Compl. Ex. A1 § 2(b) at 7. The estimated ownership was determined by computing the ratio between the acre-feet of oil and gas bearing formations underlying Navy and Standard Oil lands for each "commercially productive zone" and the estimated total acre-feet of oil and gas within the Estimated Limiting Line of Commercial Productivity. *Id.*

The parties to the 1944 Unit Plan Contract, however, agreed that little was known about the geology of the Elk Hills Reserve, because few producing wells had been drilled. *See* Compl. ¶ 14. Therefore, the 1944 Unit Plan Contract provided that the interests of Standard Oil and the Navy would be subject to redetermination, at the request of either party, at such times as there was a better way of determining the volume of oil and gas underlying an owner's property:

---

[2] A "commercially productive zone" is defined in the 1944 Unit Plan Contract as "[g]eologic strata beneath the surface of the earth which, in the opinion of the Engineering Committee, are capable of producing oil or gas in paying quantities." Compl. Ex. A1 § 2(a)(2) at 6.

[3] In 1976, a fourth commercially productive zone, the Carneros Zone, was designated. *See* Compl. ¶ 12; *see also* 7/21/05 TR at 42.

The initial or any subsequently established percentage participations in the production from any commercially productive zone underlying lands in the [Elk Hills] Reserve shall be subject to revision from time to time in the manner hereinafter set forth. Whenever Navy or Standard [Oil] is of the opinion that consideration should be given to the revision of such percentages, it shall notify the other thereof in writing. The Engineering Committee[[4]] shall promptly examine and review all available data, and if the Committee finds that any one or more of the following exist:

(1) The presence, as of November 20, 1942, of commercially productive oil and/or gas bearing formations extending beyond the Estimated Limiting Line of Commercial Productivity for any zone;

(2) The absence or exhaustion, as of November 20, 1942, of commercially productive oil and/or gas bearing formations within the Estimated Limiting Line of Commercial Productivity for any zone;

(3) A variation, as of November 20, 1942, from the acre-feet of commercially productive oil and/or gas bearing formations previously estimated to be contained within the Estimated Limiting Line of Commercial Productivity for any zone;

(4) A variation, as of November 20, 1942, from the acre-feet of commercially productive oil and/or gas bearing formations previously estimated to underlie the respective lands of Navy and Standard [Oil]; or

---

[4] The 1944 Unit Plan Contract provided for an Engineering Committee that would:

[C]onsist of six members, two of whom shall be the members of the Operating Committee hereinafter described. The other four members shall be petroleum engineers or geologists, two of whom shall be appointed by and shall represent Navy, and two of whom shall be appointed by and shall represent Standard; each member so appointed shall have had at least ten (10) years' experience as a petroleum geologist or petroleum engineer, or if a graduate geologist or engineer, at least five (5) years' such experience. Navy and Standard shall appoint their respective representatives on the Engineering Committee within thirty (30) days after the date of this contract, and shall have the right at any time and from time to time to remove any one or more of its representatives on such Committee and to appoint a new representative or representatives in substitution therefor.

Compl. Ex. A1 at § 2(a)(3) at 6.

> (5) Any condition, fact or circumstance which will aid in a more accurate determination of such percentages as of November 20, 1942;
>
> said Committee shall thereupon determine . . . the revision, if any, to be made. Any revision unanimously agreed upon by the members of the Engineering Committee shall be set forth and explained in a written report to be furnished Navy and Standard [Oil], and such revision shall be binding upon both Navy and Standard [Oil]. If the engineering committee is unable to agree unanimously upon any such proposed revision, the Secretary of the Navy, as hereinafter provided in Section 9, shall determine what revision, if any, shall be made.

Compl. Ex. A1 § 2(f) at 7-8.

The 1944 Unit Plan Contract also provided for a dispute resolution procedure, in the event the Engineering Committee was unable unanimously to agree on the terms of a proposed revision:

> Committee shall notify both Navy and Standard thereof and shall refer such matter to the Secretary of the Navy for determination. Thereupon the Secretary of the Navy on his own initiative may, and upon the request of Standard [Oil] shall, submit the matter to an independent petroleum engineer, to be selected by him, for the purpose of securing an advisory report thereon from such engineer . . . . *After consideration of the matter, the Secretary of the Navy shall render his decision thereon and such decision in each such instance shall be final and shall be binding upon the Navy and Standard* [*Oil*].

*See* Compl. Ex. A1 § 9(b) at 15 (emphasis added).

In addition, the 1944 Unit Plan Contract contained the following terms regarding termination:

> (a) Unless sooner terminated as provided in paragraph (b) of this Section, this contract shall continue and remain in full force and effect as long as oil, gas, natural gasoline and/or associated hydrocarbons can be produced from the [Elk Hills] Reserve in paying quantities.
>
> (b) This contract may be terminated at any time by the Secretary of the Navy in his discretion and subject to the approval of the President [of the United States] on six (6) months written notice to Standard [Oil]. Such termination shall be effective as of the date fixed therefor and shall not operate retroactively or to impair the rights and obligations of Navy and Standard [Oil] under this contract accruing to the termination date. *Termination shall be followed by an adjustment of all such rights and obligations, including the rights and obligations growing out of the costs incurred, and the respective quantities of production received, by Navy and Standard* [*Oil*]*, respectively, under the contract, on a fair and equitable basis.*

Compl. Ex. A1 § 11 at 15 (emphasis added).

Although equity redeterminations were delegated to the Secretary of the Navy, post-termination adjustments under the 1944 Unit Plan Contract were not. *See* Compl. Ex. A1 §11. Significantly, the 1944 Unit Plan Contract did not address the manner in which post-termination adjustments would be accomplished.[5] *Id.*

**B. The Amendment To The 1944 Unit Plan Contract.**

In 1976, Congress determined that the Navy's intent to maintain a petroleum reserve, in case of national emergency in 1944, was no longer relevant and enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258, 90 Stat. 303 (1976). *See* H.R. Conf. Rep. 94-942, at 15 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 516, 517 ("Under the compromise, petroleum at the three reserves is to be produced at the maximum efficient rate for a period of six years, with provisions for an indefinite number of extensions for period of three years each under specified circumstances."). Accordingly, on May 25, 1976, the Navy and Standard Oil executed an amendment to the 1944 Unit Plan Contract, removing any language referencing national security policy concerns and substituting language emphasizing a new policy to encourage economic productivity of the Elk Hills Reserve. *Id.*; *see also* Compl. ¶ 18.

**C. The 1977 Transfer Of Authority Over The Elk Hills Reserve To The Department Of Energy.**

In 1977, pursuant to Section 307 of the Department of Energy Organization Act, 42 U.S.C. § 7101, *et seq.*, Pub. L. No. 95-91, 91 Stat. 565 (1977), Congress transferred authority over the Elk Hills Reserve to the United States Department of Energy ("DOE"), and assigned the Navy's interests in the Elk Hills Reserve and the 1944 Unit Plan Contract to DOE. *Id.*

**D. The National Defense Authorization Act For Fiscal Year 1996.**

On February 10, 1996, Congress enacted the National Defense Authorization Act for Fiscal Year 1996 ("NDA Act"), requiring DOE to "finalize [the owners'] equity interests" in the Elk Hills Reserve through an equity finalization process no more than eight months after the effective date of the legislation, *i.e.*, no later than October 10, 1996. *See* Pub. L. No. 104-106, § 3412(a), 110 Stat. 631 (1996), 10 U.S.C. § 7420 (note). This Act also required DOE to sell the Government's interest in the Elk Hills Reserve no later than February 10, 1998. *Id*. The NDA Act also provided that:

---

[5] Chevron, however, interprets Section 11 as vesting post-termination adjustment authority, including final equity determinations, in the Secretary of Energy. *See* Compl. ¶ 28 ("Consistent with the terms of 1944 Unit Plan Contract § 11 and in keeping with a protocol issued by the Secretary of Energy in 1996 [], the Equity Process Agreement made the Assistant Secretary for Fossil Energy (as the delegate of the Secretary of Energy for finalization under the 1944 Unit Plan Contract) the decision maker with respect to the parties' interests in each of the four zones."). At this nascent stage of litigation, the court need not and, therefore, does not address this apparent discrepancy.

(2) The Secretary [of Energy] shall retain the services of an independent petroleum engineer, mutually acceptable to the equity owners, who shall provide a recommendation of final equity figures. The Secretary [of Energy] may accept the recommendation of the independent petroleum engineer for final equity in each known oil and gas zone and establish final equity interest in [the Elk Hills Reserve] in accordance with the recommendation, or the Secretary [of Energy] may use such other method to establish final equity interest in the reserve as the Secretary [of Energy] considers appropriate.

(3) *If, on the effective date, there is an ongoing equity redetermination dispute* between the equity owners under Section 9(b) of the unit plan contract, the dispute shall be resolved in the manner provided in the unit plan contract within eight months after the effective date. *The resolution shall be considered final for all purposes under this section*.

*Id*. (emphasis added).

**E. The July 8, 1996 Department Of Energy Administrative Order No. 96-01.**

On July 8, 1996, the Assistant Secretary for Fossil Energy ("ASFE") issued Administrative Order No. 96-01,"Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process," establishing an equity finalization process by which Chevron and DOE would "present their respective final equity positions to the mutually acceptable independent petroleum engineer (Netherland, Sewell & Associates, Inc.) [("Equity IPE")] . . . to be retained by the Secretary [of Energy] to provide final equity recommendations in the Dry Gas Zone, Carneros Zone, and the Stevens Zone." Compl. Ex. C; *see also* Pub. L. No. 104-106, § 3412(a), 110 Stat. 631 (1996), 10 U.S.C. § 7420 (note) (authorizing the ASFE's order).

Administrative Order No. 96-01 prohibited Chevron and DOE from having *ex parte* communication with the Equity IPE:

> There will be no written or oral equity-related communication or meeting with the Equity IPE (this term excludes contract administration communications or meetings) by an owner (including its agents and contractors) without the participation or opportunity to participate by the other owner. Before any equity-related communication or meeting occurs, the Equity IPE will notify both owners of the planned equity-related communication/meeting so as to allow both owners to participate in all communications or meetings held between the Equity IPE and an owner. . . . In the event an owner chooses not to participate in an equity-related communication/meeting, the Equity IPE will notify both owners of that fact in writing prior to having the communication/meeting and provide both owners with a summary of the communication/meeting thereafter.

* * *

> All equity-related meetings with the Equity IPE, including the presentation by the owners of their respective equity positions for each zone, will be sessions at which both owners are invited to attend (this excludes contract administration meetings that may be required by DOE). Each owner is permitted to designate its attendees, who will execute appropriate confidentiality agreements against disclosure of proprietary information.

* * *

> In the event a disagreement arises regarding the equity finalization implementation process or this Protocol which cannot be resolved jointly by the Equity IPE and the EFTs, the matter shall be referred to the Assistant Secretary of Fossil Energy (or designees) for resolution. Prior to resolution, the Assistant Secretary will consult with Chevron.

Compl. Ex. C ¶¶ B.5, B.9, B.21.

**F. The May 19, 1997 Agreements.**

The equity finalization process took longer than Congress or DOE expected and the October 10, 1996 deadline was not met. *See* Compl. ¶ 22. Given this delay, to facilitate the execution of a contract for the sale of the Elk Hills Reserve prior to the statutorily-mandated deadline of February 10, 1998, the parties agreed to "decouple" the sale of the Government's interest in the Elk Hills Reserve from the "equity finalization process." *See* Compl. ¶¶ 23, 26. Therefore, on May 19, 1997, Chevron and DOE entered into two contracts: "Agreement Regarding Fixing of Equity Interest at Naval Petroleum Reserve No. 1 for Purposes of Sale" (the "Decoupling Agreement"); and "Agreement Regarding Equity Redetermination Process" (the "Equity Process Agreement"). *See* Compl. Exs. B.1, B.2; *but see* Compl. ¶ 24 ("Consistent therewith, on May 19, 1997, DOE and ChevronTexaco entered into *an agreement implemented in two parts* [.]" (emphasis added)).

**1. The Decoupling Agreement.**

The Decoupling Agreement fixed DOE's ownership interest in the Elk Hills Reserve for purposes of sale and provided for an adjustment to be made between DOE and Chevron after finalization for any difference between the 1944 Unit Plan Contract final equity participation value and the fixed sales participations (*i.e.*, the amount DOE would receive from the sale of Elk Hills Reserve interests). *See* Compl. Ex. B.1 §§ 1.1, 1.2 at 2-4; *see also* Compl. ¶ 26.

The Decoupling Agreement established the parties' interests in the four unitized zones, as follows:

| | | |
|---|---|---|
| Dry Gas Zone: | DOE | 83.8726% |
| | Chevron | 16.1274% |
| Shallow Oil Zone: | DOE | 70.0119% |
| | Chevron | 29.9881% |
| Stevens Zone: | DOE | 79.6357% |
| | Chevron | 20.3643% |
| Carneros Zone: | DOE | 100.00% |
| | Chevron | 0.00% |

Compl. Ex. B.1 § 1.1(a).

The Decoupling Agreement also provided:

> If the UPC Final Equity Participations for a Unitized Zone are different than the Fixed Sales Participations for that zone, financial adjustments shall be made only between Chevron and DOE to compensate the party whose Fixed Sales Participation is less than its UPC Final Equity Participation for the loss of the future benefit of such interest. Such adjustments shall be made on a zone-by-zone basis . . . . The party whose Fixed Sales Participation is greater than its UPC Final Equity Participation for the zone in question shall owe the other party the "Adjustment Value" amount . . . . Such amount shall be determined when the zone's UPC Final Equity Participations have become final[.]

*Id.* § 1.2.

As security for potential obligations that could arise under the financial adjustment provision, the Decoupling Agreement required Chevron to deliver an irrevocable, direct-draw, transferrable letter of credit, payable to DOE and issued by a U.S. bank acceptable by DOE, 30 days after the Last Sale Date.[6] *See* Compl. Ex. B.1 § 3.2. The letter of credit had an initial 12-month term, but could be renewed automatically by the issuer for additional 12-month periods until payments were made on all unitized zones. *Id.* The amount of the letter of credit was equal to the sum of all "Chevron Potential Payback Amounts" plus the amount of interest that would accrue on that amount over a 36-month period at the rate of 5.85% per annum. *See* Compl. Ex. B.1 § 3.3.

[6] The "Last Sale Date" was defined as "the closing date of the sale to a third party of the last portion of DOE's interest in [the Elk Hills Reserve]." Compl. Ex. B.1 § 1.1(e).

In addition, the Decoupling Agreement provided:

> (c) Chevron and DOE acknowledge that the UPC Final Equity Participations for one or more of the zones may not be the same as the Fixed Sales Participations for such zones. Notwithstanding such situation, Chevron and DOE agree that the Fixed Sales Participations *shall govern any future allocation of production from the Unitized Zones and the Non-Unit Area as between Chevron and DOE's Purchasers*.
>
> (d) Chevron acknowledges that DOE will advise prospective bidders for DOE's interests in [the Elk Hills Reserve] that Chevron has agreed to use the Fixed Sales Participations and the Facilities Fixed Ownership Interests . . . in any future unit operation of [the Elk Hills Reserve], and that DOE will make copies of this Agreement available for review by prospective bidders. At the request of DOE, Chevron shall deliver to the purchasers of DOE's interests in [the Elk Hills Reserve] a certificate confirming Chevron's agreement to the Fixed Sales Participations and the Facilities Fixed Ownership Interests.

*See* Compl. Ex. B.1 § 1.1(c)-(d) (emphasis added).

The Decoupling Agreement further provided that, in exchange for Chevron's agreement to fix ownership interests in the Elk Hills Reserve for the purposes of sale, DOE agreed to limit the sale of the Government's interest in the Elk Hills Reserve only to purchasers that would execute a unitization contract with Chevron for the future operation of the Elk Hills Reserve ("Unit Operating Agreement"):

> DOE will oblige the DOE Purchasers to execute counterparts of the Unit Operating Agreement[[7]] on or before the Last Sale Date and will thereafter cause counterparts of the Unit Operating Agreement executed by all such purchasers to be promptly delivered to Chevron.

Compl. Ex. B.1 § 5.2 (b).

