IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CHEVRON U.S.A. INC.,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | No. 1:04CV1365<br>Judge Susan G. Braden |

**DECLARATION OF ERIC J. FYGI**

1. I am the principal Deputy General Counsel of the United States Department of Energy ("DOE") and my office is located at 1000 Independence Avenue, S.W., Washington, D.C. 20585. I have served in this position since the DOE was established in October 1977. I have also periodically served during that period as the DOE Acting General Counsel. I am a charter member of the Senior Executive Service, and my service has been recognized by the receipt of four Presidential Rank Awards from three different Presidents, as well as the Secretary of Energy's Gold Award on three separate occasions, which is the DOE's highest form of recognition for meritorious service.

2. My duties as the principal Deputy General Counsel include being responsible, along with the DOE General Counsel, to the Secretary of Energy for all of the Department's legal affairs and the management of more than 100 attorneys at the DOE headquarters in Washington, D.C. who provide legal services and guidance to DOE program offices. In the course of my duties, I have overseen and supervised the DOE's handling of and response to multiple legal problems, including those arising in administrative litigation and in litigation before federal courts.

3. I have been advised by DOE attorneys assigned to this case that the Plaintiff, Chevron U.S.A. Inc. ("Chevron"), has directed certain discovery to the DOE that requests, among other things, documents relating to a legislative proposal that DOE submitted to Congress under a transmittal letter directed to the President of the Senate and the Speaker of the House of Representatives, dated May 9, 2006, from the Secretary of Energy. DOE attorneys have further advised me that the DOE has in its possession a number of documents responsive to the Plaintiff's discovery request and that the DOE would be required to produce those documents to the Plaintiffs in the absence of a legally cognizable privilege. The DOE attorneys have further advised me that, based on their preliminary analyses, some of the responsive documents appear to be predecisional and deliberative in nature and that such materials appear to be subject to a claim of deliberative process privilege. I am further advised that attorneys for Chevron have already taken the deposition of a DOE Assistant General Counsel, Mary Ann Masterson, about the DOE legislative proposal under the provisions of Rule 30(b)(6) of the Rules of the United States Court of Federal Claims. I am further advised that attorneys for Chevron also intend to depose a DOE Deputy General Counsel, Mary Egger, on the same subject.

4. Making a claim of deliberative process privilege for documents is something that, in the first instance, is the responsibility of the head of the agency and is to be based on a personal review of the documents that are being sought. Because reviewing individual documents for a deliberative process privilege would place an inordinate burden on the Secretary of Energy, the Secretary delegated to the DOE General Counsel the authority to claim the privilege, along with the authority to further delegate the authority to assert in litigation the DOE's deliberative process privilege along with other recognized legal privileges. That delegation to the DOE

General Counsel was made by memorandum dated June 16, 2006, a true and correct copy of which is attached to this Declaration as Exhibit A.

5. Because the DOE General Counsel's duties and responsibilities prevent him from devoting the time necessary to personally review all of the documents sought in this case for which a deliberative process privilege may properly be asserted, the General Counsel, by memorandum dated July 11, 2006, redelegated to me the authority in this case "to examine and assert, where appropriate, the Department's claim of the deliberative process privilege for any documents or testimony relating to or arising from" this case. A true and correct copy of that further delegation is attached to this Declaration as Exhibit B. The delegation from the General Counsel sets forth specific guidelines that I am directed to observe in exercising the authority that has been delegated to me.

6. I have personally examined numerous documents that DOE attorneys assigned to this case have provided to me. Pursuant to the guidelines set forth in the DOE General Counsel's delegation to me, I have concluded that these documents, which are being submitted to the Court for an *in camera* review, are of the type and nature for which a deliberative process privilege should be asserted. Therefore, based on the authority delegated to me, I hereby assert on behalf of the DOE where appropriate the deliberative process privilege for all or portions of the documents that are being submitted to the Court contemporaneously with my Declaration. I explain in the following paragraphs the reasons why I have asserted, for each document, the deliberative process privilege. For the convenience of the Court, I list in Exhibit C to my Declaration the senior DOE officials, along with the positions they held, who were identified in the documents as involved in the deliberative process for which claims of privilege are being

asserted.

