**Electronically Filed on March 15, 2007**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:04CV1365 |
| UNITED STATES, | ) | Judge Susan G. Braden |
| Defendant. | ) | |

# CHEVRON U.S.A. INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL


Donald B. Ayer
Lawrence D. Rosenberg
*Counsel of Record*
Louis K. Fisher
Julia C. Ambrose
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Tel.: 202-879-3939
Fax: 202-626-1700

*Counsel for Chevron U.S.A. Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......... ii

GLOSSARY AND IDENTIFICATION OF KEY INDIVIDUALS .......... v

STATEMENT OF THE CASE AND FACTUAL BACKGROUND .......... 4

ARGUMENT .......... 14

I. THE DELIBERATIVE PROCESS PRIVILEGE CANNOT SHIELD THE GOVERNMENT'S DOCUMENTS FROM DISCLOSURE IN LIGHT OF DOE'S SERIOUS MISCONDUCT .......... 15

A. The Qualified Privilege That Attaches to Documents Reflecting Government Decision- and Policy-Making Is Inapplicable Where There Exist Serious Questions of Government Misconduct .......... 15

B. The Deliberative Process Privilege Is Inapplicable in Light of Chevron's Showing of Wrongdoing by the DOE .......... 20

II. CHEVRON'S SHOWING OF MISCONDUCT BY THE DOE DEFEATS THE APPLICATION OF THE ATTORNEY WORK PRODUCT DOCTRINE .......... 23

A. The Work Product Doctrine Does Not Apply Where There Exists a Prima Facie Showing of Government Misconduct .......... 23

B. The Attorney Work Product Privilege Should Not Be Applied Given Chevron's Showing of Misconduct by the DOE .......... 26

III. THE ATTORNEY-CLIENT PRIVILEGE IS LIKEWISE OVERCOME BY A SHOWING OF SIGNIFICANT MISCONDUCT .......... 28

A. The Attorney-Client Privilege Is Not Absolute .......... 28

1. The Privilege Does Not Apply Where Materials Relate To Policy Advice .......... 28

2. The Privilege Does Not Apply Where There Exists a Prima Facie Showing of Significant Misconduct .......... 30

B. The Attorney-Client Privilege Is Overcome by Chevron's Showing of Misconduct by the DOE .......... 34

IV. CHEVRON'S SHOWING OF MISCONDUCT BY THE DOE WARRANTS PRODUCTION OF THE WITHHELD DOCUMENTS EVEN IN THE ABSENCE OF DETAILED *IN CAMERA* REVIEW BY THE COURT .......... 36

CONCLUSION .......... 39

# TABLE OF AUTHORITIES

## CASES

*Alexander v. FBI*, 186 F.R.D. 170 (D.D.C. 1999) ....................18, 22

*Alexander v. FBI*, 193 F.R.D. 1 (D.D.C. 2000) ....................19

*Allen v. Woodford*, No. CV-F-05-1104, 2007 WL 309945 (E.D. Cal. Jan. 30, 2007)....................17

*Ampex Corp. v. United States*, 207 Ct. Cl. 1014 (1975) ....................28

*In re Antitrust Grand Jury*, 805 F.2d 155 (6th Cir. 1986) ....................32

*Burka v. New York City Transit Authority*, 110 F.R.D. 660 (S.D.N.Y. 1986)....................16, 19, 22

*Carter v. Gibbs*, 909 F.2d 1450 (Fed. Cir. 1990)....................23

*Cities Service Helex, Inc. v. United States*, 216 Ct. Cl. 470, 475 (1978)....................32

*City of Colorado Springs v. White*, 967 P.2d 1042 (Colo. 1998) ....................17

*Clark v. United States*, 289 U.S. 1 (1933) ....................24, 25, 31, 36

*Coleman v. American Broadcasting Companies*, 106 F.R.D. 201 (D.D.C. 1985) ......28, 30, 31, 32

*Dominion Cogen, D.C., Inc. v. District of Columbia*, 878 F. Supp. 258 (D.D.C. 1995)....................18

*In re Echostar Communications Corp.*, 448 F.3d 1294 (Fed. Cir. 2006)....................23, 24, 28, 30

*Enviro Tech International, Inc. v. EPA*, 371 F.3d 370 (7th Cir. 2004) ....................17

*Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 232 F.R.D. 103 (S.D.N.Y. 2005)....................17

*FDIC v. Hurwitz*, 384 F. Supp. 2d 1039 (S.D. Tex. 2005) ....................29, 30

*First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312 (2000)....................20

*In re Franklin National Bank Securities Litigation*, 478 F. Supp. 577 (E.D.N.Y. 1979)....................18

*Genentech, Inc. v. International Trade Commission*, 122 F.3d 1409 (Fed. Cir. 1997) ...........23, 28

*In re Grand Jury Investigation*, 445 F.3d 266 (3d Cir. 2006) ....................32

*In re Grand Jury Investigation*, 842 F.2d 1223 (11th Cir. 1987) ....................32

*In re Grand Jury Subpoena*, 419 F.3d 329 (5th Cir. 2005) ....................24

*In re Grand Jury Subpoena Duces Tecum*, 773 F.2d 204 (8th Cir. 1985)....................................32

*Hanna v. United States*, No. 424-77T, 1997 WL 834813 (Fed. Cl. Sept. 30, 1997).....................30

*Hinckley v. United States*, 140 F.3d 277 (D.C. Cir. 1998)..........................................................21

*Jinks-Umstead v. England*, 233 F.R.D. 49 (D.D.C. 2006)....................................................25, 26

*Kaiser Aluminum & Chemical Corp. v. United States*, 141 Ct. Cl. 38,
157 F. Supp. 939 (1958) ..........................................................................15, 17, 18

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998)..........................................................28, 29, 30, 34

*Marriott International Resorts, L.P. v. United States*, 437 F.3d 1302 (Fed. Cir. 2006)..........15, 16

*McCartney v. Attorney General*, 231 Mich. App. 722 (1998)................................................34, 36

*Miller v. Haulmark Transport System*, 104 F.R.D. 442 (E.D. Pa. 1984).....................................24

*Mitchell v. Fishbein*, 227 F.R.D. 239 (S.D.N.Y. 2005) ........................................................19, 20

*Mobil Oil Corp. v. DOE*, 102 F.R.D. 1 (N.D.N.Y. 1983)......................................................29, 30

*Moody v. IRS*, 654 F.2d 795 (D.C. Cir. 1981) ........................................................25, 26, 33, 36

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)................................................................15

*National Wildlife Federation v. United States Forest Service*, 861 F.2d 1114
(9th Cir. 1988)..........................................................................................15, 16

*Olson v. Accessory Controls & Equipment Corp.*, 757 A.2d 14 (Conn. 2000) ............................33

*Pacific Gas & Electric Co. v. United States*, 69 Fed. Cl. 784 (2006)...............................23, 28, 29

*In re Regents of the University of California*, 101 F.3d 1386 (Fed. Cir. 1996).......................28, 29

*In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997).....................................................................24, 30

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997)..............................................15, 16, 17, 18

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982)............................................................ *passim*

*In re Sealed Case*, 754 F.2d 395 (D.C. Cir. 1985)............................................................ *passim*

*Shearing v. Iolab Corp.*, 975 F.2d 1541 (Fed. Cir. 1992)............................................................28

*In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800 (Fed. Cir. 2000).......................28, 29, 30, 32

*In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 145 F.3d 1422 (D.C. Cir. 1998) .......... 15, 16, 18, 19

*In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630 (D.C. Cir. 1992) .......... 17

*In re Sunrise Securities Litigation*, 130 F.R.D. 560 (E.D. Pa. 1989) .......... 33, 36

*Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867 (1st Cir. 1995) .......... *passim*

*Tri-State Hospital Supply Corp. v. United States*, 226 F.R.D. 118 (D.D.C. 2005) .......... 25

*Tri-State Hospital Supply Corp. v. United States*, 238 F.R.D. 102 (D.D.C. 2006) .......... 25, 31

*United States v. AT&T Co.*, 524 F. Supp. 1381 (D.D.C. 1981) .......... 18

*United States v. Ballard*, 779 F.2d 287 (5th Cir. 1986) .......... 32

*United States v. Lake County Board of Commissioners*, 233 F.R.D. 523 (N.D. Ind. 2005) .......... 19

*United States v. Laurins*, 857 F.2d 529 (9th Cir. 1988) .......... 32

*United States v. Reeder*, 170 F.3d 93 (1st Cir. 1999) .......... 32

*United States v. White*, 887 F.2d 267 (D.C. Cir. 1989) .......... 32

*United States v. Zolin*, 491 U.S. 554 (1989) .......... 32

*Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir. 1978) .......... 29

*Williams v. City of Boston*, 213 F.R.D. 99 (D. Mass. 2003) .......... 19

*Yankee Atomic Electric Co. v. United States*, 54 Fed. Cl. 306 (2002) .......... 15, 16, 29, 34

*Zenith Radio Corp. v. United States*, 764 F.2d 1577 (Fed. Cir. 1985) .......... 20, 23

**STATUTES AND RULES**

Fed. R. Civ. P. 26(b)(3) .......... 23, 24

R. Ct. Fed. Cl. 26(b)(3) .......... 23, 24

National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106, § 3412(b) .......... 4

**MISCELLANEOUS**

8 John H. Wigmore, *Evidence* § 2298 (McNaughton rev. ed. 1961) .......... 32

# GLOSSARY AND IDENTIFICATION OF KEY INDIVIDUALS

## Glossary of Key Terms

| | |
|---|---|
| ASFE | Assistant Secretary for Fossil Energy – The second-line adjudicator/decisionmaker in the equity finalization process |
| Carneros Zone | The deepest zone at Elk Hills |
| DOE | United States Department of Energy |
| Dry Gas Zone | The most shallow zone at Elk Hills |
| EPA | Equity Process Agreement |
| ILA | Independent Legal Advisor – Individual designated under the equity redetermination/finalization processes to mediate legal disputes between the parties, and if mediation does not lead to agreement by the parties, to adjudicate in the first instance such legal disputes |
| IPE | Independent Petroleum Engineer – The first-line adjudicator of technical disputes in the equity finalization process |
| NSAI | Netherland, Sewell and Associates, Inc. – The IPE for the equity finalization process |
| OHA | DOE's Office of Hearings and Appeals |
| Shallow Oil Zone or "SOZ" | The second most shallow (and second largest/most valuable) zone at Elk Hills |
| Stevens Zone | The second deepest (and largest/most valuable) zone at Elk Hills |

## Assistant Secretary for Fossil Energy ("ASFE") and Staff

| | |
|---|---|
| Pat Godley | Former ASFE |
| Robert Kripowicz | Former Principal Deputy (later, Acting) ASFE |
| Carl Michael Smith | Former ASFE |
| Jeffrey Jarrett | Current ASFE |
| *Mary Egger | DOE Deputy General Counsel for Technology Transfer and Procurement; appears to have served as legal counsel to the ASFE for equity finalization purposes |
| *Gena Cadieux | DOE Associate General Counsel for Source Selection and Bid Protest Litigation (one of Mary Egger's subordinates); appears to have served as legal counsel to the ASFE for equity finalization purposes |
| Gary Latham | ASFE Technical Advisor |
| Lou Capitanio | ASFE Technical Staff |
| Arnie Smits | ASFE Technical Staff |

