No. 04-1365C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHEVRON U.S.A. INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

/s/ John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
LESLIE OHTA
ANUJ VOHRA
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:

PAUL T. MICHAEL
ADA L. MITRANI
Trial Attorneys
Office of General Counsel
Department of Energy
Washington, D.C.

APRIL 5, 2007

# TABLE OF CONTENTS

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. The Government's Privileged Documents Log Is Sufficient . . . . . . . . . . . . . . . . . . 5

II. Chevron Has Not Demonstrated That The "Government Misconduct" Exception To The Deliberative Process Privilege Applies To Any Of The Documents In The Government's Privileged Documents Log For Which The Deliberative Process Privilege Is Asserted . . . . . . . . . . . . . . . . . . . . 11

A. The Deliberative Process Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

B. Chevron's Unestablished Breach-Of-Contract Allegation Is Not "Government Misconduct" For Purposes Of The Exception To The Deliberative Process Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. Chevron Has Not Demonstrated That The Crime-Fraud Exception To The Attorney-Client Privilege And Work-Product Doctrine Applies To Any Of The Documents In The Government's Privileged Documents Log For Which The Attorney-Client Privilege And/Or Work-Product Doctrine Is Claimed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

A. The Attorney-Client Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B. The Attorney-Client Privilege In The Government Context . . . . . . . . . . 21

C. Scope Of The Attorney-Client Privilege . . . . . . . . . . . . . . . . . . . . . . . . 22

(1) Requirement That Communication Be Made For Legal Advice Or Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

(2) Attorney-Client Privilege: Exception And Implied-Waiver Doctrines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

(3) The Crime-Fraud Exception To The Attorney-Client Privilege . 24

**TABLE OF CONTENTS (CONT'D)**

D. The Work-Product Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

E. The Crime-Fraud Exception To The Work Product Doctrine . . . . . . . . . 30

F. Chevron Cannot Establish The Applicability Of The Crime-Fraud Exception To The Government's Assertion Of Either The Attorney -Client Privilege Or The Work-Product Doctrine . . . . . . . . . . . . . . . . . . 31

IV. Documents On The Government's Privilege Log Are Protected By The Attorney-Client Privilege Because They Reflect Communications That Were Made For The Purpose Of Obtaining Or Rendering Legal Advice Or Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

V. Chevron's Four "Core Categories" And Suggested Manner Of Proceeding . . . . 46

A. Chevron's "Core Categories" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

(1) Chevron Category #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

(2) Chevron Category #2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

(3) Chevron Category #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

(4) Chevron Category #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

B. The Court Should Conduct An *In Camera* Review Before Ordering Production Of Any Documents . . . . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## TABLE OF AUTHORITIES

### CASES

Abramson v. United States,
39 Fed. Cl. 290 (1997) .......... 11, 12

Alexander v. FBI,
186 F.R.D. 154 (D.D.C. 1999) .......... 16

Alexander v. FBI,
186 F.R.D. 170 (D.D.C. 1999) .......... 15

Alexander v. FBI,
186 F.R.D. 197 (D.D.C. 1999) .......... 7

In re Antitrust Grand Jury,
805 F.2d 155 (6th Cir. 1986) .......... 27

Appeal of Hughes,
633 F.2d 282 (3d Cir. 1980) .......... 41

In re BankAmerica Corp. Securities Litigation,
270 F.3d 639 (8th Cir. 2001) .......... 26, 27, 40

Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.,
220 F.Supp.2d 283 (S.D.N.Y. 2002) .......... 37

Bank of Dearborn v. Saxon,
244 F. Supp. 394 (E.D. Mich. 1965) .......... 17

Burka v. New York City Transit Authority,
110 F.R.D. 660 (S.D.N.Y. 1986) .......... 18

CACI Field Services, Inc. v. United States,
12 Cl.Ct. 680 (1987) .......... 12, 13

Chaudhry v. Gallerizzo,
174 F.3d 394 (4th Cir.), cert. denied, 528 U.S. 891 (1999) .......... 33

Chevron U.S.A., Inc. v. United States,
71 Fed. Cl. 236 (2006) .......... 4

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Cities Service Helix, Inc. v. United States,
216 Ct. Cl. 470 (1978) ........ 22, 33

Cleveland Hair Clinic, Inc. v. Puig,
968 F.Supp. 1227 (N.D. Ill. 1996) ........ 34

Coleman v. American Broadcasting Companies,
106 F.R.D. 201 (D.D.C. 1985) ........ 34

In re County of Erie,
473 F.3d 413 (2d Cir. 2007) ........ passim

Deuterium Corp. v. United States,
19 Cl.Ct. 697 (1990) ........ 21

Deutsch v. Cogan,
580 A.2d 100 (Del.Ch. 1990) ........ 35

Diamond v. Stratton,
95 F.R.D. 503 (S.D.N.Y. 1982) ........ 34

Dominion Cogen, D.C., Inc. v. District of Columbia,
878 F. Supp. 258 (D.D.C. 1995) ........ 15

Federal Savings Bank of Hegewisch v. United States,
55 Fed. Cl. 263 (2003) ........ 23

Ferrara & DiMercurio, Inc. v. St. Paul Mercury Insurance Co.,
173 F.R.D. 7 (D. Mass. 1997) ........ 33

Fidelity & Deposit Co. Of Maryland v. McCulloch,
168 F.R.D. 516 (E.D. Pa. 1996) ........ 6

First Heights Bank, FSB v. United States,
46 Fed. Cl. 312 (2000) ........ passim

Fisher v. United States,
425 U.S. 391 (1976) ........ 22

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Franklin National Bank Securities Litigation,
478 F.Supp. 577 (E.D.N.Y. 1979) ..................................................................... 50

General Electric Co. v. United States,
176 USPQ 83 (1972) ....................................................................................... 22

In re General Motors Corp.,
153 F.3d 714 (8th Cir. 1998) ............................................................................ 28

In re Grand Jury Investigation,
599 F.2d 1224 (3d Cir. 1979) ........................................................................... 30

In re Grand Jury Investigation,
842 F.2d 1223 (11th Cir. 1987) ........................................................................ 26

In re Grand Jury Investigation,
399 F.3d 527 (2d Cir. 2005) ...................................................................... 22, 38, 50

In re Grand Jury Investigation,
445 F.3d 266 (3d Cir.),
cert. denied sub nom. Doe v. United States, 127 S.Ct. 538 (2006) ................................ 25

In re Grand Jury Proceedings,
33 F.3d 342 (4th Cir. 1994) ............................................................................. 31

In re Grand Jury Proceedings,
87 F.3d 377 (9th Cir.), cert. denied, 519 U.S. 945 (1996) ............................................ 26

In re Grand Jury Proceedings,
417 F.3d 18 (1st Cir. 2005), cert. denied, 126 S.Ct. 1025 (2006) ............................ 25, 26

In re Grand Jury Proceedings # 5 Empanelled,
401 F.3d 247 (4th Cir. 2005) ...................................................................... 28, 31

In re Grand Jury Proceedings (Violette),
183 F.3d 71 (1st Cir. 1999) ............................................................................. 25

In re Grand Jury Subpoena,
419 F.3d 329 (5th Cir. 2005) ...................................................................... 27, 30

**TABLE OF AUTHORITIES (CONT'D)**

**CASES (CONT'D)**

In re Grand Jury Subpoenas,
144 F.3d 653 (10th Cir.), cert. denied, 525 U.S. 966 (1998) .......................................... 30

Haines v. Liggett Group Inc.,
975 F.2d 81 (3d Cir. 1992) ............................................................................... 21

Hasbro, Inc.v. Serafino,
168 F.R.D. 99 (D. Mass. 1996) ............................................................................ 7

Hickman v. Taylor,
329 U.S. 495 (1947) ............................................................................................ 28, 43

Hinckley v. United States,
140 F.3d 277 (D.C. Cir. 1998) ........................................................................ 16, 19

In re International Systems and Controls Corp. Securities Litigation,
693 F.2d 1235 (5th Cir. 1982) .......................................................................... 30

Jinks-Umstead v. England,
233 F.R.D. 49 (D.D.C. 2006) ............................................................................ 34

Judicial Watch, Inc. v. DOJ,
432 F.3d 366 (D.C. Cir. 2005) .......................................................................... 30

Kaiser Aluminum & Chemical Co. v. United States,
141 Ct. Cl. 38, 157 F.Supp. 939 (1958) ............................................................. 16

Koen Book Distributors v. Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C.,
212 F.R.D. 283 (E.D. Pa. 2002) ........................................................................ 37

In re Lindsey,
158 F.3d 1263 (D.C. Cir.), cert. denied, 525 U.S. 996 (1998) ...................... 21, 22, 37, 38

Madanes v. Madanes,
199 F.R.D. 135 (S.D. N.Y. 2001) ...................................................................... 34

Marriott International Resorts, L.P. v. United States,
437 F.3d 1302 (Fed. Cir. 2006) ................................................................ 11, 13, 50, 51

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Mattenson v. Baxter Healthcare Corp.,
438 F.3d 763 (7th Cir. 2006) .......... 33

McCartney v. Attorney General,
587 N.W.2d 824 (Mich.App. 1998) .......... 38

Mitchell v. Fishbein,
227 F.R.D. 239 (S.D.N.Y. 2005) .......... 18

Mobil Oil Corp. v. DOE,
102 F.R.D. 1 (N.D.N.Y. 1983) .......... 11

Moody v. IRS,
654 F.2d 795 (D.C. Cir. 1981) .......... passim

NLRB v. Sears, Roebuck & Co.,
421 U.S. 132 (1975) .......... 20

Newman v. State,
863 A.2d 321 (Md. 2004) .......... 26

Olson v. Accessory Controls and Equipment Corp.,
757 A.2d 14 (Conn. 2000) .......... 34

In re Omnicom Group Inc. Securities Litigation,
233 F.R.D. 400 (S.D.N.Y. 2006) .......... 35

Pacific Gas & Electric Company v. United States,
69 Fed. Cl. 784 (2006) .......... 6, 28

Pacific Gas & Electric Co. v. United States,
70 Fed. Cl. 128 (2006) .......... 11, 12

Purcell v. District Attorney for the Suffolk District,
676 N.E.2d 436 (Mass. 1997) .......... 25

Rambus, Inc. v. Infineon Technologies AG,
222 F.R.D. 280 (E.D. Va. 2004) .......... 34

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Redland Soccer Club v. Department of the Army,
55 F.3d 827 (3d Cir. 1995), cert. denied, 516 U.S. 1071 (1996) .................................. 12

Rhone-Poulenc Rorer Inc. v. Home Indemnity Co.,
32 F.3d 851 (3d Cir. 1994) .................................................................................. 21

In re Richard Roe, Inc.,
68 F.3d 38 (2d Cir. 1995) .................................................................................... 25

Sattar v. Motorola, Inc.,
138 F.3d 1164 (7th Cir. 1998) ................................................................................ 7

In re Sealed Case,
676 F.2d 793 (D.C. Cir. 1982) ...................................................................... passim

In re Sealed Case,
754 F.2d 395 (D.C. Cir. 1985) ............................................................................ 39

In re Sealed Case,
107 F.3d 46 (D.C. Cir. 1997) ......................................................................... 31, 40

In re Sealed Case,
121 F.3d 729 (D.C. Cir. 1997) ................................................................ 14, 15, 17

In re Sealed Case,
223 F.3d 775 (D.C. Cir. 2000) ............................................................................ 29

In re Spalding Sports Worldwide, Inc.,
203 F.3d 800 (Fed. Cir. 2000) ........................................................... 23, 24, 25, 33

Sparton Corp. v. United States,
44 Fed. Cl. 557 (1999) ..................................................................................... 21, 29

In re Subpoena Duces Tecum Served Upon the Comptroller of the Currency,
145 F.3d 1422 (D.C. Cir. 1998) ...................................................................... 15, 19

In re Subpoena Served Upon the Comptroller of the Currency,
967 F.2d 630 (D.C. Cir. 1992) ........................................................................ 15, 19

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

In re Sunrise Securities Litigation,
130 F.R.D. 560 (E.D. Pa. 1989) .................................................................. 35, 36

Swidler & Berlin v. United States,
524 U.S. 399 (1998) ............................................................................... 21, 23

Texaco Puerto Rico, Inc v. Department of Consumer Affairs,
60 F.3d 867 (1st Cir. 1995) ................................................................... 14, 15, 16

Trammel v. United States,
445 U.S. 40 (1980) ...................................................................................... 21

Tri-Star Pictures, Inc. v. Unger,
171 F.R.D. 94 (S.D.N.Y. 1997) ...................................................................... 7

Tri-State Hospital Supply Corp. v. United States,
238 F.R.D. 102 (D.D.C. 2006) ...................................................................... 34

United States v. Lake County Bd. of Comm'r,
233 F.R.D. 523 (N.D. Ind. 2005) .......................................................... 16, 17, 18

