**Electronically Filed on April 23, 2007**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:04CV1365 |
| v. | ) | |
| | ) | Judge Susan G. Braden |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

# CHEVRON U.S.A. INC.'S REPLY IN SUPPORT OF MOTION TO COMPEL

Donald B. Ayer
Lawrence D. Rosenberg
*Counsel of Record*
Louis K. Fisher
Julia C. Ambrose
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Tel.: 202-879-3939
Fax: 202-626-1700

*Counsel for Chevron U.S.A. Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. THE GOVERNMENT'S PROCEDURAL OBJECTIONS ARE MERITLESS ........ 3

A. Chevron Satisfied the Requirements of Rule 37 ........ 3

B. The Government's Privilege Log Is Deficient ........ 5

II. THE GOVERNMENT HAS FAILED TO REFUTE CHEVRON'S SHOWING THAT THE GOVERNMENT MISCONDUCT EXCEPTION TO THE DELIBERATIVE PROCESS PRIVILEGE APPLIES AND COMPELS PRODUCTION HERE ........ 7

A. The Government Does Not Seriously Dispute That the Government Misconduct Exception Applies Where the Party Seeking Disclosure Has Made Serious Allegations of Government Wrongdoing ........ 7

1. Chevron Need Not Prove Its Case on the Merits in Order to Invoke the Government Misconduct Exception ........ 7

2. An Allegation of Breach of Contract Can Establish Government Misconduct ........ 9

3. Chevron Need Not Challenge the Results of the Equity Finalization Process at This Stage of Litigation ........ 14

B. The Purpose of the Deliberative Process Privilege Is Not Furthered by Shielding Documents That Themselves Reflect or Embody Wrongdoing ........ 14

C. The Government Has Essentially Ignored Chevron's Substantial Showing of Misconduct ........ 16

D. The Government's Invocation of the Deliberative Process Privilege Is Unsupported by Any Description of Agency Policy ........ 17

III. THE MISCONDUCT EXCEPTION TO THE ATTORNEY WORK PRODUCT AND ATTORNEY-CLIENT PRIVILEGES APPLIES HERE ........ 19

A. The Government Has Not Refuted Chevron's Argument That the Misconduct Exception Should Apply Where There Is a Prima Facie Showing of Serious Misconduct Inconsistent With the Basic Premises of the Adversary System ....................19

B. Chevron's Prima Facie Showing of Misconduct Justifies Application of the Misconduct Exceptions ....................23

C. The Purposes of the Privileges Would Not Be Served by Protecting the Government's Documents From Disclosure ....................24

D. The Withheld Documents Were Not Prepared in Anticipation of Litigation ....................26

IV. CHEVRON'S PROPOSED PROCEDURE IS PROPER ....................26

A. The Court Need Not Conduct In Camera Review ....................26

B. Chevron's Four Categories Are Appropriate ....................27

CONCLUSION ....................28

## TABLE OF AUTHORITIES

### CASES

**Page**

*Alexander v. FBI*, 186 F.R.D. 170 (D.D.C. 1999) ....................8, 26

*In re Antitrust Grand Jury*, 805 F.2d 155 (6th Cir. 1986) ....................26

*In re BankAmerica Corp. Securities Litigation*, 270 F.3d 639 (8th Cir. 2001) ....................26

*Brown v. City of Detroit*, 259 F. Supp. 2d 611 (E.D. Mich. 2003)....................11, 12

*Burka v. New York City Transit Authority*, 110 F.R.D. 660 (S.D.N.Y. 1986)....................14, 15

*Chaudhry v. Gallerizzo*, 174 F.3d 394 (4th Cir. 1999) ....................21

*Clark v. United States*, 289 U.S. 1 (1933) ....................19, 23

*Dominion Cogen, D.C., Inc. v. District of Columbia*, 878 F. Supp. 258 (D.D.C. 1995)....................12

*Eagle-Picher Indus., Inc. v. United States*, 11 Cl. Ct. 452 (1987)....................24

*In re Echostar Communications Corp.*, 448 F.3d 1294 (Fed. Cir. 2006) ....................26

*Fidelity & Deposit Co. of Maryland v. McCulloch*, 168 F.R.D. 516 (E.D. Pa. 1996)....................6

*First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312 (2000)....................26

*Fisher v. United States*, 425 U.S. 391 (1976) ....................24

*In re Grand Jury Subpoenas*, 144 F.3d 653 (10th Cir. 1998)....................20

*Jinks-Umstead v. England*, 233 F.R.D. 49 (D.D.C. 2006)....................19, 23

*Kaiser Aluminum & Chemical Co. v. United States*, 141 Ct. Cl. 38, 157 F. Supp. 939 (1958) ....................10, 11

*LaBarge Products, Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1995) ....................12

*Marriott International Resorts, L.P. v. United States*, 437 F.3d 1302 (Fed. Cir. 2006)....................18

*Mobil Oil Corp. v. DOE*, 102 F.R.D. 1 (N.D.N.Y. 1983)....................15, 17

*Moody v. IRS*, 654 F.2d 795 (D.C. Cir. 1981) ....................19, 22, 23

*Olson v. Accessory Controls & Equipment Corp.*, 757 A.2d 14 (Conn. 2000) ............................22

*Pacific Gas & Electric Co. v. United States*, 70 Fed. Cl. 128 (2006)..........................................18

*In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997).........................................................................26

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997).................................................8, 9, 10, 12, 26

*In re Sealed Case*, 754 F.2d 395 (D.C. Cir. 1985)...................................................................20, 23

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982).........................................................................19

*In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800 (Fed. Cir. 2000)............................20, 21, 24

*Sparton Corp. v. United States*, 44 Fed. Cl. 557 (1999) ..............................................................24

*In re Sunrise Securities Litigation*, 130 F.R.D. 560 (E.D. Pa. 1989).....................................19, 22

*Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867 (1st Cir. 1995)...12, 13

*Tri-State Hospital Supply Corp. v. United States*, 226 F.R.D. 118 (D.D.C. 2005) ................19, 20

*United States v. Lake County Board of Comm'rs*, 233 F.R.D. 523 (N.D. Ind. 2005)...................15

*United States v. Witmer*, 835 F. Supp. 208 (M.D. Pa. 1993) ......................................................20

*Upjohn Co. v. United States*, 449 U.S. 383 (1981).......................................................................24

*Weiss v. United States*, 155 Ct. Cl. 825 (1961)...............................................................10, 11, 20

*Williams v. City of Boston*, 213 F.R.D. 99 (D. Mass. 2003).......................................................14

**RULES**

ABA Model Rules of Judicial Conduct Rule 3B(7) .............................................................16, 17

ABA Model Rules of Judicial Conduct Rule 3E(1)...........................................................................16

District of Columbia Rules of Professional Conduct 3.5(b) ......................................................16

Fed. R. Civ. P. 26(b)(3)...................................................................................................................26

**MISCELLANEOUS**

*Restatement (Third) of the Law Governing Lawyers*.....................................................................21

**Electronically Filed on April 23, 2007**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:04cv1365 |
| vs. | ) | |
| | ) | Judge Susan G. Braden |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**CHEVRON U.S.A. INC.'S REPLY IN SUPPORT OF MOTION TO COMPEL**

**INTRODUCTION**

In its opening brief, Chevron showed that communications or documents that may be covered at the threshold level by the deliberative process, attorney-client, or attorney work product privileges ultimately are not protected from disclosure when the communications or documents themselves are prohibited by law or agreement and constitute or evidence serious government misconduct. Chevron further made a prima facie showing that the Government in this case engaged in serious misconduct by willfully, repeatedly, and in bad faith breaching the wall of separation that the parties established and that fundamental principles of fairness, legal ethics, and administrative procedure require between the DOE equity/advocacy team on the one hand and the decisionmakers with respect to the Elk Hills equity finalization process on the other hand.

