No. 04-1365C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHEVRON U.S.A. INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

APPENDIX TO DEFENDANT'S MOTION TO DISMISS IN PART

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

JOHN E. KOSLOSKE
Senior Trial Counsel
LESLIE OHTA
ANUJ VOHRA
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:

PAUL T. MICHAEL
ADA L. MITRANI
Trial Attorneys
Office of General Counsel
Department of Energy
Washington, D.C.

August 16, 2007

# INDEX TO APPENDIX

Document — Page Number

Assistant Secretary for Fossil Energy ("ASFE") Administrative Order 96-01. . . . . . . . . . . . . . . . 1

ASFE Administrative Order 96-01, Supplement 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ASFE Administrative Order 96-01, Supplement 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Agreement Regarding Fixing Of Equity Interests At Naval Petroleum Reserve No. 1 For Purposes of Sale ("Decoupling Agreement"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Agreement Regarding Equity Redetermination Process ("Equity Process Agreement"). . . . . . . 37

Chevron U.S.A. Inc.'s "Response To The United States' Motion To Dismiss" (Cited Pages), dated February 1, 2005.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Chevron U.S.A. Inc's "Response To The United States' Supplemental Motion To Dismiss" (Cited Pages), dated September 29, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Transcript Of Hearing On The United States' Motions To Dismiss (Cited Pages), dated December 16, 2005. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

**Department of Energy**
Washington, DC 20585

Assistant Secretary for Fossil Energy Administrative Order No. 96-01

A. SUBJECT: PROTOCOL ON NAVAL PETROLEUM RESERVE NUMBERED 1 EQUITY FINALIZATION IMPLEMENTATION PROCESS

B. BACKGROUND

1. Pursuant to Section 3412(b)(1) of the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106 (110 Stat. 186), the Secretary of Energy is authorized and directed to "finalize the equity interests of the known oil and gas zones in Naval Petroleum Reserve Numbered 1 in the manner provided by this subsection."

2. Section 3412(b)(2) of the National Defense Authorization Act for Fiscal Year 1996 further provides:

> The Secretary shall retain the services of an independent petroleum engineer, mutually acceptable to the equity owners, who shall prepare a recommendation on final equity figures. The Secretary may accept the recommendation of the independent petroleum engineer for final equity in each know oil and gas zone and establish final equity interest in Naval Petroleum Reserve Numbered 1 in accordance with the recommendation, or the Secretary may use such other method to establish final equity interest in the reserve as the Secretary considers appropriate.

3. The equity owners of lands within Naval Petroleum Reserve Numbered 1, Chevron U.S.A. Production Company (Chevron) and the U.S. Department of Energy (DOE), will present their respective final equity positions to the mutually acceptable independent petroleum engineer (Netherland, Sewell & Associates, Inc.) (hereinafter Equity IPE) to be retained by the Secretary to provide final equity recommendations in the Dry Gas Zone, Carneros Zone, and the Stevens Zone.

4. Over the last two months there have been numerous meetings, discussions and correspondence, and oral communications between Chevron and DOE staff on the equity finalization implementation process. During the course of thesecommunications, Chevron and DOE staff each have presented varying viewsregarding the process to be utilized and have consulted with Netherland, Sewell.

5. This Protocol sets out an equity finalization implementation process that is designed to be open, fair, transparent and one that will adequately protect the respective ownership interests of the owners.

6. Chevron has been provided an opportunity to comment on this Protocol and its comments have been considered by DOE. Chevron has informed DOE that the following Equity Finalization Implementation Protocol is acceptable.

C. EQUITY FINALIZATION IMPLEMENTATION PROTOCOL

The following Equity Finalization Implementation Protocol will be utilized for the finalization of equity interests under section 3412(b)(2) of the National Defense Authorization Act for Fiscal Year 1996:

1. For equity finalization purposes, the zones will be handled in the following sequence: Dry Gas Zone, Carneros Zone, and the Stevens Zone.

2. Each owner has appointed an equity finalization team (EFT) to develop and present its equity positions for each of the three zones under consideration. The EFTs have held an initial joint meeting to begin the exchange of data and information and to identify issues of agreement and disagreement between the owners. The EFTs will provide an Equity Finalization Issues Report to the Equity IPE.

3. The EFTs will jointly meet with the Equity IPE early in the process (tentatively July 9, 1996) to present their respective views of the Equity Finalization Issues Report and to orient the Equity IPE to technical issues and geologic characteristics of the Dry Gas Zone, the Carneros Zone and the Stevens Zone.

4. During the time owners are developing their equity positions, either owner or the Equity IPE may request further orientation sessions. The Equity IPE also may request additional background information to facilitate its technical knowledge of the three zones. All written materials transmitted to the Equity IPE by an owner, including confidential and proprietary information, shall be transmitted immediately by the Equity IPE to the other owner (owners are to provide 10 copies to the Equity IPE). Confidential and proprietary information will be safeguarded by the Equity IPE and the owners, and release is subject to applicable laws and regulations. The Equity IPE shall not accept or consider any information or material that is restricted from being provided to the other owner.

5. There will be no written or oral equity-related communication or meeting with the Equity IPE (this term excludes contract administration communications or meetings) by an owner (including its agents and contractors) without the participation or opportunity to participate by the other owner. Before any equity-related communication or meeting occurs, the Equity IPE will notify both owners of the planned equity-related communication/meeting so as to allow both owners the opportunity to participate in all communications or meetings held between the Equity IPE and an owner. The Equity IPE shall record summaries of these communications/meetings and provide copies to the owners. In the event an owner chooses not to participate in an equity-related communication/meeting, the Equity IPE will notify both owners of that fact in writing prior to having the communication/meeting and provide both owners with a summary of the communication/meeting thereafter.

6. The equity presentations by the owners to the Equity IPE will commence on or about October 8, 1996 for the Dry Gas Zone and Carneros Zone, and on or about January 13, 1997 for the Stevens Zone. For the Stevens Zone, the initial presentations and rebuttals will end on or before January 24, 1997.

7. The order of presentation by the owners will be determined by a coin toss conducted by the Equity IPE in advance of the scheduled date for the Dry Gas Zone, and the owner who presents its equity position second for the Dry Gas Zone will be the first presenter of its equity position for the Carneros Zone. A separate coin toss will be conducted by the Equity IPE for the Stevens Zone.

8. Oral presentations will be conducted at a convenient location designated in advance by the owner conducting the presentation.

9. All equity-related meetings with the Equity IPE, including the presentation by the owners of their respective equity positions for each zone, will be sessions at which both owners are invited to attend (this excludes contract administration meetings that may be required by DOE). Each owner is permitted to designate its attendees, who will execute appropriate confidentiality agreements against disclosure of proprietary information.

