of "fixtures" for the purpose of the sale of DOE's interest in NPR-1.

## ARTICLE V

## LEGAL MATTERS

5.1 Covenant Not to Sue. Chevron hereby agrees that it will not commence any judicial or administrative actions or proceedings that would delay, prevent, hinder or overturn the sale of DOE's interest in NPR-1 on any grounds related to this Agreement or the Fixed Sales Participations or Facilities Fixed Ownership Interests established hereby. In addition, Chevron hereby agrees that it will not commence any judicial or administrative proceedings against any purchaser of, or bidder for, DOE's interest, seeking in any respect to invalidate or change the Fixed Sales Participations or Facilities Fixed Ownership Interests established pursuant to this Agreement. To implement the foregoing, Chevron knowingly and voluntarily waives any and all rights it may have to bring any judicial or administrative challenge to the Fixed Sales Participations or the Facilities Fixed Ownership Interests.

5.2 Agreement to Execute Unit Operating Agreement.

(a) On or before June 13, 1997, Chevron agrees to execute and deliver to DOE in multiple counterparts that certain Unit Agreement and Unit Operating Agreement ("Unit Operating Agreement") in the form attached hereto as Exhibit C, subject to completion of any exhibits thereto not yet completed. Between the date hereof and June 13, 1997 DOE and Chevron representatives will review the form of Unit Operating Agreement to identify possible modifications thereto. Any modifications mutually agreed upon by DOE and Chevron, acting reasonably and in good faith, prior to such date will be incorporated into the form executed by Chevron.

(b) DOE will oblige the DOE Purchasers to execute counterparts of the Unit Operating Agreement on or before the Last Sale Date and will thereafter cause counterparts of the Unit Operating Agreement executed by all such purchasers to be promptly delivered to Chevron.

(c) In the event this Agreement terminates pursuant to Section 6.2, the Unit Operating Agreement shall have no force or effect, and all counterparts

thereof executed by Chevron shall be returned to Chevron.

5.3 Challenges to Equity Finalization Numbers under UPC. If Chevron challenges any of the equity participation numbers issued by the ASFE for any of the Unitized Zones (which challenges may be made only to the extent permitted by the Process Agreement), the Fixed Sales Participations and the Facilities Fixed Ownership Interests shall remain entirely unaffected by the outcome of such challenge. If such a challenge is pursued for any given zone, the potential financial adjustments between Chevron and DOE referenced in Sections 1.2 and 2.1 above shall be deferred until a final resolution of the matter is obtained.

5.4 Inadmissibility in Judicial/Administrative Proceedings. The parties acknowledge and agree that this Agreement is intended solely to facilitate the sale of DOE's interest in NPR-1 and the processing of necessary accounting adjustments that will arise upon termination of the UPC. The Fixed Sales Participations, the Zone Facilities Fixed Ownership Interests, the Zone Participating Percentages (defined on Exhibit A) and the other matters specified in this Agreement have been agreed upon solely for the ease and convenience of the parties for the limited purposes of this Agreement. Therefore, Chevron and DOE each agrees that neither it nor its representations will use or cite to this Agreement or any portion thereof in any administrative or legal proceedings on any subject whatsoever, other than in a judicial proceeding involving the enforcement or the interpretation of the terms of this Agreement.

5.5 Limitation on Default Remedies. Each of Chevron and DOE irrevocably agrees that if either party defaults under the terms of this Agreement in any respect, such default shall not entitle the other party to terminate this Agreement, or to rescind or revoke its agreement to the Fixed Sales Participations, the Facilities Fixed Ownership Interests, or, in the case of Chevron, its agreement not to challenge the validity of the sale of DOE's interest in NPR-1 specified in Section 5.1 above, but instead shall entitle the non-defaulting party to whatever monetary or other relief may be available under applicable law (other than setting aside or modifying the Fixed Sales Participations or the Facilities Fixed Ownership Interests).

## ARTICLE VI

## MISCELLANEOUS

6.1 No Effect on Protocol. The parties agree that nothing contained in this Agreement shall be deemed to modify or affect in any manner the procedures and schedules contained in Assistant Secretary for Fossil Energy Administrative Order Number 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process", as the same has been modified or supplemented to date.

6.2 Termination. This Agreement shall terminate and be of no further force or effect if the United States elects not to sell its interests in NPR-1. Such termination shall be effective on Chevron's receipt of a written notice from DOE that the United States has elected not to sell its interest in NPR-1 pursuant to the Act. If this Agreement is so terminated, (i) neither party shall be liable to the other for any costs or damages, and (ii) each party may cancel any deposit arrangements (or letters of credit) that have been established.

6.3 Notices. Except as otherwise set forth herein, all notices given in connection with this Agreement shall be in writing and shall be delivered either by personal delivery, by telegram, telex, telecopy or similar facsimile means, by certified or registered mail, return receipt requested, or by express courier or delivery service, addressed to the parties at the following addresses:

Chevron:

Chevron U.S.A. Production Company
4900 California Avenue
Bakersfield, California 93309
Attn: James Brady
Phone No.: (805) 633-4332
Fax: (805) 633-4319

with a copy to:

Chevron U.S.A. Production Company
4900 California Avenue
Bakersfield, California 93309
Attn: Cynthia A. Giumarra, Esq.
Phone No.: (805) 633-4695
Fax: (805) 633-4698

DOE:

U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585
Attn: Assistant Secretary of Fossil Energy
Phone No.: (202) 586-6660
Fax: (202) 586-7847

with a copy to:

U.S. Department of Energy
Office of General Counsel
1000 Independence Avenue, S.W.
Washington, D.C. 20585
Attn: Mary Egger, Esq.
Phone No.: (202) 586-2440
Fax : (202) 586-0325

or at such other address as either party shall have previously designated by written notice given to the other party in the manner set forth above. Notices shall be deemed given when received, if sent by telegram, telex, telecopy or similar facsimile means (confirmation of such receipt by confirmed facsimile transmission being deemed receipt of communications sent by telex, telecopy or other facsimile means); and when delivered and receipted for (or upon the date of attempted delivery where delivery is refused), if hand-delivered, sent by express courier or delivery service, or sent by certified or registered mail, return receipt requested.

