IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEVRON U.S.A. INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1365C |
| v. | ) | |
| | ) | (Judge Braden) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to RCFC 56(h)(1), defendant, the United States, respectfully submits the following proposed findings of uncontroverted fact in support of "Defendant's Motion for Summary Judgment" dated August 16, 2007:[1]

1. Effective on June 19, 1944, Standard Oil Company of California, the predecessor-in-interest of plaintiff, Chevron U.S.A. Inc. ("Chevron"), and the United States, acting through the Secretary of the Navy, entered a "Unit Plan Contract" with respect to Naval Petroleum Reserve Numbered 1 ("NPR-1"), located in Kern County, California, near Bakersfield, California, and

[1]In this document, "Compl. ¶ ____" refers to the referenced paragraph(s) of the "Complaint" filed by Chevron on August 20, 2004; "Answer ¶ ____" refers to the referenced paragraph(s) of "Defendant's Answer" filed by the Government on June ____, 2006; "Egger Declaration, ¶ ___" refers to the referenced paragraph(s) of the "Declaration of Mary H. Egger" dated August 6, 2007; "Gangle Declaration, ¶ ____" refers to the referenced paragraph(s) of the "Declaration of Francis Butch Gangle" dated August 2, 2007; "Latham Declaration, ¶ ____" refers to the refer-enced paragraph(s) of the "Declaration of Gary Latham" dated August 1, 2007; "Thorpe Declar-ation, ¶ ____" refers to the referenced paragraph(s) of the "Declaration of Gregory B. Thorpe" dated August 8, 2007; "Stay Depo. ____ (____)" refers to the page(s) and (parenthetically) line(s) of the deposition of Michael H. Stay on June 5, 2007; "Stone Depo. ____ (____)" refers to the page(s) and (parenthetically) line(s) of the deposition of Norman Stone on May 31, 2007; "Taft Depo. ____ (____)" refers to the page(s) and (parenthetically) line(s) of the deposition of Wil-liam H. Taft, IV, on June 14, 2007; and "Def. App. ____" refers to the referenced page(s) of the "Appendix to Defendant's Motion for Summary Judgment" dated August ____, 2007.

commonly referred to as "Elk Hills." See Def. App. 18; Thorpe Declaration, ¶ 3, Def. App. 1-2. The Unit Plan Contract recited, among other things, that several enumerated considerations had led the Navy and Standard Oil "to conclude that the most desirable and effective means of protecting [NPR-1] and of assuring the maximum ultimate recover of oil, gas, natural gasoline and associated hydrocarbons from [NPR-1] is to develop and operate all lands in [NPR-1] as a unit[.]" Unit Plan Contract, Recital (6), Def. App. 22.

2. Section 2 of the Unit Plan Contract, which was addressed to "Relative Participations in Production," provided that "Navy and Standard shall, subject to the further provisions of this contract, share in the oil, gas, natural gasoline and associated hydrocarbons produced from each commercially productive zone underlying [NPR-1]" upon the basis of specified percentages for each of the known commercially productive zones underlying the lands in NPR-1. Id., § 2(b),(d), Def. App. 25. Section 2(f) of the Unit Plan Contract further provided that "[t]he initial or any subsequently established participations in the production from any commercially productive zone underlying lands in [NPR-1] shall be subject to revision from time to time and in the manner hereinafter set forth." Def. App. 25. Such revisions (also referred to as "redeterminations") were to be made by an Engineering Committee established pursuant to the Unit Plan Contract composed of representatives of the Navy and Standard. Unit Plan Contract, §§ 2(a)(3), (f), Def. App. 24-25. If the Engineering Committee was "unable to agree unanimously upon any such proposed revision, the Secretary of the Navy, as hereinafter provided in Section 9 [of the Unit Plan Contract], shall determine what revision, if any, shall be made." Unit Plan Contract, § 2(f), Def. App. 26.

3. Paragraph (b) of Section 9 of the Unit Plan Contract, which concerned "Determination of Disputes," provided:

> In the event the Engineering Committee is unable to agree upon any matter subject to determination by it, said Committee shall notify both Navy and Standard thereof and shall refer such matter to the Secretary of the Navy for determination. Thereupon the Secretary of the Navy on his own initiative may, and upon the request of Standard shall, submit the matter to an independent petroleum engineer, to be selected by him, for the purpose of securing an advisory report thereon from such engineer. The compensation and expenses of such engineer shall be borne by the Navy and Standard in the respective percentages then obtaining under Section 2, and a copy of such report shall be supplied to Standard. After consideration of the matter, the Secretary of the Navy shall render his decision thereon and such decision in each such instance shall be final and binding upon Navy and Standard.

Def. App. 33.

4. In 1977, the authority and functions of the Secretary of the Navy in respect of NPR-1 were transferred to and vested in the newly-established cabinet position of Secretary of Energy in charge of the Department of Energy ("DOE"). See Department of Energy Organization Act, § 307(1), Pub. L. No. 95-91, 91 Stat. 565, 581.

5. Effective on February 10, 1996, the National Defense Authorization Act for Fiscal Year 1996 ("NDA Act") was enacted. See Pub. L. No. 104-106, §§ 3411-3416, 110 Stat. 631-37 (1996) (10 U.S.C. § 7420 (2000) (note)). The NDA Act provided that, "not later than two years after [its] effective date, the Secretary [of Energy] shall enter into one or more contracts for the sale of all right, title, and interest of the United States in and to all lands owned or controlled by the United States in [NPR-1]." NDA Act, § 3412(a), 110 Stat. 631-32.

6. The NDA Act also provided that, "[n]ot later than eight months of [its] effective date, the Secretary [of Energy] shall finalize equity interests of the known oil and gas zones in [NPR-1]." Pub. L. No. 104-106, § 3412, 110 Stat. 632. For that purpose, the NDA Act provided that "[t]he Secretary shall retain the services of an independent petroleum engineer, mutually acceptable to the equity owners, who shall prepare a recommendation on final equity figures" and that [t]he Secretary may accept the recommendation of the independent petroleum engineer for final equity in each known oil and gas zone and establish final equity interest in [NPR-1] in accordance with the recommendation, or the Secretary may use such other method to establish final equity interest in [NPR-1] as the Secretary considers appropriate." Id., § 3412(b)(2), 110 Stat. 632. However, the NDA Act further provided that, "[i]f, on the effective date, there is an ongoing equity redetermination dispute between the equity owners under section 9(b) of the unit plan contract, the dispute shall be resolved in the manner provided in the unit plan contract within eight months after the effective date" and that such "resolution shall be considered final for all purposes under [§ 3412 of the Act]." Id., § 3412(b)(3), 110 Stat. 632.

7. The authority of the Secretary of Energy under the Unit Plan Contract and under the NDA Act with respect to the divestment of DOE's interest in NPR-1, including equity finalization between Chevron and DOE, was delegated to the DOE Assistant Secretary for Fossil Energy ("ASFE"). See Compl. ¶ 39; Answer, ¶ 39; Egger Declaration ¶ 6, Def. App. 476. The ASFE is the head of the Office of Fossil Energy, one of several DOE program organizations. Egger Declaration, ¶ 3, Def. App. 474; Gangle Declaration, ¶ 1, Def. App. 465. This position is located in DOE headquarters, Washington, D.C. Id.

8. Ms. Patricia Fry Godley was the ASFE from July 26, 1994, to July 31, 1998. Latham Declaration, ¶ 3, Def. App. 502.

9. The Independent Petroleum Engineer ("IPE") retained by DOE for purposes of equity finalization was the firm Netherland, Sewell & Associates, Inc., Dallas, Texas ("NSAI"). Thorpe Declaration, ¶ 6, Def. App. 2.

10. Shortly after the enactment of the NDA Act, the law firm of O'Melveny & Myers, L.L.P. ("OMM"), was retained by DOE to provide legal services to DOE relating to the sale of DOE's interest in NPR-1. Thorpe Declaration, ¶ 7, Def. App. 3. The initial contract for legal services was effective on or about April 7, 1996. Id., Def. App. 3. The OMM attorneys who provided legal services to DOE under this engagement included Arthur B. Culvahouse, Jr., managing partner of OMM's Washington D.C. office, and Owen Olpin and Gregory B. Thorpe, partners in OMM's Los Angeles, California office. Id., Def. App. 3. Prior to the sale of DOE's interest in NPR-1 in February 1998, OMM provided legal services to DOE upon a wide variety of matters related to preparation of the property for sale. Id., ¶ 23, Def. App. 7. OMM prepared sale-related materials, such as the purchase agreement and a new unit operating agreement, negotiated a settlement agreement with the State of California concerning school land funds, cleared up title issues, prepared disclosures of environmental issues for prospective purchasers, including what responsibilities the purchaser would be expected to assume, and worked on permit issues. Id., Def. App. 7. OMM also provided legal advice and assistance to DOE with respect to the equity finalization process between DOE and Chevron. Id., ¶ 24, Def. App. 7.

