# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CHEVRON, | ) |
| Plaintiff, | ) |
| v. | ) Docket No. 04-1365 |
| THE UNITED STATES, | ) |
| Defendant. | ) |

Live Tape

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on June 15, 2007.)

The parties met, pursuant to the notice of the Court, at 4:32 p.m.

BEFORE: HON. SUSAN G. BRADEN
Judge

APPEARANCES:

For the Plaintiff:

LAWRENCE DAVID ROSENBERG, Esquire
LEWIS FISHER, Esquire
MICHAEL FREED, Esquire

For the Defendant:

JOHN EDGAR KOSLOSKE, Esquire
ANUJ VOHRA, Esquire
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

P R O C E E D I N G S

(4:32 p.m.)

THE CLERK: Good afternoon. This is Matt Spengler, Judge Braden's law clerk. I am here with the Judge. If we can go ahead and get started and have each person state their name and the party they represent. The conference call is being digitally recorded. Actually, Judge Braden stepped out for just one moment and if you will stand by --

THE COURT: I think I am here.

THE CLERK: Oh, she is here. Go ahead.

MR. ROSENBERG: This is Lawrence Rosenberg on behalf of Plaintiff Chevron and with me are Lewis Fisher and Michael Freed.

MR. KOSLOSKE: This is John Kosloske with the Department of Justice. I represent the United States. With me is Anuj Vohra.

THE COURT: All right. I am calling about the government's motion for clarification of the scope of the proceedings. Let me find out, first of all, where you -- Mr. Rosenberg, can you tell me precisely, with not a lot of explanation, just what discovery -- what depositions have you noticed and you are prepared to do now?

MR. ROSENBERG: We have already taken the

deposition of the Nether Lasool (ph) individuals and we are likely going to take the depositions of the independent legal advisers in July. And that's it on our end. The government has already taken the deposition of Norman Stone, Michael Stay, and today took the deposition of William Howard Taft IV. Cynthia Giamora is another person, whose deposition was supposed to take late.

THE COURT: Well, she was the inside lawyer.

MR. ROSENBERG: She was the in-house lawyer for Chevron.

THE COURT: Okay.

MR. ROSENBERG: Her father was very -- or is very ill and in the hospital out in California. So, we have agreed to reschedule that for sometime later.

THE COURT: Okay. I am going to try to get my last order out today, which will finish up all of the -- I don't know if I'll do it today; it certainly will be done tomorrow, if it's not today -- on the attorney-client and work product privilege documents that were withheld in whole. Before embarking on the next exercise, the next list, I know a little -- I guess part of me wonders whether you need it or not, because from the document I've read and looked at, there seems to be an ample amount of evidence that Ms.

Edgar was involved in at least two roles. Now, the government probably has a legal argument about that and so there's nothing -- we haven't gotten there yet. Tt least as a factual matter, she was, was far as I'm concerned, everything I've seen is quite clearly was engaged in two functions.

Now, Mr. Kosloske, we have spent a lot of time in this Court trying Winstar cases, where the government's argument on liability and causation are conducted in two -- or bifurcated and this effect, this sort of causation goes to the damage aspect, not to liability. If you want me to pull out some of the government's briefs on that issue, if you would like me to, I would pleased to do so. But, there is not even a close call.

Now, I don't want to have the people deposed twice though. I think your point on that is well taken. I am looking at the list of people that from the letter that Mr. Rosenberg gave to you about who he thought he might want to depose someday, now, I can help everybody shorten that list, I think, unless you have some compelling need to practice your deposition skills. Let me see if I can get that here. It is in Rosenberg's letter, dated December 6th.

I certainly think the deposition of Ms.

Edgar is in order and the deposition of Igena, whatever her name is, is in order. Beth Kelly appears to me to be a minor player, if at all, and I certainly would put her at the bottom of the list. Gary Latham's deposition certainly needs to be taken. Tully Damner, I haven't the vaguest idea who this person is. I don't think I have even seen a document with his name on it. Arney Smit would be somebody you would want to depose. Mr. Gangle would be someone to depose; Mr. Kaufman, Virgil. I suppose Gotley and certainly Cripowicks, Smith, Gerard. I've seen one or two documents with Norv Cross. I can't imagine what he could possibly tell you. And I suspect -- I see nothing with Leo Scrigaman's name on it and I can't imagine she would have anything to provide. Mr. Thorpe, I can see also apparently had a dual role of sorts. That's apparent from the retainer letter, as well as from the different assignments, which he undertook at the direction, I might add, of Ms. Edgar. I'm not sure what we need to do with Rehnquist and Roberts right now. Obviously, I've identified them this week in documents. Both run the payroll of Chevron and DOE. I take it, you split the fees. That eliminates some of those people now. And then Hazard and I don't know who Gregor is. I know -- Gregor, who

is that?

