# In the United States Court of Federal Claims

No. 04-1365C
Filed: January 31, 2008
**FILED UNDER SEAL**

| | | |
|---|---|---|
| CHEVRON U.S.A., INC., Plaintiff, | * | Attorney Client Privilege; |
| v. | * | Deliberative Process Privilege; |
| THE UNITED STATES, Defendant. | * | Work Product Privilege. |

**Donald B. Ayer, Lawrence D. Rosenburg**, Jones Day, Washington, D.C., Counsel for Plaintiff.

**John E. Kosloske**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Paul T. Michael**, Office of General Counsel, Department of Energy, Washington, D.C., Of Counsel.

## MEMORANDUM OPINION AND ORDERS REGARDING PRIVILEGE ASSERTIONS MADE BY THE UNITED STATES.

The integrity of the federal litigation process depends on the parties' good faith representations when privilege assertions are made. If litigants cannot be trusted to discharge their responsibility as officers of the court, then the efficient resolution of civil litigation will come to an end, requiring trial judges to examine each and every privilege assertion to insure that the litigants comply with basic evidentiary and ethical requirements. And, it will require trial judges to impose meaningful sanctions. Zealous advocacy is one matter; abusive litigation tactics are quite another.

In this case, the Defendant ("Government") initially designated over 7,337 folders, consisting of 35,919 pages of documents, as subject to the deliberative process, attorney-client, and/or work product privileges. As to the deliberative process privilege, at the request of Plaintiff ("Chevron"), the court examined *in camera* 110 folders consisting of 553 pages of documents on a "priority basis." After the court issued initial rulings, the Government continued to assert privilege as to 103 folders of documents. As to the attorney-client privilege, at Chevron's request, the court examined *in camera* 437 of 3,396 folders, consisting of 1,722 pages of documents. After the court issued initial rulings, the Government continued to assert privilege as to 164 folders. As to the attorney

work-product privilege, the court examined *in camera* 254 of 2,075 folders, consisting of 1,451 pages of documents. After the court issued initial rulings, the Government continued to assert attorney work-product privilege as to 176 folders. The court has now re-reviewed all of the documents for which the Government has continued to assert one or more privileges and issued this Memorandum Opinion and attached three Orders, under seal, setting forth the court's rulings in detail.

## I. RELEVANT FACTS.

The relevant facts of this *sui generis* government contract case are set forth in detail in *Chevron U.S.A., Inc.* v. *United States*, 71 Fed. Cl. 236, 239-53 (2006). To understand the import of this highly contested dispute over documents that the Government alleges are subject to one or more privileges, however, a review of the major relevant facts is required.

### A. The 1944 Unit Plan Contract.

Plaintiff Chevron U.S.A., Inc. ("Chevron") is a corporation and is a wholly owned subsidiary of ChevronTexaco Corp., a publicly-traded corporation organized under Delaware law. *See* Compl. ¶ 7. Chevron's predecessor in interest, Standard Oil Company ("Standard Oil"), and the Government entered into a June 19, 1944 Unit Plan Contract ("1944 Unit Plan Contract") governing the joint operation and production of Naval Petroleum Reserve No. 1 ("Elk Hills Reserve"). *Id.* at ¶ 10; *see also United States* v. *Standard Oil Co.*, 545 F.2d 624, 626-27 (9th Cir. 1976) (discussing the history of the Elk Hills Reserve and the origins and purpose of the 1944 Unit Plan Contract).

Pursuant to the 1944 Unit Plan Contract, Standard Oil and the Government agreed to operate Elk Hills Reserve as a unit and allocate costs for oil and gas production on the basis of the parties' respective interests in the underlying petroleum and hydrocarbons. *See* Compl. ¶¶ 9, 10; *see also* Compl. Ex. A1 at 5.

To accomplish these objectives, the 1944 Unit Plan Contract divided the Elk Hills Reserve into three commercially productive zones:[1] the Dry Gas Zone; the Shallow Oil Zone; and the Stevens Zone. *See* Compl. Ex. A1 § 2© at 7.[2] The 1944 Unit Plan Contract also assigned the following ownership interests in the "commercially productive zones:"

| | | |
|---|---|---|
| Dry Gas Zone: | Navy: | 77.0492% |
| | Standard Oil: | 22.9508% |

[1] A "commercially productive zone" is defined in the 1944 Unit Plan Contract as "[g]eologic strata beneath the surface of the earth which, in the opinion of the Engineering Committee, are capable of producing oil or gas in paying quantities." Compl. Ex. A1 § 2(a)(2) at 6.

[2] In 1976, the Carneros Zone, a fourth commercially productive zone, was designated. *See* Compl. ¶ 12.

| | | |
|---|---|---|
| Shallow Oil Zone: | Navy: | 63.9301% |
| | Standard Oil: | 36.0699% |
| Stevens Zone: | Navy: | 65.4517% |
| | Standard Oil: | 34.5483% |

*See* Compl. Ex. A1 § 2(d) at 7.

These ownership interests were based on November 20, 1942 estimates for each zone of the proportionate ownership of total hydrocarbons in each field prior to unitization. *See* Compl. Ex. A1 § 2(b) at 7. The estimated ownership was determined by computing the ratio between the acre-feet of oil and gas bearing formations underlying Navy and Standard Oil lands for each "commercially productive zone" and the estimated total acre-feet of oil and gas within the Estimated Limiting Line of Commercial Productivity. *Id.*

The parties to the 1944 Unit Plan Contract, however, agreed that little was known about the geology of the Elk Hills Reserve, because few producing wells had been drilled. *See* Compl. ¶ 14. Therefore, the 1944 Unit Plan Contract provided that the interests of Standard Oil and the Navy would be subject to redetermination, at the request of either party, at such times as there was a better way of determining the volume of oil and gas underlying an owner's property. *See* Compl. Ex. A1 § 2(f) at 7-8. The 1944 Unit Plan Contract also provided for a dispute resolution procedure, in the event the Engineering Committee was unable *unanimously* to agree on the terms of a proposed revision. *See* Compl. Ex. A1 § 9(b) at 15 (emphasis added).

Although equity redeterminations were delegated to the Secretary of the Navy, post-termination adjustments under the 1944 Unit Plan Contract were not. *See* Compl. Ex. A1 §11 at 15. Significantly, the 1944 Unit Plan Contract did not address the manner in which post-termination adjustments would be accomplished. *Id.*

**B. The Amendment To The 1944 Unit Plan Contract.**

In 1976, Congress determined that the Navy's intent to maintain a petroleum reserve, for a national emergency, was no longer relevant and enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258, 90 Stat. 303 (1976). *See* H.R. CONF. REP. NO. 94-942, at 15 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 516, 517 ("Under the compromise, petroleum at the three reserves is to be produced at the maximum efficient rate for a period of six years, with provisions for an indefinite number of extensions for period of three years each under specified circumstances."). Accordingly, on May 25, 1976, the Navy and Standard Oil executed an amendment to the 1944 Unit Plan Contract, removing any language referencing national security policy concerns and substituting language emphasizing a new policy to encourage economic productivity of the Elk Hills Reserve. *Id.*; *see also* Compl. ¶ 18.

### C. The 1977 Transfer Of Authority Over The Elk Hills Reserve To The Department Of Energy.

In 1977, pursuant to Section 307 of the Department of Energy Organization Act, Pub. L. No. 95-91, 91 Stat. 565 (1977) (codified at 42 U.S.C. § 7101, *et seq.*), Congress transferred authority over the Elk Hills Reserve to the United States Department of Energy ("DOE"), and assigned the Navy's interests in the Elk Hills Reserve and the 1944 Unit Plan Contract to DOE.

### D. The National Defense Authorization Act For Fiscal Year 1996.

On February 10, 1996, Congress enacted the National Defense Authorization Act for Fiscal Year 1996 ("NDA Act"), requiring DOE to "finalize [the owners'] equity interests" in the Elk Hills Reserve through an equity finalization process no more than eight months after the effective date of the legislation, *i.e.*, no later than October 10, 1996. *See* Pub. L. No. 104-106, § 3412(a), 110 Stat. 186 (1996), 10 U.S.C. § 7420 (note). This Act also required DOE to sell the Government's interest in the Elk Hills Reserve no later than February 10, 1998. *Id*. The NDA Act also provided that: "*If, on the effective date, there is an ongoing equity redetermination dispute* between the equity owners under Section 9(b) of the unit plan contract, the dispute shall be resolved in the manner provided in the unit plan contract within eight months after the effective date. *The resolution shall be considered final for all purposes under this section*." *Id*. (emphasis added).

### E. The July 8, 1996 Department Of Energy Administrative Order No. 96-01.

On July 8, 1996, the Assistant Secretary for Fossil Energy ("ASFE") issued Administrative Order No. 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process," establishing an equity finalization process by which Chevron and DOE would "present their respective final equity positions to the mutually acceptable independent petroleum engineer (Netherland, Sewell & Associates, Inc.) [("Equity IPE")] . . . to be retained by the Secretary [of Energy] to provide final equity recommendations in the Dry Gas Zone, Carneros Zone, and the Stevens Zone." Compl. Ex. C; *see also* Pub. L. No. 104-106, § 3412(a), 110 Stat. 186 (1996), 10 U.S.C. § 7420 (note) (authorizing the ASFE's Order).

Significantly, Administrative Order No. 96-01 prohibited Chevron and DOE from having any *ex parte* communications with the Equity IPE. *See* Compl. Ex. C ¶¶ B.5, B.9, B.21.

### F. The May 19, 1997 Agreements.

The equity finalization process took longer than Congress or DOE expected, and the October 10, 1996 deadline was not met. *See* Compl. ¶ 22. Given this delay, to facilitate the execution of a contract for the sale of the Elk Hills Reserve prior to the statutorily-mandated deadline of February 10, 1998, the parties agreed to "decouple" the sale of the Government's interest in the Elk Hills Reserve from the "equity finalization process." *See* Compl. ¶¶ 23-26. Therefore, on May 19, 1997, Chevron and DOE entered into two contracts: "Agreement Regarding Fixing of Equity Interest at

Naval Petroleum Reserve No. 1 for Purposes of Sale" (the "Decoupling Agreement"); and "Agreement Regarding Equity Redetermination Process" (the "Equity Process Agreement"). *See* Compl. Exs. B.1, B.2; *but see* Compl. ¶ 24 ("Consistent therewith, on May 19, 1997, DOE and ChevronTexaco entered into *an agreement implemented in two parts* [.]" (emphasis added)).

**1. The Decoupling Agreement.**

The Decoupling Agreement fixed DOE's ownership interest in the Elk Hills Reserve for purposes of sale and provided for an adjustment to be made between DOE and Chevron after finalization for any difference between the 1944 Unit Plan Contract final equity participation value and the fixed sales participations (*i.e.*, the amount DOE would receive from the sale of Elk Hills Reserve interests). *See* Compl. Ex. B.1 §§ 1.1, 1.2 at 2-4; *see also* Compl. ¶ 26.

The Decoupling Agreement established the parties' interests in the four unitized zones, as follows:

| | | |
|---|---|---|
| Dry Gas Zone: | DOE | 83.8726% |
| | Chevron | 16.1274% |
| Shallow Oil Zone: | DOE | 70.0119% |
| | Chevron | 29.9881% |
| Stevens Zone: | DOE | 79.6357% |
| | Chevron | 20.3643% |
| Carneros Zone: | DOE | 100.00% |
| | Chevron | 0.00% |

Compl. Ex. B.1 § 1.1(a).

