# In the United States Court of Federal Claims

No. 04-1365C
Filed: May 8, 2013[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| \* | Breach of Contract; |
| \* | Department of Energy Organization Act, |
| \* |   Pub. L. No. 95-91 (1977); |
| \* | Implied Covenant of Good Faith and Fair |
| \* |   Dealing; |
| \* | National Defense Authorization Act for |
| \* |   Fiscal Year 1996, Pub. L. No. 104-106 |
| \* |   (1996); |
| \* | Naval Petroleum Reserves Production Act |
| \* |   of 1976, Pub. L. No. 94-258 (1976); |
| \* | Privileged Documents; |
| \* | Reliance Damages; |
| \* | Sanctions for "Bad Faith" Conduct During |
| \* |   Discovery; |
| \* | Pub. L. No. 105-261 (1998); |
| \* | RESTATEMENT (SECOND) OF CONTRACTS |
| \* |   §§ 344(b) (Purposes of Remedies), 349 |
| \* |   (Reliance Damages), 350 (Mitigation). |

CHEVRON U.S.A., INC.,

    Plaintiff,

v.

THE UNITED STATES,

    Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Donald B. Ayer, Lawrence D. Rosenberg**, Jones Day, Washington, D.C., Counsel for Plaintiff.

**Jeanne E. Davidson,** Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.,[**] **Carrie A. Dunsmore**, Civil Division, United States Department of Justice, Washington, D.C., Counsel for Defendant.

**Ada L. Mitrani**, Of Counsel, Office of the General Counsel, Department of Energy, Washington, D.C.

## MEMORANDUM OPINION AND ORDER

    This case arises from a commercial dispute between Chevron U.S.A., Inc. ("Chevron") and the Department of Energy ("DOE") about the finalization of their respective equity interests

---

    [*] On May 1, 2013, the court forwarded a sealed copy of this Memorandum Opinion and Final Order to the parties to suggest deletions of any confidential information and to note any editorial errors requiring correction. The court has incorporated many of the parties' suggestions.

    [**] Because all of the prior Department of Justice lead trial counsel of record in this case were no longer employed by the Government on October 5, 2012, when oral argument was held, Ms. Davidson assumed that responsibility.

in oil and gas deposits, located in the Elk Hills Reserve of California, worth approximately $37.3 billion.  To accomplish equity finalization, Congress enacted a law that required DOE to finalize equity by an "independent petroleum engineer" that was "mutually acceptable" to Chevron and DOE.  *See* National Defense Authorization Act for Fiscal Year 1996, Pub. L. No. 104-106, § 3412 (a), (b), 110 Stat. 186, 631-32 ("the 1996 NDA Act").  Accordingly, on July 8, 1996, DOE entered into a contract with an Equity Independent Petroleum Engineer ("Equity IPE").  On May 19, 1997, DOE entered into an Equity Process Agreement with Chevron.  The purpose of both of these agreements was to ensure that, despite past disputes about how equity finalization was conducted, in the future, the process would be impartial, unbiased, and transparent.  That did not happen.

The court has determined that DOE repeatedly and materially violated the May 19, 1997 Equity Process Agreement with Chevron.  In addition, DOE repeatedly and materially violated a separate July 8, 1996 contract with the Equity IPE, to which Chevron was the direct and intended third party beneficiary.  As a result, DOE is liable to Chevron for damages in an amount to be determined.

To facilitate a review of this Memorandum Opinion and Order, the court has provided the following outline:

**I.      STATUTES GOVERNING THE ELK HILLS RESERVE AND GOVERNMENT AGREEMENTS TO FINALIZE EQUITY.**

     **A.      The 1944 Department Of The Navy's Unit Plan Contract.**

     **B.      In 1977, The Department Of Energy Assumed The Obligations Of The 1944 Unified Plan Contract And Initial Equity Finalization Efforts Commenced.**

     **C.      On February 10, 1996, Congress Enacted The National Defense Authorization Act, Mandating Equity Finalization.**

     **D.      On July 8, 1996, The Department Of Energy Entered Into A Contract With An Equity Independent Petroleum Engineer To Finalize Equity.**

     **E.      On October 11, 1996, The Department Of Energy Appointed An Independent Legal Advisor To Provide Legal Advice To The Independent Petroleum Engineer.**

     **F.      The May 19, 1997 Decoupling And Final Equity Process Agreements.**

          **1.      The Decoupling Agreement.**

          **2.      The Equity Process Agreement.**

     **G.      The February 5, 1998 Agreement To Terminate The 1944 Unit Plan Contract.**

**II.     ZONE BY ZONE ANALYSIS OF EQUITY FINALIZATION.**

A.      **The Carneros Zone.**

     1.      **The Independent Petroleum Engineer's Provisional Recommendation.**

     2.      **The Independent Petroleum Engineer's Final Recommendation.**

     3.      **The Assistant Secretary For Fossil Energy's Preliminary Decision.**

     4.      **The Assistant Secretary For Fossil Energy's Final Decision.**

     5.      **The Appeal To The Department Of Energy's Office Of Hearings And Appeals.**

B.      **The Dry Gas Zone.**

     1.      **The Independent Petroleum Engineer's Provisional Recommendation.**

     2.      **The Independent Petroleum Engineer's Final Recommendation.**

     3.      **The Assistant Secretary For Fossil Energy's Preliminary Decision.**

     4.      **The Assistant Secretary For Fossil Energy's Final Decision.**

C.      **The Stevens Zone.**

     1.      **The Equity Independent Petroleum Engineer's Provisional Recommendation.**

     2.      **The Assistant Secretary For Fossil Energy's Decision Regarding The Data Cutoff Date.**

     3.      **The Equity Independent Petroleum Engineer's Final Recommendation.**

     4.      **The "Secret Report."**

     5.      **The Assistant Secretary For Fossil Energy's Preliminary Decision.**

     6.      **The Assistant Secretary For Fossil Energy's Final Decision.**

     7.      **The Department Of Energy's Office Of Hearings And Appeals Remand Decision.**

     8.      **The Assistant Secretary For Fossil Energy's Preliminary Remand Decision.**

     9.      **The Assistant Secretary For Fossil Energy's Final Remand Decision.**

D.      **The Shallow Oil Zone.**

1.      The Independent Petroleum Engineer's Provisional Recommendation.

2.      The Shallow Oil Zone Equity Was Never Finalized.

III.    PROCEDURAL HISTORY.

IV.     JURISDICTION.

A.      Pre-Trial Decisions Regarding Jurisdiction.

B.      The Effect Of The United States Court Of Appeals For The Federal Circuit's Post Trial Decision In *Rick's Mushroom Service*.

1.      The Government's Argument.

2.      The Plaintiff's Response.

3.      The Court's Resolution.

C.      Other Jurisdictional Issues Raised In The Government's May 14, 2010 Post-Trial Brief.

1.      Jurisdictional Arguments That Are Not At Issue Or Are Irrelevant In This Case.

2.      Whether The United States Court Of Federal Claims Has Jurisdiction To Adjudicate Plaintiff's Claims That The Department Of Energy Breached The Equity Independent Petroleum Engineer Protocol.

a.      The Plaintiff's Argument.

b.      The Government's Response.

c.      The Court's Resolution.

i.      The Equity Independent Petroleum Engineer Protocol Was Not A Contract Between Plaintiff And The Department Of Energy.

ii.     The Equity Independent Petroleum Engineer Protocol Was Not Incorporated Into The Equity Process Agreement As To The Carneros, Dry Gas, And Stevens Zones.

iii.    Plaintiff Was A Third Party Beneficiary Of The July 8, 1996 Contract Between The Department Of Energy And The Equity Independent Petroleum Engineer.

V.      DISCUSSION.

**A.    Whether The Secretary Of The Department Of Energy Had Authority To Prohibit Staff Attorneys From Having *Ex Parte* Communications With The Assistant Secretary For Fossil Energy.**

    **1.    The Government's Argument.**

    **2.    The Plaintiff's Response.**

    **3.    The Court's Resolution.**

**B.    Whether Department Of Energy Attorneys Who Served As Advocates In The Equity Finalization Process Were Subject To The *Ex Parte* Prohibitions Of The Equity Process Agreement.**

    **1.    The Plaintiff's Argument.**

    **2.    The Government's Response.**

    **3.    The Court's Resolution.**

**C.    Whether *Ex Parte* Communications Between Department Of Energy Staff Attorneys And The Assistant Secretary Of Fossil Energy, In Fact, Were A Breach Of The Equity Process Agreement.**

    **1.    The Plaintiff's Argument.**

    **2.    The Government's Response.**

    **3.    The Court's Resolution.**

        **a.    Specific Government Defenses Are Denied.**

        **b.    The Equity Process Agreement Was Repeatedly And Materially Breached By The Department Of Energy.**

**D.    Whether The Department Of Energy Breached The July 8, 1996 Contract With The Independent Petroleum Engineer, To Which Plaintiff Was A Third Party Beneficiary.**

    **1.    The Plaintiff's Argument.**

    **2.    The Government's Response.**

    **3.    The Court's Resolution.**

**E.    Damages.**

    **1.    Whether Plaintiff Is Entitled To Recover Reliance Damages.**

       **a.**       **The Plaintiff's Argument.**

       **b.**       **The Government's Response.**

       **c.**       **The Court's Resolution.**

   **F.**      **Sanctions For The Government's "Bad Faith" Conduct During Discovery.**

**VI.**   **CONCLUSION.**

             \*   \*   \*

**I.**   **STATUTES GOVERNING THE ELK HILLS RESERVE AND GOVERNMENT AGREEMENTS TO FINALIZE EQUITY.**[1]

---

[1] The relevant background facts set forth herein were derived from: a liability trial held in Washington, D.C. from October 13, 2009 through October 26, 2009 and in Dallas, Texas, on December 3, 2009 ("TR at 1-2980") and a subsequent damages hearing held in Washington, D.C., from May 31, 2011 through June 3, 2011 ("DTR at 1-1250"). The findings of fact made herein, pursuant to RCFC 52(a), supplant those discussed in *Chevron U.S.A., Inc. v. United States*, 71 Fed. Cl. 236, 239-53 (2006) (denying motions to dismiss) and *Chevron U.S.A., Inc. v. United States*, 80 Fed. Cl. 340, 342-49 (2008) (requiring document production), since these interim rulings necessarily relied on allegations in Chevron's August 20, 2004 Complaint, prior to discovery and trial.

At the liability trial, the following witnesses testified in order of appearance: Norman D. Stone, Chevron's Manager for the Elk Hills Equity Redetermination (TR at 142-671); Cynthia Ann Giumarra, former Assistant General Counsel for Chevron USA, Western Business Unit (1992-Jan. 1999) (TR at 672-883); Michael A. Stay, Chevron Program Director for Elk Hills and Chevron representative on the Owner Issues Group (Summer 1990-Jan. 1998) (TR at 884-929); Gary Henderson, Senior Counsel, Chevron Global Gas (July 2004-present) (TR at 951-81); Kenneth Roberts, former Independent Legal Advisor (by videotape, transcribed at TR at 983-98, and 8/15/07 Deposition); Professor Marshall J. Breger, Columbus School of Law, Catholic University (TR at 1011-50); Professor Geoffrey C. Hazard, Jr., Distinguished Professor of Law, Hastings College of Law; Trustee, University of California; Professor of Law, University of Pennsylvania; and Director Emeritus, American Law Institute (TR at 1053-96); James Gruber, a DOE Engineer (who worked on equity determination at Elk Hills Spring 1997-2000) (by videotape, transcribed at TR at 1098-1146, and 7/9/09 Dep.); Dr. Gary V. Latham, DOE Geophysicist, who worked on equity finalization 1987-2009 (by videotape, transcribed at TR at 1149-1262, and 4/20/09 Dep.); Francis J. "Butch" Gangle, Chairman of DOE's Equity Finalization Team ("DOE EFT") (1996-2010) (TR at 1271-1455); Gena Cadieux, DOE Deputy Assistant General Counsel for Procurement and Financial Assistance (by videotape, transcribed at TR at 1456-1563, and 6/16/2009, 6/24/2009, and 9/24/2009 Dep.); Louis Capitanio, DOE Program Manager for Oil and Gas and technical advisor to the Assistant Secretary for Fossil Energy (1987-1995) (by videotape, transcribed at TR at 1568-98, and 6/26/09 Dep.); Robert Kripowicz, Acting DOE Assistant Secretary for Fossil Energy (Aug. 21, 1998–Apr. 29, 1999 and Sept. 8, 2000-Feb. 5, 2002) (TR at 1606-1869); Jeffrey Jarrett, DOE Assistant Secretary for Fossil Energy (Jan. 3, 2006-Mar. 24, 2007) (TR at 1879-1904, 1914-70); Mary Egger, DOE Deputy General Counsel for Technology Transfer and Procurement (TR at 1979-2250, 2274-

2519); Eric Fygi, DOE Deputy General Counsel (TR at 2528-89); Patricia Fry Godley, DOE Assistant Secretary for Fossil Energy (July 26, 1994-July 31, 1998) (TR at 2604-2703); Gregory Thorpe, O'Melveny & Meyers, DOE Equity Finalization Team's outside counsel (by videotape, transcribed at TR at 2704-40, and 5/14/09 and 5/15/09 Dep.); Lee Liberman Otis, DOE General Counsel (March 2001-March 2005) (TR at 2743-63); Frederic D. Sewell, former Chairman and CEO, Netherland, Sewell & Associates (1967-2007) (TR at 2773-2809); Phillip Scott Frost, Senior VP and CFO, Netherland, Sewell & Associates (1984-present) (TR at 2809-2913); and Richard Krenek, Petroleum Engineer, Netherland, Sewell & Associates (TR at 2914-2977 and 4/30/07 and 5/14/08 Dep.).

At the damages hearing, the following witnesses testified, in order of appearance: Cynthia Ann Giumarra, former Assistant General Counsel for Chevron USA, Western Business Unit (1992-Jan. 1999) (DTR at 92-203); Michael A. Stay, Chevron Program Director for Elk Hills and Chevron representative on the Owner Issues Group (Summer 1990-Jan. 1998) (DTR at 204-285); Dr. Ganesh Thakur, Vice President, Chevron Energy Technology Company and Chevron Fellow and former Manager of Reservoir Simulation Division, Chevron Petroleum Technology Company (DTR at 296-330); Kimberly Anne Melton, Finance Team Leader at Chevron's San Joaquin Valley Business Unit (DTR at 344-463); Francis J. "Butch" Gangle, Chairman of DOE's EFT (1996-2010) (DTR at 465-74); Bernard A. Siwicki, DOE Program Analyst (DTR at 476-91); Norman D. Stone, Chevron's Manager for the Elk Hills Equity Redetermination (DTR at 492-698); Dr. Richard Strickland, President, The Strickland Group, Inc. (DTR at 701-710, 717-36, 739-65); Kenneth R. Metcalfe, President, Kenrich Group (DTR at 766-862, 1215-47); Patricia Fry Godley, DOE's Assistant Secretary for Fossil Energy (July 26, 1994-July 31, 1998) (DTR at 864-917); Alan A. Burzlaff, initially employed by Systems Technology Associates, hired to advise the ASFE about the Shallow Oil Zone and later employed by MHA Petroleum Consultants LLC, hired to advise the DOE's EFT (DTR at 918-1053); Letha Lencioni, Vice President and Chief of Petroleum Engineering, Gustavson Associates (DTR at 1061-95); Terry J. Musika, Managing Director, Invotex (DTR at 1096-1215).

In addition, the court admitted into evidence Joint Exhibits ("JE 1-1911"), and the following additional depositions, designated by the parties, and listed by the court in alphabetical order: Mr. Burzlaff ("5/19/09 Burzlaff Dep." and "5/20/09 Burzlaff Dep."); Steven Drake, Netherland Sewell & Associates (1996-2006) ("4/4/07 Drake Dep."); Charles Kauffman, Deputy Director of the Navy Petroleum Reserve in California ("5/18/09 Kauffman Dep."); Beth Ann Kelly, DOE Office of the General Counsel ("7/14/09 Kelly Dep."); Robert R. Nordhaus, former DOE General Counsel (1993-97) ("7/17/09 Nordhaus Dep."); Owen Olpin, O'Melveny & Myers, DOE Equity Finalization Team's outside counsel ("5/13/09 Olpin Dep."); Edward S. Renwick, former Independent Legal Advisor ("8/16/07 Renwick Dep."); Mr. Roberts ("8/15/07 Roberts Dep."); Kenneth L. Schuessler, MHA Petroleum Consultants LLC, hired to work with DOE's EFT ("7/8/09 Schuessler Dep."); Carl Michael Smith, DOE's Assistant Secretary for Fossil Energy (Feb. 5, 2002-Feb. 29, 2004) ("4/23/09 Smith Dep."); and Arnold O. "Arney" Smits, DOE Petroleum Engineer who worked on equity finalization (1987-present) ("6/25/09 Smits Dep.").

### A.    The 1944 Department Of The Navy's Unit Plan Contract.

Chevron is a publicly-traded corporation organized under Delaware law. Chevron's predecessor, Standard Oil Company ("Standard Oil"), and the United States entered into a June 19, 1944 Unit Plan Contract ("the UPC") governing the joint operation and production of Naval Petroleum Reserve No. 1 (the "Elk Hills Reserve"). JE 1; *see also United States v. Standard Oil Co.*, 545 F.2d 624, 626-28 (9th Cir. 1976) (discussing the history of the Elk Hills Reserve and the origins and purpose of the UPC). Under the UPC, Standard Oil and the United States, acting through the Secretary of the Navy ("Navy"), agreed to operate the Elk Hills Reserve as a unit and allocate production costs, based on the parties' ownership interests in the underlying oil and gas. JE 1.

To accomplish this objective, the UPC divided the Elk Hills Reserve into three commercially productive zones:[2] the Dry Gas Zone; the Shallow Oil Zone; and the Stevens Zone. JE 1 § 2(c) at 7. The UPC also assigned the following ownership interests in the "commercially productive zones:"

| Dry Gas Zone | Navy | 77.0492% |
|---|---|---|
| | Standard Oil | 22.9508% |
| Shallow Oil Zone | Navy | 63.9301%[3] |
| | Standard Oil | 36.0699% |
| Stevens Zone | Navy | 65.4517% |
| | Standard Oil | 34.5483% |

JE 1 § 2(d) at 7.[4]

Little was known at that time about the geology of these zones, because very few producing wells had been drilled. TR at 165-66 (Stone). For this reason, the UPC provided that the interests of Standard Oil and the Navy would be subject to revision, at the request of either party, by a jointly appointed Engineering Committee. JE 1 § 2(f) at 7-8. The UPC also provided for a dispute resolution procedure in the event the Engineering Committee was unable unanimously to agree on any revision to the initial ownership interest. JE 1 § 9(b) at 19. In addition, either party could request an opinion by an "independent petroleum engineer" ("IPE") that would be submitted to the Secretary of the Navy, whose "decision in each such instance

---

[2] The term "commercially productive zones" was defined in the UPC as "[g]eologic strata beneath the surface of the earth which . . . are capable of producing oil or gas in paying quantities." JE 1 § 2(a)(2) at 5.

[3] On May 1, 1957, the equity in the Shallow Oil Zone was revised to the Navy having a 70.0119% interest and Chevron having a 29.9881% interest. JE 21 at P-04160.

[4] These ownership interests were based on November 20, 1942 estimates of the proportionate ownership of total hydrocarbons for each zone, but "may be revised as hereinafter provided and when so revised shall be retroactive to November 20, 1942." JE 1 § 2(b) at 6.

shall be final and shall be binding upon [the] Navy and Standard." JE 1 § 9(b) at 19. Although equity redeterminations were delegated to the Navy, the UPC did not address the process for post-termination adjustments. JE 1 § 11(b) at 20 (stating only that "[t]ermination shall be followed by an adjustment of all such rights and obligations, including the rights and obligations growing out of the costs incurred, under the contract, on a fair and equitable basis").

In 1976, Congress determined that the Navy no longer needed to maintain a petroleum reserve for a national emergency. *See* Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258, 90 Stat. 303 (1976); *see also* H.R. CONF. REP. NO. 94-942, at 15 (1976), *reprinted in* 1976 U.S.C.C.A.N. 516, 517 ("Under the compromise, petroleum at the . . . reserves is to be produced at the maximum efficient rate for a period of six years, with provisions for an indefinite number of extensions for [a] period of three years each under specified circumstances."). Accordingly, on May 25, 1976, the Navy and Standard Oil executed an amendment to the UPC, removing any reference to the need for a petroleum reserve and substituting language emphasizing the new national policy to encourage economic productivity.

**B.     In 1977, The Department Of Energy Assumed The Obligations Of The 1944 Unified Plan Contract And Initial Equity Finalization Efforts Commenced.**

In 1977, pursuant to section 307 of the Department of Energy Organization Act, Pub. L. No. 95-91, 91 Stat. 565 (1977) (codified at 42 U.S.C. §§ 7101-7352), Congress transferred the Navy's interests and management of the Elk Hills Reserve[5] to DOE, including the Navy's obligations under the UPC.

Sometime in December 7, 1994, DOE and Chevron began efforts to finalize equity in the Shallow Oil Zone, utilizing an IPE, as required by sections 2(f) and 9 of the Unit Plan Contract. JE 21 at P-04144. On November 8, 1995, the IPE issued a report to the ASFE recommending that DOE be awarded an equity interest of 65.78% in the Shallow Oil Zone and Chevron a 34.22% equity interest. JE 21 at P-04145. The IPE's recommendation afforded Chevron an additional 4 percentage points of equity interest over the most recent equity allocation, an increase worth $340 million. JE 21 at P-04160; JE 1225 at 8; TR at 173-74 (Giumarra).

The ASFE, however, "was troubled by the extremely summary nature of the [IPE Report], and was not convinced that there was sufficient support for the accuracy of its findings." JE 1536 (10/2/09 ASFE Godley Decl.) ¶ 21 at 8. Therefore, the ASFE requested that DOE's headquarters staff obtain documentation supporting the IPE's Report, but the IPE resisted. JE 1536 (10/2/09 ASFE Godley Decl.) ¶ 21 at 8. In response, the ASFE decided to retain Systems Technology Associates to advise the ASFE about this situation. DTR at 1037 (Burzlaff) ("[We were asked] to evaluate what [the IPE] had done in his report and understand and explain to [DOE] how he had arrived at his conclusions, and in our analysis of his report, we pointed out to them his impermissible . . . methodology that he had used."). In the face of the IPE's reluctance to share back-up documentation, apparently the ASFE authorized the seizure of the IPE's computer. DTR at 1045 (Burzlaff) ("DOE did come and confiscate [the IPE's] computer."). The

---

[5] In 1976, a fourth zone was identified and included in the Elk Hills Reserve, known as the Carneros Zone. JE 9 at 2.

record does not evidence who reviewed the seized computer data, but the ASFE then turned to headquarters staff to prepare the technical analysis for the ASFE's preliminary decision regarding the Shallow Oil Zone.  DTR at 911-12 (ASFE Godley) ("Q. But your recollection isn't that you personally drafted the technical analysis in your preliminary decision, is it?  A. No, that would have been Gary Latham and Arnie [Smits] and . . . Lou Capitanio.").  The ASFE, however, appeared to have been unaware that the DOE's EFT also was involved in drafting the ASFE's preliminary decision.  DTR at 910 (ASFE Godley) ("I'm not—don't know that I would have been aware [that Mr. Gangle and Mr. Burzlaff had provided technical input into the decision] because my headquarters staff were the ones whose decision or—I'm sorry, whose advice and advisory information I relied on.").  On December 20, 1996, the ASFE sent a draft of the preliminary decision of the Shallow Oil Zone to an outside consultant to review the technical analysis.  JE 158.

C.     **On February 10, 1996, Congress Enacted The National Defense Authorization Act, Mandating Equity Finalization.**

On February 10, 1996, Congress enacted the 1996 NDA Act (JE 2), requiring DOE, no more than eight months after the effective date of the legislation, *i.e.*, by October 10, 1996, to "finalize [the owners'] equity interests" in the Elk Hills Reserve after obtaining the recommendation of an "independent petroleum engineer" that was "mutually acceptable."  JE 2 at CME002 00450.  DOE also was required to sell all interests in the Elk Hills Reserve no later than two years after the effective date of the legislation, *i.e.*, by February 10, 1998.  JE 2 at CME002 00449-50.  The 1996 NDA Act also provided: "If, on the effective date, there is an ongoing equity redetermination dispute between the equity owners under Section 9(b) of the unit plan contract, the dispute shall be resolved in the manner provided in the unit plan contract within eight months after the effective date.  The resolution shall be considered final for all purposes under this section."  JE 2 at CME002 00450.

D.     **On July 8, 1996, The Department Of Energy Entered Into A Contract With An Equity Independent Petroleum Engineer To Finalize Equity.**

After the 1996 NDA Act became effective, DOE and Chevron appointed EFTs.  JE 3 ¶ C.2 at 2; TR at 2021-23 (Egger).  DOE and Chevron also established an Owners Issues Group, through which they negotiated a process for interacting with the IPE.  JE 33 at 1.  After initially objecting to having the Owners Issue Group jointly meet with the IPE, because of confidentiality concerns, Chevron ultimately agreed to participate.  JE 40 at CGC002 00007-08.  At a May 10, 1996 meeting of this group, DOE suggested that "[b]oth owners interact with the IPE in a fully open environment [and that a]ll equity information presented to the IPE will be distributed to both owners."  JE 40 at CGC002 00006-07.  But, the May 10, 1996 meeting did not resolve how the IPE would function, requiring the parties to continue negotiations, so that DOE proposed that "all oral and written materials, submitted to the IPE (excluding contract formation and administration communications) will also be transmitted concurrently to the other owner.  This will ensure complete transparency and integrity in the process – factors which are critical to both our organizations as we complete the sales process."  JE 48 at 3.  In addition, DOE accepted Chevron's suggestion that Netherland, Sewell & Associates, Inc. be appointed to serve as the Equity IPE.  JE 48 at 1.

10

On June 17, 1996, the Secretary of DOE issued Delegation Order No. 0204-158, pursuant to a September 29, 1994 Executive Order 12929 and section 642 of the Department of Energy Organization Act, that vested "all duties and responsibilities" of the Secretary of DOE under the UPC and "all functions" under the portion of the 1996 NDA Act concerning Elk Hills in the ASFE. JE 1462 at 1. The Delegation Order included a "limitation" provision, stating, "In exercising the authority delegated by this Order, or as redelegated pursuant thereto, the delegate shall be governed by the rules and regulations of the Department of Energy and the policies and procedures prescribed by the Secretary and the Secretary's delegates." JE 1462 at 2.

At a June 26, 1996 meeting, DOE's General Counsel informed Chevron: "We would like to decide on a procedure that both parties are comfortable with, but [DOE] is prepared to go forward without Chevron's agreement." JE 54 at 2. On July 2, 1996, DOE sent Chevron a draft of an Administrative Order for "review and comment." JE 58 at 1 (requesting "expedited review . . . as we hope to promulgate the order in conjunction with the execution of the [Equity IPE's] contract."). Some of Chevron's proposed changes were incorporated into the final version of this Administrative Order. *Compare, e.g.*, JE 60 at 4 (July 3, 1996 draft of Administrative Order), *with* JE 3 ¶ C.12 (final Administrative Order).

On July 8, 1996, the ASFE issued Administrative Order No. 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process" (the "Equity IPE Protocol"), by which Chevron and DOE agreed to "present their respective final equity positions to the mutually acceptable independent petroleum engineer . . . to be retained by the Secretary [of DOE] to provide final equity recommendations in the Dry Gas Zone, Carneros Zone, and the Stevens Zone." JE 3 ¶ B.3; *see also* JE 2 at CME002 00450 (authorizing the Secretary of DOE to retain an IPE).[6] The Equity IPE Protocol reflected that, "Chevron has been provided an opportunity to comment on this Protocol and its comments have been considered by DOE. Chevron has informed DOE that the . . . Protocol is acceptable." JE 3 ¶ B.6; TR at 705 (Giumarra) (Chevron considered the Equity IPE Protocol as binding on Chevron and DOE).

Specifically, the Equity IPE Protocol prohibited Chevron and DOE from having *ex parte* communications with the Equity IPE. JE 3 ¶ C.5 ("There will be no written or oral equity-related communication or meeting with the Equity IPE (this term excludes contract administration communications or meetings) by an owner (including its agents and contractors) without the participation or opportunity to participate by the other owner."); JE 3 ¶ C.9 ("All equity-related meetings with the Equity IPE, including the presentation by the owners of their respective equity positions for each zone, will be sessions at which both owners are invited to attend (this excludes contract administration meetings that may be required by DOE)"); JE 3 ¶ C.21 ("In the event a disagreement arises regarding the equity finalization implementation

---

[6] The July 8, 1996 Equity IPE Protocol did not apply to the Shallow Oil Zone, because equity redetermination for that zone was under way at the time the Administrative Order No. 96-01 issued. TR at 768 (Giumarra) ("The protocols were in effect for the other zones, but not for [the Shallow Oil Zone], as I recall, because [the Shallow Oil Zone] was already under way in a redetermination process when the protocols were negotiated.").

process or this Protocol . . . the matter shall be referred to the [ASFE] (or designee) for resolution.  Prior to resolution, the [ASFE] will consult with Chevron.").

On that same date, *i.e.*, July 8, 1996, DOE entered into a separate contract with Netherland, Sewell & Associates, Inc. to serve as the Equity IPE under the terms specified in the Equity IPE Protocol, that was incorporated by reference.  JE 1372 at CBL003 00489 (stating that the Equity IPE Protocol was "Attachment 2 to Part III, Section J, of the [7/8/96] contract"), CBL003 00533 (requiring that the Equity IPE's "work and recommendations should be independent and impartial, and not concerned with the financial impact the recommendations may have on the owners").

**E.    On October 11, 1996, The Department Of Energy Appointed An Independent Legal Advisor To Provide Legal Advice To The Independent Petroleum Engineer.**

After the July 8, 1996 contract with the Equity IPE was executed, a dispute arose between the parties and the Equity IPE, because Ms. Egger took the position that she was authorized to provide the Equity IPE with legal advice about equity finalization.  JE 94 (8/28/96 Egger memo to the Equity IPE).  Chevron objected and asked the Equity IPE to suspend work.  JE 101 at 1-3.  To resolve this dispute, on October 11, 1996, the ASFE issued a supplement to DOE Administrative Order No. 96-01 with an Independent Legal Advisor Protocol ("ILA Protocol").  JE 4, ¶ C.3.  The ILA Protocol authorized DOE to hire an Independent Legal Advisor ("ILA") acceptable to both parties who "will be consulted only in the event the owners cannot reach agreement after consultation with the [ILA] on a given legal issue" and provide the Equity IPE with legal advice.  JE 4 ¶ C.3.  The ILA was charged with resolving legal disputes raised by the parties, but if the ILA could not do so, the ILA was authorized to provide the Equity IPE with legal advice that would be deemed as binding on the Equity IPE.  JE 4 ¶ C.3; TR at 731-32 (Giumarra) ("[T]he legal issue wouldn't become ripe unless the [Equity] IPE said . . . I need some guidance on this, I need to know how that contract is to be interpreted so I can do my technical work.").

