# In the United States Court of Federal Claims

No. 04-1365 C
**Filed under seal:** May 16, 2014[*]
**Reissued for publication:** May 16, 2014

*******************************************

| | |
|---|---|
| * | |
| * | |
| CHEVRON U.S.A., INC., | * |
| * | |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |
| | * |

Reliance Damages;
Sanctions for "Bad Faith" Conduct
    Relating to Privilege Assertions
    During Discovery.

*******************************************

**Donald B. Ayer**, **Lawrence D. Rosenberg**, **Michael S. Fried, Louis K. Fisher**, Jones Day, Washington, D.C., Counsel for the Plaintiff.

**Stuart F. Delery**, Assistant Attorney General, **Robert E. Kirschman, Jr.**, Director of National Courts, **Donald E. Kinner**, Assistant Director, **Michael Damien Snyder**, **Carrie Dunsmore, Benjamin Mark Moss**, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND FINAL JUDGMENT REGARDING PLAINTIFF'S ENTITLEMENT TO RELIANCE DAMAGES AND SANCTIONS FOR THE GOVERNMENT'S "BAD FAITH" CONDUCT RELATING TO PRIVILEGE ASSERTIONS DURING DISCOVERY

**BRADEN**, *Judge*.

This case arises from a commercial dispute between the Department of Energy ("DOE") and Chevron U.S.A., Inc. ("Chevron") about the finalization of their respective equity interests in

---

[*] On April 30, 2014, the court forwarded a sealed copy of this Memorandum Opinion and Order to the parties, requesting suggested deletions from the public version of any confidential and/or privileged information, and to note any citation or editorial errors requiring correction. *See* Docket No. 412. The court has incorporated some of these comments and corrected or clarified certain portions herein. The court has separately filed a new sealed Memorandum Opinion and Final Judgment, which replaces the April 30, 2014 version.

oil and gas deposits, located in the Elk Hills Reserve of California.  For the reasons discussed herein, the court has determined that Chevron is entitled to $17,908,857 in reliance damages for costs incurred, as a result of DOE's repeated breach of contract and violation of the covenant of good faith and fair dealing.  In addition, the court has determined that Chevron is entitled to $904,483, as a sanction for the Government's "bad faith" conduct relating to privilege assertions during discovery.

The following outline is provided to facilitate a review of the court's final rulings regarding Chevron's entitlement to reliance damages and sanctions, together with a list of Court Exhibits.

I.      SUMMARY OF RELEVANT FACTS AND PROCEDURAL BACKGROUND............ 4

II.     DISCUSSION. ......................................................................................................... 8

        A.      The Relevant Burdens Of Proof Regarding Reliance Damages. ........................... 8

        B.      The Plaintiff's Claim For Reliance Damages. ....................................................... 9

        C.      The Government's Objections To Plaintiff's Claim For Reliance Damages. ...... 14

                1.      As To The Allocation Of Costs Claimed. ................................................... 14

                        a.      Summary Of The Government's Argument. ................................ 14

                        b.      Summary Of The Plaintiff's Response. ....................................... 16

                        c.      The Court's Analysis And Resolution As To The Allocation Of Specific Costs.................................................................................. 18

                                i.      Company Payroll & Benefits. ........................................... 19

                                ii.     Other Labor Related Costs................................................. 26

                                iii.    External Non-Legal Professional And Labor. .................. 27

                                iv.     In-House Technical Consultants. ....................................... 28

                                v.      Miscellaneous Expenses. .................................................. 29

                                vi.     Legal Costs......................................................................... 29

                2.      As To Other Costs Claimed. ....................................................................... 30

                        a.      Summary Of The Government's Argument. ................................ 30

                        b.      Summary Of The Plaintiff's Response. ....................................... 32

                        c.      The Court's Analysis And Resolution Of Other Specific Costs... 32

i.     Unsupported Transactions. ................................................ 32

ii.    Improper Fixed Costs Not Related To Equity Finalization. .................................................................. 33

iii.   Accrued Benefit Costs Not Related To Equity Finalization. .................................................................. 34

iv.    Other Costs Not Related To Equity Finalization. ............. 35

III.   SUMMARY OF COSTS AWARDED AS RELIANCE DAMAGES. ........................... 36

A.     The Stevens Zone Equity Finalization. .................................................. 36

B.     The Carneros Zone Equity Finalization. ................................................ 37

C.     The Freedom Of Information Act Request And Related Proceedings. ................ 38

IV.    SANCTIONS FOR THE GOVERNMENT'S "BAD FAITH" CONDUCT RELATING TO PRIVILEGE ASSERTIONS DURING DISCOVERY. ............................................. 38

V.     CONCLUSION. .............................................................................. 40

* * *

Court Exhibit 1:  The Plaintiff's Initial Claim As Of October 2010, Presented By Cost Category. ................................................................................ 10

Court Exhibit 2:  Estimated Value Of Zones And Plaintiff's Revised Claim, Presented By Zone. ......................................................................................... 11

Court Exhibit 3:  Summary Of The Plaintiff's Final Claim For Reliance Damages And Sanctions, Based On The Court's Prior Rulings. ..................................... 12

Court Exhibit 4:  Summary Of The Plaintiff's Claim For Costs Previously Rejected By The Court. .......................................................................... 13

Court Exhibit 5:  The Government's Estimate Of Time That DOE Spent To Prepare And Present Equity Reports For The Independent Petroleum Engineer, By Zone. ............................................................................ 16

Court Exhibit 6:  The Government's Estimate Of Time Spent By The Independent Petroleum Engineer To Prepare Final Recommendations, By Zone. ....... 16

Court Exhibit 7:  Summary Of The Government's Proposed Allocation Adjustments, By Zone. ......................................................................... 19

Court Exhibit 8:  The Plaintiff's Proposed Allocation Of Employee Payroll And Benefits, By Zone. .......................................................................... 20

Court Exhibit 9:  The Government's Proposed Allocation Of Employee Payroll And Benefits, By Zone. .................................................................. 22

Court Exhibit 10:  The Court's Resolution Of Allocation Of Employee Payroll And
        Benefits, By Zone. ................................................................. 26
Court Exhibit 11:  Summary Of The Government's Proposed Adjustments For Other
        Specific Costs Claimed By Plaintiff. ....................................... 31
Court Exhibit 12:  The Government's Proposed Adjustments For Unsupported
        Transactions. ............................................................................ 32
Court Exhibit 13:  The Government's Proposed Adjustment For Internal Technical
        Consultants.............................................................................. 34
Court Exhibit 14:  Summary Of The Court's Resolution Of Allocation And Other
        Specific Costs—The Stevens Zone.......................................... 36
Court Exhibit 15:  Summary of The Court's Resolution Of Allocation And Other Specific
        Costs—The Carneros Zone..................................................... 37

## I.    SUMMARY OF RELEVANT FACTS AND PROCEDURAL BACKGROUND.[1]

On June 19, 1944, the Standard Oil Company, Chevron's predecessor, and the United States Navy ("Navy") entered into a Unit Plan Contract ("the UPC") to govern the joint operation and production of the oil and gas deposits located in three initial "commercially productive zones" of the Elk Hills Reserve.[2]   In 1977, Congress decided that the Elk Hills Reserve was no longer needed for defense and other strategic purposes and transferred the Navy's interests and management obligations to DOE.

On February 10, 1996, Congress enacted a law that required DOE to retain a "mutually acceptable" independent petroleum engineer ("IPE") to finalize the owners' equity interests in the Elk Hills Reserve.   On June 17, 1996, the Secretary of DOE delegated this task to the Assistant Secretary for Fossil Energy ("ASFE").   On July 8, 1996, the ASFE issued Administrative Order No. 96-01, "Protocol on Naval Petroleum Reserve Numbered 1 Equity Finalization Implementation Process" (the "Equity IPE Protocol"), to establish a procedure by which Chevron and DOE would present their respective positions to a "mutually acceptable

---

[1] The relevant facts and procedural history in this case have been discussed in detail in the following substantive decisions: *Chevron U.S.A., Inc. v. United States*, 71 Fed. Cl. 236, 239−55 (2006) ("*Chevron I*") (jurisdiction); *Chevron U.S.A., Inc. v. United States*, 80 Fed. Cl. 342−54 (2008), *reconsidered in part*, 83 Fed. Cl. 195, 195−96 (privilege assertions) ("*Chevron II*"); *In Re United States*, 421 F. App'x 953 (Fed. Cir. 2009) (*per curiam*); and *Chevron U.S.A. v. United States*, 110 Fed. Cl. 747, 750, 753−75 (2013) ("*Chevron III*") (finding the Government in breach of contract and of the duty of good faith and fair dealing).

[2] The UPC defined the term "commercially productive zones" as "[g]eologic strata beneath the surface of the earth which . . . are capable of producing oil or gas in paying quantities."   *Chevron III*, 110 Fed. Cl. at 753 n.2.   In 1976, the Elk Hills Reserve included the Dry Gas Zone, the Stevens Zone, and the Shallow Oil Zone.   *Id.* at 753.   In 1994, the Carneros Zone was discovered and included in the Elk Hills Reserve.   *Id.* at 754 n.5.

[IPE]" to finalize equity.  Although the Equity IPE Protocol clearly prohibited Chevron and DOE from having *ex parte* communications with the IPE, nevertheless, DOE's Deputy General Counsel for Technology Transfer and Procurement decided that she was authorized to provide the IPE with *ex parte* advice about equity finalization, and did so without Chevron's knowledge.

When this prohibited conduct was discovered by Chevron, the equity finalization process came to an abrupt impasse, but subsequently was renewed when the ASFE agreed to supplement the Equity IPE Protocol, authorizing DOE to hire an Independent Legal Advisor acceptable to Chevron and DOE to provide any legal advice requested by the IPE.  In addition, DOE and Chevron executed two additional documents that enabled the equity finalization process to resume.  The first was a May 19, 1997 Agreement Regarding Fixing of Equity Interest at Naval Petroleum Reserve No. 1 for Purposes of Sale (the "Decoupling Agreement").  The Decoupling Agreement estimated the parties' interest in the four unitized zones in Elk Hills Reserve and provided that when equity was finalized, one party would compensate the other for any difference between the pre-sale equity estimate and the final equity determination.  The second agreement, also executed on May 19, 1997, regarding the equity redetermination was the "Equity Process Agreement."   The purpose of the Equity Process Agreement was to establish an impartial, unbiased, and transparent process governing the ASFE's independent final equity decision to avoid the *ex parte* communications that arose regarding the Equity IPE Protocol.[3]

After an eleven day trial in Washington, D.C. and Dallas, Texas, the court determined that DOE not only violated the July 8, 1996 Equity IPE Protocol, as supplemented, to which Chevron was a third-party beneficiary, but DOE also "repeatedly and materially" violated the May 19, 1997 Equity Process Agreement.  *See Chevron III*, 110 Fed. Cl. at 750, 803.  The court also determined that written assurances made on May 19, 1998 by DOE to Chevron that DOE was no longer engaged in prohibited *ex parte* communications "were misleading at that time and . . . not honored by the DOE thereafter—a classic breach of the implied covenant of good faith and fair dealing." *Id.* at 804.

The court's liability determination in this case, however, pre-dated the United States Court of Appeals for the Federal Circuit's decision in *Metcalf Constr. Co. v. United States*, 742 F.3d 984 (Fed. Cir. 2014).  Therein, our appellate court held that the "duty of good faith and fair dealing [is inherent in the contract] performance and enforcement," and "[f]ailure to fulfill that duty constitutes a breach of contract, as does failure to fulfill a duty 'imposed by a promise stated in the agreement.'"  *Id.* at 990 (quoting RESTATEMENT (SECOND) OF CONTRACTS §§ 205, 235 (1981)).  Therefore, breach of the duty of good faith and fair dealing is thus an independent cause of action for which damages may be awarded.  As such, even if the court's breach of contract rulings are erroneous, Chevron has established an independent cause of action for which it is entitled to recover damages.

The court has determined that Chevron is entitled to recover costs incurred to participate in the equity finalization of: (1) the Stevens Zone, excluding all financing costs, from July 8,

---

[3] The May 19, 1997 Equity Process Agreement also provided that if the ASFE overruled a final recommendation of the IPE, that decision could be appealed by Chevron to DOE's Office of Hearings and Appeals.

1996 until June 17, 2010; (2) the Carneros Zone, excluding all financing costs, from May 19, 1997 until July 6, 2000; and (3) costs incurred to file a Freedom of Information Act request and related proceedings. *See Chevron III*, 110 Fed. Cl. at 803–04; *see also Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999) (holding that an agreement must be construed, pursuant to the "meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances" (quoting *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 975 (Ct. Cl. 1965))). In addition, because of the Government's "bad faith" conduct relating to privilege assertions during discovery, the court also determined that, the Government was required to pay Chevron 42% of the legal fees that Chevron incurred from February 16, 2007 to March 5, 2009 as a sanction. *See Chevron III*, 110 Fed. Cl. at 807.