**2. The Equity Process Agreement.**

The Equity Process Agreement established procedures for "finaliz[ing] all equity interests in the four unitized productive zones within [the Elk Hills Reserve] pursuant to section 3412(b)[.]" Compl. Ex. B.2 at 1. The Equity Process Agreement set forth two distinct processes for finalizing the parties' equity interests. *Compare* Compl. Ex. B.2 ¶¶ A.1-8 (establishing Independent Petroleum

---

[7] Under the Unit Operating Agreement, future purchasers were required to adopt the ownership interest established by the Decoupling Agreement. *See* Compl. Ex. B.1 at Ex. C at Ex. A(4).

Engineer Process for the Shallow Oil Zone), *with* Compl. Ex. B.2 ¶¶ B.1-11 (establishing Equity Redetermination Process).

The Independent Petroleum Engineer Process for the Shallow Oil Zone equity redetermination was to be undertaken consistent with the terms of the 1944 Unit Plan Contract. *See* Compl. Ex. B.2 ¶ A.1; *see also* Compl. ¶ 27. The Independent Petroleum Engineer Process expressly incorporated procedures contained in Administrative Order No. 96-01:

> The procedures of Assistant Secretary for Fossil Energy Administrative Order No. 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process," dated July 8, 1996, as amended and supplemented, *will be utilized for the* [*Shallow Oil Zone* (*"SOZ"*)] pursuant to a schedule to be agreed upon by DOE, Chevron, and [Netherland, Sewell & Associates ("NSA")]. The parties will agree upon *a SOZ schedule* based on the procedural framework set forth in Assistant Secretary for Fossil Energy Order No. 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process (Supplement 2)," dated, January 21, 1997.

*Id.* ¶ A.2 (emphasis added).

On the other hand, the Equity Redetermination Process did not incorporate any procedures from Administrative Order No. 96-01. *See* Compl. Ex. B.2 ¶¶ B.1-11 (establishing Equity Redetermination Process). Instead, under the Equity Redetermination Process, the Equity IPE would provide Chevron and DOE with a provisional equity recommendation report for each zone. *See* Compl. Ex. B.2 ¶ B.1. Pursuant to the Equity Redetermination Process, Chevron and DOE reviewed the provisional equity recommendation reports and then submitted written comments to the Equity IPE. *Id.* In response, the Equity IPE issued a final recommendation to Chevron, DOE's equity team, and the Assistant Secretary for Fossil Energy ("ASFE"). *See* Compl. Ex. B.2 ¶¶ B.2, C.1. The Equity IPE's recommendations in fact were the advisory report from an independent petroleum engineer required by Section 9(b) of the 1944 Unit Plan Contract and Section 3412(b) of the NDA Act. *See* Compl. Ex. B.2 ¶ A. The Equity Redetermination Process afforded Chevron and DOE the opportunity to review the final recommendation and submit comments to the ASFE prior to the ASFE issuing a decision. *Id.*

The Equity Process Agreement also established the following Equity Redetermination Process procedures for ASFE decisions:

> After receipt of the NSA recommendation for a zone, the ASFE shall issue a preliminary decision on such zone and shall provide the Chevron and DOE equity teams[[8]] with copies of the documents relied upon in reaching the preliminary

[8] "Equity teams" represented each owner and presented their positions to the ASFE. *See* Compl. Ex. 2 ¶ A.1 - A.3.

decision which are not already in the equity teams' possession, including . . . any geophysical, geological or petrophysical data relied upon by the ASFE, but excluding draft documents, any legal or technical advice provided to the ASFE, or documents concerning the deliberative process of reaching the preliminary decision. The Chevron and the DOE equity teams shall have the opportunity to review the preliminary decision and provide written comments thereon to the ASFE within 30 days after its issuance, or such later date as determined by the ASFE upon the request of either party, which request will not be unreasonably withheld.

The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (. . . not includ[ing] the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an *ex parte* basis. Any written materials submitted to the ASFE by either equity team shall be provided to the other party. The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.

* * *

If an ASFE decision adopts the NSA recommendation for a particular zone, that ASFE decision shall be final and not subject to challenge by Chevron. If an ASFE final decision rejects, in whole or in part, NSA's participation percentage recommendations, Chevron may challenge the ASFE decision and such challenge shall be referred to the Department of Energy Office of Hearings and Appeals ("OHA") for a decision. In this event, OHA shall review only the points on which the ASFE rejected NSA's recommendations that have been challenged by Chevron, and in all other respects the ASFE's decision shall be final. Chevron and DOE agree that the standard of review to be applied by OHA shall be the standards set forth in the Administrative Procedures Act (5 U.S.C. § 706)[[9]] and the Wunderlich Act (41

---

[9] In relevant part, the Administrative Procedures Act provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall–

* * *

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

U.S.C. §§ 321 and 322).[10] Chevron shall file with OHA any challenge to an ASFE final redetermination decision for a zone within 6 months after the date of such ASFE final redetermination decision for the zone in question. If Chevron does not file such challenge within such 6-month period, the ASFE redetermination decision for the zone in question shall be final and binding on the parties and not subject to challenge by Chevron.

---

(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

[10] In relevant part, the Wunderlich Act provides:

No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

* * *

No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.

41 U.S.C. §§ 321, 322 (italics in original).

* * *

If OHA denies the Chevron challenge to the ASFE's decision on an issue, the ASFE's decision on such issue shall be final and binding on the parties. If OHA upholds the Chevron challenge on an issue, then the NSA recommendation(s) at issued shall be adopted as final. If OHA determines to uphold the ASFE decision in part, then OHA, in its discretion, may either (i) direct that the NSA recommendation on the issue be adopted by the ASFE, (ii) remand the specific issue back to the ASFE for further determinations in accordance with OHA's instructions, or (iii) render a decision on such issue based on the record before it. If OHA remands an issue to the ASFE, Chevron shall have the right to challenge any further determination of the ASFE on such remand under the process set forth in paragraph B.7 above.

The ASFE's determination of final equity shall be final, binding and non-appealable *unless challenged by Chevron under the procedures and criteria set out above*, in which case OHA's decision shall be final, binding, and non-appealable. In order to avoid the potential for protracted and costly litigation, Chevron and DOE have agreed, as an alternative to judicial resolution of any dispute regarding the ASFE equity redetermination decisions, *to submit any challenge to such decisions to OHA and to be bound by the results thereof, without right of any further administrative or judicial review or appeal* (nothing in the foregoing, however, shall be deemed to expand Chevron's right to challenge an ASFE decision beyond that permitted in paragraphs B.7 and B.8 above). To implement the foregoing, DOE and Chevron *each knowingly and voluntarily waives any and all rights it may have (i) to bring any other judicial or administrative challenge to the final equity determination decisions by the ASFE, or (ii) to bring any judicial or administrative challenge to any decision* by OHA.

* * *

Notwithstanding the provisions of paragraph B.7 above, Chevron and DOE agree that any challenge by Chevron to the ASFE's decision *regarding the "257 area" legal issue (which affects only the Carneros Zone) shall be reviewed "de novo" by OHA and that any OHA determination of the matter shall be final and binding on the parties*. If any other legal issues arise that are processed by NSA pursuant to instructions from the Independent Legal Advisor (as opposed to instructions agreed upon by Chevron and DOE in the form of a Settlement Agreement), the ASFE's decision on such legal issue, if challenged by Chevron, also shall be reviewed "de novo" by OHA and OHA's determination of the matter shall be final and binding on the parties.

* * *

> Each party represents that it has good and sufficient authority to execute and deliver this Agreement and to perform its respective obligations hereunder. This Agreement has been duly authorized, executed and delivered by the parties and constitutes the legal, valid and binding obligation of the parties, enforceable against them in accordance with its terms[.]

Compl. Ex. B.2 ¶¶ B.3, B.4, B.7-B.9, B.11, C.4 (emphasis added).

On June 10, 1997, the Secretary of Energy issued a Memorandum for the Director, Office of Hearings and Appeals that delineated OHA's authority under the Equity Process Agreement:

> Pursuant to Paragraphs 14 and 18 of DOE Delegation Order No. 0104-24, as amended, I hereby authorize you as Director of the Office of Hearing and Appeals (OHA) to *review challenges* by Chevron U.S.A. Production Company (Chevron) *to any decision or equity redetermination made by the DOE Assistant Secretary for Fossil Energy (ASFE) under the terms and procedures set forth in the* [*Equity Process Agreement*], to implement Title XXXIV of the National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106 (110 Stat. 186) for the sale of Naval Petroleum Reserve Numbered 1 (Elk Hills).
>
> *You are further authorized, upon notice to the parties, to adopt and administer procedures for adjudicating any challenge* by Chevron under the Agreement, which you determine to be necessary or appropriate by reference to the DOE procedural regulations in 10 C.F.R. Chapter X and the terms of the Agreement.

Gov't Supp. App. at 110 (emphasis added).

**G. The February 5, 1998 Termination Of The 1944 Unit Plan Contract.**

On February 5, 1998, Chevron and DOE entered into an Agreement to Terminate the 1944 Unit Plan Contract ("Termination Agreement"), following which the Government's interest in the Elk Hills Reserve was sold to Occidental of Elk Hills, Inc. *See* Compl. Ex. E at 1, 3; *see also* Compl. ¶ 33. Under the terms of the Termination Agreement, however, the parties expressly reserved their rights under the 1944 Unit Plan Contract:

> Unless expressly provided otherwise in this Agreement, nothing in this Agreement is intended to supersede or modify the rights and obligations of the Parties under the [1944 Unit Plan Contract] accrued prior to the Termination Date. The Parties intend that the terms of the [1944 Unit Plan Contract] shall be the basis on which such rights and obligations of the parties shall be determined for all matters arising out of or relating to the [1944 Unit Plan Contract] or the Existing Unit, including, without limitation, establishment of the final equity participations of the Parties and the final accounting of all production, income, and expenses of the parties . . . . It is expressly

> acknowledged that neither the termination of the [1944 Unit Plan Contract] nor the execution of this agreement shall be deemed to constitute a waiver or release of any rights or claims that either DOE or Chevron may have with respect to each other.

Compl. Ex. E § 2.2 at 13-14.

### H. The October 17, 1998 Strom Thurmond National Defense Authorization Act For Fiscal Year 1999.

Congress did not explicitly extend the eight month equity finalization deadline set forth in the 1996 NDA Act, *i.e.*, finalization of equity must occur prior to October 10, 1996. *See* Pub. L. No. 104-106, § 3412(b), 110 Stat. 631 (1996) ("Not later than eight months after the effective date, the Secretary [of Energy] shall finalize equity interests of the known oil and gas zones in Naval Petroleum Reserve Numbered 1 in the manner provided by this subsection."). Instead, Congress ratified the Secretary of Energy's ongoing efforts to finalize the parties' equity interests by authorizing the continued expenditure of funds for that purpose:

> There are hereby authorized to be appropriated to the Secretary of Energy $22,500,000 for fiscal year 1999 for the purpose of carrying out--
>
> * * *
>
> (2) *closeout activities at Naval Petroleum Reserve Numbered 1 upon the sale of that reserve under subtitle B of title XXXIV of the National Defense Authorization Act for Fiscal Year 1996* (Public Law 104-106; 10 U.S.C. 7420 note).

Pub. L. 105-261, § 4302, 112 Stat. 1920 (Oct. 17, 1998) (emphasis added).

### I. The February 26, 1999 Office Of Hearing And Appeals Decision Letter.

On February 26, 1999, the Office of Hearing and Appeals ("OHA") issued a decision letter resolving Chevron's appeal of a May 1998 final equity determination issued by the ASFE pursuant to the Equity Process Agreement. Gov't Supp. App. at 135. Although authorized "to adopt and administer procedures for adjudicating any challenge by Chevron under the [Equity Process] Agreement," in addressing the scope of the pending appeal, OHA indicated:

> *OHA does not have the authority to review disputes over the May 1997 agreement.* The May 1997 agreement provides for OHA review of appeals from final equity redeterminations by the Assistant Secretary. The May 1997 agreement does not provide for OHA review of DOE's position on that agreement. Accordingly, DOE's position on OHA's authority under this agreement is the agency's position and governs this proceeding.

*Id.* (emphasis added).

### J. Post Year 2002 Disputes Concerning Chevron's Stevens Zone Office of Hearing and Appeals Appeal And Allegations Of *Ex Parte* Communications.

On June 18, 2002, the Principal Deputy Assistant Secretary for Fossil Energy ("PDASFE") issued a Final Decision Finalizing Elk Hills Stevens Zone Equity that fixed the parties' ownership interests in the Stevens Zone of the Elk Hills Reserve. *See* Gov't Supp. App. at 6-39. Chevron appealed the decision to OHA pursuant to the Equity Process Agreement. *See* 7/21/05 TR at 46 ("One of those issues . . . was appealed to O.H.A. The other issues decided by the A.S.F.E. were not appealable to O.H.A.").

On January 28, 2004, while Chevron's Stevens Zone appeal was pending before OHA, Chevron sent a letter to the ASFE advising that certain *ex parte* government communications appeared to breach the Equity Process Agreement:

> Chevron U.S.A. Inc., ("ChevronTexaco") very recently discovered that DOE has materially breached important contracts between DOE and Chevron Texaco concerning finalization of the United States' and ChevronTexaco's respective interests in the Elk Hills Field. The contracts concern the resolution of issues between DOE and ChevronTexaco worth hundreds of millions of dollars. In brief, it appears that personnel in DOE's Office of General Counsel both acted as advocates before a decision maker who was supposed to be impartial and served as undisclosed participants in the decision-making itself. As a result, the dispute resolution mechanism agreed to by the parties has been completely undermined, one sided rather than impartial decisions have been rendered against ChevronTexaco, and substantial amounts of time and money have been wasted.

Gov't Supp. App. at 40.

On April 1, 2004, DOE's General Counsel responded by letter stating:

> The record is thus flatly inconsistent with an assertion that there has been some "dual role of the [Office of General Counsel]" that has "striped the parties' agreed-upon-procedures of any legitimacy." That would be a very serious charge, and I am confident that you will not endorse it when you have been more fully advised. DOE has scrupulously adhered to the terms and conditions of the equity finalization process, and will continue to do so. We similarly expect no less of ChevronTexaco.

*Id.* at 52.

On June 14, 2004, Chevron replied:

> Frankly, we were both surprised and disappointed by your letter. Although you acknowledge that a lawyer in the Office of General Counsel of the Department of

> Energy acted as both counsel for one of the parties in and adversarial proceeding and simultaneously as an advisor to the decision maker, you interpret the Equity Process Agreement as permitting this dual role. Clearly, you must appreciate that in consenting to the procedures afforded in the Equity Process Agreement, and thereby waiving its right to recourse to a court to determine controversies, ChevronTexaco understood that it was agreeing to alternative procedures which, at a minimum, would provide an objective decision maker and which would be fair and equitable.
>
> * * *
>
> Any process in which the decision maker receives and relies on *ex parte* advice of counsel for one of the two adversary parties does not afford impartial decision-making nor can it be fair and equitable.
>
> * * *
>
> DOE's conduct in the Stevens Zone proceeding constitutes a fundamental and material breach of the DOE's obligations under the Equity Process Agreement. As a result of DOE's breach, ChevronTexaco considers both the Equity Process Agreement and the Decoupling Agreement to be no longer operative. Those agreements were simultaneously drafted and executed and are integrally related. Viewed together, the constitute a single, integrated contract.
>
> Given the fact that the [Principle Deputy Assistant Secretary for Fossil Energy's] decision for the Stevens Zone was not rendered in compliance with the requirements of the Equity Process Agreement and the expectations of the parties, the Office of Hearings and Appeals lacks authority to review that decision. We thus intend, on ChevronTexaco's behalf, to notify the Office of Hearings and Appeals of DOE's breach of the Equity Process Agreement and our intention to participate in further Stevens Zone proceedings before OHA, should such proceedings take place, under protest. Similarly, while ChevronTexaco will continue to participate in proceedings related to the Shallow Oil Zone equity finalization, it will do so only under protest and without waving its claim of material breach.
>
> Under the circumstances, we believe that the prior Carneros Zone and Dry Gas Zone equity determination may also have been infected and may likewise be infirm. Pending receipt of information which would confirm that no similar *ex parte* communications occurred in those proceedings and that those proceedings otherwise have been conducted in strict accord with the terms of the Equity Process Agreement, we have no choice but to assume that decisions in those proceedings are similarly tainted and to dispute the validity of those decisions as well.