**BACKGROUND**

7. As previously indicated, the documents that were presented to me to review for privilege relate to a legislative proposal that the Secretary of Energy transmitted to Congress under a letter dated May 9, 2006. It is that DOE legislative proposal I identified as being the final agency decision following the deliberations on its content in light of which the relevant documents were to be reviewed. The DOE legislative proposal relates both (1) to the equity finalization process of the respective interests of the Federal Government and Chevron in what had been formerly the Naval Petroleum Reserve Numbered 1 and is commonly known as Elk Hills, and (2) to the Independent Petroleum Engineer ("IPE"), Netherland, Sewell & Associates, Inc. ("NSAI"), that has been engaged since 1996 by the DOE, pursuant to congressional mandate, to provide professional services in that equity finalization process.

8. Congress directed the DOE in the National Defense Authorization Act for Fiscal Year 1996 ("Act") to sell the Federal Government's interest in the Elk Hills field and to finalize the respective equity interests in the field of the Federal Government and of Chevron. Section 3412(b) of the Act also required that an Independent Petroleum Engineer mutually acceptable to DOE and Chevron be hired by DOE to assist in the process of finalizing the equity interests of the Federal Government and Chevron. DOE, in consultation with Chevron, selected NSAI as the IPE, and DOE and NSAI entered into a contract in 1996 that had a term of five years. The work involved in the equity finalization process had not been completed by the end of the first contract's term. NSAI was retained as the IPE, and DOE and NSAI entered into a second contract with NSAI in 2000 for another term of five years without objection from Chevron.

9. During the summer of 2005, DOE's responsible officials concluded that it was likely that all of the work required of NSAI in the equity finalization process would not be completed by the end of the second contract between DOE and NSAI in 2005. In order to provide for continuity, DOE initiated discussions with NSAI for the purpose of negotiating another contract between DOE and NSAI. In December of 2005, however, NSAI advised DOE that it would not enter into another contract with DOE unless it, NSAI, received again certain written assurances from Chevron that Chevron had made to NSAI before.

10. Before or concurrent with the start of each contractual period between DOE and NSAI in 1996 and 2000, DOE and Chevron had also entered into certain agreements relating to the sharing of liability. Those agreements included provisions under which Chevron agreed, for the benefit of DOE and NSAI, to a covenant not to sue NSAI, on the same basis and subject to the same limitations as were set forth in the contracts between DOE and NSAI. In addition to the foregoing agreements, NSAI and Chevron previously had entered into a separate agreement, which was conterminous with the first DOE-NSAI contract, that NSAI understood gave it further protection from suit by Chevron. NSAI advised DOE in December 2005 that it – NSAI – would not enter into a new contract to continue working as the IPE unless Chevron also agreed to a new agreement with NSAI that contained the same protective terms as the earlier NSAI-Chevron agreement that had expired.

11. NSAI's refusal to enter into a new contract with the DOE to continue working as the IPE presented DOE with a problem. Additional work was required by the IPE to complete the equity finalization process, and it was uncertain if the two private parties could resolve their differences. DOE had to consider other options to enable the IPE to conduct its responsibilities

in conformance with the industry norm that an IPE is to be shielded from litigation by either owner in the course of rendering its best judgment to contesting oil reservoir owners. That problem was, and remains, the catalyst for the legislative proposal that DOE sent to Congress on May 9, 2006.