**Chevron Equity Finalization/Advocacy Team – or Chevron "EFT"**

| | |
|---|---|
| Norman Stone | Chevron Equity Team Technical Leader |
| Carnie Block | Chevron Executive |
| Cynthia Giumarra | Chevron In-House Counsel |
| Gary Henderson | Chevron In-House Counsel |
| William Taft, IV | Chevron Equity Team Outside Counsel from Fried, Frank |
| Elliott Polebaum | Chevron Equity Team Outside Counsel from Fried, Frank |

**DOE Equity Finalization/Advocacy Team – or DOE "EFT"**

| | |
|---|---|
| *Mary Egger | DOE Deputy General Counsel for Technology Transfer and Procurement; appears to have served as legal counsel and team leader for DOE Equity Team |
| *Gena Cadieux | DOE Associate General Counsel for Source Selection and Bid Protest Litigation (one of Mary Egger's subordinates); appears to have served as legal counsel to the DOE Equity Team in some instances |
| Francis ("Butch") Gangle | DOE Equity Team Technical Leader |
| Charles "Wayne" Kauffman | Former DOE Equity Team Technical Leader |
| Gary Holcomb | DOE Technical Staff |
| James Gruber | DOE Technical Staff |
| Alan Burzlaff | Lead DOE Technical Contractor from System Technology Associates, Inc. ("STA") |
| Kenneth Schuessler | DOE Technical Contractor from STA |
| Gregory B. Thorpe | DOE Equity Team outside counsel from O'Melveny & Myers |
| Owen Olpin | DOE Equity Team outside counsel from O'Melveny & Myers |
| Lydia S. Chan | DOE Equity Team outside counsel from O'Melveny & Myers |
| Christine H. Suh | DOE Equity Team outside counsel from O'Melveny & Myers |

**Other DOE General Counsel's Office Personnel**

| | |
|---|---|
| Beth Ann Kelly | DOE Attorney Advisor (one of Mary Egger's subordinates) |
| Robert Nordhaus | Former DOE General Counsel |
| Eric Fygi | DOE Deputy General Counsel |

**Netherland Sewell & Associates ("NSAI") Personnel – The IPE**

Richard Krenek
P. Scott Frost
Steven P. Drake

*Mary Egger's and Gena Cadieux's precise roles are at issue in this lawsuit.

**Electronically Filed on March 15, 2007**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:04cv1365 |
| vs. | ) | |
| | ) | Judge Susan G. Braden |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**CHEVRON U.S.A. INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL**

Plaintiff Chevron U.S.A. Inc. ("Chevron") respectfully submits this memorandum of law in support of its motion to compel the production of documents identified in the Government's 291-page privilege log dated February 16, 2007, as supplemented on March 1, 2007 (attached as Ex. 1). Chevron and the United States Department of Energy ("DOE") agreed to a process for finalizing their respective equity interests in the Elk Hills oil field that would protect the fairness and neutrality of the equity determinations by providing a wall of separation between the parties' advocacy teams and the adjudicators and their staffs. Thus, the Equity Process Agreement ("EPA") and other relevant agreements prohibit *ex parte* communications with, or input by, Chevron's or DOE's advocates to either the Independent Petroleum Engineer ("IPE") – the first-level adjudicator – or the Assistant Secretary for Fossil Energy ("ASFE") – the second-level adjudicator. Such a wall of separation is compelled by fundamental principles of good faith and fair dealing, ethics, and administrative practice, as well as by the parties' express agreements.

Chevron did not get the process that was promised. Instead, the wall of separation between the DOE advocacy team and the adjudicators was repeatedly and materially breached. Most obviously, Mary Egger, the lead lawyer and designated project manager for the DOE equity/advocacy team, played an impermissible dual role. She took the lead for the DOE's equity

team on virtually all matters related to Elk Hills that were not strictly technical in nature, while at the same time providing substantial input into the evaluation process and decisions of the ASFE. Indeed, it appears that Ms. Egger captained both the DOE equity advocacy team as well as the team that produced the ASFE's written decisions.

In addition to Mary Egger's improper dual role leading both DOE's advocacy and the ASFE's decisionmaking efforts, there were other breaches of the wall of separation as well. These include numerous direct and *ex parte* communications between the DOE equity technical team and the ASFE's technical advisors, and between DOE and the IPE. Taken together, these breaches of the wall of separation that the parties contractually constructed fatally tainted and biased the equity finalization process against Chevron's interests.

The Government has conceded that much of the conduct that underlies Chevron's claims indeed took place. The Government has admitted that Ms. Egger advised the DOE technical team and advocated DOE's position before the Independent Legal Advisor ("ILA"). *See, e.g.*, Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories (Feb. 16, 2007) (attached as Ex. 2) at 25, 39-40. The Government has also admitted that Ms. Egger provided input into the ASFE's evaluation process and decisions. *Id*. at 40, 46-47, 50-52. Moreover, the documents provided by the Government confirm this dual role and demonstrate at least some instances of the other inappropriate and *ex parte* communications that occurred.

But the Government has also sought the refuge of privilege – particularly the deliberative process, work product, and attorney-client privileges – to withhold from disclosure thousands of documents that would demonstrate the extent and full details of DOE's breach of the wall of separation established by the parties and the corresponding breach of the parties' agreements.

Unfortunately, the Government's 291-page privilege log, which contains over 5,000 allegedly privileged documents totaling more than 25,000 pages of materials, is largely uninformative and is in many instances unintelligible. A substantial number of the entries are

plainly mistaken or make no sense. Even more of the entries lack sufficient descriptions of the documents being withheld to determine the subject matter of those documents and/or to determine if in fact they have been properly withheld.

In light of the state of the Government's privilege log and in the interests of efficiency, rather than asking the Court personally to review the many thousands of pages of documents referenced on the Government's privilege log, Chevron proposes a two-step approach to resolving the parties' dispute, as follows: Chevron first asks the Court to rule that the Government cannot properly withhold as privileged (1) information that evidences or describes *ex parte* communications between Ms. Egger and her staff or other members of the DOE equity/advocacy team on the one hand and the ASFE or the ASFE's staff on the other hand, (2) information that evidences or describes *ex parte* communications between Ms. Egger and her staff or other DOE personnel on the one hand and the IPE or the IPE's staff on the other hand, (3) information that reflects improper *ex parte* input into ASFE or IPE determinations (including drafts of those determinations) from the DOE equity/advocacy team including Ms. Egger and her staff, and (4) drafts of the Equity Process Agreement, the Decoupling Agreement, and the ASFE Protocol and its supplements, which may provide evidence of the parties' understanding and intent in adopting the prohibitions on *ex parte* communications.

In response to such an order, the Government should be required to produce all such documents and to report completely on a revised privilege log any documents that it contends are not encompassed within those core categories and are properly withheld as privileged. Any remaining disputes between the parties as to the documents listed on such a revised privilege log could be raised with the Court. Should the Government claim an extraordinary or specially-compelling basis on which to withhold certain documents falling within the four categories, it could continue to withhold the documents and raise those assertions at that time as well.

Compelled disclosure of the four categories of documents Chevron seeks is fully supported by the governing law. This Court and many others have repeatedly held that information that appears to be protected at the threshold level by the deliberative process, attorney work product, or attorney-client privileges may not be withheld when that information evidences or is relevant to alleged crime, fraud, or misconduct – particularly government misconduct. So long as a party in litigation can establish a prima facie case of government misconduct, the Government may not hide behind privilege to withhold relevant information. Here, the evidence already in hand, including the Government's own admissions, reveals a clear pattern of *ex parte* communications and a general disregard for the wall of separation agreed to by the parties on the part of the DOE. Given this prima facie evidence of misconduct, which goes to the very heart of Chevron's claims, the Government should not be permitted to withhold as privileged thousands of additional documents that would reflect the full extent of DOE's breach of the wall of separation and illuminate the precise intent of the parties when they entered the relevant agreements.

## STATEMENT OF THE CASE AND FACTUAL BACKGROUND

**The Equity Process Agreement.** The EPA (attached as Exhibit B.2 to Chevron's Complaint) established a process by which the parties agreed to finalize their respective equity interests in each of four unitized "zones" within the Elk Hills Reserve, in anticipation of DOE's sale of its ownership interest in the Reserve as directed by Congress. *See* National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106, § 3412(b). Under the bargained-for terms of the EPA, the ASFE was made the arbiter of the parties' contractual interests in the Elk Hills Reserve, starting with a recommendation to be furnished by a qualified independent petroleum engineer, and aided by comment and input from the parties. The EPA significantly curtailed Chevron's right to seek review of the ASFE's equity decisions. It altogether prohibited judicial review of the ASFE's final equity determination and, in its place, it allowed Chevron to seek review before the DOE Office of Hearings and Appeals ("OHA") of any aspect of the ASFE

determination contrary to the IPE's technical recommendation, as well as any legal issue decided adversely to Chevron. In every other respect, the ASFE's decision adopting the technical recommendation of the IPE would be final and not subject to challenge by Chevron.

Chevron agreed to this restriction on its otherwise available right to judicial review "[i]n order to avoid the potential for protracted and costly litigation," and only after it received assurances from DOE that the equity finalization process would in fact be fair and open and free from *ex parte* communications between the ASFE and the parties' equity finalization teams:

> The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in Washington, D.C.). *No such communications by the ASFE with either equity team shall be on an ex parte basis*. *Any written materials submitted to the ASFE by either equity team shall be provided to the other party*. The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.

EPA ¶ B.4 (emphasis added). The parties had previously agreed that "[t]here will be no written or oral equity-related communications or meeting with the Equity IPE (this term excludes contract administration communication or meetings) by an owner (including its agents or contractors) without the participation or opportunity to participate by the other owner." Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process ¶ 5 (ASFE Administrative Order No. 96-01, July 1996).

**Mary Egger's Role As Equity Team Member and Leader.** The Government has admitted that Ms. Egger "represented DOE's interests in resolving legal questions the owners submitted to the ILA." Defs. Interrog. Resps. at 39-40 (Ex. 2); *see also id*. at 25 (identifying Mary Egger as one individual who "represent[s] or represented DOE in its capacity as 'Owner'" before the Independent Legal Advisor); *id*. at 76 (identifying Mary Egger as among those persons with whom the DOE "field equity technical team," "equity team," or "equity finalization team" "communicated concerning the Elk Hills Equity Redetermination and/or Finalization Process").

As reflected in documents already in Chevron's possession, on a regular basis, Ms. Egger also provided legal and other advice to the DOE equity/advocacy team, which included Messrs. Gangle and Gruber, technical advisor Burzlaff, and outside counsel Thorpe, among others. For example:

- On November 8, 1999, Mary Egger apparently participated in a telephone conference, initiated by DOE Equity Technical Team leader Butch Gangle, with Thorpe, Gangle, Burzlaff, and Holcomb regarding "Friday's conference call with Norm [Stone] & Company." The email correspondence that initiated the telephone call suggests that Ms. Egger participated in discussions regarding Gangle and Burzlaff's earlier conversations with Chevron and the IPE about the "conversion methodology." *See* CDE00307726 (Ex. 3).