United States v. Nixon,
418 U.S. 683 (1974) ...................................................................................... 22

United States v. Nobles,
422 U.S. 225 (1975) ...................................................................................... 28

United States v. White,
887 F.2d 267 (D.C. Cir. 1989) ................................................................ 25, 40

United States v. Zolin,
491 U.S. 554 (1989) ...................................................................................... 24

Upjohn Co. v. United States,
449 U.S. 383 (1981) ........................................................................... 21, 22, 30

Valente v. Pepsico, Inc.,
68 F.R.D. 361 (D. Del. 1975) ....................................................................... 36

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

VersusLaw, Inc. v. Stoel Rives, LLP,
111 P.3d 866 (Wash.App. 2005) .......... 36

Walsky Construction Corp. v. United States,
20 Cl.Ct. 317 (1990) .......... 11, 12

Williams v. City of Boston,
213 F.R.D. 99 (D. Mass. 2003) .......... 18

Wolfe v. Department of Health and Human Services,
839 F.2d 768 (D.C. Cir. 1988) .......... 11

Yankee Atomic Electric Co. v. United States,
54 Fed. Cl. 306 (2002) .......... 22

## STATUTES

Freedom of Information Act, 5 U.S.C. § 552 .......... 42

## MISCELLANEOUS

Rules of the Court of Federal Claims:

RCFC 26(b)(1) .......... 29

RCFC 26(b)(3) .......... 28

RCFC 26(b)(4) .......... 29

RCFC 26(b)(5) .......... 6, 10

RCFC 35(b) .......... 29

RCFC 37(a)(2)(A) .......... 8, 10

RCFC 37(a)(2)(B) .......... 7

RCFC 56 .......... 2

**TABLE OF AUTHORITIES (CONT'D)**

**MISCELLANEOUS (CONT'D)**

RCFC Appendix A ¶ 10 .......... 7

Federal Rules of Civil Procedure:

Fed.R.Civ.P. 26(b)(5) .......... 6

Fed.R.Civ.P. 37(a)(2)(A) .......... 7

Treatises:

Restatement (Third) of the Law Governing Lawyers § 82 (2000) .......... 34

## INDEX TO DEFENDANT'S APPENDIX


| Document | Page |
|---|---|
| Letter dated February 28, 2007, from plaintiff's counsel to defendant's counsel .......... | 1 |
| Letter dated March 1, 2007, from defendant's counsel to plaintiff's counsel ................ | 3 |
| Document No. 13 on Government's privilege log (redacted version) ............................ | 4 |
| Document No. 27 on Government's privilege log (redacted version) ............................ | 8 |
| Document No. 28 on Government's privilege log (redacted version) ........................... | 13 |
| Document No. 1613 on Government's privilege log (redacted version) ....................... | 16 |
| Document No. 66 on Government's privilege log (redacted version) ........................... | 18 |
| Document No. 1777 on Government's privilege log (redacted version) ....................... | 19 |
| ASFE Administrative Order No. 96-01 (7/8/96) ("Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process") .............. | 21 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1365C |
| v. | ) | |
| | ) | (Judge Braden) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

PRELIMINARY STATEMENT

Pending before the court is "Chevron U.S.A. Inc.'s Motion to Compel" dated March 15, 2007.[1/] Instead of identifying specific documents in the Government's February 16, 2007 privileged documents log (which identifies 5,086 documents protected by the attorney-client, work-product, and deliberative process privileges[2/]) for which it seeks disclosure, Chevron requests that the Court make a preemptive ruling that the Government identify and produce all documents on the log that fall within four "core" categories of documents described in Chevron's motion. The justification for this request is the alleged inadequacy of the Government's privilege log and the alleged breach by the Government of the Equity Process Agreement, a contract between

---

[1] In this response to Chevron's motion to compel, "Pl. Mem. ____" refers to the referenced page(s) of "Chevron U.S.A. Inc.'s Memorandum of Law in Support of Motion to Compel" dated March 15, 2007; "Def. App. ____" refers to the referenced page(s) of the appendix to this brief; "Document No. ____" refers to the number assigned to a document listed in "Defendant's Privileged Documents Log" dated February 16, 2007; and "Compl. ¶ ____" refers to the referenced paragraph(s) of the "Complaint" filed on August 20, 2004.

[2] The Government has since produced two supplemental privileged document logs, identifying an additional 170 documents that are responsive to Chevron's document requests and protected by the attorney-client, work-product, and/or deliberative process privileges. Each log identifies, where possible, the date, author(s), recipient(s) and applicable privilege(s) for a document, as well as a description of the document's subject matter and whether a redacted version of the document has been produced.

Chevron and the Department of Energy (DOE) relating to the equity finalization process for the Elk Hills Field, which supposed breach of contract Chevron characterizes as "misconduct."

Chevron's motion to compel should be denied. Chevron has not identified any problems with the Government's privileged documents log, aside from minor errors in a handful of documents, that prevent Chevron from conducting a "meaningful review" of the log.

Chevron's "misconduct" argument, which is based upon an alleged breach of contract, also is devoid of merit. The breach-of-contract allegation is based entirely upon the unproven assumption that DOE Deputy General Counsel Mary Egger and/or attorneys on her staff were part of the "DOE field equity technical team" that is the subject of a prohibition against *ex parte* communications set forth at ¶ B.4 of the Equity Process Agreement, which the Government disputes. The issue of whether Ms. Egger and/or any subordinate attorneys were part of the "DOE field equity technical team" within the meaning of ¶ B.4 of the Equity Process Agreement is a central issue in this litigation that involves a question of contract interpretation which the Court has yet to decide. It would be inappropriate for the Court to resolve that issue in the context of Chevron's pending discovery motion, as opposed to in the context of a dispositive motion pursuant to RCFC 56 or, if necessary, after trial.

Even assuming, for the sake of argument, that the Court could find that DOE breached the Equity Process Agreement as alleged by Chevron, its motion should be rejected. Chevron's motion is without legal support because the "misconduct" exceptions to the attorney-client privilege, work-product doctrine, or deliberative process privilege do not apply to our assertion of those privileges. While courts have recognized a "government misconduct" exception to the deliberative process privilege and a "crime-fraud" exception to the attorney-client privilege and

work-product doctrine, a breach of contract is not tantamount to the misconduct contemplated by those exceptions.

Chevron's four categories, moreover, are overbroad and seek the production of documents that are not relevant to Chevron's claims or reasonably related to the "misconduct" exceptions invoked by Chevron. The Government should not be required to justify a privilege claim with respect to any document on its privilege log unless and until such time as Chevron has specifically identified the documents on the log that Chevron contends are not exempt from disclosure. This includes the preparation of a declaration by an appropriate DOE official regarding documents on the log for which the deliberative process privilege has been tentatively identified. If and when Chevron does identify allegedly non-privileged documents, the Court should conduct an *in camera* review of the documents and resolve the Government's privilege claim(s), with the benefit of a declaration by an appropriate DOE official in the case of the deliberative process privilege.

## BACKGROUND

This case involves the alleged breach by DOE of an agreement between Chevron and DOE, referred to by the parties as the Equity Process Agreement, which established a process to determine the equity interests of Chevron and DOE in an oil-and-gas unit near Bakersfield, California, known as the Elk Hills Field. There are four distinct zones in the Elk Hills Field: the Dry Gas Zone, the Carneros Zone, the Shallow Oil Zone, and the Stevens Zone. A final determination of the parties' equity interests was to be made for each zone. The determination of the equity interests for each zone was to be made by the DOE Assistant Secretary for Fossil Energy (ASFE). The ASFE's decision in each instance was to take into consideration the rec-

ommendation of the Independent Petroleum Engineer (IPE) selected by Chevron and DOE (Netherland, Sewell & Associates, Inc. (NSAI)). See Chevron U.S.A., Inc. v. United States, 71 Fed. Cl. 236 (2006) (opinion denying Government's motion to dismiss).

The complaint filed by Chevron in August 2004 contains claims for breach of the Equity Process Agreement between Chevron and DOE. For its first cause of action, Chevron alleges that Mary Egger, DOE's Deputy General Counsel for Technology Transfer and Procurement and unidentified "others acting with or under her direction" engaged in *ex parte* communications prohibited by the Equity Process Agreement by "serving both as attorney for the DOE equity team and as an advisor to the Assistant Secretary decision maker." Compl. ¶ 60. Chevron also alleges that, "on information and belief," the ASFE engaged in *ex parte* communications prohibited by the Equity Process Agreement with the IPE and with unidentified "engineers on DOE's equity team." Compl. ¶¶ 61, 62. For its second cause of action, Chevron alleges that, in performing the Equity Process Agreement, DOE breached the implied covenant of good faith and fair dealing. Compl. ¶¶ 67-69.

Of particular relevance to Chevron's motion to compel is the following limitation contained in the Equity Process Agreement regarding "consultation" by the AFSE with the "DOE field equity technical team" concerning "equity redetermination-related matters":

> The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an ex parte basis. Any written materials submitted to the ASFE by either party shall be provided to the other party. The provisions of this paragraph B.4 shall cease to

> apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.

Id., ¶ B.4. Chevron uses this clause as the base from which it leaps to the two unestablished, and we believe unsupported, presumptions that are the premise of its motion to compel. Its first presumption is that inappropriate *ex parte* communication occurred between the "DOE field equity technical team" and the ASFE. No evidence has been presented to the Court regarding that question. More specifically, Chevron's second unestablished assumption is that Mary Egger, the DOE Deputy General Counsel for Technology Transfer and Procurement, and/or attorneys on her staff, were a part of the "DOE field equity technical team" referred to in this provision, a proposition that the Government also disputes. Again, no evidence has been presented to the Court upon this question. Chevron's motion, thus, assumes that Chevron has first prevailed upon its allegation that Ms. Egger was a member of the "DOE field equity technical team," and then also that Chevron has prevailed upon its allegation that there was improper *ex parte* communication between the team and the ASFE. Unfortunately, these are the ultimate questions in this case upon which the Court has not examined the evidence and should not rule in the presumptive context of Chevron's motion. Rather, Chevron's motion more properly presents the questions of whether Chevron can demonstrate entitlement to the documents it requests, and the proper manner for the Court to assess application of the asserted privileges to the requested documents.

## ARGUMENT

### I. The Government's Privileged Documents Log Is Sufficient.

Chevron states that the Government's privileged documents log "is largely uninformative and is in many instances unintelligible." Pl. Mem. 2. As a result, Chevron suggests that

the Court rule that the Government cannot withhold as privileged four "core categories" of documents and that the Government produce all such documents as well as produce a "revised privilege log" containing any documents it contends do not fall within those four categories. Pl. Mem. 3.

In support of its suggested proposal, Chevron identifies 12 documents on the log that "exemplify plain inaccuracies" or "are too vague and incomplete for meaningful review." Id. at 10. There are 5,086 documents identified in the Government's privileged documents log served upon Chevron's counsel on February 16, 2007. The 12 documents that Chevron has identified which constitute the basis for its criticism of the log represent less than one-quarter of one percent of the total identified documents. Yet, based solely on those 12 documents, Chevron argues that it is relieved of its responsibility to specifically identify documents it seeks to compel production despite the Government's privilege assertions. Id. at 3.

At the outset, we note that RCFC 26(b)(5), which sets forth the requirements for a privilege log, "does not attempt to define for each case what information must be provided . . . Details concerning time, persons, general subject matter, etc. may be appropriate." Pacific Gas & Electric Company v. United States, 69 Fed. Cl. 784, 812 (2006) (quoting the Advisory Committee Notes for Rule 26(b)(5) of the Federal Rules of Civil Procedure[3/]). Such details, however, "may be unduly burdensome when voluminous documents are claimed to be privileged or protected." Fidelity & Deposit Co. Of Maryland v. McCulloch, 168 F.R.D. 516, 523 n.10 (E.D. Pa. 1996) (quoting the Advisory Committee Notes to Fed.R.Civ.P. 26(b)(5)). Despite the voluminous

[3] The court in Pacific Gas noted that "RCFC 26(b)(5) and Rule 26(b)(5) of the Federal Rules of Civil Procedure are identical and thus the court uses federal courts' interpretation of the latter as persuasive authority." 69 Fed. Cl. at 812 n.27.

nature of the Government's privilege log in this matter, the log, in every instance possible, provides identification of persons, dates, and the specific subject matter of the document. As such, Chevron is without basis to question the log's sufficiency.