In response, the Government does not dispute several critical components of Chevron's argument, including that (i) misconduct exceptions to the deliberative process, attorney-client, and attorney work product privileges apply in certain instances of significant wrongdoing on the part of the Government; (ii) this Court and the Federal Circuit regularly look to the law of the D.C. Circuit with respect to such issues; (iii) Mary Egger and certain of her subordinates actively advised and represented the DOE equity team with respect to legal and other substantive matters

while also playing a major role in drafting decisions of the ASFE covering the very same legal and substantive issues; and (iv) at least a significant number of the documents that Chevron seeks plainly establish the extent of this dual role. Instead, the Government's Opposition cites general authority discussing the contours of the privileges it has invoked, attempts to distinguish Chevron's authority on irrelevant facts, and blithely ignores the significant evidence of misconduct that Chevron's opening brief describes.

Indeed, the Government's argument in opposition to Chevron's motion suffers from three fundamental and demonstrably erroneous premises: (1) that Chevron must first prevail on the merits of its breach of contract claim before it will be entitled to receive the documents that it seeks; (2) that the misconduct exceptions to the asserted privileges cannot apply in breach of contract cases; and (3) that Chevron has merely alleged a simple breach of contract. To the contrary, however, the relevant precedent establishes that a party need only raise "serious allegations" or make a "prima facie showing" of misconduct before the relevant exceptions will apply to permit discovery. The relevant precedent also establishes that the misconduct exceptions at issue apply in cases of serious misconduct, regardless of the cause of action alleged – and particularly where the specific communications at issue constitute serious misconduct and are themselves prohibited.

Moreover, Chevron has alleged much more than a simple breach of contract. It has alleged that at least some of the same Government officials who agreed to create a wall of separation between the DOE equity/advocacy team and the decisionmakers with respect to the equity finalization process themselves blatantly ignored that wall of separation and played a major role in drafting and coordinating the review process for the substantive decisions issued by the ASFE. In addition, Chevron has alleged that those Government officials made every effort to conceal their repeated breaches of the wall of separation. Those actions underscore the crux of Chevron's argument: The communications the Government has withheld, which reflect conduct by a government attorney in blatant disregard for a contractually-agreed-upon adjudicative process,

simply are not the sort of documents that the privileges are intended to protect. In these circumstances, the documents that Chevron seeks are not legitimately protected by the deliberative process, attorney-client, or attorney work product privileges.

Because Chevron has alleged (and made a prima facie showing of) wrongdoing akin to intentional violation of adjudicative procedures and fraudulent concealment, Chevron is entitled to the documents that it seeks. Its motion to compel should be granted.

## ARGUMENT

### I. THE GOVERNMENT'S PROCEDURAL OBJECTIONS ARE MERITLESS

#### A. Chevron Satisfied the Requirements of Rule 37

There is no merit in the Government's claim (Opp'n at 7) that Chevron's motion should be denied because Chevron supposedly did not abide by the requirement that it confer in good faith with the Government in an attempt to resolve the parties' discovery dispute. In fact, given the actual history of events, the Government's allegation in this regard is remarkable. The parties have long been in communication about Chevron's intention to insist upon production of documents that fall within the four categories of key materials identified in its opening brief. Chevron repeatedly has sought clarification of the Government's position and has attempted to determine whether there is any opportunity for compromise – to date, to no avail.

In early December 2006, Chevron's counsel identified for the Government the four categories of documents that are the subject of its motion to compel and informed the Government that it would seek production of those four categories of materials despite any forthcoming assertions of privilege. Just days later, counsel sent a letter asking the Government to disclose whether it planned to assert privilege over a substantial number or all of the responsive documents within Chevron's categories. *See* Ex. 1 (12/6/06 letter from Lawrence D. Rosenberg to John E. Kosloske). The Government did not respond to Chevron's inquiry until the Court convened a conference in Chambers to address the parties' privilege dispute. At that conference, the parties

and the Court discussed Chevron's position and the Government's reaction that it would likely be asserting privilege over documents included in the categories that Chevron had identified.

On February 16, 2007, Chevron received the Government's privilege log, which has been supplemented twice – once after Chevron filed its motion to compel. Before filing its motion to compel, Chevron asked the Court to convene a conference call with the Government to discuss once again Chevron's proposed motion. At that time, the Government did not raise any objection based on Rule 37 or indicate any willingness to attempt to compromise with respect to any of the categories of documents that Chevron had identified months earlier. Instead, the Government declared that it could not respond to Chevron's proposal for resolving the privilege dispute "until we have the motion [to compel] and read it." Ex. 2 (3/12/07 Hearing at 12).

Shortly after Chevron filed its motion, Chevron's counsel contacted Government counsel in an attempt to schedule a conference to discuss the privilege dispute, as the Court had suggested. Again, the Government indicated no interest in discussing the privilege issues with Chevron and stated that it would agree to meet only after it had filed its response to Chevron's motion. On April 9, 2007, the parties did meet and further discussed possibilities for compromise as to these issues. On April 16, 2007, Government counsel informed counsel for Chevron that the Government was not interested in exploring further the options for compromise that Chevron had presented.

In these circumstances, Chevron fully complied with its obligations under Rule 37. It has conferred with the Government – both before and after filing the motion – several times about the relief it seeks and has been unable to this point to get the Government to even seriously consider any compromise. The Government now claims that Chevron was obligated to conduct yet another meet-and-confer with DOE counsel prior to filing its motion to compel, despite the parties' repeated communications and the Government's declared intention to assert privilege. Nothing in the rules the Government cites, though, requires repeated meetings between the parties in futile attempts to resolve a discovery dispute that all involved expected would be the subject of a motion

to compel. In short, to the extent that a meeting and conference between the parties was required in advance of Chevron's motion, the parties had such a meeting and were unable to resolve their differences. The parties and the Court were well aware that the privilege issues would be resolved only upon motion. Thus, the Government's invocation of Rule 37 is an entirely baseless attempt to avoid the privilege issues on their merits and should be rejected.

### B. The Government's Privilege Log Is Deficient

The Government's arguments about the sufficiency of its privilege log similarly miss the point. Chevron does not claim that the Government has violated the general standards governing the sufficiency of privilege logs. Rather, Chevron argues that, taken as a whole, the Government's privilege log does not provide Chevron sufficient information to accurately determine whether certain documents fall within the four categories of documents that it seeks, much less whether any particular document is likely to be significant (or highly significant) to the case. In these circumstances, Chevron has urged that the burden should be placed on the Government – which, unlike Chevron, has access to the documents and made the privilege assertions – to determine whether the documents on the privilege log do indeed fall within the categories of documents that Chevron has identified.