10. On September 23, 1996 for the Dry Gas Zone/Carneros Zone and on December 18, 1996 for the Stevens Zone, each owner will submit to the Equity IPE 10 copies of all documentation identified in Attachment 1 hereto. The documentation submitted in advance of the oral presentations is to be the basis of the owners' final equity positions and no alteration in methodology or other significant change in the documentation will be permitted after the date of the advance submission of

documentation. (Correction of errors in the documentation by the owners will be permitted between the date required for the advance submission of documentation and the oral presentation, and any resulting changes by an owner in the documentation submitted must be promptly identified and explained in writing). The Equity IPE will ensure prompt distribution to the other owner of all materials submitted to the Equity IPE by an owner.

11. On the first day of oral presentations for each zone, the owners will provide to the Equity IPE 10 copies of all materials to be used or referred to by them in their presentations. The Equity IPE will provide each owner with copies of the other owner's presentation materials and ensure that each owner has all materials to be used or referred to by the other owner during the presentations (in addition to the documentation provided in advance pursuant to paragraph 10). Owners may not add to or change the presentation materials after the commencement of the first presentation except to correct factual errors in the materials or to provide materials in response to a question from the IPE. If the Equity IPE requests additional documentation from an owner or if an owner makes corrections to any material provided by that owner, such further documentation will be promptly provided to the Equity IPE and, by the Equity IPE, to the other owner. The Equity IPE will provide the owner receiving the further documentation with sufficient time to comment on all additional documentation.

12. For each zone, during and following the first presentation provided by an owner, the Equity IPE may present questions to the presenting owner. During and following the other owner's presentation for that zone, the Equity IPE may present questions to the second presenting owner. Subsequently, the second presenting owner may ask clarifying questions regarding the equity position of the first presenting owner through the Equity IPE and the first presenting owner may ask clarifying questions regarding the equity presentation of the second presenting owner through the Equity IPE. The second presenter for each zone may not reference the first presenter's presentation or offer rebuttal comments during its initial presentation.

13. For each zone, each owner will be permitted to provide, orally and in writing, a rebuttal of the other owner's equity position. The order for the rebuttal sessions shall be the reverse of the order of the original presentations for each zone.

14. During and following each rebuttal presentation, the Equity IPE may ask further questions of the owner making the presentation. If either owner has questions of

the other owner, the questions must be submitted to the Equity IPE, with a copy to the other owner, and the Equity IPE will determine whether to pursue the questions.

15. The Equity IPE shall present (orally and in writing) at a joint session to both parties its provisional recommendation. The owners may pose questions to the Equity IPE for clarification purposes at the oral presentation.

16. Owners will be provided 3 days to transmit written comments on the provisional recommendation to the Equity IPE as to matters of error, factual accuracy, or misinterpretation contained in the provisional recommendation. Following its receipt of both owners' comments, the Equity IPE will promptly transmit a copy of each owner's comments to the other owner.

17. After consideration of the comments, the Equity IPE shall prepare its final recommendation for each zone in accordance with the schedule set forth in the Equity IPE contract.

18. The Equity IPE shall provide its recommendation (orally and in writing) to the Assistant Secretary for Fossil Energy. Both owners may attend such presentation.

19. In the event the owners agree it is not practicable to provide 10 copies of some materials which are otherwise required by this Protocol to be supplied by an owner, the Equity IPE and the owners shall consult regarding the number of copies to be provided to the other owner and the Equity IPE, and the Equity IPE will ensure that each owner has complete and timely access to all materials submitted pursuant to this Protocol so as to provide the other owner with an opportunity to review and comment on all such materials in accordance with the schedules established for each zone. All maps required to be provided by an owner to the IPE and the other owner shall be full scale (at least 1" to 2000'), unless otherwise agreed by the owners.

20. The EFTs and the Equity IPE shall jointly determine the structure and time permitted for the initial and rebuttal presentations. The Equity IPE shall ensure that each owner is able to present its equity positions without interruption by the other owner. Any further matters required to be determined regarding the structure of the equity presentation process will be determined by the Equity IPE in consultation with the owners provided the matter is not otherwise covered by this Order or the Equity IPE contract.

Attachment 1

DOCUMENTATION TO BE SUBMITTED PRIOR TO FINAL PRESENTATIONS

Dry Gas Zone, Carneros Zone, and Stevens Zone

1. Isochore maps of productive acre-feet with Estimated Limiting Lines of Commercial Productivity as of November 20, 1942 for the respective geologic intervals. This should include a supporting digital database of net pay values (in units of feet of true vertical thickness) by well and by geologic interval that are utilized in the construction of the isochore maps.

2. A stratigraphic column or type log that identifies the specific geologic intervals associated with the maps of productive acre-feet prepared for item #1.

3. A structure map on one correlatable marker or horizon at or near the top of the equity zone.

4. Digital database consisting of tabulations by section for each geologic interval of the following as of November 20, 1942:

   - Productive acres
   - Productive acre-feet
   - Oil-in-place

5. Digital database consisting of tabulations by geologic interval and by section (if available) of the following:

   - Weighting factors
   - Hydrocarbon reserves
   - Weighted acre-feet

6. Sufficient explanation of the weighting methodology utilized to "weight" the productive acre-feet such that the weighting factors and weighted acre-feet can be reproduced by the IPE and each owner.

7. The underlying data records, such as computer model output, petrophysical properties, fluid properties, and/or engineering plots, that support the calculation of oil-in-place volumes and the derivation of all weighting factors.

21. In the event a disagreement arises regarding the equity finalization implementation process or this Protocol which cannot be resolved jointly by the Equity IPE and the EFTs, the matter shall be referred to the Assistant Secretary for Fossil Energy (or designee) for resolution. Prior to resolution, the Assistant Secretary will consult with Chevron.

U.S. Department of Energy

[signature]

Assistant Secretary for Fossil Energy

JUL 8 1996

Date

**Department of Energy**
Washington, DC 20585

Assistant Secretary for Fossil Energy Administrative Order No. 96-01, Supplement 1

A. SUBJECT: PROTOCOL ON NAVAL PETROLEUM RESERVE NUMBERED 1 EQUITY FINALIZATION IMPLEMENTATION PROCESS (Supplement No. 1)

B. BACKGROUND

Following the discussion of contract interpretation issues at orientation meetings held in Bakersfield on July 9 and 10, 1996, and communications to Netherland, Sewell & Associates (NSA) from the Department of Energy, dated August 28, 1996, and from Chevron U.S.A. Production Company (Chevron), dated September 9, 1996, the owners met to review the situation and the contract interpretation issues raised. As a result of these discussions, the owners agreed to address the matters by developing a mechanism through which joint guidance from the owners could be given to NSA with respect to the handling of UPC contract interpretation issues as NSA performs its role of the independent petroleum engineer for equity finalization (Equity IPE) under section 3412(b) of the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106 ("Act").

The mechanism described in this Protocol is the result of the discussions held between the owners. Chevron has been provided an opportunity to comment on this Protocol and its comments have been considered by the Department. Chevron informed the Department, by letter dated October 11, 1996, that this Equity Finalization Implementation Protocol Relating to UPC Contract Interpretation Issues is acceptable to it.