6.4 Waiver. The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay on the part of any party in exercising any right, power or privilege under this Agreement or the documents referred to herein shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (i) no claim or right arising out of this Agreement or documents referred to herein can be discharged by one party hereto, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party hereto; (ii) no waiver which may be given by a party hereto shall be applicable except in the specific instance for which it is given; and (iii) no notice to or demand on one party hereto shall be deemed to be a waiver of any obligation of such party, or of the right of the party giving such notice or demand to take further action without notice

or demand as provided in this Agreement or the documents referred to herein.

6.5 Representation of Authority. Each party represents that it has good and sufficient authority to execute and deliver this Agreement and to perform its respective obligations hereunder. This Agreement has been duly authorized, executed, and delivered by the parties and constitutes the legal, valid and binding obligation of the parties, enforceable against them in accordance with its terms. Each individual signing this Agreement warrants and represents that he or she has full authority to execute the same on behalf of the party for whom he or she is signing.

6.6 Entire Agreement; Modification. This Agreement is intended by the parties as a final expression of their agreement with respect to the specific subject matter hereof, and is intended as a complete and exclusive statement of the terms and conditions of that agreement, and supersedes all prior agreements of the parties with respect to the specific matters covered hereby. This Agreement may not be modified, rescinded or terminated orally, and no modification, rescission, termination or attempted waiver of any of the provisions hereof (including this section) shall be valid unless in writing and signed by the party against whom the same is sought to be enforced.

6.7 Assignments; Successors. This Agreement shall apply to and be binding in all respects upon, and shall inure to the benefit of, the successors and assigns of the parties hereto to which this Agreement is expressly assigned pursuant to a written document.

6.8 Severability. In the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provisions. Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable. Notwithstanding the foregoing, if a court rules that the provisions of this Agreement regarding the Fixed Sales Participations are invalid or unenforceable, then DOE may terminate this entire Agreement.

6.9 Section Headings; Construction. The headings of articles and sections contained in this Agreement are provided for convenience only. They form no part of this Agreement and shall not affect its construction or interpretation. All references to articles and sections in this Agreement refer to the corresponding

articles and sections of this Agreement. All words used herein shall be construed to be of such gender or number as the circumstances require. This Agreement shall be construed without regard to the identity of the party which drafted the various provisions. Each and every provision of this Agreement shall be construed as though all of the parties participated equally in the drafting and any rule of construction that a document is to be construed against the drafting party shall not be applicable to this Agreement.

6.10 Governing Law. This Agreement shall be governed by, and construed under, the federal law of the United States.

6.11 Beneficiaries of Agreement. The provisions of Section 1.1, 4.1, 4.2, 4.4, 5.1, 5.2, 5.3 and 5.5 are also for the benefit of, and may be enforced by, DOE's Purchasers.

6.12 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute but one and the same agreement.

**IN WITNESS WHEREOF,** DOE and Chevron have each caused this Agreement to be executed as of the date first written above.

| | |
|---|---|
| **UNITED STATES OF AMERICA DEPARTMENT OF ENERGY** | **CHEVRON U.S.A. PRODUCTION COMPANY,** a division of **CHEVRON U.S.A., INC.** |
| By [signature] | By [signature] |
| Print Name Patricia F. Godley | Print Name Carnie R. Block |
| Title Assistant Secretary for Fossil Energy | Title VP-Gen Mgr WBU Chevron USA Production Co. |
| Date May 19, 1997 | Date 5/19/97 |



LA3-780321.V7 05/19/97

# Agreement Regarding Equity Redetermination Process

This Agreement Regarding Equity Redetermination Process (this "Agreement"), dated as of May 19, 1997, is by and between the U.S. Department of Energy ("DOE") and Chevron U.S.A. Production Company, a division of Chevron U.S.A. Inc. ("Chevron"). DOE and Chevron officials have been engaged in an effort to finalize all equity interests in the four unitized productive zones within Naval Petroleum Reserve No. 1 (Elk Hills) pursuant to section 3412(b) of the National Defense Authorization Act for Fiscal Year 1996, Pub.L. 104-106 ("Act"). In connection with this activity and upon the execution of the Agreement Regarding Fixing of Equity Interests at Naval Petroleum Reserve No. 1 for Purposes of Sale (hereinafter the "Decoupling Agreement") by DOE and Chevron, DOE and Chevron hereby agree:

## A. Independent Petroleum Engineer Process for Shallow Oil Zone.

1. DOE will submit the pending Shallow Oil Zone ("SOZ") equity redetermination dispute to Netherland, Sewell & Associates ("NSA") for its recommendation of final SOZ equity to the Assistant Secretary for Fossil Energy ("ASFE"). Such recommendation by NSA shall constitute the advisory report of the independent petroleum engineer for purposes of both section 3412(b) of the Act and section 9(b) of the Unit Plan Contract dated June 19, 1944, as amended and supplemented (the "UPC").