11. In April 1996, DOE and Chevron established an Owner Issues Group ("OIG") to identify and address issues related to the sale of DOE's interest in NPR-1 that needed to be

resolved prior to the sale. See April 22, 1996 letter from Mr. Carnie R. Block, Vice President/-General Manager, Western Business Unit, Chevron U.S.A. Production Company, Bakersfield, California, to ASFE Godley, Def. App. 541; April 26, 1996 OIG Meeting Minutes, Def. App. 551; Stay Depo. 32(4-16), Def. App. 920; Thorpe Declaration, ¶ 19, Def. App. 6. To avoid the appearance that Chevron had an unfair advantage relative to other potential bidders in the sale of DOE's interest in NPR-1 as a result of Chevron's existing contractual and business relationship with DOE, sale-related issues were to be identified and addressed only by and through the OIG. Thorpe Declaration, ¶ 19, Def. App. 6. Detailed minutes of OIG meetings were kept and made available to potential bidders for DOE's interest in NPR-1. Id.; Stay Depo. 34(19-22)-37(1-9), Def. App. 921.

12. The DOE members of the OIG included Robert Nordhaus, DOE General Counsel, Captain Ernest R. Hunter, CEC, USN, Deputy Assistant Secretary for Naval Petroleum and Oil Shale Reserves, and Mary H. Egger, then Assistant General Counsel for Procurement and Financial Assistance, Office of General Counsel, DOE. Thorpe Declaration, ¶ 20, Def. App. 6.[2] Usually, either Mr. Culvahouse or Mr. Olpin, the two most senior OMM attorneys involved in the DOE engagement for NPR-1, would attend OIG meetings. Id. Mr. Thorpe also participated in some of the OIG meetings that took place during the first half of 1997. Id.

13. Ms. Egger has been employed by DOE in various attorney positions within the Office of General Counsel continuously from November 1980 to the present. Egger Declaration, ¶ 2, Def. App. 474. She held the position of Assistant General Counsel for Procurement and

[2]Captain Hunter left DOE in or about April 1997 and was replaced by R. Dobie Langenkamp as the Deputy Assistant Secretary for Naval Petroleum and Oil Shale Reserves. Thorpe Declaration, ¶ 20, Def. App. 6; Gangle Declaration, ¶ 7, Def. App. 466.

Financial Assistance initially in an acting capacity from July 12, 1992, until October 12, 1998. Id. She has held the position of Deputy General Counsel for Technology Transfer and Procurement continuously from October 13, 1998, to the present. Id.

14. The Office of Fossil Energy and the Office of General Counsel are separate and distinct organizations within DOE. Egger Declaration, ¶ 3, Def. App. 474-75. The General Counsel does not report to and never has reported to the ASFE. Id. The ASFE does not report to and never has reported to the General Counsel. Id. The ASFE reports to the Secretary of Energy through the Under Secretary and the General Counsel reports directly to the Secretary of Energy. Id.

15. The Chevron officials who participated in OIG meetings included Mr. Michael Stay, Program Director, Western Business Unit, Chevron U.S.A. Production Company, Warrenton, Virginia, Mr. James Brady, Profit Center Manager, Western Business Unit, Chevron U.S.A. Production Company, Bakersfield, California, and Ms. Cynthia Giumarra, the chief attorney in the Western Business Unit, Chevron U.S.A. Production Company, Bakersfield, California. Stay Depo. 13(2-11), 23(8-22), 25(17-20), Def. App. 915, 918; Taft Depo. 17(10-21), Def. App. 911; Stone Depo. 32(19-22)-20(1-7), Def. App. 929.

16. Chevron's Western Business Unit was responsible for the oversight and management of Chevron's interests in NPR-1. Stay Depo. 18(14-17), Def. App. 917. Messrs. Stay and Brady reported to Mr. Carnie R. Block, Vice President/General Manager, Western Business Unit, Chevron U.S.A. Production Company, Bakersfield, California, the head of the Western Business Unit. Stay Depo. 15(1-3), 19(9-11), 26(9-11), Def. App. 916, 917, 919. Ms. Giumarra did not report to Mr. Block; she reported to Mr. Patrick Hobin, a Chevron attorney located in San Ramos

or San Francisco, California. Stay Depo. 24(1-8), Def. App. 918. Ms Giumarra provided legal services for matters relating to NPR-1, including issues related to the sale of DOE's interest in NPR-1. Stay Depo. 25(1-13), Def. App. 918.

17. In addition to the Chevron employees, William H. Taft IV, an attorney and partner in the Washington D.C. office of the law firm Fried Frank Shriver Harris & Jacobson, Chevron's outside legal counsel for the equity finalization process, participated in OIG meetings. Thorpe Declaration, ¶ 21, Def. App. 7; Taft Depo 18(18-22)-19(1-2), Def. App. 912; Stone Depo. 32(19-22)-33(1-7), Def. App. 929.

18. Mr. Stay was Chevron's principal point of contact for the OIG and Ms. Egger was DOE's principal point of contact for the OIG. Stay Depo. 32(17-22)-33(1), Def. App. 920. They were the focal points for scheduling OIG meetings and exchange of correspondence and other OIG-related information between Chevron and DOE. Stay Depo. 33(2-6), Def. App. 920.

19. The OIG met periodically (approximately on a monthly basis) between April 1996 and the sale of DOE's interest in NPR-1 in February 1998. Stay Depo. 33(7-19), Def. App. 920.

20. The sale of DOE's interest in NPR-1 was a competitive sale. Thorpe Declaration, ¶ 17, Def. App. 6. Petrie Parkman & Co. of Houston, Texas and Credit Suisse/First Boston were co-investment banks ("Investment Bankers") for the sale of DOE's interest in NPR-1. Id. The Investment Bankers essentially served as commercial real estate brokers for the sale of DOE's interest in NPR-1, preparing offering materials describing NPR-1 and soliciting potential bidders. Id.

21. Occidental Petroleum Corporation ("Occidental") was the successful bidder for the interest of DOE in NPR-1 with a bid of approximately $3.6 billion. Thorpe Declaration, ¶ 18,

Def. App. 6; Gangle Declaration, ¶ 8, Def. App. 466-67. Chevron submitted an unsuccessful bid for DOE's interest in NPR-1. Thorpe Declaration, ¶ 18, Def. App. 6; Stay Depo. 34(12-18), Def. App. 921; Stone Depo. 39(2-4), Def. App. 931. DOE's interest in NPR-1 was sold to Occidental on February 5, 1998. Thorpe Declaration, ¶ 18, Def. App. 6. Gangle Declaration, ¶ 8, Def. App. 466-67.

22. On July 8, 1996, ASFE Godley issued Administrative Order No. 96-01, concerning "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process" ("Equity IPE Protocol"). See Def. App. 135; Thorpe Declaration, ¶ 24, Def. App. 7. Citing the provisions of the NDA Act addressed to equity finalization for NPR-1, the Equity IPE Protocol provided that "[t]he equity owners of lands within [NPR-1], [Chevron] and [DOE], will present their respective final equity positions to the mutually acceptable independent petroleum engineer (Netherland, Sewell & Associates, Inc.) (hereinafter "Equity IPE") to be retained by the Secretary to provide final equity recommendations in the Dry Gas Zone, Carneros Zone, and the Stevens Zone, id., § B.3, Def. App. 135, and that "[t]his Protocol sets out an equity finalization implementation process that is designed to be open, fair, transparent and one that will adequately protect the respective ownership interests of the owners," id., § B.5, Def. App. 136.

23. The Equity IPE Protocol did not apply to equity finalization for the Shallow Oil Zone. Thorpe Declaration, ¶ 24, Def. App. 8. The Shallow Oil Zone was the subject of an equity redetermination dispute under section 9(b) of the Unit Plan Contract pending on the effective date of the NDA Act. Id. Section 3412(b)(3) of the NDA Act provided that any such dispute "shall be resolved in the manner provided in the unit plan contract within eight months after the effective date" and that such "resolution shall be considered final for all purposes under

this section." Pub. L. No. 104-106, § 3412(b)(3), 110 Stat. 632.

24. Section C of the Equity IPE Protocol ("Equity Finalization Implementation Protocol") established the schedule and procedures to be used in proceedings before the IPE. See Def. App. 136. Section C.5 of the Equity IPE Protocol provided, in part:

> There will be no written or oral equity-related communication or meeting with the Equity IPE (this term excludes contract administration communications or meetings) by an owner (including its agents and contractors) without the participation or opportunity to participate by the other owner. Before any equity-related communication or meeting occurs, the Equity IPE will notify both owners of the planned equity-related communication/meeting so as to allow both owners the opportunity to participate in all communications or meetings held between the Equity IPE and an owner.

Def. App. 137. The Equity IPE Protocol contemplated an initial presentation and a rebuttal by Chevron and DOE for each of the three zones to which the Protocol applied. Equity IPE Protocol, §§ C.6-C.8, C.11-C.14, C.20, Def. App. 137, 138-39. Regarding equity-related meetings, the Protocol provided:

> All equity-related meetings with the Equity IPE, including the presentation by the owners of their respective positions for each zone, will be sessions at which both owners are invited to attend (this excludes contract administration meetings that may be required by DOE). Each owner is permitted to designate its attendees, who will execute appropriate confidentiality agreements against disclosure of proprietary information.

Equity IPE Protocol, § C.9, Def. App. 137.