MR. KOSLOSKE: Marshall Gregor is a professor at the Western University.

THE COURT: I know Marshall. You don't need him. Dukes Hazard. I know Marshall.

MR. KOSLOSKE: Yes.

THE COURT: Okay.

MR. KOSLOSKE: Yeah, I mean, the idea was that they would be testifying on sort of two different issues.

THE COURT: Well, you make your own case.

MR. KOSLOSKE: Yes.

THE COURT: All right. Hazard probably has a lot to say about this, I suspect, and he is going to want to see some of these documents. So, you don't want to -- you know, the issue -- I think we need to get the documents done before these people are deposed.

MR. KOSLOSKE: Right.

THE COURT: Now, I am doing my best to do that. Now, I don't know how much more these other documents you feel compelled for me to look at from these redacted things. If they're going to go fast, they'd better go real fast. I mean, I have really spent a lot of time doing this and I might say, Mr.

Kosloske, I am not amused. I know you didn't do this. But, I'm not amused. The government has gone awfully close to abuse, as far as I'm concerned. I'm not going to put that in writing. I'm just telling you that. And I'm trying to basically give you an ability to whittle out of this situation. But, it's pretty bad.

So, I mean, while I enjoy the exercise of honing my skills and identifying the privileges, at some point, it gets to be abusive with me and I don't know how many documents to go, we got to that point. But, boy, every time I hit one of these where there's nothing there -- I mean, you're alleging privilege in documents you're provided to show him.

MR. KOSLOSKE: Your Honor, without seeing the specific documents --

THE COURT: Well, I mean, you saw of them in the log last night. Can you possibly imagine how I feel at 7:00 at night, I'm standing here doing this stuff, where you're asserting privilege on documents that aren't even remotely privileged. There isn't a prayer that they're privileged. And then to get this piece of paper, that we're now going to have some new rules on bifurcation where the government's entire theory and most of the cases are just absolutely

opposite of what you're suggesting, I really have to wonder what your litigation strategy is in this, other than basically to get me so mad I would do something that becomes reversible. I mean, that may be a theory.

MR. KOSLOSKE: Your Honor, if you're talking about the bifurcation motion, I don't understand your point you're making. The Plaintiff has to establish a duty, breach, causation, and injury or damages. The bifurcation motion is addressed to causation or a nexus between breach and either.

THE COURT: Well, what type of injury are they going to have to demonstrate to you, other than the fact that there was a breach?

MR. KOSLOSKE: That the breach resulted in harm to Chevron. For example, theoretically, say you have an ex parte communication that the Court determines to violate the agreement, suppose the tenor of the communication was to result in a change to a decision or a compensated decision that was favorable to Chevron of that had no impact on that decision, what would be the harm to Chevron, that would be our argument.

THE COURT: Well, I think that's going to be an interesting argument to make. So what do you want

me -- I mean, I'm not granting your motion.

MR. KOSLOSKE: So, the motion for clarification is to not --

THE COURT: The motion assuredly is denied.

MR. KOSLOSKE: -- an order that provides any kind of clarification or is there not --

THE COURT: I think it's fairly clear the bifurcation between liability and the damages is.

MR. KOSLOSKE: So the first part of the case, as far as Your Honor is concerned, from what I understand here is that Chevron's burden is simply to establish that a communication facially breached the --

THE COURT: What you're trying to do is link the two agreements. The equity agreement is what they're suing under. What you are trying to say is that they've got to show causation under the decouple agreement, I guess it is, or the other side of what's going on, on the division of the money, or that they were hurt or not hurt by whatever the final decision is. And that's not -- I don't have jurisdiction over that issue. I have jurisdiction over whether or not there was an ex parte communication, whether it was material or not, and what the damages are that flow from that.

MR. KOSLOSKE: Respectfully, Your Honor, we're not suggesting a linkage between the two agreements.

THE COURT: It sounds like that to me. How did I miss out on that? Why don't you explain to me exactly what their causation is under your theory, precisely?

MR. KOSLOSKE: Chevron would have to demonstrate that an alleged improper communication had an effect upon either, say in the case of the IPE, a recommendation with respect to a particular zone, or in the case of the ASSE, a decision for a particular zone, and would have to have an effect that would be unfavorable to Chevron or the Chevron's disadvantage.

THE COURT: So, the government's position is that ex parte communications could take place on a daily and continual basis, for whatever reasons, even though it's prohibited by the contract?

MR. KOSLOSKE: Maybe even though it's -- even if that occurred and even though it was a facial breach of the contract, the plaintiff would still have to demonstrate a nexus between that breach and injury to the plaintiff before it could recover --

THE COURT: Well, the injury, isn't that the injury, the fact that they didn't get a proceeding

without ex parte communication?