The Decoupling Agreement also provided for financial zone adjustments. *Id.* § 1.2. In addition, the Decoupling Agreement provided that, in exchange for Chevron's agreement to fix ownership interests in the Elk Hills Reserve for the purposes of sale, DOE agreed to limit the sale of the Government's interest in the Elk Hills Reserve only to purchasers that would execute a unitization contract with Chevron for the future operation of the Elk Hills Reserve ("Unit Operating Agreement"). Compl. Ex. B.1 § 5.2 (b) at 11.

**2. The Equity Process Agreement.**

The Equity Process Agreement established procedures for "finaliz[ing] all equity interests in the four unitized productive zones within [the Elk Hills Reserve] pursuant to section 3412(b)[.]" Compl. Ex. B.2 at 1. The Equity Process Agreement set forth two distinct processes for finalizing the parties' equity interests. *Compare* Compl. Ex. B.2 ¶¶ A.1-8 (establishing Independent Petroleum

Engineer Process for the Shallow Oil Zone) *with* Compl. Ex. B.2 ¶¶ B.1-11 (establishing Equity Redetermination Process).

The Independent Petroleum Engineer Process for the Shallow Oil Zone equity redetermination was to be undertaken consistent with the terms of the 1944 Unit Plan Contract. *See* Compl. Ex. B.2 ¶ A.1; *see also* Compl. ¶ 27. The Independent Petroleum Engineer Process expressly incorporated procedures contained in Administrative Order No. 96-01. *Id.* ¶ A.2.

On the other hand, the Equity Redetermination Process did not incorporate any procedures from Administrative Order No. 96-01. *See* Compl. Ex. B.2 ¶¶ B.1-11 (establishing Equity Redetermination Process). Instead, the Equity IPE would provide Chevron and DOE with a provisional equity recommendation report for each zone. *See* Compl. Ex. B.2 ¶ B.1. Pursuant to the Equity Redetermination Process, Chevron and DOE would review the provisional equity recommendation reports and then submit written comments to the Equity IPE. *Id.* In response, the Equity IPE would issue a final recommendation to Chevron, DOE's equity team, and the ASFE. *See* Compl. Ex. B.2 ¶¶ B.2, C.1. The Equity IPE's recommendations, in fact, were the advisory report from an independent petroleum engineer required by Section 9(b) of the 1944 Unit Plan Contract and Section 3412(b) of the NDA Act. *See* Compl. Ex. B.2 ¶ A.1. The Equity Redetermination Process afforded Chevron and DOE the opportunity to review the final recommendation and submit comments to the ASFE prior to the ASFE issuing a decision. *Id.*

The Equity Process Agreement also established the Equity Redetermination Process procedures for ASFE decision, including:

> *The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter* (. . . not includ[ing] the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an *ex parte* basis. Any written materials submitted to the ASFE by either equity team shall be provided to the other party. The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.
>
> * * *
>
> The ASFE's determination of final equity shall be final, binding and non-appealable *unless challenged by Chevron under the procedures and criteria set out above*, in which case OHA's decision shall be final, binding, and non-appealable. In order to avoid the potential for protracted and costly litigation, Chevron and DOE have agreed, as an alternative to judicial resolution of any dispute regarding the ASFE equity redetermination decisions, *to submit any challenge to such decisions to OHA and to be bound by the results thereof, without right of any further administrative or judicial review or appeal* (nothing in the foregoing, however, shall be deemed to

> expand Chevron's right to challenge an ASFE decision beyond that permitted in paragraphs B.7 and B.8 above). To implement the foregoing, DOE and Chevron *each knowingly and voluntarily waives any and all rights it may have (i) to bring any other judicial or administrative challenge to the final equity determination decisions by the ASFE, or (ii) to bring any judicial or administrative challenge to any decision* by OHA.
>
> * * *
>
> Notwithstanding the provisions of paragraph B.7 above, Chevron and DOE agree that any challenge by Chevron to the ASFE's decision *regarding the "257 area" legal issue (which affects only the Carneros Zone) shall be reviewed "de novo" by OHA and that any OHA determination of the matter shall be final and binding on the parties*. If any other legal issues arise that are processed by NSA pursuant to instructions from the Independent Legal Advisor (as opposed to instructions agreed upon by Chevron and DOE in the form of a Settlement Agreement), the ASFE's decision on such legal issue, if challenged by Chevron, also shall be reviewed "de novo" by OHA and OHA's determination of the matter shall be final and binding on the parties.

Compl. Ex. B.2 ¶¶ B.4, B.9, B.11 (emphasis added).

On June 10, 1997, the Secretary of Energy issued a Memorandum for the Director, Office of Hearings and Appeals, that delineated OHA's authority under the Equity Process Agreement:

> Pursuant to Paragraphs 14 and 18 of DOE Delegation Order No. 0104-24, as amended, I hereby authorize you as Director of the Office of Hearing and Appeals (OHA) to *review challenges* by Chevron U.S.A. Production Company (Chevron) *to any decision or equity redetermination made by the DOE Assistant Secretary for Fossil Energy (ASFE) under the terms and procedures set forth in the* [*Equity Process Agreement*], to implement Title XXXIV of the National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104-106 (110 Stat. 186) for the sale of Naval Petroleum Reserve Numbered 1 (Elk Hills).
>
> *You are further authorized, upon notice to the parties, to adopt and administer procedures for adjudicating any challenge* by Chevron under the Agreement, which you determine to be necessary or appropriate by reference to the DOE procedural regulations in 10 C.F.R. Chapter X and the terms of the Agreement.

Gov't Supp. App. at 110 (emphasis added).

**G. The February 5, 1998 Termination Of The 1944 Unit Plan Contract.**

On February 5, 1998, Chevron and DOE entered into an Agreement to Terminate the 1944 Unit Plan Contract ("Termination Agreement"), following which the Government's interest in the Elk Hills Reserve was sold to Occidental of Elk Hills, Inc. *See* Compl. Ex. E at 1, 3; *see also* Compl. ¶ 33. Under the terms of the Termination Agreement, however, the parties expressly reserved their rights under the 1944 Unit Plan Contract. Compl. Ex. E § 2.2 at 13-14.

**H. The October 17, 1998 Strom Thurmond National Defense Authorization Act For Fiscal Year 1999.**

Congress did not explicitly extend the eight month equity finalization deadline set forth in the 1996 NDA Act, *i.e.*, finalization of equity must occur prior to October 10, 1996. *See* Pub. L. No. 104-106, § 3412(b), 110 Stat. 186 (1996) ("Not later than eight months after the effective date, the Secretary [of Energy] shall finalize equity interests of the known oil and gas zones in Naval Petroleum Reserve Numbered 1 in the manner provided by this subsection."). Instead, Congress ratified the Secretary of Energy's ongoing efforts to finalize the parties' equity interests by authorizing the continued expenditure of funds for that purpose. Pub. L. 105-261, § 4302, 112 Stat. 1920 (Oct. 17, 1998).

**I. The February 26, 1999 Office Of Hearing And Appeals Decision Letter.**

On February 26, 1999, the Office of Hearing and Appeals ("OHA") issued a decision letter resolving Chevron's appeal of a May 1998 final equity determination issued by the ASFE pursuant to the Equity Process Agreement. Gov't Supp. App. at 135. Although authorized "to adopt and administer procedures for adjudicating any challenge by Chevron under the [Equity Process] Agreement," in addressing the scope of the pending appeal, OHA indicated:

> *OHA does not have the authority to review disputes over the May 1997 agreement.* The May 1997 agreement provides for OHA review of appeals from final equity redeterminations by the Assistant Secretary. The May 1997 agreement does not provide for OHA review of DOE's position on that agreement. Accordingly, DOE's position on OHA's authority under this agreement is the agency's position and governs this proceeding.

*Id.* (emphasis added).

**J. Post Year 2002 Disputes Concerning Chevron's Stevens Zone Office of Hearing and Appeals Appeal And Allegations Of *Ex Parte* Communications.**

On June 18, 2002, the Principal Deputy Assistant Secretary for Fossil Energy ("PDASFE") issued a Final Decision Finalizing Elk Hills Stevens Zone Equity that fixed the parties' ownership interests in the Stevens Zone of the Elk Hills Reserve. *See* Gov't Supp. App. at 6-39. Chevron

appealed the decision to OHA pursuant to the Equity Process Agreement. *See* 7/21/05 TR at 46 ("One of those issues . . . was appealed to O.H.A. The other issues decided by the A.S.F.E. were not appealable to O.H.A.").

On January 28, 2004, while Chevron's Stevens Zone appeal was pending before OHA, Chevron sent a letter to the ASFE advising that certain *ex parte* government communications appeared to breach the Equity Process Agreement:

> Chevron U.S.A. Inc., ("ChevronTexaco") very recently discovered that DOE has materially breached important contracts between DOE and Chevron Texaco concerning finalization of the United States' and ChevronTexaco's respective interests in the Elk Hills Field. The contracts concern the resolution of issues between DOE and ChevronTexaco worth hundreds of millions of dollars. In brief, it appears that personnel in DOE's Office of General Counsel both acted as advocates before a decision maker who was supposed to be impartial and served as undisclosed participants in the decision-making itself. As a result, the dispute resolution mechanism agreed to by the parties has been completely undermined, one-sided rather than impartial decisions have been rendered against ChevronTexaco, and substantial amounts of time and money have been wasted.

Gov't Supp. App. at 40.

On April 1, 2004, DOE's General Counsel responded by letter stating:

> The record is thus flatly inconsistent with an assertion that there has been some "dual role of the [Office of General Counsel]" that has "stripped the parties' agreed-upon-procedures of any legitimacy." That would be a very serious charge, and I am confident that you will not endorse it when you have been more fully advised. DOE has scrupulously adhered to the terms and conditions of the equity finalization process, and will continue to do so. We similarly expect no less of ChevronTexaco.

*Id.* at 52.

On June 14, 2004, Chevron replied:

> Frankly, we were both surprised and disappointed by your letter. Although you acknowledge that a lawyer in the Office of General Counsel of the Department of Energy acted as both counsel for one of the parties in an adversarial proceeding and simultaneously as an advisor to the decision maker, you interpret the Equity Process Agreement as permitting this dual role. Clearly, you must appreciate that in consenting to the procedures afforded in the Equity Process Agreement, and thereby waiving its right to recourse to a court to determine controversies, ChevronTexaco

> understood that it was agreeing to alternative procedures which, at a minimum, would provide an objective decision maker and which would be fair and equitable.
>
> * * *
>
> Any process in which the decision maker receives and relies on *ex parte* advice of counsel for one of the two adversary parties does not afford impartial decision-making nor can it be fair and equitable.
>
> * * *
>
> DOE's conduct in the Stevens Zone proceeding constitutes a fundamental and material breach of the DOE's obligations under the Equity Process Agreement. As a result of DOE's breach, ChevronTexaco considers both the Equity Process Agreement and the Decoupling Agreement to be no longer operative. Those agreements were simultaneously drafted and executed and are integrally related. Viewed together, they constitute a single, integrated contract.
>
> Given the fact that the [Principle Deputy Assistant Secretary for Fossil Energy's] decision for the Stevens Zone was not rendered in compliance with the requirements of the Equity Process Agreement and the expectations of the parties, the Office of Hearings and Appeals lacks authority to review that decision. We thus intend, on ChevronTexaco's behalf, to notify the Office of Hearings and Appeals of DOE's breach of the Equity Process Agreement and our intention to participate in further Stevens Zone proceedings before OHA, should such proceedings take place, under protest. Similarly, while ChevronTexaco will continue to participate in proceedings related to the Shallow Oil Zone equity finalization, it will do so only under protest and without waving its claim of material breach.
>
> Under the circumstances, we believe that the prior Carneros Zone and Dry Gas Zone equity determination may also have been infected and may likewise be infirm. Pending receipt of information which would confirm that no similar *ex parte* communications occurred in those proceedings and that those proceedings otherwise have been conducted in strict accord with the terms of the Equity Process Agreement, we have no choice but to assume that decisions in those proceedings are similarly tainted and to dispute the validity of those decisions as well.