**F.    The May 19, 1997 Decoupling And Final Equity Process Agreements.**

The equity finalization process took longer than the parties expected.  JE 307 at P-04005; TR at 762 (Giumarra); TR at 909-10 (Stay).  This required the July 8, 1996 Equity IPE Protocol be amended on January 21, 1997.  JE 5.  Nevertheless, Congress required that DOE sell its interest in the Elk Hills Reserve no later than February 10, 1998.  JE 2 at CME002 00449-50.  To meet this deadline, the parties discussed "decoupling" the "equity finalization process" from the sale of DOE's interests in the Elk Hills Reserve.  TR at 909-10 (Stay); JE 1533 ¶ 46 (10/19/2009 Egger Decl.).  As a practical matter, this led to a negotiated process for finalizing equity.  TR at 749 (Giumarra) ("We started negotiations on the decoupling agreement first, and before it was final, we started negotiations on the equity process agreement."); JE 1533 ¶ 47 (Egger Decl.) ("The idea and negotiations for [the] Decoupling Agreement started first, followed by

negotiations for the Equity Process Agreement, although at some point parts of the agreements were discussed together.").[7]

To resolve these matters, on May 19, 1997, DOE and Chevron executed two documents: "Agreement Regarding Fixing of Equity Interest at Naval Petroleum Reserve No. 1 for Purposes of Sale" (the "Decoupling Agreement") (JE 7) and an "Agreement Regarding Equity Redetermination Process" (the "Equity Process Agreement") (JE 6).

### 1.  The Decoupling Agreement.

The Decoupling Agreement fixed DOE's and Chevron's ownership interests in the Elk Hills Reserve for purposes of sale.  TR at 741-43 (Giumarra) ("Chevron and the DOE fixed equity numbers solely for the purpose of moving the sale forward and letting the companies coming into the bid know they were buying a certain specific . . . unchangeable interest in the field."); JE 1533 (Egger Decl. ¶ 47) ("The purpose of the Decoupling Agreement was to provide certainty to potential buyers of the extent of equity interests in Elk Hills that [DOE] was selling.").  The Decoupling Agreement estimated that the parties' interests in the four unitized zones were as follows:

| | | |
|---|---|---|
| Dry Gas Zone | DOE | 83.8726% |
| | Chevron | 16.1274% |
| Shallow Oil Zone | DOE | 70.0119% |
| | Chevron | 29.9881% |
| Stevens Zone | DOE | 79.6357% |
| | Chevron | 20.3643% |
| Carneros Zone | DOE | 100.00% |
| | Chevron | 0.00% |

JE 7 § 1.1(a).[8]

A final equity determination, however, would not take place until after the sale.  JE 7 § 1.2.  If the final equity determination differed from the pre-sale determination, one party would pay the other as compensation for the difference.  JE 1533 ¶ 48 (10/19/2009 Egger Decl.) ("The

---

[7] In addition, during this time, on March 28, 1997, the ASFE issued a Preliminary Decision regarding the Shallow Oil Zone that reallocated 7.62 points or 11.6% more equity to DOE than the IPE initially recommended.  *Compare* JE 1374 at P-04384 (ASFE allocating 73.4012% to DOE), *with* JE 1374 at P-04338 (ASFE noting that the IPE initially allocated 65.78% to DOE).  Because this preliminary decision represented a $470 million benefit to DOE, Chevron suspended further participation in equity finalization and "considered stopping the process there . . . and taking it to court because . . . the changes were so dramatic."  DTR at 549 (Stone).

[8] The Decoupling Agreement also required that DOE limit the sale of its interest in the Elk Hills Reserve to purchasers willing to execute a unitization contract with Chevron for the future operation of the Elk Hills Reserve.  JE 7 § 5.2 (b).

Decoupling Agreement specified that DOE and Chevron would continue to implement the equity finalization process, and, once that process was completed, there would be a financial adjustment to resolve any differences between the actual final equity percentages in the four zones and the fixed equity interests that had been agreed upon for purposes of the sale."). The Decoupling Agreement also included an integration clause to clarify that: "This Agreement is intended by the parties as a final expression of their agreement with respect to the specific subject matter hereof, and is intended as a complete and exclusive statement[.]"  JE 7 § 6.6.

The Equity Process Agreement was contingent "upon the execution of" the Decoupling Agreement.  JE 6 at 1; *see also* JE 1533 ¶ 53 (10/19/2009 Egger Decl. stating that DOE "would not have executed the EPA without Chevron executing the Decoupling Agreement, and vice versa[.]").  Chevron also would not have signed one document without the other and viewed both as reflecting Chevron's agreement to accommodate DOE's need to divest ownership in Elk Hills and forgo judicial review of equity finalization, in exchange for a transparent process governing equity finalization.  TR at 911, 913 (Stay).  After execution of the Decoupling Agreement, the ASFE's March 28, 1997 Preliminary Decision regarding the Shallow Oil Zone was set aside.  JE 6 ¶ A.5.  Other conditions also were attached.  JE 6 ¶¶ A.6-8.

## 2.    The Equity Process Agreement.

The Equity Process Agreement established the procedure for "finaliz[ing] all equity interests in the four unitized productive zones within [the Elk Hills Reserve] pursuant to section 3412(b) [of the 1996 NDA Act.]"  JE 6 (Preamble).  Therein, DOE and Chevron agreed that the Equity IPE would provide a "provisional equity recommendation report" for each zone.  JE 6 ¶ B.1.  DOE and Chevron would then review the provisional recommendation and provide written comments to the Equity IPE within 30 days.  JE 6 ¶ B.1.  The Equity IPE then would make a Final Recommendation.  JE 6 ¶ B.2.  After reviewing the Equity IPE's Final Recommendation, DOE and Chevron would provide the ASFE with written comments.  JE 6 ¶ B.2.  Thereafter, the ASFE would issue a Preliminary Decision.  JE 6 ¶ B.3.  After any further comment from the parties, the ASFE would issue a Final Decision.  JE 6 ¶¶ B.3, 5.  In making equity redetermination decisions, the ASFE could overrule the Equity IPE's final recommendation, but only under specified circumstances:

In issuing the equity redetermination decisions for a zone, the ASFE may accept the [Equity IPE] recommendations or reject the [Equity IPE] recommendations in whole or in part.  If the ASFE decides to reject the [Equity IPE] recommendations in whole or in part, such decision must be based on a determination by the ASFE that one or more of the following criteria exist:

a.    The [Equity IPE's] recommendation(s) was arbitrary or capricious;

b.    The [Equity IPE's] recommendation(s) was a result of fraud;

c.     The [Equity IPE's] recommendation(s) was a result of undue influence, unless such undue influence had no impact on [the Equity IPE's] recommended equity participation percentages;

d.     The [Equity IPE's] recommendation(s) was inconsistent with statute, the UPC or an applicable Settlement Agreement between Chevron and DOE, unless such inconsistency had no impact on [the Equity IPE's] recommended participation percentages;

e.     The [Equity IPE's] recommendation(s) was not based on substantial geophysical, geological and/or petrophysical data; or

f.     The [Equity IPE's] recommendation(s) resulted from an approach or methodology which is inconsistent with sound oil field engineering principles.

JE 6 ¶ B.6.

The Equity Process Agreement also provided Chevron with an opportunity to appeal the substance of the ASFE's Final Decision to DOE's Office of Hearings and Appeals ("OHA") if, and only if, the ASFE's Final Decision "rejects, in whole or in part, [the Equity IPE's] participation percentage recommendations." JE 6 ¶ B.7.

Paragraph B.4 of the Equity Process Agreement provided that during this equity finalization:

The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (. . . not includ[ing] the DOE technical staff in Washington, D.C.). No such communications by the ASFE with either equity team shall be on an *ex parte* basis. Any written materials submitted to the ASFE by either equity team shall be provided to the other party. The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.

JE 6 ¶ B.4.

Court Exhibit A, attached in an Appendix to this Memorandum Opinion and Order, is a flow chart that shows an overview of the equity finalization process and the participants.

**G.     The February 5, 1998 Agreement To Terminate The 1944 Unit Plan Contract.**

On February 5, 1998, pursuant to an Agreement To Terminate The 1944 Unit Plan Contract, DOE's interest in the Elk Hills Reserve was sold to Occidental of Elk Hills, Inc. JE 1548. Although Congress did not extend the October 10, 1996 equity finalization deadline

specified in the 1996 NDA Act, on October 17, 1998, Congress authorized continued funding to finalize equity in the Elk Hills Reserve. *See* Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Pub. L. No. 105-261, § 3402, 112 Stat. 1920 (1998).

## II.      ZONE BY ZONE ANALYSIS OF EQUITY FINALIZATION.

As previously discussed, the equity finalization of the Shallow Oil Zone was started in 1995 and suspended in 1997.  The equity finalization of the Carneros Zone and Dry Gas Zone began in 1996 and finalization in both zones proceeded in tandem during 1997 and 1998.  The finalization of the Stevens Zone began in 1997.  The equity finalization of the Shallow Oil Zone resumed in 2002, but neither the Shallow Oil Zone nor the Stevens Zone equity finalizations were completed.

A zone by zone analysis of the efforts to finalize equity follows:

### A.      The Carneros Zone.[9]

The Carneros Zone, located 8000 to 10,000 feet below the surface, represented approximately .5% of the value at stake in Elk Hills Reserve, as of February 5, 1998.  JE 1225 at 2, 3.  Each equity percentage point was valued at $2 million.  JE 1225 at 8.  The total value of the Carneros Zone was approximately $200 million.

#### 1.      The Independent Petroleum Engineer's Provisional Recommendation.

A major dispute that arose during equity finalization of the Carneros Zone was whether certain land "underlying a portion of the Northeast Quarter of Section 25Z is . . . included in the Unit formed by the UPC."  JE 140 at CME001 00305.  DOE and Chevron presented this dispute to the ILA to provide legal guidance to the Equity IPE.  Ms. Egger, DOE's Deputy General Counsel for Technology Transfer and Procurement, appeared as an advocate of the DOE EFT before the ILA.  JE 140 (Nov. 20, 1996 letter from Ms. Egger to the ILA attaching a joint statement of legal issues); TR at 417-18 (Stone); TR at 997 (Renwick); TR at 2184-85 (Egger). The ILA decided on a compromise position.  JE 177 at 7 (Jan. 31, 1997 letter from the ILA to the Equity IPE re: the Carneros Zone 25Z issue, explaining that it was 60% likely that a court would adopt DOE's view that the 25Z section should be excluded for equity redetermination purposes, it was 40% likely that a court would side with Chevron, and therefore "[the Equity IPE] should treat an undivided 40% of the contested portion of the Carneros as being included and an undivided 60% of the contested portion as being excluded").

During this same period, however, Ms. Egger also served as legal advisor to the ASFE, as evidenced by her recommendation to the ASFE that any IPE ruling favorable to Chevron be handled in one of two ways: "(1) abide by the decision and resolve it administratively (ether the same or differently) at the time of the [ASFE]'s final equity decision, [or] (2) request that [the

---

[9] Court Exhibit B, attached in the Appendix to this Memorandum Opinion and Order, is a flow chart that shows how equity finalization actually took place in the Carneros Zone.

ILA] decide the matter and reissue a definitive decision."  JE 178 at 2 (2/3/97 memo from Ms. Egger to the ASFE and senior DOE General Counsel attorneys); TR at 2348 (Egger).

On February 11, 1997, the IPE issued a Provisional Recommendation awarding 96.78% of Carneros Zone equity to DOE; 3.22% to Chevron.  JE 9 at 13.

### 2.      The Independent Petroleum Engineer's Final Recommendation.

On March 6, 1997, the Equity IPE issued a Final Recommendation implementing the ILA's advice to consider 40% of Section 25Z land as inside the UPC unit, resulting in an award of 96.6138% of the Carneros Zone equity to DOE; 3.3862% to Chevron.  JE 9 at 13 & n.16. Thereafter, the DOE EFT asked Ms. Egger to review an engineering assessment of the Equity IPE's Final Recommendation in preparation for the DOE EFT's comment to the ASFE.  JE 203 (3/23/97 fax from Mr. Burzlaff to Ms. Egger re: "engineering assessment of [the Equity IPE's] Final Recommendation report for the Carneros Zone").

### 3.      The Assistant Secretary For Fossil Energy's Preliminary Decision.

Despite Ms. Egger's prior role as an advocate for the DOE EFT before the ILA and her work on the DOE EFT's presentations to the Equity IPE, Ms. Egger proceeded, without Chevron's knowledge, to assist in the preparation of ASFE's Preliminary Decision after the May 19, 1997 Equity Process Agreement was executed.  JE 174 (1/27/97 email from Ms. Egger to ASFE Godley re: format for DGZ/Carneros Zone Equity Decision."  The rest of the document was redacted and designated as subject to the attorney-client and/or deliberative process privileges.  As such, more than just "format" was discussed.); JE 1422 at 46 (Gov't Resp. to Chevron's Interrog. No. 17(c) confirming that Ms. Egger provided "input" for the ASFE's Preliminary Carneros Zone Decision); TR at 2606-07, 2692-94 (ASFE Godley confirming that Ms. Egger reviewed and commented on the ASFE's draft decisions, without Chevron being informed of that fact); 5/19/09 Burzlaff Dep. at 193 (confirming that Ms. Egger was involved in commenting on the Preliminary Carneros Zone Decision, "because there was this legal issue involving the [Section] 25Z area").

The ASFE's November 24, 1997 Preliminary Carneros Zone Decision, however, disregarded the ILA/Equity IPE's February 11, 1997 recommendation and, instead, adopted the DOE EFT's position that the 25Z Section lands should not be included in the Carneros Zone. *Compare* JE 342 (9/29/97 memo from ASFE Godley to Ms. Egger re: "Carneros Zone – Additional Inclusion of Lands") *with* JE 9 at 13 & n.16, 20-21, 23 (11/24/97 ASFE Preliminary Decision Re Carneros Zone rejecting the ILA/Equity IPE 2/11/97 recommendation to include 40% of the Section 25Z lands and concluding that "DOE's participation percentage interest in production from the Carneros is 100% and Chevron's interest is zero %").

4.    **The Assistant Secretary For Fossil Energy's Final Decision.**

After reviewing the ASFE's November 24, 1997 Preliminary Decision, Chevron sent a February 24, 1998 letter to the ASFE to ascertain whether DOE breached the Equity Process Agreement:

> It is apparent from a review of the Preliminary Decision that you reviewed not only the mediation/arbitration legal briefs submitted by DOE as part of DOE's Comments to the Assistant Secretary for Fossil Energy Regarding Inclusion of the 25Z Area Carneros Formations in Final Equity Recommendations for Carneros Zone (March 21, 1997), but also the legal briefs which were submitted by Chevron to the Independent Legal Advisor, Mr. Edward Renwick, during the mediation/arbitration.  Inasmuch as you did not request that Chevron provide you·with them, the circumstances surrounding your receipt of these documents are not clear. I would appreciate any information you can provide Chevron about this (e.g. From whom did you receive the documents?  Were there discussions with the party from which you received the documents as to the documents' contents? If so, what was the gist of those discussions?) as well as a copy of the documents actually provided to you.

JE 359 at 1 n.1.

On May 19, 1998, the same date the ASFE's Carneros Zone Final Decision issued (JE 397), the ASFE responded to Chevron in a separate letter that stated:

> So that I could consider the full written record of Chevron's position on the 25Z Area legal issue for the purpose of issuing a Carneros equity determination, I requested from Mary Egger, Assistant General Counsel, Department of Energy, copies of Chevron's briefs submitted to the ILA.  You may recall that Chevron referenced its position on the legal issue on page 3 of Chevron's Final Comments. The copies of the briefs that I reviewed had no notations, highlighting or notes attached, and I had no discussions with DOE attorneys or any other DOE personnel regarding the briefs.  With respect to your request that I provide to you the copies I reviewed, I decline to do so because, since receiving the documents, I have added comments, highlighting and notes that reflect my decisionmaking process.  It would be inappropriate to provide such predecisional information to you.

JE 396 at 1.

The ASFE's letter, however, did not advise Chevron that Ms. Egger had separate *ex parte* communications with the ASFE about the Section 25Z land issue or that Ms. Egger helped prepare the ASFE's Preliminary Decision.  JE 342 (9/29/97 redacted memo from Ms. Egger to ASFE Godley re: "Carneros Zone – Additional Inclusion of Lands"); JE 1422 at 46 (Gov't Interrog. Resp. to Chevron Interrog. No. 17(b) confirming that Ms. Egger provided "input" for the ASFE's November 24, 1997 Preliminary Carneros Zone Decision).

Nor did the ASFE reveal that she intended to request that Ms. Egger draft the Final Decision.  JE 1422 at 47 (Gov't Resp. to Interrog. No. 17(b)) (confirming that Ms. Egger also provided "input" for the ASFE's Final Decision); TR at 2693 (ASFE Godley) ("[A]ll the drafts of my decision went to both my technical staff as well as to the [G]eneral [C]ounsel's office, through Mary [Egger] or Gena [Cadieux.]").  More importantly, the ASFE did not advise Chevron that Ms. Egger had made an *ex parte* suggestion to her as early as February 3, 1997, about how to deal with the ILA/Equity IPE's Final Recommendation.  The May 19, 1998 ASFE's Final Carneros Zone Decision rejected the Equity IPE's Final Recommendation, consistent with Ms. Egger's prior advice.  JE 397 CSI001 0175-81 (5/19/98 ASFE Final Carneros Zone Decision); JE 178 (2/3/97 memo from Ms. Egger to ASFE Godley reporting on the ILA's determination about the Section 25Z land issue, suggesting that the ASFE "handle" that issue "administratively" when the ASFE's Final Equity Decision is made).

### 5. The Appeal To The Department Of Energy's Office Of Hearings And Appeals.

On November 18, 1998, Chevron lodged an appeal of the ASFE's May 19, 1998 Final Carneros Zone Decision with OHA.  JE 17 at 2.  On July 6, 2000, OHA denied Chevron's appeal and thereby, in Dr. Latham's estimation, saved DOE "about $11 million."[10]  JE 17 at 3; JE 872 (7/7/00 email between Dr. Latham and Ms. Egger).

### B. The Dry Gas Zone.

The Dry Gas Zone, located 1000 to 2000 feet below the surface, represented approximately 1% of the value of the Elk Hills Reserve, as of February 5, 1998.  JE 1225 at 2-3.  According to DOE, each equity percentage point was estimated to be worth $2 million.  JE 1225 at 8.  The total value of the Dry Gas Zone was approximately $200 million.

### 1. The Independent Petroleum Engineer's Provisional Recommendation.

On February 11, 1997, the Equity IPE issued a Provisional Recommendation apportioning 83.56% of Dry Gas Zone equity to DOE and 16.44% to Chevron.  JE 8 at 8.

### 2. The Independent Petroleum Engineer's Final Recommendation.

On March 6, 1997, the Equity IPE issued a Final Recommendation apportioning 84.382% of the Dry Gas Zone to DOE and 15.618% to Chevron.  JE 8 at 8-9.

### 3. The Assistant Secretary For Fossil Energy's Preliminary Decision.

---

[10] DOE never actually realized those savings, because the parties eventually agreed to finalize Elk Hills equity through a negotiated settlement rather than through the procedure governed by the Equity Process Agreement.  Nonetheless, the $11 million effect on Chevron's equity position evidences the materiality of DOE's breaches, which deprived Chevron of its bargained-for process to finalize equity.

After the Equity IPE issued the March 6, 1997 Final Recommendation, the ASFE asked Ms. Cadieux, from the office of DOE's General Counsel, to prepare a draft preliminary decision regarding the Dry Gas Zone.  JE 233 (5/1/97 email from Ms. Cadieux to ASFE attaching a portion of the draft).  Ms. Egger also was actively involved in preparing the ASFE's September 2, 1997 Preliminary Decision.  JE 233 at CLC001 04049 (listing Ms. Egger as a recipient of Ms. Cadieux's draft); TR at 2606-07 (ASFE Godley); JE 1422 at 45 (Gov't Interrog. Resp. No. 17(a) stating that Ms. Egger provided input for the ASFE's Preliminary Decision).

On September 2, 1997, the ASFE issued a Preliminary Decision regarding the Dry Gas Zone adopting the percentages in the Equity IPE's Final Recommendation.  JE 8 at 16.

### 4.      The Assistant Secretary For Fossil Energy's Final Decision.

On May 19, 1998, the ASFE issued a Final Decision regarding the Dry Gas Zone, in which she continued to adopt the percentages in the Equity IPE's Final Recommendation.  JE 397 at 17.  Ms. Egger also actively was involved in preparing the ASFE's Final Decision.  JE 1422 at 45-46 (Gov't Interrog. Resp. No. 17(b) stating that Ms. Egger provided input for the ASFE's Final Decision).

### C.      The Stevens Zone.[11]

The Stevens Zone, located 5000 to 8000 feet below the surface, represented 73.15% of the entire value of the Elk Hills Reserve, as of February 5, 1998.  JE 1225 at 2-3.  According to DOE, this zone was the most valuable, with each equity percentage point estimated to be worth $184 million.  JE 1225 at 8.  The total value of the Stevens Zone was approximately $18.4 billion.

### 1.      The Equity Independent Petroleum Engineer's Provisional Recommendation.

On November 4, 1997, the Equity IPE issued a Provisional Recommendation regarding the Stevens Zone that allocated 81.1572% of the Stevens Zone to DOE and 18.8428% to Chevron.  JE 14 at CSI005 1194.

### 2.      The Assistant Secretary For Fossil Energy's Decision Regarding The Data Cutoff Date.

The parties agreed that the Equity IPE would not consider data collected after March 1, 1997, except for "critical new data."  JE 12 at 2; *see also* JE 12 at 2 n.1 (explaining that the parties also sometimes referred to the data cutoff date as February 28, 1997); JE 1486.  Nevertheless, Chevron submitted new data in its March 27, 1998 comment on the Equity IPE's November 4, 1997 Provisional Recommendation.  JE726 at 3 (9/23/99 ASFE Decision Re

---

[11] Court Exhibit C, attached in the Appendix to this Memorandum Opinion and Order, is a flow chart that shows how equity finalization actually took place in the Stevens Zone.

Dispute Over Data, stating that "Chevron's comments on . . . the [Equity] IPE's provisional recommendation used, among other things, production data . . . after March 1, 1997"); JE 363 (Chevron's 3/27/98 comments on the Equity IPE's 11/4/97 Provisional Recommendation).   In response to Chevron's comment, the Deputy Director of the DOE's Naval Petroleum Reserve in California and a member of the DOE EFT sent an *ex parte* letter to the ASFE requesting that she permit the parties to submit a second round of comments on the Equity IPE's November 4, 1997 Provisional Recommendation.   JE 365 (4/7/98 letter from Mr. Kauffman to ASFE Godley).   On April 9, 1998, the ASFE, Ms. Egger, and Dr. Latham initiated a telephone conference with the Equity IPE during which they discussed "isolat[ing] a list of questions to ask both owners— technical in nature" and "separate questions to owners regarding their cases."   JE 366.   On April 27, 1998, the Equity IPE asked the ASFE for permission to submit the list of questions to the EFTs.   JE 384 at CAS0031877-78.   On May 1, 1998, the ASFE granted this request, copied both EFTs, and enclosed the April 7, 1998 *ex parte* letter from Mr. Kauffman to ASFE Godley requesting that she permit the parties to submit a second round of comments on the Equity IPE's November 4, 1997 Provisional Recommendation.   JE 384 at 1.   Chevron responded with a May 7, 1998 letter to the ASFE objecting

> to the manner in which you handled the DOE equity team's *ex parte* communications; to your failure to consult with Chevron about that communication; and your attempt in your letter to [the Equity IPE] of May 1, to change the Equity Process Agreement.   As a result of these actions, Chevron is gravely concerned that you (and possibly [the Equity IPE] as well) may have jeopardized your required status as independent decision-makers.

JE 388; *see also* TR at 398-99 (Stone) (testifying that these discussions "completely undermine[d]" Chevron's position with the Equity IPE).

On May 13, 1998, the ASFE responded that the April 7, 1998 letter from Mr. Kauffman was not prohibited by the Equity Process Agreement, because it did not concern "equity redetermination-related matters," subject to paragraph B.4 of the Equity Process Agreement.   JE 393.   The ASFE, however, added that "I have not and will not engage in communications with the [Equity] IPE concerning the merits of either party's position, the [Equity] IPE's equity recommendations, or other substantive matters without advance notice and opportunity for participation by both parties."   JE 393 at 2.   Chevron relied on that representation.   JE 512 (12/11/98 letter from Chevron to Ms. Egger stating: "Chevron is satisfied that *ex parte* communications between DOE Washington personnel and DOE's field equity team have not occurred and will not occur in the future."); TR at 350-51 (Stone); TR at 828 (Giumarra); TR at 2680-81 (ASFE Godley) (affirming that Chevron could rely on her 12/11/98 letter); TR at 1732-34 (ASFE Kripowicz) (testifying that it would have been reasonable for Chevron to rely on ASFE Godley's representation).

Relying on the ASFE's May 19, 1998 assurances that DOE was complying with the Equity Process Agreement, Chevron continued to incur substantial costs to participate in the equity finalization of the Stevens Zone.

Ms. Egger, however, continued to work with Mr. Gangle, Mr. Burzlaff, and Mr. Thorpe to develop and prepare the DOE EFT's position on the data cutoff date that would be presented to the ASFE. JE 451 (8/3/98 email from Mr. Burzlaff to Mr. Thorpe, Mr. Kauffman, and Ms. Egger re: "Equity Finalization Data Cutoff Dates"); JE 466 (10/6/98 email from Ms. Egger to Mr. Thorpe forwarding text she drafted for inclusion in DOE EFT's data cutoff briefs); JE 476 at 1 (10/23/98 email exchange between Mary Egger and other members of the DOE EFT, in which Mr. Schuessler advised, "Restricting [the Equity IPE] will substantially affect [the Equity IPE's] request . . . . [The Equity IPE] can use this to reinforce interpretations that contain errors, etc., and include them in a Final Recommendation, which will be difficult to move the ASFE from, regardless of the validity of the written owner response. Unfortunately, I think we are in the position in the Stevens [Zone] that if we crack open the door to allow [the Equity IPE] to use new data, something more than just 'objective' owner input should be allowed."); JE 516 (12/18/98 email between Ms. Egger, DOE EFT's outside counsel, and other DOE EFT members re: data cutoff dates, including draft red-line transmittal letter and cutoff date proposal letter); JE 530 (2/8/99 same); JE 607 (7/23-7/26/99 email exchange between Ms. Egger and DOE EFT showing her substantive and strategic role in advising the DOE EFT re: data cutoff issue); JE 615 (7/29/99 DOE EFT position paper on the Stevens Zone data cutoff dispute sent by DOE EFT's outside counsel to Ms. Egger, Mr. Gangle, and the other DOE EFT members for final approval); JE 625 (8/11/99 email from Ms. Egger to DOE EFT's outside counsel forwarding her suggestions on "letter to Krip"); *see also* TR at 978-79 (Senior Counsel for Chevron Global Gas testifying that he believed Ms. Egger was representing the DOE equity team, because "she was articulating the DOE equity team's position with regard to this data cut-off matter"); TR at 1307-08, 1313-15, 1323 (Gangle); TR at 2436-38 (Ms. Egger) (testifying that she advised the DOE EFT about the data cutoff dispute). On July 29, 1999, the DOE EFT's outside counsel sent a letter to the ASFE, forwarding the DOE EFT's position with a copy to Ms. Egger. JE 616.[12]

On the same day the DOE EFT's position paper on the data cutoff dispute was filed with the ASFE, Ms. Egger reassumed her role as a legal advisor to the ASFE about the same issue. In that capacity, the ASFE asked Ms. Egger her views as to how to resolve the data cutoff date dispute. JE 614 (7/29/99 email from Ms. Egger to ASFE Kripowicz re: draft letter on admissibility of Stevens Zone data); TR at 1179-80 (Latham) (stating that Ms. Egger was "coordinating all the comments on [the Stevens data cutoff] decision"). Thereafter, Ms. Egger participated in four data cutoff date meetings during a three-day period in August 1999: one with the DOE EFT (JE 608); a second on August 23, 1999 with the ASFE and technical advisory team (JE 632); a third with both parties' EFTs (JE 1491); and a fourth with the Equity IPE, the ASFE, and the ASFE's technical team. TR at 2439-41 (Egger).

---

[12] Ms. Egger also presented the DOE EFT's position on whether the Equity IPE could consider certain price data to the ILA. JE 648 (9/3/99 email from Ms. Egger to Mr. Burzlaff *et al.*) ("[A]re there other pricing scenarios that are more advantageous to DOE that we can propose to the IPE or ILA if we end up in another round of submissions/briefs?"). In the end, Ms. Egger convinced Chevron to reach a settlement of this issue. JE 792 at 2 (12/8/99 email from Mr. Gangle stating, "I must compl[i]ment our attorneys on the outstanding job they did to draw this agreement out of Chevron.").

Meanwhile, Chevron asked the ASFE for a meeting with the DOE EFT and the Equity IPE, but the ASFE never responded.  TR at 1666 (ASFE Kripowicz stating that he did not recall why he did not respond to Chevron's request).  Instead, the ASFE and Ms. Egger initiated direct *ex parte* communications with the Equity IPE.  JE 632 (referencing 8/25/99 telephone conference between the ASFE, Ms. Egger, and Equity IPE); JE 637 (8/25/99 teleconference notes of Mr. Capitanio listing the participants and their discussion about the impact of the data cutoff date on Chevron); JE 641 (typed notes of the 8/25/99 teleconference between the ASFE, Ms. Egger, and Equity IPE); *see also* 4/30/07 Krenek Dep. at 231-32; 4/21/09 Latham Dep. at 450-53.[13]

In early September 1999, the ASFE prepared an outline of a data cutoff date decision, without Ms. Egger's input, that would have allowed the Equity IPE to consider part of Chevron's post-cutoff data.  JE 652 at CME01302005 (9/7/99 email from ASFE Kripowicz to Ms. Egger, Dr. Latham, re: rationale for Stevens Zone admission of additional data and requesting Ms. Egger's input: "Mary, I'd like some guidance as to format and content of my findings."); *see also* TR at 1673, 1675 (ASFE Kripowicz); TR at 1580-83, 1587-90 (Capitanio).  In response, Ms. Egger prepared an initial draft decision, primarily based on the ASFE's outline.  JE 654; JE 659; JE 660; JE 1533 (Egger Decl. ¶ 105) ("I understood that [ASFE Kripowicz] was initially inclined to allow the Equity IPE to consider some new data generated after the agreed upon data cutoff date that was mutually agreed to, but to exclude other new data such as Chevron's April 3, 1999 submission.").  During the next days, Ms. Egger prepared several drafts of the data cutoff date decision, but continued to express disagreement with the ASFE's initial inclination to allow the Equity IPE to consider some of Chevron's post-cutoff date data.  JE 673 (9/14/99 email from Ms. Egger to Mr. Capitanio with a copy to the ASFE, stating that "[w]e may need to talk to the [Equity] IPE again . . . to make sure we all understand what use if any they intend to make of the post-1997 data"); JE 674 (9/15/99 email from Ms. Egger to the ASFE (stating: "I'm still worried about the [data cutoff date] rationale")); JE 675 (9/15/99 draft of Stevens Zone transmittal letter and data cutoff decision reflecting concern about "the 43 well submission") JE 680 at CDE00304426 (9/16/99 email from Ms. Egger to the ASFE "reflecting changes of my own . . . .  (You'll see that we are having trouble with the post 1997 data[.])").