At the liability trial, Chevron presented several alternative damage scenarios, but none conformed to the zones, precise periods, and specified costs that the court subsequently determined was appropriate. *Id.* at 805. Therefore, Chevron was instructed to provide the court with an itemized financial statement of the costs authorized by the court as reliance damages and sanctions, verified by a certified public accountant. *Id.*

In response, Chevron filed a July 2, 2013 Supplemental Brief, together with: a June 26, 2013 Declaration of Norman D. Stone[4] (Ex. A); a June 28, 2013 Declaration of Kimberly Anne Melton[5] (Ex. B); a July 2, 2013 Declaration of Kenneth Metcalfe, CPA[6] (Ex. C); and Mr. Metcalfe's work papers (Ex. D). In response, the Government filed the December 6, 2013 Supplemental Response, together with the Declarations of Alan A. Burzlaff, P.E.[7] (Burzlaff Ex.

---

[4] Mr. Stone was the Equity Team Manager for Chevron, responsible for overseeing activities related to the Elk Hills Field equity finalization until mid-2012. 6/26/13 Stone Decl. ¶¶ 1–2. Mr. Stone previously executed a declaration on October 29, 2010 (JE 1718) and testified at the liability trial (10/13/09 TR 142–671), and at the 2011 evidentiary hearing on damages. 6/1/11 TR 492–700.

[5] Ms. Melton was the Finance Team Leader for a unit of Chevron in Bakersfield, California. 6/28/13 Melton Decl. ¶ 1. Previously, Ms. Melton executed a declaration on October 14, 2010, JE 1717, and testified at the 2011 evidentiary hearing on damages. 6/1/11 TR 344–464.

[6] Mr. Metcalfe is a Certified Public Accountant, a Certified Valuation Analyst, and President of The Kenrich Group LLC, a national consulting firm that specializes in the evaluation of economic damages claims. 7/2/13 Metcalfe Decl. ¶ 1. Mr. Metcalfe submitted Written Direct Testimony, JE 1877, and testified on cross examination at the evidentiary hearing on damages. 6/2/11 TR 765–862; 6/3/11 TR 1215–48.

[7] Mr. Burzlaff "was responsible for overseeing and leading the DOE's technical team activities for the finalization of equity at the Elk Hills field." 12/6/13 Burzlaff Decl. ¶ 2. He is a registered Professional Petroleum Engineer in the State of California, a member of the Society of Petroleum Engineers, and a Managing Partner of a petroleum reservoir and geological engineering consulting company. 12/6/13 Burzlaff Decl. ¶¶ 3–4. Mr. Burzlaff also testified at the evidentiary hearing on damages. 12/6/13 Burzlaff Decl. ¶¶ 3–5.

A) and Michele M. Riley, CPA[8] (Riley Ex. B).   On January 27, 2014, Chevron filed a Supplemental Reply, together with Supplemental Declarations from Norman D. Stone (Stone Ex. A) and Kenneth P. Metcalfe (Metcalfe Ex. B), and an "Appendix."[9]

Between February 24, 2014 and March 5, 2014, the court and parties also exchanged a series of email communications regarding clarifications to the parties' supplemental briefing.  On March 10, 2014, the court placed these emails on the record ("3/10/14 Notice").[10]  On March 12, 2014, the Government filed a Response to the March 10, 2014 Notice.

---

[8] Ms. Riley is a forensic accountant and Managing Director of Invotex.  12/6/13 Riley Decl. ¶ 1.  Mr. Musika, the founder of Invotex, testified at the evidentiary hearing on damages, but died in December 2012.  12/6/13 Riley Decl. ¶¶ 3–5; *see also* JE 1776 (Musika Expert Report); JE 1911 (6/1/11 Musika Decl.); 6/3/11 TR 1096–1215 (Musika cross examination).

[9] This "Appendix" included fifty-two pages of excerpts from: the January 10, 2014 Deposition of Alan A. Burzlaff (Burzlaff Ex. 1); the January 22 Deposition of Michele M. Riley (Riley Ex. 2); and an October 30, 2013 Deposition of Norman Stone (Stone Ex. 3).

[10] On February 24, 2014, the court sent the Government an email, requesting clarification of paragraph 23 of the December 6, 2013 Riley Declaration, *i.e.*, for "[t]he summary of costs originally allocated to each zone by Chevron that Ms. Riley relied upon" and citations or other documentation to explain how Ms. Riley determined the amounts listed, therein, which the court granted.  3/10/14 Notice Ex. 1, 4, 6.

On March 3, 2014, the Government filed a Response that included a March 3, 2014 Supplemental Declaration from Ms. Riley and an explanation regarding paragraph 23 of the 12/6/13 Riley Declaration. Ms. Riley also "provide[d] updated figures" to account for a series of corrections and adjustments that took place after the Government's December 6, 2013 Supplemental Response.   3/3/14 Riley Suppl. Decl. ¶ 1 (listing five areas of updates or adjustments); *see also id.* ¶¶ 3, 11, 14, 17, 19, 21 (describing updates to the Government's estimates in various cost categories).   In the end, the proposed adjustments were, in the Government's words, "minor."  3/3/14 Gov't Resp. 2.

Nevertheless, in a March 5, 2014 email, Chevron objected to the Government's March 3, 2014 Response as unresponsive, untimely, and providing new information and corrections after the supplemental briefing schedule.  3/10/14 Notice Ex. 7.  In turn, the Government objected to Chevron's March 5, 2014 email, "as an improper sur-reply."  3/10/14 Notice Ex. 8.  Of course, the Government's March 3, 2014 Response well-exceeded the court's inquiry, but it did not escape the court's attention that Chevron's January 27, 2014 "Appendix" also did not comply with the court's instruction at a December 23, 2013 teleconference that Chevron limit its Supplemental Reply to 30 pages.  On March 10, 2014, the court placed these emails in the record as a Notice.

On April 30, 2014, the court filed a sealed version of this Memorandum Opinion and Final Order, requesting proposed redactions and edits from the parties.  In response, the parties submitted a series of emails.  The court has placed sealed copies of those emails in the record, at

On April 8, 2014, the court also issued an Order requesting that the parties calculate costs for one category of Chevron's estimated costs, based on certain assumptions. On April 14, 2014, the parties filed a Joint Notice in response.

## II.    DISCUSSION.

### A.    The Relevant Burdens Of Proof Regarding Reliance Damages.

To demonstrate entitlement to reliance damages, a plaintiff must proffer evidence that: "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Sys. Fuels, Inc. v. United States*, 666 F.3d 1306, 1311 (Fed. Cir. 2012) (quoting *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)). Although a plaintiff need not demonstrate the quantum of damages "with absolute exactness or mathematical precision," a plaintiff may not recover speculative damages. *See Ind. Mich. Power*, 422 F.3d at 1373 (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (recognizing that "absolute exactness or mathematical precision" need not be obtained in determining damages (internal quotations omitted))).

Once a plaintiff has established entitlement to reliance damages, the defendant may seek a reduction by "any loss the defendant can prove with reasonable certainty the plaintiff would have suffered had the contract been performed." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 38(2)(a) (2011); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981); *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1370 (Fed. Cir. 2005) (affirming a trial court's finding that the Government did not meet its "burden to prove with reasonable certainty the amount of offsetting benefit retained by [plaintiff]"). Where the Government has elected to breach a contract, it bears the burden to prove that a plaintiff's expenditures would not have been lost despite the breach. *See Am. Capital Corp. v. FDIC*, 472 F.3d 859, 869 (Fed. Cir. 2006); *see also id.* ("Doubts are generally resolved against the party in breach." (quoting RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a (1981))).

---

Docket No. 413. In those emails, the parties jointly proposed certain technical changes to the court's damage calculations, as set forth in the March 3, 2014 Riley Supplemental Declaration. The court accepts these proposed changes; the updated calculations are reflected in Court Exhibit 14 and related references.

The parties also jointly requested that the court modify the allocation for the External Non-Legal Professional and Labor category (Techbase invoices), to reflect the court's allocation for the Company Payroll and Benefits category (Court Exhibit 10). The Government separately requested, without Chevron's consent, that the court modify the court's adjustment to avoid overlap in the Other Labor category, to also reflect the court's allocation in the Company Payroll and Benefits category. Because the calculations for both of these categories are based on ratios in the Company Payroll and Benefits category, the court accepts both requested modifications. Therefore, these updated modifications are reflected in Court Exhibit 14 and related references.

Discretion lies with the trial court to determine proof of reliance damages. *See Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004) ("Given the complexities of reconstructing the transactions and their consequences, absent a compelling showing of clear error, [the trial court's findings] should be the end of the matter."); *see also Dairyland Power Coop. v. United States*, 645 F.3d 1363, 1373 (Fed. Cir. 2011) ("As the primary finder of fact, part of the trial court's role is to fashion a fair assignment of responsibility—even where . . . the solution departs from the specific relief requested by either party."); *Carolina Power & Light Co. v. United States*, 573 F.3d 1271, 1276 (Fed. Cir. 2009) ("[The United States Court of Appeals for the Federal Circuit] affords the [United States] Court of Federal Claims wide discretion in assessing an appropriate quantum of damages.").

**B.      The Plaintiff's Claim For Reliance Damages.**

In response to the court's Order in *Chevron III* requiring that Chevron provide an itemized financial statement of court-identified costs, Chevron stated that it "generally did not record or track its equity finalization costs by zone. Equity finalization for all zones was viewed and treated as a single project." 6/26/13 Stone Decl. ¶ 7; *see also* 7/2/13 Metcalfe Decl. ¶ 12 ("There are no specific cost centers or designations in the Chevron accounting system corresponding to the four categories of damages identified by the court."); TR 1116 (6/3/11 Musika Testimony) ("[T]he [accounting] system is not maintained to provide us any guidance or assurance that an expense was incurred in connection with Elk Hills finalization process.").

Instead, Chevron proposed an alternative methodology, by estimating all of its equity finalization costs[11] and then allocating them to one of six major categories, as reflected in Court Exhibit 1.[12]

---

[11] "Th[e]se costs are based on accounting entries in Chevron's (current and previous) computerized financial systems. . . . in accordance with Generally Accepted Accounting Principles (GAAP)." 6/28/13 Melton Decl. ¶ 3.

[12] "A relatively small portion of the invoices . . . , totaling approximately $1.4 million, appear to be related, at least in part, to sale issues other than equity finalization." 10/29/10 Stone Decl. ¶ 18.

**Court Exhibit 1:  The Plaintiff's Initial Claim As Of October 2010, Presented By Cost Category.**

| Category | Cost | Source: |
|---|---|---|
| 1. Company Payroll and Benefits | $9,353,646 | 10/29/10 Stone Decl. ¶ 7; 10/14/10 Melton Decl. ¶ 27 |
| 2. Internal Technical Consultants | $4,396,098 | 10/29/10 Stone Decl. ¶¶ 8–9; 10/14/10 Melton Decl. ¶ 27 |
| 3. External Non-Legal Professional and Labor | $7,979,411 | 10/29/10 Stone Decl. ¶¶ 10–11; 10/14/10 Melton Decl. ¶ 27 |
| 4. Legal Costs | $14,397,767 | 10/29/10 Stone Decl. ¶¶ 12–13; 10/14/10 Melton Decl. ¶ 27 |
| 5. Miscellaneous Expenses and Letter of Credit | $6,841,968 (includes $241,612.64 for 1998 letter of credit) | 10/29/10 Stone Decl. ¶¶ 10–11, 15; 10/14/10 Melton Decl. ¶ 27 |
| 6. Other: | | |
| Office Space | $800,000 | 10/29/10 Stone Decl. ¶ 14 |
| Employee Business Expenses | $775,000 | 10/29/10 Stone Decl. ¶ 14 |
| Computer Services and Equipment | $475,000 | 10/29/10 Stone Decl. ¶ 14 |
| Office Services and Equipment | $400,000 | 10/29/10 Stone Decl. ¶ 14 |
| Other Equipment, Services, and Rentals | $250,000 | 10/29/10 Stone Decl. ¶ 14 |
| Communications | $200,000 | 10/29/10 Stone Decl. ¶ 14 |
| **TOTAL** | $45,868,890 | |

Next, Chevron allocated each of these cost categories to one or more of the Elk Hills Reserve zones or to an "Other" category.  6/26/13 Stone Decl. ¶¶ 8, 16; 10/29/10 Stone Decl. ¶¶ 9–19; 10/14/10 Melton Decl. ¶ 27.  In other words, Chevron "estimated whether a portion of a cost item to be allocated to one of these zones was approximately 10, 25, 50, 75, 90 or 100 percent."  6/26/13 Stone Decl. ¶ 14.  As a result, Chevron's claim presented by zone, as of July 2, 2013, roughly approximated the estimated percentage value of the zone, as reflected in Court Exhibit 2.