*Id.* at 89-90.

On June 16, 2004, Chevron sent a letter to OHA apprising the Director of the *ex parte* communications and Chevron's belief that OHA did not have jurisdiction to resolve this issue:

> In April, DOE's General Counsel confirmed the existence of communications that ChevronTexaco believes violate the May 19, 1997 Equity Process Agreement between ChevronTexaco and DOE. As a result of these communications, the decision of the Principal Deputy Assistant Secretary for Fossil Energy currently under review in this proceeding was not rendered in accordance with the requirements of the Equity Process Agreement. In turn, because OHA's authority to hear this matter derives solely from the same agreement, and extends only to review of decisions rendered in conformity with that agreement, OHA lacks jurisdiction to decide the pending appeal.
>
> ChevronTexaco intends to proceed in the appropriate forum to seek redress for DOE's breach. If OHA decides to go forward with the pending appeal under the circumstances, ChevronTexaco will continue to participate in these proceedings. However, such participation will be under protest and with full reservation of ChevronTexaco's rights to dispute the validity and effect of any decision rendered.

*Id.* at 91.

On June 21, 2004, DOE sent a letter to OHA disputing Chevron's allegations that the Equity Process Agreement was breached and that OHA could not resolve this problem:

> The Department of Energy (DOE) completely disputes Chevron's allegation that the Equity Process Agreement has been violated.
>
> * * *
>
> There is simply no basis for Chevron's rather transparent attempt to derail these proceedings. Chevron and DOE specifically agreed that disputes over legal issues addressed in the Principal Deputy Assistant Secretary for Fossil Energy's ("PDASFE") decision would be reviewed by OHA on a "de novo" basis. The current appeal is such a dispute over a legal issue. Accordingly, even if the PDASFE's decision had not been rendered in accordance with the parties' agreement, and again, DOE completely disputes this contention, OHA is free to render its own judgment. No one has questioned in any way OHA's decision making process or procedures in this matter. OHA continues to have full authority and "jurisdiction" to decide this appeal. While Chevron, for reasons currently unknown, may wish to disrupt these proceedings, it does not have the right to do so. We respectfully submit that OHA should disregard Chevron's letter and complete these proceedings.

*Id.* at 92-93.

In response, Chevron sent a letter to OHA on July 23, 2004 requesting a stay of OHA proceedings to allow Chevron to seek judicial review:

> Since receiving DOE's confirmation of *ex parte* contacts, ChevronTexaco has been evaluating its options. We expect in the near term to file a complaint in federal court seeking appropriate redress. In contrast with OHA, which previously has acknowledged that it "does not have the authority to review disputes over the [Equity Process] Agreement," (see February 26, 1999 letter []), a court has such jurisdiction and affords a process, including discovery, that allows for the development of a factual record necessary for a full airing of ChevronTexaco's claims that DOE has materially breached the Agreement.
>
> Assuming the court finds that DOE has breached the Agreement, any decision rendered by OHA in this appeal would be a nullity because, at a minimum, a condition precedent to OHA's jurisdiction - a decision by the Assistant Secretary (or his designee) untainted by *ex parte* communications - has not been satisfied. Under the circumstances, it appears that further expenditure of time and effort by OHA and the parties pending judicial resolution of the dispute over the parties' rights and obligations under the Agreement could be wasted. *ChevronTexaco therefore respectfully requests that OHA stay the subject proceeding and await the outcome of the impending court case*. In the event OHA nonetheless decides to proceed with the appeal, as stated in my June 16 letter, Chevron will continue to participate, under protest and with full reservation of its right to contest OHA's jurisdiction and the validity and effect of any decision rendered by OHA.

*Id.* at 94-95 (emphasis added).

On August 10, 2004, OHA denied Chevron's request for a stay of proceedings, without further comment. *Id.* at 106. On August 10, 2004, Chevron requested reconsideration of OHA's decision to deny the requested stay:

> [T]he issue that Chevron will bring to court – whether DOE has materially breached the Equity Process Agreement – is not within the limited jurisdiction given OHA in the Equity Process Agreement. Indeed, OHA has recognized that it does not have the authority to resolve disputes arising under the Equity Process Agreement itself. See February 26, 1999 letter []. DOE apparently also contends that OHA's jurisdiction is unaffected by the invalidity of tee underlying PDASFE decision. However, OHA's jurisdiction here is a matter of contract, and both the Equity Process Agreement and the delegation order implementing theat agreement make clear that such jurisdiction is limited to the review of equity finalization decisions of the ASFE. In the absence of a valid ASFE/PDASFE decision, OHA lacks authority to act.

* * *

> For the reasons set forth herein, OHA should reconsider its denial of ChevronTexaco's request to stay these proceedings.

*Id.* at 108.

On August 12, 2004, OHA denied Chevron's request for reconsideration and reiterated the extent of its jurisdiction:

> Chevron filed a request for reconsideration of our August 10 denial of its request for a stay. We have reviewed Chevron's submission and do not believe that any of the arguments warrant a change in our ruling. Chevron filed an appeal pursuant to an agreement with DOE, but now argues that DOE actions relieve it from the terms of the agreement. *As we have previously stated, disputes about the agreement are outside our purview.* Accordingly, given the absence of a joint motion for stay, the proceedings should go forward.

*Id.* at 109 (emphasis added).

## II. PROCEDURAL HISTORY.

On August 20, 2004, Chevron filed a Complaint in the United States Court of Federal Claims. *See* Compl. The first cause of action asserted a claim for breach of contract, based on the Government's alleged violation, between 1999 and 2003, of the terms of the Equity Process Agreement. *Id.* ¶¶ 59-65. This alleged breach of the Equity Process Agreement also was alleged as the cause of a separate material breach of the parties' two-part May 19, 1997 Agreement. *Id.* ¶ 64.

Specifically, Chevron alleges that during finalization proceedings for the Dry Gas, Carneros, and Stevens Zone proceedings, the DOE's Deputy General Counsel for Technology Transfer and Procurement ("DOE's Deputy General Counsel") engaged in *ex parte* communications with DOE decision-makers in violation of the Equity Process Agreement. *Id.* ¶ 38. In addition, Chevron claims that it first learned of the *ex parte* communications concerning the Stevens Zone proceedings on December 23, 2003, the date DOE responded to Chevron's January 7, 2003 Freedom of Information Act request. *Id.* ¶ 58. Chevron claims that it first became aware of *ex parte* communications concerning the Dry Gas Zone and Carneros Zone proceedings on June 23, 2004, the date DOE responded to Chevron's February 19, 2004 Freedom of Information Act request. *Id.*

The decision-maker for the Dry Gas and Carneros Zone proceedings was the ASFE, the Secretary of Energy's delegate under the 1944 Unit Plan Contract, who was assigned to perform the functions of the Secretary of Energy as set forth under the Equity Process Agreement. *Id.* ¶ 39. The decision-maker for the Stevens Zone proceedings was another individual delegated by the Secretary of Energy under the 1944 Unit Plan Contract to perform the functions of the Assistant Secretary under the Equity Process Agreement. *Id.* ¶ 40. For purposes of the Stevens Zone proceedings, the

later individual, at all relevant times, either was the Acting Secretary or the Principal Deputy Assistant Secretary serving as the Assistant Secretary's delegate. *Id.*

Chevron asserts that during the finalization proceedings, the DOE's Deputy General Counsel functioned both as lead litigation counsel for the DOE Equity Team and as an advisor to the DOE decision-maker in each proceeding, including participating in the preparation of the Assistant Secretary's decisions. *Id.* ¶¶ 38, 45. In addition, Chevron states that during proceedings before the Independent Petroleum Engineer, DOE's Deputy General Counsel consistently held herself out and acted as lead in-house counsel for the DOE Equity Team. Specifically, DOE's Deputy General Counsel participated in mediation meetings with the Independent Legal Advisor as lead counsel for the DOE Equity Team; signed correspondence to the Independent Legal Advisor; represented to the Independent Legal Advisor that she was to be the primary contact for the DOE Equity Team on substantive legal matters; and participated in and supervised drafting the DOE Equity Team's submissions to the Assistant Secretary. *Id.* ¶¶ 41, 42, 44. DOE's Deputy General Counsel also corresponded with the Independent Petroleum Engineer on behalf of the DOE Equity Team discussing pending legal issues, signed an agreement with counsel for Chevron regarding the Independent Petroleum Engineer's alleged conflicts of interest, and spoke with counsel for Chevron about disputed issues before the Independent Petroleum Engineer. *Id.* ¶ 43. While acting as lead in-house counsel for the DOE Equity Team, the DOE's Deputy General Counsel also participated in preparing drafts of the Assistant Secretary's preliminary and final decisions concerning the Dry Gas Zone, Carneros Zone, and Stevens Zone proceedings and collaborated with the Assistant Secretary in drafting the decisions. *Id.* ¶¶ 47, 56, 57.

On December 23, 2003 and June 23, 2004, Chevron also received draft decisions circulated between the Assistant Secretary and DOE's Deputy General Counsel in response to Chevron's January 7, 2003 and February 19, 2004 Freedom of Information Act requests. *Id.* Chevron maintains that the drafts produced by the Government during discovery were completely redacted, except for headings, in violation of Section B.4 of the Equity Process Agreement. *Id.* Other heavily-redacted documents produced to Chevron or withheld purportedly confirm additional *ex parte* contacts between DOE's Deputy General Counsel and the Assistant Secretary or staff regarding disputed matters. *Id.* ¶ 48. As a result, Chevron argues that DOE's Deputy General Counsel's dual role as advocate for DOE in finalization proceedings and advisor to the Assistant Secretary "stripped the parties' agreed-upon procedures of any legitimacy, . . . deprived Chevron of the benefit of an independent and impartial decision from the Assistant Secretary that it bargained for, and constitutes a material breach of DOE's contract obligations." *Id.* ¶ 51.

The Complaint also alleges that documents produced in response to Chevron's January 7, 2003 and February 19, 2004 Freedom of Information Act requests evidence *ex parte* communications between the Assistant Secretary or staff and engineers on the DOE equity team, as well as the Independent Petroleum Engineer with respect to the Stevens Zone, in violation of the terms of the Equity Process Agreement. *Id.* ¶¶ 52-55; *see also* 7/21/05 TR at 52. In addition, the Complaint alleges that DOE delayed issuing the Freedom of Information Act responses, because they would show the Deputy General Counsel for Technology Transfer and Procurement's involvement

in the preparation of the Assistant Secretary's preliminary and final decisions in the Stevens Zone proceeding and include documents confirming *ex parte* communications between the Assistant Secretary and the Independent Petroleum Engineer. *See* Compl. ¶ 56.

The second cause of action asserted a claim for breach of an implied covenant of good faith and fair dealing inherent in the May 19, 1997 Agreement. *Id.* ¶¶ 66-71. Specifically, the Complaint alleged that DOE's Deputy General Counsel's *ex parte* communications with the Assistant Secretary evidence bad faith by "evading the spirit of the bargain, undermining an agreed common purpose of the parties, deliberately violating the justified expectations of Chevron, employing subterfuge, and depriving Chevron of consideration for which it bargained[,]" impartial equity determinations by the Assistant Secretary. *Id.* ¶ 68.

Finally, the Complaint seeks: (1) a finding that "DOE has materially breached the Equity Process Agreement, and in turn, the parties' two-part May 19, 1997 agreement;" (2) "damages in an amount to be determined at trial to compensate ChevronTexaco for the expenses, effort, and time it invested in proceedings tainted through *ex parte* communications;" (3) "interest, costs, and attorney's fees to the extent authorized by law and by the parties' agreements;" and, (4) "[s]uch other further relief as the Court may deem just and appropriate." *Id.* ¶¶ 64, 65, 70, 71; *see also* Compl. at Prayer for Relief.

On November 19, 2004, the Government filed a Motion to Dismiss, pursuant to Rule 12(b)(6) of the United States Court of Federal Claims ("RCFC"). On February 1, 2005, Chevron filed a Response. On February 25, 2005, the Government filed a Reply. On July 21, 2005, the court heard oral argument on the Government's Motion to Dismiss.

On August 31, 2005, the Government filed a Supplemental Motion to Dismiss, pursuant to RCFC 12(b)(1). On September 29, 2005, Plaintiff filed a Response to the Government's Supplemental Motion to Dismiss. On November 16, 2005, the Government filed a Supplemental Reply.

On September 29, 2005, Jones Day, Washington, D.C., a law firm, replaced Akin Gump Strauss Hauer & Feld, LLP, Washington, D.C., as Chevron's counsel. At the request of Chevron's new counsel, on December 16, 2005, the court heard oral argument on the Government's Supplemental Motion to Dismiss.

## III. DISCUSSION.

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. §

1491(a)(1) (2000). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Testan*, 424 U.S. 392, 398 (1976). Therefore, in order to pursue a substantive right, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action, . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit."); *Kahn* v. *United States,* 201 F.3d 1375, 1378 (Fed. Cir. 2000) ("[T]he plaintiff 'must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.'" (quoting *James* v. *Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998)).

In this case, Chevron properly invoked the court's jurisdiction over claims for damages arising from the breach of a contract, *i.e.*, the 1997 Equity Process Agreement. Chevron's substantive right to money damages is inherent in that contract, as discussed herein.

**B. Standard Of Review.**

The court's consideration of motions to dismiss for lack of subject matter jurisdiction and to dismiss for failure to state a claim is "necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer* v. *Rhodes,* 416 U.S. 232, 236 (1974). In ruling on a motion to dismiss, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke* v. *United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer* v. *Rhodes*, 416 U.S. 232, 236-37 (1974)).

**1. RCFC 12(b)(1) - - Jurisdiction.**

RCFC 12(b)(1) requires that plaintiffs bear the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds* v. *Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question it [is] incumbent upon [plaintiff] to come forward with evidence establishing the court's jurisdiction.").

**2. RCFC 12(b)(6) - - Failure To State A Claim.**

RCFC 12(b)(6) provides that "[d]ismissal for failure to state a claim under Rule 12(b)(6) . . . is proper only when a plaintiff 'can prove no set of facts in support of his claim which would entitle him to relief.'" *Adams* v. *United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004) (quoting *Leider* v. *United States*, 301 F.3d 1290, 1295 (Fed. Cir. 2002)).

### C. The Court's Resolution Of The Government's Motions To Dismiss.

#### 1. The Government's RCFC 12(b)(1) Motion To Dismiss.

##### a. Whether The Equity Process Agreement Was Money Mandating Or Otherwise Provided A Substantive Right To Money Damages.

###### i. The Government's Argument.

The Government argues that the court does not have jurisdiction over the alleged violations of federal law set forth in the Complaint, because the 1997 Equity Process Agreement is not money-mandating and, therefore, does not create a substantive right to money damages. *See* Mot. Dis. at 13 (citing *Khan* v. *United States*, 201 F.3d 1375, 1377 (Fed. Cir. 2000) ("[T]o invoke jurisdiction under the Tucker Act, a plaintiff must identify a contractual relationship . . . that provides a substantive right to money damages."); *Tippet* v. *United States*, 185 F.3d 1250 (Fed. Cir. 1999) ("A plaintiff must, therefore, identify a separate statute or regulation or contract provision that creates a substantive right entitling it to the money damages it seeks.")); *see also* Gov't Reply at 3 (citing *Ransom* v. *United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) ("To maintain a cause of action pursuant to the Tucker Act that is based on contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract.")). In other words, assuming *arguendo* that *ex parte* communications breached the Equity Process Agreement, the Government argues that the United States Court of Federal Claims does not have jurisdiction over Plaintiff's claims, because the Equity Process Agreement does not require the payment of any money damages in the event of such a breach. *See* Gov't Mot. Dis. at 14; *see also* Gov't Supp. Mot. Dis. at 5; Gov't Supp. Reply at 7.