**THE LEGISLATIVE PROPOSAL**

12. The deliberative process privilege typically involves a claim by an agency that its predecisional, recommendatory discussions should not be made public in order to protect and promote frank and uninhibited discussion within an agency that is necessary to reach the best and most effective decision possible on policy and program matters within the agency's purview. The DOE began internal debate and discussion to consider what could be done, given the circumstances, that would result in NSAI signing a contract to continue to act as the IPE and allow the equity finalization process to move forward. The DOE ultimately crafted a legislative proposal to accomplish those goals and then submitted it for standard inter-agency review. At the conclusion of that process, DOE submitted a legislative proposal to Congress on May 9, 2006, to extend immunity from suit to the IPE in connection with its work regarding the Elk Hills field. I explain in the following paragraphs the reasons why I am asserting the deliberative process privilege for certain documents covered by Chevron's discovery request.

**Intra-Agency Review**

13. I assert the deliberative process privilege for all, or portions of, those documents that are highlighted and I am informed are listed as documents 1 through 45 and 103 through 118 in the U.S. Department of Energy Documents Privileged Documents Log – July 28, 2006 ("Privilege Log"). These materials include e-mails, e-mails and attachments, facsimile messages

and attachments, handwritten notes, undated draft letters, other undated draft documents, and multiple copies thereof.

These materials reflect the internal deliberations within the DOE as to how it should address the problem presented by the failure of NSAI to obtain the assurances it had expected would be routinely forthcoming from Chevron. In early 2006, Jeffrey Jarrett, the Assistant Secretary for Fossil Energy, the head of the program office with jurisdiction over Elk Hills, was briefed by his staff on potential options. Senior members of the DOE General Counsel's office, including me, DOE Deputy General Counsel for Technology Transfer and Procurement Mary Egger, DOE Deputy General Counsel for Litigation Marc Johnston, and DOE Assistant General Counsel for Legislation and Regulatory Law Neal J. Strauss also began internal deliberations on options to deal with the problem. The possibility of proposing legislation in some form to advance the process was raised early in the process. Since NSAI appeared to be most concerned about potential litigation brought against it by Chevron, the DOE senior staff considered ways in which DOE could respond to that concern. Those discussions elicited agreement and disagreement as to the appropriate approach to resolving the problem.

14. Multiple drafts of proposed legislation were circulated for comment, along with draft letters to Congress explaining DOE's rationale in proposing legislation. Agreement was eventually reached after a number of months passed and the necessary documents describing the proposal were circulated within the DOE for final approval. At the conclusion of all internal deliberations, the legislative proposal and draft letters to Congress explaining the DOE's rationale for the proposal were transmitted to the Office of Management and Budget, Executive Office of the President, for the purpose of submitting the proposal to standard inter-agency

review. These materials reflect the DOE's internal deliberations during the period leading up to DOE settling on a legislative proposal that would respond to the problem created by Chevron's failure to renew the customary assurances to the IPE. The deliberations reflect the unguarded advice and comments by the senior DOE staff persons who participated in that process.

Releasing this type of advice and commentary to the public, in general, would risk a chilling effect on the willingness of a person providing such advice and commentary because it could subject the author to criticism or second-guessing. Furthermore, if the person providing the advice and commentary knows that the advice that person renders will be subject to a deposition, it is probable that such person either would not provide the advice and commentary to avoid a deposition altogether or would temper the advice and commentary in a way that would degrade its value to an agency such as DOE in proposing legislation because the DOE would not benefit from the frank and uninhibited discussion that would otherwise occur in the absence of the prospect of being deposed. I am advised that the Plaintiff has repeatedly expressed its opposition to the DOE legislative proposal that was transmitted to Congress on May 9, 2006, and that it is actively seeking to depose persons with knowledge about it. In view of that, the release of this advice and commentary would have a chilling effect on DOE's ability to obtain frank and unvarnished advice in the future on other proposals.

I conclude it is probable that releasing these materials would impede the DOE's ability in the future to obtain the frank and uninhibited opinions, comments, advice or suggestions that the advice and comments by or to senior DOE officials represent. I also find it probable that a person who is involved in the intra-agency review process would be less likely to provide unvarnished advice and commentary in the intra-agency review process if the advice and

commentary would be made public and subject the person to criticism or second-guessing. Nor is the substantial prospect of being deposed as a result of this material being released to the public conducive to a person providing the same type of candid advice and commentary to DOE in the future.