- On November 18-19, 1999, Ms. Egger discussed, by email exchange with Gangle, Burzlaff, and Thorpe, the ASFE's delegation of the authority to decide equity matters to the PDASFE and Chevron's reaction to that delegation. *See* CDE00307399 (Ex. 4).

- An email exchange dated December 9-10, 1999 among Gangle, Gruber, Schuessler, Holcomb, and Egger reported the details of a meeting with Chevron and the ILA at which Gangle, Burzlaff, Egger, and Thorpe "reached an agreement on the time period issue," thereby "bring[ing] to a close the gas-oil conversion factor conflict" and allowing the IPE to complete its Stevens Zone equity recommendation. Mr. Gangle's original email gives "all the credit" to "*our attorneys* on the outstanding job that they did to draw this agreement out of Chevron." *See* CDE00307623-24 (Ex. 5) (emphasis added).

- Mary Egger and Butch Gangle discussed, by email exchange dated February 17, 2000, a "key item on the Stevens Final Recommendation": a request that the PDASFE defer the date on which the parties' comments on the IPE's final Stevens Zone recommendations would be due, in order to avoid conflict with the Shallow Oil Zone equity proceedings. *See* CDE00307597 (Ex. 6).

- Ms. Egger and Mr. Gangle exchanged a series of emails in April 2000, with copies to Thorpe, discussing, among other things, the IPE's "strong interest in [DOE's] simulation model" and the progress of the parties' meetings with NSAI. *See* CDE00307619-20 (Ex. 7).

- By email on July 10, 2001, Ms. Egger and Mr. Gangle discussed an upcoming teleconference with NSAI and Chevron; Gangle proposed to Egger that they meet "for a brief update on the status of the SOZ technical work." *See* CDE00307496 (Ex. 8).

- On October 9, 2002, Mr. Gangle emailed Ms. Egger to inquire about her availability in November 2002 for a meeting with the equity team's technical consultant, STA, for "a briefing"; Gangle forwarded "a cheat sheet with all the equity percentages for the various redeterminations, owner cases, etc." *See* CDE00301431 (Ex. 9).

**Mary Egger's Role As Advisor To The ASFE.** Ms. Egger also served as an advisor to the ASFE on equity finalization issues, participated in the ASFE's evaluation process, and provided the ASFE with drafts of equity finalization decisions. The Government has admitted that Ms. Egger "provid[ed] legal guidance and advice to the ASFEs in their capacity as decision makers regarding the finalization of equity interests." Defs. Interrog. Resps. at 40 (Ex. 2); *see also id.* at 46, 47, 50, 51, 52 (identifying Mary Egger as one of the individuals "involved in . . . providing input for," and in some instances contributing to the "drafting" of, various ASFE decisions relating to the Dry Gas, Carneros, and Stevens Zones). And known *ex parte* communications between Ms. Egger and the ASFE show that:

- Most importantly, Ms. Egger actually drafted and revised ASFE decisions. *See, e.g.*, CDE00309292 (10/25/01 email from Mary Egger to Robert Kripowicz (acting ASFE) re Stevens Zone Preliminary Decision) ("At long last I'm forwarding to you today our draft (hard copy) preliminary Stevens Zone decision. While it's in pretty good shape, Gary, Arnie, Gena and I are continuing to review it and will likely find a few more knits [sic] to fix. I can send this to you electronically if you would like – just say the word. Let me know if you'd like to sit down to discuss it after you've had an initial review.") (Ex. 10).

- Ms. Egger also participated in the ASFE's analysis of equity finalization issues. *See, e.g.*, CME01401220 (Stevens Zone Equity Finalization powerpoint presentation, including handwritten note: "Mary Egger: Gave this to [ASFE] Pat Godley 4/12/98") (Ex. 11).

- Ms. Egger also commented on draft ASFE decisions. *See, e.g.*, P-00290 (7/23/97 Memorandum from ASFE Patricia Godley to, *inter alia*, Mary Egger forwarding "draft Preliminary Decision on final equity for the Dry Gas Zone" for "review and comment") (Ex. 12).

- Ms. Egger also appeared to coordinate the process by which comments on draft ASFE decisions were sought and addressed. *See, e.g.*, CDE00309028 (9/21/99 email from Mary Egger to Robert Kripowicz, Gary Latham, Louis Capitanio, Arnold Smits, and Gena Cadieux re ASFE data decision draft) ("Attached is a revised version which incorporates changes from Gary, Lou, Arnie, and Gena. Most of the changes (which are few) are editorial in nature, though there are a couple of changes that are more substantive in reaction to comments. To facilitate your review, I have attached a redlined version from the version I distributed yesterday afternoon.") (Ex. 13).

**Other DOE *Ex Parte* Communications.** Documents already in Chevron's possession also include many other *ex parte* communications by members of the DOE equity finalization/advocacy team with the ASFE or his/her staff or with the IPE. For example, by letter

dated April 7, 1998 from Charles Kauffman, the DOE equity/advocacy team contacted the ASFE to request permission to provide comments to the IPE on Chevron's comments in response to the IPE's provisional recommendation for the Stevens Zone. *See* P-02255 (Ex. 14). The DOE team did not consult Chevron about its request, provide Chevron with a copy of its letter, or otherwise inform Chevron that it had been in communication with the ASFE about equity finalization matters. Chevron was altogether unaware of the DOE's letter for almost one month, until it was copied on a letter from the ASFE to the IPE granting DOE's request. Chevron objected to this breach of the EPA, *see, e.g.*, P-02281-82 (6/24/98 letter from Cynthia A. Giumarra to Greg Thorpe and Mary Egger) (Ex. 15), and insisted that Chevron and DOE "focus on what we agree on, ensuring that no future ex parte communications among the parties takes place." P-02301-02 (8/10/98 letter from Cynthia A. Giumarra to Mary Egger and copied to Greg Thorpe) (Ex. 16) (emphasis in original). Other examples of *ex parte* communications include:

- In January 2003, Butch Gangle sent an email to Gary Latham, a member of the ASFE's headquarters team, forwarding a series of email messages "relate[d] to [Latham's] inquiry about the abandonment pressure request, originally posed by Chevron." *See* CDE00708648-49 (Ex. 17).
- In March 2005, there was a lengthy email exchange between Gary Latham and Butch Gangle discussing Mr. Gangle's "trip to Bakersfield" to review DOE records. When Latham forwarded the emails to Mary Egger, she needed to admonish him to "ensur[e] that the ex parte rule is followed." *See* CDE00706908-09 (Ex. 18).
- Handwritten notes dated 4/9/98 indicate that NSAI participated in a telephone conversation with Egger, Latham, and Godley, during which the topics discussed included preparing "a list of questions to ask both owners" that would be "technical in nature," as well as a "separate" list of questions "regarding their cases." *See* CNS00700500 (Ex. 19).
- On December 2, 1999, Gangle sent a fax to Rick Krenek of NSAI, attaching a letter in which Gangle purported to "set the record straight" regarding Chevron's suggestion in a prior conference call that DOE had "terminat[ed] settlement discussions on the conversion factor." *See* CNS00801315 (Ex. 20).

**Chevron's FOIA Requests.** On January 7, 2003 and February 19, 2004, Chevron submitted requests under the Freedom of Information Act for documents related to the process by and bases on which the ASFE had formulated his decisions, including documents reflecting

communications between the ASFE and Mary Egger or members of her staff. *See* CME01301501 (2/19/04 FOIA request) (Ex. 21). The DOE did not respond to Chevron's requests until December 23, 2003 and June 23, 2004 respectively. The heavily redacted documents that the Government reluctantly produced, however, made apparent that Mary Egger was functioning both as an advocate for the DOE's equity positions and as an advisor to the ASFE involved in drafting the ASFE's equity decisions. *See, e.g.*, P-00315 (Ex. 22), P-00811-13 (Ex. 23).

**This Lawsuit.** On August 20, 2004, Chevron brought this lawsuit against DOE, asserting claims for breach of contract and breach of the implied covenant of good faith and fair dealing arising from the EPA and related agreements. Chevron's complaint claims, *inter alia,* that Mary Egger played a prohibited dual role in the process of finalizing the parties' equity interests, thereby "stripp[ing] the parties' agreed-upon procedures of any legitimacy," "depriv[ing] [Chevron] of the benefit of an independent and impartial decision . . . that it bargained for," and "material[ly] breach[ing] DOE's contract obligations." Compl. ¶ 51. The Government subsequently moved to dismiss Chevron's complaint on a number of grounds, all of which this Court rejected on May 31, 2006.

After expedited discovery regarding DOE's unsuccessful attempt to introduce legislation that would have affected Chevron's rights under the parties' agreements, discovery commenced in late August 2006, at which time trial was set to commence on April 30, 2007. On September 22, 2006, Chevron served its initial discovery requests. After several delays and postponement of the trial date, on February 16, 2007, the Government produced its responses to Chevron's initial discovery responses, a 291-page privilege log, and a substantial number of responsive documents (the Government had been producing documents on a rolling basis since early December 2006). Additional responsive documents and a supplement to the Government's privilege log were served in late February and early March 2007.

**Deficiencies in the Government's Privilege Log.** The Government's privilege log contains over 5,000 entries, many of which are plainly inaccurate or are insufficient to permit meaningful review. Entries that exemplify plain inaccuracies include:

- Doc. No. 13 (privilege log indicates document dated 04/02/1956, but document is in fact a (redacted) fax cover sheet dated 10/20/99; description says document was prepared in anticipation of SOZ proceeding before the IPE)

- Doc. No. 27 & 28 (privilege log indicates documents dated 5/19/1981 and 8/28/1981, respectively; documents are fax transmittal sheets dated 10/3/00 from Egger to Gangle, with attachments redacted)

- Doc. No. 1613 (privilege log indicates a facsimile transmittal from Burzlaff to Gangle, Holcomb, Schuessler, and Thorpe; document in fact attaches a draft "DOE EFT response to NSAI questions dated October 6, 1999 . . . regarding uncounted NGLs" (produced in redacted form), but the redacted document itself indicates that outside counsel faxed it to Mary Egger, from whose files it was recovered)

- Doc. No. 1777 (privilege log describes document as an 8/4/00 "faxed memo from outside counsel to the EFT regarding Stevens Zone issue" and indicates document was authored by Thorpe and transmitted to Gangle, Burzlaff, and Olpin (making no mention of Egger); document in fact is a fax transmittal sheet from Thorpe to Egger enclosing memo to Gangle and Burzlaff)

- Doc. No. 3379 (document described as "email to and from attorney Kelly re documents," but Arnold Smits (not Kelly) is identified as author and Butch Gangle and Gary Latham are identified as recipients; document is withheld on basis of attorney-client privilege, although none of listed authors or recipients are attorneys)

Similarly, entries that are too vague or incomplete for meaningful review include:

- Doc. No. 66 (described as "[a]ttorney-client communication regarding alleged ex parte communication redacted"; dated 10/12/95, prior to execution of EPA)

- Doc. No. 1356 (6/22/99 emails "from to [sic] and from DOE GC (Egger) to PDASFE and DOE HQ advisory team regarding Elk Hills issues")