Moreover, Chevron has failed to comply with the requirements of RCFC 37(a)(2)(B) which provides that, in any motion to compel the production of documents, the party seeking to compel production "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party not making the disclosure in an effort to secure the disclosure without court action." RCFC 37(a)(2)(B); see also RCFC Appendix A ¶ 10 ("A motion to compel . . . shall contain a statement that the movant has in good faith conferred or attempted to confer to resolve the matters in dispute."). The purpose of the meeting requirement between parties "is to force litigants to attempt to resolve, or [at] least narrow, the disputed issues to prevent the unnecessary waste of time and effort on any given motion." Alexander v. FBI, 186 F.R.D. 197, 199 (D.D.C. 1999) (interpreting local district court rule); see also Hasbro, Inc. v. Serafino, 168 F.R.D. 99, 101 (D. Mass. 1996) (construing analogous Fed.R.Civ.P. 37(a)(2)(A)). Courts "will not condone a violation [of the meet-and-confer requirement] simply because the potential for compromise appears bleak." Tri-Star Pictures, Inc. v. Unger, 171 F.R.D. 94, 99 (S.D.N.Y. 1997). Where a party moving to compel does not attempt to resolve the disputes prior to judicial intervention, courts have not hesitated to deny the motion to compel on this ground. See, e.g., Sattar v. Motorola, Inc., 138 F.3d 1164, 1171-72 (7th Cir. 1998) (affirming denial of motion to compel for failure to confer).

Though the Government's original privileged documents log was served on Chevron's counsel on February 16, 2007, at no point prior to the March 15, 2007 filing of its motion to

compel did Chevron's counsel attempt, pursuant to RCFC 37(a)(2)(A), to discuss the issues raised or seek clarification of any of the document entries Chevron alleges are insufficient. If Chevron had done so, defendant's counsel either could have formally corrected the questioned entries in the privilege log or, at the very least, provided additional explanation to clear up any confusion or inaccuracies.[4/] This is especially true in light of the fact that in the 12 documents Chevron identifies, the errors are easily corrected and arguably harmless. For example:

- Chevron states that Document No. 13 on the privileged documents log is incorrectly dated April 2, 1956. Pl. Mem. 10. On the redacted version of the document - a facsimile cover sheet and accompanying letters - that was provided to Chevron along with the privilege log, however, the correct date, October 20, 1999, is clearly visible. (The redacted version of Document No. 13 is attached hereto as Def. App. 4-7). Moreover the error in dating is understandable, as the 4/2/56 date represents the date of the letter that is included with the redacted fax cover sheet. Chevron has not explained how the fact that the log entry is misdated prevents it from conducting a "meaningful review" of the document itself. Pl. Mem. 10.

- Chevron states that Document Nos. 27 and 28 on the privilege log are incorrectly dated May 19, 1981 and August 28, 1981. Id. On the redacted versions of these documents - facsimile cover sheets and accompanying documents - that were provided to Chevron along with the privilege log, however, the correct dates, October 3, 2000 for both documents, are clearly visible. (The redacted versions of Document Nos. 27 and 28 are attached hereto as Def. App. 8-15). Chevron has not explained how the fact that the log entries are misdated prevents it from conducting a "meaningful review" of the documents themselves. Pl. Mem. 10.

- Chevron states that Document No. 1613 on the privilege log is incorrectly identified because the log "indicates a facsimile transmittal from Burzlaff to Gangle, Holcomb, Schuessler, and Thorpe," "but that the redacted document itself indicates that outside counsel faxed it to Mary Egger, from whose file

---

[4] Indeed, on February 28, 2007, Chevron's counsel sent defendant's counsel a written request for a clarification of certain documents ostensibly withheld from production. Def. App. 1-2. Defendant's counsel promptly responded to that request on March 1, 2007, explaining that the Government had in fact produced the documents in question and providing Chevron's counsel with an additional copy of those documents. Def. App. 3.

it was recovered." Id. The privilege log, however, correctly identifies the sender of the facsimile and the intended recipients. (The redacted version of Document No. 1613 is attached hereto as Def. App. 16-17). Although Chevron is correct that the document was recovered from Ms. Egger's files,[5] the identification of the author, original recipients and subject matter of the documents is correct. It is unclear how this *correct* identification prevents Chevron from conducting a "meaningful review" of the document itself. Pl. Mem. 10.

- Chevron states that Document No. 66 identified on the privilege log "is too vague or incomplete for meaningful review" because it is "described as '[a]ttorney-client communication regarding alleged ex parte communication redacted'" and "dated 10/12/95, prior to the execution of the EPA." Id. On the redacted version of the document - an email from Gary Latham to Mary Egger and Robert Kripowicz - that was provided to Chevron along with the privilege log, it is clear that the actual date of the email is October 12, 1999, two years after the execution of the EPA. (The redacted version of Document No. 66 is attached hereto as Def. App. 18). Moreover it is clear from looking at the document that only three lines of the email were redacted. Therefore, to the extent that Chevron felt that the document description was insufficient, defendant's counsel would have certainly been willing, had Chevron requested, to provide a more detailed description of what was clearly not an extensive communication.

- Chevron states that Document No. 1777 on the privilege log is incorrectly identified because it describes the "document as an 8/4/00 'faxed memo from outside counsel to the EFT regarding Stevens Zone issue' and indicates documents was authored by Thorpe and transmitted to Gangle, Burzlaff, and Olpin (making no mention of Egger); document is in fact a fax transmittal sheet from Thorpe to Egger enclosing memo to Gangle and Burzlaff." Pl. Mem. 10. On the redacted version of the document - a facsimile cover sheet and accompanying page - however, it is clear that the error in the log is simply because the author and recipient were identified for the second page (which contains the redacted content), not the first. (The redacted version of Document No. 1777 is attached hereto as Def. App. 19-20). Chevron recognized this by pointing out that the memo from Gangle to Burzlaff accompanies the fax. Pl. Mem. 10. Chevron has not explained how this error prevents it from conducting a "meaningful review" of the document itself. Id.

---

[5] That the document came from Ms. Egger's files is indicated by the fact that the document is numbered, for purposes of this litigation, "CME013 1339." "CME" is the Government's designation for documents that were produced by Ms. Egger in this matter.

Given that these are representative of the inaccuracies and errors that Chevron has identified, its statement that it cannot conduct a "meaningful review" of the privilege log is tenuous at best. Moreover, despite the alleged insufficiencies in defendant's privileged log, Chevron has managed to use the log to identify at least fifteen documents that it contends are relevant to its claims regarding: (1) "Ms. Egger's Role as DOE Equity Team Member and Leader"; (2) "Ms. Egger's Role as Advisor to the ASFE"; and (3) "Other DOE Ex Parte Communications." Pl. Mem. 11-12.

Considering the number of responsive documents involved in this lawsuit, the identifications in the Government's 5000-document privilege log undoubtedly satisfy the requirements of RCFC 26(b)(5). In light of the fact that Chevron has already reviewed the Government's privilege log and identified specific documents relevant to its claims, and considering that Chevron made no attempt to comply with the "meet-and-confer" requirements of RCFC 37(a)(2)(A) (a meeting that certainly would have expedited Chevron's review of the privilege log), Chevron's requested order, requiring that the Government turn over *all* documents identified and provide a revised privilege log withholding only such documents for which the Government can establish an "extraordinary or specifically compelling basis," Pl. Mem. 3, is entirely without merit and premature. Chevron has not provided any cogent reasons for its request that this Court enter an order that essentially would disregard standard procedures for the adjudication of privilege disputes and impose upon the Government an arbitrarily higher standard for the assertion of appropriate privileges.

## II. Chevron Has Not Demonstrated That The "Government Misconduct" Exception To The Deliberative Process Privilege Applies To Any Of The Documents In The Government's Privileged Documents Log For Which The Deliberative Process Privilege Is Asserted.

### A. The Deliberative Process Privilege

The deliberative process privilege, a privilege unique to the Government, is "a subset of the executive privilege." First Heights Bank, FSB v. United States, 46 Fed. Cl. 312, 320 (2000). "The purpose of the privilege is to encourage frank discussion of ideas and policies, thereby ensuring the quality of governmental decision making." Mobil Oil Corp. v. DOE, 102 F.R.D. 1, 5 (N.D. N.Y. 1983); accord Wolfe v. Department of Health and Human Services, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc) (The deliberative process privilege is predicated upon the recognition "that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl.").

To assert the deliberative process privilege, the Government must follow a three-step process: (1) the head of the agency, or the agency official to whom the agency head has delegated such authority, must invoke the deliberative process privilege upon the agency's behalf over the requested documents or information within the agency's control after personal consideration; (2) the head of the agency or official to whom the authority to assert the deliberative process has been delegated must state with particularity what information is subject to the privilege; and (3) the agency must provide the Court with precise and certain reasons for maintaining the confidentiality of the requested documents or information. See Marriott International Resorts, L.P. v. United States, 437 F.3d 1302, 1308 (Fed. Cir. 2006); Pacific Gas & Electric Co. v. United States, 70 Fed. Cl. 128, 134 (2006); Abramson v. United States, 39 Fed. Cl. 290, 294 (1997); Walsky

Construction Corp. v. United States, 20 Cl.Ct. 317, 320 (1990). These procedural requirements generally are satisfied by the production of an affidavit or declaration of the agency head or the agency official to whom the authority to assert the deliberative process privilege has been delegated. Pacific Gas, 70 Fed. Cl. at 134 n.8; Abramson, 39 Fed. Cl. at 294 n.3.

To protect documents under the deliberative process privilege, the Government must satisfy two fundamental legal requirements. *First*, "the information sought must be pre-decisional, or address activities antecedent to the adoption of an agency policy." Abramson, 39 Fed. Cl. at 294 (quoting Walsky, 20 Cl. Ct. at 320). *Second*, "the information must be deliberative in nature, containing opinions, recommendations, or advice pertaining to agency decisions." Abramson, 39 Fed. Cl. at 294-95 (internal quotation marks omitted); accord Pacific Gas, 70 Fed. Cl. at 133; Walsky, 20 Cl.Ct. at 320.

The deliberative process privilege is not absolute; it can be "overcome upon a showing of evidentiary need weighed against the harm that may result from disclosure." Abramson, 39 Fed. Cl. at 295 (quoting CACI Field Services, Inc. v. United States, 12 Cl.Ct. 680, 687 (1987)); accord Marriott, 437 F.3d at 1307 ("[A] showing of compelling need can overcome the qualified deliberative process privilege."); Walsky, 20 Cl.Ct. at 320 ("Even though the Government properly asserts the [deliberative process] privilege, plaintiff nevertheless may discover the material at issue by showing a compelling need."). The party seeking discovery of documents or other evidence to which the deliberative process privilege applies (Chevron here) "bears the burden of showing that its need for the documents outweighs the government's interest" in non-disclosure. Redland Soccer Club v. Department of the Army, 55 F.3d 827, 854 (3d Cir. 1995), cert. denied, 516 U.S. 1071 (1996). In resolving a deliberative process privilege claim, a court "may conduct

in-camera review of documents." Marriott, 437 F.3d at 1307.

B. Chevron's Unestablished Breach-Of-Contract Allegation Is Not "Government Misconduct" For Purposes Of The Exception To The Deliberative Process Privilege.

Although Chevron has the burden of showing that its need for the documents outweighs the Government's interest in non-disclosure, it attempts to avoid that burden by assuming that an exception to the deliberative process privilege applies here. In its motion, Chevron assumes that government misconduct occurred . There is no basis for Chevron's claim.

To begin with, Chevron's misconduct claim is based upon the unestablished assumption that Mary Egger (the DOE Deputy General Counsel for Technology Transfer and Procurement) and/or subordinate attorneys were part of the "DOE field equity technical team" to which the prohibition against *ex parte* communications of the Equity Process Agreement applies.[6/] The Government disputes this and Chevron has not provided the Court with anything that conclusively establishes its contention, such as an admission by the Government that Ms. Egger or any subordinate attorney was a part of the "DOE field equity technical team." The Court has yet to make a finding as to whether ¶ B.4 of the Equity Process Agreement was breached as alleged by Chevron and it would be premature for the Court to do so in the context of Chevron's discovery motion, inasmuch as there is not a fully-developed record for decision upon that issue.[7/] Under

---

[6] To the extent that Chevron's motion to compel also concerns *ex parte* communications with the IPE, allegedly in breach of the Equity Process Agreement, it is without merit because, as discussed below at section VIII of the Argument, the Government has not asserted any privileges regarding, or withheld from production, documents relating to communications between DOE and the IPE, *ex parte* or otherwise.

[7] Courts understandably are reluctant to resolve the merits of a claim at the discovery stage of litigation. See CACI, 12 Cl. Ct. at 684 ("Defendant is asking the court at the discovery stage to find conclusively that the information cannot possibly be relevant, or lead to other relevant

such circumstances, invoking a "misconduct" exception to the deliberative process privilege or any other evidentiary immunity would threaten to swallow the privilege.[8]

In any event, a breach of contract is not "government misconduct" for purposes of the exception to the deliberative process privilege. Chevron asserts that DOE violated a "required" "wall of separation" between the "advocacy team responsible for maximizing DOE's equity percentage for the Elk Hills Field" and "the ASFE's team responsible for fairly adjudicating the Chevron-DOE equity dispute" and that such violation implicates the "government misconduct" exception to the deliberative process privilege.[9] Pl. Mem. 20. In support of this argument, Chevron relies upon In re Sealed Case, 121 F.3d 729, 741 (D.C. Cir. 1997) (Sealed Case IV). In that case, the court of appeals stated that "where there is reason to believe that the documents sought may shed light on government misconduct, '[the deliberative process privilege] is routinely denied,' on the grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, effective government.'" 121 F.3d at 738 (citing Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, 60 F.3d 867, 885 (1st Cir. 1995)).