Chevron's opening brief outlined numerous examples of shortcomings in the Government's lengthy privilege log and its various supplements to illustrate the impracticability of evaluating the documents on that basis. In response, the Government assumes that Chevron's list of deficiencies is exhaustive rather than illustrative, treating Chevron's criticisms of the privilege log as "based solely on [the] 12 documents" discussed in its opening brief. *See* Opp'n at 5-7. In fact, the deficiencies Chevron identified in the Government's log are pervasive, not isolated. Even setting aside the sheer length and volume of the Government's catalog of withheld documents, the information provided in its privilege log is inconsistent, uninformative, and often confusing. Although the Government claims that providing too many "details" (such as "time, persons, general subject matter, etc.") (Opp'n at 6) about the documents it has withheld "may be unduly

burdensome when voluminous documents are claimed to be privileged or protected" (Opp'n at 6, quoting *Fidelity & Deposit Co. of Maryland v. McCulloch*, 168 F.R.D. 516, 523 n.10 (E.D. Pa. 1996)), it offers no guidance as to how Chevron can be expected to isolate, from the thousands of documents the Government has withheld, those that it believes it is entitled to review without those sorts of identifying "details."

The Government's disdain for details clearly explains, though, its insistence that such descriptors as "draft Stevens Zone preliminary decision post-OHA remand,"[1] unaccompanied by any information about the date of the document, its author, its addressees, or its recipients, should enable Chevron to determine whether or not that document contains relevant information.[2] Of course, Chevron would seek production of such a document if Mary Egger (or someone acting at her direction) was involved in the drafting or editing of the document; it likely would not seek production if the draft reflected only minor grammatical and spelling edits by a member of the ASFE's staff. The Government, which has possession of, and thus the ability easily to review, the identified documents, can readily make the determination whether a document falls within the categories of critical information Chevron has identified (here, a communication reflecting Mary Egger's or her staff's direct input into the drafting of the ASFE's equity decisions). Chevron, given only the limited information provided on the Government's privilege log, cannot.

Despite the obvious impediments to Chevron's conducting a conclusive review and identification of the documents it believes are subject to production based only on the privilege log, Chevron has continued working diligently to prepare a list of documents that it believes fall within each of its four categories. Chevron has informed the Government and the Court of its ongoing efforts and will shortly provide DOE and the Court with its list as soon as it is finalized. Any

[1] *See* document # 4836.

[2] Lest the Government mistake the discussion of this single document as reflecting an exhaustive review and identification of shortcomings on its nearly-300-page log, Chevron points out that the examples of similarly vague and unhelpful entries are too numerous to count. *See*, by way of example only, documents # 4782, 4783, 4784, 4785, 4788, 4789, 4823, 4849, 4850, 4853, 4903, 4949, 4960, 4961, 4962, 4963, 4966, 4967, 4968.

identification of documents by Chevron, though, is certain to be both over- and under-inclusive, because it necessarily is based only on the frequently limited information provided in the Government's privilege log.

## II. THE GOVERNMENT HAS FAILED TO REFUTE CHEVRON'S SHOWING THAT THE GOVERNMENT MISCONDUCT EXCEPTION TO THE DELIBERATIVE PROCESS PRIVILEGE APPLIES AND COMPELS PRODUCTION HERE

The Government's Opposition both fails to come to grips with the particular circumstances of this case and fails to identify any "policy" or legitimate policy interest that would be undermined by the disclosure of the documents that Chevron seeks. The Government has not even attempted to make a persuasive argument that the prohibited and illegitimate input of Mary Egger and her subordinates into the decisions of a government adjudicator in the context of what is essentially a business relationship with Chevron should be protected from disclosure.

### A. The Government Does Not Seriously Dispute That the Government Misconduct Exception Applies Where the Party Seeking Disclosure Has Made Serious Allegations of Government Wrongdoing

In its opening brief, Chevron showed that the Government misconduct exception applies where the party seeking disclosure has demonstrated a reasonable basis for believing that the communications at issue would evidence government misconduct, such as duality of interest or actions taken in bad faith – particularly where there are allegations that the deliberative process itself was tainted by the misbehavior. The Government's opposition largely ignores Chevron's argument and authorities, relying instead on a series of unsupported and legally erroneous assumptions about Chevron's burden of proof.

#### 1. Chevron Need Not Prove Its Case on the Merits in Order to Invoke the Government Misconduct Exception

The Government's primary argument in opposition is that Chevron must effectively prove its case on the merits that DOE breached its contractual and ethical duties before it will be able to establish that the government misconduct exception requires disclosure of the subject documents. According to the Government, the Court cannot grant Chevron's motion without first ruling on "a

central issue in this litigation that involves a question of contract interpretation which the Court has yet to decide": "whether Ms. Egger and/or any subordinate attorneys were part of the [DOE EFT] within the meaning of ¶ B.4 of the [EPA]." Opp'n at 2. *See also* Opp'n at 13 (arguing that "[t]he Court has yet to make a finding as to whether ¶ B.4 of the [EPA] was breached as alleged by Chevron and it would be premature for the Court to do so in the context of Chevron's discovery motion, inasmuch as there is not a fully-developed record for decision upon that issue"). That argument cannot possibly be correct.

A party challenging the application of the deliberative process privilege on the basis of misconduct need not provide wrongdoing "conclusively." Opp'n at 13. Instead, the case law makes plain that the required showing to invoke the government misconduct exception to the deliberative process privilege is relatively minimal: "[W]here there is *reason to believe* the documents sought may shed light on government misconduct, 'the privilege is routinely denied.'" *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) (citations omitted; emphasis added). *See also, e.g., Alexander v. FBI*, 186 F.R.D. 170, 179 (D.D.C. 1999) (privilege is overcome where there is "*some reasonable basis for believing* that compelling testimony on these questions may shed some light on potential government misconduct") (emphasis added).

Chevron has amply made such a showing. Chevron is not required to *prove* that Mary Egger served as a member of the DOE EFT (as well as an advisor to the ASFE) in order to establish misconduct sufficient to overcome the privilege. The Government's limited production of documents to date, coupled with its admissions in response to Chevron's written discovery requests, establish that the parties had indeed agreed to erect a wall of separation and demonstrate Mary Egger's repeated and deliberate breaches of that wall of separation. *See* Opening Br. at 5-8. That evidence of misconduct (which the Government's brief, tellingly, ignores altogether) fully satisfies Chevron's burden of establishing misconduct sufficient to overcome the Government's assertions of the deliberative process privilege.

The Catch-22 inherent in the Government's contrary argument is obvious. According to the Government, Chevron must prove its ultimate entitlement to relief in order to be entitled to review the very documents that provide the best evidence in support of its claims. The Government appears to have forgotten that this case is presently in the earliest stages of discovery. Nothing in the authorities cited in the Government's Opposition suggests that a party seeking discovery can overcome an assertion of privilege on the basis of misconduct only if it first obtains a victory on the merits of its claims. The misconduct exceptions would be of little use to litigants – indeed, would be nothing more than legal curiosities – if a litigant seeking discovery in order to assemble evidence to satisfy its ultimate burden of proof on the merits were required first to prove its claims.

Chevron has not "assume[d] that government misconduct occurred" (Opp'n at 13) but instead has made a prima facie showing, supported by numerous documents and the Government's answers to Chevron's interrogatories, that DOE, largely in the person of Mary Egger, knowingly and deliberately violated the wall of separation the parties intended to erect in order to ensure a fair and neutral equity finalization process. Accordingly, the deliberative process privilege should be set aside.