C. EQUITY FINALIZATION IMPLEMENTATION PROTOCOL RELATING TO UPC CONTRACT INTERPRETATION ISSUES

This Protocol will supersede the above-referenced communications to the Equity IPE of September 9, 1996 and August 28, 1996 and the statements made to the IPE by the owners respecting interpretations of the Unit Plan Contract (UPC) during the Equity IPE orientation meetings held on July 9 and 10, 1996 in Bakersfield, California.

1. The Equity IPE has been retained to provide engineering services. The Equity IPE should conduct its independent technical analysis after considering the owners' presentations, and should prepare its equity recommendations.

2. In the event (a) the Equity IPE believes that it requires guidance on issues of contract interpretation or other legal issues in preparing its report, or (b) one of

legal issue requiring guidance has come up, then, unless the Equity IPE determines that the resolution of such issue will not have a material effect on its equity recommendations, the owners will use their best efforts to provide joint guidance on the issue to the Equity IPE in a timely fashion. If the owners reach agreement on the guidance to be provided to the Equity IPE such guidance will be provided to the Equity IPE, and the guidance will be binding on the owners and not subject to later administrative or judicial review in any forum. Throughout the equity finalization process, the owners agree to use their best efforts to identify legal issues that may require resolution under this protocol and to advise the other owners of the issues as quickly as possible.

3. To assist in the provision of legal guidance to the Equity IPE, the Department shall retain the services of an Independent Legal Advisor, mutually acceptable to the owners. The Independent Legal Advisor will be consulted only in the event the owners cannot agree upon a resolution of a legal issue in accordance with paragraph 2 above and upon the request of one of the owners.

(a) The Independent Legal Advisor shall have the following functions: (1) serve as a mediator to help the owners reach agreement on legal issues arising in the equity finalization process, and (2) serve as independent legal advisor to the Equity IPE if the owners cannot reach agreement after consultation with the Independent Legal Advisor on a given legal issue.

(b) If, under paragraph 3 above, an issue is to be referred to the Independent Legal Advisor, then a written request for the involvement of the Independent Legal Advisor which identifies the issue to be resolved shall be sent by one or both of the owners through the Contracting Officer's Representative within 2 working days of notification by either owner. Thereafter, the Independent Legal Advisor shall consult with the parties as to the timetable and procedures to be used to resolve the issue.

(c) If the owners, with the assistance of the Independent Legal Advisor, reach agreement on the guidance to be provided to the Equity IPE, joint guidance will be provided to the Equity IPE, and such guidance will be binding on the owners and not subject to later administrative or judicial review in any forum.

(d) If the owners, with the assistance of the Independent Legal Advisor, are unable to reach agreement then the Independent Legal Advisor will provide timely independent legal guidance to the Equity IPE on the issue, and the Equity IPE shall rely on such guidance in the development of its final equity recommendations. The owners may question legal guidance provided by the Independent Legal Advisor to the Equity IPE only in conjunction with their review of the final equity recommendations of the Equity IPE. This provision

does not impair the ability of either party to pursue any available legal remedies to review or implement the final equity decisions of the Assistant Secretary for Fossil Energy made pursuant to section 3412(b)(2) of the Act.

4. The technical analysis and presentation process being conducted by the owners and the Equity IPE related to the equity finalization process shall continue during the period the owners and/or the Independent Legal Advisor are developing guidance for the Equity IPE on the contract interpretation or other legal issues raised.

5. This Protocol supplements Assistant Secretary for Fossil Energy Administrative Order 96-01, Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process, dated July 8, 1996. With the exception of the schedule for the Dry Gas Zone, Carneros Zone, and Stevens Zone equity finalization process, which is being or may be revised at the request of Chevron, all terms of the July 8, 1996 Protocol remain in effect and are applicable to the matters addressed herein.

U.S. Department of Energy

[signature]

Assistant Secretary for Fossil Energy

October 11, 1996

Date

**Department of Energy**
Washington, DC 20585

Assistant Secretary for Fossil Energy Administrative Order No. 96-01, Supplement 2

A. SUBJECT: PROTOCOL ON NAVAL PETROLEUM RESERVE NUMBERED 1 EQUITY FINALIZATION IMPLEMENTATION PROCESS (SUPPLEMENT NO. 2)

B. BACKGROUND

In September 1996, the Department of Energy (DOE) received notification by Chevron U.S. A. Production Company (Chevron) that it required an extension of the equity finalization process schedule for Stevens Zone which had been delineated in Assistant Secretary for Fossil Energy Administrative Order 96-01, dated July 8, 1996. Chevron indicated that it required an extension of approximately six months in duration.

Since September 1996, representatives from DOE, Chevron, and the Independent Petroleum Engineer Netherland, Sewell & Associates (NSA) have had a series of meetings and discussions regarding the equity finalization process for the Stevens Zone. Most recently, by letter to NSA, Chevron and DOE representatives dated December 18, 1996, the Assistant Secretary for Fossil Energy transmitted a draft " Plan and Schedule for Completion of Stevens Equity," which was developed following receipt of advice from NSA. This letter requested NSA to consider comments and suggestions submitted by DOE and Chevron representatives and to submit any proposed revisions by January 6, 1997. Chevron and DOE submitted comments to NSA, dated December 20, 1996 and December 31, 1996, respectively. NSA, following its receipt and consideration of DOE and Chevron's comments, submitted to the Assistant Secretary for Fossil Energy revisions to the plan on January 6, 1997. Chevron submitted additional comments to the Assistant Secretary by letter, dated January 8, 1997.

The "Plan and Schedule for Completion of Stevens Zone Equity Advisory Report" attached to this Order is the result of, and is based on consideration of, the discussions, correspondence, and actions referenced above.

C. EQUITY FINALIZATION IMPLEMENTATION PROTOCOL RELATING TO THE STEVENS ZONE

1. The attached "Plan and Schedule for Completion of Stevens Zone Equity Advisory Report" will be utilized for the finalization of Stevens Zone equity interests under section 3412(b)(2) of the National Defense Authorization Act for Fiscal Year 1996.

2. This Plan and Schedule for Completion of Stevens Zone Equity Advisory Report supplements Assistant Secretary for Fossil Energy Administrative Order 96-01, Protocol on Naval Petroleum

Reserve Numbered 1 Equity Finalization Implementation Process, dated July 8, 1996. To the extent there are any conflicts between the "Plan and Schedule for Completion of Stevens Zone Equity Advisory Report" and the July 8, 1996 Protocol, this Protocol Relating to the Stevens Zone supersedes the earlier protocol.