2. The procedures of Assistant Secretary for Fossil Energy Administrative Order No. 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process," dated July 8, 1996, as amended and supplemented, will be utilized for the SOZ pursuant to a schedule to be agreed upon by DOE, Chevron and NSA. The parties will agree upon a SOZ schedule based on the procedural framework set forth in Assistant Secretary for Fossil Energy Order No. 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process (Supplement 2)," dated January 21, 1997.

3. The disposition of legal issues associated with the SOZ which are common to the other zones (e.g., issues relating to proved reserves, recovery factors, and the appropriateness of the use of API gravity as a weighting factor) will apply to the SOZ redetermination process, including, without limitation, the disposition of legal issues in the Settlement Agreement, dated January 6, 1997 and in the Stevens Zone Settlement Agreement Dated May 7, 1997 ("Stevens Settlement Agreement"). In furtherance of the foregoing, the parties specifically agree that,

notwithstanding the language of the Stevens Settlement Agreement, the Stevens Settlement Agreement shall apply to the SOZ redetermination process. Any new legal issues arising in the SOZ will be addressed by following the procedures set forth in Assistant Secretary for Fossil Energy Administrative Order No. 96-01 (Supplement No. 1), dated October 11, 1996.

4. In light of the substantial body of prior equity work already completed by the parties on the SOZ, the parties shall use their best efforts to agree on the scope and methodology to be used in the SOZ equity work, including manual sand counting and other issues, with the goal of facilitating and shortening the SOZ equity study process. The parties will use a production and data cutoff date of December 31, 1997.

5. Upon the execution of the Decoupling Agreement, the ASFE will withdraw the Preliminary SOZ Redetermination Decision, dated March 28, 1997. Upon withdrawal of the Preliminary SOZ Redetermination Decision, the parties agree to set aside the Independent Petroleum Engineer Report issued by James K. Dietrich and Associates (hereinafter the "Dietrich Report"), dated November 1995, on the SOZ and to provide a joint instruction to NSA to disregard the Dietrich Report for all purposes.

6. Neither DOE nor Chevron, or their representatives, will use, cite or reference either (i) the Preliminary SOZ Redetermination Decision, or (ii) the Dietrich Report on the SOZ, or any portions thereof, in any administrative or legal proceedings on any subject whatsoever, or in the SOZ equity finalization process described herein.

7. The ASFE's decision on SOZ equity issued as a result of the process described in this agreement will be both a redetermination of equity pursuant to sections 2(f) and 9(b) of the UPC, as well as a final determination of equity pursuant to § 3412(b) of the Act.

8. Chevron and DOE acknowledge that as a result of the process specified in this Agreement, the date for issuance of the ASFE's final SOZ equity redetermination decision will be delayed until after completion of the procedural steps described in paragraphs B.1 through B.3 below. Chevron waives any claim it may have as a result of the process specified in this Agreement that the ASFE's final SOZ decision is unduly delayed, was due by a certain date, or that following the procedures set forth in this agreement violates any requirements of § 3412(b) of the Act or the UPC.

B. Equity Redetermination Process.

Chevron and DOE agree on the following procedures for the ASFE redeterminations of equity for all four unitized zones and for any review of such equity redetermination decisions:

1. NSA will provide a provisional equity recommendation report for each zone. Chevron and DOE will review such report for factual accuracy, error or misinterpretation and provide written comments thereon to NSA within 30 days after issuance of the provisional recommendation, or such later date as determined by the ASFE upon the request of either party, which request will not be unreasonably withheld.

2. NSA shall issue its final recommendation report to the ASFE, with a copy to Chevron. Chevron and DOE will review the final recommendation and provide written comments thereon to the ASFE within two weeks after issuance of the final recommendation, or such later date as determined by the ASFE upon the request of either party, which request will not be unreasonably withheld.

3. After receipt of the NSA recommendation for a zone, the ASFE shall issue a preliminary decision on such zone and shall provide the Chevron and DOE equity teams with copies of the documents relied upon in reaching the preliminary decision which are not already in the equity teams' possession, including, without limitation, any geophysical, geological or petrophysical data relied upon by the ASFE, but excluding draft documents, any legal or technical advice provided to the ASFE, or documents concerning the deliberative process of reaching the preliminary decision. The Chevron and the DOE equity teams shall have the opportunity to review the preliminary decision and provide written comments thereon to the ASFE within 30 days after its issuance, or such later date as determined by the ASFE upon the request of either party, which request will not be unreasonably withheld.

4. The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an ex parte basis. Any written materials submitted to the ASFE by either equity team shall be provided to the other party. The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.

5. The ASFE shall use reasonable efforts to issue a preliminary decision on a zone within 6 months after the ASFE's receipt of written comments, if any, from DOE and Chevron on the NSA final recommendation for such zone. The ASFE shall use reasonable efforts to issue a final decision on such zone within 3 months after receipt of written comments, if any, from DOE and Chevron on the ASFE's preliminary decision.

6. In issuing the equity redetermination decisions for a zone, the ASFE may accept the NSA recommendations or reject the NSA recommendations in whole or in part. If the ASFE decides to reject the NSA recommendations in whole or in part, such decision must be based on a determination by the ASFE that one or more of the following criteria exist:

   a. The NSA recommendation(s) was arbitrary or capricious;

   b. The NSA recommendation(s) was a result of fraud;

   c. The NSA recommendation(s) was a result of undue influence, unless such undue influence had no impact on NSA's recommended equity participation percentages;

   d. The NSA recommendation(s) was inconsistent with statute, the UPC or an applicable Settlement Agreement between Chevron and DOE, unless such inconsistency had no impact on NSA's recommended participation percentages;

   e. The NSA recommendation(s) was not based on substantial geophysical, geological and/or petrophysical data; or

   f. The NSA recommendation(s) resulted from an approach or methodology which is inconsistent with sound oil field engineering principles.