25. The Equity IPE Protocol provided that, following the presentations by Chevron and DOE of their respective equity finalization positions for a zone, "[t]he Equity IPE shall present (orally and in writing) at a joint session to both parties its provisional recommendation," id.,

§ C.15, Def. App. 139, that the "[o]wners will be provided 3 days to transmit written comments on the provisional recommendation to the Equity IPE as to matters of error, factual accuracy, or misrepresentation contained in the provisional recommendation, id., § C.16, Def. App. 139, and that, after consideration of such comments, "the Equity IPE shall provide its recommendation (orally and in writing) to the [ASFE]," id., § C.18, Def. App. 139.

26. The Equity IPE Protocol further provided that, "[i]n the event a disagreement arises regarding the equity implementation process or this Protocol which cannot be resolved jointly by the Equity IPE and [equity finalization teams], the matter shall be referred to the [ASFE] (or designee) for resolution" and that, "[p]rior to resolution, the [ASFE] will consult with Chevron." Equity IPE Protocol, § C.21, Def. App. 140.

27. DOE assembled an equity finalization team ("EFT") in or about June 1996 for the purpose of advocating and presenting DOE's position in equity finalization proceedings before the IPE (NSAI). Gangle Declaration, ¶ 11, Def. App. 467. The DOE EFT initially consisted of the following employees of DOE's Office of Naval Petroleum Reserves in California ("NPRC") and DOE consultants:

NPRC: Mr. Wayne Kauffman, Assistant Director (Facilities Engineer)

Mr. Francis "Butch" Gangle ((Petroleum Engineer)

Ms. Helen "Ginny" Weyland (Geologist)

Mr. Mark Milliken (Geologist)

Mr. George McJannet (Geologist)

Mr. James Murphy (Petroleum Engineer)

Petroleum
Consultants: Mr. Kenneth L. Schuessler (Petroleum Engineer)
System Technology Associates/SI International, Inc.

Mr. Alan Burzlaff (Petroleum Engineer)
System Technology Associates/SI International, Inc.

Mr. Kevin E. Beacom (Petroleum Geologist)
System Technology Associates/SI International, Inc.

Mr. Stanley I. Obernyer (Geologist)
System Technology Associates/SI International, Inc.

Mr. Andrew L. Prestridge (Petroleum Engineer)
System Technology Associates/SI International, Inc.

Mr. Greg Hueni (Petroleum Engineer)
Malkewicz-Hunei Associates

Id., Def. App. 467-68.[3]

28. NPRC was a subordinate field component of the DOE Office of Naval Petroleum and Oil Shale Reserves ("NPOSR"), Washington, D.C., a component of the Office of Fossil Energy.[4] NPRC was responsible for the day-to-day management of two petroleum reserves in California: Naval Petroleum Reserve Numbered 1 ("NPR-1"), also referred to as "Elk Hills," and Naval Petroleum Reserve Numbered 2 ("NPR-2"), also referred to as "Buena Vista Hills." Gangle Declaration, ¶ 8, Def. App. 466.

29. Between February 1996 and February 1998, NPRC's staff and facilities were located at the NPR-1 field site in Kern County, California, near Bakersfield, California. Gangle Declara-

[3]In or about May 1999, Mr. James Gruber, a DOE Petroleum Engineer assigned to the Office of Strategic Petroleum Reserves, Washington, D.C., was assigned to the DOE EFT on a part-time basis. Gangle Declaration, ¶ 12, Def. App. 468.

[4]In December 2003, NPOSR was renamed the Office of Reserve Lands Management. Gangle Declaration, ¶ 5, Def. App. 466.

tion, ¶ 9, Def. App. 467. Upon the sale of DOE's interest in NPR-1 to Occidental, the NPRC staff moved into new offices in Bakersfield, California. Id. The NPRC Bakersfield office was closed in February 2006, following the transfer of NPR-2 to the Bureau of Land Management. Id.

30. In 1996, Mr. Jay Williams was the Director, NPRC, Mr. Kauffman was the Assistant Director, NPRC, and Mr. Gangle was the Director of Engineering, NPRC. Mr. Gangle reported to Mr. Williams through Mr. Kauffman. Gangle Declaration, ¶ 4, Def. App. 466.

31. In 1996, Mr. Williams reported to the Deputy Assistant Secretary for Naval Petroleum and Oil Shale Reserves, who directed the operations of NPOSR. Gangle Declaration, ¶ 6, Def. App. 466. At that time, Mr. Anton Dammer was the Deputy Director, NPOSR. Id.

32. In 1996, the Deputy Assistant Secretary for Naval Petroleum and Oil Shale Reserves was Captain Ernest R. Hunter, CEC, USN. Gangle Declaration, ¶ 7, Def. App. 466. When Captain Hunter left DOE in 1997, Mr. R. Dobie Langenkamp was appointed the Deputy Assistant Secretary for Naval Petroleum and Oil Shale Reserves. Id.; Thorpe Declaration, ¶ 20, Def. App. 6-7. In or about 2000, following the resignation of Mr. Langenkamp, the Deputy Assist-ant Secretary for Naval Petroleum and Oil Shale Reserves position was abolished and Mr. Dam-mer became the Director of NPOSR. Gangle Declaration, ¶ 7, Def. App. 466.

33. Mr. Kauffman was the principal point of contact for the DOE EFT until 1999 when he retired. Gangle Declaration, ¶ 13, Def. App. 468. Upon Mr. Kauffman's retirement in 1999, Mr. Gangle became the principal point of contact for the DOE EFT. Id.

34. The principal point of contact for the Chevron EFT was Mr. Norman Stone, a Chevron employee since 1980 and a geologist by training and experience. Stone Depo. 8-9, Def. App.

925. Mr. Stone was assigned to Chevron's Western Business Unit in 1990. Id., 9(13-16), Def. App. 925. From 1990 to 1997, Mr. Stone reported to Messrs. Block and Brady. Id., 34(7-14), Def. App. 930. After Mr. Brady left Chevron in 1997, Mr. Stone continued to report to Mr. Block. Id., 43(14-22)-44(1-10), Def. App. 932. From 1996 to the present, Mr. Stone has been the Project Manager for the Chevron EFT. Id., 16(2-5); 48(11-18), Def. App. 927, 933. According to Mr. Stone, this entailed "the task of finalizing equities from a technical point of view." Id., 54(15-17), Def. App. 934.

35. On October 11, 1996, ASFE Godley issued Administrative Order 96-01, Supplement No. 1 ("the ILA Protocol"), which established a process for providing guidance to the IPE with respect to Unit Plan Contract interpretation disputes during the course of equity finalization proceedings before the IPE and provided for an Independent Legal Advisor ("ILA") to resolve such disputes. See Def. App. 142; Thorpe Declaration, ¶ 25, Def. App. 8.

36. The ILA Protocol stated that, as a result of discussions between Chevron and DOE regarding Unit Plan Contract interpretation issues, "the owners agreed to address the matters by developing a mechanism through which joint guidance from the owners could be given to [NSAI] with respect to the handling of [Unit Plan Contract] interpretation issues as [NSAI] performs its role of independent petroleum engineer for equity finalization (Equity IPE) under section 3412(b) of the [NDA Act]." Id., § B, Def. App. 142. The ILA Protocol provided:

> In the event (a) the Equity IPE believes that it requires guidance on issues of contract interpretation or other legal issues in preparing its report, or (b) [a] legal issue requiring guidance has come up, then, unless the Equity IPE determines that the resolution of such issue will not have a material effect on its equity recommendations, the owners will use their best efforts to provide joint guidance on the issue to the

> Equity IPE in a timely fashion. If the owners reach agreement on the guidance to be provided to the Equity IPE such guidance will be provided to the Equity IPE and the guidance will be binding on the owners and not subject to later administrative or judicial review in any forum. Throughout the equity finalization process, the owners agree to use their best efforts to identify legal issues that may require resolution under this protocol and to advise the other owners of the issues as quickly as possible.

Id., § C.2, Def. App. 142-43. The ILA Protocol provided that DOE would retain the services of an ILA mutually acceptable to Chevron and DOE "[t]o assist in the provision of legal guidance to the Equity IPE," but that the ILA would be consulted "only in the event the owners cannot agree upon a resolution of a legal issue arising in the equity finalization process" and "upon the request of one of the owners." Id., § C.3, Def. App. 143.

37. The ILA Protocol provided that the ILA would "(1) serve as a mediator to help the owners reach agreement on legal issues arising in the equity finalization process and (2) serve as independent legal advisor to the Equity IPE if the owners cannot reach agreement after consultation with the [ILA] on a given legal issue." Id., § C.3(a), Def. App. 143. The ILA Protocol provided that, upon the referral of a legal issue to the ILA, the ILA "shall consult with the parties as to the timetable and procedures to be used to resolve the issue." Id., § C.3(b), Def. App. 143. If, with the assistance of the ILA, Chevron and DOE were able to reach agreement upon the guidance to be provided to the Equity IPE, the ILA Protocol provided that "joint guidance will be provided to the Equity IPE, and such guidance will be binding on the owners and not subject to later administrative or judicial review in any forum." Id., § C.3(c), Def. App. 143. If, however, Chevron and DOE, with the assistance of the ILA, were unable to reach agreement upon the guidance to be provided to the Equity IPE, the ILA Protocol provided that "the [ILA] will pro-

vide timely independent legal guidance to the Equity IPE on the issue, and the Equity IPE shall rely on such guidance in the development of its final equity recommendations." Id., § C.3(d), Def. App. 143-44. The ILA Protocol further provided that "[t]he owners may question legal guidance provided by the [ILA] to the Equity IPE only in conjunction with their review of the final equity recommendations of the Equity IPE" and that such "provision does not impair the ability of either party to pursue any available legal remedies to review or implement the final equity decisions of the [ASFE] made pursuant to section 3412(b) of the [NDA] Act." Id.