MR. KOSLOSKE: I didn't argue that, Your Honor.

THE COURT: I understand. All right. Well, you will ample opportunity to make those arguments and have them reviewed.

MR. KOSLOSKE: Thank you, Your Honor.

THE COURT: I'm disappointed. I hope you're hearing that. You know, I expect that when the government says to me something is privileged -- well, there may be a few things on the margin, okay, where there are mistakes made. But, as best as I can see, this comes very close to abuse, and I'm sorry to say that. I'm embarrassed to say it, because I was in the Department.

MR. KOSLOSKE: We're reviewing your rulings, Your Honor.

THE COURT: It's not a matter of reviewing my rulings. I mean, this is cavalier. I didn't expect this. I expected to see a lot more of these documents where there was privileged than what I've seen, a lot more. And on some of these, the issue is not you re-reviewing. That's the purpose of doing it on the work product and attorney-client privilege. There is no deliberative process review that goes on.

You represented to the Court that somebody looked at these documents and they were privileged.

MR. KOSLOSKE: And, at the end of the process, Your Honor, under your order, we have an opportunity to file a memorandum with respect to any of your rulings that we disagree with and we intend to exercise that opportunity.

THE COURT: I don't think you heard what I just said. The last word on whether they were privileged or not comes from the Justice Department. This is not a game, let me see how many we can designate and let the Judge read, so then we get to figure what changed her mind. When you represent to a court that something is subject to the attorney-client privilege, it's not a game. It's not we just say that and we'll see if the judge takes the time to read it or not and says anything to us. I'm taking your at your word as an officer of the Court. The deliberative process stuff I think is a little more squishy and there's room for disagreement on some of that type of stuff. But, on attorney work product, if I've seen those you designate, I expect that they're attorney work produce documents, period. If you give a document to Chevron, it's no longer privileged. It's not subject to any privilege. To have those

things on the log is an abuse. There is no other way to put it. I'm just not amused and I'm really disappointed. I came in to -- I mean, credibility is something that's -- when you begin to lose it, it's hard to regain.

MR. KOSLOSKE: Well, respectfully, Your Honor --

THE COURT: Mr. Kosloske, did you review these work product privileges, yourself?

MR. KOSLOSKE: I reviewed some of them --

THE COURT: Some.

MR. KOSLOSKE: -- myself. But, we had others involved in the process.

THE COURT: Did the others involved in the process understand -- hopefully, you will have them -- maybe I need to have a telephone conference and get them all together, because they need to understand that this process is not a game.

MR. KOSLOSKE: Well --

THE COURT: I mean, you designated how many documents? How many thousands of documents were designated? And you're telling the Court that these documents are -- forget about the deliberative process privileged documents. My secretary is doing a log on the number of pages that I'm reading and I can assure

you when I write my final opinion, that will be there. I mean, the courts have got to have some belief that there is some integrity in the process when these logs on done, on both side. And I'm not just saying to get me -- if I find that Jones-Day is doing the same thing, they can be sure they will hear the same lecture from me, if not worse.

Mr. Rosenberg, I would like to have you rethink how much you need else for me to do on these individual redacted documents. This has been a great experience for me, too, but enough is enough.

MR. ROSENBERG: I certainly hear what you're saying, Your Honor. Without having a whole stack of them in front of me, which I don't have, I can tell you that our sense is that the ones that were partially redacted, the ones you haven't looked at yet contain among the best stuff -- or at least we suspect it to contain among the best stuff.

THE COURT: Well, you told me that about the full documents, the redacted documents.

MR. ROSENBERG: Yeah. Well, I actually thought it was -- yes, the ones that were redacted were the ones that I thought were likely to contain the best stuff.

THE COURT: So, that pleasure still lies

ahead?

MR. ROSENBERG: Yeah. But, you know, my sense is, and I did, at one point, review what we have, which was the redacted versions of every one of those documents, and I can tell you a lot of them looked really good; but, obviously, stuff was redacted. They were short. I mean, almost none of them are more than a few pages and a lot of them are one pagers. But, I certainly don't want the Court to undertake any burden that the Court doesn't --

THE COURT: Well, I mean, I have an obligation, but I think I've got it. I've got a picture here. It's not a pleasant one.

MR. ROSENBERG: Yeah.

THE COURT: And so, I think -- I mean, the government has got some theories about what Ms. Thorpe's -- what's her name -- Mary Edgar's responsibilities were. I'm not sure what the outside lawyers did. They probably made some errors, but due to her direction.

Now, I'm beginning to get an idea of what I think why she did it, too. I don't know that for sure yet, but I think I've got a good idea from reading these documents. I do want -- I forgot this last time, did you ask for her personnel files, her ratings

or reviews in your document requests?