*Id.* at 89-90.

On June 16, 2004, Chevron sent a letter to OHA apprising the Director of the *ex parte* communications and Chevron's belief that OHA did not have jurisdiction to resolve this issue:

> In April, DOE's General Counsel confirmed the existence of communications that ChevronTexaco believes violate the May 19, 1997 Equity Process Agreement between ChevronTexaco and DOE. As a result of these communications, the decision of the Principal Deputy Assistant Secretary for Fossil Energy currently under review in this proceeding was not rendered in accordance with the requirements of the Equity Process Agreement. In turn, because OHA's authority to hear this matter derives solely from the same agreement, and extends only to review of decisions rendered in conformity with that agreement, OHA lacks jurisdiction to decide the pending appeal.
>
> ChevronTexaco intends to proceed in the appropriate forum to seek redress for DOE's breach. If OHA decides to go forward with the pending appeal under the circumstances, ChevronTexaco will continue to participate in these proceedings. However, such participation will be under protest and with full reservation of ChevronTexaco's rights to dispute the validity and effect of any decision rendered.

*Id.* at 91.

On June 21, 2004, DOE sent a letter to OHA disputing Chevron's allegations that the Equity Process Agreement was breached and that OHA could not resolve this problem:

> The Department of Energy (DOE) completely disputes Chevron's allegation that the Equity Process Agreement has been violated.
>
> * * *
>
> There is simply no basis for Chevron's rather transparent attempt to derail these proceedings. Chevron and DOE specifically agreed that disputes over legal issues addressed in the Principal Deputy Assistant Secretary for Fossil Energy's ("PDASFE") decision would be reviewed by OHA on a "de novo" basis. The current appeal is such a dispute over a legal issue. Accordingly, even if the PDASFE's decision had not been rendered in accordance with the parties' agreement, and again, DOE completely disputes this contention, OHA is free to render its own judgment. No one has questioned in any way OHA's decision making process or procedures in this matter. OHA continues to have full authority and "jurisdiction" to decide this appeal. While Chevron, for reasons currently unknown, may wish to disrupt these proceedings, it does not have the right to do so. We respectfully submit that OHA should disregard Chevron's letter and complete these proceedings.

*Id.* at 92-93.

In response, Chevron sent a letter to OHA on July 23, 2004 requesting a stay of OHA proceedings to allow Chevron to seek judicial review:

> Since receiving DOE's confirmation of *ex parte* contacts, ChevronTexaco has been evaluating its options. We expect in the near term to file a complaint in federal court seeking appropriate redress. In contrast with OHA, which previously has acknowledged that it "does not have the authority to review disputes over the [Equity Process] Agreement," (see February 26, 1999 letter []), a court has such jurisdiction and affords a process, including discovery, that allows for the development of a factual record necessary for a full airing of ChevronTexaco's claims that DOE has materially breached the Agreement.
>
> Assuming the court finds that DOE has breached the Agreement, any decision rendered by OHA in this appeal would be a nullity because, at a minimum, a condition precedent to OHA's jurisdiction - a decision by the Assistant Secretary (or his designee) untainted by *ex parte* communications - has not been satisfied. Under the circumstances, it appears that further expenditure of time and effort by OHA and the parties pending judicial resolution of the dispute over the parties' rights and obligations under the Agreement could be wasted. *ChevronTexaco therefore respectfully requests that OHA stay the subject proceeding and await the outcome of the impending court case*. In the event OHA nonetheless decides to proceed with the appeal, as stated in my June 16 letter, Chevron will continue to participate, under protest and with full reservation of its right to contest OHA's jurisdiction and the validity and effect of any decision rendered by OHA.

*Id.* at 94-95 (emphasis added).

On August 10, 2004, OHA denied Chevron's request for a stay of proceedings, without further comment. *Id.* at 106. On August 10, 2004, Chevron requested reconsideration of OHA's decision to deny the requested stay:

> [T]he issue that Chevron will bring to court – whether DOE has materially breached the Equity Process Agreement – is not within the limited jurisdiction given OHA in the Equity Process Agreement. Indeed, OHA has recognized that it does not have the authority to resolve disputes arising under the Equity Process Agreement itself. See February 26, 1999 letter []. DOE apparently also contends that OHA's jurisdiction is unaffected by the invalidity of the underlying PDASFE decision. However, OHA's jurisdiction here is a matter of contract, and both the Equity Process Agreement and the delegation order implementing that agreement make clear that such jurisdiction is limited to the review of equity finalization decisions of the ASFE. In the absence of a valid ASFE/PDASFE decision, OHA lacks authority to act.
>
> * * *

> For the reasons set forth herein, OHA should reconsider its denial of ChevronTexaco's request to stay these proceedings.

*Id.* at 108.

On August 12, 2004, OHA denied Chevron's request for reconsideration and repeated the limited extent of its jurisdiction:

> Chevron filed a request for reconsideration of our August 10 denial of its request for a stay. We have reviewed Chevron's submission and do not believe that any of the arguments warrant a change in our ruling. Chevron filed an appeal pursuant to an agreement with DOE, but now argues that DOE actions relieve it from the terms of the agreement. *As we have previously stated, disputes about the agreement are outside our purview.* Accordingly, given the absence of a joint motion for stay, the proceedings should go forward.

*Id.* at 109 (emphasis added).

## II. PROCEDURAL HISTORY.

On August 20, 2004, Chevron filed a Complaint in the United States Court of Federal Claims. *See* Compl. The first cause of action asserted a claim for breach of contract, based on the Government's alleged violation, between 1999 and 2003, of the terms of the Equity Process Agreement. *Id.* ¶¶ 59-65. This alleged breach of the Equity Process Agreement also was alleged as the cause of a separate material breach of the parties' two-part May 19, 1997 Agreement. *Id.* ¶ 64.

Specifically, the Complaint alleges that during finalization proceedings for the Dry Gas, Carneros, and Stevens Zone proceedings, the DOE's Deputy General Counsel for Technology Transfer and Procurement ("DOE's Deputy General Counsel") engaged in *ex parte* communications with DOE decision-makers in violation of the Equity Process Agreement. *Id.* ¶ 38. In addition, the Complaint states that Chevron first learned of the *ex parte* communications concerning the Stevens Zone proceedings on December 23, 2003, the date DOE responded to Chevron's January 7, 2003 Freedom of Information Act request. *Id.* ¶ 58. In addition, the Complaint states that Chevron only first became aware of *ex parte* communications concerning the Dry Gas Zone and Carneros Zone proceedings on June 23, 2004, the date DOE responded to Chevron's February 19, 2004 Freedom of Information Act request. *Id.*

The decision-maker for the Dry Gas and Carneros Zone proceedings was the Assistant Secretary for Fossil Energy ("ASFE"), the Secretary of Energy's delegate under the 1944 Unit Plan Contract, who was assigned to perform the functions of the Secretary of Energy set forth in the Equity Process Agreement. *Id.* ¶ 39. The decision-maker for the Stevens Zone proceedings was another individual delegated by the Secretary of Energy under the 1944 Unit Plan Contract to perform the functions of the ASFE under the Equity Process Agreement. *Id.* ¶ 40. For purposes of

the Stevens Zone proceedings, the latter individual, at all relevant times, either was the Acting Secretary or the Principal Deputy Assistant Secretary for Fossil Energy serving as the ASFE's delegate. *Id.*

The Complaint also alleges that, during the finalization proceedings, the DOE's Deputy General Counsel functioned both as lead litigation counsel for the DOE Equity Team as well as an advisor to the ASFE, the DOE decision-maker in each proceeding, including more importantly, preparing the Assistant Secretary's final decisions. *Id.* ¶¶ 38, 45. In addition, the Complaint states that during proceedings before the Independent Petroleum Engineer, DOE's Deputy General Counsel consistently held herself out and acted as lead in-house counsel for the DOE Equity Team. Specifically, DOE's Deputy General Counsel participated in mediation meetings with the Independent Legal Advisor as lead counsel for the DOE Equity Team; signed correspondence to the Independent Legal Advisor; represented to the Independent Legal Advisor that she was to be the primary contact for the DOE Equity Team on substantive legal matters; and participated in and supervised drafting the DOE Equity Team's submissions to the Assistant Secretary. *Id.* ¶¶ 41, 42, 44. DOE's Deputy General Counsel also corresponded with the Independent Petroleum Engineer on behalf of the DOE Equity Team discussing pending legal issues, signed an agreement with counsel for Chevron regarding the Independent Petroleum Engineer's alleged conflicts of interest, and spoke with counsel for Chevron about disputed issues before the Independent Petroleum Engineer. *Id.* ¶ 43. While acting as lead in-house counsel for the DOE Equity Team, the DOE's Deputy General Counsel also participated in preparing drafts of the Assistant Secretary's preliminary and final decisions concerning the Dry Gas Zone, Carneros Zone, and Stevens Zone proceedings and collaborated with the Assistant Secretary in drafting the decisions. *Id.* ¶¶ 47, 56, 57.

On December 23, 2003 and June 23, 2004, Chevron also received draft decisions circulated between the Assistant Secretary and DOE's Deputy General Counsel in response to Chevron's January 7, 2003 and February 19, 2004 Freedom of Information Act requests. *Id.* The Complaint maintains that the drafts produced by the Government during discovery were completely redacted, except for headings, in violation of Section B.4 of the Equity Process Agreement. *Id.* Other heavily-redacted documents produced to Chevron or withheld purportedly confirm additional *ex parte* contacts between DOE's Deputy General Counsel and the Assistant Secretary or the AS staff regarding disputed matters. *Id.* ¶ 48. As a result, the Complaint concludes that DOE's Deputy General Counsel's dual role as advocate for DOE in finalization proceedings and advisor to the Assistant Secretary "stripped the parties' agreed-upon procedures of any legitimacy, . . . deprived Chevron of the benefit of an independent and impartial decision from the Assistant Secretary that it bargained for, and constitutes a material breach of DOE's contract obligations." *Id.* ¶ 51.

In addition, the Complaint alleges that documents produced in response to Chevron's January 7, 2003 and February 19, 2004 Freedom of Information Act requests evidence *ex parte* communications regarding the Stevens Zone equity finalization between the ASFE or ASFE staff with engineers on the DOE equity team, as well as the Independent Petroleum Engineer ("IPE") prohibited by the terms of the Equity Process Agreement. *Id.* ¶¶ 52-55; *see also* 7/21/05 TR at 52. In addition, the Complaint asserts that DOE delayed issuing the Freedom of Information Act

responses, because they would show the Deputy General Counsel for Technology Transfer and Procurement's involvement in the preparation of the ASFE's preliminary and final decisions in the Stevens Zone proceeding and confirm improper *ex parte* communications between the ASFE and the IPE. *See* Compl. ¶ 56.