On September 17, 1999, the ASFE met with the ASFE's Technical Legal Staff, including Ms. Egger and thereafter agreed to exclude Chevron's "new critical data."  JE 694 at 1 (9/17/99 draft decision with Mr. Capitanio's handwritten note: "Mtg w/ Krip, M. Egger, A. Smits.  Agreed that none of the post 1997 data will be allowed.  Mary [Egger] will revise decision."); *see also* TR at 1580-83, 1587-90 (Capitanio) (ASFE reversed initial determination and excluded Chevron's post 1997 data).  Accordingly, Ms. Egger finalized a "new and improved draft decision" that "changed substantially" the ASFE's prior position and adopted DOE EFT's view that the Equity IPE could not consider Chevron's "critical new data[.]"  JE 716 (9/20/99 email

---

[13] On October 17, 2000, however, Dr. Latham, a member of the ASFE's Technical Team, initiated an *ex parte* communication with the Equity IPE about "injector locations" in a DOE-owned pool, known as 26R.  JE 936 (10/17/00 Krenek notes).  In 2001, Dr. Latham initiated another *ex parte* communication with the Equity IPE to ask for a clarification of calculations concerning solution gas heating values, gas cap heating values, and American Petroleum Institute gravities.  JE 997; JE 998.

from Ms. Egger to the ASFE and his technical staff enclosing a new draft of the data cutoff date decision).

On September 23, 1999, the ASFE issued a data cutoff date decision that substantially conformed to Ms. Egger's post-September 17, 1999 draft.  JE 726 at 13 (ASFE's decision, stating, "I have determined that the 1998 data submitted by Chevron in response to the Equity IPE's . . . request for data and Chevron's April 3, 1999 submission should not be considered by the IPE."); TR at 1179-80 (Latham) (agreeing that Ms. Egger "coordinat[ed] all the comments on [the Stevens data cutoff] decision"); TR at 1679-1707 (ASFE Kripowicz) (describing the change in rationale).  Chevron, however, was not aware of Ms. Egger's role in preparing the ASFE's decision.  TR at 2442 (Egger); TR at 459 (Stone); TR at 980 (Henderson).  The ASFE also was not aware of Ms. Egger's prior work with the DOE EFT.  TR at 1662 (ASFE Kripowicz).  And, as Ms. Egger confirmed, she did not inform Chevron that she was involved in preparing the ASFE's final "data cutoff" decision.  TR at 2442 (Egger); TR at 459 (Stone).

### 3.     The Equity Independent Petroleum Engineer's Final Recommendation.

During the period that Ms. Egger worked on the data cutoff date dispute for the DOE EFT, Ms. Egger also worked to prepare the DOE EFT's presentation to the Equity IPE in response to Chevron's contention that the Equity IPE used an impermissible "capture" analysis.[14]  JE 499 at 2 (11/24/98 fax from Ms. Egger to Mr. Gangle regarding "Capture Brief -

---

[14] "Capture" is "a technique that credits contributions to the unit [based] on where oil is produced, not where it was [located in] 1942."  TR at 433-35 (Stone).  Chevron interpreted the UPC to prohibit the use of capture analysis.  TR at 441-42 (Stone).  The record reflects that Ms. Egger was working with the DOE EFT on the capture issue on April 7, 1998, when Chevron requested that Ms. Egger and the ASFE's technical team work with Chevron to jointly instruct the Equity IPE not to use a capture analysis in making a Final Recommendation.  JE 364 at 1.  In response, Ms. Egger convened a conference call with the DOE EFT and the ASFE technical staff in Washington, D.C. to decide how to respond.  JE 370 (4/14/98 teleconference notes).

At trial, Ms. Egger conceded that this was an *ex parte* communication, in breach of the Equity Process Agreement:

> Q: So this was clearly a – you would agree that this was a technical communication at least in part; right?
>
> A: Well, it was.  And this is the one that kind of surprised me because – and I think as I look at the documents, this was the last time that the headquarters team was involved in this process.  Okay.  So I don't know if I realized at the time that, oh, jeez, this is an issue I shouldn't be involved in or what, but this is an allegation that it was using – you know, that a legal issue was arising on capture and, as you mentioned, that we went on to the ILA process.

technical review redraft") ("Attached are a few comments on your rewrite . . . . I am generally in favor of saying at every possible and appropriate juncture when the technical statements we are explaining constitute technical judgments of the IPE[.]").

On March 2, 2000, the Equity IPE issued a Final Recommendation regarding the Stevens Zone, following the ASFE's instruction that the Equity IPE not use post-1997 data, determining that DOE's equity interest in the Stevens Zone was 80.4884%; Chevron's was 19.5116%.  JE 818 at CA50020372.

### 4.   The "Secret Report."

On November 6, 2000, the ASFE informed DOE's EFT and Chevron's EFT that he intended to ask the Equity IPE for "clarification" regarding certain technical issues raised in the Equity IPE's Final Recommendation.  JE 951.  Chevron responded that it did not object, so long as "the communication is done in writing and copies of the correspondence between your staff and [the IPE] are made available to the EFTs[.]"  JE 954.  The ASFE did not respond.  TR at 1737 (ASFE Kripowicz).  Instead, on the same day, the ASFE wrote the Equity IPE requesting that the Equity IPE provide the ASFE with an assessment of the technical issues, without sending Chevron a copy of the letter or otherwise advising Chevron.  JE 952 at CN500900290; *see also* TR at 1800-01 (ASFE Kripowicz) (same); TR at 1734 (ASFE Kripowicz) ("I got advice . . . from my legal counsel that it was permissible under the protocol to contact the [Equity] IPE after the final determination was made[.]"); TR at 1718-19, 1802 (ASFE Kripowicz) (same).  At Ms. Egger's recommendation, the ASFE's November 6, 2000 letter also directed the Equity IPE to: "please mark all materials that you prepare in response to this request: 'Privileged & Confidential – Predecisional Analysis – Not for Distribution or Release[.]'"

On December 22, 2000, the Equity IPE sent the ASFE what became known within DOE as, the "Secret Report,"[15] wherein, in a sixty-seven page document with charts and attachments,

---

Q: Right.  But it certainly seemed like this was an ex parte communication – I mean, Chevron wasn't part of this communication; right?

A: No.  They weren't, no.

Q: So this certainly seems like an ex parte communication that included the DOE EFT and the headquarters technical staff.

A:  Right.  And you know, it's my fault if this was an impermissible one.  You know, I don't – I don't have an explanation for it now.

TR at 2433-34 (Egger); *see also* JE 387 (5/6/98 fax from Mr. Kauffman to Ms. Egger forwarding engineering memo on "capture analysis").

[15] JE 1103 (1/9/03 DOE staff memo itemizing documents that might be responsive to Chevron's 1/9/03 Freedom of Information Act request, citing the "Secret Report"); *see also* TR at 1355 (Gangle) (testifying that he understood the term "Secret Report" originated in DOE's Office of the General Counsel).

the Equity IPE revealed that his November 2, 2000 Final Recommendation overestimated DOE's recoverable reserves in 26R by at least eight million barrels.  JE 965; *see also* TR at 1168, 1216 (Latham); TR at 2892-93 (Frost).  The Equity IPE recommended in the "Secret Report" that the ASFE should reconsider his September 23, 1999 Data Cutoff Date Decision and "consider obtaining and using official updated production data[.]"  JE 965 at CGC004 00453.  Instead, the ASFE decided to "stick to the data cutoff point" and reject the Equity IPE's recommendation to take corrective action.  TR at 1785-86 (Kripowicz); *see also* TR at 1659-60 (ASFE Kripowicz). At trial, the ASFE conceded this mistake should have been corrected, "if it had a material effect."  TR at 1756 (ASFE Kripowicz).[16]

### 5.    The Assistant Secretary For Fossil Energy's Preliminary Decision.

Ms. Egger's complicity in the "Secret Report" affair did not deter her from preparing the ASFE's Preliminary Decision, a project to which she had already been assigned.  JE 834 (3/24/00 email from Dr. Latham to Ms. Egger, stating: "On the question of who takes the lead in developing the draft provisional decision for the Stevens Zone, we all agreed that you and your staff did such a fine job in the previous two cases, that we should continue in the same mode for the Stevens, *i.e.*, that you take the lead[.]"); TR at 1807 (ASFE Kripowicz re: same); JE 1013 (10/25/01 email from Ms. Egger to the ASFE) ("At long last I'm forwarding to you today our draft (hard copy) preliminary Stevens Zone decision."); JE 1015 at 1, 23 (10/25/01 memo from Ms. Egger to ASFE Kripowicz forwarding Preliminary Decision re: Stevens Zone).

On November 13, 2001, the ASFE issued a Preliminary Decision regarding the Stevens Zone that also adopted the DOE EFT's position on "conversion."[17]  This aspect of the ASFE"s Preliminary Decision cost Chevron about $7 million, according to the ASFE's technical expert, Dr. Latham, by increasing DOE's equity from 80.4432% to 80.4900%.  JE 995.  In addition, the ASFE relied on selected excerpts from the "Secret Report" favorable to DOE without citing the entire report or disclosing its existence.  JE 13; TR at 1794-98 (ASFE Kripowicz).

---

[16] The Equity IPE's Project Leader was "surprised" when he learned through this litigation that the ASFE withheld the "Secret Report" from Chevron.  TR at 2883 (Frost); *see also* TR at 2808 (Sewell); TR at 2466, 2469 (Egger) ("Chevron would have really wanted to know about [the "Secret Report"] at that time.").

[17] "Conversion" concerned how to convert the parties' shares of oil and gas in a particular zone into an equity share.  The DOE EFT's position was that oil and gas shares should be converted based on BTU equivalents.  TR at 547 (Stone).  Chevron's position was that conversion should be based on the price of oil and gas, as of November 20, 1942, the date the UPC was executed.  TR at 547-48 (Stone).  Ms. Egger previously worked with the DOE EFT in presenting this position to the ILA.  JE 1384 (Ms. Egger's handwritten comments on an Apr. 14, 1999 fax from Mr. Burzlaff of DOE EFT re: "Technical Report for the [ILA] Mediation Brief on the Conversion and Calculation Issues").  Ultimately, the ILA accepted the DOE EFT's position that conversion should be based on the recent market prices of gas and oil, instead of the 1942 prices urged by Chevron.  TR at 548 (Stone) (describing the ILA's ruling on this issue).

6.      **The Assistant Secretary For Fossil Energy's Final Decision.**

Ms. Egger also was the driving force behind the ASFE's Final Decision regarding Equity Finalization of the Stevens Zone.  This is best evidenced by examining the ASFE's February 18, 2001 draft preliminary decision, prior to Ms. Egger's involvement, that initially accepted the Equity IPE's March 2, 2000 Final Recommendation to use current prices to determine conversion, instead of heating values, allocating 80.4884% of the Stevens zone equity to DOE; 19.5116% to Chevron.  JE 979 at CAS0020924 (2/18/01 ASFE draft preliminary Stevens Zone decision) ("Use of relative prices is a standard technique . . . for calculating equivalent barrels of oil for a given volume of gas.  Thus, while it can be argued that the logic leading up to the ILA decision was flawed in some way, the decision nevertheless resulted in the use of a method consistent with accepted industry practices.  I, therefore, can find no justification for rejecting the results obtained in favor of results produced by an alternative approach.").  By June 2001, however, Ms. Egger began consulting with the ASFE's technical advisors to suggest a basis for changing the ASFE's approach to conversion to increase DOE equity from 80.4432% to 80.4900%, which would have resulted in a "$7 million plus interest" benefit to DOE.  JE 995; JE 1000; JE 1006;[18] JE 1009; TR at 558-60 (Stone); TR at 1345-46 (Gangle); TR at 1812, 1814-16 (ASFE Kripowicz).

In addition, Dr. Latham asked the Equity IPE to re-send him two specific sections of the "Secret Report" that could be cited in the ASFE's Final Decision as separate stand-alone documents so Chevron would not be aware they were part of the "Secret Report."  TR at 1228-30 (Latham) (admitting that he requested that the Equity IPE re-send him two sections of the "Secret Report" as a stand-alone document).  On February 23, 2001, the Equity IPE sent DOE those two sections.  *Compare* JE 981 at CBG0060093-99 (fax from Mr. Frost to Dr. Latham discussing the amount of N/A shale-to-26R migration attributable to Chevron section 31S), *with* JE 965 at CGC004 00454-61 (the "Secret Report" discussing same); *compare also* JE 981 at CBG0060100-04 (methodologies for proportional allocation of migrated volumes), *with* JE 965 at CGC004 00472-76 (same).

On June 18, 2002, the ASFE issued a Final Stevens Zone Decision that blended the DOE EFT's approach with the Equity IPE's recommendation, to achieve a hybrid conversion model "using the average of" the heat-based and current price-based methodologies, allocating DOE 80.3761% of the equity in the Stevens Zone; and Chevron 19.6239%, resulting in a more favorable resolution to DOE than the Equity IPE's initial proposal.  JE 14 at CSI005 1209 ("Although I might have a preference for one method, because both methods are acceptable, rather than select between two rational methodologies, it seems appropriate to use them both. Therefore, . . . I am using the average [of the heat-based and the current price-based methodologies.]").[19]   The ASFE, however, did not reconsider his data cutoff ruling which

---

[18] JE 1006 (7/31/01 email from Ms. Egger to Dr. Latham and Ms. Cadieux) ("I plowed through (though not every word) the 1988 and 1998 SPEE Monograph ('Guidelines for Application of Petroleum Reserves Definitions') to see if there is any indication whether its principles are designed to be used for (final) equity determinations[.]").

[19] The ASFE's Stevens Zone Final Decision incorrectly stated that "it does not appear that [the Equity IPE] even considered a lower value [than 500 psi], choosing instead to rely on an

Chevron estimated cost it $150 million.  TR at 516 (Stone); TR at 1216 (Latham); TR at 2892-93 (Frost).

### 7.     The Department Of Energy's Office Of Hearings And Appeals Remand Decision.

On January 15, 2003, Chevron filed an appeal of the June 18, 2002 ASFE's Final Decision regarding the Stevens Zone to OHA, challenging the ASFE's use of a hybrid conversion method rather than the method that the ILA/Equity IPE recommended.  JE 17 at 4; JE 1184.

On January 28, 2004, while the OHA appeal was pending, Chevron sent a letter to the ASFE again to complain about Ms. Egger's *ex parte* activities:

> [I]t appears that personnel in DOE's Office of General Counsel both acted as advocates before a decision maker who was supposed to be impartial and served as undisclosed participants in the decision-making itself.  As a result, the dispute resolution mechanism agreed to by the parties has been completely undermined, one-sided rather than impartial decisions have been rendered against Chevron[], and substantial amounts of time and money have been wasted.

JE 1137 at 1.

On April 1, 2004, DOE's General Counsel responded that "Ms. Egger was never a member of the 'DOE field equity technical team.'"  JE 1164 at 2.[20]  Instead, the DOE General Counsel insisted that both parties "have always understood" that Ms. Egger served the ASFE on Elk Hills matters in her role in the Office of the General Counsel.  JE 1164 at 3; *see also* JE 1164 at 4 ("When you review the record you will find that Chevron clearly understood that Ms. Egger acted as counsel for DOE and the ASFE, not for the field equity team[.]").  DOE's General Counsel further stated that the "record is thus flatly inconsistent with an assertion that there has been some 'dual role of the [Office of General Counsel]' that has 'stripped the parties' agreed-upon-procedures of any legitimacy.'"  JE 1164 at 5.

On June 14, 2004, Chevron replied:

> Although you acknowledge that a lawyer in the Office of General Counsel of the Department of Energy acted as both counsel for one of the parties in an

---

average of the final pressures from two simulation runs and the assumption that the 26R and NWS sand abandonment pressures should be similar."  JE 14 at CSI005 1215.  As the ASFE knew from the "Secret Report," the Equity IPE considered using 250 psi, that would have benefitted DOE, but rejected this approach in issuing a Final Recommendation.  JE 965 at 19-20; TR at 2899-2900 (Frost).

[20] JE 1225 at 6 (1/12/06 DOE PowerPoint presentation referring to the "DOE Equity Finalization Team").

adversarial proceeding and simultaneously as an advisor to the decision maker, you interpret the Equity Process Agreement as permitting this dual role. Clearly, you must appreciate that in consenting to the procedures afforded in the Equity Process Agreement, and thereby waiving its right to recourse to a court to determine controversies, [Chevron] understood that it was agreeing to alternative procedures which, at a minimum, would provide an objective decision maker and which would be fair and equitable.

\* \* \*

DOE's conduct in the Stevens Zone proceeding constitutes a fundamental and material breach of the DOE's obligations under the Equity Process Agreement. As a result of DOE's breach, Chevron[] considers both the Equity Process Agreement and the Decoupling Agreement to be no longer operative.

\* \* \*

Given the fact that the [Principal Deputy Assistant Secretary for Fossil Energy's] decision for the Stevens Zone was not rendered in compliance with the requirements of the Equity Process Agreement and the expectations of the parties, the Office of Hearings and Appeals lacks authority to review that decision.

JE 1168 at 1-2.

On June 16, 2004, Chevron sent a letter to the Director of OHA apprising him of *ex parte* communications between the DOE EFT and the ASFE and alleging that DOE's breach of the Equity Process Agreement deprived OHA of jurisdiction to resolve this issue:

In April, DOE's General Counsel confirmed the existence of communications that [Chevron] believes violate the May 19, 1997 Equity Process Agreement between [Chevron] and DOE. As a result of these communications, the decision of the Principal Deputy Assistant Secretary for Fossil Energy currently under review in this proceeding was not rendered in accordance with the requirements of the Equity Process Agreement. In turn, because OHA's authority to hear this matter derives solely from the same agreement, and extends only to review of decisions rendered in conformity with that agreement, OHA lacks jurisdiction to decide the pending appeal.

[Chevron] intends to proceed in the appropriate forum to seek redress for DOE's breach. If OHA decides to go forward with the pending appeal under the circumstances, [Chevron] will continue to participate in these proceedings. However, such participation will be under protest and with full reservation of [Chevron]'s rights to dispute the validity and effect of any decision rendered.

JE 1169.

On June 21, 2004, DOE sent a letter to the OHA disputing Chevron's contentions:

> The Department of Energy (DOE) completely disputes Chevron's allegation that the Equity Process Agreement has been violated.
>
> \*   \*   \*
>
> There simply is no basis for Chevron's rather transparent attempt to derail these proceedings. Chevron and DOE specifically agreed that disputes over legal issues addressed in the Principal Deputy Assistant Secretary for Fossil Energy's . . . decision would be reviewed by OHA on a "*de novo*" basis. The current appeal is such a dispute over a legal issue. Accordingly, even if the [Principal Deputy] ASFE's decision had not been rendered in accordance with the parties' agreement, and again, DOE completely disputes this contention, OHA is free to render its own judgment. No one has questioned in any way OHA's decision making process or procedures in this matter. OHA continues to have full authority and "jurisdiction" to decide this appeal. While Chevron, for reasons currently unknown, may wish to disrupt these proceedings, it does not have the right to do so. We respectfully submit that OHA should disregard Chevron's letter and complete these proceedings.

JE 1170 at 1-2.

In response, on July 23, 2004, Chevron requested a stay of the OHA proceedings to allow Chevron to seek judicial review:

> Since receiving DOE's confirmation of *ex parte* contacts, [Chevron] has been evaluating its options. We expect in the near term to file a complaint in federal court seeking appropriate redress. In contrast with OHA, which previously has acknowledged that it "does not have the authority to review disputes over the [Equity Process] agreement," (*see* February 26, 1999 letter []), a court has such jurisdiction and affords a process, including discovery, that allows for the development of a factual record necessary for a full airing of Chevron[]'s claims that DOE has materially breached the Agreement.
>
> Assuming the court finds that DOE has breached the Agreement, any decision rendered by OHA in this appeal would be a nullity because, at minimum, a condition precedent to OHA's jurisdiction—a decision by the Assistant Secretary (or his designee) untainted by ex parte communications—has not been satisfied. Under the circumstances, it appears that further expenditure of time and effort by OHA and the parties pending judicial resolution of the dispute over the parties' rights and obligations under the Agreement could be wasted. [*Chevron*] *therefore respectfully requests that OHA stay the subject proceeding and await the outcome of the impending court case.*

JE 1173 at 2 (first alteration in original) (emphasis added).

On August 10, 2004, Chevron received notice that OHA denied Chevron's request for a stay, without comment. JE 1177. The same day, Chevron requested reconsideration. JE 1177. On August 12, 2004, OHA denied Chevron's request for reconsideration: "As we have previously stated, disputes about the [Equity Process Agreement] are outside our purview. Accordingly, given the absence of a joint motion for stay, the proceeding should go forward." 8/31/05 App. to Gov't Mot. to Dismiss at 109.

On January 31, 2005, OHA vacated the ASFE's Final Stevens Zone Decision and ordered a remand to the ASFE with instructions to apply a conversion factor based upon a weighted average of the price of oil and gas over the "life of the Unit." JE 1184 at CDE00900037.

### 8.   The Assistant Secretary For Fossil Energy's Preliminary Remand Decision.

A central issue that arose during the OHA remand concerned whether to include natural gas liquids ("NGLs") in the equity calculation. Doing so was favorable to DOE's equity position. JE 1352. On May 4, 2006, Ms. Cadieux sent a draft preliminary decision to the ASFE, but did not indicate that inclusion of NGLs was controversial. JE 1253. At trial, the ASFE testified that he had no recollection of changing Ms. Cadieux's May 4, 2006 draft before issuing it as his preliminary decision on May 23, 2006. TR at 1925 (ASFE Jarrett); *see also* TR at 1261-62 (Latham) (praising Ms. Egger's review of the ASFE's draft "Preliminary Decision on OHA Remand" as "thorough" and "meticulous"). The Preliminary Remand Decision noted that the ASFE adopted the "Headquarters Equity Advisory Team's recommendation to exclude [certain] months [for which there was no data] from the calculation [of monthly price ratios]." JE 15 at 7-8. At trial, it was clear that the ASFE misunderstood the factual basis for the decision issued in his name. Notably, the ASFE's Preliminary Remand Decision stated that unavailable pricing information was not an issue, because the decision covered a period during which sales were "so small as to be immaterial to the overall calculation." JE15 at 8 (Preliminary Remand Decision). Chevron contends that the potential sales during those months were worth $2.5 billion. TR at 1927-36 (ASFE Jarrett admitting that he was unaware of the $2.5 billion in sales).

### 9.   The Assistant Secretary For Fossil Energy's Final Remand Decision.

After the May 23, 2006 ASFE Preliminary Remand Decision, Ms. Egger resumed her involvement with Ms. Cadieux in drafting the ASFE's Final Remand Decision. *See e.g.*, JE 1352 (12/8/06 email from Ms. Cadieux to Dr. Latham and Mr. Smits stating: "Help! I'm going through the record to develop the concept that the IPE included NGLs in his recommendation and that has never been challenged, but I'm not sure whether I'm headed off on a tangent."). Prior to trial, the ASFE insisted that "[n]either Ms. Egger nor Ms. Cadieux in any way influenced my decision on [conversion] issues or the final decision[.]" JE 1538 ¶¶ 23-24 (ASFE Jarrett Decl.). *But see* JE 1360 (2/7/07 email entitled "Stevens Zone draft final decision on remand" from Ms. Cadieux to Ms. Egger, Mr. Smits, and Dr. Latham, enclosing a draft of the remand decision and stating "I've incorporated the comments from Mary [Egger], Gary [Latham], and Arney [Smits] into this document and gone through it again. If we are all ok with this proposed version, I propose that we provide it to [the ASFE] and schedule a meeting to address any questions."). At

trial, however, the ASFE testified that he only spent "maybe a few days at the most" on the Stevens Zone Remand Decision.  TR at 1881, 1963 (ASFE Jarrett).  He admitted he relied on Ms. Egger and Ms. Cadieux for "sound and unbiased advice on the [Final Remand] decision."  TR at 1886, 1963 (ASFE Jarrett); JE 1538 ¶ 11 (ASFE Jarrett Decl.) ("I relied upon Ms. Egger regarding all legal matters relating to the equity finalization process[.]").  In fact, by this time, the ASFE abdicated any substantive role in the final equity determination of the Stevens Zone and delegated his responsibility to Ms. Egger and Ms. Cadieux.  TR at 1881-83, 1885, 1925, 1928-32, 1936-37, 1939, 1942, 1945-46, 1956-57, 1963 (ASFE Jarrett).  The ASFE, however, was aware that Chevron wanted to exclude the sale of NGLs and that the options proposed to him by the ASFE's Technical & Legal Team all included the sale of NGLs.  TR at 1969 (ASFE Jarrett).

On February 21, 2007, the ASFE issued the Final Remand Decision on the Stevens Zone that apportioned equity of 80.354% to DOE and 19.646% to Chevron.  JE 16 at 5.  In response, Chevron filed a notice of appeal with OHA and a simultaneous motion to stay or continue the appeal, pending a ruling in the United States Court of Federal Claims that might affect OHA's jurisdiction.  *See Chevron USA Inc.*, No. TES-0010 (Dep't of Energy Dec. 4, 2007) (denying Chevron's motion to continue).  On July 10, 2008, OHA issued an interlocutory order granting DOE's February 11, 2008 Motion To Dismiss Chevron's appeal with respect to: "the inclusion of non-cycled NGLs in the gas component of the conversion formula"; the Equity IPE's calculations based on "'abandonment pressures' of 500 psi in the 26R and NWS A-1 to A-3 reservoirs"; "[w]hether equity participation percentages should be established without regard to publicly available data that is obtained by the IPE and that affects the IPE's estimates of one party's share of recoverable oil by approximately eight million barrels"; and "[w]hether, in establishing equity participation percentages, the results of a simulation model which has not been found to be biased in any way may be diluted by using an average recovery based upon the combination of parcels owned by each party."  *Chevron USA Inc.*, No. TEZ-0010, at 8-9 (Dep't of Energy July 10, 2008).

On August 27, 2009, OHA issued an interlocutory order addressing issues raised in Chevron's appeal and requesting further briefing.  *See Chevron USA Inc.*, No. TEZ-0011 (Dep't of Energy Aug. 27, 2009).  On June 17, 2010, Chevron filed its final brief in the appeal.  Supplemental Reply Brief of Chevron U.S.A. Inc., No. TEA-0010 (Dep't of Energy June 17, 2010).

### D.    The Shallow Oil Zone.

The Shallow Oil Zone, located 2000 to 5000 feet below the surface, represented approximately 25% of the value of the Elk Hills Reserve, as of February 5, 1998.  JE 1225 at 2-3.  Each equity percentage point was valued at $85 million.  JE 1225 at 8.  As such, the estimated total value of the Shallow Oil Zone was $8.5 billion.

### 1.    The Independent Petroleum Engineer's Provisional Recommendation.

A central issue in the equity finalization of the Shallow Oil Zone that resumed after the May 19, 1997 Equity Process Agreement was executed was whether the Equity IPE should use a

"simulation model" to determine equity shares.  The DOE EFT argued that the Equity IPE should use a simulation model.  JE 958; JE 990.  Chevron favored "analytical" methods.  TR at 1298-99 (Gangle).  Before the Equity IPE issued a Provisional Recommendation, Dr. Latham, a member of the ASFE's technical team, had an *ex parte* communication with the Equity IPE to convince him not to adopt "a strategy whereby the interim equity does not include the simulation model."  JE 1050; 4/30/07 Krenek Dep. at 233.

On October 2, 2002, the Equity IPE issued a Provisional Recommendation that apportioned DOE a 1.01 percentage point increase over its equity percentage in the Decoupling Agreement, resulting in an estimated $100 million benefit to DOE.  JE 1086 (10/3/2002 email from Dr. Latham to the ASFE stating that "[t]his increase, including interest, would be worth about $100 million to the DOE"); JE 1225 at 8 (1/12/2006 DOE PowerPoint slide stating that DOE's gain was $85 million); JE 7 at 2 (Decoupling Agreement equity percentages); *see also* JE 1085 (10/3/02 email from Ms. Egger congratulating the DOE EFT on the Equity IPE's Provisional Recommendation).

## 2.    The Shallow Oil Zone Equity Was Never Finalized.

On January 7, 2003, Chevron's outside counsel sent a letter to DOE under the Freedom of Information Act ("FOIA"), requesting twelve categories of documents related to the Elk Hills equity determination process.  JE 1101.  The request asked for: documents that the ASFE and ASFE representatives used or relied upon in preparing Preliminary and Final Decisions; meeting notes and telephone logs; written communications; contracts between DOE and the Equity IPE; instructions and guidance provided to the Equity IPE; other materials provided to the Equity IPE; communications between DOE and the Equity IPE; documents about payments to the Equity IPE, the ILA, and consultants; and DOE submissions to members of Congress.  JE 1101 at 1-2. On January 30, 2003, DOE informed Chevron's outside counsel that DOE would be unable to respond to the FOIA request within the twenty days provided for by statute.  JE 1135 at 1 (12/19/03 letter from Chevron's outside counsel quoting a 1/30/03 letter from Dr. Latham); *see also* 5 U.S.C.A. § 552(a)(6)(A)(i) (2010) (giving an agency twenty working days to notify a requester whether the agency will comply with a FOIA request).  On April 17, 2003, Chevron's outside counsel received a single, redacted document from DOE and a letter denying the remainder of the FOIA request for lack of specificity.  JE 1135 at 1-2.  On December 19, 2003, Chevron's outside counsel notified DOE that Chevron would file a complaint in United States District Court on January 7, 2004 if DOE did not fully comply with the FOIA request.  JE 1135 at 1.  Four days later, DOE sent Chevron "three loose-leaf binders' worth of documents (heavily redacted)."  JE 1137 at CA5031059 (1/28/04 letter from the vice president of Chevron's Exploration & Production Company to the ASFE).