**Court Exhibit 2:  Estimated Value Of Zones And Plaintiff's Revised Claim, Presented By Zone.**

| Elk Hills Zone | Estimated Value of Zone | Estimated Percentage Value of Zone | Percentage of Claimed Costs Allocated By Zone | Chevron's Revised Claim |
|---|---|---|---|---|
| Stevens | $18.4 bil. | 73.15% | 74.092% | $21,365,377 |
| Shallow Oil | $8.5 bil. | 24.95% | 22.612% | $6,520,418 |
| Carneros | $200 mil. | 0.50% | 2.734% | $788,277 |
| Dry Gas | $200 mil. | 1.30% | 0.562% | $162,102 |
| **TOTAL** | $27.3 bil. | 99.90% | 100.000% | $28,836,174 |

**Source:** 7/2/13 Metcalfe Decl. ¶ 25; *Chevron III*, 110 Fed. Cl. at 760, 762, 763, 772.

Chevron then further narrowed its claim based on the court's rulings in *Chevron III*, 110 Fed. Cl. at 803–07.[13]  As reflected in Court Exhibit 3, as of January 27, 2014, Chevron claimed that it is entitled to recover $22,581,920 for costs incurred for reliance damages and discovery sanctions.[14]

---

[13]  Chevron reviewed the time period, personnel files, contractor and vendor documentation and invoices, including all trial exhibits, to estimate its costs by zone and categories per the court's rulings in *Chevron III*.  7/2/13 Metcalfe Decl. ¶ 13.  "External Non-Legal Professionals, Letter Of Credit & Miscellaneous Expenses, and Legal Costs . . . were generally supported by contractor and vendor invoices; Chevron Company Payroll And Benefits . . . were generally supported by personnel names and financial accounting records; Chevron Internal Technical Consultants . . . were supported by personnel names and work scope authorizations; and Employee Business Expenses, Office Space, Computer Services & Equipment, Other Equipment, Services, And Rentals, and Communications . . . were generally supported by various financial accounting records."  7/2/13 Metcalfe Decl. ¶ 14.

[14]  As of the July 2, 2013 Supplemental Brief, Chevron claimed $22,621,484 in damages. 7/2/13 Metcalfe Decl. ¶ 22; 12/6/13 Riley Decl. ¶ 7; 1/27/14 Metcalfe Suppl. Decl. Ex. A. During the October 30, 2013 deposition of Mr. Stone, Chevron corrected its claim to $22,588,566.  12/6/13 Riley Decl. ¶ 7 (noting the amount as $22,588,567); 1/27/14 Metcalfe Suppl. Decl. Ex. A (identifying the 10/30/13 corrected amount as $22,588,566).  Later, Chevron also made other corrections, "result[ing] in a net increase of $941.29 to Chevron's claim."  Gov't Suppl. Resp. 2; *see also* 12/6/13 Riley Decl. ¶ 7 n.2; 1/27/14 Metcalfe Suppl. Decl. Ex. A. (These corrections were not incorporated into the Government's analysis of Chevron's damages claim.  12/6/2013 Riley Decl. ¶ 7).  In the January 27, 2014 Supplemental Reply, Chevron also made "a relatively small number of minor changes . . . to the precise amounts in some damages

**Court Exhibit 3:   Summary Of The Plaintiff's Final Claim For Reliance Damages And Sanctions, Based On The Court's Prior Rulings.**

| | Description | Amount |
|---|---|---|
| (1) | Stevens Zone costs from 7/8/1996 to 6/17/2010 | $21,120,708 |
| (2) | Carneros Zone costs from 5/19/1997 to 7/6/2000 | $472,292 |
| (3) | FOIA request and related costs incurred for preparation of 1/7/2003 FOIA request to 1/28/2004 | $84,437 |
| (4) | Sanctions for 42% of the costs incurred by Chevron for the Government's "Bad Faith" conduct during discovery from 2/16/2007 to 3/5/2009 | $904,483 |
| | **TOTAL** | $22,581,920 |

**Source:** 1/27/14 Metcalfe Suppl. Decl. Ex. 1; Pl. Suppl. Br. 2.

At the evidentiary damages hearing and in subsequent briefing, however, Chevron claimed entitlement, not only to the reliance damages and discovery sanctions identified in *Chevron III*, but also eight other cost categories that the court previously rejected, as explained in Court Exhibit 4.

---

categories," reducing the total claim by $39,564.   1/27/14 Metcalfe Suppl. Decl. ¶ 5, Ex. 1. Chevron asserts that the Government "was advised of all changes identified prior to the submission of [the Government's December 6, 2013 R]esponse."  1/27/14 Metcalfe Suppl. Decl. ¶ 5 n.1; *see also id.* Ex. 1 (listing corrections related to letters sent to the Government on October 13, 2013, November 7, 2013, and November 25, 2013).   As a result, the costs claimed, $22,581,920, includes all of the corrections made by Chevron as of January 27, 2014.  Pl. Suppl. Br. 2 (footnotes omitted) and Pl. Supp. Br. Ex. D at INTERIM-2; 1/27/2014 Metcalfe Suppl. Decl. Ex. 1.

**Court Exhibit 4:  Summary Of The Plaintiff's Claim For Costs Previously Rejected By The Court.**

| | Cost Categories | Amount |
|---|---|---|
| (1) | Letter of credit costs | $7,907,204 [15] |
| (2) | Costs before 7/8/1996 and after 6/17/2010 (all categories of costs and related legal costs incurred, except letter of credit) | $3,075,646 [16] |
| 3) | Other FOIA, pre-litigation, and United States Court of Federal Claims costs from 1/29/2004 to 6/17/2010 (excluding 42% of CFC costs from 2/16/2007 to 3/5/2009) | $7,197,343 [17] |
| (4) | Carneros Zone costs from 7/8/1996 to 5/18/1997 and after 7/6/2000 | $313,040 [18] |

[15] The court excluded letter of credit costs, as a subset of financing costs for the Carneros and Stevens Zones.  *See Chevron III*, 110 Fed. Cl. at 803 & n.43; *id.* at 804; *see also England v. Contel Advanced Sys., Inc.*, 384 F.3d 1372, 1379 (Fed. Cir. 2004) ("The [no-interest] rule has been held not only to bar the recovery of interest on substantive claims against the government, but also interest costs incurred on money borrowed as a result of the government's breach or delay in payment." (citations omitted)).

[16] This amount apparently includes: $2,852,363 and $223,283 in other costs for the Stevens Zone outside the court-permitted date range.  7/2/13 Metcalfe Decl. ¶ 24 n.15 ("These costs include (1) all categories of costs, except letter of credit, before 7/8/1996 and after 6/17/2010); (2) Carneros Zone costs from 7/8/1996 to 5/18/97 and after 7/6/2000; and (3) FOIA costs after 1/28/2004."); *see also* 3/10/14 Notice Ex. 5 (2/28/14 email from Chevron's counsel, clarifying the calculation of costs for this category); 1/27/14 Metcalfe Suppl. Decl. Ex. 1 (correcting the previous estimate of $211,894 for the Stevens Zone); Pl. Suppl. Br. Ex. D at INTERIM-2 ("Transactions Outside Date Ranges"); Pl. Suppl. Br. 2 n.3 (itemizing additional costs related to Chevron's FOIA requests).

[17] This category includes 58% of Chevron's United States Court of Federal Claims costs incurred from February 16, 2007 to March 5, 2009.  *See Chevron III*, 110 Fed. Cl. at 806–07; *see also* Pl. Suppl. Br. 2.  In addition, Chevron incurred $21,480 in FOIA-related costs after the court's January 28, 2004 cutoff date.  *See Chevron III*, 110 Fed. Cl. at 804; *see also* Pl. Suppl. Br. 2 n.1; 1/27/14 Metcalfe Suppl. Decl. Ex. 1.

[18] The court awarded Chevron's costs to participate in the Carneros Zone equity finalization between May 18, 1997 and July 6, 2000.  *See Chevron III*, 110 Fed. Cl. at 803.  After the OHA issued a final decision regarding the Carneros Zone, Chevron claims that it incurred an additional $9,495 "in costs."  Pl. Suppl. Br. 2 n.4.  Chevron also claims other costs were incurred to participate in the Carneros Zone, prior to May 19, 1997.  Pl. Suppl. Br. 2.

| (5) | Dry Gas Zone costs from 7/8/1996 | $170,744 [19] |
| (6) | Shallow Oil Zone costs from 7/8/1996 | $6,545,823 [19] |
| (7) | Post-trial mediation and settlement costs until 6/17/2010 | $235,363 [20] |
| (8) | Other costs from 7/8/1996 to 6/17/2010 (including sale-related costs) | $2,420,986 |
| | **TOTAL** | $27,866,149 |

**Source:** 1/27/14 Metcalfe Suppl. Decl. Ex. 1; Pl. Suppl. Br. 2 & Ex. D at INTERIM-2.

### C.   The Government's Objections To Plaintiff's Claim For Reliance Damages.

#### 1.   As To The Allocation Of Costs Claimed.

##### a.   Summary Of The Government's Argument.

The Government objected to Chevron's allocation of costs, as described in Mr. Stone's June 26, 2013 Declaration, as "unsupported," because Mr. Stone relied on a "speculative assignment of costs to the Elk Hills zones." Gov't Suppl. Resp. 1–2; *see also* JE 1911 ¶ 12 (6/1/11 Musika Decl.) ("The key issue involving Chevron's damage claim is whether the Chevron expense was incurred in connection with the Elk Hills Equity Finalization Process. . . . Chevron's ordinary course accounting systems and controls do not provide stand-alone support that the Chevron claim costs were incurred in connection with the Elk Hills Equity Finalization Process."). Moreover, the Government contended that Chevron's allocation was biased towards the Stevens Zone. 12/6/13 Burzlaff Decl. ¶¶ 2–4, 64–65. During the equity

---

[19] The court previously determined that "DOE repeatedly and materially breached the May 19, 1997 Equity Process Agreement as to the Carneros Zone and the Stevens Zone. . . . [and] the July 8, 1996 contract with the Equity IPE, [as supplemented] . . . as to the Stevens Zone." *See Chevron III*, 110 Fed. Cl. at 803. The court, however, made no such finding as to the Dry Gas or Shallow Oil Zones. Moreover, Chevron is not entitled to recover costs prior to DOE's breach of the July 8, 1996 Equity IPE Protocol, as supplemented. *See Chevron III*, 110 Fed. Cl. at 804. Similarly, the court did not award costs incurred after Chevron filed the final OHA appeal brief, as to the Stevens Zone, on June 17, 2010. *Id.* at 803–04.

[20] As previously explained, the court awarded Chevron only specific litigation costs, related to Chevron's FOIA request for DOE's breach of the convenient of good faith and fair dealing by continuing to breach the May 19, 1997 Equity Process Agreement, after providing Chevron assurances that DOE ceased its prior *ex parte* communications. In addition, the court awarded Chevron 42% of its litigation costs that were incurred as a result of the Government's "bad faith" conduct in connection with unwarranted privilege assertions during discovery. *See Chevron III*, 110 Fed. Cl. at 804, 806–07. As such, Chevron is not entitled to other litigation, mediation, settlement or "other" costs.

finalization, the DOE (unlike Chevron) contemporaneously tracked its costs by zone.  12/6/13 Burzlaff Decl. ¶ 12. Through 2010, DOE spent 29.0% of DOE's aggregate equity finalization costs on the Stevens Zone.  12/6/13 Burzlaff Decl. ¶ 13.  The IPE spent 34.0% of its aggregate equity finalization costs on the Stevens Zone.  12/6/13 Burzlaff  Decl. ¶ 14.  On the other hand, Chevron claims that 72.1% of its total equity finalization costs were incurred for the Stevens Zone.[21]  12/6/13 Burzlaff Decl. ¶ 16 (citing Suppl. Br. Ex. D at INTERIM-2); *see also id.* ¶ 17 ("A difference of this significance [in the percentage allocations] . . . is unexpected, because Chevron and DOE were engaged in essentially the same phases of work throughout the equity finalization process, and the IPE followed essentially the same pattern of work.").

The Government explained that the disparity between DOE's and Chevron's costs by zone, is in part the result of Chevron's reliance on its declarants' "memories of the equity finalization process" and allocations of costs by zone "many years after-the-fact."  12/6/13 Burzlaff Decl. ¶¶ 18–19; *see also* 12/6/13 Riley Decl. ¶ 12 ("Mr. Stone necessarily relied, in large part, upon his memory and recollections to do much of the work of allocating the expenses to different zones. . . . [but] was often unable to recall the specifics of the allocations he had done in June of 2013[.]").  Chevron's comparison to the relative equity value of each zone also "is misplaced[,] because the equity value of each zone is not a reliable metric regarding the amount a party spent in the effort to finalize equity for each zone."  12/6/13 Burzlaff Decl. ¶ 57 (citing 7/2/13 Metcalfe Decl. ¶ 26 n.17 ("Although the Carneros Zone had less total value than the Dry Gas Zone, a legal issue in the Carneros Zone was worth several equity points and more than $10 million[.]"); 10/30/13 Stone Dep. at 157, 266 (testifying that the parties spent more on the Shallow Oil Zone than the Stevens Zone, because equity finalization for the Shallow Oil Zone was complex, although it was not finished, until after the liability trial)).

Other metrics also evidence Chevron's "bias towards allocating costs to the Stevens Zone."  12/6/13 Burzlaff Decl. ¶ 64.  For example, as Court Exhibit 5 shows, the Government estimated the time spent by DOE to prepare and present equity reports for the IPE indicate that the Stevens Zone took only 26% of total time expended.

---

[21] The Government's comparison of Chevron's allocation by zone to that of the DOE and the IPE omits Chevron's legal costs "for the sake of consistency," because DOE's estimate of costs and those of the IPE do not include legal costs.  12/6/13 Burzlaff Decl. ¶ 16 n.4.  If Chevron's legal costs were included, however, the percentage allocated to the Stevens Zone equity would increase from 72.1% to 74.1%.  12/6/13 Burzlaff Decl. ¶ 16 n.4.