In support, the Government relies on *Griswold* v. *United States*, 61 Fed. Cl. 458 (2004), *Schooling* v. *United States*, 63 Fed. Cl. 204 (2004), and *Lee* v. *United States*, 33 Fed. Cl. 374 (1995), for the proposition that the United States Court of Federal Claims does not have jurisdiction over a dispute where a plaintiff's claims are based on a non-monetary contractual provision. *See* Mot. Dis. at 13 ("Even where the Government's alleged actions would constitute a violation of the terms of the parties' agreement, the contractual right violated by the Government still has to be fairly interpreted as requiring the government to pay money for the damage sustained." (citing *Griswold*, 61 Fed. Cl. at 466) (internal quotation omitted)); Mot. Dis. at 12-13 ("Claims against the United States for damages 'must arise from violation of the Constitution, a statute or regulation, <u>or contractual rights which may be fairly interpreted as requiring the payment of compensation from the United States</u>.'" (emphasis in original) (quoting *Lee* v. *United States*, 33 Fed. Cl. at 378)); *see also* Gov't Reply at 4 ("In *Schooling*, this Court concluded that, based upon *Khan*, the plaintiff's complaint should be dismissed because, among other things, it lacked jurisdiction to entertain a claim 'based on alleged breach of a non-monetary provision of a settlement agreement.") (quoting *Schooling*, 63 Fed. Cl. at 208.).

In addition, the Government argues, even if money damages are available for breach of contract, that fact does not resolve the threshold jurisdictional issue of whether the specific terms of the Equity Process Agreement should be interpreted to require that the Government pay money damages. *See* Gov't Reply at 5. The Government does not take issue with the RESTATEMENT (SECOND) OF CONTRACTS § 346 cmt. a (1981) that provides that a "breach of contract gives the injured party a right to damages against the party in breach," however, "*the parties* [*can*] *by agreement vary the rules*[.]" *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 346 (emphasis added)). The Government argues that the terms of the Equity Process Agreement departed from this contractual principle. *Id.* at 5-6.

**ii. Chevron's Response.**

Chevron responds that the Government erroneously relies on non-contract cases, where the court properly evaluated whether the constitutional, statutory, or regulatory provision at issue could fairly be interpreted as money-mandating, as required by *Testan*. *See* Pl. Resp. at 10. Instead, Chevron maintains that it is inappropriate to examine whether contract based claims, *i.e.*, Chevron's claim for breach of the Equity Process Agreement, are money mandating, because *Testan* and progeny limit the money-mandating inquiry to cases where a non-contractual bases for Tucker Act jurisdiction is asserted. *Id.* at 11-13 (quoting *Testan*, 424 U.S. at 400 ("The respondents do not rest their claims upon a contract; neither do they seek the return of money paid by them to the Government. It follows that the asserted entitlement to money damages depends upon whether any federal statute 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'"); *Mosca* v. *United States*, 417 F.2d 1382, 1386 (Ct. Cl. 1969) ("[J]urisdiction in noncontractual actions filed under the Tucker Act is limited to . . . those in which a particular provision of law, expressly or by implication, grants [plaintiff] the right to recover a certain sum."); *Eastport S.S. Co.* v. *United States*, 372 F.2d 1002, 1008-09 (Ct. Cl. 1967) ("Monetary claims which cannot be brought within [the 'fairly be interpreted' test] [a]nd which do not fall under another head of jurisdiction, such as a contract with the United States are beyond this court's jurisdiction, even though they may intimately involve the Constitution, an Act of Congress, or an executive regulation.")).

Chevron also argues that since contract law, *i.e.*, the substantive source of law in this case, provides for money damages in the event of breach, there is no need for an inquiry into whether a contract can fairly be interpreted as money mandating. *Id.* at 12-13 (quoting *United States* v. *Mitchell*, 463 U.S. 206, 216-18 (1983) ("*Mitchell II*") (citations omitted) ("Thus, for claims against the United States 'founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department,' 28 U.S.C. § 1491, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation[.]"); *Moyer* v. *United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999) ("Under the Tucker Act, when a cause of action is not based upon breach of contract against the government, the Court of Federal Claims has jurisdiction only over those constitutional provisions, statutes, or regulations that by their terms entitle a plaintiff to money."); *Brown* v. *United States*, 86 F.3d 1554, 1559 (Fed. Cir. 1996) (citations omitted) ("A [Tucker Act] claimant must . . . demonstrate either that he or she has 'an express or implied contract

with the United States,' or that some applicable source of substantive law 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'")). Chevron also contends that "in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." *Id.* at 9 (quoting *Sanders* v. *United States*, 252 F.3d 1329, 1334-35 (Fed. Cir. 2001). Therefore, Chevron argues that the Government's reliance on *Griswold*, *Schooling*, and *Lee* is misplaced, because those cases are clearly distinguishable. *Id.* at 13-17.

**iii. The Court's Resolution.**

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000). The Tucker Act, however, is only a "jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *Testan*, 424 U.S. at 398. Therefore, in order to pursue a substantive right, plaintiffs must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. See Todd, 386 F.3d at 1094 ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action, . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

Every constitutional, statutory, and regulatory provision, however, does not provide a substantive right to money damages. *See United States* v. *Mitchell*, 445 U.S. 535, 546 (1980) (holding that there is no Tucker Act or Indian Tucker Act jurisdiction when the statute creating the trust does not create a fiduciary management responsibility because such a statute is not money-mandating). As the predecessor to the United States Court of Appeals for the Federal Circuit explained in *Eastport S.S.*:

> [I]t is not every claim involving or invoking the *Constitution, a federal statute, or a regulation* which is cognizable here. The claim must, of course, be for money. Within that sphere, *the non-contractual claims we consider under Section 1491* can be divided into two somewhat overlapping classes-those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury.

* * *

> Monetary claims which cannot be brought within these limits are beyond this court's jurisdiction, even though they may intimately involve the Constitution, an Act of Congress, or an executive regulation.

*Id.* at 1007-08 (emphasis added).

The Court of Claims, however, was careful to distinguish between claims "involving or invoking the Constitution, a federal statute, or a regulation" and claims based on contract. *Id.* at n.7 ("And which do not fall under another head of jurisdiction, such as a contract with the United States.").

The United States Supreme Court has held that the Tucker Act is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *Testan*, 424 U.S. at 398 ("The Court of Claims has recognized that the [Tucker] Act merely confers jurisdiction upon it whenever the substantive right exists.") (citing *Eastport Steamship Corp.*, 372 F.2d at 1007-09). In *Testan*, the issue presented was "whether the *two other federal statutes* that are invoked by the respondents confer a substantive right to recover money damages from the United States for the period of their allegedly wrongful civil service classifications." *Id.* (emphasis added).

The United States Supreme Court, however, maintained the distinction between claims based on the Constitution, federal statute, and/or executive regulation from those based on contract:

> [T]he Tucker Act is merely jurisdictional, and grant of a right of action must be made with specificity. *The respondents do not rest their claims upon a contract*; neither do they seek the return of money paid by them to the Government. It follows that the asserted entitlement to money damages depends upon whether any federal statute "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." We are not ready to tamper with these established principles because it might be thought that they should be responsive to a particular conception of enlightened governmental policy.

*Id.* at 400 (quoting *Eastport S.S.*, 372 F.2d at 1009) (citing *Mosca* v. *United States*, 417 F.2d 1382, 1386 (Ct. Cl. 1969) ("[O]ur jurisdiction in *noncontractual actions* filed under the Tucker Act is limited to money claims which fall into two general categories: those in which the plaintiff seeks the return of money paid over to the Government, and those in which a particular provision of law, expressly or by implication, grants him the right to recover a certain sum. Since plaintiff's claim does not fall within the first category, we must look to the statutes and regulations involved here to see whether he has a valid claim falling within the second category.") (emphasis added)).

Accordingly, the United States Court of Appeals for the Federal Circuit has limited the money-mandating inquiry to claims based on the Constitution, a federal statute, and/or an executive regulation. *See Martinez* v. *United States*, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) ("The Tucker Act authorizes certain actions for monetary relief against the United States to be brought in the Court

of Federal Claims. The actions for which the Tucker Act waives sovereign immunity are contracts with the United States, actions to recover illegal exactions of money by the United States, and actions brought pursuant to money-mandating constitutional provisions, statutes, regulations, or executive orders."); *see also Kahn* v. *United States,* 201 F.3d 1375, 1377-78 (Fed. Cir. 2000) ("[T]o invoke jurisdiction under the Tucker Act, a *plaintiff must identify a contractual relationship*, constitutional provision, statute, or regulation that provides a substantive right to money damages. In other words, the plaintiff 'must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.'" (emphasis added)) (citing *Hamlet* v. *United States,* 63 F.3d 1097, 1101 (Fed. Cir.1995)) (quoting *James* v. *Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998)); *Tippett* v. *United States*, 185 F.3d 1250, 1254-55 (Fed. Cir. 1999) ("*When a contract is not involved*, to invoke jurisdiction under the Tucker Act, a plaintiff must identify a constitutional provision, a statute, or a regulation that provides a substantive right to money damages." (emphasis added)).

In *Ontario Power Generation, Inc.* v. *United States*, 369 F.3d 1298 (Fed. Cir. 2004), the United States Court of Appeals for the Federal Circuit categorized claims that may be adjudicated by the United States Court of Federal Claims:

> The underlying monetary claims are of three types. *First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver*. Second, the Tucker Act's waiver encompasses claims where the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum. Third, the Court of Federal Claims has jurisdiction over those claims where money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury. *Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum. This category is commonly referred to as claims brought under a "money-mandating" statute.*

*Id.* at 1301 (internal citations and quotations omitted) (emphasis added).

In this case, however, the Government attempts to impose the money mandating inquiry relevant to claims asserted pursuant to the United States Constitution, federal statutes, or executive regulations onto claims based on common law contract. *See* Mot. Dis. at 12-13 (citing *Griswold*, 61 Fed. Cl. at 466;[11] *Lee*, 33 Fed. Cl. 374 (1995)[12]); *see also* Gov't Reply at 4 (citing *Schooling*, 63

---

[11] In *Griswold*, former United States Postal Service employees entered into a settlement agreement with the Government concerning claims for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17. *See Griswold*, 61 Fed. Cl. at 459. A Complaint filed in the United States Court of Federal Claims alleged that the settlement agreement provided for certain monetary damages and attorney's fees in the event of breach and the Government's failure to notify plaintiffs of the date of an upcoming administration of the civil service exam violated that agreement. *Id.* at 459-60, 465. Plaintiffs claimed compensatory damages equal to the amount that they would have earned had they taken and passed the civil service exam and been hired by the United States Postal Service, together with incidental damages, attorney's fees, costs, and interest. *Id.* at 460. The United States Court of Federal Claims held that it did not have jurisdiction over "claims alleging the breach of a Title VII settlement agreement due to the comprehensive statutory scheme established under Title VII of the Civil Rights Act." *Id.* at 465. In addition, the United States Court of Federal Claims held that, although the Government breached the settlement agreement by failing to provide plaintiffs with notice of the civil service exam, the court lacked jurisdiction because "that identified 'substantive right' to notice [could not], in the view of this court in the light of its understanding of cases interpreting the Tucker Act, be 'fairly interpreted' as requiring the government to pay money for the 'damage sustained.'" *Id.* at 466 (quoting *Eastport*, 372 F.2d at 1009).

[12] In *Lee*, a federal employee entered into a settlement agreement with the National Institutes of Health concerning race discrimination claims made pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972. *See Lee*, 33 Fed. Cl. at 376. There, the court held that "Title VII is the comprehensive, exclusive and pre-emptive remedy for federal employees alleging discrimination." *Id.* at 378 (citing *Brown* v. *General Servs. Admin.*, 425 U.S. 820, 829 (1976) ("Title VII provisions for judicial review pre-empt more general remedies sought in federal district court."). The court decided that the issue of law was:

> [W]hether the asserted breach of an agreement settling a job discrimination complaint against the United States amounts to an 'action or proceeding' under Title VII - over which the United States Court of Federal Claims lacks jurisdiction - or amounts to a contractual action within the Court's Tucker Act Jurisdiction.

*Id.* at 379. Therefore, the trial court concluded that alleged breach of a settlement agreement was an action pursuant to Title VII rather than a contractual action covered by the Tucker Act. *Id.* (citing *Fausto* v. *United States*, 16 Cl. Ct 750, 753 ("Instead, plaintiff's settlement agreement is the direct result of his discrimination claim. Thus, plaintiff does not request this court to enforce an independent contract claim, but a Title VII discrimination claim."); *see also Robles* v. *United States*, No. 84-3635, 1990 WL 155545, at *5 (D.D.C. July 20, 1990) ("The thrust of all of these decisions,

Fed. Cl. 204).[13]

The Government's reliance on *Schooling, Griswold*, *and Lee,* however*,* is misplaced, since in each of these cases the United States Court of Federal Claims held that it did not have jurisdiction, because the existence of a pre-emptive statutory scheme that deprived the court of jurisdiction. *See Schooling*, 63 Fed. Cl. at 206-08 ("[U]nder the comprehensive and integrated review scheme of the CSRA, the Claims Court . . . is not an appropriate authority to review an agency's personnel determinations. . . . Plaintiff is not entitled to enforce the settlement agreement as a contract outside

---

and of the cited law review articles advocating a different approach, has been to try to characterize whether an action to enforce a Title VII settlement agreement is (a) an action brought under Title VII, which itself provides a source of jurisdiction in federal court; (b) an action arising under federal law, providing "federal question" jurisdiction under 28 U.S.C.A. § 1331; (c) an action in the nature of a suit for breach of contract, which should be governed by state law, and which would not provide an independent basis of federal jurisdiction. With one exception, the cases dealing with private sector suits have held that federal courts do have jurisdiction under Title VII over actions to enforce settlement agreements. The Court believes that the considerations leading to that conclusion apply with equal force to actions brought by federal employees.")). Accordingly, the court held that it lacked jurisdiction to "entertain plaintiff's claim for breach of [the] Title VII settlement agreement." *Id.* at 380.