For all of the foregoing reasons, I assert the deliberative process privilege for the materials identified in this paragraph.

**Inter-Agency Review**

15. I am advised that Documents 46 through 102, Privilege Log, relate to the inter-agency review of the DOE legislative proposal. The DOE was required by Circular No. A-19, Office of Management and Budget ("OMB"), Executive Office of the President, to submit the proposed legislation to OMB for the purpose of obtaining inter-agency review. Circular No. A-19 may be found at www.whitehouse.gov/omb/circulars/a019/a019.html. Section 4 of Circular No. A–19 provides, in pertinent part, that "[a]ll executive branch agencies (as defined in section 5b [of the Circular]) are subject to the provisions of this Circular . . . ." Section 3 of Circular No. A-19 provides as follows:

> 3. **Background.** OMB performs legislative coordination and clearance functions to (a) assist the President in developing a position on legislation, (b) make known the Administration's position on legislation for the guidance of the agencies and information of Congress, (c) assure appropriate consideration of the views of all affected agencies, and (d) assist the President with respect to action on enrolled bills.

Section 7a. of Circular No. A-19 provides, in pertinent part, that "[b]efore an agency transmits proposed legislation . . . outside the Executive Branch, it shall submit the proposed legislation . . . to OMB for coordination and clearance." Section 8a. of Circular No. A-19

provides, in pertinent part, as follows:

> (1) OMB will undertake the necessary coordination with other interested agencies of an agency's proposed legislation or report. If congressional committees have not requested reports from all of the interested agencies, OMB will request other agency views within specified time limits. OMB will consult with the President, when appropriate, and undertake such staff work for him as may be necessary in cooperation with other Presidential staff. OMB may request the originating agency to provide additional information or may call interagency meetings to exchange views, resolve differences of opinion, or clarify the facts.

Section 8c.(1) of Circular No. A-19 provides that agencies "shall incorporate the advice received from OMB . . . in their letters transmitting proposed legislation to Congress," and Section 8c.(3) provides that, "[i]n the case of proposed legislation, the originating agency shall not submit to Congress any proposal that OMB has advised is in conflict with the program of the President or has asked the agency to reconsider as a result of the coordination process." In all events, Section 8d.(1) of Circular No. A-19 provides that "[a]gencies shall not submit to Congress proposed legislation that has not been coordinated and cleared within the Executive Branch in accordance with this Circular."

16. I assert the deliberative process privilege for all, or portions of, those documents that are highlighted and I am advised are listed as Privilege Log documents 46 through 54 and 58 through 62. The privilege is asserted for documents 46-47 in their entirety. The privilege is asserted for "Subject" lines and/or text of Privilege Log documents 48 through 54 and 58 through 62 that are highlighted and refer to communications from individuals, offices, and agencies regarding DOE's legislative proposal.

These materials, which are comprised of multiple copies of communications regarding

DOE's legislative proposal, as well as multiple copies of e-mails that have "Subject" lines and texts describing such communications, contain communications from various individuals, offices, and agencies regarding DOE's legislative proposal. It is critical for an agency such as the DOE to obtain frank and uninhibited commentary and advice from senior officials in other Executive Branch agencies and offices concerning matters like the DOE's proposed legislation. More specifically, it is critical that an agency such as DOE obtain frank and unvarnished advice and commentary from experienced senior officials in other agencies concerning the effectiveness of proposed legislation and what impact it might have, if any, in view of existing law.

Releasing this advice and commentary to the public, in general, would have a chilling effect on the willingness of the person providing such advice and commentary because it could subject that person to criticism or second-guessing. Furthermore, if providing advice and commentary would subject a person to a deposition, it is probable that such person either would not provide commentary and advice to avoid a deposition altogether or would temper the commentary and advice in a way that an agency such as DOE proposing legislation would not benefit from the frank and open discussion that would otherwise occur in the absence of the prospect of being deposed. I am advised that the Plaintiff has repeatedly expressed its opposition to the DOE legislative proposal that was transmitted to Congress on May 9, 2006, and that it is actively seeking to depose persons with knowledge about it. In view of that, the release of this advice and commentary would have a chilling effect on DOE's ability to obtain frank and uninhibited advice in the future on other proposals.