- Doc. No. 1451 (9/7/99 document described as "an early outline of portion of a draft decision for the PDASFE"; no author or recipient is identified)

- Doc. No. 2728 (5/28/03 "draft of letter from OMM attorney (Thorpe) to OHA (Breznay) prepared by OMM attorney (Chan)", cc'd to Egger and others)

- Doc. No. 2883 (10/1/03 email from Gangle to Egger, cc: Latham, "re contract issues")

- Doc. No. 3736 (2/27/06 "attachment to email sent to attorney [Gena] Cadieux re: OHA TEA-0001 equity advisory team process"; no author identified)

- Doc. No. 3950 (5/12/06 "email to and from attorney Cadieux [to Latham and Smits] re meeting")

**Withheld Documents Relevant to Ms. Egger's Role as DOE Equity Team Member and Leader.** Notwithstanding those deficiencies, it is plain that the Government has withheld numerous documents that evidence Ms. Egger's role in advocating DOE's equity position. Examples, of which there appear to be hundreds or even thousands noted on the privilege log, include:

- Doc. No. 1170 (12/7/98 memo from Gangle (EFT) to Thorpe, Egger, Kauffman, Burzlaff & Schuessler re: "NSAI EFT Conference Call") (produced in redacted form)
- Doc. No. 1372 (7/20/99 series of emails among Thorpe, Egger, Burzlaff, Gangle, Schuessler, Holcomb & Gruber re: "questions for NSAI on Wednesday") (produced in redacted form)
- Doc. No. 1524 (9/28/99 email chain among "DOE employee (Gangle)," "DOE attorney (Egger)" and "OMM attorney (Thorpe)" re: "Gangle draft of email from Gangle to Chevron (Stone) concerning Chevron's pricing data for Stevens Zone equity finalization")
- Doc. No. 1676 (3/17/2000 "memo from Greg Thorpe (outside counsel) to Egger (DOE counsel), cc to Gangle and Burzlaff (EFT), regarding the 16G/17G issue, with handwritten notes by Egger") (produced in redacted form)

**Withheld Documents Relevant to Ms. Egger's Role as Advisor to the ASFE.** Likewise, numerous documents that have been withheld are relevant to Ms. Egger's role as advisor to the ASFE and key player in the ASFE's decisionmaking process. Examples include:

- Doc. No. 1486 (9/16/99 email from Egger to Latham, Smits, and Capitanio re "ASFE Stevens Zone Draft Decision")
- Doc. No. 1491 (9/17/99 document from Kripowicz to Latham and Egger described as "[f]irst indication that the draft decision of the PDASFE was prepared with involvement (and apparent legal advice) of HQ attorney Mary Egger. There are handwritten marginal notes that appear to be from L. Capitanio")
- Doc. Nos. 1508, 1509 (9/21/99 documents from Egger to Smits and Capitanio re "Communications between DOE attorney (Egger) and DOE HQ advisory team regarding ASFE draft Stevens Zone decision")
- Doc. No. 2111 (3/13/01 email from Latham to Egger and Smits re "communication with attorney about preparation of preliminary and final equity decisions [addressed to Mary Egger and cc'd to Arnold Smits]")

- Doc. No. 2187 (10/25/01 memorandum from Egger to Kripowicz, Cadieux, Latham and Smits re "Memo from DOE counsel (Egger) to PDASFE regarding Draft Preliminary Decision Finalizing Elk Hills Stevens Zone Equity")
- Doc. No. 2189 (10/25/01 "Draft of preliminary decision in the Stevens zone [addressed to PDASFE Kripowicz]," authored by Egger)
- Doc. No. 2301 (6/28/02 document from Latham to Egger and Cadieux re "Attorney-client communication between DOE HQ team (Latham) and DOE GC (Egger, Cadieux) re: delegation of authority to the ASFE for SOZ decision")
- Doc. No. 2328 (10/03/02 email from Latham to Egger, Cadieux, Capitanio and Smits re "Email to Egger and Cadieux re NSAI provisional recommendation on SOZ")

**Withheld Documents Relevant to Other DOE *Ex Parte* Communications.** It also appears that the Government has withheld numerous documents relevant to other DOE *ex parte* communications with the ASFE and his advisors. Such documents include:

- Doc. No. 952 (5/6/98 "fax sheet and memorandum by staff and with staff notation re [S]tevens [Z]one equity finalization – potential capture analysis legal issue," authored by Wayne Kauffman and addressed to Gary Latham)
- Doc. No. 956 (5/7/98 "fax cover sheet and notations on documents re staff comments on NSAI spreadsheet data," from Alan Burzlaff, DOE EFT technical advisor, to Latham)
- Doc. No. 1011 (7/27/98 "fax with attached to it draft of letter to Chevron re the communications protocol, from outside counsel to Kauffman and Latham"; Egger is also copied)

**Chevron's Request for Relief.** It is therefore clear from a number of sources, including the Government's own admissions and documents that Chevron already has on hand, that Government representatives, most particularly (but not only) Mary Egger of the DOE General Counsel's Office, have repeatedly violated the letter and spirit of the *ex parte* prohibition and the fair process established by the parties. While the existing privilege log is opaque and unhelpful in numerous respects and is plainly unreliable in others, it does provide substantial further support for that conclusion. It also indicates that hundreds if not thousands of documents reflecting just such improper *ex parte* communications have been withheld by the Government on claims of privilege.

Under these circumstances, Chevron submits that it would be an unnecessary expenditure of the Court's time to undertake at this stage, as the Court has suggested it might, to personally

review all of the documents as to which there is a disputed claim of privilege. Instead, Chevron hereby requests a ruling that, under the circumstances, the Government may not assert privilege with regard to four categories of documents which are, by definition, central to determining the nature and extent of the *ex parte* communications DOE engaged in, and to the contractual provisions which prohibit them. Specifically, Chevron asks the Court to rule that the Government cannot properly withhold as privileged documents or information that (1) evidence or describe *ex parte* communications between Ms. Egger and her staff or other members of the DOE equity/advocacy team on the one hand and the ASFE or the ASFE's staff on the other hand, (2) evidence or describe *ex parte* communications between Ms. Egger and her staff or other DOE personnel on the one hand and the IPE or the IPE's staff on the other hand, (3) reflect improper *ex parte* input into ASFE or IPE determinations (including drafts of those determinations) from the DOE equity/advocacy team including Ms. Egger and her staff, and (4) drafts of the Equity Process Agreement, the Decoupling Agreement, and the ASFE Protocol and its supplements, which may provide evidence of the parties' understanding and intent in adopting the prohibitions on *ex parte* communications. With respect to this last category, most of the documents were withheld solely based on the deliberative process privilege, except for documents drafted by Mary Egger, which were also withheld on the basis of attorney-client privilege.

While it is difficult to imagine any circumstances in which the prior categories of documents could justifiably be withheld, the Court may wish to afford the Government an opportunity to offer extraordinary grounds, if any exist, for withholding particular documents falling within any of these categories. The Government should then be required to produce all other documents within these categories and to report completely on a revised privilege log any documents as to which it still claims privilege, including those not encompassed within the core categories that Chevron has identified.

**ARGUMENT**

The Government has withheld tens of thousands of pages of highly relevant documents otherwise responsive to Chevron's written discovery requests on the ground that the deliberative process privilege, attorney work product doctrine, and/or the attorney-client privilege shield those documents from production. Chevron does not contest that many of the documents identified on the Government's privilege log would, in other circumstances, satisfy the threshold requirements for the application of one or more of the privileges the Government has invoked. In this case, however, those privileges are wholly inapplicable in the face of the significant government misconduct that the communications represent. Longstanding precedents of this Court and the Court of Appeals for the Federal Circuit – which in turn rely on the seminal privilege decisions of the D.C. Circuit – make clear that the deliberative process privilege, work product doctrine and the attorney-client privilege have no application where the party seeking discovery has made a prima facie showing of government misconduct and has credibly alleged that the documents at issue have a connection to the asserted misconduct.

This case presents facts that are among the strongest imaginable in calling for rejection of such privilege claims. At issue in this case are Chevron's assertions of significant, ongoing, and willful breaches of Chevron's bargained-for contractual rights to a fair process – specifically, one in which members of the Government's advocacy team do not also play a role in the decisions rendered by the ASFE. Substantial existing evidence shows a pattern, over a period of years, of *ex parte* communications by Mary Egger and other participants in the DOE equity team with the ASFE and members of the headquarters team. And from the privilege log itself, it appears clear that many if not most of the documents as to which privilege is being asserted are themselves the improper *ex parte* communications that demonstrate Ms. Egger's improper role as an advisor to the ASFE and a drafter of ASFE equity determination decisions. Given these allegations, the

Court should begin the resolution of the disputed privilege claims by first rejecting in principle those claims as to the four categories of documents that Chevron has identified.

## I. THE DELIBERATIVE PROCESS PRIVILEGE CANNOT SHIELD THE GOVERNMENT'S DOCUMENTS FROM DISCLOSURE IN LIGHT OF DOE'S SERIOUS MISCONDUCT

### A. The Qualified Privilege That Attaches to Documents Reflecting Government Decision- and Policy-Making Is Inapplicable Where There Exist Serious Questions of Government Misconduct

The deliberative process privilege protects from disclosure "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Yankee Atomic Elec. Co. v. United States,* 54 Fed. Cl. 306, 310 (2002) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)) (emphasis omitted). *See also, e.g.*, *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citing cases); *Texaco P.R., Inc. v. Dep't of Consumer Affairs,* 60 F.3d 867, 884 (1st Cir. 1995) (privilege "'shields from public disclosure confidential inter-agency memoranda on matters of law or policy'") (quoting *Nat'l Wildlife Fed'n v. United States Forest Serv.*, 861 F.2d 1114, 1116 (9th Cir. 1988)). The Federal Circuit has cited with approval and followed the D.C. Circuit's explication of the privilege. *See, e.g.*, *Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302, 1305 n.3, 1307 (Fed. Cir. 2006) (citing *In re Sealed Case*, 121 F.3d at 745 (noting that deliberative process privilege "applies to decisionmaking of executive officials generally")).[1]

The deliberative process privilege is founded upon the desire to afford "reasonable security to the decisionmaking process within a government agency." *Texaco P.R.*, 60 F.3d at 884. *See also In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998) ("The central purpose of the privilege is to foster government

[1] *Marriott* noted that a decision of the Court of Claims, *Kaiser Aluminum & Chemical Corp. v. United States*, 141 Ct. Cl. 38, 157 F Supp. 939 (1958), "occasionally receives credit as the first federal case to recognize a deliberative process privilege." *Marriott*, 437 F.3d at 1304. *Kaiser* held that "the disclosure of confidential intra-agency advisory opinions" is not automatically required, as such documents "are privileged from inspection as against public interest but not absolutely." 157 F. Supp. at 946.

decisionmaking by protecting it from the chill of potential disclosure."). Thus, the privilege "is restricted to the intra-governmental exchange of thoughts that actively contribute to the agency's decisionmaking process." *Texaco P.R.*, 60 F.3d at 884-85.