---

information. That the court is unwilling to do.").

[8] See, e.g., Moody v. IRS, 654 F.2d 795, 800 n.17 (D.C. Cir. 1981) ("We stress that in this case, [the IRS] has admitted engaging in the conduct which forms the basis of the charge of unprofessional conduct. We are therefore not dealing with a situation where disclosure is sought for the purpose of determining whether such misbehavior has in fact occurred. The latter case involves an entirely different problem–an exception which threatens to swallow the rule–than is presented in this case.").

[9] The Equity Process Agreement did not contain the term, or any reference to, a "wall of separation." It prohibited certain *ex parte* communications between the ASFE and the "DOE field equity technical team" relating to equity finalization matters. Equity Process Agreement, ¶ B.4.

Sealed Case IV addressed the propriety of the assertion by the White House of the executive and deliberative process privileges to prevent the disclosure of certain documents in response to a grand jury subpoena issued as part of a criminal investigation of former Secretary of Agriculture Mike Espy by the Office of the Independent Counsel. 121 F.3d at 734-35. The court noted that the documents withheld likely contained evidence that would help the grand jury determine whether Espy had made false statements to the White House. Id. at 761. The court, however, did not suggest that a breach of contract, as Chevron alleges here, could constitute "government misconduct" for purposes of the exception to the deliberative process privilege.

Indeed, misconduct in the context of evading the deliberative process privilege is criminal or quasi-criminal conduct, not merely breaching a contract. None of the cases Chevron cites in support of its argument regarding the government misconduct exception discuss misconduct in the context of an alleged breach of contract. See, e.g., In re Subpoena Duces Tecum Served Upon the Comptroller of the Currency, 145 F.3d 1422 (D.C. Cir. 1998) (plaintiff trustee in bankruptcy alleging that FDIC undertook numerous fraudulent transactions to reduce its losses as receiver); Alexander v. FBI, 186 F.R.D. 170, 177 (D.D.C. 1999) (considering application of the exception in light of allegations of FBI mishandling and destruction of evidence and a "so-called political cover-up"); In re Subpoena Served Upon the Comptroller of the Currency, 967 F.2d 630, 632 (D.C. Cir. 1992) (plaintiffs alleging that defendant conspired to issue false and misleading statements in order to inflate stock price, in violation of Securities and Exchange Act of 1934); Dominion Cogen, D.C., Inc. v. District of Columbia, 878 F. Supp. 258, 268 (D.D.C. 1995) (plaintiffs alleging denial of building permits based upon "illegitimate political motives"). In Texaco Puerto Rico, the First Circuit considered the district court's denial of the motion of

the Puerto Rico Department of Consumer Affairs for restitution of alleged excess profits earned by three oil companies, 60 F.3d at 873, and upheld the court's application of the government misconduct exception in light of a showing of "arbitrariness" and "discriminatory motives" by the Department. Id. at 886.

Most tellingly, in Kaiser Aluminum & Chemical Co. v. United States, 141 Ct. Cl. 38, 50-51, 157 F.Supp. 939, 947 (1958), the Court of Claims recognized that, while there might be exceptions to the deliberative process privilege that could be invoked upon a "definite showing of necessity" that would require a review of the designated privileged materials by a judge, no such examination was necessary where "no fraud is charged, no duality of interest, *only a breach of the terms of open contracts*." (Emphasis added). Chevron alleges nothing more than a breach of the terms of an open contract.

Simply stated, the reason Chevron cites no cases in which an alleged breach of contract was sufficient to invoke the government misconduct exception to the deliberative process privilege is because a breach is not the type of conduct to which the government misconduct exception applies. Instead, some courts have held that the government misconduct exception requires a showing of improper motive behind a Government action or decision. See Hinckley v. United States, 140 F.3d 277, 286 (D.C. Cir. 1998) (refusing to apply the exception in light of plaintiff's failure to show "any improper motivations on the part of the Review Board"); United States v. Lake County Bd. of Comm'r, 233 F.R.D. 523, 527 (N.D. Ind. 2005) ("If a party can produce 'some evidence,' including circumstantial evidence, that the government had improper motivations, the government misconduct exception allows the party to conduct discovery on the question of intent.") (citing Alexander v. FBI, 186 F.R.D. 154, 165 (D.D.C. 1999)). Cf. Texaco Puer-

to Rico, 60 F.3d at 886 (upholding a district court finding of government misconduct based upon a finding of "discriminatory motives" by the government).

In Lake County Board, the court considered the application of the government misconduct exception to the deliberative process privilege in light of plaintiff's allegations that defendants had fired two employees and denied certain zoning requests based upon racial biases and in an attempt to thwart the development of an affordable housing development. 233 F.R.D. at 525. The court found that plaintiffs had presented enough evidence to show that at least one of the firings was improper in its intent and had satisfied its evidentiary burden to compel the requested discovery. Id. at 529. The government misconduct exception is also applied in instances where the invocation of the deliberative process privilege could subvert or frustrate a criminal investigation. See Sealed Case IV, 121 F.3d at 761; Bank of Dearborn v. Saxon, 244 F. Supp. 394, 402 (E.D. Mich. 1965) (denying Secretary of Treasury's privilege claim where "the Comptroller's office sought to cloak an illegal act in the habiliments of legal propriety and good faith").

In contrast, here, Chevron states that "the government misconduct for which [it] seeks redress is, primarily, repeated violation of the wall of separation between, on the one hand, the advocacy team responsible for maximizing DOE's equity percentage of the Elk Hills field and, on the other hand, the ASFE's team responsible for fairly adjudicating the Chevron-DOE equity dispute. In particular, these two teams engaged in ex parte communications expressly forbidden by the [Equity Process Agreement]." Pl. Mem. 20-21. Although making these allegations, Chevron does not argue that any of the communications it has identified were in any way nefarious or improperly motivated. Instead, Chevron simply argues that such communications, based upon *Chevron's* interpretation of the Equity Process Agreement, constitute a breach of contract.

Regardless of the merits of Chevron's underlying claim of breach, it has failed to establish (or even allege) the Government misconduct necessary to give rise to the exception to the deliberative process privilege.

Chevron also argues that the deliberative process privilege is inapplicable here because the ASFE decision-making process is a subject of the litigation. Pl. Mem. 22. This argument is equally unavailing. In neither its complaint nor its motion to compel has Chevron raised any issue with the *merits* of the ASFE decisions. Instead, Chevron merely alleges that certain communications prior to the issuance of those decisions constituted a breach of the Equity Process Agreement. In support of its argument regarding the inapplicability of the deliberative process privilege in lawsuits involving the decision-making process, Chevron relies upon various district court decisions. However, in each case cited by Chevron, the court considered whether the *actual decision* or action in question was based upon an improper or impermissible motivation, not whether an action taken *prior* to issuance of the decision was a breach of an agreement. See Burka v. New York City Transit Authority, 110 F.R.D. 660 (S.D.N.Y. 1986) (plaintiffs alleging that New York City Transit Authority's drug testing policy was arbitrary and constitutionally infirm); Williams v. City of Boston, 213 F.R.D. 99 (D. Mass. 2003) (plaintiff, police officer, alleging that actions taken against him by Boston Police Department were retaliatory and racially motivated); Lake County, 233 F.R.D. at 523; Mitchell v. Fishbein, 227 F.R.D. 239 (S.D.N.Y. 2005) (plaintiff, an attorney, alleging that decision by New York Attorney Screen Board to deny his recertification was improper and racially motivated).

Chevron's lawsuit, unlike the cases it relies upon, does not challenge the ASFE's decisions. Instead, Chevron seeks documents related to the ASFE's decisions simply to support its

claim of a breach of the Equity Process Agreement. As such, the deliberative process privilege is applicable. See Subpoena Duces Tecum, 145 F.3d at 1424 (noting that the deliberative process privilege was created for those cases where the intent behind a Government decision is not the subject of and only "collateral to the plaintiff's suit") (citing Subpoena Served Upon Comptroller of the Currency) (shareholders sought Comptroller's bank examination reports to prove fraud charges against corporation)). In Subpoenas Duces Tecum, the court considered the assertion of the deliberative process privilege by the Comptroller of Currency where a trustee in bankruptcy for the Bank of New England Corporation brought a lawsuit alleging fraud.[10] 145 F.3d at 1423. The trustee claimed that the FDIC, as the bank's receiver and acting in concert with the Federal Reserve Board and Comptroller, improperly pressured the Corporation's management to transfer assets to the bank to reduce its own losses. Id. The court denied the Comptroller's invocation of the privilege, agreeing with the trustee's argument that the "deliberative process privilege is not appropriately asserted . . . when a plaintiff's cause of action turns on the government's *intent*." Id. at 1424 (emphasis added). Unlike the matter before the court in Subpoena Duces Tecum, however, Chevron's lawsuit does not turn upon the intent behind the ASFE decisions.

If Chevron were to prevail in its argument that the government misconduct exception to the deliberative process privilege is applicable in those cases where plaintiff alleges nothing more than a willful breach of contract, the privilege will cease to have any purpose, at the very least, in the context of Government contract litigation. In Hinckley, the D.C. Circuit noted that "the deliberative process privilege would soon be meaningless, if all someone seeking information

[10] As with each of the cases cited by Chevron in support of its assertion of the government misconduct exception, Subpoena Duces Tecum does not address the exception in light of an alleged of a breach of contract.

otherwise protected under the privilege had to establish is that there was disagreement within the government entity at some point in the decisionmaking process." 140 F.3d at 285. That same concern is applicable here. If all a party seeking information otherwise protected under the privilege had to establish was a potential breach of contract, the deliberative process privilege would be meaningless, especially in the numerous cases before this Court, which are founded upon a contract with the United States. The effect would be to chill the "frank and candid deliberations among executive agencies" that the privilege is intended to protect. First Heights, 46 Fed. Cl. at 320 (citing NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150-51 (1975)). Because Chevron's motion asks this Court to so infringe upon the deliberative process privilege that it would harm the deliberations the privilege is intended to protect, the motion should be denied.

III. Chevron Has Not Demonstrated That The Crime-Fraud Exception To The Attorney-Client Privilege And Work-Product Doctrine Applies To Any Of The Documents In The Government's Privileged Documents Log For Which The Attorney-Client Privilege And/Or Work-Product Doctrine Is Claimed.

Similar to Chevron's overbroad interpretation of the government misconduct exception to the deliberative process privilege, Chevron also significantly overstates the nature of the crime-fraud exception to the attorney-client privilege and the work-product doctrine. In fact, although we demonstrate below that courts will not withdraw the protection of this privilege or the doctrine without an in camera review of the requested documents, Chevron asks this Court to "presumptively" void these protections as asserted by the Government. Pl. Mem. 36. Because Chevron's request lacks legal or factual support, it should be denied. In its motion, Chevron distorts the law regarding the attorney-client privilege and the work-product doctrine. To clarify Chevron's distortions, we provide the following detailed analysis of the applicable law for each.

A. The Attorney-Client Privilege

The attorney-client privilege "is one of the oldest recognized privileges for confidential communications." Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998). The attorney-client privilege, like other testimonial privileges, is "rooted in the imperative need for confidence and trust." Trammel v. United States, 445 U.S. 40, 51 (1980). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Id. "As the attorney-client privilege serves the interests of justice, it is worthy of maximum legal protection." Rhone-Poulenc Rorer Inc. v. Home Indemnity Co., 32 F.3d 851, 862 (3d Cir. 1994). "Although the [attorney-client] privilege belongs to the client, and only the client may waive it, an attorney may assert the privilege on the client's behalf." Haines v. Liggett Group Inc., 975 F.2d 81, 90 (3d Cir. 1992).