### 2. An Allegation of Breach of Contract Can Establish Government Misconduct

The Government's secondary argument is that a simple "breach of contract" cannot constitute government misconduct. The Government claims, without citation of authority, that "a breach of contract is not tantamount to the misconduct contemplated by" the misconduct exception to the deliberative process privilege (or the similar exception to the attorney-client and attorney work product privileges). Opp'n at 3; *see also id*. at 14.[3] The Opposition, however, provides

[3] As a corollary, the Government notes that *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (*Sealed Case IV*), "did not suggest that a breach of contract, as Chevron alleges here, could constitute 'government misconduct' for purposes of the exception to the deliberative process privilege," and that "[n]one of the cases Chevron cites . . . discuss misconduct in the context of an alleged breach of contract." Opp'n at 15. The Government is correct, but its point is meaningless. *Sealed Case IV*, like the other authority cited in Chevron's opening brief, said nothing about a

neither authority nor persuasive argument in support of the proposition that the misconduct exceptions cannot apply to misconduct derived from or related to a willful, deliberate breach of a contractual provision. Put another way, the Government offers no basis – legal, logical, or otherwise – for refusing to apply the misconduct authorities Chevron has cited to a case involving misconduct related (directly, although not exclusively) to a contractually-mandated adjudicatory process.

The few cases the Government cites do not support its argument. As its primary authority, the Government claims that *Kaiser Aluminum & Chemical Co. v. United States*, 141 Ct. Cl. 38, 50-51, 157 F. Supp. 939, 947 (1958), "[m]ost tellingly" refused to apply the government misconduct exception absent *in camera* review of disputed documents where "no fraud is charged, *no duality of interest*, only a breach of the terms of open contracts." Opp'n at 16 (emphasis added). The Government is simply incorrect that "Chevron alleges nothing more than a breach of the terms of an open contract." *Id*. In fact, Chevron alleges *precisely* the sort of misconduct that *Kaiser Aluminum* confirms warrants the setting aside of the deliberative process privilege as a categorical matter, even without *in camera* review: a clear *duality of interest* on the part of Mary Egger, who played a prohibited dual role both as an advocate for the DOE EFT and, simultaneously, as an advisor to the DOE decisionmaker. The Government's primary authority, then, in fact supports Chevron's position.

Additional authority disproves the very premise of the Government's argument. *Weiss v. United States*, 155 Ct. Cl. 825 (1961), shows that this Court's predecessor did in fact apply the government misconduct exception in a breach of contract case. There, the plaintiff, the bankruptcy receiver for Utility Electronics Corporation, brought claims for breach of contract based on

(continued…)
breach of contract simply because those cases did not involve one. What the Government does not say is far more telling. The Government does not claim, and cannot, that the rationale articulated in *Sealed Case IV* (and Chevron's other authority) for setting aside the privilege in the face of a showing of government misconduct is inapplicable when the misconduct is related to or derives from a contractual relationship.

allegations that the Department of the Army forced the Corporation into bankruptcy "in pursuit of a contrived default termination of its supply contracts, as a means of avoiding the Department's obligations under termination . . . , which would have required termination settlements." *Id*. at 825-26. In response to the plaintiff's discovery requests, the Government asserted the work product and executive (essentially, deliberative process) privileges. The plaintiff responded that "the issues of fraud [raised by the complaint] vitiate defendant's claims of privilege, whether based on grounds of public interest or the work product of attorneys." *Id*. at 871. The Court considered the evidence in support of plaintiff's bad-faith breach-of-contract allegations, ultimately concluding that the plaintiff had made out "a prima facie showing of bad faith on the part of the Army." *Id*. at 885. That "prima facie showing of bad faith establishe[d] plaintiff's right to discovery of all the documents withheld, including advisory opinions which, under the rule of *Kaiser [Aluminum]*, would be privileged . . . ." *Id*. at 887. *Weiss* makes clear that the government misconduct exception to the deliberative process privilege can and does apply when the allegations of misconduct are premised on a contractual breach.

To similar effect is *Brown v. City of Detroit*, 259 F. Supp. 2d 611 (E.D. Mich. 2003). There, a police officer brought a Section 1983 suit against the City, alleging failure to promote him in accordance with the terms of a collective bargaining agreement. *Id*. at 615. During the course of the litigation, the City withheld from production, subject only to limited inspection by plaintiff's counsel, an internal report issued by an executive review board reexamining plaintiff's actions in connection with several shooting incidents, for which plaintiff previously had been cleared of wrongdoing. Although the court "acceded to Defendants' request that [the report] remain confidential," it was "disturbed by Defendants' appeal to the deliberative process privilege as a means to prevent its disclosure" in light of plaintiff's suggestion that the City engaged in misconduct in reopening the examination of the shooting incidents in an effort to deny plaintiff a promotion. *Id*. at 623. The court found the City's conduct in relation to plaintiff's promotion and

the executive board reexamination of his conduct in the line of duty "hardly a compelling set of circumstances upon which to rest a claim of privilege." *Id*. Indeed, the court noted that "it is precisely under such conditions that privileges are deemed to be waived," *id*. at 623-24 (citing, *inter alia*, *In re Sealed Case*, 121 F.3d at 738), without any suggestion that the misconduct exception to the privilege could not apply in a case alleging breach of an agreement. *Cf. LaBarge Products, Inc. v. West*, 46 F.3d 1547, 1552 (Fed. Cir. 1995) (discussing allegations of government misconduct in context of government contractor's claim for reformation of contract with United States Army and noting that "allegations of government misconduct are the kind of allegations that are ordinarily made in pre-award bid protests").

In all events, this case involves far more than an ordinary breach of a contract term. This is not a case in which the Government did not pay a vendor an agreed-upon rate, or refused to take delivery of goods, or failed to meet a deadline set by contract. This is a case about blatant, repeated, secret Government disregard for the critical elements of a carefully negotiated adjudicatory process. That ongoing misconduct, amply described in Chevron's opening brief and supported by reference to a number of documents already produced by DOE (*see* Opening Br. at 5-8), amounts to far more than a simple breach of contract. It is, in fact, precisely the sort of misconduct – improper actions and motivations – that warrants setting aside the evidentiary privileges the Government has invoked. *See, e.g.*, *Dominion Cogen, D.C., Inc. v. District of Columbia*, 878 F. Supp. 258, 268 (D.D.C. 1995) (holding deliberative process privilege inapplicable in light of plaintiffs' allegations that their permit applications were denied for improper political reasons, without suggestion that any and all litigation alleging improper denial of permits would vitiate privilege; allegations of "misconduct or misbehavior" "place[d] the deliberative process itself directly in issue" in that case); *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995) (deliberative process privilege held not to apply in light of evidence that

defendant "acted in bad faith over a lengthy period of time," coupled with plaintiff's "'strong showing' of arbitrariness and discriminatory motives").