U.S. Department of Energy

Patricia F. Godley

Assistant Secretary for Fossil Energy

January 21, 1997

Date



CBG0100652

# PLAN AND SCHEDULE FOR COMPLETION OF THE STEVENS ZONE EQUITY ADVISORY REPORT

## INTRODUCTION

The following sets forth a plan and schedule for completing the technical work of the Department of Energy (DOE), Chevron USA (CUSA), and Netherland, Sewell & Associates, Inc. (NSA), leading to a final recommendation by NSA to the Assistant Secretary for Fossil Energy (ASFE) on the Stevens Zone. For purposes of equity finalization, NSA is functioning as the Independent Petroleum Engineer (IPE). The plan supplements the procedures set forth in the equity finalization protocol that was issued by the Assistant Secretary for Fossil Energy on July 8, 1996 (the "Equity Finalization Protocol") and supersedes the Equity Finalization Protocol where any conflict between the two documents exists.

This plan is guided by two dates that shall be fixed. The first date is June 2, 1997, which is the date that DOE and CUSA should provide their equity reports to the IPE. The second date is September 29, 1997, the date that the IPE's final recommendation is needed so that divestiture milestone dates can be met in accordance with the Defense Authorization Act of 1996 (the Act). This plan schedules the requisite work between these two dates with three process features:

1. Early exchange of key basic data. It appears that limited agreement has been reached on this issue and a substantial amount of database exchange is expected to occur in the next two months.

2. Intermediate exchange of selected preliminary "interpretive" data. Under this plan, the owners will be encouraged to contribute technical input toward the IPE's independent assessment of the Stevens Zone through several intermediate data exchanges.

3. Owner assistance is provided for model evaluation. This plan puts technical resources and reporting guidelines in place to assure, to the maximum extent possible, that the parties' models will be considered adequately and fairly.

## SUMMARY OF MILESTONE DATES

The Stevens equity resolution plan consists of nine steps, which can be summarized as follows:

| Step No. | Description | Milestone Dates |
|---|---|---|
| 1 | Owners submit basic data to IPE (*see* Exhibit A) | Begin 12/19/96 (*see* Exhibit A) |
| 2 | Orientation meeting to discuss major technical issues and identify legal issues | 2/12/97 or after Dry Gas Zone/Carneros meeting (IPE provisional recommendation) |

| Step No. | Description | Milestone Dates |
|---|---|---|
| 3 | Owners submit selected preliminary "interpretive" data (*see* Exhibit B), as follows: | |
| | • Preliminary geologic tops, fault picks, petrophysical properties and mapping strategy (*i.e.*, which reservoirs to map) | 2/26/97 |
| | • Preliminary ELLCPs by reservoir, and net pay calculation methodologies | 3/18/97 |
| | • Preliminary volumetric hydrocarbons in place by reservoir/section and performance data | 4/14/97 |
| 4 | ILA provides advice on any legal issue to IPE | On or before 5/1/97 |
| 5 | Owners submit written reports | 6/2/97 |
| | Owners make oral presentations | 6/16/97-6/25/97 |
| 6 | Owners' oral rebuttals to other owner's presentation | 6/26/97-6/27/97 |
| 7 | Models made available to IPE on owners' machines | 6/27/97 |
| 8 | Owners submit written rebuttals of other owner's position and results | 7/15/97 |
| 9 | IPE submits Final Report to ASFE | 9/29/97 |

## DISCUSSION OF MAJOR PLAN STEPS

### Steps 1 & 3: Owners submit data to the IPE

Because of the size and complexity of the Elk Hills Stevens Zone reservoir, the independent analysis performed by the IPE prior to obtaining final owners' reports and presentations is central to its ability to determine an appropriate recommendation for final equity percentages consistent with the February 1998 Elk Hills sales date as required by the Defense Authorization Act for Fiscal Year 1996. Only by performing an initial independent analysis can the IPE be in a position to properly evaluate the veracity of the DOE and CUSA studies, to perform "tests" of reasonableness on the studies, to reconcile the equity studies with previous studies, and to verify the sensitivity of the equity results to the significant discrepancies between the two owners.

To this end, the IPE has requested the cooperation of the owners in providing critical preliminary basic and interpretive data early in the process. The IPE's receipt of this data by the deadlines specified in the table above will minimize the amount of new basic data and subjective evaluation techniques that the IPE is exposed to during the owners' presentations, and allow all parties to see if there are significant differences between the owners based solely on the data that is being used.

While some data has been provided to the IPE by Bechtel, the IPE has requested actual basic data and selected interpretive data that both parties are using to perform their studies. Attached as Exhibit A is the list of categories of basic data that the IPE is requesting and the dates by which such data should be submitted by each owner; this is the information referenced in *Step 1* in the table above. Attached as Exhibit B is a list of the categories of preliminary interpretive data that the IPE is requesting; this is the information referenced and requested by the dates stated in *Step 3* in the table above.

As reflected in the discussions in previously documented meetings and correspondence exchanged between the owners and the IPE, one owner may be willing to supply certain categories of information before the parties' submission of their written reports on June 2, 1997, whereas the other owner may be unwilling to supply its corresponding data before such final submissions. It may also be that the IPE will request additional categories of information that one owner is willing to supply before the final submissions, while the other owner is not.

Accordingly, to provide both parties with an opportunity to provide information as requested by the IPE and to maximize the information the IPE can utilize in preparing its independent technical assessment prior to consideration of the parties' presentations, while at the same time ensuring that a party that declines to provide information will not obtain an advantage from having early access to data provided to the IPE by the other party, the following data production procedures will apply:

(A) If both parties submit data as requested by the IPE and in accordance with the dates stated or referenced in the table above, then the procedures set forth in the Equity Finalization Protocol will apply to the delivery of copies of such data to the other party, as well as to any communications between the IPE and a party about the data submitted.

(B) If one party submits data in compliance with the request by the IPE but the other party does not, or the other party submits data that is not fully responsive to the IPE's request, or the other party submits data after the date stated in the table above, then:

(1) the IPE will return non-responsive or late data to the party that submitted it, and will not consider that submission or discuss the data in the submission with either party before both parties present their cases (*i.e.*, not until after the presentation of both owners' cases during the period June 16-25, 1997, as described in Step 5 below);

(2) the IPE shall not at that time provide to the non-complying party copies of the data submitted by the complying party, nor discuss such data with the non-complying party. The IPE may discuss the data with the party that submitted it. If so, minutes will be kept of those discussions. The IPE shall provide copies of the data and the minutes of any discussions about the data to the non-complying party, but not until after both parties have presented their cases (*i.e.*, not until after the presentation of both owners' cases during the period June 16-25, 1997, as described in Step 5 below); and

(3) the IPE shall determine whether, in its opinion, the act of non-compliance was solely due to a reasonable misunderstanding on the part of the submitting party. If so, the IPE may give the party one additional opportunity to provide the requested data within a reasonable time period as defined by the IPE. Such party is to be considered non-complying until the IPE deems otherwise.

(C) The IPE will be the judge of whether a party has submitted data that is fully responsive to its request and whether a party has submitted data in accordance with the dates set forth in the table above.

(D) The IPE may waive the requirements of Paragraph (B) above, but only upon receipt of a written request to do so by a party and a written consent to such waiver by the other party.

(E) The IPE only requires complete working documents and open discussions to fulfill the preliminary "interpretive" data requests and asks that the owners refrain from preparing detailed, formal presentations of these data.