7. If an ASFE decision adopts the NSA recommendation for a particular zone, that ASFE decision shall be final and not subject to challenge by Chevron. If an ASFE final decision rejects, in whole or in part, NSA's participation percentage recommendations, Chevron may challenge the ASFE decision and such challenge shall be referred to the Department of Energy Office of Hearings and Appeals ("OHA") for a decision. In this event, OHA shall review only the points on which the ASFE rejected NSA's recommendations that have been challenged by Chevron, and in all other respects the ASFE's decision shall be final. Chevron and DOE agree that the standard of review to be applied by OHA shall be the standards set forth in the Administrative Procedures Act (5 U.S.C. § 706) and the Wunderlich Act (41 U.S.C. §§ 321 and 322). Chevron shall file with OHA any challenge to an ASFE final redetermination decision for a zone within 6 months after the date of such ASFE final redetermination decision

for the zone in question. If Chevron does not file such challenge within such 6-month period, the ASFE redetermination decision for the zone in question shall be final and binding on the parties and not subject to challenge by Chevron.

8. If OHA denies the Chevron challenge to the ASFE's decision on an issue, the ASFE's decision on such issue shall be final and binding on the parties. If OHA upholds the Chevron challenge on an issue, then the NSA recommendation(s) at issue shall be adopted as final. If OHA determines to uphold the ASFE decision in part, then OHA, in its discretion, may either (i) direct that the NSA recommendation on the issue be adopted by the ASFE, (ii) remand the specific issue back to the ASFE for further determinations in accordance with OHA's instructions, or (iii) render a decision on such issue based on the record before it. If OHA remands an issue to the ASFE, Chevron shall have the right to challenge any further determination of the ASFE on such remand under the process set forth in paragraph B.7 above.

9. The ASFE's determination of final equity shall be final, binding and non-appealable unless challenged by Chevron under the procedures and criteria set out above, in which case OHA's decision shall be final, binding and non-appealable. In order to avoid the potential for protracted and costly litigation, Chevron and DOE have agreed, as an alternative to judicial resolution of any dispute regarding the ASFE equity redetermination decisions, to submit any challenge to such decisions to OHA and to be bound by the results thereof, without right of any further administrative or judicial review or appeal (nothing in the foregoing, however, shall be deemed to expand Chevron's right to challenge an ASFE decision beyond that permitted in paragraphs B.7 and B.8 above). To implement the foregoing, DOE and Chevron each knowingly and voluntarily waives any and all rights it may have (i) to bring any other judicial or administrative challenge to the final equity determination decisions by the ASFE, or (ii) to bring any judicial or administrative challenge to any decision by OHA.

10. Chevron and DOE acknowledge that the procedural steps referenced in paragraphs B.1 and B.2 already have been completed for the Carneros Zone and the Dry Gas Zone for all purposes of this Agreement and that such steps shall not be repeated for such zones.

11. Notwithstanding the provisions of paragraph B.7 above, Chevron and DOE agree that any challenge by Chevron to the ASFE's decision regarding the "25Z area" legal issue (which affects only the Carneros Zone) shall be reviewed "de novo" by OHA and that any OHA determination of the matter shall be

final and binding on the parties. If any other legal issues arise that are processed by NSA pursuant to instructions from the Independent Legal Advisor (as opposed to instructions agreed upon by Chevron and DOE in the form of a Settlement Agreement), the ASFE's decision on such legal issue, if challenged by Chevron, also shall be reviewed "de novo" by OHA and OHA's determination of the matter shall be final and binding on the parties.

C. <u>Miscellaneous</u>

1. The parties acknowledge that the ASFE is currently delegated the Secretary of Energy's authorities under title XXXIV of the Act. In the event this delegation is subsequently revised to alter this designation or in the event the Secretary chooses to perform the functions himself, such later designated official or the Secretary, as the case may be, will perform the ASFE functions identified in this Agreement.

2. This Agreement shall be governed by, and construed under, the federal law of the United States.

3. If the Decoupling Agreement is terminated pursuant to Sections 6.2 or 6.8 thereof, then this Agreement shall automatically terminate effective on the termination date of the Decoupling Agreement, and thereafter shall be of no force or effect, unless extended or modified by mutual agreement of the parties.

4. Each party represents that it has good and sufficient authority to execute and deliver this Agreement and to perform its respective obligations hereunder. This Agreement has been duly authorized, executed and delivered by the parties and constitutes the legal, valid and binding obligation of the parties, enforceable against them in accordance with its terms. Each individual signing this Agreement warrants and represents that he or she has full authority to execute the same on behalf of the party for whom he or she is signing.

5. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute but one and the same agreement.

6. Following execution of this Agreement, the Secretary of Energy (or designee) will issue a written memorandum authorizing OHA to perform the functions set forth in paragraphs 7 and 8 of Part B of this Agreement. Chevron will be provided a copy of such memorandum.