38. On January 21, 1997, ASFE Godley issued Administrative Order 96-01, Supplement No. 2, which set forth a revised schedule and process for the IPE equity finalization proceeding with respect to the Stevens Zone. See Def. App. 530. In contrast to the Equity IPE Protocol, the schedule established by Supplement No. 2 for the Stevens Zone IPE equity finalization proceeding did not provide for a provisional recommendation by the IPE with opportunity for Chevron and DOE to comment thereon before the IPE issued its final equity recommendation for the Stevens Zone. Supplement No. 2 provided that, "[t]o the extent there are any conflicts between the 'Plan and Schedule for Completion of Stevens Zone Equity Advisory Report' and the [Equity IPE Protocol], this Protocol Relating to the Stevens Zone supersedes the earlier protocol." Def. App. 531. The schedule contained in Supplement No. 2 contemplated that the IPE's equity finalization recommendation for the Stevens Zone would be provided to the ASFE on September 29, 1997. Def. App. 533.

39. OMM provided legal advice and assistance to DOE upon legal issues related to equity finalization for NPR-1, including representation of DOE in proceedings before the ILA pursuant to the ILA Protocol, representation of DOE in proceedings before the DOE Office of

Hearings and Appeals initiated by Chevron with respect to ASFE equity decisions regarding the Carneros Zone and the Stevens Zone, negotiation of the "Agreement Regarding Fixing of Equity Interests at Naval Petroleum Reserve No. 1 for Purposes of Sale" dated May 19, 1997 between Chevron and DOE ("the Decoupling Agreement"), and negotiation of the "Agreement Regarding Equity Redetermination Process" between Chevron and DOE dated May 19, 1997 ("the Equity Process Agreement"). Thorpe Declaration, ¶ 26, Def. App. 8. During the period leading up to the sale of DOE's interest in NPR-1 to Occidental in February 1998, OMM's contacts at Chevron for sale-related issues were Ms. Giumarra and, to a lesser extent, Ms. Diane Russell, both of whom were Chevron attorneys. Id., ¶ 27, Def. App. 9.

40. The idea of decoupling the sale of DOE's interest in NPR-1 from the equity finalization process for NPR-1 was first raised in or about November 1996. Thorpe Declaration, ¶ 31, Def. App. 10. At the November 21, 1996 OIG meeting, Ms. Giumarra expressed the need to identify "things that will stop the sale" to which Mr. Nordhaus responded that it was necessary to "[d]etermine equity so we can tell our bidders what to buy" and that "[o]ne major problem is whether we can get equity finalized in time," i.e., prior to the February sale date mandated by the NDA Act. See November 21, 1996 OIG Meeting Minutes, at 7, Def App. 224. Timely completion of equity finalization for the Stevens Zone was the problem. Thorpe Declaration, ¶ 31, Def. App. 10. One of the alternatives identified at the November 21, 1996 OIG meeting was to decouple the Stevens Zone equity finalization process and the sale of DOE's interest in NPR-1: "Sell current DOE Stevens percent and go forward with equity finalization. When equity is finished, make retrospective adjustments for cost/production balancing, and make cash adjustment between Chevron/DOE based on a pre-determined formula reflecting the winning bid

price(s)." November 21, 1996 OIG Meeting Minutes, at 19, Def App. 236.

41. Serious discussions about decoupling equity finalization for NPR-1 and the sale of DOE's interest in NPR-1 began in early January 1997, when it became clear that the equity finalization process for the Stevens Zone would not be finished in time. Thorpe Declaration, ¶ 32, Def. App. 11. There were numerous technical issues involved in the Stevens Zone equity redetermination and a substantial amount of money was involved. Id. Decoupling the sale from the equity finalization process appeared to be the most feasible option. Id.

42. The topic of decoupling was discussed again at the January 29, 1997 OIG meeting at which a meeting was scheduled for February 5, 1997, to discuss decoupling. See January 29, 1997 OIG Meeting Minutes, at 19, Def. App. 256.

43. Decoupling initially was explored by representatives of Chevron and DOE in a small discussion group format. Thorpe Declaration, ¶ 33, Def. App. 11. The Chevron representatives were Mr. Brady, Ms. Giumarra, and Mr. Stone. Id. The DOE representatives were Messrs. Thorpe, Olpin, Kauffman, and Burzlaff. Id. The purpose of these meetings was simply to discuss whether the decoupling idea was feasible, not to negotiate a decoupling agreement. Id. The small group discussions of the decoupling idea were productive and led to the negotiations between Chevron and DOE that resulted in the Decoupling Agreement and the Equity Process Agreement. Id., ¶ 34, Def. App. 11.

44. The principal DOE representatives who negotiated the Decoupling Agreement and the Equity Process Agreement were Messrs. Thorpe, Kauffman, and Burzlaff, and Ms. Egger. Thorpe Declaration, ¶ 34, Def. App. 11-12; see also Egger Declaration ¶ 6, Def. App. 475-76. Mr. Thorpe did most of the talking upon DOE's behalf at the negotiation sessions, with support

from Messrs. Kauffman and Burzlaff on technical issues. Id., Def. App. 12. Mr. Thorpe took the lead in terms of actually drafting the interim and final drafts of the Decoupling Agreement and the Equity Process Agreement. Id. The principal Chevron representatives who negotiated the Decoupling Agreement and the Equity Process Agreement were Messrs. Stay, Brady, and Taft and Ms. Giumarra. Id.; Stone Depo. 305(13-18), 341(12-20), Def. App. 935, 938. Messrs. Stay and Brady and Ms. Giumarra did most of the talking upon Chevron's behalf at the negotiation sessions. Id.

45. The Decoupling Agreement was negotiated first followed by negotiations for the Equity Process Agreement although at some point the agreements were discussed together. Thorpe Declaration, ¶ 35, Def. App. 12. Two agreements were negotiated because DOE wanted to separate equity finalization process issues from sale issues. Id. The Decoupling Agreement, which was part of the sale process, contained provisions for the benefit of the purchaser of DOE's interest in NPR-1 and would be disclosed to bidders. Id.

46. The goal was to complete the negotiations for the Decoupling Agreement and the Equity Process Agreement by May 1997 in order that the Investment Bankers working on the sale of DOE's interest in NPR-1 could advertise equity percentages for NPR-1 that would be fixed (and upon which bidders such as Occidental could rely) for purposes of the sale. Thorpe Declaration, ¶ 36, Def. App. 12.

47. At the March 5, 1997 OIG meeting, Ms. Giumarra indicated that she would produce a draft equity decoupling agreement. See March 5, 1997 OIG Meeting Minutes, at 16, Def. App. 274. Ms. Giumarra subsequently produced a draft equity decoupling agreement in the format of a letter agreement. Thorpe Declaration, ¶ 37, Def. App. 12. On April 22, 1997, Mr. Thorpe

sent Ms. Giumarra a first draft of the Decoupling Agreement. Id. In the transmittal letter, Mr. Thorpe stated, among other things:

> We have been working on the form of the equity decoupling agreement. Since the document will cover a number of substantive matters, and will be reviewed by prospective purchasers, we believe that it should be in an 'agreement' format rather than a letter agreement format. Accordingly, I have taken a first crack at translating the document into an agreement format. This first draft is enclosed for your review and comment.

Def. App. 279. The next day, at the April 23, 1997 OIG meeting, Mr. Thorpe presented a section-by-section review of the April 22 draft of the Decoupling Agreement. See April 23, 1997 OIG Meeting Minutes, at 8, 10, Def. App. 318, 320; Thorpe Declaration, ¶ 37, Def. App. 12-13.

48. On Tuesday, May 13, 1997, Mr. Thorpe sent a draft of the Equity Process Agreement to the following DOE and Chevron representatives: Ms. Egger, Mr. Kauffman, Kenneth Meeks, Ms. Giumarra, Mr. Brady Mr. Stay, Mr. Taft, and Mr. Olpin. Thorpe Declaration, ¶ 38, Def. App. 13. In the transmittal letter addressed to these individuals, he stated:

> Attached for your review and comment is a preliminary draft of a possible agreement regarding the equity redetermination process for the Unitized Zones. In the interest of time, the draft is being simultaneously forwarded to Chevron and to the Department of Energy and, therefore, remains subject to any comments that the Department may have.

Def. App. 326. Later that day, Mr. Thorpe sent a revised draft of the Equity Process Agreement to the DOE and Chevron representatives listed above. Thorpe Declaration, ¶ 38, Def. App. 13-14. In the transmittal letter addressed to these individuals, Mr. Thorpe stated:

> Attached for your review and comment is a revised draft of the Agreement Regarding Equity Redetermination Process, marked to show changes from the draft distributed this morning. In the interest of time, the draft is being simultaneously forwarded to Chevron and

> to the Department of Energy and, therefore, remains subject to any comments that the Department may have.