MR. ROSENBERG: We did, only for the purpose of finding like job descriptions.

THE COURT: Well, they'll describe her job, but they'll say what she did each year and why it was so good.

MR. ROSENBERG: Yes.

THE COURT: That seems to me is relevant.

MR. ROSENBERG: Yes, I think we did.

THE COURT: So, if you don't have it, issue a request for that. Or, in fact, I'm just going to issue all request for it right now from the Court.

MR. ROSENBERG: Okay.

THE COURT: I mean, she gets an evaluation every year. I'm sure she got -- I don't know what they call it.

MR. ROSENBERG: Commendations.

THE COURT: Whatever, yes, whatever you get. She's senior, so she's probably already at the top of her pay grade. But, she gets -- I mean, she's got other stuff in her record. I think we need to see what that is, because we'll have a better picture of what somebody else thought she was doing. Maybe once you get those, you can find out who signed it. But, Nordhouse and Legerand didn't sign those things.

Maybe they did, but I can't imagine they did. There's some deputy there that signed them.

MR. KOSLOSKE: Your Honor, are you asking now --

THE COURT: I'm not asking. I'm telling you that the Court wants to have Ms. Edgar's personnel -- her annual ratings, whatever they're called, performance reviews, performance evaluations. I got one every year when I was at the Justice Department, any commendations she received, like a special achievement award or whatever.

MR. KOSLOSKE: You are ordering us to provide --

THE COURT: I certainly am.

MR. KOSLOSKE: -- the papers?

THE COURT: You're going to provide them certainly to me and I don't see why they can't be provided to the other side and, of course, under seal.

MR. KOSLOSKE: What purpose, Your Honor, would we --

THE COURT: To find out what she was doing. That's what this exercise is.

MR. KOSLOSKE: For what purpose?

THE COURT: What purpose?

MR. KOSLOSKE: Right.

THE COURT: I can't believe you asked that question and I am not going to respond.

MR. KOSLOSKE: Your Honor, the parties caused the case and we've received a discovery request from the Plaintiffs for that kind of material and we responded to it.

THE COURT: Did you turn it over?

MR. KOSLOSKE: Provided the information that Mr. Rosenberg asked for and we've receive no complaint.

THE COURT: Well, I'm going to issue an order and then you can appeal the order, if you wish, and the order is for her personnel records are to be turned over under seal. They will describe her job function and what she did on this project, I'm sure, in glowing terms.

I am going to return to what I'm doing now. Mr. Rosenberg, I would like to hear from you Monday, if you can cull your list anymore.

MR. ROSENBERG: Yes. We will definitely do that. I will try to eliminate as much as possible and if we can do it by tomorrow, we'll do it by tomorrow.

THE COURT: Well, I am not going to start -- I've got to have a break, folks. I mean, I know, I appreciate your great confidence in me, but, I mean, I

am not going to work on these documents this weekend. I've had enough. I mean, I go through -- I bring a stack up here every morning and get through them by the end of the day. And certainly there's a -- and I must say, also, Mr. Rosenberg, I will say, yesterday, I went through a bunch at the end of the day, which, from your perspective, even though we're going to get it anyway, I think you could have figured it out from the log. Don't put me through the exercise of reading things that quite clearly are going to be subject to privilege. The best ones I can think of, they were draft final decisions of the -- whatever these guys are, the -- I mean, those things are not work product or attorney client. They're actually -- those are actually deliberative process documents.

MR. ROSENBERG: Right.

THE COURT: Right. They weren't written by a lawyer and if a lawyer and if a lawyer -- you didn't have a lawyer identified in the log. But, they are, you know, subject to the deliberative process privilege. The process isn't found yet. So, I mean, don't make me go through and read those folders of those things when it's clear from the log what they are.

MR. ROSENBERG: Okay, Your Honor.

THE COURT: Don't -- you know, think about it a little bit what you're doing.

MR. ROSENBERG: Yeah.

THE COURT: And I -- you know, frankly, I don't know when you get this -- I want to write this opinion, so I can get this thing wound up and certified for the Appellate Court. And if they don't take it, we're going to be in trial in November. I'm not going to change that date. I don't think you're going to need to do a lot of discovery, frankly. The government has their own argument. I don't know what type of discovery they're going to make that they would want to know about. They know from the deliberative process documents that they're claiming privilege on whether people changed their mind and why. If they want to have those documents privileged, fine, they're privileged.

All right. I will talk to you guys next week and I'll get this other order out. The motion is denied. I did it in an oral order. I may have Matt put it in writing, so you can appeal the Court's direction for providing Ms. Edgar's personnel records. Good afternoon.

(Whereupon, at 4:56 p.m., the hearing in the above-entitled matter was concluded.)