The second cause of action sets forth a claim for breach of an implied covenant of good faith and fair dealing inherent in the May 19, 1997 Agreement. *Id.* ¶¶ 66-71. Specifically, the Complaint alleged that DOE's Deputy General Counsel for Technology Transfer and Procurement's *ex parte* communications evidences bad faith by "evading the spirit of the bargain, undermining an agreed common purpose of the parties, deliberately violating the justified expectations of Chevron, employing subterfuge, and depriving Chevron of consideration for which it bargained[,]" impartial equity determinations by the Assistant Secretary. *Id.* ¶ 68.

Finally, the Complaint seeks: (1) a finding that "DOE has materially breached the Equity Process Agreement, and in turn, the parties' two-part May 19, 1997 agreement;" (2) "damages in an amount to be determined at trial to compensate ChevronTexaco for the expenses, effort, and time it invested in proceedings tainted through *ex parte* communications;" (3) "interest, costs, and attorney's fees to the extent authorized by law and by the parties' agreements;" and, (4) "[s]uch other further relief as the Court may deem just and appropriate." *Id.* ¶¶ 64, 65, 70, 71; *see also* Compl. Prayer for Relief at 11.

On May 21, 2006, the court issued a Memorandum Opinion and Order denying the Government motions to dismiss, pursuant to RCFC 12(b)(1), (b)(6). *See Chevron*, 71 Fed. Cl. at 258-78. Subsequently, discovery ensued. In response to Chevron's requests for production of documents relevant to the prohibited *ex parte* contacts alleged, on February 16, 2007, the Government produced a 291-page log of 5,086 folders of documents, consisting of 25,322 pages, that were asserted to be privileged and exempt from discovery. On March 1 and March 23, 2007, the Government provided the court with supplemental logs. The privilege log dated February 16, 2007 as supplemented on March 1, 2007, for example, consisted of 292 pages that asserted over 5,000 documents. On April 11, 2007, at the court's request, the Government produced three separate logs, identifying the specific documents asserted to be subject to: the deliberative process privilege;[3]

---

[3] The Government submitted a 40 page log of 1,137 folders, consisting of 7,082 pages of documents, that were asserted to be subject to the deliberative process privilege, together with a First Supplement of 2 folders, consisting of 5 pages of documents, and a Second Supplement of 137 folders, consisting of 301 pages of documents. On April 23, 2007, the Government produced a log of an additional 140 folders of documents, consisting of 284 pages of documents.

the attorney-client privilege;[4] and/or work product privilege.[5] *See generally* 3/12/07 TR at 22-26; *see also* 4/10/07 TR. More than one privilege was asserted for certain documents.

After an initial review, the court requested that Chevron select and prioritize the documents the court was requested to review *in camera*. *See* 5/2/07 TR at 40. The parties agreed that the court would review the identified documents and issue preliminary rulings on a rolling basis. *Id*. at 41-42, 52-53.

On May 8, 2007, Plaintiff provided an initial list of folders that the court was requested to review. On May 21, 2007, the court issued a Memorandum Opinion Regarding Initial Deliberative Process Privilege Designations and Other Privilege Designations, together with Court Appendix 1,[6] reviewing 24 folders with 132 pages of documents. Court Appendix 1 was placed under seal, pursuant to the February 12, 2007 Protective Order. On May 23, 2007, the Government filed an April 23, 2007 letter from DOJ attorney John Kosloske regarding *in camera* review of documents.

On May 24, 2007, the court issued a Memorandum Opinion Regarding Initial Deliberative Process Privilege and Other Privilege Designations (*see Chevron U.S.A., Inc.* v. *United States*, No. 04-1365C (Fed. Cl. May 24, 2007) (memorandum opinion)), together with Court Appendix No. 2, reviewing 37 folders with 130 pages of documents. On that date, the court also issued a Memorandum Opinion Regarding Initial Determinations on Process Privilege and Other Privilege Designations (*see Chevron U.S.A., Inc.* v. *United States*, No. 04-1365C (Fed. Cl. May 24, 2007) (memorandum opinion)), together with Court Appendix 3, reviewing 25 folders with 110 pages of documents. Court Appendices 2 and 3 also were placed under seal.[7] In addition, Chevron

[4] The Government submitted an 118 page log of 3,322 folders, consisting of 13,010 pages of documents, that were asserted to be subject to the attorney-client privilege, together with a First Supplement of an additional 13 folders, consisting of 65 pages of documents and a Second Supplement of 61 folders, consisting of 116 pages of documents.

[5] The Government submitted an 86 page log of 2,506 folders, consisting of 14,987 pages of documents, that were asserted to be subject to the work product privilege, together with a First Supplement of 9 folders, consisting of 50 pages of documents and a Second Supplement of 10 folders, consisting of 19 pages of documents.

[6] On June 8, 2007, the court was advised that the Government decided to withdraw privileges asserted, in whole or in part, with respect to 19 entire folders consisting of 58 pages, but continued to maintain privilege with respect to 41 folders consisting of 202 pages. Of the 41 folders where privileges were maintained the Government withdrew privilege, in part, as to 13 folders. *See* Defendant's Status Report In Response To Court Appendix Nos. 1 and 2 at 1.

[7] On May 28, 2007, the Government filed a Status Report and Response to the court's May 21, 2007 Filings to confirm the process discussed during the May 2, 2007 telephone conference.

designated 263 folders of documents that the court was requested to review in light of the Government's claim of attorney-client and/or attorney work-product privilege.

On May 25, 2007, the court issued a Memorandum Opinion Regarding Initial Deliberative Process Privilege and Other Privilege Designations (*see Chevron U.S.A., Inc.* v. *United States*, No. 04-1365C (Fed. Cl. May 25, 2007) (memorandum opinion)), together with Court Appendix 4, reviewing 23 folders with 149 pages of documents. Court Appendix 4 was placed under seal.

On June 5, 2007, the court issued a Memorandum Opinion Regarding Initial Deliberative Process Privilege and Other Privilege Designations, together with Court Appendix 5, reviewing 36 folders with 326 pages of documents. *See Chevron U.S.A., Inc.* v. *United States*, No. 04-1365C (Fed. Cl. June 5, 2007) (memorandum opinion). Court Appendix 5 was placed under seal.

On June 6, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 6, reviewing 38 folders with 154 pages of documents. *See Chevron U.S.A., Inc.* v. *United States*, No. 04-1365C (Fed. Cl. June 6, 2007) (memorandum opinion). Court Appendix 6 was placed under seal.

On June 8, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 7, reviewing 38 folders with reviewing 141 pages of documents. Court Appendix 7 was placed under seal.[8]

On June 11, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 8, reviewing 38 folders with 178 pages of documents. Court Appendix 8 was placed under seal.

On June 12, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 9, reviewing 46 folders with 260 pages of documents. Court Appendix 9 was placed under seal. On June 14, 2007, the court also issued an Order requiring the Government to produce Ms. Egger's personnel file, including annual ratings, performance reviews, and performance evaluations.[9]

---

[8] On June 8, 2007, the Government also filed a Status Report in Response to Court Appendices Nos. 1 and 2, wherein the court also was advised that the Government decided to withdraw the privileges asserted regarding 11 documents and agreed with the court's re-designation as to the privileges with respect to another 11 documents. On July 15, 2007, the court re-reviewed 17 other documents to amend or supplement previously asserted Government privileges.

[9] On June 12, 2007, the Government also filed a Motion for Clarification Of The Scope Of Bifurcated Proceedings. On June 15, 2007, the court convened a telephone hearing wherein the Government's motion was denied as premature. *See* 6/5/07 TR 7-11.

On June 13, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 10, reviewing 48 folders with 72 pages of documents. Court Appendix 10 was placed under seal.[10]

On June 15, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 11, reviewing 46 folders with 243 pages of documents. Court Appendix 11 was placed under seal.

On June 18, 2007, Chevron provided the court with a revised list of 141 folders of documents to review that the Government designated as subject to the attorney-client and/or attorney work-product privilege.

On June 28, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 12, reviewing 16 folders with 136 pages of documents. Court Appendix 12 was placed under seal.

On July 2, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 13, reviewing 15 folders with 31 pages of documents. Court Appendix 13 was placed under seal.

On July 3, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 14, reviewing 20 folders with 43 pages of documents. On that date, the court also issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 15, reviewing 28 folders with 78 pages of documents. Court Appendices 14 and 15 were placed under seal.

On July 9, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 16, reviewing 16 folders with 27 pages of documents. On that date, the court also issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 17, reviewing 32 folders with 49 pages of documents. In addition, the court also issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 18, reviewing 13 folders with 66 pages of documents. Court Appendices 16, 17, and 18 were placed under seal.

On July 10, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 19, reviewing 11 folders with 42 pages of documents. Court Appendix 19 was placed under seal.

---

[10] On June 13, 2007, the Government also filed a Status Report in Response to the Court Appendices No. 3 and No. 4. *See Chevron U.S.A., Inc.* v. *United States*, No. 04-1365C (Fed. Cl. June 13, 2007) (status report).

On July 12, 2007, the court issued a Memorandum Opinion Regarding Attorney-Client and Work Product Privilege Designations, together with Court Appendix 20, reviewing 33 folders with 174 pages of documents. Court Appendix 20 was placed under seal.[11]

On July 24, 2007, Chevron filed a Status Report Regarding Disputed Documents commenting on Court Appendices nos. 1-20, explaining Chevron's basis for "compelling need" as to certain folders of documents, and seeking reconsideration of the court's initial ruling regarding folders 495, 755, and 913. On July 27, 2007, the parties filed a Joint Status Report regarding rescheduling the trial to July 4-15, 2008.

In addition, on July 27, 2007, the Government filed a Status Report In Response To Court Appendices No. 5-20 withdrawing privilege asserted regarding 96 folders and re-redacting portions of an additional 40 folders of documents.

On August 3, 2007, the Government filed a Memorandum of Law In Support of Its Attorney-Client and Work-Product Privilege Claims ("Gov't AC/WP Brief"). On August 24, 2007, Plaintiff filed a response under seal ("Pl. AC/WP Resp.").[12] The Government also filed a Supplemental Brief to Clarify Its August 3, 2007 Memorandum and revised list of documents over which attorney-client and/or work product privilege was asserted. On August 8, 2007, the Government filed a Supplement to clarify those documents over which the Government continued to assert attorney-client and attorney work-product privilege after the court's initial rulings.

On August 16, 2007, the Government filed a Second Motion to Dismiss, Pursuant to RCFC 12(b)(1), In Part. On August 27, 2007, the Government filed a Motion for Summary Judgment, together with a three volume Appendix and Proposed Findings of Uncontroverted Fact. On August 24, 2007, Chevron filed a Response to the Government's Memorandum of Law In Support of Its Attorney-Client and Work-Product Privilege Claims. On August, 28, 2007, the court convened a telephone conference with the parties to discuss the Government's recent motions. *See* 8/28/07 TR. On August 29, 2007, the court entered an Order staying briefing and ruling on the Government's August 16, 2007 and August 27, 2007 motions.