On February 19, 2004, Chevron's outside counsel filed a second FOIA request to obtain: documents that the ASFE and the ASFE's representatives used or relied upon in preparing Preliminary and Final Decisions for the Dry Gas Zone and the Carneros Zone; meeting notes and telephone logs memorializing discussions with respect to equity determinations in those zones; written communications regarding those equity determinations; records discussing the propriety or impropriety of the involvement of Ms. Egger or others in those equity determinations; lists of

the DOE EFT's members and lawyers; and written communications between DOE and the Equity IPE regarding those equity determinations.  JE 1147 at 1-2.

On August 20, 2004, Chevron filed a Complaint in the United States Court of Federal Claims ("Compl.") that alleged that DOE breached the Equity Process Agreement and the Decoupling Agreement (Compl. ¶¶ 63-64) and breached the implied covenant of good faith and fair dealing (Compl. ¶¶ 67-69).

In 2005, after learning about this case, the Equity IPE refused to renew its contract with DOE, unless Chevron executed a retroactive waiver of liability.  JE 1257 (5/9/06 letter from DOE's Secretary to the Vice President of the United States advising of the Equity IPE's concern about liability).  DOE requested Congress to authorize DOE's Secretary to immunize the Equity IPE.  JE 1257; JE 1258 (5/9/06 letter from DOE's Secretary to the Speaker of the House of Representatives).  No congressional response was received.  In November 2006, the Equity IPE's contract expired.  JE 1431 at 1.

In September 2008, an Acting ASFE proposed that Chevron suggest a new Equity IPE to resume Shallow Oil Zone finalization.  JE 1431 (9/12/08 letter from the ASFE to Chevron's Vice President for Exploration and Production).  The parties never agreed to a new Equity IPE.

## III.  PROCEDURAL HISTORY.

The early procedural history of this case was set forth in *Chevron U.S.A., Inc. v. United States*, 71 Fed. Cl. 236, 253-55 (2006) ("*Chevron I*").  The court determined that it had jurisdiction to adjudicate the claims alleged in Chevron's August 20, 2004 Complaint.  *Id.* at 258-67.  On August 16, 2007, the Government filed a second motion to dismiss on jurisdictional grounds that the court denied on August 28, 2008.  *See Chevron U.S.A., Inc. v. United States*, 83 Fed. Cl. 209, 213 (2008) ("*Chevron II*").

On September 15, 2009 the parties filed an Exhibit List and an Exhibit List Supplement, in addition to Pre-Trial Briefs.  Subsequently, each party filed a Response.

On October 7, 2009, the parties filed a Second Supplemental Exhibit List.  On October 9, 2009, the parties filed a Third Supplemental Exhibit List.  On October 22, 2009, the parties filed a Fourth Supplemental Exhibit List.  On October 27, 2009, the parties filed a Fifth Supplemental Exhibit List.  The Government also filed an October 10, 2007 Motion *In Limine* Re: Plaintiff's Designated Experts.  On April 17, 2009, Chevron filed a Response.  On May 15, 2009, the Government filed a Reply.  On August 5, 2009, the court denied the Government's October 10, 2007 Motion *In Limine*.

On October 13-26, 2009, the court held a trial on liability in Washington, D.C.  The court reconvened the trial on December 3, 2009, in Dallas, Texas.

On January 15, 2010, Chevron filed a Post-Trial Brief ("Pl. PT Br.") and Proposed Findings Of Fact And Conclusions Of Law ("Pl. PFOF").  On the same day, Chevron also filed the Supplemental Declaration Of Marshall J. Breger and a Motion For Leave To File Amended

Complaint To Conform To The Evidence Adduced At Trial.  On February 2, 2010, the court granted Chevron's January 15, 2010 Motion For Leave To File Amended Complaint ("Am. Compl.").[21]  The January 15, 2010 Amended Complaint alleges that DOE breached the Equity Process Agreement and the Decoupling Agreement (Am. Compl. ¶ 75); breached the Equity IPE Protocol (Am. Compl. ¶ 87); breached DOE's contract with the Equity IPE, to which Chevron was a third party beneficiary (Am. Compl. ¶¶ 91, 93); breached the implied covenant of good faith and fair dealing with respect to the Equity Process Agreement and the Decoupling Agreement (Am. Compl. ¶¶ 98, 100); and tortiously and fraudulently breached the Equity Process Agreement, the Equity IPE Protocol, and DOE's contract with the Equity IPE (Am. Compl. ¶ 117).

On May 14, 2010, the Government filed a Post-Trial Response Brief ("Gov't PT Resp."). On June 11, 2010, Chevron filed a Post Trial Reply ("Pl. PT Reply").

On March 11, 2011, the Government filed a motion requesting the court to defer the damages portion of the trial, then scheduled for May 31, 2011, until September 2011.  On March 14, 2011, the court denied that motion.

After the liability trial concluded, at the court's suggestion, the parties agreed to engage in private mediation.  On April 21, 2011, the parties entered into a Settlement Agreement And Release Regarding Elk Hills Equity Percentages (the "April 21, 2011 Settlement") (JE 1731). The April 21, 2011 Settlement resolved the parties' dispute regarding the determination of final equity as to all zones, resulting in an undisclosed lump sum payment, the amount of which is confidential.  JE 1731 ¶ 6.3.  The April 21, 2011 Settlement also rescinded all prior decisions issued by the Equity IPE, the ASFE, and OHA.  JE 1731 ¶ 6.2.  The Settlement, however, expressly reserved Chevron's right to proceed with this case to seek damages for DOE's breach of the Equity Process Agreement.  JE 1731 ¶¶ 5.1-5.3.[22]

Thereafter, the parties also filed a number of motions *in limine*,[23] all of which are resolved in substance by this Memorandum Opinion and Order.  In addition, on May 25, 2011,

---

[21] The court's February 2, 2010 Order denied Chevron's January 15, 2010 Supplemental Declaration of Professor Breger, because he testified at trial.

[22] The court would be remiss if it did not acknowledge the significant effort of Mr. Scott Harris, DOE's General Counsel (July 2009-March 2011), to accomplish equity finalization.  In the court's judgment, if Mr. Harris had not decided to return to the private sector, after the April 21, 2011 Settlement was entered, the court is confident that this case would have been resolved.

[23] These motions, and related briefs include: the Government's April 26, 2011 Motion *In Limine* To Exclude [Chevron's] New Damages Claim Or, In The Alternative, For A Continuance Of Trial To Allow The Government Time To Retain A New Expert And To Obtain Discovery Upon The New Theory; the Government's May 25, 2011 Motion *In Limine* To Exclude Chevron's Damages Arising From The Cost Of Litigating This Case; the Government's May 25, 2011 Motion *In Limine* To Exclude The Presentation Of Evidence Regarding Chevron's Cost Of Capital Claims; Chevron's May 27, 2011 Motion *In Limine* To Preclude Arguments Relating To The Misconduct's "Causation" Of Effects On The Aborted Equity Finalization Process;

the Government filed a Partial Motion To Dismiss that the court hereby grants, because the Fifth Cause of Action in the Amended Complaint alleges claims for a "tortious and fraudulent breach of contract" that sound in tort, and over which the court does not have jurisdiction.

On May 27, 2011, the parties filed Pre-Trial Damage Briefs.  On May 30, 2011, Chevron filed a Corrected Damages Phase Trial Brief.  On May 31, 2011, the parties filed a Sixth Exhibit List.  The damages portion trial was held in Washington, D.C. from May 31, 2011 through June 3, 2011 ("DTR at 1-1250").

On June 6, 2011 the Government filed a Motion For Judgment On Partial Findings asking the court to enter judgment in its favor on the grounds that Chevron was legally precluded from reliance damages and had not proven entitlement to expectation damages.

On August 5, 2011, Chevron filed a Post-Trial Brief ("Pl. PT D Br."), Proposed Findings Of Fact And Conclusions Of Law ("Pl. D PFOF"), and responses to four of the Government's pending Motions *In Limine*; the Government's May 25, 2011 partial Motion To Dismiss; and the Government's June 6, 2011 Motion For Judgment On Partial Findings.

On September 29, 2011, Chevron filed a Supplemental Brief Addressing The Alternative Damages Scenarios Requested By The Court ("Pl. Supp. D Br.").

On November 18, 2011, the Government filed a Post-Trial Brief ("Gov't PT D Br.") and a Response To Plaintiff's Motions *In Limine*.

On December 16, 2011, the parties filed a Seventh Supplemental Exhibit List.  On December 16, 2011, the Government filed a Response To Plaintiff's Supplemental Damages Brief ("Gov't Supp. D Resp.").  On December 23, 2011, Chevron filed a Post Trial Reply Brief ("Pl. PT D Reply").  On January 20, 2012, Chevron filed a Supplemental Reply Brief to the Government's December 16, 2011 Response ("Pl. Supp. D Reply").

On September 27, 2012, the Government filed a Renewed Motion To Dismiss ("9/27/12 Gov't Mot.").  On October 3, 2012, Chevron filed a Response ("10/3/12 Pl. Resp.").  On October 22, 2012, the Government filed a Reply ("10/22/12 Gov't Reply").

On October 5, 2012, the court heard oral argument on the Government's September 27, 2012 Renewed Motion To Dismiss, pursuant to RCFC 12(b)(1), and the parties' damage theories and proposed damage findings.

---

Chevron's May 27, 2011 Motion *In Limine* To Preclude Arguments Related To A Damages "Offset"; Plaintiff's May 27, 2011 Motion *In Limine* To Preclude The Government From Opposing Chevron's Request For Pre-Equity Process Agreement Damages; Chevron's May 27, 2011 Motion *In Limine* To Exclude Evidence Of Terms And Negotiations Of [the April 21, 2011] Settlement Agreement; and the Government's May 27, 2011 Motion *In Limine* To Exclude Late-Disclosed Evidence And For Expedited Consideration.

On January 11, 2013, the parties filed an Exhibit List Amendment and an Eighth Supplemental Exhibit List.  On February 15, 2013, the parties filed a Ninth Supplemental Exhibit List and a Consolidated Exhibit List.

## IV.    JURISDICTION.

### A.    Pre-Trial Decisions Regarding Jurisdiction.

Prior to trial, the court issued two Memorandum Opinions regarding jurisdiction.   In *Chevron I*, the court addressed four jurisdictional challenges by the Government.

> [1]  In this case, Chevron has alleged two claims for breach of contract. Therefore, as a matter of law, Chevron is not required to identify a specific money-mandating provision in the Equity Process Agreement, because inherent in every breach of contract is a right to money damages.  . . . Moreover, Chevron's claims also satisfy the requirement of a substantive right to money damages by seeking reliance damages.  . . . Therefore, the Equity Process Agreement inherently provides a substantive right to money damages.

*Chevron I*, 71 Fed. Cl. at 261-62 (citations omitted).

> [2]  [T]he [1996 NDA Act] did not implicitly repeal the Tucker Act jurisdiction vested by Congress in the United States Court of Federal Claims to adjudicate claims alleging that the Government has breached a contract with a private citizen.

*Id.* at 267.

> [3]  [T]he American Rule does not bar recovery of reliance damages, including attorney's fees. . . . Chevron seeks recovery of expenses, including attorney's fees, that were incurred relying on the process established by the Equity Process Agreement[.]
>
> Although the attorney's fees that Chevron seeks as damages were incurred advocating Chevron's final equity position, they were not incurred in litigation against the United States. Instead, the attorney's fees are a measure of Chevron's reliance on the Equity Process Agreement, assuming that Chevron can establish the breach alleged.

*Id*. at 268-70 (citations omitted).

A fourth jurisdiction argument, based on the Non-Appropriated Funds Instrumentality Doctrine, also was rejected.  *See Chevron I*, 71 Fed. Cl. at 271; *see also Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*) (holding that "the jurisdictional foundation of the Tucker Act is not limited by the appropriation status of the agency's funds or the source of funds by which any judgment may be paid").

On August 28, 2008, the court issued a Memorandum Opinion and Order denying the Government's (Second) Motion To Dismiss paragraphs 64 and 70 of the August 20, 2004 Complaint.  *See Chevron II*, 83 Fed. Cl. at 213.  Therein, the court ruled that allegations in paragraphs 64 and 70 therein, as to the Government's "material breach" did not seek declaratory relief, but a monetary award, and denied the Government's motion.  *Id.*

**B.**     **The Effect Of The United States Court Of Appeals For The Federal Circuit's Post Trial Decision In *Rick's Mushroom Service*.**

After the court issued jurisdictional decisions in *Chevron I* and *Chevron II*, the United States Court of Appeals for the Federal Circuit held in *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338 (Fed. Cir. 2008), that "[t]he [G]overnment's consent to suit under the Tucker Act does not extend to every contract."  *Id.* at 1343.  Therefore, after trial, the court *sua sponte* requested that the parties address the effect of *Rick's Mushroom* on the court's prior determinations that the May 19, 1997 Equity Process Agreement was money-mandating.  *See Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented.").

**1.**     **The Government's Argument.**

The Government argues that "the [May 19, 1997 Equity Process Agreement] includes no monetary component at all, and therefore is . . . obviously not a money-mandating contract." 9/27/12 Gov't Mot. at 7.  The contract in *Rick's Mushroom* set forth the terms of the Government's agreement for certain construction specifications; similarly, the Equity Process Agreement at issue in this case set forth the terms of the Government's agreement regarding the procedures for finalizing the parties' equity interests in an oil field.  9/27/12 Gov't Mot. at 7. And, like the plaintiff in *Rick's Mushroom*, Chevron seeks the costs that it incurred to comply with these procedures.  9/27/12 Gov't Mot. at 8.

In addition, the Government also emphasizes that the Equity Process Agreement was "a contract for a process only."  9/27/12 Gov't Mot. at 9.  The Equity Process Agreement guaranteed no particular outcome.  9/27/12 Gov't Mot. at 9.  More importantly, it specifically barred judicial review.  9/27/12 Gov't Mot. at 11 (quoting JE 6 ¶ B.9 (stating that Chevron "knowingly and voluntarily waive[d] any and all rights it may have . . . to bring any other judicial . . . challenge to the final equity determination decisions by the ASFE")).  Therefore, the Equity Process Agreement bars this court from jurisdiction over any dispute regarding the Equity Process Agreement.  9/27/12 Gov't Mot. at 10, 12 (citing *New Valley Corp. v. United States*, 119 F.3d 1576, 1583 (Fed. Cir. 1997) (holding that where a contract clause "indicates that the parties intended for any joint decision to be final and conclusive . . . [s]uch a decision would be barred, then, from judicial review")).

The Government further argues that contracts for process are not analogous to bid protest cases, that authorize recovery of bid preparation costs only when protesters demonstrate an agency's failure to follow a legally mandated process.  10/22/12 Gov't Reply at 5.  Those

recoveries do not flow from contract law, but arise from an express statutory provision, 28 U.S.C. 1491(b).  10/22/12 Gov't Reply at 5.

In addition, although the Government disputes the validity of analogizing the Equity Process Agreement to an arbitration agreement, the Government contends that analogy supports its motion.  10/22/12 Gov't Reply at 6-7 (quoting *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 487 (5th Cir. 2002) ("[E]nforcement of an agreement to arbitrate . . . does not appear to include any mechanism beyond those geared toward returning the parties to arbitration, thus appearing *not to authorize compensation by a court to parties in the form of damages* prior to the issuance of the arbitral award" (emphasis added in the Government's brief))).

## 2.     The Plaintiff's Response.

Chevron responds that the "default presumption" remains that contracts are money mandating.  10/3/12 Pl. Resp. at 2.  Moreover, the holding in *Rick's Mushroom* "was limited to the specific facts of that case," applying only to "exceptional contracts [that] . . . overcome the ordinary presumption that their breach gives rise to money damages."  10/3/12 Pl. Resp. at 3-4 . The Equity Process Agreement at issue in this case established a process for finalizing ownership interests in an oil field. Since that determination necessarily required the payment of money from one party to the other, the Equity Process Agreement "inherently relate[s] to monetary compensation."  10/3/12 Pl. Resp. at 5-6, 8-9 (quoting *Holmes v. United States*, 657 F.3d 1303, 1316 (Fed. Cir. 2011)).  Chevron also cites to the availability of reliance damages in other cases involving breach of contracts for process, such as the recovery of bid preparation costs, even when the contract contains no money-mandating provision.  10/3/12 Pl. Resp. at 6 (citing *Heyer Prods. Co. v. United States*, 140 F. Supp. 409, 413-14 (Cl. Ct. 1956)).  Finally, Chevron contends that, although the Equity Process Agreement excludes decisions of the ASFE and OHA from judicial review, it does not bar judicial review of the breach of the Equity Process Agreement.  10/3/12 Pl. Resp. at 6.

## 3.     The Court's Resolution.

The United States Court of Appeals for the Federal Circuit held that the agreement at issue in *Rick's Mushroom* did "not provide a substantive right to recover money-damages," because it was a cooperative cost-share agreement,[24] and "there was no evidence of a buyer-seller relationship, and the government did not receive a *direct benefit* from the operation of the [mushroom processing] facility."  *Rick's Mushroom*, 521 F.3d at 1343-44 (emphasis added).

Subsequently, the United States Court of Appeals for the Federal Circuit clarified that *Rick's Mushroom* did not alter the general rule that

---

[24] A cooperative cost-share agreement is one where the "principal purpose . . . is to transfer a thing of value to the State, local government, or other recipient to carry out a *public purpose* of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government[.]"  31 U.S.C. § 6305 (2006) (emphasis added).

in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement.   Indeed, as a plurality of the [United States] Supreme Court noted in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S. Ct. 2432, 135 L. Ed. 2d 964 (1996), "damages are always the default remedy for breach of contract."

*Holmes*, 657 F.3d at 1314 (quoting *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001)).

Accordingly, "when a breach of contract claim is brought in the [United States] Court of Federal Claims under the Tucker Act, the plaintiff comes armed with the presumption that money damages are available, so that normally no further inquiry is required." *Id.*  In the case of unconventional contracts, the court must inquire whether the agreement "could fairly be interpreted as contemplating money damages in the event of breach." *Id.* at 1315. *Holmes* provided the court with a two-part analysis for making this determination.

First, the court must determine whether money damages would be available for a breach of the *type* of contract at issue. *Id.* at 1314-15 (explaining that there is no presumption that money damages are available for cost-sharing agreements or Title VII discrimination complaints).  Second, the court must examine the details of the specific contract at issue. *Id.* (explaining that, for example, "[a] contract expressly disavowing money damages would not give rise to Tucker Act jurisdiction").  This second step was dispositive in *Holmes*, where the Navy entered into a settlement agreement to expunge negative information from plaintiff's record, but did not agree to make any specific monetary payments. *Id.* at 1315.  Nevertheless, the settlement agreement was held to be "inherently relate[d] to monetary compensation through [its] relationship to [plaintiff's] future employment [prospects]." *Id.* at 1316.

In this case, the Equity Process Agreement, in effect, is a contract for a quasi-judicial procedure, akin to an arbitration agreement. JE 1522 at ¶ 9 (Expert Report of Professor Geoffrey C. Hazard, Jr.);[25] *see also* BLACK'S LAW DICTIONARY 112 (9th ed. 2009) (defining "arbitration" as "[a] method of dispute resolution involving one or more neutral third parties who are usu[ally] agreed to by the disputing parties and whose decision is binding"); *George J. Grant Const. Co. v. United States*, 109 F. Supp. 245, 247 (Ct. Cl. 1953) (a government agreement that includes a dispute resolution procedure authorizing federal officials to act in a quasi-judicial manner is "a sort of arbitration, albeit by agents of one party to the contract."); *Harvey v. Joyce*, 199 F.3d 790, 792-94 (5th Cir. 2000) (construing a paragraph in an agreement among three business associates as an arbitration clause, although the text did not use the words "arbiter," "arbitrate," or "arbitration").

---

[25] For this reason, the court rejects Chevron's analogy to bid protest cases; where there is no contract between the federal agency and the protestor, but a successful protestor statutorily can recover bid preparation costs. *See* 28 U.S.C. § 1491(b)(2) (allowing monetary relief limited to bid preparation and proposal costs).

The Government's reliance on *Gulf Guaranty* is misplaced, because the United States Court of Appeals for the Fifth Circuit held in that case only that a federal trial court may not award damages for breach of an arbitration agreement while an arbitration process is ongoing. *See Gulf Guar.*, 304 F.3d at 487-88 (holding that the Federal Arbitration Act bars a court from awarding damages for breach of an arbitration agreement "prior to issuance of the arbitral award"). To the contrary, federal courts award damages for a breach of an arbitration agreement. *See Bergquist v. Mann Bracken*, 592 F.3d 816, 818-19 (7th Cir. 2010) ("[W]hen injuries created by the process of arbitration are redressable in damages, federal courts are competent to act[.]"); *Munson v. Straits of Dover, S.S. Co.*, 102 F. 926, 927 (2d Cir. 1900) (awarding nominal damages for failure to engage in contracted-for arbitration, and stating that "[t]here are many cases in the books where" actual damages have been awarded to parties who have engaged in an arbitration process that has been vitiated by the other party's withdrawal after the process began); *see also Red Cross Line v. Atl. Fruit Co.*, 264 U.S. 109, 121 (1924) (Brandeis, J.) ("If [an arbitration agreement is] executory, a breach will support an action for damages."). Therefore, the court is satisfied that the first part of the *Holmes* analysis supports the presumption in this case that the Equity Process Agreement could "fairly be interpreted as contemplating money damages."

The second part of the *Holmes* analysis also supports the presumption that the Equity Process Agreement is money-mandating, because it is "inherently related" to monetary compensation, because it created a process that would result in one party paying the other money to finalize a commercial dispute concerning equity interests in oil and gas reserves. JE 6 (Equity Process Agreement); JE 1548 ¶ 10.4 (Termination Agreement, discussing "payments between the [p]arties . . . arising from . . . equity finalization"). In addition, the April 21, 2011 Settlement terminated the Equity Process Agreement with the payment of money, albeit the amount was not disclosed. Since the Equity Process Agreement directly was related to the payment of money, the court has determined that it could "fairly be interpreted as contemplating money damages," in the event of a breach.[26]

In addition, the court also rejects the Government's argument that the Equity Process Agreement explicitly bars the court from adjudicating claims arising from its breach. 9/27/12 Gov't Mot. at 11. To the contrary, the Equity Process Agreement bars judicial review of the ASFE's final equity determination, but not the parties' compliance with the terms of the Equity Process Agreement. *Compare* JE 6 ¶ B.9 (barring review of the ASFE's decisions), *with* JE 6 ¶ C.4 (stating that the Equity Process Agreement "constitutes the legal, valid and binding obligation of the parties, enforceable against them in accordance with its terms").

For these reasons, the court has determined that the Equity Process Agreement is money-mandating and that *Rick's Mushroom Service* does not bar the court from adjudicating the claims alleged in the August 20, 2004 Complaint, as amended. The Government's September 27, 2012 Renewed Motion To Dismiss therefore is denied.

----

[26] As such, the court also rejects the Government's argument (9/27/12 Gov't Mot. at 7-8), that the Equity Process Agreement is factually akin to the cooperative agreement in *Rick's Mushroom*, because in that case, the Government "did not receive a direct benefit from the operation of the . . . facility." *Rick's Mushroom*, 521 F.3d at 1344. In this case, however, the Equity Process Agreement provided DOE with a direct benefit in the form of an agreed-upon process for determining the equity interests of DOE and Chevron in the Elk Hills Reserve.

**C.    Other Jurisdictional Issues Raised In The Government's May 14, 2010 Post-Trial Brief.**

     **a.    Jurisdictional Arguments That Are Not At Issue Or Are Irrelevant In This Case.**

The Government's May 14, 2010 Post-Trial Brief also raised several "straw man" jurisdictional arguments:

1.    The [United States Court of Federal Claims] does not have jurisdiction to adjudicate claims arising under the Administrative Procedure Act ("APA") (Gov't PT Resp. at 5-6).

2.    The [United States Court of Federal Claims] does not have jurisdiction to adjudicate claims arising under OHA's Decisions (Gov't PT Resp. at 24).

3.    The [United States Court of Federal Claims] does not have jurisdiction to adjudicate claims alleged by Chevron as to the legal aspects of the ASFE's Equity Redetermination Decisions (Gov't PT Resp. at 25).

4.    The [United States Court of Federal Claims] does not have jurisdiction to adjudicate claims alleged by Chevron as to the technical aspects of the ASFE's Equity Redetermination Decisions (Gov't PT Resp. at 25).

5.    The [United States Court of Federal Claims] does not have jurisdiction to adjudicate allegations that DOE attorneys violated the D.C. Code of Professional Responsibility (Gov't PT Resp. at 26).

The court has determined that none of these issues are relevant nor at issue in this case.

   **b.**  **Whether The United States Court Of Federal Claims Has Jurisdiction To Adjudicate Plaintiff's Claims That The Department Of Energy Breached The Equity Independent Petroleum Engineer Protocol.**

    **i.**  **The Plaintiff's Argument.**

   Chevron argues that the court has jurisdiction to adjudicate DOE's alleged breach of the Equity IPE Protocol for three reasons.  First, although the Equity IPE Protocol was issued as an Administrative Order, it evidenced an agreement between DOE and Chevron, because it: "fleshed out the understandings of the parties" (JE 58 – letter from Ms. Egger to Mr. Stay) and DOE viewed the Protocol as binding on both parties (JE 72 – minutes of a meeting between Chevron and DOE at which Ms. Egger stated "[w]e have a protocol agreement that we hope the parties regard as binding").  Pl. PT Reply at 18-20; Pl. PT Br. at 51-54.  In addition, the Equity IPE Protocol meets all the requirements for a contract, *i.e.*, intent, consideration, acceptance, and signature by an authorized government official.  Pl. PT Br. at 53-54 (citing *D&N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir. 2003)).

   Second, the Equity IPE Protocol implicitly was incorporated into the Equity Process Agreement.  Pl. PT Br. at 54-55; Pl. PT Reply at 20-21.  Although the Equity Process Agreement only expressly incorporated the procedures mandated by the Equity IPE Protocol with respect to the Shallow Oil Zone (JE 6 ¶ A(2)), this reflects the fact that the Protocol originally applied to the other three zones, so express incorporation was required to apply the Protocol to this last zone.  Pl. PT Br. at 54.  Moreover, it is implausible that the parties to the Equity Process Agreement intended to ban *ex parte* communications only as to the equity finalization of the Shallow Oil Zone, but not the other zones.  Pl. PT Br. at 54-55.

   Third, even if the Equity IPE Protocol was not a contract between Chevron and DOE, or incorporated into a contract between them, it was expressly incorporated into the July 8, 1996 Contract between the DOE and Equity IPE.  JE 1372 at CBL003 00533 ¶ 1.0.  Chevron was an intended beneficiary of that contract and therefore has standing to bring any suit, including for a breach of the incorporated Equity IPE Protocol.  Pl. PT Br. at 55-56 (citing *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001) ("In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly.")); *see also* Pl. PT Reply at 21-22.  The entire point of the July 8, 1996 Contract with the Equity IPE was to provide an impartial process that would benefit DOE and Chevron, as the Equity IPE testified at trial.  *See* JE 2 at CME002 00450 (1996 NDA Act requiring DOE to hire an IPE that is "mutually acceptable" to Chevron and DOE); *see also* TR at 2795 (Sewell); TR at 2854 (Frost).

    **ii.**  **The Government's Response.**

   The Government responds that the Equity IPE Protocol is an Administrative Order, not a contract.  Accordingly, it may only be challenged under the APA and the United States Court of Federal Claims does not have jurisdiction to adjudicate a claim under the APA.  Gov't PT Resp. at 3.  Although the ASFE permitted Chevron to provide input into the terms of the Equity IPE

Protocol, this does not establish that DOE intended the Equity IPE Protocol to be a contract between the parties. Gov't PT Resp. at 3.

In addition, the Equity IPE Protocol was not incorporated into the Equity Process Agreement for all four zones. As the court previously found, the Equity Process Agreement "did not incorporate any procedures from [the Equity IPE Protocol]" with respect to the Carneros, Dry Gas, and Stevens Zones. *See Chevron I*, 71 Fed. Cl. at 247. Accordingly, any violation of the Equity IPE Protocol by DOE as to these three zones is not a breach of the Equity Process Agreement. Gov't PT Resp. at 3-4.

Chevron cannot argue that DOE's alleged violation of the Equity IPE Protocol violated the July 8, 1996 contract between the Equity IPE and DOE. Gov't PT Resp. at 4-5. Chevron was not a beneficiary of that contract nor has Chevron demonstrated that the contract was entered into for its "direct" benefit – a prerequisite for the court's exercise of jurisdiction. *See Glass*, 258 F.3d at 1354. More importantly, no language in the Equity IPE Protocol indicates that it was entered into for Chevron's benefit. JE 1372.

### iii.    The Court's Resolution.

#### i.    The Equity Independent Petroleum Engineer Protocol Was Not A Contract Between Plaintiff And The Department Of Energy.

The United States Supreme Court has observed that consent decrees and administrative orders, "arrived at by negotiation between the parties," have "attributes . . . of contracts" and thus "are treated as contracts for some purposes[,] but not for others." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 237 n.10 (1975). For this reason, the United States Court of Appeals for the Federal Circuit has held that the United States Court of Federal Claims had jurisdiction to adjudicate a breach of contract claim arising from the Government's violation of a consent decree entered by a federal district court. *See VanDesande v. United States*, 673 F.3d 1342, 1350 (Fed. Cir. 2012) ("[T]he *ITT* line of cases supports a conclusion that settlement agreements, even if they are incorporated into judicial or administrative consent decrees, should be viewed for enforcement purposes as having the attributes of a contract."). Accordingly, if an Administrative Order formalizes a negotiated agreement between the Government and a private party, our appellate court's jurisprudence supports the proposition that a federal trial court has jurisdiction to adjudicate a breach of that Order.