**Court Exhibit 5:   The Government's Estimate Of Time That DOE Spent To Prepare And Present Equity Reports For The Independent Petroleum Engineer, By Zone.**

| Zone | Time Spent | Percentage Of Total Time Spent | Time Period |
|------|-----------|-------------------------------|-------------|
| Stevens Zone | 12 months | 26% | July 1996 to June 1997 |
| Shallow Oil Zone | 30 months | 65% | November 1997 to April 2000 |
| Dry Gas and Carneros Zones | 4 months | 9% | July 1996 to October 1996 |
| **TOTAL** | 46 months | 100% | |

**Source:** 12/6/13 Burzlaff Decl. ¶ 61.

Similarly, the time that the IPE spent to prepare the Final Recommendation for each zone suggests that the costs that Chevron allocated to the Stevens Zone should be less than 50% of the total, as Court Exhibit 6 indicates.

**Court Exhibit 6:   The Government's Estimate Of Time Spent By The Independent Petroleum Engineer To Prepare Final Recommendations, By Zone.**

| Zone | Time Spent | Percentage of Total Time Spent | Time Span |
|------|-----------|-------------------------------|-----------|
| Stevens Zone | 34 months | 31% | June 1997 to March 2000 |
| Shallow Oil Zone (not completed) | 69 months | 63% | April 2000 to December 2005 |
| Dry Gas and Carneros Zones | 6 months | 6% | October 1996 to March 1997 |
| **TOTAL** | 109 months | 100% | |

**Source:** 12/6/13 Burzlaff Decl. ¶ 62.

**b.   Summary Of The Plaintiff's Response.**

Chevron responded that the Government's proposed adjustments "contravene[] this [c]ourt's opinion" ordering Chevron "to provide the court with an itemized financial statement of the aforementioned costs, verified by a certified public accountant."  Pl. Suppl. Reply 1 (quoting *Chevron III*, 110 Fed. Cl. at 805).  Instead, the Government now seeks to "unilaterally reopen the record, reargue issues that were fully litigated in the damages trial, and introduce new evidence

and arguments." Pl. Suppl. Reply 2.  By reviewing "thousands of specific Chevron costs," Mr. Stone estimated allocations by zone using supporting evidence and personal knowledge.  Pl. Suppl. Reply 1–2.  Mr. Stone's process followed "standard practices" and was a "reasonable" and "thorough" means to quantify categories of costs that were "inherently less than absolutely certain given the nature of the task."  Pl. Suppl. Reply 2.  In any event, the Government "does not challenge the overall reasonableness of the process. . . . [n]or . . . Mr. Metcalfe's certification of the amounts[.]"  Pl. Suppl. Reply 2; *see also id.* 5 (pointing out that Ms. Riley does not dispute the soundness of Mr. Metcalfe's methodology).

Chevron further complains that the Government deductions previously were rejected by the court.  Pl. Suppl. Reply 3 ("By not ordering Chevron to make the deductions, the [c]ourt implicitly rejected the Government's position, and the Government should not be permitted to relitigate those issues now.") (citing *Smith Int'l, Inc. v. Hughes Tool Co.*, 759 F.2d 1572, 1578 (Fed. Cir. 1985) (holding that law of the case applied to the implied rejection of challenger's arguments to patent validity); *see also Aydin Corp. (W.) v. Widnall*, No. 96-1267, 121 F.3d 726, 1997 WL 413329, at *3 (Fed. Cir. July 24, 1997) (applying the law of the case to issues "explicitly or implicitly decided")).

As for the Government's comparisons of Chevron and DOE's cost allocations to the Stevens and Shallow Oil Zones, these comparisons are irrelevant "since nothing required the parties to devote the same resources to the same parts of the process, and they did not do so. . .  The IPE's costs are also an inappropriate benchmark[,] because the IPE also did not need to devote the same resources as Chevron[.]"  Pl. Suppl. Reply 6; *see also* 1/27/14 Metcalfe Suppl. Decl. ¶ 14 ("The DOE and IPE costs relied upon by the Government correspond to only a portion of Chevron's equity finalization costs.").[22]

Nor can the Government's experts' speculation, according to Chevron, be considered to be superior to Mr. Stone's estimates, as Mr. Stone's estimates were based on his personal knowledge and Chevron's business records.  Pl. Suppl. Reply 5–6 (citing 1/10/14 Burzlaff Dep. 43, 45–46, 47, 51–52 (discussing Mr. Burzlaff's lack of contemporary personal experience with Chevron's equity finalization); 1/22/14 Riley Dep. 93, 98–99, 100, 160–61 (same)); *see also* 1/27/14 Metcalfe Suppl. Decl. ¶ 11 ("[G]iven his project management position and his contemporaneous knowledge of Chevron's equity finalization process, only Mr. Stone, not the Government or its representatives, is in a position to know how these employees and consultants participated in the internal work of Chevron's equity finalization team.").

---

[22] Chevron noted, for example, that "the amount that DOE paid to Mr. Burzlaff for [Shallow Oil Zone] work was more than Chevron's total non-legal costs . . . for all four zones." Pl. Suppl. Reply 6 (citing 12/6/13 Burzlaff Decl. Ex. G).

c.      **The Court's Analysis And Resolution As To The Allocation Of Specific Costs.**

As a threshold matter, although the court rejected the Government's damage theory, it did not preclude the Government from proffering evidence to rebut Chevron's claim.  *See Chevron III*, 110 Fed. Cl. at 805 ("The relevant legal inquiry . . . is not what Chevron would have *spent* in a non-breach world, but what Chevron would have *lost* [because of the Government's conduct]." (emphasis in original)).  This is so, because the purpose of reliance damages is to compensate an aggrieved party for "uncompensated expenditures made in reasonable reliance on the contract, including expenditures made in preparation for performance or in performance."  RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 38(2)(a) (2011); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981).  As such, Chevron's contention that the Government's proposed adjustments "contravene[] this [c]ourt's opinion," (Pl. Suppl. Reply 1), is misplaced, particularly since none of Chevron's initial damage scenarios "conform[ed] to the zones, precise periods, and specified costs for which the court has determined that Chevron is entitled to damages."  *Chevron III*, 110 Fed. Cl. at 805.  Of more import, is the fact that Chevron's post-liability allocation clearly appears to have been influenced by the court's decision to award costs for only two of the four Elk Hills zones.

Therefore, to determine the reliance damages to which Chevron is entitled, the court first examined Chevron's claim in each of the six cost categories where the Government proposed adjustments, as Court Exhibit 7 shows.

**Court Exhibit 7:  Summary Of The Government's Proposed Allocation Adjustments, By Zone.**

| Cost Category | Stevens Zone | | | Carneros Zone | | |
|---|---|---|---|---|---|---|
| | Chevron's 10/30/13 Claim | Gov't Proposed Adjustments per Burzlaff | Subtotal | Chevron's 10/30/13 Claim | Gov't Proposed Adjustments per Burzlaff | Subtotal |
| Company Payroll & Benefits | $7,986,729 | ($3,582,909) | $4,403,820 | $0 | $23,838 | $23,838 |
| Other Labor Related | $2,272,599 | ($893,144) | $1,379,455 | $0 | $6,350 | $6,350 |
| External Non-Legal Professional and Labor | $2,935,430 | ($353,733) | $2,581,697 | $28,522 | $6,830 | $35,352 |
| In-House Technical Consultants | $3,747,712 | ($789,451) | $2,958,261 | $0 | $0 | $0 |
| Miscellaneous | $57,674 | ($2,827) | $54,847 | $185 | $1 | $186 |
| Legal Costs | $4,121,021 | ($126,420) | $3,994,601 | $443,585 | $0 | $443,585 |
| **TOTAL** | $21,121,165 | ($5,748,484) | $15,372,681 | $472,292 | $37,019 | $509,311 |

**Source:**  12/6/13 Riley Decl. Exs. 3.1, 3.3; 12/6/13 Burzlaff Decl. ¶¶ 20, 33–34, 42, 49, 54–55 (summarizing the Government's proposed adjustments by cost category).

### i.      Company Payroll & Benefits.

Chevron allocated almost all of its costs for the Company Payroll and Benefits category to the Stevens Zone, as Court Exhibit 8 shows:

**Court Exhibit 8:  The Plaintiff's Proposed Allocation Of Employee Payroll And Benefits, By Zone.**

| Employee | Stevens | Carneros | Dry Gas | Shallow Oil | Other[23] |
|---|---|---|---|---|---|
| [...] | $[...] | - | - | - | - |
| [...] | $[...] | - | - | - | - |
| [...] | $[...] | - | - | - | - |
| [...] | $[...] | - | - | - | - |
| [...] | $[...] | - | - | - | - |
| Other Indirect Labor | $1,580,949 | - | - | $147,138 | $140,890 |
| Unchallenged Allocation[24] | $1,473,491 | - | - | - | - |
| **Total** | **$3,054,440** | - | - | **$147,138** | **$140,890** |

**Source:** 12/6/13 Riley Decl. ¶ 17, Exs. 3.3, 3.3.1–3.3.6, 4.3, 4.4; INTERIM 75–82, 95–98, 103–106.

To recap, Chevron first allocated 100% of Mark Wilson's[25] payroll and benefits between January 1998 and February 1999 to the Stevens Zone, despite previously indicating that only 50% of Mr. Wilson's time was spent on equity finalization for the Elk Hills field.  10/30/13 Stone Dep. 249; *see also* 12/6/13 Riley Decl. Ex. 3.3.3 (listing payroll and benefits allocations by month).  Therefore, the Government proposed that Mr. Wilson's 1998 payroll and benefits should be allocated 50% to the Stevens Zone and 50% to non-equity finalization activities. 12/6/13 Burzlaff Decl. ¶ 23 (citing JE 1764).

Second, Chevron allocated 100% of Fernando Cardenosa's[26] payroll and benefits between July 1996 and December 1997 to the Stevens Zone, but proffered virtually no evidence of his role in equity finalization.  12/6/13 Burzlaff Decl. ¶ 24; *see also* 12/6/13 Riley Decl. Ex. 3.3.4 (listing payroll and benefits allocations by month).  Even Mr. Stone was unable to recall

---

[23] "Other" represents work not related to equity finalization for a particular zone.

[24] The Government recommended adjustments for five employees and "Other Indirect Labor," totaling $6,513,238.  12/6/13 Riley Ex. 3.3.  Chevron's total claim for Payroll & Benefits is $7,986,729.  Pl. Suppl. Resp. Ex. D at INTERIM-3.  The "Unchallenged Allocation" represents the difference.

[25] Mark Wilson was the Senior Geologist at Chevron.  JE 1755-006.

[26] Fernando Cardenosa was not listed in the table identifying relevant Chevron employees.  JE 1755-006.

Mr. Cardenosa's role.  The evidence is that Mr. Cardenosa attended one presentation of the IPE about the Dry Gas Zone.  12/6/13 Burzlaff Decl. ¶ 24 (citing 10/30/13 Stone Dep. 255 ("All I can tell you is [Mr. Cardenosa] wasn't there very long.")); 12/6/13 Burzlaff Decl. Ex. J (Attendees List at Oct. 21, 1996 Dry Gas Zone Presentation).  Therefore, the Government recommended that Mr. Cardenosa's payroll and benefits for 1996 and 1997 be "comparable to Mark Wilson's time," *i.e.* allocated 50% to the Stevens Zone and 50% to non-equity finalization activities. 12/6/13 Burzlaff Decl. ¶ 24.

Third, Chevron allocated 100% of Kevin Maneffa's[27] payroll and benefits between June 1998 and February 1999 to the Stevens Zone, although he was "a primary point of contact for the [Shallow Oil Zone]."  12/6/13 Burzlaff Decl. ¶ 25 (citing JE 1660 (7/15/97 Project Work Order); JE 1661 (8/1/97 Project Work Order)); 12/6/13 Burzlaff Decl. Ex. L at 1 (11/6/97 Attendees List at Shallow Oil Zone Meeting); *see also* 12/6/13 Riley Decl. Ex. 3.3.5 (listing monthly payroll and benefits allocations).  Therefore, the Government recommended that Mr. Maneffa's allocation be the same as Pat Alexander, another Chevron employee who was a primary contact for the Shallow Oil Zone.  12/6/13 Burzlaff Decl. ¶ 25 n.7 (citing JE 1660 (7/15/97 Project Work Order GO-113-4) (listing Kevin Maneffa and Pat Alexander as primary Shallow Oil Zone contacts); JE 1661 (8/1/1997 Project Work Order GO-113-4) (same)).