[13] In *Schooling*, a former employee of the Internal Revenue Service ("IRS") entered into a settlement agreement with the Government concerning the scope of disciplinary action to be taken against the plaintiff. *See Schooling*, 63 Fed. Cl. at 204. The settlement provided that the proposed thirty day suspension from duty would be mitigated to a fourteen day suspension. The Complaint alleged that the IRS materially breached the settlement by failing to issue a decision letter, as required by Section 7503(b)(4) of the Civil Service Reform Act of 1978 ("CSRA"). *Id.* at 205. Plaintiff sought back pay for the period during which he was suspended from duty. *Id.* at 207. The United States Court of Federal Claims held that it did not have jurisdiction, because plaintiff's action was properly a personnel claim under the CSRA rather than a breach of contract claim. *Id.* at 208 ("Since the CSRA is an integrated scheme, and since the settlement agreement arose from this integrated scheme, the settlement agreement must be enforced within the procedures provided for in the CSRA or not at all. . . . The same is true in this case. Plaintiff is not entitled to enforce the settlement agreement as a contract outside the CSRA in any other forum, including in the United States Court of Federal Claims."). In response to the Government's alternative argument that, even if the court possessed jurisdiction to entertain claims that are subject to the CSRA, the court would still lack jurisdiction because the claim was based on a "non-monetary provision of [the] settlement agreement," the court reiterated that "cases seeking relief other than monetary damages . . . have never been within [the United States Court of Federal Claims'] jurisdiction." *Id.* The court then concluded that "[t]he proper remedy for this alleged violation would be for the I.R.S. to provide plaintiff with the decision letter, not to pay monetary damages. This type of relief is equitable in nature. Plaintiff cites no authority for the proposition that the proper corrective action for this alleged breach would be the payment of money damages." *Id.*

the CSRA in any forum including the United States Court of Federal Claims." (internal citations and quotations omitted)); *see also Griswold*, 61 Fed. Cl. at 466 ("This court has consistently held that it lacks jurisdiction to hear claims alleging the breach of a Title VII settlement agreement due to the comprehensive statutory scheme established under Title VII of the Civil Rights Act. The court's view remains the same here."); *Lee*, 33 Fed. Cl. at 378 ("Title VII is the comprehensive, exclusive and pre-emptive remedy for federal employees alleging discrimination. . . . The presence of a comprehensive, precisely drawn statutory scheme providing for judicial review in another forum will pre-empt Tucker Act jurisdiction in this Court."). Accordingly, notwithstanding the discussions in *Griswold* and *Schooling* regarding whether the provisions of the settlement agreements at issue provided plaintiffs with a substantive right to money damages, *Schooling*, *Griswold*, and *Lee* are inapposite.[14]

In this case, Chevron has alleged two claims for breach of contract. *See* Compl. ¶¶ 59-71. Therefore, as a matter of law, Chevron is not required to identify a specific money-mandating provision in the Equity Process Agreement, because inherent in every breach of contract is a right to money damages. *See Ontario Power Generation*, 369 F.3d at 1301 ("First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver."). Moreover, Chevron's claims also satisfy the requirement of a substantive right to money damages by seeking reliance damages. *See Glendale Fed. Bank* v. *United States*, 239 F.3d 1374,

---

[14] *Schooling* and *Griswold* concern whether particular provisions of settlement agreements provided plaintiffs with a substantive right to money damages. *See Schooling*, 63 Fed. Cl. at 208 ("The Claim Is For Breach Of A Non-Monetary Provision of The Settlement Agreement. . . . Plaintiff's basis for this action is the alleged failure of the I.R.S. to provide a decision letter stating the basis for his suspension, as required by the terms of the settlement. The proper remedy for this alleged violation would be for the I.R.S. to provide plaintiff with the decision letter, not to pay monetary damages. This type of relief is equitable in nature. Plaintiff cites no authority for the proposition that the proper corrective action for this alleged breach would be the payment of money damages."); *Griswold*, 61 Fed. Cl at 466 ("Here, even though defendant's alleged failure to provide notice to plaintiffs through counsel of the date and time of an examination administered to assess potential civil service employment would constitute a violation of the terms of the Settlement Agreements, that identified substantive right to notice cannot, in the view of this court in the light of its understanding of cases interpreting the Tucker Act, be fairly interpreted as requiring the government to pay money damages for the damage sustained."(quotation omitted)). Those discussions, however, arise from the unique nature of the settlement agreements at issue. Specifically, they are predicated on the court's understanding that, although styled as breach of contract, the claims in fact were brought under Title VII and the CSRA. *See Schooling*, 63 Fed. Cl. at 208 ("Plaintiff is not entitled to enforce the settlement as a contract outside the CSRA in any other forum, including in the United States Court of Federal Claims."); *Griswold*, 61 Fed. Cl. at 464 (discussing the rationale of *Fausto*, 16 Cl. Ct. at 750-51, and *Lee*, 33 Fed. Cl. at 379, that the plaintiff's breach of contract claims are actions "under Title VII rather than a contract action covered by the Tucker Act.").

1382 (Fed. Cir. 2001) ("The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise."). Therefore, the Equity Process Agreement inherently provides a substantive right to money damages.

**b. Whether This Dispute Arises In The Context Of An Established Statutory Scheme That Does Not Provide For Judicial Review.**

**i. The Government's Position.**

The Government makes two related arguments that this dispute arises in the context of a statutory scheme that specifically does not provide for judicial review.

**a). The National Defense Authorization Act Provided The Secretary Of Energy With Discretion To Select A Method To Make A Final Determination Of The Parties' Equity Interests.**

The Government argues that Section 3412(b) of the NDA Act, 10 U.S.C. § 7420 (note), provided the Secretary of Energy with complete discretion to determine the final equity interests of the parties and establish exclusive procedures for resolving disputes arising from final equity determinations. *See* Gov't Mot. Dis. at 17. Accordingly, relying on *Collins* v. *United States*, 67 F.3d 284 (Fed. Cir. 1995), the Government contends that, as a matter of law, the ASFE's decisions are not subject to review by any court. *See* Mot. Dis. at 18-19; *see also* Gov't Reply at 12 (arguing that even if the Secretary of Energy's final decisions were tainted, as Chevron alleges, they are still "final" for purposes of the 1997 Agreement, and, therefore, the court does not have jurisdiction to adjudicate any alleged breach of contract claim).

In *Collins,* the United States Court of Appeals for the Federal Circuit held that the Military Claims Act, 10 U.S.C. §§ 2733-37, authorized the Secretary of the Army with final and conclusive discretion to settle claims against the Government up to $100,000.00. *See Collins*, 67 F.3d at 286. Therefore, because the payment of damages was discretionary under the Military Claims Act and the settlement of claims was final, the United States Court of Federal Claims did not have jurisdiction to adjudicate plaintiff's claim. *Id.* The Government asserts that the NDA Act at issue in this case is analogous to the Military Claims Act, because Section 3412(b)(3) and Section 9(b) of the 1944 Unit Plan Contract state that the Secretary of Energy's discretionary equity determinations are final. Therefore, the Government concludes that the court is precluded from exercising jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1). *See* Mot. Dis. at 18-19.

**b). The National Defense Authorization Act Did Not Provide For Judicial Review Of The Equity Finalization Process.**

The Government also asserts that the Assistant Secretary's equity redetermination were "final for all purposes[,]" and "shall be final and . . . binding" evidences that "Section 3412 does not contemplate any judicial involvement in the dispute process established by Congress." Gov't Mot. Dis. at 19-20. Moreover, judicial review of Chevron's claim would contravene *Bobula* v. *United States Dep't of Justice*, 970 F.2d 854 (Fed. Cir. 1992) (holding that the Civil Service Reform Act's provision of exclusive procedures for the resolution of employment disputes between the Government and federal employees preempted jurisdiction).

**ii. Chevron's Response.**

**a). The Secretary Of Energy's Authority To Issue A Final Decision Does Not Preclude Consideration Of Chevron's Breach Of Contract Claims.**

Chevron responds that under Section 3412(b), "the Secretary [of Energy] 'may,' but need not, follow the recommendation of the IPE. Nothing more should be read into this sentence." Pl. Resp. at 23. Accordingly, Chevron argues that Section 3412(b) does not authorize the Secretary of Energy to deprive Chevron of the right to seek judicial review of the Secretary of Energy's decision. *See* Pl. Resp. at 22-23. In addition, the Secretary of Energy's discretion under the NDA Act includes the power to enter into contracts judicially enforceable in the United States Court of Federal Claims. *Id.* at 23. In the alternative, if Section 3412(b) did not confer upon the Secretary of Energy the power to enter into judicially enforceable contracts to establish final equity interests, then the Secretary's assent to the terms of the 1997 Agreement was *ultra vires* and the Equity Process Agreement is void. *See* Pl. Resp. at 23. Section 3412(b) does not, however, authorize the Secretary of Energy to enter into a contract and then avoid adjudication for a breach thereof. *Id.* at 24-25 (citing *United States* v. *Standard Oil Co.*, 545 F.2d at 632 n.2) (interpreting Section 15(b) of the 1944 Unit Plan Contract not to address "questions . . . more appropriately resolved in judicial review of the final administrative decision under section 15(b)).

Furthermore, Chevron argues that the Government has misinterpreted the Complaint as challenging decisions under the Equity Process Agreement rather than seeking redress for the absence of "final decisions," required by the 1997 Agreement. *See* Pl. Resp. at 24. Chevron contends that the ASFE decisions are not "final decisions," because they were the result of alleged *ex parte* communications and the cause of a breach of the Equity Process Agreement, for which Chevron seeks reliance damages. *Id.*

**b). Congress Did Not Authorize An Administrative Review Process To Supplant Chevron's Rights Under The 1944 Unit Plan Contract.**

According to Chevron, the Government's suggestion that Congress' final equity determination precluded judicial review "is pure fiction." Pl. Resp. at 20. Chevron argues that unlike *Griswold*, *Lee*, and *Bobula*, in this case there is no precisely-drawn statutory scheme providing for review in another forum. *See* Pl. Resp. at 22.[15] In addition, Chevron argues that unlike the claims in *Griswold*, *Lee*, and *Bobula*, the claims at issue do not seek to enforce any rights arising under the relevant statute, here the NDA Act. *Id.*

In addition, Chevron argues that, contrary to the Government's assertion that Section 3412 does not provide for judicial review, the NDA Act expressly protects Chevron's contractual interests under the 1944 Unit Plan Contract, including the right to bring a breach of contract action under the Tucker Act. *Id.* at 20-21 (quoting Pub. L. 104-106, §§ 3413(a)(3), (c) ("The Secretary [of Energy] shall exercise the termination procedures provided in the unit plan contract so that the unit plan contract terminates not later than the date of closing of the sale of reserve. . . . *Nothing in this subtitle shall be construed to adversely effect the ownership interest of any other entity* having any right, title, and interest in and to lands within the boundaries of Naval Petroleum Reserve Numbered 1 and which are *subject to the unit plan contract*.") (emphasis added)). Therefore, the NDA Act "echoes or builds on" the 1944 Unit Plan Contract and, accordingly, did not abrogate any rights afforded to Chevron thereunder, nor enlarge the Secretary of Energy's discretion regarding the equity finalization process. *See* Pl. Resp. at 21 (stating that the NDA Act mandates the 1944 Unit Plan Contract option of hiring an Independent Petroleum Engineer, but authorizing the Secretary of Energy to "use such other method to establish final equity interest in the reserve as the Secretary [of Energy] considers appropriate." (quoting Pub. L. 104-106, § 3412(b)(2)).

**iii. The Court's Resolution.**

The court has determined that the NDA Act does not preclude judicial review of Chevron's claims. The NDA Act does not vest the Secretary of Energy with *Collins* discretion nor is the NDA Act a preemptive statutory scheme that provides for judicial review in another forum, as was the situation in *Griswold*, *Lee*, *Schooling*, and *Bobula*.

---

[15] *Lee* and *Griswold* involved claims brought under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e-2000e-17. *Bobula* involved a claim arising under the Civil Service Reform Act of 1978, Pub.L. 95-454, 92 Stat. 1111 *et seq.* (codified, as amended, in various sections of 5 U.S.C. §1101-8701).

**a). The Discretion Granted The Secretary Of Energy By The NDA Act Does Not Prohibit Judicial Review.**

Section 3412(b) of the NDA Act is not analogous to the statute at issue in *Collins*,[16] where the discretionary nature of the Secretary of the Army's decision to pay claims under Section 2733 of the MCA was at issue. In contrast, the NDA Act grants the Secretary of Energy the discretion to "use such other method to establish final equity interest in the reserve as the Secretary [of Energy] considers appropriate." Pub. L. No. 104-106, § 3412(b), 10 U.S.C. § 7420 (note). Section 3412(b), however, unequivocally mandates that "[n]o later than eight months after the effective date, the Secretary [of Energy] *shall* finalize equity interest of the known oil and gas zones in Naval Petroleum Reserve Number 1 in the manner provided by this subsection. *Id.* (emphasis added). Therefore, Congress directed that finalization of the parties' equity interests was not a discretionary act. *Id.* Accordingly, the Government's reliance on *Collins* is misplaced.

In addition, unlike Section 2735 of the MCA, Section 3412(b) of the NDA Act does not contain a blanket finality provision. Instead, the finality provision of Section 3412(b)(3) is narrowly drawn:

> If, on the effective date, there is an ongoing equity redetermination dispute between the equity owners under section 9(b) of the unit plan contract, the dispute shall be resolved within eight months after the effective date. The resolution shall be considered final for all purposes under this section.

Pub. L. No. 104-106, § 3412(b)(3).

---

[16] In *Collins*, the United States Court of Appeals for the Federal Circuit held that disallowance of the appellant's claim under the Military Claims Act ("MCA"), 10 U.S.C. §§ 2731-37, was not subject to judicial review. *See Collins*, 67 F.3d at 288 ("We hold that the disallowance of plaintiff's claim . . . was final and conclusive under section 2735 and not subject to judicial review."). In reaching that holding, our appellate court recognized that Section 2733(a) of the MCA is "permissive and not mandatory. It provides that the Secretary [of the Army] 'may' settle and pay claims. Action by [the Secretary of the Army] in settling and paying claims is entirely discretionary and not mandatory." *Id.* at 286. The court also noted that Section 2735, the finality section of the MCA, provides: "Notwithstanding any other provision of the law, the settlement of a claim under sections 2733, 2734, 2734a, 2734b or 2737 of this title is final and conclusive." *Id.* at 287 ("We now consider whether the settlement of plaintiff's claim under the provisions of section 2731 and the finality clause in section 2735 deprived the trial court of jurisdiction over plaintiff's case.") (citing 10 U.S.C. § 2735). The United States Court of Appeals for the Federal Circuit also held that the language of Sections 2731 and 2735 was identical to language in the Military Personnel and Civilian Employees Act of 1964, 31 U.S.C. §§ 240-243, that previously were determined to preclude judicial review. *Id.* at 287 ("For all practical purposes these portions of the two statutes were the same") (citing *Shull* v. *United States*, 228 Ct. Cl. 750 (1981) (holding that the finality section of the Military Personnel and Civilian Employees Act of 1964, 31 U.S.C. §§ 240-243, precluded judicial review)).

Accordingly, the finality provision of Section 3412(b)(3) is expressly limited to the Secretary of Energy's resolutions of equity redetermination disputes under Section 9(b) of the 1944 Unit Plan Contract that were ongoing, as of the effective date of the NDA. Therefore, there is no language in Section 3412(b)(3) that suggests Congress excluded or limited judicial review of final equity determinations required by Section 11 of the 1944 Unit Plan Contract. Moreover, as discussed herein, the Complaint in this case does not challenge the ASFE's final equity determination. Instead, the Complaint seeks damages for breach of the 1997 Equity Process Agreement, a contract governing the procedural manner in which final equity determinations were to be made.

**b). The National Defense Authorization Act Does Not Preclude The United States Court Of Federal Claims From Exercising Jurisdiction Under 28 U.S.C. § 1491.**

Two established cannons of statutory construction counsel against precluding judicial review of Chevron's claims. *See United States* v. *Fausto*, 484 U.S. 439, 452 (1988). First, Congress is "presumed to have intended judicial review of agency action to be available unless there is 'persuasive reason' to believe otherwise." *Id.* (quoting *Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 140 (1967)). Second, "repeals by implication are strongly disfavored, so that a later statute will not be held to have implicitly repealed an earlier one unless there is a clear repugnancy between the two." *Id.* (internal citations omitted).

The Government argues that the United States Court of Federal Claims' jurisdiction, under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded . . . upon any express or implied contract" has been preempted by the NDA Act, relying on *Griswold*, *Lee*, *Schooling*, and *Balboa*. *See* Gov't Mot Dis. at 17-21 (arguing for preemption). The CSRA, the relevant statutory scheme in *Balboa* and *Schooling*, however, "was intended to be a comprehensive and exclusive legislative scheme to govern federal personnel matters." *Balboa*, 970 F.2d at 857; *see also Schooling*, 63 Fed. Cl. at 206 (citing 5 U.S.C. 7703(b)(1)) ("Congress provided for judicial review of employee suspensions under the CSRA through the Merit Systems Protection Board ("MSPB"), final decisions of which may be appealed to the United States Court of Appeals for the Federal Circuit."). Accordingly, the CSRA prescribes "in great detail the protections and remedies applicable to such actions, including the availability of administrative and judicial review." *Fausto*, 484 U.S. at 443 ("We have recognized that the CSRA comprehensively overhauled the civil service system, creating elaborate new framework for evaluating adverse personnel actions against federal employees." (internal citations and quotations omitted)). Moreover, these procedures place the CSRA within the "persuasive reason" exception to the first cannon of construction counseling against precluding judicial review by implication. *See Fausto*, 484 U.S. at 452 ("We think Congress' intention is fairly discernible, and that the presumption favoring judicial review has been overcome by inferences of intent drawn from the statutory scheme as a whole.") (internal quotations omitted). These procedures authorize review by the agency, the MSPB, and the United States Court of Appeals for the Federal Circuit, but preclude the CSRA from conflicting with the Back Pay Act, 5 U.S.C. § 5596(b)(1), because the CSRA employs a different definition of "appropriate authority." *Id.* at 453 ("Now, as previously, if an employee is found by 'appropriate authority' to have undergone an

unwarranted personnel action a suit for backpay will lie. Post-CSRA, such authority would include the agency itself, or the MSPB or the Federal Circuit[.]"); *see also* 5 U.S.C. § 5596(b)(1) ("An employee . . . who, on the basis of a timely appeal or an administrative determination . . . is found *by appropriate authority under applicable law,* rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action . . . [is entitled to back pay].") (emphasis added). Accordingly, although "repeals by implication are strongly disfavored, so that a later statute will not be held to have implicitly repealed an earlier one unless there is a clear repugnancy between the two," the CSRA has been interpreted partially to repeal Tucker Act jurisdiction. *See Fausto*, 484 U.S. at 454 ("But repeal by implication of a legal disposition implied by a statutory text is something else. . . . All that we find to have been 'repealed' by the CSRA is the judicial interpretation of the Back Pay Act – or if you will, the Back Pay Act's implication – allowing review in the Court of Claims of the underlying personnel decision giving rise to the claim for backpay.").