Finally, the release of these materials would have a direct and adverse effect on the inter-agency review process established by OMB, of which DOE is a part. If senior government

officials who are called on to provide frank and unvarnished advice and commentary know that their advice and commentary are subject to public release, the very rationale for the process itself will be undermined to the point that the review process would be severely damaged. I find that placing senior government officials in the position of having to filter their advice and commentary because it might be released to the public is contrary to the very premise for the deliberative process privilege.

I conclude it is probable that releasing these materials would impede DOE's ability in the future to obtain frank and uninhibited opinions, comments, advice or suggestions. I also find it probable that a person who is involved in the inter-agency review process would not be willing to provide unvarnished advice and commentary in the inter-agency review process if that advice and commentary would be made public and subject the individual to criticism or second-guessing. Nor is the substantial prospect of being deposed as a result of this material being released to the public conducive to a person providing the frank and uncabined advice and commentary to DOE in the future.

For all of the foregoing reasons, I assert the deliberative process privilege for the materials identified in this paragraph.

17. I assert the deliberative process privilege for all, or portions of, those documents that are highlighted and I am advised are listed as Privilege Log documents 50 through 54 and 59 through 62 covering the "Subject" line and text of an e-mail dated April 27, 2006 at 3:55 PM.

These materials are an original and duplicates thereof of an e-mail communicating a specific suggestion regarding the DOE legislative proposal. A primary basis for the privilege is to ensure the free flow of ideas among officials so that an agency can receive the best advice

possible to help it fulfill its mission. In enacting the Elk Hills sale legislation in 1996, the Congress imposed the statutory duty on the DOE to finalize equity interests in Elk Hills as between the Federal Government and Chevron. An apparent impasse not within the DOE's control or of the DOE's own making had arisen between NSAI and Chevron, and DOE concluded that the situation had the potential of creating more than a temporary impediment to the agency fulfilling its mission.

After the DOE had tried informally to help resolve the problem, the agency decided that it had to consider other courses of action to resolve the problem lest it continue to fester and block the agency from fulfilling its statutory mission. The DOE determined that its proposed legislation was a means of resolving the problem, insofar as the IPE was concerned, and the agency moved forward to have its proposal considered within the framework of the inter-agency review process in the Executive Branch. Another agency voiced concerns about DOE's proposal, and that elicited comment from yet another office in the Executive Branch.

Releasing this type of advice and commentary to the public, in general, would have a chilling effect on the willingness of a person providing such advice and commentary because it could subject that person to criticism or second-guessing. Furthermore, if providing advice and commentary would subject a person to a deposition, it is probable that such person either would not provide the advice and commentary to avoid a deposition altogether or would temper the advice and commentary in a way that an agency such as DOE proposing legislation would not benefit from the frank and uninhibited discussion that would otherwise occur in the absence of the prospect of being deposed. I am advised that the Plaintiff has repeatedly expressed its opposition to the DOE legislative proposal transmitted to Congress on May 9, 2006, and that it is

actively seeking to depose persons with knowledge about it. In view of that, the release of this advice and commentary would have a chilling effect on DOE's ability to obtain frank and uninhibited advice in the future on other proposals.

Finally, the release of these materials would have a direct and adverse effect on the inter-agency review process established by OMB, of which the DOE is a part. If senior government officials who are called upon to provide frank and unvarnished advice and commentary know that their advice and commentary are subject to public release, the very rationale for the process itself would be undermined to the point that the review process would be severely damaged. I find that placing senior government officials in the position of having to filter their advice and commentary because it might be released to the public is contrary to the basic premise for the deliberative process privilege.