**Threshold Application of the Privilege.** To be covered by the deliberative process privilege at a threshold level, material must be both "predecisional" and "deliberative." *In re Sealed Case*, 121 F.3d at 737; *Yankee Atomic*, 54 Fed. Cl. at 311. A document is "predecisional" if it is "antecedent to the adoption of agency policy"; it is "deliberative" if it is actually "related to the process by which policies are formulated." *Nat'l Wildlife*, 861 F.2d at 1117 (citation omitted). Documents created "after the decision and designed to explain it" are not protected. *Yankee Atomic*, 54 Fed. Cl. at 311 (citation omitted). *See also Texaco P.R.*, 60 F.3d at 885. Nor are "purely factual" statements. *In re Sealed Case*, 121 F.3d at 737; *accord*, *Burka v. New York City Transit Auth.*, 110 F.R.D. 660, 667 (S.D.N.Y. 1986) ("the deliberative process privilege applies only to expressions of opinion or recommendations, not to the facts upon which such evaluations might have been based").

The privilege, even where applicable, is not absolute. Citing a decision of the D.C. Circuit, the Federal Circuit has acknowledged that "a showing of compelling need can overcome the qualified deliberative process privilege." *Marriott*, 437 F.3d at 1307 (noting that court may conduct in-camera review of documents withheld on the ground of privilege, since "[t]he qualified deliberative process privilege is subject to judicial oversight") (citing *In re Sealed Case*, 121 F.3d at 737). *See also, e.g.*, *Texaco P.R.*, 60 F.3d at 885 ("Even if a document satisfies the criteria for protection under the deliberative process privilege, nondisclosure is not automatic;" court will instead "weigh [the] competing interests.").

*In re Sealed Case*, on which the Federal Circuit relied in *Marriott*, involved the White House's assertion of executive privilege to prevent the disclosure of several documents sought by the Office of Independent Counsel in connection with its investigation of former Secretary of

Agriculture Mike Espy. After the "district court upheld the White House's claims of privilege in full," the D.C. Circuit vacated and remanded." 121 F.3d at 734. The D.C. Circuit's discussion of the origins and contours of the deliberative process privilege, *id.* at 736-40, has been cited by several other courts.[2] The court ultimately concluded that its "review of the withheld documents indicate[d] that several documents [we]re either wholly factual or contain[ed] segregatable factual sections that would not come under the deliberative process privilege." *Id*. at 740. The court explained that the privilege applies only to materials that are both "predecisional" and "deliberative," and that "[b]oth requirements stem from the privilege's 'ultimate purpose[, which] . . . is to prevent injury to the quality of agency decisions' by allowing government officials freedom to debate alternative approaches in private." *Id.* at 737 (alterations in original).

**The Government Misconduct Exception.** *In re Sealed Case*, on which the Federal Circuit relied, also articulated the "government misconduct" exception to the deliberative process privilege: "[W]here there is reason to believe the documents sought may shed light on government misconduct, 'the privilege is routinely denied,' on grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.'" 121 F.3d at 738 (citations omitted). *See also, e.g., In re Subpoena Served Upon the Comptroller of the Currency*, 967 F.2d 630, 633-34 (D.C. Cir. 1992). *Cf. Enviro Tech Int'l, Inc. v. EPA*, 371 F.3d 370, 376 (7th Cir. 2004) ("[I]nternal discussions about a course of agency action that would be nefarious, if not illegal, . . . would not be protected by the deliberative process privilege.") (citing cases). Although no decision of the Federal Circuit has addressed the misconduct exception to the deliberative process privilege, the Court of Claims suggested in *Kaiser Aluminum & Chemical Corp. v. United States*, 141 Ct. Cl. 38, 157 F. Supp. 939 (1958), that it would recognize such an

[2] *See, e.g., Allen v. Woodford*, No. CV-F-05-1104, 2007 WL 309945, at *4 (E.D. Cal. Jan. 30, 2007); *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 108-09 (S.D.N.Y. 2005); *City of Colorado Springs v. White*, 967 P.2d 1042, 1047-49, 1051 (Colo. 1998).

exception to the application of the privilege. *See* 157 F. Supp. at 947 (noting that, because "[n]o fraud [wa]s charged," and "no duality of interest" was alleged, the court would not require *in camera* inspection of the allegedly privileged document in the face of the Government's assertion of privilege).

The threshold for a showing of misconduct is met when there is "*some reasonable basis* for believing that compelling testimony on these questions *may* shed *some* light on potential government misconduct." *Alexander v. FBI*, 186 F.R.D. 170, 179 (D.D.C. 1999) (emphases added). Evidence that the documents resulting from the deliberative process at issue embody or reflect misconduct on the part of the Government negates the basis for the privilege claim. Thus, "[t]he privilege disappears altogether when there is any reason to believe government misconduct occurred." *In re Sealed Case*, 121 F.3d at 746. Where there is such reason to find the existence of misconduct, no balancing of competing interests is any longer necessary. *Id*. *See also In re Subpoena Duces Tecum*, 145 F.3d at 1425 (no balancing required); *Alexander*, 186 F.R.D. at 177-78 ("[T]he Department of Defense's argument that the court must undertake a balancing of the plaintiffs' versus the public's interest in terms of protecting alleged misconduct must be rejected."). *Cf. Texaco P.R.*, 60 F.3d at 885 ("'where the documents sought may shed light on alleged government malfeasance,' the privilege is routinely denied") (quoting *In re Franklin Nat'l Bank Sec. Litig.*, 478 F. Supp. 577, 582 (E.D.N.Y. 1979)).

Applying this exception in *Dominion Cogen, D.C., Inc. v. District of Columbia*, 878 F. Supp. 258 (D.D.C. 1995), the district court denied the defendants' motion for a protective order, on the ground that the plaintiffs' allegations that their permit applications were denied for impermissible political reasons "raise[d] questions of governmental misconduct and place[d] the deliberative process itself directly in issue." *Id*. at 268 (noting that "'[a]n exception to the general thought-process rule is made where there are allegations of misconduct or misbehavior'") (quoting *United States v. AT&T Co.,* 524 F. Supp. 1381, 1389 (D.D.C. 1981)). And in *Texaco Puerto Rico*,

the First Circuit affirmed the district court's rejection of the defendant's deliberative process privilege claim, given the "'strong showing' of arbitrariness and discriminatory motives on [defendant's] part" and the evidence that defendant "acted in bad faith over a lengthy period of time." 60 F.3d at 885.

Similarly, in *Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency*, the D.C. Circuit rejected the Comptroller of the Currency's assertion of the deliberative process privilege against a trustee in bankruptcy for the Bank of New England Corporation. The trustee claimed that the FDIC had impermissibly pressured the Corporation to provide downstream assets to its subsidiary, the bank, to reduce the losses that the FDIC would incur as the receiver. 145 F.3d at 1423. That suggestion of "misconduct" rendered the privilege wholly inapplicable. *Id*. at 1425 (noting that plaintiff's attack on "the actual goals of the regulators" meant that "the privilege does not enter the picture at all"). And in *Alexander v. FBI*, the district court granted a motion to compel answers to interrogatories served on the Executive Office of the President, holding the deliberative process privilege unavailable where the White House had obtained FBI files of former political appointees and government employees from the Reagan and Bush Administrations in violation of the Privacy Act. 193 F.R.D. 1, 10 (D.D.C. 2000).

The exception to the privilege is especially clear when the alleged government misconduct is such that "the decision-making process [which is the basis for the invocation of privilege is] itself . . . the subject of the litigation." *Burka*, 110 F.R.D. at 667. *Cf. In re Subpoena Duces Tecum*, 145 F.3d at 1424 ("If the plaintiff's cause of action is directed at the government's intent . . . , it makes no sense to permit the government to use the privilege as a shield."); *Williams v. City of Boston*, 213 F.R.D. 99, 102 (D. Mass. 2003); *United States v. Lake County Bd. of Comm'rs*¸ 233 F.R.D. 523, 526 (N.D. Ind. 2005) (deliberative process privilege "is vitiated entirely at step one when the government's decision-making process is central to the plaintiff's case"); *Mitchell v. Fishbein*, 227 F.R.D. 239, 250 (S.D.N.Y. 2005) ("the deliberative process privilege is not

applicable '[w]here the decision-making process itself is the subject of the litigation'") (citations omitted).[3]

### B. The Deliberative Process Privilege Is Inapplicable in Light of Chevron's Showing of Wrongdoing by the DOE

In this case, the Government's assertions of deliberative process privilege fall squarely within the well-established exceptions to that doctrine for misconduct. As is evident from the produced documents, interrogatory responses, and the privilege log itself, the Government is seeking to protect materials that themselves constitute the misconduct at the center of this lawsuit. But the case law in both the D.C. and Federal Circuits leaves no room for doubt that a party cannot engage in actionable conduct and then seek to avoid liability by claiming that the misconduct is itself privileged.

The government misconduct for which Chevron seeks redress is, primarily, repeated violation of the required wall of separation between, on the one hand, the advocacy team responsible for maximizing DOE's equity percentage of the Elk Hills field and, on the other hand, the ASFE's team responsible for fairly adjudicating the Chevron-DOE equity dispute. In

[3] *First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312 (2000), and *Zenith Radio Corp. v. United States*, 764 F.2d 1577 (Fed. Cir. 1985), which the Government has relied upon previously in asserting the deliberative process privilege, *see* Defendant's Memorandum in Support of Privilege Claims at 15, 24 (Aug. 11, 2006), are not to the contrary. Neither case deals with the government misconduct exception to the deliberative process privilege. *First Heights Bank* simply held that there is no "automatic bar on assertions of deliberative process privilege in any case where the Government's *intent* is *potentially relevant*." 46 Fed. Cl. at 322 (emphasis added). Here, the issue is not merely whether the Government's *intent* may be relevant. Rather, the Government's misconduct – including some of the very communications as to which privilege is claimed – is the basis of Chevron's complaint, and it is already plain that the Government has engaged in such misconduct by repeatedly and blatantly disregarding the contractual prohibition on *ex parte* contacts during the course of the equity finalization process. *See supra* pp. 6-9.

Similarly, *Zenith Radio Corp.*, addressed the very different and narrow question of whether a party seeking judicial relief "automatically" waives any privilege it might otherwise have "simply by bringing suit." 764 F.2d at 1580. Not surprisingly, the court in *Zenith* found that the fact of filing a lawsuit does not always mandate a finding that otherwise-applicable privileges have been waived. *Id*. *Zenith* did not involve allegations of misconduct by the government or in any way purport to address the government misconduct exception to privilege claims. Like *First Heights Bank*, *Zenith* does not mandate the application of the privilege in the face of the Government's wrongdoing.

particular, these two teams engaged in *ex parte* communications expressly forbidden by the EPA. Even more blatantly, DOE destroyed any notion of separation between the two teams by allowing counsel—especially in-house lawyer Mary Egger—to lead *both* teams at the same time. Ms. Egger not only was a lead advocate and strategist for the DOE equity team but also played an instrumental role in the ASFE's decisionmaking process, including drafting decisions on the same issues as to which she had advocated the DOE's position.