B. The Attorney-Client Privilege In The Government Context

Courts generally recognize the existence of a government attorney-client privilege in civil litigation between the Government and private litigants. See, e.g., In re Lindsey, 158 F.3d 1263, 1271 (D.C. Cir.) (noting the existence of "a government attorney-client privilege that is rather absolute in civil litigation"), cert. denied, 525 U.S. 996 (1998); Sparton Corp. v. United States, 44 Fed. Cl. 557, 566 (1999) ("It is well established that communications between government agencies and agency counsel are protected by the [attorney-client] privilege so long as they are made confidentially and for the purpose of obtaining legal advice for the agency."); Deuterium

Corp. v. United States, 19 Cl.Ct. 697, 699 (1990) (communications from Government employees at all levels to Government lawyers protected by attorney-client privilege); General Electric Co. v. United States, 176 USPQ 83, 84 (1972) ("the Government is entitled to the same privileges accorded other litigants, including the attorney-client privilege and the work product privilege"). The "government's claim to the protections of the attorney-client privilege is on a par with the claim of an individual or a corporate entity." In re County of Erie, 473 F.3d 413, 419 (2d Cir. 2007).[11/]

C. Scope Of The Attorney-Client Privilege

Testimonial privileges, such as the attorney-client privilege, "are not lightly created nor expansively construed, for they are in derogation of the search for truth." United States v. Nixon, 418 U.S. 683, 710 (1974). The attorney-client privilege, therefore, "applies only where necessary to achieve its purpose." Fisher v. United States, 425 U.S. 391, 403 (1976). That said, "where the attorney-client privilege applies, its protections must be reliably enforced in order to effectuate its goal of promoting compliance with the law." In re Grand Jury Investigation, 399 F.3d 527, 535 (2d Cir. 2005). As the Supreme Court explained in Upjohn:

[11] In litigation such as the present suit, the Department of Justice is the attorney and the agency (DOE here), including its in-house counsel, is the client for purposes of applying the attorney-client privilege. Cities Service Helix, Inc. v. United States, 216 Ct. Cl. 470, 476 (1978); General Electric, 176 USPQ at 85. Within DOE, the General Counsel is the attorney for non-lawyer officials of the agency involved in the matter or transaction at issue (here the Elk Hills equity finalization process). See Cities Service, 216 Ct. Cl. at 476 ("the general counsel or solicitor of the operating agency is the attorney vis-a-vis the non-lawyer officials of that agency involved in the matter or transaction"); Lindsey, 158 F.3d at 1268 ("In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer."); Yankee Atomic Electric Co. v. United States, 54 Fed. Cl. 306, 313 (2002) ("It is clear that an agency and its lawyers may enjoy the type of relationship that would entitle them to the attorney-client privilege, regardless of whether the agency's lawyer serves as in-house agency counsel, as an attorney employed by the Department of Justice, or as outside, private counsel." (citations omitted)).

> [I]f the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.

449 U.S. at 393 (criticizing test for attorney-client privilege in corporate context that restricts availability of privilege to corporate officials who play a "substantial role" in deciding and directing a corporation's legal response).[12/]

(1) Requirement That Communication Be Made For Legal Advice Or Services

The attorney-client privilege "does not shield all information that a client divulges to an attorney, or vice versa, but rather is limited to instances where legal advice is sought or rendered." Federal Savings Bank of Hegewisch v. United States, 55 Fed. Cl. 263, 266 (2003). The "central inquiry is whether the communication was one that was made for the purpose of obtaining legal advice or services." In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 805 (Fed. Cir. 2000).

Legal advice is broader than interpretation and application of legal principles to guide future conduct or to assess past conduct and it is not demarcated by a bright line. Therefore, when evaluating whether a communication is protected by the attorney-client privilege, courts consider whether the "predominant purpose" of the communication was to render or solicit legal advice or services. County of Erie, 473 F.3d at 420-21.

---

[12] See also Swidler, 524 U.S. at 409 ("Balancing *ex post* the importance of the information against client interests, even limited to criminal cases, introduces substantial uncertainty into the privilege's application. For just that reason, we have rejected use of a balancing test in defining the contours of the privilege.").

When considering the applicability of the attorney-client privilege to a communication between client and lawyer that is reflected in a document, it is enough that the "overall tenor" of the document indicates that it is a request for legal advice or services. Spalding, 203 F.3d at 806; For the privilege to apply, "it is not necessary to expressly request confidential legal assistance when that request is implied." Id.; accord First Heights, 46 Fed. Cl. at 315.

(2) Attorney-Client Privilege: Exception And Implied-Waiver Doctrines

Notwithstanding the categorical protection usually afforded by testimonial privileges, such as the attorney-client privilege, "two common law doctrines give courts a limited ability to make sure that privileges do not serve ends for which they were not intended." In re Sealed Case, 676 F.2d 793, 811 n.67, 812 (D.C. Cir. 1982) (Sealed Case I). These doctrines are exception and implied waiver. "Exception comes into play when a privileged relationship is used to further a crime, fraud, or other fundamental misconduct." Id. "Implied waiver," by contrast, "deals with an abuse of a privilege itself rather than of a privileged relationship." Id. "Where society has subordinated its interest in the search for truth in favor of allowing certain information to remain confidential, it need not allow that confidentiality to be used as a tool for manipulation of the truth-seeking process." Id.

(3) The Crime-Fraud Exception To The Attorney-Client Privilege

It "is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the seal of secrecy . . . between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." United States v. Zolin, 491 U.S. 554, 563 (1989) (citation and internal quotation marks omitted). The crime-fraud exception "withdraws protection where the client sought or employed legal representation in order

to commit or facilitate a crime or fraud." In re Grand Jury Proceedings, 417 F.3d 18, 22 (1st Cir. 2005), cert. denied, 126 S.Ct. 1025 (2006).

The "crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud." In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995). To invoke the crime-fraud exception, "a party challenging the attorney-client privilege, must make a *prima facie* showing [[13/]] that the communication was made 'in furtherance of' a crime or fraud." Spalding, 203 F.3d at 807. The privilege-challenger must present evidence "(1) that the client was engaged in or was planning criminal or fraudulent activity when the attorney-client communications took place and (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." Grand Jury Proceedings, 417 F.3d at 22 (quoting In re Grand Jury Proceedings (Violette), 183 F.3d 71, 75 (1st Cir. 1999)).

The crime-fraud exception, thus, has a narrow and precise application: "It applies only when the communications between the client and his lawyer further a crime, fraud or other misconduct. It does not suffice that the communications may be related to a crime. To subject the attorney-client communications to disclosure, they must actually *have been made with an intent to further an unlawful act*." United States v. White, 887 F.2d 267, 271 (D.C. Cir. 1989) (emphasis added).[14/]

---

[13] "The burden to make the necessary showing for the crime-fraud exception falls on the party who seeks application of the exception." In re Grand Jury Investigation, 445 F.3d 266, 274 (3d Cir.), cert. denied sub nom. Doe v. United States, 127 S.Ct. 538 (2006).

[14] Purcell v. District Attorney for the Suffolk District, 676 N.E.2d 436 (Mass. 1997), illustrates the limited reach of the crime-fraud exception to the attorney-client privilege. During a consultation with an attorney regarding a court order to vacate his apartment, the client threatened to burn the building in which the apartment was located. In rejecting the trial court's finding that the crime-fraud exception applied to such statements, the Purcell court observed: "A statement of an

The *prima facie* showing required to invoke the crime-fraud exception "must have some foundation in fact, for mere allegations of criminality are insufficient to warrant application of the exception." In re Grand Jury Investigation, 842 F.2d 1223, 1226 (11th Cir. 1987); accord In re BankAmerica Corp. Securities Litigation, 270 F.3d 639, 642 (8th Cir. 2001) ("A moving party does not satisfy this threshold burden merely by alleging that a fraud occurred and asserting that disclosure of any privileged communications may help prove the fraud. There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud."). To overcome the attorney-client privilege, there must be at least "a reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud." Grand Jury Proceedings, 417 F.3d at 23 ("The circuits . . . all effectively allow piercing of the privilege on something less than mathematical (more likely than not) probability that the client intended to use the attorney in furtherance of a crime or fraud.").

Because the attorney-client privilege "exists for the benefit of the client, not the attorney, it is the *client's* knowledge and intentions that are of paramount concern to application of the crime-fraud exception; the attorney need know nothing about the client's ongoing or planned illicit activity for the exception to apply." In re Grand Jury Proceedings, 87 F.3d 377, 381-82 (9th Cir.), cert. denied, 519 U.S. 945 (1996) (emphasis added); accord Grand Jury Proceedings,

---

intention to commit a crime made in the course of seeking legal advice is protected by the privilege, unless the crime-fraud exception applies. That exception applies only if the client or prospective client seeks advice or assistance in furtherance of criminal conduct." Id. at 441; accord Newman v. State, 863 A.2d 321, 336 (Md. 2004) (An otherwise privileged statement by defendant to her attorney, in the context of a custody dispute, that she intended to kill her husband and children was not subject to the crime-fraud exception because there was no evidence that defendant had consulted the attorney for the purpose of obtaining assistance in furtherance of a future crime or fraud.).

417 F.3d at 23 (The crime-fraud exception to the attorney-client privilege "requires the *client's* engagement in criminal or fraudulent activity and the *client's* intent with respect to attorney-client communications."(emphases in original)); BankAmerica, 270 F.3d at 642 ("Because the attorney-client privilege benefits the client, it is the *client's* intent to further a crime or fraud that must be shown." (emphasis added)).

The "proper scope of the crime-fraud exception must necessarily be limited to those attorney-client communications and work products reasonably related to the furtherance of the ongoing or future crime or fraud at issue." In re Grand Jury Subpoena, 419 F.3d 329, 347 (5th Cir. 2005). "After the party seeking disclosure meets its *prima facie* showing that the client intended to further an ongoing crime or fraud during the attorney-client relationship such that the crime-fraud exception applies, the only attorney-client communications and work product materials falling within the scope of the crime-fraud exception are those shown to hold some valid relationship to the *prima facie* violation such that they reasonably relate to the fraudulent activity." Id. at 346 (internal quotation marks omitted).

A court, therefore, "should be highly reluctant to order disclosure without conducting an *in camera* review of allegedly privileged materials." BankAmerica, 270 F.3d at 644 (trial court's assumption, "without any further showing by plaintiffs, that all contemporaneous attorney-client communications 'could be construed' as in furtherance of the alleged fraud," was "plain error"); accord In re Antitrust Grand Jury, 805 F.2d 155, 168 (6th Cir. 1986) (trial court's finding, without reviewing documents *in camera*, that, where government had established a *prima facie* case of Sherman Act violation, all documents were communicated or created in furtherance of such violation, was "plain error").

A court should not compel disclosure of allegedly privileged communications to the party opposing the privilege until it has been established that the crime-fraud exception to the attorney-client privilege applies. In re General Motors Corp., 153 F.3d 714, 716 (8th Cir. 1998). If, after *in camera* inspection of privileged materials, a court determines that the crime-fraud exception applies, "it should keep the privileged communications under seal to prevent their further disclosure until all avenues of appeal have been exhausted." Id. at 717.

D. The Work-Product Doctrine

The work-product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal strategy 'with an eye toward litigation,' free from unnecessary intrusion by adversaries." Pacific Gas, 69 Fed. Cl. at 789 (quoting Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)). The work-product doctrine "is distinct from and broader than the attorney-client privilege." United States v. Nobles, 422 U.S. 225, 238 n. 11 (1975). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." Id. at 238. The doctrine protects not only material prepared by an attorney but also material prepared by agents for the attorney. Id. at 238-39. "Because the work product privilege protects not just the attorney-client relationship but the interests of attorneys to their own work product, the attorney, as well as the client, hold the privilege." In re Grand Jury Proceedings # 5 Empanelled, 401 F.3d 247, 250 (4th Cir. 2005); accord Moody, 654 F.2d at 801 (work product doctrine "creates a legally protectable interest in non-disclosure in two parties: lawyer and client" (footnote omitted)).

The work-product doctrine, as codified at RCFC 26(b)(3), provides a two-tiered protection of "documents and tangible things" prepared by or for a party or a party's representative in

anticipation of litigation or for trial:

> Subject to the provisions of [RCFC 26(b)(4)[15/]] concerning discovery of experts], a party may obtain discovery of documents and tangible things otherwise discoverable under [RCFC 26(b)(1)] and prepared in anticipation of litigation or for trial by or for another party or by or for that party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Accordingly, to the extent that work product contains relevant, non-privileged legal facts, Rule 26(b)(3) shifts the standard presumption in favor of discovery by requiring that the party seeking discovery show "substantial need" and inability to obtain the substantial equivalent of the information in the work product from other sources without "undue hardship." But, insofar as work product reveals the opinions, judgments, and thought processes of an attorney or other representative of a party concerning the litigation, it receives a "higher level of protection" and "a party seeking discovery must show extraordinary justification." Sealed Court I, 676 F.2d at 809-10. "Core" or "opinion" work product, "unlike ordinary work product, is afforded nearly absolute protection from disclosure." Sparton, 44 Fed. Cl. at 565. It "cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship."

---

[15] Rule 26(b)(4) provides that a party may "discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial who is not expected to be called as a witness at trial *only* as provided in RCFC 35(b) [concerning physical and mental examinations of individuals] or *upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means*." (Emphases added).