Finally, the Government is simply wrong about Chevron's allegations. Chevron has pleaded breach of paragraph B.4 of the EPA – and also has pleaded breach of the covenant of good faith and fair dealing. The gist of Chevron's complaint is that the parties agreed to erect a wall of separation between the equity advocacy teams and the DOE decisionmakers; DOE recognized the need for a prohibition on *ex parte* communications in order to ensure that the equity finalization process would be fair, neutral, and objective; the EPA itself as well as the DOE Protocols specified DOE's obligation to refrain from such communications; and in blatant disregard of those provisions, as well as of the fundamental requirements of good faith and fair dealing, DOE's Mary Egger and those acting under her supervision repeatedly and blatantly breached the agreed-upon wall of separation by simultaneously advocating on behalf of the DOE equity team and advising – and even drafting decisions on behalf of – the DOE adjudicator deciding the parties' equity disputes. The Government's breach of the EPA is only one component of Chevron's claims.

To be sure, Chevron is not suggesting that the misconduct exception to the deliberative process privilege is applicable in any case involving an allegation that the Government breached a contract. But this is not an ordinary breach of contract case. Where, as here, a statute, regulation, or agreement (entered pursuant to a grant of statutory authority) sets up an adjudicatory process in which certain communications are absolutely forbidden, and withheld documents themselves demonstrate or reflect that the forbidden communications in fact took place, the misconduct exceptions apply *regardless* of the cause of action being asserted. It is not the nature of the claim, but the nature of the misconduct itself, that warrants the application of the exception. This is true whether the resulting claim is one for criminal wrongdoing, tort, breach of contract, or breach of the duty of good faith and fair dealing.

### 3. Chevron Need Not Challenge the Results of the Equity Finalization Process at This Stage of Litigation

As a fallback, the Government argues that it matters not that the ASFE's decisionmaking process is at the center of this litigation, because Chevron has not specifically challenged the merits of the ASFE's decisions. Opp'n at 18. But this argument misses the point. Chevron most certainly directly challenges the ASFE's decisionmaking process as a violation of both applicable contract terms and fundamental rules of fairness and ethics. That process is not immunized from scrutiny simply because Chevron has not challenged the ultimate result of the decisionmaking process in this forum. This is especially true where, as here, the adjudicative process whose integrity is at issue was agreed to in exchange for substantial limits on judicial review of the ultimate decisions resulting from the process.

In any event, just as the plaintiffs in the cases cited by the Government (Opp'n at 18) were able to overcome the invocation of the deliberative process privilege based on the Government's misconduct regardless of whether there could be some other legitimate bases for the Government's actions, so too does the misconduct exception apply here given Chevron's allegations of wrongdoing, without Chevron undertaking the difficult and speculative task of showing particular effects of that wrongdoing on particular decisions. *See, e.g.*, *Williams v. City of Boston*, 213 F.R.D. 99, 102 (D. Mass. 2003) (plaintiffs' allegations of racial discrimination in employment sufficient to overcome deliberative process privilege with respect to reports of disciplinary proceedings against the officer-defendants accused of discrimination). *Cf. Burka v. New York City Transit Auth.*, 110 F.R.D. 660, 667 (S.D.N.Y. 1986) (in constitutional challenge to city transit authority's drug testing policy, plaintiffs were entitled to disclosure of authority's employment files, given that "the decision-making process itself [was] the subject of the litigation").

## B. The Purpose of the Deliberative Process Privilege Is Not Furthered by Shielding Documents That Themselves Reflect or Embody Wrongdoing

In its opening brief, Chevron showed that, where the deliberative process itself is at issue, the privilege does not apply to shield evidence of misconduct by the Government. Opening Br. at

19-20. The Government's brief does nothing to confront or distinguish that authority, nor could it. This is a case in which "the decision-making process itself" is "the subject of the litigation." *Burka*, 110 F.R.D. at 667. And the deliberative process privilege "is vitiated entirely at step one when the government's decisionmaking process is central to the plaintiff's case." *United States v. Lake County Bd. of Comm'rs*, 233 F.R.D. 523, 526 (N.D. Ind. 2005). Because this is a case about the Government's decision-making process in connection with equity finalization, the privilege has no applicability at the threshold.

Nor is the purpose of the privilege served by protecting the documents the Government has withheld. The Government agrees that the purpose of the deliberative process privilege is "to encourage frank discussion of ideas and policies, thereby ensuring the quality of governmental decision making." *Mobil Oil Corp. v. DOE,* 102 F.R.D. 1, 5 (N.D.N.Y. 1983) (quoted in Opp'n at 11). That purpose is not furthered by protecting documents related to a government decisionmaking process that itself was improperly conducted. At issue in this litigation is Mary Egger's participation in the ASFE's decisionmaking process and that of her subordinates, which was, under the terms of the EPA, the Protocol, and fundamental principles of good faith and fair dealing, entirely improper. Many of the withheld documents establish both the fact and the extent of her improper participation. The core purposes of the deliberative process privilege are not served by protecting those documents against disclosure.

It also bears mention that the misconduct exception is not a balancing test based on the *need* of the party seeking discovery, but rather an exception to privilege premised on the notion that communications that embody or relate to misconduct by the Government are not to be protected and fostered. Put another way, the purpose of the privilege informs the scope of the exception. It is for this reason that Chevron's complaint need not include a cause of action for fraud (whether by misrepresentation or concealment) in order to support the application of the exception. Chevron's factual allegations describe misconduct by the Government that far exceeds

any "ordinary" breach of contract; those factual allegations in turn support the invocation of the government misconduct exception.

### C. The Government Has Essentially Ignored Chevron's Substantial Showing of Misconduct

The Government's brief suffers from tunnel vision as well as misdirection: It focuses on the argument that Chevron must prove its case prior to receiving discovery but does not acknowledge, let alone address, Chevron's substantial showing of wrongdoing.

Chevron has provided substantial evidence that Ms. Egger and other DOE equity team members engaged in repeated, improper *ex parte* communications with the IPE and with the ASFE. *See* Opening Br. at 5-8. The evidence cited in Chevron's brief shows that Mary Egger simultaneously was closely involved in the representation of the DOE EFT before the ILA and the IPE and served as an advisor to the ASFE in the equity decisionmaking process. Most importantly, Chevron has pointed to significant evidence that Ms. Egger assisted in drafting, reviewing, and coordinating comments for several key decisions of the ASFE. *See*, *e.g.*, CDE00309292 (email from Mary Egger to acting ASFE Kripowicz forwarding draft of preliminary Stevens Zone decision for "initial review") (attached to Chevron's Opening Brief as Ex. 10). Indeed, the Government's interrogatory responses admit the majority of this conduct.

The Government's position that they "dispute" that these activities were prohibited by Paragraph B.4 of the EPA is beside the point. Chevron submits that it will be able to establish that they were prohibited by B.4, other contractual terms, the covenant of good faith and fair dealing, and fundamental principles of fairness and legal ethics. *See, e.g.*, District of Columbia Rules of Professional Conduct 3.5(b) (A lawyer shall not . . . [c]ommunicate ex parte with [a judge] during the proceeding unless authorized to do so by law or court order."); ABA Model Rules of Judicial Conduct Rule 3B(7) ("A judge shall not initiate, permit, or consider ex parte communications . . . ."; if such communications do take place, the judge must "make[] provision promptly to notify all other parties of the substance of the ex parte communication."); ABA Model

Rules of Judicial Conduct Rule 3E(1)(b) (judge must disqualify herself where "the judge served as lawyer in the matter in controversy"); ABA Model Rules of Judicial Conduct Rule 3B(7)(c) (Although "[a] judge may consult with court personnel whose function is to aid the judge," "'court personnel' does not include the lawyers in a proceeding before a judge.").[4]

Chevron has shown that Mary Egger, while working secretly to maximize DOE's recovery in the equity finalization process, at the same time promoted the fiction that the decisionmaking process was impartial. Chevron intends to prove that that conduct violated the terms of the parties' agreement as well as applicable principles of fairness and legal ethics. In these circumstances, that process cannot be cloaked in privilege, and the Government has offered no plausible reason to conclude otherwise.