**Step 2: Orientation meeting to discuss major technical issues and identify legal issues**

The objective of the orientation is to familiarize the IPE with the major engineering, geologic and legal issues concerning the Stevens Zone.

**Step 4: ILA provides advice on any legal issue to IPE**

Any legal issues that arise in connection with the Stevens Zone will be resolved, if necessary, with the assistance of the Independent Legal Advisor, in accordance with the protocol already developed by the parties. The parties and the IPE shall develop a schedule as necessary to accomplish the procedures required by the protocol so that, if it is necessary for the ILA to provide advice to the IPE, he can do so on or before May 1, 1997. Any items that are thought to potentially develop into legal issues should be discussed in the orientation meeting scheduled for February 12, 1997 or after the Dry Gas Zone/Carneros meeting.

**Step 5: Owners submit written reports and make oral presentations**

The Owners will provide their written equity reports to the IPE and each other on June 2, 1997. At this time, the minimum supporting data identified in Attachment 1 to the existing Equity Finalization Protocol, including the computer models and associated input and output reports and digital input decks will also be provided, if such data has not already been provided in final form to the IPE and the other party under the procedures described in Steps 1 and 2 above.

CUSA will make its oral presentation of its case first (according to a coin toss in July 1996), on June 16, 17, 18, and 19. DOE will make its oral presentation on June 20, 23, 24, and 25. A presentation format similar to the Dry Gas Zone and Carneros will be followed. This format allowed for questions by the IPE and each owner on the last day of the presentations.

**Step 6: Owners' oral rebuttals to other owner's presentation**

Each owner is allowed one day of oral presentation to respond to the other owner's report. DOE will present its oral rebuttal on June 26, 1997 and CUSA will present its oral rebuttal on June 27, 1997. This step provides an opportunity for each owner to identify what it believes to be the deficiencies of the other owner's case. A well articulated and supported response can provide the IPE with very valuable analysis and documentation regarding these deficiencies.

**Step 7: Models made available to IPE on owners' machines**

Coincident with the completion of the presentations and rebuttals on June 27, each owner shall make available to the IPE workstations in Bakersfield to perform various ECLIPSE runs. The owners will provide personnel as necessary and requested to work with the IPE in running the models and any requested sensitivities. Generally, this would be one owner representative who is familiar with the owner's hardware, the ECLIPSE software, and the general design of the various models of the owner. The other owner may send one or, in the IPE's discretion, additional representatives to be present during the IPE's work in that owner's office. To aid the IPE's testing and evaluation of the

modeling, the IPE will prepare and submit to the owners a set of standard criteria for written reporting of the input and output of each model. This step will reduce the amount of time that the IPE would otherwise require to evaluate the models, and it will probably also reduce the amount of time that the owners will spend responding to requests for additional information following the presentations.

**Step 8: Owners submit written rebuttals to other owner's presentation**

This step of the process allows a final opportunity for each owner to document its analysis of the other owner's presentation and response material. These written rebuttals are scheduled for delivery on July 15, which is just over two weeks after completion of the oral responses. This schedule is intended to allow each party adequate time to provide a meaningful and informative document that the IPE can use in its assessment of the owners' cases.

**Step 9: IPE submits final report to ASFE**

The IPE is responsible for evaluating the evidence that has been made available to it, and to perform an independent analysis of the evidence so as to make a final recommendation on equity determination. Due to the February 1998 Elk Hills sales date required by the Act, the ASFE is requesting that the IPE provide its Final Report to the ASFE on or about September 29, 1997.

**Steps 5 through 8: Written reports and documentation, models, presentations**

If either party is late in providing deliverable items as set forth in Steps 5 through 8, that party shall not be given access to the data or materials submitted by the other party until such time that the IPE deems that the late party has submitted the data or materials in their entirety. Incomplete data or materials will be treated as late for purposes of access and exchange. In the interim, the IPE will proceed without the late data or materials.

If either party submits revised or corrected deliverable items after the initial date of submission, the IPE may call an immediate meeting of the owners to verify that such revisions were made solely to correct errors in documentation or calculations and were not an alteration of methodology or enhancement in documentation. If such alteration of methodology or enhancement is found, the IPE shall, at its option, return the revised items without using them or providing them to the other owner. In such case, the revised work shall not be presented in oral form during any presentation.

Exhibit A
Basic Data to be Submitted to the IPE

| Item | Due Date |
|---|---|
| List of deviated wells | 1/10/97 |
| Open hole log digits | 1/10/97 |
| Core analyses and core descriptions | 1/10/97 |
| Capillary pressure data | 1/10/97 |
| Relative permeability data | 1/10/97 |
| XRD/CEC/thin sections/SEM paleo and any other special core analyses | 1/10/97 |
| List of cased hole logs | 1/10/97 |
| PVT data | 2/3/97 |
| RFT, JFT, DST and all other bottomhole pressure data | 2/3/97 |
| Geologic marker tops | 2/26/97 |
| Fault picks | 2/26/97 |
| Other data to be provided by the unit operator | 2/26/97* |

* The owner EFTs and the IPE have agreed to prepare a supplemental list of data to be gathered by the unit operator. Such data may include seismic data, special core analyses, dipmeters, cased hole logs, etc.

Exhibit B
Preliminary "Interpretive" Data Requested by IPE

| Item/Discussion Topic | Due Date |
|---|---|
| List of geologic mapping horizons by structure. Discussion of strategy for choosing horizons mapped (i.e., lithological, paleontological, log character, etc.). | 2/26/97 |
| Digital file of tops and fault picks by well. | 2/26/97 |
| Petrophysical properties by structure (and lithological unit, if applicable) including a, m, n, Rw. Discussion of how core data and water samples are integrated into the analysis. Discussion of rock wettability characteristics. | 2/26/97 |
| ELLCPs by reservoir. Discussion of methodologies used to determine each ELLCP (petrophysical cutoffs, distance from low known hydrocarbons, horizontal contacts versus equivalent vertical contacts). | 3/18/97 |
| Net pay calculation methodologies including equations used (Simandoux, dual water, Waxman Smits, etc.), cutoffs (porosity, water saturation, V-shale), storage capacity of fractured rocks, and integration of available core data. | 3/18/97 |
| Digital file of net pays by reservoir and well. | 4/14/97 |
| Discussion of methodology for conversion of measured thickness to TVT and tables of measured thicknesses, TVTs, bed dip angles/directions, and wellbore deviation angles/directions. | 4/14/97 |
| Unweighted acre-feet (at 11/20/42) by reservoir and section. | 4/14/97 |
| Volumetric hydrocarbons-in-place (at 11/20/42) by reservoir and section. | 4/14/97 |
| Porosity, water saturation, oil volume factor, and reservoir pressures by reservoir and section. Discussion of methodology for incorporating parameters (contouring discrete points, averaging by section, etc.) | 4/14/97 |
| All applicable fluid property data. Discussion of derivation of oil volume factor data. | 4/14/97 |
| Interpretation and discussion of available pressure data. | 4/14/97 |

# AGREEMENT REGARDING FIXING OF EQUITY INTERESTS AT NAVAL PETROLEUM RESERVE NO. 1 FOR PURPOSES OF SALE

**THIS AGREEMENT REGARDING FIXING OF EQUITY INTERESTS AT NAVAL PETROLEUM RESERVE NO. 1 FOR PURPOSES OF SALE** (this "Agreement") is made as of May 19, 1997 between THE UNITED STATES OF AMERICA, acting by and through its DEPARTMENT OF ENERGY ("DOE"), and CHEVRON U.S.A. PRODUCTION COMPANY, a division of CHEVRON U.S.A. INC., a Pennsylvania corporation ("**Chevron**"). References herein to DOE as the owner of property or rights in NPR-1 (defined below) shall be deemed to mean and refer to the ownership interests and rights held in the name of either the United States of America or the Department of Energy.