**IN WITNESS WHEREOF**, DOE and Chevron have each caused this Agreement to be executed as of the date first written above.

| | |
|---|---|
| U.S. Department of Energy | Chevron U.S.A. Production Company, a division of Chevron U.S.A., Inc. |
| By: Patricia F. Godley | By: [signature] |
| Title: Assistant Secretary for Fossil Energy | Title: VP - Gen Mgr WSG Chevron USA Production C |

**Electronically Filed on February 1, 2005**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CHEVRON U.S.A. INC.,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | No. 1:04cv1365<br>Judge Susan G. Braden |

**CHEVRON U.S.A. INC.'S RESPONSE TO THE UNITED STATES' MOTION TO DISMISS**

Donald B. Craven
Daniel Joseph
C. Fairley Spillman
Merrill C. Godfrey
Akin Gump Strauss Hauer & Feld, L.L.P.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4000
(202) 887-4288 Fax

Counsel for Chevron U.S.A. Inc.

redetermination decisions." Section B then contains 11 numbered paragraphs setting out the process. Paragraph 4 is the prohibition on ex parte contacts, and paragraph 9 is the prohibition on judicial remedies challenging "the ASFE equity redetermination decisions." The "decisions" referred to in paragraph 9 must conform to the requirements in the preceding paragraphs for paragraph 9 to come into play at all. It would be contrary to the law of contract to allow DOE to breach paragraph 4 but insist on enforcement of paragraph 9. Assuming that paragraph 9 has any bearing at all here (a point ChevronTexaco does not concede), DOE's compliance with paragraph 4 is a (failed) condition precedent to the prohibition in paragraph 9.

As a final point, it is absurd for the Government to read the 1996 protocol (Complaint Ex. C) as foreclosing judicial remedies. *See* Motion at 26-27. Nothing in the protocol remotely suggests any such agreement—a fact confirmed by the Government's paltry argument of this point. Further, the Government's argument is disingenuous, because the Government had to bargain specifically in *1997* for ChevronTexaco's relinquishment of judicial remedies.

## IV. <u>The Government's Causation Argument Improperly Contests Facts in the Complaint and Defies Established Law Regarding Reliance Damages.</u>

ChevronTexaco seeks to recover the costs of performing under a contract that DOE materially breached. The complaint seeks compensation based on ChevronTexaco's reliance interest: the amount of money ChevronTexaco has spent in reliance on its contract with the United States. As the United States Court of Appeals for the Federal Circuit has explained, "[i]n the event of a breach, contract law recognizes that the promisee has three enforceable interests: expectation, reliance, and restitution." *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308 (Fed. Cir. 2004) (citing Restatement (Second) of Contracts § 344 (1981)).

To see how the reliance interest described in the complaint differs from the more familiar expectation interest, one must consider ChevronTexaco's situation in 1997. In 1997,

ChevronTexaco had no contractual right to be heard by the Secretary during the Secretary's consideration of the parties' respective equity interests in the Reserve, and the Secretary had a range of discretion in unilaterally determining certain factual issues.[12] *See United States v. Standard Oil Co.*, 545 F.2d 624 (9th Cir. 1976). But ChevronTexaco had a right to seek judicial remedy for any breach of contract or violation of law by the Secretary, including any factual determinations outside legal bounds. *Cf. id.* In the 1997 Agreement, ChevronTexaco traded this judicial remedy in exchange for (among other things) impartial *ex ante* consideration of its views by the Secretary, pursuant to a quasi-judicial process in which the Assistant Secretary would be an independent decision maker. To calculate directly what that right was worth would be difficult: one would have to measure (1) the value of a decision from the ASFE that impartially accounts for ChevronTexaco's views regarding disputed legal and factual issues, and then subtract (2) the value of ChevronTexaco's pre-existing right to sue for any breach of contract arising from an ASFE decision that does *not* consider ChevronTexaco's views impartially. So ChevronTexaco seeks damages by a simpler measure—reliance damages. ChevronTexaco seeks to be put in the position it was in as of 1997, when it had not spent large sums of money on a drawn-out but tainted process. Although DOE's abandonment of the parties' contract means that ChevronTexaco can now once again sue for any breach of the UPC, ChevronTexaco is still out the money it spent on the process that DOE unilaterally abrogated.

The Government raises two objections to such a recovery. The first neglects both the nature of the complaint and the relevant law regarding reliance damages. The second is a factual

[12] Pursuant to ASFE Order No. 96-01 (Complaint Ex. C), adopted by the ASFE in consultation with ChevronTexaco, ChevronTexaco was able to present information and arguments to the IPE as the IPE formulated its recommendation to the ASFE, but ChevronTexaco was not entitled to present its views and arguments directly to the ASFE. The ASFE was, however, required to solicit Chevron's views in any dispute regarding IPE procedures. *Id.* ¶ 21.

dispute, improperly raised on a motion to dismiss, contrary to the burden of proof at trial, and based on erroneous facts.

**A. Reliance Damages Are Available for All Expenditures Made in Reasonable Reliance on the Contract, Whether Made Before or After Breach.**

The Government argues that "as a matter of timing, the purported *ex parte* communications could not have, and did not, cause [ChevronTexaco's] attorney[s'] fees and expenses to be incurred," because ChevronTexaco found out about the breaches only in 2003. Motion at 32-33. Apparently, the Government thinks that breaches of contract cause damage only when they are discovered. Although the Government can be *held to account* only after a breach is discovered, reliance damages do not depend on when the breach is discovered—or even on when the breach occurs. Rather, reliance damages "are available for injuries resulting from activities that occurred either before or after the breach." *Glendale Fed. Bank v. United States*, 239 F.3d 1374, 1383 (Fed. Cir. 2001). This follows logically because "[t]he underlying principle in reliance damages is that a party who relies *on another party's promise* made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise." *Id.* at 1382 (emphasis added). The point of protecting the reliance interest is that a breach has rendered all reliance fruitless. The complaint plainly alleges that DOE's breaches have caused ChevronTexaco's expenditures made in reliance on the contract to go to waste.