Def. App. 334.

49. On Wednesday, May 14, 1997, Mr. Thorpe received a fax from Ms. Giumarra that transmitted the following proposed language to be inserted in the Equity Process Agreement:

> **INSERT FOR B.3**
>
> The ASFE shall have no ex parte communications with the attorneys or technical team members who participated in the preparation of the DOE or the Chevron equity presentations to NSA.

Def. App. 341; see also Thorpe Declaration, ¶ 39, Def. App. 14; Egger Declaration, ¶ 8, Def. App. 477.

50. There had been a long-running dispute between Chevron and DOE regarding *ex parte* communications with the IPE by the Chevron and DOE technical teams. Thorpe Declaration, ¶ 40, Def. App. 14. Prior to Ms. Giumarra's May 14, 1997 proposal, however, there had been no discussion regarding including a communications prohibition in the Equity Process Agreement. Id.

51. Upon the receipt of Ms. Giumarra's May 14, 1997 proposal, Mr. Thorpe sent the proposal to Ms. Egger and discussed it with her. Id., ¶ 41, Def. App. 14. Thereafter, Mr. Thorpe had a telephone conversation with Ms. Giumarra in which he stated that DOE would not agree to any sort of restriction in the Equity Process Agreement upon communications by attorneys. Id.; see also Egger Declaration, ¶ 8, Def. App. 477.

52. On Friday, May 16, 1997, Mr. Thorpe sent clean and marked-up copies of a revised draft of the Equity Process Agreement to the following DOE and Chevron representatives for

review and comment: Ms. Egger, Mr. Kauffman, Mr. Meeks, Ms. Giumarra, Mr. Stay, Mr. Taft, and Mr. Olpin. Thorpe Declaration, ¶ 42, Def. App. 14-15. This version of the Equity Process Agreement contained the following new ¶ B.4:

> The ASFE will not consult with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter. No such communications by the ASFE with either equity team shall be on an ex parte basis. Any written materials submitted to the ASFE by either equity team shall be provided to the other party. The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.

Def. App. 345. Later that day, Mr. Thorpe sent clean and marked-up copies of another revision to the Equity Process Agreement to Ms. Egger and Ms. Giumarra for review and comment. Thorpe Declaration, ¶ 42, Def. App. 14-15. This revision did not contain any changes to the new ¶ B.4 quoted above. Id.

53. On Monday, May 19, 1997, Mr. Thorpe had a telephone conversation with Ms. Giumarra about new ¶ B.4 of the Equity Process Agreement contained in the May 16, 1997 clean and marked-up copies of a revised draft of the Equity Process Agreement quoted above. Thorpe Declaration, ¶ 43, Def. App. 15. He discussed with Ms. Giumarra whether the participation of DOE headquarters official Gary Latham in the DOE "dry runs" for presentations to the IPE and Mr. Latham's attendance at such presentations would make Mr. Latham part of the "DOE field equity technical team" for purposes of ¶ B.4 of the Equity Process Agreement. Id.. After checking with Mr. Brady, Ms. Giumarra replied that Chevron would not regard Mr. Latham's participation in such activities as making him part of the "DOE field equity technical team" for purposes of ¶ B.4 of the Equity Process Agreement. Id. In those discussions, Ms. Giumarra did

not raise Chevron's proposal that would have prohibited *ex parte* communication by the ASFE with any attorney who participated in the preparation of the DOE or the Chevron equity presentations to the IPE. Id. Nor did Ms. Giumarra identify an objection by Chevron to new ¶ B.4 of the Equity Process Agreement, which prohibits *ex parte* consultation by the ASFE with the "DOE field equity technical team" or the Chevron equity team concerning equity redetermination-related matters but does not bar any such communication by the ASFE with attorneys such as, for example, Mary Egger. Id., Def. App. 15-16.

54. On Monday, May 19, 1997, Mr. Thorpe sent the final versions of the Decoupling Agreement and the Equity Process Agreement to Ms. Egger and Ms. Giumarra, along with mark-ups of the changed pages of the May 16, 1997 drafts of the Decoupling Agreement and the Equity Process Agreement. Thorpe Declaration, ¶ 44, Def. App. 16. In the transmittal letter, Mr. Thorpe stated, among other things:

> Attached are execution copies of both the "Decoupling Agreement" and the "Equity Process Agreement." For your convenience, I have also attached changed pages from the drafts I sent to you on Friday. The changes are primarily technical corrections or clarifications.

Def. App. 377. One of the changed pages for the Equity Process Agreement contained a revised version of ¶ B.4 with the changes underscored:

> The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an ex parte basis. Any written materials submitted to the ASFE by either equity team shall be provided to the other party. The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance

of her final equity decision for such zone.

Def. App. 381. Neither Ms. Giumarra nor any other representative of Chevron objected to the revised ¶ B.4 of the Equity Process Agreement, which prohibits only *ex parte* consultation, directly or indirectly, by the ASFE with the "DOE field equity technical team" or the Chevron equity team concerning equity redetermination-related matters but does not prohibit *ex parte* communication by the ASFE with attorneys, such as, for example, Mary Egger, concerning equity redetermination-related matters. Thorpe Declaration, ¶ 44, Def. App. 16-17. The "DOE field equity technical team" consisted of technical personnel - petroleum engineers and geologists - assigned to the DOE NPRC, whose staff and facilities as of May 1997 were located at the NPR-1 field site in Kern County, California, near Bakersfield, California, working with DOE technical (petroleum engineering) consultants. Egger Decl., ¶ 7, Def. App. 476.

55. ASFE Godley signed the execution copies of the Decoupling Agreement and the Equity Process Agreement for DOE and Carnie R. Block, Vice-President and General Manager of Chevron U.S.A. Production Company's Western Business Unit, signed the execution copies of the Decoupling Agreement and the Equity Process Agreement for Chevron. See Def. App. 160, 215; see also Thorpe Declaration, ¶ 45, Def. App. 17. The Decoupling Agreement and the Equity Process Agreement were entered by Chevron and DOE effective on May 19, 1997. See Decoupling Agreement, at 1, Def. App. 145, and Equity Process Agreement, at 1, Def. App. 209.

56. One of the subjects of the Equity Process Agreement was the pending equity redetermination proceeding for the Shallow Oil Zone pursuant to section 9(b) of the Unit Plan Contract. See Equity Process Agreement, Section A ("Independent Petroleum Engineer Process for Shallow Oil Zone"). On March 28, 1997, the ASFE issued "Preliminary Decision Determining Dis-

pute Regarding the Third Revision of Percentage Participations in Production from the Shallow Oil Zone, Naval Petroleum Reserve No. 1." See Def. App. 587.

57. Under the most recent equity redetermination for the Shallow Oil Zone (the 1957 Revision), DOE's participation percentage was set at 70.0119 and Chevron's participation percentage was set at 29.9881. Def. App. 593. James K. Dietrich and Associates, the IPE for the pending Shallow Oil Zone equity redetermination dispute pursuant to § 9(b) of the Unit Plan Contract, had recommended to the ASFE that DOE's participation percentage be set at 65.7786 and that Chevron's participation percentage be set at 34.2214. Def. App. 595. In the March 28, 1997 Shallow Oil Zone Preliminary Decision, the ASFE rejected the IPE's recommended equity participation percentages, deciding that DOE's participation percentage was 73.4012 and that Chevron's participation percentage was 26.5988. Def. App. 596.

58. The ASFE's March 1997 Preliminary Decision represented an approximately eight-point swing in the Shallow Oil Zone percentage participations in DOE's favor from that which the IPE (Dietrich) had recommended. Stone Depo. 350(2-12), Def. App. 939. The monetary value of this eight-point swing was approximately $480 million in DOE's favor. Stone Depo. 350(13-19), Def. App. 939; see also Stone Depo. 29(4-11), Def. App. 928.

59. The Equity Process Agreement provided that "DOE will submit the pending Shallow Oil Zone ('SOZ') equity redetermination dispute to [NSAI] for its recommendation of final SOZ equity to the [ASFE]" and that "[s]uch recommendation by [NSAI] shall constitute the advisory report of the independent petroleum engineer for purpose of both section 3412(b) of the [NDA] Act and section 9(b) of the Unit Plan Contract" and that "[t]he ASFE's decision on SOZ equity issued as a result of the process described in this agreement will be both a redetermination of

equity pursuant to sections 2(f) and 9(b) of the [Unit Plan Contract], as well as a final determination of equity pursuant to § 3412(b) of the [NDA] Act." Id., ¶¶ A.1, A.7, Def. App. 209, 210. The Equity Process Agreement further provided that "[t]he procedures of [ASFE] Order No. 96-01, 'Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process,' dated July 8, 1996, as amended and supplemented, will be utilized for the SOZ pursuant to a schedule agreed upon by DOE, Chevron and [NSAI]." Id., ¶ A.2, Def. App. 209. The Equity Process Agreement also provided that "[a]ny new legal issues arising in the [Shallow Oil Zone] will be addressed by following the procedures set forth in Assistant Secretary for Fossil Energy Administrative Order No. 1 (Supplement No. 1), dated October 11, 1996." Id., ¶ A.3, Def. App. 210.