On September 4, 2007, the Government filed a Memorandum of Law in Support of Its Deliberative Process Privilege Claims ("Gov't DP Brief"), together with the Declaration of Eric Fygi. On September 7, 2007, the Government filed the Declaration of Anuj Vohra. On September

[11] Seven folders, consisting of 28 pages of documents were identified in Court Appendices 1-4 as not provided for review. On June 13, 2007, they were provided to the court. Ten other folders, or 77 pages of documents, were identified in Court Appendices Nos. 5-9 as not being provided for review. On June 15, 2007, they were provided to the court. In addition, nine other folders, or 69 pages of documents, were identified in Court Appendices Nos. 10-11 as not provided for review. On June 21, 2007, they were provided to the court.

[12] On September 14, 2007, the Government filed a Reply ("Gov't AC/WP Reply").

14, 2007, the Government filed a Reply to Chevron's September 14, 2007 Memorandum of Law. On September 21, 2007, Plaintiff filed a Response ("Pl. DP Resp."), together with an Appendix, including 13 Exhibits ("Pl. DP App., Ex. __"). On October 2, 2007, the Government filed a Reply ("Gov't DP Reply").

On October 10, 2007, the Government filed a Motion *in Limine* Regarding Plaintiff's Designated Experts. On October 17, 2007, the court convened a telephone conference. On October 18, 2007, the court entered an Order staying briefing and ruling on the Government's October 10, 2007 motion.

On December 17, 2007, the court convened a telephone conference to request bates-number designations for those documents that the Government asserted were privileged. On December 19, 2007, the Government provided the court with the requested information.

## III. DISCUSSION.

### A. The Deliberative Process Privilege.

#### 1. The Government's Argument.

The Government argues that the deliberative process privilege is a "subset" of "whatever the nature of the privilege of confidentiality of Presidential communications is in the exercise of Art II. powers[.]" Gov't DP Brief at 3 (citing *United States* v. *Nixon*, 418 U.S. 683, 705 (1974)). After reciting the general rules for determining whether the privilege attaches, the Government represents, in this case, that:

> *Each* document for which we formally assert the deliberative-process privilege relates to the decision making process of *a* DOE Assistant Secretary for Fossil Energy ("ASFE") regarding *some aspect* or *issue* of the equity finalization process between the parties.

Gov't DP Brief at 8 (emphasis added).

The first category of document that the Government asserts are subject to deliberative process privilege include:

> drafts of not only ASFE equity finalization decisions, but also draft decisions relating to *other issues arising out* of the equity finalization process and brought to the attention of the ASFE by the parties' Equity Finalization Teams ("EFT's"). These documents also include communications between the ASFE and his headquarters

> technical advisory staff and DOE attorneys advising him regarding equity finalizations, as well as internal communications between members of the headquarters technical advisory staff and DOE attorneys.

Gov't DP Brief at 8 (emphasis added).

The second category of deliberative process privilege documents includes "Factual Sections In Draft Decisions." *See* Gov't DP Brief at 9-12. The third category consists of "Documents Withheld Because The Documents Are Pre-Decisional and Deliberative." *Id.* Assuming, *arguendo,* that any of these documents are not privileged, however, the Government argues that Plaintiff has failed to demonstrate a "compelling need" for discovery. *Id.* at 13-14.

In addition, the Government argues that, as a matter of law, the "misconduct" exception does not apply to the deliberative process privilege and, in any event, the court first should rule on the proof merits of whether a "mere breach of contract," *i.e.*, the "threshold liability issue," has occurred, before ruling on the applicability of the "misconduct exception" to documents that the court has ruled are subject to the deliberative process privilege. *Id.* at 15-16.

**2. Plaintiff's Response.**

Chevron responds that the Government is not entitled to withhold factual sections of draft decisions. *See* Pl. DP Resp. at 4-7. Chevron also argues that the Government has offered no grounds for disturbing the court's "evidentiary need" determinations. *Id.* at 7-9. In addition, Chevron claims that the misconduct exception requires disclosure of at least six folders: 144; 178; 281; 872; 1121; and 1123. *Id.* at 10-12. Chevron denies that the court first must rule on whether there was a breach of contract, before considering the applicability of the misconduct exception. *Id.* at 10-11 (citing Gov't DP Brief at 16).

**3. Governing Precedent.**

The purpose of the deliberative process privilege is to protect communications of the governmental executive in limited circumstances, where disclosure will harm the lawful exercise of executive authority or adversely affect the quality of advice the executive receives from subordinates. *See United States* v. *Nixon*, 418 U.S. 683, 708 (1974) ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."); *see also Wolfe* v. *Dep't HHS*, 839 F.2d 768, 773 (D.C. Cir. 1988) (*en banc*) (stating that one purpose of the deliberative process privilege is to protect "the quality of administrative decision-making [that otherwise] would be seriously undermined if agencies were forced to operate in a fish bowl.").

The deliberative process privilege, however, is not absolute. *See EPA* v. *Mink*, 410 U.S. 73, 88 (1973) ("[T]he privilege that has been held to attach to intragovernmental memoranda clearly has finite limits, even in civil litigation."); *see also Nixon*, 418 U.S. at 708 ("[T]his presumptive

privilege must be considered in light of our historic commitment to the rule of law."); *Marriott Int'l Resorts, L.P.* v. *United States*, 437 F.3d 1302, 1307 (Fed. Cir. 2006) ("[A] showing of compelling need can overcome the qualified deliberative process privilege.") (citation omitted); *Kaiser Aluminum & Chemical Co.* v. *United States*, 141 Ct. Cl. 38, 49 (1958) (holding that the "disclosure of confidential intra-agency advisory opinions . . . are privileged . . . but not absolutely.").

The United States Supreme Court has recognized that it is the federal trial courts that are on the "front line" in determining whether claims of deliberative-process privilege are legitimate. *See Mink*, 410 U.S. at 87 ("[I]n applying the [deliberative process] privilege, [trial] courts . . . [have been] required to examine the disputed documents *in camera* in order to determine which should be turned over or withheld."); *see also Marriott Int'l*, 437 F.3d at 1307 ("The qualified deliberative process privilege is subject to judicial oversight."); *Weissman* v. *CIA*, 565 F.2d 692, 698 (D.C. Cir. 1977) ("[W]here the record is vague or the agency claims too sweeping . . . [the trial court] should conduct an *in camera* examination to look for severable non-exempt matter."). Therefore, in conducting an *in camera* evaluation, federal trial courts have been instructed that the "limited . . . privilege [applies only] to materials which are both predecisional and deliberative." *Wolfe*, 839 F.2d at 774 (citing *EPA* v. *Mink*, 410 U.S. 73, 88 (1973)).

Accordingly, the Government has the burden of proof to establish both of these elements. First, information, asserted to be privileged, must be subject to a governmental communication that is "predecisional . . . to the [final] decision to which it relates." *Senate of Puerto Rico* v. *DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987). Second, the information must be deliberative in nature, *i.e.*, contain opinions, recommendations, or advice on policy. *See Zenith Radio Corp.* v. *United States*, 764 F.2d 1577, 1580 (Fed. Cir. 1985) (determining that the deliberative process privilege "protects agency officials' deliberations, advisory opinions and recommendations in order to promote frank discussion of legal or policy matters in the decision-making process.") (citations omitted); *see also Kaiser Aluminum*, 141 Ct. Cl. at 49 ("It is not a privilege to protect the official but one to protect free discussion of prospective operations and policy.").

If the Government can establish that requested information is privileged, the burden of proof then shifts to the party requesting disclosure to make an evidentiary showing of need. *See Mink*, 410 U.S. at 87 ("[I]n each case, the question [is] whether production of the contested document would be injurious to the consultative functions of the government that the privilege of nondisclosure protects.") (*quoting Kaiser Aluminum*, 141 Ct. Cl. at 49); *see also Marriott Int'l*, 437 F.3d at 1307 ("[A] showing of compelling need can overcome the qualified deliberative process privilege."); *but see Cheney* v. *United States District Court for the District of Columbia*, 542 U.S. 367, 385 (2004) ("A party's need for information is only one facet of the problem. An important factor weighing in the opposite direction is the burden imposed by the discovery orders [and whether the case involves] a routine discovery dispute."); *see also id.* at 386-87 (discussing the breadth of discovery requests as a factor mitigating against discovery and suggesting intervention by the trial court to narrow the number of documents). Finally, the court must balance a "compelling need" for discovery against any harm to the Government that "may result from disclosure." *Redland Soccer Club* v. *Dep't of the Army*, 55 F.3d 827, 854 (3rd Cir. 1995), *cert. denied*, 576 U.S. 1071 (1996).

**4. The Administrative Order No. 96-01 And The Equity Process Agreement Prohibit Certain *Ex Parte* Communications.**

The court's analysis begins with the Administrative Order No. 96-01, dated July 1996 (referenced herein as "Protocol on Equity Finalization Implementation Process" or "Protocol"), that provides:

> *There will be no written or oral equity-related communication or meeting with the Equity IPE (this term excludes contract administration communications or meetings) by an owner (including its agents and contractors) without the participation or opportunity to participate by the other owner.* Before any equity-related communication or meeting occurs, the Equity IPE will notify both owners of the planned equity-related communication/meeting so as to allow both owners the opportunity to participate in all communications or meetings held between the Equity IPE and an owner. The Equity IPE shall record summaries of these communications/meetings and provide copies to the owners. In the event an owner chooses not to participate in an equity-related communication/meeting, the Equity IPE will notify both owners of that fact in writing prior to having the communication/meeting and provide both owners with a summary of the communication/meeting thereafter.

Administrative Order 96-01 at ¶ 5 (emphasis added). Administrative Order No. 96-01 was incorporated into the May 19, 1997 Equity Process Agreement to govern the "procedures of the ASFE." *See* Compl. Ex. B ¶ A.2.

As previously discussed, the Equity IPE selected was Netherland, Sewell & Associates (also referred to hereinafter as the "IPE" and "NSAI"). *See* Compl. Ex. C. The Government has represented that the following individuals were authorized to represent DOE as an "Owner" in dealings with the Equity IPE under Administrative Order No. 96-01: Wayne Kaufman, DOE Petroleum Engineer (now retired); Francis ("Butch") Gangle, DOE Petroleum Engineer; Alan Burzlaff, Petroleum Engineer, System Technology Associates, Inc.;[13] and Kenneth K. Schuessler, Project Manager, System Technology Associates, Inc. (left in 2001). *See* February 16, 2007 Gov't Resp. to Pl. Interrogatory 8 at 23-24; *see also* Pl. March 15, 2007 Mot. to Compel at vi.

The Equity Process Agreement also provides:

> *The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in*

[13] In other DOE documents, Mr. Burzlaff was identified as a "member of a DOE headquarters technical advisory team[.]" *See* 551.

> *Washington, D.C.). No such communications by the ASFE with either equity team shall be on an ex parte basis.* Any written materials submitted to the ASFE by either equity team shall be provided to the other party. The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.

Compl. Ex. B ¶ B.4 (emphasis added).

To date, the Government has not identified the individuals who were members of the "DOE field equity technical team," or the "DOE technical staff in Washington, D.C." and whether the same individuals served in one or more capacity. The Government has represented that Butch Gangle was the "Team Leader, DOE Equity Finalization Team." *See* Fygi Decl. Exhibit C.[14] Notably, the term "DOE Equity Finalization Team" does not appear in the Equity Process Agreement. Mr. Greg Thorpe, an attorney with O'Melveny & Myers, was "the DOE EFT lawyer."[15]

The Government also has represented that the following DOE employees were members of what is characterized as the "Headquarters Equity Advisory Team:" Gary Latham, Geophysicist, Team Leader;[16] Arnold Smits, Petroleum Engineer;[17] and Louis Capitanio, Petroleum Engineer.[18] *Id*. The term "Headquarters Equity Advisory Team," however, also is not found in the Equity Process Agreement. To date, the Government also has not identified whether members of the "Headquarters Equity Advisory Team" were the same or different than members of the "the DOE Equity Finalization Team," the "DOE field equity team," or "DOE technical staff in Washington D.C."[19]

---

[14] In the other DOE documents, Mr. Gangle was identified as "Chairman, DOE Equity Finalization Team (Bakersfield, California)." *See* 1809 (CLC00102287).