In this case, DOE requested that Chevron comment on and approve the Equity IPE Protocol, as well as the two supplements. JE 65 (Equity IPE Protocol); JE 107 (First Supplement); JE 171 (Second Supplement). Thereafter, DOE consistently treated the Equity IPE Protocol as the product of negotiations between DOE and Chevron. JE 58 (7/2/96 letter from Ms. Egger to Chevron requesting "[i]f you find the [Equity IPE] Protocol acceptable, please so indicate by return telefax with your signature" and describing the Equity IPE Protocol as "flesh[ing] out the understandings of the parties"); JE 72 (minutes of 7/23/96 meeting between DOE and Chevron, where Ms. Egger advised Chevron that "[w]e have a[n Equity IPE P]rotocol agreement that we hope the parties regard as binding"); JE 171 (1/21/97 letter from ASFE

Godley to Chevron stating "[a]lthough the [Equity IPE] Protocol did not contain every element initially desired by either party, it was, as noted in your January 8 letter, agreed to by Chevron prior to its issuance"); JE 107 (9/18/96 memorandum from Ms. Egger to Chevron describing the First Supplement to the Equity IPE Protocol and indicating that "[i]n order to accommodate DOE procurement practice, we have put this in the form of an agreed-upon protocol").

The evidence suggests that, although DOE accepted input from Chevron in preparing the Equity IPE Protocol, it was done in the spirit of cooperation, not with an eye toward entering into a contractual agreement with Chevron. For example, the January 21, 1997 letter from DOE to Chevron stated:

> Even before the retention of [the IPE], the [DOE] extensively discussed with Chevron the process to be used to finalize equity and sought to reach consensus with Chevron on the process and milestones for this complex undertaking. Of course, seeking to establish a mutually acceptable process is not required by the
>
> Act. Nevertheless, we believed such an effort was desirable, and a significant effort in this regard is reflected in the [Equity IPE Protocol.]

JE 171.

Moreover, although DOE invited Chevron to "review and comment" on a final draft of the Equity IPE Protocol, DOE was not required to secure Chevron's approval. JE 58; *see also* JE 54 (minutes from June 26, 1996 meeting between DOE and Chevron where DOE's General Counsel stated "[w]e would like to decide on a procedure that both parties are comfortable with, but the Department is prepared to go forward without Chevron's agreement"). Although the 1966 NDA Act required that an IPE be "mutually acceptable" to Chevron and DOE, it did not require that the process followed by the IPE meet with Chevron's approval. *See* JE 2 at CME002 00450 (stating that, in deciding whether to accept a recommendation from the IPE, "the Secretary [of Energy] may use such other method to establish final equity interest in the reserve as the Secretary considers appropriate"). In addition, there is no indication that Chevron provided DOE with any separate consideration for the Equity IPE Protocol, as it did when it signed the Equity Process Agreement and the Decoupling Agreement where Chevron agreed to forgo judicial review of final OHA decisions as to equity finalization.

For these reasons, the court has determined that the Equity IPE Protocol was not a contract between Chevron and DOE.

ii.    **The Equity Independent Petroleum Engineer Protocol Was Not Incorporated Into The Equity Process Agreement As To The Carneros, Dry Gas, And Stevens Zones.**

Although *Chevron I* stated that the Equity Process Agreement "did not incorporate any procedures from Administrative Order No. 96-01," that statement was made in describing the Equity Process Agreement on a motion to dismiss, based solely on the allegations in the August

20, 2004 Complaint.  Since that was a pre-trial opinion, it was not a finding of fact or law subject to the law-of-the-case doctrine.  *See United States v. Palmer*, 122 F.3d 215, 221 (5th Cir. 1997) (recognizing that trial courts "are not always bound by their prior rulings on pretrial motions"); *see also Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1307 (Fed. Cir. 2012) (Newman, J., concurring in part, dissenting in part) ("The 'law of the case' does not apply to preliminary rulings made on pretrial motion.").

In any event, the court has determined that the Equity Process Agreement cannot reasonably be interpreted as incorporating the Equity IPE Protocol as to all four zones, because the Equity Process Agreement expressly incorporated only the Equity IPE Protocol with respect to the Shallow Oil Zone.  JE 6 ¶ A.2 ("The procedures of [the Protocol] . . . will be utilized *for the [Shallow Oil Zone*.]" (emphasis added)).  Nothing in the Equity Process Agreement purports to incorporate the Equity IPE Protocol with respect to the remaining three zones and the court is not at liberty to incorporate a separate document as a contract term without evidence of the parties' assent.  *See Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988) ("In construing a contract, we look first to the terms of the agreement itself.  Our task is to determine the intent of the parties at the time they contracted, as evidenced by the contract itself.  Only if there is ambiguity should parol evidence be considered.").  Therefore, the Equity Process Agreement is not ambiguous as it expressly incorporates the Equity IPE Protocol for the Shallow Oil Zone, but not the other zones.  *See Monroe M. Tapper & Assoc. v. United States*, 602 F.2d 311, 314 (Ct. Cl. 1979) ("It is an established rule of contract interpretation that where several subjects of a class or group are enumerated and there are no general words to show that other subjects or items are included, it may reasonably be inferred that the subjects or items not named were intended to be excluded." (citing 3 CORBIN ON CONTRACTS § 552, at 206 (1960))).  Nor has Chevron provided convincing evidence to the contrary.  *See City of Oxnard v. United States*, 851 F.2d 344, 347 (Fed. Cir. 1988) ("A party contesting the reasonable construction of contract language must show either that both parties had a contrary intent, or that the party seeking relief had no reason to know of that reasonable construction at the time of making the agreement.").  Instead, Chevron simply asserts that "[t]here is no explanation as to why the parties would have added heightened procedural protections only with respect to the Shallow Oil Zone[.]"  Pl. PT Br. at 54.  Chevron cites no evidence that this was DOE's intent, only *post facto* testimony by Chevron's Program Director.  Pl. PT Br. at 54 (citing TR at 914 (Stay)); *see also Varilease Tech. Grp. v. United States*, 289 F.3d 795, 799 (Fed. Cir. 2002) ("[T]he intention of a party entering into a contract is determined by an objective reading of the language of the contract, not by that party's statements in subsequent litigation.").  Therefore, as a matter of law, the court is not at liberty to import a term that is absent from the parties' written agreement.

For these reasons, the court has determined that the Equity IPE Protocol was not incorporated into the Equity Process Agreement for any zone, except the Shallow Oil Zone.

> **iii.  But, Plaintiff Was A Third Party Beneficiary Of The July 8, 1996 Contract Between The Department Of Energy And The Equity Independent Petroleum Engineer.**

The July 8, 1996 contract between DOE and the Equity IPE implemented Congress'
directive that DOE retain an IPE who would be "mutually acceptable" to both parties, reflecting
that the Equity IPE's work would be of direct benefit to DOE and Chevron.  JE 2 at CME002
00450.  This objective also is reflected in the terms of the July 8, 1996 Contract, requiring the
Equity IPE to "prepare recommendations on the respective final equity figures of the Department
of Energy (DOE) and Chevron USA (Chevron), in the specified known oil and gas zones . . . in
accordance with section 3412(b)(2) of the [NDA Act].  . . .   *The Equity IPE's work and
recommendations should be independent and impartial, and not concerned with the financial
impact the recommendations may have on the owners.*"   JE 1372 at CBL003 00533 ¶ 1.0
(emphasis added).[27]  In addition, "[t]he Equity IPE shall develop the implementation plan *based
on the process framework contained in the [Equity IPE Protocol.]*"   *Id.* at CBL003 00534 ¶
3.1.03 (emphasis added).  Therefore, the July 8, 1996 Equity IPE Protocol was incorporated into
the July 8, 1996 Contract by reference.  The Equity IPE Protocol established a "process that is
designed to be open, fair, transparent and one that will adequately protect the *respective
ownership interests of the owners*" (JE 3 ¶ B(5)).  TR at 2795 (Sewell) (agreeing that the work
the Equity IPE performed "[d]efinitely" was "of benefit to both Chevron and the Department of
Energy"); TR at 2854 (Frost) (same); TR at 2958 (Krenek) (agreeing that both Chevron and the
DOE were the Equity IPE's clients).

In *Sullivan v. United States*, 625 F.3d 1378 (Fed. Cir. 2010), the United States Court of
Appeals for the Federal Circuit held:

> For third party beneficiary status to be conferred on a party, the "contract must
> reflect the express or implied intention of the [contracting] parties to benefit the
> third-party." *Montana v. United States*, 124 F.3d 1269, 1273 (Fed.Cir.1997).
> While the third party does not need to be specifically identified in the contract,
> third party beneficiary status can only be bestowed on those parties that "fall
> within a class clearly intended to be benefited" by the contract.  *Id.*  "[M]erely
> because a third party may derive a benefit, purely incidental and not contemplated
> by the contracting parties, from the performance of a contract does not entitle that
> party to enforce the contract."  WILLISTON ON CONTRACTS § 37:7.

*Id.* at 1380 (alterations in original).

Accordingly, to determine whether a non-party to a contract is a third party beneficiary,
the court must "look to whether the beneficiary would be reasonable in relying on the promise as

---

[27]   Although some jurisdictions require that third party beneficiaries be the sole
beneficiaries; others do not.  *Compare Elmo Greer & Sons, Inc. v. Green Const. Co.*, 943 F.2d
48 (4th Cir. 1991) (unpublished opinion) (observing that "West Virginia courts have
unwaveringly upheld [the 'sole beneficiary' test as a] prerequisite to recovery by a third-party
beneficiary"), *with Avco Delta Corp. Canada Ltd. v. United States*, 484 F.2d 692, 702 (7th Cir.
1973) ("Nor does the promise have to be for the sole benefit of the third party who is suing[
under Illinois law.]"), *and Beverly v. Macy,* 702 F.2d 931, 941 (11th Cir. 1983) ("[T]he question
of 'intent to benefit' is more complex than an inquiry into whether the primary or sole purpose
(or motive) was to benefit a non-party to the contract.").

manifesting an intention to confer a right on him." *Dewakuku v. Martinez*, 271 F.3d 1031, 1041 (Fed. Cir. 2001).  Moreover, when the contract at issue "implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001).

In this case, the July 8, 1996 contract between DOE and the Equity IPE expressed that both DOE and the Equity IPE intended Chevron to benefit from the procedures set forth in the Equity IPE Protocol.  The Equity IPE was retained to provide "independent and impartial" equity determinations to "adequately protect" the interests of both DOE and Chevron.  In fact, Ms. Egger agreed that it was reasonable for Chevron to rely on the *ex parte* prohibition in the Equity IPE Protocol.  TR at 2017 ("Q: And Chevron could reasonably rely on the expectation that the Department of Energy would abide by the provisions of this protocol?  A: And vice versa, I think that's correct.").

For these reasons, the court has determined that Chevron was the direct and intended third party beneficiary of the July 8, 1996 contract between DOE and the Equity IPE, incorporating the Equity IPE Protocol as a material term therein.  Accordingly, the court has determined that it has jurisdiction to adjudicate Chevron's claims that DOE also breached the terms of the Equity IPE Protocol.  *See Roedler*, 255 F.3d at 1352 ("To establish a right of action by a third person who is not a party to or identified in the contract as a beneficiary of its performance, the contract must show the intention of the contracting parties to provide a benefit to that person.").

## V.   DISCUSSION.

### A.   Whether The Secretary Of The Department Of Energy Had Authority To Prohibit Staff Attorneys From Having *Ex Parte* Communications With The Assistant Secretary For Fossil Energy.

#### 1.   The Government's Argument.

The Government argues that, even if the terms of the Equity Process Agreement prohibited *ex parte* communications by DOE lawyers with the ASFE, any such agreement "would be a legal nullity."  Gov't PT Resp. at 18-24.  On June 17, 1996, the Secretary of the DOE delegated responsibility to the ASFE to implement all duties required by the UPC and perform all functions required to finalize equity, in the Elk Hills Reserve.  JE 1462 (DOE Order No. 0204-158).  But, the ASFE and the ASFE's agents were "governed by the rules and regulations of the Department of Energy and the policies and procedures prescribed by the Secretary and the Secretary's delegates."  JE 1462 ¶ 3.a.

Two prior Orders issued by the Secretary of the DOE, however, required that all matters of DOE "legal policy, analysis, and advice" were to be coordinated with and determined by DOE's Office of the General Counsel.  JE 1454 (2/21/92 Order stating "[i]t is essential that all matters of legal policy, analysis, and advice affecting the Department be fully coordinated by, and consistent with the views, of the General Counsel"); JE 1458 (11/27/95 Order stating "all matters of legal policy, analysis, and advice affecting the Department must be coordinated with and subject to the direction of the General Counsel.").  Since the June 17, 1996 Order issued by

DOE's Secretary did not rescind these prior Orders, the Government insists that the ASFE did not have the authority to prohibit *ex parte* communications between DOE attorneys and the ASFE, whether the DOE attorneys also served on DOE's EFT or not.  Gov't PT Resp. at 21-23. Likewise, DOE was prohibited from assigning an attorney from the Office of General Counsel to provide advice to the EFT while utilizing different attorneys to provide legal advice to the ASFE, because the attorney advising the EFT would be required to coordinate legal advice through the Office of General Counsel so the "two attorneys [would be] required to take the same legal position, that is, the legal position as determined by the General Counsel."  Gov't PT Resp. at 22. In other words, "the Secretary [of DOE] delegated authority to OGC to determine DOE's authoritative position on virtually all [and] any questions of law," so it was impossible for the ASFE to contract for a neutral process by which some DOE personnel could advocate legal positions different than those that might ultimately be adopted by the ASFE.  Gov't PT Resp. at 24.

### 2.      The Plaintiff's Response.

Chevron responds that the Government's contention that the June 17, 1996 DOE Order did not authorize the ASFE to make all decisions, including legal decisions, without the approval of the DOE Office of General Counsel is without support.  Pl. PT Br. at 39-43.  That Order authorized the ASFE to "[p]erform *all duties and responsibilities* relative to the disposition of the United States share of petroleum produced from the Naval Petroleum Reserves[.]"  JE 1462 ¶ 1.e (emphasis added).  This broad grant of authority, however, did not need to delegate to the ASFE the express authority to issue legal opinions, because it encompassed "all" necessary powers.  Pl. PT Br. at 40.  Moreover, the Government's position is not consistent with other federal agencies' "widespread . . . practice of separating General Counsel lawyers from decisionmaking functions[.]"  Pl. PT Br. at 40.  In addition, the February 21, 1992 Memorandum on which the Government relies (JE 1454) was rescinded on April 1, 1993, prior to DOE's conduct at issue in this case.  JE 1455 at 8.  And, the other DOE Orders relied upon by the Government do not authorize DOE's Office of General Counsel with final authority over the exercise of independent adjudicatory functions within DOE.  Pl. PT Br at 41-42.  Therefore, the more specific delegation to the ASFE trumps the generalized Order delegating legal functions to the DOE Office of General Counsel.  Pl. PT Br at 42.

### 3.      The Court's Resolution.

The DOE Secretary's November 27, 1995 Memorandum, entitled "Alignment of Legal Services" provides:

> The General Counsel is accountable to me for the sufficiency and consistency of legal advice provided throughout the Department.  For that reason, all matters of legal policy, analysis, and advice affecting the Department must be coordinated with and subject to the direction of the General Counsel.  The General Counsel will establish procedures to ensure that this professional consultation occurs and that advice rendered on legal issues is consistent and correct.

JE 1458 at 1.[28]

The purpose of this Memorandum was to ensure that the legal advisors within DOE's Office of General Counsel provided consistent advice to other DOE employees.  JE 1458 at 1 ("With respect to the provision of legal services, I believe an important step towards operating more efficiently is a careful alignment of legal services provided throughout the Department, including a formalization of the relationship *between [DOE] lawyers in the field and the General Counsel*." (emphasis added)).

The UPC provides that, if either the Operating Committee or Engineering Committee is "unable to agree upon any matter," a resolution will be made by the Secretary of the Navy.[29]  JE 1 § 9 (UPC "Determination of Disputes" clause).  The 1996 NDA Act further provides that the Secretary of the Navy "may accept the recommendation of the [IPE] . . . or . . . *use such other method to establish final equity interest in the reserve as the Secretary considers appropriate*." JE 2 at CME002 00450 (emphasis added).

Pursuant to the 1996 NDA Act, the Secretary of Energy issued DOE Order No. 0204-158, delegating "all" powers under the UPC to the ASFE to:

> a.  Perform *all functions* vested in Subtitle B of the [NDA Act] relating to the sale of Naval Petroleum Reserve Numbered I and the study of options for maximizing the value of the other five Naval Petroleum and Oil Shale Reserves to the United States.

> \* \* \*

> d.  Perform *all duties and responsibilities* required by the Unit Plan Contract between the United States of America and Chevron U.S.A., Inc. [and amendments thereto].

> e.  Perform *all duties and responsibilities* relative to the disposition of the United States share of petroleum produced from the Naval Petroleum Reserves to or for the Department of Defense and the Strategic Petroleum Reserve pursuant to 10 U.S.C. section 7430(k) and (l).

JE 1462 ¶ 1 (emphasis added).

---

[28] The DOE Secretary's February 21, 1992 Memorandum is irrelevant, since Chevron presented unrebutted evidence that this document was rescinded on April 1, 1993, long before the ASFE issued the Equity IPE Protocol and the parties executed the Equity Process Agreement. JE 1455 at 8.

[29] The Secretary of the Navy's authority subsequently was transferred to the Secretary of the DOE.  *See* Department of Energy Organization Act, Pub. L. No. 95-91 § 307, 91 Stat. 565 (1977).

Paragraph 3 entitled, "Limitation," however, provided that the ASFE's authority was subject to "the rules and regulations of the Department of Energy and the policies and procedures prescribed by the Secretary and the Secretary's delegates." JE 1462 ¶ 3.a.

Accordingly, the ASFE was expected to consult with and receive legal advice from attorneys in the DOE's General Counsel's Office, but the November 27, 1995 Memorandum in no way required nor authorized the ASFE to perform quasi-adjudicatory duties in any manner that was not impartial and independent.

Therefore, the Government's reliance on the November 27, 1995 Alignment of Legal Services Memorandum is misplaced. As Professor Breger observed at trial, the Government's interpretation is

> like telephone justice in the Soviet Union, [the ASFE] tries to do the right thing, [as] the judge, until he gets the call from the [C]ommissar. So, it's almost analogous. [The ASFE] gets the answer[,] when he gets the phone call from the [G]eneral [C]ounsel's office.

TR at 1032-33 (Breger).

Moreover, if the November 27, 1995 Memorandum were interpreted to prohibit the ASFE from exercising independent judgment in performing adjudicatory functions, substantial due process concerns would be implicated. JE 1522 at ¶ 11.1 (Expert Report of Professor Geoffrey C. Hazard, Jr.); *see also Withrow v. Larkin*, 421 U.S. 35, 47 (1975) ("Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)); *NEC Corp. v. United States*, 151 F.3d 1361, 1372 (Fed. Cir. 1998) ("The right to an impartial decision maker is unquestionably an aspect of procedural due process."). But, "the blend of investigative and adjudicative functions . . . found in modern administrative agencies requires that a pragmatic approach be taken to what qualifies as an 'impartial' decision maker." *Id.* at 1371. Of course, due process is not at issue even where an adjudicator could be characterized as having prejudged a case "in some measure," but due process is implicated where "the decision maker's mind is 'irrevocably closed' on a disputed issue." *Id.* at 1372-73 (quoting *FTC v. Cement Inst.*, 333 U.S. 683, 701 (1948)). Due process also prohibits an advocate from functioning as an adjudicator. *See Walker v. City of Berkeley*, 951 F.2d 182, 184 (9th Cir. 1991) (holding that due process was violated where "the same staff attorney . . . function[ed] both as the City's attorney in the federal court case and as the decisionmaker in [the contemporaneous administrative] hearing").

For these reasons, the court has determined that DOE's Secretary had the authority and the duty to prohibit DOE staff attorneys who served in an advocacy capacity from having *ex parte* communications concerning "equity redetermination-related matters" with the ASFE, who was the adjudicator of the equity finalization of the Elk Hills Reserve.

**B.**     **Whether Department Of Energy Attorneys Who Served As Advocates In The Equity Finalization Process Were Subject To The *Ex Parte* Prohibitions Of The Equity Process Agreement.**

**1.**     **The Plaintiff's Argument.**

Chevron also argues that paragraph B.4 of the Equity Process Agreement "plainly precludes either side's advocates [including attorneys] in the equity finalization process from engaging in *ex parte* communications – whether direct or indirect – with the ASFE." Pl. PT Br. at 8.  Although the term "equity team" was not defined in the Equity Process Agreement, a similar term, "equity finalization team (EFT)," was defined in the Equity IPE Protocol as individuals "appointed [by each owner] . . . to develop and present its equity positions for each of the three zones under consideration." JE 3 ¶ C(2).  Since lawyers act as agents for their clients, an *ex parte* communication provision applicable to a party "inherently applies to that party's lawyers." Pl. PT Br. at 15.  In addition, Paragraph B.4 of the Equity Process Agreement also applies to "indirect" *ex parte* communications, clarifying that a lawyer may not be a conduit through which *ex parte* communications occur between non-lawyers. Pl. PT Br. at 15.

Although paragraph B.4 of the Equity Process Agreement refers to "the DOE field equity *technical* team," the second sentence of the same paragraph prohibits "communications by the ASFE with either *equity team*" on an *ex parte* basis. JE 6 ¶ B.4 (emphasis added).  The term "equity team" is broader than the term "field equity technical team" as it includes any party representative "seeking to maximize [either] side's share of 'equity[.]'" Pl. PT Br. at 17.  Chevron does not contest that the parties intended to permit the ASFE to have communications with DOE technical staff in Washington, D.C.  It was the "field equity technical team" who were prohibited from having *ex parte* communications with the ASFE, because they served as advocates before the Equity IPE and ILA. Pl. PT Br at 17; *see also id.* at 18 n.10 (citing 6/25/09 Smits Dep. at 76; 5/19/09 Burzlaff Dep. at 159, 173-74; and JE 497 at 2 (showing that the term "equity field team" was widely used in communications between the parties to the equity finalization, but that the term "field equity technical team" was not).

Chevron's interpretation of paragraph B.4 of the Equity Process Agreement is further supported by the drafting history.  Initially, Chevron proposed a ban on *ex parte* communications between "the attorneys or technical team members who participated in the preparation of the DOE or the Chevron equity presentations to [the Equity IPE]" and the ASFE. JE 263 at 3.  Although the word "attorney" was not included in paragraph B.4, the parties viewed DOE's agreement to use the broad term "equity team" as sufficient to include attorneys within the *ex parte* prohibition. TR at 865 (Giumarra) ("When we started talking about equity teams in that provision, that took care of the need to call out attorneys or technical people with regard to the equity teams, other than mentioning the technical team in Washington.").  In addition, Chevron was satisfied that DOE attorneys could not circumvent the *ex parte* provision by DOE's agreement to add the words "directly or indirectly" to paragraph B.4 of the Equity Process Agreement, to clarify that the *ex parte* prohibition was broad and inclusive. Pl. PT Br. at 23.  Finally, if the court determines that paragraph B.4 of the Equity Process Agreement is ambiguous, the court must construe that ambiguity against DOE, under the doctrine of *contra*

*proferentem*, since DOE drafted the Equity Process Agreement.  Pl. PT Br. at 21-22 (citing *Chevron II*, 80 Fed. Cl. at 364).

## 2.    The Government's Response.

The Government responds that paragraph B.4 of the Equity Process Agreement does not prohibit communications "by DOE attorneys acting as such."  Gov't PT Resp. at 6-18.  The Government reads paragraph B.4 to prohibit only communications between the ASFE and the "DOE field equity technical team."  Gov't PT Resp. at 8.  Although the second sentence refers to the undefined term "equity team" it also uses the word "such communications," thereby referencing back to the previous sentence's prohibition about communications between the ASFE and the DOE "field equity technical team."  Gov't PT Resp. at 8-9.  DOE's technical team consisted of "engineers, geologists, or geophysicists."  Gov't PT Resp. at 10.  Therefore, an attorney in DOE's Office of General Counsel, like Ms. Egger, was not a technical professional and therefore was not subject to the prohibition on *ex parte* communications in paragraph B.4 of the Equity Process Agreement.  Gov't PT Resp. at 10-11.

Moreover, even if the EPA is considered ambiguous, parol evidence supports the Government's reading of the contract.  Gov't PT Resp. at 11.  On May 14, 1997, Ms. Giumarra, Chevron's Assistant General Counsel, proposed adding language to the second sentence of paragraph B.4 of the Equity Process Agreement to include attorneys in the prohibition on *ex parte* communications.  JE 263.  This confirms that Chevron did not view DOE attorneys as subject to the *ex parte* prohibitions applicable to DOE's "field equity technical team."  Gov't PT Resp. at 12-13.  For this reason, DOE EFT's outside counsel contacted Ms. Giumarra the same day to inform her that a prohibition on *ex parte* attorney communications was unacceptable.  JE 1427 ¶ 41 (8/8/07 Thorpe Dec.).  Nor did "[t]he addition of the phrase 'directly or indirectly'" in the first sentence of paragraph B.4 of the Equity Process Agreement "change or supplement what was already prohibited . . . .  It merely clarified that the ban upon consultation by the ASFE with the 'DOE field equity technical team' could not be evaded by communicating with the 'DOE field equity technical team' through an intermediary."  Gov't PT Resp. at 15-16.  Since Chevron was aware of DOE's understanding that paragraph B.4 did not include *ex parte* attorney communications, Chevron's interpretation must fail, because "[a] party contesting the reasonable construction of contract language must show . . . that the party seeking relief had no reason to know of that reasonable construction at the time of making the agreement."  Gov't PT Resp. at 16 (quoting *City of Oxnard*, 851 F.2d at 347).  Moreover, Chevron's subsequent conduct evidenced that it understood that lawyers, like Ms. Egger, were not part of DOE's "field equity technical team," and that she was permitted to consult with the ASFE's office on an *ex parte* basis.  Gov't PT Resp. at 17 (citing JE 310 at 2 (June 2, 1997 letter from Ms. Giumarra to Ms. Egger suggesting that Ms. Egger discuss certain matters "with your technical team and with [the ASFE]")).

## 3.    The Court's Resolution.

When interpreting a contract, the court must construe it "to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract."  *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002).  In so doing, the court "look[s] first to the terms of the

agreement itself. . . .   Only if there is ambiguity should parol evidence be considered."  *Greco*, 852 F.2d at 560.

Paragraph B.4 of the Equity Process Agreement states:

The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in Washington, D.C.).  No such communications by the ASFE with either equity team shall be on an ex parte basis.  Any written materials submitted to the ASFE by either equity team shall be provided to the other party.   The provisions of this paragraph B.4 shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.

JE 6 ¶ B.4.

The threshold issue is whether the term "equity team" in the second sentence is broader than the "field equity technical team" in the first sentence.  The Government contends that the adjective "such" refers back to both the specific parties and subject matter listed in the first sentence, *i.e.*, to communications "by the ASFE with the 'DOE field equity technical team' regarding equity redetermination-related matters."   Gov't PT Resp. at 8.    Under the Government's interpretation, the second sentence of paragraph B.4 effectively would read:

No [consultation by the ASFE with *the DOE field equity technical team* concerning equity redetermination-related matters] by the ASFE with *either equity team* shall be on an *ex parte* basis.  (emphasis added)

This interpretation has no reasonable meaning, since the reference to "the DOE field equity technical team" is inconsistent with the reference to "*either* equity team."    *See Gould v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) ("'[P]rovisions of a contract must be so construed as to effectuate its spirit and purpose . . . an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.'" (alterations in the original) (quoting *Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978))).

Instead, construing "such communications" in the second sentence of Paragraph B.4 to refer to the first sentence's text regarding communications "concerning equity redetermination-related matters," would result in the second sentence reading as follows:

No [communication concerning equity redetermination-related matters] by the ASFE with either equity team shall be on an *ex parte* basis.

This interpretation is grammatically correct and comprehensible.  Although the term "equity team" is not defined in the Equity Process Agreement, the DOE EFT's outside counsel

testified that the term "equity team" was synonymous with "equity finalization team," that was defined in the Equity IPE Protocol – a document with which the parties were familiar and which was integrated into the Equity Process Agreement as to the Shallow Oil Zone.  TR at 2711 (Thorpe) ("Q: Is it fair to say that, during your work on equity, the two sides' equity teams were commonly referred to either as equity teams or EFTs? A: They were referred to as EFTs, equity teams, field equity teams."); JE 3 ¶ C(2) ("Each owner has appointed an equity finalization team (EFT) *to develop and present its equity positions* for each of the three zones under consideration." (emphasis added)).

For these reasons, the court has determined that the second sentence of paragraph B.4 of the Equity Process Agreement prohibited *ex parte* communications between members of either party's EFT, defined as any party employee "develop[ing] and present[ing] the party's] equity position[]" and the ASFE.  JE 3 ¶ C(2).

Assuming, *arguendo*, that paragraph B.4 only prohibited *ex parte* communications between DOE's "field equity technical team" and the ASFE, the *ex parte* prohibition still would extend to attorneys working with or for the "field equity technical team," because the first sentence of Paragraph B.4 prohibits the ASFE from communicating "*indirectly*"[30] with DOE's "field equity technical team" on "equity redetermination-related matters."  JE 6 ¶ B.4.  As such, paragraph B.4 unambiguously prohibits communications between DOE's "field equity technical team" and the ASFE through an intervening person (*e.g.*, a lawyer).

Moreover, the Government's argument that the parties' addition of the phrase "directly or indirectly" in the first sentence of paragraph B.4 was of no import is contrary to two cardinal principles of contract interpretation, *i.e.*, the court must give every phrase in a contract meaning; and the plain contract language governs.  *See Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1288 (Fed. Cir. 2008) ("Generally, this court also construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative."); *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1329 (Fed. Cir. 2005) (holding that the "basic precept[] of contract interpretation" is that courts must interpret contracts to "comport with the plain meaning of [contractual] clause[s]").

The purpose of the Equity Process Agreement was to protect both parties' interest in having a neutral, fair, and unbiased procedure for determining equity in the four oil and gas zones at issue.  TR at 913 (Stay) ("[W]hat we saw we were getting was added assurance of a fair, open, transparent process[.]"); TR at 1629 (ASFE Kripowicz) (agreeing that paragraph B.4 "was meant to help preserve the ASFE's impartiality"); 5/18/09 Kauffman Dep. at 150 (stating his view that the ASFE was "supposed to be an impartial decision maker"); 5/19/09 Burzlaff Dep. at 160 ("The ASFE needed to be impartial.").  The reason that the Equity Process Agreement was so important is that prior attempts to achieve a neutral adjudication of the Shallow Oil Zone were unsuccessful.  TR at 881 (Giumarra) (explaining the parties wanted to "do away with" prior

---

[30] "Indirectly" means "[b]y indirect action, means, connexion, agency, or instrumentality; *through some intervening person or thing*; mediately."  7 OXFORD ENGLISH DICTIONARY 873 (2d ed. 1989) (emphasis added).

adjudication and "start over").[31]  Indeed, the Government does not contest that a central goal of the Equity Process Agreement was to protect Chevron from a biased adjudication: "The limitations upon the ASFE's ability to deviate from the IPE's equity recommendations . . . were intended to address Chevron's concerns about the ASFE's ability to be an impartial decisionmaker."  9/15/09 Gov't Pre-Trial Br. at 37.  As such, it would be counterintuitive for the court to interpret the Equity Process Agreement to allow lawyers to engage in *ex parte* communications to systematically undermine the purpose of the process.  *See Nw. Marine Iron Works v. United States*, 493 F.2d 652, 657 (Ct. Cl. 1974) ("Construction of the terms of a contract, like construction of a statute, should 'avoid absurd and whimsical results.'" (quoting *Anderson v. United States*, 490 F.2d 921, 928 (Ct. Cl. 1974))).