Fourth, Chevron allocated 100% of Norman Stone's[28] payroll and benefits between July 1996 and June 2010 to the Stevens Zone, even though he worked on all four zones over the entire period.  12/6/13 Burzlaff Decl. ¶¶ 27–28, 31 (citing 10/30/13 Stone Dep. 246); *see also* 12/6/13 Riley Decl. Ex. 3.3.1 (listing monthly payroll and benefits); 12/6/13 Burzlaff Decl. ¶ 28 ("Mr. Stone . . . spent significant time on the equity finalization for the other three zones, especially the [Shallow Oil Zone]."); 12/6/13 Burzlaff Decl. Ex. J (minutes of Dry Gas and Carneros Zone equity presentations); 12/6/13 Burzlaff Decl. Ex. L (minutes of Shallow Oil Zone equity meetings); 12/6/13 Burzlaff Decl. Ex. M (conference call log of participants to the Shallow Oil Zone); 12/6/13 Burzlaff Decl. Ex. N (showing Mr. Holtzclaw's approval on maps for the Shallow Oil Zone).  Mr. Stone, however, received "sizeable bonuses" for the total project, but allocated 100% to the Stevens Zone.  12/6/13 Burzlaff Decl. ¶ 29 (citing 10/30/13 Stone Dep. 289).  In addition, the Shallow Oil Zone was more important than the Stevens Zone, because of the large difference in the respective equity positions of DOE and Chevron.  *See* 12/6/13 Burzlaff Decl. ¶ 31 ("That difference was 12.7 equity percentage points or $760 billion given that each equity point in the [Shallow Oil Zone] was worth about $60 million (not including interest).  JE 1316 and JE 1084.").  Since Mr. Burzlaff "was the DOE counterpart to Mr. Stone," the Government contends that Mr. Burzlaff's well-documented allocation of labor by zone "should be used to more accurately allocate the time of Mr. Stone and Mr. Holtzclaw."  12/6/13 Burzlaff Decl. ¶ 32.

Fifth, Chevron allocated 100% of Mark Holtzclaw's[29] payroll and benefits between July 1996 and June 2010 to the Stevens Zone, although he worked on all four zones.  12/6/13 Burzlaff

---

[27] Kevin Maneffa was a Chevron Senior Petroleum Engineer.  JE 1755-006.

[28] Norman Stone was the Equity Team Leader at Chevron.  JE 1755-006.

[29] Mark Holtzclaw was a Chevron Senior Staff Geologist.  JE 1755-006.

Decl. ¶ 27; *see also* 12/6/13 Riley Decl. Ex. 3.3.2 (listing monthly payroll and benefits allocations).  Mr. Holtzclaw attended almost all the meetings that Mr. Stone attended for all four zones.  12/6/13 Burzlaff Decl. ¶ 28 (citing 10/30/13 Stone Dep. at 262 ("I will speak for Mark Holtzclaw.  He went nearly to all these things [meetings for the equity zones] with me.")).  Mr. Stone also testified that he allocated all of his and Mr. Holtzclaw's payroll and benefits to the Stevens Zone, because they both worked more than 40 hours a week on the Stevens Zone, out of a typical 80 to 100 hour workweek.  12/6/13 Burzlaff Decl. ¶ 29 (citing 10/30/13 Stone Dep. at 259–64).

In sum, the Government proposed the following allocation of payroll and benefits, by zone, as shown in Court Exhibit 9.

**Court Exhibit 9:   The Government's Proposed Allocation Of Employee Payroll And Benefits, By Zone.**

| Employee | Stevens | Carneros | Dry Gas | Shallow Oil | Other |
|---|---|---|---|---|---|
| [...] | | | | | |
| [...] | | | | | |
| [...] | | | | | |
| [...] | | | | | |
| [...] | | | | | |
| Other Indirect Labor | $    793,139 | $    3,331 | $    529 | $    911,260 | $ 160,719 |
| Unchallenged Allocation | $ 1,473,491 | $    0 | $    0 | $    0 | $    0 |
| **Total** | **$2,266,630** | **$3,331** | **$ 529** | **$911,260** | **$160,719** |

**Source:** 12/6/13 Riley Decl. ¶ 17, Exs. 3.3, 3.3.1–3.3.6, 4.3, 4.4.

In sum, the Government argued that Chevron's claim should be reduced by $3,559,071 from its October 30, 2013 claim of $7,986,729 for the Payroll & Benefits Category.[30]  12/6/13 Burzlaff Decl. ¶ 33; 12/6/13 Riley Decl. ¶ 17 and Ex. 3.  The Government's proposed adjustment represents a $3,582,909 reduction from Chevron's allocation of $7,986,729 to the Stevens Zone and a $23,838 addition to Chevron's allocation of $0 to the Carneros Zone in the Payroll &

---

[30]  Chevron's 10/30/13 claim ($7,986,729) minus the Government's allocation to the Steven's Zone ($4,403,820), minus the Government's allocation to the Carneros Zone ($23,838), equals a total reduction of $3,559,071.

Benefits Category.  *Compare* Court Exhibit 8 (The Plaintiff's Proposed Allocation Of Employee Payroll And Benefits, By Zone.)*, with* Court Exhibit 9 (The Government's Proposed Allocation Of Employee Payroll And Benefits, By Zone.).

Chevron replied that, although Mr. Stone and Mr. Holtzclaw worked on other zones, "they averaged more than 40 hours per week on the Stevens Zone alone, and they would have been assigned full-time to the equity finalization effort even if [the Stevens Zone] had been the only zone to undergo equity finalization."  Pl. Suppl. Reply 7 (citing 1/27/14 Stone Suppl. Decl. ¶¶ 8–9).  "[T]he [court's May, 2013 Memorandum Opinion] does not authorize a deduction based on the fact that these employees did some work—at no incremental cost to Chevron—on other zones."  Pl. Suppl. Reply 8.[31]  Moreover, any benefit to Chevron for work performed by the Government on other zones was "nullified by the Government's misconduct."  Pl. Suppl. Reply 7 n.5; *see also* 1/27/14 Stone Suppl. Decl. ¶ 11 ("[T]he work that Mr. Holtzclaw and I performed on the Dry Gas Zone, Carneros Zone, and Shallow Oil Zone ultimately did not benefit Chevron due to the Government's misconduct.  Because of that misconduct, the work on equity finalization was nullified, and the process never was completed.").  In addition, because of the delay in the Shallow Oil Zone equity finalization, Mr. Maneffa worked only on the Stevens Zone before leaving the equity finalization team.  1/27/14 Stone Suppl. Decl. ¶ 19.

Next, Chevron argued that, because "the Stevens Zone's value was nearly triple the value of the other three zones combined," it was logical to allocate most of the resources to that zone's equity finalization.  1/27/14 Stone Suppl. Decl. ¶ 8.  In addition, the work of Mr. Stone and Mr. Holtzclaw on other zones "was over and above [their] full-time work on the Stevens Zone" and these two employees "*would have been assigned to equity finalization for the Stevens Zone alone on a full-time basis*, even if [they] had spent no time on the other zones."  1/27/14 Stone Suppl. Decl. ¶ 9 (emphasis added); *see also* 1/27/14 Metcalfe Suppl. Decl. ¶ 8 ("Chevron's costs would have been the same[,] even if equity finalization had been undertaken only for the Stevens Zone.").  As Mr. Metcalf advised:

> In calculating a project's costs, it is standard practice to include all of the costs needed to undertake the project.  Where the same costs also contribute to a separate project, only the incremental costs (if any) attributable to the separate project should be excluded, while including all costs that would have been incurred if the separate project had not been undertaken.

1/27/14 Metcalfe Suppl. Decl. ¶ 9.

Therefore, Chevron contends that, even if some employee time should be allocated by zone, Mr. Burzlaff's proposed methodology was "entirely baseless."  1/27/14 Stone Suppl. Decl. ¶ 14.  Mr. Stone's role "went far beyond" that of Mr. Burzlaff, who was an outside contractor supervised by DOE.  1/27/14 Stone Suppl. Decl. ¶ 15.  In contrast, Mr. Stone "was required to supervise at all times the work in the Stevens and other zones."  1/27/14 Stone Suppl. Decl. ¶ 15.  In fact, at Mr. Stone's October 30, 2013 deposition, the Government's counsel undercut Mr.

---

[31] Mr. Stone and Mr. Holtzclaw also worked on the Shallow Oil Zone and the issues that arose there also "overlapped" the Stevens Zone.  1/27/14 Stone Suppl. Decl. ¶ 13.

Burzlaff's proposed allocation of 44% to the Stevens and Carneros Zones, by suggesting that a more accurate allocation must be based on percentages of costs estimated by Mr. Metcalfe, *i.e.*, allocating 77% of Chevron's costs to the Stevens and Carneros Zones.  1/27/14 Stone Suppl. Decl. ¶ 16 (citing 10/30/13 Stone Dep. 281–82; *see also* 7/2/13 Metcalfe Decl. ¶ 25 (attributing 74.1% of costs to the Stevens Zone and 2.7% to the Carneros Zone).

Chevron admitted that "Mr. Wilson spent 50 percent of his time on equity finalization and 50 percent of his time on unrelated projects," but insisted that 100% of the costs of his employment charged to equity finalization in Chevron's accounting system should be allocated to the Stevens Zone.  1/27/14 Stone Suppl. Decl. ¶ 19.[32]  Chevron also argued that even though Mr. Cardenosa attended the first presentation to the IPE concerning the Dry Gas Zone, that fact is not relevant to the allocation of his time.  1/27/14 Stone Suppl. Decl. ¶ 19.  Furthermore, Chevron allocated no payroll costs to the Carneros Zone, because equity finalization for that zone "was handled by outside contractors and lawyers."  1/27/14 Stone Suppl. Decl. ¶ 19 n.2.

The United States Court of Appeals for the Federal Circuit has considered salaried employees, working on multiple projects, as an indirect overhead cost.  *See Charles G. Williams Constr., Inc. v. White*, 326 F.3d 1376, 1379 (Fed. Cir. 2003) ("Indirect costs are usually those costs that are incurred despite . . . inactivity on a project, such as home office overhead including accounting and payroll services, general insurance, salaries of upper level management, heat, electricity, taxes, depreciation.  A contractor recovers its indirect costs by allocating them on a proportionate basis among all of its contracts." (quoting *Charles G. Williams Constr., Inc. v. White*, 271 F.3d 1055, 1057–58 (Fed. Cir. 2001)).  But, that does not mean such employee costs must be allocated equally among those projects.  For this reason, our appellate court has endorsed using an internal accounting system to establish "overhead costs with reasonable certainty," to allocate costs to particular projects.  *See Kan. Gas & Elec. Co. v. United States*, 685 F.3d 1361, 1369–71 (Fed. Cir. 2012) ("This court upholds an internal accounting system as showing overhead costs with reasonable certainty when it allocates a portion of the expenses to a particular project using codes[.]") (citing *Carolina Power & Light v. United States*, 573 F.3d 1271, 1276–77 (Fed. Cir. 2009) ("[Plaintiff's] internal accounting system uses specific codes to allocate . . . indirect overhead expenses to particular projects, including the breach-related projects."))); *see also Energy Nw. v. United States*, 641 F.3d 1300, 1309 (Fed. Cir. 2011) (agreeing that "the award of damages for overhead costs is a factual question of the damages amount, not a legal question of causation" and affirming a damage award for overhead costs supported by "generally accepted accounting practices"); *Sys. Fuels*, 666 F.3d at 1312–13 (accepting use of generally accepted accounting procedures, mandated by the Federal Energy Regulatory Commission, to allocate overhead costs to specific projects).

---

[32] During his deposition, Mr. Stone suggested "that 50 percent of [Mr. Wilson's] time was not charged to Elk Hills equity[.]"  10/30/13 Stone Dep. at 249.  In his supplemental declaration, Mr. Stone stated that "At my deposition, the Government's counsel represented to me the amounts for Mr. Wilson that were included in Chevron's damages claim.  As I testified, those amounts seem consistent with inclusion of 50 percent of Mr. Wilson's payroll and benefits."  1/27/14 Stone Suppl. Decl. ¶ 19.

Since Chevron previously represented that Mr. Wilson spent only 50% of his time on equity finalization (JE 1764), the court has determined that 50% of Mr. Wilson's payroll and benefits should be deducted from Chevron's damages claim.[33]  In addition, because the evidence presented by Chevron indicated that Mr. Cardenosa and Mr. Maneffa did *de minimis* work on the Stevens and Carneros Zones, the court has determined that all of those costs may not be claimed by Chevron.

Of course, Mr. Stone and Mr. Holtzclaw devoted many hours to finalize equity on the Stevens Zone, but the fact remains that, Mr. Stone and Mr. Holtzclaw were salaried employees that worked on equity finalization for all zones, as reflected in Mr. Stone's overall performance bonus.  10/30/13 Stone Dep. at 260 ("At the time we [Mr. Stone and Mr. Holtzclaw] were putting in 80 to 100 hours a week.  And I guarantee that we both worked 40 hours a week plus on the Stevens, plus we did, in addition to that, other zones.  And that's the way equity always was.").  The court is aware that Mr. Stone and Mr. Holtzclaw's responsibilities were different than those of Mr. Burzlaff, despite the Government's statement that he was "the DOE counterpart to Mr. Stone."  12/6/13 Burzlaff Decl. ¶ 32.

In the court's judgment, Mr. Metcalfe's approach was an accurate and reasonable estimate of Chevron's total costs by zone, because it considered different costs factors and is "generally similar to the relative percentage value of each zone."  7/2/13 Metcalfe Decl. ¶¶ 25–26 ("The results of this comparison provide a level of independent confirmation that the relative costs . . . are reasonable, as it is reasonable that Chevron would have utilized its resources on the four zones generally consistent with the expected values of each of these zones.").  Therefore, the court has determined that 23.2% of the salary and benefits for Mr. Stone and Mr. Holtzclaw should be deducted from Chevron's damages claim.