Title VII, the statutory scheme at issue in *Griswold* and *Lee,* "is the comprehensive, exclusive and preemptive remedy for federal employees alleging discrimination." *Lee*, 33 Fed. Cl. at 378 (citing *Brown* v. *General Servs. Admin.,* 425 U.S. 820, 829, 832 (1976) (Title VII provisions for judicial review pre-empt more general remedies sought in federal district court). Title VII also contains "a system of procedural mechanisms by which employees may pursue discrimination claims," "permits the filing of a *de novo* 'civil action' in federal district court once administrative remedies have been exhausted," but does not "refer to the possibility of bringing a cause of action before the United States Court of Federal Claims." *Lee*, 33 Fed. Cl. at 378 (citing 42 U.S.C. §§ 2000e-2000e-17 (containing procedural mechanisms); 42 U.S.C. §§ 2000e-5, e-16 (providing federal district court jurisdiction over Title VII actions)); *see also Brown*, 425 U.S. at 829-32 ("[T]he structure of the 1972 amendment itself fully confirms the conclusion that Congress intended it to be exclusive and pre-emptive. Section 717 of the Civil Rights Act of 1964, 42 U.S.C. s 2000e-16 (1970 ed., Supp. IV), proscribes federal employment discrimination and establishes an administrative and judicial enforcement system. . . . Sections 717(b) and (c) establish complementary administrative and judicial enforcement mechanisms designed to eradicate federal employment discrimination. Subsection (b) delegates to the Civil Service Commission full authority to enforce the provisions of subsection (a) "through appropriate remedies, including reinstatement or hiring of employees with or without back pay," to issue "rules, regulations, orders and instructions as it deems necessary and appropriate" to carry out its responsibilities under the Act, and to review equal employment opportunity plans that are annually submitted to it by each agency and department. Section 717(c) permits an aggrieved employee to file a civil action in a federal district court to review his claim of employment discrimination.").

Like Title VII, the CSRA has been interpreted to limit judicial review without violating either of the aforementioned cannons of construction. The administrative and judicial procedures created by Title VII, like those created by the CSRA, provide a "persuasive reason" to believe that Congress intended to limit judicial review to a particular forum. *See Brown*, 425 U.S. at 829, 833 ("[T]he structure of the 1972 amendment itself fully confirms the conclusion that Congress intended it to be exclusive and pre-emptive. . . . [I]t provides for a careful blend of administrative and judicial

enforcement powers. . . . It wold require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading.").

Moreover, the historical context in which Title VII was amended to provide redress for federal employees renders the second cannon disfavoring the foreclosure of judicial review inapplicable, *i.e.*, "that repeals by implication are strongly disfavored, so that a later statute will not be held to have implicitly repealed an earlier one unless there is a clear repugnancy between the two." Although Title VII, forbids "employment discrimination based on race, color, religion, sex, or national origin," prior to being amended by the Equal Employment Opportunity Act of 1972, 86 Stat. 103, 42 U.S.C. §§ 2000e, *et seq*., "it was doubtful that backpay or other compensatory relief for employment discrimination was available," because "the effective availability of either administrative or judicial relief was far from sure." *Brown*, 425 U.S. at 825-26 ("The legislative history leaves little doubt that Congress was persuaded that federal employees who were treated discriminatorily had no effective jurisdiction."). Accordingly, the second cannon of construction is not applicable in the context of Title VII, because, rather than foreclosing judicial review, Congress created administrative and judicial review where none had, theretofore, existed. *Id.* at 828-29 ("This unambiguous congressional perception seems to indicate that the congressional intent in 1972 was to [create] an exclusive, preemptive administrative and judicial scheme for the redress of federal employment discrimination.").

In contrast, the text of the NDA Act does not provide any "persuasive reason" that Congress intended to exempt the Secretary of Energy's actions from judicial review. *See* Pub. L. No. 104-106, § 3412(a), 110 Stat. 631 (1996), 10 U.S.C. § 7420 (note). The NDA Act authorizes the Secretary of Energy to select the method to finalize equity interests required by Section 11 of the 1944 Unit Plan Contract and Section 3412(b)(2) of the NDA Act.[17] Accordingly, the court has determined that the NDA Act does not overcome the established presumption that a law is subject to judicial review, unless Congress specifically provides otherwise. Moreover, the NDA Act's silence on judicial review also invokes the corollary cannon of statutory construction disfavoring implied repeal of a prior statute, here the Tucker Act. *See Fausto*, 484 U.S. at 452-53.

---

[17] Section 3412(a) provides:

> The Secretary [of Energy] shall retain the services of an independent petroleum engineer, mutually acceptable to the equity owners, who shall provide a recommendation of final equity figures. The Secretary [of Energy] may accept the recommendation of the independent petroleum engineer for final equity in each known oil and gas zone and establish final equity interest in Naval Petroleum Reserve Numbered 1 in accordance with the recommendation, or the *Secretary* [*of Energy*] *may use such other method to establish final equity interest in the reserve as the Secretary* [*of Energy*] *considers appropriate*.

Pub. L. No. 104-106, § 3412(a), 110 Stat. 631 (1996), 10 U.S.C. § 7420 (note) (emphasis added).

For these reasons, the court has determined that the NDA Act did not implicitly repeal the Tucker Act jurisdiction vested by Congress in the United States Court of Federal Claims to adjudicate claims alleging that the Government has breached a contract with a private citizen.

**c. Whether The United States Has Not Waived Sovereign Immunity For Reliance Damages, Including Attorney's Fees.**

**i. The Government's Position.**

The Government argues that Chevron cannot recover the attorney's fees, because the United States has not waived sovereign immunity for attorney's fees claims in this context. *See* Gov't Mot. Dis. at 21 ("Precedent establishes that the United States has not waived its sovereign immunity against such form of damages except in limited situations not applicable here.") (citing *Texas Instruments* v. *United States*, 991 F.2d 760, 768 (Fed. Cir. 1993) ("An award of money damages from the United States must have some concrete, legislatively authorized basis[.]") (citing *Library of Congress* v. *Shaw*, 478 U.S. 310, 314 (1986) ("In the absence of express congressional consent to the award of interest, separate from a general waiver of immunity to suit, the United States is immune from an interest.")); *see also* Gov't Supp. Mot. Dis. at 9 (citing *Yancheng Baolong Biochemical Products Co., Ltd.* v. *United States*, 406 F.3d 1377, 1382-83 (Fed. Cir. 2005) ("[A] waiver of sovereign immunity must be unequivocally expressed in the statutory text and will not be implied.")).

Moreover, the fact that Chevron's attorney's fees were incurred participating in the Equity Finalization Process, rather than in litigation against the United States, does not make them recoverable. *See* Gov't Mot. Dis. at 23 (citing *Library of Congress* v. *Shaw*, 478 U.S. 310, 314 (1986) ("in the absence of specific congressional consent to the award of interest, separate from a general waiver of immunity to suit, the United States is immune from an award of interest against it")). Therefore, Chevron cannot circumvent the requirement for an express waiver by re-characterizing attorney's fees as damages. *See* Gov't Mot. Dis. at 23 (quoting *England* v. *Contel Advanced Systems*, 384 F.3d 1372, 1379 (Fed. Cir. 2004) ("[T]he character or nature of interest cannot be changed by calling it damages, loss, earned increment, just compensation, discount, offset, or penalty, or any other term, because it is still interest." (quoting *Shaw*, 478 U.S. at 321))).

**ii. Chevron's Response.**

Chevron responds that the Government's position "contorts the American Rule that prohibits a prevailing litigant from recovering attorneys' fees, without some statutory or contractual provision. Pl. Resp. at 35 (citing *Alyeska Pipeline Serv. Co.* v. *Wilderness Soc'y*, 421 U.S. 240, 247 (1975)). Chevron argues that "[t]here is a fundamental difference between attorney's fees incurred in litigating a breach [of contract] (which generally are not recoverable) and attorney's fees that are an element of contract damages (which are recoverable) [in the absence of an express waiver of sovereign immunity]." Pl. Resp. to Supp. at 22. Chevron asserts that attorney's fees in this case can be recovered, because they are a component of reliance damages. *See Mass. Bay Trans.*

*Auth.* v. *United States*, 129 F.3d 1226, 1233 (Fed. Cir. 1997); Pl. Supp. Resp. at 23 ("[The Government] cites no precedent holding that, as a matter of law, legal fees cannot be the direct and foreseeable consequence of a breach of contract.") (citing *Pratt* v. *United States*, 50 Fed. Cl. 469, 482 (2000)). At the December 16, 2005 oral argument, Chevron emphasized that attorney fees are only a small portion of the reliance damages sought, which include "almost $4 million for a letter of credit, $6.8 million for personnel costs, $2 million for materials and services, $15 million for technology and consulting fees, $2.5 million [for] business related expenses." 12/16/05 TR at 28 ("[S]o less than 10 percent of what we're actually seeking in reliance damages are legal fees.").

**iii. The Court's Resolution.**

For the United States to be sued for money damages, Congress must waive sovereign immunity. *See Shaw* v. *United States*, 309 U.S. 495, 500-01 (1940) ("[W]e may lay the postulate that without specific statutory consent, no suit may be brought against the United States. No officer by his action can confer jurisdiction."). Congress has waived sovereign immunity for claims based on "any express or implied contract with the United States, or for liquidated or unliquidated damages[,]" brought in the United States Court of Federal Claims. 28 U.S.C. § 1491(a).

The Tucker Act's waiver of sovereign immunity, however, does not extend to expenses incurred in litigating against the United States, because under the so-called "American Rule" a specific waiver by Congress is required in order to recover attorney's fees incurred in litigation with the Government. *See Alyeska Pipeline*, 421 U.S. at 247 ("In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser."); *see also Texas Instruments,* 991 F.2d at 763 ("[I]t is [nevertheless] well-settled [that] in the absence of specific statutory authority, *expenses incurred in litigation*, whether legal, accounting, secretarial or other, are not award[ed against the United States]." (emphasis added)); *Machinery Corp. of Am.* v. *Gullfiber AB*, 774 F.2d 467, 471 (Fed. Cir. 1985) ("Under the 'American Rule,' the prevailing litigant is ordinarily not entitled to any attorney fees, absent statutory authority."); *Piggly Wiggly Corp.* v. *United States*, 81 F.Supp. 819, 829 (Ct. Cl. 1949) (acknowledging the existence of a "general rule that attorney's fees are not allowed *in suits against the United States* in the absence of an express statutory provision allowing them") (emphasis added). Accordingly, even where a disputes clause in a government contract clearly contemplates litigation, that clause does not permit the court to award attorney's fees incurred litigating a breach thereof, because "[a]n award of money damages from the United States must have some concrete, legislatively authorized basis." *Texas Instruments,* 991 F.2d at 768 (citing *Shaw*, 478 U.S. at 321; *Smithson*, 847 F.2d at 794; *Berg*, 687 F.2d at 383; *Kania*, 650 F.2d at 269; *Fausto*, 484 U.S. at 440)).

The American Rule, however, is not a blanket prohibition against the recovery of attorney's fees. *See, e.g.*, *Mass. Bay Trans. Authority*, 129 F.3d at 1230; *Southern Cal. Fed. Savings & Loan Assoc.* v. *United States*, 57 Fed. Cl. 598, 624 (2003), *rev'd on other grounds,* 422 F.3d 1319 (Fed. Cir. 2005). For example, the American Rule does not preclude recovery of compensatory damages, including attorney's fees. *See Mass. Bay Trans. Authority*, 129 F.3d at 1232-33 ("[T]he recovery sought by [Plaintiff] is *not for attorney fees in an action against the United States*, but for damages

for breach of a contract to obtain insurance.") (emphasis added); *Pratt*, 50 Fed. Cl. at 482 ("Defendant cites no precedent holding that, as a matter of law, legal fees cannot be the direct and foreseeable consequence of a breach of contract.").

The United States Court of Federal Claims has held the American Rule does not bar recovery of reliance damages, including attorney's fees. *See Southern California*, 57 Fed. Cl. at 628 ("The SoCal Plaintiffs presented uncontroverted evidence of their wounded bank expenses in the form of detailed cost notebooks complete with meticulous summaries of bills and, and in many instances, cancelled checks. These notebooks were supported by testimony of the appropriate corporate officials. They detail increased costs in the following areas: *legal*, consulting and filing fees; Federal Home Loan Bank (FHLB) collateral delivery fees; excess deposit insurance premiums; and excess OTS assessments. First, we grant SoCal's claim for *legal*, consulting, and filing fees in the amount of $278,258.55." (emphasis added)); *see also Franklin Fed. Savings Bank* v. *United States*, 55 Fed. Cl. 108, 124 (2003) (denying legal cost arising from litigation against the United States but allowing legal costs as a component of reliance damages); *Bank United of Texas FSB* v. *United States*, 50 Fed. Cl. 645, 665 (2001), *rev'd in part on other grounds,* 80 Fed. Appx. 663 (Fed. Cir. 2003) (holding plaintiff entitled to reliance damages, including attorney's fees for the cost of converting thrift's subordinated debt to equity).[18] A plaintiff, however, cannot circumvent the American Rule by re-

---

[18] Although the cited *Winstar* cases awarded post-breach reliance damages, provided they were foreseeable at the time of contract formation, costs incurred prior to the breach also are generally recoverable. *See Old Stone Corp.* v. *United States*, Case No. 05-5059,___ F.3d ___, 2006 WL 1420817 (Fed. Cir. May 25, 2006) ("[R]eliance damages can be recovered for losses of pre-breach investments pursuant to the contract. . . . As we have previously held, '[i]n order to be recoverable as reliance damages, . . . plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation." (citations omitted)); *see also Glendale Fed. Bank*, 239 F.3d at 1383 (citing CALAMARI & PERILLO, THE LAW OF CONTRACTS, § 14.9 (4th ed. 1998)) ("[A] party may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract.") (citations omitted); *Southern California*, 57 Fed. Cl. at 624 ("As a general matter, reliance damages are available for costs incurred both before and after the breach.").

The recovery of reliance damages in these cases is analogous to the award of bid preparation and proposal costs. *See Gentex Corp.* v. *United States*, 61 Fed. Cl. 49, 54 (2004) ("Returning a disappointed bidder to its pre-bid position wherein it recovers the cost of its wasted bid preparation and proposal costs also comports with longstanding precedent awarding bid preparation and proposal costs under the theory of breach of the implied contract and fair dealing."). Although the United States Claims Court held that legal fees incurred after the award of a contract cannot be recovered as bid and proposal costs, neither the United States Claims Court not the United States Court of Federal Claims has held that legal fees incurred prior the award of a contract cannot be recovered as a component of bid and proposal costs. *See Lion Raisins, Inc.* v. *United States*, 52 Fed. Cl. 629, 634 n.7 (2002) ("The court disagrees with defendant's assertion that '[t]he United States Court of Claims has determined that plaintiff may not recover legal fees because such fees are not included

characterizing litigation expenses as reliance damages. *See Franklin Fed.*, 55 Fed. Cl. at 123 ("The plaintiffs cannot change the essential character of their claim, which is for litigation costs incurred in their district court action, by relabeling it as a claim for the 'costs of mitigation.' The law is quite clear that statutory authorization is the *sine qua non* for recovery of legal costs arising from litigation against the Government.").[19]

Chevron has alleged a breach of contract claim seeking reliance damages. *See* Compl. ¶¶ 58, 65, 71. Specifically, Chevron alleged that it entered into a contract with DOE, *i.e.*, the Equity Process Agreement, providing that each party would submit a proposal supporting their respective final equity determination positions to the Independent Petroleum Engineer (IPE), who in turn would make an independent recommendation to the Assistant Secretary for Fossil Energy (ASFE). *Id.* ¶ 29; *see also* Resp. at 5-6. DOE allegedly breached a provision of the contract prohibiting certain *ex parte* communications between the parties' and the ASFE. *Id.* ¶¶ 29, 30, 36-55. Accordingly, Chevron seeks recovery of expenses, including attorney's fees, that were incurred relying on the process established by the Equity Process Agreement. *Id.* ¶¶ 58, 64, 70 ("ChevronTexaco is further entitled to an award of damages in an amount to be determined at trial to compensate ChevronTexaco for the expenses, effort, and time it invested in proceedings tainted through *ex parte* communications."); *see also* Resp. at 2.