I conclude it is probable that releasing these materials would impede DOE's ability in the future to obtain the type of frank and uninhibited opinions, comments, advice or suggestions that this commentary represents. I also find it probable that a person who is involved in the inter-agency review process would not be willing to provide unvarnished advice and commentary in the inter-agency review process if that advice and commentary would be made public and subject the individual to criticism or second-guessing. Nor is the substantial prospect of being deposed as a result of the release of this material conducive to a person providing the same type of advice or commentary to DOE in the future.

Based on the foregoing reasons, I assert the deliberative process privilege for the materials identified in this paragraph.

18. I assert the deliberative process privilege for all, or portions of, those documents that

are highlighted and I am advised are listed as Privilege Log documents 51 through 57 and 60 through 71. The privilege is asserted for "Subject" line and texts of e-mails.

These materials involve a number of e-mail exchanges, and multiple copies thereof, between other individuals, agencies and offices outside of DOE regarding DOE's legislative proposal and the concerns that had been raised about it. Contemporaneous with those discussions, senior DOE officials also engaged in discussions about an initial comment from a government official outside of the DOE regarding the legislation. That initial comment on the DOE legislative proposal elicited both agreement and disagreement from these senior DOE officials. The inter-agency review process provoked a lively debate both among senior officials within DOE and among senior officials, agencies, and offices outside DOE.

Releasing this type of advice and commentary to the public, in general, would have a chilling effect on the willingness of a person providing such advice and commentary because it could subject that person to criticism or second-guessing. Furthermore, if providing advice and commentary would subject a person to a deposition, it is probable that such person either would not provide the advice and commentary to avoid a deposition altogether or would temper the advice and commentary in a way that an agency such as DOE proposing legislation would not benefit from the frank and uninhibited discussion that would otherwise occur in the absence of the prospect of being deposed. I am advised that the Plaintiff has repeatedly expressed its opposition to the DOE legislative proposal that was transmitted to the Congress on May 9, 2006 and that it is actively seeking to depose persons with knowledge about it. In view of that, the release of this advice and commentary would have a chilling effect on DOE's ability to obtain frank and uninhibited advice in the future on other proposals.

Finally, the release of these materials would have a direct and adverse effect on the inter-agency review process established by OMB, of which DOE is a part. If senior government officials who are called on to provide frank and unvarnished advice and commentary know that it is subject to public release, the very rationale for the process will be undermined to the point that the review process itself would be severely damaged. I find that placing senior government officials in the position of having to filter their advice and commentary because it might be released to the public is contrary to the basic premise for the deliberative process.

I conclude it is probable that releasing these materials would impede DOE's ability in the future to obtain frank and uninhibited opinions, comments, advice or suggestions. I also find it probable that a person who is involved in the inter-agency review process would not be willing to provide unvarnished advice and commentary in the inter-agency review process if that advice and commentary would be made public and subject the individual to criticism or second-guessing. Nor is the substantial prospect of being deposed as a result of this material being released to the public conducive to a person providing the same type of advice and commentary in the future.

For all of the foregoing reasons, I assert the deliberative process privilege for the materials identified in this paragraph.

19. I assert the deliberative process privilege for all, or portions of, those documents that are highlighted and I am advised are listed as Privilege Log documents 72 through 102. The materials are, in whole or part, e-mails, and e-mails with attachments, and duplicate thereof, that contain drafts of legislation and letters to Congress, as well as advice and comments by and between senior officials of the Executive Branch.

These messages show how the inter-agency review process continued to evolve as the different agencies involved in the process addressed the DOE proposed legislation. There was give and take between individuals, agencies and offices over the course of a few days until they came to an agreement on the DOE legislative proposal. Those same types of exchanges also occurred between the individuals and agencies as to what language should be included in the "Speaker" letters that would transmit the legislative proposal to the Congress. Various suggestions were made as to as to how the letters should read, with those suggestions reflecting particular concerns about the legislative proposal. These documents show the exchange of frank and uninhibited advice and comments by and between senior members of the Executive Branch.