It is apparent that at least the bulk of the written communications and other documents on the Government's 291-page privilege log directly evidence – and, indeed, themselves constitute – this misconduct. Despite the Government's heavy redactions and liberal assertions of privilege, the documents that *were* produced, as well as the interrogatory responses, leave no room for doubt about Ms. Egger's extensive communications with, and dual roles on, the DOE advocacy team and the DOE adjudicative team. *See supra* pp. 6-8. And it is plain from the privilege log that the Government is withholding hundreds, if not thousands, of documents reflecting additional instances of such communications. *See supra* pp. 11-12. Among the documents being withheld by the Government, moreover, are Ms. Egger's contributions to the drafting of the ASFE's decisions, which represent the most egregious aspect of the Government's misconduct in this case. In addition, the produced documents show that there were impermissible *ex parte* communications that did not include Ms. Egger, and the privilege log includes numerous other instances of this misconduct. *See supra* pp. 8-9, 13.

Thus, the Government here is seeking to use the asserted privileges to protect improper government activity. This case is critically different from *Hinckley v. United States*, 140 F.3d 277 (D.C. Cir. 1998), where the D.C. Circuit concluded that the misconduct exception did not apply because the plaintiff had not made a "colorable showing" that any government misconduct had occurred in connection with the relevant deliberations. *Id*. at 285, 286. In this case, by contrast, it

is evident that the Government has refused to produce voluminous documentation of its own misconduct.

In light of this substantial evidence of misconduct by the DOE, the deliberative process privilege does not support DOE's request for protection of materials relating to the equity finalization process – in particular, documents reflecting input from Mary Egger (or those acting at her direction) in the ASFE decisionmaking process, and documents reflecting *ex parte* communications between or among Ms. Egger and/or her staff, members of the DOE equity team, and the ASFE's adjudicative team. At least with respect to such input and communication, "the decision-making process itself is the subject of the litigation," and the deliberative process privilege thus does not apply here, even if the ASFE's equity adjudications are the type of deliberations that otherwise might be covered. *Burka*, 110 F.R.D. at 667; *see supra* pp. 18-21.

With respect to drafts of and related communications regarding the EPA itself and the associated Decoupling Agreement, 1996 ASFE Protocol and supplements, such information is important to show the intent of the parties with respect to the wall of separation that they contractually constructed and the extent of those documents' prohibition of *ex parte* communications. Such information may provide direct evidence of government misconduct, and at the very least would "shed light" on the obligations that the government undertook and its breach of those obligations. *See Alexander*, 186 F.R.D. at 179.

In all events, even if the government misconduct exception did not compel disclosure of the materials contained in the four categories or critical documents that Chevron has identified, Chevron's interest in the documents plainly outweighs any interest that the Government has in preventing their disclosure. All of the documents in the categories that Chevron has identified are central to Chevron's claims that the parties had constructed a wall of separation between DOE's equity advocates and the ASFE and his advisors and that DOE significantly and repeatedly breached that wall of separation. This evidence is important to document the details and full extent

of DOE's breach and illuminate the precise intent of the parties when they entered the relevant agreements.

In short, given the substantial evidence of government misconduct available from the documents already produced, the Government's own interrogatory responses, and the privilege log itself, DOE's assertions of deliberative process privilege should be rejected as to all four categories of documents referenced above.

## II. CHEVRON'S SHOWING OF MISCONDUCT BY THE DOE DEFEATS THE APPLICATION OF THE ATTORNEY WORK PRODUCT DOCTRINE

### A. The Work Product Doctrine Does Not Apply Where There Exists a Prima Facie Showing of Government Misconduct

"[T]he work-product doctrine . . . can protect 'documents and tangible things' prepared in anticipation of litigation that are both non-privileged and relevant." *In re Echostar Commc'ns Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (quoting Fed. R. Civ. P. 26(b)(3)). "'The work product privilege protects the attorney's thought processes and legal recommendations.'" *Genentech, Inc. v. Int'l Trade Comm'n*, 122 F.3d 1409, 1415 (Fed. Cir. 1997) (quoting *Zenith*, 764 F.2d at 1580). Its "purpose is to prevent the disclosure of an attorney's mental impressions and thought processes either to an opponent in the litigation for which the attorney generated and recorded those impressions . . . or to a third party with interests not 'common' to those of the party asserting the privilege." *Carter v. Gibbs*, 909 F.2d 1450, 1450 (Fed. Cir. 1990) (en banc) (citations omitted), *superseded in non-relevant part*, Pub. L. No. 103-424, § 9(c), 108 Stat. 4361 (1994). *See also Echostar*, 448 F.3d at 1301.

"[T]he work product doctrine is not an absolute bar to discovery of materials prepared in anticipation of litigation." *Pacific Gas & Elec. Co. v. United States*, 69 Fed. Cl. 784, 789 (2006). *See also Echostar*, 448 F.3d at 1301. Even if a document satisfies the threshold requirements for application of the work product doctrine, the federal rules specifically provide that the work product privilege may be overcome by a showing that the party "seeking discovery has substantial

need of the materials in preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed. R. Civ. P. 26(b)(3); R. Ct. Fed. Cl. 26(b)(3). *See also Echostar*, 448 F.3d at 1301-02 ("the work-product doctrine is not absolute;" parties may discover non-opinion work product if they satisfy the substantial need and undue hardship test).

There has long been a so-called "crime/fraud" exception to the work product doctrine and the related attorney-client privilege. *See, e.g., In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997) (crime-fraud exception to attorney-client privilege applies if client both "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act" and "carried out the crime or fraud"); *id.* at 51 ("[A]s with the [attorney-client] privilege, the interests in favor of work product immunity are overcome when the client uses the attorney to further a crime or fraud."); *In re Grand Jury Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005) ("The work product privilege is subject to the same crime-fraud exception" as the attorney-client privilege.) (citing cases). Indeed, the communication at issue need not have been made with any particular intent on the part of the attorney, if in fact it served the end of advancing a nefarious scheme. *See, e.g., In re Sealed Case*, 754 F.2d 395, 402 (D.C. Cir. 1985) ("It is well settled that an attorney's ignorance of his client's misconduct will not shelter that client from the consequences of his own wrongdoing.").

"The purpose of this exception is to prevent the abuse of confidentiality guaranteed by the privilege." *Miller v. Haulmark Transport Sys.*, 104 F.R.D. 442, 446 (E.D. Pa. 1984). Thus, "'[i]t is only the 'rightful interests' of the client that the work product doctrine was designed to protect.'" *In re Grand Jury Subpoena*, 419 F.3d at 339 (citations omitted). *See also In re Sealed Case*, 676 F.2d 793, 812 (D.C. Cir. 1982) (noting that the Supreme Court has stated that "no privilege applies 'where the relation giving birth to it has been fraudulently begun or fraudulently continued'") (quoting *Clark v. United States*, 289 U.S. 1, 14 (1933)).

As a corollary to the exception to the work product privilege and attorney-client privilege for materials that shed light on a "crime" or "fraud," there is also an exception to those privileges for materials that themselves constitute or evidence "other type[s] of misconduct fundamentally inconsistent with the basic premises of the adversary system." *In re Sealed Case*, 676 F.2d at 812 (citing, *inter alia*, *Moody v. IRS*, 654 F.2d 795, 799-800 (D.C. Cir. 1981)). *See also In re Sealed Case*, 754 F.2d at 399 (citing, *inter alia*, *Clark*, 289 U.S. at 14). Just as the exception for an actual crime or fraud serves the salutary purpose of requiring disclosure of materials that shed light on the elements of nefarious conspiracies or enterprises, so does the closely related exception for other types of gross misconduct. It is plainly inconsistent with the basic premises of our adversary system to protect work product or attorney-client communications that are themselves violations of rules established by law or principles of ethics, or that evidence such violations. It simply makes no sense to protect such materials merely because those materials involve an attorney. Such materials indicate "abuse" of the attorney-client relationship sufficient to deny the protection of privilege.

Accordingly, the relevant misconduct "is not limited to criminal or fraudulent conduct, but may also encompass other 'misconduct fundamentally inconsistent with the basic premises of the adversary system.'" *Tri-State Hosp. Supply Corp. v. United States*, 238 F.R.D. 102, 105 (D.D.C. 2006) (quoting *In re Sealed Case*, 676 F.2d at 812); *Jinks-Umstead v. England*, 233 F.R.D. 49, 51 (D.D.C. 2006) (same). This exception to the work product protection applies when a party seeking discovery shows a violation "sufficiently serious to defeat the work-product privilege" and a "valid relationship between the work product [at issue] and the prima facie violation." *Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 133 (D.D.C. 2005) (quoting *In re Sealed Case*, 676 F.2d at 814-15).

Thus, in *Moody v. IRS*, the D.C. Circuit held that the work product privilege would likely not apply to a document detailing an allegedly improper *ex parte* meeting between an attorney and

a judge that had previously taken place. The Court noted that the purpose of the privilege is "to protect the adversary trial process itself," and explained that "a lawyer's unprofessional behavior may vitiate the work product privilege," as it would be "perverse" "to exploit the privilege for ends [such as covering up improper *ex parte* communications] outside of and antithetical to the adversary system." 654 F.2d at 800. Accordingly, the court remanded to the district court to determine whether the *ex parte* communication described in the document was in fact improper and whether the document should be disclosed. *See id.* at 801.

Similarly, in *Jinks-Umstead v. England*, the court recognized that the "crime-fraud exception to the work product doctrine" would apply where there exists a prima facie case of government misconduct. 233 F.R.D. at 51-52. The plaintiff there alleged that government attorneys had conspired with the Navy to cover up instances of intentional discrimination. *See id*. at 51-52. The court upheld the government's claims of work product and attorney-client privilege only after examining the disputed documents *in camera* and determining that "[e]ven if plaintiff had established a *prima facie* case of a cover-up, which I found she did not, the documents would have negated such a finding." *Id.* at 52.

### B. The Attorney Work Product Privilege Should Not Be Applied Given Chevron's Showing of Misconduct by the DOE

The same showing of misconduct that establishes the inapplicability of the deliberative process privilege also warrants the production of materials that the Government has withheld on the basis of the work product doctrine. Under the misconduct exception, Chevron is entitled to disclosure of the four categories of withheld documents because of the blatant misconduct evidenced by DOE's prohibited *ex parte* contacts with the ASFE and the IPE. *See, e.g.*, *In re Sealed Case*, 676 F.2d at 812; *Moody*, 654 F.2d at 799-800. That misconduct, outlined above, is precisely the sort of wrongdoing that negates the application of the work product doctrine. Just as the *ex parte* communications discussed in *Moody* appeared to be "misconduct fundamentally inconsistent with the basic premises of the adversary system," *In re Sealed Case*, 676 F.2d at 812,

the prima facie case of improper communications documented in this case constitutes the kind of fundamentally unfair government misconduct that negates application of the work product protection.

It would be illogical and fundamentally unfair for the Government to be permitted to agree to a process that creates a wall of separation between the DOE equity advocates and the equity adjudicators and then to hide behind privilege to conceal breaches of that wall of separation merely because the primary wrongdoer is an attorney. Indeed, this case is a paradigmatic example of circumstances appropriate for application of the misconduct exception. There plainly exists a prima facie case that, contrary to the parties' agreements and fundamental principles of good faith and fair dealing, Ms. Egger played an impermissible dual role as both advocate for the DOE equity position and significant participant in the adjudicative process by which DOE's equity interests have been resolved. Where an attorney and her staff are the principal alleged wrongdoers, evidence of their misconduct cannot be shielded by privilege.