Upjohn, 449 U.S. at 401.[16]

E. The Crime-Fraud Exception To The Work Product Doctrine

The work product-doctrine "is subject to the same crime-fraud exception" as the attorney-client privilege. Grand Jury Subpoena, 419 F.3d at 335; accord In re Grand Jury Subpoenas, 144 F.3d 653, 660 (10th Cir.) ("The crime fraud exception applies to both the attorney-client privilege and the work-product doctrine."), cert. denied, 525 U.S. 966 (1998); Sealed Case I, 676 F.2d 793, at 811 n.67, 812 ("an attorney's opinion work product cannot be privileged if the work was performed in furtherance of a crime, fraud, or other misconduct fundamentally inconsistent with the basic premises of the adversary system.").

To invoke the crime-fraud exception to the work-product doctrine, a court undertakes a two-step process: "First, there must be a *prima facie* showing of a violation sufficiently serious to defeat the work product privilege.[[17]] Second, the court must find some valid relationship between the work product [in question] and the *prima facie* violation." Sealed Case I, 676 F.2d at 814-15 (footnotes omitted).

---

[16] In contrast to the treatment of factual material under the deliberative process privilege, the work-product doctrine does not distinguish between factual and deliberative material. Judicial Watch, Inc. v. DOJ, 432 F.3d 366, 371 (D.C. Cir. 2005). "[F]actual material is itself privileged when it appears within documents that are attorney work product." Id. "If a document is fully protected as work product, then segregability is not required." Id.

[17] A mere allegation that an attorney's work product was used in furtherance of a crime or fraud is insufficient to invoke the crime-fraud exception. See In re International Systems and Controls Corp. Securities Litigation, 693 F.2d 1235, 1242 (5th Cir. 1982) ("While the pleadings in this case are unusually detailed, they are not evidence to make a prima facie case."); In re Grand Jury Investigation, 599 F.2d 1224, 1232 (3d Cir. 1979) (naked assertion of a corporate cover-up insufficient to overcome work-product doctrine).

The crime-fraud exception to the work-product doctrine "calls for a somewhat different inquiry than with the attorney-client privilege." In re Sealed Case, 107 F.3d 46, 51 (D.C. Cir. 1997) (Sealed Case III). "The focus is not on the client's intent regarding a particular communication, but on the client's intent in consulting the lawyer or using the materials the lawyer prepared." Id. "The question is: Did the client consult the lawyer or use the material for the purpose of committing a crime or fraud?" Id. (footnote omitted); accord In re Sealed Case, 223 F.3d 775, 778 (D.C. Cir. 2000) (quoting Sealed Case III).[18/]

F. Chevron Cannot Establish The Applicability Of The Crime-Fraud Exception To The Government's Assertion Of Either The Attorney-Client Privilege Or The Work-Product Doctrine.

Chevron contends, in effect, that, to the extent that the Government asserts the attorney-client privilege and/or work-product doctrine with respect to documents that fall within any of the four categories described in Chevron's motion to compel, "those privileges are wholly inapplicable in the face of the significant government misconduct that the communications represent." Pl. Mem. 14. According to Chevron, such privileges "have no application where the party seeking discovery has made a prima facie showing of government misconduct and has credibly

[18] The opinion work-product doctrine exists for the benefit of the attorney as well as the client. Therefore, a "prima facie case of crime or fraud must also be made out against the attorney for the exception to apply." Grand Jury Proceedings # 5 Empanelled, 401 F.3d at 252. Absent a showing of complicity by the attorney in the illicit enterprise, a court should redact from work product material any portions of the documents that contain the attorney's opinion work product. In re Grand Jury Proceedings, 33 F.3d 342, 349 (4th Cir. 1994). This restriction upon the operation of the crime-fraud exception in the work product context, however, comes into play only if the innocent attorney has claimed the protection of the privilege for himself or herself: "Unless the blameless attorney is before the court with an independent claim of privilege, the client's use of an attorney's efforts in furtherance of crime or fraud negates the privilege." Sealed Case I, 676 F.2d at 812. "[T]here is no need to accord a guilty client standing to assert the claims of its innocent attorney." Id. at 812 n.75.

alleged that the documents at issue have a connection to the asserted misconduct." Id. We do not agree that Chevron has made the requisite *prima facie* showing for the crime-fraud exception to apply, much less demonstrated that any documents on the Government's privilege log that fall within the four categories described in Chevron's motion to compel must be deemed to "have a connection to" the "misconduct" alleged by Chevron.

As noted above, Chevron's misconduct claim is based upon the *unestablished assumption* that DOE Deputy General Counsel Mary Egger and/or subordinate attorneys were part of the "DOE field equity technical team" to which the prohibition against *ex parte* communications at ¶ B.4 of the Equity Process Agreement applies, which the Government disputes.

Even assuming for the sake of discussion that the Government breached the Equity Process Agreement as alleged, Chevron has not made the *prima facie* showing required to invoke the crime-fraud exception to the attorney-client privilege or the work product doctrine. As to the attorney-client privilege, Chevron has not presented any evidence to suggest that the client (DOE) used a lawyer's services to facilitate or conceal, i.e., "in furtherance of," a criminal or fraudulent enterprise. As to the work product doctrine, Chevron has not presented any evidence that the client (DOE) consulted an attorney or used work product material for the purpose of committing a crime or fraud.

We are not aware of any precedent – and Chevron has cited none – which suggests, much less holds, that the crime-fraud exception extends to conduct which amounts to nothing more than an alleged breach of contract. The crime-fraud exception is addressed to misconduct, such as crimes and frauds, not to a breach of contract, which is all that Chevron alleges here.

For example, in Spalding, a patent infringement action, the Federal Circuit held that the crime-fraud exception did not apply to discovery of an invention record where the party challenging the attorney-client privilege claim had "failed to provide any evidence of fraudulent intent" in connection with the prosecution of the patent at issue in that case. 203 F.3d at 808. The privilege-challenger made an allegation of "inequitable conduct," but that was not sufficient to vitiate the attorney-client privilege because "inequitable conduct is not by itself common law fraud." Id. at 807.[19/] Other courts similarly have cabined the reach of the crime-fraud exception. See Chaudhry v. Gallerizzo, 174 F.3d 394, 403 (4th Cir.) (rejecting application of crime-fraud exception to unredacted legal bills, which allegedly evidenced wrongdoing under the Fair Debt Collection Practices Act), cert. denied, 528 U.S. 891 (1999); Ferrara & DiMercurio, Inc. v. St. Paul Mercury Insurance Co., 173 F.R.D. 7, 13 (D. Mass. 1997) (under Massachusetts law, it is not appropriate to extend crime-fraud exception beyond a crime or fraud to an unfair and deceptive trade practice claim).[20/]

---

[19] In Cities Service, the Court of Claims stated, without discussion or citation, that, in resolving a motion to compel production of documents as to which the Government asserted the attorney-client privilege or work-product doctrine, the court would apply "general rules" one of which was that "[a]ttorney-client material is producible if the client's communication is for the purpose of obtaining help in committing a crime, fraudulent act, illegality, or tort." 216 Ct. Cl. at 475. But even under that slightly broader description of the scope of the crime-fraud exception, there is no suggestion that the exception may be invoked where a client's communication is for the purpose of facilitating a breach of contract.

[20] See also Mattenson v. Baxter Healthcare Corp., 438 F.3d 763, 769 (7th Cir. 2006) (rejecting application of crime-fraud exception to attorney opinion work product where, as best the court of appeals could reconstruct the trial court's "cryptic explanation" in support of its finding of fraud, the work product contained material that contradicted Baxter Healthcare's defense, noting that, "if inconsistency between work product and other evidence were treated as proof of fraud, there would be no work-product privilege").

The Restatement (Third) of the Law Governing Lawyers (2000) also confines the exception to a "crime" or "fraud:" "The attorney-client privilege does not apply to a communication occurring when a client: (a) consults a lawyer for the purpose, later accomplished, of obtaining assistance to engage in a crime or fraud or aiding a third person to do so, or (b) regardless of a client's purpose at the time of consultation, uses the lawyer's advice or other services to engage in or assist a crime or fraud." Id., § 82.[21/]

In an attempt to bolster its argument, Chevron cites Olson v. Accessory Controls and Equipment Corp., 757 A.2d 14 (Conn. 2000), for the proposition that the crime-fraud exception to the attorney-client privilege "would apply where communication evidences failure by a party to make required disclosures of information." Pl. Mem. 33. This misrepresents both the Olson court's holding and analysis. In Olson, the court adopted "an exception to the attorney-client privilege when the privileged communications are made with the intent to further a crime or civil

---

[21] We recognize that there are several district court decisions which have extended, or were prepared to extend in an appropriate case, the crime-fraud exception to communications in furtherance of intentional torts. See, e.g., Cleveland Hair Clinic, Inc. v. Puig, 968 F.Supp. 1227, 1241 (N.D. Ill. 1996) (attorneys and clients involved in "wrongful scheme that included deceptive conduct" in violation of court rules and statute); Tri-State Hospital Supply Corp. v. United States, 238 F.R.D. 102, 104 (D.D.C. 2006) (communications allegedly in furtherance of abuse of civil process and malicious prosecution); Jinks-Umstead v. England, 233 F.R.D. 49, 51 (D.D.C. 2006) (alleged bad faith cover-up of discriminatory conduct toward the plaintiff); Rambus, Inc.v. Infineon Technologies AG, 222 F.R.D. 280, 289 (E.D. Va. 2004) (communications in planning, or in furtherance of, spoliation of evidence); Madanes v. Madanes, 199 F.R.D. 135, 149 (S.D. N.Y. 2001) (communications in furtherance of "intentional tort that undermines the adversary system itself"); Coleman v. American Broadcasting Companies, 106 F.R.D. 201 (D.D.C. 1985) (communications in furtherance of attempt to conceal or "cover up" sex discrimination, sexual harassment, or other violations of federal civil rights laws); Diamond v. Stratton, 95 F.R.D. 503, 505 (S.D.N.Y. 1982) (communications in furtherance of tort of intentional infliction of emotional distress). Accepting for purposes of argument only the correctness of these district court precedents, they do not help Chevron, inasmuch as its basis for invoking the crime-fraud exception is a putative breach of contract, *not* a tort.

fraud." id. at 30, but, in so doing, the court emphasized that, "[e]ven if probable cause exists to believe that the client intended to perpetrate a fraud, the exception is curtailed by the second requirement that the communications sought in discovery were made in furtherance of the fraud," id. at 31. The court, moreover, did not suggest that the crime-fraud exception applies whenever a party fails to make a required disclosure of information, however innocent. The court stated, rather, that "a failure to disclose can be *deceptive* only if, in light of all the circumstances, there is a duty to disclose," id. at 34, citing a case for the proposition that "for nondisclosure to amount to *fraud*, there must be failure to disclose known facts and circumstances that impose [a] duty to speak." Id. (emphases added). The court did not find a duty to disclose and, therefore, did not even reach the question of whether the company had communicated with its attorney for the purpose of fostering a crime or fraud. 757 A.2d at 33-34.

Chevron also asserts that "courts have held that where a communication sought to be shielded from disclosure itself evidences a violation of applicable standards of conduct or of the exercise of appropriate government authority, the attorney-client privilege does not apply." Pl. Mem. 33. For that proposition, Chevron cites In re Sunrise Securities Litigation, 130 F.R.D. 560 (E.D. Pa. 1989).

Sunrise does not hold anything of the sort. It involved an application of the "fiduciary exception" to the attorney-client privilege. See, e.g., In re Omnicom Group Inc. Securities Litigation, 233 F.R.D. 400, 410 (S.D.N.Y. 2006).[22] "The origin of this fiduciary exception to the privilege is found in the principle that a trustee may not withhold from the beneficiary any com-

[22] Some courts view the fiduciary-exception doctrine as "technically not an 'exception' to the lawyer-client privilege," "but [which] nonetheless results in [the privilege] not being applied." Deutsch v. Cogan, 580 A.2d 100, 104 (Del.Ch. 1990).

munications by the trustee with an attorney that were triggered by the trustee's need for advice on how to carry out his fiduciary responsibilities." Id. "That principle has been applied with some consistency in a variety of contexts in which a litigant who served as a fiduciary to his litigation adversary may be required to produce these communications with his attorney that were intended to guide his conduct in carrying out his fiduciary responsibilities." Id. Thus, "where a corporation seeks advice from legal counsel, and the information relates to the subject of a later suit by a minority shareholder in the corporation, the corporation is not entitled to claim the [attorney-client] privilege as against its own shareholder, absent some special cause." Valente v. Pepsico, Inc., 68 F.R.D. 361, 367 (D. Del. 1975).