**D. The Government's Invocation of the Deliberative Process Privilege Is Unsupported by Any Description of Agency Policy**

The Government has claimed that the deliberative process privilege protects more than 1100 documents from disclosure to Chevron, but its invocation of that evidentiary privilege is made entirely in a vacuum. The Government admits that "[t]he purpose of the privilege is to encourage frank discussion of *ideas and policies*" (Opp'n at 11, quoting *Mobil Oil Corp.*, 102 F.R.D. at 5 (emphasis added)), but it has not articulated any particular policy considered or adopted by the DOE in connection with the equity finalization process, or even any particular policy *interest*, that warrants its decision to withhold from production the very documents that illustrate the repeated and willful breaches of the parties' agreed-to wall of separation.

Indeed, the Government has not even made a full and final decision to invoke the privilege, despite its awareness since at least December 2006 that Chevron intended to seek the production of,

---

[4] The Government's insistence that "[t]he sole basis for Chevron's claim is a breach of contract, *not* professional misconduct" and that Chevron's claims relate only to a "*non-judicial* process provided for in [that] contract" (Opp'n at 43, emphases in original) appears to be based on a fundamental misunderstanding: The process established by the EPA is, in fact, a quasi-adjudicative, adversary process. The Government offers no authority to support its implicit assumption that such a quasi-adjudicative process is entirely exempt from the misconduct exceptions to the privileges it has invoked.

*inter alia*, all withheld documents that refer to or reflect input by Mary Egger and her subordinates into the drafting of the ASFE's preliminary and final equity decisions. The Government admits that its citation of the deliberative process privilege to date is nothing more than "tentative[]" (Opp'n at 3), and that it has not even begun the required process of invoking and supporting the privilege upon the review of the subject documents and the preparation of a declaration by an appropriate DOE official. *See, e.g.*, *Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302, 1308 (Fed. Cir. 2006); *Pacific Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128, 134 & n.8 (2006). The Government's delay in that regard is both inexplicable and inexcusable. Nothing in the Government's brief supports the Government's assertion that it is entitled to withhold otherwise responsive documents as to which it has *not* decided to invoke the privilege.

In all events, the Government's claim should be rejected at its inception because the facts of this case simply do not warrant the application of the deliberative process privilege at a threshold level. As the Court has observed, the equity finalization process undertaken by Chevron and DOE pursuant to the EPA is not a typical government "policymaking" activity. Quite the contrary, the relationship between DOE and Chevron is, in some respects, that of business partners interacting pursuant to a contract and, in other respects, that of advocate and adjudicator.

In large part, the agency "decisions" reflected in the withheld documents are not policy decisions at all, but business decisions. DOE entered into a commercial arrangement with Chevron; the agency then acted, under the terms of the EPA and throughout the equity finalization process, to further its own *commercial* (not policy) interests. Likewise, Mary Egger's role in the ASFE decisionmaking process reflected not her involvement in formulating and implementing DOE's *policy* decisions, but rather her participation in the adjudicative process by which a commercial dispute was to be resolved. It should follow, then, that the same general rules that apply in adjudicative proceedings generally apply with equal force here: An evidentiary privilege cannot be used to shield documents that themselves are the product of improper *ex parte* input by

counsel into the adjudicative process. *See generally, e.g.*, *Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981) (work product privilege cannot shield document reflecting improper *ex parte* communication between advocate and judge).

## III. THE MISCONDUCT EXCEPTION TO THE ATTORNEY WORK PRODUCT AND ATTORNEY-CLIENT PRIVILEGES APPLIES HERE

### A. The Government Has Not Refuted Chevron's Argument That the Misconduct Exception Should Apply Where There Is a Prima Facie Showing of Serious Misconduct Inconsistent With the Basic Premises of the Adversary System

In its opening brief, Chevron showed that a corollary to the crime-fraud exception to the attorney-client and attorney work product privileges applies to prescribe disclosure where the party seeking discovery makes a prima facie showing of significant misconduct fundamentally inconsistent with the basic premises of the adversary system, such as where the privileges have been abused. Opening Br. at 25, 31. The Supreme Court articulated this fundamental principle in *Clark v. United States*, 289 U.S. 1 (1933), in which the Court confirmed that "[t]he privilege takes as its postulate a genuine relation, honestly created and honestly maintained," and concluded that the attorney-client privilege "takes flight if the relation is abused." *Id*. at 14. That basic principle has been applied in cases involving improper *ex parte* communications with a judge (*Moody v. IRS*, 654 F.2d 795 (D.C. Cir. 1981)), intentional discrimination by the Government (*Jinks-Umstead v. England*, 233 F.R.D. 49 (D.D.C. 2006)), and self-dealing and conflict of interest (*In re Sunrise Securities Litigation*, 130 F.R.D. 560 (E.D. Pa. 1989)). The Government does not even acknowledge the Supreme Court's decision in *Clark*, and its contrary arguments are unpersuasive.

*First*, the Government's primary argument that Chevron must prove its case on the merits to establish the applicability of the misconduct exception is no more persuasive in this context than it is with respect to the deliberative process privilege. The misconduct exception to the attorney work product doctrine is available to a party who makes a prima facie showing of a violation "sufficiently serious to defeat the work-product privilege." *In re Sealed Case*, 676 F.2d 793, 814-15 (D.C. Cir. 1982). *See also, e.g.*, *Jinks-Umstead*, 233 F.R.D. at 51-52 (same); *Tri-State*

*Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 133 (D.D.C. 2005) (same). Similarly, the misconduct exception to the attorney-client privilege is available to a party who "make[s] a *prima facie* showing that the communication was made 'in furtherance of'" the asserted misconduct. *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 807 (Fed. Cir. 2000). *See also, e.g.*, *In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998) (requiring "prima facie evidence" that the allegation of misconduct "has some foundation in fact"); *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985) (requiring a "prima facie showing of a violation sufficiently serious to defeat the privilege"). Indeed, *Spalding Sports* makes clear that "the party seeking to overcome the attorney-client privilege need not conclusively prove" wrongdoing – or even "necessarily submit direct evidence" – in order to make a *prima facie* showing of misconduct. 203 F.3d at 808.

*Second*, the Government's subordinate argument that the exception cannot apply in breach of contract cases is, likewise, wrong, as a matter of both theory and logic. As noted above, this Court in *Weiss v. United States* ordered discovery of documents claimed to be protected by the work product privilege in light of the plaintiff's showing of misconduct premised on the Army's "contrived default termination" of its contracts with plaintiff's debtor. 155 Ct. Cl. at 887 (holding that plaintiff's "prima facie showing of bad faith establishes plaintiff's right to discovery of . . . the alleged work product of Army attorneys for which exemption is claimed under the rule of *Hickman v. Taylor*"). Similarly, in *United States v. Witmer*, 835 F. Supp. 208 (M.D. Pa. 1993), *aff'd*, 30 F.3d 1489 (3d Cir. 1994), the court concluded that *in camera* review of documents claimed to be protected by the attorney-client privilege was warranted by the Government's showing that the defendant "falsely asserted to the Army that it had not included in its contract bid certain federal excise taxes . . . that were due to expire before all of the contract vehicles were delivered." *Id*. at 212, 223. In *Witmer*, as in *Weiss*, the court found the misconduct exception at least potentially applicable even when the party seeking discovery asserted misconduct premised on or related to a contract with the Government.