## RECITALS

A. Chevron and DOE own, in separate ownerships, all of the parcels or mineral interests included within Naval Petroleum Reserve Numbered 1 ("NPR-1"), located in Kern County, California. A substantial portion of NPR-1 is operated pursuant to that certain Unit Plan Contract dated June 19, 1944 (as amended to date, the "UPC").

B. Title XXXIV of the National Defense Authorization Act for Fiscal Year 1996, Public Law 104-106 (the "Act"), requires that DOE sell all of the United States' interest in NPR-1, provided that such sale meets the requirements and conditions specified in the Act. Among other things, the Act requires that DOE finalize equity interests in all known oil and gas zones in NPR-1 and that the UPC be terminated not later than the closing of the sale of DOE's interest in NPR-1.

C. DOE and Chevron currently are engaged in finalizing equity interests in the four unitized oil and gas zones established by the UPC. The equity redetermination process is highly complex and technical and may not be completed in time to accommodate the sale timetable contemplated by the Act. Even when completed, the resulting equity participations potentially may be subject to judicial or administrative challenge by Chevron. Any such judicial or administrative challenge could delay final determination of the equity participations in the unitized zones well beyond the targeted sale schedule.

D. The foregoing uncertainty regarding final equity participations in the unitized zones would, among other things, adversely impact DOE's efforts to sell its interest in NPR-1 for full value and on the schedule set forth in the Act. In addition, such uncertainty would impair the ability of DOE and Chevron to estimate the various financial

adjustments that must be made between DOE and Chevron upon termination of the UPC.

E. In addition, DOE and Chevron desire to establish certain understandings between themselves regarding ownership of the facilities at NPR-1 for the purposes of the sale of DOE's interests in NPR-1.

F. In order to provide certainty for prospective bidders for DOE's interest in NPR-1 and to address certain issues regarding the financial adjustments between DOE and Chevron upon termination of the UPC, Chevron and DOE desire to enter into this Agreement on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing recitals, and for other good and valuable consideration, Chevron and DOE hereby agree as follows:

## ARTICLE I

## FIXING OF EQUITY INTERESTS FOR SALE

1.1 Final Equity Participations for Sale.

(a) The parties hereby agree that, for purposes only of the sale of DOE's interest in NPR-1 and future operations by Chevron and the purchasers of DOE's interest in NPR-1 (**"DOE's Purchasers"**), their respective equity interests in the four oil and gas zones established pursuant to the UPC (the **"Unitized Zones"**) are fixed as follows:

| | | | |
|---|---|---|---|
| i) | Dry Gas Zone: | DOE<br>Chevron | 83.8726%<br>16.1274% |
| ii) | Carneros Zone: | DOE<br>Chevron | 100.00%<br>0.00% |
| iii) | Shallow Oil Zone: | DOE<br>Chevron | 70.0119%<br>29.9881% |
| iv) | Stevens Zone: | DOE<br>Chevron | 79.6357%<br>20.3643% |

The parties further agree that, for purposes only of the sale of DOE's interests in NPR-1 and future operations by Chevron and DOE's Purchasers, the non-unit areas owned by DOE and included within NPR-1 (**"Non-Unit Area"**) is hereby fixed as 100% owned by DOE. The foregoing equity participation percentages for the Unitized Zones and the Non-Unit Area are sometimes collectively referred to herein as the **"Fixed Sales Participations"**.

(b) The parties agree that the Fixed Sales Participations are final and binding on DOE and Chevron for purposes of the sale of DOE's interest in NPR-1 and future operations of Chevron and DOE's Purchasers. The Fixed Sales Participations, however, shall not be binding on either DOE or Chevron with respect to the UPC or to any adjustments to be made under the UPC upon its termination. The percentage participations applicable to the UPC shall be those ultimately established in the equity finalization process currently underway pursuant to the Act and the UPC. As used in this Agreement, the term "**UPC Final Equity Participations**" shall mean the equity participations for the Unitized Zones issued by the Assistant Secretary for Fossil Energy ("**ASFE**") under Section 3412(b) of the Act that have become "Final" (defined below). The equity participation numbers for a zone issued by the ASFE pursuant to the Act and the UPC (including any modifications thereto by the DOE Office of Hearings and Appeals pursuant to paragraph B.8 of the "Agreement Regarding Equity Redetermination Process" of even date herewith between Chevron and DOE (the "**Process Agreement**")) shall be deemed "**Final**" upon the earlier of (i) the date the ASFE's equity redetermination decision becomes final and binding on the parties under the Process Agreement, or (ii) the date Chevron notifies DOE in writing that it will not challenge an ASFE's redetermination decision that does not fully accept the recommendation of the Independent Petroleum Engineer.

(c) Chevron and DOE acknowledge that the UPC Final Equity Participations for one or more of the zones may not be the same as the Fixed Sales Participations for such zones. Notwithstanding such situation, Chevron and DOE agree that the Fixed Sales Participations shall govern any future allocation of production from the Unitized Zones and the Non-Unit Area as between Chevron and DOE's Purchasers.

(d) Chevron acknowledges that DOE will advise prospective bidders for DOE's interests in NPR-1 that Chevron has agreed to use the Fixed Sales Participations and the Facilities Fixed Ownership Interests (defined in <u>Section 4.1</u> below) in any future unit operation of NPR-1, and that DOE will make copies of this Agreement available for review by prospective bidders. At the request of DOE, Chevron shall deliver to the purchasers of DOE's interests in NPR-1 a certificate confirming

Chevron's agreement to the Fixed Sales Participations and the Facilities Fixed Ownership Interests.

(e) Nothing in this Agreement shall be deemed to prevent Chevron and DOE's Purchasers from modifying the Fixed Sales Participations or the Facilities Fixed Ownership Interests by mutual agreement of all affected parties at any time after the Last Sale Date (defined below). As used in this Agreement, the term **"Last Sale Date"** means the closing date of the sale to a third party of the last portion of DOE's interest in NPR-1 pursuant to the Act (financial adjustments under this Agreement, including pursuant to this Section 1.2, shall not be considered a sale to a third party for the purposes of determining the "Last Sale Date").