Reliance damages should place the injured party in "'as good a position as he would have been in had the contract not been made.'" *Id.* at 1383 (quoting Restatement (Second) of Contracts § 344(b)). Before the 1997 Agreement, ChevronTexaco had not yet made substantial expenditures to present its position regarding the parties' respective interests in the Reserve to

the ASFE (and in appeals to OHA based on tainted ASFE decisions). ChevronTexaco is entitled to recover those expenditures as damages.

**B. The Government is Not Entitled to Assert in a Motion to Dismiss That Its Breach Has Caused No Harm.**

The Government next argues that "assuming such a breach of contract did occur, the only real potential harm to Chevron would be a decision that overstated the amount of equity to which DOE was entitled and understated the amount of equity to which Chevron was entitled." Motion at 33. According to DOE this "real potential harm" can be remedied by—and is governed exclusively by—the appeal process that was included *in the very same contract DOE breached* and that is dependent upon the framework which DOE's breach has destroyed.

While it is tempting to jump first to all the reasons DOE is wrong on the facts, we save that for paragraph D. below. We begin instead by noting that the most basic flaw in the Government's argument is that it is admittedly fact-based: it takes issue with the allegations of the complaint and the reasonable inferences therefrom.

ChevronTexaco clearly has alleged damages flowing from DOE's breach. *See, e.g.*, Complaint ¶ 58. The complaint alleges that DOE took actions that by their very nature stripped ChevronTexaco of the valuable right to an impartial decision by the primary fact-finder and adjudicator and relegated ChevronTexaco to an inferior procedural stance (as the appellant before OHA). *See id.* ¶ 56.

In its defense, the Government asserts the so-called "undisputed fact that ChevronTexaco has recourse before the OHA for the only real damage that it could potentially suffer as a result of the alleged breach." Motion at 34. The Government's own motion concedes that this is a question of "fact." There is nothing in the complaint or its attachments that compels the conclusion as a matter of law that Chevron's claims of having years of effort go to waste are

Government's breaches. Accordingly, ChevronTexaco respectfully asks this Court to deny the motion to dismiss.

DATED: February 1, 2005

Respectfully submitted,

/s/ Donald Baxter Craven

Donald B. Craven
Daniel Joseph
C. Fairley Spillman
Merrill C. Godfrey
Akin Gump Strauss Hauer & Feld, L.L.P.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4000
(202) 887-4288 Fax

Counsel for Chevron U.S.A. Inc.

**Electronically Filed on September 29, 2005**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| Plaintiff, | ) | No. 1:04cv1365 |
| vs. | ) | Judge Susan G. Braden |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**CHEVRON U.S.A. INC.'S RESPONSE TO THE UNITED STATES' SUPPLEMENTAL MOTION TO DISMISS**

Donald B. Ayer
Lawrence D. Rosenberg
Louis K. Fisher
Victoria Dorfman
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Tel.: 202-879-3939
Fax: 202-626-1700

*Counsel for Chevron U.S.A. Inc.*

## INTRODUCTION AND BACKGROUND

The Government's "Supplemental Rule 12(b)(1) Motion," like its Rule 12(b)(6) motion, should be denied. The Government's supplemental brief recasts the arguments from its Rule 12(b)(6) motion and brings forth new arguments in an attempt to dispute its waiver of sovereign immunity and the existence of jurisdiction in this Court. As Plaintiff Chevron U.S.A. Inc., demonstrates in this Response, however, the Complaint's allegation of a breach of contract by the United States sufficiently establishes that the United States has waived its sovereign immunity, that jurisdiction lies in this Court, and that Chevron has a claim upon which relief can be granted. The Tucker Act expressly waives sovereign immunity by providing that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1). Chevron's claim against the United States clearly is founded upon an express contract with the United States – the Equity Process and Decoupling Agreements executed by the parties on May 19, 1997. By engaging in specifically prohibited *ex parte* communications that irrevocably tainted the finalization of the parties' respective equity interests in the Elk Hills Reserve, the United States materially breached this contract with Chevron, which has suffered reliance damages in the amount of many millions of dollars as a direct result of the breach.

The Department of Energy's promise to eschew *ex parte* communications was an essential element of the consideration received by Chevron in exchange for its relinquishment of valuable legal rights. The rights relinquished by Chevron in the 1997 Agreements arise under the 1944 Unit Plan Contract (the "UPC"), which "unitized" the parties' interests in the Elk Hills Reserve. In 1995, Congress enacted legislation instructing the Secretary of Energy to terminate

judgment is not against a NAFI, there is simply no issue regarding the source of the funds. This result is dictated by the basic premise of the NAFI doctrine – that the Court lacks jurisdiction only when an agency does not *and cannot* receive appropriated funds and therefore "could not obligate public monies." *Lion Raisins*, 416 F.3d at 1366. Because of the DOE's receipt of appropriated funds, the DOE is not a NAFI, and, consequently, the concern about committing funds to pay for the breach of contract is unfounded.

**III. No Separate Waiver of Sovereign Immunity Is Required for Recovery of Equity Process Expenses as an Element of Reliance Damages**

The Government argues that legal fees Chevron expended in the course of participating in the equity finalization proceedings are not recoverable because they are litigation expenses and, as such, must be borne by Chevron absent a waiver of sovereign immunity by the Government. Supp. Br. at 9. This argument ignores the fact that Chevron is seeking recovery of these fees (including numerous expenditures of Chevron's and its consultants' time, money and resources) for breach of contract by the Government *as part* of contract damages themselves – a remedy that the Federal Circuit has approved on numerous occasions. *See, e.g., Chevron U.S.A., Inc. v. United States*, 20 Cl. Ct. 86, 88 (1990); *Gentex Corp. v. United States*, 61 Fed. Cl. 49, 54 (2004); *Massachusetts Bay Transp. Auth. v. United States,* 129 F.3d 1226, 1233 (Fed. Cir. 1997); *Pratt v. United States*, 50 Fed. Cl. 469, 482 (2001).