60. The Equity Process Agreement provided that, "[u]pon execution of the Decoupling Agreement, the ASFE will withdraw the Preliminary SOZ Redetermination Decision, dated March 28, 1997," and that, "[u]pon withdrawal of the Preliminary SOZ Redetermination Decision, the parties agree to set aside the Independent Petroleum Engineer Report issued by James K. Dietrich and Associates . . . dated November 1995, on the SOZ and to provide a joint instruction to [NSAI] to disregard the Dietrich Report for all purposes" and that "[n]either DOE nor Chevron . . . will use, cite or reference either (i) the Preliminary SOZ Redetermination Decision, or (ii) the Dietrich report on the SOZ, or any portions thereof, in any administrative or legal proceedings on any subject whatsoever, or in the SOZ equity finalization process described above." Id., ¶¶ A.5, A.6, Def. App. 210.

61. The Equity Process Agreement also contained "procedures for the ASFE redeterminations of equity for all four unitized zones and for any review of such equity redetermination

decisions." Id., Section B ("Equity Redetermination Process"), Def. App. 211. Paragraph B.4 of the Equity Process Agreement provided:

> The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an ex parte basis. Any written materials submitted to the ASFE by either equity team shall be provided to the other party. The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.

Def. App. 211.

62. Paragraph B.6 of the Equity Process Agreement imposed the following limitations upon the ASFE's decisionmaking discretion:

> In issuing the equity redetermination decisions for a zone, the ASFE may accept the [NSAI] recommendations or reject the [NSAI] recommendations in whole or in part. If the ASFE decides to reject the [NSAI] recommendations in whole or in part, such decision must be based on a determination by the ASFE that one or more of the following criteria exist:
>
> a. The [NSAI] recommendation(s) was arbitrary or capricious;
>
> b. The [NSAI] recommendation(s) was a result of fraud;
>
> c. The [NSAI] recommendation(s) was a result of undue influence, unless such undue influence had no impact on [NSAI's] recommended equity participation percentages;
>
> d. The [NSAI] recommendation(s) was inconsistent with statute, the [Unit Plan Contract] or an applicable Settlement Agreement between Chevron and DOE, unless such inconsistency had no impact on [NSAI's] recommended participation percentages;

> e. The [NSAI] recommendation(s) was not based on substantial geophysical, geological and/or petrophysical data; or
>
> f. The [NSAI] recommendation(s) resulted from an approach or methodology which is inconsistent with sound oil field engineering principles.

Def. App. 212.

63. Paragraph B.7 of the Equity Process Agreement provided for limited review of an ASFE decision by the DOE Office of Hearings and Appeals ("OHA"):

> If an ASFE decision adopts the [NSAI] recommendation for a particular zone, that ASFE decision shall be final and not subject to challenge by Chevron. If an ASFE final decision rejects, in whole or in part, [NSAI's] participation percentage recommendations, Chevron may challenge the ASFE decision and such challenge shall be referred to [OHA] for a decision. In this event, OHA shall review only the points on which the ASFE rejected [NSAI's] recommendations that have been challenged by Chevron, and in all other respects the ASFE's decision shall be final.

Def. App. 212; see also id., ¶ B.9 ("The ASFE's determination of final equity shall be final, binding, and non-appealable unless challenged by Chevron under the procedures and criteria set out above, in which case OHA's decision shall be final, binding and non-appealable."). Legal issues processed by the IPE, however, were subject to *de novo* review by OHA at the behest of Chevron:

> Notwithstanding the provisions of paragraph B.7 above, Chevron and DOE agree that any challenge by Chevron to the ASFE's decision regarding the "25Z area" legal issue (which affects only the Carneros Zone) shall be reviewed "de novo" by OHA and that any OHA determination of the matter shall be final and binding on the parties. If any other legal issues arise that are processed by [NSAI] pursuant to instructions from the [ILA] (as opposed to instructions agreed upon by Chevron and DOE in the form of a Settlement Agreement), the ASFE's decision on such legal issue, if challenged by Chevron, also shall be reviewed "de novo" by OHA and OHA's determination of

the matter shall be final and binding on the parties.

Id., ¶ B.11, Def. App. 213-214.

64. The Equity Process Agreement also provided that, "[i]f the Decoupling Agreement is terminated pursuant to Sections 6.2 or 6.8 thereof, then this Agreement shall automatically terminate effective on the termination date of the Decoupling Agreement, and thereafter shall be of no force or effect, unless extended or modified by mutual agreement of the parties." Id., ¶ C.3, Def. App. 214.

65. Mr. Stone, who had been Chevron's manager for the pending Shallow Oil Zone equity redetermination proceeding pursuant to § 9(b) of the Unit Plan Contract, Stone Depo. 9(21-22)-10(1-3), Def. App. 925-26, was unhappy with the ASFE's March 28, 1997 Preliminary Decision for the Shallow Oil Zone, which represented an eight-point swing in DOE's favor from the percentage participations recommended by the IPE (Dietrich). Stone Depo. 349(17-22)-350(1), Def. App. 939. As a result of the March 1997 ASFE Preliminary Decision, at the time the Equity Process Agreement was being negotiated, Mr. Stone was concerned about the ASFE's ability to serve as an impartial decisionmaker. Id.; see also Stone Depo. 337(19-22)-338(1-7), Def. App. 937. He perceived the March 1997 ASFE Preliminary Decision to be "self-serving" and "wildly in favor of the government that would lead to a monetary award to the DOE of several hundred million dollars . . . ." Stone Depo. 336(13-16; 20-22)-337(1-18), Def. App. 936-37.

66. During the negotiations for the Equity Process Agreement, Mr. Stone's primary concern was that Chevron needed to limit the decisionmaking authority of the ASFE with respect to equity finalization for NPR-1. Stone Depo. 334(18-22)-335(1-14), 337(19-22)-338(1-7), Def.

App. 936, 937. The limitations upon the ASFE's ability to deviate from the IPE's equity recommendations for NPR-1 set forth in ¶ B.6 of the Equity Process Agreement addressed Mr. Stone's concerns about the ASFE's ability to be an impartial decisionmaker. Stone Depo. 340(13-22)-341(1-2), Def. App. 937-38.

67. On May 14, 1997, during the negotiations for the Decoupling Agreement and the Equity Process Agreement, Mr. Block sent a memorandum to his supervisor, Peter J. Robertson, Chevron's President at the time, seeking approval of the Decoupling Agreement and the Equity Process Agreement. See Def. App. 716; Stay Depo. 121(21-22)-122(1), Def. App. 922-23; Stone Depo. 352(1-14), Def. App. 939. In this memorandum, which was drafted by Mr. Stay and Ms. Giumarra, two of Chevron's principal negotiators, Stay Depo. 123(5-15), Def. App. 923, Mr. Block stated:

> In conjunction with the agreement to decouple equity, the parties have also agreed to modify the equity finalization process under the Unit Plan Contract so that the parties will set aside the unfavorable preliminary decision from the DOE on the Shallow Oil Zone and modify the finalization process for the other zones as well. The parties will commence a new review of the Shallow Oil Zone equity with the Independent Petroleum Engineer who was retained by the parties to assist in finalizing equity for the three other producing zones.
>
> We have drafted one agreement for the 'decoupling' process and a second agreement for the equity finalization process under the Unit Plan Contract in which the [Shallow Oil Zone] work will be supplemented and submitted to the Independent Petroleum Engineer working on the other three zones. The purpose of this memo is to provide a general summary of those agreements and to obtain your approval for execution of the agreements . . . .

Def. App. 716-17. With respect to the Equity Process Agreement, Mr. Block stated, among other things:

> There are two primary benefits as a result of this agreement. ***First***, Chevron has the opportunity to present the Shallow Oil Zone to a new Independent Petroleum Engineer, so that we do not have to face the review and likely lawsuit that would have followed based on the highly unfavorable preliminary decision issued in March by the Secretary. We are getting a fresh opportunity to present our position on the [Shallow Oil Zone] to a new IPE. We will no longer be faced with the extremely difficult battle of attacking the unfavorable preliminary decision on the [Shallow Oil Zone] and taking that process up through the courts in a very difficult and costly legal process in which our chances for success are not at all certain. That legal process, even if we were successful, would have resulted in a referral of the matter back to the Secretary of Energy for another review.
>
> ***Second***, under this agreement the parties have agreed upon a process for review of the Secretary's decisions on all four zones under which it will be very difficult for him (or his designee) to modify or reject the final recommendation presented by the IPE. We have established strict review standards which the secretary must follow in reviewing the final recommendation from the IPE, which standards are the only basis upon which the Secretary or his designee may modify or reject the work of the IPE. . . . .
>
> The four-step process and Chevron's right to appeal are significant in that we have severely restricted the Secretary's ability to render a final decision that is different than the recommendation he receives from the IPE. The Unit Plan Contract does not provide for this extensive four-step process under which Chevron will now have significant early review rights and does not provide for the very strict review standards that the Secretary must follow in reviewing the recommendation from the IPE. His ability to modify or reject the IPE's decision is substantially limited under this agreement. Accordingly, we believe the possibility for an unfavorable decision, similar to what we saw in the initial [Shallow Oil Zone] redetermination process, is also much less likely to occur under this process.