[15] Ms. Egger was aware that Greg Thorpe was the DOE authorized EFT counsel. *See, e.g.,* 384 (CAS0050712), 1826. Nevertheless, she had numerous communications with Mr. Thorpe concerning his work with the DOE EFT, some of which may have been prohibited.

[16] In other DOE documents, Mr. Latham was identified as: "the head of the Headquarters technical advisory team," (*see, e.g.,* 495); a member of the "Equity Advisory Team staff," *see* 740 (CFE00100120); and "DOE HQ Team Leader." *See* 3779 (CDE00706987).

[17] In other DOE documents, Mr. Smits was identified as a member of the "Equity Advisory Team staff." *See* 740.

[18] In other DOE documents, Mr. Capitanio was identified as "with the oil & gas R&D group," but available to spend 25% of his time on the "Equity Advisory Team." *See* 740 (CDE00100120).

[19] In another filing, the Government discusses the "DOE Headquarters Advisory Staff," but states that Mr. Alan Burzlaff was not part of that staff. *See* Defendant's June 13, 2007 Status Report

The Government has advised the court that the following individuals served, at different periods, as the ASFE for purposes of the Equity Process Agreement: Patricia Godley; Jeffrey Jarrett; and Robert Kripowicz. *See* Fygi Decl. Exhibit C.

Neither Mary Egger, DOE's Deputy General Counsel, Technology Transfer and Procurement, nor Gena Cadieux, DOE's Assistant General Counsel, Procurement and Financial Assistance, however, were identified by the Government as members of any of the aforementioned entities, although many of the documents at issue evidence that both attorneys frequently had communications and/or meetings with some or all of these individuals.

To ascertain whether improper *ex parte* communications occurred that were prohibited by the Equity Process Agreement, the court carefully has examined the allegedly privileged documents to ascertain the functions and performance of the aforementioned individuals, the recipients of their communications, and nature thereof. The documents at issue provide significant information and insight about Ms. Egger's role in the Equity Finalization Process, as a May 9, 1997 exchange between the court and the parties' counsel illustrates:

| | |
|---|---|
| CHEVRON COUNSEL: | [T]he documents that we have sought establish two things. One thing that they establish is that Ms. [Egger] was certainly functioning as a member of the equity team. She was, in fact, their main lawyer and was involved not just in legal issue, but as this document evidences, although we don't have the redacted portions, this is obviously a technical communication. |
| THE COURT: | Right. |
| CHEVRON COUNSEL: | And she was involved in technical communications, legal communications, administrative -- she was doing it all. And our legal position is – |
| THE COURT: | And you did not know that she was communicating with the Assistant Secretary until you got the FOIA documents, is that correct? |
| CHEVRON COUNSEL: | Exactly. |

at 2 n.3, 8 n.5, 9 n.6.

| | |
|---|---|
| THE COURT: | Okay. |
| CHEVRON COUNSEL: | Exactly. We knew she was going to be involved with the equity team. That's what everyone's expectation was, that she was going to be their lead lawyer, their advocate. But, we had no idea, and it was contrary to everything that Chevron believed, that she was also going to be drafting these decisions, advising the Assistant Secretary, and intimately involved in all of those processes. And so that's the basis of the -- so, this establishes -- these documents establish both that she actually was doing substantive stuff for the equity team, as well as substantively advising the ASFE, and sort of at a more general level, it establishes that she had this dual role in a very significant way that couldn't possibly be what the parties contemplated, what the contract say, and what is appropriate. |

5/9/07 TR 6-8.

* * *

| | |
|---|---|
| THE COURT: | I mean, if she wasn't a member of this [“DOE field equity technical] team,[”] the question is what was she doing there. I think that's going to be a hard one to overcome. |
| GOVERNMENT COUNSEL: | Right, the question is was she a member of the team. |
| THE COURT: | If she wasn't, as you will argue, then the issue is why was she there. She wandered around attending meetings at random? What was her role? What was she doing there. Presumably, it was a member of the team. She's either on the team or she's not on the team. |
| GOVERNMENT COUNSEL: | She's an attorney at headquarters -- |

| | |
|---|---|
| THE COURT: | Well -- |
| GOVERNMENT COUNSEL: | -- advising her Assistant Secretary. |
| THE COURT: | Well, that may be fine, but it seems to me that the Assistant Secretary or the Secretary agreed to a different set of . . . procedures for this situation. |
| GOVERNMENT COUNSEL: | What we're saying is that they didn't include Ms. [Egger] on the team, that's what we're saying. |
| THE COURT: | But then if she was [at] the team meetings, why was she there? |
| GOVERNMENT COUNSEL: | Well, if you're talking about the technical meetings before the IPE, she was not involved in hardly any of those meetings, except when a legal issue arose. If you're talking about -- |
| THE COURT: | Well, how would she know where legal issues are going to arise and why couldn't the outside lawyers [O'Melveny & Myers] do that? See, I think that you've got a problem here. |
| GOVERNMENT COUNSEL: | We think that it's just a simple question of contract interpretation, whether she's covered by this prohibition and -- |
| THE COURT: | Well, it's not, because it goes to really what her function is. That's why these documents are relevant. |

5/9/07 TR 16-17.

* * *

| | |
|---|---|
| THE COURT: | But, you're arguing [that] this woman didn't do anything wrong, but [Chevron is] not allowed to see the documents that might have established that she was. |

GOVERNMENT COUNSEL: No. What we would be arguing is that she is not subject to the prohibition that's contained in the one clause in the contract.

THE COURT: And why is that? The contract doesn't exclude –

GOVERNMENT COUNSEL: It only deals with -- it is only *addressed to communications with the Assistant Secretary for fossil energy to people, who are members of the Department of Energy, field equity technical team. She wasn't a member of the technical team.*

THE COURT: But, if she's there at technical team meetings, the issue is why is she there.

GOVERNMENT COUNSEL: No. The issue is simply whether she is a part of the team for purposes of the prohibition. And once -- and if the determination is she is not covered by it, then there's no possibility of a breach of that clause.

CHEVRON COUNSEL: Your Honor . . . that clause has the words 'directly or indirectly' and we, obviously, interpret that clause differently. The limitation to field equity technical team is specified only in one sentence and it says for this sentence and then the second-half of the clause just talks about equity team. If you look at other documents, they define the equity team and they define it as anyone, who presents the DOE's position before the independent petroleum engineer or others. I mean, it's a complicated -- there's a lot of documents you've got to look through. Obviously, our position is legally that she's covered by B-4. But even if she's not, under the covenant of good faith and fair dealing, under the basic principles of fairness and legal

> ethics, what she was doing was clearly inappropriate and would be a breach of the covenant of good faith and fair dealing.

5/9/07 TR at 26-28.

The Government represented that Ms. Egger merely was "an attorney at headquarters . . . advising her Assistant Secretary." 5/9/07 TR at 16. The documents reviewed by the court, however, evidence that the parameters of Ms. Egger's activity well exceeded the boundaries of her client relationship with the ASFE and reveal that she functioned as a legal and technical member of the "DOE Equity Finalization Team."[20] Individually and collectively, these documents evidence that Ms. Egger was a key legal and strategic advisor to the "DOE Equity Finalization Team" while, at the same time, serving as the principal legal and strategic advisor to the ASFE[21] and the ASFE's technical advisors, *i.e.*, "Headquarters Equity Advisory Team," in making preliminary and final decisions. Ms. Egger also appears to have been involved to a lesser degree in direct activities before the IPE, but she appears to have been in direct communication with Mr. Gangle and others exclusively authorized to represent the DOE as "Owners" before the IPE.[22] Chevron's primary focus on Ms. Egger, however, may have underestimated the extent to which DOE engineers functioned within the boundaries of their initially assigned roles. Discovery should provide more answers.

**5. Issues Regarding The Government's Declaration.**

The court finds it remarkable that of the 7,337 folders of documents initially designated as subject to the deliberative process privilege, the Government has elected only to "formally assert" privilege as to 102 folders. *See* Gov't DP Brief at 2-3. It is equally remarkable that, of a "100-plus complement" of attorneys in the DOE's General Counsel's Office, the authority to assert privilege designations in this case was delegated to Deputy General Counsel Eric J. Fygi, the supervisor of Ms. Egger. *See* http://www.gc.energy.gov/fygi_bio.htm. Even more remarkable is Mr. Fygi's sworn statement that: "I am not intimately familiar with the particulars or briefed issues in this lawsuit." Fygi Aff. ¶ 7 at 3. Mr. Fygi's representations, however, are belied not only by his apparent knowledge of Ms. Egger's role in the Equity Finalization Process and this litigation, as evidenced

---

[20] *See, e.g.*, 13, 14, 27, 255, 268, 380, 384, 511 (CBG0060005) (CBG006008-9), 531, 626, 740, 872, 889 (1848-49) (1856) (1877) (1879-84) (1888) (1894) (1910) (1914) (1941-43) (1984-85) (2221) (2258) (2272-73), 978 (GBC0030330), 1000, 1025, 1108 (CSI0040687), 1123 (re: Oct. 29, 1998 10:15 a.m. e-mail), 1145, 1170, 1243, 1294, 1372, 1384, 1390, 1458 (CDE00307147), 1524, 1549, 1553, 1562, 1574, 1579 (CME04120-21), 1582, 1593, 1602, 1699, 1721, 1835, 1849, 1881, 1889, 2049, 2058, 2130, 2195, 2196, 2265, 2319, 2323, 2327, 2711, 3339, 4357, 4384, 4385, 4932, 4403.

[21] *See, e.g.*, 130, 132, 144, 167, 178, 210, 255, 268, 270, 281, 283, 292, 356, 357, 362, 1119, 1121.

[22] *See, e.g.*, *supra* note 19; *see also* 66, 268, 4826.

in his supervisory role of Ms. Egger's duties,[23] as well has his direct role in the Equity Finalization Process: drafting the terms of the Decoupling Agreement (*see* 65 (CME01501962-65)); selecting of the Independent Legal Advisor for the Equity IPE (*see* 185 (CDE00300528)); and delegating authority for the Elk Hills equity finalization to Deputy Assistant Secretary Robert Kripowicz (*see* 229 (CME02701832)). Mr. Fygi also was directly involved with the Equity Finalization Process before the ASFE and Independent Legal Advisor. *See, e.g.,* 355 (CME00800101-03); 679 (CME00902350-51); 379 (CME00100001587-88); 2351 (establishing that on November 18, 2002, Ms. Egger notified Mr. Fygi of Chevron's notice of appeal and proposed schedule); *see also* Sept. 25, 2007 Appendix to Chevron Response Tabs 2-5.