The DOE EFT's outside counsel testified at trial that DOE had "a very strong objection to this proposal" and that he "relayed the DOE . . . reaction to the language" to Chevron.  TR at 2713-14 (Thorpe).  But, when pressed, he could not recall any of the details of this conversation. TR at 2714-16 (Thorpe) (failing to provide any detail, in response to multiple questions by Chevron's counsel, as to the specific content of his conversations with Chevron's Assistant General Counsel); TR at 2728 (Thorpe) (testifying that, although he negotiated paragraph B.4, he could not recall why the words "directly or indirectly" were added on May 19, 1997).  Nor did Mr. Thorpe memorialize this conversation in writing, despite the fact that he committed other key issues about the scope of the *ex parte* clause into a written memorandum to Ms. Egger.  TR at 2720-21 (Thorpe); JE 285 (5/19/97 Memorandum from Mr. Thorpe to Ms. Egger regarding whether the *ex parte* clause extended to Dr. Latham's participation in a "dry run" presentation by DOE's field equity technical team to the Equity IPE).  Ms. Egger also testified that although she participated in a telephone call with Chevron's Assistant General Counsel, like Mr. Thorpe, she too could not "remember specifics," except that "we clearly conveyed to Chevron that this language and the concept of attorneys being within the *ex parte* discussion . . . was unacceptable."  TR at 2156 (Egger).

---

[31] The May 13, 1997 draft of the Equity Process Agreement did not contain any *ex parte* provision.  JE 257.  On May 14, 1997, however Chevron requested that the following paragraph be added to the Equity Process Agreement:

> The ASFE shall have no *ex parte* communications *with the attorneys* or technical team members who participated in the preparation of the DOE or the Chevron equity presentations to NSA.

JE 263 at 3 (emphasis added); *see also* TR at 766 (Giumarra) ("And we put these [constraints on the ASFE's discretion] in this agreement[,] because there had been an earlier decision outside this particular process that the ASFE had rejected a decision from the IPE and it's my recollection we didn't understand exactly why or what the basis was for the complete rejection of the decision.") (referring to the ASFE's 3/28/97 Preliminary Shallow Oil Zone Decision).

On May 16, 1997, the DOE EFT outside counsel responded to Chevron's Assistant General Counsel with a revised proposal that read, in relevant part:

> The ASFE will not consult with the DOE field equity technical team concerning equity redetermination-related matters without also consulting with the Chevron equity team on any such matter.  No such communications by the ASFE with either equity team shall be on an *ex parte* basis.

JE 274 at 3.

On May 19, 1997, the parties amended paragraph B.4 of the Equity Process Agreement, adding the words "directly or indirectly" to the first sentence of the paragraph and the parenthetical referencing DOE's technical staff in Washington, D.C. at the end of the same sentence.   JE 289 at COM006 00723 (redline version of the Equity Process Agreement incorporating these changes).   At trial, the DOE EFT's outside counsel remembered that he spoke with Chevron's Assistant General Counsel about the language of paragraph B.4 on May 19, 1997, but again could not remember whether they discussed whether the final version prohibited communications by lawyers.  TR at 2724, 2727-34 (Thorpe).

Chevron's Assistant General Counsel, however, testified that she had multiple conversations with Mr. Thorpe during this period regarding paragraph B.4:

> I do not have recollection that [Thorpe] told me that the attorneys for DOE would not be covered by this.  And the reason that I say it this way is because had we been told that the lawyers who had been advocating DOE's equity position were not going to be covered by this provision and would have free reign with the ASFE, that would have destroyed the neutrality of the process that we thought we had bargained for. . . . We wouldn't have moved forward with the agreement.

TR at 812 (Giumarra).

Chevron's Assistant General Counsel explained that she did not press for the inclusion of the word "attorney" in paragraph B.4 of the Equity Process Agreement, because "it was not necessary.  When we started talking about equity teams in that provision, that took care of the need to call out attorneys or technical people with regard to the equity teams, other than mentioning the technical team in Washington."  TR at 865 (Giumarra).

Chevron's Assistant General Counsel's specific account of the negotiations was straightforward and follows logically from the fact that the Equity Process Agreement was designed to provide the parties with a neutral process.[32]   In contrast, Ms. Egger and DOE's

---

[32] Moreover, the Government's characterization of Ms. Giumarra's June 2, 1997 letter is misleading.  Her letter was prompted by DOE's failure to provide certain information to the Equity IPE.  JE 310 at 1 ("DOE failed to deliver most if not all of documentation specifically required and agreed upon in deliverables number 1, 2, 3, 5, 8, 9, and 12a through 12d.")  Therefore, Ms. Giumarra wrote to Ms. Egger to alert her of these facts and ask her to "discuss

outside counsel's testimony were inconsistent with each other and each was tentative and/or evasive.  TR at 2160, 2165-68 (the court discussing Ms. Egger's credibility); *see also* TR at 2240-41 (the court's observation that DOE's failure to document the purported conversation between DOE's outside counsel and Chevron's Assistant General Counsel implies "that perhaps that [conversation] never took place").

For these reasons, the court also has determined that paragraph B.4 of the Equity Process Agreement prohibited direct or indirect *ex parte* communications by any DOE attorney who served on DOE's "equity team," *i.e.*, an attorney serving in an advocacy role before the Equity IPE or the ILA as to any "equity redetermination-related" communication with the ASFE.

> ### C.     Whether *Ex Parte* Communications Between Department Of Energy Staff Attorneys And The Assistant Secretary Of Fossil Energy, In Fact, Were A Breach Of The Equity Process Agreement.

> #### 1.     The Plaintiff's Argument.

Next, Chevron argues that Ms. Egger was a member of DOE's EFT.  Pl. PT Br. at 5-7. She "managed the team" in legal proceedings before the ILA.  TR at 1276-77 (Gangle).  She was involved in preparing letters and briefs to the Equity IPE and was consulted on all positions taken by the DOE EFT.  TR at 1277, 1390 (Gangle).  And, she shaped all aspects of the DOE EFT's advocacy before the ASFE.  TR at 2437-38 (Egger).

Ms. Egger also served as a legal advisor to the ASFE and the Washington, D.C.-based technical team that advised the ASFE.  Pl. PT Br. at 7-8.  Ms. Egger "advised [the ASFE] on almost every aspect of the sale of Elk Hills, with respect to the equity process" (TR at 2673 (Godley)) and she "t[ook] the lead" in drafting the ASFE decisions (TR at 1708-09 (ASFE Kripowicz)).    In sum, Ms. Egger was engaged in "countless 'direct[] or indirect[]' communications between the ASFE and the DOE equity team, thereby breaching paragraph [B.4] of the EPA."  Pl. PT Br. at 7-8.

Chevron provides numerous specific examples of how Ms. Egger's conduct materially breached the Equity Process Agreement with respect to each of the four oil and gas zones at issue.  Pl. PFOF at 91-94 (Dry Gas and Carneros Zones), 86-91 (Shallow Oil Zone), 49-85 (Stevens Zone); *see also* Pl. PT Reply 68-73 (Dry Gas and Carneros Zones), 65-68 (Shallow Oil Zone), 36-65 (Stevens Zone).  Chevron contends that each *ex parte* communication should not be analyzed in isolation, but in the context of the entire finalization process where the breach of the Equity Process Agreement "pervaded the process and rendered it fundamentally unfair."  Pl. PT Reply at 29; TR at 610-11 (Stone) ("the process was seriously flawed, and it wasn't the process that we agreed to[.]").

---

the matter with [her] technical team and with [the ASFE.]"  JE 310 at 2.  Since Ms. Giumarra requested that Ms. Egger make this specific contact with the ASFE, it was not an *ex parte* communication.

### 2.        The Government's Response.

The Government's primary response is that Ms. Egger could not have breached the Equity Process Agreement, because paragraph B.4 did not prohibit *ex parte* communications by lawyers.  Gov't PT Resp. at 8.  The Government also argues that Ms. Egger was not a member of DOE's EFT, because she was not responsible for "developing, determining[,] and advocating DOE's technical equity position to the [Equity] IPE."  Gov't PT Resp. at 10.  Moreover, she was not present at "two of the most important initial meeting [sic] of the two EFTs[.]"  Gov't PT Resp. at 11 (citing JE 66 (minutes of the June 17, 1996 Initial Meeting of Equity Finalization Teams); JE 70 (minutes of July 9-10, 1996 Equity IPE Orientation Meeting)).

The Government then devotes more than 150 pages analyzing individual communications by Ms. Egger and other members of the DOE EFT to show that no breach of the Equity Process Agreement occurred.  Gov't PT Resp. at 32-205.  Based on this analysis, the Government urges the court to find: "that only communication[s] which contain substantial and significant technical information that could impact the determination of the equity percentage participation by advocating or promoting certain technical approaches and methodologies, utilization of selected data, as well as the unilateral choice of equations and algorithms, as well as communications attempting to influence the methodologies used or involving proprietary interpretive data[,] constitute[] a breach of the [Equity Process Agreement]."  Gov't PT Resp. at 31.  The Government's document-by-document analysis repeats the recurring objections that the documents cited in Chevron's Post-Trial Brief, in isolation, do not evidence a breach of the Equity Process Agreement.

### 3.        The Court's Resolution.

#### a.        Specific Government Defenses Are Denied.

The court's resolution first addresses twelve defenses that the Government posited as to why DOE did not breach the Equity Process Agreement:

> Government Argument 1.    The communication at issue "predated the [Equity Process Agreement]," and therefore could not constitute a breach of the Equity Process Agreement.  Gov't PT Resp. at 33, 55, 57, 190.

The court agrees that communications predating the Equity Process Agreement do not violate that agreement.  Therefore, the court has not relied on pre-Equity Process Agreement documents to establish a breach of the Equity Process Agreement.

> Government Argument 2.    The communication at issue occurred after the ASFE issued a final decision with respect to the zone in question and paragraph B.4 provides that it "'shall cease to apply with respect to a zone upon the ASFE's issuance of her final equity decision for such zone.'"  Gov't PT Resp. at 41 (quoting JE 6 ¶ B.4).

The court agrees that communications occurring after the ASFE issues a final decision with respect to a particular zone may not breach paragraph B.4 of the Equity Process Agreement, but such communications, however, may provide relevant evidence of a breach to the extent they evidence DOE conduct prior to the issuance of a final decision. *See, e.g.*, JE 1123 (5/28/03 email from Dr. Latham to Ms. Egger and Ms. Cadieux, cited by Chevron (Pl. PFOF at 80 n.75) for the proposition that Ms. Egger continued to monitor developments in the Stevens Zone after the issuance of the ASFE's June 18, 2002 Final Stevens Zone Decision). In addition, post-decision *ex parte* communications may well breach the Equity Process Agreement in the event of an OHA remand to the ASFE, as occurred in the Stevens Zone.[33]

> Government Argument 3.   The communication at issue was "transmitted to both the DOE and Chevron EFTs," and therefore was not *ex parte*. Gov't PT Resp. at 40, 44, 56, 141.

The court agrees that written communications from the ASFE to both parties do not breach paragraph B.4 of the Equity Process Agreement. Accordingly, the court has not relied on any such documents as evidence of a breach of the Equity Process Agreement. Nonetheless, such documents may provide relevant evidence of separate *ex parte* communications that did breach the Equity Process Agreement. Pl. PFOF at 93 (citing the ASFE's 11/24/97 Preliminary Carneros Zone Decision, copied to both parties, to demonstrate that it differed from earlier internal drafts and evidenced Ms. Egger's influence in that process).

> Government Argument 4.   The communication at issue "was between [the] ASFE and a member of [the Washington, D.C.-based] technical advisory team," and thus permitted under paragraph B.4 of the Equity Process Agreement. Gov't PT Resp. at 34, 60, 192.

The court agrees that communications between the ASFE and members of the ASFE's technical advisory team do not breach paragraph B.4 of the Equity Process Agreement. Accordingly, the court has not relied on any such documents as evidence of a breach of the Equity Process Agreement. Nonetheless, such documents may provide relevant evidence of prohibited *ex parte* communications that did breach the Equity Process Agreement, such as those involving Ms. Egger.

> Government Argument 5.   The communication at issue "dealt with a procedural, process, or administrative issue," and was therefore not prohibited by the Equity Process Agreement. Gov't PT Resp. at 33, 61, 110, 119.

---

[33] The Government does not argue that paragraph B.4 did not apply to *ex parte* communications during the ASFE's drafting of a new Stevens Zone decision on remand. *See, e.g.*, Gov't PT Resp. at 188, 324 (declining to make the argument, with respect to documents authored during the remand).

The court is not aware of and the Government does not cite, any provision in the Equity Process Agreement permitting *ex parte* communications between the DOE EFT and the ASFE, if those communications dealt only with "procedural, process" related matters. To the contrary, paragraph B.4 of the Equity Process Agreement broadly prohibits all communications "concerning equity redetermination-related matters." JE 6 ¶ B.4. In any event, the court has not relied on minor *ex parte* communications in determining whether DOE breached the Equity Process Agreement. The Government, however, has invoked this so-called "procedural" exception to justify *ex parte* communications that impart strategic, not technical advice. *See, e.g.*, Gov't PT Resp. at 119 (applying the "procedural" exception to JE 815, a 2/25/00 *ex parte* email from Ms. Egger to the ASFE stating, "Given that none of the Chevron lawyers have in the past exhibited (to me anyway) any great technical depth, we may want to give some thought as to what their presence portends [at an upcoming presentation], and try to anticipate a couple of scenarios to be ready for.").

> Government Argument 6.  The communication at issue was "between the ASFE and a DOE attorney and paragraph B.4 of the EPA did not apply to attorneys." Gov't PT Resp. at 52, 63, 115, 203.

No part of the *ex parte* prohibition in paragraph B.4 of the Equity Process Agreement exempts communications by attorneys.

> Government Argument 7.  The communication at issue was between an OGC attorney and the ASFE, and the Equity Process Agreement "could not have prohibited communications among and between attorneys in the OGC and the ASFEs." Gov't PT Resp. at 52, 63, 115, 203.

Paragraph 4 of the Equity Process Agreement does not exempt *ex parte* communications between the attorneys in the Office of General Counsel and the ASFE.

> Government Argument 8.  The communication at issue reflected that "DOE attorneys provided guidance to [the] ASFE . . . on legal issues and assisted with revisions to the wording of the decision," but "technical and legal guidance were explicitly permitted by Paragraph B.3 of the [Equity Process Agreement.]" Gov't PT Resp. at 44, 56.

Paragraph B.3 of the Equity Process Agreement states:

After receipt of the [Equity IPE] recommendation for a zone, the ASFE shall issue a preliminary decision on such zone and shall provide the Chevron and DOE equity teams with copies of the documents relied upon in reaching the preliminary decision which are not already in the equity teams' possession, including, without limitation, any geophysical, geological, or petrophysical data relied upon by the

ASFE, but excluding draft documents, any legal or technical advice provided to the ASFE, or documents concerning the deliberative process of reaching the preliminary decision.

JE 6 ¶ B.3.

The Government is correct that the Equity Process Agreement contemplated that the ASFE would receive independent legal and technical advice that would not be disclosed to Chevron.  Paragraph B.3, however, in no way suggests that a DOE staff attorney who also served as an advocate for the DOE EFT before the IPE and/or ILA also was permitted to provide legal advice to the ASFE in making preliminary or final decisions on equity finalization.

> Government Argument 9.  The communication at issue pertained to a "legal issue" decided by the ILA, rather than the IPE, and "procedures pertaining to the ILA were set forth in [the Equity IPE] Protocol Supplement No. 1, which was an administrative order, not a contract."  Gov't PT Resp. at 33, 64, 70, 114, 200.

The Government is correct that the Equity IPE Protocol and Supplements governed the rules for *ex parte* communications between the ASFE and the IPE.  Nothing in paragraph B.4 of the Equity Process Agreement, however, permits *ex parte* communications between the DOE EFT and the ASFE.  To the contrary, paragraph B.4 of the Equity Process Agreement prohibits any *ex parte* communication between the DOE EFT and the ASFE "concerning equity redetermination-related matters."  JE 6 ¶ B.4.  Legal matters referred to the ILA were "equity redetermination-related matters," and therefore *ex parte* communications between the DOE EFT and the ASFE "concerning" such matters violated paragraph B.4 of the Equity Process Agreement.

Moreover, many of the *ex parte* communications that the Government claims concerned a "legal issue," in fact, concerned mixed questions of law and fact.  *See, e.g.*, JE 387 (5/6/98 fax from Mr. Kauffman (DOE EFT) to Mr. Burzlaff (DOE EFT), with copies to Ms. Egger and Dr. Latham (ASFE's technical advisor) discussing whether Chevron correctly characterized the IPE's Final Recommendation on the Stevens Zone as adopting a "capture methodology" and providing tables of technical data in support of DOE EFT's position).  *But see* Gov't PT Resp. at 66 (arguing that JE 387 did not breach the Equity Process Agreement, because it pertained to a legal issue).

> Government Argument 10.  The communication at issue pertained to a "Data Cutoff Decision" issue, which was decided by an Administrative Order, not pursuant to the Equity Process Agreement.  Gov't PT Resp. at 75, 81, 83.

The Government contends that *ex parte* communications concerning the data cutoff dispute were authorized by a July 9, 1999 joint letter to the ASFE, in which both parties agreed that the ASFE could "request the input or other participation of the [Equity] IPE *or any other*

*party of his choosing*." JE 597 at 3 (emphasis added). As a general matter, this letter did not waive paragraph B.4 of the Equity Process Agreement's general prohibition on *ex parte* communications, nor modify it. *See Linda Newman Const. Co. v. United States*, 48 Fed. Cl. 231, 235 (2000) ("The effect of a contract modification should be considered in the context of the entire contract, and [a]ll circumstances surrounding the negotiations held prior to the execution of the modifications need to be examined." (internal quotation marks and citation omitted) (alteration in original)). Moreover, interpreting the July 9, 1999 joint letter to authorize *ex parte* communications is inconsistent with the letter's stated goal of establishing an "open, fair and transparent" process. JE 597 at 3.

> Government Argument 11.  The communication at issue, although *ex parte*, was conducted pursuant to a previous request by Plaintiff for DOE attorneys to communicate with the DOE technical team. Gov't PT Resp. at 64, 66.

On April 7, 1998, Ms. Giumarra wrote Ms. Egger, proposing that Chevron and DOE jointly instruct the IPE not to use "capture analysis." JE 364 at 1. Ms. Giumarra asked Ms. Egger "to review this matter with your technical team[.]" JE 364 at 1. The Government argues that Ms. Egger's ensuing communication with ASFE technical advisors therefore did not breach the Equity Process Agreement. Gov't PT Resp. at 64 (discussing JE 371 (notes from 4/14/98 teleconference call with Ms. Egger and members of both the ASFE technical team and the DOE field equity technical team)). Nothing in Ms. Giumarra's April 7, 1998 letter authorized Ms. Egger to engage in *ex parte* communications with the ASFE's technical team. Moreover, Ms. Giumarra specifically testified that she was unaware that Ms. Egger also would be serving as a legal advisor to the ASFE in making the Preliminary and Final Equity Determination of the Stevens Zone. TR at 736, 781-82 (Giumarra).

> Government Argument 12.  The communication at issue, although between a member of DOE's EFT and the ASFE's technical team in Washington, D.C., was not prohibited because it only involved "factual information regarding Chevron's technical documentation." Gov't PT Resp. at 199, 201.

The Government argues that a May 19, 2000 *ex parte* email from Mr. Gangle (DOE EFT) to Mr. Smits (ASFE technical team) impugning Chevron's technical analysis was not prohibited "because it was Mr. Gangle's response to a request by Mr. Smits for factual information regarding Chevron's technical documentation." Gov't PT Resp. at 201 (citing JE 855). Paragraph B.4 of the Equity Process Agreement, however, contains no exception for "factual information regarding Chevron's technical documentation." To the contrary, factual information regarding technical documentation is a clear example of an "equity redetermination-related matter." Accordingly, the court has determined that this May 19, 2000 *ex parte* email (JE 855) evidences DOE's breach of paragraph B.4 of the Equity Process Agreement.

> **b.  The Equity Process Agreement Was Repeatedly And Materially Breached By The Department Of Energy.**

As to liability, the Government's final argument is, assuming *arguendo*, that the *ex parte* communications evidenced by 281 documents in the record breached the Equity Process Agreement, each *ex parte* communication was "at worst a facial breach, and not a material breach, because it did not serve to influence, directly or indirectly, the ASFE's decision regarding equity and in no way undermined the fairness or the integrity of the process set forth in the [Equity PT Agreement]." Gov't PT Resp. at 34-233. The court disagrees. These documents and related testimony demonstrate a pattern of conduct wherein at least three ASFEs appointed by Democratic and Republican Presidents relinquished their authority to senior DOE career legal staff who came to view *ex parte* prohibitions as a joke and the ASFE as a mere figurehead. JE 1152 (3/10/04 email from Ms. Cadieux to Ms. Egger stating "I ran into [DOE EFT member] Butch Gangle yesterday. *It will amuse you to know* that he thought he wasn't permitted to speak to me." (emphasis added)); JE 1347 (10/16/06 email from Ms. Cadieux to Ms. Egger commenting on a 10/16/06 email from Dr. Latham to ASFE Jarrett, "Bless his heart"); *see also* TR at 1963 (ASFE Jarrett) (stating that: "I didn't monitor everything they did for 14 months."). Whether these political appointees did not appreciate their role as adjudicators or their other duties were so pressing they improperly delegated their authority to the career staff, does not matter. The bottom line is their lack of diligence resulted in a breach of the Equity Process Agreement and this lawsuit.

The court appreciates the Government's concession, albeit required by the record, that Ms. Egger "played a dual role insofar as she advanced DOE's single legal position before the ILA and before the ASFE. In connection with her role, Ms. Egger communicated with the DOE EFT and the ASFE." TR at 92-93 (Government Counsel). But, the record establishes that Ms. Egger's role in equity finalization was far more pervasive and influential. Ms Egger was not only an active working member of the DOE EFT, but its leader in advocating positions before the ILA, IPE, and Equity IPE. JE 792 (12/10/99 email from Mr. Gangle to Ms. Egger and other DOE EFT members referring to Ms. Egger as the "coach[]" of the [DOE EFT team]); JE 1085 (10/3/02 email from Ms. Egger to Mr. Gangle and other DOE EFT members stating, with regard to a favorable decision to DOE from the Equity IPE, "Way to go guys!!!!"); TR at 1979 (Egger) (agreeing that she routinely "provided legal advice to the DOE EFT"); TR at 1276-77 (Gangle) (agreeing that Ms. Egger "managed the team" for ILA proceedings); TR at 1295 (Gangle) (stating that Ms. Egger advised him on how to phrase technical questions during a meeting with the Equity IPE); TR at 985 (ILA Roberts) (confirming that Ms. Egger "had the final say," as DOE EFT's legal representative).

The record also establishes that Ms. Egger serves as the principal legal advisor to the ASFE and, in that capacity, exercised considerable influence on the ASFE's preliminary and final decisions. TR at 2673 (ASFE Godley) (admitting that Ms. Egger "advised [her] on almost every aspect of the sale of Elk Hills, with respect to the equity process, how to go about complying with all these protocols"); TR at 1708-09 (ASFE Kripowicz) (admitting that Ms. Egger would "take the lead" in drafting his decisions); TR at 1963 (ASFE Jarrett) (admitting that Ms. Egger and Ms. Cadieux had a major role in preparing his draft decisions); TR at 1180 (Latham) (agreeing that Ms. Egger was "leading the effort" in preparing the ASFE's decisions).

In light of her role on the DOE EFT, any "equity redetermination-related" communication that Ms. Egger had with the ASFE's Technical and Legal Staff and/or the ASFE

breached paragraph B.4 of the Equity Process Agreement.  Conversely, in her role as the chief legal advisor to the ASFE, every "equity redetermination-related communication" Ms. Egger had with a member of the DOE EFT also was a breach of the Equity Process Agreement.

Nevertheless, the Government insists that Chevron also must demonstrate that Ms. Egger's *ex parte* communications specifically involved *technical* matters in order to establish that DOE breached paragraph B.4 of the Equity Process Agreement.  Paragraph B.4, however, consists of four sentences, three of which list separate prohibitions on *ex parte* communications; only the first sentence is even arguably limited to technical matters.  That first sentence reads: "The ASFE will not consult, directly or indirectly, with the DOE field equity technical team concerning *equity redetermination-related matters* without also consulting with the Chevron equity team on any such matter (the reference in this sentence to the DOE field equity technical team does not include the DOE technical staff in Washington, D.C.)."  JE 6 ¶ B.4 (emphasis added).  Although this prohibition refers to the "DOE field equity technical team," it does not purport to prohibit only technical *communications* with the technical team.  The second sentence provides: "No such communications by the ASFE with either equity team shall be on an *ex parte* basis."  JE 6 ¶ B.4.  This prohibition is not limited to technical communications nor to DOE's "field equity technical team."  The third sentence states that "[a]ny written materials submitted to the ASFE by either equity team shall be provided to the other party."  JE 6 ¶ B.4 at 3.  No plausible argument can be made that this sentence's reference to "*any* written materials" is restricted only to technical communications.  Accordingly, the court has determined that paragraph B.4 prohibited all direct or indirect *ex parte* communications involving *any* "equity redetermination-related" matters.

Even if the Government were correct that the Equity Process Agreement only prohibited *ex parte* communications concerning technical matters, the record establishes that Ms. Egger's *ex parte* communications frequently involved technical "equity redetermination-related matters." TR at 1901 (ASFE Jarrett) (agreeing that legal and technical were intertwined and had interrelated aspects); TR at 1946-47 (same); TR at 1309 (Gangle) ("[M]any of the legal issues were technical, of a technical nature.  The [Equity IPE] would issue a recommendation, and Chevron would raise issues about the technical methodology.").  Moreover, the record shows that Ms. Egger routinely provided technical facts that were related to issues of law, on which Ms.

Egger provided advice, such as "conversion,"[34] "capture analysis," [35] and "value weighting" issues.[36]  A few examples from the record make this point.

As to "conversion," Ms. Egger was well versed on this highly technical issue, as the following document shows:

> Per your request, here are the . . . backup materials that show how [the Equity IPE] used a BTU method to distribute the NGL content found in the solution gas and gas-cap gas to the various ownership sections.  In addition, the materials also show how [the Equity IPE] used a BTU equivalency factor to convert MMBTU of gas to Barrels of oil equivalent.

JE 521 at 1 (1/6/99 fax from Alan Burzlaff to Mary Egger).

As to "capture analysis," on April 14, 1998 Ms. Egger convened a conference call with the DOE EFT and the ASFE technical staff in Washington, D.C. to decide how to respond to Chevron's request that the Equity IPE be instructed by the ASFE not to use a capture methodology.  JE 370.  Ms. Egger then provided comments on a draft of the "technical portion" of the DOE EFT's "capture brief" that would be submitted to the ASFE.  JE 499 at 2 (11/24/98 fax from Ms. Egger to Mr. Gangle regarding "Capture Brief - technical review redraft") ("Attached are a few comments on your rewrite . . . I am generally in favor of saying at every possible and appropriate juncture when the technical statements we are explaining constitute technical judgments of the IPE[.]"); JE 501 at 1 (12/1/98 fax from Ms. Egger to the DOE EFT) ("Attached are my comments on Alan[] [Burzlaff's] most recent version" of the capture brief); JE 501 at 3 (handwritten comment "should we delete?" DOE EFT's statement that the IPE's methodology was "proper[]," in light of Ms. Egger's concern about how this would affect other issues in the "technical comments").

As to "value weighting," sometime around February 1999, Ms. Egger attended a briefing about this topic.  JE 537; *see also* TR at 2375 (Egger) (testifying that she looked at transcripts of

---

[34] "Conversion" concerned how to convert the respective parties' shares of oil and gas in a particular zone into a single equity share number.  DOE advocated converting oil and gas shares based on BTU equivalents, whereas Chevron advocated that conversion should be based on the price of oil and gas as of November 20, 1942, the date when the UPC was signed.  TR at 547-48 (Stone) (describing the issue and the parties' positions).

[35] "Capture analysis" concerned whether it was appropriate to use a technique preferred by DOE that was designed to measure where oil was located when it was produced.  Chevron advocated that the UPC required equity ownership to be calculated based on where oil was located "as of 1942, no matter where it was when it was produced[.]"  TR at 434-35 (Stone).

[36] "Value weighting" concerned whether the parties' respective shares of equity should reflect the relative value of the hydrocarbons underlying their lands.  JE 537 (2/24/99 fax from Mr. Burzlaff to the DOE EFT).

technical presentations to the Equity IPE to advise the DOE EFT how to formulate its arguments: "[I]t was important to know what the parties' technical teams actually knew and what the issues were at the time."). These examples establish that Ms. Egger was not only familiar with technical matters that arose during equity finalization but provided advice to the DOE EFT, ASFE Technical Team and the ASFE, as to the import of the aforementioned technical matters on dispositive legal issues.

Finally, Ms. Egger's DOE performance evaluations confirm the dual nature of her work in equity finalization and that it involved technical issues.[37]   JE 1394 at A131-32 (10/18/01 Senior Executive Service performance appraisal) ("Ms. Egger leads the legal effort, requiring the organization of *field*, *HQ and contractor technical and legal personnel* . . . . This highly contentious and complicated matter, involving intricate legal and technical disputes with Chevron U.S.A. Production Company, is worth hundreds of millions of dollars to the U.S. Treasury.") (emphasis added). Apparently, DOE did not consider compliance with the Equity Process Agreement relevant in Ms. Egger's professional performance appraisal.

For these reasons, the court has determined that DOE's actions were not merely a "facial" breach of the Equity Process Agreement, as they routinely concerned "technical issues" central to equity finalization. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985) (recognizing that the "practical truth [is] that the decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of allocation as it is of analysis").

In sum, as documented by the trial record and as depicted in Court Exhibits B & C, attached in the Appendix to this Memorandum Opinion and Order, DOE routinely engaged in *ex parte* "equity related" communications regarding the Carneros Zone and the Stevens Zone, in breach of the Equity Process Agreement.  JE 872.