The Government also proposed an "Other Indirect Labor" reduction of $784,479 from Chevron's 10/30/13 claim.  12/6/13 Riley Decl. Ex. 3.3, 3.3.6.  Although the Government indicated that these "[a]djusted allocations [are] based on the [12/6/13] Declaration of Alan A. Burzlaff" (12/6/13 Riley Decl. Ex. 3.3.6 n.2), Mr. Burzlaff never explained his methodology to justify this reduction.  12/6/13 Burzlaff Decl. ¶ 33 (describing proposed allocations for specific employees, but not Other Indirect Labor).[34]

For this reason, the court has determined that $6,582,634 should be allocated to the Stevens Zone and $126,690 to the Carneros Zone for payroll and benefits costs, as reflected in Court Exhibit 10.

---

[33] Mr. Stone appears to agree with the Government's allocation of Mr. Wilson's payroll and benefits.  1/27/14 Stone Suppl. Decl. ¶ 19 (stating that the amounts represented by the Government counsel at Mr. Stone's 10/30/13 deposition "seem consistent with inclusion of 50 percent of Mr. Wilson's payroll and benefits").

[34] The Government's proposed reductions for the "Other" category are distinct from "Other Indirect Labor."  12/6/13 Burzlaff Decl. ¶ 34 (describing the calculation for the "Other" category).

**Court Exhibit 10:**   **The Court's Resolution Of Allocation Of Employee Payroll And Benefits, By Zone.**

| Employee | Stevens Zone | Carneros Zone |
|----------|-------------:|--------------:|
| [...] | $[...] | $[...] |
| [...] | $[...] | $[...] |
| [...] | $[...] | $[...] |
| [...] | $[...] | $[...] |
| [...] | $[...] | $[...] |
| Other Indirect Labor | $1,580,949 | $0 |
| Unchallenged Allocation | $1,473,491 | $0 |
| **Total** | **$3,054,440** | **$ 0** |

### ii.      Other Labor Related Costs.

As of January 27, 2014, Chevron allocated $2,272,529[35] to "Other" labor related costs. 1/27/14 Metcalfe Decl. Ex. 1.  This category includes costs related to employee labor, including "Employee Business Expenses; Office Space; Computer Services & Equipment; Office Services & Equipment; Other Equipment, Services, And Rentals; and Communications."  7/2/13 Metcalfe Decl. ¶ 20.  Costs allocated to this category used only the proportion of Payroll and Benefits costs incurred for the respective zone by month.  7/2/13 Metcalfe Decl. ¶ 20.

The Government and Chevron agree that Mr. Metcalfe's allocation method for the "Other" category is reasonable.  7/2/13 Metcalfe Decl. ¶ 20; 12/6/13 Riley Decl. ¶ 17.  On April 8, 2014, the parties were asked to provide an estimated allocation of costs for the "Other" category, based on Mr. Metcalfe's methodology, adjusted to incorporate the Payroll and Benefits allocations reflected in Court Exhibit 10.

On April 14, 2014, the parties advised the court that of the $2,272,529 Chevron claimed in the "Other" category, both parties estimated that $1,930,565 should be allocated to the Stevens Zone if the Payroll and Benefits allocations in Court Exhibit 10 are used.  4/14/14 Joint Notice 1. In addition, Chevron proposed allocating $28,614 to the Carneros Zone.  4/14/14 Joint Notice 1. The Government, however, argued that the court instead should allocate $7,427 to the Carneros Zone and criticized Chevron for failing to account for the date limitations imposed by the court, *i.e.*, the exclusion of amounts incurred prior to May 19, 1997 or after July 6, 2000.  4/14/14 Joint Notice 1, 2 n.*.  Chevron responded that "most of the Carneros payroll and 'other' costs were

---

[35] As of October 30, 2013, Chevron had claimed $2,272,599 for costs for the "Other" category.  1/27/14 Metcalfe Decl. Ex. 1; 12/6/13 Riley Decl. ¶ 17 and Ex. 3.

incurred after the OHA appeal was decided and work on the Carneros Zone ended" and "that limiting the Carneros amount to the 1997–2000 timeframe would require a more complicated methodology." 4/14/14 Joint Notice 1.

As the court previously ruled, Chevron may recover costs incurred for the Carneros Zone equity finalization "until July 6, 2000, the date that Chevron's appeal to OHA was denied." *Chevron III*, 110 Fed. Cl. at 803. Therefore, Chevron's damages claim is reduced by $334,537, *i.e.*, the difference between Chevron's initial claim of $2,272,529 and the revised allocation of $1,930,565 for the Stevens Zone plus $7,427 for the Carneros Zone.

### iii.    External Non-Legal Professional And Labor.

As to cost allocations for external non-legal professional and labor, Chevron allocated 100% of the software vendor Techbase International ("Techbase") costs to the Stevens Zone, although "the software . . . was used by Chevron throughout the equity finalization process for all four zones." 12/6/13 Burzlaff Decl. ¶ 39 (emphasis omitted).

Instead, the Government contended that Chevron should "apply the monthly allocation ratio from the Payroll and Benefits category to the monthly costs incurred by Chevron for using the Techbase software, because the monthly payroll cost allocations are a reliable metric of the relative work performed by Chevron on each zone, month-to-month." 12/6/13 Burzlaff Decl. ¶ 41. Doing so, however, would reduce Chevron's damages claim in this category by $346,903: a reduction of $353,733 for the Stevens Zone, but an increase of $6,830 for the Carneros Zone. 12/6/13 Burzlaff Decl. ¶ 42; 12/6/13 Riley Decl. ¶ 18 and Ex. 3.[36]

Chevron responded that, because "Techbase later was used for [the Shallow Oil Zone] data as well, at no incremental cost, does not justify splitting the Techbase costs [among the] zones." Pl. Suppl. Reply 7 n.6 (citing 1/27/14 Metcalfe Suppl. Decl. ¶ 8; 1/27/14 Stone Suppl. Decl. ¶ 19). That is so, because the Stevens Zone equity finalization was the reason that Techbase was retained. 10/30/13 Stone Dep. 134–35 (testifying that the Stevens Zone equity finalization would not have proceeded without the Techbase system).

Chevron conceded that it used Techbase's software in more than just the Stevens Zone. Pl. Suppl. Reply 7 n.6 ("Techbase later was used for [Shallow Oil Zone] data as well[.]"); JE 1755 at 8 (describing Techbase International as a "[s]oftware vendor . . . that provided Techbase software for use in equity finalization"); JE 1755 at 65 (listing an "interactive demonstration of . . . Techbase" as part of a 3/28/00 Shallow Oil Zone presentation); *see also* 12/6/13 Burzlaff Decl. ¶ 39 ("[T]he [Techbase] software . . . was used by Chevron . . . *for all four zones*." (emphasis in original)). Of course, Chevron may be correct that it would not have undertaken equity finalization of the Stevens Zone, but for Techbase's software. But that is irrelevant. *See Glendale Fed. Bank,* 378 F.3d at 1311 ("[T]he focus of a recovery based on the reliance interest is the real costs incurred for capital and services that . . . would not have [been] incurred but for

---

[36] Exhibit 3 to the 12/6/13 Riley Declaration identifies the reduction as $346,902, presumably due to differences attributable to rounding. *Compare* 12/6/13 Burzlaff Decl. ¶ 42 *and* 12/6/13 Riley Decl. ¶ 18 ($346,903), *with* 12/6/13 Riley Decl. Ex. 3 ($346,902).

the contract and its subsequent breach."). The proper inquiry is whether the Techbase software costs were made in reliance on the procedures promised by May 19, 1997 Equity Process Agreement. *See* RESTATEMENT (SECOND) OF CONTRACTS § 344(b) (1981) (Damages may be awarded to protect the "reliance interest" of a promisee, i.e., the "interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as [it] would have been in had the contract not been made.").

Therefore, allowing Chevron to allocate 100% of the Techbase software costs, without consideration of the benefits that Chevron received in other zones would over-compensate Chevron. Because the Government's allocation depends on the monthly allocation ratio from the Payroll and Benefits category, the parties agree that, using the Payroll and Benefit allocations in Court Exhibit 10, the amount allocated to the Stevens Zone for the Techbase software should be reduced by $203,180, and the amount allocated to the Carneros Zone should be reduced by $0. Docket No. 413. Thus, Chevron's claim for this category will be reduced by $203,180.

### iv. In-House Technical Consultants.

The Government argued that Chevron's 75.4% allocation of costs for in-house technical consultants to the Stevens Zone is "is inconsistent with [Chevron's] own supporting documentation." 12/6/13 Burzlaff Decl. ¶ 46. The Manager of Chevron's consultant team testified that they "kept track of their hours very accurately and . . . they would know exactly to which zone each charge would apply." 12/6/13 Burzlaff Decl. ¶ 44 (citing 5/3/11 Thakur Dep. 101–02 (stating that Chevron's in-house consultants recorded this information on GO-113 Work Orders). By examining the titles and work described, the Government argued that only 57% of the total cost for the GO-113 Work Orders should be allocated to the Stevens Zone. 12/6/13 Burzlaff Decl. ¶ 45, Ex. K. In addition, "99 percent of the line items [in Chevron's Native File] for the work performed by consultants in 1999 are identified, in the 'title' field, as being incurred in connection with the [Shallow Oil Zone]." 12/6/13 Burzlaff Decl. ¶ 47 (citing JE 1868 (5/26/11 Native File 3B)). Accordingly, the Government would allocate Chevron's in-house consultant costs for the Stevens Zone as follows: 50% for work from August 1997 through October 1997; 100% for work from November 1997 through March 1998; and 10% for work from April 1998 onward. 12/6/13 Burzlaff Decl. ¶ 48. In sum, the Government proposed that Chevron's claim for this category should be reduced by $789,451. 12/6/13 Burzlaff Decl. ¶ 49; 12/6/13 Riley Decl. ¶ 19, Ex. 3.

Chevron responded that the GO-113 Work Orders "are unsigned drafts" that do not necessarily reflect actual charges. 1/27/14 Stone Suppl. Decl. ¶ 19. In fact, the Work Orders "do not show work being done in any zone after September 1998." 1/27/14 Stone Suppl. Decl. ¶ 19 n.5. Although Chevron's initial Shallow Oil Zone "kickoff" meeting was in November 1997, Chevron postponed this work when the IPE's November 4, 1997 Provisional Recommendation for the Stevens Zone issued. 1/27/14 Stone Suppl. Decl. ¶ 19. Consequently, "Chevron's internal technical consultants were not able to begin substantial work on the [Shallow Oil Zone] until after the first . . . interim meeting in September 1998." 1/27/14 Stone Suppl. Decl. ¶ 19.[37]

---

[37] Chevron estimated that work by Chevron's in-house consultants on the Shallow Oil Zone was 50% in July 1998, increasing to 75% by January 1999, and 90% by January 2000.

Therefore, Chevron argues that it properly allocated these costs between the Stevens Zone and the Shallow Oil Zone; and is entitled to $3,747,712 for technical work on the Stevens Zone.

Although the GO-113 Work Orders may not accurately reflect Chevron's costs for in-house consultants, Chevron has the burden to establish these costs with reasonable certainty. *See* RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981) illus. 3 ("[Plaintiff] can recover the [amount] that he has spent in reliance. He must, however, then prove that amount with reasonable certainty."). Mr. Stone's *post-hoc* explanation, however, failed to do so. 12/6/13 Riley Decl. ¶ 13 (noting that allocating costs based on Mr. Stone's chronology was "inconsistent" with Mr. Thakur's explanation of the GO-113 Work Orders) (citing 5/3/11 Thakur Dep. 14, 59–60). For this reason, Chevron's claim will be reduced by $789,451 for this category.

#### v.    Miscellaneous Expenses.

Chevron's claim included $57,859 in miscellaneous expenses for the Stevens and Carneros Zones. 1/27/14 Metcalfe Ex. 1; 12/6/13 Riley Decl. Ex. 4.1. Because Chevron allocated these expenses based on an average allocation of other categories, the Government's recommended adjustments to those other categories would necessitate a reduction of $2,826 to Chevron's Miscellaneous Expenses claim. 12/6/13 Riley Decl. ¶ 20 and Ex. 3. Chevron did not object, other than to dispute that "cost items of less than $10,000 each" does not overcome the assumption "that the process for making the assignments was reasonable and resulted in reasonably certain amounts for the categories identified by the [c]ourt." 1/27/14 Stone Suppl. Decl. ¶ 18.

The court has determined Chevron is entitled to $55,033 for this category, reflecting a $2,826 reduction.[38]

#### vi.    Legal Costs.

The Government argued that Chevron's allocation of legal costs also is biased in favor of the Stevens Zone.[39] 12/6/13 Burzlaff Decl. ¶ 53. Specifically, four invoices from the law firm of Fried Frank, in the amount of $282,171, "should, but do not, include allocations to the [other three zones]," because during the relevant time period Chevron's lawyers were working on legal issues applicable to all four zones. 12/6/13 Burzlaff Decl. ¶¶ 51–52. In addition, the Fried Frank invoices do not provide any chronology or itemized description of services performed. 12/6/13

---

1/27/14 Stone Suppl. Decl. ¶ 19. But, these costs are not recoverable. *See Chevron III*, 110 Fed. Cl. at 803.