In *Mass. Bay Trans. Authority*, the Massachusetts Bay Transportation Authority ("MBTA") entered into a Construction Agreement with the Federal Railroad Administration ("FRA") for the renovation of Boston's South Station. *See Mass. Bay Trans. Authority*, 129 F.3d at 1228. The Construction Agreement contemplated potential design defects and obligated FRA to seek compensation from the architect-engineer for design defects. *Id.* at 1229. The Construction Agreement also required FRA to obtain insurance endorsements from the architect-engineer for the benefit of MBTA. *Id.* After experiencing significant cost overruns attributed to design defects, MBTA brought suit in Massachusetts Superior Court to resolve issues of liability and responsibility. *Id.* at 1230. The Massachusetts Superior Court suit settled. *Id.* Subsequently, MBTA brought a

---

within the bid proposal costs.' In support it cites *AT & T Techs.,* [*Inc.* v. *United States,* 18 Cl.Ct. 315, 325 (1989)]. Although the Government in that case had argued that legal fees never are allocable bid and proposal costs, the court held only that the plaintiff's legal fees, incurred after contract award and in relation to the filing of its bid protest, 'are not [bid and proposal] costs but are rather protest costs.'").

[19] Similarly, the "No-Interest Rule" precludes circumvention through re-characterizing a claim for interest as a claim for damages. *See Contel Advanced Systems*, 384 F.3d at 1379 ("[T]he force of the no-interest rule cannot be avoided simply by devising a new name for an old institution: '[T]he character or nature of interest cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it.") (quoting *Shaw*, 478 U.S. at 321 (quoting *United States* v. *Mescalero Apache Tribe*, 518 F.2d 1309, 1322 (Ct. Cl. 1975)).

breach of contract suit in the United States Court of Federal Claims against FRA for "failing to secure insurance endorsements from the architect-engineers to the benefit of MBTA as required by § 222(c)" and "failing to pursue its contractual rights against the architect-engineers for the correction of design errors as required by § 220(c)." *Id.* In reversing the United States Court of Federal Claims' decision granting the Government's Motion for Summary Judgment, the United States Court of Appeals for the Federal Circuit rejected the same argument that the Government advances here:

> FRA argues that MBTA's claim to include attorney fees and consultant expenses as damages for breach of § 222(c) is barred because no statute has waived sovereign immunity for such recovery, citing *Alyeska Pipeline Serv. Co.*[, 421 U.S. at 240] for the proposition that attorney fees are not recoverable in an action against the United States unless expressly provided for by Congress. *However, the recovery sought by MBTA is not for attorney fees in an action against the United States, but for damages for breach of a contract to obtain insurance*. The damages are measured by the benefit MBTA would have received had FRA not breached its obligation under § 222(c), not the cost of MBTA's action against the United States. Thus damages would include the Massachusetts litigation and settlement expenditures to the extent that they would have been covered by the insurance endorsements and thus would not have been incurred by MBTA.

*Id.* at 1233.

Although the attorney's fees that Chevron seeks as damages were incurred advocating Chevron's final equity position, they were not incurred in litigation against the United States. Instead, the attorney's fees are a measure of Chevron's reliance on the Equity Process Agreement, assuming that Chevron can establish the breach alleged.

Moreover, while facially attractive, the Government's reliance on *Texas Instruments* and *Yancheng Baolong* is misplaced, because these cases involve the application of the American Rule, which does not apply here. *See Texas Instruments*, 991 F.2d at 763 ("[I]t is [nevertheless] well-settled [that] in the absence of specific statutory authority, *expenses incurred in litigation*, whether legal, accounting, secretarial or other, are not award[ed against the United States]."); *Yancheng Baolong*, 406 F.3d at 1380, 1383 (denying litigation expenses incurred litigating a contempt proceeding against the United States in the Court of International Trade). In addition, the Government's analogy to *Shaw* and *Contel Advanced Systems* is inapposite, because Chevron is not attempting to re-characterize attorney's fees incurred in litigation against the United States as damages in order to circumvent the American Rule.

Accordingly, the Government's Motion to Dismiss is denied, because the United States has waived sovereign immunity as to Chevron's claim for reliance damages, including attorney's fees, is denied.

**d. Whether The Non-Appropriated Funds Instrumentality Doctrine Is Applicable In This Case.**

**i. The Government's Position.**

Pursuant to the parties' Decoupling Agreement, the Department of Energy set aside $228 million from the sale of the Elk Hills Reserve in a Treasury account, to pay for any additional amounts that the Government might owe Chevron and the State of California after finalization of the parties' respective equity interests. *See* Gov't Supp. Mot. Dis. at 7. The Government argues that "if Chevron's purpose is to have this Court review the final equity redetermination decision, the Court possesses no jurisdiction because the funds in the Treasury account are not appropriated funds and the [Non-Appropriated Funds Instrumentality Doctrine ("NAFI")] applies." *Id.* at 5. If Chevron is merely seeking damages for breach of contract, instead of challenging the Secretary of Energy's final equity determinations, then "the non-appropriated funds doctrine would not be applicable." *Id.* at 5 n.3.

**ii. Chevron's Response.**

Chevron responds that the NAFI doctrine is not applicable to damages sought for breach of the Equity Process Agreement. *See* Pl. Supp. Reply at 15. Moreover, even if Chevron was challenging the Secretary of Energy's final equity determination, the Government "misconstrues both the NAFI Doctrine and the cases applying it." *Id.* The "determination of whether the NAFI [D]octrine applies is an entity-based inquiry," not an inquiry into the source of funding to satisfy an individual judgment. *Id.* at 16.

**iii. The Court's Resolution.**

The Complaint seeks damages for breach of the Equity Process Agreement, not a redetermination of final equity percentages. Accordingly, as both parties recognize, the NAFI doctrine is not applicable. The court, therefore, need not address the parties' competing theories regarding the potential application of the NAFI doctrine to a suit challenging the Secretary of Energy's final equity determinations.

**2. The Government's RCFC 12(b)(6) Motion.**

**a. Whether Plaintiff's Claims Are Barred By Section B.9 Of the Equity Process Agreement.**

**i. The Government's Position.**

The Government argues that because the 1996 NDA Act specified that the Secretary of Energy's equity determinations "shall be considered final for all purposes[,]" therefore, judicial review of final equity determinations is precluded. *See* Gov't Mot. Dis. at 25-26. Here, the

Government relies on language in the 1996 Protocol regarding the equity finalization process that provides:

> In the event a disagreement arises regarding the equity finalization implementation process or this Protocol which cannot be resolved jointly by the Equity IPE and the EFTs, the matter shall be referred to the Assistant Secretary for Fossil Energy (or designee) for resolution.

*Id.* at 27 (quoting Compl. Ex. C ¶ 21) (emphasis in original).

The Government also relies on Paragraph B.9 of the Equity Process Agreement that states:

> Chevron and DOE have agreed, as an alternative to judicial resolution of any dispute regarding the ASFE equity redetermination decisions, to submit any challenge to such decisions to OHA and to be bound by the results thereof, without right of any further administrative or judicial review or appeal (nothing in the forgoing, however, shall be deemed to expand Chevron's right to challenge an ASFE decision beyond that permitted in paragraphs B.7 and B.8 above.) To implement the forgoing, DOE and Chevron each knowingly and voluntarily waives any and all rights it may have (i) to bring any other judicial or administrative challenge to the final equity determination decisions by the ASFE, or (ii) to bring any judicial or administrative challenge to any decision by OHA.

*See* Gov't Mot. Dis. at 27 (quoting Compl. Ex. B.2) (emphasis in original); *see also id.* ("This language is controlling. The phrase 'any dispute regarding the ASFE equity redetermination decisions' is both broad and clear. Similarly, the phrases 'without right of any further administrative or judicial review or appeal' and 'Chevron . . . knowingly and voluntarily waives any and all rights it may have . . . to bring any other judicial . . . challenge to the final equity determination decisions by the ASFE,' both express an unequivocal bar to judicial actions such as the one Chevron has filed here, related to the equity determination decisions of the ASFE."); *see also Todd*, 386 F.3d at 1094 (holding that where federal employees' union was party to a collective bargaining agreement that contained grievance procedures applicable to all disputes arising under the employment contract, "the exclusive grievance procedures of the [collective bargaining agreement] preclude[d] any party from challenging the [agreement] in the Court of Federal Claims, thereby providing an additional reason that the Court of Federal Claims lacks jurisdiction.").

In addition, the Government contends that "[b]ecause Chevron never had a right to bring this matter to the [c]ourt for consideration pursuant to the Authorization Act for FY96 or the 1996 protocol, it in [sic] indisputable that it gained no such right through the 1997 Equity Process Agreement." Gov't Mot. Dis. at 28. The Government's parry to Chevron's stance that there is no limitation to Chevron's "resort to a court" is that the Equity Process Agreement arose out of the NDA Act providing the that Secretary of Energy's final equity determinations may not be challenged in another forum. *Id.* at 29. Therefore, Chevron's purported challenge to the procedures related to

the final equity determination, *i.e.*, that it was "'deprived . . . of the benefit of an independent and impartial decision from the Assistant Secretary,' . . . goes to the very core of the ASFE's determination of final equity" and should be subject to a determination that is final and non-appealable. *Id.* at 30. Therefore, under the Equity Process Agreement, the ASFE's decisions can only be challenged before OHA, as evidenced by the fact that Chevron currently is challenging the final equity determinations in that forum. *Id.* at 31.

**ii. Chevron's Response.**

Chevron responds that the terms of the 1997 Equity Process Agreement and Decoupling Agreements contemplate that both would be subject to judicial review:

> Each party represents that it has good and sufficient authority to execute and deliver this Agreement and to perform its respective obligations hereunder. This Agreement has been duly authorized, executed and delivered by the parties and constitutes the legal, valid and binding obligation of the parties, *enforceable against them in accordance with its terms*. Each individual signing this agreement warrants and represents that he or she has full authority to execute the same on behalf of the party for whom he or she is signing.

Pl. Resp. at 18 (quoting Compl. Exs. B.1 § 6.5, B.2 ¶ C.4) (emphasis in original); *see also* Pl. Resp. at 25 (quoting Compl. Ex. B.2 ¶ C.4) ("[The Equity Process Agreement] constitutes the legal, valid and binding obligation of the parties, enforceable against them in accordance with its terms."). In addition, Chevron argues that the fact that the Equity Process Agreement is to be "'governed by, and construed under, the federal law of the United States,'" implies judicial enforceability. *See* Pl. Resp. at 18 (quoting Compl. Exs. B.1 § 6.10, B.2 ¶ C.2).

In addition, Chevron argues that the interpretation sought by the Government would render unenforceable all rights that the Equity Process Agreement was to convey. *Id.* at 25-6 ("'[The] approach [advocated by the Government] leads to the bizarre result that the very agreement in which [the plaintiff] sought to reserve the right to pursue its claim also caused that reserved right to be worthless. The government's illogical contentions as to what the settlement agreement means are, to say the least, not overly persuasive.'" (quoting *Gould, Inc.* v. *United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). Therefore, Chevron contends that appeal procedures specified in the Equity Process Agreement are not the exclusive procedures under which that Agreement may be enforced. *See* Pl. Resp. at 25. Indeed, a February 26, 1999 letter ruling by OHA conceded that OHA does not have authority to review disputes over the Equity Process Agreement. *See* Gov't Supp. App. at 135. Accordingly, Chevron argues that were the court to hold "that OHA is the exclusive forum for claims of breach of the 1997 Agreement, the procedural limitations on DOE in that agreement would be a nullity." *Id.*

Although Chevron does not dispute that it relinquished judicial review of the final equity determinations, it did so in exchange for impartial decisions from the ASFE. *See* Pl. Resp. at 26.

Accordingly, Chevron argues that under RESTATEMENT (SECOND) OF CONTRACTS § 237,[20] and comment b thereto,[21] that relinquishment of judicial review was conditioned on DOE's compliance with the terms of the 1997 Equity Process Agreement. Further, Chevron's relinquishment was discharged by DOE's material breach. *Id.* Chevron relies on the structure of the text of Section B of the Equity Process Agreement, wherein Paragraph 4 first prohibits *ex parte* contacts and then Paragraph 9 prohibits any judicial challenge to equity redetermination decisions. *See* Pl. Resp. at 27. Therefore, Chevron argues that DOE's compliance with Paragraph 4 is a condition precedent to the prohibition on judicial challenges contained in Paragraph 9. *Id.* Finally, Chevron contends that the 1996 Protocol does not foreclose judicial remedies for breach of the Equity Process Agreement. *Id.*

**iii. The Court's Resolution.**

OHA has advised the parties in this case that it does not have authority to review any dispute concerning the procedure and implementation of the Equity Process Agreement. *See* Gov't Supp. App. at 135 ("OHA does not have authority to review disputes over the [Equity Process Agreement].") Accordingly, OHA will not address, much less remedy, the contractual violations alleged in this case. Moreover, Chevron's ability to appeal the ASFE equity determination decisions to the OHA does not prohibit judicial review of allegations of breach of the Equity Process Agreement. As the United States Court of Appeals for the Federal Circuit held: "[a] contractor must seek the relief provided for under the contract or be barred from any relief in the courts," administrative exhaustion is not required where such a procedure is not available. *See New Valley Corp.* v. *United States*, 119 F.3d 1576, 1580 (Fed. Cir. 1997) (quoting *Crown Coat Front Co.* v. *United States*, 386 U.S. 503, 512 (1967)) (quoting *United States* v. *Joseph A Holpoch, Co.*, 328 U.S. 234, 240 (1946) ("Absent clear evidence that the appeal procedure is inadequate or unavailable, that procedure must be pursued and exhausted before a contractor can be heard to complain in a court.")).

---

[20] RESTATEMENT (SECOND) OF CONTRACTS § 237 provides:

> [I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.

[21] RESTATEMENT (SECOND) OF CONTRACTS § 237 cmt. b provides:

> In many disputes over failure of performance, both parties fail to finish performance, and the question is whether one of them is justified in so doing by the other party's failure. . . . The rule is based on the principle that where each party is entitled to the assurance that he will not be called upon to perform his remaining duties of performance with respect to the expected exchange if there has already been an uncured material failure of performance by the other party. . . .

To be sure, Paragraph B.9 of the Equity Process Agreement provides:

> The *ASFE's determination of final equity shall be final, binding and non-appealable* unless challenged by Chevron under the procedures and criteria set out above, in which case OHA's decision shall be final, binding, and non-appealable. In order to avoid the potential for protracted and costly litigation, Chevron and DOE have agreed, as an alternative to judicial resolution of any dispute regarding the ASFE equity redetermination decisions, to submit any challenge to such decisions to OHA and to be bound by the results thereof, without right of any further administrative or judicial review or appeal (nothing in the foregoing, however, shall be deemed to expand Chevron's right to challenge an ASFE decision beyond that permitted in paragraphs B.7 and B.8 above). To implement the foregoing, DOE and Chevron each knowingly and voluntarily waives any and all rights it may have (i) to bring any other judicial or administrative challenge *to the final equity determination decisions by the ASFE*, or (ii) to bring any judicial or administrative challenge *to any decision by OHA*.