Releasing this type of advice and commentary to the public, in general, would have a chilling effect on the willingness of a person providing such advice and commentary because it could subject that person to criticism or second-guessing. Furthermore, if providing advice and commentary would subject a person to a deposition, it is probable that such person either would not provide the advice and commentary to avoid a deposition altogether or would temper the advice and commentary in a way that an agency such as DOE proposing legislation would not benefit from the frank and uninhibited discussion that would otherwise occur in the absence of the prospect of being deposed. I am advised that the Plaintiff has repeatedly expressed its opposition to the DOE legislative proposal that was transmitted to Congress on May 9, 2006 and that it is actively seeking to depose persons with knowledge about it. In view of that, the release of this advice and commentary would have a chilling effect on DOE's ability to obtain frank and unvarnished advice in the future on other proposals.

Finally, the release of these materials would have a direct and adverse effect on the inter-agency review process established by OMB, of which DOE is a part. If senior government officials who are called on to provide frank and uninhibited advice and commentary know that it is subject to public release, the very rationale for the process itself will be undermined to the point that the review process itself would be severely damaged. I find that placing senior government officials in the position of having to filter their advice and commentary because it might be released to the public is contrary to the basic premise for the deliberative process privilege.

I conclude it is probable that releasing these materials would impede DOE's ability in the future to obtain frank and untempered opinions, comments, advice or suggestions. I also find it probable that a person who is involved in the inter-agency review process would not be willing to provide unvarnished advice and commentary in the inter-agency review process if that advice and commentary would be made public and subject the person to criticism or second-guessing. Nor is the substantial prospect of being deposed as a result of this material being released to the public conducive to a person providing the same type of advice and commentary to DOE in the future.

For all of the foregoing reasons, I assert the deliberative process privilege for the materials identified in this paragraph.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 11, 2006.

Eric J. Fygi

EXHIBIT A

Memorandum from Secretary of Energy Samuel W. Bodman to David R. Hill, dated June 16, 2006

The Secretary of Energy
Washington, DC 20585

June 16, 2006

MEMORANDUM FOR: DAVID R. HILL
GENERAL COUNSEL

FROM: SAMUEL W. BODMAN

SUBJECT: Authority to Assert in Litigation the Federal Government's Privileges Including the Deliberative Process Privilege on Behalf of the Department of Energy

The Department participates in various litigation and has been and will be required to provide testimony and produce numerous documents in discovery. These demands may implicate privileged matters, specifically including predecisional drafts and other candid internal recommendations previously prepared for the Secretary and other senior DOE officials. With respect to testimony and documents that have been temporarily withheld from requesting parties by the litigating attorneys on the ground of deliberative process privilege, in order to prevent their ultimate disclosure to requesting parties, the Department is required to formally assert the privilege in an affidavit executed by the "head of the agency" or his lawful delegate.

Since the head of a large department cannot reasonably be expected to devote his or her individual time to examining internal documents for the assertion of privileges in litigation, the Secretary of Energy has, from time to time, delegated that responsibility. To ensure the Department may assert this privilege when necessary, I delegate to the General Counsel of the Department of Energy the authority to assert in litigation the Department's deliberative process and other legally-recognized privileges. The General Counsel is authorized to further delegate this authority.

All actions pursuant to any authority delegated prior to this Memorandum or pursuant to any authority delegated by this Memorandum taken prior to and in effect on the date of this Memorandum are ratified and remain in force as if taken under this Memorandum, unless or until rescinded, amended or superseded.