In all events, even if the Court were to conclude that the misconduct exception were not applicable, Chevron's need for the materials in the four categories that Chevron has identified plainly outweighs the Government's interest in withholding those materials. As noted above, those materials are central to Chevron's claims and are important to document the details and full extent of DOE's breach of the wall of separation created by the parties and illuminate the precise intent of the parties when they entered the relevant agreements. Accordingly, every document that falls within any of the four categories of critical materials identified by Chevron but has been withheld on the basis of the work product doctrine should be produced absent a particularized showing that DOE has extraordinary grounds to withhold the document.

## III. THE ATTORNEY-CLIENT PRIVILEGE IS LIKEWISE OVERCOME BY A SHOWING OF SIGNIFICANT MISCONDUCT

### A. The Attorney-Client Privilege Is Not Absolute

"'The attorney-client privilege protects the confidentiality of communications between attorney and client made for the purpose of obtaining legal advice.'" *Echostar*, 448 F.3d at 1300 (quoting *Genentech*, 122 F.3d at 1415). *See also Shearing v. Iolab Corp.*, 975 F.2d 1541, 1546 (Fed. Cir. 1992); *Ampex Corp. v. United States*, 207 Ct. Cl. 1014, 1016 (1975) ("The attorney-client privilege fosters the full and uninhibited communication of information and ideas between a client and his attorney."). A "central inquiry" in determining the applicability of the privilege is "whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal advice or services." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805 (Fed. Cir. 2000).

#### 1. The Privilege Does Not Apply Where Materials Relate To Policy Advice

As a threshold matter, "only communications that seek *legal advice* from a professional legal adviser in his capacity as such are protected." *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (emphasis added; internal quotation marks omitted). "The attorney-client privilege attaches only when the attorney acts in that capacity." *Texaco P.R.*, 60 F.3d at 884 (citing cases); *Pacific Gas*, 69 Fed. Cl. at 810 ("[T]he attorney-client privilege does not shield all information that a client divulges to an attorney, or vice versa, but rather is limited to instances where legal advice is sought or rendered.") (quotation omitted); *Coleman v. American Broadcasting Companies*, 106 F.R.D. 201, 205 (D.D.C. 1985) ("[C]ommunications between an attorney and another individual which relate to business, rather than legal matters, do not fall within the protection of the privilege.").

The Federal Circuit is in agreement: "'The professional relationship for purposes of the privilege for attorney-client communications hinges upon the client's belief that he is consulting a lawyer *in that capacity* and his manifested intention to seek professional legal advice.'" *In re*

*Regents of the Univ. of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996) (emphasis added) (quoting *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978)). *See also, e.g.*, *Spalding*, 203 F.3d at 806 (holding that attorney-client privilege applied and rejecting argument that communication was made in context of "making *business* decisions" rather than "rendering *legal* advice") (emphases in original).

As a general matter, "an agency and its lawyers may enjoy the type of relationship that would entitle them to the attorney-client privilege." *Yankee Atomic*, 54 Fed. Cl. at 313 (citation omitted). That is the case, however, only when the attorney *acts as a legal advisor* vis-à-vis the agency. "For the privilege to apply, legal advice must predominate. . . . The privilege does not apply where legal advice is merely incidental to business advice." *Pacific Gas*, 69 Fed. Cl. at 811 (citation omitted). Where an attorney acts not as a legal advisor but instead as a policymaker, for instance, the privilege does not apply. Thus, where counsel was charged with "policymaking authority" to such an extent "that counsel ceased to function as lawyers and began to function as regulators," a government agency was not permitted to invoke the attorney-client privilege. *Texaco P.R.*, 60 F.3d at 884. Similarly, where "it [wa]s not clear whether the addressees [of documents, including a high-ranking official in the General Counsel's office,] were acting in their capacities as attorney advisors or as regulatory decision-makers," the privilege did not apply. *Mobil Oil Corp. v. DOE*, 102 F.R.D. 1, 9 (N.D.N.Y. 1983). And where "[t]he government was investigating a failed thrift and had simply elected to have attorneys be the investigators," the privilege was inapplicable. *FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1097 (S.D. Tex. 2005). *See also, e.g.*, *In re Lindsey*, 158 F.3d at 1270 ("Thus, Lindsey's advice on political, strategic, or policy issues, valuable as it may have been, would not be shielded from disclosure by the attorney-client privilege.").

It follows that the simple fact that counsel for the agency reviewed a document does not cloak that document with the privilege. *Mobil Oil*, 102 F.R.D. at 9-10 ("[A] document does not

come within the attorney-client privilege merely by being forwarded to or routed through the counsel's office."). *Cf. Hurwitz*, 384 F. Supp. 2d at 1097 (attorney-client and work product privileges do not "protect documents sent by or to [every] government employee with a law license" "when that employee acts as an executive, investigator, or regulator" rather than as a lawyer; "[a] person must give legal advice in a context of advice sought to render his communication privileged"); *Hanna v. United States*, No. 424-77T, 1997 WL 834813, at *15 (Fed. Cl. Sept. 30, 1997) ("[D]ocuments, or portions thereof, do not acquire protection under the attorney-client privilege merely because they were transferred from the client to the attorney.").

In sum, "the attorney-client privilege must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Lindsey*, 158 F.3d at 1272 (quoting *In re Sealed Case*, 676 F.2d at 807 n.44). That logic precludes application of the privilege to every document that passes across a lawyer's desk, without consideration of whether the document in fact reflects the exchange of information between lawyer and client made "for the purpose of obtaining legal advice." *Echostar*, 448 F.3d at 1300 (citation omitted).

### 2. The Privilege Does Not Apply Where There Exists a Prima Facie Showing of Significant Misconduct

As with the work product doctrine, there is a long-established exception to the application of attorney-client privilege for materials that evidence a "crime" or "fraud." *See, e.g., In re Sealed Case*, 107 F.3d at 49; *Spalding*, 203 F.3d at 806-07. The rationale for this exception is that, in certain rare circumstances, communication between an attorney and client is undesirable and contrary to public policy:

> If the privilege is meant to encourage frank discussions between the client and counsel to promote the observance of law and zealous advocacy by the attorney for the client, then communications made with a view toward engaging in and/or perpetuating criminal or fraudulent conduct fall outside these laudable aims and do not deserve the same sort of solicitous protection.

*Coleman*, 106 F.R.D. at 206-07. This is so, even if the attorney is ignorant of any wrongdoing planned or undertaken by the client. *See, e.g., In re Sealed Case*, 754 F.2d at 402.

Just as with respect to the work product doctrine, there is a corollary exception for communications "made in furtherance of" "other misconduct." *In re Sealed Case*, 754 F.2d at 399 (citing, *inter alia, Clark*, 289 U.S. at 14). Indeed, it is black-letter law that "[a]n exception or waiver of the work product privilege will also serve as an exception or waiver of the attorney-client privilege, since the coverage and purposes of the attorney-client privilege are completely subsumed into the work product privilege." *In re Sealed Case*, 676 F.2d at 812 (footnote omitted). The same policies that support restrictions on the attorney-client privilege and work product protections with respect to communications evidencing criminal and fraudulent conduct also support restrictions on those privileges with respect to communications evidencing other types of serious misconduct. It would undermine the fundamental premises of our adversary system to protect from disclosure communications that are themselves or that evidence violations of clearly-established rules, merely because the misconduct is committed by an attorney. That unavoidable conclusion has been clear for many decades.

Nearly eighty years ago, in *Clark v. United States*, the Supreme Court was faced with a case involving the privilege protecting against disclosure of jury deliberations, which it analyzed by drawing a direct analogy to the attorney-client privilege. It reasoned that "[t]he privilege takes as its postulate a genuine relation, honestly created and honestly maintained," and concluded that the attorney-client privilege "takes flight if the relation is abused." 289 U.S. at 14. Thus, as with the work product privilege, it may be lost as to attorney-client communications that amount to or evidence misconduct, even if they do not constitute a "crime" or "fraud." *See Tri-State Hosp.*, 238 F.R.D. at 104 (citing cases in which "courts have expanded the crime-fraud exception to include communications made in furtherance of an intentional tort or other misconduct"). *See also, e.g., Coleman*, 106 F.R.D. at 207 (noting that several courts have "formulated the exception in broader terms" to extend beyond criminal or fraudulent conduct) (citing cases and holding that exception to privilege is applicable where plaintiff establishes prima facie case that communications would

evidence attorney participation in cover-up of sexual harassment activities). Indeed, as Wigmore argued long ago:

> [I]t is difficult to see how any moral line can properly be drawn at [the] crude boundary [of the definition of crime or fraud], or how the law can protect a deliberate plan to defy the law and oust another person of his rights, whatever the precise nature of those rights may be.

8 John H. Wigmore, *Evidence* § 2298, at 577 (McNaughton rev. ed. 1961).

"To overcome a claim of privilege . . . [the challenger] must first make a prima facie showing of a violation sufficiently serious to defeat the privilege" and also must "establish some relationship between the communication at issue and the prima facie violation." *In re Sealed Case*, 754 F.2d at 399. *See also Spalding*, 203 F.3d at 807 (citing cases). The necessary *prima facie* showing need not be "established entirely with independent evidence – the documents themselves are commonly the best evidence available." *Tri-State Hosp.*, 238 F.R.D. at 104 (citing *United States v. Zolin*, 491 U.S. 554, 567 (1989)).

The Court of Claims has previously recognized this exception. *See Cities Service Helex, Inc. v. United States*, 216 Ct. Cl. 470, 475 (1978) (privilege exception is applicable "if the client's communication is for the purpose of obtaining help in committing a crime, fraudulent act, illegality, or tort"). Moreover, in support of its description of the contours of privilege, the Federal Circuit in *Spalding* cited *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989), which in turn relied on *In re Sealed Case*, 754 F.2d at 399. *See Spalding*, 203 F.3d at 807.

Indeed, *In re Sealed Case*, 754 F.2d 395, is widely cited as a seminal expression of the crime-fraud and misconduct exceptions; at least six federal courts of appeals have cited or relied upon it in invoking or discussing the doctrine.[4] That case in turn relied on the D.C. Circuit's work

[4] *See, e.g.*, *In re Grand Jury Investigation*, 445 F.3d 266, 279 & n.4 (3d Cir. 2006); *United States v. Reeder*, 170 F.3d 93, 106 (1st Cir. 1999); *In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987); *United States v. Laurins*, 857 F.2d 529, 540 (9th Cir. 1988); *In re Antitrust Grand Jury*, 805 F.2d 155, 164 (6th Cir. 1986); *United States v. Ballard*, 779 F.2d 287, 293 n.12 (5th Cir. 1986). *See also, e.g.*, *In re Grand Jury Subpoena Duces Tecum*, 773 F.2d 204, 207-08 (8th Cir. 1985) (Fagg, J., dissenting).

product precedent. *See id*. at 399 (citing *In re Sealed Case*, 676 F.2d at 813). As noted above, the court in *Moody v. IRS* held that an improper *ex parte* communication would likely not be protected by the work product doctrine, *see* 654 F.2d at 799-800, and thus such an improper *ex parte* communication would likely not be protected by attorney-client privilege. *See also, e.g., Olson v. Accessory Controls & Equip. Corp.*, 757 A.2d 14, 34 (Conn. 2000) (holding that "crime-fraud" exception to attorney-client privilege would apply where communication evidences failure by party to make required disclosures of information).