Sunrise concerns the application of the fiduciary exception to the attorney-client privilege in the context of a dispute between an attorney and a client. The attorney-client relationship is a fiduciary one and this is reflected in codes of professional responsibility, which proscribe representation by an attorney of a client if such representation may be materially limited by the attorney's own interests, unless the attorney reasonably believes that the representation will not be adversely affected and the client consents after full disclosure by the attorney of the material facts. "When a law firm seeks advice from its in-house counsel lawyer concerning potential malpractice in its representation of a client, the law firm's position can be adverse to or limit the law firm's representation of its client and create a conflict of interest." VersusLaw, Inc. v. Stoel Rives, LLP, 111 P.3d 866, 879 (Wash.App. 2005). Courts, thus, have applied the fiduciary exception in malpractice litigation between attorney and client, holding that a law firm's communications with in-house counsel seeking advice on how best to position the law firm in light of a possible malpractice action by the client are not shielded from disclosure by the attorney-client

privilege. E.g., Koen Book Distributors v. Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C., 212 F.R.D. 283, 286 (E.D. Pa. 2002); see also Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A., 220 F.Supp.2d 283, 288 (S.D.N.Y. 2002) (because "a law firm cannot invoke the attorney-client privilege against a current client when performing a conflict check in furtherance of representing that client[,]" law firm required to produce documents related to its internal review of representation of client). The issues raised in Chevron's motion to compel are not remotely analogous to these cases.

The present case, of course, does not call for an application of the fiduciary exception to the attorney-client privilege. This is not a suit between a client and an attorney, much less a suit where a client is seeking to discover communications between an attorney and a fellow attorney that implicate the attorney's fiduciary duty to the client. Chevron does not suggest that it should have access to the attorney-client communications it seeks because of a conflict-of-interest prohibited by a code of professional responsibility.

Next, Chevron asserts that "[l]imitations on the scope of the attorney-client privilege are particularly important and must be interpreted especially broadly when otherwise privileged information is sought from the Government and a government attorney is involved in impermissible activity." Pl. Mem. 34. Once again, the authorities Chevron cites for that proposition do not support it. In Lindsey, the court held that, "[w]hen government attorneys learn, through communications with their clients, of information related to criminal misconduct, they may not rely on the government attorney-client privilege to shield such information from disclosure to a grand jury." 158 F.3d at 1278. The present litigation, a civil proceeding, does not involve such

a situation.[23/]

To the extent that Chevron suggests that the attorney-client privilege does not have as much vitality in the context of a civil action to which the Government is a party, it is mistaken. See County of Erie, 473 F.3d at 419 (government's claim to the protections of the attorney-client privilege is "on a par with the claim of an individual or a corporate entity"); Grand Jury Investigation, 399 F.3d at 534 ("We believe, if anything, the traditional rationale for the [attorney-client] privilege applies with special force in the government context."). Even in Lindsey, the court noted the existence of "a government attorney-client privilege that is rather absolute in civil litigation." 158 F.3d at 1271.

According to Chevron, "[a]s a corollary to the exception to the work product privilege and attorney-client privilege for materials that shed light on a 'crime' or 'fraud,' there is also an exception to those privileges for materials that themselves constitute or evidence 'other type[s] of misconduct fundamentally inconsistent with the basic premises of the adversary system.'" Pl.

[23] The other authority cited by Chevron is McCartney v. Attorney General, 587 N.W.2d 824 (Mich.App. 1998). That case involved a proceeding under the Michigan Freedom of Information Act seeking disclosure of documents relating to the Governor's negotiations with Indian tribes with respect to casino gambling. The Attorney General withheld the documents, invoking the attorney-client privilege. The plaintiff contended that the privilege did not apply because the Governor's actions were ultra vires. The court stated that, "[a]ccepting that there would be no valid attorney-client relationship if the Governor's actions were outside the scope of his authority, it is necessary to determine if the Governor's actions were clearly ultra vires or rather, whether there was no possible basis for the Governor's authority." Id. at 826. In rejecting the plaintiff's contention, the court held that "there is a reasonable foundation for the Governor's authority to negotiate tribal-state gaming compacts and, thus, his actions were not clearly ultra vires to the extent that an attorney-client relationship did not arise when he sought legal assistance from [the Attorney General]." Id. In the present case, Chevron does not suggest that the actions of any DOE officials regarding the Elk Hills equity finalization process were ultra vires such that an attorney-client relationship could not have arisen between them and any DOE attorneys relating to the Elk Hills equity finalization process.

Mem. 25. "Just as the exception for an actual crime or fraud serves the salutary purpose of requiring disclosure of materials that shed light on the elements of nefarious conspiracies or enterprises," Chevron argues, "so does the closely related exception for other types of gross misconduct." Id. In support of that argument, Chevron cites three decisions of the court of appeals for the District of Columbia Circuit: In re Sealed Case, 754 F.2d 395 (D.C. Cir. 1985) (Sealed Case II); Sealed Case I; and Moody. None of those decisions, however, purports to establish a "corollary" to the crime-fraud exception to the attorney-client privilege "for materials that themselves constitute or evidence" of misconduct deemed "fundamentally inconsistent with the basic premises of the adversary system" and Moody only suggests that the *work-product doctrine* may be overcome in certain instances by a showing of professional misconduct in a *judicial* proceeding.

Sealed Case II involved a straightforward application of the crime-fraud exception to the attorney-client privilege. The D.C. Circuit concluded that "the district court applied the correct legal standard and properly found that the crime-fraud exception barred invocation of the attorney-client privilege." 754 F.2d at 402. The court observed that "[c]ommunications otherwise protected by the attorney-client privilege are not protected if the communications are made *in furtherance of* a crime, fraud, or other misconduct." (Emphasis added). The court observed that, to overcome the privilege, the party asserting the crime-fraud exception (the Government there) "must first make a prima facie showing of a violation sufficiently serious to defeat the privilege" and that "[a] prima facie violation is shown if it is established that the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme." Id. In Sealed Case II, the court held that the crime-fraud exception applied where the affidavits presented by the Government "reveal[ed] in extraordinary detail a pervasive and syste-

matic scheme [by Synanon Church] to destroy or alter subpoenaed evidence," id. at 400, noting that Synanon's attorneys, who "were used to file and verify the authenticity of false documents," "were instrumentalities in the ongoing cover-up whether they realized it or not, and the fact that their primary role was the prosecution of legitimate lawsuits cannot whitewash Synanon's ancillary use of the attorneys to assist in its fraudulent scheme." Id. at 402.

Two subsequent decisions of the D.C. Circuit underscore that, to invoke the crime-fraud exception to the attorney-client privilege, communications must have been made with the intent to further an unlawful act. In Sealed Case III, the D.C. Circuit stated that two conditions must be satisfied to pierce the attorney-client privilege, the first of which is that "the client must have made or received the otherwise privileged communication with the intent to further an unlawful act or fraudulent act." 107 F.3d at 46. In White, the D.C. Circuit overturned the conviction of an individual that was based in part upon evidence of an attorney-client communication, concluding that the crime-fraud exception did not apply to the communication:

> The crime-fraud exception has a precise focus: It applies only when the communications between the client and his lawyer further a crime, fraud, or other misconduct. It does not suffice that the communications may be related to a crime. To subject the attorney-client communications to disclosure, they must actually have been made with an intent to further an unlawful act.

887 F.2d at 271.[24/] Chevron has not made any such demonstration in the present case.

---

[24] Other courts are in agreement with the D.C. Circuit on this point. See, e.g., BankAmerica, 270 F.3d at 642 ("A moving party does not satisfy this threshold burden merely by alleging that a fraud occurred and asserting that disclosure of any privileged communications may help prove the fraud. There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud.").

Sealed Case I involved an unremarkable application of the crime-fraud exception to the work-product doctrine. A multinational corporation was investigated by a grand jury for possible conspiracy to defraud the Government by providing false information to a government agency and obstruction of justice. The D.C. Circuit held that the crime-fraud exception applied to portions of attorney work product because the record before the trial court revealed that there was "a substantial likelihood that the work reflected in [the documents] was performed *in furtherance of* a crime or fraud by Company or its officers . . . ." Id. at 816 (emphasis added).

The Sealed Case I court described a two-pronged test for determining when the crime-fraud exception may defeat the work-product doctrine. Under the first prong, "there must be a *prima facie* showing of a violation sufficiently serious to defeat the work product privilege." 676 F.2d at 814. The court stated that this first condition "may be met by a showing that the client was engaged in planning a criminal or fraudulent scheme when it sought the advice of counsel, or that the client actually committed or attempted a crime or fraud subsequent to receiving the benefit of counsel's work product." Id. at 815. Alternatively, the court stated that "[t]he *prima facie* violation may also be the attorney's, since attorney misconduct negates the premise that the adversary system furthers the cause of justice," citing Moody and Appeal of Hughes, 633 F.2d 282 (3d Cir. 1980). Id. at 815 & n.87.[25/] Of course, the attorney misconduct referenced

---

[25] In Hughes, the Third Circuit vacated a district court order holding a private investigator in civil contempt for refusing to answer questions before a grand jury. The court observed that, "[w]hen the government chooses to subpoena an agent of an attorney to inquire into his investigative activities, and a valid work product claim is interposed, a motion to quash should be granted unless the government can show that its proposed line of inquiry falls within the good cause exception of which our cases have recognized." 633 F.2d at 290. The court remarked that one showing the Government could have made, but did not make, "is that the agent was engaged in criminal activity" such as "obstruction of justice," stating that "[i]t would be intolerable to permit investigators hired by defense counsel to attempt to obstruct justice by influencing or threatening

in that case pertained to advancing criminal activity, or something sufficiently serious to defeat the privilege. Clearly, an alleged violation of the terms of a contract is not something sufficiently serious to defeat the privilege.

In Moody, the appellant (Moody) sought the release of records possessed by the Internal Revenue Service (IRS) relating to Moody, several charitable entities in which Moody had an interest, and "Project Southwest," an IRS investigation of political corruption in Texas and its attendant tax consequences pursuant to the Freedom of Information Act, 5 U.S.C. § 552. The IRS withheld certain documents under Exemption 5, asserting the work-product doctrine. One of the withheld documents was a memorandum to file prepared by an IRS lawyer that detailed a meeting between the lawyer and a district court judge who had presided over a receivership action. 654 F.2d at 799. Moody contended that the work-product doctrine did not extend to the IRS attorney memorandum because it was "the fruit of impermissible legal conduct," i.e., the "purposeful exclusion of opposing counsel from the meeting [in violation of] the court's rules and the American Bar Association's ethical standards." Id. (footnotes omitted).

The court of appeals in Moody agreed that, "at least in some circumstances, a lawyer's unprofessional behavior may vitiate the work product privilege" and remanded the case to the district court "so that it may determine in the first instance whether such circumstances exist in this case, and more fundamentally, whether the actions of the IRS attorney in fact violated professional standards." 654 F.2d at 800 (footnote omitted). In that connection, the court stated that "[i]t would indeed be perverse . . . to allow a lawyer to claim an evidentiary privilege to prevent

---

witnesses" or "to violate the law by posing as officers or employees of the Government." Id. But the "speculative possibility" that attorneys or their agents might engage in such activities could not "justify endangering protected work product by bringing them before a grand jury." Id.

disclosure of work product generated by those very activities the privilege was meant to prevent." Id. "The integrity of the adversary process is not furthered by protecting a lawyer who steps outside his role as 'an officer of the court . . . work[ing] for the advancement of justice while faithfully protecting the rightful interests of his clients.'" Id. (quoting Hickman, 329 U.S. at 510). "An attorney should not be able to exploit the privilege for ends outside of and antithetical to the adversary system any more than a client who attempts to use the privilege to advance criminal or fraudulent activity." Id.

Granting for the sake of discussion that work product which evidences or is the fruit of unprofessional conduct by an attorney in a judicial proceeding could, in some instances, constitute misconduct sufficient to invoke the crime-fraud exception to the work-product doctrine with respect to such work product, Chevron has made no such showing in the present case regarding any document on the Government's privilege log for which the work-product doctrine is claimed. The sole basis for Chevron's claim is a breach of contract, *not* professional misconduct. Chevron alleges, in the context of a *non-judicial* process provided for in a contract (i.e., the Equity Process Agreement), that DOE attorney Mary Egger and/or attorneys on her staff communicated with the ASFE in *breach* of a prohibition against *ex parte* communications between the ASFE and the "DOE field equity technical team" set forth at ¶ B.4 of the Equity Process Agreement.

Contrary to Chevron's repeated characterization of the alleged misconduct as conduct outside the adversary system, the alleged misconduct plainly is not. There is a vast distinction between an alleged breach of contract and the criminal or quasi-criminal conduct discussed in these cases. There is no reasonable comparison between the alleged violation of a contract provision, for which there are contract remedies, and blatant violations of professional standards,

such as *ex parte* communications with a judge. A breach of contract, alleged or proven, is not "misconduct" for purposes of the crime-fraud exception to the work-product doctrine contemplated by the decisions of the D.C. Circuit discussed above and upon which Chevron relies.[26]

IV. Documents On The Government's Privilege Log Are Protected By The Attorney-Client Privilege Because They Reflect Communications That Were Made For The Purpose Of Obtaining Or Rendering Legal Advice Or Services.