The cases that the Government cites do not establish, to the contrary, that the misconduct exception could never apply in a breach of contract case. None of those cases involved the sort of misconduct at issue here: repeated and deliberate disregard of the fundamental rules of an adjudicative process. *Spalding Sports* found the exception inapplicable to an otherwise-privileged patent invention record submitted to in-house counsel for a determination of patentability, because the "mere allegation" that the patent holder had failed to cite a prior art reference before the Patent and Trademark Office did not amount to a prima facie showing of misconduct absent some indication that the failure was coupled with "evidence of a purpose to conceal that art" or other bad-faith conduct. 203 F.3d at 808. Nothing in *Spalding*, however, suggests that the failure by the party seeking discovery in that case to provide a sufficient quantum of proof of wrongdoing to overcome the attorney-client privilege means that *only* a showing of common-law fraud can negate the privilege. No breach of contract was at issue in *Spalding*; it should come as no surprise, then, that the court did not discuss whether a prima facie showing of such a breach might in some cases also warrant setting aside the privilege.[5]

Moreover, the Government's reliance (Opp'n at 34) on the *Restatement (Third) of the Law Governing Lawyers* is misleading. Section 82, which the Government quotes, is entitled "Client Crime or Fraud." It is thus not surprising that Section 82 does not in its text describe other conduct that warrants an exception to the attorney-client privilege. Nevertheless, in the comments to Section 82, the *Restatement* explains that "[t]here is a public interest in preventing clients from attempting to misuse the client-lawyer relationship for seriously harmful ends. Denying protection of the privilege can be founded on the additional moral ground that the client's wrongful intent forfeits the protection." *Id.* cmt. b. Thus, rather than supporting the Government's position, if anything, the *Restatement* supports Chevron's position.

---

[5] Similarly, *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999) (cited in Opp'n at 33) did not involve any breach of contract claim. The Fourth Circuit affirmed the district court's conclusion that no exception to the attorney-client and work product privileges applied where the party seeking disclosure had failed to make any showing of bad faith or deceptive conduct.

Contrary to the Government's argument, *Olson v. Accessory Controls & Equipment Corp.*, 757 A.2d 14 (Conn. 2000), cited in Chevron's opening brief at page 33, suggests by analogy that such a breach of a contractual duty could, in appropriate circumstances, overcome the attorney-client privilege. *Olson* reasoned that the misconduct exception could apply in the case of a duty to disclose and a breach of that duty. *Id*. at 34. In discussing *Olson*, the Government repeats its logical error: It notes that the Court in that case found no duty to disclose and thus no basis for applying the misconduct exception, but fails to contend with the *import* of *Olson*'s reasoning, which plainly teaches that a duty to make (or, conversely, not to make) a particular communication, coupled with evidence of a breach of that duty, can provide grounds for setting aside the privilege.

Of even greater relevance is *In re Sunrise Securities Litigation*, which provides an apt analogy because it involved conflicts of interest very similar to those at issue here. There, the court concluded that a communication between a law firm and a company's in-house counsel would not be shielded by the attorney-client privilege where the communication itself violated the applicable rules of professional conduct governing conflicts of interest. 130 F.R.D. at 597-98. *Sunrise* teaches that an inherently improper communication will not be protected, regardless of whether an attorney was involved, and equally regardless of whether the client sought legal advice to further the commission of a *separate* wrongful act. Contrary to the Government's argument, the importance of *Sunrise* is not that there exists a "fiduciary exception" to the attorney-client privilege that may or may not apply here, but rather that the privilege does not apply to shield communications that evidence a conflict of interest or breach of the rules of professional conduct.

Likewise, *Moody v. IRS*, which involved *ex parte* communications, is directly analogous. There, the D.C. Circuit concluded that the misconduct exception to the work product privilege would likely apply to a document that reflected an allegedly improper *ex parte* communication between an attorney and a judge, because the attorney's unprofessional conduct was contrary to the very purpose of the privilege and thus took the communication outside its protection. 654 F.2d

at 800. And the Government does not even discuss *Jinks-Umstead v. England*, 233 F.R.D. 49 (D.D.C. 2006), in which the court reaffirmed that the misconduct exception to the work product doctrine applies upon a prima facie showing of "misconduct . . . fundamentally inconsistent with the basic premises of the adversary system." *Id*. at 51 (quoting *In re Sealed Case*, 754 F.2d at 399). *Jinks-Umstead* concluded that a showing of the sort of misconduct alleged in that case – that "the government consulted with its attorneys as part of a bad faith effort to cover-up discriminatory conduct" – would make out a prima facie case sufficient to overcome the work product privilege, but ultimately found, after *in camera* review, that the documents did not support the cover-up alleged by the plaintiff. *Id*.

In the face of the weighty authority that Chevron cites, the Government provides no justification for its argument. It entirely ignores the lesson of *Clark* – that the attorney-client privilege evaporates upon abuse of the integrity of the attorney-client relationship – and the similar reasoning in the Wigmore treatise (cited in Chevron's opening brief at page 32) that no "moral line can properly be drawn" between types of serious misconduct, whether or not they technically constitute a "crime" or a "fraud." Ultimately, there is no persuasive justification for the Government's position.

### B. Chevron's Prima Facie Showing of Misconduct Justifies Application of the Misconduct Exceptions

Pointing to a handful of the documents produced by the Government and the Government's own interrogatory responses, Chevron has shown conduct on the part of the Government throughout the equity finalization process that is both dishonest and unfair. *See* Opening Br. at 5-8. Indeed, many of the documents the Government has withheld *themselves* constitute the misconduct at issue – Mary Egger's improper simultaneous involvement as both DOE EFT advocate and advisor to the ASFE and her direct input into the preparation of the ASFE's written equity decisions. Under the case law cited in Chevron's opening brief, this showing is enough to justify the discovery that Chevron seeks.

Allowing Chevron access to the withheld documents would not chill any legitimate attorney-client interactions in the Government. As noted above, Chevron does not suggest that any breach of contract by the Government involving a government attorney means that the attorney-client privilege evaporates altogether. But this is not an ordinary breach of contract case. The unusual and severe wrongdoing described in Chevron's complaint and confirmed by the limited discovery to date is not likely to be repeated in every (or, indeed, any) breach of contract case against the Government.

### C. The Purposes of the Privileges Would Not Be Served by Protecting the Government's Documents From Disclosure

There is a profound dissonance between the purposes of the privileges that the Government invokes and the precise nature of the communications embodied in the documents at issue. The purpose of the work product doctrine "is to protect counsel's mental processes so that the attorney can analyze and prepare for the client's case without interference from an opponent." *Sparton Corp. v. United States*, 44 Fed. Cl. 557, 564 (1999) (citation omitted). *See also, e.g.*, *Eagle-Picher Indus., Inc. v. United States*, 11 Cl. Ct. 452, 457 (1987) ("The primary purpose of the work product privilege is to assure that an attorney is not inhibited in his representation of his client by the fear that his files will be open to scrutiny upon demand of an opposing party."). Likewise, the purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administrative of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). That privilege exists to protect the rendering of legal advice by an attorney on the basis of confidential information provided by the client. *See, e.g.*, *Spalding Sports*, 203 F.3d at 805 ("central inquiry" in determining applicability of the privilege is "whether the communication . . . was made by a client to an attorney for the purpose of obtaining legal advice or services").