1.2 Potential Financial Adjustments between DOE and Chevron for Differences between UPC Final Equity Participations and Fixed Sales Participations. If the UPC Final Equity Participations for a Unitized Zone are different than the Fixed Sales Participations for that zone, financial adjustments shall be made only between Chevron and DOE to compensate the party whose Fixed Sales Participation is less than its UPC Final Equity Participation for the loss of the future benefit of such interest. Such adjustment shall be made on a zone by zone basis using the formula attached hereto as Exhibit A. The party whose Fixed Sales Participation is greater than its UPC Final Equity Participation for the zone in question shall owe the other party the "Adjustment Value" amount determined pursuant to the formula on Exhibit A. Such amount shall be determined when the zone's UPC Final Equity Participations have become Final. In no event shall amounts owing under this Section 1.2 be subject to setoff or deduction of any kind against other amounts owing under this Agreement or the UPC, except that amounts owing under this Section 1.2 from one party shall be set off against amounts due from the other party, resulting in a single, combined amount due under this Section 1.2. No payments shall be due under this Section until 30 days after all of the UPC Final Equity Participations for the Unitized Zones have become Final (the **"Section 1.2 Payment Due Date"**). The party owing sums to the other party under this Section 1.2 shall also pay the other party interest on the single, combined amount due, at the rate of 5.85% per annum (not compounded), from the Last Sale Date to the date such payment is made.

## ARTICLE II

## UPC POST-TERMINATION ADJUSTMENTS

2.1 Post-termination Adjustments under the UPC. The parties acknowledge that upon termination of the UPC, a final accounting must be made of all production and costs (including capital costs of the Facilities as referenced in Section 4.3 below) during the term of the UPC. The parties hereto further agree that such adjustments shall be calculated on a zone by zone basis for each of the Unitized Zones. Such adjustments shall be performed in accordance with the provisions of the UPC, and the parties shall endeavor to complete the accounting work for the zone in question within 6 months after the later of (i) the termination of the UPC, or (ii) the date the UPC Final Equity Participations for such zone became Final. However, no payments shall be due with respect to a zone until all such cost and production accounting adjustments for all zones have been agreed upon by both DOE and Chevron and combined into a single amount due. The party owing sums as a result of the final accounting of production and costs under the UPC shall also pay the other party interest on the single, combined amount due at the rate of 5.85% per annum (not compounded), from the Last Sale Date to the date such payment is made.

2.2 Production Pricing Mechanism. If, upon termination of the UPC, the quantities of production received by DOE and Chevron, respectively, from a zone are not in balance with the UPC Final Equity Participations for such zone, then the party which received more production than it was entitled (based on the Final UPC Equity Participations) shall owe the other party a lump sum cash amount equal to the value of the excess production allocation. Such payment is a part of the final UPC cost and production balancing payments referenced in Section 2.1, and shall bear interest as provided in Section 2.1. To facilitate calculation of such production balancing payment, Chevron and DOE have agreed to use the following prices for the product types indicated below:

| | Product Type | Price |
|---|---|---|
| (i) | SOZ Oil | $17.43 per barrel |
| (ii) | Stevens Oil | $18.98 per barrel |
| (iii) | Natural Gas | $ 1.79 per MMBTU |
| (iv) | Propane | $ 0.44 per gallon |
| (v) | Mixed Butane | $ 0.36 per gallon |
| (vi) | Isobutane | $ 0.51 per gallon |
| (vii) | Natural Gasoline | $ 0.42 per gallon |

2.3 Funding of Post-Termination Payments under UPC. Chevron and DOE acknowledge that UPC Section 11(b) provides that "Termination [of the UPC] shall be followed by an adjustment of all [of the parties' prior] rights and obligations, including the rights and obligations growing out of the costs incurred, and the respective quantities of production received, by [DOE] and [Chevron], respectively, under the contract, on a fair and equitable basis". Chevron and DOE acknowledge and agree that this provision of the UPC constitutes a general obligation of the United States secured by its full faith and credit and is enforceable in a court of competent jurisdiction. The parties also acknowledge that payment by DOE of any amounts referenced in this Article II is subject to the availability of funds appropriated for such purpose.

2.4 Basis of Adjustments. Chevron and DOE acknowledge that the production balancing and cost sharing records of the unit formed by the UPC (the "Unit") currently do not reflect the Fixed Sales Participations and that the adjustments necessary to implement the UPC Final Equity Participations shall be based on the Unit's actual records of historical production and costs, not on figures reflecting the Fixed Sales Participations.

ARTICLE III

SECURITY FOR CERTAIN PAYMENTS

3.1 DOE Account. DOE shall establish a non-interest bearing deposit fund account with the U.S. Treasury Department (the "**Deposit Fund Account**") to secure DOE's potential obligations under Section 1.2 of this Agreement. DOE shall deposit the DOE Deposit Amount (as defined in Section 3.3 below) in the Deposit Fund Account from the proceeds of the sale of its interest in NPR-1 within 30 days after the Last Sale Date. If, after offsetting all amounts owing between the parties under Section 1.2, DOE owes Chevron funds under Section 1.2, DOE shall make such payment after demand therefor by Chevron by promptly authorizing the U.S. Treasury Department to wire transfer to Chevron the sum due under Section 1.2 from the funds held in the Deposit Fund Account. Such payment shall be made within 30 days after the Section 1.2 Payment Due Date. Any funds remaining in the Deposit Fund Account after any such payment to Chevron (or a determination that no such amount is due from DOE to Chevron under Section 1.2) shall be immediately released from such account and delivered to the miscellaneous receipts account of the U.S. Treasury, and Chevron shall have no claim whatsoever to any of such remaining funds.

3.2 Chevron Letter of Credit. As security for its potential obligations under Section 1.2, Chevron shall, within 30 days after the Last Sale Date, deliver to DOE an irrevocable, direct draw, transferrable letter of credit, which letter of credit (i) shall be issued by a financial institution organized under the laws of the United States (or one of the States) acceptable to DOE, (ii) shall name the United States of America as beneficiary, and (iii) shall be in the amount of the Chevron L/C Amount (defined in Section 3.3 below) (the "**Letter of Credit**"). The Letter of Credit shall have an initial term of 12 months from the Last Sale Date. The Letter of Credit shall provide that it shall be automatically renewed by the issuer thereof for additional 12-month periods until all payments have been made under Section 1.2 above for all of the Unitized Zones, unless written notice of non-renewal is delivered to DOE at least 30 days prior to the then-current expiration date of the Letter of Credit. The Letter of Credit shall provide that DOE may draw thereon by presenting a sight draft in accordance with the provisions of this Section 3.2. The Letter of Credit shall be immediately drawable in full upon DOE's presentation of a sight draft to the issuer certifying that the issuer has notified DOE that it will not renew the then-current Letter of Credit and Chevron has failed to replace such Letter of Credit with another Letter of Credit, meeting all of the terms and conditions of this Section 3.2, at least 15 days prior to the expiry date of the then-current Letter of Credit. In addition, the Letter of Credit shall be immediately drawable in part upon DOE's presentation of a sight draft to the issuer certifying that Chevron has failed to pay an amount due under Section 1.2 of this Agreement within 30 days after the Section 1.2 Payment Due Date, and specifying the amount of such draw (which shall be the amount Chevron failed to pay). DOE shall return the Letter of Credit to Chevron within 10 business days after the earlier of (i) full payment by Chevron of any amounts owing to DOE under Section 1.2, or (ii) a determination that no such amounts are due from Chevron to DOE under Section 1.2.