There is a fundamental difference between attorney's fees incurred in litigating a breach (which generally are not recoverable) and attorney's fees that are an element of contract damages (which are recoverable). Indeed, in litigation pursuant to the Unit Plan Contract itself, the court granted summary judgment against the United States on liability for breach of contract and rejected the Government's argument that UPC did not require it to reimburse legal fees – costs of Chevron's litigation against a third party. *Chevron*, 20 Cl. Ct. 86. The court held that Chevron

consequence of a breach of contract. To the contrary, where legal fees incurred in an action by a third party are determined to be a direct and foreseeable consequence of defendant's breach, they have been awarded.").[3]

*Yancheng Baolong Biochem. Prods. Co. v. United States*, 406 F.3d 1377 (Fed. Cir. 2005), cited by the Government in its Supplemental Brief (at 9-10), is inapposite. In *Yancheng*, the basis for the claim of attorney's fees was not breach of contract, but a Rule of the Court of International Trade. 406 F.3d at 1383 ("In the present case, attorney fees were requested based on Rule 86.2 of the Rules of the United States Court of International Trade which provides that '[a] reasonable counsel fee, necessitated by the contempt proceeding, may be included as an item of damage.' . . . Rule 86.2 of the Court of International Trade has no corollary rule in the Federal Rules, and the Rules of the Court of International Trade are not promulgated subject to congressional approval. The court is given blanket authority by statute to promulgate its own rules, but without any specific power to subject the United States to monetary liability."). Equally unpersuasive is *Texas Instruments Inc. v. United States*, 991 F.2d 760 (Fed. Cir. 1993) (Reply at 18). There, no attorney's fees were warranted because no contract had been breached. *Id.* at 768.

By contrast, this is a classic case where legal expenses are an appropriate element of direct damages. Chevron incurred substantial costs in participating in a process that has been irrevocably tainted by the Government. Compl. ¶¶ 58, 65, 71. These costs are recoverable

[3] The Government's attempts in its prior reply (at 18-20) to distinguish these cases are unavailing. The *Chevron* case plainly demonstrates that the measure of contract damages recoverable from the United States can include legal expenses other than those incurred litigating the breach of contract itself. Moreover, neither *Gentex* nor *Massachusetts Bay* are limited to their precise facts. The case law uniformly holds that attorney's fees, just like other expenses, incurred in the performance of a breached contract may be recovered as damages from the Government. *See, e.g., Pratt*, 50 Fed. Cl. at 482-83.

contract damages under a reliance theory, just as the preparation bid costs were recoverable in *Gentex*. As in *Gentex*, Chevron's efforts "have been wasted in reliance upon the Government's obligation to treat" Chevron's equity team's submissions "fairly," here by promising not to engage in *ex parte* communications with the DOE equity team. 61 Fed. Cl. at 54. As in *Gentex*, Chevron is asking to be "restore[d]" to its pre-contract position by obtaining the "costs" of attorney's fees (and substantial other costs) "wasted" in an effort to comply with the flawed process. *Id.*

Because Chevron seeks recovery of damages for the breach of the Government's obligation to follow faithfully the equity redetermination process, Chevron needs no special waiver of sovereign immunity nor a special contractual provision allowing recovery of attorney's fees. *See, e.g., Mass. Bay Transp. Auth.*, 129 F.3d at 1233; *Pratt*, 50 Fed. Cl. at 482-83.

## IV. The Equity Process Agreement Does Not Give OHA Authority to Resolve Disputes Over the Agreement Itself

The Equity Process Agreement provides OHA with narrowly circumscribed jurisdiction that does not encompass disputes over the procedures to be followed under the Equity Process Agreement itself. Indeed, in refusing to stay its own proceedings pending resolution of this dispute, OHA unequivocally stated that "disputes about the agreement are outside our purview." U.S. Appx. at 109. This statement by OHA confirms not only that OHA lacks jurisdiction but also that, for the same reason, resort by Chevron to OHA would have been futile.

Under the Equity Process Agreement, OHA has jurisdiction only over a "challenge" by Chevron to an "ASFE final decision [that] rejects, in whole or in part, NSA's [the independent petroleum engineer's] . . . recommendations." Equity Process Agreement ¶ B.7. Thus, when "an ASFE decision adopts the NSA recommendation for a particular zone," OHA has no jurisdiction. *Id.* Even when the ASFE does not adopt NSA's overall recommendation, OHA can "review

**CONCLUSION**

For the foregoing reasons, and for those set forth in Chevron's prior Response to the United States' Motion to Dismiss, the Government's motion to dismiss should be denied.

Dated: September 29, 2005

Respectfully submitted,

s/ Lawrence D. Rosenberg by s/ Louis K. Fisher

Donald B. Ayer
Lawrence D. Rosenberg
Louis K. Fisher
Victoria Dorfman
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
Tel.: 202-879-3939
Fax: 202-626-1700

*Counsel for Chevron U.S.A. Inc.*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHEVRON USA, INC., )
)
Plaintiff, )
)
v. ) Docket No.: 04-1365
)
UNITED STATES, )
)
Defendant. )

Courtroom 8
National Courts Building
717 Madison Place N.W.
Washington, D.C.

Friday,
December 16, 2005

The parties met, pursuant to notice of the Court, at 9:58 a.m.

BEFORE: HONORABLE SUSAN G. BRADEN
Judge

APPEARANCES:

For the Plaintiff:

LAWRENCE D. ROSENBERG, Esquire
LOUIS K. FISHER, Esquire
DONALD B. AYER, Esquire
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939

APPEARANCES: (cont'd.)