Def. App. 719.

68. The Decoupling Agreement fixed DOE's ownership interest in NPR-1 for purposes of sale and provided for an adjustment to be made between DOE and Chevron after equity final-

ization for any difference between the Unit Plan Contract final equity participation value determined by the ASFE and the "fixed sales participations" for Chevron and DOE set forth, upon a zone-by-zone basis, in the Decoupling Agreement. Decoupling Agreement, Article I ("Fixing of Equity Interests for Sale"), Def. App. 146. Specifically, Article I, § 1.1(a), of the Decoupling Agreement provided:

> The parties hereby agree that, for purposes only of the sale of DOE's interest in NPR-1 and future operations by Chevron and the purchasers of DOE's interest in NPR-1 . . . , their respective equity interests in the four oil and gas zones established pursuant to the [Unit Plan Contract] . . . are fixed as follows:

| | | | |
|---|---|---|---|
| (i) | Dry Gas Zone: | DOE | 83.8726% |
| | | Chevron | 16.1274% |
| (ii) | Carneros Zone: | DOE | 100.00% |
| | | Chevron | 0.00% |
| (iii) | Shallow Oil Zone: | DOE | 70.0119% |
| | | Chevron | 29.9881% |
| (iv) | Stevens Zone: | DOE | 79.6357% |
| | | Chevron | 20.3643% |

Def. App. 146. Article I, § 1.1(b), of the Decoupling Agreement provided, in part:

> The parties agree that the Fixed Sales Participations are final and binding on DOE and Chevron for purposes of the sale of DOE's interest in NPR-1 and future operations of Chevron and DOE's Purchasers. The Fixed Sales Participations, however, shall not be binding on either DOE or Chevron with respect to the [Unit Plan Contract] or to any adjustments to be made under the [Unit Plan Contract] upon its termination. The percentage participations applicable to the [Unit Plan Contract] shall be those ultimately established in the equity finalization process currently underway pursuant to the [NDA Act] and the [Unit Plan Contract]. As used in this Agreement, the term "UPC Final Equity Participations" shall mean the equity participations for the Unitized Zones issued by the Assistant Secretary for Fossil Energy ("ASFE") under Section

> 3412(b) of the [NDA] that have become "Final" (defined below). The equity participation numbers for a zone issued by the ASFE pursuant to the [NDA] Act and the [Unit Plan Contract] (including any modifications thereto by the DOE Office of Hearings and Appeals pursuant to paragraph B.8 of the "Agreement Regarding Equity Redetermination Process" of even date herewith between Chevron and DOE (the "Process Agreement") shall be deemed "Final" upon the earlier of (i) the date the ASFE's equity redetermination decision becomes final and binding on the parties under the Process Agreement, or (ii) the date Chevron notifies DOE in writing that it will not challenge an ASFE's redetermination decision that does not fully accept the recommendation of the Independent Petroleum Engineer.

Def. App. 147. Article I, § 1.1(c), of the Decoupling Agreement provided:

> Chevron and DOE acknowledge that the [Unit Plan Contract] Final Equity Participations for one or more of the zones may not be the same as the Fixed Sales Participations for such zones. Notwithstanding such situation, Chevron and DOE agree that the Fixed Sales Participations shall govern any future allocation of production from the Unitized Zones and the Non-Unit Area as between Chevron and DOE's Purchasers.

Def. App. 147. Article I, § 1.2, of the Decoupling Agreement provided, in part:

> Potential Financial Adjustments between DOE and Chevron for Differences between UPC Final Equity Participations and Fixed Sales Participations. If the [Unit Plan Contract] Final Equity Participations for a Unitized Zone are different than the Fixed Sales Participations for that zone, financial adjustments shall be made only between Chevron and DOE to compensate the party whose Fixed Sales Participation is less than its [Unit Plan Contract] Final Equity Participation for the loss of the future benefit of such interest.

Def. App. 148. Article II, § 2.1, of the Decoupling Agreement provided for similar financial adjustments with respect to "production and costs . . . during the term of the [Unit Plan Contract]. Def. App. 149.

69. Chevron expressly acknowledged in the Decoupling Agreement that copies of the

Decoupling Agreement would be disclosed to prospective bidders for DOE's interest in NPR-1:

> Chevron acknowledges that DOE will advise prospective bidders for DOE's interest in NPR-1 that Chevron has agreed to use the Fixed Sales Participations and the facilities Fixed Ownership Interests . . . in any future unit operation of NPR-1, and that DOE will make copies of [the Decoupling Agreement] available for review by prospective bidders.

Id., Article I, § 1.1(d), Def. App. 147. The Decoupling Agreement further provided that "[t]he provisions of Section 1.1, 4.1, 4.2, 4.4, 5.1, 5.3, and 5.5 are also for the benefit of, and may be enforced by, the Purchasers." Id., Article VI, § 6.11 ("Beneficiaries of Agreement"), Def. App. 160.

70. Article V of the Decoupling Agreement, concerning "Legal Matters," contained the following provisions, among others:

> 5.1 Covenant Not to Sue. Chevron hereby agrees that it will not commence any judicial or administrative actions or proceedings that would delay, prevent, hinder or overturn the sale of DOE's interest in NPR-1 on any grounds related to this Agreement or the Fixed Sales Participations or Facilities Fixed Ownership Interests established hereby. In addition, Chevron agrees that it will not commence any judicial or administrative proceedings against any purchaser of, or bidder for, DOE's interest, seeking in any respect to invalidate or change the Fixed Sales Participations or Facilities Fixed Ownership Interests established pursuant to this Agreement. To implement the foregoing, Chevron knowingly and voluntarily waives any and all rights it may have to bring any judicial or administrative challenge to the Fixed Sales Participations or Facilities Fixed Ownership Interests.
>
> 5.3 Challenges to Equity Finalization Numbers under [Unit Plan Contract]. If Chevron challenges any of the equity participation numbers issued by the ASFE for any of the Unitized Zones (which challenges may be made only pursuant to the extent permitted by the Process Agreement), the Fixed Sales Participations and the Facilities Fixed Ownership Interests shall remain entirely unaffected by the outcome of such challenge. . . . .

> 5.5 Limitation on Default Remedies. Each of Chevron and DOE irrevocably agrees that if either party defaults under the terms of this Agreement in any respect, such default shall not entitle the other party to terminate this Agreement, or to rescind or revoke its agreement to the Fixed Sales Participations, the Facilities Fixed Ownership Interests, or, in the case of Chevron, its agreement not to challenge the sale of DOE's interest in NPR-1 specified in Section 5.1 above, but instead shall entitle the non-defaulting party to whatever monetary or other relief may be available under applicable law (other than setting aside or modifying the Fixed Sales Participations or the Facilities Fixed Ownership Interests).

Def. App. 155-56.

71. Article VI of the Decoupling Agreement, titled "Miscellaneous," contained the following provisions, among others:

> 6.1 No Effect on Protocol. The parties agree that nothing contained in this Agreement shall be deemed to modify or affect in any manner the procedures and schedules contained in Assistant Secretary for Fossil Energy Administrative Order Number 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process," as the same has been modified or supplemented to date.
>
> 6.2 Termination. This Agreement shall terminate and be of no further force or effect if the United States elects not to sell its interests in NPR-1. . . . .
>
> 6.6 Entire Agreement; Modification. This Agreement is intended by the parties as a final expression of their agreement with respect to the specific subject matter hereof, and is intended as a complete and exclusive statement of the terms and conditions of that agreement, and supersedes all prior agreements of the parties with respect to the specific matters covered hereby. . . . .
>
> 6.8 Severability. . . . . Notwithstanding the foregoing, if a court rules that the provisions of this Agreement regarding the Fixed Sales Participations are invalid or unenforceable, then DOE may terminate this entire Agreement.

Def. App. 157, 159.

72. Article VI, § 6.9, of the Decoupling Agreement provided as follows with respect to its construction:

> This Agreement shall be construed without regard to the identity of the party which drafted the various provisions. Each and every provision of this Agreement shall be construed as though all of the parties participated equally in the drafting and any rule of construction that a document is to be construed against the drafting party shall not be applicable to this Agreement.

Def. App. 160.

73. The ASFE had a technical advisory staff that was responsible for reviewing and providing advice and assistance to the ASFE regarding equity finalization decisions for Elk Hills ("ASFE Technical Advisory Team"). Latham Declaration, ¶ 2, Def. App. 501. From June 1996 until May 1999, the members of the ASFE Technical Advisory Team were Gary Latham, Ph.D., a Geophysicist, Mr. Arnold O. "Arney" Smits, a Petroleum Engineer, Mr. Louis Capitanio, a Petroleum Engineer, and Mr. James Gruber, a Petroleum Engineer. Id. In or about May 1999, Mr. Gruber was reassigned from the ASFE technical advisory staff to the DOE EFT in Bakersfield, California, responsible for advocating and presenting the DOE equity finalization position to the IPE. Id.

74. Mr. Robert S. Kripowicz was the Acting ASFE from August 1, 1998, to April 29, 1999, and from September 8, 2000, to February 5, 2002. Latham Declaration, ¶ 4, Def. App. 502. He also served as the Principal Deputy ASFE from March 3, 1996, until his retirement on June 28, 2002. Id. Mr. Kripowicz issued the November 13, 2001 preliminary equity decision for the Stevens Zone and the June 18, 2002 final equity decision for the Stevens Zone. Id.