In the court's judgment, the designation of Mr. Fygi as the Government's representative for making DOE's executive decision regarding the applicability of the deliberative process privilege to documents in this case directly contradicts the direction of the United States Court of Appeals for the Federal Circuit in *Marriott Int'l*. *See* 437 F.3d at 1308 (advising the head of a federal agency to delegate decision-making authority regarding privilege assertions to a "subordinate [who] is not directly responsible for or involved in [the] substantive . . . litigation[.]"). Nevertheless, the court

[23] *See, e.g.*, A98 (July 31, 2002 DOE SES Performance Appraisal of Ms. Egger, signed by Mr. Fygi as the "Rating Official"); A 116 (memo noting that regarding the Elk Hills Equity Finalization "Ms. Egger is the legal focus point working with the Office of Fossil and outside technical experts. Related to the effort is the support of FOIA litigation involving a novel and unprecedented legal issue."). Mr. Fygi also signed a Nov. 6, 2002 SES Bonus Nomination for Ms. Egger in the 10%-20% range. *See* A237; A89 (Nov. 6, 2003 DOE Annual Summary Rating of Ms. Egger signed by Mr. Fygi as the "Rating Official," noting Ms. Egger's "OGC lead for special projects (*e.g*. . . . Elk Hills equity adjudication)," and noting Ms Egger's role in the Elk Hills Equity Finalization as "the legal focus point working with the office of Fossil and outside technical experts. Efforts this year included support to defend against ChevronTexaco's challenge to the Office of Hearings and Appeals relating to IPE's final Stevens Zone equity determination."); *see also* A94; A49-60 (Oct. 26, 2004 DOE Annual Summary Rating of Ms. Egger, signed by Mr. Fygi as "Rating Official"); A67, 70 (Oct. 26, 2004 DOE Annual Summery Rating of Ms. Egger, signed by Mr. Fygi as the "Rating Official," noting "Ms. Egger's continuing service as 'DOE's Lead Legal Counsel.'"). This rating was the basis for a 2004 SES Bonus Nomination of 8.585%. *See* A73; *see also* A 25-39 (Apr. 27, 2005 DOE SES Performance Appraisal for Ms. Egger, signed by Mr. Fygi as "Rating Official"); A40-43 (Oct. 19, 2005 DOE Annual Summary Rating of Ms. Egger signed by Mr. Fygi as "Rating Official," noting Ms. Egger's continuing service as "DOE's Lead Legal Counsel."). This rating was the basis for a 2005 SES Bonus Nomination of 3.45% and 2005 Bonus Nomination of 5-20%. *See* A1-24; *see also* A47-48.

reviewed the 102 folders that Mr. Fygi "formally designated" as subject to the deliberative process privilege and has provided a final ruling on each.[24]

**6. The Court's Resolution.**

The Equity Finalization Process essentially is a contract to determine how to divide commercial property interests in oil rights. In that regard, the Government participants were not engaged in policy-making in the traditional sense. This case does not concern any communications of the President, White House staff, nor at the Secretary level. *See Cheney*, 542 U.S. at 385 ("The discovery requests are directed to the Vice President and other senior Government officials who served on the [National Energy Policy Development Group] to give advice and make recommendations to the President."). In addition, the communications at issue do not concern national defense, international relations, law enforcement, and the like. In fact, the majority of the communications at issue are about technical matters and how they impact the process, strategy, and potential range of options that the IPE and ASFE could or should consider in issuing final decisions. As such, arguably they are not subject to the deliberative process privilege at all. Chevron's counsel, however, did not make this argument. Therefore, the court has assumed that all 7,337 folders, initially designated as subject to the limited deliberative process privilege, could be subject to that privilege.

First, the court examined line-by-line all text asserted to be deliberative to ascertain whether factual content could be isolated, because "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context must be disclosed." *Mink*, 410 U.S. at 88. Factual content should be disclosed, however, but only if it "do[es] not reveal the deliberative process and [is] not intertwined with the policy-making process." *Ryan* v. *Dep't of Justice*, 617 F.2d 781, 791 (D.C. Cir. 1980); *see also Judicial Watch, Inc.* v. *United States*, 432 F.3d 366, 372 (D.C. Cir. 2005) ("Factual material is not protected . . . unless it is 'inextricably intertwined' with the deliberative material.") (citing *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (*per curiam*)). The United States Supreme Court has held that "inextricably intertwined" means that disclosure of the factual information would "compromise the confidentiality of deliberative information that is entitled to protection[.]" *Mink*, 410 U.S. at 92. Faithful to that instruction, it has been the practice of the United States Court of Federal Claims to disclose: "Where possible, facts that are separable from the privileged portions of a document[.]" *Pac. Gas & Elec. Co.* v. *United States*, 70 Fed. Cl. 128, 134 (2006) (internal quotations omitted). In light of the absolute clarity of the applicable precedent, the court considers the Government's continued assertion that factual content is subject to the deliberative process privilege to border on abuse. *See, e.g.*, Gov't DP Brief at 12 (continuing to assert privilege as to 130, 265, 278, 281, 298, 526, 548, 572, 577, 794, 809, 816, 819, 975, 979, 980, 983, 1002, 1060, 1126, 1127, 1472, 1486, 1497, 1505,

[24] Mr. Fygi also appears not to be "intimately familiar" with the court's prior rulings regarding several folders since he continued to assert privilege on documents the court previously ruled were privileged. *See, e.g.*, 161, 283, 292, 294, 373, 551, 557, 571, 589, 672, 750, 754, 809, 840, 841, 846, 872 (CBG01100268), 1059, 2286 (CDE00717619-21) (CDE00717623-25), 3801 (CDE001403-06), 3819 (CDE00100395).

1507, 3819, 3946, 3954, 3956, 3964, 3970, 3978; *see also* Fygi ¶ 8 at 4. The court will consider this matter further at the conclusion of this litigation.

Second, as to any documents for which the court has determined were privileged, but Chevron has established a "compelling need" for production, the court has ordered those documents be disclosed, subject to a Protective Order.

Third, the court declined to consider Chevron's request that the court apply the alleged "misconduct exception," because no federal appellate court has considered the application of that exception to the deliberative process privilege.

The court's rulings on each folder designated as subject to the deliberative process privilege are set forth in detail in a Final Order Regarding Documents The Government Asserts Are Subject To The Deliberative Process Privilege that is filed herewith, under seal, and incorporated herein.

**B. The Attorney-Client Privilege.**

**1. The Government's Arguments.**

The Government argues that, in ruling on an assertion of attorney-client privilege, the court must consider the "predominant purpose" of the communication, including whether the communication was to render or solicit legal advice or services. *See* Gov't AC/WP Brief at 23 (citing *Swidler & Berlin* v. *United States*, 524 U.S. 399, 409 (1998) ("[W]e have rejected use of a balancing test in defining the contours of privilege."); *see also In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805 (Fed. Cir. 2000) (advising trial courts to assess the "overall tenor" of the communication in making privilege rulings). In this case, however, the Government also advances the novel proposition that "[l]egal advice is broader than interpretation and application of legal principles to guide future conduct or to assess past conduct and is not demarcated by a bright line." *Id.*

Although the Government admits that "DOE's EFT (a term not used in the Equity Process Agreement) consists entirely of non-attorneys and the majority of the underlying issues in the equity dispute are technical," the Government asserts nevertheless that attorneys for DOE were "*involved* in providing legal advice and guidance throughout the process as necessary." *Id.* at 24 (emphasis added). Therefore, the Government reasons that since such documents were "*created as part of the equity finalization process*," the attorney-client privilege should attach. *Id*. at 24-25 (emphasis added) (continuing to assert privilege as to 164 folders of documents)).

As to the crime-fraud exception, the Government insists that the court cannot reach this issue before determining: "whether a *mere* breach of contract . . . is tantamount to the type of misconduct contemplated by the crime/fraud exception;" and "whether any of the alleged communications by Ms. Egger, even if true, *actually breach*, the Equity Process Agreement." *Id*. at 26 (emphasis added). Regarding the latter issue, the Government claims that the "negotiation history" of the "Equity Process Agreement" indicates that the parties did not intend the prohibition of *ex parte*

communications to apply to attorneys. *Id*. Accordingly, the Government argues that the court's consideration of folders 1108, 1237, 1294, 1583, 1602, and 2327 is premature. *Id*. at 27; *see also* Chevron's July 24, 2007 Status Report at 8-9.

**2. Plaintiff's Response.**

Chevron responds that the Government has not established that any of the court's initial rulings on attorney-client privilege substantively were incorrect. *See* Pl. AC/WP Brief at 10-11. As to the crime/fraud exception, Chevron argues that exception applies beyond criminal and fraudulent conduct, including "other type[s] of misconduct fundamentally inconsistent with basic premises of the adversary system." *Id*. at 11 (quoting *In re Sealed Case*, 676 F.2d 793, 812 (D.C. Cir. 1982)); *see also In re Sealed Case*, 754 F.2d 395, 399, 402 (D.C. Cir. 1985) ("Communications otherwise protected by the attorney-client privilege are not protected if the communications are made in furtherance of a crime, fraud, or *other misconduct*.") (emphasis added) (citations omitted). Chevron further argues that a "basic premise of the adversary system" is that an adjudicator may not also serve as an advocate in the same proceeding. *See* Pl. AC/WP Brief at 11-12 (citing *Moody* v. *IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981) (applying the crime fraud exception to an *ex parte* communication between a judge and attorney and determining that "[i]t would indeed be perverse . . . to allow a lawyer to claim an evidentiary privilege to prevent disclosure of work product generated by those very activities the privilege was meant to prevent.")).

As to the Government's argument that consideration of the crime/fraud exception is premature, Chevron also contends that once a *prima facie* showing has been made of an alleged *ex parte* communication, consideration of the crime/fraud exception is ripe for judicial review. *See* Pl. AC/WP Brief at 14 (*quoting In re Spalding Sports Worldwide, Inc.* 203 F.3d at 807 (holding that first the party challenging the attorney-client privilege must "make a *prima facie* showing that the communication was made 'in furtherance of'" [prohibited conduct, and only then may the trial court consider the exception]));" *see also id*. at 808 ("[T]he party seeking to overcome the attorney-client privilege need not conclusively prove fraud, or necessarily submit direct evidence to make a *prima facie* showing of fraud[.]") (citation omitted).

**3. Governing Precedent.**

The United States Supreme Court recognized in *Upjohn Co.* v. *United States*, 449 U.S. 383 (1981) that the attorney-client privilege derives its existence and limits from the common law tenant that the "full and frank communication between attorneys and their clients . . . promote broader public interests in the observance of law and administration of justice." *Id*. at 389; *see also Nixon*, 418 U.S. at 710 (observing that the attorney-client privilege is "not lightly created nor expansively construed, for they are in deterioration of the search for truth."); *In re Seagate Technology, LLC*, 497 F.3d 1360, 1372 (2007) (same). Although the presumption of attorney-client privilege should be afforded deference, that deference is not absolute. As the United States Court of Appeals for the D.C. Circuit observed in *In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997): "The relationship between client and counsel may . . . be abused." *Id*. at 49.

To invoke the crime/fraud exception, "[t]wo conditions must be met. First, the client must have made or received the otherwise privileged communication with the intent to further an *unlawful* or fraudulent *act.* Second, the client must have carried out the crime or fraud." *Id*. (citing *In Re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985) ("communications otherwise protected by the attorney client privilege are not protected if the communications are made in furtherance of a crime, fraud, or *other misconduct*.") (emphasis added)). Although the United States Court of Appeals for the Federal Circuit has not specifically addressed whether this exception extends to "other misconduct," instead of only a crime or unlawful act, the United States Court of Appeals for the D.C. Circuit's most recent consideration of the exception did not overrule or diminish the viability of a "misconduct" exception. *See In Re Sealed Case*, 107 F.3d at 49. Therefore, the court sees no reason why our appellate court would do so, particularly in the circumstances of this case, where the "misconduct" at issue involves alleged violations of an Administrative Order and an essential term in a high-profile government contract.