### D.   Whether The Department Of Energy Breached The July 8, 1996 Contract With The Independent Petroleum Engineer, To Which Plaintiff Was A Third Party Beneficiary.

#### 1.   The Plaintiff's Argument.

DOE's July 8, 1996 contract with the Equity IPE incorporated paragraph C.5 of the Equity IPE Protocol prohibiting "written or oral equity-related communication or meeting with the Equity IPE . . . by an owner (including its agents or contractors) without the participation or

---

[37] Ms. Egger's DOE performance evaluations were subject to a July 13, 2007 Protective Order. The court lifts that Order with respect to the portions of Ms. Egger's performance evaluations discussed in this Memorandum Opinion and Order, because the public interest in access to that evidence greatly exceeds any privacy interest Ms. Egger has in it. *See BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1335 n.1 (Fed. Cir. 2002) ("'[T]he beneficial effects of public scrutiny upon the administration of justice' support a presumption in favor of public access to judicial records." (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975))).

opportunity to participate by the other owner."  JE 3 ¶ C.5.  This prohibition extended to the ASFE, as a representative or agent of DOE.  Pl. PT Br. at 43-44.  The only exception to this prohibition was for "contract administration communications or meetings[.]"  JE 3 ¶ C.5. Chevron argues that the events surrounding the "Secret Report," as well as other communications between the ASFE's Washington, D.C.-based technical team and the Equity IPE, breached the Equity IPE Protocol.  Pl. PT Br. at 43-49.

On May 13, 1998, after Chevron challenged the ASFE's *ex parte* communication with the Equity IPE, the ASFE reassured Chevron that she "ha[d] not and will not engage in communications with the IPE concerning the merits of either party's position, the IPE's equity recommendations, or other substantive matters without advance notice and opportunity for participation by both parties."  JE 393 at 2 (5/13/98 letter from ASFE Godley to Chevron).

Nevertheless, DOE subsequently breached the July 8, 1996 Contract with the Equity IPE, that incorporated by reference, paragraph C.5 of the Equity IPE Protocol, because DOE requested that the Equity IPE prepare an *ex parte* technical report of Chevron's comments on the Equity IPE's March 2, 2000 Final Recommendation, without notice to Chevron.  JE 952 (11/6/00 letter from ASFE Kripowicz to the Equity IPE).  Ms. Egger, however, determined that this request did not violate paragraph C.5 of the Equity IPE Protocol, because the Equity IPE already issued his final recommendation regarding the Stevens Zone.  JE 937 (10/19/00 e-mail from Ms. Egger to ASFE Kripowicz and his technical staff).[38]  In addition, after the Equity IPE's *ex parte* report informed the ASFE of a material error in the Equity IPE's Final Recommendation, not only did the ASFE decline to reconsider his 5/23/06 Preliminary Recommendation, but his staff requested that the Equity IPE produce a revised version of the 69 page report (JE 965) – so that portions of the "Secret Report" hostile to Chevron's position would appear to be a separate document.  TR at 1230 (Latham) (explaining that he requested a revised version of the Secret Report, because he "wanted these [sections] to be referenceable [by the ASFE] as separate documents").

_____

[38] This is not the only incident where the ASFE and staff violated paragraph C.5 by directly urging the Equity IPE to reach substantive technical conclusions that would be favorable to DOE.  For example, on April 9, 1998, notes on the Equity IPE's stationery evidence that the Equity IPE had a teleconference with the ASFE and staff, including Ms. Egger, regarding, "questions to ask both owners – technical in nature."  JE 366; *see also* 4/21/09 Latham Dep. at 450-53 (acknowledging contacting the Equity IPE to request an explanation of "their analysis" regarding a "technical discussion" about gas heating values contained in one of the Equity IPE's final recommendations (discussing JE 997-98 (the Equity IPE's handwritten notes of 6/21/01 conversations with Dr. Latham))).  Likewise, on August 25, 1999, while the ASFE was drafting a decision on the "data cutoff" issue, the ASFE and his staff had discussions with the Equity IPE about the merits of the issue without Chevron being present.  JE 637 (Mr. Capitanio's notes on an 8/25/99 teleconference between ASFE Kripowicz and the Equity IPE); JE 641 (typewritten summary of the 8/25/99 teleconference).  And, during the parties' dispute over whether to use a "simulation model" to determine equity, Dr. Latham contacted the Equity IPE to "discourage [the Equity IPE] from a strategy whereby the Interim equity does not include the simulation model."  JE 1050 (3/11/02 email from the Equity IPE summarizing a phone call with Dr. Latham).

###### 2.    The Government's Response.

The Government responds reciting its prior document-by-document analysis to show that DOE did not violate the Equity Process Agreement.  Gov't PT Resp. at 206-55.  In addition, the Government posits other arguments to support its position that none of the aforementioned communications between DOE staff and the ASFE breached the Equity IPE Protocol.

First, the Government argues that none of the communications involving the "Secret Report" violated paragraph C.5, because the Equity IPE Protocol did not apply to communications "occur[ring] *after* the [Equity] IPE had issued its final recommendation for the Stevens Zone."  Gov't PT Resp. at 239 (emphasis added).  Furthermore, the "Secret Report" was "at worst an inconsequential violation because it did not serve to influence, directly or indirectly, the ASFE's decision regarding equity and in no way undermined the fairness or the integrity of the process set forth in the Equity IPE Protocol."  Gov't PT Resp. at 241-42.

Second, the ASFE staff's communications with the Equity IPE about the simulation model (JE 1050) and other issues (*e.g.*, JE 366) did not violate paragraph C.5 of the Equity IPE Protocol, because they pertained only to "scheduling and procedural matter[s]."  Gov't PT Resp. at 227, 247.  Specifically, when Dr. Latham attempted to "discourage" the Equity IPE from relying on Chevron's alternate model, he was "not directing [the Equity IPE] to use a particular methodology, but merely suggesting that unveiling a different methodology for the first time in its Final Recommendation would not be desirable."  Gov't PT Resp. at 248.

Third, any *ex parte* communication between the ASFE and the Equity IPE regarding the "data cutoff" dispute was authorized by Chevron.  JE 597 at 3-4 (7/9/99 letter from both EFTs to the ASFE requesting that the ASFE follow certain procedures to resolve the "data cutoff" dispute, and stating that the ASFE "in his discretion . . . may request the input or other participation of the IPE or any other party of his choosing").

###### 3.    The Court's Resolution.

The July 8, 1996 contract between DOE and the Equity IPE incorporated by reference, the Equity IPE Protocol's broad prohibition on *ex parte* contacts between DOE, Chevron, and the Equity IPE:

> There will be no written or oral equity-related communication or meeting with the Equity IPE (this term excludes contract administration communications or meetings) by an owner (including its agents and contractors) without the participation or opportunity to participate by the other owner.  Before any equity-related communication or meeting occurs, the Equity IPE will notify both owners of the planned equity-related communication/meeting so as to allow both owners the opportunity to participate in all communications or meetings held between the Equity IPE and an owner. . . .  In the event an owner chooses not to participate in an equity-related communication/meeting, the Equity IPE will notify both owners

of that fact in writing prior to having the communication/meeting and provide both owners with a summary of the communication/meeting thereafter.

\* \* \*

All equity-related meetings with the Equity IPE, including the presentation by the owners of their respective equity positions for each zone, will be sessions at which both owners are invited to attend (this excludes contract administration meetings that may be required by DOE). Each owner is permitted to designate its attendees, who will execute appropriate confidentiality agreements against disclosure of proprietary information.

\* \* \*

In the event a disagreement arises regarding the equity finalization implementation process or this Protocol which cannot be resolved jointly by the Equity IPE and the EFTs, the matter shall be referred to the Assistant Secretary for Fossil Energy (or designee) for resolution. Prior to resolution, the Assistant Secretary will consult with Chevron.

JE 3 ¶¶ C.5, C.9, C.21.

No language therein, however, supports the Government's position that *ex parte* communications were allowed after the Equity IPE issued a final recommendation for a particular zone. In fact, Ms. Egger acknowledged as much. TR at 2020 (Egger). Moreover, the Government has suggested no reason why the *ex parte* prohibitions in the July 8, 1996 Equity IPE Contract, designed to be "open, fair, transparent and . . . [to] adequately protect the respective ownership interests of the owners," would permit the ASFE to engage in *ex parte* communications with the Equity IPE at any time, much less before the ASFE issued either a Preliminary or Final Decision, particularly since technical issues relating to one zone often were applicable to other zones. *See e.g.*, JE 174 (1/27/97 email from Ms. Egger to ASFE Godley re: format for [Dry Gas Zone]/Carneros Zone Equity Decisions"). Accordingly, the court rejects the Government's atextual argument that the *ex parte* provisions of the July 8, 1996 contract did not apply to communications between the Equity IPE and the ASFE, after the Equity IPE issued a final recommendation with respect to a particular zone.

In sum, as documented by the trial record and depicted in Court Exhibit C, attached in the Appendix to this Memorandum Opinion and Order, DOE routinely engaged in prohibited *ex parte* "equity-related communications" regarding the Stevens Zone in breach of the July 8, 1996 contract with the Equity IPE, to which Chevron was the direct and intended third party beneficiary. Aside from *ex parte* contacts initiated by the ASFE and the ASFE's Technical & Legal Staff during the data cut-off decisionmaking process,[39] the ASFE subsequently requested a

---

[39] In determining that DOE repeatedly breached the July 8, 1996 contract with the Equity IPE, to which Chevron was the direct and intended third party beneficiary, the court did not rely on any communications related to the "data cutoff" dispute, because of ambiguity in a July 9,

"Secret Report" from the Equity IPE, without notice to Chevron, that the ASFE and Ms. Egger attempted to prevent Chevron from knowing about the improper assertion of privilege. JE 952 (11/6/00 fax from the ASFE to the Equity IPE requesting that the Equity IPE provide its "view on the [DOE] EFT's technical issues," but instructing the Equity IPE to designate that report as "Privileged & Confidential – Predecisional Analysis – Not for Distribution or Release"); JE 965 ("Secret Report," labeled "Privileged & confidential predecisional analysis not for distribution or release"); *see also* TR at 1739 (ASFE Kripowicz) (agreeing that he instructed the Equity IPE not to provide the "Secret Report" to Chevron). In addition, after the ASFE received the "Secret Report" a member of the ASFE's technical staff subsequently went so far as to request that an "edited" version of the "Secret Report" be sent to the ASFE, only reflecting information favorable to DOE that the ASFE could cite in the Final Stevens Zone Decision. JE 981 ("edited" version of the "Secret Report"); *see also* TR at 1228-30 (Latham) (acknowledging that he requested selected portions of the "Secret Report" as a stand-alone document); TR at 1794 (ASFE Kripowicz) (admitting that "we provided *a couple sections of the report* to the EFTs . . . that were relevant to the decision process," but "did not provide [the entire "Secret Report"] to Chevron so that it could consider whatever it might want to try to do in light of [the Equity IPE's] evaluation") (emphasis added). At best, the ASFE and the ASFE's staff's actions were misleading to Chevron; at worst, they could be viewed as fraudulent.[40]

Moreover, the ASFE's June 18, 2002 Final Stevens Zone Decision ignored and misrepresented information favorable to Chevron, as evidenced in withheld portions of the "Secret Report." *Compare* JE 1073 at 32 (ASFE's 6/18/02 Final Stevens Zone Decision) (concluding that "[the Equity IPE's] choice of 500 psi as the abandonment pressure for the 26R sands was arbitrary and capricious," in part, because "it does not appear that NSA even considered a lower value"), *with* JE 965 at 19-20 ("Secret Report") (explaining why the Equity IPE did not choose the lower abandonment pressure advocated by the DOE's EFT).[41]

In sum, as documented by the trial record and depicted in Court Exhibit C, attached in the Appendix to this Memorandum Opinion and Order, the ASFE's November 13, 2001 Preliminary

---

1999 joint DOE and Chevron letter to the ASFE stating that the ASFE could "request the input or other participation of the [Equity] IPE" in resolving the data cutoff dispute. JE 597 at CME0001 0018. That letter, however, did not relieve DOE from complying with the *ex parte* prohibition of the Equity Process Agreement.

[40] In addition, the ASFE also initiated and was involved in other *ex parte* telephone conferences with the Equity IPE wherein substantive technical matters related to the ASFE's Final Stevens Zone Decision were discussed. TR at 1753-64 (Kripowicz) (testifying about his handwritten notes of an 8/25/99 meeting with the Equity IPE (JE 636-A)).

[41] This conduct was not limited only to ASFE Kripowicz or to the Stevens Zone. For example, Dr. Latham actively lobbied the Equity IPE not to reject the "simulation model" preferred by DOE's EFT in determining equity shares in the Shallow Oil Zone. JE 1050 (3/11/02 Equity IPE email reporting on an *ex parte* telephone call from Dr. Latham, wherein he "discourage[d]" the Equity IPE from switching from the simulation model relied on in its preliminary report to the classical model preferred by Chevron).

Decision, the ASFE's June 18, 2002 Final Decision, and the ASFE's February 21, 2007 Final Remand Decision all failed to reconsider the Equity IPE's March 2, 2000 Final Recommendation as the Equity IPE recommended in the "Secret Report."  JE 965 at CGC004 00453 ("Secret Report" recommendation).  The ASFE's rejection of the Equity IPE's advice cost Chevron more than $150 million in equity.  TR at 516 (Stone); TR at 1216 (Latham); TR at 2892-93 (Frost).

As such, the court has determined that DOE repeatedly breached the July 8, 1996 contract between DOE and the Equity IPE, to which Chevron was the direct and intended third party beneficiary, and both the economic impact and the substance of DOE's breaches were material. *See Thomas v. Dep't of Housing & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997) ("A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract." (citing 5 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1104 (1964))).

### E.      Damages.

#### 1.      Whether Plaintiff Is Entitled To Recover Reliance Damages.

##### a.      The Plaintiff's Argument.

Chevron argues that it is entitled to $74,743,806 in reliance damages for costs incurred during equity finalization of the Elk Hills Reserve as of May 7, 2011.  Pl. Supp. D Reply at 7.[42] This amount includes $50,448,000 in nominal damages and $24,295,797 in financing costs, including its United States Court of Federal Claims litigation costs, from January 1996 through May 7, 2011.  Pl. Supp. D Reply at 7 & n.3.

As Chevron explains, it bargained for a finalization process for the Elk Hills Reserve based on the neutral technical expertise of an Equity IPE, as directed by the ILA, and an independent and non-biased ASFE, not a particular monetary outcome, but Chevron did not receive that process.  TR at 913 (Stay) ("[W]hat we saw we were getting was added assurance of a fair, open, transparent process[.]"); 5/19/09 Burzlaff Dep. at 160 ("The ASFE needed to be impartial."); TR at 1629 (ASFE Kripowicz) (agreeing that paragraph B.4 of the Equity Process Agreement "was meant to help preserve the ASFE's impartiality"); 5/18/09 Kauffman Dep. at 150 (stating that the ASFE was "supposed to be an impartial decision maker").  Although the post-trial April 21, 2011 Settlement eventually finalized equity for the Elk Hills Reserve, it did not "restore" Chevron to its position prior to executing the May 19, 1997 Equity Process Agreement or becoming the third party beneficiary to DOE's July 6, 1998 contract with the Equity IPE, because the April 21, 2011 Settlement was a negotiation between the parties' lawyers, instead of a determination made by a neutral technical expert and independent non-biased Assistant Secretary, appointed by the President and confirmed by the Senate, for their expertise in and knowledge of fossil energy.  Pl. PT D Reply at 10-11.

---

[42] At the October 5, 2012 oral argument, Chevron increased this damages claim to $81.3 million, including $2.5 million in additional legal fees and $4.1 million in interest incurred on that amount since May 7, 2011.  10/5/2012 TR at 132 (Pl. Closing Statement).

Chevron cites four categories of cases that support the proposition that reliance damages are the appropriate remedy in this case. Pl. PT D Br. at 17-23. First, in *Winstar*-related cases, damages were awarded to purchasers of financially distressed thrifts for amounts expended to acquire the thrifts in reliance on the Government's contractual assurances that such expenditures would be creditable as "supervisory goodwill." *See Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1364 (Fed. Cir. 2005) (holding that the purpose of reliance damages is to "put the non-breaching party in as good a position as [it] would have been in had the contract not been made."); *see also id*. at 1368. Second, several United States Court of Federal Claims cases have determined that reliance damages are an appropriate remedy to compensate a plaintiff for money expended to develop federal lands, in pursuit of a mineral lease agreement that subsequently was breached by the United States. *See Mann v. United States*, 86 Fed. Cl. 649 (2009) (awarding reliance damages to plaintiff for expenditures made to develop a geothermal lease that was later terminated by the Department of the Interior), *appeal dismissed*, 356 Fed. App'x 387 (Fed. Cir. 2009); *see also Amber Res. Co. v. United States*, 73 Fed. Cl. 738, 746 (2006) (suggesting that in a case where plaintiffs did not seek reliance damages, such damages would be available for a company to recover sunk costs from developing an offshore oil and gas lease), *aff'd*, 538 F.3d 1358 (Fed. Cir. 2008). Third, other federal appellate courts have awarded reliance damages in contractual process cases. *See e.g., Entergy Arkansas, Inc. v. Nebraska*, 358 F.3d 528 (8th Cir. 2004) (affirming an award of $97 million plus interest in reliance damages where the State of Nebraska, in bad faith, delayed a utility's application for a permit to use a radioactive waste storage facility in breach of an interstate compact); *see also Designer Direct Inv. v. Deforest Redev. Auth.*, 313 F.3d 1036, 1049-50 (7th Cir. 2002) (holding plaintiff was entitled to reliance damages so that it would not "suffer a loss of expense made in preparation for the . . . redevelopment."). Chevron also cites bid protest cases where preparation costs have been awarded as reliance damages, without proof that the Government's improper actions affected the outcome of the procurement process. *See Heyer Prods. Co. v. United States*, 140 F. Supp. 409, 413-14 (Ct. Cl. 1956) (granting bid preparation costs, where the Government breached its duty to consider bids honestly); *see also Gentex Corp. v. United States*, 61 Fed. Cl. 49, 54 (2004) (describing the recovery of proposal costs as a form of reliance damages).

Chevron argues that the breaching party is entitled to an offset against the non-breaching party's expenditures in reliance on the contract only if the breaching party establishes that: (1) the non-breaching party would have incurred those expenditures had the contract not been entered or (2) the expenses conferred some benefit on the non-breaching party. Pl. PT D Br. at 51. In this case, since the Government failed to establish that Chevron received any benefit from the costs incurred to achieve equity finalization under the Equity Process Agreement, DOE is not entitled to any offset. Pl. PT D Br. at 51-61. In fact, if Chevron refused to sign the Decoupling and Equity Process Agreements, the parties would have achieved equity finalization in a different manner, rather than pursuing the complex and expensive process of retaining an independent petroleum engineer, an independent legal advisor for the Equity IPE, and spending millions of dollars for geological research. Pl. PT D Br. at 8-12, 53-57; Pl. PT D Reply at 28-29. DOE, however, was under pressure from Congress to finalize equity in the Elk Hills site. JE 2 at CME002 00450 (1996 NDA Act, setting an eight-month deadline for equity finalization). This gave Chevron a strong bargaining position in negotiating the Equity Process Agreement to obtain an impartial, unbiased, and transparent process. Chevron, however, did not receive the benefit of that bargain.

Chevron also contends that the Government did not establish that any of the costs that Chevron incurred in the equity finalization process assisted Chevron in achieving the April 21, 2011 Settlement.  Pl. PT D Br. at 57-61.  The April 21, 2011 Settlement did not "benefit" Chevron, because it was an arm's-length negotiation, necessarily requiring new consideration of equal value from DOE and Chevron.  Moreover, the confidentiality terms of the April 21, 2011 Settlement render it "impossible for the Government to prove that Chevron got any benefit from the settlement that is attributable to [the costs Chevron incurred for participating in] the corrupted equity finalization process."  Pl. PT D Br. at 51.  More importantly, the April 21, 2011 Settlement specifically preserved Chevron's right to continue to seek damages for the breach of the Equity Process Agreement and the July 8, 1996 Contract with the Equity IPE.  JE 1731 ¶¶ 5.1-5.2.

### b.    The Government's Response.

The Government posited four alternative arguments, each of which would deny Chevron reliance damages in this case.  First, Chevron is not entitled to receive damages because: the April 21, 2011 Settlement finalized equity; Chevron received a financial benefit from the process; and Chevron continued performance after DOE's alleged breaches were known by Chevron.  Gov't PT D Br. at 22-34.  Second, Chevron did not establish that any breach in this case caused Chevron to incur costs that could be considered reliance damages, nor were any such costs linked to specific breaches.  Gov't PT D Br. at 34-46, 51-58.  Third, Chevron's actual equity finalization costs were less than Chevron anticipated.  Gov't PT D Br. at 48-51, 58-61.  Fourth, any reliance damage award in this case necessarily would result in a windfall for Chevron.  Gov't PT D Br. at 25, 29, 31-32.

The Government first asserts that, since the purpose of reliance damages is to restore the parties to the *status quo ante*, when the non-breaching party achieves contractually derived benefits through other means that objective is impossible in this case.  In other words, Chevron cannot demonstrate prejudicial harm, because it received what it bargained for, *i.e.*, a fair and unbiased equity finalization.  Gov't PT D Br. at 25-26.  Although the April 21, 2011 Settlement preserved Chevron's right to pursue its claims before this court, that did not mean that the Government agreed that Chevron was entitled to reliance damages.  Gov't PT D Br. at 26-27.  Moreover, Chevron obtained the benefit of having the ASFE's initial March 1997 Shallow Oil Zone decision withdrawn.  That decision would have awarded 11.6% more equity to DOE, an increase that was worth $470 million.  In addition, DOE's agreement to enter into the Equity Process Agreement provided Chevron with other procedural benefits, including the right to appeal the ASFE's final equity decisions to the OHA.  Gov't PT D Br. at 29-31.  And, although Chevron was able to confirm DOE's alleged breaches in January 2004, Chevron nevertheless elected to continue pursuing equity finalization.  Gov't PT D Br. at 32-34.

Second, Chevron did not demonstrate that the costs it incurred to participate in the equity finalization in the Elk Hills Reserve were caused by any breach, *i.e.*, Chevron must demonstrate that it would not have incurred any equity finalization costs in a "but for" world.  Gov't PT D Br. at 34-38.  Chevron also failed to satisfy its burden of proof to show that any specific expenditures were caused by DOE's alleged breaches.  Gov't PT D Br. at 45-48.  Nor did

Chevron establish that its expenditures in any zone increased, as a result of DOE's breach of the Equity Process Agreement. Gov't PT D Br. at 51-58.

Third, Chevron would have been required to expend substantial funds to finalize equity under some alternative process. Gov't PT D Br. at 45-60. In the end, despite any DOE breaches, Chevron's actual finalization costs were reasonable and less than what Chevron anticipated. Gov't PT D Br. at 48-51. Therefore, the only damages to which Chevron would be entitled in this case are "mitigation payments," *i.e.*, "additional costs Chevron was forced to incur after DOE's alleged breach[.]" Gov't PT D Br. at 38.

### c.    The Court's Resolution.

As the record demonstrates, DOE repeatedly and materially breached the May 19, 1997 Equity Process Agreement as to the Carneros Zone and the Stevens Zone. In addition, DOE repeatedly and materially breached the July 8, 1996 contract with the Equity IPE, to which Chevron was the direct and intended third party beneficiary, as to the Stevens Zone. By its terms, the April 21, 2011 Settlement did not bar Chevron from seeking damages for these breaches. Therefore, the court has determined that Chevron is entitled to certain costs that it incurred to participate in equity finalization. *See Am. Capital Corp. v. FDIC*, 472 F.3d 859, 867 (Fed. Cir. 2007) (holding that "the injured party has a right to damages . . . , including *expenditures made in preparation for performance or in performance*[.]") (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 350 (1981) (emphasis added)); *see also id.* at 868-69 (discussing the burden of proof in reliance damage cases); *see also Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1364 (Fed. Cir. 2005) (same); RESTATEMENT (SECOND) OF CONTRACTS § 344(b) (1981) (Damages may be awarded to protect the "reliance interest" of a promisee, *i.e.*, the "interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as [it] would have been in had the contract not been made.").

At trial, Chevron insisted that it was entitled to all costs incurred in the finalization of equity in the Stevens Zone, because "as it turned out everything was wasted." TR at 100 (Giumarra); *see also* 10/5/12 Oral Argument TR at 143 (Chevron's Counsel). The court disagrees. Chevron is entitled only to three specific categories of damages.

First, Chevron is entitled to reliance damages for the costs incurred to participate in the equity finalization of the Carneros Zone, excluding all "financing costs,"[43] from May 19, 1997, the date the Equity Process Agreement was executed, until July 6, 2000, the date that Chevron's appeal to OHA was denied, because Chevron was required to pursue the July 6, 2000 OHA appeal to preserve Chevron's objections to the ASFE's May 19, 1998 Final Carneros Zone Decision. *See* RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981) (stating that "damages are . . . recoverable for loss that the injured party could [not] have avoided without undue risk").

---

[43] The court considers "financing costs" to include any interest, the cost of capital, and letters of credit. *See England v. Contel Advanced Sys., Inc.*, 384 F.3d 1372, 1379 (Fed. Cir. 2004) (explaining that the "no-interest rule" bars "not only . . . the recovery of interest on substantive claims against the government, but also interest costs incurred on money borrowed as a result of the government's breach or delay in payment" (citation omitted)).

Contrary to the Government's argument, the election doctrine does not apply in these circumstances. *See Dow Chem. Co. v. United States*, 226 F.3d 1334, 1346 (Fed. Cir. 2000) (holding that a non-breaching party is subject to the election doctrine, only when "the breaching party . . . changed [its] position in reliance on the injured party's failure to cancel or the injured party's conduct [is] such that it would be unjust" not to enforce the doctrine (quoting *Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1314 (Ct. Cl. 1976))); *see also N. Helex Co. v. United States,* 455 F.2d 546, 553 (Ct. Cl. 1972) ("The guiding principle is whether, in the individual circumstances, the [non-breaching party] exercised 'reasonable commercial judgment[.]'"). Chevron acted reasonably in an attempt to limit its damages; it twice sought stays of its OHA appeals. *Chevron USA Inc.*, No. TES-0010 (Dep't of Energy Dec. 4, 2007) (denying Chevron's motion to stay or continue its appeal); JE 1173 at 2. In fact, the Government apparently thwarted one of Chevron's attempts at mitigation by declining to join Chevron's first motion for a stay of OHA proceedings. 8/31/05 App. to Gov't Mot. to Dismiss at 109 (OHA opinion stating that "*given the absence of a joint motion for stay*, the proceeding should go forward" (emphasis added)). Under the circumstances, the court has determined that the election doctrine does not apply in this case.

Second, Chevron is entitled to reliance damages for the costs incurred to participate in the equity finalization of the Stevens Zone, excluding all "financing costs," from July 8, 1996, the date that DOE's contract with the Equity IPE was executed to which Chevron was the direct and intended third party beneficiary, until June 17, 2010, *i.e.*, the date of Chevron's Supplemental Reply Brief in Chevron's OHA appeal of the ASFE's Final Stevens Zone Remand Decision. RESTATEMENT (SECOND) OF CONTRACTS §§ 349-350 (1981); Supplemental Reply Br. of Chevron U.S.A. Inc., .

Third, on May 19, 1998, the ASFE assured Chevron in writing that DOE had not and would not engage in prohibited *ex parte* communications. Chevron reasonably relied on those assurances. As the record shows, these assurances were misleading at that time and were not honored by DOE thereafter—a classic breach of the implied covenant of good faith and fair dealing. *See First Nationwide Bank v. United States*, 431 F.3d 1342, 1349-50, 1353 (Fed. Cir. 2005) (recognizing and enforcing the implied covenant of good faith and fair dealing); RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (defining "good faith" as "honesty in fact in the conduct or transaction concerned" (quoting U.C.C. § 1-201(19)). On January 7, 2003, Chevron sent DOE a FOIA request to obtain twelve categories of documents to determine whether DOE had engaged in prohibited *ex parte* communications. JE 1101. A January 9, 2003 DOE staff memo determined that "EFT exchanges" were not covered by the FOIA request, but the "Secret Report" might have to be disclosed. JE 1103. Instead, three months later, on April 17, 2003, DOE released only one redacted document and declined to provide any other documents, claiming that the remainder of Chevron's FOIA request was not sufficiently specific. JE 1135 at 1-2. After Chevron threatened to sue DOE to obtain compliance with the FOIA request, on December 23, 2003, Chevron was provided with three loose-leaf binders of heavily redacted documents. JE 1137 at CA5031059. On January 28, 2004, Chevron advised the ASFE that, based on the documents disclosed, it appeared that DOE breached the May 19, 1997 Equity Process Agreement on more than one occasion. JE 1137. After Chevron failed to reach a resolution of this matter with DOE, this case was filed on August 20, 2004. Therefore, the court has determined that Chevron also is entitled to the costs to: prepare its January 7, 2003 FOIA

request; obtain compliance from DOE; review the documents that DOE provided to Chevron on April 17, 2003 and December 23, 2003; and prepare Chevron's January 28, 2004 notice letter to the ASFE.

The court next turns to whether the Government "may be credited with any benefit the plaintiff retained from its expenditure in reliance of the breached agreement." *Westfed*, 407 F.3d at 1370. To be sure, Chevron learned relevant information during equity finalization that informed Chevron's negotiations that produced the April 21, 2011 Settlement. DTR at 1084-85 (Gov't Damage Expert Lencioni); *see also* Frank H. Easterbrook, *Discovery As Abuse*, 69 B.U. L. Rev. 635, 648 (1989) (observing that "sharing information increases the extent to which parties agree on the likely outcome of the case if it goes to trial, which facilitates settlement"). But, establishing that Chevron retained *some* benefit is not a sufficient basis to establish an offset in a sum certain, a fact that the Government's damage expert recognized. DTR 1084 (Lencioni). In addition, it is true, as the Government points out, that Chevron ultimately received equity finalization through the April 21, 2011 Settlement. But, it is impossible for the court to place a value on that settlement or to determine whether Chevron would have received more favorable equity finalization in a non-breach world, because the settlement terms prohibit the Government and Chevron from disclosing the final equity determination. JE 1731 ¶ 6.3 ("[N]either the amount of the payment in Section 1.1 of this Agreement nor the content of any of the discussions leading up to this Agreement will be disclosed, cited, used or admissible in . . . the pending Court of Federal Claims litigation[.]"). Therefore, the court has no basis for granting the Government an offset. *See Westfed*, 407 F.3d at 1370 ("If the government wanted an offset, it was the government's burden to prove with reasonable certainty [the precise financial] benefit retained by [the non-breaching party.]").