[38] Exhibit 3.1 to the 12/6/13 Riley Declaration allocated $55,034 to the Miscellaneous Expenses category, presumably due to differences attributable to rounding. *See* 12/6/13 Riley Decl. Ex. 3.1 (combining $54,847 for the Stevens Zone with $186 for the Carneros Zone).

[39] The Government pointed out that several invoices also were misallocated during Mr. Stone's deposition; but Chevron subsequently corrected these "insignificant" amounts. 12/6/13 Burzlaff Decl. ¶ 53.

Burzlaff Decl. ¶ 51 (noting that the only chronology available was identification of "legal-related activities" from the Equity Finalization Chronology (JE 17)). As a result, Chevron's costs for this category should be reduced by $126,420. 12/6/13 Burzlaff Decl. ¶ 54; 12/6/13 Riley Decl. ¶ 20 and Ex. 3.

Chevron responded that, because "[t]he value of the Stevens Zone was about 98 percent of the combined value of the [other three zones]," it was reasonable to assign all of Chevron's legal costs to the Stevens Zone, because "Chevron would have incurred the same costs on these issues for the Stevens Zone alone." 1/27/14 Stone Suppl. Decl. ¶ 19. In addition, Mr. Burzlaff had no basis for assigning 60% of these legal costs to the Shallow Oil Zone. 1/27/14 Stone Suppl. Decl. ¶ 19.

Furthermore, Chevron allocated *all* legal costs to the Stevens Zone, because the May 19, 1997 Decoupling and Equity Process Agreements were required before Chevron would resume equity finalization for the Stevens Zone. 1/27/14 Stone Suppl. Decl. ¶ 19. Both of these agreements, however, applied to all four zones. *See* 12/6/13 Riley Decl. ¶ 21 and Ex. 3 (allocating legal costs); 1/27/14 Stone Suppl. Decl. ¶ 19 (acknowledging that the May 19, 1997 Decoupling and Equity Process Agreements "applied to all four zones").

Moreover, as a matter of law, the United States Court of Appeals for the Federal Circuit has held that speculative damages are not recoverable; in this instance, an invoice, without any description of services, is insufficient to meet Plaintiff's burden. *See Ind. Mich. Power*, 422 F.3d at 1373 (precluding recovery of "speculative damages"); *see also Glendale Fed. Bank,* 378 F.3d at 1311–12 (holding that establishing damages "is a matter of proof; if too speculative, it can and should be denied as the burden lies with the plaintiff to establish its damages").

For these reasons, the court has determined that Chevron's claim will be reduced by $126,420.

### 2.        As To Other Costs Claimed.

#### a.        Summary Of The Government's Argument.

At trial, one of the Government's expert damage witnesses initially proposed a $24 million offset, reasoning that is the amount that Chevron would have spent "but for" the Government's breaches. *Chevron III*, 110 Fed. Cl. at 805. The court rejected that approach, because it was based on a misperception of the relevant theory underlying reliance damages. *See id.* ("[E]stablishing that Chevron retained *some* benefit is not a sufficient basis to establish an offset in a sum certain, a fact that the Government's damage expert recognized." (emphasis in original)); *see also* 12/6/13 Riley Decl. ¶ 29 n.8. Post-trial, the Government took a different approach and advised the court that the following other costs claimed by Chevron should be excluded or reduced:

(1) Unsupported transactions, acknowledged by Chevron and Mr. Metcalfe;

(2) Improper inclusion of fixed costs unrelated to equity finalization in the CVX Internal Technical Consultants category;

(3) Improper inclusion of accrued benefit costs unrelated to equity finalization; and

(4) Improper inclusion of costs related to sale.

12/6/13 Riley Decl. ¶ 28.[40]

Court Exhibit 11 summarizes these proposed adjustments:[41]

**Court Exhibit 11: Summary Of The Government's Proposed Adjustments For Other Specific Costs Claimed By Plaintiff.**

| Category | Unsupported Transaction Costs | Improper Inclusion Of Fixed Costs | Improper Inclusion Of Accrued Benefit Costs | Improper Inclusion Of Costs Related To Sale | Total |
|---|---|---|---|---|---|
| Company Payroll & Benefits | $0 | $0 | ($1,102,362) | $0 | ($1,102,362) |
| Other Labor Related | ($964,138) | $0 | $0 | ($70) | ($964,208) |
| External Non-Legal Professional and Labor | ($209,433) | $0 | $0 | ($10,951) | ($220,384) |
| In-House Technical Consultants | $0 | ($1,615,264) | $0 | $0 | ($1,615,264) |
| Miscellaneous | $0 | $0 | $0 | $0 | $0 |
| Legal Costs | ($20,900) | $0 | $0 | $0 | ($20,900) |
| Total | ($1,194,471) | ($1,615,264) | ($1,102,362) | ($11,021) | ($3,923,118) |

**Source:** 12/6/13 Riley Decl. Ex. 4.2 ¶ 28, Riley, 6/3/11 TR 1110–34; *see also* 6/3/11 TR 1110–34 (describing Mr. Musika's two-part analysis); 6/3/11 TR 1121–31 (describing the five categories); 3/3/14 Riley Suppl. Decl. Ex. 3 n.1.

---

[40] Mr. Musika's "Systems Analysis" and "Transaction Analysis" were not addressed by Chevron's final damages claim, because Chevron did not produce the necessary itemized financial information.  12/6/13 Riley Decl. ¶ 26.  "Deficiencies in Chevron's claimed support" originally identified by Mr. Musika, however, were corrected by Chevron.  12/6/13 Riley Decl. ¶ 29 n.8; *see also* 12/6/13 Riley Decl. Ex. 1 (itemizing corrections Chevron made in response to Mr. Musika's analysis).

[41] All but $1 of the adjustments recommended by Mr. Musika are deductions to Chevron's allocated costs for the Stevens Zone.  *Compare* 12/6/13 Riley Decl. Ex. 4.3 (quantifying $3,938,177 in deductions for the Stevens Zone), *with id.* Ex. 4.4 (identifying $1 in additions for the Carneros Zone).

b.      **Summary Of The Plaintiff's Response.**

Chevron's general response to these proposed adjustments previously has been discussed and objections to specific categories are discussed in the court's analysis that follows.

c.      **The Court's Analysis And Resolution Of Other Specific Costs.**

i.      **Unsupported Transactions.**

The Government argued that many of the costs claimed by Chevron had no supporting documentation, as Court Exhibit 12 shows.

**Court Exhibit 12:      The Government's Proposed Adjustments For Unsupported Transactions.**

| | Stevens Zone | Carneros Zone | Total |
|---|---|---|---|
| **Legal Costs** | | | |
| Total | $  4,121,021 | $      443,585 | $  4,564,606 |
| Supported | 4,100,121 | 443,585 | 4,543,706 |
| **Not Supported** | $      20,900 | $          0 | $      20,900 |
| **External Non-Legal Prof & Labor** | | | |
| Total | $  2,935,430 | $       28,522 | $  2,963,952 |
| Supported | 2,725,996 | 28,523 | 2,754,519 |
| **Not Supported** | $    209,434 | $         (1) | $    209,433 |
| **Other** | | | |
| Total | $  1,627,683 | $          0 | $  1,627,683 |
| Supported | 663,545 | 0 | 663,545 |
| **Not Supported** | $    964,138 | $          0 | $    964,138 |
| **Total** | | | |
| Total | $  8,684,134 | $      472,107 | $  9,156,241 |
| Supported | 7,489,662 | 472,108 | 7,961,770 |
| **Not Supported** | $  1,194,472 | $         (1) | $  1,194,471 |

**Source:** 12/6/13 Riley Decl. ¶ 30 & n.9 (citing JE 1871), ¶ 31, Exs. 4.2 and 4.5; 3/3/14 Riley Suppl. Decl. Ex. 3 n.1.

Chevron countered that Ms. Riley's approach was "flawed in that[,] rather than analyzing the overall support provided by all of the available information, she proposes to reduce Chevron's claimed costs based on individual transactions that she deems as imperfectly supported." 1/27/14 Metcalfe Suppl. Decl. ¶ 18. Deducting costs for intercompany or small-dollar transactions for lack of support is unreasonable, because, "it would simply be too burdensome to retrieve all of the related supporting documentation" or where "one would not expect to find the type of 'support' she demands." 1/27/14 Metcalfe Suppl. Decl. ¶ 18. Secondary documentation supports 86% of Chevron's claim, which is higher than that of many spent nuclear fuel cases. 1/27/14 Metcalfe Suppl. Decl. ¶¶ 19–20.

It is well established that all costs claimed must have supporting documentation. *See Ind. Mich. Power*, 422 F.3d at 1373 (precluding recovery of "speculative damages"). Moreover, these transaction costs are not, as Chevron suggests, simply small-dollar or *de minimis* amounts. For these reasons, the court has determined that Chevron's claim will be reduced by $1,194,471.

### ii. Improper Fixed Costs Not Related To Equity Finalization.

The Government also argued that, but for the Elk Hills equity finalization, Chevron nevertheless would have incurred a portion of the fixed costs of the Energy Technology Group.[42] 12/6/13 Riley Decl. ¶¶ 33–34. According to Chevron's internal policies and procedures, "key cost components included in the standard rates developed by the [Energy Technology Group] to be charged to other Chevron programs included payroll costs, office rent, computers and software, telecommunications and network connectivity, material and supplies, general travel costs, the president, planning, human resources, and finance." 12/6/13 Riley Decl. ¶ 33 (citing CVXD5238–CVXD5247 (6/6/05 Chevron ETC Labor Rates); 6/3/11 TR 1124–26. In addition, but for the Elk Hills equity finalization, Chevron would have re-tasked the Energy Technology Group to other projects. 12/6/13 Riley Decl. ¶ 33 (citing 5/3/11 Thakur Dep. 60–62).

The Government calculated that 43.1% of the fixed costs of Chevron's Energy Technology Group "would have existed even without the Elk Hills equity finalization process." 12/6/13 Riley Decl. ¶ 34. This amount was ascertained by comparing the rate of the most senior Chevron employee assigned directly to the Elk Hills project (Mr. Stone at $91 per hour) with the rate of the highest Energy Technology Group employee (approximately $55 per hour).[43] 12/6/13 Riley Decl. ¶ 34 (citing JE 1911 ¶ 18 (6/1/11 Musika Decl.)).

As Court Exhibit 13 shows, the Government proposed that Chevron's claim for Internal Technical Consultants be reduced by 43.1% or $1,615,264.

---

[42] The Energy Technology Group is also referred to as the Chevron Petroleum Technology Company or the CVX Internal Technical Consultants. 12/6/13 Riley Decl. ¶ 33.

[43] Mr. Stone's $91 per hour rate represents 56.9% of the services rendered by the Energy Technology Group, so that the inverse percentage, 43.1%, represents the fixed costs, or the "[Group's] costs over and above the employee's salary and benefit costs." 12/6/13 Riley Decl. ¶ 34 (citing JE 1911 ¶ 18 (6/1/11 Musika Decl.)).

**Court Exhibit 13:   The Government's Proposed Adjustment For Internal Technical Consultants.**

|  | Stevens Zone | Carneros Zone |
|---|---|---|
| Total CVX Internal Technical Costs | $  3,747,712 | $        - |
| Adjustment of Labor Rate for Removal of Resources Costs | 43.1% | 43.1% |
| **Adjustment to Claimed Costs** | $  1,615,264 | $        - |

**Source:** 12/6/13 Riley Decl. ¶ 34, Exs. 4.2 and 4.6.

Chevron responded that, in spent nuclear fuel cases, "it is typical for an internal group to include overhead in its charging process, in exactly the way that [Chevron's Energy Technology Group] [is] billing here."  1/27/14 Metcalfe Suppl. Decl. ¶ 22 (citing *Bos. Edison Co. v. United States*, 658 F.3d 1361, 1370 (Fed. Cir. 2011) (affirming the award of "overhead costs associated with the procurement of materials and capital expenditures" related to the Government's breach of its contractual obligation to collect nuclear waste)).  For this same reason, these overhead costs were billed to DOE by Mr. Burzlaff's firm.  1/27/14 Metcalfe Suppl. Decl. ¶ 23. Therefore, as part of Chevron's award, it should receive $3,747,712 for the amount that Chevron saved not hiring outside consultants.  1/27/14 Metcalfe Suppl. Decl. ¶ 24.

In the court's judgment, it was foreseeable that Chevron's Energy Technology Group would be required to conduct equity finalization.  If the Group had been assigned to other projects, presumably it would have contributed to profitable work and Chevron would have received a reasonable a return for this work product.  *See Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 46 (2d Cir. 1995) (allowing plaintiff to recover "reasonable overhead costs when it is shown that there is a demonstrable past history of ongoing business operations, without requiring proof that a specific alternative project would have absorbed the overhead costs at issue" (footnote omitted)); *see also Autotrol Corp. v. Cont'l Water Sys. Corp.*, 918 F.2d 689, 694–95 (7th Cir. 1990) (allowing plaintiff to recover overhead costs on a reliance theory, where the plaintiff established "a reasonable probability" that the overhead costs would have been covered with another contract if the breached contract never occurred).

Since Chevron would have incurred these overhead costs to avoid the more expensive alternative of retaining outside consultants, Chevron is entitled to recover internal technical consultant costs.