Compl. Ex. B.2 ¶ B.9 (emphasis added).

As an exculpatory provision, however, Paragraph B.9 of the Equity Process Agreement must be construed narrowly and strictly. *See New Valley*, 119 F.3d at 1584 ("Moreover, as an exculpatory provision, we must construe Article V, paragraph 4, narrowly and strictly.") (citing *Freedman* v. *United States*, 320 F.2d 359, 366-67 (Ct. Cl. 1963). In addition, Paragraph B.9 must be interpreted in a manner that gives reasonable meaning to all contractual terms without rendering any term superfluous and best effectuates the parties intent. *Id.* (citing *Gould*, 935 F.2d at 1274.) Therefore, the prohibition on judicial review contained in Paragraph B.9 of the Equity Process Agreement is necessarily limited to: challenges to the "ASFE's determination of final equity;" "final equity determination decisions by the ASFE;" and "any decision by OHA." Accordingly, Paragraph B.9 does not bar Chevron's claims, because Chevron has not challenged the ASFE's final equity determinations.[22] Instead, Chevron alleges a breach of contract based on the Government's failure to comply with the Equity Process Agreement's prohibitions on *ex parte* communications, a breach that OHA has stated it does not have authority to address.

---

[22] Chevron argues that the Government's compliance with the Equity Process Agreement's *ex parte* communications prohibition is a condition precedent to any waiver contained in Paragraph B.9. *See* Pl. Resp. at 27. Implicit in this argument is the position that, absent compliance with the procedures contained in the Equity Process Agreement, the ASFE cannot render a final equity determination within the meaning of the Equity Process Agreement. The court's resolution of the Government's motion to dismiss does not reach this issue, because the court does not interpret Paragraph B.9 as waiving judicial review for procedural violations.

The court also declines to adopt the Government's view, because doing so would render the other waiver of judicial review contained in the Equity Process Agreement superfluous. Specifically, Paragraph A.8 provides:

> *Chevron waives any claim it may have as a result of the process specified in this Agreement* that the ASFE's final [Shallow Oil Zone] decision is unduly delayed, was due by a certain date, or that following the procedures set forth in this agreement violates any requirements of § 3412 (b) of the Act or the UPC.

Compl. Ex. B.2 ¶ A.8 (emphasis added).

Paragraph A.8 constitutes a limited waiver of claims based on the "process specified in this Agreement," unlike Paragraph B.9 that contains a broad waiver of any right to challenge final equity decisions of the ASFE and OHA decisions. Therefore, Paragraph A.8 waives only process-based claims for undue delay of the SOZ decision and claims that the procedures therein violate "any requirements of § 3412 (b) of the Act or the UPC." *Id.*

For these same reasons, the court does not adopt the Government's broad interpretation of Paragraph B.9, because doing so would conflict with and render superfluous Paragraph A.8's limited waiver of claims based on procedural violations. The interpretation sought by the Government directly conflicts with Paragraphs C.2 and C.4 of the Equity Process Agreement, both of which contemplate judicial review:

> This Agreement shall be governed by, and construed under, the federal law of the United States.
>
> * * *
>
> This Agreement has been duly authorized, executed and delivered by the parties and constitutes the legal, valid and binding obligation of the parties, *enforceable against them in accordance with its terms*.

Compl. Ex. B.2 ¶¶ C.2, C.4 (emphasis added).

Likewise, the Government's argument that Paragraph 21 of Administrative Order No. 96-01 ("1996 Protocol") bars judicial review is flawed. Paragraph 21 of the 1996 Protocol provides:

> In the event a *disagreement arises regarding the equity finalization implementation process* or this Protocol which cannot be resolved jointly by the Equity IPE and the EFTs, *the matter shall be referred to the Assistant Secretary for Fossil Energy (or designee) for resolution*. Prior to resolution, the Assistant Secretary will consult with Chevron.

Compl. Ex. C ¶ 21 (emphasis added). Therefore, Paragraph 21 provides that matters that cannot be resolved "shall be referred" to the ASFE. Paragraph 21, however, does not bar judicial review.

Moreover, Chevron has alleged a breach of the Equity Process Agreement, not the 1996 Protocol. The Equity Process Agreement contains only a limited incorporation of the 1996 Protocol procedures:

> The procedures of Assistant Secretary for Fossil Energy Administrative Order No. 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process," dated July 8, 1996, as amended and supplemented, *will be utilized for the SOZ* pursuant to a schedule to be agreed upon by DOE, Chevron and NSA.

Compl. Ex. B.2 ¶ A.2 (emphasis added). This language does not address whether the "referral to the Assistant Secretary" provision of Paragraph 21 is incorporated. Moreover, even if incorporated, the judicial waiver interpretation of Paragraph 21 sought by the Government is inconsistent with Paragraph A.8 of the Equity Process Agreement, which, as previously discussed, contains a limited waiver of judicial review for procedural violations not at issue in this case.

Finally, the Government's argument that the 1996 NDA Act bars judicial review of Chevron's claims is flawed, because it takes the relevant language out of context. Citing § 3412(b)(2) of the NDA Act, the Government argues that "Congress expressly stated that the Secretary [of Energy] 'shall' establish final equity interests and specified a clear intent that the Secretary [of Energy's] determination of any continuing equity redetermination dispute '<u>shall be considered final for all purposes under this section</u>." Gov't Mot. Dis. at 25-6 (emphasis in original) (quoting NDA Act for FY 1996, § 3412(b)(2)).

The language cited by the Government, however, is contained in a different provision:

> *If*, on the effective date, *there is an ongoing equity redetermination dispute between the equity owners under section 9(b) of the unit plan contract*, the dispute shall be resolved in the manner provided in the unit plan contract within eight months after the effective date. *The resolution shall be considered final for all purposes under this section*.

Pub. L. No. 104-106, § 3412(b)(3), 110 Stat. 631 (1996), 10 U.S.C. § 7420 (note) (emphasis added).

Accordingly, § 3412 (b)(3) requires that the Assistant Secretary comply with a pre-existing contractual obligation within eight months of the Act's effective date. The finality language, therein, is consistent with the Government's and Chevron's pre-existing contractual obligation under the 1944 Unit Plan Contract. Significantly, it applies only to equity redeterminations ongoing as of the Act's effective date. *Id.* The Government offers no support for expanding the application of this language beyond preexisting equity redeterminations. Moreover, although the language relied upon

by the Government makes the resolution final, as previously discussed, Chevron does not challenge the ASFE's resolution of any equity redetermination. Rather, Chevron alleges a breach of the procedures contained in the Equity Process Agreement.

**b. Whether Reliance Damages Were Caused By The Alleged Breach.**

**i. The Government's Position.**

The Government argues that attorney's fees and expenses Chevron seeks would have been incurred as a cost of participating the equity finalization process, regardless of whether an alleged breach took place, because the alleged *ex parte* communications occurred during the finalization process. *See* Gov't Mot. Dis. at 32. Since Chevron did not learn of the alleged *ex parte* communications until after the conclusion of equity finalization proceedings, *ipso facto* those communications could not have influenced the amount of expenses and costs that Chevron incurred during the equity finalization process. *Id.* at 33 (citing Compl. ¶¶ 47, 48, 52, 54). Therefore, the Government insists that because Chevron still is pursuing an appeal of the Assistant Secretary's decision at the OHA, an award of reliance damages would be speculative and premature. *Id.*

To establish reliance damages, the Government contends that under *Westfed Holdings, Inc.* v. *United States*, 52 Fed. Cl. 135, 160-61 (2002), the plaintiff must demonstrate: (1) that the alleged damages were incurred in reliance upon the contract; and (2) that the damages were sustained as a result of the purported breach of the contract by DOE. *See* Gov't Reply at 13. As a result, "[t]he value of the expenditures must have been lost as a result of the breach." *Id.* (quoting *Westfed*, 52 Fed. Cl. at 161). The Government maintains that Chevron cannot satisfy the first requirement, because the alleged breach did not result in damages, since Chevron incurred costs for participation in the final equity determination process on its own volition and was unaware of the *ex parte* communications until after the conclusion of the finalization process. *Id.* The Government maintains that Chevron cannot satisfy the second requirement, because the 1997 Equity Process Agreement provided for review of equity determinations by OHA, which reviews *de novo* legal issues, pursuant to 5 U.S.C. § 706. *See* Gov't Reply at 13. Therefore, Chevron did not lose the value of expenditures as a result of the alleged breach. *Id.* In addition, the Government asserts that Chevron cannot be harmed until the OHA has made a final decision, since the pending OHA appeal could eliminate or moot any harm to Chevron. *Id.* For example, on January 31, 2005, the OHA issued a decision regarding the appropriate factor to be used to convert the volumes of gases underlying the Elk Hills unit to barrel-of-oil equivalents, in order to determine each party's percentage participation in the Stevens Zone, the largest producing zone in the unit. *Id.* at 15-16. In the decision, the OHA granted Chevron's appeal, in part, concluding that "neither [the DOE's nor Chevron's] methodology complies with the UPC." *Id.* at 16. Because the IPE's position was not sustained, the Government maintains that Chevron cannot demonstrate that the alleged *ex parte* contacts have caused any reliance damages. *Id.* at 17.

**ii. Chevron's Response.**

Chevron responds that the Government's causation argument improperly contests facts in the Complaint and disregards established law regarding reliance damages. *See* Pl. Resp. at 28. The Complaint properly seeks reliance damages for the purported breach of the 1997 Agreement, *i.e.*, the amount of money Chevron ultimately spent on a tainted equity finalization process. *Id.*

**a). Reliance Damages Are Available For All Expenditures Made In Reasonable Reliance On The Contract, Whether Made Before Or After The Breach.**

In response to the Government's contention that the alleged *ex parte* communications could not have caused Chevron to incur attorney's fees and costs, because Chevron did not discover the communications until 2003, Chevron argues that reliance damages "are available for injuries resulting from activities that occurred before or after the breach." *Id.* at 29 (quoting *Glendale Fed. Bank*, 239 F.3d at 1382-83 ("The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise. . . . [Reliance] damages are available for injuries resulting from activities that occurred either before or after the breach."). Reliance damages place the non-breaching party "in as good a position as he would have been in had the contract not been made." RESTATEMENT (SECOND) OF CONTRACTS § 344(b). Chevron claims that the costs incurred to participate in the equity finalization process were made in reliance on the Equity Process Agreement. *See* Pl. Resp. at 29-30.

**b). The Government Is Not Entitled To Assert In A Motion To Dismiss That Its Breach Has Caused No Harm.**

Chevron also contends that the Government's arguments are improper, because they address questions of fact, namely, whether there was a total breach of contract and the extent of any damage suffered by Chevron. *Id.* at 30-31. The Complaint alleges material breaches of the Equity Process Agreement and the court need only consider whether such purported breaches may be adjudicated by the United States Court of Federal Claims, when considering a motion to dismiss. *Id.* at 31.

**c). The Government Is Required To Prove At Trial That Chevron Is No Worse Off After The Breach Than If The Contract Had Been Performed.**

Here, Chevron compares the Government's actions in this case to *United States* v. *Behan*, 110 U.S. 338, 342 (1884), where the Government appealed an adverse ruling in a breach of construction contract action in which the plaintiff claimed lost profits as damages. *See* Pl. Resp. at 31-32. In *Behan*, the United States Supreme Court affirmed the trial court's award of reliance damages holding that:

> Unless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures. So far as appears, they were incurred in the fair endeavor to perform the contract which he assumed.

*Behan*, 110 U.S. at 344.

Chevron also distinguishes *Chevron U.S.A. Prod. Co.* v. *O'Leary*, 958 F. Supp. 1485 (E.D. Ca. 1997), where a federal trial court declined to issue a preliminary injunction to compel the Secretary of Energy to issue an equity finalization decision within a deadline set forth in the Authorization Act. *See* Pl. Resp. at 32-3. In contrast, Chevron does not seek preliminary relief in this case, but reliance damages already incurred. *Id.* at 33. Therefore, Chevron argues that the ability to appeal ASFE decisions to OHA is an inadequate remedy. *Id.* The OHA appeal was meant to correct decisions made within the framework set for the in the 1997 Equity Process Agreement; it was not designed to be a cure for a breach of that Agreement. *Id.*

**iii. The Court's Resolution.**

In this case, Chevron seeks reliance damages for an alleged breach of the Equity Process Agreement. *See* Compl. ¶¶ 64, 70; *see also Hansen Bancorp, Inc.* v. *United States*, 367 F.3d 1297, 1308 (Fed. Cir. 2004) ("In the event of a breach, contract law recognizes that the promisee has three enforceable interests: expectation, *reliance*, and restitution." (emphasis added)) (citing RESTATEMENT (SECOND) OF CONTRACTS § 344). The underlying principle of reliance damages is that "a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise." *Glendale Fed.*, 239 F.3d at 1382-83 (citing RESTATEMENT (SECOND) OF CONTRACTS § 344(b) ("[Judicial remedies serve to protect the promisee's] reliance interest, which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made."); *see also* 3 Dan B. Dobbs, *Law of Remedies* § 12.3(1) (2d ed. 1993) ("The reliance recovery is a reimbursement for losses the plaintiff suffers in reliance on the defendant's contractual promise.")).

The RESTATEMENT (SECOND) OF CONTRACTS considers reliance damages:

> As an alternative to the measure of damages stated in § 347, the injured party has a right to damages based on his reliance interest, *including expenditures made in preparation for performance or in performance*, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.

RESTATEMENT (SECOND) OF CONTRACTS § 349 (emphasis added); *see also Kinzley* v. *United States*, 661 F.2d 187, 193 (Ct. Cl. 1981) ("If a contract itself does not provide an ascertainable measure of

damages or one that would fully compensate the plaintiff for loss he has suffered from the breach, then an alternative theory of damages may be used, under which the plaintiff receives the benefits he relinquished in reliance upon the anticipated benefits under the contract."). Accordingly, reliance damages are "available for injuries resulting from activities that occurred either before or after the breach." *Glendale Fed.*, 239 F.3d at 1383 (quoting CALAMARI & PERILLO, THE LAW OF CONTRACTS, § 14.9 (4th ed. 1998) ("[A] party may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract."); RESTATEMENT § 350 cmt. g, illus. 18; *cf.* RESTATEMENT (SECOND) OF CONTRACTS § 349(b) ("As an alternative to the measure of damages stated in § 347, the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance[.]" (emphasis added))).

Reliance damages are "recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Michigan Power Co.* v. *United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (emphasis added) ("[T]he general principle is that all losses, however described, are recoverable." (citing RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. c. (1981))).

The Government seeks dismissal of the Complaint on the theory that Chevron cannot, as a matter of law, establish the causation required to recover the damages sought. *See* Gov't Mot. Dis. at 31-4; Gov't Reply at 13 ("To recover reliance damages, a party has to demonstrate not only that (1) its alleged damages were incurred in reliance upon the contract, but also (2) that the damages were sustained as a result of the purported breach by the DOE. . . .Even assuming , arguendo, that Chevron can meet the first element, it cannot meet the second, as a matter of law."). Causation, however, is a question of fact. *See Bluebonnet Sav. Bank, FSB* v. *United States,* 266 F.3d 1348, 1356 (Fed. Cir.2001) ("Causation is a question of fact, reviewed under the clear error standard."); *see also Westfed Holdings, Inc.* v. *United States*, 407 F.3d 1352, 1364 (Fed. Cir. 2005) ("Causation is a question of fact, which we review for clear error."); *see also Anchor Sav. Bank, FSB* v. *United States*, 59 Fed.Cl. 126, 154-55 (2003) (denying summary judgment due to a genuine issue of material fact on causation and concluding, "This court therefore rejects defendant's arguments that, as a matter of law, FIREA was not the cause of Anchor's branch sales."). The Government's motion, therefore, is premature, because at this juncture the court must accept the factual allegations of the Complaint as true. *See* RCFC 12(b)(6). Accordingly, the Government's motion to dismiss is denied.

## IV. CONCLUSION.

For the foregoing reasons, the Government's Motions to Dismiss are **DENIED.**

**IT IS SO ORDERED.**

/s Susan G. Braden
**Susan G. Braden**
**Judge**