EXHIBIT B

Memorandum from David R. Hill to Eric J. Fygi, dated July 11, 2006

**Department of Energy**
Washington, DC 20585

July 11, 2006

MEMORANDUM TO: Eric J. Fygi
Deputy General Counsel

FROM: David R. Hill
General Counsel

SUBJECT: Authority to assert in Chevron v. United States, 04-1365 (Fed. Cl.) the Federal Government's deliberative process privilege on behalf of the United States Department of Energy

By memorandum dated June 16, 2006, the Secretary of Energy delegated to the General Counsel, along with the right to further delegate such authority, "the authority to assert in litigation the Department's deliberative process and other legally-recognized privileges." Because my duties and responsibilities as the Department's General Counsel prevent me from devoting the time necessary to examine documents produced in the referenced case for privilege, I hereby delegate to you my authority to examine and assert, where appropriate, the Department's claim of the deliberative process privilege for any documents or testimony relating to or arising from the referenced case because any such documents or testimony could contain information that is recommendatory and predecisional, or part of the agency decision-making process, and thus a privilege is necessary in order to protect and promote the frank and open discussion within the agency that is essential to effective decision making.

Because of my other duties and responsibilities, I cannot devote my time to the personal review of all the materials or testimony that will arise in this case. Therefore, I hereby delegate to you the authority to conduct that review and, if you determine it to be appropriate, to assert the Government's deliberative process privilege for recommendatory and deliberative documents, and for testimony relating thereto, the release of which would in your judgment threaten the free flow of communication which is necessary for the effective functioning of the agency.

In general, documents will be presented to you by the attorneys representing the Department in this litigation. The attorneys will have made a preliminary judgment that these materials may be privileged, and will advise you of the nature of the action, the scope of the discovery request at issue and other pertinent information. Review of documents pursuant to this delegation should be in accord with the following guidelines:

1. Each document must be personally examined, and careful consideration must be given as to whether the release of a document, or of a related set of documents, would seriously inhibit or impair the frank and open discussion of legal or policy matters among agency personnel and among agency personnel and other executive and legislative branch officials.

Directives from a superior to subordinates explaining a decision already made should not be withheld pursuant to this privilege unless they are elements of an unfinished deliberative process involving other executive and legislative branch officials. However, drafts of substantive documents or documents reflecting discussions, analyses, recommendations, advice or other deliberations leading to a possible decision on a legal or policy matter should, consistent with advice of counsel and the guidance herein, be withheld.

2. In evaluating the public interest in any possible disclosure, particular consideration is to be given to the implications of any inquiry into the formation and exposition of any legislative initiative authorized on behalf of the President under his constitutional responsibility to make legislative proposals of his own choosing.

3. If only certain portions of particular documents memorializing purely intra-Departmental deliberations should be protected and those segments are reasonably segregable, the remaining portions should be released. For example, purely factual portions of memoranda generally should not be withheld pursuant to this privilege, but drafts should be withheld in their entirety.

4. The degree of harm to the public interest resulting from release of a given document or group of related documents should be carefully weighed against any public benefits or individual need for the information contained in that document.

5. Decisions in various civil actions as to whether the privilege is to be asserted should be based on consistent considerations. In addition, all similar or related documents in a particular case should be evaluated consistently. Consistency is also important because the requesting party may later contend that a waiver has occurred, i.e., that release of one document concerning a particular issue has waived the privilege as to all documents regarding the same subject, as may be the case with the attorney-client privilege.

6. In addition to the foregoing standards for evaluation, any particular request by the litigant or other demanding entity for documents or testimony the response to which would result in intrusion into the President's constitutional responsibility to make legislative proposals shall be denied on both the ground of the deliberative process privilege and on the ground of separation of powers under which the President's actions supervising the making of and subsequently advancing to the Congress legislative recommendations are committed to his discretion and therefore are not subject to inquiry by any private litigant.

7. All assertions of deliberative process privilege shall be reduced to written form and described with a degree of particularity that is sufficient to permit any court or other reviewer to understand the reasons for the assertions of such privilege.

EXHIBIT C

UNITED STATES DEPARTMENT OF ENERGY OFFICIALS

Jeffrey Jarrett, Assistant Secretary for Fossil Energy

Eric J. Fygi, Deputy General Counsel

Mary Egger, Deputy General Counsel for Technology Transfer and Procurement

Marc Johnston, Deputy General Counsel for Litigation

Neal J. Strauss, Assistant General Counsel for Legislation and Regulatory Law