Similarly, courts have held that where a communication sought to be shielded from disclosure itself evidences a violation of applicable standards of conduct or of the exercise of appropriate government authority, the attorney-client privilege does not apply. For example, in *In re Sunrise Securities Litigation*, 130 F.R.D. 560 (E.D. Pa. 1989), the court explained that a law firm's communication with in-house counsel was not protected by the attorney-client privilege where that "communication or legal advice . . . itself violated [Pennsylvania Rule of Professional Conduct] 1.7," which governs conflicts of interest. *Id*. at 597-98. Thus, no attorney-client privilege applies if "the communication implicates or creates a conflict between the law firm's fiduciary duties to itself and its duties to the client seeking to discover the communication." *Id*. at 597. In that case, the court therefore remanded to the Special Master to review whether the relevant withheld documents "contain communications or legal advice in which Blank Rome's representations of itself violated Rule 1.7." *Id*. at 598. Accordingly, *Sunrise* confirms that the attorney-client privilege should not apply to a communication that itself is impermissible, even if the client is not using legal advice to commit a separate wrong. Just like communications that foster crime, fraud, or other misconduct, communications that themselves are unethical or otherwise improper do not deserve the same sort of protection given to attorney-client communications generally.

Limitations on the scope of the attorney-client privilege are particularly important and must be interpreted especially broadly when otherwise privileged information is sought from the Government and a government attorney is involved in impermissible activity. "[G]overnment attorneys stand in a far different position from members of the private bar. . . . The constitutional responsibility of . . . all members of the Executive Branch, is to 'take Care that the Laws be faithfully executed.' U.S. Const. art. II § 3." *In re Lindsey*, 158 F.3d at 1272. "This view of the proper allegiance of the government lawyer [to the people in our democracy] is complemented by the public's interest in uncovering illegality among its elected and appointed officials." *Id*. at 1273. For example, in *McCartney v. Attorney General*, 231 Mich. App. 722 (1998), the plaintiff sought documents relating to the Governor's allegedly improper negotiations of gaming compacts with Indian tribes. The Attorney General withheld the documents, citing the attorney-client privilege. The court explained that "there would be no valid attorney-client relationship" with the Attorney General where the Governor "acts outside the scope of his authority," and thus acts "ultra vires." *Id.* at 726.

In short, when a party seeking discovery makes an adequate showing of wrongdoing on the part of a government attorney, that showing should negate the application of the attorney-client privilege to the misconduct itself, or to communications that will tend to shed light on the extent and character of the misconduct.

### B. The Attorney-Client Privilege Is Overcome by Chevron's Showing of Misconduct by the DOE

As with the deliberative process privilege and the work product doctrine, DOE's assertion of attorney-client privilege cannot shield the evidence sought by Chevron. In this instance, there are two distinct reasons for that outcome.

*First*, the privilege has no application when counsel acts not as a legal advisor but as a policymaker or regulator. *Yankee Atomic*, 54 Fed. Cl. at 313; *Texaco P.R.*, 60 F.3d at 884-85. Here, in many instances – including virtually all of those in which Ms. Egger contributed in some

way to ASFE decisions – DOE cannot establish that the communications at issue were made by DOE employees in their capacity *as attorneys,* rather than as policymakers or regulators. Input by Mary Egger into the ASFE's equity determination process reflects not her role as counsel for the DOE – a role she arguably played when she acted as advocate for DOE in the equity finalization process – but rather her (improper) role as a forbidden participant in the regulatory process by which the parties' claims to equity ownership of the Elk Hills Reserve were to be resolved. Furthermore, even if the ASFE's adjudicative activities could have entailed the solicitation of legal advice, the ASFE could not have had a legitimate attorney-client relationship with *Mary Egger* (or with her subordinates) because Ms. Egger simultaneously was advising the DOE advocacy team on the same issues.

Similarly, with respect to drafts of and communications related to the EPA, Decoupling Agreement, ASFE Protocol, and supplements, the Government's assertion of attorney-client privilege, merely because Mary Egger was involved in the communications, is plainly improper. Ms. Egger's participation in the process by which those agreements were drafted was primarily a regulatory function and not one normally encompassed within the attorney-client privilege. Indeed, it is unlikely that Ms. Egger's input was in response to "confidential" client information, rather than regulatory objectives. Moreover, even if Ms. Egger did provide some limited legal advice in the course of commenting on the draft documents, the Government's interest in withholding such communications is conclusively outweighed by the relevance of those communications to the Government's demonstrated misconduct.

*Second*, given the abundant evidence of DOE's misconduct throughout the equity finalization process as outlined above, the misconduct exception applies and defeats assertion of privilege here. *See In re Sealed* Case, 754 F.2d at 399. The documents DOE has withheld from production relate directly to the pattern of repeated, willful communications between Mary Egger, the DOE equity team, and the ASFE, in blatant violation of Chevron's bargained-for procedural

rights under the EPA and related agreements. Significantly, those alleged attorney-client communications do not merely discuss or otherwise evidence misconduct by the client that did not involve the lawyer. Rather, many of the communications *themselves* constitute the misconduct at issue. Where, as here, there have been communications sufficiently improper to be the subject matter of a colorable legal claim, the plaintiff has made the required showing of "a violation sufficiently serious to defeat the privilege" and "some relationship between the communication at issue and the prima facie violation." *In re Sealed Case*, 754 F.2d at 399. There is simply no interest in protecting and fostering attorney-client communications that perpetrate or facilitate such serious misconduct. *See, e.g., Clark*, 289 U.S. at 14; *Moody*, 654 F.2d at 799-800; *In re Sunrise Sec. Litig.*, 130 F.R.D. at 597-98; *McCartney*, 231 Mich. App. at 726. Accordingly, every document that falls within any of the four categories of relevant materials identified by Chevron but has been withheld on the basis of attorney-client privilege is also presumptively subject to disclosure.

## IV. CHEVRON'S SHOWING OF MISCONDUCT BY THE DOE WARRANTS PRODUCTION OF THE WITHHELD DOCUMENTS EVEN IN THE ABSENCE OF DETAILED *IN CAMERA* REVIEW BY THE COURT

Because none of the privileges that the Government asserts here properly preclude disclosure of the four categories of documents that Chevron seeks, the Court should rule that all documents within those categories should be disclosed. To be sure, the Court had previously indicated that it might be appropriate to examine all of the withheld documents *in camera* – and that is certainly a possible option. However, the sheer number of documents – over 5,000 documents totaling over 25,000 pages – listed on the Government's privilege log, the substantial deficiencies in that privilege log, and the plain relevance of the categories of the documents that Chevron has identified, appear to render that option less feasible and attractive. Instead, Chevron submits that it would be appropriate and more efficient for the Court to determine that all of the documents in the categories that Chevron has identified should presumptively be produced by the

Government. The Government should then be required to produce all such documents and to report completely on a revised privilege log any documents that it contends are not encompassed within those core categories and are properly withheld as privileged. Any remaining disputes between the parties as to the documents listed on such a revised privilege log could be raised with the Court. Should the Government claim an extraordinary or specially compelling basis on which to withhold certain documents falling within the four categories, it could continue to withhold those documents and raise those assertions at that time as well. Moreover, Chevron has prepared a compilation of several examples of documents withheld fully or in part for each category of the documents for which it seeks a presumptive ruling from the Court. *See* Ex. 24A-24C. The Court could certainly elect to examine those examples *in camera* if it would assist the Court in its resolution of this motion.

The four categories for which Chevron seeks an order of presumptive disclosure are:

1) <u>Documents that evidence or describe *ex parte* communications between Mary Egger and her subordinates or other members of the DOE equity/advocacy team on the one hand and the ASFE or the ASFE's staff on the other hand</u>: This category of communications is at the very heart of the misconduct alleged by Chevron. It contains materials that are *themselves* plain breaches of the wall of separation that the parties agreed to establish between the DOE equity/advocacy team and the ASFE/adjudicator. Such communications inherently evidence government misconduct sufficient to deny application of any of the privileges that the Government has asserted, and Chevron's need for them in this suit plainly outweighs any interest that the Government has in withholding them from disclosure.

2) <u>Documents that evidence or describe *ex parte* communications between Mary Egger and her subordinates or other DOE personnel on the one hand and the IPE or the IPE's staff on the other hand</u>: This category contains communications with the first-level decisionmaker in the equity finalization process set forth in the EPA that likewise are *themselves* violations of the

parties' agreements that preclude such *ex parte* communications. It is all but impossible to imagine any legitimate basis for *ex parte* communications with the IPE to be withheld as privileged. Thus, Chevron is entitled to review any documents that reflect such communications, so that it can determine the extent of DOE's breach of its obligations in this regard. To the extent that any conceivably privileged basis for such communications with the IPE can be imagined – and Chevron can think of none – Chevron's need for such documents in this suit surely outweighs any interest that the Government has in withholding them from disclosure.

3) Documents that reflect *ex parte* input into ASFE or IPE determinations (including drafts of those determinations) from the DOE equity/advocacy team, including Mary Egger and her staff: This category is really a focused subcategory of the two previous ones, which targets only inputs to actual decisions. Ms. Egger's participation in the preparation of the decisions of the ASFE and the IPE is the central focus of Chevron's claims that the wall of separation the parties intended to establish was repeatedly and willfully breached by DOE and that Ms. Egger played a prohibited dual role throughout the equity finalization process. The Government simply has no credible basis on which to object to their disclosure, and denying their release would let the Government cloak in privilege its most egregious acts of wrongdoing.

4) Drafts of the Equity Process Agreement, the Decoupling Agreement, and the ASFE Protocol and its supplements: These draft agreements are necessary to allow resolution of any dispute that may arise concerning the parties' intent in entering the various agreements and adopting the prohibitions on *ex parte* communications. The Government has at various times asserted interpretations of those prohibitions that confine their application to certain persons. Thus, drafts of the parties' agreements are plainly relevant to show that the Government breached those agreements, and that its breach was knowing. The drafts Chevron seeks are not protected by any privilege, because the agreements themselves establish the very rules Chevron alleges were

violated. Determining the precise content of the rules is essential to Chevron's ability to prove DOE's breach of those rules.

**CONCLUSION**

For the foregoing reasons, Chevron respectfully requests that this Court deny the Government's assertion of privilege and require that those documents that fall within the four categories of relevant materials Chevron has identified be disclosed.

Dated: March 15, 2007

Respectfully submitted,

/s/ Lawrence D. Rosenberg

Donald B. Ayer
Lawrence D. Rosenberg
*Counsel of Record*
Louis K. Fisher
Julia C. Ambrose
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Tel.: 202-879-3939
Fax: 202-626-1700

*Counsel for Chevron U.S.A. Inc.*