Chevron notes that the attorney-client privilege does not apply to communications when a Government attorney is acting as a policymaker or as a regulator. It contends, without pointing to a single document or any other evidence, that, "in many instances – including virtually all of those in which [Mary] Egger contributed in some way to ASFE decisions – DOE cannot establish that the communications at issue were made by DOE employees in their capacity *as attorneys*, rather than as policymakers or regulators." Pl. Mem. 35. Chevron speculates that "[i]nput by Mary Egger into the ASFE's equity determination process reflects not her role as counsel for the DOE – a role she arguably played when she acted as advocate for DOE in the equity finalization process – but rather her (improper) role as a forbidden participant in the regulatory process by which the parties' claims to equity ownership of the Elk Hills Reserve were to be resolved." Id.

The primary difficulty with Chevron's contention here is that Chevron has not identified any specific documents on the Government's privilege log that it contends are not protected by the attorney-client privilege because, in the case of those communications, the DOE attorney was

---

[26] Chevron also cannot support its motion upon the implied-waiver doctrine. The Government's invocation of the attorney-client privilege and the work-product doctrine in the present case is not the result of an *affirmative* act such as, for example, the assertion of an affirmative defense to Chevron's breach-of-contract claims through which protected information has been put in issue. Absent such an *affirmative* act, the implied-waiver doctrine may not be invoked, notwithstanding the relevance of the protected information to Chevron's claims or Chevron's need for the information.

acting in some other capacity than as an attorney. The Government cannot, and should not have to, address Chevron's claim without the context of specific communications. It is Chevron's burden to identify the particular documents that its contends are not covered by the attorney-client privilege because the DOE attorney allegedly was not acting in the capacity of a legal advisor. Other than its presumptive speculation, Chevron has not provided any reason to suggest that Ms. Egger or members of her staff, who are part of the DOE Office of General Counsel, were doing anything other than providing legal advice or services in connection with the Elk Hills equity finalization process. After all, as noted above, the requirement is that the "predominant purpose" of a communication is to render or solicit legal advice or services. County of Erie, 473 F.3d at 420-21.

Chevron similarly speculates that, "with respect to drafts of and communications related to the [Equity Process Agreement], Decoupling Agreement, ASFE Protocol, and supplements," "Ms. Egger's participation in the process by which those agreements were drafted was primarily a regulatory function and not one normally encompassed within the attorney-client privilege" and that "it is unlikely that Ms. Egger's input was in response to 'confidential' client information, rather than regulatory objectives." Pl. Mem. 35. Again, without a specific identification by Chevron of the documents on the Government's log against which this claim is leveled, the Government cannot properly evaluate and should not be required to address it. Aside from that deficiency, Chevron also is incorrect when it asserts that, in communicating with DOE officials and with DOE's outside counsel for the Elk Hills sale and equity finalization process (O'Melveny & Myers) about the contracts and the Protocol, Ms. Egger could not have been acting in a legal capacity. Ms. Egger's position within DOE is that of an attorney, not a regulator or policy-

maker such as, for example, the ASFE. Government attorneys routinely are called upon to provide *legal* services to their clients with respect to the formation and administration of contracts and agency regulations. Ms. Egger, DOE's Deputy General Counsel for Technology Transfer and Procurement, is no exception.[27/]

Lastly, Chevron asserts that, "even if Ms. Egger did provide some limited legal advice in the course of commenting on the draft documents, the Government's interest in withholding such communications is conclusively outweighed by the relevance of those communications to the Government's demonstrated misconduct." Pl. Mem. 35. But the alleged "misconduct" of which Chevron complains occurred *after* the Equity Process Agreement was executed by Chevron and DOE. Documents that *predate* the Equity Process Agreement, such as drafts of the contract, therefore, could not possibly constitute evidence of the *alleged* "misconduct" of which Chevron complains, i.e., communications between Ms. Egger and/or attorneys on her staff with the ASFE about Elk Hills equity finalization matters in breach of ¶ B.4 of the Agreement.

V. Chevron's Four "Core Categories" And Suggested Manner Of Proceeding

A. Chevron's "Core Categories"

Chevron argues that, based upon the alleged "misconduct" by DOE officials, the Court should require that the Government produce all documents within the four "core" categories described in its motion, Pl. Mem. 36, and that the Government identify a "revised privilege log" which of the documents presently withheld by the Government do not fall into any of Chevron's

[27] Chevron also neglects to mention that the internal drafts of the Equity Process Agreement or the Decoupling Agreement and many of the related communications that it seeks to discover were prepared not by a DOE attorney, but rather by the outside counsel to DOE for the Elk Hills sale and equity finalization process (O'Melveny & Myers), much less explain why those documents would not be protected by the attorney-client privilege.

document categories, Pl. Mem. 37.[28] We have addressed the merits of Chevron's "misconduct" arguments above. The merits of those arguments notwithstanding, the four categories Chevron identifies are either overly broad or irrelevant to its breach-of-contract claims. We address each of Chevron's four categories below.

(1) Chevron Category #1

Category #1 includes "[d]ocuments that evidence or describe *ex parte* communications between Mary Egger and her subordinates or other members of the DOE equity/advocacy team on the one hand and the ASFE or the ASFE's staff on the other hand." Pl. Mem. 37.

To begin with, Category #1 is argumentative and vague in that it presupposes that Mary Egger and unspecified "subordinates" were part of a "DOE equity/advocacy team." As discussed above, the Government disputes that Ms. Egger or any attorney on her staff was part of the "DOE field equity technical team" and the Court has not made any finding in that regard. Absent such a finding, which would require the Court to interpret and apply ¶ B.4 of the Equity Process Agreement, communications between the ASFE and Mary Egger and/or her "subordinates" should not be deemed a violation of the Equity Process Agreement.

Furthermore, Category #1 is too broad because it encompasses documents that are not relevant to Chevron's breach-of-contract claim, which is predicated upon the alleged violation of ¶ B.4 of the Equity Process Agreement. See Compl. ¶ 60-62; Pl. Mem. 5. While ¶ B.4 prohibits certain communications between the ASFE and the "DOE field equity technical team,"

---

[28] Chevron suggests that the Government be allowed to withhold documents falling within the identified four categories only if the Government can establish "an extraordinary or compelling basis" to prevent their production. Pl. Mem. 37. That is not the legal standard for withholding privileged information.

it provides that "the provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone." Category #1 also includes communications that may have occurred *prior to* May 19, 1997, the effective date of the Equity Process Agreement. Documents reflecting communications relating to equity finalization for a particular zone that took place after the ASFE final decision for such zone or that occurred before the effective date of the Equity Process Agreement are not relevant to Chevron's claim that DOE breached the Equity Process Agreement.

(2) Chevron Category #2

Category #2 includes "[d]ocuments that evidence or describe *ex parte* communications between Mary Egger and her subordinates or other DOE personnel on the one hand and the IPE or the IPE's staff on the other hand." Pl. Mem. 37. The Government, however, does not claim that any such documents are privileged. There are no such documents on the Government's privilege log.[29]

(3) Chevron Category #3

Category #3 includes "[d]ocuments that reflect *ex parte* input into ASFE or IPE determinations (including drafts of those determinations) from the DOE equity/advocacy team, including

---

[29] The Equity Process Agreement does not address *ex parte* communications with the IPE. The subject is dealt with in ASFE Administrative Order 96-01 ("Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process," issued July 8, 1996, which provided, in relevant part, that "[d]uring the time owners are developing their equity positions," "[a]ll written materials transmitted to the Equity IPE by an owner . . . shall be transmitted immediately by the Equity IPE to the other owner," that "[t]here will be no written or oral equity-related communication or meeting with the Equity IPE (this term *excludes contract administration* communications or meetings) by an owner (including its agents and contractors) without the participation or opportunity to participate by the other owner," and that "[t]he Equity IPE shall record summaries of these communications/meetings and provide copies to the owners." Id., §§ C.4, C.5, Def. App. 21-27 (emphasis added).

Mary Egger and her staff." Pl. Mem. 38. To the extent Category #3 is addressed to documents reflecting *ex parte* communications between employees or representatives of DOE and the IPE, as stated above, the Government has not asserted that any such documents are exempt from disclosure and no such documents appear on the Government's privilege log. Category #3 is also argumentative for the same reason that Category #1 is argumentative, inasmuch as it presupposes that Ms. Egger and her staff were part of a "DOE equity/advocacy team."

(4) Chevron Category #4

Category #4 includes "[d]rafts of the Equity Process Agreement, the Decoupling Agreement, and the ASFE Protocol and its supplements." Pl. Mem. 38. To the extent Chevron could establish a right to discovery of any documents based upon a showing of "misconduct" by the Government, that showing necessarily involves conduct that occurred *after* the effective dates of the Equity Process Agreement, Decoupling Agreement, and the ASFE Protocol and related supplements. Because the Category #4 documents are drafts of the Equity Process Agreement, the Decoupling Agreement, and the Protocol and its supplements, they could not reflect or have been the product of the "misconduct" alleged by Chevron. In other words, such drafts (and any related communications) are not reasonably related to the alleged "misconduct" of which Chevron complains.

B. The Court Should Conduct An *In Camera* Review Before Ordering Production Of Any Documents.

Chevron presents its four categories and its proposal for the resolution of this privilege dispute as a "feasible and attractive" alternative to having the Court review *in camera* those documents in the Government's privileged documents logs. Pl. Mem. 36. Chevron also con-

tends that an *in camera* review by the Court is unnecessary because "Chevron's interest in the documents plainly outweighs any interest that the Government has in preventing their disclosure." Id. at 22. We disagree.[30]

For those documents the Government has identified in its privileged documents logs as protected by the attorney-client privilege or work-product doctrine, Chevron has no right to the documents at all absent a showing of "crime" or "fraud," which it has clearly failed to make.[31] And the deliberative process privilege may be overcome only after a "showing of evidentiary need *weighed against the harm that may result from disclosure*," an approach that is "consistently" used in the Court of Federal Claims. First Heights, 46 Fed.Cl. at 322 (emphasis added). The court in First Heights rejected an automatic bar to the deliberative process privilege discussed by the D.C. Circuit in litigation where the government's intent is potentially relevant. Id.

The customary and appropriate method of proceeding is an *in camera* review by the Court of the documents on the Government's privilege log that Chevron asserts should be produced. See Marriott, 437 F.3d at 1307; Franklin National Bank Securities Litigation, 478 F. Supp. 577,

---

[30] We note that because Chevron 1) has failed to specifically identify any individual documents in the Government's privilege log it seeks to disclose; 2) has made no effort to "meet and confer" with defendant's counsel prior to filing its motion to compel; and 3) has failed to successfully invoke any of the privileges to the attorney-client, work-product, or deliberative process privileges, Chevron is not entitled to any of the documents in the Government's privilege log and its motion should be summarily denied. Otherwise, the Court should examine *in camera* the Government's privileged documents prior to making a ruling.

[31] When evaluating the attorney-client privilege or opinion work product, it is inappropriate to consider the privilege-challenger's need for evidence. See Grand Jury Investigation, 399 F.3d at 535 ("Having determined that the attorney-client privilege applies to the communications at issue in this case, we decline to fashion a balancing test, or otherwise establish a rule whereby a generalized assertion of privilege must yield to the demonstrated, specific need for evidence[.]" (internal quotation marks omitted)).

582 (E.D. N.Y. 1979) ("privilege usually requires examination of the documents *in camera*").[32] Such a review, however, first requires Chevron to identify the particular documents on the privileged document log as to which it is challenging the Government's privilege claim, so that DOE may produce a declaration of an agency official that states with particularity the information subject to the privilege as well as the precise reasons for maintaining the confidentiality of the identified documents.[33] Marriott, 437 F.3d at 1308. Up to this point, however, Chevron has failed to make any such identification.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to compel should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

---

[32] In the case of the deliberative process privilege, only through such a review can the Court appropriately weigh Chevron's need for the documents against the harm to the Government that would occur as a result of such disclosure.

[33] The Government's formal invocation of the deliberative process privilege also is contingent upon the approval of the Deputy Assistant Attorney General for Commercial Litigation, whose review of the privilege claim occurs when DOE has prepared its declaration regarding the documents that Chevron seeks to discover. As with the preparation of the DOE declaration, review by the DOJ official requires that Chevron first identify the specific documents on the Government's privilege log that it contends are not protected from disclosure by the privileges claimed by the Government.

/s/ John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
LESLIE OHTA
ANUJ VOHRA
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:

PAUL T. MICHAEL
ADA L. MITRANI
Trial Attorneys
Office of General Counsel
Department of Energy
Washington, D.C.

APRIL 5, 2007

CERTIFICATE OF FILING

I hereby certify that on this 5th day of APRIL, 2007, a copy of "DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL" and Appendix in support thereof were filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/John E. Kosloske