But the Government concedes that the attorney-client privilege "applies only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403 (1976). That truism

dooms the Government's argument here, because the purpose of the attorney-client privilege (and, similarly, the purpose of the work product doctrine) would not be served by protecting communications that refer to or reflect Mary Egger's (or her subordinates') improper dual role in the equity finalization process. In this case, the Government is *not* trying to shield confidential communications made by the client agency in the course of the appropriate provision of legal advice by Ms. Egger and her subordinates, but rather direct evidence of Ms. Egger's misconduct throughout the equity finalization process.

Indeed, given Ms. Egger's dual role, it is doubtful that the work product or attorney-client privileges even apply at a threshold level to most of the communications at issue. To begin with, Ms. Egger's role was so pervasive that many of the withheld documents evidencing communications between Ms. Egger and other members of the DOE equity team appear to pertain to technical and administrative matters, rather than legal issues; it is hard to fathom how such documents could reflect *confidential* client information about legal matters or *legal* advice based upon such confidential client information. Furthermore, if the DOE equity team is Ms. Egger's client, then *a fortiori* no communications between Ms. Egger *and the ASFE* can be shielded by the attorney-client privilege, and no documents related to her interactions with the ASFE would reflect legal analysis and recommendations in furtherance of her representation of her client subject to protection as work product. Such communications with the ASFE would not directly and exclusively relate to Ms. Egger's representation of the DOE equity team. If, on the other hand, Ms. Egger's client were the ASFE, then the documents the Government has withheld simply would not warrant protection as confidential attorney-client communications: The ASFE was not seeking legal advice from Ms. Egger in response to information the ASFE conveyed, but instead was inviting input from Ms. Egger in the ASFE's own decisionmaking process. DOE has offered no justification as to how to Ms. Egger's communications with both the DOE equity team and the ASFE – two alleged clients with conflicting interests – could all have been privileged.

### D. The Withheld Documents Were Not Prepared in Anticipation of Litigation

The Government's arguments with respect to work product suffer from an independent flaw as well: At a threshold level, the Government has made no showing that the documents it claims are protected as work product were in fact prepared in anticipation of litigation – a fundamental premise of the doctrine. *See, e.g.*, *In re Echostar Commc'ns Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (quoting Fed. R. Civ. P. 26(b)(3)). Neither the Government's privilege log nor its brief in opposition identify any anticipated litigation that would trigger the application of the doctrine at the threshold.

## IV. CHEVRON'S PROPOSED PROCEDURE IS PROPER

### A. The Court Need Not Conduct In Camera Review

In its opening brief, Chevron cited authority to suggest that the Court can order disclosure in these circumstances without the need to conduct *in camera* review of the thousands of withheld documents, because Chevron's exception-to-privilege arguments can be resolved as a matter of law. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 746 ("the [deliberative process] privilege disappears altogether when there is any reason to believe government misconduct occurred"); *Alexander*, 186 F.R.D. at 177-78 (holding that balancing of interests is unnecessary if party seeking discovery shows "identifiable government misconduct"); *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997) (attorney-client privilege is overcome by showing that client both "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act" and "carried out the crime or fraud"). The authority cited by the Government is not to the contrary. *First Heights Bank, FSB v. United States*, 46 Fed. Cl. 312, 322 (2000), did not deal with the government misconduct exception to the deliberative process privilege at all; the Government's suggestion, then, that *First Heights* "rejected an automatic bar to the deliberative process privilege" recognized by the D.C. Circuit (in cases involving such misconduct) misses the point. Opp'n at 50. Moreover, neither *In re BankAmerica Corp. Securities Litigation*, 270 F.3d 639, 644 (8th Cir. 2001), nor *In re Antitrust Grand Jury*, 805 F.2d 155, 168 (6th Cir. 1986) (both cited in Opp'n at 27)

involved a great number of documents that were withheld as privileged or a prima facie showing that the documents themselves constituted prohibited communications. The reasoning supporting *in camera* review in those cases that involved a limited number of documents does not compel *in camera* review here.

Although the "customary and appropriate method of proceeding" when a party seeks disclosure of documents withheld on privilege grounds may well be *in camera* review, as the Government suggests (Opp'n at 50), this is not a "customary" case, given the sheer number of documents the Government has withheld on privilege grounds and the difficult identification problems engendered by the often inadequate descriptions provided in the Government's privilege log. Of course, the Court certainly has the prerogative to review the documents at issue *in camera* if it wishes. Chevron's opening brief in no way suggested that such review is improper. Instead, Chevron's suggested method of proceeding reflects nothing more than a proposal for an alternative procedure that would be less time-consuming and would minimize if not eliminate the need for the Court to review thousands of pages of documents before resolving the dispute.

**B. Chevron's Four Categories Are Appropriate**

The Government's insistence notwithstanding (Opp'n at 3, 46-47), the four core categories of documents identified in Chevron's opening brief are neither overbroad nor irrelevant. Quite the opposite. Chevron has carefully described four discrete categories from among the wealth of information generated by the decade-long equity finalization process that go directly to the heart of its claims: (1) information that evidences or describes *ex parte* communications between Ms. Egger and her staff or other members of the DOE equity/advocacy team on the one hand and the ASFE or the ASFE's staff on the other hand, (2) information that evidences or describes *ex parte* communications between Ms. Egger and her staff or other DOE personnel on the one hand and the IPE or the IPE's staff on the other hand, (3) information that reflects improper *ex parte* input into ASFE or IPE determinations (including drafts of those determinations) from the DOE equity/advocacy team including Ms. Egger and her staff, and (4) drafts of the Equity Process

Agreement, the Decoupling Agreement, and the ASFE Protocol and its supplements, which may provide evidence of the parties' understanding and intent in adopting the prohibitions on *ex parte* communications.

The Government's claim that these documents "are not relevant to Chevron's claims or reasonably related to the 'misconduct' exceptions invoked by Chevron" (Opp'n at 3) is plainly wrong.[6]

**CONCLUSION**

For the foregoing reasons as well as for the reasons set forth in Chevron's opening memorandum of law, Chevron respectfully requests that this Court deny the Government's assertion of privilege and require that those documents that fall within the four categories of relevant materials Chevron has identified be disclosed.

Dated: April 23, 2007

Respectfully submitted,

/s/ Lawrence D. Rosenberg

Donald B. Ayer
Lawrence D. Rosenberg
*Counsel of Record*
Louis K. Fisher
Julia C. Ambrose
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Tel.: 202-879-3939
Fax: 202-626-1700

*Counsel for Chevron U.S.A. Inc.*

[6] Even if the Court declines to rule presumptively that Chevron's four categories of documents are subject to production absent some compelling basis for withholding them, a balancing of the interests still compels the conclusion that Chevron is entitled to production of the documents it seeks. As Chevron's opening brief makes clear, Chevron's need for the documents plainly outweighs the Government's interest in withholding the materials. *See* Opening Br. at 22-23, 27.