3.3 Determination of Deposit and L/C Amounts. The amount of funds DOE shall deposit in the Deposit Fund Account ("**DOE Deposit Amount**") shall equal (A) the sum of all "DOE Potential Payback Amounts" (calculated using the formula set forth on Exhibit B to this Agreement) for the Unitized Zones, plus (B) the amount of interest that would accrue on the sum determined under clause (A) over a 36 month period at the rate of 5.85% per annum (not compounded). The amount of Chevron's Letter of Credit ("**Chevron L/C Amount**") shall equal (C) the sum of all "Chevron Potential Payback Amounts"

(calculated using the formula set forth on Exhibit B to this Agreement) for the Unitized Zones, plus (D) the amount of interest that would accrue on the sum determined under clause (C) over a 36 month period at the rate of 5.85% per annum (not compounded). The parties acknowledge that the DOE Deposit Amount and the Chevron L/C Amount are only estimates of the potential amounts that each party may owe the other under Section 1.2 and thus do not constitute a limitation on the maximum amount that a party may owe under Section 1.2. Notwithstanding the foregoing, the parties acknowledge that DOE has no funds other than those that will be reserved in the Deposit Fund Account available for purposes of payment under Section 1.2, and is restricted by the Anti-Deficiency Act (31 U.S.C. § 1341) from making an obligation or entering into a contract for payments in excess of funds available and appropriated for this purpose. In the event the Deposit Fund Account does not contain funds sufficient to pay the amount DOE may owe under Section 1.2, DOE agrees promptly to request that the President of the United States transmit to Congress at the earliest available time a request for an appropriation for and in the amount DOE owes under Section 1.2 in excess of the amounts contained in the Deposit Fund Account.

3.4 Adjustments to Deposit and L/C Amounts. Upon the UPC Final Equity Participations for a particular zone becoming Final, the parties may, if mutually agreeable, agree to re-calculate, and subsequently reduce, both or either the DOE Deposit Amount and/or the Chevron L/C Amount. Such re-calculation shall be based on the UPC Final Equity Participations and the formula set forth on Exhibit B to this Agreement. No such adjustments may be made, however, until after the parties submit their equity reports to Netherland, Sewell & Associates, Inc., the Independent Petroleum Engineer, for the SOZ Zone. In addition, no such adjustments may increase the amount of the DOE Deposit Amount or the Chevron L/C Amount.

## ARTICLE IV

## FACILITIES

4.1 Allocation of Facilities.

(a) In order to facilitate the sale of DOE's interest in NPR-1, DOE and Chevron have agreed, for the purposes only of the sale of DOE's interest in NPR-1 and future operations by Chevron and DOE's Purchasers, to the allocation of the Facilities (defined below) to the following nine categories (each a "Facility Category"):

i. DGZ Facilities.

ii. SOZ Facilities.

iii. Stevens Zone Facilities.

iv. Carneros Zone Facilities.

v. Multi-Zone Facilities.

vi. DOE Facilities.

vii. Chevron Facilities.

viii. Materials and Supplies Inventory.

ix. Non-Capitalized Property ("Wall-to-Wall Inventory").

Such allocation of Facilities is set forth in the Schedule of Facilities attached to that certain transmittal letter dated May 19, 1997 from DOE to Chevron (the **"Schedule of Facilities"**).

(b) In addition, Chevron and DOE have agreed, for purposes only of the sale of DOE's interest in NPR-1 and future operations by Chevron and DOE's Purchasers, that the ownership interest of Chevron and DOE in each Facility shall be the ownership interest for that Facility specified on the Schedule of Facilities (the **"Facilities Fixed Ownership Interests"**).

(c) The parties agree that the Facilities Fixed Ownership Interests are final and binding on DOE and Chevron for purposes of the sale of DOE's interest in NPR-1 and future operations by Chevron and DOE's Purchasers. The Facilities Fixed Ownership Interests, however, shall not be binding on either DOE or Chevron with respect to the UPC or to any of the final accounting adjustments under the UPC referenced in <u>Section 2.1</u>.

(d) As used in this Article IV, the term **"Facilities"** shall mean and include all of the personal property and fixtures listed on the Schedule of Facilities, and the term **"Facility"** shall mean each specific item listed on the Schedule of Facilities.

(e) The Schedule of Facilities is intended to list all of the physical personal property and fixtures owned by DOE and/or Chevron and used in connection with operation of NPR-1. At the request of either

DOE or Chevron the parties shall from time to time update the Schedule of Facilities (i) to reflect any additions to or deletions from the items of physical personal property and fixtures used in connection with operations at NPR-1 that have occurred since the date hereof, (ii) to reflect reallocation of any items from one Facility Category to another Facility Category, or (iii) to add items which were inadvertently omitted from the original Schedule of Facilities. All references herein to the Schedule of Facilities shall be deemed to mean the original Schedule of Facilities, as modified by any such updates thereto agreed upon by both DOE and Chevron in writing.

4.2 Fixtures to be Treated as Personal Property. For the purposes of this Agreement and ownership and conveyance of the Facilities in connection with the sale of DOE's interest in NPR-1, the parties intend that any Facility which may be considered to be a "fixture" under applicable law shall be deemed severed from the real property to which it is attached and the ownership thereof established pursuant to this Agreement, and not based on the ownership of such real property.

4.3 Retrospective Adjustment of Capital Costs under the UPC.

(a) Some of the allocations of capital costs specified on the Schedule of Facilities are based upon the parties' equity interests under the UPC. Upon termination of the UPC, such capital costs shall be subject to readjustment between DOE and Chevron as part of the final accounting adjustments under the UPC referenced in Section 2.1 above.

(b) The adjustments referenced in Section 4.3(a) above are for the purpose of the final accounting between DOE and Chevron of capital costs incurred under the UPC and such adjustments shall not affect in any manner the Facilities Fixed Ownership Interests.

4.4 Implementation. To document the allocation of ownership in the Facilities established by this Article IV, Chevron and DOE shall execute and deliver, prior to the sale of DOE's interest in NPR-1, such documents and conveyances as are reasonably necessary to establish that the ownership of each Facility is the "Facility Fixed Ownership Interest" specified on the Schedule of Facilities. Such documents shall include any instruments reasonably necessary to cause the Facilities to be treated as personal property instead