For the Defendant:

JANE W. VANNEMAN, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-8283

Also for the Defendant:

PAUL MICHAEL, Esquire
U.S. Department of Energy
L'Enfant Plaza Building
1000 Independence Avenue, S.W.
Washington, D.C. 20585-1615

contract with the United States. We have an expressed contract with the United States.

THE COURT: We've got that.

MR. ROSENBERG: We claim a breach. I just want to take one second to explain that this contract is a little unusual in that it is a contract for a process, and the process that we bargained for was to have the ASFE act as neutral as possible, and the prime directive, if you will, Your Honor, of that process was no ex parte communications between the DOE equity team and the ASFE and his people.

What we've alleged in the complaint, Your Honor, is that Ms. Mary Egger, who was the lead DOE lawyer for the equity team, not only had communications with, but she drafted the decision.

There's no more clear violation of that rule that we believe is possible and so that's the breach that we've alleged here. What we're seeking in this case are the money damages, our reliance damages.

THE COURT: That's a new argument. It's certainly a new variation on the theme.

MR. ROSENBERG: Okay. Well, it was in the supplemental brief that we --

THE COURT: I know it's in your materials.

MR. ROSENBERG: Right. We'll explore this a

went through the restatement and talked about the kinds of contract damages that are available. What we are seeking here is what I believe you characterized as express reliance damages, the expenditures Chevron put forth for this process.

We are not asking you in any way, shape or form to second guess the validity or correctness of any OHA decision or ASFE determination. We just want in this case what we put into this defective process.

THE COURT: Well, let's assume for the moment, and the other interesting argument that I don't need to get to today, but obviously if there were ex parte communications I think I mentioned this. What if they were talking about making arrangements of who is the best hairdresser in town? I mean, nothing that has anything to do with this, but if they were chit-chatting.

MR. ROSENBERG: It would have to be material breach, Your Honor. I think the Court could say that's not a material breach.

There are all kinds of hypotheticals you could come up with where it wouldn't matter, but here the ex parte communication isn't just talking. It's that their lawyer wrote the decision. I mean, the whole point is a wall of separation between the

decision maker and the lawyer.

THE COURT: We don't know that. I don't know that yet.

MR. ROSENBERG: You don't know that. We've alleged that's what the documents show, but you're right.

THE COURT: And you had not done a full FOIA. I had suggested that you do some more FOIA work when I was here before.

MR. ROSENBERG: I believe that's still in the process, Your Honor.

THE COURT: All right.

MR. ROSENBERG: Obviously, Your Honor, Chevron would like the chance to take discovery to find all that out.

THE COURT: Okay.

MR. ROSENBERG: The point here is there is no waiver. You know, there's no statute that waives sovereign immunity here. This provision doesn't foreclose it for this particular kind of action. We're within the Tucker Act waiver, and in our view that means we've got jurisdiction in this Court.

What the damages actually are is an issue for later. You know, under the reliance damages framework the government may be able to prove that

some of the damages we seek would have had to have been spent anyway and that might reduce the damages, but we get the right, we believe, to be in this Court to pursue the basic expenditures.

I want to just discuss the essence of the damages for a second. We believe that these findings, while they are so much different, are not unique.

THE COURT: Your claims are certainly unique.

MR. ROSENBERG: Okay. Well, we don't think they are. Let's talk about this for a minute.

First of all, we are just seeking the essential reliance damages for participating in the finalization process. As you said in American Capital, those are damages we can get. While I admit they're not directly analogous, I think they are somewhat analogous to American Capital because this is what Chevron put on the table for the process that we bargained for.

THE COURT: Another vanity quote.

MR. ROSENBERG: But it's a pertinent case because it goes through this in great detail. Just like the claims in American Capital put on the table the equity value of TransOhio, here we put on the table these expenses to participate in the process.

my job description?

MR. ROSENBERG: I think it is, Your Honor. I think it is, Your Honor. I mean, I think the Court of Claims --

THE COURT: Why don't you go on with the rest of your argument? I see you've got some more slides.

MR. ROSENBERG: Sure.

THE COURT: I interrupted you.

MR. ROSENBERG: The sort of concluding point here on this issue is that we really believe, and I think this is where the argument is going, to rule against Chevron the Court would have to find that Chevron has failed to sufficiently seek reliance damages.

In our view, the reliance damages issue again is not a 12(b)(1) issue. It's a 12(b)(6), which actually both of these in our view are really 12(b)(6) issues, but, as we've already talked about B.9, we don't fall within specific waiver of B.9, so we haven't waived it.

If you look at reliance damages, we think that the precedent that exists, Winstar's rule that contracts are inherently money mandating, the Gentex holding that reliance damages for wasted bid

bargained for, and we really believe that this Court does provide a remedy, at least for the reliance damages, that we put into this process, and that's what we're seeking in this Court.

Is there anything else that I can do to help or questions I can answer at this point?

THE COURT: I don't have anything else other than what I've raised as I've gone along. I think the government wants to have a short response, and then what I think we will do is go back and try to retackle the opinion.

What happened is we had started writing the opinion, and when I was going through it I really decided that I needed to get back to the 101 question of is this in my job description? Am I the person that's supposed to be involved in this?

MR. ROSENBERG: Right.

THE COURT: What was the jurisdiction? I think there are some pretty big issues, which is why I asked you for additional briefing.

I thought the argument was good that the parties gave. I thought your arguments were very good today, and you did a nice job. It's a complicated argument to present. As I said this morning, I went back and for the third time wrote out my chart of how