75. On January 15, 2003, Chevron appealed the final decision by Mr. Kripowicz for the

Stevens Zone to the DOE OHA (Case No. TEA-0001). Def. App. 792; see also Latham Declaration, ¶ 4, Def. App. 502.

76. On or about January 28, 2004, Mr. Warner Williams, Vice President, ChevronTexaco Exploration & Production Company, a Division of Chevron U.S.A. Inc., sent a letter to the ASFE in which he asserted:

> [Chevron] very recently discovered that DOE has materially breached important contracts between DOE and [Chevron] concerning finalization of the United States' and [Chevron's] respective interests in the Elk Hills Field. . . . . In brief, it appears that personnel in DOE's Office of General Counsel both acted as advocates before a decision maker who was supposed to be impartial and served as undisclosed participants in the decision-making itself. As a result, the dispute resolution mechanism agreed to by the parties has been completely undermined, one-sided rather than impartial decisions have been rendered against [Chevron], and substantial amounts of time and money have been wasted.

Def. App. 721. On April 2, 2004, the DOE General Counsel (Ms. Lee Lieberman Otis) sent a response to Mr. Williams in which she disputed his accusations. Def. App. 729. On June 14, 2004, Mr. Donald B. Craven of the law firm Akin Gump Strauss Hauer & Feld LLP, Chevron's legal representative, sent a response to the DOE General Counsel that reiterated the accusations by Mr. Williams and stated:

> DOE's conduct in the Stevens Zone proceeding constitutes a fundamental and material breach of the DOE's obligations under the Equity Process Agreement. As a result of DOE's breach, [Chevron] considers both the Equity Process Agreement and the decoupling Agreement to be no longer operative. These agreements were simultaneously drafted and executed ans are integrally related. Viewed together, they constitute a single, integrated contract.
>
> Given the fact that the PDASFE's decision for the Stevens Zone was not rendered in compliance with the requirements of the Equity Process Agreement and the expectations of the parties, the Office of

> hearings and Appeals lacks the authority to review that decision. We thus intend, on [Chevron's] behalf, to notify the Office of Hearings and Appeals of DOE's breach of the Equity Process Agreement and our intention to participate in further Stevens Zone proceedings before OHA, should such proceedings take place, under protest. Similarly, while [Chevron] will continue to participate in proceedings relating to the Shallow Oil Zone equity finalizations, it will do so only under protest and without waiving its claim of material breach.

Def. App. 736. On June 16, 2004, Mr. Craven sent a letter to Mr. George Breznay, Director, DOE OHA in which he stated:

> In April, DOE's General Counsel confirmed the existence of communications that [Chevron] believes violate the May 19, 1997 Equity Process Agreement between [Chevron] and DOE. As a result of these communications, the decision of the Principal Deputy Assistant Secretary for Fossil Energy currently under review in this proceeding was not rendered in accordance with the requirements of the Equity Process Agreement. In turn, because OHA's authority to hear this matter derives solely from that same agreement, and extends only to review of decisions rendered in conformity with that agreement, OHA lacks jurisdiction to decide the pending appeal.
>
> [Chevron] intends to proceed in the appropriate forum to seek redress for DOE's breach. If OHA decides to go forward with the pending appeal under the circumstances, [Chevron] will continue to participate in those proceedings. However, such participation will be under protest and with full reservation of [Chevron's] rights to dispute the validity and effect of any decision rendered.

Def. App. 737. On July 23, 2004, Mr. Craven sent a letter to Mr. Thomas L. Wieker, Deputy Director, DOE OHA, in which he stated, among other things:

> As stated in my June 16 letter, [Chevron] believes that DOE has materially breached the May 19, 1997 Equity Process Agreement . . . by engaging in ex parte communications precluded by the Agreement. . . . [Chevron] first learned of an apparent breach of the Agreement in late December 2003 . . . . In the vent OHA decides to proceed with this appeal, as stated in my June 16 letter, [Chevron] will continue to participate, under protest and with full reservation of its right to contest OHA's jurisdiction and the validity and effect of

any decision rendered by OHA.

Def. App. 738.

77. On September 1, 2004, Chevron filed a brief in the Stevens Zone OHA appeal that responded to a surreply brief filed by DOE in that proceeding. Def. App. 799.

78. On January 31, 2005, OHA issued a decision in the Stevens Zone appeal that granted in part Chevron's appeal and remanded the matter to the Principal Deputy ASFE for further consideration and issuance of a new determination consistent with OHA's decision. Def. App. 806; see also Latham Declaration, ¶ 4, Def. App. 502.

79. On September 1, 2005, following the remand by OHA of the June 18, 2002 Principal Deputy ASFE Stevens Zone final decision for a new decision, the ASFE Technical Advisory Team provided the DOE and Chevron EFTs with a document concerning "[c]urrent thinking on the OHA mandated equity redetermination procedure based on a 1942-1998, revenue weighted, conversion factor[.]" Def. App. 819. On September 22, 2005, Chevron submitted a response to the ASFE Technical Advisory Team's "current thinking" paper. Def. App. 824.

80. Mr. Jeffrey D. Jarrett was the ASFE from January 3, 2006, to March 31, 2007. Latham Declaration, ¶ 5, Def. App. 502.

81. On May 23, 2006, ASFE Jarrett issued a Preliminary Decision finalizing equity for the Stevens Zone on remand from OHA. Def. App. 826; see also Latham Declaration, ¶ 5, Def. App. 502.

82. On or about September 8, 2006, Chevron submitted to the ASFE comments upon the May 23, 2006 ASFE Preliminary Decision finalizing equity for the Stevens Zone on remand from OHA. Def. App. 835.

83. On February 27, 2007, ASFE Jarrett issued a Final Decision finalizing equity for the Stevens Zone on remand from OHA. Def. App. 851; see also Latham Declaration, ¶ 5, Def. App. 502.

84. Between June 2004 and January 2006 when NSAI suspended work under the contract for IPE services between NSAI and DOE, Chevron continued to participate in proceedings before the IPE with respect to equity finalization for the Shallow Oil Zone. See Stone Depo. 466(2-22)-474(1), Def. App. 942-44; June 21, 2004 e-mail message from Chevron (Stone) to NSAI (Krenek) & DOE (Gangle) (Chevron questions for NSAI re: petrophysics), Def. App. 740; July 8, 2004 letter from NSAI (Krenek) to Chevron (Stone) & DOE (Gangle) transmitting minutes and attachments for "first interim post-provisional [Shallow Oil Zone] meeting held in Bakersfield, California, on June 17, 2004," Def. App. 742; July 29, 2004 letter from NSAI (Krenek) to Chevron (Stone) transmitting questions for Chevron regarding Chevron's "equity petrophysical case and the data used to support that case," Def. App. 765; August 5, 2004 e-mail from NSAI (Krenek) to NSAI (Frost) forwarding August 4, 2004 e-mail from Chevron (Stone) to NSAI (Krenek) & DOE (Gangle) regarding NSAI questions for Chevron, Def. App. 786; March 17, 2005 e-mail from NSAI (Krenek) to Chevron (Stone) & DOE (Gangle) transmitting "questions regarding core compressibility measurements, and the determination and application of various compressibility functions," Def. App. 787; November 1, 2005 e-mail from Chevron (Stone) to NSAI (Krenek) re: "NSAI Oil Gravity and Density Calculations," Def. App. 790.

85. Monthly progress reports were one of the deliverables under the contracts between NSAI and DOE for IPE services. Latham Declaration, ¶ 6, Def. App. 502. The NSAI progress reports from mid-June 2004 through February 2006 also reflect Chevron's continuing participa-

tion in proceedings before the IPE regarding equity finalization for the Shallow Oil Zone. See NSAI Progress Reports Nos. 46-66, Def. App. 505-29. These progress reports reflect monthly teleconferences between representatives of NSAI, Chevron, and DOE related to equity finalization for the Shallow Oil Zone. Id. The NSAI progress reports also reflect questions to and from Chevron regarding technical aspects of equity finalization for the Shallow Oil Zone and responses to such questions. See NSAI Progress Reports Nos. 48, 51, 57, 61, 65, Def. App. 507, 511, 517, 521, 528. In addition, the NSAI progress reports reflect Chevron attendance at interim meetings with NSAI and DOE representatives in Bakersfield, California (June 17, 2004), Denver, Colorado (June 27 & 28, 2005), and Irving, Texas (September 13 & 14, 2005). See NSAI Progress Reports Nos. 48, 60, 63, Def. App. 507, 520, 525.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

/s/ John E. Kosloske by s/ Donald E. Kinner
JOHN E. KOSLOSKE
Senior Trial Counsel
LESLIE OHTA
ANUJ VOHRA
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W., Room 8012
Washington, D.C. 20530

Attorneys for Defendant

OF COUNSEL:

PAUL T. MICHAEL
ADA L. MITRANI
Trial Attorneys
Office of General Counsel
Department of Energy
Washington, D.C.

August 16, 2007

CERTIFICATE OF FILING

I hereby certify that on this 16th day of AUGUST, 2007, a copy of "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Anuj Vohra