**4. The Court's Resolution.**

Of the 3,396 folders of documents initially designated as subject to the attorney-client privilege, the Government has continued to assert privilege, after the court's initial ruling, as to 164 folders, including 14 documents that were authored by or were received by Chevron. *See, e.g.*, 27, 631 (COM0060014), 968 (CGB0030184), 978, 1057 (Attachments 3, 4, 6), 1243 (Table III), 1390 (CME01602658-63), 819 (CDE007021010-18), 1549 (CME01100835-36), 1553, 1721 (CSI0041055-61), 1727 (CBG0040579), 1889 (CBG0051007-10). This was not an oversight. The court specifically raised this apparent disregard of applicable precedent with the Government's counsel on several occasions. *Se,e e.g.*, 5/2/07 TR at 28; 6/15/07 TR at 7-14; 12/19/07 TR at 4-8. The Government's persistence in asserting attorney-client privilege over Chevron documents can only be interpreted as a complete disregard for its duty of candor to the court. The court also will consider this matter further at the conclusion of this litigation.

In ruling whether the attorney-client privilege attaches to documents withheld by the Government in this case, the court made the following decisions. First, the court rejects the Government's assertion that the parties *intended* the prohibition of *ex parte* communication not to apply to the Equity Process Agreement. The United States Court of Appeals for the Federal Circuit has held that where the terms of a contract are "phrased in clear and unambiguous language, they must be given their plain and ordinary meaning[.]" *Coast Fed. Bank, FSB* v. *United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing *McAbee Constr. Inc.* v. *United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). The court has determined that the *ex parte* prohibitions in the Equity Process Agreement are clear and unambiguous; however, even if they were not, the court would be required to construe any ambiguity against the Government. *See Metric Construction, Inc.* v. *Nat'l Aeronautics and Space Admin*., 169 F.3d 747, 751 (Fed. Cir. 1999) (explaining that the "general rule of *contra proferentem* . . . construes an ambiguity against the drafter.").

Second, the court has declined the Government's request to extend the well established parameters of the attorney-client privilege to attorney communications that do not provide legal advice, but rather concern primarily or exclusively technical or factual information. Again, the court

made a line-by-line examination of each document to determine whether technical or factual content could be disclosed, without compromising any privileged communications. *Cf. Mink*, 410 U.S. at 92. The court's examination was guided by the test established by our appellate court: "[T]he *central inquiry* [is] whether the communication was one that was made . . . *for the purpose of obtaining legal advice or services*." *In re Spalding Sports,* 203 F.3d at 805 (emphasis added) (citations omitted). The court also was mindful to assess the "overall tenor" of the communications. *Id*. at 806 ("It is enough that the *overall tenor* of the document indicates that it is a request for legal advice or services.") (emphasis added). Where the issue was close, the court gave the Government the benefit of the doubt, ruling that the communication "arguably could be construed" to request or convey legal advice.

Third, the court has determined that the misconduct exception requires that 12 documents be produced that appear to evidence *ex parte* communications prohibited by the Equity Process Agreement. *See In re Spalding Sports Worldwide, Inc.*, 203 F.3d at 807-8 (requiring only *prima facie* showing of prohibited conduct, not conclusive proof).

Finally, as to any documents that the court determined were not subject to the attorney-client privilege, the court has ordered that these documents be disclosed, subject to a Protective Order.

The court's ruling on each designated folder as subject to the attorney-client privilege is set forth in detail in a Final Order Regarding Documents The Government Asserts Are Subject To The Attorney-Client Privilege that is filed herewith, under seal, and incorporated herein.

### C. The Attorney Work-Product Privilege.

#### 1. The Government's Argument.

The Government has advised that the court's prior work product privilege rulings are "flawed for three principal reasons. First, the [c]ourt's assessments do not recognize the equity finalization process as 'litigation' for purposes for the work-product doctrine. Second, the [c]ourt's assessments erroneously limit the application of the work-product doctrine to documents prepared by attorneys or reflecting 'attorney thought-process.' Third the [c]ourt's assessments do not recognize that the work-product privilege doctrine applies to factual information contained in a document prepared in anticipation of litigation or for trial." Gov't AC/WP Brief at 9-10; *see also id.* at 19 ("Work-product reflecting 'attorney thought process' is subject to 'near absolute' protection.").

#### 2. Plaintiff's Response.

Chevron responds that none of the court's work product rulings assumed that the equity finalization proceedings were not litigation. *See* Pl. AC/WP Resp. at 3-5. Chevron also challenges the Government's assertion that, even though none of the DOE EFT members were attorneys, nevertheless, factual technical information prepared by them are subject to the attorney work-product privilege, even though they do not contain any attorney thought process. *Id*. at 5-7. In addition, Chevron states that the Government's claim that factual information is subject to the attorney work-

product privilege and may not be segregated and disclosed is incorrect. *Id*. at 8-9. Finally, Chevron rejects the Government's contention that a party seeking attorney work-product privilege must establish more than "substantial need." *Id*. at 9-10. In any event, Chevron contends that the court conducted the required balancing test where warranted and that the documents at issue do not seek attorney thought process regarding this case, but rather information as to the role of the attorneys in the equity finalization proceedings, specifically that of Ms. Egger. *Id*. at 10.

### 3. Governing Precedent.

The United States Court of Appeals for the Federal Circuit recognizes that "the [attorney] work-product immunity . . . can protect 'documents and tangible things' prepared in anticipation of litigation that are both non-privileged and relevant." *In Re Echostar Communications Corp.*, 448 F.3d 1294, 1301 (2006) (citing Fed. R. Civ. P. 26(b)(3)). Moreover, this "doctrine," "immunity," or "privilege" applies to "all communication whether written, oral, . . . [including] documents and tangible things, such as memoranda, letters, and e-mails." *Id*. Our appellate court also has recognized that the work product "immunity . . . promotes a fair and efficient adversarial system by protecting the *attorney's thought process* and legal recommendations from the prying eyes of [his or] her opponent." *Id*. (emphasis added) (quotations omitted) (citing *Hickman* v. *Taylor*, 329 U.S. 495, 511 (1947) (Jackson, J., concurring)). Accordingly, three categories of attorney work-product have been identified as "relevant to the advice-of-counsel defense," *i.e.*: "(1) documents that embody a communication between the attorney and client concerning the subject matter of the case[;] (2) documents analyzing the law, facts, trial strategy, . . . that reflect the attorney's mental impressions but were not given to the client; and (3) documents that discuss a communication between attorney and client convey the subject matter of the case but are not themselves communications to or from the client." *Id*. Our appellate court has acknowledged, however, that: "we by no means anticipate that all work product in every case will fit into one of these three categories." *Id.* at 1302 n.3.

On the other hand, the United States Court of Appeals for the Federal Circuit has reminded litigants that the "[w]ork-product doctrine is not absolute." *Id*. at 1301; *see also In Re Seagate Tech., LLC*, 497 F.3d 1360, 1375 (Fed. Cir. 2007) ("[The] work product protection is *qualified* and may be overcome by need and undue hardship.") (emphasis added). In that regard, the requester may require disclosure of "certain types of work product[,] if they have a 'substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent . . . by other means.'" *Id*. at 1302 (citing Fed. R. Civ. P. 26(b)(3)). If the attorney work-product is factual, however, it may be discovered by a showing of "substantial need and undue hardship." *In Re Seagate*, 497 F.3d at 1375. On the other hand, if the attorney work-product content is "the result of mental processes such as plans, strategies, tactics, impressions . . . [it] is afforded even greater, nearly absolute, protection." *Id*. (citing *Upjohn Co.*, 449 U.S. at 400). As our appellate court recognized, "the line between factual work product and opinion work product is not always distinct, especially when, as here, an attorney's opinion may itself be factual work product. When faced with the distinction between where that line lies, however, a [trial] court should *balance* the policies to prevent sword-and-shield litigation tactics with respect to the policy to protect work product." *Id*.

### 4. The Court's Resolution.

The Government's argument that the court has failed to comprehend that the Equity Finalization Process is "litigation" for purposes of the applicability of the attorney work-product doctrine can only be characterized as surreal. *See* Gov't AC/WP Brief at 10-14. The court has not stated nor implied in any manner that the Equity Finalization Process was not an adversarial proceeding. Indeed, the fact that the Equity Finalization Process was and is an adversarial process, governed by the Equity Finalization Agreement, is the central issue in this case.

On the other hand, the Government, properly asserts that the attorney work-product privilege protects materials prepared by non-attorneys and consultants. *See* Gov't AC/WP Brief at 16 (quoting *United States* v. *Nobles*, 422 U.S. 225, 238 (1975) ("the [attorney work-product] doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system . . .[and it is] necessary that the doctrine protect materials prepared by agents for the attorney, as well as those prepared by the attorney[.]")) The threshold inquiry, however, is who is an "agent for the attorney." *Id*. O'Melveny & Myers (*e.g.*, A. B. Culvahouse, Greg Thorpe, Owen Olpin, and Christine Suh) were employed by the Government under contract to represent the DOE EFT team, *i.e.*, Mr. Butch Gangle, Mr. Alan Burzlaff, and Mr. Ken Schuessler. These individuals were client/agents of O'Melveny and Myers. Gary Latham, Arnold Smits, and Louis Capitanio, however, were DOE technical employees designated by the ASFE as members of the "Headquarters Equity Advisory Team." Fygi Decl. Exhibit C. These individuals were client/agents of Ms. Egger in her capacity as counsel for the ASFE. *See* 5/9/07 TR at 16-17. Neither Mr. Gangle, Mr. Burzlaff, nor Mr. Schuessler, were client/agents of Ms. Egger for purposes of the Equity Process Agreement.

Again, the Government's assertion that the attorney work-product privilege applies to factual information, simply if it is embodied in a document prepared for or in anticipation of trial, is unsupported in law and contrary to the specific and defined parameters of this privilege. *Cf. Mink*, 410 U.S. at 88. Factual information is not subject to the deliberative process privilege, because facts, by definition, have no deliberative content. *Id.* Likewise, factual information is not subject to the attorney work-product privilege, because facts by definition have no attorney work-product content.

Finally, the court has declined to consider Chevron's request to apply the misconduct exception to contested work-product privilege documents at this time. The court may revisit this decision, if required. Any documents that the court determined were not subject to the attorney work-product privilege, the court also has ordered that these documents be disclosed, only subject to a Protective Order.

The court's rulings on each folder designated as subject to the attorney work-product privilege are set forth in detail in a Final Order Regarding Documents The Government Asserts Are Subject To The Attorney-Work Product Privilege that is filed herewith, under seal, and incorporated herein.

## IV. CONCLUSION.

For the aforesaid reasons, the court orders the Government to produce documents previously withheld on the bases of assertions of the deliberative process, attorney-client, and/or attorney work-product privileges, as directed in the three Final Orders filed herewith, under seal, and incorporated herein.

The parties also are ordered to provide their views as to whether they intend to request the court to certify the Memorandum Opinion and Orders for interlocutory appeal on or before March 18, 2008. If the Government decides not to request certification, production of the documents withheld on the basis of privilege should occur on that date.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**