The Government's damage expert opined that Chevron's reliance damages should be offset by approximately $24 million,[44] since that is an amount that Chevron estimated the equity finalization of the Elk Hills Reserve would cost and would have been spent by Chevron "but for" the breaches. DTR at 1163 (Gov't Damage Expert Musika) (relying on 5/18/09 Stone Dep. at 137-40).[45] The relevant legal inquiry, however, is not what Chevron would have *spent* in a non-breach world, but what Chevron would have *lost*. *See Westfed*, 407 F.3d at 1369-70 (holding that an offset against reliance damages is available for "any *loss* that the party in breach can prove" that would have been suffered but for the breach) (quoting Restatement (Second) of Contracts § 349) (1981) (emphasis added) (internal quotation marks and citation omitted); *see also L. Albert & Sons v. Armstrong Rubber Co.*, 178 F.2d 182 (2d Cir. 1949). In *L. Albert*, the

---

[44] Chevron's total equity finalization costs were $27.14 million, excluding legal costs and letters of credit. JE 1878 ¶ 11 (6/2/11 Strickland Decl.).

[45] The Stone deposition, however, was never introduced into evidence. But, at the damages hearing, Mr. Stone confirmed that, he estimated in 1993 that equity finalization of the Carneros Zone would cost Chevron $3 million to $5 million. DTR 663 (Stone). Mr. Stone confirmed that he estimated in 1993 that equity finalization of the Stevens Zone would cost Chevron approximately $2 million per year or up to $10 million, if it took five years or until 1998 to complete. DTR 663 (Stone). In addition, Mr. Stone estimated that, between 1997 and 2000, equity finalization of Elk Hills would cost Chevron $4 million per year. DTR 667 (Stone).

non-breaching party spent $3000 on building a foundation for four rubber refiners it never received, and the court found this foundation was "necessary to prepare for performance." *Id.* at 189. The non-breaching party would have *spent* the money in a non-breach world, but to receive an offset the defendant needed to prove that the expense would not have been recovered through the prospective earnings of the four machines *i.e.*, the offset would equal the amount of the expenditure that would have been a *loss* in a non-breach world. *Id.* Similarly, in this case, for the Government to receive an offset, it must show the amount of Chevron's expenses, in a non-breach world, that would be considered as loss *i.e.*, the amount that would exceed the value to Chevron of receiving equity finalization through the procedure set forth in the Equity Process Agreement and the Equity IPE Contract. The Government, however, has failed to prove that either agreement was a "losing contract" for Chevron, let alone the amount of the loss.

Chevron has presented the court with several damages scenarios that included all four zones and different breach dates. Pl. Supp. D Reply at 7. None of these scenarios, however, conform to the zones, precise periods, and specified costs for which the court has determined that Chevron is entitled to damages, based on its "reliance interest." Therefore, Chevron is ordered to provide the court with an itemized financial statement of the aforementioned costs, verified by a certified public accountant.

Our appellate court has observed that "reliance damages are inappropriate where relief would result in an 'unfair windfall' to the non-breaching party." *Old Stone Corp. v. United States*, 450 F.3d 1360, 1378 (Fed. Cir. 2006). In the court's judgment, the reliance damage award that the court has defined in this case is not a windfall, because it does not compensate Chevron for: the costs incurred to finalize equity in the Dry Gas Zone or Shallow Oil Zone; the costs incurred from January 28, 2004 to August 20, 2004 to file this case in the United States Court of Federal Claims, after DOE failed to settle this matter when it was confronted by Chevron's FOIA request; the costs to litigate this case from August 20, 2004 to date, other than those that arose from the Government's "bad faith" conduct with respect to certain privileged documents, as discussed below; and the additional costs incurred after the trial to achieve equity finalization via a private mediation process that resulted in the April 21, 2011 Settlement. Nor did the Government make any effort to establish the economic effect of its breaches on Chevron.[46]

---

[46] There is evidence in the record proffered by Chevron, that the *ex parte* communications that occurred during the finalization of Carneros Zone equity caused Chevron a loss of equity worth at least $11 million. JE 872. There is also evidence in the record that the *ex parte* communications that occurred during finalization of Stevens Zone equity caused Chevron a loss of equity worth at least $157 million. JE 1015 at 1, 23; TR at 516 (Stone); TR at 1215 (Latham); TR at 2892-93 (Frost). The Government correctly argues that the April 21, 2011 Settlement superseded and voided all previous equity determination recommendations and decisions. JE 1731 ¶ 6.2. Therefore, the Government argues that any damages should be limited to Chevron's mitigation costs, equal to Chevron's (non-litigation and non-financing-related) costs incurred since filing the August 20, 2004 Complaint. Gov't PT D Br. at 91-94 (citing *Old Stone*, 450 F.3d at 1368-70 (awarding $74.5 million in recapitalization expenses that enabled the non-breaching party to retain the benefit of its bargain)). Unlike the non-breaching party in *Old Stone*, however, Chevron never received what it bargained for—a final equity determination

**F.      Sanctions For The Government's "Bad Faith" Conduct During Discovery.**

Finally, the court turns to whether the Government is liable for sanctions for "bad faith" conduct during discovery. In response to Chevron's initial document request, on February 16, 2007 the Government submitted a 291 page "Master Log" of more than 5000 documents, consisting of approximately 25,000 pages, that DOE designated and the Government insisted were subject to the attorney-client, attorney work product, and/or deliberative process privileges. *See Chevron U.S.A., Inc. v. United States*, 76 Fed. Cl. 442, 443 (Fed. Cl. 2007). Thereafter, the Government ultimately designated 35,919 pages of allegedly privileged documents that were organized in 7337 folders. *Id.* At Chevron's request, the court conducted an *in camera* review of 437 folders, consisting of 1722 pages allegedly subject to attorney client privilege; 254 folders, consisting of 1451 pages allegedly subject to the attorney work product privilege; and 110 folders, consisting of 553 pages allegedly subject to the deliberative process privilege. Thereafter, the court issued a series of evidentiary rulings regarding the Government's privilege assertions. *Id.*; *see also Chevron U.S.A., Inc. v. United States*, 80 Fed. Cl. 340, 342 (2008); *Chevron U.S.A., Inc. v. United States*, No. 04-1365C, 2008 WL 958395 (Fed. Cl. Apr. 4, 2008) (ordering production of documents not subject to the Government's Motion For Reconsideration); *see also Chevron U.S.A., Inc. v. United States*, 83 Fed. Cl. 195 (2008) (denying the Government's February 13, 2008 Motion For Reconsideration); *Chevron U.S.A., Inc. v. United States*, 83 Fed. Cl. 313 (2008) (denying the Government's April 16, 2008 Motion For Interlocutory Appeal).

In response to the Government's February 13, 2008 Motion for Reconsideration and the court's August 28, 2008 partial denial thereof, the Government filed a September 19, 2008 Petition for Mandamus. The United States Court of Appeals for the Federal Circuit denied the Government's contested attorney client privilege assertions regarding documents that evidenced DOE's liability for breach of the May 19, 1997 Equity Process Agreement and the July 8, 1996 contract with the Equity IPE, to which Chevron was the direct and intended beneficiary. *See In re United States*, 321 Fed. App'x 953, 956 (Fed. Cir. 2009) (*per curiam*) ("[W]e determine that the [United States] Court of Federal Claims properly held that the particular documents at issue in this case should be produced, because the documents were incident to alleged misconduct."); *see also id.* at 958, 961 (but, reversing the court's ruling only as to twenty-six folders, wherein the Government claimed either attorney work product and/or deliberative process privilege). The bottom line is that after time-consuming review conducted by the court and the United States Court of Appeals for the Federal Circuit, at least 42% of the folders analyzed contained an improper assertion of privilege.

The United States Court of Appeals for the Federal Circuit has held that federal trial courts have the "inherent power to sanction an attorney's bad faith conduct during litigation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1288 (Fed. Cir. 2000). And, the Government, like a private party, may be subject to "monetary sanctions for abuse of discovery[.]" *M.A. Mortenson Co. v. United States*, 996 F.2d 1177, 1184 (Fed. Cir. 1993).

---

based on the expert findings of an Equity IPE and an ASFE whose decisions were untainted by *ex parte* communications, so mitigation costs are not appropriate and cannot be determined.

Although Chevron was able to fund the costs to ascertain whether the Government's privilege assertions were legitimate in this case, most litigants cannot afford such protracted discovery battles.  In addition, the collateral discovery proceedings delayed the trial in this case by four years and imposed significant, unnecessary costs on Chevron, as well as the court.  In *Advanced Display Systems*, the United States Court of Appeals for the Federal Circuit described "bad faith" conduct in words that express the court's view about this case:

> Indeed, to say that the counsel's conduct during discovery raises the collective eyebrow of this court would be to understate the severity of their transgressions. Counsel's tactics during discovery evinced a brazen disregard for the legal process.  Throughout discovery, counsel's strategy consisted of efforts to obfuscate, cover-up, and subvert evidence that was properly discoverable and responsive to [plaintiff's discovery] requests.

*Advanced Display*, 212 F.3d at 1288 (emphasis added).

Federal trial courts necessarily tend to trust the parties' counsel's assertion of privilege, as officers of the court.  But, when that trust is misplaced, appropriate consequences should follow.  The court has determined that DOE and Government discovery tactics as to privileged documents in this case constitute "bad faith" conduct.  *Id.*

Consequently, the court has determined that the appropriate sanction is for the Government to reimburse Chevron for 42% of the legal fees expended from February 16, 2007, the date that the Government produced its "Master Log" of privileged documents to March 5, 2009, the date the United States Court of Appeals for the Federal Circuit filed its order on the Government's Mandamus Petition.  Therefore, Chevron is ordered to provide the court with a financial statement of the aforementioned legal fees, verified by a certified public accountant.

## VI.    CONCLUSION.

For these reasons, the court has determined that DOE breached the May 19, 1997 Equity Process Agreement with Chevron and the July 8, 1996 Equity IPE Contract, to which Chevron was the direct and intended third party beneficiary**.**  In addition, the court has determined that DOE breached the implied covenant of good faith and fair dealing.  Therefore, Chevron is entitled to be compensated for damages, in an amount to be determined, including sanctions for DOE and the Government's "bad faith" conduct and abusive discovery tactics.

Chevron will report to the court within sixty days on the status of Chevron's efforts to provide the court with the itemized financial information requested herein.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

Enclosure:      Appendix (Court Exhibits A-C)

**COURT EXHIBIT A**
Case 1:04-cv-01365-SGB Document 392 Filed 05/08/13 Page 82 of 91
Court Exhibit A is an overview showing the equity finalization process and the principal participants.



---

* The descriptive designations in quotations are the same as those used by DOE in JE 1225 at 5.

**COURT EXHIBIT B**

**Carneros Zone Equity Finalization Process
(valued at $200 million)**



---

\*   The --- lines show *ex parte* communications by DOE in breach of the Equity Process Agreement.

[1]     Documents showing Ms. Egger's work for DOE EFT before the ILA: JE 140; TR at 417-18 (Stone); TR at 997 (Renwick); TR at 2184-85 (Egger).

[2]     JE 177 (1/13/97 ILA instructing the IPE to include 40% of the Section 25Z land, as inside the Carneros Zone).

[3]     JE 178 (2/3/97 memo from Ms. Egger to ASFE Godley reporting on ILA's determination about the Section 25Z land issue suggesting that the ASFE "handle" that issue "administratively," when the ASFE's Final Equity Decision is made); TR at 2348 (Egger).

[4]     JE 9 at 13 (11/24/97 Carneros Zone Preliminary Decision).

[5]     JE 9 at 13 & n.16 (3/6/97 IPE Final Recommendation allocating 96.6138% of the Carneros Zone equity to DOE and 3.3862% to Chevron).

[6]     Document showing Ms. Egger's work for DOE EFT: JE 203 (3/23/97 fax to Ms. Egger from Burzlaff forwarding a final draft of an engineering assessment of IPE Equity Final Recommendation for her review and comment).

[7]     Documents showing Ms. Egger's work for ASFE Technical & Legal Staff on the ASFE Preliminary Decision: JE 342 (9/29/97 memo from ASFE Godley to Ms. Egger with draft approach to including the Section 25Z lands into the ASFE's Preliminary Decision); JE 1422 at 46 (Gov't Resp. to Chevron Interrog. No. 17(c) confirming that Ms. Egger provided "input" for the ASFE's 11/24/97 Preliminary Carneros Zone Decision); TR at 2606-07, 2692-94 (ASFE Godley) (confirming that Ms. Egger reviewed the ASFE's draft decisions, without Chevron's being informed of that fact).

[8]     *Compare* JE 174 (1/27/97 email from Ms. Egger to ASFE Godley re: "Format for DGZ/Carneros Zone Equity Decision." The rest of the document was redacted and designated as subject to the attorney-client and/or deliberative process privilege.  As such, more than just "format" was discussed.); JE 342 (ASFE Godley forwarding DOE EFT outside counsel's draft to Ms. Egger with a proposed approach to the Section 25Z land issue for Ms. Egger's review), *with* JE 9 at 13 & n.16, 20-21, 23 (11/24/97 ASFE Preliminary Decision rejecting ILA/IPE decision re: 25Z land issue and concluding that Chevron had 0% equity interest in the Carneros Zone).

[9]     Document showing Ms. Egger's work for DOE EFT before the ASFE: JE 354 (1/13/98 fax from DOE EFT member Kauffman to Ms. Egger forwarding Chevron's positions re: Carneros Zone).

[10]     JE 1422 at 47 (Gov't Resp. to Chevron Interrog. No. 17 (d) confirming that Ms. Egger provided "input" for the ASFE's Final Carneros Zone Decision); TR at 2606-07, 2692-94 (ASFE Godley) (confirming that Ms. Egger reviewed the ASFE's draft decisions, without Chevron's being informed of that fact).

[11]     JE 359 n.1 (Chevron letter to ASFE Godley questioning how the ASFE's 11/24/97 Preliminary Decision came to reflect the content of Chevron's briefs to the ILA).

[12]     *Compare* JE 396 (5/19/98 letter from ASFE Godley assuring Chevron there were no *ex parte* communications re: the Carneros Zone), *with* JE 342 (9/29/97 memo from ASFE Godley to Ms. Egger forwarding a draft approach to the Section 25Z land issue in the ASFE's Preliminary Decision re: the Carneros Zone) *and* TR 2606-07, 2692-94 (ASFE Godley) (confirming that Ms. Egger viewed the ASFE's draft decision without Chevron being aware of that fact).

[13]     JE 397 at CSI0010181 (5/19/98 ASFE Final Decision assigning 100% equity interest in the Carneros Zone to DOE).

[14]     JE 17 at 3; JE 872 (7/7/00 email from Dr. Latham advising Ms. Egger that OHA's denial of Chevron's appeal regarding the ASFE's Final Decision re: the Carneros Zone saved DOE $11 million).

**COURT EXHIBIT C**

**Stevens Zone Equity Finalization Process**

**(Valued at $18.4 billion)**

The --- lines show *ex parte* communications in breach of the Equity Process Agreement between DOE and Chevron.

The *** lines show *ex parte* communications in breach of DOE's 7/8/96 Contract with the Equity IPE, to which Chevron was a third party beneficiary.

[1]     JE 14 at CSI005 1194 (referencing 11/4/97 Equity IPE Provisional Recommendation allocating 81.157% of the Stevens Zone equity to DOE; 18.842% to Chevron).

[2]     Documents showing Ms. Egger reviewed 4/3/98 summary of DOE EFT comments on Equity IPE Provisional Recommendation marked privileged and confidential: JE 346 at MCE0140122-25.

[3]     JE 346 (10/31/97 PowerPoint presentation by Equity IPE re: post Provisional Recommendation briefing schedule of DOE EFT provided by Ms. Egger to ASFE Godley on 4/12/98); JE 365 (4/7/98 letter from DOE EFT to ASFE Godley requesting to respond to Chevron comments on Equity IPE Provisional Decision re: Stevens Zone).

[4]     JE 366 (4/9/98 handwritten notes reflecting ASFE Godley's telephone conference with the Equity IPE in which ASFE Godley, Ms. Egger, and Dr. Latham participated, generating a list of questions to ask both owners "technical in nature.").

[5]     JE 384 at CA50031877 (4/27/98 letter from Equity IPE to ASFE Godley with questions the Equity IPE would like to pose to both parties, without notice to Chevron). On May 1, 1998, ASFE Godley forwarded the 4/27/98 questions to the parties and Ms. Egger, but did not mention her prior discussion with Equity IPE re: same without Chevron's knowledge (JE 366).

[6]     JE 388 (5/7/98 letter from Chevron to ASFE Godley protesting her *ex parte* communications with Equity IPE that included Ms. Egger); *see also* TR at 398-99 (Stone).

[7]     JE 393 (5/13/98 letter from ASFE Godley assuring Chevron of no *ex parte* communications). Testimony that Chevron relied on the ASFE's representation: TR at 350-51 (Stone); TR at 827-28 (Giumarra); TR at 2208-09 (Egger); TR at 2679-81 (ASFE Godley).

[8]     Documents showing Ms. Egger's work for DOE EFT: JE 387 (5/6/98 fax from Kauffman to Ms. Egger forwarding engineering memo on "capture analysis."); JE 451 (8/3/98 email from Burzlaff to Ms. Egger re: Equity Finalization Data Cutoff Dates); JE 466 (10/6/98 email from Ms. Egger to Mr. Thorpe forwarding text she drafted for inclusion in DOE EFT data cutoff briefs); JE 476 at 1 (10/23/98 email exchange between Ms. Egger and other members of the DOE EFT re: "Revised Equity Data Cutoff Date Proposal" and Ms. Egger's response re: same); JE 516 (12/18/98 email from Ms. Egger to DOE EFT's outside counsel, and other DOE EFT members re: data cutoff dates, including draft red-line transmittal letter and cutoff date proposal); JE 530 (2/8/99 email from Ms. Egger to DOE EFT re: "data cut off" date proposal letter); JE 607 (7/23-26/99 email exchange between Ms. Egger and DOE EFT showing her substantive and strategic role in advising the DOE EFT re: data cutoff issue); JE  615 (7/29/99 DOE EFT position paper on Stevens Zone data cutoff dispute sent by DOE EFT's outside counsel to Ms. Egger, Mr. Gangle, and other DOE EFT members for final approval); JE 616 (7/29/99 letter from DOE EFT outside counsel to ASFE Kripowicz re: DOE EFT position on data cutoff date dispute with cc: to Ms. Egger at CSI004 0603, as a member of the DOE EFT); JE 625 (8/11/99 email from Ms. Egger to DOE EFT outside counsel forwarding her suggestions on "letter to Mr. Krip."); *see also* TR at 978-79 (Henderson); TR at 1307-08, 1314, 1323 (Gangle); TR at 2435-38 (Egger) (testifying that she advised the DOE EFT about the data cutoff dispute).

[9]       JE 370 (4/14/98 notes of telephone conference between DOE EFT, *i.e.*, Thorpe, Smits, Gangle, Kauffman and ASFE Technical Staff (Capitanio, Latham, Smits) re: discussion about Equity IPE capture analysis.  Ms. Egger also participated).

[10]      Documents showing Ms. Egger's work for the ASFE on the data cutoff decision: JE 614 (7/29/99 email the same day the DOE EFT comments on the data cutoff dispute were sent to the ASFE, from Ms. Egger to ASFE Kripowicz re: draft letter on admissibility of Stevens Zone data); JE 632 (8/18/99 email from Latham to Capitanio re: schedule of meetings re: Stevens Zone cut off showing 8/23/99 meeting with Ms. Egger and ASFE Kripowicz and 8/25/99 telephone conference with Equity IPE); JE 635 (email from Latham to Ms. Egger re: critical data and decline curves); JE 641 (typed notes of 8/25/00 telephone conference between the ASFE, Ms. Egger, and Equity IPE); JE 652 at CME01302005 (9/7/99 email from ASFE Kripowicz to Ms. Egger, Latham re: rationale for Stevens Zone admission of additional data); JE 654 (9/8/99 email from Ms. Egger to ASFE Kripowicz re: converting Ms. Cadieux's narrative into preliminary draft of ASFE Data Cutoff Date Decision); JE 659 (9/10/99 email from Ms. Egger to ASFE Kripowicz re: attached a preliminary draft decision, "based on your outline"); JE 660 (drafts of Stevens Zone transmittal letter and draft ASFE Data Cutoff Decision); JE 673 (9/14/99 email from Capitanio to Ms. Egger re: comments on ASFE Draft Data Cutoff Decision and response); JE 674 (9/15/99 email from Ms. Egger to ASFE Kripowicz re: new draft decision); JE 675 (9/15/99 draft of Stevens Zone transmittal letter and data cutoff decision, reflecting concern about "the 43 well request rationale"); JE 680 (9/16/99 email from Ms. Egger to ASFE Kripowicz with revised version of decision reflecting Ms. Egger's changes re: post 1997 data concerning the 43 well submission); JE 687 (9/16/99 email from Cadieux to Ms. Egger with attached comments on draft Stevens Zone data cutoff decision requesting Ms. Egger's technical advice and Ms. Egger's response); JE 694 (9/17/99 draft of Stevens Zone transmittal letter and data cutoff decision with Capitanio's handwritten note "Mtg. w/ Krip, MEgger ASmits.  Agreed that none of the post-1997 data will be allowed.  Mary will revise decision."); JE 714 (9/21/99 email from Ms. Egger to Smits  re: ASFE data decision draft); JE 716 (9/24/99 email from Ms. Egger to ASFE Kripowicz.  "Attached is the new and improved draft decision [explaining that] the rationale on the 43-well data submission issue changed substantially" and response from Capitanio to Ms. Egger re: comments on draft ASFE data decision); JE 726  (9/23/99 letter from ASFE Kripowicz to DOE EFT outside counsel enclosing ASFE Stevens Zone data cutoff decision); *see also*  TR 459 (Stone); TR at 1179-80 (Latham); TR at 1580-83, 1587-90 (Capitanio); TR at 1673-75, 1679-1707 (ASFE Kripowicz).

[11]      Documents showing *ex parte* communications between Equity IPE and ASFE Kripowicz and DOE Technical and Legal Team prior to 9/23/99 ASFE Data Cutoff Decision: JE 637 (8/25/99 handwritten notes re: ASFE technical staff *ex parte* communication with Equity IPE, initiated by ASFE Kripowicz, including DOE Technical and Legal Staff including Ms. Egger); JE 641 (8/31/99 typed notes of 8/25/99 telephone conference initiated by ASFE Kripowicz with Equity IPE re: Stevens Zone "data cut-off" issue, also reflected in JE 637).

          Other e*x parte* communications between DOE and Equity IPE: *see also* 4/30/07 Krenek Dep. at 231-32; 4/20/09 Latham Dep. at 116-17, 119-20; 4/21/09 Latham Dep. at 450-53.

[12]      *Compare* JE 726 at 13 (9/23/99 ASFE Data Cutoff Decision Excluding Additional Data per Ms. Egger's suggestion) *with* JE 652 at CME01302006-07 (9/7/99 ASFE Kripowicz outline

of Rationale for Admission of Additional Data re: Stevens Zone prior to Ms. Egger's work in preparing final decision).  The following documents show Ms. Egger's drafting changes to the ASFE's 9/7/99 views that resulted in the exclusion of the additional data: JE 694; JE 714; JE 716; TR at 459 (Stone); *see also* TR at 980 (Henderson); TR at 1675-1709 (ASFE Kripowicz).

13      Documents showing Ms. Egger's work with DOE EFT after working with the ASFE on the Data Cutoff Decision: JE 1384 (Ms. Egger represented DOE EFT before the ILA on the conversion issue); *see also* TR 546-49 (Stone).

14      JE 818 at CA500020372-428 (3/2/00 Equity IPE Final Recommendation allocating 80.4884% of the Stevens Zone to DOE; 19.5116% to Chevron).

15      Other DOE ASFE Technical Team e*x parte* communications with Equity IPE: JE 936 (10/17/00 Equity IPE handwritten notes of telephone call from DOE EFT (Latham) to Equity IPE re: "Distribution of Injectors in Chevron Simulation model is a big DOE issue"); JE 997-98 (6/21/01 Equity IPE handwritten notes of telephone call from DOE EFT (Latham) to Equity IPE re: technical issues re: Stevens Zone).

16      Documents showing *ex parte* communications between ASFE and Equity IPE: *Compare* JE 936 (10/17/00 *ex parte* communications between Dr. Latham and Equity IPE re: 26R Zone) *with* JE 952 at CNS00900290 (11/6/00 letter from ASFE Kripowicz to Equity IPE requesting a privileged and confidential technical report); *see also* JE 935 (10/17/00 email from Latham to ASFE Kripowicz regarding his concern that *ex parte* communications with the Equity IPE were prohibited by the Equity IPE Protocol); *see also* TR at 1737 (ASFE Kripowicz) (failing to inform Chevron of his 11/6/00 request to Equity IPE and subsequent *ex parte* communications with the Equity IPE); TR at 1718-19, 1734, 1800-02 (ASFE Kripowicz) (stating it was Ms. Egger's "direction" and "advice" that he should request that the Equity IPE's report be marked privileged and confidential).

17      JE 965 (12/22/00 Equity IPE "Secret Report" to ASFE admitting that the Equity IPE overestimated DOE's recoverable reserves in 26R by 8 million barrels); *see also* TR at 1168, 1216 (Latham); TR at 2892-93 (Frost).  The Equity IPE recommended in the "Secret Report" that the ASFE should reconsider his September 23, 1999 Data Cutoff Date Decision and "consider obtaining and using official updated production data." JE 965 at 7, 11-12.  The ASFE declined to do so.  TR at 1659-60, 1756, 1785-86 (ASFE Kripowicz).

18      Documents showing Ms. Egger's work with ASFE's Technical & Legal Staff regarding the ASFE's 11/13/01 Preliminary Decision: JE 834 (3/24/00 email from Latham to Ms. Egger re: Ms. Egger taking the lead in drafting the ASFE's Preliminary Decision); JE 995 (6/19/01 email from Latham to Ms. Egger estimating that the use of heating values, instead of current prices. as mandated by the ILA would increase the DOE equity from 80.4432% to 80.4900%, and was worth about $7 million plus interest to DOE.); JE 1000 (6/26/01 email from Latham to Ms. Egger summarizing his impression of Ms. Egger's argument to have the ASFE reject the Equity IPE's 3/2/00 Final Recommendation (based on the ILA's incorrect premise) and substitute "heating values as a more stable basis for conversion (an assumption yet to be proven)."  But Latham cautioned that this would be rejected by OHA); JE 1006 (7/31/01 email from Ms. Egger to ASFE Technical and Legal Team discussing her review of SPEE Monograph ("Guidelines for

4

Application of Petroleum Reserve Definitions") in response to JE 1000); JE 1009 (10/17/01 email from Cadieux to Ms. Egger forwarding draft comments on DOE issue); JE 1013 (10/25/01 email from Ms. Egger to ASFE Kripowicz forwarding draft Preliminary Stevens Zone Decision); JE 1015 (10/25/01 draft ASFE Preliminary Decision); *see also* TR at 1807-23 (ASFE Kripowicz).

19    *Compare* TR at 1228-30 (Latham) (requesting selected portions of the "Secret Report" be submitted as a stand-alone document) *with* JE 981 at CBG0060092 (2/23/01 Equity IPE forwarding the ASFE only two selected sections of the "Secret Report" as a stand-alone document, *i.e.*, JE 965 at CGC0040054-61 and JE 965 at CGC00400472-76); *see also* TR at 1794-98 (ASFE Kripowicz).

20    JE 13 (11/13/01 ASFE Preliminary Stevens Zone Decision).

21    JE 1422 at 50 (Gov't Resp. to Chevron Interrog. No. 17 at 50 (confirming that Ms. Egger provided "input" for the ASFE's 11/13/01 Preliminary Steven's Zone Decision))

22    JE 14 at CSI00512009 (ASFE's 6/18/02 Final Stevens Zone Decision allocating 80.3761% of the Stevens Zone equity to DOE; 19.6239% to Chevron); *see also* JE 1422 at 45-46 (Gov't Resp. to Chevron Interog. No. 17(b) at 45-46 (confirming that Ms. Egger provided "input" fo the ASFE's Final Stevens Zone Decision).

23    JE 1184 at CDE00900037 (11/31/05 OHA Remand to the ASFE).

24    JE 1360 (2/7/07 e-mail from Cadieux to Ms. Egger enclosing draft final decision on remand, incorporating the changes from Ms. Egger); *see also* TR 1261-62 (Latham) (praising Ms. Egger's review of the ASFE's draft OHA Preliminary Decision on Remand).

25    JE 158 (ASFE's 5/23/06 Preliminary Remand Decision).

26    Documents showing Ms. Egger's work with ASFE Technical & Legal Staff on ASFE's 2/21/07 Final Remand Decision: JE 1360 (2/7/07 email from Cadieux to Ms. Egger forwarding draft ASFE Final Remand Decision); *compare* JE 1538 ¶ 11 (ASFE Jarrett Decl. stating that he relied on Ms. Egger regarding "all legal matters relating to equity finalization process."), *with* JE 1538 at ¶¶ 23, 24 (ASFE Jarrett Decl. stating that in the 2/21/07 Final Remand Decision the ASFE decided that he "only needed to consider the price of oil and gas over the entire history of the unit in order to comply with the OHA ruling and did not need to decide whether or not NGLs should be factored into the formula as part of the gas."  In that regard, the ASFE stated that he did not use the DOE proposed methodology, but "the ratio of oil to gas favored by Chevron." Neither Ms. Egger nor Ms. Cadieux "in any way influenced my decision on these issues, or the final decision.").  At trial, however, ASFE Jarrett admitted that Ms. Egger and Ms. Cadieux, in fact, had a role in preparing his draft final decision.  TR at 1881-82, 1963 (ASFE Jarrett).  He also admitted that "I didn't monitor everything they did for 14 months[.]"  TR at 1963 (ASFE Jarrett); *see also* TR at 1956-57 (ASFE Jarrett) ("[I]t's probably fair to say that I didn't study every document" and relied on his advisors).  But, the ASFE was aware that Chevron wanted to exclude the sale of NGLs and that the three options proposed to him all included the sale of NGLs.  TR at 1969 (ASFE Jarrett).  In addition, the Equity IPE's mistake in excluding twenty

5

percent of monthly production data or the potential sale of oil worth $2.5 billion was never corrected by the ASFE.  TR at 1927-36 (ASFE Jarrett).

27      JE 16 at 5 (ASFE's 2/21/07 Final Stevens Zone Remand Decision) (allocating 80.354% of the Stevens Zone equity to DOE; 19.646% to Chevron).