### iii.    Accrued Benefit Costs Not Related To Equity Finalization.

In addition, the Government argued that four categories of employee benefits paid by Chevron, stock plan, savings plus plan, OPEB [Other Post-Employment Benefits] Cash, and OPEB non-cash, should not be allocated to all employees who worked on the Stevens Zone. 12/6/13 Riley Decl. ¶ 37 (citing JE 1911 ¶ 20 (6/1/11 Musika Decl.)).

Chevron responded that its Stevens Zone payroll reflected accrued benefits paid.  1/27/14 Metcalfe Suppl. Decl. ¶ 26 ("Chevron's method to apply payroll burdens to its personnel is

consistent with that of many organizations I have seen throughout my career."). As to the specific benefits contested by the Government, Mr. Metcalfe confirmed that Chevron's personnel "actually do receive" these benefits. 1/27/14 Metcalfe Suppl. Decl. ¶ 27 ("[S]tock options are not included in that benefit burden, and are not included in the amounts in total, and therefore should not be deducted.") (citing 6/1/11 TR 403–07 (Melton); 6/3/11 TR 1227–30 (Metcalfe)).

The court has determined that the $1,102,362 in accrued benefit costs claimed by Chevron and contested by the Government are typical and appropriate costs that have been identified with reasonable certainty. *See Sys. Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 65–66 (2007) ("The payroll loader associated with employee benefit costs is for the most part a proper, directly allocable component of the internal labor costs for the mitigation activities, as the [G]overnment concedes."), *aff'd in part and rev'd in part*, 457 F. App'x 930 (Fed. Cir. Jan. 19, 2012). Therefore, Chevron is entitled to recover these accrued benefit costs.

### iv.    Other Costs Not Related To Equity Finalization.

At the liability trial, the Government proposed to deduct other costs claimed by Chevron that were not related to equity finalization. 6/11/11 Musika Decl. ¶ 21 (JE 1911). After reviewing Chevron's revised damages claim, the Government found that Chevron still claimed $15,094 that should be excluded. 12/6/13 Riley Decl. ¶ 38 (citing JE 1718 ¶ 18 (10/29/10 Stone Decl.)).

Chevron responded that it has accounted for all appropriate adjustments. 1/27/14 Metcalfe Suppl. Decl. Ex. 1 (reallocating $15,094 in costs for "Invotex Adjustment for Sales-Related Costs" from the Stevens Zone to "Other"). Of this $15,094, Chevron subtracted $11,021 from its claim, but indicated that $4,073 was attributable to invoices outside the date court's allowable time period, and thus had not been included in Chevron's original claim and did not need to be deducted from Chevron's claim. 1/27/14 Metcalfe Suppl. Decl. Ex. 1 (decreasing the "Stevens Out of Date Range" category by $4,073). The Government agreed with this analysis. 3/3/14 Riley Suppl. Decl. Ex. 3 n.4; Docket No. 413.

Accordingly, $0 will be deducted from Chevron's claim.

III.     SUMMARY OF COSTS AWARDED AS RELIANCE DAMAGES.

A.     The Stevens Zone Equity Finalization.

Court Exhibit 14 is a summary of Chevron's January 27, 2014 revised Stevens Zone claim and the court's allocation and other specific cost adjustments.

**Court Exhibit 14:  Summary Of The Court's Resolution Of Allocation And Other Specific Costs—The Stevens Zone.**

| Cost Category | Chevron's 1/27/14 Revised Claim | The Court's "Allocation Adjustments" | The Court's "Other Adjustments" | The Court's Adjustments To Avoid Overlap[44] | Total Award |
|---|---|---|---|---|---|
| Company Payroll & Benefits | $7,986,729 | ($1,404,095) | $0 | $0 | $6,582,634 |
| Other Labor | $2,272,529 | ($341,964) | ($964,138) | $161,082 | $1,127,509 |
| External Non-Legal Professional and Labor | $2,924,479 | ($203,180) | ($209,434) | $1 | $2,511,866 |
| Internal Technical Consultants | $3,747,712 | ($789,451) | $0 | $0 | $2,958,261 |
| Miscellaneous Expenses | $57,674 | ($2,827) | - | - | $54,847 |
| Legal Costs | $4,131,585 | ($126,420) | ($20,900) | $1,323 | $3,985,588 |
| **TOTAL** | $21,120,708 | ($2,867,937) | ($1,194,472) | $162,406 | $17,220,705 |

For the above-stated reasons, the court has determined that Chevron is entitled to $17,220,705 as reliance damages.  It was foreseeable to the Government that these costs would need to be incurred by Chevron to participate in the equity finalization of the Stevens Zone and that Chevron would not have incurred these costs, if it had known that DOE would "repeatedly and materially" violate the May 19, 1997 Equity Process Agreement, the July 8, 1996 contract

---

[44] The court also made adjustments suggested by the Government to avoid any overlap between the "allocation" and "other" adjustments.  *See* 12/6/13 Riley Decl. ¶ 41 (explaining the adjustments to avoid overlap); Docket No. 413.

with the Equity IPE, as supplemented, to which Chevron was the direct and intended beneficiary, and would continue to engage in *ex parte* communications to Chevron's financial detriment in violation of the covenant of good faith and fair dealing.  In addition, the court is satisfied that these costs have been verified to a reasonable degree of certainty,

###   B.   The Carneros Zone Equity Finalization.

Court Exhibit 15 is a summary of Chevron's revised Carneros Zone claim and the court's allocation of cost adjustments and overlap adjustments.

**Court Exhibit 15:  Summary of The Court's Resolution Of Allocation And Other Specific Costs—The Carneros Zone.**

| Cost Category | Chevron's 1/27/14 Revised Claim | The Court's "Allocation Adjustments" | The Court's "Other Adjustments" | The Court's Adjustments To Avoid Overlap | Total Award |
|---|---|---|---|---|---|
| Company Payroll & Benefits | $0 | $126,690 | $0 | $0 | $126,690 |
| Other Labor | $0 | $7,427 | $0 | ($2,696) | $4,731 |
| External Non-Legal Professional and Labor | $28,522 | $0 | $1 | $0 | $28,523 |
| Internal Technical Consultants | $0 | $0 | $0 | $0 | $0 |
| Miscellaneous Expenses | $185 | $1 | - | - | $186 |
| Legal Costs | $443,585 | $0 | $0 | $0 | $443,585 |
| **TOTAL** | $472,292 | $134,118 | $1 | ($2,696) | $603,715 |

For the above stated reasons, the court has determined that Chevron is entitled to $603,175 as reliance damages.  It was foreseeable to the Government that these costs would need to be incurred by Chevron to participate in the equity finalization of the Carneros Zone and that Chevron would not have incurred these costs if it had known that DOE would "repeatedly and materially" violate the May 19, 1997 Equity Process Agreement, the July 8, 1996 contract with the Equity IPE, as supplemented, to which Chevron was the direct and intended beneficiary, and would continue to engage in *ex parte* communications to Chevron's financial detriment in

violation of the covenant of good faith and fair dealing. In addition, the court is satisfied that these costs have been verified to a reasonable degree of certainty.

### C.     The Freedom Of Information Act Request And Related Proceedings.

On January 7, 2003, Chevron sent DOE a Freedom of Information Act ("FOIA") request to obtain documents related to potential *ex parte* communications between DOE and the IPE. *Chevron III*, 110 Fed. Cl. at 772, 804. On April 17, 2003, DOE released one redacted document. *Id.* On December 23, 2003, DOE provided additional documents to Chevron. *Id.* On January 28, 2004, Chevron advised the ASFE that the disclosed documents evidenced DOE's breach of the May 19, 1997 Equity Process Agreement. *Id.* at 804. On February 19, 2004, Chevron filed a second FOIA request for documents relating to the ASFE's preparation of the Preliminary and Final Decisions of the Dry Gas and Carneros Zones and any records discussing the involvement of Ms. Egger. *Id.* at 772–73.

Chevron has claimed $84,437 to prepare a January 7, 2013 FOIA request and related proceedings. These costs were incurred from January 1, 2003, *i.e.*‚ six days prior to Chevron's January 7, 2003 FOIA request to DOE until January 28, 2004, *i.e.*, the date of Chevron's notice letter to the ASFE. Pl. Suppl. Br. 2; 1/27/14 Metcalfe Suppl. Decl. Ex. 1. The Government did not object to the costs incurred by Chevron to file and pursue its FOIA request, but reserved the right to appeal. Gov't Suppl. Resp. 4 n.1.

For the above stated reasons, the court has determined that Chevron is entitled to $84,437 in costs incurred related to Chevron's FOIA request.

## IV.    SANCTIONS FOR THE GOVERNMENT'S "BAD FAITH" CONDUCT RELATING TO PRIVILEGE ASSERTIONS DURING DISCOVERY.

After this case was filed, in response to Chevron's document requests in this case, the Government designated 35,919 pages as privileged. *See Chevron III*, 110 Fed. Cl. at 806. After an extensive *in camera* review, issuance of twenty-two Orders, and review by the United States Court of Appeals for the Federal Circuit, the court has determined that at least 42% of the folders analyzed contained an improper assertion of privilege.

Chevron has claimed $2,153,533 in legal costs from February 16, 2007, *i.e.*, the date of Chevron's initial document request, to March 5, 2009, *i.e.*, the date of the United States Court of Appeals for the Federal Circuit's decision in *In re United States*, 321 F. App'x 953. Pl. Suppl. Br. 2; 1/27/14 Metcalfe Suppl. Decl. Ex. 1; *see also* 7/2/13 Metcalfe Suppl. Decl. ¶ 24 (itemizing 58% of Chevron's legal costs during the relevant period). Forty-two percent of these legal costs would be $904,483. The Government did not object to these legal costs incurred by Chevron, but reserved the right to appeal. Gov't Suppl. Resp. 4 n.1.

The United States Court of Appeals for the Federal Circuit has held a court has "the ability to 'fashion an appropriate sanction for conduct which abuses the judicial process.'" *Nat'l Org. of Veterans Advocates, Inc. v. Sec'y of Veterans Affairs*, 710 F.3d 1328, 1335 (Fed. Cir. 2013) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)). Moreover, the United States Supreme Court historically has held that a federal trial court has the inherent power to award attorneys' fees as a sanction. *See Chambers*, 501 U.S. at 45. Although a federal trial

court has discretion to impose sanctions in its court's inherent powers, it may not circumvent the Federal Rules of Civil Procedure. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) (holding that a trial court may not circumvent a clear mandate of applicable federal rules).

Rule 37 of the United States Rules of the Court of Federal Claims ("RCFC") provides for sanctions, if a party fails to make a required disclosure. *See* RCFC 37(a)(3)(A), (a)(5); *see also Ingalls Shipbuilding, Inc. v. United States*, 857 F.2d 1448, 1450 (Fed. Cir. 1988) ("[Rule 37] provides the . . . [c]ourt with an arsenal of discovery sanctions designed to discourage dilatory practices and encourage full disclosure of relevant information prior to trial."). In addition, RCFC 37(a)(5) authorizes the court to require a party to pay reasonable expenses incurred to compel disclosure from another party.[45] *See Ingalls Shipbuilding*, 857 F.2d at 1450 ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court."); *see also Willhite v. Collins*, 459 F.3d 866, 870 (8th Cir. 2006) ("[A]n award of attorneys' fees is permissible under a court's inherent powers as long as the person being sanctioned has demonstrated bad faith."); *Harlan v. Lewis*, 982 F.2d 1255, 1260 (8th Cir. 1993) (holding that bad faith implicitly was established where a party engaged in intentional disruption of discovery process).

As the court previously stated:

Although Chevron was able to fund the costs to ascertain whether the Government's privilege assertions were legitimate in this case, most litigants cannot afford such protracted discovery battles. In addition, the collateral discovery proceedings delayed the trial in this case by four years and imposed significant, unnecessary costs on Chevron, as well as the court. . . . [T]he United States Court of Appeals for the Federal Circuit described "bad faith" conduct in words that express the court's view about this case:

Indeed, to say that the counsel's conduct during discovery raises the collective eyebrow of this court would be to understate the severity of their transgressions. Counsel's tactics during discovery

---

[45] RCFC 37(a)(5)(A) states, in part, provides:

[T]he court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion [to compel disclosure], the party or attorney advising the client, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:

(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii) the opposing party's nondisclosure . . . was substantially justified; or

(iii) other circumstances make an award of expenses unjust.

RCFC 37(a)(5)(A).

evinced a brazen disregard for the legal process.   Throughout discovery, counsel's strategy consisted of efforts to obfuscate, cover-up, and subvert evidence that was properly discoverable and responsive to [plaintiff's discovery] requests.

Federal trial courts necessarily tend to trust the parties' counsels' assertion of privilege, as officers of the court.  But, when that trust is misplaced, appropriate consequences should follow.   The court has determined that DOE and Government discovery tactics as to privileged documents in this case constitute "bad faith" conduct.

*Chevron III*, 110 Fed. Cl. at 807 (alteration in original) (quoting *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1288 (Fed. Cir. 2000)).

For the aforementioned reasons, the court has determined that Chevron is entitled to $904,483, as a sanction for the Government's "bad faith" conduct related to privilege assertions during discovery.

## V.   CONCLUSION.

For the reasons discussed in *Chevron III* and herein, the Clerk of the Court is ordered to enter judgment in favor of Chevron in the amount of $18,813,340.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**